# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., | |
| Plaintiffs, | |
| v. | |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC | CASE NO. 1:22-CV-828-TDS-JEP |
| and | |
| CORTEVA, INC., | |
| Defendants. | |

# MEMORANDUM IN SUPPORT OF
# DEFENDANT CORTEVA'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................................... i

**PRELIMINARY STATEMENT** ...................................................................... 1

**BACKGROUND** .............................................................................................. 4

      A.    The Parties ...................................................................................... 4

      B.    The Crop Protection Industry ............................................................ 4

      C.    Allegations Regarding the Relevant AIs ........................................... 5

      D.    Product Market Allegations .............................................................. 6

      E.    Allegations Regarding Corteva's Loyalty Agreements ...................... 6

      F.    Procedural History ........................................................................... 8

**LEGAL STANDARD** ........................................................................................ 8

**ARGUMENT** ..................................................................................................... 9

I.     PLAINTIFFS' CLAIMS FAIL TO ALLEGE IMPERMISSIBLE
       EXCLUSIVE DEALING. ....................................................................... 10

II.    PLAINTIFFS' CLAIMS LONG AGO EXPIRED. .................................... 17

III.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RELEVANT
       PRODUCT MARKET. ............................................................................. 18

IV.   PLAINTIFFS' STATE LAW CLAIMS FAIL. ......................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Segura,*
907 S.W.2d 503 (Tex. 1995) ...................................................................................... 23

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.,*
910 F.2d 139 (4th Cir. 1990) ...................................................................................... 10

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP,*
592 F.3d 991 (9th Cir. 2010) ...................................................................................... 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................ 8, 17

*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.,*
275 F. Supp. 3d 957 (W.D. Wis. 2017) ...................................................................... 23

*Associated Gen. Contractors of Cal., Inc. v. Carpenters,*
459 U.S. 519 (1983) .................................................................................................... 9

*Barr Lab'ys, Inc. v. Abbott Lab'ys,*
978 F.2d 98 (3d Cir. 1992) ......................................................................................... 12

*Bayer Schering Pharma AG v. Sandoz, Inc.,*
813 F. Supp. 2d 569 (S.D.N.Y. 2011) ............................................................ 19, 21, 22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .................................................................................................... 8

*Benfield v. Magee,*
945 F.3d 333 (5th Cir. 2019) ...................................................................................... 20

*Berghausen v. Microsoft Corp.,*
765 N.E.2d 592 (Ind. Ct. App. 2002) ......................................................................... 23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) .............................................................................................. 12, 13

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) .................................................................................................... 18

*Cascade Health Sols. v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) ...................................................................................... 15

*Christy Sports, LLC v. Deer Valley Resort Co.,*
555 F.3d 1188 (10th Cir. 2009) .................................................................................... 9

*Cnty. Materials v. Allan Block Corp.*,
502 F.3d 730 (7th Cir. 2007)................................................................... 12

*Cota v. Ralph Lauren Corp.*,
No. 21-C-1089, 2022 WL 1597631 (E.D. Wis. May 19, 2022)................................ 25

*In re Cotton Yarn Antitrust Litig.*,
505 F.3d 274 (4th Cir. 2007)................................................................... 18

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019)........................................................... 23

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002)................................................................... 10

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
No. 08-4168, 2014 WL 1343254 (D.N.J. Mar. 28, 2014) ............................ 13, 15, 17

*GEICO Corp. v. Autoliv, Inc.*,
345 F. Supp. 3d 799 (E.D. Mich. 2018) ....................................................... 24

*Klein v. Facebook Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022)......................................................... 20

*Linzer Prods. Corp. v. Sekar*,
499 F. Supp. 2d 540 (S.D.N.Y. 2007) ......................................................... 22

*Mailand v. Burckle*,
572 P.2d 1142 (Cal. 1978) ..................................................................... 22

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
859 F.3d 408 (7th Cir. 2017)................................................................... 17

*Miami Prods. & Chem. Co. v. Olin Corp.*,
546 F. Supp. 3d 223 (W.D.N.Y. 2021)......................................................... 23

*Miller Brewing Co. v. Bartholemew Cnty. Beverage Co.*,
674 N.E. 2d 193 (Ind. Ct. App. 1996) ......................................................... 22

*Miller v. W.H. Bristow, Inc.*,
739 F. Supp. 1044 (D.S.C. 1990) .............................................................. 19

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989)............................................................... 18, 19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009).................................................................. 17

iii

*Newton v. Am. Debt Servs., Inc.*,
  75 F. Supp. 3d 1048 (N.D. Cal. 2014)........................................................24

*Novartis Pharma AG v. Regeneron Pharms., Inc.*,
  582 F. Supp. 3d 26 (N.D.N.Y. 2022)........................................................20

*Olstad v. Microsoft Corp.*,
  700 N.W.2d 139 (Wis. 2005)........................................................24

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)........................................................13

*People ex rel. Scott v. College Hills Corp.*,
  91 Ill. 2d 138 (1982)........................................................22

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)........................................................19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)........................................................19

*Rambus Inc. v. FTC*,
  522 F.3d 456 (D.C. Cir. 2008) ........................................................11, 13

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022)........................................................24

*State by Humphrey v. Alpine Air Prods., Inc.*,
  490 N.W.2d 888 (Minn. Ct. App. 1992)........................................................22

*Tampa Elec. Co. v. Nashville Co.*,
  365 U.S. 320 (1961) ........................................................18

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016)........................................................21

*Thanander v. Uponor, Inc.*,
  887 F. Supp. 2d 850 (D. Minn. 2012)........................................................25

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)........................................................19

*In re Urethane Antitrust Litig.*,
  663 F. Supp. 2d 1067 (D. Kan. 2009)........................................................24

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ........................................................13, 14, 15

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ........................................................ 11, 12, 14

**Statutes & Rules**

15 U.S.C. § 53(b) ........................................................................ 18

Cal. Bus. & Prof. Code § 17200 ...................................................... 24

Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................ 24

Colo. Rev. Stat. Ann. § 6-4-119 ...................................................... 22

Fed. R. Civ. P. 12(b)(6) ............................................................ 1, 8

FTC Act, 15 U.S.C. §§ 41 *et seq.* ...................................................... 3

Ind. Code § 24-5-0.5-1 *et seq.* ...................................................... 24

Iowa Code Ann. § 553.2 .............................................................. 22

Iowa Code § 714.16 .................................................................. 24

Minn. Stat. § 325D.54 ............................................................... 23

Neb. Rev. Stat. Ann. § 59-829 ....................................................... 22

Neb. Rev. Stat. §§ 59-1601–02 ....................................................... 23

Or. Rev. Stat. § 646.715 ............................................................ 22

Or. Rev. Stat. § 646.715(2) ......................................................... 23

Wis. Stat. § 133.03 *et seq.* ......................................................... 23

Defendant Corteva, Inc. ("Corteva"), by and through its undersigned attorneys and pursuant to Fed. R. Civ. P. 12(b)(6) and Local Rule 7.3, moves to dismiss all claims asserted against it by the Federal Trade Commission ("FTC") and ten state attorneys general.

## PRELIMINARY STATEMENT

Plaintiffs' claims require that this Court ignore two principles at the heart of American industry: first, competition for customers helps American industry thrive. Businesses invest in their relationships with customers, leading to higher quality products, new ways of delivering them, and lower prices. In virtually every area, businesses compete hard to retain customers. Loyalty programs are a tried-and-true means for doing so. Except under unusual circumstances not alleged (and not present) here, loyalty programs are neither nefarious nor unlawful. Frequent flyer programs incent customers to stick with one airline, to reach certain milestones by year-end to receive special status for the following year; but if customers fall short in December, they start again at zero. The same is true with numerous loyalty programs nationwide. There is simply nothing wrong with rewarding loyalty.

Second, statutes of limitations are designed to keep companies that have been operating consistently for years from waking up one day to lawsuits claiming that those operations were in fact illegal. Businesses need clarity, and the law gives it to them.

These two principles form a context and backdrop for why each of plaintiffs' claims must be dismissed. As set forth below, all of the claims assert a form of exclusive dealing. This assertion relies on the mistaken premise that Corteva's routine loyalty programs are anticompetitive. Labeling Corteva's loyalty programs as "exclusionary" does not, through alchemy, make lawful programs anticompetitive. While some loyalty programs could go too far, none of the allegations about Corteva's programs suggest that they did so here. According to plaintiffs, Corteva's programs offer discounts for distributors who choose to participate in them; none is forced to do so. And there is no allegation that any Corteva program crosses the anticompetitive red line: the price-cost test.

The belated timing of all claims is plaintiffs' next failure, with regard to every claim except for the FTC's Section 5 claim (which is not available to the state plaintiffs, and which fails for other reasons). According to plaintiffs' allegations, the loyalty programs for each of the three Corteva active ingredients ("AIs") at issue were implemented many years ago, in two cases at least a decade after the statutory exclusivity protections on the products expired. In the third case, the loyalty program was implemented by a predecessor company so many years ago that any possible claim long expired. No claim against Corteva can overcome this lengthy delay.

Next—and dispositively for each of plaintiffs' claims—antitrust actions require that a plaintiff allege sufficient facts to support a cognizable product market. This is the beginning and foundation of an antitrust claim. It is

2

only within a well-defined market that conduct and (alleged) power can be assessed, or competitive effects understood.  Properly alleging a market takes work:  a plaintiff has to lay out potential substitutable products and assert facts to support whether they fall within the market.  Plaintiffs' Complaint does none of this.  Plaintiffs merely allege that each of three Corteva AIs—acetochlor, rimsulfuron and oxamyl (collectively, the "Relevant AIs")—is its own product market.  (¶148.)  This is not enough.

Finally, plaintiffs' state law antitrust and unfair competition claims fail for a number of reasons.  First, several state claims follow the same analytical framework as the federal claims, and fail for the same reasons.  Second, two states purport to seek a remedy on behalf of customers precluded by those states' laws.  Four states require allegations of intra-state activity, but the complaint lacks such allegations.  Finally, because unfair competition laws require a predicate unlawful act, those claims fail as well.

As previewed above and as set forth below, we respectfully submit that all claims should be dismissed.[1]

---

[1] Although Corteva disputes plaintiffs' allegations, this Motion assumes the truth of plaintiffs' well-pled factual assertions, as is required on a motion to dismiss.

## BACKGROUND[2]

A.   _The Parties_

Plaintiff FTC is a U.S. administrative agency established and organized pursuant to the FTC Act.  (¶17.)  State plaintiffs are the states of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Texas and Wisconsin represented by their respective Attorneys General.  (¶¶18-27.)

Corteva is a company "engaged in the development, manufacture, and sale of crop protection products" used in farming.  (¶33.)  Defendants Syngenta Crop Protection AG, Syngenta Corporation and Syngenta Crop Protection, LLC (collectively, "Syngenta") are also companies engaged in the "development, manufacture, and sale of" such products.  (¶¶29-31.)  Corteva sells its crop protection products ("CPPs") to distributors.  (¶¶49-50.)  These distributors, which allegedly account for roughly ██ of U.S. CPP sales, (¶8), then either sell the CPPs to independent retailers, who in turn sell to farms and growers, or sell the CPPs to farms and growers through their own integrated retail arms.  (¶¶49-50.)

B.   _The Crop Protection Industry_

Corteva and other manufacturers invest their time and resources to "initially develop, patent, and register" the AIs in CPPs.  (¶4.)  Manufacturers are rewarded for their investments with the opportunity to harness "the commercial

---

[2] Citations to the Complaint are given as "¶_" or "¶¶_".

4

potential of their innovations through lawfully obtained exclusive rights" (¶4), under both patent laws and the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). (¶¶45-46.) After patent and regulatory exclusive-use terms expire, generic competition may enter the market. (¶48.) This comprehensive regulatory regime "incentivizes innovation while encouraging price and other competition". (¶4.)

C.    *Allegations Regarding the Relevant AIs*

Plaintiffs allege that Corteva made "payments in the form of rebates" (¶200) to motivate distributors to purchase Corteva products. (¶6.) Plaintiffs assert that Corteva's allegedly anticompetitive acts relate to three AIs: rimsulfuron, oxamyl and acetochlor. (¶¶117, 127, 134.) Plaintiffs allege that rimsulfuron's statutory exclusivity periods expired no later than 2007. (¶118.) Corteva's predecessor DuPont implemented a loyalty program with regard to this AI prior to 2017, and Corteva implemented one beginning in the 2017-2018 market year; *i.e.*, before 2018. (¶¶119-20.) This Complaint was filed on September 29, 2022—more than four years later.

Corteva's statutory exclusivities relating to oxamyl expired in 1987. (¶128.) Corteva placed oxamyl in a loyalty program before the 2018-2019 market year, which would have been sometime in 2017, more than four years before the Complaint was filed. (¶130.) Oxamyl was on the market without any exclusivity for a period of thirty years before being placed into a loyalty program. Corteva's statutory exclusivities relating to acetochlor expired in or about 2007 (¶136), and

Corteva added it to a loyalty program for the 2016-2017 market year. (¶139.) Acetochlor was marketed for a decade without any exclusivity before it became part of a loyalty program.

### D. *Product Market Allegations*

The sole allegations regarding the market power of Corteva AI's here are contained in paragraph 145 of the Complaint. The allegations state:

> At all times relevant to this Complaint, Corteva has had monopoly and market power with respect to rimsulfuron, oxamyl, and with respect to [CPPs] containing those Relevant AIs. . . . Corteva has [also] had market power with respect to acetochlor and with respect to [CPPs] containing acetochlor.

Oddly, this allegation of market power *precedes* several summary assertions regarding product market. (¶¶148, 150-51.) Plaintiffs simply assert that "each relevant market is defined by reference to a Relevant AI" (¶148), without any support. At most, there are general statements of product differentiation—but product differentiation does not define market boundaries. (¶¶150(d)-(f).) Plaintiffs summarily state that no other AIs are close enough substitutes to prevent Corteva from maintaining prices above competitive levels. (¶151.)

### E. *Allegations Regarding Corteva's Loyalty Agreements*

Corteva's loyalty programs incentivize distributors to continue to purchase its products. Distributors are not required to participate in such programs. (*See, e.g.*, ¶¶67, 75, 78.) Corteva offers rebates to distributors that purchase a certain percentage of their total purchases of CPPs containing the relevant AIs from Corteva. (¶54.) The terms of those programs allow distributors

to transact in some amount of third-party products "without forfeiting at least part" of the rebate payment.  (¶55.)

Specifically, plaintiffs allege that Corteva operates two programs. The Crops, Range & Pasture and Industrial Vegetation Management Loyalty Program ("CRPIVM") involves set "loyalty thresholds" that customers must meet to qualify for rebate payments.  (¶67.)  Plaintiffs also allege that an additional discount offered by Corteva, the Corporate Distributor Offer ("CDO"), ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)  The CRPIVM offers rebates on purchases of specific AIs, whereas the CDO covers a broader range of products, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (¶¶67-73.)  Plaintiffs allege that rebates under these programs are typically ▮▮▮▮▮▮▮▮▮ and that missing a loyalty threshold during the payment period makes a customer ineligible for the associated discount.  (¶72.)

Again, plaintiffs allege that "[l]oyalty requirements for each Relevant AI have been in place—with nearly complete distributor compliance—since at least 2017, in most cases longer."  (¶165.)  Further, they allege that "[g]eneric manufacturers of crop-protection products containing the applicable Relevant AIs have been substantially foreclosed from the Relevant Market for five years or more."  (*Id.*)

F.    *Procedural History*

Plaintiffs assert 14 causes of action under federal antitrust law and various state antitrust and unfair competition laws.  (¶¶197-242.)  All plaintiffs assert a violation of Section 3 of the Clayton Act.  (¶¶199-200.)  The FTC asserts a violation of Section 5 of the FTC Act.  (¶¶197-98.)  All state plaintiffs assert violations of Sections 1 and 2 of the Sherman Act.  (¶¶201-05.)  Colorado, Illinois, Minnesota, Nebraska, Oregon, Texas and Wisconsin assert violations of their respective state antitrust laws.  (¶¶210-18, 225-42.)  California, Indiana and Iowa assert violations of their respective state antitrust and unfair competition laws. (¶¶206-09, 219-24.)

Corteva now moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* This is particularly important in the antitrust context, where "proceeding to antitrust discovery can be expensive," and where "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Twombly*, 550 U.S. at 558 (quoting

8

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17

(1983); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188,

1191 (10th Cir. 2009) (affirming dismissal of antitrust claims and noting that the

Supreme Court in *Twombly* "warned particularly of the high costs and frequent

abuses associated with antitrust discovery").

## ARGUMENT

As set forth above, plaintiffs' federal claims fail for three separate

reasons:  first, each claim against Corteva is premised on allegedly unlawful,

exclusionary conduct.  But no allegation actually supports such a claim.  Plaintiffs

instead resort to the repeated invocation of the word "exclusionary".  In fact, the

so-called exclusionary activities are routine loyalty programs that have existed for

years.  Even if a loyalty program were to run afoul of the antitrust laws, it would

have to fail the price-cost test, and these do not.  This failing also defeats the

FTC's Section 5 claim.

Second, as made clear from the allegations in the Complaint,

Corteva implemented the loyalty programs for each Relevant AI *at least* five years

ago.  For all but the Section 5 claim, the statute of limitations is four or fewer

years, and ran long ago.

Third, vague assertions of AIs as single-product markets are

inadequate to support a cognizable market for purposes of an antitrust case.

Plaintiffs wholly fail to consider reasonable substitutes available for each Relevant

9

AI.  The failure to plead an antitrust product market also defeats the FTC's Section

5 claim.

For the reasons previewed above and discussed in more depth below,

plaintiffs' state law claims fail.

## I.     PLAINTIFFS' CLAIMS FAIL TO ALLEGE IMPERMISSIBLE EXCLUSIVE DEALING.

Plaintiffs sue under Sections 1 and 2 of the Sherman Act, 15 U.S.C.

§§ 1-2, Section 3 of the Clayton Act, 15 U.S.C. § 14, Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), and various state antitrust and unfair competition laws.  Each

claim is premised on exclusionary behavior that allegedly either maintained a

monopoly position (Section 2), or agreements in restraint of trade that

substantially lessened competition or created a monopoly in a relevant market

(Section 1, Clayton Section 3).

To establish a Section 1 violation, a plaintiff must allege "(1) a

contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of

trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).  To

establish a Section 2 violation, a plaintiff must allege "possession of monopoly

power in a relevant market, willful acquisition or maintenance of that power in an

exclusionary manner, and causal antitrust injury." *Advanced Health-Care Servs.,*

*Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990).  To establish a

Section 3 violation for unlawful conditioning of payments, a plaintiff must allege

that defendant entered into a contract with the effect of substantially lessening

Case 1:22-cv-00828-TDS-JEP   Document 70   Filed 12/12/22   Page 16 of 34

competition or creating a monopoly in a relevant antitrust market.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012).  Claims brought under Section 5(a) of the FTC Act undergo the same analysis as those brought under the Sherman Act.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 462 (D.C. Cir. 2008).

Plaintiffs challenge Corteva's loyalty programs as anticompetitive exclusive dealing arrangements.  Their allegations are plainly insufficient to support that characterization.  As a threshold and entirely dispositive matter, plaintiffs have not pled any actual exclusivity.  The allegations make clear that loyalty programs are opt-in, not required; moreover, not all distributors choose to opt-in.  (*See* ¶8 (alleging that Corteva distributor customers "collectively account for approximately ▮▮▮ or more of U.S. [CPP] sales").)  Plaintiffs do not plead that distributors must participate in Corteva's programs to deal with Corteva, or that Corteva in fact excluded any customers who failed to meet the terms of Corteva's loyalty programs.[3]  Nor do plaintiffs plead that Corteva's programs obligate customers to exclusively purchase Corteva products.  Rather, plaintiffs concede that "[t]o qualify for [a discount] for a given active ingredient in a given market year under the CRPIVM Loyalty Program, a distributor must source a certain percentage of its purchases of that active ingredient from Corteva."  (¶69.)  The

---

[3] Plaintiffs plead that "Defendants have retaliated and threatened to retaliate" against customers that failed to meet loyalty thresholds, "by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage."  (¶ 82.)  But plaintiffs plead collectively, failing to identify any conduct Corteva engaged in.

discount offered by Corteva is optional—Corteva never required exclusivity from any of its customers to participate in the programs, or required customers to participate in the loyalty program to purchase Corteva products. *See Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 110 n.24 (3d Cir. 1992) ("An agreement affecting less than all purchases does not amount to true exclusive dealing.").

Even if Corteva's programs are evaluated as exclusive dealing arrangements, plaintiffs have still failed to plead a claim. Exclusive dealing arrangements may be challenged under Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act. *See ZF Meritor*, 696 F.3d at 268. Whatever statute the plaintiff relies on, the analysis is the same—courts universally apply the rule of reason to evaluate the legality of exclusive dealing arrangements. *Cnty. Materials v. Allan Block Corp.*, 502 F.3d 730, 736 (7th Cir. 2007). To evaluate an exclusive dealing arrangement when "the plaintiff alleges that price is the vehicle of exclusion", "the price-cost test may be utilized as a specific application of the 'rule of reason'". *ZF Meritor*, 696 F.3d at 273. The "price-cost test" requires a showing (1) that the defendants set prices below cost, and (2) "a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability," that the defendants could recoup the attendant losses once a plaintiff is excluded from the market. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993). Moreover, the Supreme Court has "specifically declined to allow plaintiffs to recover for above-cost price cutting" because discouraging lower prices "does not constitute sound antitrust policy." *Weyerhaeuser Co. v. Ross-*

12

*Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007) (quoting *Brooke Grp.*, 509 U.S. at 224). Where a plaintiff fails to satisfy the price-cost test, claims based on alleged rebates or discounts must be dismissed at the pleading stage.[4] *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451-52 (2009).

Plaintiffs' allegations make clear that price is the primary means of exclusion, but do not allege that Corteva's programs fail the price-cost test. Their claims are predicated on the theory that "Defendants pay a portion of their elevated profits to distributors"—which plaintiffs colorfully term "exclusion payments"—"in exchange for the distributors excluding Defendants' generic competitors, resulting in near exclusivity for Defendants." (¶6.) This creative terminology does not change the fact that Corteva's "exclusion payments" are simply procompetitive discounts to incent customer loyalty. *See, e.g., Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168, 2014 WL 1343254, at *28 (D.N.J. Mar. 28, 2014) (noting that the argument that "disloyalty penalties [are] not the same as 'discounts' . . . does not change the nature of [plaintiff's] claim"). Indeed, plaintiffs concede that Corteva's "payments [are a] form of rebates in the sale of crop-protection products". (¶200.) A rebate is simply a discount. Allowing plaintiffs' claims to proceed would risk depriving Corteva's customers of a discount—the very outcome the price-cost test was intended to prevent.

---

[4] This applies to plaintiffs' arguments under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, in addition to Section 5 of the FTC Act, which is coextensive with the Sherman Act. *Rambus*, 522 F.3d at 462.

*Weyerhaeuser*, 549 U.S. at 319.  Because plaintiffs do not allege that Corteva's discounts fail the price-cost test, the Complaint must be dismissed.

Plaintiffs cannot escape these pleading deficiencies by asserting that the price-cost test is inapplicable. The basis for such a claim relates to situations when price is not the predominant means of exclusion.  Plaintiffs' entire claim is premised on the opposite.

*First*, plaintiffs do not allege that Corteva's loyalty programs either lock customers into lengthy contract terms or that Corteva excludes noncompliant distributors from access to its products, the two primary characteristics that have been found to predominate over price in determining whether the price-cost test applies.  *See ZF Meritor*, 696 F.3d at 275, 284-86.  Where distributors are free to terminate agreements with Corteva and purchase from competitors at any time without being excluded from access to Corteva's products, all competitors needed to do was "offer a better product or a better deal to acquire" more business.  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*, 592 F.3d 991, 997 (9th Cir. 2010).

*Second*, plaintiffs allege that Corteva's loyalty programs include terms that ███████████████████████████████ (conveniently eliding ██████████████████████████████), meaning distributors must continue to meet the relevant loyalty thresholds for a set time or ████████████████████.  (¶72.)  This amounts to no more than the "threat of a lost discount", which courts have explained is "a far cry from the [kind

14

of] anticompetitive conduct" that a non-pricing-based exclusive dealing arrangement would affect. *Eisai*, 821 F.3d at 407. For instance, in *Eisai*, the court found that competitors were not foreclosed by a rebate program in which "[t]he consequence of not obtaining the 75% market share threshold . . . was receiving the base 1% discount." *Id.* at 406-07. The court rejected the plaintiff's arguments that "the threat of not obtaining a higher discount (ranging up to 30% off) 'handcuffed' hospitals to the [rebate] Program." *Id.* at 407. Plaintiffs do not allege that a distributor must repay rebates already received or forfeit anything beyond a discount if it violates the terms of Corteva's programs.

   *Third*, plaintiffs allege that Corteva's loyalty programs are anticompetitive because Corteva provides discounts to distributors who meet loyalty thresholds ██████████████. (¶¶69, 73.) "Bundling is the practice of offering, for a single price, [multiple] goods . . . that could be sold separately." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). "A bundled discount occurs when a firm sells a bundle of goods . . . for a lower price than the seller charges for the goods . . . purchased individually." *Id.* Competitive concerns arise if a potential competitor does not offer the same array of products, as it could only make a comparable offer by giving the customer a price compensating for the foregone discount.

   Here, plaintiffs challenge both the CRPIVM and the CDO. (¶67.) Plaintiffs allege that Corteva's CRPIVM offers rebates on several AIs, and if a distributor chooses to purchase ██████████████, it can earn a rebate by

purchasing a certain percent of its needs of that AI from Corteva.  (¶69.)  But plaintiffs admit that the AIs within the CRPIVM all "typically face competition from generic manufacturers", (¶73), and identify no instances where a generic cannot compete with an AI within the CRPIVM.  Plaintiffs allege no facts showing that an efficient manufacturer could not make a comparable offer.

Plaintiffs allege that Corteva provides discounts under its CDO on products that only Corteva sells, ███████████████████████████ ██████████████████.  (¶73.)  But this is not a bundled discount at all.  Corteva is not offering a lower price to customers who purchase both the products in the CRPIVM, which the FTC admits face generic competition, and those in the CDO, which the FTC claims do not.  Rather, plaintiffs allege that if a customer ██████ █████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████ (*Id.*)  Failure to purchase the CDO products does not impact a customer's entitlement to a rebate under the CRPIVM.  Thus, the CDO just offers an additional discount to Corteva's customers who do buy products covered by the CDO, and it is not bundled with the CRPIVM.

*Fourth*, the Court should not credit plaintiffs' unsupported, conclusory and nonspecific allegation that "Defendants have retaliated and threatened to retaliate" against distributors that have failed to satisfy loyalty by canceling distribution contracts or withholding access to supply.  (¶82.)  Such "bare assertions 'devoid of further factual enhancement[]' . . . are not entitled to an

16

assumption of truth". *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 260 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 681). Not only are these allegations conclusory, but plaintiffs also fail to identify what conduct Corteva engaged in. The only "penalty" plaintiffs adequately plead regarding Corteva is non-payment of an annual rebate. As discussed above, this amounts to the loss of a discount, and courts decline to find that these types of loyalty programs violate antitrust law. *Eisai*, 821 F.3d at 406-07.

Plaintiffs attempt to obscure that their "exclusive dealing claims", at bottom, challenge a pro-competitive pricing practice. Without more, the "logical inference" is that Corteva merely offered customers a "better deal" than its competitors. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 411 (7th Cir. 2017). Plaintiffs have pled nothing more than a discount program that is presumptively lawful without pleading below-cost pricing, and their claims should be dismissed.[5]

## II.    PLAINTIFFS' CLAIMS LONG AGO EXPIRED.

All of plaintiffs' claims relate to loyalty programs allegedly put in place more than five years before the Complaint was filed. (¶165.) The statute of

---

[5] Plaintiffs contend the agreements under which Syngenta supplies the AIs mesotrione and metalochlor to Corteva for use in Corteva's own finished products are part of the "course of conduct" challenged by Plaintiffs. However, Plaintiffs' conclusory allegations fail to explain how or why these normal course agreements are anticompetitive or to allege they were the result of anything other than an arms-length negotiation in a competitive marketplace in which Corteva attempted to get the best possible deal for reliable supply of needed inputs for its products.

limitations for Sherman and Clayton Act claims is four years.[6]  *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287 (4th Cir. 2007).  Plaintiffs also allege that generic manufacturers have been "foreclosed from the Relevant Markets for five years or more" (¶165), precluding any plausible explanation of plaintiffs' claims accruing later.  Plaintiffs' recent departure from established agency precedent creates the precise risk of inappropriate punishment for long-term, good-faith business practice that antitrust statutes of limitations are designed to prevent.  *See* Complaint, *FTC v. Novartis AG, et al.*, No. C-3979 (Nov. 1, 2000), at 2 ("Novartis Complaint"); Complaint, *U.S. and Plaintiff States v. The Dow Chemical Company and E.I. Du Pont De Nemours and Company, Inc.*, No. 17-cv-01176 (Jun. 15, 2017), at 8.  Plaintiffs' Sherman Act and Clayton Act claims should be dismissed accordingly.

## III.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET.

Every antitrust claim plaintiffs allege requires allegations sufficient to support a cognizable product market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Only when such a market is adequately alleged can assertions about market power be recognized.  *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989); *see Tampa*

---

[6] Although plaintiffs' claims under Section 5 of the FTC Act do not expire like those under the Clayton and Sherman Acts, *see* 15 U.S.C. § 53(b), plaintiffs' Section 5 claims here fail for their inadequate pleadings of exclusionary conduct and market definition, explained elsewhere.

18

*Elec. Co. v. Nashville Co.*, 365 U.S. 320, 328 (1961) (noting that for a contract to violate Section 3 of the Clayton Act "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market"). The same is true of the FTC Act. *See Miller v. W.H. Bristow, Inc.*, 739 F. Supp. 1044, 1055 (D.S.C. 1990).

A properly defined product market must take account of which products, if any, compete with the defendant's product, and must include reasonably interchangeable substitutes that limit the defendant's ability to sustain an increase in price above competitive levels. *See Murrow Furniture Galleries,* 889 F.2d at 528. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability" or "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir. 1997). To plead a product market based on "reasonable interchangeability," a plaintiff must allege sufficient details about a product's "price, use and qualities" and explain why products without those characteristics are not reasonably interchangeable. *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curium)). Dismissal is warranted if a plaintiff fails to provide a "plausible explanation as to why a market should be limited in a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

19

Plaintiffs have not even attempted to sufficiently plead a product market. At best, their allegations are a form of ipse dixit: because they say it is true, so it must be. The law requires more than mere vague references to other products and potential characteristics that some may or may not have. As the allegations stand, they are as consistent with product differentiation as with individual markets. *Twombly* requires more. *See Benfield v. Magee*, 945 F.3d 333, 336-37 (5th Cir. 2019). For each of the Relevant AIs, plaintiffs provide only *two sentences* that describe a couple of general characteristics[7] vaguely in comparison to "other, similar herbicide active ingredients" (for rimsulfuron and acetochlor) and "other, similar insecticide active ingredients" (for oxamyl). (¶¶150(d)-(f).) Plaintiffs fail to "explain why products without those characteristics are not reasonably interchangeable". *Klein v. Facebook Inc.*, 580 F. Supp. 3d 743, 766 (N.D. Cal. 2022). Many of plaintiffs' proffered reasons for differentiating the Relevant AIs are simply alleged advantages they have over other products. (*See, e.g.*, ¶150(e) (alleging that oxamyl is "safer for crops and better for soil health than other, similar [AIs]").) But merely listing allegedly unique features of a product is insufficient to plead a relevant market. *See Novartis Pharma AG*, 582 F. Supp. 3d at 41.

---

[7] For example, rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" and "is inexpensive to produce compared to other, similar herbicide [AIs]". (¶ 150(d).) Plaintiffs do not explain why growers would view the cost to produce an AI as relevant to substitutability. *See Novartis Pharma AG v. Regeneron Pharms., Inc.*, 582 F. Supp. 3d 26, 41 (N.D.N.Y. 2022) (finding such differences "say[] nothing about whether a consumer would find [these products] interchangeable").

Plaintiffs' cursory treatment of substitutability results in alleged relevant markets that are both too broad and too narrow. On the one hand, plaintiffs do not acknowledge that distinct CPPs containing the same AI may not be substitutes if they are labeled for *different* uses. On the other hand, plaintiffs also fail to explain why any number of CPPs containing different AIs are not reasonably interchangeable when labeled for the *same* use. *See Bayer Schering*, 813 F. Supp. 2d at 578 (finding the plaintiff failed to allege facts demonstrating that no combination of drugs could serve as a functional substitute). For example, plaintiffs do not explain why thiencarbazone is not reasonably interchangeable with rimsulfuron. Thiencarbazone is a herbicide that may be used on a wide variety of crops including corn, peanuts and potatoes that may be applied pre- or post-emergence using multiple application methods. EPA Reg. No. 264-1066 at 5, 9-11.[8] Plaintiffs do not explain why flumetsulam, a pre- and post-emergence corn herbicide with multiple methods of application that can be used on a variety of weeds, is not substitutable for acetochlor. EPA Reg. No. 524-614 at 9, 22, 25-26. Nor do plaintiffs explain why methomyl, an insecticide used on cotton, potatoes and other crops, with multiple methods of application, is not substitutable for oxamyl. EPA Reg. No. 89167-91 at 5-8, 16, 19-20. Moreover, the FTC itself previously defined a broader market for "corn herbicides for pre-emergent control

---

[8] The Court may take judicial notice of EPA label registrations at the motion to dismiss stage , as is routinely done with FDA and copyright registrations. *See, e.g.*, *TCA Television Corp. v. McCollum*, 839 F.3d 168, 173 (2d Cir. 2016).

of grasses", which included the AIs metolachlor, acetochlor and dimethenamid. Novartis Complaint at 3.[9]  Plaintiffs mention none of these products and summarily conclude that "other active ingredients are not close enough substitutes".  (¶151.)  That pleading deficiency, on its own, is enough to dismiss the Complaint.  *See Bayer Schering*, 813 F. Supp. 2d at 577-78.

Thus, plaintiffs' claims should be dismissed for "alleg[ing] a proposed relevant market that clearly does not encompass all interchangeable substitute products[,] even when all factual inferences are granted in plaintiff's favor".  *Id.* at 575 (quoting *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 554 (S.D.N.Y. 2007)).  Because sufficiently alleging a relevant product market is a requirement of plaintiffs' claims, their failure to do so here is fatal.

## IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL.

There are also four separate reasons why state plaintiffs' antitrust and consumer protection law claims must be dismissed.

First, the state antitrust laws of all state plaintiffs are harmonized with the federal antitrust laws.  Because plaintiffs' federal claims fail, these claims correspondingly fail.  *See, e.g.*, Colo. Rev. Stat. Ann. § 6-4-119; Iowa Code Ann. § 553.2; Neb. Rev. Stat. Ann. § 59-829; Or. Rev. Stat. § 646.715; Tex. Bus. & Com. Code § 15.04; *Mailand v. Burckle*, 572 P.2d 1142, 1147 (Cal. 1978); *People ex rel. Scott v. College Hills Corp.*, 91 Ill. 2d 138, 153 (1982); *Miller Brewing Co.*

---

[9] Since that enforcement action, the AI pyroxasulfone also has been labeled for use as a corn herbicide for pre-emergent control of grasses.  EPA Reg. No. 63588-91 at 1.

22

*v. Bartholemew Cnty. Beverage Co.*, 674 N.E. 2d 193, 205 (Ind. Ct. App. 1996);

*State by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 894 (Minn. Ct.

App. 1992); *Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp.

3d 957, 968-69 (W.D. Wis. 2017). The presence of such provisions, lacking

"countervailing statutory law or case law", suffices "to permit a district court to

apply federal antitrust [law]" to state law antitrust claims. *In re Dealer Mgmt. Sys.*

*Antitrust Litig.*, 362 F. Supp. 3d 510, 540 (N.D. Ill. 2019) (emphasis omitted).

Doing so here requires that this Court dismiss plaintiffs' claims under these states'

antitrust laws.

Second, the state antitrust laws of Texas and Indiana follow the

*Illinois Brick* indirect purchaser bar, 431 U.S. 720 (1977), preventing those states

from bringing damages claims on behalf of end-consumers. *See Abbott Lab'ys v.*

*Segura*, 907 S.W.2d 503, 503-04 (Tex. 1995); *Berghausen v. Microsoft Corp.*, 765

N.E.2d 592, 596 (Ind. Ct. App. 2002). State plaintiffs assert their claims on behalf

of "end-consumers" of Corteva products. (¶159.) Accordingly, Indiana and Texas

cannot receive their requested relief of civil damages.

Third, the state antitrust laws of Minnesota, Nebraska, Oregon and

Wisconsin each require allegations of intra-state activity that plaintiffs have not

pled. *See* Minn. Stat. § 325D.54; Or. Rev. Stat. § 646.715(2); Neb. Rev. Stat.

§§ 59-1601–02; Wis. Stat. § 133.03 *et seq.* Under these states' laws, plaintiffs

must specifically plead that effects of the alleged anticompetitive conduct were

felt in their state. *See, e.g.*, *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F.

23

Supp. 3d 223, 244 (W.D.N.Y. 2021). The Complaint is devoid of specific allegations as to Minnesota. As to Nebraska and Oregon, plaintiffs merely allege, without any specifics, that the alleged anticompetitive conduct "had direct and indirect impacts" in each state. (*See, e.g.*, ¶¶233(e), 235.) This is insufficient to withstand a motion to dismiss. *See, e.g.*, *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 841-42 (E.D. Mich. 2018). Wisconsin's statute requires even more: that conduct "substantially affects the people of Wisconsin and has impacts in [the] state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside [the] state". *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1083 (D. Kan. 2009) (quoting *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005)). Here, plaintiffs merely recite the legal standard, alleging that "[t]hese violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin." (¶241.) This too is insufficient to withstand a motion to dismiss. *See, e.g.*, *In re Urethane*, 663 F. Supp. 2d at 1084.

Fourth, California, Indiana and Iowa allege violations of their state unfair competition and consumer fraud laws, each of which fails. Cal. Bus. & Prof. Code § 17200 *et seq.*; Ind. Code § 24-5-0.5-1 *et seq.*; Iowa Code § 714.16. First, the California Unfair Competition Law ("UCL") prohibits "unlawful, unfair or fraudulent" business acts or practices. *Newton v. Am. Debt Servs., Inc.*, 75 F. Supp. 3d 1048, 1056 (N.D. Cal. 2014) (quoting Cal. Bus. & Prof. Code § 17200). Where a claim under the UCL is based upon, or "derivative" of failed allegations

of antitrust violations, "the UCL claim falls with those claims." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 2022). Therefore, plaintiffs' claims under the UCL fail. Second, a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA") must allege "that a defendant engaged in one or more defined deceptive acts." *Thanander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 873 (D. Minn. 2012). Such deceptive acts must be either "uncured," where plaintiff provides defendant notice of harm and an opportunity to cure, or "incurable," where the act is done "as part of a scheme, artifice, or device with intent to defraud or mislead." *Id.* at 874 (quoting Ind. Code § 24-5-.05-2(a)(8)). Plaintiffs have not specified the nature of their claim but offered no notice, so they presumably allege "incurable" deceptive acts, which are subject to Rule 9(b)'s heightened pleading requirements. *Id.* Plaintiffs makes only conclusory allegations that the "acts, omissions, or practices alleged in the Complaint constitute violations". (¶219(a).) These cannot meet Rule 9(b)'s heightened "particularity" standard, so plaintiffs' IDCSA claims fail. Finally, under Iowa's Consumer Fraud Act ("CFA"), plaintiffs must "plausibly allege that [Corteva] made a misrepresentation of material fact with the intent that others rely upon it in connection with the sale of merchandise." *Cota v. Ralph Lauren Corp.*, No. 21-C-1089, 2022 WL 1597631, at *3 (E.D. Wis. May 19, 2022). Here, plaintiffs merely allege that Corteva's "conduct constitutes deceptive and unfair practices in violation" of the statute. (¶223.) Plaintiffs' claims under the CFA fail accordingly.

Therefore, this Court must dismiss plaintiffs' state law claims.

# CONCLUSION

For the reasons set forth above, Corteva respectfully requests that each of plaintiffs' claims be dismissed.

Respectfully submitted this 12th day of December, 2022.

MCGUIREWOODS LLP

/s/ Mark E. Anderson
Mark E. Anderson (Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone:  919.755.6600
Fax:  919.755.6699

Katherine B. Forrest*
kforrest@cravath.com
David R. Marriott*
dmarriott@cravath.com
Margaret T. Segall*
msegall@cravath.com
CRAVATH, SWAINE &
MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendant Corteva, Inc.*

26

# CERTIFICATE OF WORD COUNT

The undersigned certifies that this Brief is in compliance with Rule 7.3(d)(1) of the Local Rules for the Middle District of North Carolina because it contains fewer than 6,250 words.

This the 12th day of December, 2022.

MCGUIREWOODS LLP

/s/ Mark E. Anderson
Mark E. Anderson (Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone:  919.755.6600
Fax:  919.755.6699

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of December, 2022, I caused the foregoing MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P 12(b)(6), and all attachments thereto, to be filed electronically with the Clerk of Court via the Court's CM/ECF system.  Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF System:

MCGUIREWOODS LLP

/s/ Mark E. Anderson
Mark E. Anderson (Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone:  919.755.6600
Fax:  919.755.6699