# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| STATE OF CALIFORNIA, | ) | |
| STATE OF COLORADO, | ) | |
| STATE OF ILLINOIS, | ) | |
| STATE OF INDIANA, | ) | |
| STATE OF IOWA, | ) | |
| STATE OF MINNESOTA, | ) | |
| STATE OF NEBRASKA, | ) | |
| STATE OF OREGON, | ) | |
| STATE OF TEXAS, | ) | |
| and | ) | |
| STATE OF WISCONSIN, | ) | |
|  | ) | Civil Action No. 22-CV-828 |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| SYNGENTA CROP PROTECTION AG, | ) | |
| SYNGENTA CORPORATION, | ) | |
| SYNGENTA CROP PROTECTION, | ) | |
| LLC, | ) | |
| and | ) | |
| CORTEVA, INC., | ) | |
|  | ) | |
| Defendants. | | |

# MEMORANDUM OF LAW IN SUPPORT OF
# SYNGENTA'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES ............................................................ ii

NATURE OF THE MATTER .............................................................1

PRELIMINARY STATEMENT ...........................................................1

QUESTION PRESENTED .................................................................6

FACTUAL ALLEGATIONS ...............................................................7

      A.    The Crop-Protection Industry ...............................................7

      B.    Syngenta's Loyalty Rebate Program .....................................9

      C.    Syngenta Products at Issue................................................ 11

      D.    Supply Agreements Between Syngenta and Corteva ....... 12

LEGAL STANDARDS ...................................................................... 12

ARGUMENT ................................................................................... 13

    I.    The Complaint Fails to State a Federal Antitrust Claim .......... 13

      A.    The Price-Cost Test Applies to Non-Coercive, Single Product Loyalty Rebates .................................................... 14

      B.    Syngenta's Loyalty Rebates, Which Lack Any Coercive Non-Price Feature, Are "the Very Essence of Competition"..................................................................... 18

      C.    Plaintiffs Have Failed to Plead Harm to Competition ..... 24

      D.    Plaintiffs Do Not Plead a Plausible Product Market........ 28

    II.    The Complaint Fails to State a Claim Under State Law ........... 33

      A.    The State Law Antitrust Claims Fail................................ 33

      B.    The State Law Consumer Protection Claims Fail ............ 34

    III.    Plaintiffs' Group Pleading Fails to State a Claim Against Syngenta Crop Protection AG or Syngenta Corporation........... 35

CONCLUSION................................................................................. 36

# TABLE OF AUTHORITIES

CASES

PAGE(S)

*Allen-Myland, Inc. v. IBM Corp.,*
33 F.3d 194 (3d Cir. 1994) ......................................................... 30

*Allied Orthopedic Appliances Inc. v.*
*Tyco Health Care Grp. LP,*
592 F.3d 991 (9th Cir. 2010) ................................................. 19, 25

*Arandell Corp. v. CenterPoint Energy Servs. Inc.,*
900 F.3d 623 (9th Cir. 2018) ........................................................ 34

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ............................................................... 16, 24

*Bayer Schering Pharm. AG v. Sandoz, Inc.,*
813 F. Supp. 2d 569 (S.D.N.Y. 2011) ........................................ 29

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................... 12, 13, 23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ............................................................... 13, 15

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) .................................................................... 28

*Chapman v. N.Y. State Div. for Youth,*
546 F.3d 230 (2d Cir. 2008) ....................................................... 28

*Chicoine v. Wellmark, Inc.,*
894 N.W.2d 454 (Iowa 2017) ..................................................... 34

*Concord Boat Corp. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ............................................ *passim*

*Covert v. Stryker Corp.,*
2009 WL 2424559 (M.D.N.C. Aug. 5, 2009) .............................. 22

ii

*Davis v. Univ. of N. Carolina at Greensboro*,
2022 WL 3586093 (M.D.N.C. Aug. 22, 2022) ........................................... 27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ............................................................... 23, 28

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d. Cir. 1984) ....................................................... 18

*Eastman Kodak Co. v. Image Tech. Servs. Inc.*,
504 U.S. 451 (1992) ................................................................. 15

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ................................................... *passim*

*Epic Games, Inc. v. Apple, Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ....................................... 33

*Epic Games, Inc. v. Apple, Inc.*,
2021 WL 6755197 (9th Cir. Dec. 8, 2021) ................................. 33

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ................................................... 16

*Four Corners Nephrology Assocs., P.C. v.*
*Mercy Med. Ctr. of Durango*,
582 F.3d 1216 (10th Cir. 2009) ................................................. 34

*FTC v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir. 1999) ................................................... 28

*Gen. Foods Corp.*,
103 F.T.C. 204 (1984) ............................................................... 17

*Glob. Disc. Travel Servs., LLC v. TWA Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) ............................................ 30

*Guthrie v. McClaskey*,
2012 WL 5494457 (W.D. Va. Nov. 13, 2012) ............................. 32

*Hannah's Boutique, Inc. v. Surdej*,
112 F. Supp. 3d 758 (N.D. Ill. 2015) ......................................... 34

Case 1:22-cv-00828-TDS-JEP   Document 78   Filed 12/22/22   Page 4 of 46

*Intercollegiate Women's Lacrosse Coaches Ass'n v.*
   *Corrigan Sports Enters. Inc.,*
   505 F. Supp. 3d 570 (M.D.N.C. 2020) ..................................... 13, 22, 35, 36

*It's My Party, Inc. v. Live Nation, Inc.,*
   811 F.3d 676 (4th Cir. 2016) ............................................... 28, 33

*JSW Steel (USA) Inc. v. Nucor Corp.,*
   586 F. Supp. 3d 585 (S.D. Tex. 2022) ....................................... 34

*Justice 360 v. Stirling,*
   42 F.4th 450 (4th Cir. 2022) ................................................ 32

*LePage's, Inc. v. 3M,*
   324 F.3d 141 (3d Cir. 2003) ................................................ 19

*Lorix v. Crompton Corp.,*
   736 N.W.2d 619 (Minn. 2007) ............................................... 34

*Masimo Corp. v. Tyco Health Care Grp., L.P.,*
   350 F. App'x 95 (9th Cir. 2009) ............................................ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ........................................................ 15

*McKinney v. State,*
   693 N.E.2d 65 (Ind. 1998) .................................................. 34

*McWane, Inc. v. FTC,*
   783 F.3d 814 (11th Cir. 2015) ......................................... 19, 20, 28

*Midwest Gas Servs. Inc. v. Ind. Gas Co.,*
   317 F.3d 703 (7th Cir. 2003) ............................................... 34

*Moeller v. Samsung Elecs. Am., Inc.,*
   2022 WL 4182205 (S.D. Iowa Aug. 24, 2022) ................................. 34

*Murrow Furniture Galleries, Inc. v.*
   *Thomasville Furniture Indus., Inc.,*
   889 F.2d 524 (4th Cir. 1989) ............................................... 29

Case 1:22-cv-00828-TDS-JEP   Document 78   Filed 12/22/22   Page 5 of 46

*NicSand, Inc. v. 3M Co.,*
  507 F.3d 442 (6th Cir. 2007) ................................................................. 16, 25

*Ohio v. Am. Express Co.,*
  138 S. Ct. 2274 (2018) ........................................................................... 28

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
  555 U.S. 438 (2009) ............................................................................... 15

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
  199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd sub nom.*
  *RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.,*
  67 F. App'x 810, 812 (4th Cir. 2003) ...................................................... 21

*RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.,*
  67 F. App'x 810 (4th Cir. 2003)................................................................ 21

*S.C. State Bd. of Dentistry v. FTC,*
  455 F.3d 436 (4th Cir. 2006) .................................................................. 17

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015) .............................................................. 35, 36

*Shore v. Charlotte-Mecklenburg Hosp. Auth.,*
  412 F. Supp. 3d 568 (M.D.N.C. 2019) .................................................... 13

*Spectrum Pharms., Inc. v. Burwell,*
  824 F.3d 1062 (D.C. Cir. 2016) ................................................................ 8

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.,*
  57 F.3d 1317 (4th Cir. 1995)................................................................... 21

*Triple 7, Inc. v. Intervet, Inc.,*
  338 F. Supp. 2d 1082 (D. Neb. 2004) ..................................................... 34

*United States v. Dentsply Int'l, Inc.,*
  399 F.3d 181 (3d Cir. 2005) .............................................................. 19, 20

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966) ............................................................................... 31

Case 1:22-cv-00828-TDS-JEP   Document 78   Filed 12/22/22   Page 6 of 46

*Volm v. Legacy Health Sys.*,
    237 F. Supp. 2d 1166 (D. Or. 2002)  ............................................................  34

*Woods v. Gerber Life Ins. Co.*,
    536 F. Supp. 3d 15 (M.D.N.C. 2021)  ........................................................  12

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)  ....................................................  15, 16, 19, 21

## Statutes & Rules

15 U.S.C. § 1 ....................................................................................  1, 14, 28

15 U.S.C. § 2 ....................................................................................  1, 14, 28

15 U.S.C. § 14 ..................................................................................  1, 14, 28

15 U.S.C. § 45 ....................................................................................*passim*

21 U.S.C. § 355(j)(2)(A) ................................................................................  8

40 C.F.R. § 152.113  .....................................................................................  8

Fed. R. Civ. P. 9(b)  ...................................................................................  34

Fed. R. Civ. P. 12(b)(6) ..........................................................................  1, 12

Iowa Code § 714.16(1)(n)  .........................................................................  35

## Other Authorities

*Ciba-Geigy Ltd.*, 62 Fed. Reg. 409 (FTC Jan. 3, 1997) ....................................  33

FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition*
    *Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022) .......5

H.R. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914) ..........................................  18

*In re Novartis AG*,
    (FTC No. 001-0082) (Nov. 1, 2000)...........................................................  32

FTC, *Statement of Chair Lina M. Khan Joined by Commissioner Rebecca*
    *Kelly Slaughter and Commissioner Alvaro M. Bedoya on the Adoption of*
    *the Statement of Enforcement Policy Regarding Unfair Methods of*
    *Competition Under Section 5 of the FTC Act* (Nov. 10, 2022) ...............  5, 33

*United States v. Bayer AG,*
    83 Fed. Reg. 27652 (DOJ June 13, 2018) ..................................................... 32

*United States v. The Dow Chemical Co.,*
    82 Fed. Reg. 28887 (DOJ June 26, 2017) ..................................................... 32

vii

## NATURE OF THE MATTER

Plaintiffs assert claims under FTC Act § 5, Clayton Act § 3, Sherman Act §§ 1 and 2, and the antitrust and consumer protection laws of ten states. Defendants Syngenta Crop Protection, LLC, Syngenta Crop Protection AG, and Syngenta Corporation (collectively, "Syngenta") move to dismiss under Rule 12(b)(6).[1]

## PRELIMINARY STATEMENT

This lawsuit is premised on the remarkable proposition that reducing prices—without more—is anticompetitive. The FTC and the States advance an unprecedented and unfounded theory that an industry-standard rebate program offering a modest, optional discount to customers to incentivize increased purchases violates the antitrust laws. That theory turns antitrust law on its head, and no court has *ever* endorsed it.

Rebate programs that reduce prices to above-cost levels are permissible as a matter of law, except in narrow circumstances where customers are *forced* to participate by coercive *non*-price features. Nothing of the sort is pleaded or present here. Stripped of its pejorative characterizations and empty labels, the Complaint describes a standard, above-cost rebate program that offers lower prices to incentivize customers of all sizes to purchase more

---

[1] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, citations and footnotes have been omitted.

of a particular product line from Syngenta. This program is entirely lawful. As courts have repeatedly recognized, the only "harm" that such a program could cause is pressuring rivals to compete more vigorously against above-cost prices. This is the essence of legitimate competition. Accordingly, the Complaint fails to allege competitive harm.

If this Complaint is upheld, then virtually any loyalty rebate program could plausibly be alleged to be anticompetitive. That is not the law, and the Court should not create new law that would punish the very conduct—*price cutting*—the antitrust laws are designed to promote.

The Complaint's deficiencies are particularly glaring given that the FTC investigated Syngenta—and obtained nearly unlimited discovery from Syngenta and third parties—for *three* years before filing this lawsuit. If there were any facts that *could* have been pleaded to bolster Plaintiffs' claims, then they *would* have been pleaded.

The Complaint fails for five central reasons.

*First*, because the Complaint alleges nothing more than a typical loyalty rebate program, the applicable legal standard is the well-established "price-cost test," which precludes liability on Plaintiffs' allegations. Under this test, when *price* is the core feature of a loyalty program, courts will not condemn the program, regardless of alleged market power or purported effects, as long as the reduced prices are above cost—and thus not

2

"predatory."  Here, Plaintiffs have not alleged any non-price exclusionary feature of Syngenta's single-product line, short-term loyalty rebate program, nor can they.

The Third Circuit—the circuit with the most experience analyzing loyalty rebate programs—has explained:

> [W]hen pricing predominates over other means of exclusivity, the price-cost test applies.  This is usually the case when a firm uses a single-product loyalty discount or rebate ….  In that situation, an equally efficient competitor can match the loyalty price and … compete on the merits.  More in-depth factual analysis is unnecessary because … 'the balance always tips in favor of allowing above-cost pricing practices' ….  [T]he above-cost pricing … is *per se* legal.

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016). Here, Plaintiffs do not—and cannot—plead that Syngenta's discounted prices are below its costs.  Thus, the legal question presented by this motion is simply:  Is this presumption of "usual" legality overcome by plausible allegations of fact showing that coercive or otherwise exclusionary non-price features of Syngenta's loyalty program "predominate" over price?  The answer is no.

The facts here contrast sharply with the few cases where loyalty programs have been found to be potentially anticompetitive.  Those programs involved multiple *non*-price features that could have coerced customers to comply with the rebate conditions, or could have excluded rivals other than by lowering prices—features such as (i) bundling or tying across multiple

3

product lines, (ii) multi-year purchasing requirements, (iii) punishments for falling below loyalty thresholds (such as termination of supply or forfeiture of accrued but unpaid rebates), or (iv) conditioning rebates on customers blocking all rival suppliers. After three years of discovery by the FTC, the Complaint alleges *no* such features of Syngenta's program that could harm competition, and pleads *no* factual allegations of cognizable harm to competition. In an attempt to evade dismissal, the Complaint asserts in vague, conclusory fashion that Syngenta's program has a coercive effect and that Syngenta behaved coercively on unspecified occasions. But those allegations, which should not be credited, simply signpost the Complaint's fatal omissions.

*Second*, Plaintiffs' claims fail for the independent reason that the Complaint does not show the requisite element of harm to competition. Competing on quality and price can impact competitors, but only conduct causing *anticompetitive* foreclosure can be unlawful. Because Syngenta's rebate program constitutes competition on the merits, its effect on competitors *cannot* be anticompetitive. Indeed, Plaintiffs plead facts showing how the substantial and thriving presence of generic competitors in the market pose a "competitive threat" to Syngenta.

*Third*, the FTC's claim under Section 5 of the FTC Act does not circumvent the well-established law governing loyalty rebate programs. This

4

lawsuit is part of the current FTC's well-publicized agenda to *transform* established antitrust law. The FTC recently announced—in a policy statement it issued *after* filing this lawsuit—its belief that Section 5 grants it sweeping powers.[2] That FTC statement rejects prior bipartisan guidance interpreting Section 5 consistently with long-established Sherman Act precedent. In support of that position, the FTC Chair even criticized the Obama Administration as "abdicat[ing]" its role because it did not attempt to enforce Section 5 in the unprecedented manner asserted now.[3] Whatever authority Section 5 does or does not afford the FTC, Section 5 does *not* upend bedrock antitrust principles, including that antitrust law exists to protect *competition*, not competitors, and that above-cost price-cutting is the essence of competition, as courts have long recognized. This Court should reject the attempt by the FTC to invent a new standard for loyalty rebate programs under Section 5.

*Fourth*, the Complaint should be dismissed for the independent reason that it alleges legally defective product markets. Under black-letter antitrust

---

[2] FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022), *available at* www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf.

[3] *Available at* www.ftc.gov/system/files/ftc_gov/pdf/Section5PolicyStmtKhanSlaughterBedoyaStmt.pdf.

law, claims of anticompetitive exclusion require allegations showing market power within a properly defined product market. A product market is properly defined to reflect commercial realities by embracing "reasonable interchangeable" substitutes in consumer use. The improper market definitions pleaded here—based on a product's "active ingredient" (or "AI") rather than the product's functional usage—are too narrow, because no facts are pleaded excluding pesticides containing different AIs as reasonable substitutes. The Complaint fudges this issue by alleging that pesticides based on the same AI are *closer* substitutes—but that slippery standard is not the legal test. Notably, Plaintiffs' market definitions are significantly narrower than functional definitions used by the FTC itself in matters *involving the same products*.

*Fifth*, the legality of Syngenta's loyalty program under federal antitrust law defeats the claims under the various state antitrust laws, which are generally interpreted consistently with federal law. The two consumer protection claims fail for additional reasons explained below. Alternatively, if the Court dismisses the federal claims, it can decline jurisdiction over the state claims.

## QUESTION PRESENTED

Should the Complaint be dismissed for these five reasons?

6

**A.     The Crop-Protection Industry**

Syngenta researches, discovers, develops, manufactures, and sells pesticides that "dramatically increase" farmers' "crop yields and quality." Compl. ¶¶ 31, 34-35.  Each pesticide combines at least one chemical—the "AI"—with inert components.  *Id.* ¶ 37.  Each AI has a "mode of action" and different AIs that "share a common mode of action tend to have similar use cases"; among different products with similar use cases, products containing the same AI are allegedly "closer" substitutes.  *Id.* ¶ 40.

A "patent and regulatory framework" that "rewards innovation" governs the development and manufacturing of crop-protection products. Compl. ¶ 44.  When an innovator that researches and develops new products (also called a "basic" manufacturer) such as Syngenta invents a new AI, it can apply for 20-year patent protection.  *Id.* ¶¶ 42, 45.  Under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), Environmental Protection Agency (EPA) approval of a new AI grants the inventor "the exclusive right to cite the data it submitted in support of the [AI]" for ten years.  *Id.* ¶¶ 46-47.

---

[4] Plaintiffs' allegations are incomplete, misleading, and often inaccurate.  The well-pleaded facts are nonetheless assumed to be true for this motion.

After an AI's patent and FIFRA exclusivity end, generic manufacturers may sell generic versions of the AI. Compl. ¶ 48. Plaintiffs assert that "generic manufacturers may enter the market with *equivalent* products containing the same [AIs]." *Id.* ¶ 4. But unlike generic pharmaceuticals, for example, generic pesticides do *not* have to prove they are equivalent.[5] Plaintiffs do not—and cannot—allege that generic pesticide manufacturers provide a similar or substitutable value proposition to customers—that is, that generic manufacturers provide the same level of quality and suite of services to consumers that Syngenta provides.

To the contrary, Plaintiffs implicitly concede that the quality and supply availability of generics are *not* equivalent to originator products. Compl. ¶¶ 98, 110, 172 (vaguely alleging that generics have "sufficient" quality and supply availability). Generic products "are generally sold at significantly lower prices," including ███████████████████████ *Id.* ¶¶ 51, 192. The Complaint ignores how Syngenta's value-added services,

_____

[5] *Compare Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1066 (D.C. Cir. 2016) ("To secure FDA approval," a manufacturer must prove "the generic drug is equivalent in all material respects to the pioneer drug.") (citing 21 U.S.C. § 355(j)(2)(A)), *with* 40 C.F.R. § 152.113(b) (EPA requirements that a generic pesticide "and its proposed use are identical or substantially similar to" a registered pesticide and use *or* that any differences "would not significantly increase the risk of unreasonable adverse effects on the environment").

8

higher quality products, and other product advantages contribute to price differences. And the Complaint likewise disregards the broader implications of ███████████████████ on competition among products used by farmers for whom a successful harvest is paramount.

"Traditional" distributors handle about 90% of all U.S. sales of crop protection products, branded and generic, with seven distributors handling over 90% of sales through this channel. Compl. ¶ 49. Distributors sell to retailers "in close proximity to farmers" nationwide. *Id.* Plaintiffs acknowledge that generic manufacturers can "circumven[t]" traditional distributors through "direct sales to local retailers or farmers," but argue that direct sales are generally not "efficien[t]." *Id.* ¶ 50(c).

## B. Syngenta's Loyalty Rebate Program

For decades, Syngenta's loyalty program has offered rebates to distributors and retailers for purchasing Syngenta products containing certain AIs for which the compound patent has expired. Compl. ¶¶ 53, 108. Syngenta adds AIs to this program to compete against generics. *Id.* ¶ 56.

Syngenta's "marketing agreements" with distributors offer the opportunity to receive a year-end rebate that reduces the net price of products containing a certain AI if the distributor meets a negotiated

9

threshold for the purchase or sale of such products.  Compl. ¶¶ 60, 62-63.[6]

Although Plaintiffs rhetorically disparage Syngenta's payments as "exclusion payments" (*see, e.g., id.* ¶ 54), Plaintiffs concede that they are actually "payments in the form of rebates."  *Id.* ¶ 200.[7]  "Distributors profit more from accepting [Syngenta's rebates] than they would from distributing lower-priced generic products in substantial volumes."  *Id.* ¶ 7.

The rebate thresholds and amounts differ "by year, by [AI], and by distributor."  Compl. ¶¶ 63-64.  The thresholds for the AIs at issue are currently in the 90-92% range, and Syngenta has lowered these thresholds over time.  *Id.* ¶¶ 87, 96, 108.  Not all distributors meet their thresholds, but no penalty results; others exceed them, but the rebate level does not increase.  *Id.* ¶¶ 75, 80.

_____

[6] For each AI, the rebate threshold is calculated as follows:

$$\frac{\text{Qualification-eligible products}}{\text{Qualification-eligible products} + \text{Non-Syngenta products}}$$

Compl. ¶ 62.  Eligible products include "Syngenta-branded products and certain non-Syngenta products for which the [AI] is sourced from Syngenta." *Id*.  Other products, including products containing an AI purchased from Syngenta, are "neutral" and count "in neither the numerator nor the denominator."  *Id.*

[7] The FTC Chair has publicly disparaged Syngenta's rebates as "payoffs."  *See* www.ftc.gov/news-events/news/press-releases/2022/09/ftc-state-partners-sue-pesticide-giants-syngenta-corteva-using-illegal-pay-block-scheme-inflate.

The rebate program for retailers is "similar," except retailers earn rebates by choosing to meet the rebate threshold (not under written agreements). Compl. ¶ 66. Retail rebates generally equal "5% of total eligible purchases of covered Syngenta products." *Id.*

Plaintiffs plead no potentially coercive non-price features of Syngenta's loyalty rebate program. No alleged facts show, for example, that (i) Syngenta's marketing agreements contractually obligate distributors to purchase any minimum amount of Syngenta's products or prohibit distributors from dealing with generic competitors; (ii) Syngenta's loyalty rebates involve more than one AI (that is, are "bundled") or more than one year; or (iii) Syngenta threatens or imposes any penalty (such as loss of product supply, forfeiture of accrued rebates) for distributors or retailers who fail to meet the threshold. *See infra* Point I.B.

C.     **Syngenta Products at Issue**

Plaintiffs' allegations focus on three Syngenta AIs: azoxystrobin, mesotrione, and metolachlor (including s-metolachlor). Compl. ¶ 83. Azoxystrobin is a "broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases." *Id.* ¶ 84. Mesotrione and metolachlor are herbicides that protect corn, and metolachlor also protects a variety of other crops. *Id.* ¶¶ 93, 106.

11

Plaintiffs allege that Syngenta added each AI to its rebate program in response to market entry by generics, which have lower prices. Compl. ¶¶ 85-87, 94-96, 107-108. Plaintiffs concede that generic entry "caused Syngenta to reduce prices" of azoxystrobin, mesotrione, and metolachlor products. *Id.* ¶¶ 92, 100, 114.

### D. <u>Supply Agreements Between Syngenta and Corteva</u>

Corteva makes a mixture containing mesotrione, which Syngenta ███████ supplies under an agreement providing that Corteva's product is ████████ under Syngenta's loyalty rebate program. Compl. ¶¶ 101-102, 191-192. Syngenta also is Corteva's ████████ supplier of s-metolachlor under an agreement providing that Corteva's s-metolachlor products are ████████ ████████ under Syngenta's rebate program's threshold calculations. *Id.* ¶ 115.

## <u>LEGAL STANDARDS</u>

A claim should be dismissed under Rule 12(b)(6) when Plaintiffs fail to plead facts sufficient "to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)—including when the well-pleaded allegations of fact do not state a claim that is "plausible on its face." *Woods v. Gerber Life Ins. Co.*, 536 F. Supp. 3d 15, 18 (M.D.N.C. 2021). In assessing plausibility, the court relies "upon its judicial experience and common sense." *Id.* Given "the costs of modern federal antitrust litigation,"

antitrust cases should not proceed "into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Twombly*, 550 U.S. at 558.

A complaint's conclusory factual allegations and legal conclusions are not credited on a motion to dismiss. *Id.* at 556-57; *Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 572-73 (M.D.N.C. 2019). Nor can a plaintiff "rely on bare allegations relating to the conduct of 'all defendants' to hold a defendant liable." *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 505 F. Supp. 3d 570, 581–82 (M.D.N.C. 2020).

## ARGUMENT

## I. The Complaint Fails to State a Federal Antitrust Claim

Plaintiffs' allegations plainly fail to state an antitrust claim under well-established law. The well-pleaded allegations show that under Syngenta's loyalty rebate program, there is no stick, and price is the only carrot. Of course, price *competition* itself can exclude *competitors*, but the antitrust laws prohibit only *anticompetitive* exclusion. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).

We are aware of no case condemning as anticompetitive an above-cost market share rebate program, such as Syngenta's, that lacks coercive non-price features. The FTC's attempt to create such a precedent through this

13

case highlights how radically it seeks to transform settled antitrust law. Indeed, by seeking to enjoin a pure price-cutting practice, this lawsuit seeks to upend rational antitrust law.

## A. The Price-Cost Test Applies to Non-Coercive, Single Product Loyalty Rebates

The gravamen of Plaintiffs' claims under Section 5 of the FTC Act, Section 3 of the Clayton Act, and Sections 1 and 2 of the Sherman Act is the same: Syngenta's loyalty rebate program allegedly constitutes *de facto* exclusive dealing that denies or impedes generic manufacturers access to distributors. *See*, *e.g.*, Compl. ¶ 5 ("Defendants use their loyalty programs to exclude generic manufacturers from the traditional distribution channel"); *id.* ¶ 7 ("Defendants' loyalty programs are designed to hinder the entry and expansion of generic ma[n]ufacturers ….").

Loyalty or "market share" discounts or rebates challenged as *de facto* exclusive dealing are not unlawful on their face but instead are analyzed under the rule of reason. *See, e.g., Eisai*, 821 F.3d at 403 (Sherman Act § 1 and Clayton Act § 3); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (Sherman Act §§ 1 and 2). Where "price is the clearly predominant mechanism of exclusion," the rule of reason standard is applied through the "price-cost test." *Eisai*, 821 F.3d at 409. The principles underlying this test "extend to above-cost discounting or rebate programs,

14

which condition the discounts or rebates on the customer's purchasing of a specified volume or a specified percentage of its requirements from the seller." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012). Failure to satisfy the price-cost test requires that claims based on alleged rebates should be dismissed at the pleading stage. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451-52 (2009) (dismissing claim).

One of the bedrock principles on which the price-cost test rests is that "cutting prices to increase business is 'the very essence of competition.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); *accord, e.g., linkLine*, 555 U.S. at 451. In *Matsushita*, the Supreme Court rejected an attempt "to prove an antitrust conspiracy 'through evidence of rebates and other price-cutting activities.'" *Eastman Kodak*, 504 U.S. at 478 (quoting *Matsushita*, 475 U.S. at 594). The Court explained that "mistaken inferences" in an antitrust case based on price-cutting "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594; *accord, e.g., Brooke Grp.*, 509 U.S. at 226.

The price-cost test is buttressed by the principle that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they

are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("*ARCO*").

On this settled legal foundation, courts have upheld as pro-competitive above-cost market share rebates and discounts that lack coercive non-price features. *See*, *e.g. Eisai*, 821 F.3d at 409; *Concord Boat*, 207 F.3d at 1063; *see also In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 1000 (10th Cir. 2022) (concluding that rebate "payments exemplified vigorous price competition—something we strenuously protect"); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (manufacturer's payments for exclusive distribution "furthered" "the competition-enhancing goals of the antitrust laws").

The test for when a market share rebate or discount *might* be anticompetitive is also well developed:

> [C]ontracts in which discounts are linked to purchase (volume or market share) targets are frequently challenged as *de facto* exclusive dealing arrangements on the grounds that the discounts induce customers to deal exclusively with the firm offering the rebates. However, when price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects.

*ZF Meritor*, 696 F.3d at 275. In *ZF Meritor*, the Third Circuit "join[ed] [its] sister circuits in holding that the price-cost test applies to market-share or

volume rebates offered by suppliers within a single-product market." *Id.* at 275 n.11.

Under the price-cost test, courts first consider "whether the conduct constitutes an exclusive dealing arrangement or simply a pricing practice"—that is, whether "price is the clearly predominant mechanism of exclusion." *Eisai*, 821 F.3d at 408-09. If price predominates, then the rule of reason applies through the price-cost test, under which plaintiffs may succeed only if defendant's prices fall below cost. *Id.* Plaintiffs fail to state a claim as a matter of law because they do not—and cannot—allege facts showing (i) Syngenta's rebate program entails non-price coercion (much less that coercion predominates over pricing) or (ii) Syngenta's post-rebate prices are below cost.

The analysis is no different under Section 5 of the FTC Act. "[W]hile 'unfair competition' [under Section 5] may not be coterminous with 'anticompetitive conduct,' the two concepts are still intimately intertwined." *S.C. State Bd. of Dentistry v. FTC,* 455 F.3d 436, 443 n.7 (4th Cir. 2006). As the FTC has acknowledged, "[w]hile Section 5 may empower the Commission to pursue those activities which offend the 'basic policies of the antitrust laws, we do not believe that power should be used to reshape those policies when they have been clearly expressed and circumscribed." *Gen. Foods Corp.,* 103 F.T.C. 204, 365 (1984). Thus, using Section 5 to condemn conduct

17

that is protected as *procompetitive* under the price-cost test would be directly contrary to the FTC Act's purpose of "protect[ing] society against oppressive anti-competitive conduct." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d. Cir. 1984) (citing H.R. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914)).

## B.    Syngenta's Loyalty Rebates, Which Lack Any Coercive Non-Price Feature, Are "the Very Essence of Competition"

The well-pleaded facts of the Complaint, rid of its rhetoric, show that Syngenta's rebates constitute price competition of the very kind that the Supreme Court sought to protect in *Matsushita*.

Syngenta's rebates offer distributors and retailers lower net prices to incentivize them to purchase more of each Syngenta AI. *See*, *e.g.*, Compl. ¶ 6 (deriding as "exclusion payments" Syngenta's "incentive payments based on [a distributor's] purchases of branded crop-protection products"). The threshold for earning a rebate is market-share based, *see id.* ¶¶ 61, 66, so the incentives exist regardless of the customer's size.

Significantly, Plaintiffs do not—and cannot—plead that Syngenta's loyalty rebates entail any of the non-price coercive features that courts have required before deeming a market share rebate or discount to be potentially anticompetitive:

- Syngenta's rebate program does not "contractually obligat[e] customers to purchase a set percentage of their [product] requirements" from Syngenta.[8]

- Syngenta's rebates are not "conditioned … on purchases across various product lines"[9] and do not involve "tying or bundling with another product."[10]

- Syngenta does not threaten distributors that purchased its competitors' products that they may lose "any unpaid rebates [they had accrued]" or "be cut off from purchasing" Syngenta's products.[11]

- Syngenta's rebate program is not "unilaterally imposed by fiat upon all distributors"[12] and customers are "free to walk away from [Syngenta's] discounts at any time."[13]

---

[8] *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 n.2 (9th Cir. 2010) (distinguishing *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 350 F. App'x 95 (9th Cir. 2009)).

[9] *Eisai*, 821 F.3d at 405.

[10] *Concord Boat*, 207 F.3d at 1062; *see ZF Meritor*, 696 F.3d at 282 (explaining that in *LePage's Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003), the court "held that bundled rebates and discounts offered to major suppliers were designed to and did operate as exclusive dealing arrangements").

[11] *McWane, Inc. v. FTC*, 783 F.3d 814, 820-21 (11th Cir. 2015); *see ZF Meritor*, 696 F.3d at 265, 278 ("compliance with the market penetration targets was mandatory because failing to meet such targets would jeopardize the [customer's] relationships with" the defendant, which could also require "repayment of all contractual savings" under long-term agreements); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (policy under which manufacturer stopped supplying dealers who carried competing manufacturers' products violated § 2).

[12] *McWane*, 783 F.3d at 834.

[13] *Concord Boat*, 207 F.3d at 1063.

19

The only well-pleaded consequence to a distributor or retailer that does not meet Syngenta's rebate threshold for a particular AI is not earning the rebate for that AI that year. This is not illegal or anticompetitive.

The few precedents that have found loyalty programs to be anticompetitive highlight the absence of any similarly coercive features in Syngenta's program. In *McWane*, the manufacturer's mandatory loyalty program compelled exclusivity from distributors to avoid being "cut off" from purchasing the manufacturer's products and forfeiting accrued rebates. 783 F.3d at 821, 834. In *Dentsply*, the manufacturer prohibited dealers from offering competitors' products, backed by threats to "sever access" to not only defendant's competing artificial tooth products, but also its "other dental products." 399 F.3d at 185, 190. *ZF Meritor* involved "restrictive long-term agreements," each a minimum of five years, under which customers failing to meet volume targets for a single year risked forced "repayment of all contractual savings," along with "cancellation of the contract, price increases, and shortages"—so, in practice, "compliance with the market penetration targets was mandatory." 696 F.3d at 265, 277-78, 287. Further, the defendant "forced" its customers to exclude competitors' products from "essential" marketing materials provided to consumers ("data books"), thereby "block[ing]" consumer access to competing products. *Id.* at 264, 277.

Syngenta's loyalty rebate program does not impose any non-price means of exclusivity—much less any that predominates over price. To the contrary, Syngenta's rebates are specific to products containing a particular AI during a single year. Compl. ¶¶ 54, 61, 66. The single-AI feature of Syngenta's rebates undermines Plaintiffs' antitrust claims because "when a firm uses a single-product loyalty discount or rebate to compete with similar products," "pricing [usually] predominates over other means of exclusivity." *Eisai*, 821 F.3d at 409.

The single-year term of the rebates further undermines Plaintiffs' antitrust claims because, as the Fourth Circuit has held, even *express* exclusive dealing agreements—which are *not* at issue here—with a one-year duration are presumptively incapable of harming competition. *See, e.g., R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 391 (M.D.N.C. 2002) ("The Fourth Circuit has held that exclusive contracts terminable after thirty days to one year do not have substantial anticompetitive effects.") (citing *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1326 (4th Cir. 1995)), *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810, 812 (4th Cir. 2003) (affirming "on the reasoning of the district court with one [inapplicable] exception").

In an attempt to save their claims, Plaintiffs improperly employ group pleading and otherwise vague allegations of coercion. Plaintiffs allege, for example, that "Defendants … threaten penalties for disloyalty." Compl. ¶ 7; *see also id.* ¶ 82 ("*Defendants* have retaliated and threatened to retaliate in other ways against distributors that failed to satisfy applicable loyalty thresholds, including by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage."). But Plaintiffs plead no facts showing any such retaliation by *Syngenta*— much less that any distributor's supply issues were connected to the rebate program that Plaintiffs seek to enjoin.

Thus, Plaintiffs' allegations of "penalties" and "retaliation" are useful only in that they identify the deficiencies in the Complaint that Plaintiffs seek to obscure. Plaintiffs' conclusory attempts to cure these deficiencies do not save Plaintiffs' claims. *See Corrigan Sports*, 505 F. Supp. 3d at 582 ("[A] plaintiff cannot rely on bare allegations relating to the conduct of 'all defendants' to hold [a defendant] liable, but must identify specific acts or conduct taken by each defendant to state a claim."); *Covert v. Stryker Corp.*, 2009 WL 2424559, at *10 (M.D.N.C. Aug. 5, 2009) ("[I]t is only by taking care to require allegations that reach the [requisite] level [of specificity] … that we can hope to avoid the potentially enormous expense of discovery in cases with

no reasonably founded hope that the discovery process will reveal relevant evidence to support [the alleged] claim.") (quoting *Twombly*, 550 U.S. at 559).

That Plaintiffs have only vague allegations and group pleading is especially noteworthy here because the FTC investigated Syngenta for *three years* before suing. If there were any facts that supported Plaintiffs' conclusory claims of coercion by Syngenta, those facts surely would have been pleaded in the 91-page Complaint.

In a final effort to muddy the waters, Plaintiffs allege that Syngenta has two agreements under which it ███████ supplies Syngenta AIs (mesotrione and s-metolachlor, respectively) to Corteva for use in products that compete against Syngenta products. Compl. ¶¶ 101-103, 115, 191-192. But there is no showing that either of these (unremarkable) supply agreements has any substantial effect on competition. *See*, *e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 451 (4th Cir. 2011) ("[A]n exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition[.]").

Instead, the Complaint shows that 

Compl. ¶ 191. These facts demonstrate price

competition in action—and undermine Plaintiffs' argument that Syngenta's loyalty program forecloses generic competition. *See infra* Point II.C.

### C. Plaintiffs Have Failed to Plead Harm to Competition

"The antitrust laws were enacted for the protection of competition, not competitors." *ARCO*, 495 U.S. at 338. "To hold that the antitrust laws protect competitors from the loss of profits due to nonpredatory price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Id.*

Plaintiffs argue that Syngenta's rebate program has "impaired the competitiveness of generic competitors" and resulted in generics "exit[ing]" the market or abandoning "plans to enter." Compl. ¶ 157. But Plaintiffs do not plead facts showing *anticompetitive* exclusion of generic competitors, as opposed to the effects of lawful price competition.

And Plaintiffs cannot, as a matter of law, infer exclusion. It is impermissible to infer that a defendant's "superior market share was achieved or maintained by means other than competition on the merits" through non-coercive, above-cost market share discounts that did not entail "tying or bundling with another product." *Concord Boat*, 207 F.3d at 1062. Where, as here, "customers had the ability to switch to competing products [but] simply chose not to do so," it is improper to infer that "the probable effect of [a loyalty rebate program] was to substantially lessen competition in

24

the relevant market, rather than to merely disadvantage rivals." *Eisai*, 821
F.3d at 407-08.

Thus, even crediting Plaintiffs' speculation that generic competitors
would sell more product absent Syngenta's loyalty rebates, such speculation
cannot establish *anticompetitive* foreclosure. *See*, *e.g.*, *NicSand*, 507 F.3d at
455 ("[The plaintiff's] injury does not correspond to any allegedly
anticompetitive effect on the market but rather a truly competitive one.").

Where a customer's choice is incentivized by a lower price, and not
coerced, the resulting effect on competitors is not anticompetitive. Thus, any
potential to foreclose competition is negated where, as here, "[a]ny customer
subject to one of [Syngenta's] market-share [rebate] agreements could choose
at anytime to forego the [rebate] offered by [Syngenta] and purchase from a
generic competitor." *Tyco*, 592 F.3d at 997. "[T]he threat of a lost discount is
a far cry from the anticompetitive conduct at issue in *ZF Meritor* or
*Dentsply*." *Eisai*, 821 F.3d at 407. Absent "the kind of clear-cut harm to
competition that was present" in those cases—mandatory compliance with
threshold targets (*ZF Meritor*) and threats to cut off supply if customers
purchased any products from competitors (*Dentsply*)—Plaintiffs are unable to
demonstrate *anticompetitive* foreclosure. *Id.*

Plaintiffs do not explain why generic competitors do not likewise offer
rebates, or otherwise lower their prices, to make their products more

25

profitable to distributors. If, as Plaintiffs assert, "[d]istributors profit more from accepting [Syngenta's rebates] than they would from distributing lower-priced generic products in substantial volumes" (Compl. ¶ 7), then it is economically rational for distributors not to distribute generics in greater volume if generic manufacturers do not lower their prices to distributors (or increase the quality of their products so they command higher prices when distributors resell them).

Not only have Plaintiffs failed to plead that Syngenta's rebate program entails the type of conduct that could harm competition, but Plaintiffs have affirmatively pleaded facts showing the program has *not* insulated Syngenta from generic competition—thus undermining the essential element of *anticompetitive* foreclosure. *See Eisai*, 821 F.3d at 407.

Specifically, Plaintiffs allege that in 2017—years after Syngenta added mesotrione to its loyalty program (Compl. ¶ 96)—Corteva



*Id.* ¶ 191. The prospect of Corteva ▮▮▮▮▮▮▮▮▮▮ allegedly posed a "competitive threat" to Syngenta that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Compl. ¶¶ 101-102.

If, however, Syngenta's loyalty program foreclosed generic mesotrione competition, then Syngenta could not have been, years later, vulnerable to a

26

███████████████ from the "competitive threat" of ████████████████. Thus, these allegations refute Plaintiffs' vague assertions that, for example, "[t]hrough its loyalty program, each Defendant has substantially impeded generic manufacturers from providing effective competition." *Id.* ¶ 57. Plaintiffs' antitrust claims should be dismissed on this basis alone, because "[w]here, as here, a plaintiff pleads contradictory allegations, those inconsistencies defeat a reasonable inference in the plaintiff's favor." *Davis v. Univ. of N. Carolina at Greensboro*, 2022 WL 3586093, at *8 (M.D.N.C. Aug. 22, 2022) (Schroeder, C.J.).



Similarly, Plaintiffs claim that ██████████████████████████ ██████████████████████████████████████████ ████████████████ Compl. ¶¶ 104, 191-92. But the facts as pleaded by Plaintiffs show otherwise. ██████████████████████████ ████████████████████████████████████████ ████████████████████ (*id.* ¶¶ 101, 191). ████████ ██████████████████████████████████████████ ███████████ (*id.* ¶ 192). Thus, Corteva did *not* use the ██████████████████████████████████████████ ██████████ to change the treatment of its mixture under Syngenta's rebate program, but instead ████████████████████████████ *Id.* ¶ 191. This is precisely how price competition is supposed to work.

27

### D.     <u>Plaintiffs Do Not Plead a Plausible Product Market</u>

Plaintiffs' failure to define a plausible relevant product market is independently fatal to their antitrust claims. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("*Amex*") (Sherman Act § 1); *Kolon Indus.*, 637 F.3d at 441 (Sherman Act § 2); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999) (Clayton Act); *McWane*, 783 F.3d at 828 (FTC Act § 5). Plaintiffs must define a relevant product market even when they "rely exclusively on direct evidence to prove that [the defendant's challenged actions] have caused anticompetitive effects in [a] market," because "[t]o assess this evidence, [plaintiffs] must first define the relevant market." *Amex*, 138 S. Ct. at 2284-85.

Product market definition "depends on whether [a product] is reasonably interchangeable with other products or the extent to which consumers will change their consumption of one product in response to a price change in another." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016). The foremost obligation in market definition is to reflect the commercial realities. *See Amex*, 138 S. Ct. at 2285; *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336-37 (1962). A market pleaded more narrowly than the obvious set of reasonably interchangeable substitutes is not plausible. *E.g. Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

28

Plaintiffs' narrow, AI-specific product markets are implausible because Plaintiffs plead no facts excluding similar AIs with overlapping uses from these markets. Plaintiffs acknowledge that "[AIs] that share a common mode of action tend to have similar use cases." Compl. ¶ 40. Plaintiffs further concede that azoxystrobin is a versatile pesticide "used across all major row crops," and that "other" herbicide AIs are "similar" to each of mesotrione and metolachlor. *Id.* ¶ 150(a)-(c). The existence of functional substitutes requires Plaintiffs to plead facts that justify excluding the substitutes from the alleged product markets. *See, e.g.*, *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (dismissing antitrust claims because the plaintiff did not "allege sufficient facts about other [potentially substitutable products] to make its proposed [single molecule combination] product market plausible").

Plaintiffs fail to meet this pleading requirement. They seek to "differentiate" Syngenta's AIs at issue from the similar AIs—alleging, for example, that azoxystrobin is more versatile and may have "effects not proven in other [AIs]"; mesotrione is "superior" in certain respects; and metolachlor "outperforms" other AIs in other respects. Compl. ¶ 150(a)-(c). But merely claiming that a product has some unique qualities, or that consumers may prefer one product over another, is not sufficient. *See, e.g.*, *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889

29

F.2d 524, 528 (4th Cir. 1989) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically meaningless where the differences are actually a *spectrum* of price and quality differences.") (emphasis in original); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994) ("'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively."); *Glob. Disc. Travel Servs.. LLC v. TWA, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) ("A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network.").

Plaintiffs also attempt to limit their product markets to a single AI on the grounds that Syngenta's AIs are arguably superior in certain respects to *other* AIs. But that is especially implausible given Plaintiffs' allegations implying that Syngenta's AIs are also superior to *generic manufacturers' versions* of Syngenta's AIs. Compl. ¶ 98 (tepidly alleging that generics are "of sufficient quality and supply availability"). Under Plaintiffs' contorted logic, Syngenta's AIs have quality differences from *other* substitutable AIs and those AIs should therefore be *excluded*—but Syngenta's AIs also have quality

30

differences from generic versions of the *same* AIs, and yet those AIs should be *included*. Plaintiffs rest their market definition on a line of logic that directly undermines itself.

Plaintiffs also insist that a generic version of an AI "is a *closer* substitute for a given branded product than is a product containing a different [AI]." Compl. ¶ 40. But the legal standard governing product markets is "reasonable interchangeability" for use by consumers, and under this standard, alleging that there is a relatively "closer substitute" does not establish the outer limits of the market. Indeed, if "closer substitute" were the standard, then there would never be a relevant market that goes beyond identical products—which, of course, is not the case. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.").

The unreasonable narrowness of Plaintiffs' single-AI product markets is confirmed by the FTC's own prior market definitions, including for the *same AIs at issue here*. The FTC stated in a merger proceeding, for example, that the relevant product market for metolachlor is "pre-emergent

31

herbicides." *In re Novartis AG* (FTC No. 001-0082) (Nov. 1, 2000).[14]  The FTC

also stated, in that matter, that Corteva's acetochlor belongs in the same

multiple-AI relevant market as metolachlor:

> Most pre-emergent herbicides used by corn growers to control
> grassy weeds belong to a class of chemicals known as
> acetanilides.  The major [AIs] within this class are metolachlor,
> acetochlor, and dimenthenamid.  These products are used by
> growers because preventing early competition between the
> growing corn and grassy weeds for water and nutrients is
> essential to the economic production of corn. … [F]armers have
> no economic substitutes for acetanilide herbicides.

*Id.*  Here, Plaintiffs neglect to inform the Court that the unidentified AIs they

allege are "similar" to Syngenta's metolachlor include Corteva's acetochlor.

Compl. ¶ 150(c).

Similarly, the FTC—and the U.S. Department of Justice ("DOJ")—have

alleged multi-AI crop protection product markets in other antitrust matters.

*See*, *e.g.*, *United States v. Bayer AG*, 83 Fed. Reg. 27652, 27653 (DOJ June 13,

2018) (analyzing alleged "foundational herbicides" and "nematicidal seed

treatments" product markets); *United States v. The Dow Chemical Co.*, 82

---

[14] *Available at*
[www.ftc.gov/sites/default/files/documents/cases/2000/11/novartanalyis.htm](http://www.ftc.gov/sites/default/files/documents/cases/2000/11/novartanalyis.htm).
The Court may take judicial notice of this document as a "matte[r] of
public record." *Justice 360 v. Stirling*, 42 F.4th 450, 455 (4th Cir. 2022); *see*
*Guthrie v. McClaskey*, 2012 WL 5494457, at *3 (W.D. Va. Nov. 13, 2012)
(courts can take judicial notice of "public records of an administrative body"
on a motion to dismiss) (citing cases).

Fed. Reg. 28887, 28887 (DOJ June 26, 2017) (analyzing alleged "broadleaf herbicides for winter wheat" and "insecticides for chewing pests" product markets); *Ciba-Geigy Ltd.*, 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997) (analysis of alleged "corn herbicides for pre-emergent control of grasses" product market—including metolachlor—and "corn herbicides for post-emergent control of broadleaf weeds" product market).

The difference in the FTC's prior functional markets and its AI-specific markets here does not appear to be based in different facts, but instead in the evolving philosophy of the FTC's Chair, who has charged her predecessors with "abdicat[ing]" their responsibilities to enforce the antitrust laws by interpreting Section 5 in accord with well-established antitrust law. *See supra* n.3. By defining different relevant product markets for the same products in different cases, the FTC is attempting to "gerrymander its way to an antitrust victory." *It's My Party, Inc.*, 811 F.3d at 683.

## II.   The Complaint Fails to State a Claim Under State Law

### A.   The State Law Antitrust Claims Fail

Because the state antitrust statutes at issue are interpreted consistently with federal antitrust law, the state law antitrust claims brought by plaintiff States fail for the same reasons as Plaintiffs' federal claims. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1048 (N.D. Cal. 2021) (Count V ¶ 207); *Epic Games, Inc. v. Apple, Inc.*, 2021 WL 6755197, at

33

*1 (9th Cir. Dec. 8, 2021) (Count V ¶ 208); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1219-20 (10th Cir. 2009) (Count VI); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 765 n.7 (N.D. Ill. 2015) (Count VII); *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317 F.3d 703, 714 (7th Cir. 2003) (Count VIII ¶ 219(b)-(c)); *Chicoine v. Wellmark, Inc.*, 894 N.W.2d 454, 462 (Iowa 2017) (Count IX ¶¶ 221-222); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (Count X); *Triple 7, Inc. v. Intervet, Inc.*, 338 F. Supp. 2d 1082, 1087 (D. Neb. 2004) (Count XI); *Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1174 (D. Or. 2002) (Count XII); *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 601 (S.D. Tex. 2022) (Count XIII); *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 629 (9th Cir. 2018) (Count XIV).

### B. <u>The State Law Consumer Protection Claims Fail</u>

Indiana's consumer protection claim (Count VIII ¶ 219(a)) fails because it does "not distinguish between its allegations of 'incurable deceptive acts' (which require intent) and 'deceptive acts' (which do not)," such that "the entire complaint" is subject to Rule 9(b) but does "not meet its requirements." *McKinney v. State*, 693 N.E.2d 65, 71 (Ind. 1998).

Iowa's consumer protection claim (Count IX ¶¶ 223-224) fails because it does not plead facts showing any fraud or deceptive conduct satisfying Rule 9(b), *Moeller v. Samsung Electronics Am., Inc.*, 2022 WL 4182205, at *4 (S.D.

Iowa Aug. 24, 2022), or any "unfair practic[e]" resulting in "unavoidable injury to consumers" that "is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714.16(1)(n).

## III. Plaintiffs' Group Pleading Fails to State a Claim Against <u>Syngenta Crop Protection AG or Syngenta Corporation</u>

Plaintiffs' allegations do not show that either Syngenta Crop Protection AG or Syngenta Corporation participated in the challenged conduct. As this Court has held:

> In an action against multiple defendants, a complaint must state facts that support a cause of action against each individual defendant. Blanket conclusory allegations as to multiple defendants are insufficient. A plaintiff cannot rely on bare allegations relating to the conduct of "all defendants" to hold a defendant liable.

*Corrigan Sports*, 505 F. Supp. 3d at 582; *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) ("A plaintiff in a[n antitrust] case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.") Plaintiffs do not meet this standard.

Plaintiffs vaguely allege that the Syngenta-affiliated Defendants "each transacts or has transacted business in this District, and each is engaged in the development, manufacture, and sale of crop-protection products." Compl. ¶ 31. But Plaintiffs fail to specify which, if any, of these three Defendants is the subject of any given allegation against "Defendants" or "Syngenta."

35

Indeed, each of the parent companies is mentioned *only* three times in the Complaint. *See id.* ¶¶ 1, 28, 29, 31. Plaintiffs' group pleading does not satisfy Rule 8. *See SD3*, 801 F.3d at 422 ("[I]f [the complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed."); *Corrigan Sports*, 505 F. Supp. 3d at 581-82 ("[A] plaintiff … must identify specific acts or conduct taken by each defendant to state a claim.").

## CONCLUSION

For all these reasons, the Complaint should be dismissed in its entirety. Because the Complaint followed a multi-year FTC investigation, this dismissal should be with prejudice.

Date: December 22, 2022

*/s/ Patrick M. Kane*
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC 27401
Telephone: (336) 378-5200
Facsimile: (336) 378-5400

Paul S. Mishkin*
paul.mishkin@davispolk.com
David B. Toscano*
david.toscano@davispolk.com

36

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC*

## CERTIFICATE OF WORD COUNT

As allowed by the Court's Order of December 22, 2022, (ECF No. 77), I hereby certify that the foregoing document contains 7,726 words, excluding those portions exempted by Local Rule 7.3(d).

/s/ *Patrick M. Kane*
Patrick M. Kane