# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

FEDERAL TRADE COMMISSION,

STATE OF CALIFORNIA,

STATE OF COLORADO,

STATE OF ILLINOIS,

STATE OF INDIANA,

STATE OF IOWA,

STATE OF MINNESOTA,

STATE OF NEBRASKA,

STATE OF OREGON,

STATE OF TENNESSEE,

STATE OF TEXAS,

STATE OF WASHINGTON,

and

STATE OF WISCONSIN,

        Plaintiffs,

    v.

SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION,
SYNGENTA CROP PROTECTION, LLC,

    and

CORTEVA, INC.,

        Defendants.

Case No. 1:22-cv-00828-TDS-JEP

**AMENDED COMPLAINT**

**[PUBLIC REDACTED VERSION OF DOCUMENT FILED UNDER SEAL]**

1

1.      For many years, Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta") and Corteva, Inc. ("Corteva") have unfairly impeded competitors and artificially inflated the prices that U.S. farmers pay for crop-protection products. Defendants do this by deploying a set of so-called "loyalty programs," which are designed to severely limit the availability of lower-priced generic products. Through this scheme, Defendants have suppressed generic competition and maintained monopolies long after their lawful exclusive rights to particular crop-protection products have expired. These unlawful business practices have cost farmers many millions of dollars a year.

2.      Plaintiffs Federal Trade Commission and the states of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin, by and through their Attorneys General, petition this Court pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and applicable state laws to enter permanent injunctions, other equitable relief, and monetary relief against Syngenta and Corteva to undo and prevent their unlawful conduct in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); Section 3 of the Clayton Act, 15 U.S.C. § 14; Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and state competition and consumer protection laws.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 2 of 108

## I. NATURE OF THE CASE

3. Every year, U.S. farmers purchase over ten billion dollars of crop-protection products (also commonly known as agricultural "pesticides"), crucial farm inputs that improve crop yields and food security for everyone in the United States. And every year, U.S. farmers collectively pay many millions of dollars more than they should for these products because of Defendants' so-called "loyalty programs," which function as unlawful exclusionary schemes. Defendants design those programs to exclude and marginalize competitive generic products even after relevant patent and regulatory exclusivity periods expire and thereby to maintain excessive, supracompetitive prices. This law enforcement action seeks to end those "loyalty programs" and restore competition in this vital sector of the economy.

4. Congress has enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition. "Basic" manufacturers like Defendants Syngenta and Corteva initially develop, patent, and register the active ingredients within crop-protection products. They may then exploit the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years. After patent and regulatory exclusivity periods expire, generic manufacturers may enter the market with equivalent products containing the same active ingredients and relying upon the same toxicology and environmental impact data. Unimpeded competition from generic products predictably leads to dramatic

price reductions. This regulatory structure thus incentivizes innovation while encouraging price and other competition—all of which benefits U.S. farmers and consumers.

5. Defendants systematically undermine and frustrate the goals of this system. When exclusivity periods for crop-protection products expire and generic manufacturers threaten to launch lower-priced competing products, Defendants use their loyalty programs to exclude generic manufacturers from the traditional distribution channel, which is a critical link between manufacturers and farmers.

6. Under their respective programs, Defendants offer each participating distributor—collectively constituting over ██ of all sales—substantial payments to exclude or minimize generic manufacturers. Defendants promise the distributor a complex set of incentive payments based on its purchases of branded crop-protection products, paid as one sum at the end of the year ███████████ on one critical condition: the distributor must limit its purchases of comparable generic products to a set percentage share, usually 15% or less, and sometimes as low as 0%. Defendants term this a "rebate" for "loyalty." In substance, however, these are exclusion payments to distributors. Defendants pay a portion of their elevated profits to distributors in exchange for the distributors excluding Defendants' generic competitors, resulting in near-exclusivity for Defendants.

7. Defendants' loyalty programs are designed to hinder the entry and expansion of generic manufacturers, resulting in, among other things, higher prices than would have otherwise prevailed and costing farmers many millions of dollars in

overcharges. Distributors participate in and comply with Defendants' loyalty programs because Defendants both offer rewards for participation and threaten penalties for disloyalty. Distributors profit more from accepting Defendants' exclusion payments than they would from distributing lower-priced generic products in substantial volumes. The loss of these payments can have severe financial consequences for distributors, as can the loss of access to Defendants' products, which each Defendant has threatened in response to perceived disloyalty.

8.     A small number of large distributors dominate the sale of crop-protection products in the United States. ██ of those distributors have participated in Defendants' loyalty programs, accepting exclusion payments in return for severely limiting purchases from generic manufacturers. Each Defendant's scheme almost entirely forecloses generic competitors from efficient distribution of their products, preventing generic competitors from making significant sales to national distributors that collectively account for approximately ██ or more of U.S. crop-protection product sales.

9.     Each Defendant expressly designs its program to maintain its ability to price its products above competitive levels while still retaining large market shares. Defendants thus enjoy outsized profits during the "post-patent" period—when prices would otherwise fall substantially.

10.     Defendants' loyalty programs enable Defendants to maintain high prices and dominant market positions years after exclusivity for an active ingredient has expired. Defendants' schemes have forced generic manufacturers to exit markets

encumbered by loyalty programs or to decide not to enter due to those programs. Even when they offer competitive products, generic manufacturers are relegated to selling limited volumes, often through undesirable, less efficient channels of distribution.

11.     Absent Defendants' unlawful conduct, Defendants would face increased generic competition, which would lead to increased choice and lower prices for American farmers. Farmers would save many millions of dollars each year when paying for essential crop-protection products.

## II.     JURISDICTION

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. § 26, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). This Court's exercise of supplemental jurisdiction over Plaintiffs' state law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

13.     This Court has personal jurisdiction over each Defendant because each has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b). This Court also has personal jurisdiction over each Defendant because each is engaged in substantial activity in North Carolina, pursuant to N.C. Gen. Stat. §1-75.4.

14.     Defendants' general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning

of Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

15.     Defendants are, and at all times relevant herein have been, corporations, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## III.    VENUE

16.     Venue in this District is proper under 15 U.S.C. § 22; Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and 28 U.S.C. §§ 1391(b), (c) and (d). Each Defendant is found, resides, transacts business, and/or has agents in this State and District, and a portion of the affected commerce described herein has been carried out in this State and District.

## IV.    THE PARTIES

17.     Plaintiff Federal Trade Commission ("FTC") is an independent administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq*., with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

18.     Plaintiff State of California is a sovereign state. Rob Bonta is the Attorney General of the State of California, the chief legal officer for the state, and brings this action on behalf of the people of the State of California to protect the state, its general

economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unfair competition.

19. Plaintiff State of Colorado is a sovereign state. Philip J. Weiser is the Attorney General of the State of Colorado, the chief legal officer for the state, and brings this action on behalf of the people of the State of Colorado to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

20. Plaintiff State of Illinois is a sovereign state. Kwame Raoul is the Attorney General of the State of Illinois, the chief legal officer for the state, and brings this action on behalf of the people of the State of Illinois to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The Attorney General also has authority to seek treble damages and civil penalties under state law to compensate those injured and punish and deter those engaged in unlawful conduct.

21.     Plaintiff State of Indiana is a sovereign state. Theodore E. Rokita is the Attorney General of the State of Indiana, the chief legal officer for the state, and brings this action on behalf of the people of the State of Indiana to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

22.     Plaintiff State of Iowa is a sovereign state. Tom Miller is the Attorney General of the State of Iowa, the chief legal officer for the state, and brings this action on behalf of the people of the State of Iowa to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

23.     Plaintiff State of Minnesota is a sovereign state. Keith Ellison is the Attorney General of the State of Minnesota, the chief legal officer for the state, and brings this action on behalf of the people of the State of Minnesota to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 9 of 108

state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

24.     Plaintiff State of Nebraska is a sovereign state. Douglas J. Peterson is the Attorney General of the State of Nebraska, the chief legal officer for the state, and brings this action on behalf of the people of the State of Nebraska to protect the state, its general economy, its state agencies and political subdivisions, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek damages and civil penalties under state law to punish and deter those engaged in unlawful conduct.

25.     Plaintiff State of Oregon is a sovereign state. Ellen F. Rosenblum is the Attorney General of the State of Oregon, the chief legal officer for the state, and brings this action on behalf of the people of the State of Oregon to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

26.     Plaintiff State of Tennessee is a sovereign state. Jonathan Skrmetti is the Attorney General of the State of Tennessee, the chief legal officer for the state, and brings this action on behalf of the people of the State of Tennessee to protect the state, its

general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

27. Plaintiff State of Texas is a sovereign state. Ken Paxton is the Attorney General of the State of Texas, the chief legal officer for the state, and brings this action on behalf of the people of the State of Texas to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

28. Plaintiff State of Washington is a sovereign state. Robert W. Ferguson is the Attorney General of the State of Washington, the chief legal officer for the state, and brings this action in the name of the state, and as *parens patriae* on behalf of the people of the State of Washington for the benefit of the state, and its harmed consumers and businesses. The Attorney General has authority under federal and state law to seek an injunction, disgorgement, equitable remedies, and any other remedy available at law to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek damages on behalf of its state agencies and civil penalties under state law to punish and deter those engaged in unlawful conduct.

29.     Plaintiff State of Wisconsin is a sovereign state. Joshua L. Kaul is the

Attorney General of the State of Wisconsin, the chief legal officer for the state, and

brings this action to protect the state, its general economy, and its residents from

Defendants' unlawful business practices. The Attorney General has authority under

federal and state law to pursue injunctive and other equitable relief to prevent and remedy

the harms caused by anticompetitive conduct. The state also has authority to seek civil

penalties under state law to punish and deter those engaged in unlawful conduct.

30.     The Syngenta Group is a global company based in Switzerland. Defendants

Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection,

LLC are all part of the Syngenta Group and collectively do business as part of a single

enterprise.

31.     Defendant Syngenta Crop Protection AG is a for-profit company

headquartered in Basel, Switzerland and is organized and existing under the laws of

Switzerland. Syngenta Crop Protection AG operates and oversees the Syngenta Group's

global crop protection business. Since in or about May 2021, Syngenta Crop Protection

AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a global

chemical company based in Beijing, China. Syngenta Crop Protection AG's North

American headquarters is located in Greensboro, North Carolina.

32.     Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop

Protection AG and is headquartered in Wilmington, Delaware. It is the Syngenta Group's

top-level business incorporated in the United States. Syngenta Corporation is a

corporation organized and existing under the laws of the State of Delaware. Syngenta Corporation is registered to conduct business in North Carolina.

33. Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Greensboro, North Carolina. Syngenta Crop Protection, LLC operates the Syngenta Group's crop protection business in the United States. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is the successor in interest to Syngenta Crop Protection, Inc. Syngenta Crop Protection, LLC is registered to conduct business in North Carolina.

34. The Syngenta Group operates and holds itself out as an integrated enterprise. It describes itself as "one of the world's leading agriculture innovation companies," with four business units, including Syngenta Crop Protection, headquartered in Switzerland. Syngenta AG, which houses the Syngenta Group's Crop Protection and Seeds business units, describes itself as "a world leading agribusiness," and reports consolidated financial statements for all of its subsidiaries, including Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC.

35. Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC function as a single enterprise, both structurally and operationally. The company has described itself as "███████████████████████████████ ███████████." Syngenta's global management approves the appointment of senior executives for all Syngenta Group companies, including Syngenta Crop Protection, LLC,

and determines what authority is delegated to the local level. For example, Syngenta Crop Protection, LLC cannot settle significant litigation without approval from Syngenta's global management. According to Vern Hawkins—the President of Syngenta Crop Protection, LLC, President of Syngenta Corporation, and North America Regional Director for Crop Protection for the overall Syngenta enterprise—Syngenta has "a global strategy philosophy" and "a local implementation and execution implementation plan."

36.     Syngenta Crop Protection AG has directed, overseen, and approved Syngenta's sales and marketing strategy, ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

37.     Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC each transacts or has transacted business in this District, and each is engaged in the development, manufacture, and sale of crop-protection products.

38.     Corteva, Inc. is a publicly held, for-profit corporation headquartered in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of

E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a corporation organized and existing under the laws of the State of Delaware.

39.     Corteva transacts or has transacted business in this District and is engaged in the development, manufacture, and sale of crop-protection products.

## V.     INDUSTRY BACKGROUND

### A.     Crop-Protection Products

40.     A pesticide is a chemical used to kill or control a "pest"—a disease, weed, insect, or other unwanted organism. The large majority of pesticides sold in the United States are used for crop protection.

41.     Farmers (or "growers") use pesticides to control pests that would otherwise harm their crops. Pesticides used for crop protection are referred to herein as "crop-protection products." Crop-protection products are vitally important inputs for American farmers. Use of effective crop-protection products allows farmers to dramatically increase crop yields and quality, contributing to a stable food supply.

42.     Crop-protection products fall into three main categories: herbicides, which target unwanted plants or weeds; insecticides, which target insect infestations (including nematicides, which target nematodes (roundworms)); and fungicides, which target fungal diseases.

43.     A crop-protection product contains at least one active ingredient, which is the chemical substance that kills or controls the targeted pest. Active ingredients are combined with inert components such as water, adjuvants, surfactants, and in some cases

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 15 of 108

other active ingredients, to formulate finished crop-protection products. Finished crop-protection products that contain only one active ingredient are referred to as "straight goods," while products containing two or more active ingredients are called "mixtures."

44.    An active ingredient may also be sold in "technical grade" or for "manufacturing use," before being formulated into a finished crop-protection product. Active ingredients sold in this form require additional processing before they can be used by farmers in finished crop-protection products.

45.    Several criteria serve to distinguish active ingredients from each other. These include the pest(s) targeted by an active ingredient; the effectiveness of an active ingredient at controlling the targeted pest, which is often measured in terms of crop yield improvements; the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; the stage of the growing cycle at which an active ingredient may be used; and the performance of an active ingredient under prevailing climate and weather conditions.

46.    Each active ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While active ingredients that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or in a given condition. Farmers may prefer one active ingredient over another for various reasons, including the specific performance characteristics of the active ingredient or a farmer's

past success with an active ingredient. As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different active ingredient.

### B. Crop-Protection Product Manufacturers

47.     Crop-protection product manufacturers create, market, and sell crop-protection products. They may synthesize the active ingredients for their formulated products in their own facilities or purchase the active ingredients from other chemical manufacturers.

48.     A crop-protection product manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally. In 2020, Syngenta was the second-largest crop-protection product manufacturer in the United States by revenue, and Corteva was the third-largest.

49.     Generic manufacturers primarily sell crop-protection products containing active ingredients initially developed by others and as to which patent and regulatory exclusive-use periods have expired (sometimes called "post-patent" active ingredients). More than a dozen generic manufacturers sell crop-protection products in the United States.

## C.    The Regulatory Process for Crop-Protection Products

50.    The Congressionally enacted patent and regulatory framework governing crop-protection products rewards innovation by granting the developer of a new active ingredient protection from competition in that active ingredient for a period of years. But the governing legal framework also contains mechanisms intended to facilitate generic entry and price competition when exclusivity periods end.

51.    When a basic manufacturer develops a new active ingredient, it can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

52.    The basic manufacturer also benefits from exclusive rights under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). To ensure the safety of crop-protection products, FIFRA requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") of detailed toxicology and environmental impact data prior to the sale or distribution of any pesticide in the United States.

53.    Following EPA approval of a new active ingredient, the original registrant (generally a basic manufacturer) receives the exclusive right to cite the data it submitted in support of the active ingredient for a baseline period of ten years. This regulatory exclusive-use period often extends beyond the basic manufacturer's patent term and effectively extends the basic manufacturer's right to be the exclusive supplier of products containing that active ingredient.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 18 of 108

54.     When the basic manufacturer's relevant patent and regulatory exclusive-use terms expire, a generic manufacturer may enter the market with crop-protection products containing the same active ingredient. Those products may be generic equivalents of branded crop-protection products or may combine the active ingredient with other active ingredients to create new mixtures. A generic entrant must apply to register its product for sale in the United States under FIFRA, but FIFRA permits generic entrants to rely on data that the original registrant submitted to the EPA. The original registrant, in turn, may be entitled to receive data "compensation" payments from the generic firm, depending on the timing of the generic entrant's reliance on the data. This reflects FIFRA's objective of facilitating generic entry and thus encouraging competition.

## D.     The Traditional Distribution Channel

55.     In general, crop-protection product manufacturers sell to distributors that in turn sell to (and in some cases are integrated with) a much larger number of retail outlets dispersed across the country in close proximity to farmers. This path to market is referred to as the traditional distribution channel, or just the "channel." Sales through the traditional distribution channel account for approximately 90% or more of all sales of crop-protection products in the United States. Just seven distributors account for over 90% of sales through the traditional channel, and thus account for approximately 80% or more of all sales of crop-protection products in the United States.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 19 of 108

56.     Selling through distributors is the most efficient way for a crop-protection product manufacturer to reach farmers.

(a)     Distributors typically offer services and functions such as warehousing, transportation, credit, and marketing.

(b)     Distributors give manufacturers access to a network of retail and farmer customers, and to the logistics networks required to service widely dispersed customers. By selling through a relatively small number of distributors, a crop-protection product manufacturer can reach thousands of retailers, and in turn, hundreds of thousands of farms.

(c)     Distributors provide scale and services that would require substantial investments for a manufacturer to replicate. Crop-protection product manufacturers cannot efficiently compete by circumventing the traditional distribution channel and focusing primarily on direct sales to local retailers or farmers.

**E.     Life Cycle Management of Crop-Protection Products**

57.     Generic crop-protection products are generally sold at significantly lower prices than equivalent branded products. Accordingly, to the extent generic manufacturers are able to gain market access with respect to a given active ingredient, their entry generally sparks price competition and causes the price and sales volume of branded products containing that active ingredient to decline. This in turn causes the associated profits of basic manufacturers to decline.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 20 of 108

58.    In response to actual or expected generic entry with respect to an active ingredient, Defendants have employed "generic defense" strategies (sometimes also referred to as "post-patent" strategies). These strategies are designed to inhibit generic entry after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on the prices and market shares of branded products containing the same active ingredient. For both Syngenta and Corteva, loyalty programs have been a central component of the companies' generic defense strategies.

## VI.    DEFENDANTS' UNLAWFUL CONDUCT

59.    Syngenta and Corteva each operates a so-called "loyalty program" that is designed to severely limit the distribution of—and ultimately, farmers' ability to purchase—competing generic products. Each Defendant designed and administers its loyalty program with the purpose, intent, and expectation that the program will impede generic competition and thereby maintain market prices and branded market share at levels higher than would otherwise prevail, despite the expiration of applicable patent and regulatory exclusive-use terms. Each does so for its own benefit and for the benefit of its distributor partners.

60.    Under its respective loyalty program, each Defendant offers substantial exclusion payments to distributors conditioned on distributors limiting their purchases of generic crop-protection products containing specified post-patent active ingredients. The payments are generally calculated as a percentage of a distributor's total purchases or sales of certain branded crop-protection products containing relevant active ingredients

and are paid in a single sum at the end of the year. Annual exclusion payments to an individual distributor can be ████████████ and the payments are designed to maximize distributor profits at the expense of farmers. Defendants design and operate their programs to make it easier for distributors to avoid passing the payments to retailers and farmers in the form of lower prices.

61.     Defendants' loyalty programs generally allow distributors to deal in a small amount of generic product containing a covered active ingredient, expressed as a percentage of the customer's total purchases or sales of the active ingredient. The amount of generic product that a customer may deal in without forfeiting at least part of the exclusion payment is referred to as "open space" or "head space." The open space for an active ingredient is typically 15% or less of the distributor's total purchases or sales of the active ingredient—*i.e.*, distributors must be 85% (or more) "loyal" to Syngenta or Corteva to obtain exclusion payments.

62.     Defendants typically have added an active ingredient to their existing loyalty programs either shortly before, or upon, the expiration of that active ingredient's patent or FIFRA exclusivity period, or when faced with the threat of generic competition after such expiration.

63.     Defendants' loyalty programs are designed to marginalize generic manufacturers and enable Defendants to retain share while pricing their crop-protection products above competitive levels. As to active ingredients that are the primary focus of this Complaint, each Defendant has substantially achieved these goals. Through its

loyalty program, each Defendant has substantially impeded generic manufacturers from providing effective competition and has maintained prices for crop-protection products above competitive levels.

A.   **Syngenta's Loyalty Program**

64.   Syngenta refers to its loyalty program as the "Key AI" program. Syngenta operates this program with both distributors and retailers.

65.   Syngenta's loyalty program is designed to maintain supracompetitive profits, which Syngenta shares in part with its distributor and retailer partners, at the expense of farmers. Syngenta does this by restricting access to the traditional distribution channel for generic products, and thereby elevating both market prices and Syngenta share. ███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████

██████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████

AMENDED COMPLAINT

66.     Syngenta's Key AI program for distributors is implemented through written marketing agreements with participating distributors. Syngenta Crop Protection, LLC is the Syngenta entity that signs these agreements.

67.     To qualify for an exclusion payment for a given active ingredient in a given market year (running from October 1 through September 30), a distributor must source a certain percentage of its purchases or sales of that active ingredient from Syngenta rather than from generic manufacturers. The specified threshold is usually 85% or more, and it can be as high as 99%, *i.e.*, the open space for generic competition is usually no greater than 15% and can be as low as 1%.

68.     Syngenta calculates a distributor's loyalty performance for a given year as follows: the numerator is the amount of active ingredient contained in "qualification-eligible" products purchased or sold by the distributor in the year. These include Syngenta-branded products and certain non-Syngenta products for which the active ingredient is sourced from Syngenta, either in a finished crop-protection product or as a technical-grade or manufacturing-use active ingredient. The denominator consists of the same qualification-eligible active ingredient amount, plus the amount of non-Syngenta (typically generic) active ingredient purchased or sold by the distributor. In some cases, particularly where another basic manufacturer's product uses Syngenta-sourced active ingredient, Syngenta will treat the product as "neutral" under the Key AI program, counting the corresponding active ingredient amounts in neither the numerator nor the denominator.

69.     By restricting its use of generic products to satisfy the specified loyalty threshold, a distributor is eligible to reap various "special marketing bonuses" (exclusion payments) under its Syngenta marketing agreement. Although these payments differ by year, by active ingredient, and by distributor, and are subject to complex calculations and additional conditions, they generally amount to a high single-digit or greater percentage of the distributor's purchases or sales of eligible Syngenta-branded products during the market year. Thus, a distributor or retailer that makes a single purchase of a single product that causes it to miss an active-ingredient threshold stands to lose exclusion payments associated with many purchases of many products that contain that active ingredient. Syngenta generally makes a single exclusion payment to each distributor at the end of the year.

70.     The active ingredients included in distributor marketing agreements can vary by year and across distributors, as can the associated share thresholds and calculation methods, but generally Syngenta applies similar loyalty thresholds across all distributors.

71.     In addition to its distributor loyalty program, Syngenta also requires retailers to meet loyalty thresholds to receive exclusion payments under its retail Key AI program. The stated intent of this program is to "[r]eward Retailers for their support of Syngenta products where a generic alternative exists," and to "defend[] Syngenta's market share position."

72.     Syngenta's retail Key AI program operates in a manner that is similar to its distributor program, including conditioning additional exclusion payments on the retailer limiting generic purchases of specified active ingredients. The Key AI program generally offers loyal retailers an exclusion payment of 5% of total eligible purchases of covered Syngenta products. Participating retailers accept Syngenta's offers by complying with the terms of the offers, *i.e.*, through performance.

## B.     Corteva's Loyalty Program

73.     Corteva operates two related programs that condition exclusion payments to distributors on meeting loyalty thresholds for specified active ingredients. First, Corteva operates a program known as the "Crops, Range & Pasture and Industrial Vegetation Management (IVM) Loyalty Program" ("CRPIVM Loyalty Program"). The CRPIVM Loyalty Program is implemented through written agreements with participating distributors. Second, Corteva operates a program known as the "Corporate Distributor Offer" (or "Corporate Offer"). The Corporate Offer is implemented through written offers that participating distributors accept by complying with the terms of the offers, *i.e.*, through performance. ████████████████████

████████████████████████████████████

74.     Corteva's loyalty program is designed to a maintain "value," meaning higher prices and profits, for both Corteva and its distributor partners in the face of generic competition. According to one Corteva employee, the "primary objective" of the

loyalty program is to prevent the "value" deterioration associated with generic entry, in other words, to maintain high prices and shares.

75.     To qualify for an exclusion payment for a given active ingredient in a given market year under the CRPIVM Loyalty Program, a distributor must source a certain percentage of its purchases of that active ingredient from Corteva. The specified threshold is generally at least 85%, and up to ████ depending on the active ingredient. In other words, the open space for competing generic products in Corteva's program is generally no greater than 15% and may be as low as ████ The CRPIVM Loyalty Program ███████████████████████████████████████████████ requiring the distributor to reach the minimum loyalty threshold for ██████████████████████████ in order to receive exclusion payments for ███████████████████████████. For most active ingredients, a distributor can also reap a larger payment by meeting a second, higher threshold—as high as ████.

76.     Corteva calculates the distributor's achieved loyalty level by measuring the distributor's purchases of the active ingredient from Corteva as a percentage of the distributor's total purchases of the active ingredient (*i.e.*, units of active ingredient purchased from both Corteva and non-Corteva—typically generic—sources). In some cases, such as where a product containing a given active ingredient is not marketed for use on crops, Corteva will treat a product as "neutral" and exclude it from this calculation.

27                          AMENDED COMPLAINT

77.      Corteva generally makes a single CRPIVM Loyalty Program exclusion payment to distributors at the end of the year. Because exclusion payments under the CRPIVM program are calculated as a percentage of all of the distributor's eligible purchases during the market year, a distributor that makes a single purchase of a single product that causes it to miss an active-ingredient threshold stands to lose exclusion payments associated with many purchases of many products that contain that active ingredient. The percentage that Corteva pays varies by year, by active ingredient, and by threshold level, but generally ranges from ██ to ███ of the distributor's payment-eligible purchases in the year.

78.      Each loyalty offer also typically contains a term ████████████ ██████████████████████████████████████████. To receive payments ██████████████████████ the distributor must continue to meet the relevant loyalty thresholds under the then-current loyalty offer. If a distributor misses the loyalty threshold for any one active ingredient in an offer, it ████████████████████████ for all active ingredients in the relevant offer.

79.      Corteva also █████████████████████████████████████ ████████████ on distributors meeting the CRPIVM Loyalty Program thresholds. Corteva's Corporate Offer covers a broad range of products and a variety of incentives that often total ████████████████ annually in payments to distributors. In addition to active ingredients that are part of Corteva's CRPIVM Loyalty Program, which typically face competition from generic manufacturers, Corteva's Corporate Offer

28                          AMENDED COMPLAINT

includes █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████ .

### C. Operation of and Adherence to Loyalty Programs

80.     For many years, each Defendant has maintained loyalty-program agreements with a group of distributors that collectively comprise approximately ████ or more of all sales of crop-protection products in the United States.

81.     Defendants' agreements with participating distributors have required distributors to meet very high loyalty thresholds for each active ingredient in exchange for exclusion payments—generally 85% or higher. Participating distributors have largely adhered to these thresholds. In exchange, each Defendant has made substantial exclusion payments to participating distributors.

82.     Syngenta has maintained its retail loyalty program with the participation of retailers that account for the vast majority of U.S. crop-protection product sales. ████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████ Syngenta's Key AI program with participating retailers has required retailers to meet very high loyalty thresholds—generally 85% or higher—in exchange for exclusion payments. Participating retailers have largely adhered to these thresholds. In exchange, Syngenta has made substantial exclusion payments to participating retailers.

83.     Each Defendant has structured its loyalty program to promote adherence to loyalty thresholds and thus ensure that the practical effect of the program is to prevent the distribution of generic crop-protection products in substantial volumes. Each Defendant has described exclusion payments as profit-enhancing "rewards" for loyalty performance and support of branded products over generic products. Internal Syngenta planning documents depict its Key AI program as a way to generate "channel profit." This channel profit is contingent on the higher prices achieved through the exclusion of generic competition. And the exclusion payment is not in substance a discount—it is a payment in exchange for exclusivity. As explained by a Syngenta executive, "████████████████ ████████████████████████████████████████████."

84.     Each Defendant enters loyalty-program agreements with substantially all leading distributors, a fact broadly known in the industry. The participation of so many leading distributors gives participating distributors increased confidence that no significant competing distributor will partner closely with low-price generic manufacturers to undercut them. Syngenta and Corteva each promotes this broad participation to distributors, and provides assurances to distributors from time to time that

other distributors are acting within their permitted loyalty open space. One example of Corteva's loyalty program messaging to distributors states that "all channel partners" are adhering as to a covered active ingredient, that Corteva has "always stood with the Channel," and that, in reference to Corteva's generic defense strategy, "[i]f we stay together it won't fail."

85.     Each Defendant further designed its loyalty program to minimize the likelihood that any distributor will undercut other distributors by passing exclusion payments on to farmers during the year in the form of lower transaction prices. Exclusion payments are generally made as a single payment at the end of the year and eligibility and payment calculations are complex, involving multiple products with varying active-ingredient contents. This complexity, uncertainty, and timing reduce the transparency of exclusion payments and make it less likely that a distributor will lower its prices in anticipation of receipt of a future (uncertain) exclusion payment. As one Corteva executive observed, program complexity "isn't necessarily a bad thing" and "[s]ome level of complexity helps customers maintain margins." Corteva has further enhanced distributor incentives by ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████.

86.     Through these and other steps, Defendants have incentivized distributors to exercise extreme caution in dealings with generic manufacturers, lest they risk missing loyalty thresholds, and in some instances, distributors will not purchase from generic

31                                          AMENDED COMPLAINT

manufacturers at all. The consequences of missing a loyalty threshold can be so severe that distributors often have declined to purchase or promote generic products at all, have endeavored to exceed loyalty thresholds by a healthy margin, and have deferred purchases of generic products until the end of the season, in order to minimize the risk of inadvertently missing a loyalty threshold, such as due to late-season returns or shifts in demand.

87.    Defendants have strictly enforced the terms of their loyalty programs. Each Defendant regularly exercises the contractual right to ███████████ which has resulted in withheld exclusion payments and other consequences. Each rarely grants exceptions for missed thresholds without good cause.

88.    Defendants have retaliated and threatened to retaliate in other ways against distributors that failed to satisfy applicable loyalty thresholds, including by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage. For example, according to Syngenta management meeting materials, ███████████████████████████████████████ ███████████████████████████. Syngenta meeting minutes ████████ ████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████. In another example, Corteva ███████████ ███████████████████████████████████████████.

AMENDED COMPLAINT

According to internal Corteva emails, ███████████████████████

██████████████

### D.    Relevant Syngenta Active Ingredients

89.    Syngenta's loyalty program applies to active ingredients that are threatened by generic competition. These include three Syngenta active ingredients that are the primary focus of this Complaint: azoxystrobin, mesotrione, and metolachlor (together with Corteva active ingredients, identified below, "Relevant AIs").

90.    ***Azoxystrobin.*** Azoxystrobin is a broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases. Syngenta touts azoxystrobin as the "largest fungicide in the world"; it has annual global sales of over $1 billion. Sales of crop-protection products containing azoxystrobin in the United States totaled over $285 million in 2020.

91.    Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA expired no later than 2010, and Syngenta's relevant patent protection for azoxystrobin expired in or about 2014.

92.    In or about 2014, Syngenta adopted a post-patent strategy to "aggressively defend [its] azoxystrobin share position while upholding market value." Syngenta projected that if it did not do so, including by deploying loyalty programs, both it and the traditional distribution channel would lose substantial revenues and profits due to downward pricing pressure from generic entry. On the other hand, were Syngenta to

succeed in securing loyalty from a critical mass of the distribution channel, Syngenta projected that azoxystrobin pricing would remain flat for several years before beginning a slower descent. Syngenta anticipated that generic entry would in any event erode Syngenta's azoxystrobin prices and the corresponding "market value" to Syngenta, but that the erosion would be substantially more severe if it did not successfully implement its Key AI loyalty program and other generic countermeasures.

93.    To prevent the effects of unimpeded generic competition, Syngenta added azoxystrobin to its Key AI loyalty program, beginning in or about the 2013-2014 market year, with a 98% share threshold, *i.e.*, 2% open space. The threshold was gradually reduced over time to 92%, *i.e.*, 8% open space, where it stands today. Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin products.

94.    Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of azoxystrobin products and as a result maintained supracompetitive prices for azoxystrobin products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced azoxystrobin products in the United States. Generic azoxystrobin products were priced significantly below Syngenta's existing azoxystrobin crop-protection products. In spite of this, generic manufacturers have struggled to make inroads with distributors.

95.     As a result of the incentives created by Syngenta's loyalty program, major distributors have repeatedly met Syngenta's azoxystrobin loyalty threshold. To meet the threshold, distributors strictly manage their generic azoxystrobin open space under the loyalty program, steer their customers toward Syngenta azoxystrobin products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced azoxystrobin products. Generic manufacturers seeking to sell crop-protection products containing azoxystrobin have found distributors unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

96.     At least two generic manufacturers have exited the market entirely. These two generic manufacturers abandoned azoxystrobin products after failing to achieve market success in the face of constraints imposed by Syngenta's loyalty program. At least one other generic manufacturer decided against introducing an azoxystrobin product because of the lack of market access due to Syngenta's loyalty program. ███████

████████████████████████████████████████

97.     In at least one instance, a generic manufacturer has been hindered in its attempt to market an innovative product containing azoxystrobin. This generic manufacturer sought to combine azoxystrobin with a different fungicide to target a market opportunity presented by particular crop diseases. Distributor customers were unwilling to purchase significant amounts of the product because the inclusion of

azoxystrobin in the product could impact distributors' ability to meet Syngenta's loyalty threshold.

98.     The presence of generic products in the market has caused Syngenta to reduce prices of azoxystrobin products to some degree. But Syngenta's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing azoxystrobin than would prevail in a competitive market.

99.     ***Mesotrione.*** Mesotrione is a widely used corn herbicide. Sales of crop-protection products containing mesotrione in the United States totaled over $740 million in 2020.

100.    Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for mesotrione expired in or about 2008, and Syngenta's exclusive-use period under FIFRA expired no later than 2014.

101.    ██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████

AMENDED COMPLAINT

██████████████████████████████████████████████████

████████████████████████

102.    Among other steps, Syngenta added mesotrione to its Key AI loyalty
program. Mesotrione was first added to the program in or about the 2014-2015 market
year, with a 99% share threshold, *i.e.*, 1% open space. Syngenta gradually lowered the
loyalty threshold over time, arriving at 92% (*i.e.*, 8% open space) for the 2020-21 market
year. Under its loyalty program, Syngenta has made exclusion payments to distributors
and retailers to deter them from marketing significant volumes of competing, lower-
priced generic mesotrione products.

103.    Syngenta's loyalty program has substantially impeded generic
manufacturers from providing effective competition in the sale of mesotrione products. A
generic manufacturer first introduced a mesotrione product in or about 2016. ████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

104.    As a result of the incentives created by Syngenta's loyalty program, major
distributors have repeatedly met Syngenta's mesotrione loyalty threshold. To meet the
threshold, distributors strictly manage their generic mesotrione open space under the
loyalty program and curtail marketing efforts associated with generic mesotrione. Some
distributors have removed generic mesotrione products from their price lists altogether
because of loyalty program considerations. Loyalty-program constraints have thus

AMENDED COMPLAINT

prevented distributors from purchasing more than minimal amounts of generic mesotrione (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

105.     Two generic manufacturers delayed or terminated their planned mesotrione entry due to loyalty-program concerns. A third developed a mixture product containing mesotrione, but dropped the product after the manufacturer was unable to make sufficient sales in the face of Syngenta's loyalty program.

106.     The presence of generic products in the market has caused Syngenta to reduce prices of its mesotrione products to some degree. But Syngenta's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing mesotrione than would prevail in a competitive market.

107.     Following expiration of patent and regulatory exclusivity terms protecting mesotrione, Syngenta faced a threat not only from generic manufacturers, but also from Corteva. A Corteva predecessor company developed a mixture product containing mesotrione and two other active ingredients. ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

AMENDED COMPLAINT

[REDACTED]

108.     Syngenta used its loyalty program to respond to this competitive threat. Specifically, Syngenta leveraged its ability to prevent distributors from purchasing significant quantities of products containing mesotrione from generic sources to obtain and maintain a [REDACTED] supply agreement with Corteva.

109.     Under the Syngenta-Corteva supply agreement, Syngenta is the [REDACTED] supplier of mesotrione that Corteva uses in mixture products, at specified prices. [REDACTED]

[REDACTED]

110.     [REDACTED]

[REDACTED]

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

111.    Syngenta's President of Global Crop Protection, the Chief Executive

Officer of the Syngenta Group, and Syngenta Crop Protection AG's Head of Third Party

Relations ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████. A Syngenta Corporation executive ████████████████

████████████████████████████████.

112.    Together with Defendants' other anticompetitive conduct, the Syngenta-

Corteva ████████ mesotrione supply agreement has harmed competition in the sale of

crop-protection products containing mesotrione.

113.    ***Metolachlor.*** Metolachlor (which term is used herein to refer to both the

original metolachlor compound and the subsequent s-metolachlor variant, each as

described below) is an herbicide used on a wide variety of crops, including corn,

soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and

sugarbeets. Sales of crop-protection products containing metolachlor in the United States

totaled over $470 million in 2020.

114.    The original metolachlor compound was developed, patented, and

registered with the EPA by a Syngenta predecessor company in or about 1976, and

40                        AMENDED COMPLAINT

Syngenta's relevant patent protection for that compound expired in or about 1996. A Syngenta predecessor company also developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor, and by 2001 Syngenta phased out its original metolachlor products and promotional activities in favor of s-metolachlor. Syngenta's relevant patent protection for s-metolachlor expired in or about 2008, and the FIFRA exclusive-use period for s-metolachlor expired no later than 2010. A patent held by Syngenta relating to s-metolachlor manufacturing processes expired in or about July 2016.

115.    In or about the early 2000s, in response to anticipated generic competition on the original form of metolachlor, Syngenta added metolachlor to its Key AI loyalty program, with loyalty thresholds at or above 90% (*i.e.*, 10% open space), and Syngenta's loyalty threshold stands at 90% today. Syngenta counts the original metolachlor and the s-metolachlor variant, which are commonly viewed as largely interchangeable at varying use rates, as a single active ingredient for purposes of its Key AI loyalty program. This means that there is a single loyalty calculation for the two variants, and a distributor that purchases too much original metolachlor from a generic manufacturer (as a proportion of its combined metolachlor and s-metolachlor purchases) risks forfeiting payments associated with Syngenta s-metolachlor products.

116.    Under its loyalty programs, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic metolachlor products.

AMENDED COMPLAINT

117.   Syngenta's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of metolachlor products. As a result of the incentives created by Syngenta's loyalty program, major distributors have repeatedly met Syngenta's metolachlor loyalty threshold. To meet the threshold, distributors strictly manage and allocate their generic metolachlor open space under the loyalty program and steer their customers toward loyalty-compliant metolachlor products, despite customer demand for lower-priced generic products that exceeds the available open space. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic metolachlor, despite generic products being of sufficient quality and supply availability.

118.   Although generic manufacturers introduced products containing original metolachlor in or about 2003, they were unable to achieve significant market success. Other generic manufacturers delayed or canceled introduction of metolachlor products as a result of Syngenta's loyalty program. There has also been more recent entry by generic manufacturers into the sale of crop-protection products containing s-metolachlor. But these manufacturers, too, have been marginalized by Syngenta's loyalty program.

119.   █████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████

42

120.    In at least one instance, a generic manufacturer was thwarted in its attempt to innovate with a product containing metolachlor. The generic manufacturer considered combining metolachlor with a different herbicide to market a new mixture product. The manufacturer decided not to bring the product to market, however, because of concerns that Syngenta's loyalty program would prevent the manufacturer from gaining share in the United States.

121.    The presence of generic products in the market has caused Syngenta to reduce prices of its metolachlor products to some degree. But Syngenta's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing metolachlor than would prevail in a competitive market.

122.    As with mesotrione, Syngenta has maintained an ▮▮▮▮▮▮ agreement with Corteva (and its predecessor DuPont) for the supply of technical-grade and manufacturing-use s-metolachlor used in Corteva-branded products. ▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Syngenta Corporation executive ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This agreement has reduced the incentive for Corteva to challenge Syngenta's loyalty program by sourcing generic metolachlor or s-metolachlor at lower prices and, together with Defendants' other

anticompetitive conduct, has harmed competition in the sale of crop-protection products containing metolachlor.

### E. Relevant Corteva Active Ingredients

123. Corteva's loyalty program applies to active ingredients that are threatened by generic competition. These include three Corteva active ingredients that are the primary focus of this Complaint: rimsulfuron, oxamyl, and acetochlor (together with Syngenta active ingredients, identified above, "Relevant AIs").

124. ***Rimsulfuron.*** Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Sales of crop-protection products containing rimsulfuron in the United States totaled over $100 million in 2020.

125. Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for rimsulfuron expired in or about 2006, and the exclusive-use period under FIFRA expired no later than 2007.

126. Prior to the 2017 Dow-DuPont merger that led to the formation of Corteva, DuPont successfully maintained a very high share of rimsulfuron sales through operation of its own loyalty program.

127. By the time of the merger, Corteva believed that its rimsulfuron business had become vulnerable to lower-priced generic competition. It recognized that competing on price would risk a downward price spiral, so rather than lowering price it placed rimsulfuron in its loyalty program beginning in the 2017-2018 market year.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 44 of 108

128. Corteva's strategy involved maintaining both a high loyalty-program threshold and a price significantly higher than generic prices. Distributors had to meet at least a ▬ rimsulfuron threshold (*i.e.*, ▬ open space) (▬▬▬▬▬ ▬▬▬▬) to qualify for exclusion payments; they could reap higher payments by hitting even higher thresholds. Corteva later modified the operation of its loyalty program as applied to rimsulfuron, including as to the basis for payments made to distributors and applicable loyalty thresholds. The applicable threshold was set at ▬ (*i.e.*, ▬ open space) for the 2021-2022 market year.

129. Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron products.

130. Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of rimsulfuron products. Generic manufacturers have registered rimsulfuron products in the United States, but the marketing efforts of these manufacturers have generally been stifled due to Corteva's loyalty program.

131. As a result of the incentives created by Corteva's loyalty program, major distributors have repeatedly met Corteva's rimsulfuron loyalty thresholds. To do so, distributors carefully manage and allocate their generic rimsulfuron open space under Corteva's loyalty program, with some removing generic rimsulfuron products from their

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 45 of 108

price lists altogether. Generic manufacturers have thus been unable to make significant sales through the traditional distribution channel.

132. At least one generic manufacturer withdrew its rimsulfuron product and others canceled or deferred entry plans. A Corteva employee observed internally that its loyalty program has succeeded despite farmer demand for lower-priced generic products: "We have many growers who put generic on the bid but buy Matrix [Corteva's rimsulfuron brand] because nobody sells generic." In this way, Corteva has been able to achieve its stated generic defense objectives of maintaining volume, preserving margin, and slowing the decline in profits both for itself and for distributors.

133. The presence of generic products in the market has caused Corteva to reduce prices of its rimsulfuron products to some degree. But Corteva's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. One Corteva employee observed that through operation of its loyalty program, "we have been able to hold a significant brand premium over the generics." Corteva's loyalty program has resulted in higher prices for crop-protection products containing rimsulfuron than would prevail in a competitive market.

134. ***Oxamyl.*** Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco. Sales of crop-protection products containing oxamyl in the United States totaled over $30 million in 2020.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 46 of 108

135.    Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for oxamyl expired in or about 1988 and the exclusive-use period under FIFRA expired no later than 1987.

136.    A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva. At the time, oxamyl was not included in Corteva's loyalty program. In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017. Other generic manufacturers followed in or about 2018. Given Corteva's plant outage and the absence of loyalty constraints, generic entrants were at first relatively successful.

137.    Following the 2017 Dow-DuPont merger, a Corteva integration planning team determined that the company's oxamyl business was threatened by generic competition, and planned a generic defense strategy to maintain profit margins and share. Corteva added oxamyl to the new company's loyalty program, with the stated objective of maintaining "the vast majority of share," while still operating at "a price premium to generics (at all levels)." As of the 2018-2019 market year, Corteva set the oxamyl threshold at ▮▮ *i.e.*, ▮▮ open space, with higher exclusion payments available at a ▮▮ threshold, or ▮▮ open space. Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic oxamyl products.

AMENDED COMPLAINT

138.    Corteva's loyalty program has had the intended effect of reversing the initial success of generic manufacturers selling crop-protection products containing oxamyl. Corteva's oxamyl business quickly re-stabilized. Generic sales volumes plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices. Corteva recognized that the potential loss of exclusion payments created a "significant penalty" to ensure that distributors stayed loyal. A Corteva product manager responsible for oxamyl observed that generic competitors had curtailed or limited oxamyl imports and declared the program a success, stating: "[O]ur team truly has done an A+ job blocking generics."

139.    Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of oxamyl products. As a result of the incentives created by Corteva's loyalty program, major distributors have repeatedly met Corteva's oxamyl loyalty threshold. After Corteva placed oxamyl into its loyalty program, in order to meet the threshold distributors began managing their compliance with the oxamyl loyalty threshold, and drastically curtailed their purchases of generic oxamyl. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic oxamyl (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

140.    The presence of generic products in the market has caused Corteva to price its oxamyl products somewhat lower than it otherwise would have, particularly upon Corteva's return to the market following a supply interruption. But with the success of its

loyalty program, Corteva's prices are significantly above prices of equivalent generic products and significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for crop-protection products containing oxamyl than would prevail in a competitive market.

141. *Acetochlor.* Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of crop-protection products containing acetochlor in the United States totaled over $695 million in 2020.

142. The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the U.S. registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties.

143. Relevant patent protection for acetochlor expired in or about 2000, and the exclusive-use period under FIFRA expired no later than 2007.

144. In or about 2017, Corteva (then Dow) received reports that a generic manufacturer was planning to launch an acetochlor product in the United States. Corteva assessed the risk of generic acetochlor competition as potentially affecting two million acres and causing a 10-15% price devaluation across the market.

145. Rather than lower price in response to the perceived new competitive threat, Corteva implemented an acetochlor generic defense strategy. Corteva's strategy documents reflect its intent to use its loyalty program to "keep the channel locked up," to

defend market share while holding the "value" of acetochlor products in the marketplace, and to "battle [the generic] in our core market and push them out" with the help of distributors.

146.    Corteva added acetochlor to its loyalty program for the 2016-2017 market year. Distributors had to purchase ██ of their acetochlor from Corteva ████████ to qualify for exclusion payments and to avoid ████████████████ a distributor could reap higher acetochlor payments by hitting ████. In or about the 2020-2021 market year, Corteva lowered these two acetochlor loyalty thresholds to ███ and ████ respectively. Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic acetochlor products.

147.    Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of acetochlor products. As a result of the incentives created by Corteva's loyalty program, major distributors have repeatedly met Corteva's acetochlor loyalty thresholds. To meet the thresholds, distributors strictly manage compliance with the acetochlor loyalty thresholds, whether by refusing to purchase any acetochlor products from generic manufacturers despite customer demand for the lower-priced products or by purchasing only limited quantities of generic acetochlor products. Loyalty-program constraints have prevented distributors from purchasing more than minimal amounts of generic acetochlor (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

148. Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors. Even though one generic manufacturer offered acetochlor prices substantially below Corteva's prices, major distributors have declined to purchase from the manufacturer as a result of Corteva's loyalty program.

149. Corteva's loyalty program has deterred generic manufacturers from introducing acetochlor products in the United States at all, or from offering innovative new products. This includes one generic firm that has achieved significant success in the sale of acetochlor products overseas, beyond the constraints of Corteva's loyalty program.

150. The presence of generic products in the market has constrained Corteva's pricing of its acetochlor products to a limited degree. But Corteva's prices remain significantly above prices of equivalent generic products and significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for crop-protection products containing acetochlor than would prevail in a competitive market.

## VII.   DEFENDANTS' MARKET AND MONOPOLY POWER

151. At all times relevant to this Complaint, Syngenta has had monopoly and market power with respect to azoxystrobin, mesotrione, and metolachlor, and with respect to crop-protection products containing those Relevant AIs. Both direct and indirect evidence demonstrates Syngenta's monopoly and market power.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 51 of 108

152.    At all times relevant to this Complaint, Corteva has had monopoly and market power with respect to rimsulfuron and oxamyl, and with respect to crop-protection products containing those Relevant AIs. At all times relevant to this Complaint, Corteva has had market power with respect to acetochlor and with respect to crop-protection products containing acetochlor. Both direct and indirect evidence demonstrates Corteva's monopoly and market power.

153.    Direct evidence of each Defendant's monopoly and market power includes each Defendant's ability to price Relevant AIs and crop-protection products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program.

154.    Each Defendant's monopoly and market power is also shown through circumstantial evidence, including dominant or substantial market shares in relevant markets with substantial barriers to entry.

155.    For the purposes of assessing the competitive effects of Defendants' conduct, each relevant market is defined by reference to a Relevant AI. For each of azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor:

(a)    A relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and

AMENDED COMPLAINT

(2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and

(b)     A relevant product market(s) also exists that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.

As to each Relevant AI, allegations herein relating to product markets, including market share and foreclosure allegations, apply to both sets of product markets described above. As used herein, the term "Relevant Market" refers to each of the markets described above.

156.    For each Relevant AI, absent the restraints imposed by Syngenta's or Corteva's loyalty program, as applicable, unconstrained competition from generic crop-protection product manufacturers would have a significant and non-transitory downward effect on prices in the applicable Relevant Market. Syngenta and Corteva each regularly anticipates such price effects and implements its loyalty program to counteract or slow such anticipated price effects.

157.    Each Relevant AI has particular characteristics and uses that differentiate it from other active ingredients.

(a)     *Azoxystrobin.* Azoxystrobin can be used across all major row crops, which simplifies pesticide management. Syngenta also claims that azoxystrobin has growth-enhancing effects not proven in other active ingredients.

(b)     *Mesotrione.* Compared to other, similar herbicide active ingredients, mesotrione has superior efficacy and crop safety, and a low use rate.

(c)     *Metolachlor.* Compared to other, similar herbicide active ingredients, metolachlor has superior water solubility, and so tends to perform better in dry conditions. Metolachlor also outperforms other active ingredients in warmer conditions, is more "crop friendly," and can be used on a broader spectrum of crops.

(d)     *Rimsulfuron.* Compared to other, similar herbicide active ingredients, rimsulfuron can be used on a broader range of crops, controls a wider spectrum of weeds, can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate. Further, rimsulfuron is inexpensive to produce compared to other, similar herbicide active ingredients.

(e)     *Oxamyl.* Oxamyl products can be sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil. Oxamyl is also safer for crops and better for soil health than other, similar insecticide active ingredients.

(f)     *Acetochlor.* Compared to other similar, herbicide active ingredients, acetochlor tends to perform better in wetter and cooler conditions. Acetochlor also tends to have better weed control early in the growing season and is more effective against certain weed species.

158. For each Relevant AI, other active ingredients are not close enough substitutes to prevent Syngenta or Corteva, as applicable, from maintaining prices of crop-protection products containing the Relevant AI above competitive levels.

159. The relevant geographic market as to all products is the United States. Crop-protection products are largely sold and regulated on a nationwide basis. Because the EPA must approve and register all crop-protection products prior to sale or distribution in the United States, United States farmers may not lawfully use crop-protection products manufactured and labeled for use outside the United States.

160. There are substantial barriers to entry into each Relevant Market. Entry is difficult, costly, and time-consuming. Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers. Those barriers include obtaining registration from the EPA, developing manufacturing processes and sourcing active ingredient, and paying data compensation costs to the initial active ingredient registrant. Syngenta's and Corteva's use of loyalty programs also imposes a substantial barrier to entry by, among other things, limiting generic manufacturers' access to the traditional distribution channel.

161. Syngenta has maintained dominant shares of the U.S. Relevant Markets for azoxystrobin, mesotrione, and metolachlor. Each year from at least 2017 through 2020, Syngenta's share of sales in each of these markets exceeded 70%.

AMENDED COMPLAINT

162.    Corteva has maintained dominant shares of the U.S. Relevant Markets for rimsulfuron and oxamyl. Each year from at least 2017 through 2020, Corteva's share of sales in each of these markets exceeded 70%.

163.    Corteva has maintained a substantial share of the U.S. Relevant Market for acetochlor. Each year from at least 2017 through 2020, Corteva's share of sales in that market exceeded 40%. Bayer, ███████████████████████ ███████████████ accounts for roughly 50% of sales in the Relevant Market. Bayer imposes limited constraints on Corteva's pricing of acetochlor products compared to generic manufacturers, and Bayer's presence in the market has not prevented Corteva from maintaining prices of crop-protection products containing acetochlor above competitive levels.

## VIII.   EACH DEFENDANT'S CONDUCT HAS HARMED COMPETITION AND CONSUMERS

164.    Through operation of its so-called "loyalty program," each Defendant has harmed competition and consumers. Each Defendant has also harmed competition through other anticompetitive conduct deployed in conjunction with loyalty programs, including Defendants' ██████ supply agreements with each other and actual or threatened retaliation against distributors that do not meet the terms of their respective loyalty programs. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from the applicable Relevant Markets, has caused generic competitors to exit the applicable Relevant Markets or to abandon plans to enter,

and has significantly impaired the competitiveness of generic competitors even when they have been able to enter. Each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and farmer choice in the applicable Relevant Markets.

165.    Each Defendant's anticompetitive conduct may substantially lessen competition or tend to create or maintain monopolies in the Relevant Markets.

166.    Each Defendant's anticompetitive conduct has harmed competition and end-consumers—farmers—both within and outside the applicable Relevant Markets.

167.    Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

168.    Each Defendant's unlawful conduct is ongoing. Each Defendant continues to operate its loyalty program, including by enforcing loyalty thresholds and making exclusion payments to distributors and retailers for meeting these thresholds and thus excluding generic competition. Absent injunctive relief by this Court, each Defendant is likely to continue to harm competition and the public interest.

A.    **Each Defendant's Unlawful Conduct Has Substantially Foreclosed Generic Manufacturers From Each Applicable Relevant Market**

169.    A seller can harm competition and consumers in circumstances such as those present here by foreclosing actual or potential competitors from access to

distribution services, or by foreclosing actual or potential competitors from access to efficient distribution services.

170.    The most efficient channel of distribution for each Relevant Market is the traditional distribution channel. Each Defendant's so-called "loyalty program" has almost entirely foreclosed generic manufacturers from access to the traditional channel. With respect to each Relevant Market, this exclusion of generic competitors from the traditional channel has harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, lower-cost distribution.

171.    By excluding generic competitors from the traditional channel, each Defendant's loyalty program has foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all crop-protection product sales are made through the traditional channel (over 90%), a high proportion of the traditional channel participates in Defendants' loyalty programs (over ▮%), and Defendants' loyalty programs have high market share thresholds (over 85%). Thus, each Defendant's program has effectively foreclosed generic competitors from approximately ▮% or more of each applicable Relevant Market.

172.    The market foreclosure created by Defendants' loyalty programs has been of substantial duration. Loyalty requirements for each Relevant AI have been in place—with nearly complete distributor compliance—since at least 2017, and in most cases longer. Generic manufacturers of crop-protection products containing the applicable

Relevant AIs have been substantially foreclosed from the Relevant Markets for five years or more.

173. A seller's program of offering and providing exclusion payments to distributors can foreclose equally efficient competitors from the market and harm competition in circumstances such as those present here. This is true even when distributors do not agree or otherwise commit, in advance, to meet the share threshold that the seller specifies as a condition to payment. The prospect of receiving a payment— as well as the prospect of other profit opportunities associated with the market-wide exclusion of generics—can, in circumstances such as those present here, serve as a sufficient incentive to induce distributors to participate in the program and to limit or forgo purchases from competitors. Distributors adhere to Defendants' loyalty-program thresholds in significant part due to the prospect of receiving substantial payments under the programs. In addition, structural features of each Defendant's loyalty program promote adherence. These include the spreading of exclusion payments (and the risk of losing those payments) (1) over an extended period of time, with a single, conditional, "all units" payment occurring at the end of the year ████████████████, and (2) across multiple crop-protection products containing the same active ingredient ██ ███████████████. If a distributor makes a purchase or sale of generic product that causes it to miss the loyalty threshold for a given active ingredient, it risks incurring a disproportionately large financial loss, calculated as a percentage of all eligible transactions for the year, including past transactions ████████████████.

AMENDED COMPLAINT

████████████████, transactions involving other products, ███████

███████████████████████████████████. Taken together

with Defendants' strict enforcement efforts, these features of Defendants' loyalty

programs incentivize distributors to meet applicable loyalty thresholds by forgoing or

severely limiting purchases from generic manufacturers. Distributors' incentive to

comply with loyalty-program thresholds is enhanced by the fact that substantially all

major distributors participate in the programs. Distributors profit more when prices to

retailers and farmers are higher, and the distributors' collective participation in the

loyalty programs has the effect of maintaining higher prices to retailers and farmers.

174.    A seller's program of offering and providing exclusion payments to

distributors can benefit the participating distributors and harm end-consumers, including

by enabling distributors to retain exclusion payments, in circumstances such as those

present here. There are several scenarios in which distributors will not pass on exclusion

payments to end-consumers. There are also various means by which a seller can—and

each Defendant does—discourage distributors from passing on exclusion payments to

end-consumers.

175.    Defendants and distributors recognize that loyalty-program complexity,

lack of transparency to farmers and generic manufacturers, and deferred payment timing

cause distributors to be more likely to retain exclusion payments as profit, and less likely

to pass them on to farmers in the form of reduced downstream pricing.

176. A seller's program of offering and providing exclusion payments to distributors can, in circumstances such as those present here, exclude equally efficient competitors from the market and harm competition even when the seller's net price for the product, after accounting for the payments, is not below the seller's cost of producing the product.

177. As a result of Syngenta's and Corteva's respective loyalty programs, distributors have severely limited their purchase, promotion, and sale of generic crop-protection products containing each applicable Relevant AI. To meet applicable loyalty thresholds, distributors have omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward branded products.

178. As a result of Syngenta's and Corteva's respective loyalty programs, distributors have declined to buy more than minimal amounts of crop-protection products containing each applicable Relevant AI from generic manufacturers even though (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (3) absent Defendants' loyalty programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under Defendants' respective loyalty programs. This unwillingness is caused by the limited open space available under the applicable Syngenta or Corteva loyalty program. According to one generic manufacturer, this dynamic is so well established in the industry that it is futile to even approach a large

Amended Complaint

distributor that is subject to loyalty requirements. In contrast, when selling products containing active ingredients that are not subject to loyalty programs, generic manufacturers are able to make all or nearly all of their sales through traditional-channel distributors.

179.    With respect to each Relevant AI, in the absence of the applicable Syngenta or Corteva loyalty program, generic manufacturers would make significantly more sales to distributors, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit American farmers.

180.    In the absence of Defendants' respective loyalty programs, sales of generic crop-protection products containing active ingredients subject to the programs, including each Relevant AI, would be significantly higher and would exceed the open space allowed by the programs. American farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

181.    In the applicable Relevant Markets (azoxystrobin, mesotrione, and metolachlor), Syngenta has added an additional layer of foreclosure to that created by its distributor program through its retail loyalty program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

## B. Each Defendant's Unlawful Conduct Has Prevented Generic Entry and Expansion and Caused Generic Exit

182.    Each Defendant's so-called "loyalty program" has prevented, delayed, and diminished entry and expansion by generic manufacturers of crop-protection products containing applicable Relevant AIs, and caused generic exit as to products containing applicable Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

183.    Multiple generic manufacturers that have assessed the competitive landscape and evaluated whether to enter a particular Relevant Market have concluded that entry is not economically feasible due to the artificial constraints created by applicable Syngenta or Corteva loyalty programs.

184.    In some cases, Syngenta's or Corteva's loyalty program has caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product, or to stop offering a product containing the Relevant AI.

185.    In the absence of Defendants' respective loyalty programs, generic manufacturers would compete more effectively and compete for more sales in each Relevant Market.

## C. Each Defendant's Unlawful Conduct Has Resulted in Fewer Innovative Products

186.    Each Defendant's so-called "loyalty program" has reduced the ability and incentive of generic manufacturers to bring new differentiated crop-protection products

containing applicable Relevant AIs to market, harming innovation and restricting farmer choice.

187.    Generic manufacturers often create new active-ingredient mixtures or other new offerings that meet farmer needs. Generic manufacturers also often innovate on the non-active-ingredient components of crop-protection product sales in ways that are beneficial to farmers.

188.    Because of the barriers to entry created by Syngenta's and Corteva's respective loyalty programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs. For the same reason, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using active ingredients that are subject to either Defendant's loyalty program.

189.    In the absence of Defendants' respective loyalty programs, there would be more innovative products from generic manufacturers in the applicable Relevant Markets, leading to more farmer choice.

### D.    Each Defendant's Unlawful Conduct Has Resulted in Supracompetitive Prices

190.    Each Defendant's so-called "loyalty program" has resulted in higher prices to retailers and farmers for crop-protection products containing applicable Relevant AIs than would prevail in competitive markets. Each Defendant's anticompetitive conduct has thwarted the downward pressure that generic manufacturers' entry and expansion

with access to efficient distribution would otherwise impose on prices in markets for crop-protection products containing applicable Relevant AIs.

191.    Generic crop-protection products are generally priced lower than branded equivalents, and as to each Relevant AI, farmers pay more for crop-protection products containing the active ingredient because the applicable loyalty program artificially limits the availability of lower-priced generic alternatives. In many cases, farmers buy the more expensive, branded product because that is what is available and/or what is promoted by the traditional distribution channel, and not because that is what they prefer. Defendants' loyalty programs thus result in unmet and unrealized demand for lower-priced equivalent generic products.

192.    When generic manufacturers are able to access the market for an active ingredient, they put downward pressure on the prices of branded products containing that active ingredient, and they exert more pressure the more access they achieve. This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the active ingredient, including higher-end mixture products. Defendants' loyalty programs, however, inhibit generic manufacturers' ability to access relevant markets and thus limit downward pricing pressure from generic competition.

193.    Even where generic manufacturers enter and sell at low prices to distributors, Defendants' loyalty programs result in higher prices to farmers by limiting the amount of available generic product. This in turn enables distributors or retailers to

price generic products just under branded products and to maintain branded prices, thus preventing the full benefits of generic price competition from flowing to farmers.

194.    Syngenta and Corteva each regularly forecasts in planning documents and communications with distributors that successful loyalty-program implementation will lead to higher prices for crop-protection products containing affected active ingredients, to each of their own benefit and the benefit of distributors, by reducing the downward price effect of generic entry.

195.    Syngenta and Corteva each regularly makes backward-looking assessments concluding that successful loyalty-program implementation has curtailed generic entry and sustained higher prices than would otherwise prevail.

196.    ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████

197. 

198.

199. Corteva has also recognized the effects of its loyalty program on prices of covered crop-protection products. An internal Corteva analysis concluded that its loyalty

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 67 of 108

program was "best in class for generic defense," effective because it "[d]elays erosion in price and volume" for products subject to generic competition.

200. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████

201. In countries where loyalty programs for crop-protection products do not exist, generic manufacturers have been able to compete more effectively and farmers pay correspondingly lower prices.

202. Even where generic manufacturers have been able over time to enter a given Relevant Market and have provided some measure of price competition, Defendants' loyalty programs have limited the effects of this competition. Defendants' respective price responses, and responses of prices more generally in the applicable Relevant Market, have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

## COUNT I

## UNFAIR METHODS OF COMPETITION
## IN VIOLATION OF SECTION 5 OF THE FTC ACT (15 U.S.C. § 45(a))

203.     Plaintiff FTC re-alleges and incorporates by reference the allegations in all of the paragraphs above.

204.     Each Defendant's course of conduct as alleged herein—including (i) entering and maintaining agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms; (ii) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty; and (iii) entering agreements with each other for the supply of mesotrione and metolachlor—constitutes an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

## UNLAWFUL CONDITIONING OF PAYMENTS
## IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

205.     Plaintiffs re-allege and incorporate by reference the allegations in all of the paragraphs above.

206.     Each Defendant has provided payments in the form of rebates in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with "loyalty" terms. This conduct may substantially lessen competition or tend to create monopolies in each applicable Relevant Market, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

## COUNT III

### UNREASONABLE RESTRAINTS OF TRADE
### IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

207. State Plaintiffs re-allege and incorporate by reference the allegations in all of the paragraphs above.

208. Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms, and Defendants' agreements with each other for the supply of mesotrione and metolachlor, are unreasonable restraints of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT IV

### UNLAWFUL MONOPOLIZATION
### IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

209. State Plaintiffs re-allege and incorporate by reference the allegations in all of the paragraphs above.

210. At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione. At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron and oxamyl.

211. Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct—including (i) entering and maintaining agreements with distributors and retailers that contain loyalty requirements; (ii) enforcing

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 70 of 108

and threatening enforcement of loyalty requirements or otherwise threatening penalties for disloyalty; and (iii) in the case of mesotrione and metolachlor, entering agreements with each other for the supply of mesotrione and metolachlor—in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT V

## VIOLATIONS OF CALIFORNIA STATE LAW

212.　Plaintiff State of California re-alleges and incorporates by reference the allegations in all of the paragraphs above.

213.　With respect to each Defendant, many hundreds of farmers in California have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

214.　Defendants' agreements constitute anticompetitive contracts, agreements, and arrangements in violation of California's Cartwright Act, California Business and Professions Code § 16700 *et seq*., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

215.　Defendants' agreements with distributors and downstream purchasers constitute anticompetitive contracts, agreements, and arrangements in violation of California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq*., which prohibits any unlawful, unfair, or fraudulent business act or practice.

216.    Plaintiff State of California is entitled to an injunction, disgorgement, equitable remedies, and any other remedy available at law for these violations, including, without limitation, the following:

(a)    Injunctive and equitable relief in the form of disgorgement of Defendants' ill-gotten gains under the Cartwright Act (Cal. Bus. & Prof. Code § 16750, *et seq.*);

(b)    Injunctive, restitution and other equitable relief under the UCL (Cal. Bus. & Prof. Code § 17203);

(c)    Civil penalties assessed at up to $2,500 for each violation of the UCL (Cal. Bus. & Prof. Code § 17206); and

(d)    Costs of suit, including reasonable attorney's fees, and such other relief as may be just and equitable (Cal. Bus. & Prof. Code §§ 16750, 16754, 16754.5, and 16760).

## COUNT VI

## VIOLATIONS OF THE COLORADO ANTITRUST ACT (C.R.S. § 6-4-104-105)

## A. ILLEGAL RESTRAINT OF TRADE (C.R.S. § 6-4-104)

217.    Plaintiff State of Colorado re-alleges and incorporates by reference the allegations in all of the paragraphs above.

218.    The acts alleged above constitute illegal restraints of trade or commerce in Colorado pursuant to the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-104.

219. With respect to each Defendant, many hundreds of farmers in Colorado have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

220. Colorado seeks all remedies available under federal law or the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-101, *et seq*., including, without limitation, the following:

(a) Injunctive and other equitable relief, including restitution in the form of disgorgement, pursuant to Colo. Rev. Stat. § 6-4-111(1) and Colorado common law;

(b) Civil penalties pursuant to Colo. Rev. Stat. § 6-4-112(1) which provides that the Court may impose civil penalties in an amount up to "two hundred fifty thousand dollars for each such violation";

(c) Costs and attorney's fees pursuant to Colo. Rev. Stat. § 6-4-111(4); and

(d) Other remedies as the court may deem appropriate under the facts and circumstances of the case.

221. Colorado does not seek damages on behalf of any governmental or public entity.

## B. UNLAWFUL MONOPOLY MAINTENANCE (C.R.S. § 6-4-105)

222.    Plaintiff State of Colorado re-alleges and incorporates by reference the allegations in all of the paragraphs above.

223.    The acts alleged above constitute unlawful monopoly or attempt to monopolize trade or commerce in Colorado pursuant to the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-105.

224.    With respect to each Defendant, many hundreds of farmers in Colorado have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

225.    Colorado seeks all remedies available under federal law or the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-101, *et seq*., including, without limitation, the following:

    (a)    Injunctive and other equitable relief, including restitution in the form of disgorgement, pursuant to Colo. Rev. Stat. § 6-4-111(1) and Colorado common law;

    (b)    Civil penalties pursuant to Colo. Rev. Stat. § 6-4-112(1) which provides that the Court may impose civil penalties in an amount up to "two hundred fifty thousand dollars for each such violation";

    (c)    Costs and attorney's fees pursuant to Colo. Rev. Stat. § 6-4-111(4); and

(d)  Other remedies as the court may deem appropriate under the facts

and circumstances of the case.

226.  Colorado does not seek damages on behalf of any governmental or public

entity.

**COUNT VII**

**VIOLATIONS OF THE ILLINOIS ANTITRUST ACT**

227.  Plaintiff State of Illinois re-alleges and incorporates by reference the

allegations in all of the paragraphs above.

(a)  Defendants' agreements with distributors and retailers, as alleged

herein, for the sale of crop-protection products that condition exclusion payments

on compliance with "loyalty" terms and Defendants' agreements with each other

for the supply of mesotrione and metolachlor are unreasonable restraints of trade

or commerce in violations of 740 ILCS 10/3(2).

(b)  Defendants' conduct as alleged herein was done with the purpose of

maintaining monopoly power over a substantial part of trade of commerce of

Illinois in Relevant Markets for azoxystrobin, metolachlor, mesotrione,

rimsulfuron, and oxamyl, in violation of the Illinois Antitrust Act, 740 ILCS

10/3(3).

(c)  With respect to each Defendant, many hundreds of farmers in

Illinois have purchased the Defendant's crop-protection products containing

applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

(d)     Each Defendant has provided rebates, as alleged herein, in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with "loyalty" terms, resulting in a substantial lessening of competition and tending to create monopolies in Relevant Markets for azoxystrobin, metolachlor, mesotrione, rimsulfuron, and oxamyl, as applicable, in violation of the Illinois Antitrust Act 740 ILCS 10/3(4).

(e)     Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS 10/7, seeks relief, including but not limited to treble damages, for Illinois consumers and Illinois state entities that paid for one or more products containing one or more of the active ingredients identified in this Complaint during the relevant period, and thereby paid more than they would have paid but for Defendants' unlawful conduct. Plaintiff State of Illinois also seeks, and is entitled to, injunctive relief, civil penalties, other equitable relief (including equitable monetary relief), fees and costs, and any other remedy available for these violations under sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act. 740 ILCS 10/1 *et seq*.

**COUNT VIII**

**VIOLATIONS OF INDIANA STATE LAW**

228.     Plaintiff State of Indiana re-alleges and incorporates by reference the allegations in all of the paragraphs above.

(a)     The acts, omissions, or practices alleged in the Complaint constitute violations of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*

i.     The acts, omissions, or practices alleged in the Complaint occurred in connection with consumer transactions within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

ii.     With respect to each Defendant, many hundreds of farmers in Indiana have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

iii.     Defendants are suppliers within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

iv.     The acts, omissions, or practices alleged in the Complaint are unfair, abusive, or deceptive within the meaning of Ind. Code § 24-5-0.5-3(a).

v.     Defendants knowingly committed the acts, omissions, or practices alleged in the Complaint.

vi.    Indiana seeks all remedies available under the Indiana

Deceptive Consumer Sales Act including, without limitation, the following:

1.    Civil penalties pursuant to Ind. Code § 24-5-0.5-4(g)

for knowing violations of the Indiana Deceptive Consumer Sales

Act.

2.    Disgorgement and restitution pursuant to Ind. Code §

24-5-0.5-4(c)(2);

3.    Injunctive and other equitable relief pursuant to Ind.

Code § 24-5-0.5-4(c)(1);

4.    Costs pursuant to Ind. Code § 24-5-0.5-4(c)(4); and

5.    Other remedies as the Court finds necessary to redress

and prevent recurrence of each Defendant's violations.

(b)    The acts alleged in the Complaint constitute violations of the Indiana

Antitrust Act, Ind. Code § 24-1-2-1.

i.    The acts alleged in the Complaint constitute schemes,

contracts, or combinations in restraint of trade or commerce or are

otherwise illegal under Ind. Code § 24-1-2-1.

ii.    Indiana seeks all relief available under the Indiana Antitrust

Act including, without limitation, the following:

1.    Disgorgement and restitution pursuant to Ind. Code §

24-1-2-5 or common law;

2.　　Injunctive and other equitable relief pursuant to Ind. Code § 24-1-2-5;

3.　　Costs pursuant to Ind. Code § 24-1-2-5; and

4.　　Other remedies as the Court finds necessary to redress and prevent recurrence of each Defendant's violations.

(c)　　The acts alleged in the Complaint also constitute violations of the Indiana Antitrust Act, Ind. Code § 24-1-2-2.

i.　　The acts alleged in the Complaint constitute monopolization of a part of trade or commerce within the state under Ind. Code § 24-1-2-2.

ii.　　Indiana seeks all relief available under the Indiana Antitrust Act including, without limitation, the following:

1.　　Disgorgement and restitution pursuant to Ind. Code § 24-1-2-5;

2.　　Injunctive and other equitable relief pursuant to Ind. Code § 24-1-2-5;

3.　　Costs pursuant to Ind. Code § 24-1-2-5; and

4.　　Other remedies as the Court finds necessary to redress and prevent recurrence of each Defendant's violations.

## COUNT IX

## VIOLATIONS OF IOWA STATE LAW

229. Plaintiff State of Iowa re-alleges and incorporates by reference the allegations in all the paragraphs above.

230. Defendants' conduct violates the Iowa Competition Law, Iowa Code Chapter 553.

231. With respect to each Defendant, many hundreds of farmers in Iowa have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

232. For violations of the Iowa Competition Law, Plaintiff State of Iowa seeks an injunction and all other available relief provided by Iowa Code Chapter 553, including but not limited to relief contained in Iowa Code §§ 553.12 and 553.13.

233. Defendants' conduct constitutes deceptive and unfair practices in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16.

234. For violations of the Iowa Consumer Fraud Act, Plaintiff State of Iowa seeks all available relief provided by Iowa Code § 714.16, including but not limited to relief contained in Iowa Code §§ 714.16(7) and 714.16(11).

AMENDED COMPLAINT

## COUNT X

## VIOLATIONS OF MINNESOTA STATE LAW

### A. UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF MINNESOTA STATUTES SECTION 325D.51

235.    Plaintiff State of Minnesota re-alleges and incorporates by reference the allegations in all of the paragraphs above.

236.    Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms and Defendants' agreements with each other for the supply of mesotrione and metolachlor are unreasonable restraints of trade, in violation of Minnesota Statutes Section 325D.51. Minn. Stat. § 325D.51 ("A contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful.").

237.    Defendants have entered into agreements for the sale of crop-protection products with distributors and retailers in the State of Minnesota that condition exclusion payments on compliance with "loyalty" terms. For example, Defendants have ███████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

238.    Defendants' agreements for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms, wherever created, formed, or entered into, have affected the trade or commerce of the State of Minnesota

AMENDED COMPLAINT

and substantially affected the people of Minnesota. With respect to each Defendant, many hundreds of farmers in Minnesota have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct. Through operation of their so-called "loyalty programs," as alleged above, each Defendant has harmed competition and consumers in the State of Minnesota. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from entering and/or competing within the State of Minnesota, and each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and farmer choice for crop-protection products in the State of Minnesota.

## B. UNLAWFUL MONOPOLY MAINTENANCE AND USE OF MONOPOLY POWER IN VIOLATION OF MINNESOTA STATUTES SECTION 325D.52

239.    Plaintiff State of Minnesota re-alleges and incorporates by reference the allegations in all of the paragraphs above.

240.    At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione. At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron and oxamyl.

241.    Each Defendant has maintained and used its monopoly power through a course of anticompetitive and exclusionary conduct—including (i) entering and maintaining agreements with distributors and retailers, including distributors and retailers

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 82 of 108

in the State of Minnesota, that contain loyalty requirements; (ii) enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties for disloyalty; and (iii) in the case of mesotrione and metolachlor, entering agreements with each other for the supply of mesotrione and metolachlor—in violation of Minnesota Statutes Section 325D.52. Minn. Stat. § 325D.52 ("The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful.").

242.    Each Defendant's monopoly power has affected the trade or commerce of the State of Minnesota and substantially affected the people of Minnesota. With respect to each Defendant, many hundreds of farmers in Minnesota have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct. Through operation of their so-called "loyalty programs," as alleged above, each Defendant has harmed competition and consumers in the State of Minnesota. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from entering and/or competing within the State of Minnesota, and each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and farmer choice for crop-protection products in the State of Minnesota.

AMENDED COMPLAINT

## C. PROHIBITED CONTRACT, COMBINATION, OR CONSPIRACY IN VIOLATION OF MINNESOTA STATUTES SECTION 325D.53

243.    Plaintiff State of Minnesota re-alleges and incorporates by reference the allegations in all of the paragraphs above.

244.    Each Defendant's course of conduct as alleged herein—including (i) entering and maintaining agreements with distributors and retailers, including distributors and retailers in the State of Minnesota, for the sale of crop-protection products that condition exclusion payments on loyalty, (ii) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty, and (iii) entering agreements with each other for the supply of mesotrione and metolachlor—restrain trade, in violation of Minnesota Statutes Section 325D.53. Minn. Stat. § 325D.53, subd. 1(1) ("[T]he following shall be deemed to restrain trade or commerce unreasonably and are unlawful: . . . [a] contract, combination, or conspiracy between two or more persons in competition: (a) for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service; (b) affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service; or (c) allocating or dividing customers or markets, functional or geographical, for any commodity or service."); Minn. Stat. § 325D.53, subd. 1(3) ("[T]he following shall be deemed to restrain trade or commerce

unreasonably and are unlawful . . . A contract, combination, or conspiracy between two or more persons refusing to deal with another person . . . .").

245.    Defendants' agreements for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms have been entered into with distributors and retailers in the State of Minnesota.

246.    Defendants' agreements for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms, wherever created, formed, or entered into, have affected the trade or commerce of the State of Minnesota and substantially affected the people of Minnesota. With respect to each Defendant, many hundreds of farmers in Minnesota have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct. Through operation of their so-called "loyalty programs," as alleged above, each Defendant has harmed competition and consumers in the State of Minnesota. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from entering and/or competing within the State of Minnesota, and each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and farmer choice for crop-protection products in the State of Minnesota.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 85 of 108

## D. REQUEST FOR RELIEF

247.    Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971, Minnesota Statutes sections 325D.49-.66. Plaintiff State of Minnesota seeks relief, including but not limited to the following:

(a)    Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents, or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in conduct in violation of Minnesota Statutes sections 325D.49-.66;

(b)    Awarding judgment against Defendants for disgorgement under the *parens patriae* doctrine, the general equitable powers of this Court, Minnesota Statutes section 8.31, and any other authority;

(c)    Awarding judgment against Defendants for civil penalties pursuant to Minnesota Statutes sections 8.31, subd. 3, and 325D.56; and

(d)    Costs and reasonable attorneys' fees under Minnesota Statutes sections 325D.57 and 8.31, subd. 3a.

## COUNT XI

## VIOLATIONS OF NEBRASKA STATE LAW

248.    Plaintiff State of Nebraska re-alleges and incorporates by reference the allegations in all of the paragraphs above.

(a) *Unfair Methods of Competition*. Each Defendant's course of conduct as alleged herein—including (i) entering and maintaining agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on loyalty; (ii) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty; and (iii) entering agreements with each other for the supply of mesotrione and metolachlor—constitutes an unfair method of competition, in violation of § 59-1602 of the Nebraska Consumer Protection Act.

(b) *Unlawful Rebates*. Each Defendant has provided rebates in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with loyalty terms, resulting in a substantial lessening of competition in all applicable Relevant Markets and tending to create monopolies in Relevant Markets for azoxystrobin, metolachlor, mesotrione, rimsulfuron, and oxamyl, as applicable, in violation of § 59-1605 of the Nebraska Consumer Protection Act.

(c) *Unreasonable Restraint of Trade*. Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on loyalty and Defendants' agreements with each other for the supply of mesotrione and metolachlor are unreasonable restraints of trade, in violation of § 59-1603 of the Nebraska Consumer Protection Act.

(d)    *Unlawful Monopoly Maintenance.* At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione. At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron and oxamyl. Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct—including (i) entering and maintaining agreements with distributors and retailer that contain loyalty requirements; (ii) enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties for disloyalty; and (iii) in the case of mesotrione and metolachlor, entering agreements with each other for the supply of mesotrione and metolachlor—in violation of § 59-1604 of the Nebraska Consumer Protection Act.

(e)    Defendants' violations of Nebraska antitrust law arise from the sale of Defendants' crop-protection products in the State of Nebraska and from sales of Defendants' crop-protection products that caused actual or threatened injury to persons or property in the State of Nebraska. These violations have had direct and indirect impacts upon the State of Nebraska, and its citizens, state agencies, and political subdivisions have been injured and continue to be injured by Defendants' unlawful conduct. With respect to each Defendant, many hundreds of farmers in Nebraska have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been

88                                  AMENDED COMPLAINT

harmed by the Defendant's unlawful conduct. Accordingly, Plaintiff State of Nebraska, on behalf of it itself and as *parens patriae* for all citizens within the state, seeks all relief available under the Nebraska Unlawful Restraint of Trade Act, the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 84-212, 15 U.S.C. 15c, and 15 U.S.C. § 26.

(f)    Plaintiff State of Nebraska is entitled to relief including, but not limited to, treble damages, disgorgement, civil penalties, equitable relief, injunctive relief, and its costs and attorney's fees pursuant to Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1610, 59-1614, 84-212; 15 U.S.C. 15c, and 15 U.S.C. § 26.

## COUNT XII

## VIOLATIONS OF OREGON STATE LAW

249.    Plaintiff State of Oregon, acting by and through its Attorney General, Ellen Rosenblum (the "State of Oregon"), re-alleges and incorporates by reference the allegations in all of the paragraphs above.

250.    The acts alleged above constitute violations of the Oregon Antitrust Law, Oregon Revised Statutes ("ORS") 646.705 to ORS 646.836. Defendants' violations of the Oregon Antitrust Law have had impacts within the State of Oregon and have substantially affected the people of Oregon. Defendants' violations of the Oregon Antitrust Law arise from sales of Defendants' crop-protection products in the State of Oregon or alternatively, from sales of Defendants' crop-protection products in interstate

trade or commerce involving actual or threatened injury to persons or property located in the State of Oregon. Through operation of their so-called "loyalty programs," as alleged above, each Defendant has harmed competition and consumers in the State of Oregon. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from the State of Oregon, and each Defendant's anticompetitive conduct has led to higher prices in the State of Oregon and has reduced innovation and farmer choice in the State of Oregon.

251.    With respect to each Defendant, many hundreds of farmers in Oregon have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

252.    The State of Oregon appears in its sovereign or quasi-sovereign capacities and under its statutory, common law, and equitable powers, and as *parens patriae* on behalf of natural persons residing in the State of Oregon pursuant to Section 4 C of the Clayton Act, 15 U.S.C. § 15c. The State of Oregon seeks all remedies available under federal law and the Oregon Antitrust Law, including, without limitation, the following:

(a)    Disgorgement and other equitable and monetary relief pursuant to federal law including Section 4 of the Sherman Act, 15 U.S.C. § 4, Section 4 C of the Clayton Act, 15 U.S.C. § 15c in addition to ORS 646.770 and ORS 646.775;

(b)    Injunctive and other equitable relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, ORS 646.760, ORS 646.770, and ORS 646.775.

(c)     Civil penalties pursuant to ORS 646.760(1) which provides that a court may assess for the benefit of the state a civil penalty of not more than $250,000 for each violation of the Oregon Antitrust Law,

(d)     Costs of suit, including expert witness fees, costs of investigation, and attorney's fees pursuant to Section 4 C of the Clayton Act, 15 U.S.C. § 15c(d), Section 16 of the Clayton Act, 15 U.S.C. § 26, ORS 646.760, ORS 646.770, ORS 646.775; and

(e)     Other remedies as the court may deem appropriate under the facts and circumstances of the case.

## COUNT XIII

## VIOLATIONS OF TENNESSEE STATE LAW

253.    Plaintiff State of Tennessee re-alleges every preceding allegation as if fully set forth herein.

254.    Defendants directly and/or indirectly through nationwide distributors and retailers, sold the crop-protection products at issue to Tennessee businesses and individual consumers.

255.    Defendants entered arrangements, including both loyalty agreements and supply agreements, with a view to lessening, or which tend to lessen, full and free competition in the importation or sale of these crop-protection products in Tennessee.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 91 of 108

256.    As a result of these arrangements, and the concomitant reduction in competition from generic manufacturers, Tennesseans and Tennessee businesses paid supracompetitive prices for the relevant crop-protection products.

257.    For these reasons, these arrangements affected Tennessee commerce to a substantial degree.

258.    With respect to each Defendant, many hundreds of farmers in Tennessee have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

259.    Accordingly, these actions by Defendants violate the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*

260.    On behalf of Tennessee businesses and individual consumers, the State of Tennessee seeks all legal and equitable relief available under the Tennessee Trade Practices Act and the Common Law, including, but not limited to: the full consideration paid by direct and indirect purchasers, disgorgement of ill-gotten gains, attorneys' fees and costs, and other further relief as this Court deems just and equitable.

## COUNT XIV

## VIOLATIONS OF TEXAS STATE LAW

261.    Plaintiff State of Texas re-alleges and incorporates by reference the allegations in all of the paragraphs above.

262.     The acts alleged above constitute illegal restraints of trade or commerce in Texas pursuant to Tex. Bus. & Com. Code § 15.05(a) and § 15.05(b).

263.     With respect to each Defendant, many hundreds of farmers in Texas have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

264.     Plaintiff State of Texas is entitled to an injunction, disgorgement, and civil penalties and any other remedy available at law for these violations.

## COUNT XV

## VIOLATIONS OF WASHINGTON STATE LAW

265.     The state of Washington repeats and re-alleges and incorporates by reference the allegations in all of the paragraphs above in this Complaint.

266.     Defendants' agreements constitute anticompetitive contracts, agreements, and arrangements in violation of the Washington Consumer Protection Act, RCW 19.86.030.

267.     Defendants' agreements with distributors and downstream purchasers constitute anticompetitive contracts, agreements, and arrangements in violation of the Washington Consumer Protection Act, RCW 19.86.030.

268.     Defendants' acts alleged above constitute unlawful monopoly or attempt to monopolize any part of trade or commerce in Washington in violation of the Washington Consumer Protection Act, RCW 19.86.040.

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 93 of 108

269. With respect to each Defendant, many hundreds of farmers in Washington have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

270. Washington seeks all remedies available under the Washington Consumer Protection Act including, without limitation, the following:

(a) Disgorgement and restitution pursuant to RCW 19.86.080;

(b) Damages on behalf of Washington governmental or public entities;

(c) Injunctive and other equitable relief pursuant to RCW 19.86.080;

(a) Civil penalties pursuant to RCW 19.86.140;

(b) Costs and attorney's fees pursuant to RCW 19.86.080; and

(c) Other remedies, including interest, as the court may deem appropriate under the facts and circumstances of the case.

271. The State of Washington respectfully requests:

(a) The Court determine that the unlawful conduct alleged in this Complaint be adjudged and decreed to be in violation of RCW 19.86.030 and RCW 19.86.040.

(b) The Court award disgorgement and restitution to the State of Washington for consumers and businesses in Washington to the maximum extent allowed under RCW 19.86.080.

(c)     The Court award civil penalties for each violation of RCW 19.86.030 and RCW 19.86.040 to the State of Washington to the maximum extent allowed under applicable state law, RCW 19.86.140.

(d)     The Court award damages to the State of Washington for governmental or public entities in Washington to the maximum extent allowed under RCW 19.86.090.

(e)     The Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the agreement, conduct, contract, or combinations alleged in this Complaint, or from entering into any other contract or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

(f)     The Court award the State's reasonable costs and attorneys' fees, as provided by law.

(g)     The Court award pre-judgment and post-judgment interest, as provided by law.

(h)     The Court award such other relief as it may deem just and proper.

## COUNT XVI

## VIOLATIONS OF WISCONSIN STATE LAW

272.    Plaintiff State of Wisconsin repeats and re-alleges each and every allegation in all of the paragraphs above.

273.    Defendants' violations of Wisconsin's Antitrust Law have had impacts within the State of Wisconsin and substantially affect the people of Wisconsin.

274.    Defendants' violations of Wisconsin's Antitrust Law arise from the sale of Defendants' crop-protection products in the State of Wisconsin. Through operation of their so-called "loyalty programs," as alleged above, each Defendant has harmed competition and consumers in the State of Wisconsin. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors entering and/or competing within the State of Wisconsin, and each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and farmer choice for crop-protection products in the State of Wisconsin.

275.    With respect to each Defendant, many hundreds of farmers in Wisconsin have purchased the Defendant's crop-protection products containing applicable Relevant AIs and have paid supracompetitive prices and otherwise been harmed by the Defendant's unlawful conduct.

276.    Plaintiff State of Wisconsin, under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to an injunction, disgorgement, civil penalties, and any

other remedy available at law for these violations pursuant to Wis. Stat. §§ 133.03, 133.14, and 133.16.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the FTC and the States of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin respectfully request that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; California's Cartwright Act, California Business and Professions Code § 16700 *et seq.*, and California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*; the Colorado Antitrust Act, C.R.S. § 6-4-104 and C.R.S. § 6-4-105; Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*; the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*; the Indiana Antitrust Act, Ind. Code § 24-1-2-1; the Iowa Competition Law, Iowa Code Chapter 553, and the Iowa Consumer Fraud Act, Iowa Code § 714.16; the Minnesota Antitrust Law of 1971, Minnesota Statutes Sections 325D.49-.66; the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1604 *et seq.*, and Neb. Rev. Stat. § 84-212; the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836; the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*; Sections 15.20(a) and 15.20(b) of the Texas Business and Commerce Code and Section 402.006 of the Texas Government Code; the Washington Consumer Protection Act, RCW 19.86.030 *et seq.*; and the Wisconsin Antitrust Act, Wis. Stat. Ch. § 133.03 *et*

*seq*.; and as authorized by its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

1. That each Defendant's conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2. That each Defendant's conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14;

3. That each Defendant's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

4. That each Defendant's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

5. That each Defendant's conduct violates applicable California state law;

6. That each Defendant's conduct violates applicable Colorado state law;

7. That each Defendant's conduct violates applicable Illinois state law;

8. That each Defendant's conduct violates applicable Indiana state law;

9. That each Defendant's conduct violates applicable Iowa state law;

10. That each Defendant's conduct violates applicable Minnesota state law;

11. That each Defendant's conduct violates applicable Nebraska state law;

12. That each Defendant's conduct violates applicable Oregon state law;

13. That each Defendant's conduct violates applicable Tennessee state law;

14. That each Defendant's conduct violates applicable Texas state law;

15. That each Defendant's conduct violates applicable Washington state law;

16.     That each Defendant's conduct violates applicable Wisconsin state law;

17.     That each Defendant is permanently enjoined from engaging in its unlawful conduct;

18.     That each Defendant is permanently enjoined from engaging in similar and related conduct in the future as to all crop-protection products and active ingredients;

19.     That the Court grant Plaintiff States equitable monetary relief pursuant to applicable state and federal law;

20.     That the Court grant such other equitable relief as the Court finds necessary to redress and prevent recurrence of each Defendant's violations, as alleged herein;

21.     That the Court issue civil penalties as sought by Plaintiff States of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Texas, Washington, and Wisconsin, and grant monetary damages as sought by Plaintiff States of Illinois and Nebraska, and award damages for its state agencies as sought by Plaintiff State of Washington as applicable;

22.     That the Court grant Plaintiff States an award of the cost of suit, including reasonable attorneys' fees and costs.

Dated: December 23, 2022                    Respectfully submitted,

                                            /s/ James H. Weingarten
Of counsel:                                 JAMES H. WEINGARTEN (DC Bar No. 985070)
                                            Deputy Chief Trial Counsel
HOLLY VEDOVA                                Federal Trade Commission
Director                                    Bureau of Competition
Federal Trade Commission                    600 Pennsylvania Avenue, NW
Bureau of Competition                       Washington, DC 20580
                                            Telephone: (202) 326-3570
                                            Email: jweingarten@ftc.gov

                                            GEOFFREY M. GREEN
                                            Assistant Director

                                            MARK J. WOODWARD
                                            Deputy Assistant Director

                                            MICHAEL J. TURNER
                                            JOSEPH R. BAKER
                                            ERIC BROOKS
                                            WESLEY G. CARSON
                                            RACHEL S. FRANK
                                            ELIZABETH A. GILLEN
                                            PHILIP J. KEHL
                                            LAUREN B. PATTERSON
                                            EDWARD H. TAKASHIMA
                                            Attorneys

                                            Bureau of Competition

                                            *Attorneys for Plaintiff Federal Trade Commission*

Case 1:22-cv-00828-TDS-JEP   Document 79   Filed 12/23/22   Page 100 of 108

FOR PLAINTIFF STATE OF CALIFORNIA

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

PAULA L. BLIZZARD
Supervising Deputy Attorney General

/s/ Nicole S. Gordon
NICOLE S. GORDON
California Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94610
Telephone: (415) 510-4400
Email: nicole.gordon@doj.ca.gov

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO

PHILIP J. WEISER
Attorney General

/s/ Carla J. Baumel
JAN M. ZAVISLAN
Senior Counsel
CARLA J. BAUMEL
CONOR J. MAY
Assistant Attorneys General
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Jan.Zavislan@coag.gov
        Carla.Baumel@coag.gov
        Conor.May@coag.gov

*Attorneys for Plaintiff State of Colorado*


FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General

/s/ Paul J. Harper
PAUL J. HARPER
Assistant Attorney General, Antitrust
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Telephone: (312) 814-3000
Email: paul.harper@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF INDIANA

THEODORE E. ROKITA
Attorney General

/s/ Matthew Michaloski
MATTHEW MICHALOSKI
Deputy Attorney General
SCOTT BARNHART
Chief Counsel and Director of Consumer
Protection
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 234-1479
Email: matthew.michaloski@atg.in.gov
        scott.barnhart@atg.in.gov

*Attorneys for Plaintiff State of Indiana*


FOR PLAINTIFF STATE OF IOWA

TOM MILLER
Attorney General

/s/ Noah Goerlitz
NOAH GOERLITZ
BRYCE PASHLER
Assistant Attorneys General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 725-1018
Email: noah.goerlitz@ag.iowa.gov
        bryce.pashler@ag.iowa.gov

*Attorneys for Plaintiff State of Iowa*

AMENDED COMPLAINT

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General

JAMES W. CANADAY
Deputy Attorney General

/s/ Katherine Moerke
KATHERINE MOERKE
JASON PLEGGENKUHLE
ELIZABETH ODETTE
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 296-3353
Email: james.canaday@ag.state.mn.us
        katherine.moerke@ag.state.mn.us
        jason.pleggenkuhle@ag.state.mn.us
        elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

AMENDED COMPLAINT

FOR PLAINTIFF STATE OF NEBRASKA

DOUGLAS J. PETERSON
Attorney General

/s/ Joseph M. Conrad
JOSEPH M. CONRAD
COLIN P. SNIDER
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-3840
Email: Joseph.Conrad@nebraska.gov
        Colin.Snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*


FOR PLAINTIFF STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

/s/ Timothy D. Smith
TIMOTHY D. SMITH
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 934-4400
Email: tim.smith@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF TENNESSEE

JONATHAN SKRMETTI
Attorney General

/s/ Hamilton Millwee
HAMILTON MILLWEE
Assistant Attorney General
TATE BALL
Assistant Attorney General
Office of the Attorney General of Tennessee
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
        Tate.Ball@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*
*Notice of Special Appearance forthcoming*

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

/s/ Margaret Sharp
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN E. COWLES
Deputy Attorney General for Civil Litigation
JAMES LLOYD
Chief, Antitrust Division
TREVOR YOUNG
Deputy Chief, Antitrust Division
MARGARET SHARP
WILLIAM SHIEBER
Assistant Attorneys General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, TX 78701
Telephone: (512) 936-1674
Email: Margaret.Sharp@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

/s/ Luminita Nodit
LUMINITA NODIT
Lumi.Nodit@atg.wa.gov
Assistant Attorney General, Antitrust Division
Washington State Office of the Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104
Tel: (206) 254-0568

*Attorneys for Plaintiff State of Washington*
*Notice of Special Appearance forthcoming*


FOR PLAINTIFF STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General

/s/ Laura E. McFarlane
LAURA E. MCFARLANE
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-8911
Email: mcfarlanele@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*