# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., | |
| Plaintiffs, | |
| v. | |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC | CASE NO. 1:22-CV-828-TDS-JEP |
| and | ORAL ARGUMENT REQUESTED |
| CORTEVA, INC., | |
| Defendants. | |

# MEMORANDUM IN SUPPORT OF
## DEFENDANT CORTEVA, INC.'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................ii

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND........................................................................................................ 5

    A.    The Parties .............................................................................................. 5

    B.    The Crop Protection Industry .................................................................. 5

    C.    Allegations Regarding the Relevant AIs .................................................. 6

    D.    Product Market Allegations...................................................................... 7

    E.    Allegations Regarding Corteva's Loyalty Agreements.............................. 7

    F.    Procedural History .................................................................................. 9

LEGAL STANDARD ................................................................................................. 9

ARGUMENT ........................................................................................................... 10

    I.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET .......................................................................... 10

    II.    PLAINTIFFS' CLAIMS FAIL TO ALLEGE IMPERMISSIBLE EXCLUSIVE DEALING ......................................................................... 14

    III.    THE FTC'S CLAIMS CANNOT BE ASSERTED CONSISTENT WITH ARTICLE II OF THE U.S. CONSTITUTION............................. 23

    IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL ........................................ 27

CONCLUSION ........................................................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. Medtronic, Inc.*,
209 F. Supp. 3d 994 (S.D. Ohio 2016) .................................................................. 13

*Abbott Lab'ys v. Segura*,
907 S.W.2d 503 (Tex. 1995) ................................................................................. 28

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ................................................................................ 15

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*,
592 F.3d 991 (9th Cir. 2010) ................................................................................ 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 9, 22

*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*,
275 F. Supp. 3d 957 (W.D. Wis. 2017) ................................................................ 27

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
459 U.S. 519 (1983) ............................................................................................. 10

*Barr Lab'ys, Inc. v. Abbott Lab'ys*,
978 F.2d 98 (3d Cir. 1992) ................................................................................... 16

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020) (plurality opinion) .......................................................... 26

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011) ...................................................... 11, 13, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. 9, 10, 12

*Benfield v. Magee*,
945 F.3d 333 (5th Cir. 2019) ................................................................................ 12

*Berghausen v. Microsoft Corp.*,
765 N.E.2d 592 (Ind. Ct. App. 2002) ................................................................... 28

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................................. 17

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................................. 10

ii

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................................................. 25

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ............................................................................... 20

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) ........................................................................... 10

*Cnty. Materials v. Allan Block Corp.*,
502 F.3d 730 (7th Cir. 2007) ............................................................................... 17

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) .......................................................................................... 26

*Cota v. Ralph Lauren Corp.*,
No. 21-C-1089, 2022 WL 1597631 (E.D. Wis. May 19, 2022) ............................ 30

*In re Cotton Yarn Antitrust Litig.*,
505 F.3d 274 (4th Cir. 2007) ............................................................................... 23

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ............................................................................... 15

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
No. 08-4168, 2014 WL 1343254 (D.N.J. Mar. 28, 2014) ..................................... 18

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ................................................................. 19, 20, 22

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) .............................................................................. 1

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .............................................................................................. 24

*Freeman Indus., LLC v. Eastman Chem. Co.*,
172 S.W. 3d 512 (Tenn. 2005) ...................................................................... 28, 29

*Frost v. Corp. Comm'n*,
278 U.S. 515 (1929) .............................................................................................. 26

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ...................................................................................... passim

*Illinois Brick*,
431 U.S. 720 (1977) .............................................................................................. 27

iii

*Klein v. Facebook Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022) ........................................................ 12

*Linzer Prods. Corp. v. Sekar*,
499 F. Supp. 2d 540 (S.D.N.Y. 2007) ........................................................ 14

*Mailand v. Burckle*,
572 P.2d 1142 (Cal. 1978) ........................................................................ 27

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ................................................................... 10

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
859 F.3d 408 (7th Cir. 2017) ..................................................................... 22

*Miller Brewing Co. v. Bartholemew Cnty. Beverage Co. Inc.*,
674 N.E. 2d 193 (Ind. Ct. App. 1996) ....................................................... 27

*Morrison v. Olson*,
487 U.S. 654 (1988) .................................................................................. 25

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) ............................................................... 10, 11

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ..................................................................... 22

*In the Matter of Novartis AG et al.*,
Dkt. No. C-3979 (Nov. 1, 2000) ........................................................... 14, 23

*Novartis Pharma AG v. Regeneron Pharms., Inc.*,
582 F. Supp. 3d 26 (N.D.N.Y. 2022) ......................................................... 12

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) .................................................................................. 18

*Panag v. Farmers Ins. Co. of Wash.*,
204 P.3d 885 (Wash. 2009) (en banc) ........................................................ 27

*Scott v. College Hills Corp.*,
435 N.E.2d 463 (Ill. 1982) ......................................................................... 27

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002) ...................................................................... 11

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) ...................................................................... 11

iv

*Rambus Inc. v. FTC*,
  522 F.3d 456 (D.C. Cir. 2008) ........................................................... 15, 18

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) .................................................... 29

*Seila Law LLC v. Consumer Financial Protection Bureau*,
  140 S. Ct. 2183 (2020) ........................................................... passim

*State v. Alpine Air Prods., Inc.*,
  490 N.W.2d 888 (Minn. Ct. App. 1992) .................................................... 27

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................... 10

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016) ........................................................... 13

*Thunander v. Uponor, Inc.*,
  887 F. Supp. 2d 850 (D. Minn. 2012) .................................................... 29

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ........................................................... 11

*U.S. v. The Dow Chemical Co.*,
  No. 17-cv-01176 (June 15, 2017) ....................................................... 23

*In re Urethane Antitrust Litig.*,
  663 F. Supp. 2d 1067 (D. Kan. 2009) ................................................ 28, 29

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .......................................................... 27

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ............................................................... 17, 18

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) .................................................... 15, 17, 19

**Statutes & Rules**

15 U.S.C. § 41 ......................................................................... 24

15 U.S.C. § 53(b) .................................................................. 23, 24

15 U.S.C. § 57 ......................................................................... 26

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1810, at 161 (4th ed.
  2015) ................................................................................. 1

v

Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................................. 29

Clayton Act ............................................................................................... passim

Colo. Rev. Stat. Ann. § 6-4-119 ........................................................................ 27

Federal Rule of Civil Procedure 12(b)(6) ................................................... 1, 9, 2

Federal Trade Commission Act .................................................................... passim

Ind. Code § 24-5-0.5-1 *et seq* ........................................................................ 29

Ind. Code § 24-5-.05-2(a)(8) .......................................................................... 29

Iowa Code. § 553.2 ....................................................................................... 27

Iowa Code § 714.16 ...................................................................................... 29

Local Rule 7.3 ................................................................................................ 1

Local Rule 7.3(d) ........................................................................................... 1

Neb. Rev. Stat. § 59-829 ................................................................................ 27

Or. Rev. Stat. § 646.715 ................................................................................ 27

Federal Rule of Civil Procedure 9(b) .......................................................... 29, 30

Sherman Act ........................................................................................... passim

Tenn. Code. § 47-25-101 *et seq.* .................................................................... 28

Tex. Bus. & Com. Code § 15.04 ...................................................................... 27

Wis. Stat. § 133.03 *et seq.* ............................................................................ 28

**Other Authorities**

U.S. Const. art. II ..................................................................................... passim

Defendant Corteva, Inc. ("Corteva"), by and through its undersigned attorneys and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.3, moves to dismiss all claims asserted against it by the Federal Trade Commission ("FTC") and 12 state attorneys general.

## PRELIMINARY STATEMENT

This case concerns loyalty discounts for crop protection products, such as herbicides, insecticides and fungicides. Plaintiffs challenge Corteva's discounts on three active ingredients ("AIs")—acetochlor, rimsulfuron and oxamyl—on the grounds that they constitute exclusive dealing arrangements that violate federal antitrust and various state laws. In so doing, however, plaintiffs ignore the fact that loyalty discounts, which come in many forms, are not only "extremely common" but also "presumptively lawful in all but a few carefully defined circumstances". *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 983, 1001 (10th Cir. 2022) (quoting 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1810, at 161 (4th ed. 2015)). Exclusive dealing arrangements offer numerous procompetitive benefits, such as maintaining customers' incentives to invest in a manufacturer's products, ensuring consistent purchases by customers over time and reducing free riding by customers and competitors. Plaintiffs also elide the fact that Corteva's loyalty programs, which have been in place for many years, relate to a small number of its products, have significantly decreased prices to its customers over many years, and have successfully encouraged its customers to invest in services, stewardship and

support for Corteva's products. Plaintiffs' claims concerning Corteva's loyalty programs fail as a matter of law for multiple, independent reasons and should be dismissed.[1]

To begin, in an action based in antitrust, a plaintiff must allege actual facts sufficient to support a cognizable product market. Conclusory assertions are insufficient. It is only within a well-defined market that alleged anti-competitive conduct, supposed market power and purported competitive effects can be assessed and understood. Properly alleging a market takes work: a plaintiff has to lay out potential substitutable products and assert facts to support whether they fall within the market. Plaintiffs' Amended Complaint does none of this. Plaintiffs merely allege that each of three Corteva AIs—acetochlor, rimsulfuron and oxamyl—is its own product market. This is not enough, especially when a cursory search of FDA label registrations shows that numerous products manufactured by Corteva's competitors, like flumetsulam, thiencarbazone and methomyl, treat the same pests, on the same crops, at the same time as Corteva's products. (*See infra* Section I.)

Even if plaintiffs had properly pled one or more relevant markets, they have failed adequately to allege that Corteva's discount programs should be

---

[1] Although plaintiffs filed an Amended Complaint on December 23, 2022, *see* Doc. 79, they made no effort to address the majority of the arguments in Corteva's Motion to Dismiss, *see* Doc. 70. As such, Corteva reasserts those arguments herein.

Additionally, Corteva joins the arguments set forth by co-defendant Syngenta to the extent they apply to Corteva.

treated differently from the thousands of lawful loyalty programs incorporated into economies worldwide, *e.g.*, frequent flyer programs, credit card points and hotel stay rewards. Corteva's programs are purely voluntary: they offer discounts for distributors who choose to participate, and no one is forced to do so. The programs are one year in duration and do not obligate distributors to purchase any Corteva products at all; distributors are free to cease purchasing Corteva's products at any time with the sole consequence being the loss of a discount. And they do not result in below cost or predatory pricing. Plaintiffs have not alleged—and could not allege—otherwise. Rather, they merely recast the rebates awarded under the programs as "payments" and declare them to be exclusionary. More is required. Tellingly, the loyalty programs for each of the three Corteva AIs at issue were implemented many years ago, in two cases at least a decade after the statutory exclusivity protections on the products expired. Plaintiffs plead no facts justifying litigation after such a lengthy delay. (*See infra* Section II.)

What's more, all of the FTC's claims suffer from a fundamental, constitutional flaw. They are at odds with Article II of the U.S. Constitution. Article II vests "[t]he executive Power . . . in a President of the United States of America", who must "take Care that the Laws be faithfully executed". U.S. Const. art. II, § 1, cl. 1, § 3. While the President may appoint other officers to assist him or her, the President must retain the power to remove them if necessary to ensure accountability. The Supreme Court recognized an exception to this rule in 1935 in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which held that

3

Congress could permissibly prohibit the President from removing the FTC Commissioners, as then-empowered, except for "good cause". However, Congress has since given FTC Commissioners extensive executive powers (far beyond what they had in 1935), including the power to bring this suit, and the Supreme Court recently ruled in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), that the *Humphrey's Executor* exception is limited to inferior officers who do not exercise executive powers. Under the principles set out in *Seila Law*, Congress exceeded its authority in authorizing the FTC to bring this litigation while limiting the President's ability to remove them. (*See infra* Section III.)

Finally, plaintiffs' state law antitrust and unfair competition claims fail for a number of reasons. *First*, several state claims follow the same analytical framework as the federal claims and fail for the same reasons. *Second*, two states purport to seek a remedy on behalf of customers precluded by those states' laws. Two states require allegations of intra-state activity, but the Amended Complaint lacks such allegations. Because unfair competition laws require a predicate unlawful act, those claims fail as well. (*See infra* Section IV.)

As previewed above and as set forth below, we respectfully submit that all claims should be dismissed.[2]

---

[2] Although Corteva disputes plaintiffs' allegations, this Motion assumes the truth of plaintiffs' well-pled factual assertions, as is required on a motion to dismiss.

4

# BACKGROUND[3]

A.    *The Parties*

Plaintiff FTC is a U.S. administrative agency established and organized pursuant to the FTC Act.  (¶17.)  State plaintiffs are the states of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington and Wisconsin represented by their respective Attorneys General.  (¶¶18-29.)

Corteva is a company "engaged in the development, manufacture, and sale of crop-protection products" used in farming.  (¶39.)  Defendants Syngenta Crop Protection AG, Syngenta Corporation and Syngenta Crop Protection, LLC (collectively, "Syngenta") are also companies engaged in the "development, manufacture, and sale of" such products.  (¶¶30-37.)  Corteva sells its crop protection products ("CPPs") to distributors.  (¶¶55-56.)  These distributors, which allegedly account for roughly ■■ of U.S. CPP sales (¶8), then either sell the CPPs to independent retailers, who in turn sell to farms and growers, or sell the CPPs to farms and growers through their own integrated retail arms.  (¶¶55-56.)

B.    *The Crop Protection Industry*

Corteva and other manufacturers invest their time and resources to "initially develop, patent, and register" the AIs in CPPs.  (¶4.)  Manufacturers are

---

[3] Citations to the Amended Complaint are given as "¶_" or "¶¶_".

5

rewarded for their investments with the opportunity to harness "the commercial potential of their innovations through lawfully obtained exclusive rights" (*id*.), under both patent laws and the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). (¶¶51-52.) After patent and regulatory exclusive-use terms expire, generic competition may enter the market. (¶54.) This comprehensive regulatory regime "incentivizes innovation while encouraging price and other competition". (¶4.)

C.    *Allegations Regarding the Relevant AIs*

Plaintiffs allege that Corteva made "payments in the form of rebates" (¶206) to motivate distributors to purchase Corteva products. (¶6.) Plaintiffs assert that Corteva's allegedly anticompetitive acts relate to three AIs: rimsulfuron, oxamyl and acetochlor. (¶¶123-24, 134, 141.) Plaintiffs allege that rimsulfuron's statutory exclusivity periods expired no later than 2007. (¶125.) Corteva's predecessor DuPont implemented a loyalty program with regard to this AI prior to 2017, and Corteva implemented one beginning in the 2017-2018 market year; *i.e.*, before 2018. (¶¶126-27.) The Amended Complaint was filed on December 23, 2022—more than four years later. (*See* Doc. 89.)

Corteva's statutory exclusivities relating to oxamyl expired no later than 1987. (¶135.) Corteva placed oxamyl in a loyalty program before the 2018-2019 market year, which would have been sometime in 2017, more than four years before the Amended Complaint was filed. (¶137.) Oxamyl was on the market without any exclusivity for a period of 30 years before being placed into a loyalty

6

program. Corteva's statutory exclusivities relating to acetochlor expired no later than 2007 (¶143), and Corteva added it to a loyalty program for the 2016-2017 market year. (¶146.) Acetochlor was marketed for a decade without any exclusivity before it became part of a loyalty program.

D.    *Product Market Allegations*

The sole allegations regarding the market power of Corteva AI's here are contained in paragraph 152 of the Amended Complaint. The Amended Complaint states:

> At all times relevant to this Complaint, Corteva has had monopoly and market power with respect to rimsulfuron and oxamyl, and with respect to [CPPs] containing those Relevant AIs. . . . Corteva has [also] had market power with respect to acetochlor and with respect to [CPPs] containing acetochlor.

Oddly, this allegation of market power *precedes* several summary assertions regarding product market. (¶¶155, 157-58.) Plaintiffs simply assert that "each relevant market is defined by reference to a Relevant AI" (¶155), without any support. At most, there are general statements of product differentiation—but product differentiation does not define market boundaries. (¶¶157(d)-(f).) Plaintiffs summarily state that no other AIs are close enough substitutes to prevent Corteva from maintaining prices above competitive levels. (¶158.)

E.    *Allegations Regarding Corteva's Loyalty Agreements*

Corteva's loyalty programs incentivize distributors to continue to purchase its products. Distributors are not required to participate in such programs. (*See, e.g.*, ¶¶73, 79, 84.) Corteva offers rebates to distributors that

7

purchase a certain percentage of their total purchases of CPPs containing the relevant AIs from Corteva. (¶60.) The terms of those programs allow distributors to transact in some amount of third-party products "without forfeiting at least part" of the rebate payment. (¶61.)

Specifically, plaintiffs allege that Corteva operates two programs. The Crops, Range & Pasture and Industrial Vegetation Management Loyalty Program ("CRPIVM") involves set "loyalty thresholds" that customers must meet to qualify for rebate payments. (¶73.) Plaintiffs also allege that an additional discount offered by Corteva, the Corporate Distributor Offer ("CDO"), ███ ███████████████████████████████████████████████ (*Id.*) The CRPIVM offers rebates on purchases of specific AIs, whereas the CDO covers a broader range of products, ████████████████████████████████████ ████████████████████ (¶¶73-79.) Plaintiffs allege that rebates under these programs are typically paid ███████████████████ and that missing a loyalty threshold during the payment period makes a customer ineligible for the associated discount. (¶78.) Plaintiffs also allege an apparently single instance in which Corteva ████████████████████████████████████████ ████████████████████████ (¶88.)

Again, plaintiffs allege that "[l]oyalty requirements for each Relevant AI have been in place—with nearly complete distributor compliance— since at least 2017, and in most cases longer." (¶172.) Further, they allege that "[g]eneric manufacturers of crop-protection products containing the applicable

8

Relevant AIs have been substantially foreclosed from the Relevant Market for five years or more." (*Id.*)

F.    *Procedural History*

Plaintiffs assert 16 causes of action under federal antitrust law and various state antitrust and unfair competition laws. (¶¶203-76.) All plaintiffs assert a violation of Section 3 of the Clayton Act. (¶¶205-06.) The FTC asserts a violation of Section 5 of the FTC Act. (¶¶203-04.) All state plaintiffs assert violations of Sections 1 and 2 of the Sherman Act. (¶¶207-11.) Colorado, Illinois, Minnesota, Nebraska, Oregon, Texas and Wisconsin assert violations of their respective state antitrust laws. (¶¶217-27, 235-76.) California, Indiana and Iowa assert violations of their respective state antitrust and unfair competition laws. (¶¶212-16, 228-34.) Tennessee asserts violations of its trade practices law. (¶¶253-60.) Washington asserts violations of its consumer protection law. (¶¶265-71.)

Corteva now moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

9

This is particularly important in the antitrust context, where "proceeding to antitrust discovery can be expensive," and where "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (affirming dismissal of antitrust claims and noting that the Supreme Court in *Twombly* "warned particularly of the high costs and frequent abuses associated with antitrust discovery").

## ARGUMENT

### I.     PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET

Every antitrust claim plaintiffs allege requires allegations sufficient to support a cognizable product market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). Only when such a market is adequately alleged can assertions about market power be recognized. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989); *see Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (noting that for a contract to violate Section 3 of the Clayton Act "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market"). The same is true of the FTC Act. *See McWane, Inc. v. FTC*, 783 F.3d 814, 828 (11th Cir. 2015) ("[F]or the Commission's conclusion that [the defendant] violated

the Federal Trade Commission Act to stand, it must have successfully defined the relevant market".).

A properly defined product market must take account of which products, if any, compete with the defendant's product, and must include reasonably interchangeable substitutes that limit the defendant's ability to sustain an increase in price above competitive levels. *See Murrow Furniture Galleries,* 889 F.2d at 528. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability" or "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). To plead a product market based on "reasonable interchangeability," a plaintiff must allege sufficient details about a product's "price, use and qualities" and explain why products without those characteristics are not reasonably interchangeable. *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)). Dismissal is warranted if a plaintiff fails to provide a "plausible explanation as to why a market should be limited in a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

Plaintiffs have not even attempted to sufficiently plead a product market. At best, their allegations are a form of *ipse dixit*: because they say it is true, so it must be. The law requires more than mere vague references to other

11

products and potential characteristics that some may or may not have.  As the allegations stand, they are as consistent with product differentiation as with individual markets.  *Twombly* requires more.  *See Benfield v. Magee*, 945 F.3d 333, 336-37 (5th Cir. 2019).  For each of the Relevant AIs, plaintiffs provide only *two sentences* that describe a couple of general characteristics[4] vaguely in comparison to "other, similar herbicide active ingredients" (for rimsulfuron and acetochlor) and "other, similar insecticide active ingredients" (for oxamyl).  (¶¶157(d)-(f).)  Plaintiffs fail to "explain why products without those characteristics are not reasonably interchangeable".  *Klein v. Facebook Inc.*, 580 F. Supp. 3d 743, 773 (N.D. Cal. 2022).  Many of plaintiffs' proffered reasons for differentiating the Relevant AIs are simply alleged advantages they have over other products.  (*See, e.g.*, ¶157(e) (alleging that oxamyl is "safer for crops and better for soil health than other, similar [AIs]").)  But merely listing allegedly unique features of a product is insufficient to plead a relevant market.  *See Novartis Pharma AG*, 582 F. Supp. 3d at 41.

Plaintiffs' cursory treatment of substitutability results in alleged relevant markets that are both too broad and too narrow.  On the one hand, plaintiffs do not acknowledge that distinct CPPs containing the same AI may not

---

[4] For example, rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" and "is inexpensive to produce compared to other, similar herbicide [AIs]".  (¶157(d).)  Plaintiffs do not explain why growers—the consumers purchasing a CPP—would view the cost to produce an AI as relevant to substitutability.  *See Novartis Pharma AG v. Regeneron Pharms., Inc.*, 582 F. Supp. 3d 26, 41 (N.D.N.Y. 2022) (finding such differences "say[] nothing about whether a consumer would find [these products] interchangeable").

12

be substitutes if they are labeled for *different* uses. For example, different products containing the same AI—rimsulfuron—are labeled for the suppression and control of different weeds, and for the application to different crops. *Compare* EPA Reg. No. 352-853 at 18-19 (2020)*, with* EPA Reg. No. 432-1604 at 8-9 (2020) (listing different weeds controlled); *compare* EPA Reg. No. 352-768 at 1 (2021)*, with* EPA Reg. No. 352-837 at 1 (2020) (listing application to different crops).[5] On the other hand, plaintiffs also fail to explain why any number of CPPs containing different AIs are not reasonably interchangeable when labeled for the *same* use. *See Bayer Schering*, 813 F. Supp. 2d at 578 (finding the plaintiff failed to allege facts demonstrating that no combination of drugs could serve as a functional substitute). For example, plaintiffs do not explain why thiencarbazone is not reasonably interchangeable with rimsulfuron. Thiencarbazone is a herbicide that may be used on a wide variety of crops including corn, peanuts and potatoes that may be applied pre- or post-emergence using multiple application methods. EPA Reg. No. 264-1066 at 5, 9-11 (2020). Plaintiffs do not explain why flumetsulam, a pre- and post-emergence corn herbicide with multiple methods of application that can be used on a variety of weeds, is not substitutable for acetochlor. EPA Reg. No. 524-614 at 9, 22, 25-26 (2015). Nor do plaintiffs explain why methomyl, an insecticide used on cotton, potatoes and other crops,

---

[5] The Court may take judicial notice of EPA label registrations at the motion to dismiss stage, as is routinely done with FDA and copyright registrations. *See, e.g.*, *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1014 (S.D. Ohio 2016); *TCA Television Corp. v. McCollum*, 839 F.3d 168, 173 (2d Cir. 2016).

13

with multiple methods of application, is not substitutable for oxamyl.  EPA Reg. No. 89167-91 at 5-8, 16, 19-20 (2020).  Moreover, the FTC itself previously defined a broader market for "corn herbicides for pre-emergent control of grasses", which included the AIs metolachlor, acetochlor and dimethenamid. Complaint at 3, *In the Matter of Novartis AG, et al.*, Dkt. No. C-3979 (Nov. 1, 2000) ("Novartis Complaint").[6]  Plaintiffs mention none of these products and summarily conclude that "other active ingredients are not close enough substitutes".  (¶158.)  That pleading deficiency, on its own, is enough to dismiss the Amended Complaint.  *See Bayer Schering*, 813 F. Supp. 2d at 577-78.

Thus, plaintiffs' claims should be dismissed for "alleg[ing] a proposed relevant market that clearly does not encompass all interchangeable substitute products[,] even when all factual inferences are granted in plaintiff's favor".  *Id.* at 575 (quoting *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 554 (S.D.N.Y. 2007)).  Because sufficiently alleging a relevant product market is a requirement of plaintiffs' claims, their failure to do so here is fatal.

## II.    PLAINTIFFS' CLAIMS FAIL TO ALLEGE IMPERMISSIBLE EXCLUSIVE DEALING

Even if plaintiffs' had properly pled a relevant antitrust market, they fail to allege impermissible exclusive dealing.  Plaintiffs sue under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Section 3 of the Clayton Act, 15 U.S.C.

---

[6] Since that enforcement action, the AI pyroxasulfone also has been labeled for use as a corn herbicide for pre-emergent control of grasses.  EPA Reg. No. 63588-92 at 7-8 (2012).

14

§ 14, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and various state antitrust and unfair competition laws. (¶2.) Each claim is premised on exclusionary behavior that allegedly either maintained a monopoly position (Section 2), or agreements in restraint of trade that substantially lessened competition or created a monopoly in a relevant market (Section 1, Clayton Section 3).

To establish a Section 1 violation, a plaintiff must allege "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002) (citation omitted). To establish a Section 2 violation, a plaintiff must allege "possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) (citation omitted). To establish a Section 3 violation for unlawful conditioning of payments, a plaintiff must allege that defendant entered into a contract with the effect of substantially lessening competition or creating a monopoly in a relevant antitrust market. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012). Claims brought under Section 5(a) of the FTC Act undergo the same analysis as those brought under the Sherman Act. *See Rambus Inc. v. FTC*, 522 F.3d 456, 462 (D.C. Cir. 2008).

Plaintiffs challenge Corteva's loyalty programs as anticompetitive exclusive dealing arrangements. Their allegations are plainly insufficient to support that characterization. As a threshold and entirely dispositive matter,

15

plaintiffs have not pled any actual exclusivity. The allegations make clear that loyalty programs are opt-in, not required; moreover, not all distributors choose to opt-in. (*See* ¶8 (alleging that Corteva distributor customers "collectively account for approximately ██ or more of U.S. [CPP] sales").) Plaintiffs do not plead that distributors must participate in Corteva's programs to deal with Corteva, or that Corteva in fact excluded any customers who failed to meet the terms of Corteva's loyalty programs.[7] Nor do plaintiffs plead that Corteva's programs obligate customers to exclusively purchase Corteva products. Rather, plaintiffs concede that "[t]o qualify for [a discount] for a given active ingredient in a given market year under the CRPIVM Loyalty Program, a distributor must source a certain percentage of its purchases of that active ingredient from Corteva." (¶75.) The discount offered by Corteva is optional—Corteva never required exclusivity from any of its customers to participate in the programs, or required customers to participate in the loyalty program to purchase Corteva products. *See Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 110 n.24 (3d Cir. 1992) ("An agreement affecting less than all purchases does not amount to true exclusive dealing.").

---

[7] Plaintiffs plead that "Defendants have retaliated and threatened to retaliate" against customers that failed to meet loyalty thresholds, "by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage." (¶88.) But plaintiffs plead collectively, failing to identify any conduct Corteva engaged in. Plaintiffs' one allegation specific to Corteva appears to state that in one single instance, Corteva allocated product to two distributor customers, but not a third, "based on those companies' 'generic support'". (*Id.*) Plaintiffs allege only that this product was "an insecticide" and do not allege whether it was a Corteva Relevant AI or even if this product was part of any loyalty program at all.

16

Even if Corteva's programs are evaluated as exclusive dealing arrangements, plaintiffs have still failed to plead a claim. Exclusive dealing arrangements may be challenged under Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act. *See ZF Meritor*, 696 F.3d at 268. Whatever statute the plaintiff relies on, the analysis is the same—courts universally apply the rule of reason to evaluate the legality of exclusive dealing arrangements. *Cnty. Materials v. Allan Block Corp.*, 502 F.3d 730, 736 (7th Cir. 2007). To evaluate an exclusive dealing arrangement when "the plaintiff alleges that price is the vehicle of exclusion", "the price-cost test may be utilized as a specific application of the 'rule of reason'". *ZF Meritor*, 696 F.3d at 273. The "price-cost test" requires a showing (1) that the defendants set prices below cost, and (2) "a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability", that the defendants could recoup the attendant losses once a plaintiff is excluded from the market. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993). Moreover, the Supreme Court has "specifically declined to allow plaintiffs to recover for above-cost price cutting" because discouraging lower prices "does not constitute sound antitrust policy." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007) (quoting *Brooke Grp.*, 509 U.S. at 224). Where a plaintiff fails to satisfy the price-cost test, claims based

on alleged rebates or discounts must be dismissed at the pleading stage.[8]  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451-52 (2009).

Plaintiffs' allegations make clear that price is the primary means of exclusion, but do not allege that Corteva's programs fail the price-cost test.  Their claims are predicated on the theory that "Defendants pay a portion of their elevated profits to distributors"—which plaintiffs colorfully term "exclusion payments"—"in exchange for the distributors excluding Defendants' generic competitors, resulting in near exclusivity for Defendants."  (¶6.)  This creative terminology does not change the fact that Corteva's "exclusion payments" are simply procompetitive discounts to incent customer loyalty.  *See, e.g., Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168, 2014 WL 1343254, at *28 (D.N.J. Mar. 28, 2014) (noting that the argument that "disloyalty penalties [are] not the same as 'discounts' . . . does not change the nature of [plaintiff's] claim").  Indeed, plaintiffs concede that Corteva's "payments [are a] form of rebates in the sale of crop-protection products".  (¶206.)  A rebate is simply a discount.  Allowing plaintiffs' claims to proceed would risk depriving Corteva's customers of a discount—the very outcome the price-cost test was intended to prevent. *Weyerhaeuser*, 549 U.S. at 319.  Because plaintiffs do not allege that Corteva's discounts fail the price-cost test, the Amended Complaint must be dismissed.

---

[8] This applies to plaintiffs' arguments under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, in addition to Section 5 of the FTC Act, which is coextensive with the Sherman Act.  *Rambus*, 522 F.3d at 462.

Plaintiffs cannot escape this pleading deficiency by asserting that the price-cost test is inapplicable. The basis for such a claim relates to situations when price is not the predominant means of exclusion. Plaintiffs' entire claim is premised on the opposite.

*First*, plaintiffs do not allege that Corteva's loyalty programs either lock customers into lengthy contract terms or that Corteva excludes noncompliant distributors from access to its products, the two primary characteristics that have been found to predominate over price in determining whether the price-cost test applies. *See ZF Meritor*, 696 F.3d at 275, 284-86. Where distributors are free to terminate agreements with Corteva and purchase from competitors at any time without being excluded from access to Corteva's products, all competitors needed to do was "offer a better product or a . . . better deal to acquire" more business. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*, 592 F.3d 991, 997 (9th Cir. 2010) (citation omitted).

*Second*, plaintiffs allege that Corteva's loyalty programs include terms that ███████████████████████████████ (conveniently eliding ███████████████████████████████), meaning distributors must continue to meet the relevant loyalty thresholds for a set time or ███████████████████████ (¶78.) This amounts to no more than the "threat of a lost discount", which courts have explained is "a far cry from the [kind of] anticompetitive conduct" that a non-pricing-based exclusive dealing arrangement would affect. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394,

19

407 (3d Cir. 2016).  For instance, in *Eisai*, the court found that competitors were not foreclosed by a rebate program in which "[t]he consequence of not obtaining the 75% market share threshold . . . was receiving the base 1% discount".  *Id.* at 406-07.  The court rejected the plaintiff's arguments that "the threat of not obtaining a higher discount (ranging up to 30% off) 'handcuffed' hospitals to the [rebate] Program".  *Id.* at 407.  Plaintiffs do not allege that a distributor must repay rebates already received or forfeit anything beyond some portion of a discount from ███████ if it chooses not to meet the relevant loyalty threshold for a particular AI in a subsequent year.

    *Third*, plaintiffs appear to suggest that Corteva's loyalty programs are anticompetitive because Corteva provides discounts to distributors who meet loyalty thresholds ███████████ (¶¶75, 79.)  "Bundling is the practice of offering, for a single price, [multiple] goods . . . that could be sold separately." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).  "A bundled discount occurs when a firm sells a bundle of goods . . . for a lower price than the seller charges for the goods . . . purchased individually." *Id.*  Competitive concerns arise if a potential competitor does not offer the same array of products, as it could only make a comparable offer by giving the customer a price compensating for the foregone discount.

    Here, plaintiffs challenge both the CRPIVM and the CDO.  (¶73.) Plaintiffs allege that Corteva's CRPIVM usually offers rebates on several AIs within each offer, and if a distributor chooses to purchase ███████████ it can

20

earn a rebate by purchasing a certain percent of its needs of ██████ from Corteva. (¶75.) But plaintiffs admit that the AIs within the CRPIVM all "typically face competition from generic manufacturers" (¶79), and identify no instances where a generic cannot compete with an AI within the CRPIVM. Plaintiffs allege no facts showing that an efficient manufacturer could not make a comparable offer.

Plaintiffs allege that Corteva provides discounts under its CDO on products that only Corteva sells, ████████████████████████████████ ██████████████ (¶79.) But this is not a bundled discount at all. Corteva is not offering a lower price to customers who purchase both the products in the CRPIVM, which the FTC admits face generic competition, and those in the CDO, which the FTC claims do not. Rather, plaintiffs allege that if a customer ████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████ (*Id.*) Failure to purchase the CDO products does not impact a customer's entitlement to a rebate under the CRPIVM. Thus, the CDO just offers an additional discount to Corteva's customers who do buy products covered by the CDO, and it is not bundled with the CRPIVM.

*Fourth*, the Court should not credit plaintiffs' unsupported, conclusory and nonspecific allegation that "Defendants have retaliated and threatened to retaliate" against distributors that have failed to satisfy loyalty by canceling distribution contracts or withholding access to supply. (¶88.) Such "bare assertions 'devoid of further factual enhancement[]' . . . are not entitled to an

21

assumption of truth". *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 260 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Not only are these allegations conclusory, but plaintiffs also fail to identify what conduct Corteva engaged in.[9] The only "penalty" plaintiffs adequately plead regarding Corteva is non-payment of an annual rebate. As discussed above, this amounts to the loss of a discount, and courts decline to find that these types of loyalty programs violate antitrust law. *Eisai*, 821 F.3d at 406-07.

Plaintiffs attempt to obscure that their "exclusive dealing claims", at bottom, challenge a pro-competitive pricing practice. Without more, the "logical inference" is that Corteva merely offered customers a "better deal" than its competitors. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 411 (7th Cir. 2017). Plaintiffs have pled nothing more than a discount program that is presumptively lawful without pleading below-cost pricing, and their claims should be dismissed.[10]

Moreover, plaintiffs' claims relate to loyalty programs that were allegedly put in place more than five years before the Amended Complaint was filed and that supposedly "foreclosed [generic manufacturers] from the Relevant

---

[9] *See supra* n.7.

[10] Plaintiffs contend the agreements under which Syngenta supplies the AIs mesotrione and metalochlor (neither of which are Corteva Relevant AIs) to Corteva for use in Corteva's own finished products are part of the "course of conduct" challenged by plaintiffs. However, plaintiffs' conclusory allegations fail to explain how or why these normal course agreements are anticompetitive or to allege they were the result of anything other than an arm's length negotiation in a competitive marketplace in which Corteva attempted to get the best possible deal for reliable supply of needed inputs for its products.

22

Markets for five years or more" (¶172), despite the fact that the statute of limitations for Sherman and Clayton Act claims is four years. *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287 (4th Cir. 2007). Plaintiffs' belated challenge to long-standing, well-known practices is not the result of a recent discovery or change in the law; rather, it is the result of new enforcement priorities that depart from established precedent and creates the precise risk of inappropriate punishment for long-term, good-faith business practice. *See* Novartis Complaint at 2; Complaint at 8, *United States v. The Dow Chemical Company and E.I. Du Pont De Nemours and Company, Inc.*, No. 17-cv-01176 (D.D.C. June 15, 2017).

## III.    THE FTC'S CLAIMS CANNOT BE ASSERTED CONSISTENT WITH ARTICLE II OF THE U.S. CONSTITUTION

The FTC's claims must be dismissed because the FTC lacks the constitutional authority to bring these claims. The FTC seeks to proceed under a statutory provision that purports to authorize it to enforce the FTC Act by suing violators in federal court for injunctive relief. *See* 15 U.S.C. § 53(b); (¶¶2,17). But when Congress provided the FTC with this executive law-enforcement power, it provided an unconstitutional grant of executive power to an independent agency whose members are not removable at will by the President. The Supreme Court's decisions in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), compel a finding that the FTC lacks authority to bring these claims.

23

Article II of the Constitution provides that "the executive Power—all of it—is vested in [the] President". *Seila Law*, 140 S. Ct. at 2191 (quoting Const. art. II, § 1). Principal executive officers "must remain accountable to the President, whose authority they wield". *Id.* at 2197. To ensure accountability, the President must be able to appoint, oversee and remove such officers on an "unrestricted" basis. *Id.* at 2197-98. This is because it is *the President's* "responsibility to take care that the laws be faithfully executed". *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 493 (2010). While the President may delegate certain powers, as the Supreme Court has emphasized, "[t]he buck stops with the President". *Id.*

In 1935, the Supreme Court found in *Humphrey's Executor* that the FTC was an "administrative body" that exercised "quasi-legislative or quasi-judicial powers" that were "neither political nor executive". 295 U.S. at 624, 628. Because the FTC lacked executive power, the Court upheld the statutory removal provision that allows the President to remove an FTC Commissioner only for "inefficiency, neglect of duty, or malfeasance". *Id.* at 618-20, 625-32 (quoting 15 U.S.C. § 41).

But this is no longer the case. In 1973, Congress dramatically expanded the FTC's authority, giving it the power to seek permanent injunctive relief in the absence of an agency adjudication, the same power the FTC seeks to wield in this action— "a quintessentially executive power not considered in *Humphrey's Executor*". *See* 15 U.S.C. § 53(b) (amended in Pub. L. No. 93-153,

§ 408(f), 87 Stat. 576, 592 (1973)); *Seila Law*, 140 S. Ct. at 2200; (¶¶2,17).

Indeed, the Supreme Court noted that "it is hard to dispute that the powers of the

FTC . . . would at the present time be considered 'executive,' at least to some

degree". *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988). And in *Seila Law*,

the Court emphasized that the holding in *Humphrey's Executor* rested on "viewed

the FTC (*as it existed in 1935*) as exercising 'no part of the executive power'".

140 S. Ct. at 2198 (citation omitted) (emphasis added); *see also Buckley v. Valeo*,

424 U.S. 1, 139 (1976) (per curiam) ("A lawsuit is the ultimate remedy for a

breach of the law, and it is to the President . . . that the Constitution entrusts the

responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S.

Const. art. II, § 3)).

The FTC cannot, consistent with Supreme Court precedent and

Article II of the Constitution, both enjoy its removal protections as upheld in

*Humphrey's Executor* and exercise the "quintessentially executive" powers

granted to it by Congress in 1973. *See Seila Law*, 140 S. Ct. at 2200. The FTC

can function as an independent agency whose commissioners are removable only

for cause *or* it may exercise executive power. But when it does both, it violates

the separation of powers principles at the core of the Constitution.[11] *See id.* at

---

[11] This tension has been termed an "unconstitutional combination" or "convergence" by scholars. William Baude, *Severability First Principles*, 109 Va. L. Rev. (forthcoming 2023) (manuscript at 38-39), https://ssrn.com/abstract=4064156 ("Vesting executive power in removable officials is okay. Limiting the power to remove non-executive officials is okay. But not both together.").

25

2224 (explaining that "multiple provisions of law [can] combine to cause a constitutional injury" (Thomas, J., concurring in part and dissenting in part)).

The only adequate remedy in this situation is the dismissal of this action. Congress's later grant of executive power to the FTC combined with the Commissioners' insulation from removal created a constitutional conflict. It is inappropriate for a court facing this conflict to simply sever one provision while upholding the other. Where "a constitutional injury arises as a result of two or more statutory provisions operating together . . . the text of [a] severability clause provides no guidance as to *which* provision should be severed" and a court may not decide which provision to sever based merely on "speculation as to what the Legislature would have preferred". *Id*. at 2222-24 (Thomas, J., concurring in part and dissenting in part); *see* 15 U.S.C. § 57 (FTC Act Separability clause).

Because the FTC was a valid independent agency before Congress unconstitutionally granted it executive powers, this case is unlike others where the agency had valid executive powers from the outset and thus the removal restriction was never constitutionally enforceable. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2207-11; *Collins v. Yellen*, 141 S. Ct. 1761, 1788 & n.23 (2021) (finding the removal restriction unenforceable and severable where the officer lawfully possessed "the authority to carry out the functions of the office"). Here, Congress's grant of executive power to the FTC is "an unconstitutional statutory amendment" that was "'void' when enacted". *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2353 (2020) (plurality opinion) (quoting *Frost v. Corp. Comm'n*, 278 U.S.

26

515, 526 (1929)).  Accordingly, because the FTC lacks constitutionally valid authority to bring its claims, they must be dismissed.

## IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL

Finally, there are four additional reasons why state plaintiffs' antitrust and consumer protection law claims must be dismissed.

*First*, the state antitrust laws relied on by all state plaintiffs but Tennessee are harmonized—by statute or by common law—with the federal antitrust laws.  *See, e.g.*, Colo. Rev. Stat. § 6-4-119; Iowa Code § 553.2; Neb. Rev. Stat. § 59-829; Or. Rev. Stat. § 646.715; Tex. Bus. & Com. Code § 15.04; *Mailand v. Burckle*, 572 P.2d 1142, 1147 (Cal. 1978); *People v. College Hills Corp.*, 435 N.E. 2d 463, 470-71 (Ill. 1982); *Miller Brewing Co. v. Bartholemew Cnty. Beverage Co. Inc.*, 674 N.E. 2d 193, 205 (Ind. Ct. App. 1996); *State v. Alpine Air Prods., Inc.*, 490 N.W. 2d 888, 894 (Minn. Ct. App. 1992); *Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968-69 (W.D. Wis. 2017); *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 894 (Wash. 2009) (en banc).  Where the "analysis under the state antitrust statutes tracks federal antitrust law, . . . the federal antitrust analysis controls whether the state antitrust claims survive."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 449 (7th Cir. 2020).  Because plaintiffs' federal claims fail, their state law claims correspondingly fail.

*Second*, Texas and Indiana are not entitled to their requested relief of civil damages because the state antitrust laws of these states follow the *Illinois*

27

*Brick* indirect purchaser bar, 431 U.S. 720 (1977), preventing those states from bringing damages claims on behalf of end-consumers.  *See Abbott Lab'ys v. Segura*, 907 S.W. 2d 503, 503-04 (Tex. 1995) (noting that the Texas attorney general's suit as *parens patriae* on behalf of consumers was barred); *Berghausen v. Microsoft Corp.*, 765 N.E. 2d 592, 596 (Ind. Ct. App. 2002).  State plaintiffs assert their claims on behalf of "end-consumers" of Corteva products.  (¶166.) Accordingly, Indiana and Texas cannot receive their requested relief of civil damages.

*Third*, the state antitrust laws of Tennessee and Wisconsin each require allegations that the challenged conduct had substantial effects that were felt in each respective state, and these states have failed to sufficiently plead such effects.  *See* Tenn. Code § 47-25-101, *et seq.*; Wis. Stat. § 133.03, *et seq.* Tennessee's statute requires that "the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree".  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W. 3d 512, 523 (Tenn. 2005).  Wisconsin's statute similarly requires that conduct "substantially affects the people of Wisconsin and has impacts in [the] state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside [the] state".  *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1083 (D. Kan. 2009) (citation omitted). Here, plaintiffs merely recite the legal standards, alleging that these violations "affect[] Tennessee commerce to a substantial degree", (¶257), and "substantially affect the people of Wisconsin", (¶273).  Plaintiffs' other factual allegations are

28

insufficient to show substantial impacts on commerce generally and the scope of the impacts on these states as a whole. *See, e.g.*, *In re Urethane*, 663 F. Supp. 2d at 1084; *see also Freeman*, 172 S.W. 3d at 523 (noting that the substantial impacts "test is pragmatic, turning upon the particular facts of the case"). These states have failed to plead facts supporting intra-state activity, and therefore the claims must be dismissed.

   *Fourth*, California, Indiana and Iowa fail to adequately allege violations of their state unfair competition and consumer fraud laws. Cal. Bus. & Prof. Code § 17200, *et seq.*; Ind. Code § 24-5-0.5-1, *et seq.*; Iowa Code § 714.16. *First*, where a claim under the California Unfair Competition Law ("UCL") is based upon, or "derivative" of failed allegations of antitrust violations, "the UCL claim falls with those claims". *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 2022). Therefore, plaintiffs' claims under the UCL fail. *Second*, a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA") must allege "that a defendant engaged in one or more defined deceptive acts". *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 873 (D. Minn. 2012). Such deceptive acts must be either "uncured", where plaintiff provides defendant notice of harm and an opportunity to cure, or "incurable", where the act is done "as part of a scheme, artifice, or device with intent to defraud or mislead". *Id.* at 874 (quoting Ind. Code § 24-5-0.5-2(a)(8)). Plaintiffs have neither specified the nature of their claim nor offered notice, so they must allege "incurable" deceptive acts, which are subject to Rule 9(b)'s heightened pleading requirements. *Id.* Plaintiffs make only

conclusory allegations that the "acts, omissions, or practices alleged in the Complaint constitute violations". (¶228(a).) These cannot meet Rule 9(b)'s heightened "particularity" standard, so plaintiffs' IDCSA claims fail. *Finally*, under Iowa's Consumer Fraud Act ("CFA"), plaintiffs must "plausibly allege that [Corteva] made a misrepresentation of material fact with the intent that others rely upon it in connection with the sale of merchandise". *Cota v. Ralph Lauren Corp.*, No. 21-C-1089, 2022 WL 1597631, at *3 (E.D. Wis. May 19, 2022). Here, plaintiffs merely allege that Corteva's "conduct constitutes deceptive and unfair practices in violation" of the statute. (¶233.) Plaintiffs' claims under the CFA fail accordingly.

Therefore, this Court must dismiss plaintiffs' state law claims.

## **CONCLUSION**

For the reasons set forth above, Corteva respectfully requests that each of plaintiffs' claims be dismissed.

30

Respectfully submitted this 13th day of January, 2023.

MCGUIREWOODS LLP

/s/ *Mark E. Anderson*
Mark E. Anderson (Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone: 919.755.6600
Fax: 919.755.6699

David R. Marriott*
dmarriott@cravath.com
Margaret T. Segall*
msegall@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Specially appearing under L.R.
  83.1(d)

*Attorneys for Defendant Corteva, Inc.*

31

## CERTIFICATE OF WORD COUNT

As allowed by the Court's Order of January 13, 2023 (Doc. 93), the undersigned certifies that this Brief contains 7,560 words, excluding those portions exempted by Local Rule 7.3(d).

This the 13th day of January, 2023.

MCGUIREWOODS LLP

/s/ *Mark E. Anderson*
Mark E. Anderson (Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone: 919.755.6600
Fax: 919.755.6699

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of January, 2023, I caused the foregoing MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P 12(b)(6), and all attachments thereto, to be filed electronically with the Clerk of Court via the Court's CM/ECF system.  Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF System:

MCGUIREWOODS LLP

/s/ *Mark E. Anderson*
Mark E. Anderson (Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone:  919.755.6600
Fax:  919.755.6699