# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| STATE OF CALIFORNIA, | ) | |
| STATE OF COLORADO, | ) | |
| STATE OF ILLINOIS, | ) | |
| STATE OF INDIANA, | ) | |
| STATE OF IOWA, | ) | |
| STATE OF MINNESOTA, | ) | |
| STATE OF NEBRASKA, | ) | |
| STATE OF OREGON, | ) | |
| STATE OF TENNESSEE | ) | |
| STATE OF TEXAS, | ) | |
| STATE OF WASHINGTON | ) | |
| and | ) | |
| STATE OF WISCONSIN, | ) | Civil Action No. 22-CV-828 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYNGENTA CROP PROTECTION AG, | ) | |
| SYNGENTA CORPORATION, | ) | |
| SYNGENTA CROP PROTECTION, | ) | |
| LLC, | ) | |
| and | ) | |
| CORTEVA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF SYNGENTA'S
# MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

NATURE OF THE MATTER .............................................................1

PRELIMINARY STATEMENT ..........................................................1

QUESTION PRESENTED ..................................................................7

FACTUAL ALLEGATIONS ..............................................................8

      A.    The Crop-Protection Industry .........................................8

      B.    Syngenta's Loyalty Rebate Program ............................. 10

      C.    Syngenta Products at Issue............................................ 12

      D.    Supply Agreements Between Syngenta and Corteva ....... 13

LEGAL STANDARDS ..................................................................... 13

ARGUMENT .................................................................................. 14

   I.    The Amended Complaint Fails to State a Federal Antitrust Claim ........................................................................... 14

      A.    The Price-Cost Test Applies to Non-Coercive, Single-Product Loyalty Rebates .................................... 14

      B.    Syngenta's Loyalty Rebates, Which Lack Any Coercive Non-Price Feature, Are "the Very Essence of Competition"..................................................... 18

      C.    Plaintiffs Have Failed to Plead Harm to Competition ..... 25

      D.    Plaintiffs Do Not Plead a Plausible Product Market........ 29

   II.    The Amended Complaint Fails to State a Claim Under State Law .............................................................................. 34

      A.    The State Law Antitrust Claims Fail............................... 34

      B.    The State Law Consumer Protection Claims Fail ............ 35

   III.    The Amended Complaint Fails to State a Claim Against Syngenta Corporation or Syngenta Crop Protection AG............ 36

CONCLUSION................................................................................ 37

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Allen-Myland, Inc. v. IBM Corp.*,
    33 F.3d 194 (3d Cir. 1994) .......................................................................... 31

*Allied Orthopedic Appliances Inc. v.*
    *Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ................................................................. 19, 26

*Arandell Corp. v. CenterPoint Energy Servs. Inc.*,
    900 F.3d 623 (9th Cir. 2018) ........................................................................ 35

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ............................................................................... 16, 25

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
    813 F. Supp. 2d 569 (S.D.N.Y. 2011) ......................................................... 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 13, 24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ............................................................................... 14, 16

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...................................................................................... 30

*Chapman v. N.Y. State Div. for Youth*,
    546 F.3d 230 (2d Cir. 2008) ......................................................................... 30

*Chicoine v. Wellmark, Inc.*,
    894 N.W.2d 454 (Iowa 2017) ....................................................................... 35

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................................. *passim*

*Covert v. Stryker Corp.*,
    2009 WL 2424559 (M.D.N.C. Aug. 5, 2009) .............................................. 24

ii

*Davis v. Univ. of N. Carolina at Greensboro,*
2022 WL 3586093 (M.D.N.C. Aug. 22, 2022) ........................................... 28

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
637 F.3d 435 (4th Cir. 2011) ............................................................... 24, 29

*E.I. du Pont de Nemours & Co. v. FTC,*
729 F.2d 128 (2d Cir. 1984) ....................................................................... 18

*Eastman Kodak Co. v. Image Tech. Servs. Inc.,*
504 U.S. 451 (1992) ............................................................................ 15, 16

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
821 F.3d 394 (3d Cir. 2016) .......................................................... *passim*

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC,*
2014 WL 1343254 (D.N.J. Mar. 28, 2014),
*aff'd,* 821 F.3d 394 (3d Cir. 2016) ........................................................ 11

*Epic Games, Inc. v. Apple, Inc.,*
559 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................... 34

*Epic Games, Inc. v. Apple, Inc.,*
2021 WL 6755197 (9th Cir. Dec. 8, 2021) ........................................... 34

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.,*
44 F.4th 959 (10th Cir. 2022) .................................................................. 16

*Four Corners Nephrology Assocs., P.C. v.*
*Mercy Med. Ctr. of Durango,*
582 F.3d 1216 (10th Cir. 2009) ............................................................... 34

*FTC v. Tenet Health Care Corp.,*
186 F.3d 1045 (8th Cir. 1999) ................................................................. 29

*Gen. Foods Corp.,*
103 F.T.C. 204 (1984) ................................................................................ 18

*Glob. Disc. Travel Servs., LLC v. TWA Inc.,*
960 F. Supp. 701 (S.D.N.Y. 1997) .......................................................... 31

iii

*Hannah's Boutique, Inc. v. Surdej,*
  112 F. Supp. 3d 758 (N.D. Ill. 2015) ......................................................... 35

*Intercollegiate Women's Lacrosse Coaches Ass'n v.*
  *Corrigan Sports Enters. Inc.,*
  505 F. Supp. 3d 570 (M.D.N.C. 2020) ................................................. 23, 36

*It's My Party, Inc. v. Live Nation, Inc.,*
  811 F.3d 676 (4th Cir. 2016) ............................................................... 29, 34

*JSW Steel (USA) Inc. v. Nucor Corp.,*
  586 F. Supp. 3d 585 (S.D. Tex. 2022) ....................................................... 35

*Justice 360 v. Stirling,*
  42 F.4th 450 (4th Cir. 2022) ..................................................................... 33

*LePage's, Inc. v. 3M,*
  324 F.3d 141 (3d Cir. 2003) ...................................................................... 19

*Lorix v. Crompton Corp.,*
  736 N.W.2d 619 (Minn. 2007) .................................................................. 35

*Masimo Corp. v. Tyco Health Care Grp., L.P.,*
  350 F. App'x 95 (9th Cir. 2009) ................................................................ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ............................................................................ 15, 16

*McWane, Inc. v. FTC,*
  783 F.3d 814 (11th Cir. 2015) ................................................. 19, 20, 22, 29

*Midwest Gas Servs., Inc. v. Ind. Gas Co.,*
  317 F.3d 703 (7th Cir. 2003) .................................................................... 35

*Moeller v. Samsung Elecs. Am., Inc.,*
  2022 WL 4182205 (S.D. Iowa Aug. 24, 2022) .......................................... 36

*Murrow Furniture Galleries, Inc. v.*
  *Thomasville Furniture Indus., Inc.,*
  889 F.2d 524 (4th Cir. 1989) .................................................................... 31

iv

*NicSand, Inc. v. 3M Co.*,
  507 F.3d 442 (6th Cir. 2007) ................................................................ 16, 26

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ..................................................................... 29, 30

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ............................................................................ 15

*PBTM LLC v. Football Nw., LLC*,
  2022 WL 670920 (W.D. Wash. Mar. 7, 2022) .......................................... 35

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
  199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd sub nom.*
  *RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.*,
  67 F. App'x 810, 812 (4th Cir. 2003) ...................................................... 21

*S.C. State Bd. of Dentistry v. FTC*,
  455 F.3d 436 (4th Cir. 2006) ................................................................. 18

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ................................................................. 36

*Shore v. Charlotte-Mecklenburg Hosp. Auth.*,
  412 F. Supp. 3d 568 (M.D.N.C. 2019) ..................................................... 13

*Spahr v. Leegin Creative Leather Prod., Inc.*,
  2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ......................................... 35

*Spectrum Pharms., Inc. v. Burwell*,
  824 F.3d 1062 (D.C. Cir. 2016) .............................................................. 9

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
  57 F.3d 1317 (4th Cir. 1995)................................................................. 21

*Triple 7, Inc. v. Intervet, Inc.*,
  338 F. Supp. 2d 1082 (D. Neb. 2004) ...................................................... 35

*United States v. Bestfoods*,
  524 U.S. 51 (1998) .............................................................................. 37

v

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ................................................................ 19, 20

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ................................................................................... 32

*Volm v. Legacy Health Sys.*,
  237 F. Supp. 2d 1166 (D. Or. 2002) ......................................................... 35

*Woods v. Gerber Life Ins. Co.*,
  536 F. Supp. 3d 15 (M.D.N.C. 2021) ........................................................ 13

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ..................................... 15, 17, 19, 21

### Statutes & Rules

15 U.S.C. § 1 .............................................................................. 1, 15, 29
15 U.S.C. § 2 .............................................................................. 1, 15, 29
15 U.S.C. § 14 ............................................................................ 1, 15, 29
15 U.S.C. § 45 .................................................................................. *passim*
40 C.F.R. § 152.113 ............................................................................... 9
Fed. R. Civ. P. 9(b) ............................................................................... 36
Fed. R. Civ. P. 12(b)(6) .................................................................... 1, 13
Iowa Code § 714.16(1)(n) ..................................................................... 36

### Other Authorities

*Ciba-Geigy Ltd.*, 62 Fed. Reg. 409 (FTC Jan. 3, 1997) ...................... 33

FTC, *FTC and State Partners Sue Pesticide Giants Syngenta and Corteva
  for Using Illegal Pay-to-Block Scheme to Inflate Prices for Farmers*
  (Sept. 29, 2022) .................................................................................... 10

FTC, *Policy Statement Regarding the Scope of Unfair Methods of
  Competition Under Section 5 of the Federal Trade Commission Act*
  (Nov. 10, 2022) ....................................................................................... 6

FTC, *Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya on the Adoption of the Statement of Enforcement Policy Regarding Unfair Methods of Competition Under Section 5 of the FTC Act* (Nov. 10, 2022) ............... 6, 34

Lina M. Khan, *"*Opinion: Ag companies' loyalty programs unfairly extract profits from consumers*," Des Moines Register* (Oct. 6, 2022) ................... 11

*In re Novartis AG* (FTC Nov. 1, 2000) ............................................................. 32

*United States v. Bayer AG,*
83 Fed. Reg. 27652 (DOJ June 13, 2018) .................................... 33

*United States v. The Dow Chemical Co.,*
82 Fed. Reg. 28887 (DOJ June 26, 2017) .................................... 33

Case 1:22-cv-00828-TDS-JEP   Document 100   Filed 01/13/23   Page 8 of 47

## NATURE OF THE MATTER

On September 29, 2022, Plaintiffs filed a Complaint that reflected a three-year Federal Trade Commission ("FTC") investigation into Syngenta Crop Protection, LLC's loyalty rebate program. On December 12, 2022, Defendants Syngenta Crop Protection, LLC, Syngenta Crop Protection AG, and Syngenta Corporation (collectively, "Syngenta") moved to dismiss the Complaint.

Instead of defending the Complaint, Plaintiffs used Syngenta's motion to revise it. On December 23, 2022, Plaintiffs filed an Amended Complaint asserting claims under FTC Act § 5, Clayton Act § 3, Sherman Act §§ 1 and 2, and antitrust and consumer protection laws of the twelve plaintiff states. Syngenta moves to dismiss under Rule 12(b)(6) on the grounds set forth below.[1] In addition, Syngenta joins the arguments set forth by co-defendant Corteva, Inc. to the extent they apply to Syngenta.

## PRELIMINARY STATEMENT

This lawsuit is premised on the remarkable proposition that reducing prices—without more—is anticompetitive. The FTC and the States advance an unprecedented and unfounded theory that an industry-standard rebate program offering a modest, optional discount to customers to incentivize

---

[1] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

increased purchases violates the antitrust laws. That theory turns antitrust law on its head, and no court has *ever* endorsed it.

Rebate programs that reduce prices to above-cost levels are permissible as a matter of law, except in narrow circumstances where customers are *forced* to participate by coercive *non*-price features. Nothing of the sort is pleaded or present here. Stripped of its pejorative characterizations and empty labels, the Amended Complaint describes a standard, above-cost rebate program that offers lower prices to incentivize customers of all sizes to purchase more of a particular product line from Syngenta. This program is entirely lawful. As courts have repeatedly recognized, the only "harm" that such a program could cause is pressuring rivals to compete more vigorously. This is the essence of legitimate competition. Accordingly, the Amended Complaint fails to allege competitive harm.

If the Amended Complaint is upheld, then virtually any loyalty rebate program, regardless of its terms, could plausibly be alleged to be anticompetitive. That is not the law, and the Court should not create new law that would punish the very conduct—*price cutting*—the antitrust laws are designed to promote.

The Amended Complaint's deficiencies are particularly glaring given that: (i) the FTC investigated Syngenta—obtaining nearly unlimited discovery from Syngenta and third parties—for *three* years before filing this

2

lawsuit; and (ii) Plaintiffs have now taken the opportunity to amend in response to Syngenta's original motion to dismiss. If any facts *could* have been pleaded to bolster Plaintiffs' claims, they *would* have been pleaded.

For five central reasons, the Amended Complaint should be dismissed with prejudice.

*First*, because the Amended Complaint alleges nothing more than a typical loyalty rebate program, the applicable legal standard is the well-established "price-cost test," which precludes liability on Plaintiffs' allegations. Under this test, when *price* is the core feature of a loyalty program, courts will not condemn the program, regardless of alleged market power or purported effects, as long as the reduced prices are above cost—and thus not "predatory." Here, Plaintiffs have not alleged any non-price exclusionary feature of Syngenta's single-product line, short-term loyalty rebate program, nor can they.

The Third Circuit—the circuit with the most experience analyzing loyalty rebate programs—has explained:

> [W]hen pricing predominates over other means of exclusivity, the price-cost test applies. This is usually the case when a firm uses a single-product loyalty discount or rebate …. In that situation, an equally efficient competitor can match the loyalty price and … compete on the merits. More in-depth factual analysis is unnecessary because … 'the balance always tips in favor of allowing above-cost pricing practices' …. [T]he above-cost pricing … is *per se* legal.

3

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016).
Here, Plaintiffs do not—and cannot—plead that Syngenta's discounted prices
are below its costs. Thus, the legal question presented by this motion is
simply: Is the presumption of "usual" legality overcome by plausible
allegations of fact showing that coercive or otherwise exclusionary non-price
features of Syngenta's loyalty program "predominate" over price? The
answer is no.

The facts here contrast sharply with the few loyalty programs that
have been deemed anticompetitive. Those programs involved multiple *non*-
price features that could have coerced customers to comply with the rebate
conditions, or could have excluded rivals other than by lowering prices—
features such as (i) bundling or tying across multiple product lines, (ii) multi-
year purchasing requirements, (iii) punishments for falling below loyalty
thresholds (such as termination of supply or forfeiture of accrued but unpaid
rebates), or (iv) conditioning rebates on customers blocking all rival suppliers.

After three years of discovery by the FTC, the Amended Complaint
alleges *no* such features of Syngenta's program. To attempt to portray
Syngenta's loyalty program as coercive, the Amended Complaint adds a
misleading, out-of-context allegation that Syngenta once terminated a
distributor that ███████████████████████████. But that
isolated allegation—characterizing a single event, over decades of program

4

implementation—does not show that Syngenta's *program* in itself is coercive. Indeed, that allegation does not even plausibly support the notion that Syngenta's program was *administered* coercively, particularly in light of contrary acknowledgments that distributors do not always meet thresholds and that Syngenta sometimes pays rebates despite missed thresholds. And Plaintiffs' other attempts to plead coercion rest on conclusory allegations with no factual content, which should not be credited. Plaintiffs' unavailing attempts to plead coercion simply signpost the Amended Complaint's fatal omissions.

*Second*, Plaintiffs' claims fail for the independent reason that the Amended Complaint does not show the requisite harm to competition. Competing on quality and price can impact competitors, but only conduct causing *anticompetitive* foreclosure can be unlawful. Because Syngenta's rebate program constitutes competition on the merits, its effect on competitors *cannot* be anticompetitive. Indeed, Plaintiffs plead facts showing how the substantial and thriving presence of generic competitors in the market pose a "competitive threat" to Syngenta.

*Third*, the FTC's claim under Section 5 of the FTC Act does not circumvent the well-established law governing loyalty rebate programs. This lawsuit is part of the current FTC's well-publicized agenda to *transform* established antitrust law. The FTC recently announced, *after* filing this

5

lawsuit, its belief that Section 5 grants it sweeping powers.[2]  That announcement rejects prior bipartisan guidance interpreting Section 5 consistently with long-established Sherman Act precedent.  In support of that position, the FTC Chair even criticized the Obama Administration for being insufficiently aggressive—and "abdicat[ing]" its enforcement role—for not attempting to enforce Section 5 in the unprecedented and unbounded manner asserted now.[3]  Whatever authority Section 5 does or does not afford the FTC, Section 5 does *not* upend bedrock antitrust principles, including that antitrust law exists to protect *competition*, not competitors, and that above-cost price-cutting is the essence of competition.  This Court should reject the FTC's attempt to expand its powers by inventing a new standard for loyalty rebate programs under Section 5.

*Fourth*, the Amended Complaint should be dismissed for the independent reason that it alleges legally defective product markets.  Under black-letter antitrust law, claims of anticompetitive exclusion require allegations showing market power within a properly defined product market.

---

[2] FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022), *available at* www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf.

[3] *Available at* www.ftc.gov/system/files/ftc_gov/pdf/Section5PolicyStmtKhanSlaughterBedoyaStmt.pdf.

6

A properly defined market must reflect commercial realities by embracing "reasonable interchangeable" substitutes in consumer use. Plaintiffs' improper market definitions—based on a product's "active ingredient" (or "AI") rather than growers' use of the product—are too narrow, because no facts are pleaded excluding pesticides containing different AIs as reasonable substitutes. Plaintiffs fudge this issue by alleging that pesticides based on the same AI are *closer* substitutes—but that slippery standard is not the legal test. Notably, Plaintiffs' market definitions are significantly narrower than usage-focused definitions used by the FTC itself in matters *involving the same products*.

*Fifth*, the legality of Syngenta's loyalty program under federal antitrust law defeats the claims under the relevant state antitrust laws, which are generally interpreted consistently with federal law. The two consumer protection claims fail for additional reasons explained below. Alternatively, if the Court dismisses the federal claims, it can decline jurisdiction over the state claims.

## QUESTION PRESENTED

Should the Amended Complaint be dismissed for these five reasons?

## FACTUAL ALLEGATIONS[4]

### A.    The Crop-Protection Industry

Syngenta researches, discovers, develops, manufactures, and sells pesticides that "dramatically increase" farmers' "crop yields and quality." ¶¶ 37, 40-41.[5] Each pesticide combines at least one active chemical—the "AI"—with inert components. ¶ 43. Each AI has a "mode of action" and different AIs that "share a common mode of action tend to have similar use cases"; among different products with similar use cases, products containing the same AI are allegedly "closer" substitutes. ¶ 46.

A "patent and regulatory framework" that "rewards innovation" governs crop-protection products. ¶ 50. Inventors such as Syngenta can apply for 20-year patents to protect new AIs. ¶¶ 48, 51. Environmental Protection Agency (EPA) approval of a new AI grants the inventor "the exclusive right to cite the data it submitted in support of the [AI]" for ten years. ¶¶ 52-53.

After an AI's patent and data exclusivity expire, generic manufacturers may sell generic versions. ¶ 54. Plaintiffs assert that generic manufacturers

---

[4] Plaintiffs' allegations are incomplete, misleading, and often inaccurate. The well-pleaded facts are nonetheless assumed to be true for this motion.

[5] Citations in the form "¶_" or "¶¶_" refer to the Amended Complaint.

8

offer "*equivalent* products containing the same [AIs]." ¶ 4. But unlike generic pharmaceuticals, for example, generic pesticides do *not* have to prove they are equivalent.[6]  Plaintiffs do not—and cannot—allege that generic pesticides provide a similar or substitutable value proposition to customers— that is, that generic manufacturers provide the same level of quality and suite of services to consumers that Syngenta provides.

To the contrary, Plaintiffs implicitly concede that the quality and supply availability of generics are *not* equivalent to Syngenta's products. ¶¶ 104, 117, 178 (vaguely alleging that generics have "sufficient" quality and supply availability).  Generic products "are generally sold at significantly lower prices," including ███████████████████████ ¶¶ 57, 198. Plaintiffs ignore how Syngenta's value-added services, higher quality products, and other product advantages contribute to price differences. Plaintiffs likewise disregard the broader implications of ████████████ ██████████ on competition among products used by farmers for whom a successful harvest is paramount.

_____

[6] *Compare Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1066 (D.C. Cir. 2016) (a generic drug must be "equivalent in all material respects to the pioneer drug" to obtain FDA approval), *with* 40 C.F.R. § 152.113(b) (a generic pesticide "and its proposed use" must be "identical or substantially similar to" a registered pesticide and use *or* the differences must "not significantly increase the risk of unreasonable adverse effects on the environment").

9

"Traditional" distributors handle about 90% of U.S. sales of crop protection products, branded and generic, with seven distributors handling over 90% of sales through this channel. ¶ 55. Plaintiffs acknowledge that generic manufacturers can "circumven[t]" traditional distributors through "direct sales to local retailers or farmers," but argue that direct sales are generally not "efficien[t]." ¶ 56(c).

## B. Syngenta's Loyalty Rebate Program

For decades, Syngenta's loyalty program has offered a year-end rebate that reduces the net price of products containing a certain AI if the distributor meets a negotiated threshold for the purchase or sale of such products. ¶¶ 60, 66, 68-69, 115.[7] Syngenta adds AIs whose patents have expired to this program to compete against generics. ¶ 62.

Plaintiffs rhetorically disparage Syngenta's payments as "exclusion payments" (*e.g.*, ¶ 60),[8] but concede that they are actually "payments in the

---

[7] For each AI, the rebate threshold is calculated as follows:

$$\frac{\text{Qualification-eligible products}}{\text{Qualification-eligible products} + \text{Non-Syngenta products}}$$

¶ 68. Eligible products include "Syngenta-branded products and certain non-Syngenta products for which the [AI] is sourced from Syngenta." *Id.* Other products, including products containing an AI purchased from Syngenta, are "neutral" and count "in neither the numerator nor the denominator." *Id.*

[8] The FTC Chair has publicly disparaged Syngenta's rebates as "pa[y] off[s]." www.ftc.gov/news-events/news/press-releases/2022/09/ftc-state-partners-sue-pesticide-giants-syngenta-corteva-using-illegal-pay-block-

10

form of rebates." ¶ 206.[9] "Distributors profit more from accepting [Syngenta's rebates] than they would from distributing lower-priced generic products in substantial volumes." ¶ 7.

The rebate thresholds and amounts differ "by year, by [AI], and by distributor." ¶¶ 69-70. The current thresholds for the AIs at issue are 90-92%, and Syngenta has lowered them over time. ¶¶ 93, 102, 115. Not all distributors meet their thresholds, but no penalty results; others exceed them, but the rebate percentage does not increase. ¶¶ 81, 86.

The rebate program for retailers is "similar," except retailers earn rebates by choosing to meet the threshold (without written agreements). ¶ 72. Retail rebates generally equal "5% of total eligible purchases of covered Syngenta products." *Id.*

------

scheme-inflate; *see also* Lina M. Khan, "Opinion: Ag companies' loyalty programs unfairly extract profits from consumers," *Des Moines Register* (Oct. 6, 2022), *available at* www.desmoinesregister.com/story/opinion/columnists/2022/10/06/syngenta-corteva-farmers-lawsuit-unfairly-extract-profits-from-consumers/69542239007.

[9] Plaintiffs insist that Syngenta's rebates payments are not discounts because they are a "percent incentive paid at the end of the year for performance." ¶ 83. That rebates are conditional, however, does not negate that they are, as a matter of law, discounts. *See infra* Point I.A; *see also Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *28 (D.N.J. Mar. 28, 2014) (rejecting as "semantics" the plaintiff's characterization of loyalty discounts as "disloyalty penalties"). Plaintiffs are engaging in essentially the same semantic exercise here.

11

Plaintiffs plead no potentially coercive non-price features of Syngenta's rebate program. No alleged facts show, for example, that (i) Syngenta's marketing agreements contractually obligate distributors to purchase any minimum amount of Syngenta's products or prohibit distributors from dealing with generic competitors; (ii) Syngenta's loyalty rebates are conditioned on sales of any AI other than the AI on which they are paid (i.e., are "bundled") or on sales in any other year; or (iii) Syngenta threatens or imposes any penalty (e.g., loss of product supply, forfeiture of accrued rebates) for failure to meet the threshold. *See infra* Point I.B.

## C. <u>Syngenta Products at Issue</u>

Plaintiffs focus on three Syngenta AIs: azoxystrobin, mesotrione, and metolachlor (including s-metolachlor). ¶ 89. Azoxystrobin is a "broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases." ¶ 90. Herbicides mesotrione and metolachlor protect corn, and metolachlor also protects a variety of other crops. ¶¶ 99, 113.

Plaintiffs allege that Syngenta added each AI to its rebate program in response to entry by lower-priced generics. ¶¶ 91-93, 100-102, 114-115. Plaintiffs concede that generic entry "caused Syngenta to reduce prices" of azoxystrobin, mesotrione, and metolachlor products. ¶¶ 98, 106, 121.

Case 1:22-cv-00828-TDS-JEP   Document 100   Filed 01/13/23   Page 20 of 47

**D. <u>Supply Agreements Between Syngenta and Corteva</u>**

Corteva makes a mixture containing mesotrione, which Syngenta

███████ supplies under an agreement providing that Corteva's product is

███████ under Syngenta's rebate program. ¶¶ 107-108, 197-198. Syngenta

also ███████ supplies s-metolachlor to Corteva under an agreement

providing that Corteva's s-metolachlor products are ███████

███████ under Syngenta's rebate threshold calculations. ¶ 122.

<u>LEGAL STANDARDS</u>

Rule 12(b)(6) dismissal is compelled when Plaintiffs fail to plead facts

sufficient "to raise a right to relief above the speculative level," *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 545 (2007)—including when well-pleaded

allegations do not state a claim that is "plausible on its face." *Woods v.*

*Gerber Life Ins. Co.*, 536 F. Supp. 3d 15, 18 (M.D.N.C. 2021). In assessing

plausibility, the court relies "upon its judicial experience and common sense."

*Id.* Conclusory factual allegations and legal conclusions are not credited.

*Twombly*, 550 U.S. at 556-57; *Shore v. Charlotte-Mecklenburg Hosp. Auth.*,

412 F. Supp. 3d 568, 572-73 (M.D.N.C. 2019). And given "the costs of modern

federal antitrust litigation," antitrust cases should not progress to "discovery

when there is no reasonable likelihood that the plaintiffs can construct a

claim from the events related in the complaint." *Twombly*, 550 U.S. at 558.

13

## ARGUMENT

## I. The Amended Complaint Fails To State a Federal Antitrust Claim

Plaintiffs' allegations fail to state an antitrust claim under well-established law. The well-pleaded allegations show that Syngenta's loyalty rebate program wields no stick, and price is the only carrot. Price *competition* itself can exclude *competitors*, but the antitrust laws prohibit only *anticompetitive* exclusion. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).

We are aware of no case condemning as anticompetitive an above-cost market share rebate program, such as Syngenta's, that lacks coercive non-price features. The FTC's attempt to create such a precedent through this case highlights how radically it seeks to transform settled antitrust law. Indeed, by seeking to enjoin a pure price-cutting practice, this lawsuit seeks to upend rational antitrust law.

### A. The Price-Cost Test Applies to Non-Coercive, Single-Product Loyalty Rebates

The gravamen of Plaintiffs' claims is that Syngenta's loyalty rebate program allegedly constitutes *de facto* exclusive dealing that impedes generic manufacturers' access to distributors. *See, e.g.*, ¶ 5 ("Defendants use their loyalty programs to exclude generic manufacturers from the traditional

14

distribution channel …."); ¶ 7 ("Defendants' loyalty programs are designed to hinder the entry and expansion of generic manufacturers ….").

Loyalty or "market share" discounts or rebates challenged as *de facto* exclusive dealing are not unlawful on their face, but instead are analyzed under the rule of reason. *See, e.g.*, *Eisai*, 821 F.3d at 403 (Sherman Act § 1 and Clayton Act § 3); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (Sherman Act §§ 1 and 2). Where "price is the clearly predominant mechanism of exclusion," the rule of reason standard is applied through the "price-cost test." *Eisai*, 821 F.3d at 409. The principles underlying this test "extend to above-cost discounting or rebate programs, which condition the discounts or rebates on the customer's purchasing of a specified volume or a specified percentage of its requirements from the seller." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012). Failure to satisfy the price-cost test requires that claims based on alleged rebates should be dismissed at the pleading stage. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451-52 (2009) (dismissing claim).

One of the bedrock principles on which the price-cost test rests is that "cutting prices to increase business is 'the very essence of competition.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); *accord, e.g.*, *linkLine*, 555 U.S. at 451. In *Matsushita*, the Supreme

15

Court rejected an attempt "to prove an antitrust conspiracy 'through evidence of rebates and other price-cutting activities.'" *Eastman Kodak*, 504 U.S. at 478 (quoting *Matsushita*, 475 U.S. at 594). It explained that "mistaken inferences" in an antitrust case based on price-cutting "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594; *accord*, *e.g.*, *Brooke Grp.*, 509 U.S. at 226.

The price-cost test is buttressed by the principle that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("*ARCO*").

On this settled legal foundation, courts have upheld as procompetitive above-cost market share rebates and discounts that lack coercive non-price features. *See, e.g.*, *Eisai*, 821 F.3d at 409; *Concord Boat*, 207 F.3d at 1063; *see also In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 1000 (10th Cir. 2022) (rebate "payments exemplified vigorous price competition—something we strenuously protect"); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (manufacturer's payments for exclusive distribution "furthered" the antitrust laws' "competition-enhancing goals").

Case 1:22-cv-00828-TDS-JEP   Document 100   Filed 01/13/23   Page 24 of 47

The test for when a market share rebate or discount *might* be anticompetitive is well developed:

> [C]ontracts in which discounts are linked to purchase (volume or market share) targets are frequently challenged as *de facto* exclusive dealing arrangements on the grounds that the discounts induce customers to deal exclusively with the firm offering the rebates. However, when price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects.

*ZF Meritor*, 696 F.3d at 275. In *ZF Meritor*, the Third Circuit "join[ed] [its] sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market." *Id.* at 275 n.11.

Courts first consider "whether the conduct constitutes an exclusive dealing arrangement or simply a pricing practice"—that is, whether "price is the clearly predominant mechanism of exclusion." *Eisai*, 821 F.3d at 408-09. If price predominates, then the rule of reason applies through the price-cost test, under which plaintiffs may succeed only if defendant's prices fall below cost. *Id.* Here, Plaintiffs fail to state a claim as a matter of law because they do not—and cannot—allege facts showing (i) Syngenta's rebate program entails non-price coercion (much less that coercion predominates over pricing) or (ii) Syngenta's post-rebate prices are below cost.

17

The analysis is no different under Section 5 of the FTC Act. "[W]hile 'unfair competition' [under Section 5] may not be coterminous with 'anticompetitive conduct,' the two concepts are still intimately intertwined." *S.C. State Bd. of Dentistry v. FTC,* 455 F.3d 436, 443 n.7 (4th Cir. 2006). As the FTC has acknowledged, "[w]hile Section 5 may empower the Commission to pursue those activities which offend the 'basic policies of the antitrust laws, we do not believe that power should be used to reshape those policies when they have been clearly expressed and circumscribed." *Gen. Foods Corp.*, 103 F.T.C. 204, 365 (1984). Thus, using Section 5 to condemn conduct that is protected as *procompetitive* under the price-cost test would directly contradict the FTC Act's purpose of "protect[ing] society against oppressive anti-competitive conduct." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d Cir. 1984).

## B. Syngenta's Loyalty Rebates, Which Lack Any Coercive Non-Price Feature, Are "the Very Essence of Competition"

The well-pleaded facts of the Amended Complaint, rid of its rhetoric, show that Syngenta's rebates constitute price competition of the very kind that the Supreme Court protected in *Matsushita*.

Syngenta's rebates offer distributors and retailers lower net prices to incentivize them to purchase more of each Syngenta AI. *See, e.g.*, ¶ 6 (deriding as "exclusion payments" Syngenta's "incentive payments based on

[a distributor's] purchases of branded crop-protection products"). The threshold for earning a rebate is market-share based, ¶¶ 67, 72, so the incentives exist regardless of the customer's size.

Significantly, Plaintiffs do not—and cannot—plead that Syngenta's loyalty rebate program has any of the non-price coercive features that courts have required before deeming a market share rebate or discount program to be potentially anticompetitive:

- Syngenta's rebate program does not "contractually obligat[e] customers to purchase a set percentage of their [product] requirements" from Syngenta.[10]

- Syngenta's rebates are not "conditioned … on purchases across various product lines"[11] and do not involve "tying or bundling with another product."[12]

- Syngenta does not threaten distributors that purchasing competitors' products may result in losing "any unpaid rebates [they had accrued]" or "be[ing] cut off from purchasing" Syngenta's products.[13]

---

[10] *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 n.2 (9th Cir. 2010) (distinguishing *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 350 F. App'x 95 (9th Cir. 2009)).

[11] *Eisai*, 821 F.3d at 405.

[12] *Concord Boat*, 207 F.3d at 1062; *see ZF Meritor*, 696 F.3d at 282 (explaining that in *LePage's Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003), the court "held that bundled rebates and discounts offered to major suppliers were designed to and did operate as exclusive dealing arrangements").

[13] *McWane, Inc. v. FTC*, 783 F.3d 814, 820-21 (11th Cir. 2015); *see ZF Meritor*, 696 F.3d at 265, 278 ("compliance with the market penetration targets was mandatory because failing to meet such targets would jeopardize the [customer's] relationships with" the defendant, which could also require "repayment of all contractual savings" under long-term agreements); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (policy under

19

- Syngenta's rebate program is not "unilaterally imposed by fiat upon all distributors"[14] and customers are "free to walk away from [Syngenta's] discounts at any time."[15]

The only well-pleaded consequence to a distributor or retailer that does not meet Syngenta's rebate threshold for a particular AI is not earning the rebate for that AI that year. This is not illegal or anticompetitive.

The few precedents that have found loyalty programs to be anticompetitive highlight the absence of any similarly coercive features in Syngenta's program. In *McWane*, the manufacturer compelled total exclusivity by threatening to "cut off" product supply and withhold accrued rebates, and the program "was enforced as threatened." 783 F.3d at 821, 834. In *Dentsply*, the manufacturer prohibited dealers from offering competitors' products, backed by threats to "sever access" to the defendant's competing artificial tooth products *and* its "other dental products." 399 F.3d at 185, 190. *ZF Meritor* involved "restrictive long-term agreements," each a minimum of five years, under which customers failing to meet targets for a single year risked forced "repayment of all contractual savings," and "cancellation of the contract, price increases, and shortages," rendering "compliance …

---

which manufacturer stopped supplying dealers who carried competing manufacturers' products violated § 2).

[14] *McWane*, 783 F.3d at 834.

[15] *Concord Boat*, 207 F.3d at 1063.

20

mandatory." 696 F.3d at 265, 277-78, 287.  Further, the defendant "forced"

its customers to exclude competitors' products from "essential" marketing

materials provided to consumers ("data books"), thereby "block[ing]"

consumer access to competing products.  *Id.* at 264, 277.

Syngenta's loyalty rebate program does not impose any non-price

means of exclusivity—much less any that predominates over price.  To the

contrary, Syngenta's rebates are specific to products containing a particular

AI during a single year.  ¶¶ 60, 67, 72.  The single-AI feature of Syngenta's

rebates undermines Plaintiffs' antitrust claims because "when a firm uses a

single-product loyalty discount or rebate to compete with similar products,"

"pricing [usually] predominates over other means of exclusivity."  *Eisai*, 821

F.3d at 409.

The single-year term of the rebates further undermines Plaintiffs'

claims because, as the Fourth Circuit has held, even *express* exclusive dealing

agreements—which are *not* at issue here—with a one-year duration are

presumptively incapable of harming competition.  *See, e.g.*, *R.J. Reynolds

Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 391 (M.D.N.C. 2002)

("The Fourth Circuit has held that exclusive contracts terminable after thirty

days to one year do not have substantial anticompetitive effects.") (citing

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1326 (4th

Cir. 1995)), *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA*,

21

*Inc.*, 67 F. App'x 810, 812 (4th Cir. 2003) (affirming "on the reasoning of the district court with one [inapplicable] exception").

To attempt to save their claims, Plaintiffs allege a single incident in which Syngenta terminated a distributor that ███████████████████ ██████████. ¶ 88. But that isolated allegation does not show that Syngenta's rebate program—which Plaintiffs "see[k] to end" (¶ 3)—has any non-price coercive feature. Indeed, it is simply not probative of the *program* itself. Nor does that allegation show that the program is *administered* coercively, particularly alongside Plaintiffs' acknowledgment that distributors do not always meet program thresholds, and that Syngenta sometimes grants exceptions for missed thresholds, even without "good cause." ¶¶ 81, 87.

*McWane* stands in stark contrast, and illustrates what genuine, actionable coercion looks like. There, the loyalty program was not voluntary, but instead "was 'unilaterally imposed' by fiat upon all distributors." 783 F.3d at 834. The manufacturer coerced exclusivity through threats, expressed in the announced terms of the program, to sever access to its products and withhold earned rebates, which it then enforced. *McWane*, 783 F.3d at 821. Those threats had their intended effect, and distributors "abid[ed] by the [mandated loyalty program] in order to avoid the devastating result of being cut off from all McWane [products]." *Id.*

22

Despite the FTC's three-year investigation into Syngenta's decades-old program, Plaintiffs allege nothing of the sort here that would suggest Syngenta designed, or even administered, its rebate program to be coercive. Plaintiffs do not allege Syngenta threatened this or any other distributor (implicitly or explicitly), or otherwise acted to compel compliance with loyalty thresholds. Under these circumstances, an isolated termination simply is not probative of the features of the program that Plaintiffs "see[k] to end." ¶ 3.

Other than this one inapposite allegation, Plaintiffs rely solely on improper group pleading and otherwise vague allegations of coercion. Plaintiffs allege, for example, that "*Defendants* … threaten penalties for disloyalty." ¶ 7; *see* ¶ 88 ("*Defendants* have retaliated and threatened to retaliate … against distributors that failed to satisfy applicable loyalty thresholds, including by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage."). These unsupported allegations of "threat[s]" and "retaliat[ion]" are useful only in that they identify the deficiencies in the Amended Complaint that Plaintiffs seek to obscure.

Plaintiffs' conclusory attempts to cure these deficiencies do not save their claims. *See Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 505 F. Supp. 3d 570, 582 (M.D.N.C. 2020) ("[A] plaintiff cannot rely on bare allegations relating to the conduct of 'all defendants' to

hold [a defendant] liable, but must identify specific acts or conduct taken by each defendant to state a claim."); *Covert v. Stryker Corp.*, 2009 WL 2424559, at *10 (M.D.N.C. Aug. 5, 2009) ("[I]t is only by taking care to require allegations that reach the [requisite] level [of specificity] … that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support [the alleged] claim.") (quoting *Twombly*, 550 U.S. at 559).

That Plaintiffs, following amendment, allege only a single inapplicable instance of supposedly improper conduct, together with vague allegations and group pleading, is especially noteworthy because the FTC investigated Syngenta's loyalty program for *three years* before suing. If there were any facts supporting a characterization of the program as coercive, Plaintiffs' 108-page Amended Complaint surely would have pleaded them.

In a final effort to muddy the waters, Plaintiffs allege two agreements under which Syngenta ███████ supplies Syngenta AIs (mesotrione and s-metolachlor, respectively) to Corteva for use in products that compete against Syngenta products. ¶¶ 107-109, 122, 197-198. But Plaintiffs plead no facts showing that either of these (unremarkable) supply agreements has a substantial effect on competition. *See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 451 (4th Cir. 2011) ("[A]n exclusive deal

affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition[.]").

Instead, the Amended Complaint shows that ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ ¶ 197. These facts demonstrate price competition in action—and undermine Plaintiffs' argument that Syngenta's loyalty program forecloses generic competition. *See infra* Point II.C.

## C. <u>Plaintiffs Have Failed to Plead Harm to Competition</u>

"The antitrust laws were enacted for the protection of competition, not competitors." *ARCO*, 495 U.S. at 338. "To hold that the antitrust laws protect competitors from the loss of profits due to nonpredatory price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Id.*

Plaintiffs argue that Syngenta's rebate program has "impaired the competitiveness of generic competitors" and resulted in generics "exit[ing]" the market or abandoning "plans to enter." ¶ 164. But Plaintiffs do not plead facts showing *anticompetitive* exclusion of generic competitors, as opposed to the effects of lawful price competition.

Even crediting Plaintiffs' speculation that generic competitors would sell more product absent Syngenta's loyalty rebates, such speculation cannot establish *anticompetitive* foreclosure. It is impermissible, as a matter of law, to infer that a defendant maintained its "superior market share … by means other than competition on the merits" through non-coercive, above-cost market share discounts that did not entail "tying or bundling with another product." *Concord Boat*, 207 F.3d at 1062. Where, as here, "customers had the ability to switch to competing products [but] simply chose not to do so," it is improper to infer that "the probable effect of [a loyalty rebate program] was to substantially lessen competition in the relevant market, rather than to merely disadvantage rivals." *Eisai*, 821 F.3d at 407-08.

Because Syngenta is incentivizing its customers to buy more of its products by lowering its prices, the effect on generic competitors is not anticompetitive. *See, e.g.*, *NicSand*, 507 F.3d at 455 ("[The plaintiff's] injury does not correspond to any allegedly anticompetitive effect on the market but rather a truly competitive one.").

Any potential to foreclose competition is negated where, as here, "[a]ny customer subject to one of [Syngenta's] market-share [rebate] agreements could choose at anytime to forego the [rebate] offered by [Syngenta] and purchase from a generic competitor." *Tyco*, 592 F.3d at 997. "[T]he threat of a lost discount is a far cry from the anticompetitive conduct at issue in *ZF*

26

*Meritor* or *Dentsply*." *Eisai*, 821 F.3d at 407. Absent "the kind of clear-cut harm to competition that was present" in those cases—mandatory compliance with threshold targets (*ZF Meritor*) and threats to cut off supply if customers purchased any products from competitors (*Dentsply*)—Plaintiffs are unable to demonstrate *anticompetitive* foreclosure. *Id.*

Plaintiffs do not explain why generic competitors do not likewise offer rebates, or otherwise lower their prices, to make their products more profitable to distributors. If, as Plaintiffs assert, "[d]istributors profit more from accepting [Syngenta's rebates] than they would from distributing lower-priced generic products in substantial volumes" (¶ 7), then it is economically rational for distributors *not* to distribute generics in greater volume unless generic manufacturers lower their prices to distributors (or increase the quality of their products so they command higher prices when distributors resell them).

Instead of pleading facts showing harm to competition, Plaintiffs affirmatively plead facts showing that Syngenta's rebate program does *not* insulate it from generic competition—thus undermining the essential element of *anticompetitive* foreclosure. *See Eisai*, 821 F.3d at 407.

Specifically, Plaintiffs allege that in 2017—years after Syngenta added mesotrione to its loyalty program (¶ 102)—Corteva ███████████████ ████████████████████████████████████████████ ¶ 197.

27

The prospect of Corteva ██████████████████ allegedly posed a "competitive

threat" to Syngenta that ███████████████████████████████

████████████████████████████████████████████████

¶¶ 107-108.

If, however, Syngenta's loyalty program foreclosed generic mesotrione

competition, then Syngenta could not have been, years later, vulnerable to a

████████████████ from the "competitive threat" of ████████████████ Thus,

these allegations refute Plaintiffs' vague assertions that, for example,

"[t]hrough its loyalty program, each Defendant has substantially impeded

generic manufacturers from providing effective competition." ¶ 63.

Plaintiffs' antitrust claims should be dismissed on this basis alone, because

"[w]here, as here, a plaintiff pleads contradictory allegations, those

inconsistencies defeat a reasonable inference in the plaintiff's favor." *Davis v.*

*Univ. of N. Carolina at Greensboro*, 2022 WL 3586093, at *8 (M.D.N.C. Aug.

22, 2022) (Schroeder, C.J.).

Similarly, Plaintiffs contend that ██████████████████████████

████████████████████████████████████████

████████████████████ ¶¶ 110, 197-198. But the facts as pleaded by

Plaintiffs show otherwise. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (¶¶ 107, 197), ████████

28

████████████████████████████████████ ██ (¶ 198).  Thus, Corteva did *not* use the ██████

██ █████████████████ to change the treatment of its mixture under Syngenta's rebate program, but instead

█████████████████████████ ¶ 197.  This is precisely how price competition is supposed to work.

### D.  Plaintiffs Do Not Plead a Plausible Product Market

Plaintiffs' failure to define a plausible relevant product market is independently fatal to their antitrust claims.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("*Amex*") (Sherman Act § 1); *Kolon Indus.*, 637 F.3d at 441 (Sherman Act § 2); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999) (Clayton Act); *McWane*, 783 F.3d at 828 (FTC Act § 5). Plaintiffs must define a relevant market even when they "rely exclusively on direct evidence to prove that [the defendant's challenged actions] have caused anticompetitive effects in [a] market," because "[t]o assess this evidence, [plaintiffs] must first define the relevant market."  *Amex*, 138 S. Ct. at 2284-85.

Product market definition "depends on whether [a product] is reasonably interchangeable with other products or the extent to which consumers will change their consumption of one product in response to a price change in another."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d

676, 683 (4th Cir. 2016).  The foremost obligation in market definition is reflecting commercial realities.  *See Amex*, 138 S. Ct. at 2285; *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336-37 (1962).  A market pleaded more narrowly than the obvious set of reasonably interchangeable substitutes is not plausible. *E.g.*, *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

Plaintiffs' narrow, AI-specific product markets are implausible because Plaintiffs plead no facts excluding similar AIs with overlapping uses from the markets.  Plaintiffs acknowledge that "[AIs] that share a common mode of action tend to have similar use cases."  ¶ 46.  Plaintiffs further concede that azoxystrobin is a versatile pesticide "used across all major row crops," and that "other" herbicide AIs are "similar" to each of mesotrione and metolachlor.  ¶ 157(a)-(c).  The existence of substitutes in use requires Plaintiffs to plead facts that justify excluding the substitutes from the markets.  *See, e.g.*, *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (dismissing antitrust claims because the plaintiff did not "allege sufficient facts about other [potential substitutes] to make its proposed [single molecule combination] product market plausible").

Plaintiffs fail this pleading requirement.  They seek to "differentiate" Syngenta's AIs at issue from the similar AIs—alleging, for example, that azoxystrobin is more versatile and may have "effects not proven in other [AIs]"; mesotrione is "superior" in certain respects; and metolachlor

30

"outperforms" other AIs in other respects.  ¶ 157(a)-(c).  But alleging that a product has unique qualities, or consumers may prefer it, is insufficient.  *See, e.g.*, *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances.  Such distinctions are economically meaningless where the differences are actually a *spectrum* of price and quality differences.") (emphasis in original); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994) ("'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively."); *Glob. Disc. Travel Servs. LLC v. TWA, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) ("A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network.").

The implausibility of Plaintiffs' single-AI market definitions is highlighted by Plaintiffs' implicit concession that Syngenta's AIs are superior to *generic manufacturers' versions* of them.  ¶ 104 (tepidly alleging that generics are "of sufficient quality and supply availability").  Under Plaintiffs' contorted logic, Syngenta's AIs have quality differences from *other*

31

*substitutable AIs* so those AIs should be *excluded*—but Syngenta's AIs also have quality differences from generic versions of the *same* AIs, yet those AIs should be *included*.  Plaintiffs rest their market definition on logic that directly undermines itself.

Plaintiffs insist that a generic version of an AI "is a *closer* substitute for a given branded product than is a product containing a different [AI]."  ¶ 46. But the governing legal standard is "reasonable interchangeability" for use by consumers, and under this standard, alleging there is a relatively "closer substitute" does not establish the outer limits of the market.  Indeed, if "closer substitute" were the standard, then there would never be a relevant market that goes beyond identical products—which, of course, is not the case. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.").

The unreasonable narrowness of Plaintiffs' single-AI product markets is confirmed by the FTC's prior market definitions, including for the *same AIs at issue here*.  The FTC stated in a merger proceeding, for example, that the relevant product market for metolachlor is "pre-emergent  herbicides." *In re*

32

*Novartis AG* (FTC Nov. 1, 2000).[16]  And the FTC included Corteva's

acetochlor in that same multiple-AI relevant market together with

metolachlor:

> Most pre-emergent herbicides *used by corn growers* to control
> grassy weeds belong to a class of chemicals known as
> acetanilides.  The major [AIs] within this class are metolachlor,
> acetochlor, and dimenthenamid.  These products are *used by
> growers* because preventing early competition between the
> growing corn and grassy weeds for water and nutrients is
> essential to the economic production of corn. … [F]armers have
> no economic substitutes for acetanilide herbicides.

*Id.*  Here, Plaintiffs neglect to inform the Court that the unidentified AIs they

allege are "similar" to Syngenta's metolachlor include Corteva's acetochlor.

¶ 157(c).

Similarly, the FTC—and the U.S. Department of Justice ("DOJ")—have

alleged multi-AI crop protection product markets in other antitrust matters.

*See, e.g.*, *United States v. Bayer AG*, 83 Fed. Reg. 27652, 27653 (DOJ June 13,

2018) (analyzing alleged "foundational herbicides" and "nematicidal seed

treatments" markets); *United States v. The Dow Chemical Co.*, 82 Fed. Reg.

28887, 28887 (DOJ June 26, 2017) (analyzing alleged "broadleaf herbicides

for winter wheat" and "insecticides for chewing pests" markets); *Ciba-Geigy*

_____

[16] *Available at* www.ftc.gov/sites/default/files/documents/cases/2000/11/
novartanalyis.htm.

The Court may judicially notice this document as a "matte[r] of public
record." *Justice 360 v. Stirling*, 42 F.4th 450, 455 (4th Cir. 2022).

*Ltd.*, 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997) (analyzing alleged "corn herbicides for pre-emergent control of grasses" market—including metolachlor—and "corn herbicides for post-emergent control of broadleaf weeds" market).

The difference in the FTC's prior usage-based markets and its single-AI markets here does not appear to be based on different facts, but instead on the evolving philosophy of the FTC's Chair, who has charged her predecessors with "abdicat[ing]" their enforcement responsibilities by interpreting Section 5 in accord with well-established antitrust law. *See supra* n.3. By defining different relevant product markets for the same products in different cases, the FTC is attempting to "gerrymander its way to an antitrust victory." *It's My Party*, 811 F.3d at 683.

## II. The Amended Complaint Fails To State a Claim Under State Law

### A. The State Law Antitrust Claims Fail

Because the state antitrust statutes at issue are generally interpreted consistently with federal antitrust law, the state law antitrust claims brought by plaintiff States fail for the same reasons as Plaintiffs' federal claims. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1048 (N.D. Cal. 2021) (Count V ¶ 214); *Epic Games, Inc. v. Apple, Inc.*, 2021 WL 6755197, at *1 (9th Cir. Dec. 8, 2021) (Count V ¶ 215); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1219-20 (10th Cir. 2009)

34

(Count VI); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 765 n.7

(N.D. Ill. 2015) (Count VII); *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317

F.3d 703, 714 (7th Cir. 2003) (Count VIII ¶ 228(b)-(c)); *Chicoine v. Wellmark,*

*Inc.*, 894 N.W.2d 454, 462 (Iowa 2017) (Count IX ¶¶ 230-232); *Lorix v.*

*Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (Count X); *Triple 7, Inc.*

*v. Intervet, Inc.*, 338 F. Supp. 2d 1082, 1087 (D. Neb. 2004) (Count XI); *Volm*

*v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1174 (D. Or. 2002)

(Count XII); *Spahr v. Leegin Creative Leather Prod., Inc.*, 2008 WL 3914461,

at *14 (E.D. Tenn. Aug. 20, 2008) (Count XIII); *JSW Steel (USA) Inc. v. Nucor*

*Corp.*, 586 F. Supp. 3d 585, 601 (S.D. Tex. 2022) (Count XIV); *PBTM LLC v.*

*Football Nw., LLC*, 2022 WL 670920, at *5 (W.D. Wash. Mar. 7, 2022) (Count

XV); *Arandell Corp. v. CenterPoint Energy Servs., Inc.*, 900 F.3d 623, 629 (9th

Cir. 2018) (Count XVI).

### B.  <u>The State Law Consumer Protection Claims Fail</u>

Indiana's consumer protection claim (Count VIII ¶ 228(a)) fails because

Indiana has not pleaded facts showing any wrongful conduct.  The only

theory of wrongdoing attempted in the Amended Complaint is that

Syngenta's loyalty program allegedly excluded generic competition such that

retailers and farmers pay "higher prices … than would prevail in competitive

markets."  ¶ 190; *see* ¶ 228(a)(ii).  But that theory fails for the same reasons

that Plaintiffs' antitrust claims fail.

35

Iowa's consumer protection claim (Count IX ¶¶ 233-234) fails because it does not plead facts showing fraud or deceptive conduct satisfying Rule 9(b), *Moeller v. Samsung Elecs. Am., Inc.*, 2022 WL 4182205, at *4 (S.D. Iowa Aug. 24, 2022), or any "unfair practic[e]" resulting in "unavoidable injury to consumers" that "is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714.16(1)(n).

## III. The Amended Complaint Fails to State a Claim Against Syngenta Corporation or Syngenta Crop Protection AG

Plaintiffs' allegations do not cognizably connect Syngenta Corporation or Syngenta Crop Protection AG to the challenged rebate program. Allegations about "Defendants" and "Syngenta" constitute impermissible group pleading. *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015); *Corrigan Sports*, 505 F. Supp. 3d at 582.

Allegations linking these parent companies to Syngenta's supply agreements with Corteva (¶¶ 111, 122) are not a basis for antitrust liability because the allegations about these agreements merely highlight the price competition from generics that thrives alongside Syngenta's rebate program. *See supra* Point I.B.

Straining to portray the parent companies as part of a vaguely alleged "single enterprise" of Syngenta entities (¶¶ 30, 35), Plaintiffs allege that one individual serves as president of both Syngenta Crop Protection, LLC and

36

Syngenta Corporation and as "North America Regional Director for Crop Protection for the overall Syngenta enterprise." ¶ 35. But more is required, as a matter of law, to overcome the "principle … deeply ingrained in our economic and legal systems that a parent company … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 69 (1998); *see id.* at 69 (invoking "the well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately").

Plaintiffs try to tie Syngenta Crop Protection AG to the U.S. rebate program through vague allegations of high-level oversight and strategic guidance. ¶ 36. But Plaintiffs concede that the global parent is not responsible for "implementation" of post-patent strategies in individual countries. *Id.* Consistent with that concession, Plaintiffs do not allege any facts showing that Syngenta Crop Protection AG is involved in designing or implementing the U.S. rebate program, and thus fail to plead any basis to hold it liable.

## CONCLUSION

For these reasons, the Amended Complaint should be dismissed in its entirety. Because Plaintiffs pleaded their Complaint following a multi-year FTC investigation, and now have amended it, the Amended Complaint should be dismissed with prejudice.

37

Date: January 13, 2023

/s/ Patrick M. Kane
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC 27401
Telephone:  (336) 378-5200
Facsimile:  (336) 378-5400

Paul S. Mishkin*
paul.mishkin@davispolk.com
David B. Toscano*
david.toscano@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone:  (212) 450-4292
Facsimile: (212) 701-5292

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC*

38

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing document contains 7,995 words,

excluding those portions exempted by Local Rule 7.3(d).

/s/ *Patrick M. Kane*
Patrick M. Kane
