# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

FEDERAL TRADE COMMISSION,
STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF ILLINOIS,
STATE OF INDIANA, STATE OF IOWA,
STATE OF MINNESOTA, STATE OF
NEBRASKA, STATE OF OREGON,
STATE OF TENNESSEE, STATE OF
TEXAS, STATE OF WASHINGTON, and
STATE OF WISCONSIN,

        Plaintiffs,

    v.

SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION,
SYNGENTA CROP PROTECTION, LLC,
and CORTEVA, INC.,

        Defendants.

Case No. 1:22-cv-00828-TDS-JEP

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

**[PUBLIC REDACTED VERSION
OF DOCUMENT FILED UNDER
SEAL]**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PROCEDURAL BACKGROUND ....................................................................... 3

FACTUAL BACKGROUND ............................................................................... 4

    A.    The pesticides industry relies overwhelmingly on a "traditional distribution channel" .................................................... 4

    B.    Defendants pay distributors to exclude generics and punish distributors that do not .................................................................. 5

    C.    Defendants' exclusive-dealing schemes harm competition .......................... 7

LEGAL BACKGROUND ................................................................................... 9

ARGUMENT .................................................................................................... 13

I.    The Complaint Properly Alleges Anticompetitive Exclusive Dealing ................. 13

    A.    Plaintiffs adequately allege both indirect and direct evidence of harm to competition .................................................................. 15

    B.    A loyalty program secured through payments can constitute anticompetitive exclusive dealing .............................................. 20

    C.    The price-cost test does not apply .............................................. 28

    D.    The Complaint states a "standalone" claim under the FTC Act ................ 34

II.    The Complaint Alleges Valid Antitrust Markets .................................... 37

    A.    Principles of market definition .................................................... 38

    B.    The Complaint properly alleges relevant antitrust markets ...................... 41

    C.    Defendants' market-definition arguments are meritless .......................... 43

III.    The FTC Has the Authority to Bring this Action .................................... 50

IV.    The Complaint States a Claim Against Syngenta Crop Protection AG and Syngenta Corporation .................................................................. 53

V.    The Claims Are Timely ........................................................................ 56

VI.    The State-Law Claims Should Not Be Dismissed .................................... 57

CONCLUSION ................................................................................................. 61

i

# TABLE OF AUTHORITIES

## Cases

*Advanced Health-Care Servs. v. Radford Cmty. Hosp.*,
   910 F.2d 139 (4th Cir. 1990) ................................................................ 10, 11, 12, 21

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ................................................................ 23

*Agostini v. Felton*,
   521 U.S. 203 (1997) ................................................................ 52

*Allied Orthopedic Appliances v. Tyco Health Care Group*,
   592 F.3d 991 (9th Cir. 2010) ................................................................ 22, 24

*American Motor Inns, Inc. v. Holiday Inns, Inc.*,
   521 F.2d 1230 (3d Cir. 1975) ................................................................ 16

*American President Lines v. Matson*,
   2022 WL 4598538 (D.D.C. 2022) ................................................................ 22, 32

*Arthur v. Microsoft Corp.*,
   676 N.W.2d 29 (Neb. 2004) ................................................................ 57

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................ 9

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
   813 F. Supp. 2d 569 (S.D.N.Y. 2011) ................................................................ 46

*Berlyn, Inc. v. The Gazette Newspapers, Inc.*,
   157 F. Supp. 2d 609 (D. Md. 2001) ................................................................ 50

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ................................................................ 28, 29

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ................................................................ 38, 39, 40, 43

*Carter Carburetor Corp. v. FTC*,
   112 F.2d 722 (8th Cir. 1940) ................................................................ 22

ii

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ................................................................................. 58

*Chuck's Feed & Seed Co. v. Ralston Purina Co.*,
    810 F.2d 1289 (4th Cir. 1987) ............................................................... passim

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ............................................................................ 52, 53

*Comes v. Microsoft Corp.*,
    646 N.W.2d 440 (Iowa 2002) ....................................................................... 57

*Concord Boat v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ..................................................................... 34

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ..................................................................................... 19

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ..................................................................................... 54

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ....................................................................... 38

*E.I. du Pont de Nemours & Co. v. FTC*,
    729 F.2d 128 (2d Cir. 1984) ........................................................................ 35

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
    637 F.3d 435 (4th Cir. 2011) ................................................................. passim

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ......................................................................... 14, 15, 33

*Eisai, Inc. v. Sanofi Aventis U.S.*,
    821 F.3d 394 (3d Cir. 2016) .................................................................. passim

*Felder v. Casey*,
    487 U.S. 131 (1988) ..................................................................................... 57

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................................... 51, 53

iii

*Freeman Indus., LLC v. Eastman Chem. Co.*,
 172 S.W.3d 512 (Tenn. 2005) ................................................................. 60

*FTC v. Actavis, Inc.*,
 570 U.S. 136 (2013) ................................................................. 12, 34, 38

*FTC v. Brown Shoe Co.*,
 384 U.S. 316 (1966) ................................................................. 35

*FTC v. Facebook, Inc.*,
 581 F. Supp. 3d 34 (D.D.C. 2022) ................................................................. 37

*FTC v. Meta Platforms Inc.*,
 No. 5:22-cv-04325-EJD (N.D. Cal. Jan. 31, 2023) ................................................................. 44

*FTC v. Roomster Corp.*,
 2023 WL 1438718 (S.D.N.Y. Feb. 1, 2023) ................................................................. 50, 51, 52, 53

*FTC v. Sanford Health*,
 926 F.3d 959 (8th Cir. 2019) ................................................................. 39

*FTC v. Shkreli*,
 581 F. Supp. 3d 579 (S.D.N.Y. 2022) ................................................................. 24, 38, 40

*FTC v. Staples, Inc.*,
 190 F. Supp. 3d 100 (D.D.C. 2016) ................................................................. 49

*FTC v. Surescripts, LLC*,
 424 F. Supp. 3d 92 (D.D.C. 2020) ................................................................. 21, 32, 34

*FTC v. Vyera Pharms., LLC*,
 479 F. Supp. 3d 31 (S.D.N.Y. 2020) ................................................................. 56

*Gasbi, LLC v. Sanders*,
 120 N.E.3d 614 (Ind. Ct. App. 2019) ................................................................. 59

*General Indus. Corp. v. Hartz Mountain Corp.*,
 810 F.2d 795 (8th Cir. 1987) ................................................................. 49

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
 386 F.3d 485 (2d Cir. 2004) ................................................................. 39

iv

*Global Discount Travel Servs. v. Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997) .......................................................... 47

*Grand Union Co. v. FTC*,
    300 F.2d 92 (2d Cir. 1962) .................................................................... 36

*Holloway v. Bristol-Myers Corp.*,
    485 F.2d 986 (D.C. Cir. 1973) ....................................................... 35, 36

*Houck v. Substitute Tr. Servs., Inc.*,
    791 F.3d 473 (4th Cir. 2015) ............................................................ 9, 44

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ...................................................................... 50, 52

*In re Aggrenox Antitrust Litig.*,
    199 F. Supp. 3d 662 (D. Conn. 2016) ............................................. 38, 40

*In re Aiken Cnty.*,
    645 F.3d 428 (D.C. Cir. 2011) .............................................................. 51

Complaint, *In re China National Chemical Corporation*,
    Docket No. C-4610 (FTC June 16, 2017) ............................................. 48

*In re Cipro Cases I & II*,
    61 Cal. 4th 116 (2015) .................................................................. 13, 57

*In re EpiPen Antitrust Litig.*,
    2017 WL 6524839 (D. Kan. 2017) ................................................. 32, 34

*In re EpiPen Mktg. Litig.*,
    44 F.4th 959 (10th Cir. 2022) .............................................................. 33

*In re Impax Labs., Inc.*,
    2019 WL 1552939 (FTC 2019), *aff'd* 994 F.3d 484 (5th Cir. 2021) .................... 38

*In re Keurig Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................... 60

*In re Nexium Antitrust Litig.*,
    968 F. Supp. 2d 367 (D. Mass. 2013) ....................................... 38, 41, 45

v

*In re Surescripts Antitrust Litig.*,
    2022 WL 2208914 (N.D. Ill. 2022) ................................................................ passim

*In re Zetia Antitrust Litig.*,
    2021 WL 6689718 (E.D. Va. 2021) ............................................................... 38, 40

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*,
    2016 WL 160263 (D. Md. 2016) ........................................................................ 55

*Intercollegiate Women's Lacrosse Coaches Association v. Corrigan Enterprises*,
    505 F. Supp. 3d 570 (M.D.N.C. 2020) ............................................................... 56

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ........................................................................ 39, 46

*Jien v. Perdue Farms, Inc.*,
    2020 WL 5544183 (D. Md. 2020) ................................................................. 38, 44

*K-Flex, Inc. v. Armacell, Inc.*,
    299 F. Supp. 3d 730 (E.D.N.C. 2017) ............................................................... 12

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ......................................................................................... 56

*Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*,
    2015 WL 5712640 (M.D.N.C. 2015) ................................................................. 47

*L.G. Balfour Co. v. FTC*,
    442 F.2d 1 (7th Cir. 1971) ................................................................................ 37

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    847 F.3d 1221 (10th Cir. 2017) ........................................................................ 54

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................................... 33

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ................................................................... passim

*Meijer, Inc. v. Barr Pharms., Inc.*,
    572 F. Supp. 2d 38 (D.D.C. 2008) .................................................................... 45

vi

*Meyers v. Bayer AG*,
    303 Wis. 2d 295 (2007) ....................................................................... 60

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................... 51

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*,
    889 F.2d 524 (4th Cir. 1989) ............................................................. 47

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ............................................................... 17

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) (en banc) .............................................. 31

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004) ............................................... 55

*Novartis Pharma AG v. Regeneron Pharmaceuticals*,
    582 F. Supp. 3d 26 (N.D.N.Y. 2022) ................................................. 46

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ....................................................................... 15

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ............................................................. 47

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ........................................................... 56

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ........................................................................... 33

*People v. Crawford Distrib. Co.*,
    53 Ill.2d 332 (1972) ........................................................................... 57

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3rd Cir. 1997) ............................................................. 47

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) .............................................. 28

vii

*Rambus Inc. v. FTC*,
    522 F.3d 456 (D.C. Cir. 2008) ............................................................... 36

*Robertson v. Sea Pines Real Estate Companies, Inc.*,
    679 F.3d 278 (4th Cir. 2012) ................................................................ 11

*Rowley v. McMillan*,
    502 F.2d 1326 (4th Cir. 1974) .............................................................. 50

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ................................................................ 55

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    140 S. Ct. 2183 (2020) ............................................................. 51, 52, 53

*Silicon Servs. Consortium, Inc. v. Applied Materials, Inc.*,
    2007 WL 9701128 (W.D. Tex. 2007) ................................................... 49

*Standard Oil Co. of California v. United States*,
    337 U.S. 293 (1949) ........................................................................ 12, 27

*State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*,
    694 N.W.2d 518 (Iowa 2005) ............................................................... 59

*State ex rel. Miller v. Vertrue, Inc.*,
    834 N.W.2d 12 (Iowa 2013) ................................................................. 60

*State v. LG Elecs., Inc*,
    375 P.3d 636 (Wash. 2016) .................................................................. 57

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ............................................................ 12, 15, 20, 21

*Thompson Everett, Inc. v. Nat'l Cable Advert. L.P.*,
    57 F.3d 1317 (4th Cir. 1995) ................................................................ 28

*Thurman Indus. Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) .............................................................. 39

*Times Picayune Publ'g Co. v. United States*,
    345 U.S. 594 (1953) ............................................................................. 45

viii

*Unigestion Holding, S.A. v. UPM Tech., Inc.,*
    305 F. Supp. 3d 1134 (D. Or. 2018)...................................................................55

*UniStrip Technologies, LLC v. LifeScan, Inc.,*
    153 F. Supp. 3d 728 (E.D. Pa. 2015)........................................................21, 32, 34

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA,*
    296 F. Supp. 3d 1142 (N.D. Cal. 2017)...............................................................38

*United Shoe Mach. Corp. v. United States,*
    258 U.S. 451 (1922) ............................................................................................27

*United States v. American Express Co.,*
    838 F.3d 179 (2d Cir. 2016) ...............................................................................39

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005) ..........................................................................22, 28

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ......................................................................................41, 49

*United States v. H&R Block, Inc.,*
    833 F. Supp. 2d 36 (D.D.C. 2011) .....................................................................44

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................11, 15, 16, 37

*Williams v. Estates LLC,*
    2020 WL 887997 (M.D.N.C. 2020) .....................................................................9

*ZF Meritor LLC v. Eaton Corp.,*
    696 F.3d 254 (3d Cir. 2012) .......................................................................passim

**Statutes**

15 U.S.C. § 1 ................................................................................................................10

15 U.S.C. § 2 ................................................................................................................10

15 U.S.C. § 14 ........................................................................................................11, 21

15 U.S.C. § 41 ..............................................................................................................52

15 U.S.C. § 45(a)(1) ................................................................. 12

15 U.S.C. § 53(b) ................................................................ 51, 56

15 U.S.C. § 57 ........................................................................ 52

P.L. 63-203, 38 Stat. 717 (1914) ............................................ 51

Ind. Code § 24-5-0.5-3 ........................................................... 59

Ind. Code § 24-5-0.5-4 ........................................................... 59

Neb. Rev. Stat. § 59-829 ......................................................... 57

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law (2022) ................... 19, 20, 30, 49

J. Asker & H. Bar-Isaac, *Raising Retailers' Profits*,
  104 Amer. Econ. Rev. 672 (2014) .......................................... 23

A. Gavil & S. Salop, *Probability, Presumptions and Evidentiary Burdens in
  Antitrust Analysis*, 168 U. Pa. L. Rev. 2107 (2020) ................. 24

DOJ & FTC, Horizontal Merger Guidelines § 4.1.1 (2010) ....... 39, 45

D. Moore & J. Wright, *Conditional Discounts and the Law of Exclusive Dealing*,
  22 Geo. Mason L. Rev. 1205 (2015) .................................... 30, 33

S. Salop, *The Raising Rivals' Cost Foreclosure Paradigm*,
  81 Antitrust L.J. 371 (2017) ................................................. 30

**Rules**

Fed. R. Civ. P. 12(g)(1) ........................................................... 50

Fed. R. Civ. P. 8 ...................................................................... 9

x

Defendants Syngenta and Corteva sell expensive brand-name agricultural pesticides, including many covered by patents that have now expired. For these post-patent products, competing firms are willing and able to sell—and farmers want to buy—much cheaper generic equivalents. Generic competition would erode Defendants' monopoly positions. And so, in an effort to extend their monopolies beyond their patent terms, Syngenta and Corteva have put in place so-called "loyalty programs" under which they pay distributors (an essential link in the supply chain) to limit how much generic product they ship.

The loyalty programs work as intended. They severely limit generic firms' market access, keeping pesticide prices high and causing farmers to overpay by many millions of dollars each year. ██████████████████████████ without the programs, prices to farmers would plunge. These loyalty programs are anticompetitive exclusive-dealing schemes that violate the Federal Trade Commission Act, the Clayton Act, the Sherman Act, and state laws.

Defendants' motions to dismiss misapprehend the applicable law, ignore the allegations in the Complaint, and introduce disputed issues of fact.

First, Defendants assert that exclusive-dealing arrangements that involve only payments to distributors are permitted as a matter of law. That is incorrect. Many courts have applied the Sherman Act to exclusive-dealing schemes secured by payments. The Clayton Act expressly covers payments for loyalty. And in any event, in addition to using

1

exclusion payments, Defendants also threaten and retaliate against distributors to secure their "loyalty."

Second, Defendants apply the wrong law. They assert that the loyalty programs are *per se* legal because the payments do not bring Defendants' net prices below their costs. But this "price-cost" test is the rule for the separate and distinct legal theory of predatory pricing. Plaintiffs do not allege predatory pricing—*i.e.*, that Defendants exclude generics by lowering prices below what generics could match. Rather, Plaintiffs allege exclusive dealing—*i.e.*, that Defendants exclude generics and maintain high prices by imposing exclusivity conditions across a substantial portion of the market. Defendants' prices are too high, not too low, and the price-cost test does not apply here.

Third, Defendants dispute the Complaint's definition of the relevant antitrust markets. Defining a relevant market can help a court assess whether a defendant's conduct can harm competition. Plaintiffs allege relevant antitrust markets corresponding to six different pesticide active ingredients. To allege an antitrust market, a complaint need give only some plausible explanation for its choice. The Complaint gives several, including that the markets it defines are the same ones Defendants use in designing their loyalty programs, and that these markets are confirmed by direct pricing evidence. Defendants' motions ignore these allegations and instead introduce disputed facts from outside the Complaint.

Finally, Defendants wrongly suggest that some claims are time-barred, that two Syngenta parties should be dismissed, and that the Court should ignore binding Supreme

2

Court precedent to declare this action unconstitutional. They close with a shotgun spray of meritless arguments against the State claims.

This is not the rare antitrust case that may be dismissed on the pleadings. The Court should deny Defendants' motions.

## PROCEDURAL BACKGROUND

On September 29, 2022, the unanimous Federal Trade Commission and ten States sued Syngenta and Corteva for violating federal and state antitrust laws. Doc. 1. Defendants filed separate motions to dismiss, and Plaintiffs (including two additional States) filed an Amended Complaint. Docs. 64, 65, 79. The Amended Complaint alleges that Defendants have monopoly or market power in markets corresponding to six pesticide active ingredients and that Defendants have engaged in unlawful exclusive dealing that has harmed competition. ¶¶ 151–152, 164.[1]

The FTC brings two counts: one for unfair methods of competition under Section 5 of the FTC Act (Count I)[2] and one for unlawful conditioning of payments under Section 3 of the Clayton Act (Count II). ¶¶ 203–206. The States join the FTC in its Clayton Act claim, assert restraint of trade and monopolization claims under the Sherman

---

[1] Unless otherwise specified, references to "the Complaint" and to ¶ or ¶¶ are to the Amended Complaint.

[2] The FTC Act count permits a finding of liability under the legal standards of Sherman Act Section 1 (restraint of trade), Sherman Act Section 2 (monopolization), or FTC Section 5 on a "standalone" basis. *See infra* Part I.D.

3

Act (Counts III and IV), and assert claims under state antitrust and consumer-protection laws (Counts V–XVI). ¶¶ 205–276.

Defendants moved to dismiss the Amended Complaint. Docs. 94, 99.[3]

## FACTUAL BACKGROUND

### A. The pesticides industry relies overwhelmingly on a "traditional distribution channel"

A pesticide is a chemical that farmers use to control a disease, weed, insect, or other unwanted organism. ¶ 40. Every year, American farmers spend more than ten billion dollars on pesticides. ¶ 3. Pesticides contain at least one active chemical ingredient; some combine two or more. ¶ 43. "Basic" manufacturers like Syngenta and Corteva develop new active ingredients. ¶ 48. After a basic manufacturer develops and registers a new pesticide, it obtains—under patent law and other federal regulations—an exclusive window to sell pesticides containing that ingredient. ¶ 4. Once that window closes, however, other companies may use the same active ingredient in their own products. These companies include generic pesticide manufacturers, which do not typically develop their own new active ingredients. Generic pesticides are cheaper than equivalent products from basic manufacturers, and "[u]nimpeded competition from generic products predictably leads to dramatic price reductions." ¶ 4.

---

[3] References to Defendants' memoranda (Docs. 98, 102) are in the format "Syngenta ##" and "Corteva ##."

Pesticide manufacturers normally do not sell their products directly to retailers or farmers. Instead, they rely on what the industry calls the "traditional channel," a group of large distributors that together handle over 90% of pesticides in the United States. ¶ 55. These distributors are expert in storing and shipping pesticides, managing their customers' credit risk, and building relationships with retailers and farmers. Some own and operate retail chains. ¶¶ 55–56. Because of their expertise, selling through channel distributors is the most efficient way for a manufacturer to get its pesticides to farmers. When a manufacturer must go around the channel and sell directly to farmers or independent retailers, it cannot sell its products as effectively. ¶¶ 5, 10, 55, 56, 170.

### B. Defendants pay distributors to exclude generics and punish distributors that do not

When a basic manufacturer patents and registers a new active ingredient, it enjoys many years of a legitimate monopoly. But Syngenta and Corteva have acted to extend their monopolies beyond what federal law envisions. To avoid or slow the drop in prices and loss of market share that would otherwise follow generic entry, each implements "generic defense" strategies for their post-patent active ingredients. ¶¶ 3, 4, 58, 65, 74. The centerpiece of each company's strategy is a loyalty program. Defendants run their loyalty programs for many active ingredients. The Complaint focuses on six: for Syngenta, azoxystrobin, mesotrione, and metolachlor; and for Corteva, rimsulfuron, oxamyl, and acetochlor. ¶¶ 89, 123.

As one Corteva executive explained, the idea is to "keep the channel locked up." ¶ 145. Defendants do this in two broad ways: by paying loyal distributors and by punishing disloyal ones. ¶¶ 58, 83, 88.

*Exclusion payments*. Each Defendant pays distributors to limit their business with generic pesticide manufacturers. Syngenta does this through its "Key AI" program. For each active ingredient in the program, Syngenta sets a "loyalty" threshold. The thresholds vary by ingredient and by year, and have usually been between 85% and 99%. ¶ 67. For instance, in the 2014–2015 market year, Syngenta set a 99% threshold for mesotrione. ¶ 102. For a distributor to qualify for the mesotrione payment, 99% of its mesotrione sales had to be Syngenta products; no more than 1% could be generic. ¶ 68. If a distributor met the threshold, then Syngenta would reward it with an exclusion payment. Syngenta also runs a loyalty program for retailers. They too receive exclusion payments if they hit loyalty thresholds. ¶ 72.

While the exact size of the exclusion payment is "subject to complex calculations," the payments "generally amount to a high single-digit or greater percentage of the distributor's purchases or sales of eligible Syngenta-branded products during the market year." ¶ 69. The loyalty program is designed to be all-or-nothing. If a distributor buys one pound too much of a generic ingredient (and thus fails to meet a loyalty threshold), then it risks losing the entire payment linked to that ingredient. ¶ 69.

Corteva runs a similar loyalty program. It also sets loyalty thresholds (85% to ███) for certain active ingredients and pays distributors that meet them. ¶¶ 73, 75. Each

6

time a distributor misses an active-ingredient threshold, it forfeits payments that can amount to millions of dollars. ¶¶ 77–79. Unlike Syngenta, Corteva groups its active ingredients into sets. A distributor must meet a separate loyalty threshold for █████ ███████████████ in order to receive a payment for ██████████████████. ¶¶ 75, 77. To further ensure loyalty, Corteva also ██████████████████. If a distributor buys too much generic product ██████████████████████████████████. ¶ 78.

*Retaliation*. Defendants also coerce distributors into staying loyal by punishing those who do not. For example, ██████████████████████████████████████ ███████, Syngenta stopped selling pesticides to it altogether. In another example, Corteva ████████████████████████████████████████████████████████ ██████████████████████. ¶ 88.



### C. Defendants' exclusive-dealing schemes harm competition

Defendants' loyalty programs, as intended, have allowed Syngenta and Corteva to maintain their monopolies beyond the relevant patent and regulatory exclusivity periods.

Almost every major distributor participates in the programs. ¶ 84. For them, missing a loyalty threshold would result in a "significant penalty" (quoting Corteva). ¶¶ 83–88, 138. To ensure compliance, distributors have "severely limited their purchase, promotion, and sale" of generic pesticides. ¶ 177. They have "omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward branded products." ¶ 177.

As a result, generic manufacturers have very limited access to the market. One explained that it is "futile to even approach a large distributor that is subject to loyalty requirements." ¶ 178. Without full access to the distribution channel, selling a pesticide is often "not economically feasible." ¶ 183. Generic manufacturers have thus abandoned some markets and chosen not to enter others. Even when they do enter a market for a particular ingredient, they can sell only a small amount. ¶ 171. As a Corteva manager boasted in discussing the program, "[O]ur team has truly done an A+ job blocking generics." ¶ 138.

Because of the limited market access that generic firms do have, Syngenta and Corteva have been forced to lower their pesticide prices to some degree. But their prices have fallen much less than they would have in an open and competitive market. ¶¶ 98, 202. Defendants' own research confirms this: each "regularly forecasts" and "regularly" concludes that its program leads to "higher prices than would otherwise prevail." ¶¶ 194–195. By contrast, where similar loyalty programs do not exist (in certain international markets), "generic manufacturers have been able to compete more effectively and farmers pay correspondingly lower prices." ¶ 201.

Defendants' exclusive-dealing schemes also harm competition in other ways. For example, American farmers enjoy fewer innovative new pesticides. Generic manufacturers that want to combine Syngenta or Corteva active ingredients into new products have given up because they could not freely sell such products. ¶¶ 186–189.

8

## LEGAL BACKGROUND

A motion to dismiss should be denied when the complaint contains facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).[4] A claim is plausible if its "factual allegations [are] enough to raise a right to relief above the speculative level." *Id.* A complaint needs only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. It need not have "detailed factual allegations," just something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Motions to dismiss fact-intensive antitrust cases are particularly disfavored unless a complaint suffers "glaring deficiencies." *Williams v. Estates LLC*, 2020 WL 887997, at *9 (M.D.N.C. 2020) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011)).

Plaintiffs allege a theory of unlawful exclusive dealing. Exclusive dealing is a recognized form of anticompetitive conduct. It occurs when a firm arranges for its customers or suppliers to limit their dealings with its rivals. Exclusive dealing violates the antitrust laws when it is "likely to foreclose" competing products from "entry into a substantial part of the market." *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987). An example is when a manufacturer ties up most distributors,

---

[4] When quoting from court decisions, this brief omits internal citations, quotation marks, ellipses, and brackets unless otherwise noted.

9

making it "difficult for the manufacturer of a competing product to break into the market." *Id*.

Exclusive dealing may take a variety of forms and result in substantial foreclosure in different ways. For example, a firm may secure a customer's express promise to stay exclusive. Or it can secure exclusivity using other means. An arrangement that does not involve an express requirement may be described as "*de facto* exclusive dealing." *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). Courts analyze *de facto* exclusive dealing as they would analyze an express exclusive-dealing scheme. *Id.* at 281–82. Exclusive dealing does not need to feature "[c]omplete exclusivity" with each customer to be unlawful. *Id.* at 283. An arrangement can be anticompetitive even when it requires that customers "buy somewhat less than all of their . . . requirements" from one company. *Kolon*, 637 F.3d at 452. What matters is that the scheme "foreclose[s] a substantial share of the relevant market" and so harms competition. *ZF Meritor*, 696 F.3d at 283.

Exclusive dealing may violate several federal and state laws.

*Sherman Act*. Section 1 of the Sherman Act bans "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Section 2 makes it illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." *Id.* § 2. An exclusive-dealing arrangement can be illegal under either section. *See Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144–49 (4th Cir. 1990). Section 1

10

requires proof of an agreement, and Section 2 (as relevant here) requires proof that the defendant has monopoly power. *Id.* at 145; *Kolon*, 637 F.3d at 441. Defendants do not dispute the adequacy of the Complaint's allegations regarding the existence of an agreement. Nor do they dispute monopoly power other than to contest Plaintiffs' market-definition allegations, a point addressed in Part II of the argument below.

Courts applying the Sherman Act judge the competitive effects of exclusive dealing under the "rule of reason." They assess whether the scheme has the "probable effect [of] foreclos[ing] competition in a substantial share of the line of commerce affected." *Kolon*, 637 F.3d at 451. Section 2 requires proving a greater degree of market power (*i.e.*, monopoly power) than Section 1, but requires a lesser showing of harm to competition than Section 1. *See United States v. Microsoft Corp.*, 253 F.3d 34, 69–70 (D.C. Cir. 2001). When a plaintiff shows harm to competition, the defendant may try to rebut that evidence by showing that its conduct has "procompetitive justifications." But this "inquiry is best conducted with the benefit of discovery," *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 292 (4th Cir. 2012), and Defendants do not raise the point here.

*Clayton Act.* Section 3 of the Clayton Act prohibits offering a "price" or "rebate" "on the condition, agreement, or understanding that the . . . [buyer] shall not use or deal in the goods . . . of a competitor or competitors . . . where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. To establish liability under this section, a plaintiff must first identify "an

11

arrangement[ ] in a line of commerce." *K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730, 736 (E.D.N.C. 2017). Defendants do not challenge this element, other than contesting market definition. Like the Sherman Act, Clayton Act Section 3 asks whether it is "probable" that an exclusive-dealing scheme will "foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *see Kolon*, 637 F.3d at 451. But Section 3—which covers conduct that "*may*" lessen competition—"was intended to reach specific conduct which had been held by the courts to be outside the ambit of the Sherman Act." *Advanced Health-Care*, 910 F.2d at 153. Thus, it does not require showing the same degree of "detriment to the public interest" as the Sherman Act. *Standard Oil Co. of California v. United States*, 337 U.S. 293, 312 (1949).

*FTC Act*. Section 5 of the FTC Act bans "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). Any practice that violates the Sherman Act or the Clayton Act also violates the FTC Act. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 145 (2013). Section 5 also extends beyond those laws, *see Chuck's Feed*, 810 F.2d at 1292–93, and is addressed further in Part I.D below.

*State laws*. Each State Plaintiff has sued under its own antitrust or consumer-protection laws. Although Defendants broadly assert that these laws track the federal antitrust laws, this is not correct. For example, the California Supreme Court has held that "the [California] Cartwright Act is broader in range and deeper in reach than the Sherman Act," and "[i]nterpretations of federal antitrust law are at most instructive, not conclusive,

12

when construing the Cartwright Act." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 142, 160–61 (2015). Plaintiffs address Defendants' state-law arguments in Part VI below.

## ARGUMENT

Defendants have organized their arguments differently, but they each focus on the same two flawed arguments in favor of dismissal. First, Defendants argue—incorrectly— that their exclusive-dealing schemes are actually procompetitive as a matter of law despite the Complaint's allegations of harm to competition. Second, Defendants argue that the Complaint has failed to plead a relevant antitrust market, even though (among other allegations) the alleged markets are the ones around which Defendants designed their loyalty programs. Between them, Defendants also advance a hodgepodge of other arguments—that the Court should strike down the FTC Act as unconstitutional, that various Syngenta entities should be dismissed from the case, that the statute of limitations bars some claims, and that the state-law claims should be dismissed. None warrants dismissing any part of this action.

## I. The Complaint Properly Alleges Anticompetitive Exclusive Dealing

Defendants' chief argument is that the Complaint does not plausibly allege that their loyalty programs harm competition. Defendants fail to address, or even acknowledge, many of the relevant allegations. Namely: Defendants set out to block generic competition and maintain high prices; their loyalty programs have largely shut generic firms out of the most effective distribution channel; as a result, generics cannot

compete effectively and have remained minor players or left the market entirely; and with competition throttled, prices to farmers stay high and innovation is stunted. ¶¶ 164–202.

Rather than address these allegations, Defendants name two features of their programs that, in their view, require the Court to disregard the alleged competitive harm and rule for them as a matter of law. Defendants' arguments have no basis in the antitrust laws and (at most) raise factual disputes that are inappropriate for resolution now.

First, Defendants claim that because their loyalty programs are secured by financial incentives (rather than by what Syngenta terms "coercive non-price features"), the programs are *per se* legal—with no need to analyze competitive effects. But they cite no case adopting that rule. Instead, many courts reject Defendants' statement of the law, and the Clayton Act expressly reaches payments for loyalty. Even putting that aside, the Complaint alleges conduct that satisfies Defendants' mistaken standard.

Second, Defendants argue that because the schemes involve financial incentives, Plaintiffs must plead that Defendants' prices are too *low*—below their cost of making the product. Defendants lifted this rule from a line of cases addressing predatory pricing, a different type of claim based on a different theory of competitive harm. They have not cited any case dismissing an exclusive-dealing claim on this ground, while at least seven recent decisions have rejected this argument.

With each of these arguments, Syngenta and Corteva are searching for a shortcut that does not exist. "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v.*

14

*Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992). Antitrust cases turn instead on the "particular facts disclosed by the record." *Id*. Plaintiffs have alleged facts showing that the loyalty programs are anticompetitive. Defendants cannot invent *per se* rules to escape liability.

### A. Plaintiffs adequately allege both indirect and direct evidence of harm to competition

In an exclusive-dealing case, there are two alternative ways to show harm to competition, and the Complaint plausibly alleges both. First, a plaintiff can establish "indirect" evidence of harm to competition. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018). An indirect "proxy for anticompetitive harm" is the percentage of the market that the defendant has foreclosed. *McWane, Inc. v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015). Second, a plaintiff can show "direct evidence of anticompetitive effect," *i.e.*, proof of "reduced output, increased prices, or decreased quality." *American Express*, 138 S. Ct. at 2284. Either type of evidence is sufficient to show competitive harm. *Id*.

1. *Indirect evidence: substantial foreclosure*. A plaintiff can establish harm to competition by showing that the challenged scheme is likely to foreclose a "substantial part of the market." *Chuck's Feed*, 810 F.2d at 1293–95; *Microsoft*, 253 F.3d at 70–71; *see also Tampa Electric*, 365 U.S. at 328–29 (competition is harmed when "a substantial share of the relevant market" has been foreclosed); *Kolon*, 637 F.3d at 451–52 & n.12 (applying *Tampa Electric* foreclosure framework and stating that a specific foreclosure percentage is not needed at the motion-to-dismiss stage). In *Microsoft*, for example, the

Court found "harm to competition" because the defendant had "clos[ed] to [its] rivals a substantial percentage of the available opportunities." 253 F.3d at 70–71.

What constitutes substantial foreclosure may depend upon the antitrust statute in play. Under Section 1 of the Sherman Act, a plaintiff must usually show "40% or 50%" foreclosure "to establish a . . . violation." *Microsoft*, 253 F.3d at 70. Less is required under Section 2. *Id.* And 15% foreclosure can be enough under the Clayton Act. *See American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975).

Here, Plaintiffs have alleged foreclosure well beyond what is needed for their claims. Syngenta and Corteva have foreclosed generic competitors from "approximately ███ or more" of sales in each relevant market. ¶ 171. This is a conservative estimate because it assumes a market-share threshold of ███ for each active ingredient, the lowest of the thresholds alleged. *See* ¶¶ 93, 102, 115, 128, 137, 146. And because the "consequences of missing a loyalty threshold" by a single pound are "so severe," distributors often clear the thresholds "by a healthy margin" or "decline[ ] to purchase or promote generic products at all." ¶ 86.

The absence of alternative distribution channels and the lengthy duration of exclusion are also indirect evidence of harm to competition. *McWane*, 783 F.3d at 835. The Complaint alleges these as well. In addition to foreclosing a large share of each market overall, Defendants even more severely foreclose the most important channel for reaching farmers. As in *McWane*, the traditional distribution channel here is "essential to the . . . market" due to a lack of "viable alternate distribution channels." *McWane*, 783

16

F.3d at 834. "For there to be an antitrust violation, generics need not be barred from all means of distribution if they are barred . . . from the cost-efficient ones." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015). Without access to the traditional distribution channel, a generic firm cannot ship its products efficiently. *See* ¶¶ 8, 10, 56, 169, 170, 181, 190. The foreclosure is also long-lasting. Each of the six relevant active ingredients has been in a loyalty program for at least four years, and one has been included for almost two decades. ¶¶ 93, 102, 115, 127, 137, 146; *see also infra* Part I.B.4.

2. *Direct evidence*. The Complaint also alleges direct evidence of three types of competitive harm that Defendants' exclusive-dealing schemes visit upon farmers: fewer choices, higher prices, and less innovation. These allegations, while not necessary to state a claim, are sufficient.

First, as to reduced choice, farmers cannot find and purchase the generic pesticides they prefer. ¶¶ 191–192. As a Corteva employee celebrated, there are "many [farmers] who put generic on the bid but buy [from Corteva] because nobody sells generic." ¶ 132.

Second, Defendants' programs "ha[ve] resulted in higher prices . . . than would prevail in competitive markets." ¶¶ 190–202. Those farmers who can find generics overpay, because Defendants' schemes limit the supply of generics. ¶ 193. Even a farmer who would still buy brand-name products in a competitive world is worse off; if generic products were fully available, they would put "downward pressure on the prices of branded products." ¶ 192.

17

Syngenta and Corteva documents confirm that prices are higher because of their

exclusive dealing. ██████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ ¶ 196. Corteva likewise concluded that its loyalty

program "[d]elays erosion in price" from "generic competition." ¶ 199. ████████████

████████████████████████████████████████████████████████████

█████████████████████████████ ¶ 200.

A supply agreement between Defendants illustrates the harmful price effects of

their exclusive-dealing schemes. After Syngenta's patent for mesotrione expired, Corteva

wished to sell a pesticide containing that ingredient. ¶ 107. ████████████████████████

████████████████████████████████████████████████████

¶ 197. But Syngenta's program would have "prevent[ed] distributors from purchasing" a

Corteva mesotrione product in significant amounts. ¶ 108. Syngenta used its exclusive

dealing as "leverage"—████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ¶¶ 108–

109. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

18

██████████████████████████████████████████████

████████ ¶ 198.

Syngenta asserts that Defendants' mesotrione deal actually proves that it *faces* competition, because the presence of generics gave ████████████████████████████████ ████████████████. Syngenta 27–29. The Complaint does not contain any such allegations. But even if this factual assertion were cognizable, it is consistent with the Complaint. The Complaint does not, and need not, deny that generic manufacturers have had some limited effect on prices. ¶¶ 106, 202. Plaintiffs plausibly allege, however, that this effect is much smaller than it would be absent Defendants' unlawful exclusive dealing. *See, e.g.*, ¶ 202.[5]

Third, Defendants' exclusive-dealing schemes have reduced innovation. Though generic firms do not typically develop new active ingredients, they design new products—for example, by mixing off-patent active ingredients in new ways or by improving a pesticide's non-active ingredients. ¶ 187. Defendants' exclusive dealing has impeded this innovation because generic firms avoid selling new products that use ingredients covered by loyalty programs. ¶¶ 120, 188.

_____

[5] The mesotrione ████████ deal, and a similar one for metolachlor, exclude generics and are part of Defendants' anticompetitive conduct. ¶¶ 107–112, 122. Syngenta argues (at 24–25) that the agreements have not had a "substantial effect on competition" because they involve only "a fraction of the market." But the agreements cannot be assessed in isolation; they must be considered with the rest of the conduct, which forecloses over ████ of each relevant market. ¶ 171; *see Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); Areeda & Hovenkamp, Antitrust Law ¶ 310c7 (2022).

19

In sum, the Complaint alleges that Syngenta and Corteva "severely restricted [their rivals'] access to customers" for multi-year periods ranging from four years to two decades, and that this conduct "has had a direct, substantial and adverse effect on competition"; has allowed Defendants "to control output and increase prices"; and has precluded rivals "from competition for [ ] customers, . . . reducing if not practically eliminating additional competition, as well as preserving and growing" their monopoly positions. *Kolon*, 637 F.3d at 452. Those allegations were sufficient to withstand a motion to dismiss in *Kolon*. *Id*. They are enough here too.

## B. A loyalty program secured through payments can constitute anticompetitive exclusive dealing

Defendants cannot dispute the Complaint's allegations of substantial foreclosure, diminished choice, higher prices, and reduced innovation. Instead, they argue that an "optional" exclusive arrangement secured only through conditional payments is not actually exclusive dealing and cannot be anticompetitive as a matter of law. Syngenta 18–21; Corteva 15–16. Defendants' argument ignores Plaintiffs' well-pleaded allegations and contradicts the established principle that "[a] discount conditioned on exclusivity should generally be treated as no different from an orthodox exclusive-dealing arrangement." Areeda & Hovenkamp, Antitrust Law ¶ 1807b1.

1. *Defendants are wrong on the law*. Defendants are wrong that a loyalty program secured solely by payments is necessarily lawful. This rule has no basis in any statute. As the Supreme Court explained, as long as an exclusivity arrangement has the "practical effect" of tying up customers, it can harm competition. *Tampa Electric*, 365 U.S. at 326–

27. Thus, in a "prototypical" exclusive-dealing case, a seller persuades a buyer "by whatever means" to take part; "[i]t makes no difference whether this [arrangement] is voluntary or is imposed by coercion." *Advanced Health-Care*, 910 F.2d at 152–53. And the text of Section 3 of the Clayton Act expressly bans payments that may harm competition: it covers "rebate[s]" made "on the condition, agreement, or understanding that the [customer] shall not use or deal in the goods . . . of a competitor." 15 U.S.C. § 14. Defendants' rule would contradict the plain meaning of the statute.

Courts accordingly recognize that an exclusivity arrangement secured by payments can be unlawful, even when the payment is called a rebate or discount. For example, the court in *In re Surescripts Antitrust Litigation* held that offering "preferential pricing" to "exclusive[ ]" customers could constitute unlawful exclusive dealing. 2022 WL 2208914, at *7 (N.D. Ill. 2022). Although Surescripts argued that "its loyalty arrangements [were] categorically not exclusive deals . . . because they [did] not require any customer to be exclusive," the court recognized that a loyalty "arrangement is proscribed . . . so long as its practical effect is to prevent a lessee or buyer from using a competitor." *Id.* at *10; *see also FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 101–02 (D.D.C. 2020) (same holding in the parallel FTC case against Surescripts).

Similarly, in *UniStrip Technologies v. LifeScan*, the defendant offered "rebates" to purchasers "on the condition that a competitor's products would not be purchased." 153 F. Supp. 3d 728, 737 (E.D. Pa. 2015). In denying a motion to dismiss, the court refused to "limit its review of the exclusive dealing arrangements to an express exclusivity

requirement in a contract." *Id.* at 738. And the court in *American President Lines v. Matson* held that a loyalty discount for customers who shipped "90% or more of their cargo" with the defendant "could plausibly constitute an impermissible exclusionary practice." 2022 WL 4598538, at *9 (D.D.C. 2022).

Nor is this a new rule. In *Carter Carburetor Corp. v. FTC*, a manufacturer "made perfectly clear to all [retailers] that their preferential discount would be available only on condition that they did not carry or take on a new competing line." 112 F.2d 722, 732 (8th Cir. 1940). The court found that this "condition" was "as fully effective as" a binding contract and that it violated the Clayton and FTC Acts. *Id.*

Defendants' cases (Syngenta 19–20; Corteva 19–20) do not support their erroneous claim that more than a payment is required for an exclusive-dealing scheme to be subject to antitrust scrutiny. The arrangements in *McWane*, *ZF Meritor*, and *Dentsply* included incentives other than payments, but none of those decisions—each of which followed trial—held that these other incentives were essential to the claims. *McWane*, 783 F.3d at 820–21; *ZF Meritor*, 696 F.3d at 265; *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005). Next, *Eisai, Inc. v. Sanofi Aventis U.S.* was an unsuccessful challenge to a loyalty discount program, but those plaintiffs had presented, at summary judgment, no "concrete examples of anticompetitive consequences." 821 F.3d 394, 406 (3d Cir. 2016). So too with *Allied Orthopedic Appliances v. Tyco Health Care Group*, 592 F.3d 991 (9th Cir. 2010). That case held that "on the facts of this case"—which included "no evidence" that rivals lacked effective alternative distribution

22

channels—"something more than [a loyalty] discount itself is necessary." *Id.* at 997. The same court later recognized that "rebates conditioned on . . . purchase of a specified quantity or market share . . . may be understood as 'de facto' exclusive dealing contracts." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016).

In sum, while a defendant may use tactics like threats and retaliation to secure an exclusive-dealing scheme, such conduct is not necessary to state a claim. Exclusive dealing can also be secured through payments conditioned on exclusivity.

2. *Defendants are wrong on the economics*. Defendants further argue (Syngenta 26; Corteva 18) that a payment from a manufacturer is necessarily a form of legitimate price competition. But while some payments are procompetitive, this is not a general rule. Payments can lead to competitive harm when they are used to secure exclusivity from middlemen. Then, the payment can be "in effect, a 'bribe' to the [middlemen] to help maintain [the manufacturer's] dominant position." J. Asker & H. Bar-Isaac, *Raising Retailers' Profits*, 104 Amer. Econ. Rev. 672, 673 (2014). The payment aligns the middlemen with the monopolist by cutting them a "share [of] industry profits." *Id*. at 672. Since competition by other manufacturers would "reduce[] industry profits," the middlemen have "an incentive to not accommodate" a competing manufacturer. *Id.* at 672–73. In the end, "*both* the [middlemen] *and* the incumbent manufacturer can gain from these exclusionary practices." *Id.* at 681; *see also* ¶ 173.

Case 1:22-cv-00828-TDS-JEP   Document 110   Filed 02/10/23   Page 34 of 76

Just so here. Defendants argue, contrary to the Complaint's allegations, that an equally efficient generic firm could compete simply by offering similar exclusion payments. This ignores that the payment is a vehicle for sharing with distributors Defendants' "elevated profit[s]" from excluding competition. ¶ 6. "[A] dominant firm typically has more profits to protect . . . than an entrant can gain by achieving viability." *See* A. Gavil & S. Salop, *Probability, Presumptions and Evidentiary Burdens in Antitrust Analysis*, 168 U. Pa. L. Rev. 2107, 2126 (2020). If generic manufacturers freely entered the market, those firms would not become instant monopolists able to offer their own exclusion payments. Instead, ████████████, they would ████████████ and evaporate the monopoly profits that have been funding the exclusion payments. ¶ 200. The distributors thus have no incentive to help generic firms enter and compete down Defendants' supracompetitive prices. ¶ 173. The loyalty programs lead distributors to prefer the non-competitive status quo over robust competition, and thereby exclude even equally efficient generic competitors. ¶ 173.

Defendants miss the harm to competition because they focus on benefits to *distributors*, while ignoring harm to the principal victims, *farmers*. The benefits to distributors of staying loyal are not passed on to farmers. ¶¶ 174–175. Defendants' cases, like *Eisai* and *Allied Orthopedic*, do not involve this scenario. *Cf. FTC v. Shkreli*, 581 F. Supp. 3d 579, 633 (S.D.N.Y. 2022) (finding that a seller harmed competition by "pay[ing] a sizeable premium" to distributors for their help excluding rivals).

Defendants also argue that their loyalty programs should be celebrated for lowering prices, but this contradicts the Complaint's allegations. Syngenta 1, 12, 10, 26; Corteva 3. The Complaint repeatedly alleges, based on internal Syngenta and Corteva documents, that the challenged loyalty programs result in higher, not lower, prices. ¶¶ 65, 196–200. Even Syngenta executives have recognized that their rebates are *not* price reductions. As a Syngenta executive explained, the loyalty payment is "not 11 percent off. It's 11 percent incentive paid at the end of the year for performance." ¶ 83. Defendants' argument misleadingly compares the prices that loyal and disloyal distributors pay. But the relevant comparison is between their prices with an exclusive-dealing program and their prices without one. *Cf. In re Surescripts*, 2022 WL 2208914, at *2 (upholding complaint alleging that a "differential between [defendant's] loyalty rate and its non-loyalty rate" is not a true benefit to consumers). As detailed above, the challenged programs substantially elevate pesticide prices to farmers.

3. *The Complaint alleges threats and retaliation*. In addition, Defendants' argument rests on a false premise. Plaintiffs do not contend that Syngenta and Corteva rely solely on payments to secure exclusivity. The Complaint also alleges that Defendants have "threatened to retaliate . . . against [disloyal] distributors . . . by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage." ¶ 88. Defendants follow through on their threats: Syngenta refused to sell any pesticides to a distributor who ███████████████████████

██████, and Corteva ██████████████████████████████████████████████

██████████████████████████████████████████████. ¶ 88.

Defendants concede that this type of coercion can render a loyalty program anticompetitive. They retreat to claiming that the factual allegations are insufficient to support an inference of retaliation. But inferences are to be drawn in Plaintiffs' favor. *Kolon*, 637 F.3d at 448. Even putting that aside, Defendants' arguments are unpersuasive. Corteva, advancing its own facts, argues (at 16 n.7) that the product it withheld was not itself part of a loyalty program. Even if true, that would not take the sting out of the punishment of losing access to the product. Syngenta argues (at 22–24) that the alleged threats are not part of the loyalty "program itself" because they are not written down, but that is immaterial. Plaintiffs challenge not just the written terms of each program, but also "each Defendant's course of conduct—including . . . threatening penalties for disloyalty." ¶ 204. Syngenta also argues (at 22) that alleging an "isolated" example of retaliation is insufficient. But actual retaliation need not be frequent to be effective; it can be rare because "the goal of the program [i]s not necessarily to enforce the punishments but to dissuade customers from leaving [the manufacturer] in the first place." *McWane*, 783 F.3d at 821 n.3.

Finally, because the Complaint mentions that Defendants only "rarely" grant exceptions to their loyalty thresholds, Syngenta argues (at 22) that there was no coercion because it did not punish every distributor every time it missed a threshold. But even when restrictions are not always enforced, "the power to enforce them is omnipresent,

26

and their restraining influence constantly operates." *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 458 (1922). Here, even if Syngenta forgave the occasional slip-up, this hardly means it let distributors ignore the program. When one did, ██████████ ██████████████. ¶ 88.[6]

4. *Annual renewals do not make Syngenta's program per se lawful*. Syngenta points out that its exclusion payments to distributors are earned and paid year-by-year. It argues (at 21–22) that "exclusive dealing arrangements . . . with a one-year duration are presumptively incapable of harming competition," even when the exclusivity repeats year after year. Syngenta is wrong on the law. There is no such presumption, let alone an irrebuttable one requiring dismissal. As the *McWane* court explained in rejecting the same argument about one-year agreements, an exclusive-dealing program can harm competition and violate the antitrust laws even if it is "nonbinding . . . short-term and voluntary." 783 F.3d at 833–35, 840. "[T]hese characteristics do not render the program presumptively lawful." *Id.*; *see also, e.g.*, *Standard Oil*, 337 U.S. at 296 (condemning exclusive agreements even though they could be terminated annually). Courts instead focus on "the practical effect of exclusive dealing arrangements." *McWane,* 783 F.3d at 834.

---

[6] Corteva argues that its practice of ██████████████████████████████████ is not a form of anticompetitive "bundling." Corteva 20. This argument does not rebut Plaintiffs' allegations. By ████████████████████████████, Corteva increases the pressure on distributors to stay loyal and thus increases the effectiveness of its exclusive-dealing scheme.

Here, the program's practical effect is long-term foreclosure. While Syngenta may execute annual contracts with new loyalty thresholds, the "strong economic incentives" to comply with those thresholds have been in place year after year for two decades. *Dentsply*, 399 F.3d at 194; *see* ¶ 115. The shorter formal length of each contract is thus "no ground to doubt the [program's] effectiveness." *Dentsply*, 399 F.3d at 193.

Syngenta's cases (at 21) do not say otherwise. Both are summary-judgment decisions that weighed contract duration as one factor among many. *See Thompson Everett, Inc. v. Nat'l Cable Advert. L.P.*, 57 F.3d 1317, 1326 (4th Cir. 1995); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 389–91 (M.D.N.C. 2002). Syngenta's argument requires weighing of facts and inferences that is inappropriate at this stage.

### C. The price-cost test does not apply

Defendants argue that they are immune from liability because their prices to distributors, after netting out the rebates, are too *high*. They invoke the "price-cost test," which asks whether a defendant's prices are below cost. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993). Defendants incorrectly argue that the test applies here because the challenged conduct includes payments to distributors. Syngenta 14–18; Corteva 17–18. In substance, this would be another *per se* rule exonerating nearly all exclusive-dealing arrangements, but it is not the law. The price-cost test applies when a plaintiff brings a claim based on predatory pricing, *i.e.*, pricing that is so low that it excludes rivals from the market. It does not apply to the exclusive-

28

dealing schemes here. Plaintiffs allege that an exclusivity condition (not a price) excludes rivals, and that prices are too high (not too low). At least seven other courts have declined to apply the price-cost test on this fact pattern, and Defendants cite no contrary case.

1. *The price-cost test applies to predatory pricing, not exclusive dealing.* The price-cost test applies when "a plaintiff seek[s] to establish competitive injury resulting from a rival's low prices." *Brooke Group*, 509 U.S. at 222. In such cases of "predatory pricing," the plaintiff posits that the low prices are only temporary and that the defendant plans to drive its rivals out of the market, attain a monopoly, and then raise its prices to supracompetitive levels. *Id*. at 224. Though predatory pricing is potentially anticompetitive, in the short term it may look like consumer-friendly price-cutting. *Id*. at 226. The price-cost test helps distinguish between the two: if a company is charging so little that it is running a loss, it likely plans to exclude rivals and raise prices later.

The price-cost test is irrelevant here. Plaintiffs are not "seek[ing] to establish competitive injury resulting from . . . low prices." *Id*. at 222. Quite the opposite: the Complaint alleges that Syngenta's and Corteva's post-patent prices are too high. *E.g.*, ¶ 7 ("higher prices . . . costing many millions of dollars in overcharges"); ¶ 10 ("high prices and dominant market positions"); ¶ 83 ("higher prices achieved through the exclusion of generic competition"); ¶ 173 ("maintaining higher prices to retailers and farmers"). Defendants have maintained these prices not by briefly charging very low prices, but by imposing an exclusivity condition. Because Plaintiffs "[n]owhere . . . allege that

29

[Defendants'] prices are now, or ever were, too low," the "predatory pricing rubric is . . . inappropriate here." *In re Surescripts*, 2022 WL 2208914, at *6.

2. *The payments do not change the result*. Ignoring this black-letter law, Defendants argue that the price-cost test applies here because their strategy is to offer payments to distributors in exchange for exclusivity. But the presence of payments is not a talisman that converts any case into a predatory-pricing suit. Loyalty programs can harm competition in at least two distinct ways. *See* D. Moore & J. Wright, *Conditional Discounts and the Law of Exclusive Dealing*, 22 Geo. Mason L. Rev. 1205, 1211 (2015). In one type of case, payments might cut a defendant's prices to predatory levels. When this is the problem alleged—"when price is the clearly predominant mechanism of exclusion"—then the price-cost test may apply. *ZF Meritor*, 696 F.3d at 273–75.

In the second type of case (like this case), payments are used by "a dominant supplier" to secure "*de facto* exclusive dealing arrangements." *Id.* at 281. When that is so, the harm is caused "not by the price [but] rather by the condition limiting rivals' sales." Areeda & Hovenkamp, Antitrust Law ¶ 768b4. "In these [cases], simply querying whether the fully discounted price is above cost often misses important elements of exclusion." *Id.* And thus, when a loyalty program is challenged on exclusive-dealing grounds, it may be held illegal "irrespective of below-cost pricing." *ZF Meritor*, 696 F.3d at 281; *see also* S. Salop, *The Raising Rivals' Cost Foreclosure Paradigm*, 81 Antitrust L.J. 371, 399 (2017) (payments based on market share "fundamentally differ from the

30

plain-vanilla discounts of the predatory pricing paradigm because of the conditions attached to them").

Courts routinely recognize that the presence of payments does not make the price-cost test applicable to exclusive-dealing claims. In *Eisai*, a company challenged a rival's loyalty discounts. The rival replied that because the case involved "discounts," the price-cost test should apply. The Third Circuit disagreed, explaining that the price-cost test does not apply invariably to loyalty discounts. 821 F.3d at 408–09. The key distinction was "whether the conduct constitutes an exclusive dealing arrangement or simply a pricing practice." *Id*. Because the *Eisai* plaintiff challenged the loyalty condition attached to defendant's prices and not the absolute level of the prices, price was not the "clearly predominant mechanism of exclusion." *Id*. The price-cost test did not apply. *Id*.

In *NicSand, Inc. v. 3M Co.*, the plaintiff challenged a loyalty-payment program as unlawful exclusive dealing and disclaimed any predatory-pricing claim. 507 F.3d 442 (6th Cir. 2007) (en banc). The court explained that "[t]he plaintiff remains the master of its complaint, and when it says that it is not bringing a predatory-pricing claim, we should take it at its word." *Id.* at 453–54, 458. The court therefore did not dispose of the case under the price-cost test, but instead assessed whether the defendant's "exclusivity requirement created entry barriers" and harmed competition. *Id.* at 454. While the court ruled for the defendant, it explained that if the defendant *had* "use[d] [its exclusive] contracts and its current market dominance to establish unreasonable barriers to entry . . . , a potential competitor might have a legitimate antitrust claim." *Id.* at 457.

31

In *In re EpiPen Antitrust Litigation*, the defendant "required [customers] to exclude [a rival]" "in exchange for large rebates." 2017 WL 6524839, at *7 (D. Kan. 2017). The defendant asked the court to apply the price-cost test, but the court held that the "price-cost test . . . does not apply" because the plaintiff was challenging the defendant's loyalty conditions and not the rebates standing alone. *Id.*

*UniStrip*, *Matson*, and the two *Surescripts* cases are similar. The plaintiffs in those cases challenged loyalty discounts or payments, and each defendant invoked the price-cost test. Because each plaintiff's claims rested on exclusive-dealing theories, each court found the price-cost test "inapposite." *In re Surescripts*, 2022 WL 2208914, at *1; *see also FTC v. Surescripts*, 424 F. Supp. 3d at 102 ("Surescripts's alleged practice of charging loyal [customers] less . . . does not need to constitute predatory pricing for Surescripts's exclusionary practices to constitute illegal maintenance of a monopoly."); *Matson*, 2022 WL 4598538, at *11 ("[P]redatory pricing allegations are not necessary for [the plaintiff] to plausibly allege that [the] loyalty program constitutes anticompetitive exclusive dealing."); *UniStrip*, 153 F. Supp. 3d at 737 ("[The plaintiff's] argument[ ] that the price-cost test applies is . . . unpersuasive.").

Here, Plaintiffs do not bring a predatory-pricing claim. ¶ 176. The Complaint alleges high prices and challenges Defendants' loyalty programs as an unlawful form of exclusive dealing. As in all the cases cited above, price is not the "predominant mechanism of exclusion," and the price-cost test is inapplicable. Indeed, any plaintiff challenging a loyalty program on exclusive-dealing grounds must allege high prices.

32

Therefore, under Defendants' view of the law, applying the price-cost test to all claims involving payments "w[ould] make loyalty discounts effectively *per se* legal." Moore & Wright, *supra* at 1244. Defendants' argument would effectively erase the word "rebate" from the Clayton Act.

3. *Defendants' cases do not hold otherwise.* None of the cases Defendants cite supports applying the price-cost test here. The only one in which a court applied the test to dismiss claims like these—the district court decision in *Eisai* (cited at Corteva 18)—was reversed on this exact point by the Third Circuit. 821 F.3d at 408. Others of Defendants' cases either did not involve payments or did not even address whether the price-cost test applied.[7]

Defendants rely mainly on *ZF Meritor* (Syngenta 17; Corteva 15). But the Third Circuit in *ZF Meritor* declined to apply the price-cost test and affirmed the trial verdict in favor of the plaintiff. Syngenta cites dicta stating that the "test applies to market-share . . . rebates offered by suppliers within a single-product market." *ZF Meritor*, 696 F.3d at 275 n.11. The context of that statement shows that the court was referring to rebates "that lower the prices to at or below the competitive market rate" when that low price is the alleged antitrust problem. *In re Surescripts*, 2022 WL 2208914, at *6 n.10 (discussing similar language in *Eisai*, 821, F.3d at 409). By contrast, an exclusive-dealing

---

[7] *In re EpiPen Mktg. Litig.*, 44 F.4th 959, 1004 (10th Cir. 2022) (held question open); *Eastman Kodak*, 504 U.S. at 460 (not about loyalty discounts); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451–52 (2009) (same); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) (same).

scheme involving a payment can be illegal "irrespective of below-cost pricing." *ZF Meritor*, 696 F.3d at 281. Indeed, in *Eisai*, the same circuit that decided *ZF Meritor* declined to apply the price-cost test to a loyalty discount. 821 F.3d at 408. Three other courts also interpret *ZF Meritor* contrary to Defendants' argument. *See UniStrip*, 153 F. Supp. 3d at 737; *In re Epipen*, 2017 WL 6524839, at *7; *FTC v. Surescripts*, 424 F. Supp. 3d at 102.

*Concord Boat v. Brunswick Corp.* is similarly unavailing. 207 F.3d 1039 (8th Cir. 2000). In that challenge to loyalty discounts, the court discussed how the discounts left prices above cost, but the court did not rely on that fact alone. *Id.* at 1060–62. Instead, the court applied the rule of reason on a trial record, noting that "customers could purchase up to 40% of requirements from other sellers without forgoing the discount" and that they regularly left the defendant for its rivals. *Id.* at 1063. The court did not consider the price-cost test at all when resolving the plaintiff's Sherman Act Section 1 claim. *Id.* at 1058–60.

### D. The Complaint states a "standalone" claim under the FTC Act

Defendants assert (Syngenta 18; Corteva 18) that the same arguments they raise against the Sherman Act and Clayton Act claims suffice to defeat the FTC's claim under Section 5 of the FTC Act. Both Defendants' analyses of Section 5 are wrong.

Practices that violate the Sherman Act or the Clayton Act also violate Section 5 of the FTC Act. *Actavis*, 570 U.S. at 145. But Section 5 also prohibits—as a standalone antitrust law—practices that conflict with the basic policies of the Sherman Act or the

34

Clayton Act, even if they do not violate those laws. *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321 (1966). The FTC Act "was designed to supplement and bolster the Sherman Act and the Clayton Act." *Chuck's Feed*, 810 F.2d at 1293.[8] Given the "breadth of [this] prohibition," only the FTC—not private parties—may sue under the Act. *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 990, 997 (D.C. Cir. 1973). This ensures that a government agency "weigh[s] each action against [its] broad range policy goals." *Id.*

Applying these principles to exclusive dealing arrangements, the Fourth Circuit has held that a plaintiff makes a prima facie case under Section 5 by showing that the arrangements have substantially closed off market access for manufacturers of competing products. *Chuck's Feed*, 810 F.2d at 1292–95. The FTC has alleged such substantial foreclosure. *Supra* Part I.A. Under Fourth Circuit precedent, no more is required.

Syngenta is wrong to suggest that Section 5 requires application of the price-cost test here. As discussed, the price-cost test is inapplicable to the Sherman Act and Clayton Act theories advanced here. *Supra* Part I.C. But even if it were applied to evaluate Defendants' conduct under those statutes, it would not apply to the claim that Defendants have violated the FTC Act on a standalone basis.

---

[8] Generally, conduct that (1) is a method of competition; and (2) is unfair—by going beyond competition on the merits—violates Section 5. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 138–40 (2d Cir. 1984) (conduct that is "collusive, coercive, predatory or exclusionary in character," or possesses other "indicia of oppressiveness" violates Section 5); *see also Brown Shoe*, 384 U.S. at 321 (finding an unfair method of competition when a shoe manufacturer "require[d] shoe retailers . . . substantially to limit their trade with [its] competitors").

35

The FTC Act gives the FTC "a broad[er] range of flexible enforcement powers" than private plaintiffs, in part because an expert agency "control[s] [all] matters to be litigated," *Holloway*, 485 F.2d at 997–99, and because treble damages do not attach to its violation. The Act thus puts substance over technical rules and fills gaps that may be left when applying the other antitrust laws to economically harmful behavior. *See, e.g.*, *Grand Union Co. v. FTC*, 300 F.2d 92, 95, 96–97 (2d Cir. 1962) (applying the FTC Act to *buyers* that practiced anticompetitive price discrimination, even though the Clayton Act covered only *sellers*). Neither the price-cost test nor any other technical rule that Defendants try to graft onto this case—whether around the length of their programs or a supposed lack of coercion—applies to the FTC Act, as reflected in the test set forth by the Court of Appeals in *Chuck's Feed*. 810 F.2d at 1292–95. Defendants have not cited (and Plaintiffs are not aware of) any case applying the price-cost test to a standalone Section 5 claim.

For its part, Corteva, relying on *Rambus Inc. v. FTC*, simply ignores binding precedent and asserts that "the FTC Act . . . is coextensive with the Sherman Act." Corteva 18 n.8 (citing 522 F.3d 456, 462 (D.C. Cir. 2008)). *Rambus*, however, was a Section 5 case in which the FTC "expressly limited its theory of liability to Rambus's unlawful monopolization . . . in violation of § 2 of the Sherman Act." 522 F.3d at 462. The FTC has not done so here. To be sure, Defendants' violations of the Sherman and Clayton Acts establish a violation of the FTC Act. But even if they did not, the Complaint states a claim for violation of the FTC Act on a standalone basis.

36

## II.    The Complaint Alleges Valid Antitrust Markets

The Complaint alleges that Defendants have harmed competition in antitrust product markets corresponding to six individual active ingredients, termed "Relevant AIs." ¶ 155. Three sets of allegations converge to this market definition. First, Defendants have structured their programs around markets for individual active ingredients. Second, a pesticide's price is affected much more by pesticides with the same active ingredient than by other products. Third, each ingredient's unique chemical properties and consistent user base confirm that it belongs in a separate market.

Any of these sets of allegations would make the Complaint's market definitions plausible. The three together are more than enough. Even so, Defendants argue that the Complaint should be dismissed because it fails to disprove the existence of broader markets containing multiple active ingredients. These arguments misconstrue the law, ignore large swaths of the Complaint, and at best present a factual dispute that cannot be resolved at this stage. To the extent that Plaintiffs' claims require them to allege relevant markets, this burden has been satisfied.[9]

---

[9] Though the Court need not reach the issue, the Complaint alleges that Defendants' monopoly power is also shown through direct evidence of their pricing power and ability to exclude competitors. ¶ 153; *see Microsoft*, 253 F.3d at 51, 57–58; *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 43–44 (D.D.C. 2022). In addition, a precise market-definition exercise is not required under Section 5 of the FTC Act. *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 21 (7th Cir. 1971) (citing *Brown Shoe*, 384 U.S. at 316).

37

### A. Principles of market definition

Antitrust courts define a market to assess whether a given "arrangement" has "the potential for genuine adverse effects on competition." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002). A group of products forms a relevant market if a firm that controlled all those products could profitably raise prices above the competitive level. This is so when the products are more reasonably interchangeable with each other than with products outside the market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Market analysis often begins with the conduct at issue. *See In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 663 (D. Conn. 2016). The conduct can indicate both a defendant's own "conception of the . . . market," *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *11 (D. Md. 2020), and that the defendant has market power within that market, *Actavis*, 570 U.S. at 157. For example, where the challenged conduct involves the alleged restraint of competition between branded and generic pharmaceuticals, courts have frequently found that "a brand-name drug and its generic analogs" can constitute a relevant market. *In re Nexium Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) (collecting cases); *see United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017); *Shkreli*, 581 F. Supp. 3d at 630–32; *In re Zetia Antitrust Litig.*, 2021 WL 6689718, at *13 (E.D. Va. 2021); *In re Impax Labs., Inc.*, 2019 WL 1552939, at *26–28 (FTC 2019), *aff'd* 994 F.3d 484 (5th Cir. 2021).

From this starting point, a court defining the relevant market seeks to "identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Products do not belong in the same market just because they have the same use. Instead, they belong in a market when they "qualify as *economic* substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand." *Thurman Indus. Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (emphasis added); *see also Brown Shoe*, 370 U.S. at 325. "Cross-elasticity of demand" refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

The hypothetical monopolist test assesses reasonable interchangeability and cross-elasticity of demand to evaluate whether an identified group of products constitutes a relevant product market. DOJ & FTC, Horizontal Merger Guidelines § 4.1.1 (2010) ("Guidelines")[10]; *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019). For a given proposed market, the test asks whether sellers in that market, "if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level." *United States v. American Express Co.*, 838 F.3d 179, 198–99 (2d Cir. 2016).

---

[10] *Available at* https://www.justice.gov/atr/horizontal-merger-guidelines-0.

Where, as here, a defendant is alleged already to be monopolizing a market, courts can answer this question by comparing prices in the market before and after a new competitor enters. *See Shkreli*, 581 F. Supp. 3d at 630 ("The high degree of cross-elasticity in demand . . . is demonstrated . . . by [a drop in prices in] reaction to . . . [the] first-to-market generic."). If prices fall significantly upon new entry (here, by a generic manufacturer), this shows that the proposed market is well-defined. *See Aggrenox*, 199 F. Supp. 3d at 667 (if competitive prices were being charged before generic entry, then entry "would not result in a substantial change in prices."). The price reaction indicates that other potential substitute products (here, other active ingredients) were not sufficiently close substitutes to prevent a monopolist from sustaining supracompetitive prices. *See Zetia*, 2021 WL 6689718, at *15 (price drop upon entry of generic competition established market consisting of branded and generic versions of the same drug); *Shkreli*, 581 F. Supp. 3d at 630 (same).

In addition to the hypothetical monopolist test, courts may consider the so-called "*Brown Shoe* factors" to define antitrust markets. These factors include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

Because market definition turns on the details of substitutability, response to pricing movements, and the defendant's own behavior, it is a "deeply fact-intensive inquiry." *Kolon*, 637 F.3d at 443–44. Dismissals at the pleading stage are "rare" and

40

generally limited to certain types of "glaring deficiencies," such as "fail[ing] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id.*; *see also Nexium*, 968 F. Supp. 2d at 388 (declining to decide on summary judgment which drugs were interchangeable with branded Nexium, because "such a factually intensive determination is better left for resolution by a jury").

### B. The Complaint properly alleges relevant antitrust markets

For each of the six Relevant AIs—azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor—the Complaint alleges two alternative markets. The first consists of the Relevant AI itself, and the second consists of the finished pesticide products that contain that active ingredient. ¶ 155. Ample factual allegations support these markets.

1. *Defendants design their loyalty programs around Relevant AIs*. The market-definition exercise begins with the challenged conduct itself—Defendants' loyalty programs. The programs are designed to thwart competition at the active-ingredient level, and specifically to hinder generic products and maintain high prices after a Relevant AI has gone off patent. *See, e.g.*, ¶¶ 58, 60. The programs measure distributor loyalty in active-ingredient-specific markets (but not in larger markets) and penalize distributors that purchase the Relevant AIs (but not other active ingredients) from rivals. ¶¶ 67, 76. Defendants thus recognize the competitive importance of the Relevant AI markets. These allegations establish the "commercial realities" around which markets are defined. *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

41

2. *The markets satisfy the hypothetical monopolist test.* Defendants ignore the allegations that each Relevant AI market satisfies the hypothetical monopolist test. Absent Defendants' loyalty programs, if a generic firm entered the market for a particular Relevant AI, prices would fall substantially. ¶ 156. This shows that the market was one in which a hypothetical monopolist could (and did) charge prices above the competitive level.

The Complaint supports this contention for each Relevant AI, including by reference to Defendants' own market assessments. For example, Syngenta "anticipated that generic entry would . . . erode [its] azoxystrobin prices." ¶ 92. ███████████████ ████████████████████████████████████████████████████████████ ███████████████████████████ ¶ 101. ██████████████████████████ ████████████████████████████████████████████ ¶ 119. Corteva expected a "downward price spiral" upon unconstrained generic rimsulfuron entry. ¶ 127. It expected acetochlor prices to fall by 10–15% if a generic version entered the market. ¶ 144. And generic entry indeed resulted in a drop in oxamyl prices. ¶ 140; *see also* ¶ 121 (same for Syngenta's metolachlor). These allegations—which Defendants do not address—show that for each active ingredient, other ingredients are "not close enough substitutes to prevent Syngenta and Corteva . . . from maintaining" prices "above competitive levels." ¶ 158. This suffices to plausibly allege that each ingredient defines a separate market.

42

3. *The Relevant AIs have distinct characteristics and uses*. Finally, the Complaint alleges that each Relevant AI has distinct "characteristics and uses" and "industry or public recognition." *Brown Shoe*, 370 U.S. at 325. Azoxystrobin has "growth-enhancing effects not proven in other active ingredients." ¶ 157(a). Mesotrione has "superior efficacy and crop safety" "[c]ompared to other, similar herbicide active ingredients." ¶ 157(b). Metolachlor "has superior water solubility," and "outperforms other active ingredients" in warmer and drier conditions. ¶ 157(c). Rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" than similar chemicals. ¶ 157(d). Oxamyl, unlike "similar insecticide active ingredients," "can be sprayed directly onto crops." ¶ 157(e). And acetochlor "tends to perform better" than similar herbicides "in wetter and cooler conditions," and has "better weed control early in the growing season." ¶ 157(f).

For these and other reasons, often "one active ingredient cannot readily replace another for a given application or in a given condition." ¶ 46. And farmers who have success with one active ingredient may prefer it over others. *Id*. Therefore, again, "other active ingredients are not close enough substitutes to prevent Syngenta or Corteva . . . from maintaining prices of crop-protection products containing the Relevant AI above competitive levels." ¶ 158.

### C. Defendants' market-definition arguments are meritless

Defendants' responses contradict each other and depend on introducing facts from outside the Complaint. On the one hand, they assert that the relevant markets must be

43

broader than a single active ingredient because the Relevant AIs have "overlapping uses" with other active ingredients. Syngenta 30; *see also* Corteva 12. On the other hand, Corteva briefly suggests that the Relevant AI markets are overbroad.

These arguments ignore the allegations about Defendants' conduct and the pricing evidence, and introduce new factual contentions. Defendants' arguments also contradict the principle that the existence of a broad market (say, all fungicides) for some purposes does not preclude the existence of a narrower market (say, azoxystrobin fungicides) for other purposes. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) ("A broad, overall market may contain smaller markets which themselves 'constitute product markets for antitrust purposes.'" (quoting *Brown Shoe*, 370 U.S. at 325)); *see also* Order, *FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, Doc. 549, slip op. at 21 (N.D. Cal. Jan. 31, 2023)[11] (a larger market "in no way precludes the existence of a submarket . . . for antitrust purposes"). And in pleading a relevant market, "[p]laintiffs need not disprove alternative relevant markets proposed by the Defendant." *Jien*, 2020 WL 5544183, at *11; *cf. Houck*, 791 F.3d at 484 (at pleading stage, district court "incorrectly undertook to determine whether a lawful alternative explanation appeared more likely").

1. *The Relevant AI markets are not too narrow*. Defendants argue that the relevant markets must be broader than a single active ingredient because other active ingredients

_____

[11] *Available at* https://storage.courtlistener.com/recap/gov.uscourts.cand.398508/gov.uscourts.cand.398508.549.0.pdf.

44

have "overlapping uses." Syngenta 30; *see also* Corteva 12. But products do not belong in the same market just because they have overlapping uses: "For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953); *see also* Guidelines § 4.1.1 (a properly defined antitrust market need not include the "full range of substitutes from which consumers choose").

While "functional interchangeability" may be evidence that products share a market, "it is certainly not dispositive." *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 58 (D.D.C. 2008). Rather, the "essential inquiry is whether the amount of actual or potential substitution" between products "constrain[s] the pricing behavior" of the Defendant. *Id.* For example, in *Nexium*, the court found that pricing allegations were enough to plausibly allege a market comprising a particular brand-name drug and its generic equivalents. It was "immaterial" that "other drugs may be used to treat [the same] conditions." 968 F. Supp. 2d at 388. So too here.[12] By including allegations of the *price*

---

[12] Syngenta wrongly argues that the relevant markets are "contorted" because its products are supposedly better than generic equivalents. Syngenta 31. First, the Complaint alleges no such quality differences. Second, any quality differences between products are already accounted for by the hypothetical monopolist test. The fact that prices would fall following generic entry establishes that brands and generics are reasonably interchangeable and constitute a market, notwithstanding any purported quality differences. ¶¶ 156, 158.

impact of generic entry, the Complaint plausibly alleges that generic entry constrains Defendants' Relevant AI pricing substantially beyond the constraint imposed by other active ingredients. ¶¶ 92, 101, 119, 121, 127, 140, 144–45, 156, 158.[13]

Defendants' cases say nothing different. In *Bayer Schering Pharma AG v. Sandoz, Inc.*, the counterclaim plaintiffs failed to allege any evidence of price effects satisfying the hypothetical monopolist test, and conceded that for a key indication the product at issue had "dozens" of functional substitutes. 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011). And in *Novartis Pharma AG v. Regeneron Pharmaceuticals*, the court rejected an alleged market definition because of how it interacted with the "*Walker Process*" rule, which "strip[s]" "an unlawful patent . . . of its usual immunity from antitrust liability." 582 F. Supp. 3d 26, 39–42 (N.D.N.Y. 2022). *Novartis* did not reject using product characteristics or price changes as evidence of market definition. Indeed, it agreed that the "subject of a patent" (here, each Relevant AI is the subject of expired patents) could itself be a market. *Id.* at 42.

Defendants' other cases mostly involve different procedural postures or markets limited to a single brand, and do not involve the pricing and program design allegations made here. *See, e.g.*, *Live Nation*, 811 F.3d at 683 (summary judgment decision with no

---

[13] Defendants' willful blindness to these allegations is striking: Corteva describes the Complaint's product-market allegations as being limited to paragraphs 155, 157, and 158, simply skipping the pricing allegations that are set forth in paragraph 156 and supported throughout the Complaint. Corteva 7. Syngenta, too, never addresses the allegations of paragraph 156.

46

"record evidence" that a monopolist could charge supracompetitive prices); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 528 (4th Cir. 1989) (preliminary-injunction decision with no pricing evidence); *Global Discount Travel Servs. v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (rejecting market consisting of travel on a single airline; no discussion of pricing allegations); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 435 (3rd Cir. 1997) (rejecting contract-based market of "Domino's-approved ingredients and supplies used by Domino's franchisees").

Defendants resort to importing facts from far outside the Complaint's boundaries. Corteva cites examples of other purported substitute active ingredients. Corteva 13–14. These active ingredients are not named in the Complaint, and Corteva asks the court to take judicial notice of EPA registrations. More accurately, Corteva asks the Court to interpret the registrations and conclude that they favor its view of the facts. That request falls outside the bounds of permissible judicial notice. *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009) (declining to take judicial notice of documents because the party seeking notice sought "notice of its own interpretation of the contents of those documents"). Nor is it proper in evaluating a motion to dismiss. *Kolon*, 637 F.3d at 449; *see also Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*, 2015 WL 5712640, at *7 n.6 (M.D.N.C. 2015) (disregarding references to facts outside of the pleadings at the motion-to-dismiss stage). Weighing Defendants' evidence is for a later stage of the case.

Both Defendants also reference market definitions used in past FTC and Department of Justice merger investigations (some more than twenty years old). Syngenta 32–33, Corteva 14. Those cases—which again, are outside the record—only show that market definition is context-dependent and that broader and narrower markets may be appropriate in different circumstances.

Unsurprisingly, the competitive effects of mergers between chemical companies with product overlaps in broader, functional markets (*e.g.*, corn herbicides) may be assessed with reference to those broader markets. But where a merger presented product overlaps between brand and generic manufacturers of a particular active ingredient, as did ChemChina's 2017 acquisition of Syngenta (which neither Defendant references), the FTC alleged narrower markets at the active-ingredient level. *See* Complaint, *In re China National Chemical Corporation*, Docket No. C-4610 (FTC June 16, 2017) at ¶ 6.[14]

2. *The Relevant AI markets are not too broad*. Corteva briefly argues that one set of alleged alternative markets is too *broad*, because it includes pesticides that are not

---

[14] If the Court is inclined to take judicial notice of such things, the complaint and the order from the ChemChina matter may be found at https://www.ftc.gov/legal-library/browse/cases-proceedings/1610093-china-national-chemical-corporation-et-al-matter. Plaintiffs reiterate, however, that such matters are not germane to deciding Defendants' motions.

substitutes for each other. Corteva 12–13.[15] Here again, Corteva relies not on the

Complaint, but on its own interpretation of EPA registrations.

In any event, Corteva's factual assertion does not defeat the alleged markets.

Alleging that every product in the market is wholly interchangeable "is not necessary to

survive a motion to dismiss." *Silicon Servs. Consortium, Inc. v. Applied Materials, Inc.*,

2007 WL 9701128, at *4 (W.D. Tex. 2007). In particular, goods that share a common

component and common features may be grouped in a single market for purposes of

antitrust analysis even if they are not functional substitutes. For example, non-

substitutable office supplies may be grouped where they pass through the same vendors.

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117–18, 122–25 (D.D.C. 2016); *see also*

*Grinnell*, 384 U.S. at 572 (grouping distinct services that rely on same equipment);

Areeda & Hovenkamp, Antitrust Law ¶ 565c (non-substitutable surgical services may be

grouped in a market where they rely upon a single facility). Likewise, the Complaint

groups pesticides containing a given Relevant AI, and so sharing common characteristics.

This is "the most pragmatic and realistic description" of the market, even if the markets

include some number of non-interchangeable goods. *General Indus. Corp. v. Hartz*

*Mountain Corp.*, 810 F.2d 795, 805–06 (8th Cir. 1987).

---

[15] Corteva's argument applies only to the set of product markets alleged in ¶ 155(b) of the
Complaint, consisting of EPA-registered crop-protection products that contain the
applicable Relevant AI. It has no bearing on the alternative relevant product markets
alleged in ¶ 155(a) of the Complaint, which are limited to the undifferentiated active
ingredients themselves.

49

\* \* \*

The parties will have the opportunity to develop the factual record regarding the relevant markets here. *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 617 (D. Md. 2001). Defendants' arguments about market definition are without merit.

## III. The FTC Has the Authority to Bring this Action

According to Corteva, because FTC commissioners are removable by the President only for cause, the FTC has unconstitutionally exercised executive authority in bringing this suit. This argument is untimely and wrong. It is untimely because Corteva did not advance the argument in its motion to dismiss the original complaint (Doc. 72), and "[a]n unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended." *Rowley v. McMillan*, 502 F.2d 1326, 1333 (4th Cir. 1974); *see* Fed. R. Civ. P. 12(g)(1). The argument also "grossly misinterpret[s] binding Supreme Court precedent." *FTC v. Roomster Corp.*, 2023 WL 1438718, at \*8 (S.D.N.Y. Feb. 1, 2023) (rejecting an identical challenge). Corteva misstates the FTC's historical powers. It ignores the features that the Supreme Court has cited to distinguish the FTC from other agencies. And even if Corteva's argument had merit, dismissing the FTC's claims would not be the appropriate remedy.

The Supreme Court held long ago that Congress may protect FTC Commissioners with a for-cause removal restriction. *Humphrey's Executor v. United States*, 295 U.S. 602, 632 (1935). "Since then, the Supreme Court has addressed presidential removal power multiple times, each time citing *Humphrey's Executor* and declining to overrule

50

it." *Roomster*, 2023 WL 1438718, at *8; s*ee, e.g.*, *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2198–200 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010); *Morrison v. Olson*, 487 U.S. 654, 686–91, 706–07 (1988). Accordingly, "*Humphrey's Executor* is an entrenched Supreme Court precedent, protected by stare decisis." *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring).

Corteva purports to accept *Humphrey's Executor*, but argues incorrectly that Congress acted unconstitutionally in 1973 when it gave the FTC the authority to seek injunctive relief in federal court. *See* 15 U.S.C. § 53(b). It asserts that this is a new "executive power" that *Humphrey's Executor* did not consider in 1935. Corteva 24–25. "This interpretation is mistaken on a number of levels." *Roomster*, 2023 WL 1438718, at *9. The FTC has exercised its power under Section 13(b) hundreds of times over the last 50 years, and the Supreme Court has repeatedly declined to revisit *Humphrey's Executor*. Moreover, even in 1935, the FTC Act "empowered and directed" the agency to enforce its cease-and-desist orders in federal court. *See* FTC Act, P.L. 63-203, 38 Stat. 717, 720 (1914). The Act also authorized the FTC to enforce subpoenas in federal court. *Id.* at 722. With powers like these, "[i]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Morrison*, 487 U.S. at 689 n.28. Corteva quotes this passage but omits the words "at the time of *Humphrey's Executor*." Corteva 25.

51

Corteva points out that *Humphrey's Executor* referred to the FTC as "no[t] executive." But as the Court later observed, this characterization is explained by "several organizational features" that make the FTC's removal restrictions constitutionally permissible. *Seila Law*, 140 S. Ct. at 2198–99. Namely: The FTC has five members balanced by political party, yielding a "nonpartisan" impartial body of experts. *See Humphrey's Executor*, 295 U.S. at 624–26. The Commissioners serve staggered, seven-year terms, letting the President "shape [the agency's] leadership and thereby influence its activities." *Seila Law*, 140 S. Ct. at 2204. And the President selects the FTC's chair. 15 U.S.C. § 41. These features still exist today and distinguish the FTC from the agencies at issue in recent Supreme Court executive-power cases. When the Court voided removal protections for the Directors of the FHFA and CFPB, it stressed that those agencies had a single head. *See Collins v. Yellen*, 141 S. Ct. 1761, 1783–84 (2021); *Seila Law*, 140 S. Ct. at 2192. In *Seila Law*, the Court repeatedly contrasted the CFPB with the FTC on this point. *See, e.g.*, 140 S. Ct. at 2192, 2198–200. Given that none of the core characteristics of the FTC have changed since the time of *Humphrey's Executor*, Corteva's argument is nothing more than an attack on that precedent. But only the Supreme Court has the "prerogative of overruling" its own binding decisions. *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

Even if Corteva's "baseless" argument had merit, it "would not invalidate this action or necessitate its dismissal." *Roomster*, 2023 WL 1438718, at *9 & n.9. The FTC Act contains a "separability" section, 15 U.S.C. § 57. "The Supreme Court has never

52

suggested, in *Seila Law* or subsequent cases, that Congress lacks constitutional authority to delegate regulatory power to an independent agency; it has only held Congress has limited authority to restrict the President's removal power." *Roomster*, 2023 WL 1438718, at *9. Even if the removal protections of the FTC Act violate the Constitution and were void, that would not mandate dismissal of this suit. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2208–11 (severing removal protections rather than limiting the agency's powers); *Free Enter. Fund*, 561 U.S. at 509 (same, because there was no suggestion that Congress "would have preferred no Board at all to a Board whose members are removable at will"). This is because "the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the . . . responsibilities of his office." *Collins*, 141 S. Ct. at 1788 n.23. And thus it does not render the agency's actions automatically void.

Under *Collins*, Corteva must show harm resulting from the removal restriction, such as that "the President had attempted to remove a [commissioner] but was prevented from doing so" in a way that affected the case. *Id.* at 1789. That is not true here. Corteva makes no argument otherwise. So there is "no reason to void this action." *Roomster*, 2023 WL 1438718, at *9.

## IV. The Complaint States a Claim Against Syngenta Crop Protection AG and Syngenta Corporation

Plaintiffs sue three Syngenta entities: Syngenta Crop Protection, LLC and its parent companies, Syngenta Crop Protection AG and Syngenta Corporation. Syngenta concedes that (putting aside its other arguments) the Complaint states a claim against the LLC, but it argues that the Complaint fails to connect the LLC's parent companies to the

53

challenged conduct. This argument ignores that the parent companies directly designed, participate in, and implement key aspects of Syngenta's anticompetitive conduct.

When companies in the same corporate family engage in "coordinated acts" that violate the antitrust laws, then "the related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017). "[I]t is that aggregated conduct which must be scrutinized"; a particular corporate entity can be liable even if it has not "individually satisfied the elements" of the antitrust violation. *Id.*; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) (an enterprise consisting of "corporations and their wholly owned subsidiaries" is "fully subject to § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act").

The Syngenta Defendants all belong to the same corporate family—the Syngenta Group. ¶ 30. Syngenta Crop Protection AG owns Syngenta Corporation, which in turn indirectly owns Syngenta Crop Protection, LLC. *See* ¶¶ 31–33; Docs. 31, 32. The companies hold themselves out as an integrated "one Syngenta" enterprise, have adopted a strategy of "One Team, One Plan," and share senior executives. ¶¶ 34–36. Thus, all three entities can be held liable as a single enterprise if they "independently participated in the enterprise's scheme." *Lenox MacLaren*, 847 F.3d at 1237.

The Complaint alleges that they have. "[W]hen [a corporate] parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise."

54

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2016 WL 160263, at *5 (D. Md. 2016); *see Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1068–70 (D. Colo. 2004). Here, Syngenta Crop Protection AG directs and oversees Syngenta's "post-patent strategy" ████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ¶¶ 36, 65. It also reviews, modifies, and approves Syngenta's U.S. budget, which includes sales targets based on Syngenta's loyalty program. *Id.* And it was directly involved in the negotiation of (and is a party to) the Syngenta-Corteva ██████ mesotrione supply agreement. ¶¶ 36, 111. Those allegations are more than enough to plausibly state claims against Syngenta Crop Protection AG.

Syngenta Corporation, for its part, manages Syngenta's contacts with Corteva concerning the mesotrione agreement, as well as its contacts regarding a similar ██████ supply agreement for metolachlor. ¶¶ 111, 112. By doing so, it "operate[s] in tandem to suppress competition," and is part of the Syngenta enterprise. *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1145–46 (D. Or. 2018). These allegations are more than sufficient to plead that each Syngenta Defendant is involved in the exclusive-dealing scheme.

Syngenta's authorities (at 36) are inapposite. In *SD3, LLC v. Black & Decker (U.S.) Inc.*, the plaintiffs did not allege any facts related to the conduct of corporate affiliates and relied on "[u]nadorned conclusory allegations." 801 F.3d 412, 423 (4th Cir.

55

2015). And *Intercollegiate Women's Lacrosse Coaches Association v. Corrigan Enterprises* actually undermines Defendants' claims. 505 F. Supp. 3d 570 (M.D.N.C. 2020). The court denied a motion to dismiss even though—unlike here—the complaint contained "no factual allegation regarding specific acts or omissions" of the defendant. *Id.* at 582. The court found that the defendant's involvement had been sufficiently alleged based on a press release suggesting that the defendant was involved in promoting the infringing conduct. *Id.* Measured against that standard, Plaintiffs' allegations here are more than sufficient.

## V. The Claims Are Timely

Corteva suggests (at 22–23) that a four-year statute of limitations bars Plaintiffs' Clayton Act claims and the States' Sherman Act claims. This is incorrect. The FTC's Clayton Act claim is authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). This claim is "not subject to a statute of limitations." *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 53 (S.D.N.Y. 2020). Similarly, the States bring claims under 15 U.S.C. § 26, and there is no statute of limitations for injunctive relief claims under that section. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014).

In any event, the limitations period has not run for any claim. Corteva fleetingly addresses two exceptions that toll limitations, but ignores the continuing violation doctrine. "Antitrust law provides that, in the case of a continuing violation, . . . each overt act . . . , *e.g.*, each sale . . . , starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Defendants are still operating their loyalty

56

programs today, ¶ 168, and still overcharging for their products. Therefore, all of the claims are timely.

## VI. The State-Law Claims Should Not Be Dismissed

Defendants make no separate argument about most of the state-law claims, arguing instead that dismissal is automatic if the federal claims fail. Syngenta 34–35; Corteva 27. But Defendants ignore the fact that state and federal laws are not automatically harmonized, and vary from state to state.[16] In claims arising out of supplemental jurisdiction, federal district courts must apply state substantive law.[17]

Defendants' few remaining arguments are undeveloped and lack merit.

---

[16] *See, e.g.*, Neb. Rev. Stat. § 59-829; *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004) (§ 59–829 should not be interpreted "as a delegation of state authority to the federal government" and allows indirect purchasers to recover for antitrust violations); *People v. Crawford Distrib. Co.*, 53 Ill. 2d 332, 338–39 (1972) (state courts may look to federal law as a persuasive guide in construing the state law). Other states have taken an even more limited approach to harmonization. *See, e.g.*, *State v. LG Elecs., Inc*, 375 P.3d 636, 641 (Wash. 2016) (declining to follow federal antitrust law "where the language and structure of the [state law] departs from otherwise analogous federal provisions"); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 445–47 (Iowa 2002) (Iowa Code Section 553.2 requires courts to interpret the Iowa Competition Law differently than federal law when it encourages the primary goal of antitrust law); *In re Cipro Cases I & II*, 61 Cal. 4th at 160–61 ("[T]he Cartwright Act is broader in range and deeper in reach than the Sherman Act.").

[17] *Felder v. Casey*, 487 U.S. 131, 151 (1988) ("[W]hen a federal court exercises diversity or pendent jurisdiction over state-law claims, the outcome of the litigation in the federal court should be the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.").

1. *Texas's and Indiana's nonexistent damages claims*. Corteva argues (at 27–28) that the Court should dismiss Texas's and Indiana's damages claims on behalf of "end-consumers." But neither Texas nor Indiana seeks damages for consumers. ¶¶ 228, 264.

2. *California's unfair-competition claim*. Corteva asserts (at 29) that California's unfair-competition claim rises and falls with the antitrust claims. But in addition to "unlawful" and "fraudulent" activities, California's Unfair Competition Law (UCL) also prohibits "unfair" conduct even if that conduct is "not specifically proscribed by some other law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The UCL, intended to be broader and more flexible than the Sherman Act, "permit[s] tribunals to enjoin on-going wrongful business conduct . . . [and] deal with the innumerable new schemes which the fertility of man's invention would contrive." *Id.* at 181. Expressly concluding that conduct may be actionable under the UCL even if it does not rise to the level of an antitrust violation, the California Supreme Court found the UCL proscribes conduct that "violates the policy or spirit" of the antitrust laws "or otherwise significantly threatens or harms competition." *Id.* at 180–81, 187. Syngenta's and Corteva's course of conduct—paying off or coercing major distributors to block rivals from relevant markets—satisfies these criteria.

3. *Indiana's consumer-protection claim*. Corteva attacks Indiana's consumer-protection claim, arguing that to be liable, "a defendant [must have] engaged in one or more defined deceptive acts." Corteva 29 (quoting *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 873 (D. Minn. 2012)). Corteva's citation is outdated. Two years after

58

*Thunander*, Indiana amended its statute to cover "*unfair*, *abusive*, or deceptive act[s]." Ind. Code § 24-5-0.5-3(a) (emphasis added). Syngenta suggests without citing any authority (at 35) that Indiana's claim under this broad statutory offense should fall with the antitrust claims. Indiana's law, like California's, covers "unfair" practices (and additionally covers "abusive" practices) and is not limited to antitrust violations, although allegations of antitrust violations are sufficient to state a claim under the Act. *Gasbi, LLC v. Sanders*, 120 N.E.3d 614, 620 (Ind. Ct. App. 2019) ("unfair consumer fee" forbidden by other statutes could also violate the Act).

Corteva also argues that under Indiana's consumer-protection law, the plaintiff must classify the alleged conduct as either "curable" or "uncurable." Not so. While this distinction appears in the law's section on *private party* suits, the section at issue here—for government enforcement—omits it. *Compare* Ind. Code § 24-5-0.5-4(a) *with* -4(c). Indiana also may recover under § 24-5-0.5-4(g) because Defendants' conduct was "knowing." Indiana's claims for recovery under §§ -4(c) and -4(g) do not sound in fraud and are not subject to Rule 9(b).

4. *Iowa's consumer-protection claim*. Corteva argues (at 30) that Iowa must allege "a misrepresentation of material fact" to state a consumer-protection claim. But Iowa's law covers *both* "[d]eceptive" *and* "unfair" practices, which are "distinct lines of inquiry." *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 527 (Iowa 2005) (discussing Iowa Code § 714.16(2)(a)).

59

While Syngenta admits this (at 36), it argues that Iowa cannot show an unfair practice. Syngenta is wrong. Section 714.16 "infuse[s] flexible equitable principles . . . to respond to the myriad of unscrupulous business practices modern consumers face." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 30 (Iowa 2013). These practices include overcharging consumers by paying distributors to exclude rivals.

5. *Tennessee's and Wisconsin's antitrust claims*. With no explanation, Corteva asserts (at 28–29) that Tennessee and Wisconsin failed to allege that Corteva's conduct had a "substantial effect" in each of those states.

"Substantial effects" is a low burden. An antitrust violation has a "substantial effect" simply by causing higher prices for a significant number of consumers. *See, e.g.*, *Meyers v. Bayer AG*, 303 Wis. 2d 295, 300–01 (2007) (holding that price-fixing, where consumers paid supracompetitive prices as a result of monopolistic conduct by an interstate seller, would "substantially affect[ ] the people of Wisconsin"); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523 (Tenn. 2005) (adopting the same "substantial effects" test, borrowing in part from Wisconsin law). The plaintiff need not show any broader economic effect, nor must the impacts be "distinguishable from or disproportionate to its impacts on other states." *Meyers*, 303 Wis. 2d at 320; *Freeman*, 172 S.W.3d at 523–24. For instance, in *In re Keurig Antitrust Litigation*, the defendant allegedly "shipped at least forty-five [coffee] brewers to a distributor in Tennessee and at least eighteen brewers to a distributor in Wisconsin over the span of less than a year," and also "numerous retail outlets" sold its coffee pods. 383 F. Supp. 3d 187, 265–66

60

(S.D.N.Y. 2019). The court found that these allegations raised "a sufficient inference that [the defendant's] allegedly anticompetitive conduct substantially affected intrastate commerce in Tennessee and Wisconsin." *Id*.

The effects here have been similarly "substantial." ¶¶ 254–258, 273–275. Because of Defendants' conduct, "many hundreds of farmers in Tennessee" and "many hundreds of farmers in Wisconsin" have allegedly bought pesticides at inflated prices. ¶¶ 258, 275. Tennessee and Wisconsin have stated valid claims under their state laws.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss.

Dated:  February 10, 2023               Respectfully submitted,

                                         /s/ James H. Weingarten
                                        JAMES H. WEINGARTEN (DC Bar No. 985070)
                                        Deputy Chief Trial Counsel
                                        Federal Trade Commission
                                        Bureau of Competition
                                        600 Pennsylvania Avenue, NW
                                        Washington, DC 20580
                                        Telephone: (202) 326-3570
                                        Email: jweingarten@ftc.gov

                                        JOSEPH R. BAKER
                                        ERIC BROOKS
                                        WESLEY G. CARSON
                                        ELIZABETH A. GILLEN
                                        GEOFFREY M. GREEN
                                        PHILIP J. KEHL
                                        LAUREN B. PATTERSON
                                        EDWARD H. TAKASHIMA
                                        MARK J. WOODWARD

                                        *Attorneys for Plaintiff Federal Trade Commission*

61

/s/ Nicole S. Gordon
NICOLE S. GORDON
California Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94610
Telephone: (415) 510-4400
Email: nicole.gordon@doj.ca.gov

*Attorney for Plaintiff State of California*

/s/ Carla J. Baumel
JAN M. ZAVISLAN
Senior Counsel
CARLA J. BAUMEL
CONOR J. MAY
Assistant Attorneys General
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Jan.Zavislan@coag.gov
        Carla.Baumel@coag.gov
        Conor.May@coag.gov

*Attorneys for Plaintiff State of Colorado*

/s/ Paul J. Harper
PAUL J. HARPER
Assistant Attorney General, Antitrust
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Telephone: (312) 814-3000
Email: paul.harper@ilag.gov

*Attorney for Plaintiff State of Illinois*

/s/ Matthew Michaloski
MATTHEW MICHALOSKI
CHRISTI FOUST
Deputy Attorneys General
SCOTT BARNHART
Chief Counsel and Director of Consumer
Protection
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 234-1479
Email: matthew.michaloski@atg.in.gov
        christi.foust@atg.in.gov
        scott.barnhart@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

62

/s/ Noah Goerlitz
NOAH GOERLITZ
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 725-1018
Email: noah.goerlitz@ag.iowa.gov

*Attorney for Plaintiff State of Iowa*

/s/ Katherine Moerke
KATHERINE MOERKE
JASON PLEGGENKUHLE
ELIZABETH ODETTE
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 296-3353
Email: katherine.moerke@ag.state.mn.us
        jason.pleggenkuhle@ag.state.mn.us
        elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

/s/ Joseph M. Conrad
JOSEPH M. CONRAD
COLIN P. SNIDER
Office of the Attorney General of
Nebraska
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-3840
Email: Joseph.Conrad@nebraska.gov
        Colin.Snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

/s/ Timothy D. Smith
TIMOTHY D. SMITH
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 934-4400
Email: tim.smith@doj.state.or.us

*Attorney for Plaintiff State of Oregon*

/s/ Hamilton Millwee
HAMILTON MILLWEE
Assistant Attorney General
TATE BALL
Assistant Attorney General
Office of the Attorney General of
Tennessee
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
         Tate.Ball@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

/s/ Margaret Sharp
JAMES LLOYD
Chief, Antitrust Division
TREVOR YOUNG
Deputy Chief, Antitrust Division
MARGARET SHARP
WILLIAM SHIEBER
Assistant Attorneys General
Office of the Attorney General of Texas
300 West 15th Street
Austin, TX 78701
Telephone: (512) 936-1674
Email: Margaret.Sharp@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

/s/ Luminita Nodit
LUMINITA NODIT
Assistant Attorney General,
Antitrust Division
Washington State Office
of the Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104
Telephone: (206) 254-0568
Email: Lumi.Nodit@atg.wa.gov

*Attorney for Plaintiff State
of Washington*

/s/ Laura E. McFarlane
LAURA E. MCFARLANE
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-8911
Email: mcfarlanele@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

64

# CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) and this Court's Order of January 13, 2023 (Doc. 93) in that it contains fewer than 16,000 words as reported by word processing software.

Dated:  February 10, 2023

       /s/ James H. Weingarten
JAMES H. WEINGARTEN
Deputy Chief Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3570
Email: jweingarten@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*