<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2


 3


 4  FEDERAL TRADE COMMISSION, et al., ) CASE NO. 1:22CV828
                                      )
 5          Plaintiff,                )
                                      )
 6          vs.                       )
                                      )
 7  SYNGENTA CROP PROTECTION AG,      )
    SYNGENTA CORPORATION, SYNGENTA    )
 8  CROP PROTECTION, LLC, and         )
    CORTEVA, INC.                     )
 9                                    ) Winston-Salem, NC
            Defendants.               ) December 1, 2023
10  _____    11:03 a.m.


11


12


13          TRANSCRIPT OF THE **MOTION TO DISMISS HEARING**
                BEFORE THE HONORABLE THOMAS D. SCHROEDER
14                   UNITED STATES DISTRICT JUDGE


15


16  APPEARANCES:


17  For the FTC:            JAMES H. WEINGARTEN, ESQ.
                            PHILIP KEHL, ESQ.
18                          MICHAEL J. TURNER, ESQ.
                            FEDERAL TRADE COMMISSION
19                          400 7th Street SW
                            Washington, DC 20024
20


21


22


23


24


25
</pre>

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:
     Syngenta:                 PAUL MISHKIN, ESQ.
 3                             CHUI-LAI CHEUNG, ESQ.
                               DAVID B. TOSCANO, ESQ.
 4                             DAVIS POLK & WARDWELL, LLP
                               450 Lexington Avenue
 5                             New York, NY 10017

 6                             PATRICK M. KANE, ESQ.
                               FOX ROTHSCHILD LLP
 7                             230 N. Elm Street, Suite 1200
                               Greensboro, North Carolina 27401
 8
     Corteva:                  DAVID MARRIOTT, ESQ.
 9                             CRAVATH, SWAINE & MOORE, LLP
                               825 Eighth Avenue
10                             New York, NY 10019

11                             MARK E. ANDERSON, ESQ.
                               MCGUIREWOODS LLP
12                             501 Fayetteville Street, Suite 500
                               Raleigh, North Carolina 27601
13

14   Court Reporter:           BRIANA L. CHESNUT, RPR
                               Official United States Court Reporter
15                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120
16

17

18

19

20

21

22

23

24
         Proceedings recorded by mechanical stenotype reporter.
25        Transcript produced by computer-aided transcription.
```

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

P R O C E E D I N G S

1

2          **THE COURT:**  All right.  Good morning, everyone.  We

3    here on Federal Trade Commission versus Syngenta, et al.,

4    22CV828 on motions to dismiss.

5          Let me ask -- for those who will be speaking, let me

6    ask, if you would, just introduce yourself so we have a record

7    of who's here.

8          **MR. WEINGARTEN:**  Certainly, Your Honor.  James

9    Weingarten on behalf of the Federal Trade Commission.  I will

10   be addressing nearly all the issues on behalf of all the

11   Plaintiffs.  My colleague Mr. Kehl will be addressing market

12   definition, to the extent that comes up.  And we do have some

13   representatives from the states if any of the particular issues

14   that were raised as to particular state laws arise.

15         **THE COURT:**  All right.

16         **MR. WEINGARTEN:**  Thank you, Your Honor.

17         **MR. MARRIOTT:**  Good morning, Your Honor, David

18   Marriott for Corteva.

19         **THE COURT:**  Hold on just a minute.  All right.

20         **MR. KANE:**  Good morning, Your Honor, Patrick Kane

21   with Fox Rothschild for the Syngenta Defendants.  Here with me

22   from Davis Polk who will be doing most of the speaking is Paul

23   Mishkin.

24         **MR. MISHKIN:**  Good morning, Your Honor.

25         **THE COURT:**  Good morning.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 3 of 118

1           All right.  I probably have folks who are monitoring

2  this because of the related MDL, and I'll simply say I had

3  thought that once the MDL complaint was filed that the motions

4  to dismiss would all be filed at the same time.  That's the

5  reason I haven't ruled on this yet.  I was waiting for

6  everything to get resolved because I thought I would resolve

7  motions to dismiss once, and then I was a little surprised

8  when, in the other MDL cases, folks said, well, we would like

9  to all wait and see what happens with the federal case.

10          So I say that only by explanation of why it's taken a

11 little longer.  Otherwise, I would have reached this by now,

12 and I was waiting to try to do it once.  And I debated the

13 merits of doing it once or waiting and resolving this and

14 seeing what happens with everything else.  So that explains the

15 delay.  Otherwise, I would have -- I normally don't sit this

16 long on a motion.

17          So the motions are made by the Defendants.  So I'll

18 be happy to hear from the Defendants first.

19          It strikes me that the principal issues here are the

20 application of the price-cost test or not and then the relevant

21 product market.  Those seem to be the two key issues that have

22 been raised.  I have a number of questions.  Whether I will get

23 to them all or not, I don't know.  We'll see.

24          I'm always troubled when I have a case where the

25 parties disagree on what law applies.  That's an additional

    22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  challenge.  This seems to be one of those.  So we will work

2  with that.

3          I don't know who would like to go first.  I have read

4  the materials obviously, and so you can assume that I have been

5  through all of those.  But I'm happy to hear from you.

6          **MR. MISHKIN:**  Thank you, Your Honor.  Paul Mishkin

7  again for the Syngenta Defendants.

8          Just as a point of organization on those two key

9  issues that Your Honor had identified, I am going to plan to at

10 least take the lead on that price-cost test issue of whether

11 the complaint pleads exclusionary conduct regardless of the

12 market definition.  And Mr. Marriott for Corteva was going to

13 plan to take the lead on the market definition piece.  If Your

14 Honor has a preference as to which issue to begin with, then

15 we're happy to --

16         **THE COURT:**  It does not matter to me because we are

17 going to get to both of them.

18         **MR. MISHKIN:**  Okay.  Since I'm standing here, then

19 I'll begin with this issue of the price-cost test and whether

20 the complaint pleads exclusionary conduct regardless of what

21 the market is.

22         And I think the place I would like to begin, Your

23 Honor, is just what to me is the guiding principle that really

24 decides this case, and that's that above-cost price cutting is

25 procompetitive regardless of its form.  And the Supreme

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 5 of 118

1 Court -- as we set forth in our briefing, the Supreme Court has

2 made that point multiple times.  It said that price reductions

3 are the very essence of competition, that lower prices to

4 consumers are beneficial regardless of how they're set, and

5 that, importantly, that it is beyond the practical ability of

6 courts to try to figure out an instance where above-cost price

7 cutting might somehow be anticompetitive, and that to try to do

8 that is going to court intolerable risks -- that's the way the

9 language goes -- of chilling procompetitive conduct.

10          So I think this is -- really, to our mind, the

11 foundation of this point is that the Supreme Court is saying

12 that courts need to be very careful before condemning any kind

13 of -- before condemning any kind of above-cost price cutting

14 and that there needs to be a wide zone of protection carved out

15 for price cutting.

16          Okay.  So that's the foundation.  How do we apply

17 that to market share --

18          **THE COURT:**  So your argument is that the price is the

19 exclusive -- or predominant, rather, method of exclusion in

20 this case?

21          **MR. MISHKIN:**  That's correct, Your Honor.  I think

22 there is a strong consensus in appellate case law that that's

23 the test that we ought to be applying.

24          **THE COURT:**  Does your -- do the Defendants' loyalty

25 programs differ in terms of exclusion from what I have seen you

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 6 of 118

1 argue as traditional quintessential loyalty programs?

2       For example, the frequent flyer programs for airlines

3 and the hotel programs, which you all mentioned in your briefs,

4 they don't measure, as I understand them, the purchases as a

5 function of overall purchases.  They measure just a volume

6 discount, if you will.  So you reach 20,000 miles on an

7 airline, you get a discount or get some benefit; whereas, these

8 programs measure them from -- as a percentage of overall

9 purchases by the distributor, if I understand it.

10      So does that render something different -- first of

11 all, it seems to me that's a distinguishing factor from the

12 other programs.  The next question is so what's the consequence

13 of that?  And does that mean price is no longer the predominant

14 mechanism of exclusion; it's the measurement over all purchases

15 that now becomes the exclusionary effect?

16      **MR. MISHKIN:**  The short answer, Your Honor, is, no,

17 it doesn't matter to the analysis.  Ultimately, the question

18 about what is the predominant mechanism of exclusion -- what

19 the cases are telling us is that the question is why are the

20 customers participating.  What is it that's inducing them or

21 incentivizing them to meet the share thresholds?  Is it because

22 they want the rebate?  Is it predominantly because they want

23 the better price?  If so, then the pricing is going to

24 predominate.  If it's something else, then maybe pricing

25 doesn't predominate.  So that fundamental question is the same

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  regardless of whether we're talking about a volume-based rebate

2  or a share-based rebate.

3            And there are differences.  I think Your Honor is

4  absolutely correct that there are versions of these programs

5  out in the world, ones we might encounter every day that may be

6  more volume-based.  So I think Your Honor is correct that that

7  difference certainly is there, that many of the programs we

8  might encounter on a daily basis would be volume-based.

9  Share-based are also very, very common across multiple

10  industries as all the case law shows.  And there are advantages

11  often to the customers of share-based programs.

12            **THE COURT:**  Who else has -- what industry or

13  manufacturers have these kinds of price discount programs that

14  operate based on a percentage of overall purchases as opposed

15  to volume discount?

16            **MR. MISHKIN:**  Yeah.  I'm not sure I can give Your

17  Honor sort of a current rundown, but I think, just based on the

18  case law, it's a variety of industries, right.  We see it in

19  pharmaceuticals.  We see it in boats.  We see it in automotive

20  sandpaper.  We see it in medical devices.  I think it comes up

21  again and again and again across multiple industries, and

22  that's why there's so much case law on this because it does

23  come up.

24            I think critically, Your Honor, the cases -- when

25  they're talking about it -- when, for example, *ZF Meritor* and

                22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  *Eisai*, which I think do a good synthesis of the case law in

2  this area, they talk about the price-cost test, they don't draw

3  any distinction between volume- or share-based.  And I think

4  there is a strong consensus in the case law that there is no

5  such distinction.

6          I'll point out that a share-based program, Your

7  Honor -- that has certain advantages to the customer that a

8  volume would not have, right.  It can be tailored to the

9  customer.  It doesn't matter what your total overall purchases

10 are.  So it's actually -- can offer advantages that volume

11 programs don't offer.  It's a basic competitive tool I think is

12 really our point, and there's nothing unusual, strange about

13 this.  It's been recognized as a cross-cutting -- as a

14 price-cutting device across numerous cases.

15         **THE COURT:**  So if price predominates, one of the

16 disputes is the other question of relevant product market.  And

17 the argument the Defendants make there is that there are all

18 these other products that are interchangeable with the

19 Defendants' AIs in this case.  And why isn't -- I guess I'm a

20 little confused as -- if those are all interchangeable but

21 there's a price that predominates here as the discount that's

22 procompetitive, why aren't all those other products being

23 purchased, or are they?

24         I know that's a little bit outside the record, but it

25 seems a little inconsistent to me to say price predominates

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 9 of 118

1   here and also say but there are all these other products that

2   could be bought.  And I'm wondering, well, are people buying

3   them, and is it a competitive market, if you will?

4          Does that make sense, the question?

5          **MR. MISHKIN:**  Yes, Your Honor.

6          The short answer is absolutely, yes, all of these

7   products are being purchased.  I think the categories of

8   products generally that we're talking about are the other

9   products that have similar uses based on different AIs.  That's

10  one category of products.  Those are purchased all the time.

11  There is very robust competition in that area.  And then what I

12  think Plaintiffs are focusing on here is, for the particular

13  AI, the alternative between the branded version of products

14  that have that AI and the generic version, and there is

15  certainly competition there as well.

16         I think in this context what I'm addressing right now

17  is why the conduct is not exclusionary; it's not

18  anticompetitive regardless of what -- regardless of how we

19  define that market.

20         But the answer is absolutely, yes, there's robust

21  competition across all of those different types of products

22  here.

23         And so -- and I just want to really explain because I

24  think this phrase can sometimes be confusing as to what does it

25  mean for price to predominate.  Really what gives us the lens

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 10 of 118

1   on that is looking at it from the customer and if you're the

2   distributor perspective, right. They are -- we're alleged to

3   be excluding because the distributors are opting to meet these

4   share thresholds and to buy branded versions, in many cases

5   branded versions of these AIs rather than the generic version.

6   And the question is why are they doing it? What is

7   incentivizing them to do it?

8           And what the complaint pleads here is that they are

9   doing it because it's in their economic interest to do it.

10  They want the rebate. And that is really what decides this

11  under whether the price-cost test applies. That is the theory

12  of this complaint as to why distributors are doing it. They

13  want to get higher quality products, and they want the

14  discount. And so to the extent any exclusion is happening,

15  it's happening because the distributors are making that free

16  choice to accept the rebate. And the point of the price-cost

17  test is to say if it's price, if it's the desire to get the

18  rebate, if that's what's incentivizing the distributors or the

19  customers to participate, then that's a pricing practice

20  because a rival could contest that. A rival -- if the

21  inducement is price, then an equally efficient rival or a rival

22  who's prepared to offer products of similar quality at the

23  right price, they can contest it. They're not being excluded

24  in any anticompetitive way.

25          So that to me is the key point about what the

1  predominance of price means here.

2        **THE COURT:**  Do barriers to entry relate to the

3  application of the test in this case?

4        The Government alleges and the Plaintiffs allege that

5  there are high barriers to entry, and that's why the generic

6  manufacturers are not entering the market, if I read it right.

7  And because of the loyalty programs, that that essentially

8  freezes out the generics from being able to enter the market.

9        So do I -- should I take into account barriers to

10 entry in any analysis under price-cost test?

11       **MR. MISHKIN:**  I think they reference briefly a

12 barrier in terms of regulatory approval process, but it's not a

13 significant barrier, and I don't really think that's the theory

14 of the complaint.  I think the barrier that Plaintiffs are

15 talking about is this program.  That's what they're saying is

16 creating the barrier.  They're saying that the program is

17 locking up the distributors and depriving the generics of a way

18 to get their product to market, which brings us right back to

19 the question of, all right, why are the distributors opting in

20 or not?  And is this barrier as -- maybe we can use that word.

21 You know, why is this barrier or this type of quote/unquote

22 exclusion -- why does it exist and does it have to do with

23 anything other, predominantly, than a pricing practice?  And

24 our position is no.

25       So the barrier is price.  There would always, I

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 12 of 118

1  suppose in any market, be an argument that if someone is

2  offering a better price, a better value proposition with the

3  product, that that creates a barrier to competitors.  That's

4  essentially what Plaintiffs have alleged here.

5          **THE COURT:**  Does the price-cost test contemplate an

6  efficient market, if you will, so that if the market has

7  barriers to entry, then you have to examine that as to whether

8  the price-cost applies?

9          **MR. MISHKIN:**  The price-cost test, no, does not look

10  to barriers to entry.  It looks at -- it takes the basic

11  principle that price cutting -- if that is what it is alleged

12  to be doing the excluding, then that will never be

13  anticompetitive unless it's predatory.  That's the one

14  situation in which it will be predatory.

15          But once it's determined to be a pricing practice,

16  which is the fundamental question, then that's what the Supreme

17  Court has told us is that there's only one way under that

18  circumstance where that type of conduct is going to be found to

19  be exclusionary or anticompetitive, and that's if it's below

20  cost, which, again, brings us right back to that's why the

21  fundamental question here is whether this is a pricing

22  practice.

23          And, you know, the case law, as we focused on, it

24  very much talks about does price predominate.  I think we've

25  talked a fair amount on that.  I've explained why we think

1    that's absolutely what the complaint alleges.  There's sort of
2    a corollary to that test that comes through from both *Eisai* and
3    *ZF Meritor*, which is that if you're talking about
4    single-product rebate programs in particular, in other words,
5    where there's no alleged bundling -- and Plaintiffs have not
6    alleged that as to the Syngenta program -- that those kind of
7    programs are usually going to be legal.

8            And *Eisai* says that quite explicitly.  *ZF Meritor*,
9    the quote there is that "we join our sister" courts "in holding
10   that the price-cost test applies to" single-product,
11   share-based rebate programs.  And they cite the Sixth Circuit
12   and Eighth Circuit and the First Circuit.  And so that's sort
13   of a corollary to the main point that we've been making here.

14           And I think if you take these different aspects of
15   the test and you apply it to the programs here, I think it is a
16   very straightforward application.  There are no alleged
17   non-price features of the Syngenta program.  It's the offer of
18   the rebate that's doing the inducing.  And because it's single
19   product, the question under the case law is going to be is
20   there something so unusual that Plaintiffs have alleged here to
21   take it out of that presumptive legality that the case law is
22   talking about?

23           And the answer is they certainly have not.  They have
24   alleged a market-share rebate program that is standard,
25   typical.  They criticize elements of it --

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 14 of 118

1          **THE COURT:**  So you can have exclusive arrangements.

2   You can have exclusive distributors and not be anticompetitive

3   under the law.

4          **MR. MISHKIN:**  Right.

5          **THE COURT:**  And your argument is these are not

6   exclusive, I guess, on two grounds:  One is voluntary and, two,

7   they allow for what's called "open space," I think is the

8   phrase used in the complaint.  Is that right?

9          **MR. MISHKIN:**  That's right, Your Honor.

10          **THE COURT:**  But the so-called "open space" is

11   relatively small, as alleged here.

12          Are these not, at least in that sense -- these

13   programs not exclusionary in the sense that you have to have a

14   pretty high percentage of purchases from the defendant

15   corporations or else you won't get the benefit of the discount?

16          **MR. MISHKIN:**  I think that's Plaintiffs' theory, Your

17   Honor, is that the share -- because these share percentages are

18   high, that if the distributors choose to meet them, there's not

19   enough or, you know, not as much open space as there would be,

20   obviously, if they were not meeting those share thresholds.

21          **THE COURT:**  Isn't that, by definition -- I mean, if

22   you look at the percentages, isn't that -- I wouldn't -- I

23   guess a fact.  I mean --

24          **MR. MISHKIN:**  Sure, Your Honor.  It's a

25   consideration, but the case law tells us how to consider that

1  fact is what I would say.  And it brings us back to the -- what

2  is the mechanism of the exclusion of why are the distributors

3  deciding to buy if it's, you know, for example, 85 or

4  90 percent of the type of product from the Defendants.

5          **THE COURT:**  Is what distinguishes this case the fact

6  that the complaint alleges that the Defendants' conduct is

7  anticompetitive as it relates only to the generics?  Is that

8  what makes this case different?

9          Because in the -- and I am going to be asking the

10 Government this in a minute and the Plaintiffs.  In the absence

11 of the issue of generics, your argument would be this is a

12 procompetitive -- put that issue aside.  I shouldn't say "in

13 the absence."  Put that issue aside.  Your argument would be

14 exactly what it is now, that it's procompetitive.  You get

15 discounts.  And if a distributor wants to be eligible for them,

16 they just need to agree to distribute a high percentage of your

17 client's products for certain chemicals in order to get the

18 benefit of the discount.  And, largely, that would be

19 procompetitive; correct?

20         **MR. MISHKIN:**  Right.

21         **THE COURT:**  And the reason I guess I'm asking -- what

22 makes it procompetitive in the case law?  Is it because there's

23 no other situation where there are other factors such as high

24 barriers to entry that would relate to it?

25         In other words, does it assume -- I think you call

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1   it -- it's been a long since I've had economics in college.  Do

2   they call it an efficient marketplace, that there could be

3   people entering and leaving the market without significant

4   barriers?  And so if that's the case, question mark, does it

5   matter, as I get back to my earlier question, that there might

6   be barriers to entry for certain people?  And is what

7   distinguishes this case the fact that the Government is

8   bringing the claims as it relates to products that have their

9   patent protection expired and they go to generic where the

10  price would be significantly lower?

11          **MR. MISHKIN:**  Your Honor, I don't think it matters in

12  a way -- any way to the argument that we are making here.  I

13  think -- again, I don't think the Government has alleged any

14  materially high barriers to entry other than what they

15  characterize --

16          **THE COURT:**  Well, in the other cases where there's --

17  that you say are similar to this where price cost applies, do

18  each of those cases involve markets that don't have significant

19  barriers to entry that are alleged in this case?

20          **MR. MISHKIN:**  Your Honor, I think that all of

21  those -- there are all sorts of different markets alleged.

22  There's no, certainly, trend in the case law that those cases

23  involve other markets where there are lower barriers to entry.

24  I think the key issue in these cases is what effect is the

25  rebate program itself having, right.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 17 of 118

1          Because if I go back, again, to the Supreme Court

2    teaching on this, the Supreme Court teaching is that if the

3    practice at issue is fundamentally a pricing practice, those

4    other considerations do not matter.  There is only going to be

5    one way in which the conduct is going to be anticompetitive,

6    and that's if it's predatory pricing.  And that's because

7    cutting prices is competition.  It's the essence of

8    competition.

9          And so all those other considerations, they simply do

10   not apply when we're talking about a pricing practice, which is

11   why the whole test that is developed and all the appellate

12   courts are talking about and have synthesized in *ZF Meritor* and

13   *Eisai* -- that's why there's this initial question about whether

14   the rebate itself is a pricing practice and why are

15   distributors participating.  Because if they are participating,

16   for example, for reasons of alleged coercion, right, if they're

17   being told that all their supply is going to disappear -- and

18   you see these other -- you see factors in the case law, types

19   of aspects of programs that are alleged to be non-price, but

20   you don't have those here.

21          That's the initial inquiry that we need to do is to

22   figure out whether it is a pricing practice.  And here it is

23   because the only inducement is the offer of the rebate.  So

24   that's, again, the fundamental question that I think we have to

25   answer here.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 18 of 118

1          And if you look at the aspects of the programs, as
2     they're alleged, they do not have the coercive aspects that are
3     talked about in the case law.  And, frankly, with respect to
4     the Syngenta program as a single-product program that's
5     voluntary, short term, one year, not alleged to be outside of
6     the ordinary in this industry, going through all of the
7     different aspects of it and all the different aspects of
8     programs that have been looked at in the case law, we think it
9     would be unprecedented to find that a market-share-based rebate
10    program of the kind that Syngenta has is potentially
11    anticompetitive.  Every case that has looked at these
12    market-share rebate programs, to the extent they have found
13    them potentially problematic, it's because of some non-price
14    coercive feature that is simply not present here in this
15    program.

16          **THE COURT:**  The complaint alleges three AIs for each
17    of the Defendants.  It also says that the action includes these
18    three, and the primary focus is those three.  I'm not exactly
19    sure what that means.  So we'll find out in a little bit.  I
20    don't know if others are at stake.  I presume that the loyalty
21    program applies to other ingredients, if you will.  I'm not
22    sure what we call --

23          **MR. MISHKIN:**  Active ingredients.

24          **THE COURT:**  Active ingredients, if that's the
25    appropriate phrase.

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1          Do the programs apply to ingredients that don't

2  involve products that have come off of patent protection?  Can

3  you say?

4          I'm a little careful in what I'm asking because some

5  of this is confidential.  If you're uncomfortable answering

6  anything in a public forum, feel free to tell me that.

7  Otherwise, I am trying to get the idea of the scope of this and

8  the nature of the Government's action in this case because it's

9  a very -- the action is very focused on apparently six, and

10 they all have involved the generic aspect.  I am curious as to

11 whether the program otherwise might be deemed not

12 anticompetitive, except insofar as it relates to the products

13 that have come off generic -- or come off patent protection.

14         **MR. MISHKIN:**  Yeah.  And I'm happy to address that,

15 Your Honor.

16         I think, first of all, there are -- there's certainly

17 other AIs that are covered by these kinds of programs.  I also

18 do not entirely know what is meant by the focus of the

19 complaint on these products, but I do know that paragraph 3 of

20 the complaint says they seek to end these programs.  So it is a

21 broad-sweeping remedy that I think is --

22         **THE COURT:**  And I don't know if that means totally or

23 just as to these products.  And that's why the question I'll

24 have later for the Government is whether -- whether the concern

25 is what's alleged, and, that is, the anticompetitive effect as

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 20 of 118

1   to the generics, because you're telling me that these kind of
2   programs exist in the marketplace, and they're not being
3   attacked and that the case law supports them.  So the question
4   in my mind is is the distinguishing feature in this case the
5   fact that these are programs that are implemented on a
6   post-patent protection basis in order to stem the decline and
7   revenue as long as possible?  The Government alleges that and
8   has provided some factual support for that.

9           **MR. MISHKIN:**  A couple points, Your Honor.

10          I think there -- it is the case that these types of
11  programs are meant to, in large part, compete -- to help
12  compete against generics.  So I don't think that aspect of the
13  case in any way renders this anticompetitive.  In fact, it is
14  competition.  That's really our point.  And that there --

15          **THE COURT:**  Well, some of the allegations are that
16  these were put in place after generic -- after patent
17  protection expired and I guess FIFRA protection.  I'm presuming
18  FIFRA protection generally expires during the patent protection
19  period of time.  Is that true or not?

20          **MR. MISHKIN:**  I think it depends.  I think it can
21  depend, Your Honor, depending on how long it takes to get the
22  patent and when that kicks in.  So you can have times, I think,
23  when it can expire on either side of the patent.

24          That's absolutely their allegation, Your Honor.  Yes,
25  they allege that we're targeting generics with these types of

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 21 of 118

1  programs, but the point --

2          **THE COURT:**  You say -- I'm sorry.  You say in your

3  briefing that these have gone on for decades, and now they're

4  being attacked by the FTC and the Plaintiffs.  And that's why I

5  asked, is --

6          **MR. MISHKIN:**  Yeah.

7          **THE COURT:**  -- if they've been going on for decades,

8  exactly how have they been going on?  It's not clear to me the

9  scope of these.  And I get back to my same question of are they

10  general -- are these programs generally procompetitive, but

11  potentially not so if they have an anticompetitive effect in

12  the generic context?

13          **MR. MISHKIN:**  Right.  I think Your Honor is right,

14  that these programs have been around for a long time.  They may

15  each target a different AI.  And I think that's an important

16  feature of this case, that it's -- this challenge is unusual in

17  light of that.  These are programs that have been understood to

18  be legal for a very, very, very long time.  So that, I think,

19  is an important general point.

20          But to Your Honor's core question, no, I don't

21  think -- the fact that this is a competitive tool that's being

22  used to try to win a competitive battle with whether it's other

23  branded or whether it's generics, absolutely, that is a target

24  of these programs, trying to win a competitive battle in a very

25  competitive marketplace.

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1        And the proposition that's being made to the

2   distributors is I know you have choices.  You can buy generic.

3   You can buy -- there's a lot of different things that you can

4   buy, but I would like you to buy -- to the extent you want to

5   get a particular AI, I would like you to buy it from me, and

6   I'm going to offer you a price reduction for doing that.

7        That is a procompetitive -- classically

8   procompetitive tool, and there is nothing about -- there's

9   nothing -- there is no anticompetitive effect that's really

10  been alleged here on the generics.  There are allegations that

11  the generics haven't had the penetration that maybe they ought

12  to have had.  But why is that an anticompetitive effect?  And,

13  again, you have to come back to the program itself.

14       **THE COURT:**  I think the allegation is that the

15  barriers for entry are too high for the generics and that the

16  farmers would like to have generics, but the distributors are

17  unwilling to sell them because they don't have the ability to

18  sell any reasonable amount of them under their programs or else

19  they lose all the discounts that they get from your clients.

20       **MR. MISHKIN:**  That's the allegation, which brings us

21  back to why are the distributors participating, right.  Why do

22  they want to participate?  And as the complaint pleads again

23  and again, it's because they want the rebate, absolutely.  That

24  is what's pleaded.

25       But what is the Supreme Court telling us then?  If

        22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  the inducements -- if it's a pricing practice, if they're doing

2  it to get the lower price -- because there can't be any

3  realistic debate that what is happening here is that the price

4  is being lowered in exchange for meeting the share.  So if the

5  reason the distributors are opting to do it is to get the

6  better price, then whatever exclusion is happening as a result

7  of that is not anticompetitive exclusion.

8        That is what all the case law is telling us.  And the

9  Supreme Court is basically saying when you've got a

10  price-reducing program, like you have here, you do not want to

11  get into granular detail about how -- well, maybe this type of

12  above-cost price cutting could be anticompetitive.  What the

13  doctrines are telling us is that because price cutting is

14  procompetitive, we have to carve out a zone here of protection.

15        And it really comes down to is it a pricing practice

16  in the first instance, and why couldn't the generics contest

17  it, right?  That's why we're asking whether it's a pricing

18  practice, because if it is, then they should be able to contest

19  it.

20        **THE COURT:**  What cases are you aware of where the

21  loyalty program involves not just volume discounts, but

22  involves the exclusion -- I call it exclusionary, but you have

23  to have a certain high percentage of purchases -- of the

24  purchasers overall -- bucket of purchases in order to qualify?

25        Are there any cases that have that component to them?

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 24 of 118

1        **MR. MISHKIN:**  Yeah.  I think all -- the cases that we

2   cite and rely on, they all have that component to them.

3        **THE COURT:**  Which ones are those?

4        **MR. MISHKIN:**  *Eisai* case involves that; *ZF Meritor*

5   certainly involves that, where it announces that the price-cost

6   test would apply to the single-product programs; the *NicSand*

7   case in the Sixth Circuit; the *Concord Boat* case in the Eighth

8   Circuit; all the cases that *ZF Meritor* cites for the

9   proposition that the price-cost test should apply.

10        The cases are not distinguishing between the volume

11   and the share base.  They're putting those together and saying

12   that that is a form of price cutting here.  So I think Your

13   Honor is not going to find that type of a distinction in all

14   the cases that we're talking about.  They are all firmly

15   talking about not just volume, but market-share rebates, and

16   they are recognizing that that is a form of price cutting of

17   the kind that the Supreme Court has said we have to protect and

18   we can't try to find a way in which that might be

19   anticompetitive unless it is predatory.

20        **THE COURT:**  All right.  But some of those programs

21   were a little diff -- like *NicSand* was one where they were

22   buying shelf space, if I remember right.  Isn't that the *3M*

23   case where they went to the retailers and agreed to pay them a

24   bunch of money if they allow them to have exclusive shelf

25   space?

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 25 of 118

1          **MR. MISHKIN:**  Your Honor, *NicSand* was the automotive

2     sandpaper case with suppliers to -- you know, four out of six

3     the retailers had agreed.

4          So it does show up in a variety of contexts; I agree

5     with that.  But the concept that you can offer a lower price in

6     exchange for a higher market share, that is a very familiar

7     proposition that repeats itself again and again in these cases.

8          And the cases are not -- they're not saying, well,

9     price maybe doesn't predominate because it's share-based.

10    That's just -- you're not going to find that in the case law

11    generally.  And the -- this appellate court consensus -- this

12    synthesis that you see in *ZF Meritor* and *Eisai*, it is just not

13    asking that question.  It is accepting that share-based are a

14    form of price reduction, and then it's saying what are the

15    features?  What is doing the inducement?  And then we're back

16    to the same analysis that we've done before.

17         So I do -- I'll return to my basic point here which

18    is that -- you know, using the Syngenta program as an example,

19    a single-product program with the features it has and, very

20    importantly, with the features that it does not have, there is

21    no case that we're aware of that has condemned that.

22         Your Honor, if I could just maybe take one more

23    moment and just address one, I think -- I'm not going to try to

24    rebut all the arguments that I'm sure Plaintiffs will make.  I

25    will save some of that for later, but just there's this one

1  basic threshold point that I think they make about what's the
2  right test to apply, and Your Honor mentioned that at the
3  outset as an important point.  Plaintiffs say that because they
4  allege that the prices are too high, that the framework that I
5  have been talking about doesn't apply here and that they --
6  that the price-cost test is reserved for situations where they
7  actually are alleging that it is the low cost that is doing the
8  excluding.  And that's just clearly not --
9       THE COURT:  Your contention is essentially a safe
10 harbor, that because you're selling above cost that you have a
11 safe harbor, that what you're doing is -- that that test
12 applies, and, therefore, you're permitted to do it.  Is that a
13 fair characterization?
14      MR. MISHKIN:  I think they may characterize it that
15 way, and I would say that, well, the Supreme Court absolutely
16 creates a safe harbor for price reductions.  So that's exactly
17 what the Supreme Court is saying that we need to have here, and
18 the question, though, is what -- again, how to determine
19 whether it's a price --
20      THE COURT:  So would you agree, though, that even if
21 price cost were to apply generally because you're selling
22 above -- margins above cost, that if there were other
23 exclusionary aspects to the program, then under the rule of
24 reason, you would have to look at -- beyond the price-cost
25 test?

1       **MR. MISHKIN:** If there were features of the program

2 that means it's not predominantly a pricing practice, then I

3 think Your Honor would be correct, right. If there were -- if

4 you look at the question of why are the customers

5 participating, and you conclude that there is a theory that

6 they are doing it predominantly for some reason other than they

7 want the rebate, it's in their economic interest, and, instead,

8 they're doing it because they're -- they have -- they feel like

9 they have no choice or they feel like it's not in their

10 economic interest, but they -- that the rebate wouldn't be in

11 their economic interest, but they're being coerced in some way,

12 or, for example, Your Honor, if there were some requirement to

13 get the rebate other than meeting the share threshold -- you'll

14 sometimes see in the cases requirements that not only do you

15 have to meet the share threshold, but you have to go into your

16 advertising book and take out the names of the competitors or

17 do other things to exclude that would not be price basis.

18       So there are ways, of course, that you could find

19 that there are non-price related aspects to the exclusion. But

20 if you don't have those -- and that's our basic point is you

21 don't have those here. So you're left with a program that is

22 price based fundamentally, and all the case law is telling us

23 what to do with that, which is you can't --

24       **THE COURT:** So one of the allegations is there is

25 threat to cut off supply. The Defendants say, well -- there's,

1  I think, one instance that's been cited to terminate a

2  distributor for not complying with the program.  But as I

3  recall the Plaintiffs' argument in the briefs that, well, we

4  don't have to have a lot of those because it's the threat, it's

5  not the actual carrying it out that's important.

6          **MR. MISHKIN:**  Yeah.  If I can --

7          **THE COURT:**  They allege that there were threats.

8  Now, granted, I understand there's been an investigation for

9  some period of time.  So this allegation -- the complaint is

10 not filed on an empty slate.  I mean, it's a clean slate.

11 There's a history.

12         But if the Government's alleging there were other

13 threats -- two questions, I guess.  Why wouldn't that be

14 enough?  And, two -- at least at the pleading stage.  I'm very

15 cognizant of the stage where we are.  And, two, is it possible

16 that whether the price-cost test applies has to depend in some

17 cases, theoretically, hypothetically, on what the facts

18 develop?  And if it turns out that there is no evidence to

19 support sufficiently that those threats predominate, then price

20 cost applies; but if the evidence demonstrates they do

21 predominate, then some other test applies.

22         **MR. MISHKIN:**  I understand the question, Your Honor.

23 Let me try to address that.

24         So I think if we needed more facts to tell us what

25 the program was or what it consisted of, then potentially there

1  would be an open question.  But we know what the features of
2  the program are, and there is no alleged coercive feature of
3  the program itself.  I'll comment in a moment to that
4  particular episode that's alleged.  But I don't think there's
5  any dispute that the program itself and its features don't
6  contain coercive aspects, at least that could be the only
7  correct interpretation under the current --

8          **THE COURT:**  Are there distributors who don't meet the
9  thresholds who continue to distribute?

10         **MR. MISHKIN:**  I believe so, Your Honor.  I think that
11 may take us outside of the complaint.

12         **THE COURT:**  It clearly does.

13         **MR. MISHKIN:**  Yes, I think that happens.

14         **THE COURT:**  I'm aware discovery in these cases can be
15 hugely expensive.  I'm just trying to get a sense of where this
16 may be headed.

17         **MR. MISHKIN:**  Sure.  But let me just come to a key
18 point here, though, on this idea about threats.  I am going to
19 come back again to this theme of why are the distributors --
20 fundamentally what is it that predominantly is motivating the
21 distributors to participate here.

22         I would say read the complaint.  Obviously, look
23 closely at the complaint.  Look at paragraph, for example, 7,
24 paragraph 173, which is probably the most detailed description
25 in the complaint of why the distributors are actually

1  participating.  And what is the theory on which Plaintiffs are

2  proceeding?  They are not proceeding based on any factual

3  support on a theory that distributors are in any meaningful way

4  participating because they were threatened.  That is just not

5  the theory that's pleaded in this complaint.  And the one

6  episode that is alleged about a discontinuation of supply with

7  a distributor who didn't comply with Key AI, there's no threat

8  that's actually pleaded in the complaint.  They don't plead

9  that it was threatened ahead of time.  They plead that there

10 was a discontinuation after the fact.  They don't connect that

11 episode -- to me this is really the key point.  They don't

12 connect that episode with any factual allegations to a

13 perception among distributors --

14        **THE COURT:**  So the --

15      (Indiscernible cross-talk.)

16        **MR. MISHKIN:**  -- in general.

17        **THE COURT:**  -- complaint alleges, the amended

18 complaint, that the "...loyalty programs" accept "exclusion

19 payments in return for severely limiting purchases."  And then

20 it says "from generic manufacturers."  That's the allegation.

21 I don't know if that means all manufactures or if it means

22 generic manufacturers.

23        **MR. MISHKIN:**  I think that's just a re-articulation

24 of the terms of the program itself, Your Honor.  I think that

25 what they are saying is that there is a share that you have to

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 31 of 118

1  meet in order to get the rebate.  If you're going to meet that

2  share, that's going to mean you're not going to be able to buy

3  as much from competitors.  So they do say --

4          **THE COURT:**  Well, that's my question.  It doesn't say

5  "competitors."  It says "generic manufacturers."

6          Is that the program, that you can't buy from

7  generics, or is the program any competitor?

8          **MR. MISHKIN:**  It says you can't buy -- it has to do

9  with who the maker of the other AI would be.  It's not phrased

10  in terms of generics, but it is the case that the makers of the

11  AI -- that they will frequently be generic competitors.

12          So we're not disputing that, certainly, if you buy

13  from generic, that's not going to count toward the share

14  threshold that we're talking about here.  But the point is

15  that --

16          **THE COURT:**  You're saying, as a practical matter,

17  that's what it would have to be?  It would have to be a generic

18  because the only other person who could make it would be a

19  manufacturer of a generic one?

20          **MR. MISHKIN:**  Well, Your Honor, once it's all

21  patented, anybody could potentially make it, but it would be

22  largely the generics.  I think that's absolutely right.

23          But the question then is, again, what is the

24  inducement?  Why can't generics match it?  And at the end of

25  the day on all of these points, it really all comes back down

          22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  to the same thing, which is what is the alleged mechanism

2  that's actually doing the inducing.  At the end of the day,

3  that's the key question.  And it's nothing other than the

4  price.

5        **THE COURT:**  In your view, does the applicable test

6  apply to all the federal claims?

7        **MR. MISHKIN:**  Yes, Your Honor.  I think, if you look

8  at *ZF Meritor* and *Eisai*, they have all the same claims at issue

9  here.  I think the Plaintiffs make an argument under Section 5

10 that they have broader powers, but that's not substantiated.

11 Certainly, in your view, it would be -- it's the same test.

12 Certainly, under the Sherman Act and the Clayton Act, it would

13 be the same test.

14        And as I say, there's nothing substantiated that

15 would allow them to -- that would allow Plaintiffs to go

16 against these -- sort of these basic doctrines and expand the

17 theory and take something that has always been permissible and

18 make it impermissible under Section 5.

19        **THE COURT:**  All right.

20        **MR. MISHKIN:**  If there are no further questions, then

21 why don't I stop there for now and let -- I don't know if --

22 Mr. Marriott may want to add something, but we'll proceed

23 however Your Honor would like.

24        **MR. WEINGARTEN:**  I certainly want to defer if

25 Mr. Marriott wants to add on the subject.  I was just rising,

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 33 of 118

1   Your Honor, to suggest we may keep talking about price-cost

2   test before we get to the market definition piece, but,

3   obviously, however Your Honor wants to proceed.

4           **THE COURT:**  I think I will go ahead and just hear

5   from the Defendants, and then I will let you respond to both,

6   if that's all right.

7           **MR. MARRIOTT:**  Thank you, Your Honor, David Marriott

8   for Corteva.

9           I will focus my remarks, if I may, on the market

10  issues, as I think the conduct allegations have been

11  crystallized nicely for the Court.

12          We think, Your Honor, that a fundamental flaw in

13  these complaints relates to the alleged markets.  We think the

14  alleged markets fail -- are not properly pled under the

15  required test.  And it's only really when the market is

16  properly pled that the allegations of market power can properly

17  be assessed.  That's why it's a fundamental requirement here.

18          And, effectively, Your Honor, what we contend is that

19  the Plaintiffs here have simply cherry-picked individual AIs,

20  defined those AIs as the market in order artificially to

21  inflate the shares, the supposed market power that the

22  defendants have.  And when, instead, Your Honor, the Court

23  takes account of all of the available alternatives to the AIs

24  in question, we respectfully submit that would have to be the

25  appropriate relevant market.  That's the relevant market under

        22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  the tests as they've been defined by the Supreme Court.

2  Reasonable interchangeability really defines, the Supreme Court

3  cited in *Brown Shoe*, the outer boundaries of the market.

4           And when you --

5           **THE COURT:**  Isn't embedded in that, though, a

6  question of cross elasticity of demand, which -- your papers go

7  to some length obviously to point to what you believe are other

8  ingredients that can be interchanged with these, and you cite

9  to the EPA documents and things.  You don't say anything

10  about -- they're interchangeable, but -- according to your

11  arguments, but they don't say anything about whether they're

12  priced in a way that they would be interchangeable.  In other

13  words, they are functionally interchangeable.  I don't know if

14  they are interchangeable in terms of cross elasticity of

15  demand.  Isn't that necessary, the first question?

16           The second is to what extent is that a factual

17  question that has to be developed outside the 12(b)(6) context?

18  My understanding is the case law takes a dim view on dismissing

19  a case for failure to plead the relevant product market, that

20  those cases are pretty rare.

21           **MR. MARRIOTT:**  I've got the questions, Your Honor.

22           **THE COURT:**  Okay.

23           **MR. MARRIOTT:**  If I may?

24           **THE COURT:**  Sure.

25           **MR. MARRIOTT:**  With respect to cross elasticity of

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 35 of 118

1  demand, no question that is part, broadly speaking, as the

2  Supreme Court describes the test of the analysis.  We don't

3  contest that.

4        However, I think as the Court nets out the test, when

5  in *Brown Shoe* it's talked about, when it's talked about in

6  other places, fundamentally what the courts are deciding is

7  whether or not the products in question are reasonably

8  interchangeable with one another.  That can be measured in part

9  in some circumstances by elasticity of demand.

10        Here, of course, we're on a motion to dismiss.  What

11  we are required to take as a given are both the facts as they

12  pled -- properly are pled in the complaint and any facts in

13  which the Court can take judicial notice.  And that latter part

14  is particularly important in this case, and it goes to Your

15  Honor's second question.

16        But I think what you don't see pled in the complaint

17  is any evidence indicating that the specifically kind of

18  isolated, I call them cherry-picked, AIs that are at issue, the

19  six (indiscernible) lack any kind of -- there is no analysis

20  there of cross elasticity of supply and demand on their part.

21      (Court reporter requested clarification.)

22        **THE COURT:**  You're going to lose our court reporter.

23      **MR. MARRIOTT:**  What there is, Your Honor, in the

24  complaint is a discussion of pricing as it relates to the

25  generic version of a particular AI and the branded version to

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 36 of 118

1  the market as the Plaintiffs would have it defined.  What

2  there's not in the complaint is any discussion of cross

3  elasticity of demand or supply as it relates to the AIs they

4  say are alone in the market and the other ones that we contend

5  should be in the market but that they don't mention in the

6  complaint.

7          So the question then is -- and it is true there are

8  not enormous numbers of cases that deal at the motion to

9  dismiss stage with the market definition, but there are some,

10 Your Honor.  We cited them, I believe, in our papers:  The

11 *Bayer* case, the *Globe Disc. Travel Services* case, and the

12 *Chapman v. New York State Division for Youth*.  Those all, Your

13 Honor, were motion to dismiss cases.  Those were all cases in

14 which the court was evaluating this question of whether or not

15 the products that were alleged in the complaint had or didn't

16 have reasonable substitutes.

17         So it is a question that can be dealt with under

18 these circumstances.  And I think what the courts are

19 fundamentally saying here, Your Honor, is that even on a motion

20 to dismiss or a motion for judgment on the pleadings, what a

21 plaintiff ought not be able to do is basically cherry-pick or

22 gerrymander their way past a motion to dismiss when the

23 indisputable facts are that there are, in fact, alternatives

24 for the products that are alleged in the complaint.

25         And that we think here is what the Court can and

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 37 of 118

1   should find when you look at what the Court can take judicial

2   notice of in terms of alternatives to these products.

3          Now --

4          **THE COURT:**  If I agree with all that, why do the

5   loyalty programs not take those into account in terms of

6   overall purchases for the numerator of the equation?

7          As I understand it, the programs don't take those

8   into account.  You're saying that they're part of the relevant

9   market; but when you apply your loyalty program, you're not

10  considering them part of the market.

11         **MR. MARRIOTT:**  I think the loyalty -- it is true,

12  Your Honor, that the loyalty programs are more narrowly drawn

13  than we contend the market actually is.  There not need to be a

14  debate about that.  But it is not the way a particular party

15  draws a marketing program that defines the relevant market.  If

16  that were the case internally, we could define programs in any

17  way we like, and then the FTC, the government, anybody else

18  would be stuck with the market as we've defined it.

19         **THE COURT:**  Would that not be some evidence of cross

20  elasticity of demand, the fact that the program itself doesn't

21  even consider those as competitive products, if you will?

22         **MR. MARRIOTT:**  I don't think so, Your Honor.  In a

23  lay, loose sense, perhaps, but I don't think in an economic

24  sense in which the cross elasticity of demand test is applied.

25  I don't think so.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 38 of 118

1          What you've got here is a record -- if you take

2   account of the matters which we're suggesting the Court can or

3   should take judicial notice, what you've got is a record in

4   which it is really indisputable that the Plaintiffs have pulled

5   out a particular AI and disregarded any number of other AIs

6   that are effectively chemically in the same family, that are

7   used to treat the same crops, that are used in really

8   functionally identical ways by farmers every day.  And what the

9   market definition tests are saying is we can't -- and, frankly,

10  the test is that they relate to the merits, too.  They're

11  saying we can't disregard economic reality.

12          And the complaint we respectfully submit --

13          **THE COURT:**  I guess my point, again, is but your

14  clients don't seem to regard those to be economically

15  competitive products for purposes of the loyalty program --

16          **MR. MARRIOTT:**  Your Honor, I wouldn't --

17          **THE COURT:**  -- because they're not included in the

18  open space provision.  As I understand the programs, the open

19  space provision is just for that one AI, which means

20  essentially a generic.

21          **MR. MARRIOTT:**  It is -- it depends on the particular

22  program.  It is true that the programs are not defined

23  coterminous with what we contend the markets to be.

24          My point simply is, Your Honor, that is not the way

25  in which on the reasonable interchangeability test, as defined

1 by *Brown Shoe* and in a number of other cases, reasonable

2 interchangeability is determined.  The question is what

3 alternatives are available in the marketplace for the farmer

4 who's looking to treat a particular crop for a particular

5 insecticide or fungicide or pesticide.

6         **THE COURT:**  So the complaint alleges that they're

7 not -- well, it doesn't specifically name a lot of those, I

8 don't think.  But it essentially says the AIs are preferred

9 because of certain features.  And I think it actually, if I

10 remember right, speaks to some of the other alleged

11 alternatives and says they're not regarded by farmers to be

12 interchangeable because of certain aspects related to the AIs.

13         Is that correct?

14         **MR. MARRIOTT:**  I think the first part of that is

15 definitely correct, Your Honor.  I don't recall the second part

16 as to the allegation that -- any specific allegation that a

17 particular other AI is not considered as comparable.

18         There's no question in the complaint what the

19 Plaintiffs do, and they march through it with respect to each

20 of the AIs.  What they do is they say that each of those AIs

21 has certain features that make it different in some sense from

22 other AIs.

23         And we can't and don't dispute that.  Each of these,

24 Your Honor, is a different chemical compound.  They have

25 certain differences between them in the way they are composed.

1   But product differentiation is not and has never been the

2   method by which one determines what a relevant market is.

3   There are markets that are full of products that have

4   differences between them, and mere product differentiation

5   doesn't define the relevant market.  And I don't think the

6   Plaintiffs have cited any case to suggest, Your Honor, that it

7   does.

8             So if I -- at the risk of using a toy, Your Honor, I

9   have a board I would like to show to the Court.

10            **THE COURT:**  All right.

11            **MR. MARRIOTT:**  This is really -- if I may I approach?

12            **THE COURT:**  Sure.  Absolutely.

13            **MR. MARRIOTT:**  This is simply Exhibit 7 to --

14            **THE COURT:**  It will be a little hard to see from

15   here.

16            **MR. MARRIOTT:**  Well, it certainly will.  It's even

17   harder if you look in our brief.

18            But this is Exhibit 7 to Mr. Anderson's declaration,

19   Your Honor.  And this is one of the reasons why we contend that

20   the Court really can and should take judicial notice of the

21   alternatives that are out there.

22            So this is the North Dakota herbicide chart.  And it

23   is really, I think, just, frankly, a reflection of scientific

24   fact or at least the way that these products are approved by

25   government for use in the United States.  So if you just take

1  one of them, for example, so it organizes these herbicides by

2  mode of action.  And this is kind of an industry

3  standardized -- you know, really, the world standardized method

4  of thinking about these.

5        The second group here is the ALS inhibitors.  And you

6  will see that it's got -- you know, the various herbicides are

7  classified by site of action, they are classified by chemical

8  family, and then they are classified by ingredient.

9        And what the Plaintiffs have done is they've come

10 down, for example, to this site of action group, No. 2, which

11 is the ALS inhibitors.  And they look over and they found

12 rimsulfuron, which is one of the Corteva products, and they

13 basically said that that AI, that active ingredient, is by

14 itself the relevant market.

15       And in doing that, Your Honor, they have defined the

16 market without regard to all of the other active ingredients

17 that are in that exact same chemical family, that have the

18 exact -- you know, that are used to treat the exact sort of

19 same sets of weeds, and that have the exact same site of

20 action.  And they've defined those out.  They've simply pulled

21 them out.  And, of course, in pulling them out in that way,

22 it's much easier to give the impression I think -- this is just

23 a much easier way to look at it, Your Honor, than what's in the

24 papers.

25       **THE COURT:**  All right.

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1          MR. MARRIOTT:  But in doing that -- and the same is

2     true for each of the AIs, Your Honor.

3          In doing that, what they've done is they've elevated,

4     we think artificially and misleadingly, the perception of what

5     the shares are and what, therefore, the power is of the

6     Defendants to potentially have some effect on competition.  And

7     this in a sense goes to the earlier subject that Mr. Mishkin

8     was discussing.

9          THE COURT:  Let me stop right there.  So does the

10    generic version of the Corteva AI, in your view, compete with

11    all those other products in that category?

12         MR. MARRIOTT:  It does.

13         THE COURT:  Okay.

14         MR. MARRIOTT:  And so that's why -- to touch a little

15    bit upon an issue that was raised during the Court's

16    questioning of Mr. Mishkin, Your Honor asked about whether the

17    focus here was just on generics and whether that somehow

18    distinguished or differentiated this case.  And I guess in some

19    sense it does, Your Honor.  But what the Government effectively

20    seeks to do, as I read the complaint, is to eliminate these

21    programs altogether.  They focused on the --

22         THE COURT:  So my question was -- the Government

23    doesn't seem to be challenging the program as it relates to --

24    as being anticompetitive for any of those other products.  But

25    maybe that begs the question of can -- under the loyalty

              22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1   programs, can distributors purchase those other products

2   without running afoul of the thresholds and the loyalty

3   program?

4         The answer is yes because those aren't the same AI;

5   right?

6         **MR. MARRIOTT:**  I think it probably depends on the

7   program.  I think in some cases, Your Honor, it's probably yes,

8   and in some cases it's probably no, without getting into the --

9   on this open record too much into what the programs actually

10   say.

11         **THE COURT:**  Okay.

12         **MR. MARRIOTT:**  I think, Your Honor, what the

13   Government seeks to do, as I read the complaint, is they seek

14   to end these programs altogether.  They will, of course, speak

15   for themselves, but they have identified, I think by way of

16   example, the six on which they wish to focus.

17         But the effect of eliminating these programs, Your

18   Honor, is to eliminate a competitive tool that at least the

19   folks at Corteva use not only to compete against generic

20   manufacturers of the particular AI, but to compete against

21   branded manufacturers of the other AIs as well as generic

22   manufacturers of the other AIs.  The tool has effect and allows

23   them to compete not just in a limited sense of the brand for a

24   particular AI and the generic for a particular AI.  It allows a

25   more broad -- you know, more broad competitive fight to take

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 44 of 118

1  place.  And that's why it's important, we think, to preserve
2  the procompetitive benefits of these policies.
3          But at the end of the day, Your Honor, if -- the
4  record, as I think the Court can take judicial notice of, is
5  that you've got a set of individual AIs, and you've got a whole
6  other set of AIs, the features, the functions of which are
7  indisputable.  The Government takes issue with our asking the
8  Court to take judicial notice of these other AIs, but not, so
9  far as I can tell, because they contend in any that one is not
10  a substitute for the other, but, instead, because they contend
11  that the Court would be required in some sense to do some
12  interpretation of the labels in which these AIs are referenced.
13          And what I would respectfully submit to the Court is
14  that that is not at all the case.  The Court is not being asked
15  to do anything other than, for purposes of evaluating whether
16  there are other AIs available, look to see whether the federal
17  government and, in some cases, states have approved for use in
18  particular applications more than simply the six AIs they've
19  identified for these different things.  And I think the
20  indisputable fact is that they have.
21          There are a number of cases we cite in our papers,
22  Your Honor, for the proposition that the Court can and could
23  and should take judicial notice here.  What's interesting about
24  those cases is that the courts there are taking judicial notice
25  in at least one case -- and this one may not be in our papers,

1  Your Honor, but it's a case from the Eighth Circuit, *Williams*

2  *v. Emps. Mutual Casualty*, which is 845 F.3d 891 at 903 to 904.

3  And in this case, the court is asked to take judicial notice

4  that radium is a solid that emits particular alpha particles.

5  And the court is able -- you know, it says the Eighth

6  Circuit -- to take judicial notice in that circumstance.

7          We're asking the Court far less than that.  We're not

8  asking the Court to determine that any one of these AIs has any

9  particular effect or emits any particular kinds of particles.

10  We're simply saying that the Court can and should take notice

11  of the fact that for the specific AIs they identify, there are

12  government-approved, on-the-market-available alternatives as to

13  which the Government has offered no explanation as to why those

14  alternatives are not reasonable substitutes for acetochlor or

15  rimsulfuron or the other AIs that are specifically identified

16  in the complaint.  And it's the failure to explain or to

17  justify what, again, we contend is a gerrymandering of the

18  marketplace that we think creates the issue for purposes of a

19  motion to dismiss.

20          And courts have and can dismiss complaints that fail

21  at the motion to dismiss stage adequately to explain the

22  exclusion of potentially or, in fact, actually competitive

23  products.  And that is, we think, Your Honor, the fatal flaw in

24  the complaint as it is alleged here.

25          Unless Your Honor has questions, I think -- I hope

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 46 of 118

1  the point is clear.

2          **THE COURT:**  All right.  Hold on just a minute.  I

3  will let you know.

4          Let me hear from the Government then on those.  We

5  may take a break at some point.

6          Mr. Weingarten.

7          **MR. WEINGARTEN:**  Thank you very much, Your Honor.

8  James Weingarten from the FTC on behalf of the Plaintiffs.

9          I would like to start with where Your Honor started:

10  What is the applicable law?  And I would like to start with a

11  fundamental error that respectfully the Defendants have made as

12  to the law that applies here.

13          There are two cases to which I would direct Your

14  Honor that are Fourth Circuit cases that feature predominantly

15  in our briefs:  The *Kolon* case and the *Advanced Health* case.

16          The Defendants' position, as Your Honor elicited, is

17  that the test or the principle for determining whether we're in

18  an exclusive dealing case or a predatory pricing case is the

19  reason why the distributors here choose to participate in these

20  rebate programs.  The defense clearly said that's part of the

21  test, and they said what matters is showing some kind of

22  coercion.  And that's their theory as to all the claims, at

23  least the Sherman Act and Clayton Act claims.  That is

24  incorrect respectfully as a matter of law in this circuit.

25          I will direct Your Honor respectfully to the *Advanced*

1  *Health* case, 910 F.2d 139 at 153.  This is the direct quote

2  from the Fourth Circuit:  "It makes no difference whether this

3  is voluntary or imposed by coercion, but without such

4  agreement, condition, or understanding, there can be no

5  statutory infraction."  The "it," Judge, is the exclusive

6  dealing.  The "it" is the agreement not to purchase the

7  competitive product.

8        So that's the Fourth Circuit stating clear as a bell

9  that coercion is not an element.  The Defendants have no case

10  saying that coercion is an element.

11        I would like to refer Your Honor respectfully to the

12  *Kolon* case, 637 F.3d at 452.  On that page, the Fourth Circuit

13  explained the kinds of allegations that suffice to allege

14  exclusive dealing.  These are allegations that a defendant

15  precluded a competitor from competing for key customers,

16  allegations that the defendant constrained the competitor from

17  effectively entering the market, that the defendant reduced, if

18  not practically eliminated, additional competition, and that

19  the defendant thereby preserved its monopoly position.  That's

20  what *Kolon* found sufficient.

21        The Plaintiffs in this case have alleged those kinds

22  of allegations, plus more, with exceptional detail based on

23  Defendants' own documents and statements from their own

24  executives.  This case does not allege that Defendants have

25  lowered their prices so far that generics can't match their

        22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  price.  That is not the gravamen of this complaint.  The

2  complaint focuses on the structure of the marketplace and the

3  structure of Defendants' programs to explain in detail the

4  point of the programs is to exclude generic competition.

5          So I will cut to the chase, if I may be so bold.  If

6  and when liability is established, what relief will the

7  Government ask for?  The Government will not ask the Court to

8  say no more discounting.  The condition -- the thing we're

9  challenging is not any kind of discounting.  What we're

10 challenging is to get the discount, you, Distributor, have to

11 exclude generic competition.

12         So the relief would be --

13         **THE COURT:**  Can the -- can a program be legal if you

14 exclude other competitors?

15         **MR. WEINGARTEN:**  Absolutely.  But if the percentage

16 of foreclosure reaches 95 or 100 percent, as it is alleged in

17 this complaint, and the overall marketplace foreclosure is well

18 north -- I can't say the actual number, Judge; it's under

19 seal -- but well north of 40 or 50 percent, that suffices to

20 allege unlawful exclusive dealing.

21         Let me take a step --

22         **THE COURT:**  Let me back up a minute then, just to

23 make sure I understand the parameters of your argument.

24         So put aside the generic issue.  If the program was

25 to require that if you want to be a distributor for one of the

         22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1 Defendants, you have to agree to be the exclusive distributor,

2 in which case, if you do that, you'll get certain financial

3 benefits, legal or anticompetitive?

4          **MR. WEINGARTEN:**  With nothing more?

5          **THE COURT:**  With nothing more.

6          **MR. WEINGARTEN:**  Probably legal on just that fact,

7 Judge.  There is nothing per se illegal about that.

8          **THE COURT:**  That's why I asked questions earlier

9 about -- I used the phrase "efficient marketplace."  There's

10 probably-- you all do this more than I see this.  You probably

11 have the proper phrase for it, but I think the presumption is

12 no barriers to entry -- no unreasonable barriers to entry so

13 that competitors can easily enter and leave the marketplace; in

14 which case, generally speaking, exclusive dealing arrangements

15 are not anticompetitive.

16          **MR. WEINGARTEN:**  Generally speaking, they are not.

17          **THE COURT:**  Okay.  So if this program said you have

18 to buy 85, 90 -- anything up to 100 percent of the product from

19 these Defendants, would -- and it didn't -- and we didn't have

20 a generic issue, then FTC probably wouldn't be bringing this

21 action?

22          **MR. WEINGARTEN:**  What I would like to say, Your

23 Honor -- I'm not trying to dodge it -- is in *Tampa Electric* the

24 Supreme Court said the big focus here is practical effects.

25 That's the direct line.  That's why these cases are usually not

      22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1    dismissed because we have to wait to see how that all develops.

2            If the practical effect of the program Your Honor

3    just described is that competition is thwarted or harmed, that

4    is unlawful.  But if Seller 1 and Buyer 2 in a vast market make

5    that kind of arrangement, no, that will not have substantial

6    foreclosure.  That would not be a problem.

7            **THE COURT:**  So your position is price-cost test is

8    not a safe harbor if you -- if the practical effect of the

9    program is anticompetitive?

10           **MR. WEINGARTEN:**  That's right, Judge, because -- and

11   it's not just the FTC's position.  The defense rests heavily on

12   *ZF Meritor*.  I will direct Your Honor to *ZF Meritor*, 696 F.3d

13   254 at 278:  "Although the Supreme Court has created a safe

14   harbor for above-cost discounting, it has not established a per

15   se rule of non-liability under the antitrust laws for all

16   contractual practices that involve above-cost pricing."  That's

17   *ZF Meritor* explaining very clearly that what the defense is

18   trying to do, take the predatory pricing rubric and force it

19   onto well-pleaded allegations of exclusive dealing, does not

20   work.  The Supreme Court has not immunized exclusive dealing

21   just because you call it a discount.

22           So if I may, Your Honor, if a -- if this case were

23   about the Defendants having a program where they just show up

24   at the doorstep of the distributors and say, we're going to pay

25   you a sack of money if you don't deal with generics, plainly

              22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  unlawful exclusion.  They cannot escape antitrust liability,

2  and this Court respectfully should not immunize antitrust

3  liability because, instead of coming with a sack of money

4  separate and saying that's the deal, they disguise it as a

5  discount and say, you keep generics out, Distributors.  We all

6  enjoy the benefit.  We all get to share in this higher price

7  world that results, and we'll split that with you.  Same

8  practical effect as the sack of money at the end of the year.

9         And we've alleged in detail why that's so with the

10  structure, the timing, the complexity of their programs.  Just

11  because they're paying for exclusivity doesn't immunize their

12  program, and they can't disguise that by calling it a discount

13  or rebate.

14         The case is not about challenging prices being too

15  low.  I can't say it more -- enough and enough, and the

16  complaint says that.  And the way we know -- or one of the ways

17  we know that this case is not just about price competition,

18  which the Supreme Court correctly says we want to encourage, is

19  Defendants' own documents.  The allegations are filled, Judge,

20  with material, some confidential, some not, about Defendants'

21  own view of what their program does and its purpose and effect

22  as alleged.  And they are full of statements like it's not a

23  discount off of price.  It's a payment for performance.  That's

24  Syngenta's own executive.  That's paragraph 83.

25         Paragraph 138, Corteva says, losing exclusion

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 52 of 118

1  payments creates a "significant penalty" and ensures that

2  distributors will stay loyal, that is, exclude generics.  "Our

3  team truly has done an A-plus job blocking generics."

4       The theory of this case, Judge, is that the defense

5  is thwarting competition.  We want generic competition because

6  it will lower prices.  That is not what the Defendants want.

7  They want to maintain their monopoly prices.

8       **THE COURT:**  Is it a separate question on causation

9  whether generics still would enter the marketplace?  I mean, is

10 it -- they are alleged to be barriers of entry.  Is it possible

11 that even if generics are allowed to be sold, they still are

12 not going to be able to be sold in some significant amount in

13 order to be substantially affected because of other reasons?

14 Is that a causation question if that's the case?

15      **MR. WEINGARTEN:**  Possibly.  I would say two things.

16 One is the Government is not set to the usual, same kind of

17 causation standard, let me say that, as a private plaintiff may

18 be saying, okay, well, but for you harmed me.  However, the

19 complaint does allege but for these programs and the

20 exclusivity condition, generics would enter.  And for every

21 active ingredient, the Government and the Plaintiffs allege

22 multiple examples of where generics tried to enter and were

23 thwarted by the program, entered but couldn't get headway

24 because of the exclusivity condition, and exited.

25      So that is pled in spades, Judge.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 53 of 118

1    **THE COURT:**  What would happen if the discounts were
2  provided to the -- all the way down the retail level?
3    **MR. WEINGARTEN:**  So that would be an indication that
4  it's a true discount.  So if by all the way down to the retail
5  you mean Syngenta or Corteva say it's 20 percent off the price
6  to the distributor, the distributor says, great, now I can
7  compete even better, it's 20 percent off to my retailer, and
8  the retailers says, oh, great, it's 20 percent, right, that's
9  just pricing working its way through the system.  That's how
10 it's supposed to work.  That would be probably procompetitive,
11 right.  That's discounting, just like any other, McDonald's --
12    **THE COURT:**  Well, the Defendants say, well, we don't
13 tell our distributors not to pass it on.  It's up to the
14 distributors.  They could do the same thing we do, and, that
15 is, if a retailer buys a certain amount over the year, we'll
16 pass along their percentage of what we get less the margin for
17 us, I guess, for a profit, whatever.  But we'll pass it along,
18 and it's not really our fault if they choose not to do that.
19    **MR. WEINGARTEN:**  So two responses, both grounded in
20 the allegations of the complaint.
21    One response is the complaint alleges in detail why
22 the economics encourage the distributors not to pass it along
23 and that they do not, and the Defendants know this and
24 structure the program in such a way that the pass-through does
25 not happen.  So that's one way we know.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 54 of 118

1    Two, there are a lot of allegations in the
2  complaint --
3    **THE COURT:**  Well, they're structured that way only,
4  as you say, because they make the payment after year end.  But
5  my recollection is I don't know if I've met my threshold for my
6  hotel or frequent flyer until December 31.
7    **MR. WEINGARTEN:**  Well, respectfully, Judge, you earn
8  those points the moment you check out of the room, right.  You
9  go to a Marriott, or whatever brand.  You check in; you check
10 out.  You got your points.  You may not get to the right levels
11 or whatever, but no one at Marriott says to you at the end of
12 the year, actually, you stayed one too many times at the
13 Hilton; all your points are gone.  That is a very big
14 difference.
15    I was, frankly, surprised to see that analogy in the
16 Defendants' brief because it is, frankly, inept.  That is not
17 how that program works.  If there was one hotel in town, and
18 somebody else tried to open up a competing hotel and get the
19 convention business, and the hotel that already existed had the
20 monopoly on hotel stays and said, I don't want anyone staying
21 there, and they said, you know what, you can't stay there, you
22 have to spend 90 percent of your nights with me before you'll
23 get any of your loyalty benefit, that's what this case is
24 about, Judge.  That's not how hotel and frequent flyer programs
25 work.  You can choose.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 55 of 118

1          But to go back to the discounting point, another way

2    we know, and as alleged, that this is not a regular, good ole

3    price competition discount is because the Defendants tell us

4    that in their documents that are alleged in the complaint.

5    Paragraph 83:  It's not a percentage off the price.  It's a

6    payment for performance.  That's what the executive said.  And

7    payment for performance means keep generics out.

8          And Your Honor had a lot of questions about the role

9    of generics in other brands.  Mr. Kehl can talk to the market

10   definition component of that.  But the complaint alleges over

11   and over again that the generics will enter, if they are

12   allowed to, if the exclusivity condition is ended, and bring

13   prices down.  That's the competitive harm of exclusive dealing.

14   It stops price competition from happening.  Predatory pricing

15   theories are about, well, you're a monopolist, and so you're

16   driving your prices so far down no can enter because of that.

17         We allege over and over again in the complaint that

18   generics are equally efficient competitors.  They can compete

19   on price.  The problem is they're being thwarted from even

20   trying to enter in exactly the same way that *Kolon*, the Fourth

21   Circuit, said suffices to state an allegation.  That's the harm

22   of exclusive dealing.  The price competition can't even get

23   going because the defense has locked up the distribution

24   channel that matters most.

25             **THE COURT:**  Is there a percentage of so-called "open

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 56 of 118

space" that would render these programs, in your view, not
anticompetitive?

       **MR. WEINGARTEN:**  In the abstract, yes, of course,
Judge, yes.  So the case law teaches if you're a monopolist,
something like less than even 50 percent foreclosure might
suffice to be substantial foreclosure.  I think *Kolon* quotes
the D.C. Circuit *Microsoft* case talking about 40 or 50 percent
foreclosure maybe being enough.

       I don't have a safe harbor to offer today for the
defense, but the case law is pretty clear that 90, 95,
100 percent programs that require that level of exclusivity and
that add up to a percentage that I can't say out loud but that
is well north of 50 percent total foreclosure suffice to allege
unlawful exclusive dealing.

       The generic companies whose presence would bring down
prices, generate innovation, and provide choice cannot enter
the market because they have been substantially foreclosed.
They have not been kept out of the market, again, because
prices are so low.  They have been kept out of the market
because of the exclusivity condition.

       **THE COURT:**  What's the line between a volume discount
and a payment for performance if you have a threshold
requirement?

       **MR. WEINGARTEN:**  Right.  So I think a volume
discount -- a straight volume discount would say if you buy

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 57 of 118

1  10 million tons of product X, you get a discount.  If you need

2  100 million tons and you get 90 million elsewhere, so be it.

3  That's a straight volume discount, not what we're dealing with

4  here and probably raises very little concern abstractly,

5  because it says go buy elsewhere if you need it.  Just buy a

6  significant amount from us, and you get a discount.

7          **THE COURT:**  So your argument, again, getting back to

8  what I asked earlier, is that, I guess, the feature of the

9  program that's the bug is the fact that it is a percentage of

10 overall AI?

11         **MR. WEINGARTEN:**  I want to be very clear.  Yes and,

12 Judge, right.  It's that plus the market structure, how this

13 market works, the barriers to entry, the patent protection

14 that's expired, and the fact that seven distributors control 90

15 percent of the market.  So if you lock up a significant number

16 of them, you can achieve your substantial foreclosure if you're

17 the defendant.

18         So if it were just lots of people in the market, lots

19 of buyers, lots of sellers, and Company A says come buy all

20 your product from me and we'll help you build a showroom, we'll

21 help you do lots of procompetitive things, generally not a

22 problem.  You have to be attuned to the market structure.

23 That's what the Supreme Court tells us in *Tampa Electric*, what

24 the Fourth Circuit says in *Kolon*.  That's what all the cases

25 say, and that's why they're hard to dismiss, frankly, because

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1   there's a lot of nitty-gritty about how the market works that

2   has to be worked out.

3          But suffice it to say, has the Government alleged

4   more than a speculative right to relief on a theory of

5   exclusive dealing?  That's what *Twombly* requires.  Yes,

6   undoubtedly.

7          **THE COURT:**  We're kind of bleeding into the relevant

8   market discussion, too, as well.  I know it's in your papers,

9   and I was looking through the amended complaint, which is 108

10  pages, or something like that.  Are there not allegations that

11  other AIs -- other products, rather, are not interchangeable

12  with these AIs?  Is that in the complaint, or is that in your

13  briefs?  I know it's in some of your papers somewhere.

14         **MR. WEINGARTEN:**  So Mr. Kehl can help with some of

15  the detail on that, but I can say, Judge, for the purposes of

16  our complaint and the allegation, what we allege is the

17  generics offer a unique kind of price competition that will

18  result in lower prices.  That's why they are in the market.

19         If other AIs or other products or other brands were

20  also in the market, then if the generics entered, it wouldn't

21  do anything.  The price would already be competitive.  That's a

22  sort of -- that's what matters.  That's why the functional

23  utility is -- doesn't matter as much here, Judge.  What matters

24  is what's the effect on the price.

25         **THE COURT:**  How do I know that on a complaint?  That

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 59 of 118

1  sounds like a fact that would be proven later.  In other words,

2  I mean, the Defendants showed me this chart with other

3  ingredients that allegedly, according to their briefs, have the

4  same mode of action, the same purpose, the same chemical

5  family, et cetera, which sounds to me a little bit more like

6  the *Nexium* case with the proton pump inhibitors versus other

7  modes of action like Tagamet and other things.  And the court

8  clearly said that the proton pump inhibitors are their own kind

9  of market.  And so the -- Prilosec v. Nexium I think is what it

10  was, if I remember right.  But that was the market.

11         That strikes me that's a little bit of the

12  Government's theory in this case, that the market is narrow in

13  the sense of these AIs because they're their own -- for

14  whatever reason, they're their own functional equivalents, the

15  generic versus the AI.  And your allegation is that these other

16  ingredients are not part of the relevant market.  The

17  Defendants say, well, no, they are because they function all

18  the same way.  They're essentially more like the proton pump

19  inhibitor group as opposed to the larger group of reflux drugs.

20         So how do I work my way through that part of this

21  case?  Some of that sounds very fact based to me at the

22  pleading stage.  They want me to take judicial notice of the

23  filings.  But they do point out that the FTC apparently, at

24  least previously, has described at least, for example, I think

25  it was the corn herbicide market to be broader than what you're

describing here.

So what is your response to that?  I'm asking, I know, the lawyer who is probably not as prepared on that as others, but feel free to answer any way you can.

MR. WEINGARTEN:  No, I will, Judge.  Thank you.

So a couple of points there.  If I may go to the chart?

How does Your Honor respectfully answer these kinds of questions?  Not today, respectfully, because this chart and the explanation from the defense counsel are best left, if at all, to summary judgment one day.  This is not appropriate judicial notice, Judge.

THE COURT:  What --

MR. WEINGARTEN:  I have a more substantive answer, if Your Honor would like --

THE COURT:  No, I would like as many answers as you have, but --

MR. WEINGARTEN:  Whether a court has taken judicial notice of an undisputed scientific fact, like the kind of particle that radon [sic] emits, which was a new case we hadn't heard of until this morning, that is maybe more susceptible to judicial notice as an undisputed scientific fact than this exhibit here (indiscernible) --

THE COURT:  Even if they are functionally equivalent, does that answer the cross elasticity question?

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1          **MR. WEINGARTEN:**  It does not, Judge, respectfully.

2          So backing up one second -- and I actually was on the

3  *Nexium* case, so I'm happy to talk about that in more detail.

4          **THE COURT:**  I, fortunately, quit taking those.

5          **MR. WEINGARTEN:**  They're over-the-counter now.

6          **THE COURT:**  I have taken care of my reflux issue.

7          **MR. WEINGARTEN:**  So backing up a second, why do we

8  define markets?  Because we want to understand the effects of

9  the conduct at issue, right.  A relevant antitrust market for

10 understanding whether conduct has procompetitive or

11 anticompetitive effects does not include every possible

12 competitor.  We know that, okay.  We define the market with a

13 view to the conduct at issue and the market structure so that

14 we can understand what is the effect of this conduct.

15         **THE COURT:**  What is your burden at this point, at

16 this pleading stage, do you contend?

17         **MR. WEINGARTEN:**  Our burden is simply to allege a

18 nonspeculative, plausible market and alleging with three bases

19 in the complaint.  And they are elaborated in our briefing, for

20 that -- for our allegations and for the markets we've pled, not

21 least, Judge -- the complaint pleads over and over again that

22 if the generics are allowed to enter and aren't thwarted,

23 prices will significantly decline.  That means that whatever --

24         **THE COURT:**  Based on internal documents as well as

25 historical practice?

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 62 of 118

1    **MR. WEINGARTEN:**  Yes and yes.  We allege the

2  Defendants' own analyses about what's going to happen if the

3  generics enter, and that tells the Court, it tells an

4  economist, it tells anyone that generics and brands have a

5  unique competitive interaction.

6          But even putting that aside, what it tells you is

7  whatever all these things on this chart are, they're not

8  encouraging competitive prices right now, because if they were

9  in perfect competition or in good competition, when a generic

10  enters, it wouldn't do anything.

11         So to make the point, if I create a soft drink

12  company tomorrow, I don't think it's going to bring down the

13  price of Coke or Pepsi much.  But, here, we're alleging if the

14  generics enter, the market price is going to decline

15  significantly.  So that's essentially the cross elasticity

16  point of demand.  That's the point, that if the entrant is

17  going to result in significantly lower prices, that's how we

18  know they're in the market together and that's how we know for

19  antitrust purposes the other brands and AIs are not, because if

20  they were, the price would already have come down as much as

21  it's going to.  That would already be enough competition.  And

22  we've alleged in spades, Judge --

23         **THE COURT:**  What's the evidence that the price is

24  currently supercompetitive?

25         **MR. WEINGARTEN:**  We have Defendants' own documents,

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  that their whole point of these programs is to maintain value.

2  We have evidence that they are a monopolist.  We have

3  allegations that they're a monopolist in these markets.  And at

4  this stage, Judge, we have a good faith allegation that the

5  prices are supercompetitive and that the generics will bring

6  them down.  And that's based on the allegations from

7  Defendants' own documents.

8          I want to give Mr. Kehl a second to --

9          **THE COURT:**  No, that's fine.  We've been going an

10  hour and a half.  So I think what I am going to do is take a

11  lunch break.  At the risk of going through your lunch hour, I

12  would like to just go ahead and finish.  I assume some of you

13  are trying to get back home today after this.

14          I think what I would like to do is take about a

15  20-minute break and let the court reporter rest her fingers.

16          I do want to hear about the relevant market argument

17  from the Government.  As I read the amended complaint, I think

18  there are two relevant markets that are alleged.  I'm a little

19  confused about that.  So I need some explanation as to why

20  there could be more than one relevant market because my

21  understanding is the market is supposed to be as narrow as can

22  be defined; is that correct?

23          **MR. WEINGARTEN:**  That is a principle, but there can

24  be more than one relevant market.

25          **THE COURT:**  Okay.  Well, I'll be interested in

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 64 of 118

1   hearing about that, and I have more questions.  So let's just

2   stop right there.

3           Why don't we take a 20-minute break.  There are

4   restrooms out in the halls out there, and then we'll come back

5   in 20 minutes.

6           Thank you.

7       (Proceedings recessed at 12:33 p.m.)

8       (Proceedings called back to order at 1:00 p.m.)

9       **THE COURT:**  All right.  Do you want to talk about the

10  relevant market, or did you have something else you wanted to

11  raise before we get to that?

12      **MR. WEINGARTEN:**  Lest I wear out my welcome, Judge,

13  there were two points that actually relate to relevant market

14  that I left hanging before we took a break.  And if I may

15  before my colleague, Mr. Kehl, starts?

16          One is Your Honor asked about evidence of price

17  effects from generic entry.  It's throughout the complaint, but

18  I would respectfully refer Your Honor to paragraphs 190 and

19  following, in particular.  And paragraphs 194 and 195 in that

20  section allege that the Defendants' own studies, studies

21  looking backward retrospectively at the effects of their

22  programs and forecasts looking prospectively, have concluded

23  that their programs prevent generic price competition and

24  sustain higher prices.

25          And then one other point before I turn it to

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 65 of 118

1   Mr. Kehl, Your Honor brought up *Nexium*.  I was actually on the

2   defense side of the table in the *Nexium* case.  On the motion to

3   dismiss, the company -- let me back up.

4            The complaint had alleged a brand generic market

5   similar to what's alleged here.  The defense had moved to

6   dismiss on the ground that there are so many functional

7   alternatives:  Prilosec, Zantac, and even Pepto-Bismol.  And

8   for our purposes today, the court denied that part of the

9   motion to dismiss and let the case proceed through discovery

10  and, in fact, to the jury on the market definition question.

11           So I want to be clear that the court did not accept

12  on a motion to dismiss phase that you can't have a brand

13  generic market just because there's all these other functional

14  substitutes.

15           **THE COURT:**  Before you sit down then, just a couple

16  of follow-ups, I think.

17           Under *ZF Meritor*, how do you contend that I should

18  characterize how to weigh price versus other non-price factors

19  to determine which clearly predominates?  I should say, whether

20  price clearly predominates, because that's the test.

21           **MR. WEINGARTEN:**  Right.  Is the theory of the

22  complaint that the price is so low and that is what is driving

23  or preventing competition?  Okay.  If the price is too low and

24  that is what is preventing competitive entry, price is

25  predominating.  If what is preventing competition is an

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 66 of 118

1  exclusion condition, price is not predominating.  Price does

2  not automatically predominate just because a defendant is

3  paying for the exclusion and using a pricing mechanism to do

4  it.  The allegation in this complaint is not that price alone

5  is the problem.

6       **THE COURT:**  But can exclusion alone be sufficient?  I

7  think I heard you say earlier that if you were to offer a

8  distributor a sack of money to be exclusive, then that would be

9  anticompetitive.  But that was the *NicSand* case, and the court

10 held, as I recall, that that's not anticompetitive because

11 NicSand and 3M can go in and compete for shelf space and offer

12 whatever they want, which seems to beg the question of is it

13 the question of barriers to entry that is the real issue.

14      **MR. WEINGARTEN:**  Right.  So on *NicSand*, just briefly,

15 what makes *NicSand* not a great analogue here, Judge, is that

16 the plaintiff, NicSand, was the monopolist.  Now, the court

17 relied heavily on the fact that *NicSand* had 70 percent market

18 share and was earning 40 percent premiums and then brought a

19 complaint because 3M, the Defendant, came in to compete.  And

20 the court viewed that as more appropriate competition.  So I

21 think that is already a distinguishing factor from this case

22 where the Defendants are the monopolist.

23      To your question about barriers to entry, so in the

24 antitrust sphere we look at barriers to entry to understand the

25 structure of the market.  Is there a reason why the market is

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 67 of 118

1  set up as such that it's easier or harder to get into the

2  market?  So with something like an FDA approval, that can be a

3  barrier to entry.  Or an EPA approval, that can be a barrier to

4  entry.

5         The question which I think the Court is rightly

6  focused on and what the complaint is focused on is, yes, are

7  there barriers to entry that tells us about the structure of

8  the market.  But what is excluding the generics?  Why are the

9  generics not able to enter?  And what is it that Defendants are

10  doing that is the exclusionary piece?  That's sort of the

11  difference between a barrier to entry and exclusion.

12         If what the Defendants are doing --

13         **THE COURT:**  But there must be a barrier to entry,

14  because, theoretically, couldn't the generics go to the

15  distributors and say, we'll do the same thing; we'll offer you

16  a similar program, and here is the discount we're willing to

17  offer, and you're going to sell a lot more because it's going

18  to be cheaper?

19         **MR. WEINGARTEN:**  So the complaint explains why that

20  isn't happening.  If that could happen, the complaint alleges

21  the generics are just as efficient makers of this product as

22  the brand.  And if there were just price competition, that's

23  probably what would happen, right.  The generics would show up,

24  and that's a good world in which we all want to live as a

25  procompetitive place.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 68 of 118

1        That is not what the complaint alleges is happening.

2   And the reason why the generics aren't even getting that chance

3   is because a monopolist will always have more money to play

4   with than the competitive entrant who is going to drive down

5   prices because they're the monopolist.  That's in the

6   allegations, and it's in the briefing.  So the monopolist is

7   enjoying supercompetitive prices and supercompetitive profits.

8        And the monopolist will always have more to offer,

9   because if the generic comes in, they are going to compete on

10  price, and then the price war will ensue.  And that's good for

11  consumers, but it means that the generic doesn't have a cushion

12  or the would-be competitor doesn't have that same cushion.  And

13  I think the case law speaks to this also.

14       **THE COURT:**  But that didn't stop NicSand.

15       **MR. WEINGARTEN:**  Well, NicSand, again, was the

16  monopolist that started out as a monopolist.  And they sat on

17  their haunches until 3M, the would-be entrant, came in and took

18  share --

19       **THE COURT:**  That was not a problem in that case,

20  though, because, as you say, it was the monopolist, but the

21  court held that that was okay to be exclusionary because the

22  monopolist could compete with 3M.

23       So I guess the question is does it have something to

24  do with the ability of the competitors to be able to enter into

25  the marketplace?

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1          **MR. WEINGARTEN:**  I apologize for interpreting.

2          **THE COURT:**  No, that's all right.

3          **MR. WEINGARTEN:**  It does indeed.  Your Honor is

4  absolutely right, and I'm sorry if I'm not being clear.

5          The complaint alleges that something like 90 percent

6  of crop protection products are sold through this traditional

7  distribution channel.  The complaint alleges that's the most

8  efficient way to get your product to market.  The complaint

9  alleges that there are something like seven distributors who

10 own that channel, more or less.  And the complaint alleges that

11 if you tie it up or lock up all those distributors, that's

12 going to thwart someone else from entering.

13         So that -- whether Your Honor wants to call that a

14 barrier to entry -- we would call that taking advantage of the

15 market structure to impose an exclusion that excludes

16 competition.  Same difference; the structure of the market is

17 such that there is no other efficient way for the generics to

18 enter.  That's why they do this.

19         **THE COURT:**  How is *NicSand v. 3M* different from that?

20         **MR. WEINGARTEN:**  My understanding in *NicSand*, Judge,

21 is that there were more avenues for competition.

22         **THE COURT:**  I thought there were -- well, there might

23 have been, but I thought Pep Boys and some of the auto parts --

24 auto sandpaper I think is what the case was about, if I

25 remember right.  But I thought that the largest retailers were

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 70 of 118

1 by far one or two of them.

2       **MR. WEINGARTEN:**  No, that's right, Judge.  I want to

3 get to the case so I can be absolutely sure.

4       So NicSand offered upfront payments that could

5 then -- okay.  There was no predatory pricing.

6       **THE COURT:**  I regard it to be they're basically like

7 paying a lump sum for shelf space, which is --

8       **MR. WEINGARTEN:**  Yes.

9       **THE COURT:**  -- the bag of money example I asked you

10 about earlier.

11       **MR. WEINGARTEN:**  Yes, Judge.  Yes.

12       One of the issues was the retailers were the ones

13 demanding the exclusivity.  I'm on page 452, -53, and -54 of

14 *NicSand* here, Judge:  "According to NicSand's own complaint,

15 all but one of the large retailers made exclusivity a condition

16 for doing business with the new supplier."  And the court then

17 at page 454 really did rely heavily on the fact that NicSand

18 was the incumbent.  That did seem to figure quite heavily in

19 the analysis, which, again, is extremely different.

20       **THE COURT:**  So does it matter if the distributor is

21 the one that's demanding exclusivity versus -- or the retailer

22 versus the manufacturer?

23       **MR. WEINGARTEN:**  No, it does not matter, Judge.  It

24 doesn't matter, but I think it was indicia in *NicSand* which --

25 it was indicia in *NicSand* that led the Court to be less

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 71 of 118

1    concerned about exclusion by the monopolist, again, the

2    plaintiff being the monopolist.

3           I'm also seeing here where the Court said that --

4    yeah.  This is page 454 again, Judge:  "...to allow this

5    litigation to continue on these allegations is to allow one

6    monopolist" -- that's NicSand -- "to sue a competitor" --

7    that's 3M -- "for seizing its market position by charging less

8    for its goods."

9           That one, I think, really sums up why the case is

10   different.  Obviously, the Government's not alleging the

11   Defendants are not the monopolist here.  The Defendants here

12   are the monopolist not the putative plaintiff, as was the case

13   in *NicSand*.  I believe the Court relied heavily on that fact to

14   say that the plaintiff NicSand had pleaded itself out of court.

15   And that's at 458.

16          I'm happy to turn it to Mr. Kehl, unless you have

17   other questions, Your Honor.

18          **THE COURT:**  One, and, that is, on this same topic.

19   In *Concord Boat*, the court applied price-cost test there.  Was

20   that because the barriers to entry were low?

21          **MR. WEINGARTEN:**  Well, as I do recall in *Concord

22   Boat*, Judge, the discount program required at most 80 percent

23   compliance.  So there were avenues for entry by the competitor.

24   And I do recall in that case, Judge, that -- courts have

25   determined that makes the competitive pressure on the

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 72 of 118

1  marketplace that the Defendant inflicted different than what

2  would be the case here where you have 90, 95, and 100 percent.

3        And I will --

4        **THE COURT:**  Have the -- has the Government ever taken

5  the position as to what that level is?

6        **MR. WEINGARTEN:**  I don't believe, to my knowledge,

7  the Government has ever set forth a bright-line rule, and I

8  would expect it never will for the simple reason that each case

9  is extremely fact dependent:  Market structure, who are the

10  players, who do they sell to.  The methods of competition,

11  Judge, and the methods for thwarting competition I think the

12  Supreme Court has said are all myriad.  So we're very attentive

13  to the facts.

14        **THE COURT:**  Okay.  I have a question about the

15  Government's view of the significance of I think it's the

16  Corteva factual scenario, and I'm not sure whether folks want

17  to discuss this at the bench or in open court.  It has to do --

18  there are two different programs alleged, and it has to do with

19  the practical effect of the second program in that series.

20        I don't know if that's something you want to discuss

21  in open court or whether you want to talk about that at the

22  bench.  I'm not sure what the Government's contention is as to

23  the second program, if you understand my question.

24        **MR. WEINGARTEN:**  Well --

25        **THE COURT:**  You qualify for one, and then if you

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 73 of 118

1  qualify for that, you can qualify for another.  And it's the

2  other one that I -- I don't know what the significance of that

3  is in this case.

4          MR. WEINGARTEN:  I think I can say -- and I'm sure

5  Mr. Marriott will jump in if I go too far, but I will try not

6  to -- what matters to the Government's allegations is that the

7  programs work together to make the exclusionary effect even

8  greater, that the earner -- if you're a distributor earned

9  under one program, you have to also meet the other, and that

10  the interlocking effect just makes the exclusionary effect

11  even -- or the -- yeah, the exclusionary effect even greater on

12  the distributor.  I'm happy to talk at the bench --

13          THE COURT:  I presume the Defendants' argument is it

14  just makes the discount greater.  Is that essentially it?

15          MR. MARRIOTT:  That, Your Honor, and we certainly

16  don't think that's present -- what's described presents a

17  competitive problem.  And I'm happy to say more, if you wish,

18  at the bench.

19          MR. WEINGARTEN:  I think I will just direct Your

20  Honor to paragraph 79.  If you fail to meet one program, you

21  might lose something under the other.  I don't want to say any

22  more than that.  I think that's what we're driving at with --

23  it's confidential, but it's -- there are other features of that

24  program as well, Judge, at paragraph 78 that are also unique to

25  Corteva that make it particularly troubling.  I will leave it

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1   at that.  I can go to the bench if Your Honor --

2           **THE COURT:**  No, that's all right.  We didn't get to

3   the issue of the Syngenta's various levels of companies, but

4   your brief argues *Copperweld*, I think, for the appropriate

5   test, is that right, for the coordinated activity?  Is that

6   your position?

7           **MR. WEINGARTEN:**  I think -- I'm not sure about

8   *Copperweld*.  Our position, Judge, is simply that we have made

9   sufficiently detailed allegations as to the involvement --

10          **THE COURT:**  I guess my question is what's the test to

11  involve -- because there's no conspiracy claim --

12          **MR. WEINGARTEN:**  No, no, Judge.  No, we are not

13  alleging an intracorporate conspiracy which would implicate

14  *Copperweld* and have -- that is not the allegation.  The

15  allegation is that the Syngenta sister and parent companies

16  have engaged in independent conduct that suffices to bring them

17  under these claims; to wit, Syngenta Corporate AG, the Swiss

18  company, produces that post-patent strategy handbook.  That's

19  at paragraph 36.  And then at paragraph I think it's 65, we go

20  into under-seal detail on what that post-patent strategy

21  handbook directs the other entities to do, and what it directs

22  them to do is highly probative of the fact that this conduct is

23  unlawful.

24          So we are pleading independent factual bases to

25  assert claims against Syngenta AG and Syngenta Corporation.

        22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  It's not a conspiracy-*Copperweld* issue.

2          **THE COURT:**  Does it reach the issue of generics or

3  just generally reach the issue of budgets and market shares?

4          **MR. WEINGARTEN:**  No, the post-patent strategy

5  handbook that the Swiss parent sets out is the Bible for this

6  scheme, Judge.

7          **THE COURT:**  All right.  So your contention, though,

8  is that they're independent --

9          **MR. WEINGARTEN:**  Yes.

10          **THE COURT:**  -- coordinated actors?

11          **MR. WEINGARTEN:**  Yes.  They are independently liable

12  because they have independently acted in unlawful ways?

13          **THE COURT:**  Okay.  All right.  I understand.

14          Hold on a minute.  Let me see if I have any other

15  questions on these issues.

16      (Pause in the proceedings.)

17          **THE COURT:**  I will hear from Corteva in a minute, but

18  my understanding is Corteva resulted as some kind of a

19  corporate transaction that earlier was E.I. du Pont.  Some of

20  this alleged conduct occurred when it was DuPont.

21          What's the practical effect of that for purposes of

22  this case?

23          **MR. WEINGARTEN:**  Well, for discovery purposes, we'll

24  be seeking discovery from Corteva as it exists now.  If they

25  tell us that records and evidence we need has to come from

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 76 of 118

1   DuPont, we'll figure that out, but I don't anticipate that.

2   But that will depend on what the defense tells us.

3          Is that the gist of Your Honor's question?

4          **THE COURT:**  Well, I think the allegations in the

5   amended complaint reach back before the merger, or whatever the

6   corporate transaction is called technically.  And I guess my

7   question is -- you have the statute of limitations issue, in

8   any event.  So I don't know that you can go back beyond the --

9   or at least on most claims you have the statute of limitations.

10         So it sounds like for that purpose it's kind of not

11  going to be an issue, but is there any -- I mean, is that to be

12  considered, I guess, without any problem in terms of

13  evidentiary proof?

14         **MR. WEINGARTEN:**  Yes, I think -- so let me back up a

15  second.  We don't have a statute of limitations issue for the

16  reasons we explained in our brief, and it would seem the

17  Defendants have walked back from that argument to the extent

18  they --

19         **THE COURT:**  They currently say they're not -- they

20  raise it in the first briefing, but they are not raising it

21  now.

22         **MR. WEINGARTEN:**  Right.  So putting aside the statute

23  of limitations which doesn't apply, what we're interested in as

24  an evidentiary matter is information that's probative of what

25  the point of these programs is.  And if that information comes

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  from when the programs were generated, you know, so when the

2  company came up with the program, we'll go back to find that

3  information.  And we think it's probative, but it's not about

4  violations going back to that point necessarily, Judge.

5         **THE COURT:**  Okay.  I do have a question about one

6  matter that's part of the under-seal part.  And so maybe -- if

7  you all can step up here, maybe we'll do that at the bench.  It

8  involves Corteva, but all lawyers are welcome to come up here.

9         I'll have two microphones up here.  So the Defendants

10 have to be on one, I guess, and the Government and Plaintiffs

11 are on the other, and then we'll see how we do.

12        If you all will step up here.

13    (The following proceedings were had at the bench by the

14    Court and Counsel out of the hearing of the gallery:)

15        **THE COURT:**  Okay.  So can you all hear me okay?

16        When you speak, if you would just get close to the

17 microphone.

18        So my questions -- I just have a couple of them.  One

19 of them has to do with the corporate offer with respect to

20 Corteva and the CRPIVM Loyalty Program.  There is an allegation

21 in paragraph 79 that I don't fully understand.  It says: "If a

22 distributor fails to meet a given active ingredient's loyalty

23 threshold under Corteva's CRPIVM Loyalty Program, the

24 distributor stands to forfeit between 5 percent and 20 percent

25 of certain loyalty-dependent payments under the Corporate

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1    Offer, and across all active ingredients cumulatively it stands

2    to forfeit 100 percent of these payments."

3              Can you put some flesh -- what does that mean?  I

4    understand that you basically are then going to lose your

5    corporate offer.  What does it mean, though, you're going to

6    lose -- you stand to forfeit 100 percent of payments across all

7    active ingredients?  Does that mean you don't get anything?

8              **MR. TURNER:**  So, Your Honor, I think -- "all active

9    ingredients cumulatively," I think it means ones that are

10   implicated by the loyalty program.  So all the active

11   ingredients under the -- that are in the loyalty program, you

12   could lose all the money that you get from the loyalty program.

13             **THE COURT:**  So if you miss the threshold, if I have

14   it right, for one ingredient, then you lose it for all?  Is

15   that the allegation?

16             **MR. TURNER:**  All that are tied together, yes, under

17   the loyalty program.  And in the corporate offer, there is a

18   bucket of funds that are tied to meeting the loyalty program

19   separate offer in order to receive those under the corporate

20   offer.

21             **THE COURT:**  Okay.  I'm just interested in what the

22   allegation is.

23             **MR. MARRIOTT:**  In that case, Your Honor, I think I

24   have nothing to add.  The allegation is what it is.

25             **THE COURT:**  Okay.  And the other is the exclusive

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1    supply agreement between the Defendants for mesotrione and

2    metolachlor, if I said that right.  Under one agreement, and

3    that is mesotrione, it's excluded from the Syngenta program,

4    the Key AI program, but it's also described as a favorable

5    treatment.  And for the metolachlor -- is it metolachlor?

6            MR. WEINGARTEN:  I think it's metolachlor.

7            THE COURT:  In that regard, it's described as being

8    counted as Syngenta branded.  Are those different things, or is

9    that meant to be the same?

10           MR. WEINGARTEN:  No, sorry, Judge.  What's favorable

11   about it for Corteva is purchases of the Corteva product,

12   because they take in Syngenta's AI, don't count against the

13   open space.  So it's good --

14           THE COURT:  Is it counted in favor as an AI or is it

15   just neutral and not counted at all?  Because somewhere you use

16   the phrase "neutral."

17           MR. WEINGARTEN:  I think it's neutral.  It's neutral,

18   Judge.  So it doesn't hurt Corteva -- let me put it this way:

19   Corteva's ability to sell is not going to be hurt by the

20   program in the way the generics are because it's neutral under

21   the program.  So a distributor doesn't have to worry about

22   buying too much or too little Corteva product.

23           THE COURT:  That's the allegation.

24           Do you want to add anything to that?

25           MR. MARRIOTT:  That's the allegation, Your Honor.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 80 of 118

1          **THE COURT:**  All right.  That's all I needed.

2       (End of bench conference.)

3          **THE COURT:**  It's the best technology that was

4   available 20 years ago.

5          Okay.  All right.  Anything else you want to add?

6          **MR. WEINGARTEN:**  No.  I would like Mr. Kehl to have

7   his chance to talk about alternative markets.

8          Thank you, Judge.

9          **THE COURT:**  So why do we have two markets?

10         **MR. KEHL:**  Good morning, Your Honor, Phil Kehl on

11  behalf of the FTC.

12         The complaint alleges for each active ingredient two

13  alternative markets.  The first is the market for the active

14  ingredient itself, and the second is the market for finished

15  products containing that active ingredient.

16         You can think of the first market as describing the

17  active ingredient as a component of the finished product, while

18  the second market describes the finished product itself.

19         **THE COURT:**  Are there cases supporting that relevant

20  market for each of those or either of those?

21         **MR. KEHL:**  Cases in this particular -- describing

22  loyalty programs, Your Honor?

23         **THE COURT:**  Not this one, just generally speaking.  I

24  mean, I remember in the *Nexium* case it involved omeprazole, I

25  think, and esomeprazole, which I guess are two different

              22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  things.  I'm not sure.  But they are all proton pump

2  inhibitors.  But I don't know if that was the active ingredient

3  in those cases or whether that was the only ingredient in those

4  cases.

5          MR. WEINGARTEN:  I am happy to speak that, Judge.

6          THE COURT:  Sure.

7          MR. WEINGARTEN:  Every pharmaceutical product has an

8  active ingredient, right, but there's also the gel cap and

9  other stuff in it.  The case was about esomeprazole as the

10  active ingredient -- that's what makes Nexium work per se --

11  and whether generic esomeprazole was a competitor and whether

12  there was anticompetitive effects between those two.  So that's

13  sort -- I don't know if that clears it up or makes it more

14  complicated.

15          But in this case, Judge, it's perfectly routine to

16  allege alternative markets.  The defense doesn't even challenge

17  that we're alleging alternative markets.

18          THE COURT:  They point out that you have two

19  different markets.  I thought they --

20          MR. WEINGARTEN:  Yes.  But as Mr. Kehl will explain,

21  it's perfectly reasonable to take note of multiple markets if

22  that's where the competitive effects will be felt.  It doesn't

23  have to be just one market.

24          THE COURT:  All right.

25          MR. KEHL:  Just to elaborate on that point, Your

1  Honor, these are two ways of describing the same economic

2  situation.

3          **THE COURT:**  The second market would be broader than

4  the first, though; right?

5          **MR. KEHL:**  Not necessarily, Your Honor, no.  The

6  second market includes the finished products, which in

7  paragraph 43 -- you know, the complaint describes it as

8  including adjuvants and surfactants, those sort of things.

9  Those adjuvants and surfactants are not where the Defendants'

10  market power lies.  The Defendants' market power lies in the

11  active ingredient.

12          So because we're trying to assess the competitive

13  effects of Defendants' loyalty programs, which are organized

14  around the active ingredient, we could just think about this

15  situation into -- it's really two sides of the same coin.  You

16  could have the finished product that has that active ingredient

17  together with the other surfactants and the like, or you can

18  think about just the active ingredient itself as the component.

19          **THE COURT:**  All right.  So what happens in a case

20  like that where you have two different relevant markets?  Does

21  it eventually get resolved as to one or does it depend?  Can

22  you go forward on two?

23          **MR. KEHL:**  We can go forward on two, and this will

24  depend on the factual development and discovery in the case.

25  We could ultimately prove both markets.  We could ultimately

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 83 of 118

1   prove one.  That will depend on the --

2          **THE COURT:**  I thought there was a general rule, if

3   you will, you're supposed to have the most narrowly defined

4   market, if you can, that is inclusive?

5          **MR. KEHL:**  I would describe that principle as the

6   most narrowly defined market that enables the fact finder to

7   assess the competitive effects of the conduct under scrutiny,

8   and I wouldn't say either one of these markets -- either one of

9   them is narrower or broader than the other.  They're really

10  just describing the same thing, which is a market based around

11  an active ingredient.

12         **THE COURT:**  Okay.

13         **MR. KEHL:**  So moving on from the two alternative

14  markets, Your Honor, we would emphasize that market definition

15  is a factually intensive inquiry and that there are ample

16  factual allegations in the complaint supporting these markets.

17         **THE COURT:**  What's your position as to the

18  Defendants' argument that you have -- to make it a plausible

19  allegation, you have to at least address the -- what they

20  contend are interchangeable ingredients?

21         **MR. KEHL:**  Well, first we'd say that's just not the

22  law, Your Honor, that we have to address.

23         **THE COURT:**  Are these cases distinguishable that

24  they've cited to me: *Bayer*, *Globe*, and *Chapman*?

25         **MR. KEHL:**  What I would say more so, Your Honor, is

        22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1   that the Defendants' interpretation of *Bayer* as importing this

2   kind of sweeping requirement is really an outlier for the

3   thrust of the case law. Your Honor pointed to *In re Nexium* as

4   an example of, you know, where a complaint proceeded past the

5   motion to dismiss stage where it alleged a product market for

6   the branded pharmaceutical and the generic analogues, even

7   though there were other drugs that treated the same condition,

8   other drugs that were functional substitutes.

9        We also cite *In re Zetia*, for instance, Your Honor.

10   This was a summary judgment decision in which the court found

11   that there was a relevant product market limited to the brand

12   and its generic analogues, again, where there were other drugs

13   that treat the same condition.

14        We point the Court as well to *Jien v. Perdue Farms*,

15   which makes clear that at the pleading stage, the plaintiff

16   doesn't have to rule out other potential markets that the

17   defendants might argue after factual discovery.

18        But more broadly, Your Honor, I would argue -- and

19   this goes to some of your questions you had asked earlier --

20   functional substitutability or whether a product has

21   overlapping uses is not dispositive of the ultimate product

22   market. See *Meijer v. Barr Pharms*, for instance.

23        So because this is not dispositive, I don't see how

24   there could possibly be a pleading requirement to plead

25   something that's ultimately not going to --

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 85 of 118

1      **THE COURT:**  How does the cross elasticity of demand

2   figure in at this pleading stage, because the Defendants say

3   there are all these other products that are interchangeable?  I

4   don't know if by that they mean also that there's cross

5   elasticity of demand or at least that they have -- as I read

6   their arguments, they say it has the same functions, same

7   chemical family, same mechanism, et cetera.  That doesn't

8   necessarily seem to me to say it's also, therefore, meeting the

9   cross elasticity test.

10      **MR. KEHL:**  That's absolutely right, Your Honor.  And

11  cross elasticity can be dispositive of the relevant market.  We

12  point the Court to several cases like *In re Aggrenox*, *FTC v.*

13  *Shkreli*, where the courts look at evidence of cross elasticity

14  of demand as the determinative factor in defining markets

15  between branded pharmaceuticals and the generic analogues.

16      **THE COURT:**  Well, *Brown Shoe* has a number of factors,

17  one of which is cross elasticity.  I was a little confused

18  because Judge Beach had written an opinion -- maybe she adopted

19  a magistrate judge's ruling, or maybe it's the magistrate

20  judge.  But as I recall, you can correct me, that was the

21  ultimate question.  You have to show cross elasticity of demand

22  or else the other factors are not going to be relevant to

23  resolve the case.  I wouldn't say they're not relevant.  They

24  won't be sufficient.  So in the absence of cross elasticity of

25  demand, you're not going to be able to have a feasible

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 86 of 118

1  alternative.

2         MR. KEHL:  That could be one way to look at it.  I

3  think that's the *In re Zetia* case that you might be referring

4  to.

5         I would say that this is a factually intensive

6  inquiry, and there could be cases where the more qualitative

7  *Brown Shoe* factors might be dispositive.  And here, again, Your

8  Honor, this is at the motion to dismiss stage.  We've alleged

9  both, evidence that goes to cross elasticity, and this is the

10 anticipated price for actions, and that it was --

11        THE COURT:  In that regard, I presume that the issue

12 of geographic market is not contested; it's the product market

13 that's contested?

14        MR. KEHL:  We understand the Defendant is contesting

15 product market and not geographic market.

16        THE COURT:  All right.

17        MR. KEHL:  I just would like to emphasize one other

18 point, Your Honor, which is the structure of the loyalty

19 programs themselves is itself evidence of cross elasticity of

20 demand.  Defendants are uniquely concerned with competition

21 from generic suppliers, and so they've structured their loyalty

22 programs around keeping out generics.  That tells us how

23 Defendants conceive of this market, and it goes directly to

24 cross elasticity of demand, as some of the Court's questions

25 earlier were suggesting.

1      **THE COURT:**  So what cases are the strongest authority

2  for the Defendants' own design of the program can be evidence

3  of the relevant market?

4      **MR. KEHL:**  I would say *In re Aggrenox*, Your Honor,

5  which we cite in the brief, which interprets *FTC v. Actavis*, a

6  Supreme Court case addressing reverse payments between a

7  branded pharmaceutical and a generic counterpart.

8      **THE COURT:**  Okay.  All right.  Anything else you want

9  to add?

10     **MR. KEHL:**  Nothing further on markets, Your Honor.

11  Thank you.

12     **THE COURT:**  Unless there's anything else from the

13  Government, I will hear from the Defendants then and give you a

14  chance to respond.

15     So I don't know who wants to go first.

16     **MR. MISHKIN:**  Your Honor, Paul Mishkin again for the

17  Syngenta Defendants.  I'll respond briefly.

18     The first point is about what law applies.  And I

19  think as we've seen time and again, the Plaintiffs are applying

20  the wrong test, and we know that because they're citing cases

21  that don't have to do with rebates and that don't grapple with

22  this threshold question of whether there's a pricing practice

23  at issue:  *Advanced Healthcare*, *Kolon* from the Fourth Circuit,

24  the *Tampa Electric* Supreme Court case.  It's a different line

25  of cases.  It doesn't address rebates, and that's what really

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 88 of 118

1    is missing the key point.

2            When we talk about coercion in our context, we're

3    talking about a way in which the arrangement might not

4    predominantly be priced.  That is the key question:  Is it

5    predominantly priced or not?  And I think Plaintiffs are simply

6    skipping that part of the analysis.

7            And the Supreme Court is saying if it is a pricing

8    practice, all of this case law taken together says at that

9    initial stage, if it's a pricing practice, we don't do a

10   full-blown analysis.  We don't look at barriers to entry and

11   all of these things about the market because the law teaches us

12   that it's going to be procompetitive as a matter of law.  These

13   are programs that are not capable of being anticompetitive as a

14   matter of law.  That is our key point, and I think Plaintiffs

15   are simply skipping over that part of the test.

16           They say that the test doesn't apply because they're

17   alleging low cost -- rather, that they are alleging that the

18   prices are high.  I addressed that briefly before, but that is

19   not enough to get out of the test.  As you read these tests,

20   they apply regardless of whether the prices are allegedly low

21   or high.  The question is whether it's a pricing practice.

22           They quoted *ZF Meritor* as saying that there is no

23   immunity for practices if they involve above-cost pricing.

24   We're not saying there's immunity because there is some

25   involvement of above-cost pricing.  We're saying that there is

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 89 of 118

per se legality because that is all that's alleged.  All that's
alleged is a pricing practice, and they have not contended with
that.

       I will point out --

       **THE COURT:**  Don't they allege a little bit more than
that?

       **MR. MISHKIN:**  I don't think --

       **THE COURT:**  It may be -- your argument is that it's
predominantly a price, which would be what you have to show,
you contend, for application of the price-cost test.  But the
Government says it alleges that there are exclusionary
practices involved that you -- that the payments are discounts,
but they're structured in such a way as to be -- to have an
exclusionary effect on the generics and that they -- given the
limitations of the distribution system, that that has further
exclusionary effect because the generics cannot enter into the
system given the structure.

       So why is that not at least some allegation?  And
then there is the allegation of retaliation, which is, you say,
only one evidence of it.

       **MR. MISHKIN:**  On the first point, Your Honor, they're
simply recounting the features that are inherent in a rebate --
in a market-share rebate program and saying that they are
exclusive inherently.  That's what the factual allegations are.
There are no allegations of fact as to why -- the inducement of

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 90 of 118

1  why the distributors would participate is anything other than
2  price driven.  And the idea about, well, maybe increasing --
3  lowering the price is a way of somehow ultimately increasing
4  the price, they are trying to engage in the analysis --
5        **THE COURT:**  Well -- I'm sorry -- isn't there an
6  allegation that it's not just price driven, but that the
7  distributors are concerned about being cut off from having
8  access to your client's products, and so they have to
9  participate because there's sufficient demand for some of the
10 products, that if they don't participate, they will lose
11 everything?
12       **MR. MISHKIN:**  That's a key issue I want to discuss,
13 Your Honor, because the allegations are not sufficient on that
14 point, and there is this one episode that is pleaded.  Other
15 than that, which I will come to, there are no allegations of
16 non-price features in the program.
17       As to that one episode, a couple of points.  It is
18 not part of the program.  One -- paragraph 164 says that that
19 is other conduct.  It's not part of the program.  And there is
20 only --
21       **THE COURT:**  But the Government says it doesn't have
22 to be formally the program --
23    (Indiscernible cross-talk)
24       **MR. MISHKIN:**  They --
25       **THE COURT:**  -- that gets the effect.

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1      **MR. MISHKIN:** -- they do.  They do say that, but they
2 are trying to end these programs, right.  The relief they're
3 seeking is they want to end these programs.  So I think it is
4 important to know what the program is and kind of what it's
5 not.

6          But, more fundamentally, Your Honor, the question is
7 have they pleaded enough in the complaint to show that
8 distributors are making a decision to participate in some
9 meaningful way because they're afraid of this retaliation?
10 That's the question, I think.  And the answer is, no, there are
11 no threats pleaded in the complaint.  They pleaded an episode
12 of a discontinuation of supply where a distributor didn't meet
13 Key AI.  They don't allege that there was a threat there.  They
14 don't try to connect with any factual allegations that one
15 episode to some belief generally among distributors that they
16 are going to be cut off.

17          If you look at what the complaint pleads as to why
18 they are participating, again, I will say it -- again,
19 paragraphs 7, 173, they have a very clear story.  It's not
20 about threats.  It's about their economic desire to get the
21 rebate.

22          And I think, Your Honor, if you look at the whole
23 complaint and you look for where is there even conclusionary
24 allegation that the reason distributors participate is because
25 they are afraid, there's a single sentence in paragraph 7 that

        22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  says that.  Every time they go to describe why the distributors

2  are actually participating, other than that one conclusory

3  statement in paragraph 7, there are no statements, there are no

4  allegations based on fact that they participate because of

5  perceived threats, and the complaint doesn't allege a

6  single --

7          **THE COURT:**  So the Government alleges and they

8  alleged that your client's and Corteva's documents acknowledge

9  that this program has helped to prop up prices on products that

10 have had their patent protection expired, and without the

11 program, there would be a degradation of the prices at a faster

12 rate.

13         Why would that not be some evidence of

14 anticompetitive effect of these programs and -- I mean, even if

15 I agree with everything you say and that it passes price-cost

16 tests -- in fact, Government doesn't claim that it does not.

17 If it has an anticompetitive effect, though, you're saying that

18 that's not impermissible, that the antitrust laws can't reach

19 that?

20         **MR. MISHKIN:**  If I can make three points --

21         **THE COURT:**  Okay.

22         **MR. MISHKIN:**  -- fundamentally about the documents,

23 Your Honor?

24         The first is that the documents that are talked

25 about, they don't allege anything about the features of the

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 93 of 118

1  program.  They don't change the analysis about what the program

2  is and what it's not.  And so as a fundamental matter, no, it's

3  not relevant here where we're trying to decide if it is a

4  pricing practice.

5          **THE COURT:**  I'm not sure I followed that.  I thought

6  the allegation is the feature of the program that's the problem

7  is the low open space?

8          **MR. MISHKIN:**  Well, that's maybe a different issue

9  than the documents, but the -- there's no non-price feature of

10  the program that's -- nothing that's been recognized certainly

11  as a non-price feature in the case law.  And the documents that

12  I think they're invoking on this idea about anticompetitive

13  effects of the program -- the documents they're talking about

14  there, they don't go to this question about what are the

15  features of the program, line it up with what the case law has

16  said, and let's see whether that's a pricing practice or not.

17  I don't think the documents go to that question is what I am

18  saying, and that is the fundamental, initial legal question

19  that I think they are jumping over and not applying in the

20  right way.

21          So that's my first point about the documents.

22          **THE COURT:**  I only know what's alleged in the

23  complaint.  So I don't know what's out there in terms of the

24  documents and the corporate documents.  But the allegation is

25  that the effect of the program is to, I should say, suppress

1  price reduction, in other words, to maintain supercompetitive

2  prices.  And it would seem logical that that is an effect of

3  the program because I do think, as I understand at least the

4  pleaded allegations, that the company has acknowledged that.

5  In fact, that's part of the strategy here.

6          **MR. MISHKIN:**  So let me make two other points then,

7  Your Honor.  I do think as a matter of law it's not relevant

8  because we looked at the features of the program.  The law

9  tells us it's not capable of being anticompetitive.  So that's

10  my first point.

11          In terms of the documents themselves, there is a bit

12  of a sleight of hand going on, and you can tell this if you

13  read the allegations.  Almost all of these allegations that are

14  describing documents, they're talking about documents that are

15  talking about more than just these particular rebate programs.

16  They're talking about competitive strategies more generally,

17  much of which is not challenged here.  So I think they're

18  overreading those documents and not comparing apples to apples.

19          And then the final point I would make is that the

20  context here about the quality differences, which are

21  acknowledged in the complaint, that is getting overlooked here

22  because there are no allegations that the price differential,

23  which is the main allegation, I think, of reported

24  anticompetitive effects -- there are no facts pleaded that

25  would explain why that price differential wouldn't be

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 95 of 118

1  explainable based on quality differences.

2         Let me also refer to this use of this term "value"

3  that gets used in the documents.  In a context where Syngenta,

4  for example, is competing so heavily on quality and it's trying

5  to persuade a market that the value is there and that it makes

6  sense to pay more for premium product, in that context

7  references to value and measuring success in terms of whether

8  there's value preservation in the market, I don't think the

9  Court should find that to be remarkable in any way.

10         **THE COURT:**  Would that be a fact question?  Why

11  wouldn't that be a fact question?

12         **MR. MISHKIN:**  Because it's not a fact question

13  because the Supreme Court is telling us the practice as alleged

14  can't be anticompetitive.  So, as I say, I don't think you get

15  to these documents at all; but if the Court is concerned about

16  what the documents say or believes there could be some

17  potential relevance, they're not entitled to an inference that

18  would be contrary to what the Supreme Court is telling us

19  certain conduct is capable of or not.

20         And so what I'm really saying to the Court is that

21  there is certainly no reason to read the complaint the way they

22  are characterizing it, mainly in light of what the law says,

23  but also I think this context of the value -- the value

24  proposition, I think it's -- I think it could be relevant to

25  the way the Court would look at those documents.

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 96 of 118

1      **THE COURT:**  Is there a requirement under these

2 loyalty programs that to be a distributor you have to

3 participate in the loyalty program?

4      **MR. MISHKIN:**  No, Your Honor.  That's not what's

5 alleged here.  What's alleged here is that in order to get the

6 rebate, you have to meet the threshold.  And that is really the

7 key point at the end of the day.

8      It's voluntary and it's fully contestable.  And there

9 has been no theory that's credibly or coherently alleged in the

10 complaint as to why a generic, for example, couldn't contest

11 it.  They recite kind of an economic theory that, well, maybe

12 there's supercompetitive profits, and that is -- means that the

13 Defendants can afford more.

14      Two main things about that.  They're assuming their

15 conclusion; they're assuming the program is anticompetitive

16 when they make these allegations about supercompetitive prices,

17 and they're engaging in the kind of analysis that the Supreme

18 Court has said to courts we should not be doing.  If it's a

19 pricing practice and it's above cost, we don't try to engage in

20 analyses to figure out how it might at the end of the day be

21 anticompetitive.

22      **THE COURT:**  But if it has other exclusionary aspects

23 of the program, then you would, would you not?

24      **MR. MISHKIN:**  If it had non-price exclusionary

25 features?

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 97 of 118

1          **THE COURT:**  Yes.

2          **MR. MISHKIN:**  Then that would be a potential issue.

3   But, again, they have not adequately alleged any non-price

4   exclusionary feature.

5          **THE COURT:**  All right.

6          **MR. MISHKIN:**  On another point, I don't think I've

7   had occasion to point out, Your honor, is it's alleged in

8   paragraph 87 that exceptions are also granted to these levels.

9          Unless Your Honor has any further questions, I'll

10  stop there.

11         **THE COURT:**  I don't think so.  Do you want to just

12  briefly speak to the question of the corporate parent issue?

13         The FTC acknowledges, of course, that there can't be

14  any corporate conspiracy.  But as I recall, *Copperweld* says you

15  have to show coordinated activity to involve various entities.

16         Is that -- my only question is what's the test?  You

17  didn't speak to the test in your briefing.

18         **MR. MISHKIN:**  Okay.  I think, Your Honor, largely, we

19  can rely on our briefs, but on that point there has to be

20  independent, anticompetitive conduct alleged by each of the

21  entities, and that's not alleged here, especially after a

22  three-year investigation.  It's just way too thin is our basic

23  point.  It's too high level.  It's not connected --

24         **THE COURT:**  The FTC said that the -- I think the word

25  Mr. Weingarten used was the "Bible" for the -- the whole

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1   process is at the higher corporate level.

2           **MR. MISHKIN:** Yeah. I don't think that's adequately

3   alleged in the complaint, Your Honor, that this high-level

4   document -- if you go -- including some of the allegations that

5   are under seal, you can see that there is a gulf between the

6   high-level kind of thing that's pleaded and the actual sort of

7   program that's at issue here. So we just don't think there's

8   enough there. If there had been enough, I think it would have

9   been pleaded because they've had plenty of discovery --

10           **THE COURT:** What about at least the issue about the

11   arrangement between the Defendants?

12           There's certain allegations about that that's

13   separate from those with some corporate involvement in those

14   that's unique to that. Would that not be sufficient at least

15   for that purpose?

16           **MR. MISHKIN:** They haven't alleged that those supply

17   agreements are anticompetitive. That's not part of what they

18   are trying to end. So I think a little bit of a touch point

19   that they've alleged with some of the affiliates and those

20   supply agreements --

21           **THE COURT:** I don't know if they alleged they're

22   anticompetitive, but I thought the allegation was they

23   contributed to the overall anticompetitive feature of the

24   loyalty programs because of the agreement between the two to

25   avoid generics?

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 99 of 118

1          **MR. MISHKIN:**  Yeah.  I don't think that's -- I don't

2     think there are facts that sufficiently allege that, Your

3     Honor.  I don't think they've explained sufficiently why this

4     arm's length supply agreement could possibly be creating any

5     anticompetitive effects.  It doesn't help them with the basic

6     test about whether it's a pricing practice in the first place

7     at all.

8          Your Honor, if I could, one other point I just wanted

9     to make about volume versus market share, because I think we

10    heard Plaintiffs say that volume would be okay.  That's an

11    important concession, I think, because if you're going to meet

12    volume thresholds, you are necessarily going to be purchasing

13    less from rivals.  You could have every distributor meeting

14    volume thresholds, for example.  They're different.  They do

15    different things.  And the share-based has certain advantages,

16    as I've talked about.

17         But once they've admitted that a conditional rebate

18    is okay, what's the limiting principle at this point, right?

19    And the Supreme Court has said you're supposed to be carving

20    out a wide scope around pricing practices.  If the Court is

21    supposed to be saying, well, volume is okay, share-based is

22    not, and now we have to open up this whole inquiry, that is not

23    the type of parsing that a court should be doing, and I think

24    the cases make that clear.

25         **THE COURT:**  All right.  Thank you.  Anything further?

          22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1          **MR. MARRIOTT:**  Your Honor, on the market, if I may

2     just briefly respond?

3          **THE COURT:**  Sure.

4          **MR. MARRIOTT:**  So I think what we heard from counsel

5     for the Government is, and what I took as a suggestion, that

6     market definition is a useful tool, but it is not, in some

7     sense, a necessarily required element in order for the case to

8     proceed.  To the extent that's the argument, I think that

9     misstates the law.

10         Market definition is a required element.  It has to

11    be properly pled.  And if it isn't properly pled, the claim has

12    to be dismissed at the pleading stage, at the summary judgment

13    stage, whatever stage it might be.

14         The suggestion was made, Your Honor, that the market

15    here is properly defined as they define what I'll call the

16    narrower market, the AI-only market.  And I do think it's

17    narrower than their other alternative market.  But the

18    suggestion is made that that market must be properly defined

19    because they've alleged that there is a generic and that there

20    is a price difference between the brand and the generic.  And

21    if there's a price difference between the brand and the

22    generic, they must be in the same market with one another,

23    because if the others were in there, then there somehow

24    wouldn't be any price difference.

25         And that allegation, Your Honor, I think is not

      22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  supported by the cases.  I think the allegation of this vast

2  price difference is not even really supported by the complaint,

3  except in a most generalized sense.  There certainly is a

4  general suggestion in the pleading that generic prices are

5  lower than branded prices, but there's no particular pricing

6  pled in this complaint.  They effectively do a form of group

7  pleading when it comes to these allegations and some of the

8  other allegations when they're essentially saying, referring to

9  all of the AIs together, that prices were up or prices were

10 down.  There's no kind of effort to particularize -- and I

11 don't mean to suggest that a Rule 9 particularization standard

12 is required.  I'm not saying that.  But there's no effort to

13 break out an allegation that would allow even the kind of cross

14 elasticity analysis that they suggest is satisfied.  We just

15 don't have that in this pleading.  They're very generalized

16 references to generic pricing being lower than the branded

17 pricing.

18          **THE COURT:**  Well, they have at least one allegation

19 of somebody who tried to enter the generic market before and

20 did for a period of time and then allegedly got frozen out

21 later, and they have allegations that farmers are interested in

22 the generics.

23          I think the allegation about the generic being in

24 there before at least presumes that it was at a lower price.  I

25 don't know if that's a fair inference.  You may contest that.

1    But why would that not at least be enough at the pleading
2    stage?
3              I mean, you're suggesting that maybe the generics are
4    more expensive to produce than the --
5              **MR. MARRIOTT:**  I'm not suggesting that, Your Honor.
6    They may or may not be.  I suspect they're not.  In fact, I'm
7    confident they're not, given all that goes into preparing a
8    branded product.
9              What I'm suggesting is that if the obligation is to
10   provide evidence sufficient to allow an inference of either
11   reasonable interchangeability or cross elasticity, we don't
12   have that in this pleading.  All we have is the most
13   generalized allegations, not particular to any one of the two
14   alternative markets.
15             And, by the way, the first of those alternatives --
16   there's really six different supposed markets.  So we have
17   seven-ish markets, and really, frankly, probably more like 12
18   markets that are alleged here.  We have no detail of any kind
19   that would allow us to make conclusions that would permit an
20   inference that they need in order to show that the products
21   that are pled in the complaint really are reasonably
22   interchangeable one with another.
23             And I think that defeats this idea that just because
24   you say, as I think they suggest, generics are less expensive,
25   brands are more expensive, so, of course, they're in their own

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 103 of 118

1    product market, nothing else conceivably in that market -- I
2    think that's not supported by their own pleading.  Nor, Your
3    Honor, as I think one of the Court's questions eluded to, is it
4    supported by the approach taken by the FTC and the Department
5    of Justice in prior proceedings where they have, themselves,
6    defined the markets, indeed, in some cases for the very AIs
7    that are at issue here, in a much broader way than is presently
8    being defined here.  And that inconsistency is not in any way
9    explained in this pleading.
10           What we're saying, Your Honor, is that in a world in
11   which we have by really indisputable fact -- and I haven't
12   heard them say anything different from this even as they
13   approached the chart.  By indisputable fact, we have not just
14   on this marketplace the existing AIs pled in the complaint,
15   rimsulfuron, oxamyl, acetochlor, but we have a whole host of
16   others that the Government has identified as having been
17   approved to treat exactly the same weeds, exactly the same
18   sites of action, exactly the same chemical families.
19           And nothing in this pleading allows us to understand
20   why it is the case that it is plausible -- and I do think that
21   reasonably plausible is the standard -- why it is plausible to
22   say that those things for antitrust purposes, for reasonable
23   interchangeable purposes don't, in fact, compete with one
24   another as alternatives in the market.
25           **THE COURT:**  The FTC's argument is that that's a tough

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 104 of 118

1  burden on a motion to dismiss because it's difficult for the

2  Court to take judicial notice of some pretty specific

3  scientific facts.  Even if I did, though, there is nothing in

4  there that addresses the issue of cross elasticity of demand,

5  which is ultimately the test.

6          So why at this point shouldn't I at least be

7  constrained to require the case to move forward?  It may be

8  that the FTC has an insurmountable burden on proving that, but

9  how do I determine that at this early motion to dismiss stage,

10 even with the notion of taking judicial notice?

11         It seems to me that it's -- it requires some specific

12 almost Rule 702 fact or opinions that would be pretty hard for

13 me to determine at the 12(b)(6) stage.

14         **MR. MARRIOTT:**  So, Your Honor, respectfully, I don't

15 think it requires any kind of 702 analysis at all.  I think it

16 requires the Court to determine whether or not it can take

17 judicial notice that there are on the market, right, approved

18 by the government for sale, AIs that do essentially the same

19 thing as the ones that the Government is saying is in the same

20 (indiscernible).

21         In *Brown Shoe*, the Supreme Court says:  "The outer

22 boundaries of a product market are determined by the reasonable

23 interchangeability of use or the cross elasticity of demand

24 between the product itself and the substitutes for it."

25         I think the court is talking about reasonable

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 105 of 118

1  interchangeability and cross elasticity as part of the same

2  fundamental analysis.  And what we have here in terms of --

3          **THE COURT:**  Can you have reasonable

4  interchangeability without cross elasticity of demand in order

5  to have a product market?

6          **MR. MARRIOTT:**  That's a great question, Your Honor.

7          **THE COURT:**  What does "or" mean in that?  Does "or"

8  mean in other words or does "or" mean the disjunctive?

9          **MR. MARRIOTT:**  It's a great question as to whether

10  you can ever have it.  I wouldn't foreclose the possibility

11  that you could have one, not the other, I think, as a general

12  matter.  Here we're talking about the usage of these terms not

13  in kind of a lay sense, but in an antitrust, economic sense.

14  So there's unquestionably some element of needing a sense of

15  cross elasticity.  But it's a very practical, realities-based

16  test, and I don't think you could say necessarily that it's one

17  or that it's --

18          **THE COURT:**  I mean, if it is practically reality

19  based, if you have interchangeable products that nobody will

20  buy so you can't lead -- you can lead the horse to the water,

21  but nobody's going to drink it.  As a -- in practical reality,

22  don't I have to at least consider that fact as to whether they

23  are interchangeable, which makes me have to look at the cross

24  elasticity question?

25          **MR. MARRIOTT:**  I think the question is whether the

1  Government has -- if you accept my judicial notice point for a

2  moment, Your Honor, and assume that the Court should take

3  judicial notice of the existence of these alternative AIs, that

4  you should look at those AIs as well as the specific AIs that

5  are pled in the complaint -- once you have that world, right,

6  and you have the Government suggesting that the Court ought to

7  look at one narrow AI, for example, acetochlor, I think what

8  the cases that deal with this issue -- and, admittedly, there

9  are not enormous numbers of them there, but I think the ones

10 that do are looking to find an explanation as to why it is the

11 case that the Government -- you know, if it's the government

12 versus a private plaintiff -- has written out of existence an

13 AI that has been approved for sale and marketing in the United

14 States.

15        They could, for example, say in a pleading that

16 actually dealt with the alternatives -- they could say, Judge,

17 yes, it's true that FDA or EPA, or whoever, has approved a

18 particular AI for use in a particular indication, to treat a

19 particular insecticide with respect to a particular product.

20 But don't worry, Judge, nobody uses that, or the company went

21 bankrupt, or it doesn't exist.  They will not, with respect,

22 ever be able to plead that with respect to the AIs that --

23        **THE COURT:**  I thought they did in some portions of

24 the amended complaint?  Maybe it's in the briefs.  But

25 somewhere in there is there not something from the Plaintiffs

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 107 of 118

1  that say that there are other ingredients for some of these,

2  but they are not regarded by consumers to be interchangeable

3  for some reason because of value or quality issues?  Am I

4  missing something?

5          **MR. KEHL:**  No, that's correct, Your Honor.  Paragraph

6  157 goes to this.  Paragraph 46 goes to this.

7          **THE COURT:**  157?

8          **MR. MARRIOTT:**  What I'm saying, Your Honor -- I will

9  let you get there.

10         **THE COURT:**  Okay.

11         **MR. MARRIOTT:**  This really is the product

12 differentiation point, Your Honor, and they do that with

13 respect to each of these.

14         But all this is really saying is, without reference

15 to any other particular product, we have special unique

16 characteristics.  And we don't dispute any product, essentially

17 any product, even the generic version of a branded product --

18 there are differences between them.  They are not exactly

19 identical.  And so it would be possible for any plaintiff in

20 any complaint to say here's the market; it's just this product,

21 and it has unique features.  If that's all that's required,

22 then any plaintiff in any context in any case can basically

23 plead that the market is their own branded product or their own

24 specific product.

25         What I'm saying to the Court is that in a world in

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 108 of 118

1  which if you accept my judicial notice point and you consider

2  the existence of these other products, and the burden is on the

3  Government to explain why it is the particular AIs -- if I may

4  just approach?

5          **THE COURT:**  Sure.

6          **MR. MARRIOTT:**  If they are required, for example, in

7  this category of, you know, Number 2 herbicides to explain why

8  one, two, three, four, five, six, seven, eight -- nine others

9  that are in exactly the same chemical family are, in fact, not

10  alternatives because maybe the company went of business, maybe

11  there is something that's been shown about that to demonstrate

12  that it really isn't reasonably interchangeable, that I think

13  is the burden that gets undertaken when you take judicial

14  notice of what's there.

15          I don't think they will ever be able to show that,

16  but that's not something this complaint endeavors to do.

17  Instead, Your Honor, what this complaint does is it groups --

18  other than where there's -- the paragraphs like 157 where it's

19  pointed out in the very generic sense that there's some

20  differences between products, that's not undertaken to really

21  say that consumers don't use these various products to do

22  exactly the same thing.  That's what I would submit the

23  indisputable evidence will show.

24          And what we're saying is that they ought to have at

25  least the burden to do more than what has been done before we

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 109 of 118

1    have to spend enormous amounts of time, money, and resources

2    for presumably years of taking discovery on things that are not

3    getting any less scientifically factual today than later on.

4          What counsel suggested at one point, Your Honor, was

5    that there was something different about asking the Court to

6    take judicial notice with respect to the existence of one of

7    these AIs.  Somehow it was different from a scientific fact.

8    And in some sense it is, but I think it's different in a way

9    that's favorable to our position.  We're not asking the Court

10   for purposes -- present purposes to say that any one of these

11   AIs has certain features or functions or properties offered in

12   an exact particular way.  What we're saying is you ought to

13   take judicial notice of the fact that the United States

14   government, which approves for marketing and sale in the United

15   States these products, has done it for a series of AIs, again,

16   same family, same site of action, same weeds.  That's an easier

17   thing than asking the Court to declare, as some courts actually

18   do, that particular pro -- you know, chemicals have certain

19   properties.

20         So I think it's a lesser burden, Your Honor, not a

21   higher burden of what we're asking here.

22         **THE COURT:**  All right.

23         **MR. MARRIOTT:**  I would refer Your Honor to the cases

24   which are in our papers: *Novartis*, *Bayer*, *Dow*, *Seila* -- all

25   cases in which the DOJ and FTC have defined markets very

Case 1:22-cv-00828-TDS-JEP  Document 159-1  Filed 01/05/24  Page 110 of 118

1  differently from the markets that have been defined here.

2          My colleague suggested that the alternative market is

3  somehow really not any broader and maybe the definition there

4  is sufficient.  But what -- again, if I may approach the chart?

5          What I understand counsel to be saying with respect

6  to their alternative market, right -- so their first market is

7  the AI by itself.  So it's rimsulfuron -- that is the market --

8  and the generic versions of rimsulfuron, just that particular

9  AI.  Their alternative market, as I understand it, is any

10  product, anything that includes rimsulfuron.  So it could be a

11  product that has 99 percent of one of these other AIs and

12  1 percent of rimsulfuron.  And as they have defined the market,

13  the market will then include these two probably very different

14  products used for very different purposes.  So it's anything

15  that in any way has that AI in a finished product as they

16  defined this alternative market --

17          **THE COURT:**  Would that not depend on what the facts

18  are?

19          I don't know currently whether any AI is present in a

20  thousand different products in minute quantities or whether

21  it's really only present in seven products in substantial

22  quantities.  They don't allege that, but wouldn't that be a

23  fact question as to how many products it would include?

24          **MR. MARRIOTT:**  Well, I do think ultimately it's a

25  fact question, Your Honor, but I think it's also an allegation

1  problem.  You don't know what it is, and I suppose none of us
2  here as an official matter knows what it is because it's not
3  pled in the complaint.  All we're told is that anything,
4  whatever that might be, that includes that AI is another
5  market.  And I would suggest that's certainly very different in
6  kind than what's being -- what's being suggested here.
7          Final point, Your Honor, you asked earlier whether
8  the fact that the programs themselves are -- you know, can
9  relate to a specific AI doesn't somehow do violence to our
10 argument that the market is broader than that.  And I will
11 stand by what I said before, which is that the analyses are
12 different and market definition is really not about how a
13 company internally defines the product.
14         But the colloquy that took place at the bench where
15 Your Honor asked about particular other programs and the CDO
16 program, for example, and asked whether or not some of the
17 programs had multiple AIs and how different thresholds might be
18 (indiscernible) as between them, the allegations made there,
19 that some of them in a sense incorporate other AIs, is
20 inconsistent with the Government's argument that the market
21 ought to be defined AI specific.
22         So I don't think the program definition is key here.
23 And if it is, then the market they have alleged is inconsistent
24 with their own allegations as it relates to some of these other
25 programs.

1          Thank you, Your Honor.

2          **THE COURT:**  Briefly?

3          **MR. WEINGARTEN:**  I don't want to belabor it, Judge,

4  but the Defendants' arguments respectfully are inviting error,

5  significant error.  Defendants are missing the entire standard

6  that's applicable here.

7          The facts as alleged are taken as true.  The

8  inferences are drawn in the Plaintiffs' favor.  I know the

9  Court knows that, but what Defendants argue instead is they put

10 forward their own, essentially, fact and expert testimony.

11 Counsel for Syngenta has fact testimony that he has proffered

12 in the form of argument about how to interpret Syngenta

13 documents and whether they're being overread in the complaint

14 or not.

15         Respectfully, Corteva's counsel has proffered fact

16 testimony and, as Your Honor alluded to, if I may approach, 702

17 testimony and expert testimony about how to interpret the North

18 Dakota herbicide chart.  There is no pleading standard under

19 which the Government is supposed to anticipate the North Dakota

20 herbicide chart, input into its complaint expert and fact

21 analysis about the interchangeability of products that are

22 listed on exhibits that the Defendants come up with after the

23 complaint's filed.  They are inviting error, Your Honor.

24         We pointed Your Honor to the language in *ZF Meritor*,

25 which is one of the Defendants' favorite cases, but the

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 113 of 118

language could not be more clear that the Supreme Court has not

immunized an exclusive dealing contract just because it

involves above-cost pricing.

        The feature of this program and these programs that

is at issue is not the discount.  The feature at issue -- and

Your Honor had it exactly right -- is the open space.  It's the

exclusivity condition.  We would have a different case,

probably not in front of this Court, even if they had offered a

lot of discounts, and because their prices were so good,

distributors showed up to buy.  But what we have is a case

about, yes, prices are low, but they are not as low as they

would be if the generics could enter.  The generics can't enter

because of the exclusivity condition.

        The allegations are extremely well pleaded, and for

the defense to say --

        **THE COURT:**  Well, they say they can.  They just have

to compete to get that same space.

        **MR. WEINGARTEN:**  But the complaint alleges, and the

inferences ought to be drawn in favor of the Government, that

by locking up all the distributors with 95 percent plus

exclusivity requirements, the generics cannot get the foot in

the door to compete on price.  And the complaint alleges --

        **THE COURT:**  Their argument is they've just got to do

it every year.  They're annual contracts and so --

        **MR. WEINGARTEN:**  Well, the case law is clear that's

Case 1:22-cv-00828-TDS-JEP   Document 159-1   Filed 01/05/24   Page 114 of 118

1  not dispositive, and it's certainly not dispositive at the

2  allegation stage.

3          The other thing I would say is there are allegations

4  that are under seal, particularly with respect to Corteva's

5  program, that cut against that argument.  I'll leave it at that

6  because it's under seal.

7          The Defendants also on the legal point make a huge

8  issue about coercion.  The test here is not why the

9  distributors enter the program.  This case is not going to

10  hinge on intent testimony from the distributors.  It is going

11  to be about the economics of this industry and Defendants'

12  knowledge of those economics and use of them to make sure the

13  program works.

14          But to be very clear, and I think Your Honor picked

15  up on it, the Government does allege threats and retaliation.

16  I believe it's at paragraph 77.  The word is not just

17  threatened, it's actually retaliated.  And under the

18  appropriate standard, that suffices.  It is not appropriate for

19  the defense to say, well, that's just one time, Judge.

20          I heard a lot of summary judgment arguments here

21  today, Judge.  I heard a lot of arguments that, frankly,

22  wouldn't even satisfy the summary judgment standard because

23  there are still material issues of fact everywhere.  But I

24  didn't hear arguments, Judge, that explain why this detailed

25  complaint is not well pleaded.  And the standard is simply take

1 the allegations as true, draw the inferences in the Plaintiffs'

2 favor.  Do we have more than a speculative right to relief?

3 The answer is yes on these allegations.

4          **THE COURT:**  All right.  I haven't addressed the state

5 claims.  I've read the materials.  I am familiar with them.

6 The largest defense for the Defendants is that for the same

7 reasons the federal claims fail, according to the Defendants,

8 the state claims fail as well.  So I understand that.

9          Unless there is something specific somebody wants to

10 raise about the state claims, I'll just rely on the briefing on

11 that.  So I don't know if anybody wants to be heard about any

12 of those.

13          **MR. WANG:**  Yes, Your Honor, Brian Wang, State of

14 California.

15          I would like to address California's unfair

16 competition law which prohibits businesses from engaging in

17 unfair, unlawful, or fraudulent conduct.

18          In its motion to dismiss, Defendant Corteva claimed

19 that California's unfair competition law is derivative of the

20 antitrust violations and falls within those antitrust claims.

21 Corteva's motion misstates the law.  Both the California

22 Supreme Court and the Ninth Circuit are clear:  A business

23 practice may be unfair and, therefore, illegal under

24 California's unfair competition law even if not specifically

25 prohibited by some other law.  Just this year, the Ninth

          22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  Circuit affirmed that principle in *Epic v. Apple*, 67 F.4th 946,

2  999 to 1003.

3          **THE COURT:** All right. Thank you.

4          **MR. WANG:** Thank you.

5          **THE COURT:** Any Defendant want to be heard?

6          **MR. MARRIOTT:** Your Honor, I would just say that I

7  think we don't disagree that in theory under California law

8  unfair practices can be unlawful. We simply don't believe the

9  allegations here amount to unfairness.

10          **THE COURT:** I understand. Okay. Any other issue

11  anybody wants to raise at this point?

12          **MR. MARRIOTT:** None here, Your Honor.

13          **MR. MISHKIN:** No, Your Honor.

14          **THE COURT:** Mr. Weingarten?

15          **MR. WEINGARTEN:** No, Your Honor, thank you.

16          **THE COURT:** All right. Well, I'll take it under

17  submission and endeavor to make a decision as soon as I can.

18  It will not be tomorrow, obviously. I will do it as soon as I

19  reasonably can reach it. I would anticipate after the

20  beginning of the year, hopefully, if not slightly before.

21          All right. Thank you all for the argument, for the

22  briefing, and I think I have what I need. So I will take it

23  under submission.

24          Have a safe trip home.

25       (END OF PROCEEDINGS AT 2:15 P.M.)

22cv828 FTC v Syngenta  -- Motion to Dismiss  -- 12/1/23

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6         I,  Briana L. Chesnut, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings in the above-entitled

9  matter prepared to the best of my ability.

10

11         Dated this 9th day of December 2023.

12

13                    _Briana L. Chesnut_

14         _____
                Briana L. Chesnut, RPR
15              Official United States Court Reporter

16

17

18

19

20

21

22

23

24

25