IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FEDERAL TRADE COMMISSION, )
STATE OF CALIFORNIA, STATE OF )
COLORADO, STATE OF ILLINOIS, )
STATE OF INDIANA, STATE OF )
IOWA, STATE OF MINNESOTA, STATE )
OF NEBRASKA, STATE OF OREGON, )
STATE OF TENNESSEE, STATE OF )
TEXAS, STATE OF WASHINGTON, and )
STATE OF WISCONSIN, )
                                  )
              Plaintiffs,         )        1:22CV828
                                  )
         v.                       )
                                  )
SYNGENTA CROP PROTECTION AG,      )
SYNGENTA CORPORATION, SYNGENTA    )
CROP PROTECTION, LLC, and         )
CORTEVA, INC.,                    )
                                  )
              Defendants.         )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

In this action, the Federal Trade Commission and a dozen states allege that two major manufacturers of crop-protection products have employed anticompetitive loyalty discount programs. These programs allegedly exclude generic competition from the market even after the products' patent and other federal exclusivity protections have expired, thereby leading to supracompetitive prices for farmers. Before the court are the motions of Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc., to dismiss all claims against them pursuant to Federal Rule of Civil

Procedure 12(b)(6).  (Docs. 94, 99.)  Plaintiffs have responded in opposition (Doc. 150), and Defendants have replied (Docs. 130, 133).  The court held argument on the motions on December 1, 2023.  (Doc. 157.)  For the reasons set forth below, the motions will be denied.

## I.  BACKGROUND

### A.  Factual Background

The facts outlined in Plaintiffs' amended complaint (the "complaint") (Doc. 149),[1] which are taken as true for the purpose of the present motion, show the following:

#### 1.  Crop-Protection Product Industry

The Syngenta Group is a global company comprised of businesses including Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively "Syngenta").  (Doc. 149 ¶ 30.)  Syngenta Crop Protection AG oversees Syngenta's global crop protection business.  (Id. ¶ 31.)

---

[1] Limited portions of the complaint and briefs remain under seal.  (See Doc. 148 (granting parties' motions to seal).)  Citations are to the unsealed versions, except where the court references sealed and redacted material.  While the court preliminarily granted motions to seal portions of the complaint in this case, the court discloses here those portions of the pleadings necessary for a full understanding of the allegations and legal issues raised.  Courthouse News Serv. v. Schaefer, 2 F.4th 318, 327 (4th Cir. 2021) ("[A]ccess to [allegations in] complaints . . . is crucial to 'not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.'" (quoting Doe v. Pub. Citizen, 749 F.3d 246, 266 (4th Cir. 2014)); Doe, 749 F.3d at 271 ("When parties call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials." (internal quotation marks omitted)).

Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG and is the top-level Syngenta business incorporated in the United States. (Id. ¶ 32.) Syngenta Crop Protection, LLC operates Syngenta's U.S. crop-protection manufacturing, which is the second largest by revenue among crop-protection product manufacturers in the United States. (Id. ¶¶ 33, 48.) Syngenta allegedly operates as a single enterprise. (Id. ¶ 35.)

Corteva, Inc. ("Corteva") was established to operate as an independent agriscience business through the merger of E.I. du Pont de Nemours and Dow Chemical Company. (Id. ¶ 38.)[2] Corteva is the third largest by revenue among crop-protection product manufacturers in the United States. (Id. ¶ 48.)

Defendants manufacture crop-protection products — commonly referred to by Plaintiffs as "pesticides" — to control diseases, weeds, insects, or other unwanted organisms that harm crops. (Id. ¶¶ 37, 39, 40.) These include herbicides, insecticides, and fungicides. (Id. ¶ 42.) Every crop-protection product contains at least one active ingredient ("AI"). (Id. ¶ 43.) Manufacturers may sell AIs in technical-grade form, which requires further processing before being sold in finished form, which is ready for use by farmers. (Id. ¶ 44.) AIs are distinguished by the pests

_____

[2] To the extent the complaint includes allegations involving Corteva's predecessor corporations, the court will simply refer to all such entities as "Corteva."

they target, the effectiveness at controlling the target pest, and the crops upon which the AI is used and registered for use, among other characteristics. (Id. ¶ 45.) The AI's "mode of action" is the chemical and biological manner in which the crop-protection product kills or controls the target pest. (Id. ¶ 46.) Farmers' preferences for one AI over another may depend on variations in the mode of action. (Id.)

Developers of new AIs obtain exclusive use through two mechanisms. First, under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., a developer of crop-protection products must submit environmental impact data to the U.S. Environmental Protection Agency prior to sale or distribution in the United States. Upon approval, the developer obtains 10-year exclusive protection from others citing the data the developer used to support its FIFRA submission. (Id. ¶¶ 51, 52.) Second, under patent law, a developer can obtain 20-year patent protection. (Id. ¶ 51.) The timing of the FIFRA application can effectively extend the exclusive-use period beyond the date the patent expires. (Id. ¶ 52.) When both exclusive-use protections expire, however, a generic manufacturer may enter the market. (Id. ¶ 54.)

Manufacturers of crop-protection products traditionally sell to distributors, who then sell to retailers, who then sell to farmers. (Id. ¶ 55.) Approximately 90% of crop-protection

4

products reach farmers through this traditional supply chain, and about 90% of the traditional supply chain is managed by seven distributors. (Id.) In other words, these seven distributors account for approximately 80% of all sales of crop-protection products in the United States. (Id.) This traditional channel of distribution is allegedly the most efficient because it provides access to retail and logistics networks and economies of scale, among other factors. (Id. ¶ 56.)

## 2. Defendants' Loyalty Programs

Plaintiffs allege that Defendants operate loyalty programs intended to limit the distribution of competing generic products. (Id. ¶ 59.) Under these programs, Defendants offer "substantial" payments as an end-of-year lump sum to distributors — allegedly up to millions of dollars — conditioned on the distributors limiting their purchases of generic crop-protection products containing specified post-patent AIs. (Id. ¶ 60.) The threshold to receive the loyalty payment is expressed as a percentage of the distributors' total purchases of the AI, and the permissible amount of generic AI a distributor may sell is referred to as "open space" or "head space." (Id. ¶ 61.) Typically, a distributor must source less than 15% of its total purchase of a certain AI from generic manufacturers to qualify to receive the loyalty payment. (Id.)

Syngenta implements its loyalty program, known as "Key AI," through written marketing agreements with distributors. (Id.

5

¶ 66.) Loyalty performance is calculated by dividing the amount of qualifying AI purchased or sold by the distributor in the year by the total of the AI purchased or sold by the distributor, including generics. (Id. ¶ 68.) If the distributor's percentage is above the threshold for the specific AI, it will reap a "special marketing bonus." (Id. ¶ 69.) If not, the distributor will lose the entire loyalty payment. (Id.) Year-to-year, Syngenta can change the AIs included in distributor marketing agreements as well as the associated share thresholds and calculation methods. (Id. ¶ 70.) A similar program is offered for retailers as well, in which multiple top retailers nationally have participated. (Id. ¶¶ 71, 72; Doc. 81 ¶ 82.)

Under Corteva's program — the Crops, Range & Pasture and Industrial Vegetation Management ("CRPIVM") Loyalty Program, a distributor generally receives an annual payment for sourcing a certain percentage of its purchases of an AI from Corteva. (Doc. 149 ¶¶ 75, 77.) The percentage that Corteva pays varies but could run as high as 11%. (Id. ¶ 77.) Corteva offers a second, higher payment when a distributor reaches a higher threshold for the AI. (Id. ¶ 75.) Moreover, the CRPIVM usually links together multiple active ingredients within each offer, thus requiring a distributor to hit the loyalty threshold for every AI in the offer to receive the payment for any one AI. (Doc. 81 ¶ 75.) Additionally, Corteva typically permits a portion of any payment to be deferred into

6

subsequent years, which would otherwise be forfeited if the distributor missed the loyalty threshold for any AI in the offer. (Id. ¶ 78.) Further, Corteva conditions its Corporate Offer — another annual payment offer that covers a broader range of Corteva products — on meeting the CRPIVM figure. (Id. ¶ 79.) If a distributor fails to qualify, it could forfeit certain loyalty-dependent payments under the Corporate Offer. (Id.)

"[S]ubstantially all leading distributors" enter into loyalty program agreements, and Defendants promote broad participation allegedly to assure distributors that others are not partnering with generic manufacturers to undercut prices. (Doc. 149 ¶ 84.) Moreover, the structure of the program is designed to make it less likely that distributors will lower prices in anticipation of a future loyalty payment because of its complexity, uncertainty, and timing. (Id. ¶ 85.) Defendants "regularly" audit distributors, which has allegedly led to withheld loyalty payments. (Doc. 81 ¶ 87.) Defendants also "rarely" grant exceptions for missing the threshold without good cause. (Doc. 149 ¶ 87.) Additionally, they have allegedly retaliated against distributors who fail to reach the loyalty thresholds by canceling distribution contracts, delaying access to new products, and withholding product allocation during a supply shortage. (Id. ¶ 88.)

7

Plaintiffs focus on the following AIs:

| Syngenta AI | Current Loyalty Threshold | Date Added to Loyalty Program | Patent Expiration | FIFRA Expiration |
|---|---|---|---|---|
| Azoxystrobin (fungicide) | 92% | 2013-14 | 2014 | 2010 |
| Mesotrione (herbicide) | 92% | 2014-15 | 2008 | 2014 |
| Metolachlor[3] (herbicide) | 90% | Early 2000s | 2008 | 2010 |
| Corteva AI | Current Loyalty Threshold | Date Added to Loyalty Program | Patent Expiration | FIFRA Expiration |
| Rimsulfuron (herbicide) | 85% | 2017-18 | 2006 | 2007 |
| Oxamyl (insecticide/ nematicide) | 90% | After 2017 Merger | 1988 | 1987 |
| Acetochlor[4] (herbicide) | 95% | 2016-17 | 2000 | 2007 |

(See id. ¶¶ 89-150; Doc. 81 ¶¶ 89-150.)  Plaintiffs allege that distributors of each of these AIs have strictly managed their purchases and sales to ensure that they stay above the respective threshold to receive the payments.  (Id.)

Further, Plaintiffs allege, generic manufacturers have attempted to enter the market for each AI — with demand from farmers — but have had little to no success because distributors

---

[3] Syngenta produces "s-metolachlor," which was phased in by 2001 over the original metolachlor.  (Doc. 149 ¶ 114.)  However, Syngenta allegedly includes sales of generic original metolachlor in the denominator of its calculation of a distributor's loyalty figure.  (Id. ¶ 115.)

[4] Acetochlor is manufactured by a joint venture of Corteva and Bayer. (Doc. 149 ¶ 142.)  Corteva apparently treats the sale or purchase of Bayer acetochlor as it would a sale or purchase of Corteva acetochlor. (Doc. 81 ¶ 146.)

8

would not purchase the generic. (Id.) As to azoxystrobin, two generics have exited the market entirely, and one that attempted to mix azoxystrobin was "hindered in its attempt to market" because of the Key AI program. (Doc. 149 ¶¶ 96-97.) As to mesotrione, two generics delayed or terminated entry, and a third that developed a mixture product dropped it due to the Key AI program. (Id. ¶ 105.) As to metolachlor, a generic manufacturer had considered bringing a mixture to market but chose not to do so because of the Key AI program. (Id. ¶ 120.) As to rimsulfuron, at least one generic canceled or deferred entry plans, despite apparent demand from farmers to bid on generics, because of the CRPIVM program. (Id. ¶ 132.) As to oxamyl, Corteva's production of oxamyl stopped for a span of roughly two years, generics entered the market with "relative[] success[]," but generic sales "plummeted" upon Corteva's re-entry into the market with the loyalty program applied to oxamyl. (Id. ¶¶ 136-38.) And as to acetochlor, the CRPIVM program has allegedly deterred generics from the market altogether, even though one generic firm has had success selling the AI overseas. (Id. ¶ 149.) For each AI, Plaintiffs allege that the presence of generics has imposed downward pricing pressure.

The complaint further alleges that Syngenta supplies Corteva with mesotrione and metolachlor. (Id. ¶¶ 109, 122.) Defendants allegedly struck this agreement as an incentive to keep Corteva

9

from purchasing generics of these two AIs.  In exchange, Syngenta does not penalize distributors in the Key AI program who buy Corteva products containing these two Syngenta AIs. (Doc. 81 ¶¶ 109, 122.)

### 3.  Alleged Market and Competitive Harm

Plaintiffs allege that Syngenta has had monopoly and market power as to azoxystrobin, mesotrione, and metolachlor, and that Corteva has had monopoly and market power as to rimsulfuron and oxamyl and market power as to acetochlor.  (Doc. 149 ¶¶ 151, 152.) Plaintiffs claim two relevant product markets:

> (a) A relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and

> (b) A relevant product market(s) also exists that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.

(Id. ¶ 155.)  Syngenta's market share for azoxystrobin, mesotrione, and metolachlor exceeded 70% from at least 2017 through 2020.  (Id. ¶ 161.)  Corteva's market share for rimsulfuron and oxamyl also exceeded 70% for those same years, while its market share for acetochlor exceeded 40% (with another roughly 50% attributable to Bayer, its joint venture partner for that AI).  (Id. ¶¶ 162, 163.) In all, Plaintiffs allege that Defendants have foreclosed generics

10

from "approximately 70% or more" of the market. (Doc. 81 ¶ 171.)

Each AI has "particular characteristics and uses that differentiate it from other active ingredients." (Doc. 149 ¶ 157.) Azoxystrobin "can be used across all major row crops [and] has growth-enhancing effects not proven in other active ingredients." (Id.) Mesotrione has "superior efficacy and crop safety, and a low use rate." (Id.) Metolachlor has "superior water solubility, and so tends to perform better in dry conditions[, and it] outperforms other active ingredients in warmer conditions, is more 'crop friendly,' and can be used on a broader spectrum of crops." (Id.) Rimsulfuron "can be used on a broader range of crops, controls a wider spectrum of weeds, can be used on both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate." (Id.) Oxamyl can be "sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil[, and] is also safer for crops and better for soil health[.]" (Id.) Acetochlor "tends to perform better in wetter and cooler conditions, [and] tends to have better weed control early in the growing season and is more effective against certain weed species." (Id.)

Plaintiffs allege that other AIs are not close enough substitutes to prevent Defendants from maintaining supracompetitive prices of their crop-protection products

11

containing these six AIs. (Id. ¶ 158.) Moreover, substantial barriers exist to enter the market for these AIs notwithstanding the loyalty programs. (Id. ¶ 160.) These capital, technical, regulatory, and legal barriers include "obtaining registration from the EPA, developing manufacturing processes and sourcing [the] active ingredient, and paying data compensation costs to the initial active ingredient registrant." (Id.) The loyalty programs impose a substantial barrier by limiting generic manufacturers' access to the traditional distribution channel. (Id.)

Plaintiffs contend that the loyalty programs cause anti-competitive harms. First, the programs "forclos[e] actual or potential competitors from access to distribution services," or to "efficient distribution services" (i.e., the traditional distribution channel). (Id. ¶¶ 169, 170.) Although the programs are nominally voluntary, Plaintiffs allege that the mere prospect of receiving a payment is sufficient incentive to induce distributors to participate and to limit or forego purchases from generic competitors. (Id. ¶ 173.) Allegedly, one generic manufacturer represented that "this dynamic is so well established in the industry that it is futile to even approach a large distributor that is subject to loyalty requirements." (Id. ¶ 178.) Absent the loyalty programs, Plaintiffs allege, sales of generics would be significantly higher and would exceed the open space presently allowed for each AI, thus decreasing prices overall for

12

farmers.  (Id. ¶ 180.)

Second, and relatedly, Plaintiffs charge that the loyalty programs have prevented, delayed, and diminished entry and expansion by generic manufacturers into, as well as caused the exit from, the market for products containing the AIs. (Id. ¶ 182; see also, e.g., id. ¶¶ 96-97 (demonstrating that generic manufacturer of azoxystrobin mixture was "hindered in its attempt to market"; id. ¶ 132 (alleging that at least one generic manufacturer of rimsulfuron canceled or deferred entry plans, despite apparent demand from farmers to bid on generics, because of the CRPIVM program).)  Third, these programs have reduced the ability and incentive for generic manufacturers to innovate crop-protection products containing the AIs.  (Id. ¶ 186.)  Finally, the programs have resulted in supracompetitive prices for retailers and farmers for products containing the AIs.  (Id. ¶ 190.)  Plaintiffs point to Defendants' internal studies that allegedly demonstrate that the loyalty programs have curtailed generic entry and sustained higher prices than would otherwise prevail. (Id. ¶¶ 195-99.)

### B.  Procedural History

On September 29, 2022, Plaintiffs filed this action seeking declaratory, injunctive, equitable monetary relief, and civil penalties.  (Doc. 1.)  Defendants moved to dismiss the original complaint, after which Plaintiffs filed an amended complaint.

13

(Doc. 79; Doc. 149 (lesser-redacted complaint).) Now before the court are Defendants' motions to dismiss the amended complaint. (Docs. 94, 99.) Following this court's order granting the parties' respective motions to seal (Doc. 148), the operative public complaint is at docket entry 149.[5]

Plaintiffs allege sixteen counts under state and federal law. Under federal law, Plaintiff Federal Trade Commission ("FTC") alleges violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a), and all Plaintiffs allege violations of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. (Doc. 149 ¶¶ 203-10.) The remaining claims arise under state law and are raised by the states of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin.[6] (Id. ¶¶ 212-76.)

_____

[5] Separate similar actions brought by farmers have been consolidated by the United States Judicial Panel on Multidistrict Litigation and transferred to this court for pretrial proceedings. (See Doc. 78 in 1:23-md-3062 (amended consolidated complaint); In re Crop Protection Prods. Loyalty Program Antitrust Litig., 655 F. Supp. 3d 1380 (J.P.M.L. 2023).

[6] Specifically, the state law claims arise under California's Cartwright Act, California Business and Professions Code § 16700 et seq., and California's Unfair Competition Law, California Business and Professions Code § 17200 et seq.; the Colorado Antitrust Act, C.R.S. § 6-4-104 and C.R.S. § 6-4-105; Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 et seq.; the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 et seq. and the Indiana Antitrust Act, Ind. Code § 24-1-2-1; the Iowa Competition Law, Iowa Code Chapter 553, and the Iowa Consumer Fraud Act, Iowa Code § 714.16; the Minnesota Antitrust Law of 1971, Minnesota Statutes Sections 325D.49-.66; the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602 et seq., and Neb. Rev. Stat. § 84-212; the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836; the

Following oral argument on the motions to dismiss, they are ready for resolution.

## II. ANALYSIS

### A. Legal Background

#### 1. Motion to Dismiss Standard

A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). Rule 12(b)(6) must be read in light of Rule 8's standard that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to

---

Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.; Sections 15.20(a) and 15.20(b) of the Texas Business and Commerce Code and Section 402.006 of the Texas Government Code; the Washington Consumer Protection Act, RCW 19.86.030 et seq.; and the Wisconsin Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.

15

relief." Fed. R. Civ. P. 8(a)(2).

### 2. Federal Antitrust Statutes

Plaintiffs allege violations of the Sherman Act (sections 1 and 2) and Clayton Act (section 3), and Plaintiff FTC alleges violations of the Federal Trade Commission Act (section 5). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. A violation of Section 2 consists of two elements: (1) possession of monopoly power and (2) "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992). Monopoly power is defined as the ability "to control prices or exclude competition." United States v. Grinnell Corp., 384 U.S. 563 (1966) (internal quotation marks omitted). Although evidence of such ability is "only rarely available," courts turn to circumstantial evidence — such as a company's share of the market — to determine whether monopoly power exists. United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) (quoting

16

United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001)). Maintenance of that power requires some illegal conduct that forecloses competition, gains a competitive advantage, or destroys a competitor. Eastman Kodak, 504 U.S. at 482-83.

Section 3 of the Clayton Act makes it unlawful for

> any person engaged in commerce . . . to lease or make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

Section 5 of the FTC Act makes illegal "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The act, while not solely focused on antitrust, is "nonetheless linked to the antitrust laws." Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1989). The Supreme Court has stated that the act was "designed to supplement and bolster the Sherman Act and the Clayton Act, [] — to stop in their incipiency acts and practices which, when full blown, would violate those Acts." Fed. Trade Comm'n v. Motion Picture Advert. Serv. Co., 344 U.S. 392, 394-95 (1953) (internal citation omitted).

17

The act "functions as a kind of penumbra around the federal antitrust statutes," Chuck's Feed, 810 F.2d at 1292-93, such that any practice that violates the Sherman Act or the Clayton Act also violates the FTC Act. See Fed. Trade Comm'n v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986) ("The standard of 'unfairness' under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, [] but also practices that the Commission determines are against public policy for other reasons." (internal citations omitted)). The extent to which these four provisions impose varying requirements on a plaintiff is discussed in more detail below.

### 3. Exclusive Dealing

Plaintiffs allege that Defendants' loyalty rebate programs are illegal exclusive dealing arrangements. An exclusive dealing arrangement is one in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1800a (4th & 5th ed. 2023). Neither absolute exclusivity nor an express agreement is necessary for an exclusive dealing arrangement to violate antitrust laws. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 270, 282 (3d Cir. 2012); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a

18

substantial share of the relevant market." (emphasis added)). Although not "per se" illegal, exclusive dealing arrangements may give rise to cognizable claims under all four statutory provisions alleged here. See, e.g., Grinnell Corp., 384 U.S. at 576 (Sherman Act § 2); ZF Meritor, 696 F.3d at 281 (Sherman Act §§ 1 and 2, Clayton Act § 3); LePage's Inc. v. 3M, 324 F.3d 141, 157 & n.10 (3d Cir. 2003) (same); Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 996 (9th Cir. 2010) (Sherman Act § 1); McWane, Inc. v. Fed. Trade Comm'n, 783 F.3d 814, 827 (11th Cir. 2015) (FTC Act § 5).

Exclusive contracts serve many pro-competitive purposes. ZF Meritor, 696 F.3d at 270. On the demand side, they can assure supply, protect against rises in price, enable long-term planning based on known costs, and reduce the expense and risk of storing goods that have fluctuating demand. Standard Oil Co. v. United States, 337 U.S. 293, 306 (1949). On the supply side, they can substantially reduce selling expenses, protect against price fluctuations, justify and enable capital expenditures, and shield against counterattacks by competitors. Id. at 306-07. Indeed, "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought." Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.) (emphasis removed). Accordingly, whether a contract rises to

19

illegal exclusivity, "rather than merely a form of vigorous competition, can be difficult to discern[.]" Microsoft Corp., 253 F.3d at 58. "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad," posing a challenge for an antitrust court in "stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it." Id.

While exclusive dealing is formally a vertical restraint (e.g., as alleged here, a restraint between manufacturer and distributor), it has the potential to have adverse economic consequences on horizontal competition. Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring). More specifically, an exclusive dealing arrangement runs afoul of the antitrust laws when it unreasonably deprives other suppliers of a market for their goods or allows one buyer of goods unreasonably to deprive other buyers of a needed source of supply. Id. The potential collateral consequences of illegal exclusive dealing include higher prices, restricted output, reduced quality, or slower innovation. McWane, Inc., 783 F.3d at 827.

**B. Defendants' Grounds for Motion to Dismiss**

Defendants argue two primary grounds to dismiss the complaint: first, they contend that Plaintiffs fail to allege a relevant product market; and second, they argue that Plaintiffs

20

fail to allege anticompetitive conduct and injury. Syngenta further argues that the claims against Syngenta Crop Protection AG and Syngenta Corporation should be dismissed. Corteva argues that the FTC Act violates Article II of the U.S. Constitution, thus requiring dismissal of the complaint. And finally, all Defendants argue that the state law claims should be dismissed on a range of grounds.

The court turns first to the threshold question of whether Plaintiffs allege a relevant product market.

### 1. Relevant Product Market

Defendants contend that the complaint is defective because it fails to allege a cognizable product market. (Doc. 95 at 17; Doc. 100 at 37.) A relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Courts begin with a preliminary inquiry into market definition because it serves as the frame through which the court analyzes monopoly power and substantial market foreclosure. E.I. Du Pont De Nemours & Co. v. Kolon, 637 F.3d 435, 441 (4th Cir. 2011); Ind. Fed'n of Dentists, 476 U.S. at 460 ("[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." (emphasis in original)).

21

Plaintiffs allege two product markets in the United States. One is the AI itself, in both its finished and technical-grade form. (Doc. 149 ¶ 155.) The other is crop-protection products that contain the active ingredient. (Id.) Defendants do not contest the markets' geographical scope or that Plaintiffs allege more than one market.

Corteva argues that Plaintiffs' market definitions are only two sentences that vaguely describe general characteristics of the AIs that amount to "alleged advantages they have over other products." (Doc. 95 at 19.) In Corteva's view, Plaintiffs have an obligation to do more — namely, to explain why products without those characteristics are not reasonably interchangeable. (Id. at 18 (citing Bayer Schering Pharm AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011); Todd v. Exxon Corp., 275 F.3d 191, 200 (2d. Cir. 2001)).) In support, Corteva points to several EPA label registrations outside of the record that, per Corteva, demonstrate that the alleged product markets are both too narrow and too broad. This follows, according to Corteva, because these EPA label registrations show that the EPA has registered crop-protection products that (1) contain AIs within Plaintiffs' alleged markets but have different uses, and (2) are products outside of Plaintiffs' alleged markets but share similar uses. (Id. at 19-20.) Syngenta argues that Plaintiffs' market definition is unreasonably narrow because each market is only a single AI.

22

(Doc. 100 at 38-40.)  In support, Syngenta points to other antitrust proceedings outside of the record where the FTC and the U.S. Department of Justice have alleged broader crop-protection product markets with multiple AIs.  (Id. at 41-42.)  For example, Syngenta cites United States v. Bayer AG, 83 Fed. Reg. 27652, 27653 (DOJ June 13, 2018), as "analyzing alleged 'foundational herbicides' and 'nematicidal seed treatment' markets," and Ciba-Geigy Ltd., 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997), as "analyzing alleged 'corn herbicides for pre-emergent control of grasses' market — including metolachlor — and 'corn herbicides for post-emergent control of broadleaf weeds' market."  (Id.)  Syngenta contends that FTC's effort to allege narrower product markets here is not based on "different facts, but instead on the evolving philosophy of the FTC's Chair," and demonstrates that "FTC is attempting to gerrymander its way to an antitrust victory."  (Id. at 42 (internal quotation marks omitted).)

Plaintiffs respond that their product markets are supported by ample factual allegations.  (Doc. 150 at 52.)  Namely, Plaintiffs point to the conduct of Defendants, who design their loyalty programs around each individual AI.  (Id.)  Further, Plaintiffs allege "characteristics and uses" and "industry or public recognition" for each AI:

> Azoxystrobin has "growth-enhancing effects not proven in
> other active ingredients."  Mesotrione has "superior
> efficacy and crop safety" "[c]ompared to other, similar

23

herbicide active ingredients." Metolachlor "has superior water solubility," and "outperforms other active ingredients" in warmer and drier conditions. Rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" than similar chemicals. Oxamyl, unlike "similar insecticide active ingredients," "can be sprayed directly onto crops." And acetochlor "tends to perform better" than similar herbicides "in wetter and cooler conditions," and has "better weed control early in the growing season."

(Id. (quoting Doc. 149 ¶ 157) (internal citations omitted).) Plaintiffs also allege that each AI is distinguishable enough that farmers "may prefer it over others." (Id. at 54 (citing Doc. 149 ¶ 46).) Finally, Plaintiffs contest that the court should take judicial notice of the EPA label registrations and prior FTC and DOJ antitrust proceedings at this stage. (Doc. 150 at 58-59.)

A relevant product market must include all reasonably interchangeable products. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). The reasonable interchangeability of products is generally determined according to the cross-elasticity of demand for the product and its alternatives. It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 683 (4th Cir. 2016). In other words, courts look to the degree to which a defendant would sacrifice sales to alternative products by raising the price of its goods. Eastman Kodak, 504 U.S. at 469. It is therefore more than simply technical interchangeability. Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218 n.4 (D.C. Cir. 1986) (discussing functional substitutability as one

24

factor among many as it relates to "the economic criteria that make one market distinct from another").

Market definition is a question of fact. Kolon, 637 F.3d at 442 (collecting cases). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Id. (quoting Todd, 275 F.3d at 199-200). Nevertheless, there is "no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." Id. (quoting Todd, 275 F.3d at 199-200). "No party can expect to gerrymander its way to an antitrust victory without due regard for market realities." It's My Party, Inc., 811 F.3d at 683. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Kolon, 637 F.3d at 442 (quoting Todd, 275 F.3d at 199-200).

Under this fact-intensive inquiry, the scope of the relevant product market differs on a case-by-case basis. For example, in Eastman Kodak, 504 U.S. at 481-82, the Supreme Court held that a properly constituted market may be comprised of a single product. In the pharmaceutical context, lower courts have ruled that a brand-name drug and its generic analogs can comprise a relevant

25

product market. <u>In re Zetia (Ezetimibe) Antitrust Litig.</u>, MDL No. 2:18-md-2836, 2021 WL 6689718, at *18-20 (E.D. Va. Nov. 1, 2021), <u>adopted in full by</u> 587 F. Supp. 3d 356 (E.D. Va. 2022); <u>In re Nexium (Esomeprazole) Antitrust Litig.</u>, 968 F. Supp. 2d 367, 388 (D. Mass. 2013); <u>In re Cardizem CD Antitrust Litig.</u>, 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000) (accepting plaintiffs' contention on motion to dismiss that branded and generic versions of heart medication constitute a single market), <u>aff'd</u>, 332 F.3d 896 (6th Cir. 2003). Whether a market is plausible when comprised of a single product — or many products — "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." <u>Eastman Kodak</u>, 504 U.S. at 482 (quoting <u>Grinnell Corp</u>, 384 U.S. at 572).

Courts employ a variety of methods to determine if a product market is properly constituted. Plaintiffs urge the court to consider (1) the Defendants' own conduct; (2) the "hypothetical monopolist test"; and (3) the factors set out in <u>Brown Shoe</u>, 370 U.S. 294. (Doc. 150 at 49-52.) Courts generally consider Plaintiffs' first proposed methodology — the Defendants' own conduct and recognition of the market — under the assumption that "economic actors usually have accurate perceptions of economic realities." <u>Todd</u>, 275 F.3d at 205 (collecting cases) (quoting <u>Rothery Storage</u>, 792 F.2d at 218 n.4); <u>Kolon</u>, 637 F.3d at 442-43 (considering the "area within which the defendant and its

competitors view themselves as competing").

Plaintiffs' second proposed methodology is the hypothetical monopolist test ("HMT"). The HMT is an aid in determining if the relevant product is properly constituted. The court begins by hypothesizing that every good as alleged in the product market is under the control of a hypothetical monopolist. United States v. Am. Express Co., 838 F.3d 179, 198-99 (2d. Cir. 2016). Under such conditions, if the hypothetical monopolist could profitably impose a small but significant and nontransitory increase in price ("SSNIP"), then the product market is properly defined. Id. By contrast, the product market is improperly defined when the hypothetical monopolist imposes the SSNIP unprofitably because the alleged market does not include reasonably interchangeable goods — i.e., goods that consumers will shift demand toward in light of the SSNIP. Id. While the Fourth Circuit has yet to endorse this test, other circuits have at least acknowledged it or outright embraced it as a viable methodology in the context of defining markets. See, e.g., Fed. Trade Comm'n v. Penn State Hershey Med. Ctr., 838 F.3d 327, 339-41 (3d Cir. 2016) (adopting HMT as proper test to define market); Fed. Trade Comm'n v. Sanford Health, 926 F.3d 959, 964 (8th Cir. 2019) (holding not clear error to define relevant market with HMT); Fed. Trade Comm'n v. Advocate Health Care Network, 841 F.3d 460, 473 (7th Cir. 2016) (endorsing HMT); Am. Express Co., 838 F.3d at 198-99 (2d Cir. 2016) ("[T]his Court

27

often applies a 'hypothetical monopolist test[.]').

Plaintiffs' third proposed methodology is the Brown Shoe factors. In Brown Shoe, the Court endorsed considering the following factors when defining a product market: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325. Notably, the D.C. Circuit has observed that some of these factors are merely "evidentiary proxies for direct proof of substitutability." Rothery Storage, 792 F.2d at 218. The Rothery court noted that while sensitivity to price changes, distinct prices, and unique production facilities "relate directly to the economic definition of the market," the other factors require inferential reasoning to draw economic conclusions and "may be helpful where the other indicia are ambiguous." Id. at 218 n.4.

Turning to Defendants' arguments, the court finds unpersuasive Defendants' contention that Plaintiffs must explain in their complaint why certain AIs or crop-protection products are excluded from the markets. To the extent Defendants' cases demonstrate a burden on antitrust plaintiffs to explain a negative, they are either anomalous or distinguishable. For example, in Bayer-Schering, 813 F. Supp. 2d 569, the court appeared to apply enhanced scrutiny to the alleged product market because the

28

counterclaimant amended its product market inconsistently with its original counterclaim. Id. at 576-77 ("Sandoz's contradictory pleadings counsel that this Court closely scrutinize the amended counterclaims in ensuring that they meet Rule 12(b)(6) standards."). Through this lens, the court analyzed particular alternatives outside of the alleged market, many of which, it appears, the counterclaimant introduced into the record itself. Id. Whatever caused the Bayer-Schering court to impose this burden and analyze particular products, the Fourth Circuit has suggested that such scrutiny is misguided on a motion to dismiss. See, e.g., Kolon, 637 F.3d at 442 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." (quoting Todd, 275 F.3d at 199-200)).

Defendants' other cases fare no better. For example, in Therapearl, LLC v. Rapid Aid Limited, Civil No. 13-2792, 2014 WL 4794905 (D. Md. Sept. 25, 2014), the court dismissed a Sherman Act claim for failure to plead a product market because the plaintiff did not even attempt an explanation of why the market was limited and "made no allegations concerning" reasonable interchangeability. In Global Discount Travel Services, LLC v. Trans World Airlines, Inc., 960 F. Supp. 702, 706 (S.D.N.Y. 1997), the court found the product market was improperly pleaded because the plaintiff included only its brand in the product market and

29

made no plausible explanation as to why other competitors did not supply interchangeable products. And in Chapman v. New York State Division for Youth, 546 F.3d 230, 238 (2d Cir. 2008), the court found a product market too narrow where the plaintiff did not provide "any theoretically reasonable explanation for restricting the product market." Here, Plaintiffs have included such an explanation and include in the market products beyond just those of Defendants (namely, the generics).

Moreover, the court is unpersuaded that taking judicial notice of the EPA label registrations and FTC and DOJ antitrust matters would materially alter the court's analysis at this stage. While the court, under Federal Rule of Evidence 201, may take judicial notice of facts that are "matters of public record," Justice 360 v. Stirling, 42 F.4th 450, 455 (4th Cir. 2022), Defendants ask the court to also accept their interpretation of facts within the cited public records. The EPA registrations may be probative of interchangeability, but they appear to speak to interchangeable function, not whether and how these crop-protection products are interchangeable in the marketplace — i.e., cross-elasticity of demand. In re Nexium, 968 F. Supp. 2d at 388 (finding it "immaterial" on a motion to dismiss that other pharmaceuticals could be used to treat the same symptoms because function does not necessarily speak to cross-elasticity of demand among consumers). At a minimum, the EPA label registrations raise

fact questions, which are ill-suited for determination at the pleading stage. And while the prior FTC and DOJ antitrust proceedings may suggest some inconsistency in how the government views the crop-protection product market, the court must consider each antitrust dispute on a case-by-case basis. Eastman Kodak, 504 U.S. at 467 (demonstrating preference to resolve antitrust claims "on a case-by-case" basis); (See Doc. 100 at 41-42 (citing Ciba-Geigy Ltd., 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997), because FTC alleged in merger action a broader product market of "corn herbicides").) As a result, even if the court took judicial notice of these facts outside of the record, they would not materially impact the court's analysis at this stage.

Defendants' other arguments fall short as well. Plaintiffs have alleged plausible, albeit narrow, product markets. The reasoning applied in cases analyzing the relevant product market for pharmaceuticals, specifically that a plausible product market may consist of a brand chemical and its generic alternative, is instructive. See In re Nexium, 968 F. Supp. 2d at 388-89; In re Zetia, 2021 WL 6689718 at *19 (finding proper a product market consisting of brand drug and generic on summary judgment). Additionally, Plaintiffs have plausibly alleged facts that show that there is limited cross-elasticity between the products inside and outside of Plaintiffs' alleged markets. For example, Plaintiffs allege that Defendants' prices would fall significantly

31

upon entry of a generic of the same AI. (See Doc. 149 ¶¶ 92, 121, 127, 144, 150, 158; Doc. 81 ¶¶ 101, 119 (demonstrating anticipated market devaluation upon generic entry).) The alleged effect on price resulting from generic entry plausibly suggests that the AI in each alleged product market does not already face substantial competition from products outside the alleged market. See Areeda & Hovenkamp, supra ¶ 561b2 ("[I]f the price of one incumbent product drops significantly in response to new entry, while the prices of other incumbents do not, then that first incumbent product, plus the new entrant, is very likely a market."). Moreover, Defendants' own alleged conduct, namely that Defendants' own loyalty programs cover only individual AIs, plausibly suggests that Defendants view the market as including only one AI but not others. (Doc. 149 ¶¶ 67, 76); Todd, 275 F.3d at 205 (crediting evidence of defendant's conduct as suggestive of scope of product market). Finally, Plaintiffs plausibly allege characteristics that make each AI unique in the marketplace, that alternatives are not considered by farmers as suitable, and that farmers prefer specific AIs. (Doc. 149 ¶¶ 46, 157.)

In sum, Plaintiffs have alleged a plausible explanation as to why the market should be limited as alleged. Cf. Kolon, 637 F.3d at 442. Whether, as Defendants argue, they have the better of the argument after the facts develop, and the evidence is weighed, must await another day. As a result, Defendants' motion to dismiss

for failure to plausibly allege a product market will be denied.

## 2. Anticompetitive Conduct and Injury

Defendants argue that Plaintiffs have not plausibly alleged anticompetitive conduct and injury. (Doc. 95 at 21; Doc. 100 at 25.) The parties dispute first which legal test the court should apply to Defendants' loyalty programs, and second, depending on the test applied, whether Plaintiffs have alleged anticompetitive conduct and injury. The court considers each in turn for the purposes of the instant motion.

### a. The Rule of Reason and Price-Cost Test

Defendants urge the court to apply the "price-cost" test, arguing that Plaintiffs failed to allege facts to survive this measure of anticompetitive conduct. (Doc. 95 at 24; Doc. 100 at 22-23.) As suggested by its name, where the price-cost test is applied, alleged conduct may only be illegal if the price is set below the cost. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993). Plaintiffs appear to concede that the complaint does not allege prices below cost. (Doc. 150 at 43 ("Plaintiffs do not bring a predatory-pricing claim.").) This concession would seemingly short-circuit Plaintiffs' antitrust claims if the price-cost test applies. Plaintiffs maintain, however, that the court would gravely err in applying the price-cost test, arguing instead that the court must apply the default "rule of reason." (Doc. 150 at 39-40.) Under that test,

33

an exclusive dealing arrangement is unlawful only if its "probable effect" is to substantially lessen competition in the relevant market. Tampa Elec., 365 U.S. at 327-29.

As a matter of principle, antitrust law is not intended to prevent all price-cutting. Brooke Grp., 509 U.S. at 223 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990)). In fact, competitors should generally be enabled to cut prices to a certain extent — even to increase market share — without running afoul of the antitrust laws. Id. ("The antitrust laws require no such perverse result." (quoting Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 116 (1986)). Low prices that are still above-cost are generally procompetitive because "the exclusionary effect of prices above a relevant measure of cost [generally] reflects the lower cost structure of the alleged predator, and so represents competition on the merits." Id. at 222-24.

On the other hand, predatory pricing harms competition. Predatory pricing occurs where a company sets prices below cost to eliminate competitors in the short run and reduce competition in the long run. Cargill, 479 U.S. at 117. Such a pricing scheme is "rarely tried, and even more rarely successful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986). "For

34

such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supracompetitive phase." ZF Meritor, 696 F.3d at 272 (citing Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318 (2007)).

To separate the competitive wheat from the predatory chaff, the Supreme Court devised the price-cost test: to succeed on a predatory pricing claim, a plaintiff must demonstrate (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the defendant had "a dangerous probability . . . of recouping its investment in below-cost prices." Id. (quoting Brooke Grp., 509 U.S. at 222-24). In fashioning this formalistic approach, the Court acknowledged that the price-cost test will miss some anticompetitive above-cost pricing, but that it "is beyond the practical ability of a judicial tribunal" to ascertain whether above-cost pricing is anticompetitive "without courting intolerable risks of chilling legitimate price-cutting." Id. at 273.

Where the price-cost test does not apply, courts apply the rule of reason to exclusive dealing arrangements.[7] Tampa Elec.,

---

[7] The ZF Meritor court indicated that the price-cost test is a "specific application of the rule of reason" when applied in the context of exclusive dealing. ZF Meritor, 696 F.3d at 273; see also In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 44 F.4th 959, 983 n.7 (10th Cir. 2022) (quoting ZF Meritor's "specific application" language and referring to the Tampa Electric analysis as the "full rule of reason

35

365 U.S. at 327.  "[E]xclusive dealing arrangements violate the antitrust laws only if they are likely to foreclose the entry into a substantial part of the market of products that compete with the products benefitting from the exclusive dealing arrangement." Chuck's Feed, 810 F.2d at 1293 (citing Standard Oil Co. v. United States, 337 U.S. 293, 314 (1949)).  The Supreme Court set out the following considerations when analyzing an exclusive dealing arrangement:

> [T]he probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

Tampa Elec., 365 U.S. at 329.  The concern of the courts about exclusive dealing arrangements is "the possibility that a single manufacturer will control all or a substantial number" of the available options for a certain kind of product in a specified geographical area.  Chuck's Feed, 810 F.2d at 1293 (addressing concern in the context of retail markets).

　　To succeed on an exclusive dealing claim, a plaintiff must

---

analysis"); UniStrip Techs., LLC v. LifeScan, Inc., 153 F. Supp. 3d 728, 736 (determining whether to apply the "'price cost test' or the 'rule of reason'"); In re Surescripts Antitrust Litig., 608 F. Supp. 2d 629, 636 (N.D. Ill. 2022) (describing the "apt test" as the "rule of reason," as opposed to the "price-cost test"); cf. Atl. Richfield, 495 U.S. at 342 ("Per se and rule-of-reason analysis are but two methods of determining whether a restraint is "unreasonable," i.e., whether its anticompetitive effects outweigh its procompetitive effects.").

prove (1) the relevant product market; (2) the geographical area of competition for the product market; and (3) that the arrangement at issue extends to a "substantial share of the relevant market." Id. (citing Tampa Elec., 365 U.S. 327-28). If a court finds substantial foreclosure, it must still consider "whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies." Id. at 1294 (citing Cont'l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 57-58 (1977); Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 343 (1982)). Substantial foreclosure has been found "even though the contracts foreclose[d] less than [a] roughly 40% or 50% share." Microsoft, 253 F.3d at 70 (Sherman Act § 2 claim).

The Supreme Court's price-cost line of cases demonstrates that the price-cost test applies at least where a pricing practice itself operates as the exclusionary tool, regardless of how the plaintiff styles its allegations. In Pacific Bell Telephone Company v. Linkline Communications, Incorporated, for example, the defendant, which sold inputs at wholesale and finished goods at retail, allegedly drove competitors out of the market by raising the wholesale price while simultaneously lowering the retail price. 555 U.S. 438, 457 (2009). The Supreme Court analyzed this "price-squeezing" claim under Brooke Group, holding that the scheme was permissible because "the defendant's retail price remain[ed] above cost." Id. at 451-52. In Cargill, Incorporated

37

v. Monfort of Colorado, Incorporated, the Supreme Court rejected a plaintiff's theory of antitrust injury where the plaintiff alleged that the defendant's merger would lead to reduced prices that were still at or above cost. 479 U.S. at 114-16. And in Atlantic Richfield Company v. USA Petroleum Company, the plaintiff alleged that the defendant, a gasoline manufacturer, had engaged in price-fixing by offering its dealers discounts and rebates to stave off competition from independent dealers. 495 U.S. at 331-32. The Supreme Court held that where a firm or group of firms lowers prices through a vertical agreement, but maintains prices above cost, competitors' losses are attributable to procompetitive forces, not anticompetitive predatory pricing. Id. at 337-38.

Lower courts have nevertheless grappled with the question of when to apply the price-cost test when it is not clear that a company engages merely in "price-cutting" — e.g., when a company offers discounts in exchange for purchasing a certain percentage of goods from that company. To be sure, courts have in some cases applied the test to above-cost discounting in such instances. For example, in NicSand Incorporated v. 3M Company, two suppliers of automotive sandpaper competed for business with six large retailers that controlled 80% of the retail market. 507 F.3d 442, 447 (6th Cir. 2007). Five out of the six retailers sold only one brand at a time, meaning each retailer sold only either NicSand or 3M, but not both. Id. In order to obtain that exclusive shelf-

38

space, NicSand or 3M had to offer a favorable price and meet a number of additional terms, such as providing a full line of automotive sandpaper and providing the racks for the shelves. Id. at 448. For years, NicSand dominated the shelves in four of the five retailers that insisted on single-brand shelves. That is, until 3M offered retailers up-front payments worth hundreds of thousands of dollars in exchange for switching to 3M. Id. The Sixth Circuit applied the price-cost test in rejecting NicSand's claim. In doing so, the court reasoned that exclusivity was an essential feature of this specific retail market because the retailers (i.e., the buyers) required exclusivity, and that NicSand, as the market incumbent, could not now complain that 3M had knocked it from its perch using similar exclusive terms it had previously utilized. Id. at 456 ("When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury."). Ultimately, the court found that the up-front payments 3M offered were a pricing measure that the retailers "insisted on receiving" in order to switch suppliers. Id. at 453.

The Eighth Circuit, in Concord Boat Corporation v. Brunswick Corporation, 207 F.3d 1039 (8th Cir. 2000), applied the price-cost test to the plaintiffs' Sherman § 2 claim and the rule of reason to the plaintiffs' Sherman § 1 claim, albeit with little discussion as to why the court applied different tests to the different

claims.  The defendant, Brunswick, offered market-share discounts
to boat builders and dealers in order to increase the sales of its
engines.  Id. at 1044.  From 1995 to 1997, Brunswick offered a 3%
discount if a buyer purchased 70% of its engines from the
defendant, a 2% discount for 65% of its engines, and a 1% discount
for 60% of its engines.  Id.  Brunswick also offered additional
discounts to anyone who signed a multi-year market-share agreement
and to those who purchased a higher volume of engines (i.e., a
volume discount).  Id.  Analyzing the plaintiffs' section 1 claim
under the rule of reason because the plaintiffs did not allege
activity that would "trigger a per se analysis," the Eight Circuit
held that the plaintiffs failed to establish that Brunswick's
discount program was anticompetitive exclusive dealing because
boat builders were not required to commit for a specified time
period and many had switched to other sellers when offered superior
discounts.  Id. at 1058-59.  Moreover, the court held that the
plaintiffs did not show that "significant barriers to entry
existed" in the market because firms had little difficulty entering
the market.  Id.  Then, applying the price-cost test to plaintiffs'
section 2 claim, the court held that Brunswick's loyalty program
was a "normal competitive tool" because its prices remained above
variable cost.  Id. at 1062.  Though not apparently necessary to
justify this holding, the court reiterated that the discount
program was not exclusive dealing, that the boat builders could

walk away at any time (and did so), and that there were low barriers to entry.  Id. at 1063.

Equipped with these precedents, the Third Circuit in ZF Meritor dealt more explicitly with which of the two tests to apply when presented with another loyalty discount program.  In that case, the defendant, Eaton, had about an 80% market share in the manufacture of heavy-duty truck transmissions and introduced loyalty contracts that provided both upfront payments and rebates to four major truck manufacturers that purchased truck transmissions.  ZF Meritor, 696 F.3d at 265, 286 n.5.  These contracts lasted for at least five years and would scale discounts based on the percentage of goods the manufacturers purchased from the defendant.  Id. at 265.  Generally, the market-share targets ranged from 85% to 95%.  Id.  Eaton included additional terms beyond the discounts.  Notably, Eaton retained the right to terminate the agreements if the market share figures were not met, and if the manufacturers did not meet the market-share figure for one year, Eaton could require "repayment of all contractual savings."  Id.  Moreover, direct-from-manufacturer truck buyers could customize certain equipment, including transmissions, and could browse options in the manufacturers' catalogues.  Eaton's agreements required that its transmissions be featured as the standard offering in the catalogues and even required the removal of competitors' products in two of the four manufacturers'

41

catalogues. Id. Further, the manufacturers were contractually required to price competitors' products above those of Eaton. Id. at 265-66.

The ZF Meritor court weighed whether to apply the price-cost test or the rule of reason to Eaton's agreements. Id. at 268. The court noted that the price-cost test "would control if this case presented solely a challenge to Eaton's pricing practices." Id. at 273-74. However, the court credited testimony that demonstrated that manufacturers were forced to meet the market-share targets, or else risk financial penalties, supply shortages, or severed ties with the market-dominant defendant entirely. Id. at 277. Because Eaton was a monopolist, the court reasoned, forgoing the rebates and "losing Eaton as a supplier was not an option." Id. at 278.

The court stated that "this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price." Id. (citing Concord Boat, 207 F.3d at 1063 as a counter-analogy). Put another way, Eaton's de facto exclusive dealing arrangements drove out other firms "not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand." Id. at 281. The court held that when price itself is

42

not the "clearly predominant mechanism of exclusion," the price-cost test does not apply. Id. at 277.[8]

A few years later, the Third Circuit revisited ZF Meritor in the pharmaceutical context. Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394 (3d Cir. 2016). In that case, Eisai alleged that Sanofi Aventis engaged in three modes of anticompetitive conduct in the market for anticoagulant drugs in U.S. hospitals: "(1) market-share and volume discounts, (2) a restrictive formulary access clause, and (3) aggressive sales tactics used to market the program." Id. at 400. Specifically, Sanofi offered a baseline 1% discount for a market-share below 75% and a scaled discount from 9% to 30% for market-shares above 75%. Id. The court ultimately held that Sanofi's program was distinguishable from that in ZF Meritor because the discounts were not de facto mandatory, did not threaten repayment of contractual savings, and did not threaten refusal to deal in the future. Id. at 406. The court nevertheless refrained from commenting on whether the price-

---

[8] In dissent, Judge Greenberg disagreed with the majority's view that the agreements were exclusive dealing and instead would have applied the price-cost test. ZF Meritor, 696 F.3d at 349 (Greenberg, J., dissenting). He principally disagreed with the majority's characterization of Eaton's conduct as coercive, as he viewed the agreements as neither exclusive nor mandatory and contended that there was no evidence "that Eaton would have refused to supply transmissions to the [manufacturers]" if they failed to meet the market share targets. Id. at 312. Moreover, Judge Greenberg took the position that the price-cost test should apply in a situation such as this because the agreements themselves — with or without non-price features — would not exist "without the reduced prices that Eaton offered" as an incentive to enter the agreement in the first place. Id. at 321.

43

cost test applied because, even under the rule of reason test applied in ZF Meritor, the plaintiff's claims failed due to insufficient evidence of market foreclosure.  Id. at 408-09.

The Third Circuit's approach suggests that loyalty discount arrangements may be pure (or nearly pure) pricing schema, and in such situations, the price-cost test applies neatly.  See, e.g., NicSand, 507 F.3d at 453.  However, an arrangement may include other allegedly coercive mechanisms that impose costs on competitors to enter the market such that price is not "clearly" doing the work of exclusion.  Following the Third Circuit's formulation, other circuits have since relied upon and cited ZF Meritor where the defendant offers loyalty discounts.  See, e.g., In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 545 F. Supp. 3d 922, 1016-17 (D. Kan. 2021) (explicitly applying the "clearly predominant mechanism of exclusion" analysis), aff'd, 44 F.4th 959 (10th Cir. 2022) (observing that ZF Meritor and other Third Circuit precedent "merit close consideration in this case"); McWane, 783 F.3d at 835 (citing ZF Meritor to justify a rule of reason approach to exclusive dealing cases); Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1182-83 (9th Cir. 2016) (citing ZF Meritor as a counter-analogy for situation with "extra-contractual conditions, or preferential treatment terms"); see also Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 32 (S.D.N.Y. 2016) (citing and applying ZF Meritor's "clearly predominant

44

method of exclusion" test in non-loyalty discount exclusive dealing case).

ZF Meritor appears to balance the important concerns the Supreme Court has identified in over-regulating price-cutting schema, see Matsushita, 475 U.S. at 594 ("[M]istaken inferences in [pricing cases] cases . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect."), and under-regulating exclusive dealing, see Jefferson Par., 466 U.S. at 45 (O'Connor, J., concurring) ("Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]"). The ZF Meritor approach counsels applying the price-cost test where a pricing practice is clearly doing the work of exclusion and the rule of reason where there are mechanisms beyond price-cutting that exclude competition by imposing unilateral costs on competitors.

The parties do not appear to disagree with the above analysis. (Doc. 100 at 25; Doc. 95 at 24-25; Doc. 150 at 41.) Rather, they depart on whether price clearly predominates over other mechanisms of exclusion in this case. Syngenta argues that Plaintiffs do not plead "any of the non-price coercive features that courts have required" before finding a market-share rebate program anticompetitive. (Doc. 100 at 27.) Further, Syngenta argues, the single-year and single-product scope of the rebates undermines

45

Plaintiffs' claim that price clearly predominates. (Id. at 29.) Syngenta dismisses Plaintiffs' allegation that it terminated a distributor as an "isolated allegation" that is "simply not probative of the program itself." (Id. at 30 (emphasis removed).) Finally, Syngenta characterizes Plaintiffs' allegations regarding Defendants' agreement whereby Syngenta supplies mesotrione and s-metolachlor for Corteva's use as an "effort to muddy the waters." (Id. at 32.)

Corteva first argues that "Plaintiffs' allegations make clear that price is the primary means of exclusion, but do not allege that Corteva's programs fail the price-cost test." (Doc. 95 at 25.) Corteva specifically contends that Plaintiffs do not allege long-term contract terms or exclusions from supply based on noncompliance, which are recognized non-price conditions that would trigger the default rule of reason. (Id. at 26.) Second, Corteva claims that its term that defers a certain percentage of rebates into subsequent years and retracts unpaid rebates for noncompliance is "no more than a 'threat of a lost discount'" that is, in its view, not anticompetitive. (Doc. 98 at 26.)

Third, Corteva claims that conditioning the Corporate Offer on compliance with the CRPIVM is not anticompetitive "bundling." (Id. at 27-28.) Bundling occurs "when a firm sells a bundle of goods . . . for a lower price than the seller charges for the goods . . . purchased individually." Cascade Health Sols. v.

46

PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008). In Corteva's view, the Corporate Offer "just offers an additional discount to Corteva's customers who do buy products covered by the [Corporate Offer]." (Doc. 95 at 28.) Fourth, Corteva contends that the court "should not credit [P]laintiffs' unsupported, conclusory and nonspecific allegations that 'Defendants have retaliated and threatened to retaliate' against distributors that have failed to satisfy loyalty by cancelling distribution contracts or withholding access to supply." (Id.)[9]

Plaintiffs argue in response that Defendants mischaracterize their own discount program as a pricing scheme. (Doc. 150 at 35.) Plaintiffs point to the complaint's allegations that "Defendants have 'threatened to retaliate . . . against [disloyal] distributors . . . by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage." (Id. at 36 (citing Doc. 149 ¶ 88).) Plaintiffs further maintain that they allege that each Defendant "follow[ed] through" on their threats by refusing to sell pesticides or

_____

[9] Corteva argues that this litigation was filed well over four years after the loyalty programs were allegedly put in place, outside the four-year statute of limitations provided for in the Sherman Act and Clayton Act. (Doc. 95 at 29-30.) In its briefing on its motion to dismiss the original complaint, Corteva argued that those claims therefore "long ago expired." (Doc. 70 at 23-24.) Though Corteva does not claim that now, and while Plaintiffs responded to Corteva's suggestion by noting, among other bases, the continuing violation doctrine, (Doc. 150 at 67-68), the court concludes that the issue is not fairly raised in Corteva's brief and therefore does not consider it.

47

limiting sales of an insecticide to two distributors. (Doc. 112 at 36 (citing Doc. 81 ¶ 88).) Plaintiffs respond to Defendants' argument — that these are isolated incidents that do not exemplify the program — by arguing that the reasonable inference which must be drawn in Plaintiffs' favor at this stage is that limited instances of retaliation are evidence of the loyalty program working as intended. (Id. at 37-38.) Plaintiffs also contend that the one-year length of the agreements triggers no presumption that the contracts are lawful and that looking to the practical effect of agreements demonstrates "long-term foreclosure." (Id. at 38-39.) Plaintiffs finally argue that even if the price-cost test applies to the Sherman Act and Clayton Act claims, it does not apply to the FTC Act claim. (Id. at 45-47.)

In other loyalty discount cases, courts have observed a number of non-price mechanisms of exclusion, such as provisions aggravating existing barriers to enter the market, McWane, Inc., 783 F.3d at 836; In re Surescripts Antitrust Litig., 608 F. Supp. 3d 629, 645 (N.D. Ill. 2022); whether the buyer insists on exclusive dealing, NicSand, 507 F.3d at 456; contractual obligations to purchase a set percentage of products from the defendant, Allied Orthopedic, 592 F.3d at 997 n.2; discounts involving tying or bundling, Eisai, 821 F.3d at 405; LePage's, 324 F.3d at 157-58; threats to retract unpaid rebates or claw back discounts from prior years, McWane, 783 F.3d at 820-21; threats to

48

cut off supply from a monopolist, ZF Meritor, 696 F.3d at 278; requirements to exclude competitors from marketing materials, id.; and the length of time of the discounting agreements, McWane, 783 F.3d at 820-21. While these cases are instructive, each antitrust case "must be determined upon the particular facts disclosed by the record, and . . . the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 579 (1925).

Here, Plaintiffs have alleged sufficient non-price mechanisms of exclusion to foreclose application of the price-cost test as a matter of law at this pleading stage. First, the complaint plausibly alleges that the loyalty programs leverage the Defendants' monopolist status and the market's substantial barriers to entry to exclude competition for the AIs. (Doc. 149 ¶ 160.) Among the alleged "capital, technical, regulatory and legal barriers" are "obtaining registration from the EPA, developing manufacturing processes and sourcing active ingredient, and paying data compensation costs to the initial active ingredient registrant." (Id.) While high entry barriers alone may not trigger the rule of reason, Plaintiffs have plausibly alleged that Defendants' use of the loyalty discounts — as alleged monopolists

49

relating to production of the AIs — exacerbates the already high costs to enter the market by locking up access to the most efficient channel of distribution. See McWane, 783 F.3d at 836; ZF Meritor, 696 F.3d at 284-85 (applying rule of reason where high barriers existed in high-concentration market); Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting) ("Behavior that might otherwise not be of concern to the antitrust laws . . . can take on exclusionary connotations when practiced by a monopolist.")

Second, the complaint alleges not only that Defendants threatened to cut off supply, but that each Defendant followed through on that threat, albeit in limited instances. (Doc. 149 ¶ 88.) While Defendants contend that these do not exemplify the program, the court must draw all reasonable inferences in Plaintiffs' favor at this stage. Such instances plausibly support the claim that Defendants' threats to restrict supply are effective deterrence against non-compliance. (See id. ¶ 84 (alleging that Defendants communicate adherence to loyalty thresholds to distributors).) The complaint plausibly alleges that the threats to restrict supply factors into distributors' purchasing decisions.

Third, while the length of the agreements is facially one year, the alleged yearly renewals and threat of retaliation are claimed to have a longer-term effect. (Id. ¶¶ 164, 172.) Further, Corteva's agreements allegedly contain terms that defer payments

50

into subsequent years and require forfeiture of unpaid discounts for non-compliance. (Doc. 81 ¶ 78.)

Fourth, Corteva's agreements allegedly share some features with bundling because Corteva offers terms that link discounts for any one AI to compliance with the loyalty threshold for all AIs in a distributor's offer and that link discounts under the Corporate Offer to compliance with the CPRIVM offer. (Id. ¶ 79.)

Finally, Plaintiffs plausibly allege that the Syngenta-Corteva supply agreement for mesotrione and metolachlor allegedly enhances the exclusive effect of the loyalty programs. (Doc. 149 ¶¶ 109, 122.)

Whether these non-price mechanisms have the alleged exclusive effect vis-à-vis price will depend on the development of the record. In light of these plausible allegations, Defendants have not demonstrated at this stage that price clearly predominates over non-price mechanisms of exclusion.

Defendants' other arguments do not alter this analysis. First, that the loyalty discounts cover a single product (i.e., each individual AI) does not necessarily mean that price clearly predominates. While Defendants cite to ZF Meritor and Eisai for this proposition, neither supports it. In ZF Meritor, the Third Circuit did state, "we join our sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market." ZF Meritor,

51

696 F.3d at 274 n.11 (citing NicSand, 507 F.3d at 452; Concord

Boat, 207 F.3d at 1061; Barry Wright, 724 F.2d at 236). In making

this observation, the Third Circuit was distinguishing LePage's v.

3M, 324 F.3d 131 (3d Cir. 2003), where the court did not apply the

price-cost test because the alleged conduct involved "bundling"

across multiple products. Id. The court reasoned that LePage's

should not extend to the facts of ZF Meritor, where "only one

product is at issue and the plaintiffs have not made any

allegations of bundling." ZF Meritor, 696 F.3d at 274 n.11.

Though the court stated that the price-cost test "applies" to a

single-product discount, the ZF Meritor court itself applied the

rule of reason — not the price-cost test — to a single-product

discount. This indicates that the price-cost test can apply where

there is a single-product market, not that it must. Defendants'

reliance on Eisai fares no better, as the Third Circuit stated

that pricing "usually" predominates over other means of

exclusivity when "a firm uses a single-product loyalty discount or

rebate to compete with similar products." Eisai, 821 F.3d at 409.

However, the court ultimately refrained from applying the price-

cost test because the plaintiff's claim failed under Tampa Electric

as well. Id. at 409 ("Because we have concluded that Eisai's

claims are not substantiated and that they fail

a rule of reason analysis, we will not opine on when, if ever,

the price-cost test applies to this type of claim."). Notably,

52

neither ZF Meritor nor Eisai was decided at the pleadings stage but after the development of a factual record. ZF Meritor was decided on post-trial motion, and Eisai was decided on motion for summary judgment. Though the price-cost test may apply to certain loyalty discount programs, the Supreme Court admonishes that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities" are "generally disfavored" and that courts should resolve antitrust cases on a case-by-case basis, "focusing on the 'particular facts disclosed by the record.'" Eastman Kodak, 504 U.S. at 466-67 (quoting Maple Flooring, 268 U.S. at 579).

Second, at least at this early stage, it is not clear that the single-year term of the loyalty discount agreements mandates application of the price-cost test as a matter of law. Defendants contend that the single-year term of their agreements in this case "are presumptively incapable of harming competition." (Doc. 100 at 29.) While long-term exclusive dealing has been found to factor in favor of finding anticompetitive injury, ZF Meritor, 696 F.3d at 286-87, Defendants have not demonstrated that any such presumption exists. Rather, the cases Defendants cite for this position show that courts have weighed short duration in determining anticompetitive effects, not presumed a lack of anticompetitive effects. See R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 391-93 (M.D.N.C 2002), aff'd sub

53

nom. <u>RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.</u>, 67 F. App'x 810 (4th Cir. 2003) (unpublished) (considering contract length along with percentage of foreclosure and costs of switching to other vendors); <u>see also</u> <u>In re EpiPen Mktg.</u>, 44 F.4th at 988 ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination." (collecting cases)); <u>Allied Orthopedic</u>, 592 F.3d at 997 ("The 'easy terminability' of an exclusive dealing arrangement 'negate[s] substantially [its] potential to foreclose competition.'" (quoting <u>Omega Env't, Inc. v. Gilbarco, Inc.</u>, 127 F.3d 1157, 1163-64 (9th Cir. 1997))). Here, Plaintiffs allege that Defendants' renewable single-year contracts create long-term competitive harms, including cutting off supply and, in Corteva's case, deferring rebates into subsequent years conditioned on further compliance with meeting market-share. <u>See</u> <u>Dentsply</u>, 399 F.3d at 193-94 (finding "strong economic incentive to continue" compliance with market-share agreement despite "legal ease with which the relationship can be terminated"); <u>McWane</u>, 783 F.3d at 833-34 (finding anticompetitive injury even though exclusive dealing was "short-term and voluntary"). Moreover, each of the AIs has been in a loyalty program for at least four years, and one has been included for almost two decades. (Doc. 149 ¶¶ 93, 102, 115, 127, 137, 146.) While the annual length of the agreements is

54

generally a factor that favors Defendants, the court must draw all reasonable inferences from the complaint's allegations in Plaintiffs' favor at this early stage. As such, the court cannot say that the length of the agreements requires a finding at this time that price clearly predominates over other alleged non-price mechanisms of exclusion.

In sum, Plaintiffs have plausibly alleged sufficient facts, if believed, for the court to conclude that price is not the clearly predominant mechanism of exclusion. The complaint alleges that Defendants are dominant suppliers who have entered into de facto exclusive dealing arrangements that include plausibly significant mechanisms of exclusion beyond price-cutting. Accordingly, the court cannot conclude at this stage that the price-cost test must apply as a matter of law. Indeed, Defendants' cited cases demonstrate that courts have reached, or even closely considered, such a conclusion before discovery in only rare circumstances. NicSand, 507 F.3d 442 (price-cost applied on motion to dismiss where plaintiff did not have antitrust standing); Concord Boat, 207 F.3d 1039 (price-cost partially applied post-trial); ZF Meritor, 696 F.3d 254 (rule of reason applied post-trial after extensive discussion); Pac. Bell, 555 U.S. 438 (dismissing price-squeezing claim, not exclusive dealing claim). Depending on the facts adduced at a later stage, it remains to be seen whether the price-cost test or Tampa Electric's rule of reason

55

and its progeny will ultimately be the proper test for Plaintiffs'
claims. For purposes of the pending motions, therefore, the court
turns to Defendants' contention that the complaint fails under the
rule of reason.

### b. Allegations of Anticompetitive Conduct and Injury

Defendants argue that Plaintiffs have failed to allege
anticompetitive conduct and injury. Corteva contends that it is
"entirely dispositive" that Plaintiffs have not pled any actual
exclusivity because the loyalty programs are voluntary, do not
cover all distributors in the market, and do not require 100%
exclusivity. (Doc. 95 at 22-23.) Syngenta principally argues
that any market foreclosure is the result of "lawful price
competition," that Syngenta incentivized customers to "buy more of
its products by lowering its prices," and that there is an absence
of non-price mechanisms of exclusion present in other cases like
ZF Meritor and Dentsply. (Doc. 100 at 33-35.) Syngenta further
argues that Plaintiffs failed to explain why generic competitors
do not lower their prices to make their products more profitable
to distributors. (Id. at 35.) Finally, Syngenta claims that its
exclusive dealing arrangement with Corteva is evidence of legal
competitive conduct. (Id. at 36-37.)

Plaintiffs respond that they have plausibly alleged both
indirect and direct evidence of harm to competition. (Doc. 150 at

56

26.)  On the indirect side, Plaintiffs contend that they have alleged foreclosure of a "substantial part of the market."  (Id. (citing Chuck's Feed, 810 F.2d at 1293-95).)  Specifically, they contend that Defendants have foreclosed generics from "approximately 70% or more" of the market.  (Doc. 112 at 27 (citing Doc. 81 ¶ 171).)  Plaintiffs further argue that this estimate is likely conservative because it relies on the lowest market-share threshold available and conservatively assumes that distributors only narrowly hit the market-share threshold.  (Doc. 150 at 27.) On the direct side, Plaintiffs argue that they have alleged three competitive harms: reduced choices for farmers, higher prices for farmers, and less innovation.  (Id. at 28.)  Plaintiffs further contend that Defendants' discounts may benefit participating distributors but do not get passed on to farmers.  (Id. at 35.)

As an initial matter, Defendants ask the court to apply the same mode of inquiry, i.e., the rule of reason or price-cost test — regardless of the antitrust statute at issue.  (Doc. 157 at 33:7-13.)  Indeed, courts have conducted the exclusive dealing inquiry in such a manner.  See, e.g., ZF Meritor, 696 F.3d at 269 n.9 (stating that the rule of reason is applicable to the plaintiff's claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act); Microsoft, 253 F.3d at 59 (applying rule of reason to Sherman Sections 1 and 2); Chuck's Feed, 810 F.3d at 1294 (applying rule of reason to exclusive dealing under the FTC

57

Act and Clayton Section 3).

Moreover, Defendants do not argue that Plaintiffs' claims may survive under some antitrust statutes but not others, at least at this stage. Here, the relevant threshold requirements specific to the statutes are Sherman Section 1's contract requirement, 15 U.S.C. § 1 ("Every contract . . ."), Sherman Section 2's monopoly power requirement, 15 U.S.C. § 2 ("Every person who shall monopolize . . ."), and Clayton Section 3's conditional discount or rebate requirement, 15 U.S.C. § 14 (". . . discount from, or rebate upon, such price, on the condition . . ."). Defendants do not appear to contest that these requirements are alleged, so the court will treat them as uncontested for the purpose of these motions. Boles v. United States, 3 F. Supp. 3d 491, 507 n.10 (M.D.N.C. 2014). In any event, it appears that Plaintiffs have adequately pleaded these elements. Kolon, 637 F.3d at 450 ("[T]his Court has previously noted that when monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market." (internal quotation marks omitted)); (Doc. 150 ¶¶ 81, 84, 161-63 (alleging agreements with substantially all leading distributors; market share in excess of 70% during relevant time period for five of six AIs and 40% for Corteva's acetochlor (based on its joint venture partner having approximately 50%); and conditional payments).)

To prevail, Plaintiffs must plausibly allege that Defendants'

58

loyalty agreements constitute anticompetitive conduct and caused antitrust injury. <u>Microsoft</u>, 253 F.3d at 58-59. As to the first issue, there is no set formula to demonstrate anticompetitive conduct under the rule of reason. <u>ZF Meritor</u> 696 F.3d at 271. Courts have considered

> a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, [] an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects[,] whether there is evidence that the dominant firm engaged in coercive behavior, [] the ability of customers to terminate the agreements[, and t]he use of exclusive dealing by competitors of the defendant[.]

<u>ZF Meritor</u>, 696 F.3d at 271-72 (internal citations omitted) (collecting cases). An allegation of a percentage of market foreclosure is not required. <u>Kolon</u>, 637 F.3d at 452 n.12. As to the second issue, an antitrust injury is "of the type that the statute was intended to forestall" <u>Microsoft</u>, 253 F.3d at 59 (quoting <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 487-88 (1977)) (internal quotation marks omitted). "[I]n a case brought by the Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor." <u>Id.</u>

Section 1 and 2 of the Sherman Act and Section 3 of the Clayton Act require different degrees of substantiality. The Supreme Court has implied in dicta that Section 3 of the Clayton Act requires a lesser showing than the Sherman Act does: "[I]f

[the contract] does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the [Sherman Act]." Tampa Elec., 365 U.S. at 335 (summarily rejecting Sherman claims after rejecting Clayton claim). The majority of courts have since followed Tampa Electric's dicta. See, e.g., Microsoft Corp., 253 F.3d at 69; see also Areeda & Hovenkamp, supra ¶ 1800c4 n.67 (collecting cases). As between Sections 1 and 2 of the Sherman Act, Section 2 may require less foreclosure to be substantial than Section 1. Microsoft Corp., 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").

Corteva lodges several arguments that it contends establish per se legality, namely that the agreements are voluntary and cover neither 100% of the distributors nor 100% of participating distributors' goods. It is true that courts have factored in whether customers were "free to walk away from the discounts at any time." Concord Boat, 207 F.3d at 1059; see also Allied Orthopedic, 592 F.3d at 995 (affirming district court that found that agreements were "voluntary and [could] be ended at any time, and hospitals [were] thus free to switch to more competitively priced generics"); Omega Env't, 127 F.3d at 1163 ("[T]he short duration and easy terminability of these agreements negate

60

substantially their potential to foreclose competition."). However, these cases do not treat this fact as "entirely dispositive," as Corteva suggests. By contrast, courts are admonished to look to "the practical effect" of exclusive dealing agreements. <u>Tampa Elec.</u>, 365 U.S. at 326. By doing so, courts have found de facto partial exclusive dealing arrangements to be cognizable violations under antitrust law. <u>ZF Meritor</u>, 696 F.3d at 282; <u>Concord Boat</u>, 207 F.3d at 1059 ("[C]laims that allege only de facto exclusive dealing may be viable.").

Assuming Defendants' agreements are formally voluntary, Plaintiffs have plausibly alleged that the Defendants' market-share targets combined with the schedule of payments and threat of non-price retaliation create de facto exclusivity. For example, the complaint alleges that the "complexity, uncertainty, and timing" of payments "make it less likely that a distributor will lower its prices" and that the threat of "canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage" instills strict compliance. (Doc. 149 ¶¶ 85-88.) The complaint also alleges that the loyalty discounts create an incentive for distributors to "strictly manage" their generic purchases and "steer" customers toward loyalty discount-qualifying products despite consumer demand for generics. (<u>Id.</u> ¶¶ 95, 104, 117, 147.) In other words, it is plausible that Defendants' loyalty discount programs are "as

61

effective as express purchase requirements." See ZF Meritor, 696
F.3d at 283 (recognizing voluntary agreement as de facto exclusive
dealing because "no risk averse business would jeopardize its
relationship with the largest manufacturer of transmissions in the
market" (internal quotation marks omitted)); Dentsply, 399 F.3d at
194 ("[I]n spite of the legal ease with which the relationship can
be terminated, the dealers have a strong economic incentive to
continue carrying [the defendant's product]."); McWane, 783 F.3d
at 833-34 (rejecting argument that short-term and voluntary
exclusive dealing agreements are "presumptively legal").

Moreover, the lack of complete exclusivity is not fatal to
Plaintiffs' claims, as Corteva argues.  It contends that the
ability of distributors to purchase some generics and the fact
that some distributors (approximately 20%) do not participate
creates a presumption of legality.  This position appears at odds
with Tampa Electric, which requires that Plaintiffs demonstrate
the exclusive contract's probable effect is to "foreclose
competition in a substantial share of the line of commerce
affected."  365 U.S. at 327 (emphasis added); see also 15 U.S.C.
§ 14 (". . . where the effect of . . . such condition, agreement,
or understanding may be to substantially lessen competition[.]"
(emphasis added)).  "[J]ust as 'total foreclosure' is not required
for an exclusive dealing arrangement to be unlawful, nor is
complete exclusivity required with each customer."  ZF Meritor,

696 F.3d at 283 (analyzing claim under the Sherman Act). Rather than treating lack of true exclusivity or voluntariness as legally dispositive, the court may weigh the relevance of these facts at a later stage. See, e.g., Concord Boat, 207 F.3d at 1060 (weighing lack of true exclusivity on review of summary judgment order).

Syngenta's argument that dismissal is warranted because Plaintiffs did not explain why generic competitors do not lower their price to make their products more profitable to distributors is similarly unpersuasive at this stage. (Doc. 100 at 35.) Even assuming, without deciding, that Plaintiffs bear this burden at this stage, they have plausibly alleged that generic manufacturers' attempts to lower their prices would be futile in the presence of the loyalty programs. This follows from the allegation that distributors would not be willing to accept the risk of losing all supply from Defendants and because Defendants' foreclosure of the most efficient distribution channel imposes costs on generic manufacturers that has "harmed the[ir] effectiveness." (Doc. 149 ¶ 170, 173.)

This contention is supported by Plaintiffs' specific allegations regarding manufacturers of generics that have attempted to enter the market. Manufacturers of generics of Syngenta's azoxystrobin and metolachlor allegedly exited the market because of "constraints imposed by Syngenta's loyalty program." (Id. ¶¶ 96-97, 118, 120.) One generic manufacturer of

63

azoxystrobin that sought to mix azoxystrobin with a fungicide failed because the distributor feared it could impact its ability to meet the market-share target. (Id. ¶¶ 96-97.) Manufacturers of generics of mesotrione were also hindered from entering the market, an issue Plaintiffs allege was exacerbated by Syngenta's agreement to supply Corteva with mesotrione under the condition that Corteva's products containing mesotrione be treated neutrally under Syngenta's Key AI program. (Id. ¶ 105; Doc. 81 ¶ 109.)

Plaintiffs allege that a generic manufacturer of Corteva's rimsulfuron "canceled or deferred entry plans," despite farmer demand for lower-priced generics of rimsulfuron. (Doc. 149 ¶ 132.) According to the complaint, generics of oxamyl found some success in the market during a "plant outage" at Corteva from 2015 to 2017, but thereafter under Corteva's loyalty program, "generic sales plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices." (Id. ¶ 136-38.) One Corteva manager allegedly said of this pattern, "[O]ur team truly has done an A+ job blocking generics." (Id. ¶ 138.) Finally, a generic manufacturer of acetochlor that was priced "substantially below Corteva's prices" allegedly made "little headway" because major distributors declined to purchase the generic due to Corteva's loyalty program. (Id. ¶ 148.) At this preliminary stage, the court must accept these plausible factual allegations as true and draw all reasonable

64

inferences in Plaintiffs' favor. Through this lens, Defendants have not demonstrated that the widespread failure of generics to enter the market is due to competition on the merits rather than plausibly anticompetitive conduct by Defendants.

Finally, Plaintiffs have plausibly alleged anticompetitive conduct and injury. In Kolon, the Fourth Circuit, in reviewing a Sherman Act § 2 claim on motion to dismiss, held that an allegation of dominant market share and exclusionary conduct was sufficient at the pleading stage. 637 F.3d at 452 (citing Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 147 (4th Cir. 1990)). While the court also held that pleading a percentage of market foreclosure is not necessary, Plaintiffs have pleaded a foreclosure of "approximately 70% or more of each applicable market." (Doc. 81 ¶ 171); see Microsoft, 253 F.3d at 70 (finding substantial 40-50% of market foreclosure under Sherman Act § 2 claim). Under all of the antitrust statutes, Plaintiffs' allegations of substantial foreclosure are plausible and, at a minimum, "turn[] on a factual dispute ill suited for the pleadings stage." F.T.C. v. Surescripts, LLC, 424 F. Supp. 3d 92, 104 (D.D.C. 2020). Moreover, for the reasons noted above, Syngenta's argument — that Plaintiffs have not alleged anticompetitive conduct because they have not alleged predatory pricing — likewise fails. To the extent these arguments apply under the rule of reason, they appear to speak to "whether an otherwise unacceptable

65

level of market foreclosure is justified by procompetitive efficiencies." Chuck's Feed, 810 F.2d at 1294; (Doc. 100 at 34 (framing price reductions as procompetitive).) Simply put, the court is not equipped at this stage and on this record to weigh the merits of this procompetitive justification against the plausible allegations of market foreclosure.

Plaintiffs have also sufficiently alleged antitrust injury. They claim harm to farmers, growers, and generic manufacturers, and that Defendants' conduct "may substantially lessen competition or tend to create or maintain monopolies in the [r]elevant [m]arkets." (Doc. 149 ¶¶ 164-66.) Specifically, Plaintiffs allege that generic manufacturers have been substantially foreclosed from the most efficient channel of distribution (id. ¶¶ 170-71); that the structure of the payments over an extended period of time, and across multiple crop-protection products containing the same AI, make it less likely that discounts will pass on to end-consumers (id. ¶¶ 173-75); that distributors have "omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward branded products" (id. ¶ 177); that the loyalty programs have caused generics to exit or never enter the market (id. ¶¶ 182-85); and that the loyalty programs have stunted innovation (id. ¶¶ 186-89). The complaint also alleges that Defendants' internal analyses acknowledge that the

66

loyalty programs lead to supracompetitive prices for end-consumers. (Id. ¶¶ 194-200.)

In sum, Defendants' contention that their loyalty programs neither are anticompetitive nor cause anticompetitive injury depends on further factual development. At this stage, the complaint plausibly alleges both.[10]

### 3. Claims Against Syngenta Corporation and Syngenta Crop Protection AG

Syngenta argues that "Plaintiffs' allegations do not cognizably connect Syngenta Corporation or Syngenta Crop Protection AG to the challenged rebate program." (Doc. 100 at 44.) Consequently, Syngenta contends, the claims against those two entities should be dismissed. (Id.) As to Syngenta Corporation, Syngenta maintains that more is required than an allegation that Syngenta is a "single enterprise" and that one person is the president of both Syngenta Corporation and Syngenta Crop Protection, LLC. (Id. at 44-45.) And as to Syngenta Crop Protection AG, Syngenta argues that Plaintiffs' "vague allegations of high-level oversight and strategic guidance" are insufficient

---

[10] Plaintiff FTC argues that its section 5 claim is a "standalone" claim. (Doc. 150 at 45.) In particular, the FTC argues that the price-cost test should not apply to its section 5 claim, regardless of how the court rules on the Sherman Act and Clayton Act claims. (Id. at 47.) Because Plaintiffs plausibly allege violations of the Sherman Act and Clayton Act, the court will deny Defendants' motion to dismiss Plaintiff FTC's section 5 claim for the same reasons as for the Sherman Act and Clayton Act claims. Therefore, whether or not the court may find it necessary to parse distinctions between the statutes at a later stage in this action, it need not do so now.

67

in light of Plaintiffs' "conce[ssion] that the global parent is not responsible for 'implementation' of post-patent strategies in individual countries." (Id. at 45.)

Plaintiffs respond that their allegations of Syngenta Corporation's shared senior leadership with Syngenta Crop Protection, LLC, and management of contacts with Corteva regarding the mesotrione and metolachlor supply agreements suffice to state claims against Syngenta Corporation. (Doc. 150 at 65-66; Doc. 112 at 65-66.) Further, Plaintiffs contend that they have stated a claim against Syngenta Crop Protection AG because it "directs and oversees" the LLC's post-patent strategy, "reviews, modifies, and approves Syngenta's U.S. budget, which includes sales targets based on Syngenta's loyalty program," and was "directly involved in the negotiation of" the mesotrione supply agreement with Corteva. (Doc. 150 at 66.)

To be sure, Plaintiffs do not allege a conspiracy between the Syngenta entities. Parents and subsidiaries, as well as sister subsidiaries, are "incapable" of conspiring with one another under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 777 (1984) (parent-subsidiary under Sherman Section 1); Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 847 F.3d 1221, 1234 (10th Cir. 2017) ("[S]ubsidiaries are incapable of conspiring under § 1 of the Sherman Act. . . . [W]e also conclude that

68

*Copperweld*'s reasoning with respect to § 1 applies equally to § 2."); *Advanced Health-Care Servs.*, 910 F.2d at 146, 152 (extending *Copperweld* to sister subsidiaries under Sherman Section 1 and Clayton Section 3). Instead, "[t]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise[.]" *Copperweld*, 467 U.S. at 771.

In *Lenox MacLaren*, the Tenth Circuit affirmed on other grounds but wrote at length on the district court's error in treating each corporate affiliate as a separate entity rather than a "single enterprise." 847 F.3d at 1230-39. The court observed that requiring each corporate affiliate to independently satisfy every element of an antitrust violation "would be difficult to justify" because the Supreme Court and other courts have sealed off access to the claim of conspiracy between corporate affiliates. *Id.* at 1236 (citing *Copperweld*, 467 U.S. at 776-77). Moreover, the court reasoned that *Copperweld* must foreclose sophisticated corporations from "spread[ing] its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability." *Id.* But the *Lenox MacLaren* court was careful to cabin the reach of the single-enterprise theory by emphasizing *Copperweld*'s restriction of intra-enterprise liability only to "coordinated activity" of affiliates. *Id.* at 1237 (emphasis in original).

Indeed, "[a]ntitrust law doesn't recognize guilt by mere

69

association, imputing corporate liability to any affiliated company unlucky enough to be a bystander to its sister company's alleged misdeeds." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015). "[I]n the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary." Arnold Chevrolet LLC v. Tribune Co., 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) (citing Invamed. Inc. v. Barr. Lab'ys, Inc., 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998); see also United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (internal quotation marks omitted)). Accordingly, claims may properly be dismissed against parent corporations where "at least as to them, the 'complaint was vague, never explained its case, and lumped [them] together without sufficient detail.'" Black & Decker, 801 F.3d at 423 (quoting Bates v. City of Chicago, 726 F.3d 951, 958 (7th Cir. 2013)). Here, the complaint defines "Syngenta" as "Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC." (Doc. 149 ¶ 1.) Notwithstanding this definition, Plaintiffs still must allege sufficient independent but coordinated activity for each named corporate affiliate. Black & Decker, 801 F.3d at 422.

70

While the Lenox MacLaren court ultimately refrained from adopting either party's proposed definition of "coordinated activity," the court considered as tests (1) "[w]hen the parent controls, dictates or encourages the subsidiary's anticompetitive conduct"; and (2) "that each defendant must have played a 'role' — or 'participated' — in the anticompetitive conduct of the enterprise as a whole." Id. at 1237-38 (quoting Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005)). Plaintiffs appear to endorse the "controls, dictates, or encourages" test. (Doc. 150 at 65-66 (citing Intellectual Ventures I LLC v. Cap. One Fin. Corp., Case No. 14-111, 2016 WL 160263, at *5 (D. Md. 2015); Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc., 311 F. Supp. 2d 1048, 1068-70 (D. Colo. 2004)).) Syngenta does not take a position on the proper articulation of the standard and relied on its briefs when questioned about it at the hearing. (See Doc. 100 at 44-45; Doc. 130 at 23; Doc. 157 at 98:18-23.)

At least at the time of the complaint, the same individual served as the president of both Syngenta Corporation and Syngenta Crop Protection, LLC. (Doc. 149 ¶ 35.) Further, Plaintiffs allege that Syngenta Crop Protection AG has "directed, overseen, and approved Syngenta's sales and marketing strategy, including its loyalty program." (Id. ¶ 36.) Moreover, Syngenta Crop Protection AG allegedly has "reviewed, modified, and approved" Syngenta's

71

U.S. budget, which includes the sales targets associated with Key AI, and provides "generic defense" strategy to be "tailored for implementation in each country." (Doc. 81 ¶ 36 (quoting Syngenta Crop Protection AG's global post-patent strategy handbook).) Finally, Plaintiffs allege that executives of Syngenta Crop Protection AG were "directly involved in the negotiation" of the Syngenta-Corteva mesotrione supply agreement, that Syngenta Crop Protection AG is the Syngenta entity that signed the agreement, and that a Syngenta Corporation executive "manages Syngenta's contacts with Corteva regarding the agreement." (Doc. 149 ¶ 111.)

Based on these allegations, Syngenta has not demonstrated that the complaint fails to plausibly allege "coordinated activity." As a result, the motion to dismiss Syngenta Crop Protection AG and Syngenta Corporation will be denied.

### 4. Article II Challenge to FTC Authority

Defendant Corteva argues that the "FTC's claims must be dismissed because the FTC lacks the constitutional authority to bring these claims." (Doc. 95 at 30.) Plaintiff FTC's alleged authority to bring this lawsuit arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). (Doc. 149 ¶ 2.) Corteva contends that Congress' grant of authority to the FTC to pursue relief under these provisions amounts to a grant of executive law-enforcement power that is unconstitutional because its "members are not removable at will by the President." (Id. (citing Humphrey's

72

_Executor v. United States_, 295 U.S. 602 (1935); _Seila Law LLC v._
_Consumer Fin. Protection Bureau_, 140 S. Ct. 2183 (2020).) Corteva
maintains that because executive agencies must be subject to the
President's removal power, the suit before this court cannot go
forward. (_Id._ at 32.) The FTC responds that Corteva's Article II
challenge is untimely because it was not raised in its motion to
dismiss the original complaint. (Doc. 150 at 61.) Moreover, in
the FTC's view, Corteva "grossly misinterpret[s] binding Supreme
Court precedent" by misstating the FTC's historical powers and
ignoring features of the FTC that distinguish it from other
agencies. (_Id._ (quoting _Fed. Trade Comm'n v. Roomster Corp._, No.
22 Civ. 7389, 2023 WL 1438718, at *8 (S.D.N.Y. Feb. 1, 2023)).)
Finally, the FTC contends that even if Corteva were correct,
dismissal of the action would be the improper remedy. (_Id._) In
reply, Corteva contends that its claim is not waivable because it
is akin to a subject matter jurisdiction challenge. (Doc. 133 at
17-18.)

As to timeliness, the FTC cites to Federal Rule of Civil
Procedure 12(g)(1). (Doc. 150 at 61.) But this rule does not
support the FTC's position that Corteva waived its argument by
omitting it in an earlier motion to dismiss. Rule 12(g)(1) applies
to joinder of motions and is thus inapplicable here. In any event,
the Federal Rules do not otherwise support the FTC's position.
Rule 12(h)(1) provides that a party waives any defense available

73

under Rules 12(b)(2) through (5) if the defense was available to the party at the time of an earlier motion. Fed. R. Civ. P. 12(h)(1) (providing for waiver through omission as described in Rule 12(g)(2)[11]). Notably, these include motions to challenge personal jurisdiction, venue, and service of process, not a motion to dismiss for failure to state a claim upon which relief can be granted (Rule 12(b)(6)) or lack of subject matter jurisdiction (Rule 12(b)(1)). Fed. R. Civ. P. 12(h)(1) and (3). In fact, the 1966 Advisory Committee note to Rule 12(h) states that, "while the defenses specified in subdivision (h)(1) are subject to waiver as there provided, the more substantial defense[] of failure to state a claim upon which relief can be granted . . . [is] <u>expressly preserved against waiver</u> by amended subdivision (h)(2) and (3)." Fed. R. Civ. P. 12(h) advisory comm. note (1966 amend.) (emphasis added).

Similarly, the FTC's citation to <u>Rowley v. McMillan</u>, 502 F.2d 1326 (4th Cir. 1974) is misguided. In <u>Rowley</u>, the court interpreted Rule 12(g) to mean that "an amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were

---

[11] Rule 12(g)(2) provides:

> Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

not available at the time of his response to the initial pleading." Id. at 1333. Despite this broad language covering "defenses," the issue before the court was a waiver of a personal jurisdiction defense pursuant to Rule 12(b)(2), which is covered by Rule 12(h)(1)'s strict waiver rules. Id. at 1333. Cases that approvingly cite Rowley deal similarly with the 12(b)(2) through (5) defenses that Rule 12(h)(1) covers. See, e.g., Hand Held Prods., Inc. v. Code Corp., 265 F. Supp. 3d 640, 643 (D.S.C. 2017) (challenging venue); Maxtena, Inc. v. Marks, Civ. No. 11-0945, 2012 WL 113386 (D. Md. Jan. 12, 2012) (same); Lederman v. United States, 131 F. Supp. 2d 46, 58 (D.D.C. 2001) (challenging service of process). Moreover, Rule 12(h)(2) clearly authorizes Corteva to raise this same constitutional argument in its answer, so "little would be gained by preventing a defense under Rule[] 12(b)(6)." Wright and Miller, Fed. Prac. & Proc. § 1388 (2023) ("[E]arly determination of [12(b)(6)] arguments] is to be encouraged."). While Corteva argues that its constitutional challenge is akin to non-waivable subject matter jurisdiction, such an analogy is both unnecessary to save its argument and appears to be an improper characterization in any event. See Holloway v. Pagan River Dockside Seafood Inc., 669 F.3d 448, 453 (4th Cir. 2012) ("If a plaintiff invoking § 1331 pleads a colorable claim 'arising under' the Constitution or laws of the United States, he invokes federal subject matter jurisdiction, and

deficiencies of the claim should be addressed by the other mechanisms provided by the federal rules." (internal quotation marks and citations omitted)). This is a long way of explaining that the court must turn to the merits of Corteva's constitutional challenge.

The power to enforce the law is vested in the President of the United States. U.S. Const. art. II, § 1. "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." Seila Law, 140 S. Ct. at 2191. "[A]s a general matter," the Constitution gives the President the power to remove subordinate officers so that the President can be held "fully accountable for discharging his own responsibilities." Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 514 (2010). There are "only two exceptions" to the President's otherwise unrestricted removal power. Seila Law, 140 S. Ct. at 2192. First, Congress may create "expert agencies led by a group of principal officers removable by the President only for good cause." Id. (citing Humphrey's Executor, 295 U.S. 602) (emphasis in original). Second, Congress may provide "tenure protections to certain inferior officers with narrowly defined duties." Id. (citing United States v. Perkins, 116 U.S. 483 (1886); Morrison v. Olson, 487 U.S. 654 (1988)) (emphasis in original). The parties agree that this case implicates only the

76

first exception.    (Doc. 95 at 31; Doc. 150 at 61.)

Under the FTC Act, commissioners are removable only for "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  Five members sit on the Commission and are appointed by the President and confirmed by the U.S. Senate.  Id.  The FTC Act includes a "separability clause" that states that the other provisions of the FTC Act "shall not be affected" by a court's holding that finds any provision invalid.  15 U.S.C. § 57.

The constitutionality of the FTC commissioner's for-cause protection was first addressed in Humphrey's Executor, 295 U.S. 602 (1935).  In 1933, President Franklin Delano Roosevelt sought the removal of Commissioner William E. Humphrey, who was appointed by President Herbert Hoover.  Id. at 618.  After Humphrey rebuffed his resignation request, President Roosevelt wrote him: "Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission."  Id. at 619.  Reviewing the constitutionality of the President's action, the Supreme Court observed that the FTC is "charged with the enforcement of no policy except the policy of the law," adding that "[i]ts duties are neither political nor executive, but predominantly quasi judicial and quasi legislative."  Id. at 624.  The court reasoned that the authority of Congress to create quasi legislative or quasi judicial agencies "cannot well be doubted" and includes the power to "forbid their removal except for cause."

77

Id. at 629. In supporting Congress' authority to restrict removal, the Court observed that its holding would not offend the separation of powers because the FTC was created by Congress "as a means of carrying into operation legislative and judicial powers" and was "wholly disconnected from the executive department." Id. at 630.

The Supreme Court has since questioned the holding of Humphrey's Executor. See, e.g., Seila Law, 140 S. Ct. at 2198 n.2 ("The Court's conclusion [in Humphrey's Executor] that the FTC did not exercise executive power has not withstood the test of time."); Morrison, 487 U.S. at 690 n.28 ("[I]t is hard to dispute that the powers of the FTC at the time of Humphrey's Executor would at the present time be considered 'executive,' at least to some degree."). Nevertheless, the Court has declined to overrule this "entrenched Supreme Court precedent, protected by stare decisis." In re Aiken Cnty., 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring); see also Collins v. Yellen, 141 S. Ct. 1761, 1786-87 (2021) (citing Humphrey's Executor as a counter-analogy and striking down removal restriction as violation of separation of powers).

Congress added the FTC's authority to file suit under section 13(b) in 1973 — decades after the Court decided Humphrey's Executor in 1935. See Pub. L. No. 93-153, § 408, 87 Stat. 592 (1973). While Corteva is correct that the FTC's authority under section 13(b) is executive in nature, that is about where the merit of its

78

constitutional challenge ends. First, Corteva effectively asks this court to overrule Supreme Court precedent. But the role of a lower court is clear: "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 485 (1989)). Humphrey's Executor directly addresses whether Congress may restrict the removal power of FTC commissioners, so the court could stop its analysis here.[12]

Second, even were the court to accept Corteva's position that the FTC commissioners must be removable, Corteva's requested relief — dismissal of the suit — would be inappropriate. Corteva

---

[12] Even so, there is hardly a consensus, as Corteva contends, that Humphrey's Executor is wrong in light of the FTC's greater scope of authority since the case was decided. See, e.g., Seila Law, 140 S. Ct. at 2198 ("Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" (quoting Humphrey's Executor, 295 U.S. at 628)); id. at 2200 n.4 ("Perhaps the FTC possessed broader rulemaking, enforcement, and adjudicatory powers than the Humphrey's Court appreciated. Perhaps not. Either way, what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court."); id. at 2239 n. 10 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) (describing the FTC's authority in 1935 as including the power to "run investigations, bring administrative charges, and conduct adjudications"). Simply put, this court is not at liberty to "read the tea leaves" of the Supreme Court with respect to settled precedent. Stewart v. Justice, 518 F. Supp. 3d 911, 917 (S.D.W. Va. 2021).

contends that the FTC cannot "both enjoy its removal protections as upheld in Humphrey's Executor and exercise the 'quintessentially executive' powers granted to it by Congress in 1973." (Doc. 95 at 32 (citing Seila Law, 140 S. Ct. at 2200).) But no case cited by Corteva suggests that the appropriate remedy would be to excise the FTC's executive power. To the contrary, the Supreme Court's cases on removal suggest the exact opposite. In Seila Law, the Court held the CFPB director must be removable, severed the provision restricting removal, and declined to strike down the Consumer Financial Protection Bureau's enforcement authority. 140 S. Ct. at 2199. In Free Enterprise Fund, the Court held that the removal restrictions of the Public Company Accounting Oversight Board violated the separation of powers, but it explicitly upheld the board's regulatory authority. 561 U.S. at 508-09. And in Collins, the Court struck down the removal protections for the Federal Housing Finance Agency director, but it nevertheless stated that "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office." 141 S. Ct. at 1788. Thus, even if Congress oversteps its authority to restrict the President's removal power, a principal officer may still "undertake the [] responsibilities of his office." Id. at 1788 n.23.

In sum, Corteva's position that section 13(b) was void when enacted is unpersuasive, and even if it were not, dismissal would

not be the proper remedy.  As a result, Corteva's motion to dismiss based on its constitutional challenge will be denied.

### 5.  State Law Claims

Defendants argue that all of the state Plaintiffs' claims should be dismissed.  (Doc. 95 at 34; Doc. 100 at 43.)  First, Defendants contend that each state's (except Tennessee's and Wisconsin's) antitrust laws are "harmonized — by statute or by common law — with the federal antitrust laws."  (Doc. 95 at 34; Doc. 100 at 43.)  Consequently, Defendants maintain that the state Plaintiffs' claims should be dismissed on the same grounds as the federal claims.  (Doc. 95 at 34; Doc. 100 at 43.)  With respect to Tennessee and Wisconsin, Corteva argues that the complaint fails to allege "substantial effects that were felt in each respective state."  (Doc. 95 at 35.)  Second, Corteva contends that Texas and Indiana cannot recover civil damages under state antitrust laws because those states are "prevent[ed] . . . from bringing damages claims on behalf of end-consumers."  (Doc. 95 at 34-35.)  Third, Defendants argue that California, Indiana, and Iowa fail to adequately allege violations of their state unfair competition and consumer fraud laws.  (Doc. 95 at 36; Doc. 100 at 43-44.)

In response, Plaintiffs first argue that state and federal laws are not "automatically harmonized, and vary from state to state."  (Doc. 150 at 68.)  As to Tennessee and Wisconsin, Plaintiffs contend, they have met the substantial effects burden,

81

which they characterize as "low." (Doc. 150 at 71-72.) Second, Plaintiffs argue that Texas and Indiana are not seeking damages on behalf of "end-consumers," and, in any event, these states are not barred from recovering civil penalties. Third, Plaintiffs contend that the California unfair competition claim and Indiana and Iowa consumer protection claims are sufficiently pleaded.

As to the state antitrust laws that Defendants contend are harmonized with federal law, in light of the court's rulings on the federal antitrust claims, Defendants have not demonstrated that these claims should be dismissed. As to Tennessee and Wisconsin, Defendants' arguments similarly fail. Tennessee and Wisconsin courts require plaintiffs to allege that a defendant's anticompetitive conduct had a "substantial effect" on intrastate commerce." See Meyers v. Bayer AG, Bayer Corp., 735 N.W.2d 448, 461 (Wis. 2007) ("[A] complaint under the Wisconsin Antitrust Act . . . is sufficient if it alleges [anticompetitive conduct] that substantially affected the people of Wisconsin and had impacts in [Wisconsin]."); Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 523 (Tenn. 2005) ("[C]ourts must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree."). "The [substantial effects] test is pragmatic, turning on the particular facts of the case." Freeman Indus. 172 S.W.3d at 523. Under Wisconsin law, a plaintiff need not allege that the impact of the conduct is "distinguishable

82

from or disproportionate to its impacts on other states." Meyers, 735 N.W.2d at 320.[13] Under Tennessee law, a plaintiff need not allege that the anticompetitive conduct "threaten[s] the demise of Tennessee business or affect[s] market price to substantially affect intrastate commerce," but a plaintiff must show more than a "bare allegation" of substantial effects. Freeman Indus., 172 S.W.3d at 524 (finding allegation insufficient where lone plaintiff with ties to Tennessee did not allege that he purchased goods from defendant).

Corteva claims that these Plaintiffs did no more than recite each state's legal requirement regarding substantial effects. (Doc. 95 at 35-36.) But Tennessee's and Wisconsin's claims incorporated, by re-alleging, every preceding allegation in the complaint, Tennessee alleged that Defendants sold the crop-protection products at issue to Tennessee businesses and individual customers, and Wisconsin alleged "substantial foreclosure of generic competitors" within the state and that "many hundreds of farmers" in the state have purchased crop-protection products at supracompetitive prices due to the loyalty programs. (Doc. 149 ¶¶ 253-54, 272, 274-75.) Accepting these facts as true, as the court must at this stage, Tennessee and Wisconsin plausibly

---

[13] While the Meyers court announced this rule in light of its self-described "liberal pleadings standard," Meyers, 735 N.W.3d at 320, Defendants have not provided any authority to suggest that a different result should obtain under the federal rules.

allege substantial effects.

As to Texas's and Indiana's claims, Corteva argues that the indirect purchaser rule bars Texas and Indiana from recovering on behalf of end-consumers. The indirect purchaser rule restricts indirect purchasers from recovering compensatory damages, except in limited circumstances not relevant here. See Dickson v. Microsoft Corp., 309 F.3d 193, 214 (4th Cir. 2002) (citing Illinois Brick Co. v. Illinois, 431 U.S. 720, 730-33 (1977)). However, Defendants have not demonstrated that Illinois Brick extends to a state seeking civil penalties. See, e.g., Fed. Trade Comm'n v. Mylan Lab'ys, Inc., 62 F. Supp. 2d 25, 46 (D.D.C. 1999) (dismissing state claims for actual damages under Illinois Brick but maintaining claims for civil penalties); Apple Inc. v. Pepper, 139 S. Ct. 1514, 1520 n.1 ("Illinois Brick held that the direct-purchaser requirement applies to claims for damages." (emphasis added)). Additionally, the cases that Corteva cites to support Texas's and Indiana's prohibitions on parens patriae suits do not support extending Illinois Brick to those state's civil penalties provisions. See Berghausen v. Microsoft Corp., 765 N.E.2d 592, 596 (Ind. Ct. App. 2002) (acknowledging application of Illinois Brick to Indiana antitrust law but not discussing civil penalties or suits brought by the state); Abbott Lab'ys, Inc. v. Segura, 907 S.W.2d 503, 503-04 (Tex. 1995) (barring parens patriae suit under state DTPA to recover damages, but not civil penalties, on behalf

84

of consumers). Moreover, while all Plaintiffs identify harm to end-consumers, (Doc. 149 ¶ 166), the claims for civil penalties are not damages compensation for consumers. (Doc. 149 ¶¶ 228, 264.) Accordingly, on this record Texas's and Indiana's requests for civil penalties survive the motion to dismiss.

As to California's unfair competition claim, Corteva argues that because Plaintiffs' antitrust claim should fail, so should the California unfair competition claim. The California Unfair Competition Law covers conduct that "violates the policy or spirit" of the antitrust laws "or otherwise significantly threatens or harms competition." Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180-87 (1999). Because California re-alleged and incorporated by reference all allegations in the complaint, (Doc. 149 ¶ 212), the court will deny the motion to dismiss on the same bases that it has denied Defendants' motions with respect to the federal antitrust claims.

As to Indiana's consumer protection claim, Defendants argue that Indiana did not specify an "incurable deceptive act" which, in Corteva's view, must be alleged with particularity "as part of a scheme, artifice, or device with intent to defraud or mislead." (Doc. 95 at 36 (citing Fed. R. Civ. P. 9(b); Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 873 (D. Minn. 2012); Ind. Code § 24-5-0.5-2(a)(8)).) Syngenta also argues that the theory of wrongdoing is not illegal for the same reasons it offered to dismiss the

85

federal antitrust claims, which the court has now rejected at this stage. (Doc. 100 at 43.) Indiana responds that reliance on Thunander is improper because the case predates an amendment to Indiana's consumer protection law that expanded the scope of the statute covering "deceptive" acts to also preclude "unfair" acts. (Doc. 150 at 70.) In Indiana's view, this amendment likens its law to the California unfair competition law. (Id.) Lastly, Indiana maintains that it does not need to show an "incurable deceptive act" because only private plaintiffs are subject to this requirement, not the state attorney general. (Id.)

In 2014, Indiana amended its consumer protection statute to prohibit "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." 2014 Ind. Acts 736, Ind. P.L. 65-2014, § 7 (codified as amended at Ind. Code § 24-5-0.5-3(a)). Under section 4(a), "a person" may file suit to recover damages for an "uncured or incurable deceptive act." Ind. Code § 24-5-0.5-4(a). An "incurable deceptive act" is one that is "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). Under sections 4(c) and (g), the state attorney general may file suit for an injunction and civil penalties against "a deceptive act." Ind. Code § 24-5-0.5-4(c), 4(g).

First, Corteva has not provided any authority to support the contention that "unfair" or "abusive" should be read more narrowly

86

than under the FTC Act, so the court will not read it so at this time.  Second, it appears that Indiana is correct that section 4(c), which grants authority to the state attorney general to enjoin "a deceptive act," does not impose a requirement to show that the deceptive act is "uncured" or "incurable."  By contrast, the private party provision does.  Compare Ind. Code. § 24-5-0.5-4(a) ("A person relying upon an uncured or incurable deceptive act may bring an action . . . ." (emphasis added)), with id. § 24-5-0.5-4(c) ("The attorney general may bring an action to enjoin a deceptive act . . . ." (emphasis added)).  If this additional requirement were read into section 4(c), the claim would apparently sound in fraud and require pleading with particularity.  See Ind. Code § 24-5-0.5-2(a)(8) ("act done . . . with intent to defraud or mislead."); Fed. R. Civ. P. 9(b).  While it appears that Indiana has the better of the argument, this question of statutory interpretation is inadequately briefed to facilitate a definitive resolution at this stage, so the court will simply hold that Defendants have not demonstrated for the purposes of this motion that Indiana has not stated a claim for relief.

Finally, as to Iowa's consumer protection claim, Corteva argues that Iowa did not allege a "misrepresentation of material fact." (Doc. 95 at 37 (citing Cota v. Ralph Lauren Corp., No. 21-C-1089, 2022 WL 1597631, at *3 (E.D. Wis. May 19, 2022).) Syngenta agrees and adds that Iowa also did not allege an "unfair

87

practic[e]." (Doc. 100 at 44 (citing Iowa Code § 714.16.) Iowa argues that the Iowa consumer protection law covers both deceptive and unfair practices, and that Iowa has alleged an unfair practice. (Doc. 150 at 70-71.)

The Iowa Consumer Fraud Act, Iowa Code § 714.16, makes it unlawful for a person to "act, use or employ[]" an "unfair practice." Iowa Code § 714.16(2)(a). For the same reasons stated above, Defendants have not demonstrated that the court should read "unfair" any more narrowly than under the FTC Act. As a result, Defendants' motion to dismiss the Iowa consumer protection claim will be denied.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motions to dismiss (Docs. 94, 99) are DENIED.

/s/  Thomas D. Schroeder
United States District Judge

January 12, 2024