# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

FEDERAL TRADE COMMISSION,
STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF ILLINOIS,
STATE OF INDIANA, STATE OF IOWA,
STATE OF MINNESOTA, STATE OF
NEBRASKA, STATE OF OREGON,
STATE OF TENNESSEE, STATE OF
TEXAS, STATE OF WASHINGTON, and
STATE OF WISCONSIN,

        Plaintiffs,

    v.

SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION,
SYNGENTA CROP PROTECTION, LLC,
and CORTEVA, INC.,

        Defendants.

Case No. 1:22-cv-00828-TDS-JEP

**PLAINTIFFS' FIRST SET OF
REQUESTS FOR PRODUCTION
TO CORTEVA, INC.**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs Federal

Trade Commission ("FTC") and the states of California, Colorado, Illinois, Indiana,

Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin

request that Corteva, Inc. produce the documents and data specified in this First Set of

Requests for Production ("Requests") for inspection, examination, and reproduction. The

documents and data requested herein should be sent to the attention of undersigned

counsel in a manner agreed upon by the parties. The production of documents and data

shall be in accordance with the Instructions and Definitions set forth below, Rule 34 of

the Federal Rules of Civil Procedure, and the local rules of this Court. These Requests are continuing in nature and should be supplemented in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

## INSTRUCTIONS

1.      Unless otherwise indicated, all Requests for Documents seek Documents generated, prepared, created, sent, or received during the period from January 1, 2015 to the present. For documents relating to Crop Protection Products containing rimsulfuron, oxamyl, and acetochlor, these Requests cover any and all Documents generated, prepared, created, sent, or received during the period from twenty-four (24) months prior to the AI first being included in a Loyalty Program to the present.

2.      Documents requested are those in the actual or constructive possession, custody, or control of the Company (as the Company is defined in these Requests), or its representatives, attorneys, or other agents, including without limitation consultants, accountants, lawyers, or any other persons retained, consulted by, or working on behalf or under the direction of the Company, wherever they may be located.

3.      Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

      a.      the singular form of any word includes the plural and the plural form includes the singular;

2

b. the past tense of a verb includes the present tense and the present tense includes the past tense;

c. the masculine form includes the feminine form;

d. the term "date" means the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters;

e. the terms "and," and "or" shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any Request all information that otherwise might be construed to be outside the scope of the Request; and

f. the term "any" shall be construed to include "all," and "all" shall be construed to include "any."

4. Unless otherwise stated, construe each Request independently and without reference to any other for the purpose of limitation.

5. If you assert that part of a Request is objectionable, respond to the remaining parts of the request to which you do not object. For those portions of any Request to which you object, please state the reasons for such objection and describe the documents or categories of documents that are not being produced.

6. If, in responding to any Request, you assert any ambiguity in interpreting either the Request or a definition or instruction applicable thereto, please state the language deemed to be ambiguous and the interpretation used in responding to the Request, and produce all Documents that are responsive to the Request as you interpret it.

3

7.   All Documents responsive to these Requests:

   a.   shall be produced in complete form, unredacted unless privileged, and in the order in which they appear in the Company's files. Each document requested herein must be produced in its entirety and without deletion, abbreviation, redaction, expurgation, or excisions, regardless of whether you consider the entire Document to be relevant or responsive to these Requests;

   b.   shall be marked on each page with corporate identification and consecutive document control numbers when produced in image format. None of the numbers should be identical to control numbers on Documents previously submitted to the FTC in the course of the FTC's pre-complaint investigation, FTC File No. 191-0031;

   c.   shall be produced in color; and

   d.   shall be accompanied by an affidavit of an officer of the Company stating that the copies are true, correct, and complete copies of the original Documents.

8.   If the Company withholds any responsive Document or masks or redacts any portion of any responsive Document based on a claim of privilege or other protection from discovery, provide a log in Microsoft Excel format describing the claim and all facts supporting the claim sufficient for Plaintiff and the Court to assess the claim of privilege, in accordance with Rule 26(b)(5) of the Federal Rules of Civil Procedure.

9.     Without waiving any right or ability for the FTC to seek information that would allow it to assess the Company's previous claims of privilege, and to challenge the basis for any of those claims, the Company need not produce, in response to these Requests, another copy of documents previously submitted in the course of the FTC's pre-complaint investigation, FTC File No. 191-0031.

10.     Where these Requests calls for data that the Company maintains in database form, the Company may in, lieu of providing the requested information in the form maintained in the ordinary course of business, provide the requested data in Microsoft Excel or similar format, with all underlying data unredacted and all underlying formulas and algorithms intact; and identifying the specific Company databases from which these data were obtained.

11.     Unless otherwise specified herein, all defined terms shall have the same meaning as the Definitions contained in the Subpoena *Duces Tecum* issued to the Company on May 26, 2020 and the Civil Investigative Demand issued to the Company on December 4, 2021.

12.     All Documents responsive to these Requests should be produced in a format in accordance with the ESI Stipulation entered in this matter.

13.     Unless otherwise agreed among counsel, Documents responsive to this subpoena should be sent to the Federal Trade Commission (1) if under 20GB in size, by secure File Transfer Protocol ("FTP") link provided by the FTC, and (2) if over 20GB in size, via FedEx or UPS at the following address:

Raul Sawh, Complete Discovery Source
Equinix
5851 West Side Avenue
North Bergen, NJ 07047
(800) 322-9280

Data Sets produced in response to Requests 27 through 33 should be sent to the Federal

Trade Commission BE Data Support Center using the Commission's secure FTP. For

instructions on using this FTP, please contact the Federal Trade Commission BE Data

Support Center by phone at 202-326-3481 or 202-326-2147 or by email at BE-

DataMgt@ftc.gov. If using the FTP is not feasible, the Company's responses to this CID

shall be delivered via FedEx or UPS, between 8:30 a.m. and 5:00 p.m., to the following

address:

BE Data Support Center, Room H-285
600 Pennsylvania Avenue NW
Washington, D.C. 20580
Attn: Kevin Richardson and Constance Herasingh

## DEFINITIONS

1.      "Company," "the Company," and "Corteva" means Corteva, Inc., also

known as Corteva Agriscience, and its directors, officers, trustees, employees, attorneys,

agents, consultants, and representatives, its domestic and foreign parents, predecessors

(including the Dow Chemical Company, Dow Agrosciences, DowDuPont, and E.I. du

Pont de Nemours and Company), divisions, subsidiaries, affiliates, partnerships, and joint

ventures, and the directors, officers, trustees, employees, attorneys, agents, consultants,

6

and representatives of its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures.

2.     "Active Ingredient" or "AI" means an ingredient, chemical, or molecule in a pesticide product that kills, controls, prevents, mitigates, or repels pests. *See* 40 C.F.R. § 158.300.

3.     "Agreement" or "Contract" means any oral, written, or implied contract, arrangement, understanding, or plan, whether formal or informal, between two or more Persons, together with all modifications or amendments thereto.

4.     "And," as well as "Or" shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any Request all information that otherwise might be construed to be outside the scope of the Request.

5.     "Any" shall be construed to include "all," and "all" shall be construed to include "any."

6.     "BASF" means BASF Ag Solutions, and its directors, officers, trustees, employees, attorneys, agents, consultants, and representatives, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and the directors, officers, trustees, employees, attorneys, agents, consultants, and representatives of its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures.

7.     "Basic Manufacturer" means, as to an Active Ingredient, the original EPA registrant of such Active Ingredient (including affiliates, co-registrants, and successors in interest thereof).

7

8. "Bayer" means Bayer Crop Science, and its directors, officers, trustees, employees, attorneys, agents, consultants, and representatives, its domestic and foreign parents (including Bayer Group and Bayer AG), predecessors (including The Monsanto Company), divisions, subsidiaries, affiliates, partnerships, and joint ventures, and the directors, officers, trustees, employees, attorneys, agents, consultants, and representatives of its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures.

9. "Benefit" means any actual or potential price or non-price benefit or consideration, including payments; price discounts; rebates; supply preferences or assurances; and technical or engineering support.

10. "Collaborative Work Environment" means a platform used to create, edit, review, approve, store, organize, share, and access documents and information by and among authorized users, potentially in diverse locations and with different devices. Even when based on a common technology platform, Collaborative Work Environments are often configured as separate and closed environments, each of which is open to a select group of users with layered access control rules (reader vs. author vs. editor). Collaborative Work Environments include Microsoft SharePoint sites, eRooms, document management systems (*e.g.*, iManage), intranets, web content management systems ("CMS") (*e.g.*, Drupal), wikis (*e.g.*, Confluence), work tracking software (*e.g.*, Jira), and blogs.

11. "Communication" or "Communicate" means any transmittal, exchange, transfer, or dissemination of information, regardless of the means by which it is

8

accomplished, and includes all communications, whether written or oral, and all discussions, meetings, telephone communications, text messages, instant messenger, Messaging Applications or systems (without limitation, including ephemeral messaging), or email messages.

12.     "Competitor" means any Person, other than the Company, that produces, manufactures, formulates, or imports any Crop-Protection Product for sale within the United States, and includes both generic pesticide companies and branded pesticide companies.

13.     "Covered Crop Protection Product" means any Crop Protection Product containing or consisting of any of the following Active Ingredients: acetochlor, mesotrione, methomyl, methoxyfenozide, oxyfluorfen, oxamyl, propyzamide (pronamide), or rimsulfuron.

14.     "Crop-Protection Product" means any pesticide product, formulated product, or manufacturing-use or technical-grade Active Ingredient, including any fungicide, herbicide, insecticide, nematicide, rodenticide, seed treatment or plant growth regulator. The term "Crop-Protection Product" includes each Loyalty Product.

15.     "Crop Year" means the business cycle year beginning on October 1 and ending on September 30.

16.     "Customer" means any Person that purchases or has purchased any Crop-Protection Product directly from the Company.

17.     "Data Set" means data held by, or accessible to, the Company in the ordinary course of business that is provided by the Company to respond to any Request,

9

in the form and with the accompanying information called for in Instruction 10. Wherever possible Data Sets should be provided on a Crop Year basis.

18. "Documents" means all written, printed, recorded, or electronically stored information ("ESI") of any kind in the possession, custody, or control of the Company, including information stored on and communications sent through social media accounts like Twitter, Facebook, or Snapchat; including chats, instant messages, text messages, direct messages, other Messaging Applications, audio/visual recordings, wherever stored, including documents contained in Collaborative Work Environments and other document databases as well as copies of documents that are not identical duplicates of the originals in a person's files; and copies of documents the originals of which are not in the possession, custody, or control of the Company. Employee-Owned Devices used to store or transmit documents responsive to this Subpoena are considered in the possession, custody, or control of the Company. "Documents" includes metadata, formulas, and other embedded, hidden, and bibliographic or historical data describing or relating to any document.

19. "Each" shall be construed to include "every," and "every" shall be construed to include "each."

20. "Employee-Owned Device" means any computer, phone, tablet, or other electronic device owned by a Company employee that has been used to conduct business for the Company.

10

21.     "End-Use Crop-Protection Product" means a Crop-Protection Product that has been formulated into a form suitable for sale to and application by end users, whether or not such product is in its final packaged form.

22.     "Exclusivity Condition" means any offer, Agreement, or program term pursuant to which a Basic Manufacturer conditions any Benefit to a Customer on that Customer limiting its purchase or sale of Crop Protection Products for which an Active Ingredient is sourced from a different manufacturer; whether or not that offer, Agreement, or program requires a Customer to completely refrain from the purchase or sale of Crop Protection Products for which an Active Ingredient is sourced from a different manufacturer. Exclusivity Conditions may include loyalty or market share conditions or requirements, loyalty or market share discounts, bundled discounts, volume discounts, or volume commitments. The term "Exclusive" shall be construed in accordance with the foregoing.

23.     "FMC" means FMC Corporation, and its directors, officers, trustees, employees, attorneys, agents, consultants, and representatives, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and the directors, officers, trustees, employees, attorneys, agents, consultants, and representatives of its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures.

24.     "Generic" means a Crop Protection Product that is EPA registered by a Person other than BASF, Bayer, Corteva, FMC, and Syngenta.

11

25.     "Including" means "including, but not limited to," and "include" shall be construed accordingly.

26.     "Information Systems Diagram" means an organized list, schematic, diagram, or other representation sufficient to show where and how the Company stores all physical and electronic information in its possession, custody, or control, including, but not limited to, information systems (e.g., email messages, voice-mail messages, communications logs, enterprise content management, instant messaging, database applications), Collaborative Work Environments, locations where information is stored, including servers and backup systems (e.g., physical Company facility, third-party vendor location, cloud). The Diagram shall include, for each Custodian of the Company, an "Application List" identifying any communication, collaboration, Messaging Application, or Collaborative Work Environment accessible, either currently or at any time during the period for which information is requested per Instruction I.1, on any Employee-Owned Device or electronic device in the possession, custody, or control of the Company if the application has ever been used on any occasion, in any manner whatsoever, to discuss the Company or its business, and the associated telephone number(s), account name(s), user name(s), affiliated with each Messaging Application.

27.     "Loyalty Program" means any offer, program, or Agreement containing an Exclusivity Condition. Loyalty Programs include, but are not limited to, "Loyalty," "Crops, Range & Pasture and Industrial Vegetation Management (CRPIVM) Loyalty," and "Corporate Offers."

28.     "Loyalty Product" means any Crop-Protection Product that consists of, includes, or contains an Active Ingredient that has at any time been expressly subject to an Exclusivity Condition of the Company.

29.     "Manufacturing-Use Crop-Protection Product" means any Crop-Protection Product other than an End-Use Crop-Protection Product, including any Crop-Protection Product in manufacturing-use and/or technical-grade form.

30.     "Messaging Application" refers to any electronic method that has ever been used by the Company and its employees to communicate with each other or entities outside the Company for any business purposes. "Messaging Application" includes platforms, whether for ephemeral or non-ephemeral messaging, for email, chats, instant messages, text messages, and other methods of group and individual communication (*e.g.*, Microsoft Teams, Slack). "Messaging Application" may overlap with "Collaborative Work Environment."

31.     "Person" includes the Company, and shall mean any natural person, corporate entity, partnership, association, joint venture, governmental entity, trust, or any other organization or entity engaged in commerce.

32.     "Plan" means any decision, strategy, intention, proposal, policy, recommendation, or consideration, whether or not precisely formulated, finalized, authorized, or adopted.

33.     "Relating to," "referring to," "regarding," or "about" mean, in whole or in part, constituting, containing, concerning, embodying, reflecting, discussing, explaining,

13

describing, analyzing, identifying, stating, supporting, refuting, relating to, referring to, regarding, about, dealing with, or in any way pertaining to.

34.     "Sufficient to show" means both necessary to provide the specified information and sufficient to provide the specified information.

35.     "Syngenta" means Syngenta Crop Protection, LLC, Syngenta Corporation, and Syngenta Crop Protection AG, and their respective directors, officers, trustees, employees, attorneys, agents, consultants, and representatives, their respective domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and the directors, officers, trustees, employees, attorneys, agents, consultants, and representatives of their respective domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1**

Unless previously produced, for each of the following Specifications contained in the Subpoena *Duces Tecum* issued to the Company on May 26, 2020 and the Civil Investigative Demand issued to the Company on December 4, 2021, provide all Documents responsive to the listed Specifications for the time periods requested by Instruction 1:

(a)     For the Subpoena *Duces Tecum* issued on May 26, 2020, Specifications 1, 3, 12, 13, and 21;

14

(b)     For the Civil Investigative Demand issued on December 4, 2021, Specifications 3, 5, 6, and 7.

**Request for Production No. 2**

Unless previously produced, for each of the following Specifications contained in the Subpoena *Duces Tecum* issued to the Company on May 26, 2020, provide all Documents responsive to the listed Specifications, replacing the phrase "Relevant Product" for "Loyalty Product" (as defined in these Requests) for the time periods requested by Instruction 1: Specifications 5, 6, 7, 8, 11, 16, 19, and 20.

**Request for Production No. 3**

Unless previously produced, for each of the following Specifications contained in the Subpoena *Duces Tecum* issued to the Company on May 26, 2020, provide all Documents responsive to the listed Specifications, replacing the phrase "Relevant Product" for "Covered Crop Protection Product" (as defined in these Requests) for the time periods requested by Instruction 1: Specifications 4, 9, 10, 15, and 17.

**Request for Production No. 4**

All Documents and Communications received by or exchanged between the Company and any non-party (whether informally or pursuant to a subpoena duces tecum or other formal process), in, regarding, or pursuant to this litigation or in any other litigation relating to any Exclusivity Condition, including *In re: Crop Protection*

15

*Products Loyalty Program Antitrust Litigation*, Case No. 1:23-md-3062-TDS-JEP (W.D.N.C.) and *State of Arkansas v. Syngenta Crop Protection AG*, Case No. 4:22-cv-01287-BSM (E.D. Ark.).

**Request for Production No. 5**

All Documents produced by the Company, transcripts of depositions and hearings, discovery requests and responses served and documents filed in any other litigation relating to any Exclusivity Condition, including: *In re: Crop Protection Products Loyalty Program Antitrust Litigation*, Case No. 1:23-md-3062-TDS-JEP (W.D.N.C.) and *State of Arkansas v. Syngenta Crop Protection AG*, Case No. 4:22-cv-01287-BSM (E.D. Ark.).

**Request for Production No. 6**

All Documents concerning and/or discussing the Federal Trade Commission's investigation of the Company, FTC File No. 191-0031, and/or this Litigation, including the Company's compliance with any civil investigative demand or subpoena issued to the Company in the course of that investigation or this Litigation.

**Request for Production No. 7**

All Documents that the Company intends to rely upon or use at trial and/or relies upon to answer interrogatories.

16

**Request for Production No. 8**

Documents sufficient to show, for each Loyalty Product or Crop Protection Product that the Company considered adding to a Loyalty Program developed, manufactured, offered for sale, or sold by the Company, such product's (a) identity and description, (b) chemical composition, (c) market segment (as defined by the Company), and (d) closest substitutes (as identified by the Company).

**Request for Production No. 9**

All Documents relating to the services, capabilities, and other benefits provided by Persons (other than basic or generic manufacturers) involved in the distribution or sale of Crop-Protection Products, including assessments, analyses, or comparisons of the benefits provided by such Persons compared with any other method of distribution or sale of Crop-Protection Products.

**Request for Production No. 10**

All Documents relating to assessments or analyses of the pricing or profits of any Persons (other than basic or generic manufacturers) involved in the distribution or sale of Crop-Protection Products, and the effect of any Benefits received from Loyalty Programs on the pricing or profits of any such Persons, including analyses, calculations, or estimates of the actual or intended pass-through of loyalty Benefits by any such Person.

**Request for Production No. 11**

All Communications between the Company and Persons (other than basic or generic manufacturers) involved in the distribution or sale of Crop-Protection Products relating to: (1) the price or terms on which Crop-Protection Products are distributed or sold; (2) the distribution or sale of Crop-Protection Products by any other Person; and (3) Loyalty Programs.

**Request for Production No. 12**

All Documents relating to the allocation of Crop-Protection Products to any Person (other than basic or generic manufacturers) involved in the distribution or sale of Crop-Protection Products.

**Request for Production No. 13**

All Documents, including assessments, analyses and strategic plans, related to any consideration of terminating any Loyalty Program, including any analysis of any possible effect such termination may have on the Company's business, competition, sales, pricing and/or profitability.

**Request for Production No. 14**

All Documents relating to any scientific data required to be submitted when registering a Crop-Protection Product or compensation owed to the original registration

of a Crop-Protection Product under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq. (1996).

**Request for Production No. 15**

All Documents relating to data compensation owed to the Company for any Loyalty Product under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq. (1996).

**Request for Production No. 16**

All Documents relating to the effects of any Loyalty Program on the Company's research and development of any Crop-Protection Product.

**Request for Production No. 17**

For January 1, 2002 to the present, copies of all Loyalty Programs and all actual or contemplated Exclusivity Conditions for any Crop-Protection Product, and all Documents relating to:

(a)    the terms of any Loyalty Program or Exclusivity Condition;

(b)    Plans and the implementation of any Plans relating to the Company's use of any Loyalty Program or Exclusivity Condition, including: (1) the Company's decision to initiate, maintain, or discontinue Exclusivity for any Crop-Protection Product or Active Ingredient, (2) the Company's decision to set or change the terms of an Exclusivity Condition, and (3) the

19

Company's decision to make the terms of Loyalty Programs public or nonpublic;

(c)    the actual, expected, contemplated, or potential effects of any such Loyalty Program or Exclusivity Condition, whether implemented by the Company or any other Basic Manufacturer, on competition for, prices of (including prices to distributors, retailers, and growers), performance of, output of, revenues for, and costs of any Crop-Protection Product;

(d)    assessments of the sales or profitability of Crop-Protection Products in geographies or time periods with Loyalty Programs or Exclusivity Conditions, including Loyalty Programs or Exclusivity Conditions implemented by the Company or any other Basic Manufacturer, in comparison to the sales or profitability of Crop-Protection Products in geographies or time periods without Loyalty Programs or Exclusivity Conditions;

(e)    the origin or purpose of any Loyalty Program;

(f)    the actual or expected value of any Loyalty Programs or Exclusivity Condition to the Basic Manufacturer implementing such Loyalty Program or Exclusivity Condition or to any other Person sourcing an Active Ingredient from such Basic Manufacturer; or

(g)    assessments of the sales or profitability of Crop-Protection Products that are subject to Loyalty Programs or Exclusivity Conditions, whether implemented by the Company or any other Basic Manufacturer, in

20

comparison to the sales or profitability of Crop-Protection Products that are

not subject to Loyalty Programs or Exclusivity Conditions.


**Request for Production No. 18**

From January 1, 2002 to the present, all documents relating to determining

eligibility for or financial accounting of, any Benefit accrued or paid under any Loyalty

Program, including all documents relating to any strategies, methods, or tools used to

determine or track any Person's eligibility for any Loyalty Program or for Benefits under

a Loyalty Program, including audits of purchases.


**Request for Production No. 19**

All Communications with Persons relating to Exclusivity Provisions and/or

Loyalty Programs, including but not limited to, negotiations or discussions of the terms

of those Exclusivity Provisions and/or Loyalty Programs, requirements to achieve any

Benefit, determining eligibility for any Benefit, audits of purchases to determine

eligibility to achieve any Benefit, and complaints about Exclusivity Provisions and/or

Loyalty Programs.


**Request for Production No. 20**

All Documents relating to allegations that the Company has engaged in

anticompetitive or unfair conduct in the manufacture or sale of Crop-Protection Products,

21

including complaints from actual or potential Customers or other Persons; threatened, pending, or completed lawsuits; and federal and state investigations.

**Request for Production No. 21**

All Documents relating to any actual, threatened, or anticipated instance of the Company failing or refusing to meet a current or former Customer's request or order for any Crop-Protection Product (whether any existing Product or a new Product, without limitation), including any allocation of Crop-Protection Products or termination of any supply, distributor, or retailer agreement related in any way to an actual or perceived failure by the Customer to agree to or meet the requirements of any Exclusivity Provision, whether or not related to that Crop-Protection Product.

**Request for Production No. 22**

All actual or potential Agreements or proposals between the Company and any Person relating to the sale of Crop Protection Products, including Documents relating to any actual or potential Agreement or proposal for:

(a)     the Company's supply or purchase of any Crop-Protection Product, including sales by the Company of Crop-Protection Products for use as (or to be formulated into) a Customer's private label products, or

(b)     the inbound or outbound "third-party" or "industrial" sale or purchase of a Crop-Protection Product to or from a Competitor.

**Request for Production No. 23**

       All Documents relating to actual or potential Agreements or proposals between the Company and any Basic Manufacturer relating to the sale of Crop Protection Products, including the April 27, 2015 mesotrione supply agreement between Syngenta Crop Protection LLC and Dow Agrosciences and any predecessor or successor agreements.

**Request for Production No. 24**

       All Documents negotiating, discussing, or constituting any Agreement between the Company and any other third party regarding the joint production or supply of acetochlor, including all Document negotiating, discussing, or constituting the terms of Acetochlor Registration Partnership.

**Request for Product No. 25**

       All Documents related to FTC-CTVA_00788143 (entitled "Black Friday Project Final Report") including all drafts, prior versions, or subsequent versions of; Communications about; analyses of; and data or other materials referenced to create FTC-CTVA_00788143 or any of its drafts, prior versions, or subsequent versions.

**Request for Production No. 26**

       A current copy of the Company's Information Systems Diagram, or if the Company does not maintain an Information Systems Diagram, documents sufficient to show the information contained in an Information Systems Diagram, including:

23

(a)     documents sufficient to show the location, identity, and folder structure of any internal or third-party data storage systems or databases that may contain documents or data relating to Crop-Protection Products; and

(b)     documents sufficient to show all methods of communication used by any Company employee in the conduct of business involving Crop-Protection Products, including Messaging Applications, electronic email, internal or third-party chat programs, and text messages.


**Request for Production No. 27**

All Documents Relating to Crop Protection Product sales data, import data, manufacturing data, market surveys, or other market data, research, or reports compiled, generated, prepared, created, sent, or distributed by any person other than the Company during the period from January 1, 2002 to the present, including any data or reports generated by the Company based on such materials, and including:

(a)     Kynetec AgroTrak data and reports, including FIPS county-level data;

(b)     Kynetec EZTrak data and reports, separately on a national and regional basis;

(c)     Kynetec RetailTrak data and reports;

(d)     Kynetec FarmTrak data and reports;

(e)     Panjiva, Fanwood, or other import data and reports;

(f)     Cal Agriscience data and reports;

(g)     AgData data and reports;

24

(h)     Electronic Data Interchange data and reports;

(i)     Stratus data and reports;

(j)     Kline and CropLife data and reports; and

(k)     Third-party indirect sales data, including expanded data corresponding to all fields included in Corteva's prior, investigation-stage productions of third-party data from the HUB database contained in Appendix A.2 to Corteva's Second Data Production Letter (Oct. 26, 2020) and Appendix A.3 to Corteva's Second Data Production Letter (Oct. 26, 2020).


**Request for Production No. 28**

Data Sets sufficient to show, from January 2002 to present, transactional sales data for each of the Company's Crop Protection Products sold in, or for use in, the United States, broken down by State in which Crop Protection Products were sold, including:

(a)     expanded data corresponding to all fields included in Corteva's prior, investigation-stage productions in Appendix A.1 to Corteva's Second Data Production Letter (Oct. 26, 2020), including but not limited to the product name, material number, price, net sales, and units;

(b)     the EPA registration number;

(c)     product classification indicating whether the product is a Manufacturing-Use Crop Protection Product or End-Use Crop Protection Product;

(d)    product identification and classification variables used by the Company for the relevant Crop Protection Product, such as category, subcategory, segment, fighting brand, private label, or value-added product;

(e)    the identity, Customer number(s), and classifications of the Customer to which the product was sold (e.g., manufacturer, distributor, independent retailer, cooperative, farmer, broker, size, location, and/or other (specify));

(f)    the product name on packaging and any other names of the relevant End-Use Crop Protection Product sold by the Customer that incorporates such Crop Protection Product; and

(g)    conversion factor to determine approximate acres treated per unit of the Crop Protection Product.

**Request for Production No. 29**

Data Sets sufficient to show, from January 2002 to present, monthly quantity, use, transfer, and pricing data for each of the Company's Manufacturing-Use Crop Protection Products, broken down by State if kept by State, including:

(a)    name of the Active Ingredient contained within the Manufacturing-Use Crop Protection Product;

(b)    pounds of the Manufacturing-Use Crop Protection Product manufactured by the Company;

(c)    for Manufacturing-Use Crop Protection Products acquired from a manufacturer other than the Company, pounds and costs in dollars of the

26

Manufacturing-Use Crop Protection Product acquired (listing imports and US production separately);

(d)     units and costs in dollars of End-Use Crop Protection Products acquired from a manufacturer other than the Company (listing imports and US production separately), and a conversion factor to determine pounds of Manufacturing-Use Crop Protection Product per unit of the End-Use Crop Protection Product;

(e)     pounds of Manufacturing-Use Crop Protection Product used to make End-Use Crop Protection Products internally, including:

   i.     the internal transfer price;

   ii.    the list of End-Use Crop Protection Products created with the Manufacturing-Use Crop Protection Product;

   iii.   conversion factor to determine pounds of Manufacturing-Use Crop Protection Product per unit of the End-Use Crop Protection Product;

(f)     volume of each End-Use Crop Protection Product created with the Manufacturing-Use Crop Protection Product (listing U.S. market and international market volumes separately);

(g)     the net revenue and pounds of the Manufacturing-Use Crop Protection Product sold externally, broken down by State in which Crop Protection Products were sold, including

   i.     the net price;

27

ii.    the list of End-Use Crop Protection Products created with the Manufacturing-Use Crop Protection Product;

iii.    conversion factor to determine pounds of Manufacturing-Use Crop Protection Product per unit of the End-Use Crop Protection Product;

iv.    volume of each End-Use Crop Protection Product created with the Manufacturing-Use Crop Protection Product (listing U.S. market and international market volumes separately).

**Request for Production No. 30**

Data Sets sufficient to show, from January 2002 to present, on an annual basis and by product, the Company's costs and margins with respect to the manufacture, transportation, promotion, and sale of Crop Protection Products, broken down by State in which Crop Protection Products were sold, including:

(a)    expanded data corresponding to all fields included in Corteva's prior, investigation-stage productions in Appendix A to Corteva's Fifth Data Production Letter (Dec. 4, 2020), including identification of Active Ingredient; components of cost of good sold such as (i) freight or shipping charges, (ii) storage, and (iii) plant overhead; and categories of expenses such as (i) promotional expenses, and (ii) advertising expenses;

(b)    additional components of cost of goods sold, including: (i) ingredients other than the Active Ingredient; (ii) direct labor; (iii) depreciation; and (iv) any other component of cost of goods sold tracked in the ordinary course of

28

business, stated separately in dollars and indicating method of allocation, if any;

(c)     gross margins in dollars, indicating method of calculation;

(d)     other categories of expenses, including: (i) marketing expenses; (ii) detailing expenses; (iii) research and development expenses, and (iv) any other significant expenses related to or allocated to each Crop Protection Product tracked in the ordinary course of business, stated separately in dollars;

(e)     net margins in dollars; and

(f)     expanded data sets corresponding to all fields included in Corteva's prior, investigation-stage productions in Appendix A to Corteva's Fourth Data Production Letter (Nov. 16, 2020) and Appendix B to Corteva's Fifth Data Production Letter (Dec. 4, 2020).

**Request for Production No. 31**

Data Sets sufficient to show, from January 2002 to present, annual sales, pricing, cost, and margin data for each Covered Crop Protection Product sold by the Company worldwide from January 2002 to present, including:

(a)     country and region;

(b)     product name on packaging;

(c)     any other product names used for marketing or other purposes;

(d)     all product identification and classification variables used by the Company, such as category, subcategory, segment, fighting brand, private label, or value-added product;

(e)     the SKU or other product number or identifier used by the Company;

(f)     the formulation, including the concentration of each Active Ingredient(s);

(g)     any applicable regulatory registration number;

(h)     gross sales in US dollars;

(i)     each component of any difference between gross sales and net sales, including any discounts, rebates, or other associated payments or credits to the Customer with respect to the sales, stated separately in dollars;

(j)     net sales in US dollars;

(k)     currency conversion used to transform local currency into dollars;

(l)     units sold;

(m)     average per-unit price net of discounts, rebates, and other associated payments and credits;

(n)     each component of cost of goods sold, including: (i) Active Ingredient; (ii) other ingredients; (iii) freight or shipping charges; (iv) storage; (v) direct labor; (vi) plant overhead; (vii) depreciation; and (viii) any other component of cost of goods sold tracked in the ordinary course of business, stated separately in dollars and indicating method of allocation, if any;

(o)     gross margins in dollars, indicating method of calculation;

(p)     each category of other expenses, including: (i) promotional expenses; (ii) marketing expenses; (iii) detailing expenses; (iv) advertising expenses; (v) research and development expenses, and (vi) any other significant expenses related to or allocated to each Covered Crop Protection Product tracked in the ordinary course of business, stated separately in dollars; and

(q)     net margins in dollars.

(r)     conversion factor to determine pounds of each Active Ingredient per unit;

(s)     pounds of Active Ingredient sold;

(t)     conversion factor to determine approximate acres treated per unit; and

(u)     estimated acres treated.

**Request for Production No. 32**

From 2002 to the present, all data, documents, and calculations related to Customer qualification with respect to Active-Ingredient-based Exclusivity Conditions offered by the Company, including:

(a)     Customer name;

(b)     names of the program, Agreement, and offer containing the Exclusivity Condition;

(c)     Active Ingredient subject to the Exclusivity Condition;

(d)     share threshold(s) required to satisfy the Exclusivity Condition in whole or in part;

(e)     whether each share threshold was satisfied;

31

(f)     total qualifying sales/purchases of Company Crop Protection Products by the Customer, allocated on a state-by-state basis, during the program year (numerator of share calculation);

(g)     detail by product of all qualifying sales/purchases of Company Crop Protection Products by the Customer during the program year, including product name, SKU or other product number or identifier, units, price, and net sales/purchases;

(h)     total sales/purchases of all relevant Crop Protection Products by the Customer during the program year (denominator of share calculation);

(i)     detail by product of all sales/purchases, on a state-by-state basis, of all relevant Crop Protection Products by the Customer during the program year, including product name, SKU or other product number or identifier, units, price, net sales/purchases, and whether such sale/purchase is counted for or against the applicable share threshold, or held neutral or outside the calculation;

(j)     total amount, in dollars, of Benefit earned by the Customer as a result of the Customer meeting the share threshold;

(k)     total amount, in dollars, of payments made (or other Benefit conferred) to the Customer by the Company contingent upon the Customer satisfying the Exclusivity Condition in whole or in part;

(l)     detail of calculations underlying all such contingent payments, including, for all payment-eligible sales/purchases of Company Crop Protection

32

Products by the Customer, product name, SKU or other product number or

identifier, units, price, and net sales/purchases, and amount or percentage

rate of payment;

(m)     names of any additional programs, incentives, or offers that became

available to Customer based on Customer satisfying Exclusivity Condition;

(n)     total amount (in dollars) of payments made (or other Benefit conferred) to

the Customer by the Company pursuant to such additional program,

incentive, or offer; and

(o)     expanded data corresponding to all fields included in Corteva's prior,

investigation-stage productions in Appendix C to Corteva's First Data

Production Letter (Oct. 13, 2020) and Appendix B to Corteva's Second

Data Production Letter (Oct. 26, 2020).


**Request for Production No. 33**

For every Data Set submitted by the Company in response to the FTC's May 26,

2020 Subpoena Duces Tecum, the FTC's December 4, 2021 Civil Investigative Demand,

or in the course of the FTC's pre-complaint investigation—including any Data Set

submitted on a voluntary basis—and not separately referenced in a prior specification, a

corresponding Data Set expanded to cover the time period from January 1, 2002 to the

present and to cover all Crop Protection Products manufactured, produced, or sold by

Company, including:

33

(a)     Pricing and program data corresponding to Appendices A.1, A.2, A.3, B.1,

B.2, B.3, B.4, B.5, and B.6 to Corteva's First Data Production Letter (Oct.

13, 2020);

(b)     Capacity data corresponding to Appendix A to Corteva's Third Data

Production Letter (Nov. 13, 2020);

(c)     Production, facility, and cost data corresponding to Appendices B and C to

Corteva's Third Data Production Letter (Nov. 13, 2020);

(d)     Intellectual property data corresponding to Appendices D.1 through D.8 to

Corteva's First Data Production Letter (Oct. 13, 2020);

(e)     Projected sales and expense data corresponding to Appendix C to Corteva's

Third Data Production Letter (Nov. 13, 2020).


Dated:  April 19, 2024          Respectfully submitted,

  /s/ Wesley G. Carson
WESLEY G. CARSON
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3743
Email: wcarson@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

34

/s/ Nicole S. Gordon
NICOLE S. GORDON
Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94610
Telephone: (415) 510-4400
Email: nicole.gordon@doj.ca.gov

*Attorney for Plaintiff State of California*


/s/ Paul J. Harper
PAUL J. HARPER
Assistant Attorney General, Antitrust
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
Telephone: (312) 814-3000
Email: paul.harper@ilag.gov

*Attorney for Plaintiff State of Illinois*


/s/ Noah Goerlitz
NOAH GOERLITZ
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 725-1018
Email: noah.goerlitz@ag.iowa.gov

*Attorney for Plaintiff State of Iowa*

/s/ Conor J. May
JAN M. ZAVISLAN
Senior Counsel
CONOR J. MAY
Assistant Attorney General
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Jan.Zavislan@coag.gov
        Conor.May@coag.gov

*Attorneys for Plaintiff State of Colorado*


/s/ Matthew Michaloski
MATTHEW MICHALOSKI
CHRISTI FOUST
Deputy Attorneys General
SCOTT BARNHART
Chief Counsel and Director of Consumer
Protection
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 234-1479
Email: matthew.michaloski@atg.in.gov
        christi.foust@atg.in.gov
        scott.barnhart@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

/s/ Colin P. Snider
COLIN P. SNIDER
Office of the Attorney General of
Nebraska
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-3840
Email: Colin.Snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

/s/ Hamilton Millwee
HAMILTON MILLWEE
Assistant Attorney General
TATE BALL
Assistant Attorney General
Office of the Attorney General of
Tennessee
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
        Tate.Ball@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

/s/ Luminita Nodit
LUMINITA NODIT
Assistant Attorney General,
Antitrust Division
Washington State Office
of the Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104
Telephone: (206) 254-0568
Email: Lumi.Nodit@atg.wa.gov

*Attorney for Plaintiff State
of Washington*

/s/ Katherine Moerke
KATHERINE MOERKE
JASON PLEGGENKUHLE
ELIZABETH ODETTE
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 296-3353
Email: katherine.moerke@ag.state.mn.us
        jason.pleggenkuhle@ag.state.mn.us
        elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

/s/ Timothy D. Smith
TIMOTHY D. SMITH
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 934-4400
Email: tim.smith@doj.state.or.us

*Attorney for Plaintiff State of Oregon*

/s/ William Shieber
JAMES LLOYD
Chief, Antitrust Division
TREVOR YOUNG
Deputy Chief, Antitrust Division
WILLIAM SHIEBER
Assistant Attorney General
Office of the Attorney General of Texas
300 West 15th Street
Austin, TX 78701
Telephone: (512) 936-1674
Email: William.Shieber@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

36

/s/ Laura E. McFarlane
LAURA E. MCFARLANE
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-8911
Email: mcfarlanele@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*