# Exhibit AB



Neutral Citation Number: [2023] EWHC 1065 (Comm)

Case No: CL-2019-000118

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**KING'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 05/05/2023

Before :

**THE HONOURABLE MR JUSTICE HENSHAW**

- - - - - - - - - - - - - - - - - - - - -

Between :

**THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**　　**Claimant**

**- and -**

**(1) FAHAD MAZIAD RAJAAN AL RAJAAN**　　**Defendants**
**(1) MUNA AL-RAJAAN AL WAZZAN**
**(in her capacity as representative of the estate of Mr Fahad**
**Maziad Rajaan Al Rajaan (deceased))**
**(2) MUNA MOHAMMED ABDULAZIZ AL WAZZAN**
**(3) BANQUE PICTET & CIE SA**
**(4) PHILIPPE BERTHERAT**
**(5) KAMRAN AMOUZEGAR**
**(6) PHOENIX INTERNATIONAL CONSULTANTS SARL**
**(7) ANTOINE NASRALLAH**
**(8) PICTET & CIE (EUROPE) SA**
**(9) PICTET BANK AND TRUST LIMITED**
**(10) BANK PICTET & CIE (ASIA) LIMITED**
**(11) MIRABAUD & CIE SA**
**(12) PIERRE MIRABAUD**
**(13) THIERRY FAUCHIER-MAGNAN**
**(14) LUC ARGAND**
**(15) MAN GROUP LIMITED (formerly MAN GROUP PLC)**
**(16) MAN STRATEGIC HOLDINGS LIMITED**
**(17) MAN INVESTMENTS LIMITED**
**(18) MAN INVESTMENTS AG**
**(19) MAN INVESTMENTS MIDDLE EAST LIMITED**
**(20) ANTOINE MASSAD**
**(21) MOHAMMEAD EL GHAZZI**
**(22) UNION BANCAIRE PRIVÉE, UBP SA**
**(23) UBP ASSET MANAGEMENT (BERMUDA) LIMITED**

**(24) ANNE ROTMAN DE PICCIOTTO**
**(25) DANIEL DE PICCIOTTO**
**(26) FRANCESCO MOMBELLI**
**(27) ICS INVESTMENT CONSULTING SERVICES SA**
**(28) SINTESI LIMITED**
**(29) METHIS MANAGEMENT LIMITED**
**(30) EFG BANK AG**
**(31) GILLES GUERIN**
**(32) THE ESTATE OF EDGAR DE PICCIOTTO**
**(33) GUY DE PICCIOTTO**
**(34) MARC DE PICCIOTTO**
~~**(35) DANIELE DE PICCIOTTO**~~
**(36) VP BANK AG**
**(37) VP BANK (SCHWEIZ) AG**
**(38) RENATO GHITTINI**
**(39) ELY MICHEL RUIMY**
**(40) AERIUM FINANCE LIMITED**
**(41) THE PENSÉE FOUNDATION**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Stuart Ritchie KC and Christopher Burdin** (instructed by **Stewarts Law LLP**) for the
**Claimant**
**Tom Weisselberg KC and Kendrah Potts** (instructed by **Greenberg Traurig LLP**) for the
**First Defendant**
**Tim Akkouh KC** (instructed by **PCB Byrne LLP**) for the **Second Defendant**
The Third to Forty-First Defendants did not appear and were not represented

Hearing dates: 20 and 21 March 2023
Draft judgment circulated to the parties: 21 April 2023

# Approved Judgment

This judgment was handed down remotely at 10.30am on 05 May 2023 by circulation to the
parties or their representatives by e-mail and by release to the National Archives.

.............................

**Mr Justice Henshaw:**

(A) INTRODUCTION ............................................................................................ 3

(B) FACTUAL BACKGROUND ........................................................................... 5

(C) LOCATION OF AND CONTROL OVER THE DOCUMENTS ................... 12

(D) THE ENGLISH LEGAL POSITION ............................................................. 14

(E) SWISS LAW .................................................................................................. 17

    (1) Introduction .............................................................................................. 17

    (2) SCPC Articles 69, 73 and 101-108 (pre-trial proceedings and access to file) .............. 18

    (3) SCC Article 271 (official foreign activities on Swiss territory) .................... 27

        (a) Effect of Article 271 ............................................................................ 27
        (b) Compulsion .......................................................................................... 31
        (c) Documents relating to third parties ..................................................... 41
        (d) Impact of MLA requests ...................................................................... 43
        (e) Territorial extent of Article 271 ........................................................... 44
        (f) Conclusions .......................................................................................... 46
    (4) SCC Article 273 (trade secrets) .................................................................. 46

    (5) SCC Articles 292 and 293 (publication of official files declared secret) .............. 48

    (6) Other confidentiality/secrecy provisions .................................................... 49

    (7) The applicants' legal advisers .................................................................... 50

(F) RISK OF PROSECUTION OR OTHER PREJUDICE .................................. 51

(G) COMITY EXERCISE OF DISCRETION .................................................... 53

(H) CONCLUSION .............................................................................................. 55

## (A) INTRODUCTION

1.    The Claimant ("***PIFSS***") is a public institution authorised by law to operate the State of Kuwait's social security system and pension scheme. Its primary role is to provide Kuwaiti nationals with insurance for retirement, disability, sickness and death.

2.    In these proceedings, PIFSS brings claims for sums totalling in the region of US$874 million, arising from the alleged corruption between 1994 and 2014 of its former Director General, the late Mr Fahad Maziad Rajaan Al Rajaan. That sum is said to represent the known total of unlawful corrupt payments received by Mr Al Rajaan and his associates. The payments are alleged to have been received in violation of Mr Al Rajaan's fiduciary duties to PIFSS (as its most senior officer) and of Kuwaiti public property and anti-bribery laws. PIFSS has identified nine alleged corrupt schemes to date, pursuant to which it says the payments were made and concealed by different groups of defendants.

3.    Mr Al Rajaan died on 6 September 2022. By orders made on 26 March 2023 his widow, Muna Al-Rajaan Al Wazzan, who is also the Second Defendant, was appointed administrator *ad litem* to represent Mr Al Rajaan's estate in respect of these

proceedings, and administrator *ad colligenda bona* to represent his English estate for the purpose of collecting, getting in and receiving that estate, and doing such acts as are or may be necessary for its preservation; and was authorised *inter alia* to take and do all acts necessary to comply with her disclosure obligations.

4.  Ms Al Wazzan is also sued in her own right. PIFSS in its Re-Re-Re-Amended Particulars of Claim summarises the case against her thus:

> "PIFSS' primary case is that in relation to all of the Schemes above, Ms. Al Wazzan was used by Mr. Al Rajaan as his nominee, in setting up companies and bank accounts in her name through and/or in to which Secret Commissions were paid. It claims that the acts and omissions carried out by him in her name are acts for which he is liable. She is joined to these proceedings to ensure that PIFSS' obtains effective remedies, including under Article 22 of the Kuwait Public Property Law."

5.  PIFSS alleges that the other defendants, who are mainly financial institution defendants, individual partners or representatives of those institutions and a number of other financial intermediaries and associated corporate vehicles, acted in concert in various combinations to make corrupt payments to Mr Al Rajaan and to assist him to conceal and dispose of such payments.

6.  This judgment deals with an application dated 12 January 2023 issued by the First and Second Defendants to resist disclosure and inspection (on grounds other than legal professional privilege) of any documents to which the estate and/or Mr Al Rajaan has or had access which are held by any Swiss-based entity or individual or which are located in (or originating from and obtained under compulsion in) Switzerland. The application thereby aims to restrict the disclosure that would otherwise have to be made pursuant to the Order of Jacobs J made at the first CMC in this case on 9 June 2022. There are two main categories of affected documents:

    i)   a large file of documents held by the Swiss Federal Prosecutor's Office arising from its investigations of Mr Al Rajaan and Ms Al Wazzan since 2012 ("***the SFPO file***"), and

    ii)  other documents held by Swiss-based entities or individuals, or located in Switzerland, or originating from and obtained under compulsion in Switzerland. These are said to include documents held by a number of third parties, and also documents located at Mr Al Rajaan's/his estate's Swiss properties and/or held by Mr Al Rajaan/the estate and/or otherwise originating in Switzerland.

7.  The application is supported by two witness statements from Annabel Thomas of the First Defendant's solicitors dated 12 January 2023 and 6 March 2023; and two reports on Swiss law from Professor Marcel Niggli dated 11 January 2023 and 6 March 2023. PIFSS also relies on a witness statement from its solicitor Martin Walsh dated 27 February 2023; and a report on Swiss law from Professor Mark Pieth dated 22 February 2023. Both of the experts are experienced Swiss lawyers. Professor Niggli has been a professor of criminal law since 1995, and since 2003 has been the principal editor of the most comprehensive commentaries on Swiss criminal law and procedure. Professor Pieth has been a professor of criminal law and criminology since 1993, has worked in

4

private practice, held a senior role for four years in the Swiss Federal Office of Justice, and has co-edited one of the main commentaries on Swiss criminal law. I have considered all these materials very carefully. I also heard argument from counsel over one and a half days, and am very grateful to them for their very cogent and helpful submissions.

8.      In summary, the First and Second Defendants ("*the applicants*") resist disclosure and inspection on the basis that: (i) an order for disclosure of the SFPO file or the other documents referred to in § 6(ii) above would expose them and their legal representatives to a real risk of prosecution and sanction under Swiss law; (ii) the Swiss courts have repeatedly refused to remove certain restrictions which apply to PIFSS's access to the SFPO file and, as a matter of comity, the English courts should not undermine the Swiss courts or the mutual legal assistance ("*MLA*") process to which I refer below; (iii) PIFSS will in any event be entitled to obtain copies of documents (and has already received some documents) from the SFPO file if and when documents are remitted by Switzerland to Kuwait pursuant to MLA requests made by the State of Kuwait for the purpose of its own criminal proceedings against the applicants; and (iv) PIFSS could lawfully obtain documents through letters of request pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("*the Hague Convention*"). In consequence, it is said, this court should not exercise its discretion to order disclosure as such an order is not reasonable, proportionate, fair or just and would therefore be contrary to the overriding objective and CPR PD 57AD §§ 2.4 and 6.4.

9.      PIFSS's position, in brief outline, is that the evidence does not establish that the disclosure would involve any breach of Swiss law, still less any real risk of prosecution or other relevant prejudice; that the documents are essential for the proper conduct of the present case; that the Hague Convention route would (as has been observed in previous cases) be a slow and unsatisfactory alternative to disclosure; and that, overall, the balance comes down firmly in favour of disclosure.

10.     For the reasons set out below, I have come to the conclusion that PIFSS is correct, and that I should refuse the applications, subject to one limited potential caveat. The caveat is that, in the interests of comity, measures should be put in place, at least for the time being and subject to later review by the court, to avoid any risk of the documents in question being transmitted onward to the State of Kuwait. That may or may not require measures to prevent individuals at PIFSS itself (with the possible exception of named individuals in PIFSS's legal department) obtaining copies of the documents; however, I shall hear further argument as to the appropriate measures.

## (B) FACTUAL BACKGROUND

11.     In 2008 the Kuwaiti public prosecutor launched case 1499/2008 against Mr Al Rajaan and Ms Al Wazzan.

12.     On 14 June 2011 the Kuwaiti authorities made an international MLA request of the Swiss Federal Prosecutor's Office, in support of case 1499/2008 ("*the First MLA Request*").

13.     On 1 May 2012 a criminal investigation was instituted in Switzerland against Mr Al Rajaan and Ms Al Wazzan in relation to various matters now raised by PIFSS in the present English proceedings. Since then, the Swiss authorities have been investigating

their conduct in relation to the alleged payment and laundering of secret commissions pursuant to allegedly corrupt schemes which (on PIFSS's case) depended at its core upon the abuse of Mr Al Rajaan's position as Director General of PIFSS between 1984 to 2014 ("*the Swiss criminal proceedings*").

14. The Swiss criminal proceedings have led to the compilation of an extensive file of evidence, the SFPO file, which is highly material to the allegations in the present proceedings. As noted below, Mr Al Rajaan had (and his estate has) full access to the file, but PIFSS's access is restricted. The materiality of the contents of the file is illustrated by the fact that PIFSS's case is very largely pleaded on the basis of the notes which it was permitted to take of the contents of the SFPO file at the Swiss Federal Prosecutor's premises, and Mr Al Rajaan's Defence contains numerous references to documents in the file.

15. In January and April 2015 the Swiss authorities provided to the State of Kuwait documents relating to the Mirabaud scheme, in response to the First MLA Request made in 2011. Copies of those documents were transmitted to PIFSS, which is free to use them without restriction.

16. Also in January 2015, PIFSS filed a criminal complaint in Switzerland against Mr Al Rajaan and Ms Al Wazzan.

17. In May 2016, PIFSS was accepted as a plaintiff, a private victim, in the Swiss criminal proceedings.

18. Since 2017, PIFSS has had access to the SFPO file, notwithstanding that "*Mr Al Rajaan had fought a long and hard battle to prevent the claimant from obtaining access to those documents*" in Switzerland ([2019] EWHC 2886 (Comm) § 62 per Jacobs J).

19. Pursuant to a decision of the Swiss Federal Criminal Court (Appellate Division) on 10 January 2017, PIFSS's access to the SFPO file is restricted to taking notes, but not copies, of documents. That ruling was made on an appeal brought by Mr Al Rajaan and Ms Al Wazzan against a decision of the Office of the Attorney General of Switzerland recognising PIFSS's access to the SFPO file as a private plaintiff in the criminal proceedings and rejecting the appellants' contention that access should be restricted. The Appellate Division noted the appellants' objection that if access were not restricted, then PIFSS would send the documents to the State of Kuwait, and that that would circumvent the conditions set by international mutual assistance law in criminal matters regarding the transmission of evidence (§ 1.4.1). In a previous case (ATF 139 IV 293) the Swiss Federal Supreme Court had held an access restriction to be justified by a risk of undue transmission of information between a bank and a state (Russia) that had requested mutual assistance. The bank there was of a 'quasi-state nature', being owned by a Russian bank that was itself 75% owned by the State (§ 1.4.3.3). The Appellate Division considered that PIFSS too should be regarded as a 'quasi-state entity', giving rise to a risk of undue transmission, since the Minister of Finance of Kuwait presides over PIFSS's board of directors, the board's members are appointed by the Council of Ministers (including a member of the Ministry of Social Affairs and Labour) and PIFSS has a deficit secured by the Public Treasury of the State of Kuwait (§ 1.4.4).

20. The Appellate Division considered various possible mitigating measures, which it did not consider would work: a promise by the State of Kuwait not to use the materials for its own criminal proceedings (which the court considered would not be binding), an examination of each and every document in the case file to determine whether access was permissible (which was considered impracticable given the complexity and volume of the files, being several dozen binders), and a process of electronic restrictions that would prevent printing and mean that each document bore a watermark setting out conditions of use (which it was thought would not be effective). The court therefore decided to allow PIFSS to take notes but not copies of the documents, saying:

> "Therefore, and since, in the present case, it is impossible to conceive of a less invasive measure conducive to preventing the transmission of documents to Kuwait outside of any mutual assistance proceedings, this manner of exercising the right to consult the file—which guarantees taking note of all the documents constituting the file—addresses the requirements of proportionality imposed in this regard …" (§ 2.2)

21. A further decision of the Swiss Federal Court on 26 July 2017 provided that PIFSS's counsel were authorised to take verbatim notes of the SFPO file, on the basis that such notes would not have evidential value in foreign proceedings.

22. On 21 February 2019 PIFSS commenced the present proceedings.

23. On 27 June 2019 a Kuwaiti criminal court found Mr Al Rajaan and Ms Al Wazzan guilty of a range of offences and sentenced them to life in prison, with hard labour, and pecuniary penalties. Those verdicts were rendered *in absentia,* in a case which the applicants say was politically motivated and violated fundamental human rights (with no right of appeal or retrial without submission to imprisonment during the same).

24. Following a request made by PIFSS in June 2019, the Kuwaiti authorities instituted a new criminal investigation against Mr Al Rajaan and Ms Al Wazzan, number 217/2019.

25. On 3 July 2019 PIFSS withdrew its participation as a civil plaintiff in the Swiss criminal proceedings, in order to permit it to pursue the present proceedings and to seek a worldwide freezing order against Mr Al Rajaan, which was granted. In his judgments ordering freezing relief against Mr Al Rajaan ([2019] EWHC 2886 (Comm) § 62) and on PIFSS's later application for further asset disclosure from him ([2020] EWHC 1498 (Comm) § 71), Jacobs J noted that Mr Al Rajaan "*had complete and unrestricted access to the [SFPO file]*", and "*does not allege that the production of documents to PIFSS…would result in his breaching any order of the Swiss court or that he would be exposed to any penalty or sanction*".

26. On 12 September 2019 the Swiss Federal Prosecutor's Office rejected a request by PIFSS (made on 19 June 2019) to have the restrictions on its access to the SFPO file removed on the basis, *inter alia*, that they violated its right to be heard, the principle of equality of arms and Article 108 of the Swiss Criminal Procedure Code. The Swiss Federal Criminal Court rejected PIFSS's appeal against that decision by a decision dated 7 April 2020. The court noted that restrictions on the right to access the court file can be imposed, particularly where the party seeking access is of a quasi-state nature, to ensure the MLA process was not circumvented.

7

27.     In 2020, the Swiss Federal Prosecutor's Office initiated separate criminal proceedings against Banque Pictet & Cie and its former partner Philippe Bertherat (who were defendants in these proceedings but who succeeded in challenging the court's jurisdiction). PIFSS is a party to the Swiss criminal proceedings against Mr Bertherat (at least) and in that capacity has access to the SFPO file on the same restricted basis as it has in the investigation concerning Mr Al Rajaan and Ms Al Wazzan.

28.     In January 2021 the State of Kuwait made a further MLA request ("***the Second MLA Request***") to obtain documents relating to the other alleged schemes pleaded in the present proceedings (other than the Pensée scheme, which is not known to have operated through Switzerland, and the Mirabaud scheme): namely those known as the Pictet, EFG / Nasrallah, UBP, Man, Mombelli, VP Banking and Aerium schemes. A limited number of documents requested pursuant to the Second MLA Request were sent to the Kuwaiti Embassy in Berne in 2022, and PIFSS received copies of those documents from the Swiss Prosecutor in its capacity as a private victim in the Swiss criminal proceedings. PIFSS expects to receive copies of other documents provided pursuant to the Second MLA Request once they have been provided to the State of Kuwait, but it is not known how many documents will be received or when.

29.     The Swiss criminal proceedings against Mr Al Rajaan and Ms Al Wazzan were suspended in April 2021, and remain suspended now, two years later. Formal criminal proceedings cannot be advanced against Mr Al Rajaan personally following his death. The proceedings may continue in relation to Ms Al Wazzan and/or in respect of the assets of Mr Al Rajaan's estate currently frozen by the Swiss Federal Prosecutor. The SFPO's charges of aggravated money laundering still stand against Ms Al Wazzan, and at least the confiscation/compensation aspects of the Swiss proceedings may continue.

30.     Letters of request were granted by Jacobs J on 20 December 2021 following applications by EFG and UBP, who are also Defendants to these proceedings. At first instance, EFG's request was refused by the Geneva Court of First Instance and UBP's request was granted. On appeal, the Court of Justice of the Canton of Geneva held on 22 July 2022 that granting the requests would circumvent the Second MLA Request, and should not occur until the Swiss criminal courts have decided whether to accede to the Second MLA Request. The cantonal court, referring to submissions on behalf of Antoine Nasrallah (the Seventh Defendant to the present case in England) said *inter alia*:

> "4. Antoine NASRALLAH criticises the Court for having executed the challenged letter rogatory, even though it infringes Switzerland's sovereignty and security, since international mutual legal assistance proceedings in criminal matters, concerning the transmission of the same documents, are still pending.
>
> …
>
> 4.2 In this matter, PIFSS is a plaintiff in Swiss criminal proceedings No. [] against [] in connection with possible unlawful commissions received by the latter during his term of office as Managing Director. In the context of these proceedings, the Federal Criminal Court considered that PIFSS was a quasi-

state entity, so that there was a concrete risk that it would transmit to the State of Kuwait the documents of the proceedings, in particular those relating to bank account number [] opened with the []  PIFSS's access to the criminal file was therefore limited, in that it could not collect copies of these documents.

Based on the above proceedings, criminal proceedings were initiated against [] in Kuwait. In January 2021, Kuwait filed a request for mutual legal assistance in criminal matters with the OAG (proceedings No. []), aimed in particular at obtaining the above-mentioned bank documents.  [] opposed this request, the fate of which has not yet been decided.

PIFSS has also initiated civil proceedings in the United Kingdom against [] and [] relating to the same set of facts. At the request of the respondent, the United Kingdom has requested mutual legal assistance in civil matters, which also concerns the same bank documents.

In these specific circumstances, it appears that the Swiss civil courts cannot, as it stands, rule on the disputed request for mutual assistance in civil matters, as this would render the previous mutual legal assistance procedure in criminal matters, No. [] meaningless and would probably be contrary to the fundamental principles of Swiss procedural law.

Contrary to what the Respondent maintains, the fact that the OAG had authorised the transmission of bank documents relating to another bank, according to its allegations, is not in itself decisive, as this part of the dispute is not known and the outcome of the mutual legal assistance procedure No. [] is not known either.

Furthermore, authorising the transmission of the documents that are the subject of the challenged Order would have the consequence that PIFSS would probably have full access to them in the English proceedings, even though the Federal Criminal Court limited this access in in view of the concrete risk of transferring the context of criminal proceedings SV [] the information and documents to the State of Kuwait.

Thus, as long as the Swiss criminal courts have not made a final decision on whether to grant or refuse to hand over to the State of Kuwait the documentation relating to account No. [] the Swiss civil courts cannot grant the mutual legal assistance in civil matters requested for the transmission of these same documents in the context of proceedings on the merits, which are also between PIFSS and Fahad Maziad AL-RAJAAN and which relate to an identical set of facts, at the risk of rendering a contradictory decision with irreparable consequences.

> …
>
> It thus appears inadmissible, from the point of view of plausibility, to execute the disputed letter rogatory as it stands, even though the mutual legal assistance proceedings No. [] are still pending before the Swiss federal criminal courts.
>
> Consequently, the challenged Order will be annulled and the request for mutual legal assistance in civil matters in civil matters made by THE SENIOR MASTER OR THE SENIOR COURTS OF ENGLAND AND WALES on 7 February 2022 rejected."

31.   On 14 February and 14 March 2023 respectively, the First Civil Law Court of the Swiss Federal Court allowed EFG's and UBP's appeals.   The reasoning of its decisions became available, and was provided to me by the parties, after circulation of my draft judgment.  In EFG's case, the Swiss Federal Court annulled the decision of the cantonal court, and remitted the matter to that court for a fresh decision, on procedural grounds. The Federal Court held that the cantonal court had infringed EFG's right to be heard by basing its decision largely on a ground put forward in a letter submitted by Mr Al Rajaan, which the cantonal court had declared inadmissible and of which EFG had not received notice.  In UBP's case, the Federal Court reversed the cantonal court's decision on substantive grounds.   In summary, after reviewing in some detail the travaux préparatoires to the 1970 Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, the Federal Court concluded (in sections 4.5 and 4.6 of its decision) that:

i)      Article 12(1)(b) of the Hague Convention permits a requested state to refuse to execute a letter of request (letter rogatory) only if the state considers that its execution is likely to prejudice the state's sovereignty or security;

ii)     it is the execution, rather than the purpose, of the letter of request that must be considered to prejudice the state's sovereignty or security;

iii)    the possible future use of the requested evidence must be disregarded;

iv)    the exception must be strictly construed and (as the travaux make clear) it does not include the requested state's public policy considerations;

v)     the expression 'sovereignty' is equivalent to international public policy;

vi)    it is not clear that execution of the letter of request in the present case would prejudice the security or sovereignty of Switzerland, nor that it would be incompatible with international public policy;

vii)   even if the principles of good faith and the prohibition of abuse of right form part of international public policy, the execution of the letter of request would not amount to circumventing the mutual legal assistance procedure in criminal matters pending in Switzerland: the two procedures in question are different in nature and do not necessarily involve the same parties, the states requesting Switzerland's mutual legal assistance are different, and the objective pursued by

the two states concerned also diverges: one seeks to enable a party to produce its evidence in order to defend its rights in a civil trial, while the other seeks to collect evidence in the context of criminal investigations conducted on its territory*;*

viii)   as to the respondents' contention that the request for mutual legal assistance is in fact being 'driven' by PIFSS, it must be borne in mind that it was UBP, which has the status of a defendant in the English proceedings, who, in order to be able to put forward its defence lawfully in view of the obligations relating to bank secrecy to which it was subject, asked the English court to request mutual legal assistance from Switzerland; only a Swiss authority - in this case the Swiss judge hearing an application for international legal assistance - can release the bank from banking secrecy; and

ix)   *"[i]n those circumstances, [UBP] cannot be deprived of the right to defend itself by any means it deems to be useful, since it is not for the requested state to decide whether or not the production of the evidence referred to in the letter rogatory at issue serves its interests, on the pretext that the right of one of the parties to the dispute to take copies of some of the documents in question has been restricted in other proceedings pending in Switzerland. To admit otherwise would be tantamount to an unacceptable infringement of [UBP's] rights of defense."*

The Federal Court added:

"For the sake of completeness, it should be noted that the Respondents, if they consider that this is necessary to safeguard their interests, will retain the possibility of applying to the British court hearing the action brought by [PIFSS] to take measures similar to those adopted by the FCC to prevent the aforementioned company from making copies of certain bank documents."

32.   At the first CMC, in June 2022, Jacobs J ordered Mr Al Rajaan to set out any objections to his disclosure of any relevant documents to which he has access, including those held by: (i) legal representatives in Switzerland; and/or (ii) the Swiss Federal Prosecutor's Office.  Mr Al Rajaan gave notice of such objections on 27 June 2022 via a letter from Greenberg Traurig LLP ("*Greenberg*"), who had taken over from Mishcon de Reya LLP ("*MdR*") as Mr Al Rajaan's solicitors in December 2021 following a move of personnel from MdR to Greenberg (with the same individuals continuing to act for him).  Mr Al Rajaan's objections were limited to disclosure of the SFPO file, and based on arguments that disclosure must be "*tightly controlled*" to avoid a "*circumvention*" of the MLA regime and of restrictions the Swiss courts have imposed on PIFSS's access to those documents, or a violation of the rules governing the access to the SFPO file. No objection was made to disclosing Swiss documents from outside the SFPO file, and under § 7 of the Order made at that CMC Mr Al Rajaan was required to provide disclosure and inspection of such documents.

33.   PIFSS responded in the first instance by requesting further information under CPR 18 on 12 July 2022.  That request was not pursued further, on the basis of indications that the answers would be contained in Mr Al Rajaan's evidence.  However, such evidence was never filed as a result of Mr Al Rajaan's death on 6 September 2022.

34.     The issue came back before Jacobs J at the second CMC, by which point Ms Al Wazzan had been appointed as representative under CPR 19.8. Jacobs J ordered the First and Second Defendants to apply for any restrictions they sought to limit their disclosure, pursuant to which the present applications were made. These applications go well beyond Mr Al Rajaan's 27 June 2022 grounds, and extend to a wide range of other documents in or connected with Switzerland.

## (C) LOCATION OF AND CONTROL OVER THE DOCUMENTS

35.     The definition of control extends to all documents "*(a) which are or were in a party's physical possession; (b) in respect of which a party has or has had a right to possession; or (c) in respect of which a party has or has had a right to inspect or take copies*" (CPR PD 57AD Appendix 1.1).

36.     During his lifetime, Mr Al Rajaan had access to the SFPO file via his Swiss lawyers, Pestalozzi, who obtained copies of the file. Jacobs J found that Mr Al Rajaan had "*complete and unrestricted access*" to the SFPO file ([2019] EWHC 2886 (Comm) § 62) and Mr Al Rajaan confirmed at the first CMC that the SFPO file was "*the primary source of documents to which he currently has access*".

37.     There is no suggestion that relevant Swiss documents <u>outside</u> the SFPO file could fall outside the First or Second Defendant's control. Mr Al Rajaan's grounds of 27 June 2022 stated that where "*documents have been provided to the SFPO by him or by companies under his control, he will obviously disclose those documents*" (Greenberg letter of 27 June 2022).

38.     As to Mr Al Rajaan/his estate's control over the other documents in the SFPO file:

  i)      It is common ground that the First and Second Defendants have a right to access the SFPO file and that no restrictions on their ability to request and take copies have ever been applied. Professor Pieth's evidence (which is uncontradicted) is that their access to the file does not depend on any administrative discretion: a request for the file will be routinely granted, usually by provision of digital copies of the file.

  ii)     Full copies of the SFPO file have been repeatedly received by Mr Al Rajaan's Swiss lawyer (M Christophe Emonet of Pestalozzi). Ms Thomas of Greenberg states that Pestalozzi has "*accessed*" the SFPO file on approximately 34 occasions since 2012; and, between 8 June 2012 and 12 July 2019, the prosecutor transmitted a full copy of the file to M Emonet 28 times. M Emonet acts for the First Defendant and there is no Swiss law evidence to contradict the English principle that documents held by an agent are within the control of the principal (*North Shore Ventures Limited v Anstead Holdings Inc* [2012] EWCA Civ 11 § 40).

  iii)    The evidence indicates that a copy of the SFPO file was obtained by Mr Al Rajaan's former English solicitors, MdR, on 27 September 2019. A further information response indicates that the file is now held by MdR Discover LLP (an English LLP owned and used by MdR to provide disclosure services), which retains that copy following Mr Al Rajaan's change of solicitors. The copy has

12

apparently been archived, but counsel for the First Defendant informed me that it could be accessed if necessary.

iv) An historic copy (or part thereof) of the SFPO file was transferred to Greenberg when Mr Al Rajaan changed solicitors. I am told that, to date, a comparison has not been made to see whether Greenberg received a complete set of the file that MdR had.

v) Ms Thomas of Greenberg states that MdR received the documents "*with the express limitation that they cannot be used for any other purpose nor submitted to court*". A further information response indicates that that limitation was "*stipulated by Mr. Al Rajaan and his Swiss lawyers [Pestalozzi], in advance of the documents being provided to Mishcon de Reya LLP on 26 September 2019*", and that "*a copy of the SFPO File was transmitted to Mishcon de Reya LLP by Pestalozzi in the context of privileged discussions between Mr Al Rajaan's lawyers for the purpose of preparing Mr Al Rajaan's Defence*". I agree with PIFSS that such instructions did not remove the MdR or Greenberg copies of the file from Mr Al Rajaan's control or that of his estate. Nor did they render either copy privileged: the SFPO file is not privileged from PIFSS in Switzerland, and a party cannot confer privilege on a copy of a pre-existing unprivileged document by attaching a copy of it to a privileged communication: *Sports Direct International Plc v Financial Reporting Council* [2020] EWCA Civ 177, [2021] Ch 457 §§ 53-55. It was not argued before me that inspection should be refused on the grounds of privilege.

vi) It was stated (for the first time) in Professor Niggli's reply report that "*before June 2022, the client and his Swiss lawyers demanded the SFPO File back from the English lawyers*", such that from the perspective of Swiss law they "*are not entitled to hold these documents anymore*". However, any such instruction could be revoked by Mr Al Rajaan or his estate, and does not deprive them of control over the file. It was not argued before me that inspection should be refused on this ground.

39. In these circumstances, I consider that the First Defendant has control, for English disclosure purposes, over the SFPO file and all the copies of it which have been received by Pestalozzi, MdR or Greenberg.

40. As to Ms Al Wazzan's control over the SPFO file:

i) As noted above, she has a currently unrestricted right to access the file and take copies of it.

ii) The evidence of Mr Walsh of Stewarts Law, PIFSS's solicitors, is that:

"I understand that Ms Al Wazzan's Swiss lawyer Jean-Marie Crettaz has also accessed and received full copies of the SFPO File, including on 18 May 2016, and that he most recently requested the file on 14 October 2022. I infer that Ms Al Wazzan's English solicitors (PCB Byrne) would also have received copies of the SFPO File, whether from Mr Crettaz or from Mr Al Rajaan's lawyers. That inference is further supported

by Ms Al Wazzan having referred to, and deployed information in relation to documents within the SFPO File in response to PIFSS's application for asset relief and disclosure from her dated 13 March 2020 (which was compromised on the basis of undertakings), including (inter alia) by her evidence in that application referring to various SFPO orders from the SFPO File; and PCB Byrne's letter of 27 May 2020 making specific references to documents and document folders in the form held within the SFPO File (page 22 of MW23)."

Counsel for Ms Al Wazzan informed me that PCB Byrne do not have a complete copy of the SFPO file, though Ms Al Wazzan has not provided evidence about the extent to which the copy is incomplete.

41. For similar reasons to those which apply to the First Defendant, I consider that Ms Al Wazzan has control, for English disclosure purposes, over the SFPO file and all the copies of it that have been received by M Crettaz or PCB Byrne.

42. It is unclear whether further documents have been added to the SFPO file since the last versions obtained by Pestalozzi or M Crettaz, or the versions transmitted to MdR or PCB Byrne.

## (D) THE ENGLISH LEGAL POSITION

43. It is necessary to consider the evidence of Swiss law and (to the extent available) Swiss practice when forming a view on the risk of liability or other sanction. Ultimately, though, questions of disclosure and inspection are part of the law of procedure and are therefore matters of English law as the *lex fori* (*Bank Mellat v HM Treasury* [2019] EWCA Civ 449 §§ 2 and 56). Duties of confidentiality (which, if breached, may result in sanction) arising under foreign law do not provide an automatic basis to withhold disclosure and inspection. Whether to make an order for disclosure and production is a matter for the court's discretion: *Bank Mellat* § 16.

44. It has been stated that, whilst the English court has a discretion to excuse disclosure based on a proven actual risk of prosecution in the foreign state, "*it will rarely be persuaded not to make a disclosure order on this ground*" and only if the disclosing party shows that the foreign law is "*regularly enforced, so that the threat to the party is real*" (Matthews and Malek, *Disclosure*, 5th edn., § 8.26, quoted in *Bank Mellat* at § 62). Neuberger J in *Morris v Banque Arabe et Internationale d'Investissement SA* [2001] ILPr 37 said:

"Although not necessary to my decision, I agree…that the Court should normally lean in favour (probably heavily in favour) of ordering inspection, especially where a substantial number of important documents are involved. As I have mentioned, the question of discovery and inspection is obviously a question of procedure which, under international law, is to be determined in accordance with the lex fori." (§ 73)

In *Morris*, the defendant French bank resisted inspection in BCCI-related proceedings on the basis that providing inspection would be a criminal offence under a blocking

14

statute in France. Neuberger J declined to exercise his discretion to excuse disclosure (§§ 68-74): (i) the documents were highly material and their absence would "*very substantially interfere with the liquidators' ability to pursue the case and would clearly hamper the Court's ability to try the case fairly*"; (ii) the defendant had itself requested disclosure from the claimant; and (iii) even though the experts agreed that disclosure would infringe the French blocking statute (a criminal offence with penalties including up to six months' imprisonment), they were not aware of prosecutions where French companies had litigated abroad. For the French authorities to prosecute in the circumstances "*would not correspond with generally accepted notions of comity*".

45. Neuberger J also rejected an argument that disclosure should be sought by a letter of request under the Hague Convention, which would have created unjust delay and was not clear to succeed (§ 75-82). The Court of Appeal in *Secretary of State for Health v Servier Laboratories Ltd* [2013] EWCA Civ 1234 similarly considered the "*court to court*" route "*likely to be a slow, cumbersome and inadequate alternative*" compared to a direct order between the parties (§ 104).

46. Conversely, Neuberger J made clear in *Morris* that the court is not bound to order disclosure (§§ 53 and 60). Modern disclosure principles confirm that the court retains a discretion to refuse disclosure.

47. The Court of Appeal reviewed the law in *Bank Mellat*, in which it upheld an order against an Iranian bank requiring it to produce certain unredacted documents, even though doing so would breach Iranian criminal law. The court summarised the principles thus:

> "i) In respect of litigation in this jurisdiction, this Court (i.e., the English Court) has jurisdiction to order production and inspection of documents, regardless of the fact that compliance with the order would or might entail a breach of foreign criminal law in the "home" country of the party the subject of the order.
>
> ii) Orders for production and inspection are matters of procedural law, governed by the lex fori, here English law. Local rules apply; foreign law cannot be permitted to override this Court's ability to conduct proceedings here in accordance with English procedures and law.
>
> iii) Whether or not to make such an order is a matter for the discretion of this Court. An order will not lightly be made where compliance would entail a party to English litigation breaching its own (i.e., foreign) criminal law, not least with considerations of comity in mind (discussed in Dicey, Morris and Collins, op cit, at paras. 1-008 and following). This Court is not, however, in any sense precluded from doing so.
>
> iv) When exercising its discretion, this Court will take account of the real – in the sense of the actual – risk of prosecution in the foreign state. A balancing exercise must be conducted, on the one hand weighing the actual risk of prosecution in the foreign state and, on the other hand, the importance of the documents of

which inspection is ordered to the fair disposal of the English proceedings. The existence of an actual risk of prosecution in the foreign state is not determinative of the balancing exercise but is a factor of which this Court would be very mindful.

v) Should inspection be ordered, this Court can fashion the order to reduce or minimise the concerns under the foreign law, for example, by imposing confidentiality restrictions in respect of the documents inspected.

vi) Where an order for inspection is made by this Court in such circumstances, considerations of comity may not unreasonably be expected to influence the foreign state in deciding whether or not to prosecute the foreign national for compliance with the order of this Court. Comity cuts both ways." (§ 63)

48.    The Court of Appeal held that the first instance judge (Cockerill J) had been right to exercise her discretion in the way that she did, having concluded that: (i) the "*actual risk of prosecution*" in Iran was more than "*purely hypothetical*" but "*less serious*" than the bank's expert had suggested (noting also that, in any event, "*an actual risk of prosecution of the Bank is not, ipso facto, determinative of the balancing exercise but is to be taken into account as part of it*" (§§ 72 and 89);  and (ii) the documents sought were needed "*in the interests of the fair disposal of the trial*" (§§ 80-87).  Equally, the judge had been entitled to order safeguards, in the form of a "*confidentiality club*" (§§ 27, 88 and 91-93).

49.    Although each case turns on its own facts, I note that the *Bank Mellat* principles were applied by Fancourt J in *Byers v Samba Financial Group* [2020] EWHC 853 (Ch), refusing to vary an order for disclosure on the basis that to comply with that order would force the respondent bank to act contrary to Saudi Arabian law, or to issue a letter of request to the Saudi Arabian authorities seeking a direction that the Saudi Arabian Monetary Authority allow the bank to give disclosure.  Notwithstanding a risk of prosecution and regulatory action in Saudi Arabia, Fancourt J ordered disclosure given that the documents sought were likely to be "*of the highest importance for a fair trial.*"

50.    The *Bank Mellat* principles were also considered by Butcher J in *Tugushev v Orlov* [2021] EWHC 1514 (Comm), refusing a defendant's application to be relieved from disclosing documents that had been seized by a Russian investigator pursuing criminal proceedings in Russia, where the risk of prosecution was held to be real but not significant and the documents were centrally relevant to a fair trial of the English proceedings.  Butcher J stated *inter alia* that:

i)      the relevant question is as to the risk of <u>prosecution</u>:

"It is not as to the risk of a sanction being imposed, but the question is one as to the actual risk of prosecution and not merely the question of whether the conduct which is relevant discloses a breach of foreign criminal law";

ii)     the smaller or less significant the risk which the court considers that there is (even if it surmounts the threshold of being a "*real risk*"), the less weight it will be given in the balance; and

iii)    the defendant applicant bore the burden of showing the reality of the risk of prosecution, and absence of evidence of any prosecutions in the circumstances weighed against him.  (§§ 32-38 and 49)

51.     On the topic of comity, which is referenced in *Bank Mellat* § 66(iii) and (vi) quoted above, the First Defendant quotes Dicey, Morris and Collins, *The Conflict of Laws* (16th ed., 2022) § 7-002: "*The United [States] Supreme Court famously said in Hilton v Guyot, a case on the recognition of foreign judgments: "'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.*"  In my view comity is capable of playing a freestanding part in the judicial decision-making process, and (contrary to a submission made by PIFSS) does not arise for consideration solely when a real risk of prosecution has been shown.

52.     The proper approach to evidence of foreign law is well-established.  In summary: (i) foreign law is a question of fact to be proved, generally, by a qualified expert in the law of the foreign country and whose expertise extends to the interpretation and application of the foreign law; (ii) the court will not undertake its own research but is not inhibited from using its own intelligence and common sense; (iii) where expert evidence is uncontradicted the court should be reluctant to reject it; and (iv) by way of qualification to the foregoing points, there may be cases where the nature of the issue and the foreign law make it unnecessary to have evidence from an expert (see, e.g., *Bank Mellat* § 53, citing *A/S Tallina Laevauhisus v Estonian State S.S. Line* (1947) 80 Ll. L. Rep. 99, 107-108; Dicey, Morris and Collins, Ch. 3; *FS Cairo (Nile Plaza) v Brownlie* [2021] UKSC 45 § 148).

## (E) SWISS LAW

### (1) Introduction

53.     The applicants, i.e. the First and Second Defendants, contend that providing disclosure and inspection to PIFSS of the SFPO file and the other documents referred to in § 6.ii) above would contravene Swiss law and expose them and/or their legal advisers to the risk of (a) prosecution or (b) other prejudice, such as restrictions on their future access to the file which would inhibit their defence of the criminal charges against them in Switzerland.

54.     It is common ground that in order to assess these contentions, it is necessary to form a view on which side is more likely to be correct as to the substantive Swiss law issues raised, that being a factor relevant to the question of risk of prosecution or other prejudice, though I should be cautious in doing so and refrain from seeking to make any definitive findings about Swiss law.  In assessing the Swiss law issues for that purpose and in that context, I aim to follow the approach indicated in § 52 above.

55.     The key provisions or principles of Swiss law raised, which I consider in turn below, are these:

    i)      Articles 69, 73 and 101-108 of the Swiss Criminal Procedure Code ("**SCPC**"), dealing with pre-trial criminal proceedings and access to the prosecutor's file;

    ii)     Article 271 of the Swiss Criminal Code ("**SCC**") on official activities carried out on Swiss territory on behalf of a foreign state;

    iii)    SCC Article 273 on the obtaining and dissemination of manufacturing or trade secrets ("*industrial espionage*");

    iv)    SCC Article 293 on the publication of information from public authority files that have been declared secret; and

    v)     duties of confidentiality imposed by SCC Article 320 SCC (breach of official secrecy), SCC Article 321 (breach of professional confidentiality), Article 35 of the Federal Act on Data Protection ("**FADP**") (breach of professional confidentiality) and Article 47 of the Federal Law on Banks and Savings Banks ("**FLBSB**") (breach of confidentiality).

56.     I understand that the English translations provided to me of the Swiss Codes are the official translations, though they are not official versions for the purposes of Swiss law.

### (2) SCPC Articles 69, 73 and 101-108 (pre-trial proceedings and access to file)

57.     SCPC Articles 69 and 73 state:

> "**Section 2 Public Proceedings**
>
> Art. 69 Principles
>
> 1 Proceedings before the court of first instance and the court of appeal, together with the oral passing of judgments and decrees of these courts shall, with the exception of the judges' deliberations, be conducted in public.
>
> …
>
> 3 The following proceedings are not conducted in public:
>
> > a. preliminary proceedings, with the exception of public announcements made by the criminal justice authorities;
> >
> > b. proceedings before the compulsory measures court;
> >
> > c. proceedings before the objections authority and, in cases where they are conducted in writing, before the court of appeal;
> >
> > d. summary penalty order proceedings.

…"

**"Section 3**

**Confidentiality, Information to the Public, Communications to Authorities**

Art. 73 Duty of confidentiality

1 Members of criminal justice authorities, their employees and experts appointed by criminal justice authorities shall treat as confidential information that comes to their knowledge in the exercise of their official duties.

2 The director of proceedings may require private claimants and other persons involved in the proceedings and their legal agents, under caution as to Article 292 SCC 18, to maintain confidentiality with regard to the proceedings and the persons concerned if the object of the proceedings or a private interest so requires. A time limit must be placed on this obligation."

58.     It is common ground between the experts that the expression "*other persons involved in the proceedings*", in the phrase "*private claimants and other persons involved in the proceedings*" in Article 73(2), does not include the defendant.   The meaning of "*other persons involved in the proceedings*" can be found in Article 105.  Articles 104 and 105 are in SCPC Title 3, which deals with "*Parties and Other Persons involved in the Proceedings*".  Article 104 defines "*parties*" to mean the accused, the private claimant, and (in the main hearing and in appellate proceedings) the public prosecutor.  Full or limited party rights can also be given to other authorities.  Article 105(1) defines "*other persons involved in the proceedings*" as:

> "a. persons suffering harm;
>
> b. the person who has reported the offence;
>
> c. witnesses;
>
> d. persons providing information;
>
> e. expert witnesses;
>
> f. third parties who have suffered detriment due to procedural acts."

Article 105(2) provides that where such persons' rights are directly affected, they shall, in order to safeguard their interests, be entitled to the procedural rights of a party.

59.     Thus the duty of confidentiality imposed by Article 73(1) does not apply to defendants, and nor does the Article 73(2) power to impose confidentiality restrictions: it can be

19

applied only to private claimants (such as PIFSS) and to victims, witnesses, informants and the other persons listed in Article 105(1).

60. Mr Al Rajaan was (and Ms Al Wazzan in her personal capacity is) a "*party*", as an accused, for the purposes of Article 101. The experts agree that once the heirs of the estate become involved in the Swiss proceedings they will have the accompanying rights of access to safeguard their interests, either as a party or as an other person interested in the proceedings.

61. Article 100 provides for a file to be opened for each criminal case, including documents compiled by the criminal justice authority, documents submitted by the parties and records of proceedings and examination hearings. Access to the file is governed by Articles 101 and 102:

> "**Art. 101** Inspection of case documents in pending proceedings
>
> 1 The parties may inspect the documents relating to the criminal proceedings at the latest following the first interview with the accused and the gathering of the other most important evidence by the public prosecutor; Article 108 is reserved.
>
> 2 Other authorities may inspect the case documents if they need to do so for the purposes of pending civil, criminal or administrative proceedings and inspection is not contrary to any overriding public or private interests.
>
> 3 Third parties may inspect the case documents if they claim to have an academic or other legitimate interest in doing so and inspection is not contrary to any overriding public or private interests.
>
> **Art. 102** Procedure relating to applications to inspect case documents
>
> 1 The director of proceedings decides on whether case documents may be inspected. He or she shall take the measures required to prevent abuses and delays and to protect legitimate interests in confidentiality.
>
> 2 The case documents must be inspected at the offices of the relevant criminal justice authority or those of another criminal justice authority in mutual assistance proceedings. Normally they shall be delivered to other authorities or the legal agents for the parties.
>
> ..."

62. Thus the parties' Article 101(1) right to inspect the file is qualified by reference to Article 108. Article 107 ("*Right to be heard*") provides that the parties have the right to be heard, including the right to inspect case documents. Article 108 ("*Restriction of the right to be heard*") provides:

20

"1 The criminal justice authorities may restrict the right to be heard if:

  a. there is justified suspicion that a party is abusing his or her rights;

  b. this is required for the safety of persons or to safeguard public or private interests in preserving confidentiality.

2 Restrictions in relation to legal agents are only permitted if the legal agent gives personal cause for imposing a restriction.

3 Restrictions must be limited in time or to individual procedural acts.

4 If the reason for imposing the restriction continues to apply, the criminal justice authorities may base their decisions on files that have not been disclosed to a party only if that party has been informed of the essential content thereof.

5 If the reason for the restriction has ceased to apply, the right to be heard must be granted in a suitable form retrospectively."

63. A question which arises is whether preliminary, i.e. pre-trial, proceedings are secret, since that issue is relevant to SCC Articles 273 and 293 which I consider later.

64. Professor Niggli's position is that as a consequence of the non-public nature of preliminary proceedings as provided in Article 69(3), they are secret. Professor Niggli explains that the justifications for Article 69(3) are (i) to prevent collusion and the disappearance of evidence; (ii) to protect the interests of persons affected by the proceedings (given the presumption of innocence); and (iii) to protect the rights of other parties to the proceedings. Professor Niggli notes that that approach is consistent with the duty of confidentiality applicable to those working for the criminal justice authorities pursuant to Article 73(1). The only exception to the general obligation of confidentiality or secrecy is that the defendant can communicate information that concerns exclusively himself, provided this does not infringe Article 271 SCC (which I consider later).

65. Professor Pieth disagrees that non-public preliminary proceedings are secret. Whilst he accepts that, at the preliminary stage, "*[f]iles ... are in general not open to the wider public*", he considers that that does not import an obligation of secrecy. Professor Niggli disagrees, stating "*If anybody involved in criminal proceedings was free to communicate all information gathered in those proceedings, even if the information concerned others, not involved in the proceedings, there would exist no difference between «public to the parties» and «public to everyone»*". The applicants submit that since the experts agree there is a difference between the preliminary and trial phases, the latter being public and the former non-public, there must necessarily be secrecy and confidentiality in the court file at the preliminary stage; otherwise, the distinction in Article 69(1) and 69(3) would be devoid of any real meaning and the interests that Professor Niggli mentions could be harmed. At this interlocutory phase, the court is

21

invited to reach that conclusion, as being both logically sensible and appropriately precautionary, given the risks that exist to the applicants and their lawyers.

66.     Professor Niggli also refers in this context to a Swiss Federal Supreme Court decision dated 1 November 2021 (FTD 148 IV 66) ("*Swisspartners*"), which addressed the issue of secrecy in the context of Art 271. I consider that case in section (E)(3)(c) below. For the reasons I give there, consistently with Professor Pieth's evidence, I do not consider it to support Professor Niggli's approach.

67.     I prefer the views of Professor Pieth on this issue, which I consider to be both coherent and consistent with the text of the relevant provisions. He explains that Swiss law has departed from the French concept of 'secrecy of the investigation', arriving at a compromise whereby (under Article 73) the authorities can exceptionally require private claimants and other persons to maintain secrecy for specified reasons and for a limited time, but this does not apply to the defendant, who is under no obligation to maintain confidentiality. Files are not open to the wider public at the preliminary stage, but Article 69(3) does not impose a secrecy obligation on parties.

68.     Professor Pieth very fairly mentions one case pointing in the other direction together with Commentary about it:

> "30 There has been one exceptional decision by the Lower Appeals Chamber of the Swiss Federal Criminal Court of first instance going in the other direction. In a political case Turkish complainants close to the Gülen-Movement complained that government agents were spying on them. There was an interest in withholding the names of the complainants. Instead of applying Art. 108(1)(b) SCPC to exceptionally protect the claimants, the file was shown to the lawyer. The Court wanted to prevent the lawyer from sharing the file with his client and the Turkish Government. Art. 73 SCPC was not the right basis to achieve this goal. Art. 108(1)(b) SCPC would have been a good enough basis to exceptionally withhold the names of the complainants from the parties altogether.
>
> 31 This is the reason why this exceptional decision has not been followed in further case law. Authors (including in a Commentary edited by Professor Niggli) insist that Art. 73(2) SCPC is not applicable to defendants and their lawyers.
>
> 32 Furthermore, case law and literature make it clear that the threshold to Art. 73(2) SCPC is also otherwise high. Art. 73(2) SCPC has to be clearly addressing certain obliged persons, and has to specify the object of the obligation. The written decision has to give reasons, based on the concrete risk to the goals of proceedings or the interests of private persons.
>
> 33 What is more, the decision has to be limited in time." (footnotes omitted)

22

69.    I accept Professor Pieth's evidence that the fact that confidentiality of pre-trial investigations is regulated in such a limited way in Article 73(2), excluding the defendant, makes clear that Article 69(3)(a) is not a basis for a general secrecy obligation covering the pre-trial phase.  The applicants are not bound by obligations of secrecy in relation to it.

70.    Another question is whether disclosure of the SFPO file in the present English proceedings could lead to the imposition of restrictions on the First and Second Defendants' future access to the SFPO file.  This point turns on the effect of Articles 102(1) and 108.  The former requires the director of proceedings to take measures required to prevent abuses and delays and to protect legitimate interests in confidentiality.  The latter allows the authorities to restrict the right to be heard (including to inspect case documents) if there is justified suspicion that a party is abusing his or her rights, or to protect persons' safety or public or private interests in preserving confidentiality.

71.    Professor Pieth explains that court practice makes it abundantly clear that the legislator has placed a strong emphasis on the right of the defendant to be heard. Therefore, restrictions founded on a suspicion of abuse of rights according to Art. 108(1)(a) SCPC are generally limited to an early stage of proceedings and are put in place in order to secure an orderly conduct of the proceedings. Depending on the circumstances, restrictions may aim at preventing the defendant from collusion with co-defendants, avoiding a suppression of evidence or an influencing of witnesses, or preventing an 'instrumentalization' of proceedings (e.g. for political purposes). This is reflected in the time limit in Art. 101(1) SCPC as well as in the requirement of "founded" suspicion according to Art. 108(1)(a) SCPC: the risk of collusion must be concrete, the indicia tangible and the suspicion to be based on the concrete case.  Mere abstract considerations are insufficient.  The mere lack of cooperation of the defendant or the prolongation of proceedings is not considered an abuse.  Any  restrictions need to be limited in time and in scope, and directed at specific procedural acts (Article 108(3) SCPC); and they have to be lifted as soon as the justification for the restriction is no longer applicable (Article 108(5) SCPC).

72.    Professor Pieth considers that risk of collusion would be viewed by the authorities as highly unlikely in this case, so many years after the Swiss criminal proceedings have been initiated. Besides, so far Mr. Al Rajaan/Ms. Al Wazzan's access to the files has never been restricted, to his knowledge, before the Swiss criminal proceedings against the applicants were suspended in 2021.

73.    Professor Pieth states that similar considerations apply to the safeguarding of public or private secrecy interests.  Under the SCPC, reflecting the European Convention on Human Rights, the right to be heard is fundamental. Secrecy interests can only exceptionally stand in the way of access to the file. The interest of the defendant's right to be heard is considered *a priori* essential. Public interests may prevail if, for example, an undercover agent or a key witness needs to be protected or where the details of the construction of weapons of mass destruction are at stake (as in the case against Urs and Marco Tinner, where the Swiss Government intervened and had the evidence, in particular construction plans for an atomic bomb and related bank files, shredded).  It is not, however, the task of defendants to take care of the public interest.  Article 108(4) SCPC clarifies that where the defendant is not informed of the contents of files kept from him, they would not be a valid basis for the judicial decision.

74.     Overall, in Professor Pieth's view, both in relation to the risk of abuse of rights and the protection of secrecy, the possibilities of authorities to limit the access to the file are very restricted. Professor Pieth does not consider Professor Niggli to have stated sufficient reasons, connected to the concrete case, to satisfy the strict requirements. There is a valid, legally protected interest that the defendant is able to represent his or her interests in criminal and civil proceedings. According to Swiss law, parties in an ongoing as well as (under certain circumstances) a closed criminal proceeding would continue to have access to the criminal files and to take copies. They could present them in parallel or in ensuing civil proceedings, and to protect one's interests can hardly be an 'abuse'.

75.     The applicants invite the court to reject this evidence on the basis that, in summary:

i)      As noted earlier, the Swiss courts have already determined that the risk of documents being sent to Kuwait is so real that they refused to lift the restrictions on PIFSS's access to the SFPO file, given the perceived risk of undermining the MLA process. If the applicants were to disclose documents from the SFPO file this would likely constitute an abuse of right contrary to Article 108 that would attract prosecution and sanction.

ii)     PIFSS has itself asked the SFPO on several occasions to question certain defendants in the English proceedings, some of whom are also the subject of separate claims in Switzerland by PIFSS concerning the same alleged schemes, which gives rise to a real risk of collusion.

iii)    The Swiss Federal Supreme Court has held that restrictions on access to the court file can be imposed without violating the right to be heard, so long as the proceedings have not ended and particularly where there are parallel MLA proceedings.

iv)     The issue at hand is not the use of the SFPO file to plead a Defence, but rather the disclosure under compulsion of a foreign court order, which is an obligation and not the exercise of a right. Consequently, there is no good legal basis to dispute Professor Niggli's view that restrictions on access to the SFPO file may be imposed and "*especially in cases of parallel MLA proceedings*".

76.     I do not consider any of those points to detract from the force of Professor Pieth's evidence.

i)      It was as a result of the applicants' own objections, and for their own protection, that the Swiss courts refused to lift the restrictions on PIFSS's access to the SFPO file given the risk of the documents being provided to the State of Kuwait and undermining the MLA process. It seems highly counter-intuitive to expect that the Swiss authorities would penalise the applicants themselves, by restricting their future access to the file, if the applicants were required to disclose the documents in the present proceedings. Further, the SCPC provisions on abuse of right (in particular, Articles 102 and 108) do not create criminal offences and do not expose the applicants to risk of prosecution, as Professor Pieth (whose evidence on this point I consider to be entirely consistent with the tenor of the provisions) has confirmed, and as Professor Niggli does not appear to dispute. (I consider later Professor Niggli's point that access

24

restrictions may nonetheless be significant in themselves.) In any event, any concerns about onwards transmission of the documents to the State of Kuwait, or about such transmission undermining the MLA process, can be addressed in the way I discuss in section (G) below.

ii)     The fact that PIFSS has asked the Swiss authorities to question other persons about the alleged corruption does not mean that disclosure of the files would give rise to a risk of collusion. Many of the SFPO file documents have already been cited and quoted in the statements of case in the present proceedings, and, as Professor Niggli confirms, under SCPC Article 105(2) witnesses are entitled to the procedural rights of a party, and hence the right to inspect the file, if and when their rights are directly affected by the proceedings, in order to safeguard their interests. The same right applies to "persons providing information" (Article 105(1)(d)). Thus persons questioned have the right of access to the SFPO file anyway in relation to anything that directly affects their interests. Further, in response to the applicants' suggestion that he was not fully aware of the risk of collusion when preparing his report, Professor Pieth in a supplementary letter dated 17 March 2023 stated:

"It will be noted that the procedures against Mr. Al Rajaan and Ms. Al Wazzan had been running since 2012. In the course of these proceedings the SFPO requested bank files. Banque Pictet and Mr. Bertherat were – according to my instructions – aware of the proceedings as early as 2014. Since paying retrocommissions to the employee of an investor, knowing or assuming that they would not be brought to the attention of his principal, is illegal according to Swiss law, it is certain that the bank and its employees would have assessed their own risk immediately. The eventuality of a criminal investigation being directed against them did in fact materialise in 2020. The relevant parties have been on notice at the latest since 2021. There has therefore been ample time for all participants to co-ordinate their defence, if they chose to. Therefore, it continues to be my view that authorities would rate the risk of collusion low and regard collusion as highly unlikely."

iii)    The applicants rely on a decision on the Swiss Federal Supreme Court, referred to in Professor Niggli's reply report (Swiss Federal Supreme Court, decision 1B_350/2020 of 28 May 2021). Professor Niggli quotes 'consideration 6.3' of that decision:

"According to the case law of the Federal Supreme Court, information from criminal proceedings in Switzerland may not be disclosed to the state requesting mutual assistance in parallel proceedings as long as the mutual assistance proceedings have not been concluded with legal effect. This is in the private interest of the accused person as well as in the public interest of enforcing the law on mutual assistance."

Professor Niggli states that the decision shows that the right to be heard is respected sufficiently when a consultation of the file is possible or where the

25

person is "*informed of the essential content thereof*" but copies cannot be made. Based on the quotation provided, the decision appears to relate to the provision of information to the State requesting mutual assistance. It is not clear whether it concerned a restriction imposed on the accused by reason of his having himself provided documents to the State that was seeking mutual assistance. In any event, (a) the decision suggests that a defendant would as a minimum be entitled to know the essential content of the file and (b) in the present case, as I have mentioned, I consider that any concerns about transmission to the requesting State itself can be mitigated.

iv) I see no logic in the proposition that a defendant is more likely to be subject to access restrictions, based on abuse of right, for disclosing documents pursuant to duties owed under orders made in foreign proceedings which he is defending than for doing so wholly voluntarily.

77. I therefore consider Professor Pieth's evidence most likely to reflect the actual position. In the context of a situation where duties of confidentiality are expressly not imposed on defendants, and no measures have to date been taken to restrict the applicants' access to the file, I consider it unlikely that disclosure of the contents of the SFPO file in civil proceedings, relating to essentially the same matters as the criminal proceedings, would be regarded as an abuse of right by the applicants. Nor is there any clear basis on which to expect such disclosure to harm public or private interests in preserving confidentiality for third parties. Given the subject matter of the investigation, it seems highly likely that the documents on the file relate largely to the activities of Mr Al Rajaan, corporate entities with which he is associated, Mr Nasrallah (who accepts that he acted as nominee for Mr Al Rajaan in relation to at least one scheme, and who is a defendant to the present claim and subject to his own duties of disclosure), and institutions to whom they made payments or placed investments or from whom they received payments or assets.

78. Further, it is apparent from the evidence referred to in §§ 38 and 40 above that Pestalozzi and M Crettaz did not regard it as abusive for copies of the SFPO file to be provided to Mr Al Rajaan's and Ms Al Wazzan's English lawyers for the purpose of preparing their Defences to the present claim, notwithstanding the fact that they are bound to contain many references to transactions involving third parties (as is overwhelmingly to be expected and is also apparent from the documents referred to in the Particulars of Claim and the applicants' Defences whose source are likely to have been the SFPO file).

79. It is difficult to see how, then, it could be regarded as abusive for the documents to be made available to the other parties and the court in order for Mr Al Rajaan's and Ms Al Wazzan's defences to be properly scrutinised and fairly assessed, to ensure equality of information in the present proceedings, and to comply with duties of disclosure in these proceedings that can fairly be regarded as a necessary incident of the applicants' defence of the claims made against them here: cf the observations of Hoffmann J in *Mackinnon v Donaldson, Lufkin and Jenrette* [1986] 1 Ch 482, 494-495 quoted in *Bank Mellat* § 56:

"…I am not concerned with the discovery required by RSC Ord. 24 from ordinary parties to English litigation who happen to be foreigners. If you join the game you must play according to the

local rules. This applies not only to plaintiffs but also to defendants who give notice of intention to defend…..Of course a party may be excused from having to produce a document on the grounds that this would violate the law of the place where the document is kept…..But, in principle, there is no reason why he should not have to produce all discoverable documents wherever they are."

### (3) SCC Article 271 (official foreign activities on Swiss territory)

80. Article 271 forms part of Title Thirteen of the SCC, which is headed "*Felonies and Misdemeanours against the State and National Security*". It provides that:

> "1. Any person who carries out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official, any person who carries out such activities for a foreign party or organisation, any person who facilitates such activities, shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year.
>
> 2. Any person who abducts another by using violence, false pretences or threats and takes him abroad in order to hand him over to a foreign authority, party or other organisation or to expose him to a danger to life or limb shall be liable to a custodial sentence of not less than one year.
>
> 3. Any person who makes preparations for such an abduction shall be liable to a custodial sentence or to a monetary penalty."

81. Article 271 plays a key part in Professor Niggli's analysis, and is the only basis on which it is suggested that the disclosure of documents other than the SFPO file would violate Swiss law.

#### (a) Effect of Article 271

82. It is common ground that Article 271 is concerned with protecting Swiss sovereignty. It aims to prohibit any person from taking action reserved to public authorities, including judicial functions. Professor Niggli expresses the view that by giving disclosure and inspection under compulsion by an order of a foreign court, the applicants would breach Article 271, alternatively would thereby be facilitating unlawful activity and liable to the same punishment.

83. Professor Pieth explains that a person "*carries out activities on behalf of a foreign state*" if he or she "*performs an act that, according to its essence and purpose, is characterized as an official act; the decisive factor is whether the act is official by its nature*". It is well established that such acts include the service of foreign process in Switzerland and the examination of witnesses there. However, Professor Pieth states, they do not include provision of documents from Switzerland for disclosure in overseas

proceedings, either voluntarily or pursuant to duties enforced only by procedural sanctions.

84.    That view is consistent with the Swiss Federal Office of Justice's Guidelines on International Judicial Assistance in Civil Matters, cited by Professor Pieth, which state:

> "In cases where a foreign judge or a person appointed by him or her or the representatives of the parties in common law systems do not come to Switzerland, but require a party domiciled in Switzerland to provide evidence (for the limits see Federal Supreme Court Decision 114 IV 128), to fill in a questionnaire, or to appear before a foreign court, the submission of a letter of request to the Swiss authorities is not necessarily required. Letters of request are therefore not necessary in the event that a refusal to cooperate leads only to consequences of a procedural nature (e.g. a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage). The party concerned is free to cooperate. The service of this type of invitation must, however, be carried out according to the proper procedure for judicial assistance.
>
> Where non-compliance by a party to the proceedings leads to sanctions that are not of a procedural nature (e.g. the criminal offence of contempt of court) the procedure for judicial assistance must be followed and thus a letter of request is required. This is because only the Swiss authorities may apply coercive measures on Swiss territory." (footnote omitted)
>
> (https://www.rhf.admin.ch/dam/rhf/en/data/zivilrecht/wegleitun gen/wegleitung-zivilsachen-e.pdf.download.pdf/wegleitung-zivilsachen-e.pdf)

85.    Both experts commented on the case cited in the above passage, Federal Supreme Court Decision 114 IV 128. There, a criminal investigation had been ongoing against B, whom H had been representing as a lawyer in Switzerland, concerning alleged financial offences. A Swiss bank had provided various copy documents to the Australian authorities in connection with the matter. In order to seek to undermine them, lawyer H and his staff member S interviewed or participated in the interviewing of various persons in Switzerland, in effect witnesses, and prepared statements purporting to set out their evidence. The purpose was to enable S to use this as 'secondary evidence' and 'evidence on information and belief', when he testified before the Australian court. As H knew, the memoranda of these interviews were then used by S as an aide-memoire when he gave evidence in the Australian court, and B's defence counsel also filed them with the court. Authorisation had not been sought for these activities. In simple terms, therefore, H was engaged in interviewing potential witnesses in order to collect evidence for use in a foreign court. That was held to be in breach of Swiss law. The following passages from the court's judgment are important and need to be set out at some length:

> "Considerations:

1. According to Article 271(1) StGB the offence of unlawful activities on behalf of a foreign state is committed by any person who carries out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official.

The cantonal supreme court concluded that the appellant had fulfilled all constituent elements of the actus reus under this provision. In order to avoid hearing people according to mutual assistance procedures, Attorney-at-law and Notary Public S. had himself clarified the matters observed by third parties by questioning them himself so that he could subsequently provide evidence concerning them as a witness within criminal proceedings against B. before a foreign court for the benefit of B. However, according to Swiss legal doctrine the determination of the facts by hearing eyewitnesses or witnesses who have heard relevant facts constitutes a form of taking of evidence that is reserved to the courts. The state has a general interest in resolving judicial proceedings by judgment, and hence in the enforcement of the law. Accordingly, the taking of evidence in another country for this purpose constitutes an act carried out in the interest of the foreign state, and hence on its behalf. The appellant had knowingly aided and abetted these actions, in particular by involving Attorney-at-law and Notary Public S.

2. a) The appellant alleges that this case does not involve any act that falls to an authority or an official.

b) According to the literature and the case law, any activity falling to an authority or an official within the meaning of Article 271(1) StGB includes – irrespective of whether an official actually took any action – any activity that, considered in itself, i.e. having regard to its nature and purpose, is characteristic of official activity; the key issue is accordingly whether it is official on account of its nature, and not the offender who actually carried it out ...

c) Moreover, contrary to the appellant's assertions, the cantonal supreme court does not draw a distinction between allegation procedures and evidentiary procedures, which is in any case not recognised within a criminal trial; moreover, it does not presume that everything that takes place within a criminal trial, including in particular the procedure relating to evidence, is without exception a matter for the state. On the contrary, it limits itself to (correctly) asserting that the taking of evidence, for example by the oral questioning of eyewitnesses and witnesses who have heard relevant facts, is – under Swiss law and according to Swiss legal doctrine – reserved to the courts, law enforcement authorities or prosecutors. …

29

Accordingly, there cannot be any doubt that the hearing of persons within the ambit of judicial proceedings is by its nature an official act; this is generally recognised ... The reliance on Guldener (GULDENER/MILLER, in International Co-operation in Litigation: EUROPE, Hans Smit Ed., The Hague 1965, p. 360 to 362) is not of any benefit: GULDENER does not refute this standpoint but rather asserts that a person making a statement cannot be heard orally in private (p. 365); the part of the argument referred to by the appellant deals exclusively with the submission of documents within the trial, and it is not explained to what extent it is possible to doubt the prevailing opinion regarding this aspect. In contrast to the hearing of witnesses, the submission of documents involves acts by parties that do not require any official action; the prevailing opinion that the hearing of persons for judicial purposes falls under the exclusive competence of authorities and officials cannot therefore be overturned by the reference to the presentation of documentary evidence.

d) If the sole consideration is the actual nature of the activity carried out, and not the offender who did so, contrary to the appellant's assertions the fact that neither S. nor B. supposedly exercised any coercion is immaterial; in many cases, there will have been no coercion precisely because the official act reserved for a Swiss state body was carried out by another person; as such, Article 271(1) StGB would be rendered practically a dead letter if coercion on the part of the offender were to constitute a prerequisite for its applicability. As the cantonal supreme court rightly held, S. was not simply carrying out preparations in order to be heard as a witness but rather, in order to be able to provide any witness testimony at all, for this purpose clarified himself, with the assistance of B., facts of which he was unaware, acting in the manner of an investigative body by orally questioning witnesses; according to the findings of the cantonal supreme court, he did so with the intention of avoiding these persons being heard by a court according to mutual assistance procedures, which would not have resulted in the outcome desired by B. He therefore carried out activities that were not merely preparatory for the proceedings, but that rather fell to a state body, as moreover his activities were portrayed when he was heard by the Australian court."

86.   That reasoning draws a distinction between the hearing of witnesses, which is an official act reserved to the Swiss State, and the presentation of documentary evidence, which is not. The applicants nevertheless submit that, whilst the submission of documents (such as skeleton arguments) within a trial does not involve an official act reserved to the Swiss state, the collection of evidence in advance of a trial does, whether it be oral or documentary evidence. However, the decision in my view provides no support for that proposition. It is focussed on the hearing and examination of witnesses, which is contrasted with the submission of documentary evidence. Insofar as Professor

Niggli relies on it in support of his view that the collection of evidence in Switzerland in order to provide disclosure in England contravenes Article 271, I respectfully do not consider it to support his view.

*(b) Compulsion*

87. In addition to decision FTD 114 IV 128, Professor Niggli cites a passage from a commentary, Courvoisier/Zogg, Handbook, note 28.77 and especially 28.79, which states "*a foreign lawyer who carries out a deposition or examination of a party or witness in Switzerland without authorisation or a foreign court that orders a Swiss party to disclose documents under threat of coercion or punishment is liable to prosecution*". The first part of this passage deals only with the examination of witnesses, which is the subject-matter of Decision 114 IV 128. The second part leads on to the next question, which is whether it makes a difference that evidence is being collected pursuant to a disclosure order made by the English court.

88. The significance of compulsion is that the experts agree that voluntary acts of disclosure do not engage Article 271. The question is whether an English disclosure order involves coercion of the kind that does engage Article 271.

89. Professor Niggli in his first report appears simply to assume (reflecting his instructions) that disclosure pursuant to an English order is "*under compulsion*", despite the fact that Jacobs J's disclosure order in the present case, as a standard disclosure order, contains no penal notice. In his second report, Professor Niggli expresses the view that there is a contravention of Article 271 unless disclosure is wholly voluntary, i.e. "*out of free will*".

90. Professor Pieth, on the other hand, expresses the view that if a breach of the order would not lead to criminal sanctions, then the disclosure would not have been given under compulsion in the sense that would engage Article 271.

91. In this respect, the Guidance quoted in § 84 above draws a distinction between disclosure duties backed only by procedural sanctions – which may include the consequences that "*a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage*" – and duties whose breach leads to sanctions such as the criminal offence of contempt of court. The Guidance in my view supports Professor Pieth's view.

92. Professor Niggli in his second report refers to English case law to which his instructions have drawn attention, on the basis of which he concludes that the Jacobs J order, "*although it does not contain an explicit penal notice, from the perspective of Art. 271 could in itself be deemed to be a coercive order amenable to the contempt jurisdiction, particularly so in view of the tracing disclosure ordered*". Professor Niggli says this about the English case law:

> "59 I am instructed that in *Kea Investments Ltd v Eric John Watson* [2020] EWHC 2599 (Ch), the court appeared to accept that contempt applications will rarely be appropriate or necessary, but that they remain possible. I am further instructed that in *Bird v Hadkinson* [2000] C. P. Rep 21 Neuberger J held that "if one has the benefit, as the applicant did, of an order

31

requiring disclosure, and one has reasons, justified as it turns out, to believe that it has not been complied with, then the obvious course is to apply for committal, or for other relief, appropriate for contempt. An order the court makes on a contempt motion is normally not primarily to punish a contemnor, but to ensure compliance with the order, as far as the court can. It seems to me that is what the applicant was seeking to do in the present case."

60 I am instructed, finally, that "in *Olympic Council of Asia v Novans Jets LLP and Ors* [2023] EWHC 276 (Comm), the Court (Foxton J) cited and considered *Kea* (at [55] and [56]) and accepted that there may be circumstances, although they are likely to be rare, in which the Court would make a coercive order amenable to the contempt jurisdiction in relation to an order for disclosure made for the purposes of the Court's adjudicative jurisdiction", and, furthermore, that "Foxton J did not accept that a standard order for disclosure has, on an inchoate basis, the potential to form the basis for an order for committal simply by asking the court to waive the requirement for a penal notice.""

93.     The applicants also highlight the statement in CPR PD57AD § 20.2 that:

"If a party has failed to comply with its obligations under this Practice Direction including by—

…

(2) failing to discharge its Disclosure Duties; or

..

the court may adjourn any hearing, make an adverse order for costs or order that any further disclosure by a party be conditional on any matter the court shall specify. This provision does not limit the court's power to deal with the failure as a contempt of court in an appropriate case."

94.     However, I agree with PIFSS that the applicants' (and Professor Niggli's) reliance on these cases is misplaced.  In *Bird v Hadkinson* [2000] CP Rep 21 contempt of court was found for non-disclosure under a freezing order with a penal notice.  *Kea Investments Ltd v Watson* [2020] EWHC 2599 (Ch) concerned an order to disclose the defendant's assets after a judgment had been entered against him.  As Foxton J explained in *Olympic Council of Asia v Novans Jets LLP* [2023] EWHC 276 (Comm), those cases are very different from a standard disclosure order:

"I accept that there may be circumstances, although they are likely to be rare, in which the court would make a coercive order amenable to the contempt jurisdiction in relation to an order for disclosure made for the purposes of the court's adjudicative jurisdiction. However, such an order would clearly be conceived and "badged" as such. I do not accept that a standard order for

> disclosure has, on an inchoate basis, the potential to form the
> basis of an order for committal simply by asking the court to
> waive the requirement for a penal notice." (§ 56)

95.     Whilst CPR PD 57AD 20.2 clarifies that it does not limit the court's power to deal with
a failure to comply with obligations under the Practice Direction by way of contempt
of court in an appropriate case, that does nothing more than reflect the approach
explained by Foxton J in *Olympic.*  It does not confer a power to punish disclosure
failures by way of contempt proceedings independently of the provisions of CPR 81.
The disclosure orders in the present case are standard orders that are not 'badged' with
a penal notice, and (on the basis of *Olympic*) an English court could not be expected to
waive the requirement under CPR 81.4(2)(e) that the order founding a contempt
application must include a penal notice.

96.     Counsel for Ms Al Wazzan referred to a passage in Hollander on Documentary
Evidence, citing Lord Keith's statement in *Home Office v Harman* [1983] 1 A.C. 280
that "*Discovery constitutes a very serious invasion of the privacy and confidentiality of
a litigant's affairs*" and Browne-Wilkinson V-C's statement in *Derby v Weldon (No.2)*,
The Times, 20 October 1988 that:

> "Discovery in the course of an action is an interference with the
> right of privacy which an individual would otherwise enjoy to
> his own documents. As a result of the public interest in ensuring
> that all relevant information is before the court in adjudicating
> on the claim in the action that right of privacy is invaded and the
> litigant is forced under compulsion by the process of discovery,
> to disclose his private documents. But such invasion of privacy
> being only for the purpose of enabling a proper trial of the action
> in which the discovery is given, the court is astute to prevent a
> disclosure so obtained from being used for any other purpose."

97.     However, those passages in my view take the matter no further.  They are consistent
with disclosure being compulsory in the sense that non-compliance may result in
procedural sanctions, and do not support the view that ordinary CPR disclosure duties
or 'vanilla' disclosure orders involve coercion in the sense that would engage Article
271.

98.     Professor Niggli makes the further point that:

> "Even if contempt of court sanctions were not only unlikely, but
> not available at all, I understand from my Supplemental Letter
> of Instruction dated 1 March 2023 that one of the potential
> sanctions for not complying with a disclosure order would be the
> complete striking out of the defence presented in the English
> Proceedings. In my view, the striking out of the defence would
> be considered as an undue deprivation of the fundamental right
> to be heard granted at Art 6 ECHR, Art 29 par. 1 and 2 of the
> Swiss Federal Constitution, in contradiction with Swiss public
> order, in a situation where the defendant is confronted with an
> impossible choice between (1) either to disclosing documents
> and facing the related consequences, i.e. notably restriction of

33

his access to the criminal file, violation of Art 293, Art 271 and Art 273 SPC, or (2) not disclosing and see his defence being struck out. Further, the striking out of the defence against a claim said to be worth in excess of 850 million USD, would be treated as being more than just procedural in nature for the purposes of Art 271 SCC. Such an enormous economic risk would exclude the assumption of voluntariness and constitute coercion. In this context, it might be helpful to recall that Swiss law con-siders coercion (Art. 181 SCC) any influence on the decision of another that affects the victim's freedom of action or will in such a way that his or her will appears to be determined by the perpetrator. Therefore, the striking out of the defence under such circumstances will likely be seen as coercive by Swiss authorities." (2nd report § 56, footnote omitted)

"The mere threat in itself of having sanctions applied including the striking out of the defence would be sufficient from a Swiss court's perspective to treat compliance as being not voluntary under Art. 271 SCC, and the consequences of non-compliance, therefore, as not purely procedural, wherefore punishment under the provision would be possible, if not likely." (2nd report § 61)

99.    These points having been made only in Professor Niggli's reply report, Professor Pieth has responded only briefly, in his letter of 17 March 2023, where he states:

"There is agreement that where official acts are executed for a foreign entity in Switzerland by compulsion, Art. 271 could be engaged.

However, the First Defendant in D1 Skeleton paragraph 51, relying on Niggli 2 paragraphs 56 et seq., causes major confusion: Professor Niggli attempts to introduce a new theory of coercion unsupported by case law. Paragraph 51 does not reflect my views in Pieth 2.

I am not able to say whether noncompliance with an English court order would risk criminal sanctions as this is a question of English law. However, the assumption that I was instructed to make in Pieth 2 is that breach of an English disclosure order would not result in criminal sanctions such as contempt of court or imprisonment. On this basis I insist that the distinction made by the Swiss Federal Office of Justice in its established "*Guidelines on Judicial Assistance in Civil Matters*" is considered state of the art. For reference it says: letters of request are "*not necessary in the event that a refusal to cooperate leads only to consequences of a procedural nature (e.g. a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage).*"" (footnote omitted)

100.    As PIFSS points out, whilst the court is empowered to strike out a defence, the case law indicates that responses to non-compliance can be carefully calibrated to do justice in

the case (an example being Fancourt J's decision in *Byers v SAMBA* [2020] EWHC 853 (Ch) §§ 120-123 and 129-130, where he disbarred the defaulting party from defending only on the particular issues where disclosure was required for a fair trial). In any event, I prefer the views of Professor Pieth on this issue. They are consistent with the Guidance which he cites – which draws a clear distinction between procedural sanctions, even those of a serious nature, and criminal liability for contempt – and are in my view cogent. There appears to be no case law or commentary in support of Professor Niggli's approach. Moreover, Professor Niggli's approach would appear to create an uncertain and potentially arbitrary situation where the commission or non-commission of a criminal offence under Swiss law could depend on such matters as the size of the claim being brought or defended, and the seriousness of the particular procedural sanction that might result from non-compliance with the disclosure order.

101. I draw some further comfort in this view from three further considerations. First, Professor Niggli's approach, if correct, would appear to mean that no Swiss party to English litigation could, consistently with Swiss law, be subject to an English order (or even, presumably, a duty under the CPR) to give disclosure. That would appear, moreover, to follow whether the party were a claimant or a defendant. It would be surprising, were that the case, that no previous English case drawn to my attention has held that to be the position.

102. Secondly, the Federal District Court for the Southern District of New York in *EFG Bank AG v AXA Equitable Life*, 2018, Case 1:17-CV-4767, in refusing to grant a motion brought by the Cayman branch of EFG Bank AG seeking a protective order to use the Hague Evidence Convention to obtain EFG documents located in Switzerland, noted that:

> "… decisions of the Swiss Federal Department of Justice and Police ("FDJP") — an administrative, non-judicial body — indicate that Swiss law does not preclude the voluntary production of documents by a private party and that "**voluntary**" is defined broadly to include the production of discovery so long as the party faces only procedural consequences rather than criminal sanctions for its failure to produce. (See Hempel Decl. ¶¶ 12-21). In Application to Grant Authorization Concerning the Surrender of Documents in an English Civil Proceeding, April 10, 2014, VPB/JAAC 2016.3, pp. 32-37 (Docket No. 124, Ex. 1 ("April 10, 2014 Decision")), for example, the FDJP found that there was no Article 271 violation "*if no criminal sanctions are threatened in the event of a refusal to cooperate [with the discovery order]*." Id. ¶ 7. The FDJP noted that, under the discovery order at issue in that case, "*the parties undert[ook] to mutually surrender certain documents*." Id. Because "there [was] no order by a foreign authority" threatening criminal sanctions in that case, the FDJP found that Article 271 did not apply. Id.
>
> …
>
> Conspicuously, EFG fails to identify a single case in which a party was found to have violated Article 271 by disclosing its

own documents absent a court order threatening criminal sanctions. That is presumably because no such case exists." (footnote omitted)

The court also noted that the Swiss Justice Department's Guidelines which I quote earlier were consistent with its conclusions.

103. Thirdly – though perhaps more relevant to risk of prosecution than to the substantive Swiss legal position – counsel for Ms Al Wazzan referred in oral argument to an article by lawyers Deborah Hondius and Sandrine Giroud published on 3 December 2019 entitled "*Swiss Blocking Statute: update on do's and don'ts under the threat of criminal sanctions*". The article discusses the *Swisspartners* case as it then stood, and also states:

> "Recent OAG statistics have also shown that prosecution for violations of the Swiss Blocking Statute is a concrete risk. Between 2014 and 2018, the OAG opened twelve criminal proceedings for breach of Art. 271(1) SCrC, which resulted to date in the issuance of:
>
> • Two indictments (i.e. requests for trial before the FCC);
>
> • Four penal ordinances (with sentences to conditional penalties of 40 to 120 days amounting from CHF 30 to 1'000 each, and immediately payable fines from CHF 300 to 500, plus costs proceedings); and
>
> • Three acquittals.
>
> Such cases related to the direct service of foreign judicial documents (in particular, summonses to appear before foreign courts, foreign claims for payment and foreign bankruptcy decisions) by private individuals (some of them foreign lawyers) to companies and/or individuals located in Switzerland, as well as to the hearing of witnesses on Swiss soil by foreign individuals (some of them being foreign public officials)."

The subject-matter of these prosecutions involved service of foreign proceedings and hearing of witnesses on Swiss soil, but not the collecting or disclosure of documents in overseas proceedings.

104. Finally on this topic, the First Defendant in her witness statements and submissions seeks to rely on certain passages from experts' reports for which permission was not given in relation to the present application. The first is the report of Professor Isabelle Romy dated 11 October 2019, which addressed related issues of disclosure in the context of Swiss banking secrecy, and was filed on behalf of the Pictet Defendants in relation to their jurisdiction challenge. Permission for that the expert evidence was granted on 6 March 2020 to the Pictet Defendants for the purpose of their particular application. The First Defendant contends that it should not be precluded from referring to other expert reports on Swiss law to the extent that they are relevant and before the court in these proceedings. I do not accept that view, and do not consider that Professor Pieth should reasonably have been expected to respond to this report in addition to the

36

report of Professor Niggli for which permission was granted in relation to the present application. I set out for completeness only the passages on which the First Defendant seeks to rely. Professor Romy states (in the context of a report which primarily concerned documents alleged to be covered by Swiss banking secrecy) the following:

> "81. Art. 271 § 1 SPC prohibits, in particular, the taking of evidence on Swiss territory by foreign officials and attorneys as well as the direct service of documents by mail or through Swiss lawyers.
>
> 82. Even though the exact scope of Art. 271 SPC gives raise to discussions among legal scholars, it is well established that a party to a foreign proceeding may voluntarily submit to the foreign court evidence that is already in the possession of said party in order to support its pleadings, provided that the disclosure is not inconsistent with third party secrecy rights and/or in violation of data protection laws. Should the documents be protected by Art. 47 BA and/or business or trade secrets and/or data protection law, then production must be ordered by a Swiss court, unless the client has validly waived its privacy rights, as explained in §§ 55 seq. hereinabove.
>
> 83. Under Swiss law, a unilateral order of a foreign court seeking to compel the release of documents or information from Switzerland without the participation or consent of the Swiss authorities would be an infringement of Swiss sovereignty even if the documents and information concerned are not covered by Art. 47 BA or data protection rules. Under Swiss law, to compel a party or a third party custodian of records in Switzerland to produce information or documents, a foreign court must use the available proceedings for international legal and/or administrative assistance, thereby requesting the competent Swiss authorities to exercise their judicial power.
>
> 84. For the same reason, a foreign court could not compel the live testimony of Swiss-resident witnesses.
>
> 85. Art. 271 SPC provides that a party seeking to take evidence or conduct discovery in Switzerland without proceeding under the Hague Evidence Convention may request authorization from the Swiss authorities to perform acts that otherwise would fall under Art. 271. Such authorization must be obtained from the Swiss Federal authorities, and is granted only in exceptional circumstances. …
>
> 86. By disclosing information as described in SS 82 and 83 hereinabove outside of proper legal assistance proceedings, the bank's officers and employees would violate Art. 271 SPC and expose themselves to prosecution, incarceration and/or monetary fines under Art. 271 SPP. The employees, officers or representatives of the bank could not avoid this proscription by

37

turning over the documents to their colleagues in a foreign
subsidiary for the purpose of production in foreign proceedings
because it is the act of facilitating the improper production
abroad that constitutes the violation of Art. 271 SPC. Violations
of Art. 271 SPC are prosecuted in Switzerland and have resulted
in conviction and criminal sanctions.

87. Art.271 SPC is not a "blocking statute" intended to thwart
non-Swiss discovery; it merely ensures that actions in aid of
foreign proceedings are conducted through official Swiss
channels (those that would be applicable to Swiss domestic
matters). Parties to domestic Swiss proceedings are subject to
similar restraints, in that domestic Swiss discovery also must
proceed only through judicial auspices (e.g., parties to domestic
litigation must apply to the court to compel the production of
documents held by third parties or held by a party but protected
by banking secrecy or other secrets). Likewise, Swiss law
imposes, under Art. 299 SPC, criminal penalties upon persons
acting in Switzerland who violate the sovereignty of other
nations, for example, by issuing judicial orders directing actions
be taken on foreign soil (e.g., gathering evidence, service of
process). Instead, Swiss courts must act through international
treaties, like the Hague Evidence Convention."

105.    Professor Romy does not cite case law or commentary in these paragraphs.  To the
extent that these passages might suggest that any form of English disclosure
requirement or order imposed in relation to documents in Switzerland might contravene
Article 271, they fail to consider or draw any distinction between different types of
sanctions (contempt of court vs procedural sanctions) and orders; and they are not
consistent with the reasoned views expressed by Professor Pieth or the Guidance and
other materials he considers.  Even if I were willing to admit her report in evidence on
this application, I would not regard it as altering the position.

106.    Similar considerations apply to the other passages, namely § 6.13 of the first report of
Professor Jeanneret dated 30 July 2021, §§ 6.6 to 6.8 of his second report dated 21
September 2022, and § 9.7 of the second expert report of David Zollinger dated 6
August 2021.  Permission was granted for these in relation to other defendants'
applications to resist disclosure based on Swiss banking secrecy.  Those applications
were at one stage expected to be listed alongside the present applications, but remain
separate in principle.

107.    I have in any event reviewed the passages cited, which state:

"6.13 An order or injunction issued by a foreign authority
pursuant to a foreign law does not fall within the exception
provided by Article 47, Section 5. Article 271 SCC prohibits any
foreign authority from acting with direct effect on Swiss territory
without authorisation. Both foreign officials and private Swiss
or foreign persons are subject to Article 271. If a Bank were to
disclose information or documents which would otherwise be
caught by Article 47 pursuant solely to an English court order,

38

any person [fn] acting on behalf of the Bank, including but not limited to, directors, officers, employees and external counsel of the Bank would be exposed to the risk of prosecution and conviction for an offence under Article 271 SCC. Article 271 SCC falls into the category of 'political offences', the prosecution of which is subject to approval by the Swiss Federal Council. The decision to prosecute offences under Article 271 SCC is a highly political one and it is not possible to assess the probability of the authorisation to prosecute being granted/refused." (Jeanneret 1st report)

"6.6 As I explained at paragraph 6.13 of my First Report, Article 271 SCC falls into the category of 'political offences', the prosecution of which is subject to approval by the Swiss Federal Council. I stated in my First Report that since the decision to prosecute offences is highly political, it was not possible for me to assess the probability of authorisation to prosecute being granted or refused. However, in light of the Factual Developments referred to above, and in particular the fact that any disclosure would be in direct contravention of the Court of Appeal Decisions (and notwithstanding the fact of Mr Al-Rajaan's death), in my opinion that authorisation would be given, and accordingly there is now a high risk of prosecution for a breach of Article 271 SCC as well as of Article 47.

6.7 I do not consider that the risk of prosecution for Article 47, or Article 271 SCC, would be diminished in any way if UBP SA were to make such disclosure pursuant to an English court order:

6.7.1 As explained in paragraph 6.10 of my First Report, it is only compliance with a decision of a Swiss authority that can make a violation of banking secrecy lawful; a decision of a foreign authority will not fall within the exception under section 5 of Article 47, and accordingly UBP SA would breach banking secrecy even if it gave disclosure in compliance with an English court order (having regard to precisely the same factors as those referred to in paragraph 6.3 above). The same applies to Article 271 SCC, as stated in paragraph 6.13 of my First Report and in paragraph 39 of the Girsberger expert report, which I agree with.

6.7.2 In relation to the requirement mentioned above for there to have been "a decision of a Swiss authority" capable of sanctioning what would otherwise be a violation of banking secrecy, I have been asked whether a decision of the Swiss Office of the Attorney General (OAG) authorising the transmission of documents to a foreign prosecuting authority might amount to such a decision. …

6.8 I consider the risk of prosecution to be the same regardless of whether the potential breach came to a Swiss Prosecutor's

39

attention via a complaint (which, so far as the late Mr Al-Rajaan is concerned, could now be made by his representative) or via other means. As I explained at paragraph 5.12 of my First Report, if there is a suspicion that an offence has been committed, the prosecutor is obliged to initiate proceedings and to bring the case to trial. This is the case even in circumstances where the public interest aspect of the prosecution is not particularly strong. I also described in my First Report the circumstances in which a Swiss Prosecutor might in principle decide to abandon a prosecution, which includes where the offence is extremely minor. It remains my opinion that none of the circumstances described in that paragraph would arise in this case." (Jeanneret second report)

"9.7   [Article 271] is meant to protect the sovereignty of Switzerland and its institutions and dates back to the era of WW I and WW II and later to the Cold War. The basic idea is to avoid foreign authorities and their agents acting on Swiss territory or with direct effect on Swiss territory. Obedience to foreign orders falls under this provision. While court cases of espionage have become very rare lately, the article has been invoked recently in relation to Swiss based client data. In Bger 6B_804/2018 (the "Swisspartners" case), FINMA had filed a criminal complaint for breach of Article 271 SCC regarding the voluntary transmission of client data by the Chairman of the Swiss asset manager, Swisspartners, to the US Department of Justice. The case is still pending but the chairman has been convicted by the Swiss Federal Criminal Court as well as by its appellate chamber. The court considered that the chairman had acted under no direct threat from the DoJ but wanted to offer client data in order to negotiate a deferred prosecution agreement for his company." (Zollinger second report)

108.    These passages are focussed on the disclosure of documents covered by Swiss banking secrecy, even more so than the Romy report extract. The only authorities cited in them are:

i)      a footnote to Professor Jeanneret's 1st report § 6.13, referring to Consideration 2(b) of Decision 114 IV 128 (which I quote earlier) and a Commentary as indicating that the Article 271 offence can be committed by any person who consciously and willingly performs acts falling under the offence; and

ii)     Professor Zollinger's summary, quoted above, of the *Swisspartners* case, which he cites for the proposition that another possible consequence of an established breach of FLBSB Article 47 is that a criminal complaint might be filed for breach of SCC Article 271.

Neither of these sets of extracts provides any support, in my view, for the suggestion that Article 271 is infringed by an English disclosure order requiring production of documents whose disclosure is not alleged to infringe Swiss banking secrecy law; nor

any basis for preferring the views of Professor Niggli on this topic to those of Professor Pieth.

*(c) Documents relating to third parties*

109.    Professor Niggli suggests that it is relevant to the Article 271 analysis to ask whether the information being disclosed concerns third parties, even if there is no compulsion in the relevant sense.  He expressed the view that only documents and information that can be 'freely disposed of' by the disclosing party can be disclosed without risk of sanction under Art 271.

110.    Professor Niggli bases that opinion on the Federal Supreme Court's Decision 148 IV 66 of 1 November 2021 (the "*Swisspartners*" case).  The defendant was a director of a fiduciary company which held bank accounts for USA clients, including one suspected of breaching USA tax law.  In breach of his fiduciary obligations, the defendant physically brought 109 client files on a USB flash drive from Switzerland to the USA and handed them over to the authorities there without authorisation from the Swiss authorities. The Federal Criminal Tribunal of first instance held, in the context of a transmission from Switzerland to the US, at § 4.2.7 that:

> "Anyone who discloses information concerning third parties that is protected by Swiss public policy ["ordre public"] to a foreign authority outside of the mutual administrative or legal assistance channels or without authorisation commits a criminal offence within the meaning of Art. 271 SCC."

111.    The reason why 'ordre public' protected the information in question was that it was subject to obligations of bank secrecy or the contractual secrecy of fiduciaries.  As Professor Pieth explains, the extradition of this data, against the will of the defendant's clients, would have required a public decision and a mutual legal assistance procedure: "*this is the case where bank secrecy or the contractual secrecy of fiduciaries are in question*".  By contrast, as Professor Pieth points out, in the present case it is not alleged that the applicants owe secrecy duties of that kind, and (as considered earlier) the applicants are free to use the SFPO file for their own purposes subject to any restrictions imposed pursuant to SCPC Articles 102 or 108 on the ground of abuse of right.  Thus the defendant in *Swisspartners* took it upon himself to take and hand over to foreign authorities client information that was subject to secrecy duties such that an official Swiss state action was the only proper mechanism for extracting the information and conveying it to the overseas authorities.  In the present case, however, the Swiss authorities have already taken any necessary official action to compile the SFPO file, and that file has been made available to the applicants.  The situation is not analogous to that in *Swisspartners*.

112.    The Federal Supreme Court reasoned in *Swisspartners*, in line with other case law, that the crucial factor was the official character of the activity, i.e. whether Swiss law would regard it as activity of an official character, and whether part of the punishable activities had been carried out on Swiss territory.  The court asked itself whether the act in question was likely to jeopardise the "*state area of control*", and noted that Article 271 clearly covered "*an act that entails violating or circumventing Swiss or international law on international mutual administrative or legal assistance or lies, pursuant to the*

*law of international mutual administrative and legal assistance, within the scope of responsibility of a Swiss public authority or public official*". The court went on to state:

> "As the lower court accurately finds, there is detailed discussion in the literature regarding whether, and if so to what extent, compiling documents with an eye to foreign proceedings and subsequently submitting those documents can be punishable. There is no need to go into this in detail in the case at hand, as with all other conceivable sets of circumstances. The operative factor is that turning over <u>information and documents that in Switzerland can only be lawfully turned over in response to a governmental order to that effect</u> affects the legal interest protected by Art. 271 Criminal Code … In all sets of circumstances, the only files and information that can be turned over are those over which free disposal is permitted. <u>Only international mutual administrative or legal assistance offers a procedural vessel within which the obligations of secrecy and disclosure can be set against each other and the principle of specialty can be ensured.</u> Free disposal over identifying information concerning third parties that is not publicly accessible is not permitted (HUSMANN, loc. Cit., N. 45 on Art. 271 Criminal Code; see the unpublished rulings of the Federal Department of Finance invoked by GRAF, loc. Cit., p. 183; for a critical view, see GRAF, loc. Cit., pp. 183 et seqq.).

> 1.4.3 According to the lower court's findings, the electronic files turned over by the Appellant contained exclusively documents concerning clients of the B. group of companies that are potentially relevant from the standpoint of tax law. The clients' bank records were originally provided to B. AG in Switzerland in the role of asset manager in copy by the banks based on the contractual relationship. The bank records were entrusted to B. AG subject to clear contractual terms and conditions. The Appellant was consequently not authorized to transmit the documents concerning third parties directly to the DoJ. Rather, the DoJ should have sought international mutual administrative and/or legal assistance and requested the electronic files via the Swiss public authorities with jurisdiction from B. AG as the holder of the information domiciled in Switzerland. By transmitting the documents directly to the DoJ, thereby circumventing the international mutual administrative and/or legal assistance process, the Appellant carried out an activity on behalf of a foreign state that was the responsibility of the Swiss public authorities.

> …

> <u>The Appellant supplied data concerning third parties that had been entrusted to him, or to B. AG,</u> and were at least also present in Switzerland, directly to the DoJ, departing from Switzerland in order to do so. In so doing, he violated Swiss sovereignty, as

the data originating in Switzerland would only have been permitted to be disclosed from Switzerland by the Swiss authorities via international mutual administrative or legal assistance in compliance with relevant legal provisions. …" (my emphasis)

113.    Professor Niggli notes that the quotation I give in § 110 above from the first instance judgment was not repeated by the Federal Criminal Court, which instead used the phrase "*information about third parties that is not publicly accessible, must not be disclosed*".  However, I agree with Professor Pieth that it is necessary to read that statement in the context of the actual subject-matter of the case, as reflected in the quotation above from the first instance court's decision, namely the specific category of third party information protected by Swiss *ordre public*.  Moreover, the passages I have underlined in the above quotation make clear that the Federal Criminal Court's focus too was very much on third party information in respect of which the defendant owed banking secrecy or cognate obligations, and which for that reason could not lawfully be obtained from the clients without Swiss state action pursuant to a request for international assistance.

114.    Professor Pieth states in his report that the decisions in this case created a stir among some legal practitioners, who considered them to represent a drastic expansion of the scope of Article 271, often oversimplifying the conclusions actually reached in the case.  His view is that the decisions are focussed on the protection of "*qualified secrecy concerns (e.g. bank secrecy)*" that have not been shown to apply to the present applicants, and that they do not in fact extend the law and are not relevant to the present case.  For the reasons given above, I consider his view to be cogent and consistent with the actual contents of the decisions, and accordingly more likely to be correct than the contrary views put forward.

*(d) Impact of MLA requests*

115.    Professor Niggli expresses the view that disclosure of the SFPO file would be viewed as contrary to Article 271 in a situation where the Swiss courts have denied requests for access in the Swiss criminal proceedings.  In his first report he states that providing disclosure/inspection of the SFPO file in English proceedings would probably contravene Article 271 because it would be regarded as a circumvention of MLA proceedings: seemingly referring both to the possibility of a civil law letter of request and also the pending criminal MLA process involving the State of Kuwait.  He elaborates in his reply report:

"46  I agree with Prof. Pieth's assertion that Art. 271 SCC aims to counter «entraide sauvage» (i.e. illegal acts of legal assistance) and to keep international judicial assistance within the limits of the applicable rules of MLA procedures (whether criminal or civil in nature). The Swiss Courts have sought to guard their rights to control the manner in which evidence is collected insofar as the evidence is to be found in Switzerland or derives from actions that the Swiss authorities have taken to obtain evidence.

43

47 Since copies of documents from the SFPO File have been requested by PIFSS in the Swiss criminal proceedings and this request has been explicitly denied by Swiss authorities and courts, disclosure of these documents in a parallel foreign proceeding where it is also a claimant, would probably be seen as such (illegal) entraide sauvage.

48 Collection and disclosure of documents originating from Switzerland, especially documents of on-going Swiss criminal proceedings, should be made through mutual assistance. This seems even more evident where, in on-going Swiss criminal proceedings, copies of the documents in question have been requested by PIFSS, but the request has been denied by the authorities." (footnotes omitted)

116.   As Professor Pieth points out, these considerations address two separate matters.

117.   First, insofar as Professor Niggli has in mind the ongoing criminal MLA process initiated by the State of Kuwait, Professor Pieth explains that Swiss practice and case law concerns the relation between two states (here, Kuwait and Switzerland) and seeks to prevent the overseas state using its private plaintiff status in Swiss criminal proceedings to obtain prematurely information requested by way of MLA. Here, prosecutors can restrict the overseas state's access to the file pursuant to SCPC Article 108. However, the applicants are private parties and cannot themselves be said to be circumventing the criminal MLA process by making use of their own procedural rights as defendants. They have no obligation to protect Swiss interests in an MLA procedure with Kuwait. In any event, any concerns that PIFSS might be viewed as seeking to circumvent the criminal MLA procedure on behalf of the State of Kuwait can be addressed by other measures as a matter of comity: see section (G) below.

118.   Secondly, the fact that documents could be obtained by the alternative route of a request for assistance in civil proceedings, i.e. the letter of request procedure, does not mean that an ordinary disclosure requirement imposed directly on a party (and not backed by a penal notice) should be treated as an official act in violation of Article 271. It makes no sense to speak of 'circumventing' the civil law mutual assistance channel unless there is some *a priori* prohibition on a direct order against a party. Professor Pieth repeats his view that collecting evidence for the purpose of using it in civil proceedings in England is permitted and involves no violation of Article 271 unless sovereign authority is usurped in the way discussed in section (E)(3)(b) above.

*(e) Territorial extent of Article 271*

119.   Insofar as copies of the SFPO file already exist in England, it is also relevant to consider the territorial scope of Article 271.

120.   Professor Niggli expresses the view that Article 271 effectively has extraterritorial effect and would be applicable to English lawyers and even English authorities acting outside Switzerland. That view is essentially based on two code provisions.

121.   First, Professor Niggli relies on SCC Article 8 SCC, which provides that an offence "*is considered to be committed at the place where the person concerned commits it or*

44

*unlawfully omits to act, and at the place where the offence has taken effect*". However, Professor Pieth, citing commentary, explains that under Swiss law Article 271 is an "*offence of conduct…that has no place of effect*".

122.   Secondly, SCC Article 3 provides that a person who commits an offence in Switzerland is subject to the Code.  Article 4 SCC, captioned "*Felonies or misdemeanours against the state committed abroad*", provides that the Code also applies to "*any person who commits [an offence] against the state or its national security (Article. 265-278)*".  As Professor Pieth points out, though, Article 271 is by its own terms limited to specified conduct "*on Swiss territory*".  Accordingly, no offence can be committed or facilitated under Article 271 unless at least some part of the proscribed conduct has occurred on Swiss territory.  That view, as well as being consistent with the language of Article 271, is supported by the Commentary Professor Pieth cites stating:

> "Since the principal offence requires at least part of the act to have been committed in Switzerland, an offence within the meaning of Art. 271 SCC can be avoided if the entire act were transferred abroad." (Graf, Damian K., "Mitwirkung in ausländischen Verfahren im Spannungsfeld mit Art. 271 StGB", GesKR 2016)

123.   The territorial scope of Article 271 was also considered in Decision 148 IV 66, which I discuss earlier.  The court there distinguished Commentary about situations where the data in question was already available abroad, noting that in the case at hand the data were undisputedly not present in the United States (where the defendant turned them over to the authorities); instead, they were present in Switzerland and (partly) also in a third country.  The court explained:

> "The passages from the literature cited by the Appellant can also be understood to the effect that in each of them, it is presumed that the data are also present (in addition to Switzerland) in the country where the proceedings in which they are to be introduced are being conducted. For example, GRAF writes: "If the information to be disclosed in the foreign proceedings is already located abroad [...], it can be provided without limitation. In this case, companies must, according to the opinion at hand, even be able to supply the documents at their own discretion either from another country or from Switzerland if the information [...] is available in both states, as such data are no longer covered by the protective purpose of Art. 271 Criminal Code." (GRAF, loc. Cit., p. 179). There are no indications that the term "abroad" means a state other than the one in which the proceedings are being conducted. … ROSENTHAL concerns himself, in the passage cited by the Appellant, with the link to Switzerland, or the question of whether the activity took place on Swiss territory. His view is that taking of evidence involving evidence present in Switzerland is no longer considered to take place in Switzerland if this evidence or content is also available abroad at any rate due to its intended purpose and can therefore be accessed abroad within the scope of the concrete taking of evidence (ROSENTHAL, loc. cit., N. 35 on Art. 271 Criminal Code). The

matter at hand differs from this example in two ways. First, this case concerns not the taking of evidence, but rather directly turning over data to a public authority of a foreign state. Second, the data were not accessed abroad; instead, they were taken abroad from Switzerland. Consequently, the opinions from the literature cited by the Appellant cannot change anything about the foregoing assessment …"

124.    On the basis of this reasoning and Professor Pieth's views, it is highly probable that the disclosure of copies of the SFPO file that are already present in England would not require any act on Swiss territory and could not infringe Article 271. The applicants' proposition that the prior transfer of the file from Switzerland could in some way be regarded as part of the *actus reus* of an offence, with no corresponding *mens rea*, followed by a transfer outside Switzerland that is (allegedly) accompanied by the relevant *mens rea*, is not supported by evidence or logic.

125.    I note for completeness that it does not seem to have been suggested in previous English cases that Article 271 has extraterritorial effect. To the contrary, in *Derby & Co Ltd v Weldon (No.6)* [1990] 1 WLR 1139, 1147H, 1155F, the Court of Appeal treated it as axiomatic that "*article [271] is not concerned with what happens outside Switzerland*."

*(f) Conclusions*

126.    For these reasons, whilst refraining from seeking to make definitive findings, I consider it much more likely than not that:

    i)    disclosure in these proceedings of the SFPO file, or other documents collected by the First Defendant or Second Defendant in Switzerland, pursuant to Jacobs J's disclosure order (or other standard English disclosure order or duty) would not contravene Article 271; and

    ii)   *a fortiori¸* disclosure of any copies of the SFPO file, or other documents collected from Switzerland, that are already present in England and Wales would not contravene Article 271.

**(4) SCC Article 273 (trade secrets)**

127.    SCC Article 273, captioned "*Industrial espionage*", provides that:

        "Any person who seeks to obtain a manufacturing or trade secret in order to make it available to an external official agency, a foreign organisation, a private enterprise, or the agents of any of these, or, any person who makes a manufacturing or trade secret available to an foreign official agency, a foreign organisation, a private enterprise, or the agents of any of these, shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year. …"

128.    The applicants submit that the documents and information in the SFPO file will concern numerous third parties and 'secret' information (such as banking documentation),

which would fall within the broad concept of a manufacturing or trade secret. In addition, the protection of potential alleged co-conspirators from civil or criminal proceedings and of information pertaining to alleged illegal behaviour (including where criminal proceedings are pending against the alleged conspirators), as well as the protection of interests of business/customer relationships, are legitimate interests that are protected by Art 273.

129. Those submissions are based on Professor Niggli's opinion to the effect that "*depending on the information contained in the documents in question, Art.293 SCC ... (Industrial espionage) might be applicable*"; and, in his reply report, that Article 273 also "*protects the interests of business and customer relationships ... [and] thus encompasses all relationships between the banks, the financial intermediaries and their customers*", and may be applied particularly as Swiss authorities have already denied PIFSS's requests to obtain copies of the SFPO file.

130. Professor Pieth explains that Article 273 was introduced on the eve of World War II to fend off industrial espionage. The information in question must be secret in a 'material' sense, meaning that the information is relatively unknown, the privilege holder has a legitimate interest in it and that they actually wish to keep the information secret. Further, he says:

i)      the type of secrets covered is broad, but the offence is directed against fundamental institutions of Swiss economic life, which does not apply to every Swiss business secret. In the vast majority of cases, the violation of banking secrecy is at stake;

ii)     the requirement that the interest be legitimate cannot be taken for granted with information pertaining to illegal behaviour: there is no legitimate interest in protecting potential co-conspirators from civil proceedings at home or abroad;

iii)    Article 273 does not create new secrecy obligations, and a person not already subject to confidentiality obligations cannot be regarded as a disclosure-offender (as opposed to a spy): which I take to mean that the 'making available' limb of Article 273 cannot apply to a person who is not already subject to duties of confidentiality in relation to the information in question; and

iv)     Overall, there is little likelihood that Article 273 applies.

131. I prefer the views expressed by Professor Pieth on this point. Although Article 273 may potentially apply to a range of types of trade secret, its language indicates that it is focussed on secrets in the true sense, rather than covering the generality of business dealings (even in relation to matters with a financial element). It is implausibly broad to suggest that any disclosure of information relating to business dealings involving third parties could be caught by a provision aimed at the wrongful obtaining or disclosure of trade secrets (i.e. industrial 'espionage'). Indeed, were that the case then it would seem that the First Defendant, in particular, is likely already to have contravened Article 273 by obtaining copies of the SFPO file and using material from it in his Defence: a process which was undertaken with the close involvement of Mr Al Rajaan's Swiss lawyers as outlined earlier.

47

132.    Moreover, the evidence before me does not establish that the SFPO file contains documents whose obtaining or disclosure by the applicants would involve any violation of duties of banking or other secrecy obligations owed to third parties. There is no sufficient basis on which to conclude, or even to consider it likely, that any such violation would be involved.

133.    I am therefore not persuaded that there is any material likelihood that the disclosure ordered would involve a breach of Article 273.

### (5) SCC Articles 292 and 293 (publication of official files declared secret)

134.    SCC Articles 292 and 293 provide:

> "Art. 292 (Contempt official orders)
>
> Any person who fails to comply with an official order that has been issued to him by a competent authority or public official under the threat of the criminal penalty for non-compliance in terms of this Article shall be liable to a fine."
>
> "Art. 293 (Publication of secret proceedings)
>
> 1 Any person who publishes information from the files, proceedings or official investigations of a public authority which have been declared secret by that authority by law or by a lawful order issued by the authority shall be liable to a fine.
>
> 2 Complicity is also a criminal offence."

135.    The applicants submit based on Professor Niggli's views that, given the number of defendants in the English proceedings and the fact that they take place in public, disclosing information from the SFPO file would have the effect that the information was "*brought to the attention of the wider public*" and therefore published for the purposes of Article 293. Though Article 293 has been primarily used to punish journalists, it is not subject to any such restriction.

136.    Article 292 is cross-referenced in Article 73(2), quoted in § 57 above, in the context of the power conferred on the director of proceedings to require private claimants and various other persons *other than* defendants to maintain confidentiality with regard to pre-trial criminal proceedings. It does not in my view advance the analysis, other than by underlining (by implication) the points that (a) non-defendants who are permitted access to the file are not subject to duties of confidentiality under Articles 69 and following, still less to risk of criminal sanction, unless and until the director imposes such duties on them, and (b) defendants are not subject to such duties at all.

137.    Article 293 can apply only where proceedings have been "*declared secret*" by the relevant authority, by law or by a lawful order issued by the authority. For the reasons given in section (E)(2) above, and as Professor Pieth says, that is not the case in relation to the SFPO file.

138.    Further, there is no evidence that Article 293 applies extraterritorially to any publication in England.

139.    I note in passing that, if the applicants' analysis were correct, it would appear to follow that they have already infringed this provision by relying in their (publicly available) Defences on information from the SFPO file.

140.    For the reasons given above, I see no material risk that Article 293 would be infringed.

   **(6) Other confidentiality/secrecy provisions**

141.    The applicants submit, based on evidence from Professor Niggli, that as the documents or information in the SFPO file concern third parties, disclosure could amount to a breach of the confidentiality obligations imposed under FADP Article 35, FLBSB Article 47, SCC Article 320 (breach of official secrecy) or SCC Article 321 (breach of professional confidentiality).

142.    FLBSB Art 47 provides (in Professor Pieth's translation):

> "A custodial sentence not exceeding three years or a monetary penalty shall be imposed on anyone who wilfully:
>
> a.  discloses a secret that has been entrusted to him in his capacity as an organ, employee, agent or liquidator of a bank…or as an organ or employee of an audit company, or that he has perceived in this capacity;
>
> b.  seeks to induce such a breach of professional secrecy;
>
> c.  discloses a secret disclosed to him according to letter (a) to other persons or exploits it for himself or another person…"

143.    Professor Niggli does not elaborate as to how this, or the other provisions cited above, might apply to disclosure by the applicants of the SFPO file.  Professor Pieth explains that Swiss banking secrecy only applies to banks domiciled and licensed in Switzerland. Article 47 does not apply to the applicants because they are not bankers and do not fall under the clauses applicable to non-bankers (Article 47(1)(b) and (c)).  That view appears entirely consistent with the provisions of Article 47 as quoted above.

144.    Similarly, SCC Article 320 applies to a person who "*discloses secret information that has been confided to him in his capacity as a member of an authority or as a public official or which has come to his knowledge in the execution of his official duties or as an auxiliary to a public official or an authority*", and Article 321 to a person "*who in his capacity as a member of the clergy, lawyer, defence lawyer, notary, patent attorney, auditor subject to a duty of confidentiality under the Code of Obligations (CO)386, doctor, dentist, chiropractor, pharmacist, midwife, psychologist, nurse, physiotherapist, occupational therapist, dietician, optometrist, osteopath or as an assistant to any of the foregoing persons discloses confidential information that has been confided to him in his professional capacity or which has come to his knowledge in the practice of his profession*".  The applicants have not demonstrated any plausible basis on which they could be subject to any such duties of official or professional secrecy.

145.    The basis on which FADP Article 35 might apply is also unexplained.

146.    In any event, as PIFSS points out, the nature of the Swiss criminal investigations into Mr Al Rajaan's misconduct in this case means that very many of the documents in the SFPO file will have been provided to the SFPO: (i) by him or by companies under his control (which on PIFSS's case were nominees); and/or (ii) by banks whose customer was Mr Al Rajaan, Ms Al Wazzan, or one of Mr Al Rajaan's nominees who facilitated the pleaded schemes. As Jacobs J recently held in the context of jurisdiction arguments run by other defendants (AFL and Mr Ruimy) allegedly complicit in one of Mr Al Rajaan's schemes:

> "AFL and Mr Ruimy are not Swiss banks, and there is no evidence (for example) that Swiss banking secrecy will prevent or cause difficulties in their disclosing their own documents. There appears to be no reason why Mr Ruimy and AFL could not waive any banking secrecy, and this court could if necessary order a waiver: see *Arab Monetary Fund v Hashim (No 3)* [1991] 2 AC 114, 126". ([2023] EWHC 177 (Comm) § 113)

147.    The applicants have therefore not demonstrated a real risk of infringement of any of these provisions.

### (7) The applicants' legal advisers

148.    The applicants submit that their legal advisers could be at risk should the applicants be required to disclose the SFPO file in these proceedings, because:

i)      their Swiss lawyers were entitled to request copies of the SFPO file from the SFPO, and will be entitled to request copies of (at least part of) the SFPO file on behalf of the heirs once the heirs are party to the Swiss criminal proceedings;

ii)     their English lawyers may request a copy from the Swiss lawyers (but not directly from the SFPO) provided the documents are requested for a use permitted by Swiss law and the request does not serve an illegal purpose;

iii)    seeking copies in order to provide disclosure in the English proceedings would, in Professor Niggli's view, constitute an illegal purpose given the risk of circumventing the MLA process and/or international legal assistance in civil matters, and would constitute an abuse of rights and a breach of SCC Article 271;

iv)     their Swiss or English lawyers, if they were to provide disclosure/inspection of the SFPO file, would be at risk of breaching SCC Articles 271, 273 and/or 293, FADP Art 35 and/or FLBSB Art 47; and

v)      the Swiss lawyers would be at additional risk of professional sanctions, because they have a duty to practice their profession "*diligently and conscientiously*" (Article 12(a) of the Federal Act on the Free Movement of Lawyers), a duty which includes the lawyers' conduct vis-à-vis the authorities, opponents and the general public; and (according to a Commentary source) they "*may only use personal information for the purposes for which access to the file was granted, i.e. primarily for the criminal proceedings in question*". Professor Niggli considers that an abuse of right would contravene these professional duties, and

50

points out that the courts regard circumvention of the rules of international criminal mutual legal assistance as an abuse of right.

The applicants add that this would be the case regardless of whether the documents from the SFPO file have already been obtained from the file and/or transferred to England, and regardless of any former voluntary disclosure. It is, they say, the fact of providing documents under compulsion that renders the disclosure unlawful.

149. Professor Pieth agrees that Swiss lawyers have a duty to practise their profession diligently and conscientiously, and could be sanctioned for abuse of rights or as a consequence of being convicted of a criminal offence incompatible with their profession. At the same time, a Swiss lawyer has the duty to defend his client as defence counsel with all available and legal means and is not an official of the state. The concept of "*abuse of rights*" is very narrow indeed here, and refers to acts like lying to authorities.

150. The alleged concerns which the applicants and Professor Niggli set out are premised on disclosure of the SFPO file in the present English proceedings being an abuse of right or a contravention of SCC Articles 271, 273 and/or 293, FADP Art 35 and/or FLBSB Art 47. For the reasons set out in sections (E)(2) to (6) above, I do not consider the applicants to have established a real risk that such disclosure by them in the present proceedings would be an abuse of right (whether by 'circumventing' the pending criminal MLA procedure or available civil MLA procedures, or otherwise) or contrary to any of those substantive legal provisions.

151. Further, insofar as copies of the SFPO file are present in England already, there is in my view no tenable basis, again for the reasons discussed earlier, for considering that any abuse of right or contravention of any of the provisions discussed above could be involved.

## (F) RISK OF PROSECUTION OR OTHER PREJUDICE

152. There are two main strands to the applicants' arguments under this heading.

153. First, the applicants submit that there is an actual risk that they will be prosecuted in Switzerland if they are required to disclose the SFPO file, or any of the documents referred to in § 6.ii) above. As part of that submission they make the following points:-

i) Even to the extent that the court prefers the views of Professor Pieth to those of Professor Niggli on the substantive Swiss law issues considered above, the court should be cautious about concluding that no real risk of prosecution arises. The court can at most form a view as what appears more likely to be the Swiss legal position, and given the serious potential consequences involved for the applicants, any disagreements between the experts should prudently be regarded as indicating that real risks do exist.

ii) The risks are accentuated by the fact that the Swiss courts, in the decisions considered in section (B) above, have already made clear that documents from the SFPO file must not be disclosed so as to circumvent the pending criminal MLA procedures. For example, in the context of Article 271 Professor Niggli states in his reply report that if there is a risk of circumvention of criminal and

civil MLA, a risk of which the Swiss authorities have already found, there would be political reasons to launch a prosecution.

iii) The risks are already accentuated by the fact that both applicants are already firmly in the sights of the authorities in Switzerland, where they have already been under investigation for many years, and face serious charges.

154. Secondly, in addition to risk of prosecution, the applicants risk restrictions on their right of access to the SFPO file, on the grounds of abuse of right, which would be seriously detrimental to their ability properly to defend themselves against the charges brought against them in Switzerland. Although the *Bank Mellat* line of cases focusses on risks of prosecution, other forms of serious prejudice of this kind must also be taken into account when deciding whether to require disclosure.

155. I do not find those submissions persuasive.

156. In principle I would agree that the court should exercise care when approaching issues of Swiss substantive law on which experienced experts have expressed different views. However, it does not follow that the mere existence of genuine disagreement must be equated to the existence of a real risk. (To the contrary, there is force in the view that prosecution is relatively unlikely if there is real doubt about the law.) In my view the court can and should form a view as to whether, on the evidence put forward, one or other opinion appears materially more likely than the other to be correct. It is for the applicants to establish a real risk of prosecution or (arguably) other prejudice, and a component of that assessment must be the court's view as to how likely it is that disclosure and inspection would infringe Swiss law. In the present case, for the reasons given in section (E) above, I consider it much more likely on the evidence that there would be no such infringement.

157. Further, even to the extent that some risk of infringement might arise, the applicants have not in my view established a real risk of prosecution (either of them or of their legal advisers). Professor Niggli's first report, seemingly reflecting his instructions, essentially does not address risk of prosecution as such. In his second report, he makes general observations of the kind mentioned in § 153.ii) above. However, the applicants and Professor Niggli have not provided any concrete examples of prosecution in situations comparable to the facts of the present case. The facts of Decision 114 IV 128 and the *Swisspartners* case are dissimilar to the present case for the reasons I have already explained.

158. Further:

i) If the Swiss authorities were (contrary to the views I express) to conclude that the applicants have been wrongly compelled by the English court to make a disclosure contrary to Swiss law, then it is far from obvious that one would expect the authorities to react by imposing punishment or other detriment (such as restriction to file access) on the applicants themselves. Again, no comparable examples have been put forward.

ii) The proceedings to date in Switzerland provide no support for the notion that the Swiss courts would regard a direct order for party disclosure in England and Wales as contravening the regime for civil law mutual assistance, or that they

take the view that disclosure for overseas proceedings should be secured solely by that means.

iii)     Insofar as the Swiss courts have been concerned about circumvention by the State of Kuwait of the criminal MLA procedure, and have declined certain applications by PIFSS on those grounds, it does not follow that the authorities would regard the applicants themselves as in some way seeking to circumvent those procedures.  After all, the applicants have been consistently opposed to those applications.  In any event, I consider that it should, as a matter of comity, be possible to mitigate any concerns about onward transmission from PIFSS to the State of Kuwait by appropriate restrictions (see section (G) below).

iv)     On the specific topic of access by the applicants to the SFPO file, the evidence considered in section (E)(2) above indicates that Swiss law would in no case operate so as to deprive the applicants of fundamental rights in relation to the Swiss criminal proceedings, and it is also relevant to note that the applicants have already had access to, and retain copies of, the existing contents of the SFPO file.

v)      Professor Pieth's view is that there is no risk of prosecution for defendants for breach of SCPC Articles 102 and 108; that SCC Article 271 is "*a political offence that requires an authorisation to prosecute by the Federal Council*", and (with the benefit of his experience) "*the risk of prosecution under Art. 271 SCC is merely theoretical because there is no political reason to launch a prosecution*"; and that even if Article 273 applied any risk of prosecution is further limited by the fact that Article 273 is a political offence which would require Federal Council authority to prosecute.

vi)     No evidence has been provided of any real risk of prosecution, or professional sanctions, in relation to any of the other provisions cited by the applicants.

vii)    Mr Al Rajaan has already provided disclosure of documents from Switzerland in the English proceedings pursuant to a worldwide freezing order with a penal notice.  These included copies of Swiss Federal Prosecutor orders freezing his Swiss accounts, and documents from Swiss entities enclosing documents including bank statements.  There is no evidence of this having led to any hint of a prosecution in Switzerland, notwithstanding the ongoing Swiss criminal investigations into Mr Al Rajaan's dealings.

159.   For all these reasons, I do not consider the applicants to have established any real risk of prosecution or other real prejudice.

## (G) COMITY EXERCISE OF DISCRETION

160.   The applicants contend that the court should, as a matter of comity and/or in its discretion (including having regard to fairness and proportionality), grant their application:

i)      in order to avoid circumvention of civil or criminal MLA procedures, especially in circumstances where the Swiss authorities have already repeatedly restricted PIFSS's access to the SFPO file;

53

    ii)      given that PIFSS already has some documents by reason of the first criminal MLA request and may receive others via the second request;

    iii)     bearing in mind that PIFSS can obtain further documents via civil MLA, especially as it already has access to the file and its knowledge of the documents would enable it to specify them very clearly;

    iv)     taking into account the fact that the problems are at least in part of the State of Kuwait's own making, by reason of its pursuit of further criminal proceedings in Kuwait (despite the heavy sentences already passed on Mr Al Rajaan and Ms Al Wazzan *in absentia*) and the second MLA request; and

    v)      in circumstances where PIFSS chose to sue the applicants in England rather than in Switzerland, where Mr Al Rajaan was domiciled and/or living from August 1990.

161.    For the reasons I have given earlier, I am unpersuaded by the notion that disclosure by the applicants could be regarded as circumventing the pending criminal MLA procedures, still less a potential civil letter of request. As a matter of comity, though, I consider that respect should be accorded to the Swiss criminal courts' concern that disclosure of the SFPO file documents to PIFSS could create a risk of transmission to the State of Kuwait, and that that in turn might be viewed as sidestepping the State of Kuwait's pending MLA request for the purpose of the continuing criminal proceedings in Kuwait. I do not consider that the evidence established an actual risk of such transmission, but I do consider it appropriate, at least for the time being, to impose measures in order to mitigate any such risk. Such measures may include restrictions on the categories of persons to whom copies of the documents can be provided. As I indicated at the hearing, I shall hear further argument on this matter (including on the impact, if any, of the outcome of the civil appeals referred to in § 31 above) before determining the form of any such restrictions.

162.    I am unpersuaded by the applicants' points about the access that PIFSS already has to the SFPO file. It is clear that the documents which PIFSS seeks on disclosure are essential to the fair trial of the case, and their absence would "*very substantially interfere with the [claimant's] ability to pursue the case and would clearly hamper the Court's ability to try the case fairly*" (*Morris* § 68). The documents in the SFPO File are the primary source for PIFSS's understanding of Mr Al Rajaan's alleged corruption, and the basis for much of its pleaded case. The evidence has been gathered in Switzerland in the investigation of Mr Al Rajaan's alleged crimes which substantially overlap with PIFSS's claims in England. This is a substantial claim for over $874 million, and PIFSS has so far been investigating complex schemes orchestrated over many years and on an international scale. It will advance the litigation for all parties if these core documents are available in the English proceedings.

163.    It is unclear what, if any, further documents will emerge via the second MLA request. That process is in any event not designed to provide disclosure for parallel civil proceedings, though that can be a side effect. A civil letter of request process would be cumbersome and slow, and (based on events to date) would be likely to be opposed by the applicants. There is no good reason to require PIFSS to take that approach, and it would result in delay to the detriment of PIFSS and, potentially, of other defendants.

164.    Moreover, disclosure would also support the CPR 1.1 objective that "*the parties are on an equal footing*".  The applicants have full and unrestricted access to the SFPO file, which they have used to plead their Defences and to make strategic judgments about the case.  It is fair that all parties should be on the same footing.  Otherwise the applicants would be able to scrutinise PIFSS's and other parties' disclosure whilst withholding large quantities of relevant material, which they remained privately free to consult, use and cherry-pick from without disclosing the full context.

165.    Finally, I see no merit in the applicants' complaint that PIFSS has forum-shopped in relation to them.  Mr Al Rajaan and Ms Al Wazzan were both living in England when the proceedings were commenced (and, at least in Mr Al Rajaan's case, had been since about 2014), though their position on domicile is apparently reserved; and there is no reason to believe that they could have been sued in Switzerland.  There are also numerous other defendants to the claims who submitted to English jurisdiction or objected to jurisdiction but lost.

166.    I therefore conclude that, as a matter of discretion and having regard to comity, the applicants' applications resisting disclosure and inspection should be refused, subject only to the limited caveat identified in § 161 above.

## (H) CONCLUSION

167.    The applications will be dismissed, save to the extent of any measures that, after hearing further argument, I impose of the kind indicated in § 161 above.

168.    I am very grateful to all counsel for their cogent and helpful submissions.