# Exhibit 1

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| STATE OF CALIFORNIA, | ) | |
| STATE OF COLORADO, | ) | |
| STATE OF ILLINOIS, | ) | |
| STATE OF INDIANA, | ) | |
| STATE OF IOWA, | ) | |
| STATE OF MINNESOTA, | ) | |
| STATE OF NEBRASKA, | ) | |
| STATE OF OREGON, | ) | |
| STATE OF TENNESSEE | ) | |
| STATE OF TEXAS, | ) | |
| STATE OF WASHINGTON, | ) | |
| and | ) | Case No. 1:22-cv-00828-TDS-JEP |
| STATE OF WISCONSIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYNGENTA CROP PROTECTION AG, | ) | |
| SYNGENTA CORPORATION, | ) | |
| SYNGENTA CROP PROTECTION, LLC, | ) | |
| and | ) | |
| CORTEVA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DAVID ROSENTHAL ON SWISS LAW

I, David Rosenthal, lic. iur., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over the age of twenty-one and otherwise competent to provide this Declaration, which is based on my personal knowledge and a review of the legal authorities cited therein.

2.      I am a partner at VISCHER Ltd., a Swiss business law firm, where I head the Data & Privacy practice, the eDiscovery & Investigations practice and co-head the

firm's Technology, Media and Telecommunications practice. Before I joined VISCHER in 2020, I was a counsel at another Swiss business law firm, Homburger, for 19 years, heading the data law practice team and co-heading its IT practice team.

3.      I am secretary of the Swiss Association of Corporate Data Protection (VUD) since 2012 and secretary of the Swiss Cross-border eDiscovery Privacy & Investigations Association (CeDIV) since 2015.

4.      I earned my licentiatus iuris from the University of Basel, Switzerland, in 1997, and am lecturer for information technology law at the University of Basel Law School since 1999 and at the Federal Institute of Technology of Zürich since 2006.

5.      My professional focus is on data, technology and AI law, technology transactions, internal investigations and e-discovery. Among other things, I regularly advise international businesses in complying with Swiss and European laws governing the transfer and other processing of data. In addition to my legal education, I also have a technical background in IT and software development and worked in the media sector. I have published numerous articles and various books, and I give regular speeches on data and technology law. My publications include commentary of 2008 on the Swiss Data Protection Act, which also included a commentary on Article 271 Swiss Criminal Code (SCC), which is at issue in this declaration.

6.      I am knowledgeable of and familiar with Swiss law, including the law relating to the discovery of Swiss documents in a U.S. proceeding, and submit this declaration regarding same.[1]

---

[1] Article 271(1) SCC does not require authorization or judicial assistance for an expert to submit his/her opinion if submission of that opinion is not mandated by the court.  However, under 271(1) SCC, a foreign court may not hear live testimony from the expert in Switzerland "without following the path of judicial assistance, as this

2

**Legal Opinion**

7.    I have been asked by Syngenta Crop Protection AG (SCPAG) to opine on Swiss law provisions that must be observed by Swiss companies, such as SCPAG, when producing own records from Switzerland to a U.S. legal proceeding to which they are a party, including relevant Swiss law provisions on criminal law, data protection law and employment law. I understand that the Federal Trade Commission (FTC) and other U.S. public authorities have initiated a civil enforcement action against SCPAG for alleged violation of U.S. law.

**Art. 271 Swiss Criminal Code**

8.    Article 271(1) of the Swiss Criminal Code (SCC)[2] reads:

> "1. Any person who carries out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official,
> any person who carries out such activities for a foreign party or organisation,
> any person who facilitates such activities,
> shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year."

9.    Article 271(1) SCC is a Swiss criminal statute applicable among other things to cross-border discovery, the purpose of which is to protect Swiss sovereignty and which as a general rule criminalizes the taking of evidence in Switzerland for use in a foreign proceeding other than under the auspices of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters concluded on March 18, 1970 (Hague Evidence Convention) or otherwise through Swiss authorities or with a

---

would be tantamount to the taking of evidence on Swiss soil." Ex. A at 37-39 (*Philipp Fischer/Deborah Hondius, Jusletter 4 April 2022*).

[2] An unofficial English translation of the SCC is available here:
https://www.fedlex.admin.ch/eli/cc/54/757_781_799/en.

corresponding authorization (example: Swiss banks under certain conditions are authorized to comply with requests by foreign financial markets regulators). As a general rule, the production and taking of evidence in Switzerland qualifies as a responsibility of a Swiss public authority (i.e. courts) and thus falls within the scope of Article 271(1) SCC. This provision aims at preventing the circumvention of Swiss law for foreign states, especially regarding the Swiss law provisions on international judicial and administrative assistance. Evidence, the taking and production of which is prohibited by Article 271(1) SCC, includes the production of documents and the provision of written or oral answers to questions.

10.     Accordingly, to be certain to avoid a violation of Article 271(1) SCC, a private party seeking to compel another party to produce its documents located in Switzerland or to compel a party to provide answers with information from Switzerland for use in a foreign civil proceeding must proceed under the procedures set forth in the Hague Evidence Convention, as available (or any other available judicial or administrative assistance or with an authorization by the Swiss government or law).

11.     With respect to production outside of the Hague Evidence Convention (or other official) procedures, risk and uncertainty remains, and the redactions that may be applied to documents to mitigate such risks are in my experience often not only very costly and take time be implement, they often also greatly reduce the information value of the documents because they usually will have to be rather extensive.

12.     It is generally accepted that production of non-public documents or provision of information by way of answering questions under a foreign court order compelling their production or provision under the threat of a criminal sanction for

4

noncompliance poses a serious risk of being deemed to be a non-voluntary production or provision and violating Article 271(1) SCC. This is true even if the producing or providing party might have been willing to produce the documents or provide the answers to questions voluntarily in the absence of a court order compelling such production or provision.

13.     While it is generally accepted that orders imposing criminal sanctions (e.g., contempt of court) for non-compliance will cause such production or provision to no longer qualify as voluntary, it is not clear which threat of negative consequences short of a criminal sanction will also result in cooperation no longer to be considered voluntary. The usual counterexample to criminal sanctions are consequences of merely procedural nature (e.g., loss of the right to prove the claim at a later stage). *Cf.* Ex. A at 27 (*Philipp Fischer/Deborah Hondius, Jusletter 4 April 2022*). I am of the opinion that other types of sanctions, specifically consequences that would be considered punitive from a Swiss law perspective even if not formally qualified as "criminal" (e.g., entry of an adverse judgment in civil litigation, or default adverse rulings on certain issues without considering the facts in the case), may also result in production requests to be considered of coercive nature and thus trigger the applicability of Article 271(1) SCC. I would refer to them as "quasi-criminal" sanctions. See also para. 27 below on the topic of "voluntariness".

14.     Violation of Article 271(1) SCC carries significant potential penalties for the cooperating party, including up to three years imprisonment or a fine. Any person knowingly and intentionally participating in the violation, including outside counsel, may be prosecuted. This also applies if the individuals participating in such a violation

are and act only in the U.S. (Art. 4(1) SCC); the reason for this is that Switzerland considers a violation of Art. 271(1) SCC as a crime against Switzerland and has, therefore, defined its scope of application broadly – including by giving it extra-territorial effect.

15.     Moreover, case law underscores that the risk of being prosecuted in Switzerland for violating Article 271(1) SCC by producing or providing materials or information from Switzerland in another form abroad is not merely hypothetical, but is real and substantial, and that Article 271(1) SCC violations are in fact prosecuted by the Swiss authorities. A recent case of a Swiss business man in what was originally considered a voluntary (and, thus, permitted) disclosure of documents is discussed below.

16.     In sum, in the absence of a court order compelling production of evidence, Article 271(1) SCC until recently has been generally understood not to criminalize the voluntary production of evidence by a private party in a pre-trial discovery in the U.S. provided that the parties had a sufficient protective order in place and applied certain redactions to comply with privacy, employment law and secrecy obligations.

17.     This changed, however, on November 1, 2021, with the decision of the Swiss Federal Court (i.e. the Swiss Supreme Court) in the case of the chairman of *Swisspartners*, a Swiss asset management company, voluntarily disclosing customer data to the U.S. Department of Justice for the purpose of concluding a Non Prosecution Agreement (NPA) in relation to a tax dispute. Ex. B (*Swiss Federal Court, Case Reference 6B_216/2020*).

18.     In a nutshell, the court held that under Art. 271(1) SCC information about identifiable third parties that is not publicly accessible may be produced by a party out of Switzerland as evidence in a foreign legal proceeding **only** through judicial or administrative assistance, essentially barring even the voluntary production of evidence by a company without first redacting all third-party identifying information, including information on company employees.  Of note, statements made by an identifiable employee in his or her capacity as an employee are in my view also considered third-party identifying information (and in any event personal data, i.e. subject to data protection, see below).

19.     The *Swisspartners* decision discusses in general the restrictions set forth by Art. 271(1) SCC and comes to the conclusion that "[i]n all constellations, o*nly files and information that can be freely disposed of may be released*. Only the official or legal assistance route offers a procedural framework in which confidentiality and disclosure obligations can be weighed against each other and the principle of specialty can be guaranteed." Ex. B at 1.4.2 (*Op.cit.)* (emphasis added)*.* The court then continues that "Not freely disposable is identifying information about third parties that is not publicly accessible." Ex. B (*Op.cit.*). "Third parties" include company employees, as discussed above and below.

20.     The court applied the foregoing general rule to the specifics of the case and confirmed the criminal conviction of the chairman by the lower instance on the basis of Art. 271(1) SCC.

21.     Later on, the court concluded that the decision was of particular importance beyond the specific case and published it in its series of Federal Court

precedents together with a synopsis of what it considered the key points of its decision.

Ex. C (*Decision Federal Court (DFC) 148 IV 66*). The synopsis reads:

> "Art. 271 No. 1 para. 1 StGB; prohibited acts for a foreign state.
> The offense is intended to prevent the exercise of foreign state power in the territory of Switzerland and to protect the state monopoly of power and Swiss sovereignty (E. 1.4.1). An act that involves a violation or circumvention of Swiss or international administrative or legal assistance law or that lies within the jurisdiction of a Swiss authority or official in accordance with mutual administrative and judicial assistance law is covered by Art. 271 No. 1 StGB. The handover of information and documents that may only be lawfully issued in Switzerland upon sovereign order is affected by Art. 271 StGB protected legal interests. Affected persons may only hand over filed that they may freely dispose of. Non-publicly accessible, identifying information about third parties may not be freely disposed of (E. 1.4.2). The fact that the information to be issued is also stored in a third country as intended does not lead to any other assessment (E. 1.4.3)."

*Id.*

22.    The court's decision in *Swisspartners* effectively up-ended the manner in which clients of mine and other Swiss companies engaged in the production of documents to foreign authorities and in foreign litigation, in particular in pre-trial discovery in the U.S. The court here did not distinguish between different types of foreign proceedings (classical civil litigation vs. government legal action or criminal proceedings), and was much stricter than previous rulings of the Federal Department of Justice and Police / Federal Office of Justice concerning Art. 271(1) SCC, at least in civil matters.

23.    While commentators criticized the court, they acknowledged that the language in the *Swisspartners* decision is indeed worded broadly, is not limited to the production of documents in criminal proceedings and that the court even considered employees to be "third parties", and not only customers. *See* Ex. A at 30 (*Philipp Fischer/Deborah Hondius, op.cit.*); Ex. D at 788 et seq. (*Länzlinger/Atanas, SJZ*

8

*118/2022*). I agree with them that the decision provides no such limitation. In fact, the court expressly said that when determining whether an action is punishable (under Art. 271(1) SCC) one should "not consider the nature of the data, but the preservation of the state's monopoly on power is to be considered." Ex. C at 1.4.3 (*DFC 148 IV 66*). This is consistent with the court's view expressed in the decision that a foreign court or authority should have no authority to decide over whether certain non-public information related to third parties should be produced in a foreign proceeding or not; this decision should be reserved exclusively to Swiss courts and authorities (see para. 19 above). By later on publishing its decision as a key precedent with a corresponding synopsis (see para. 21 above) it further emphasized that it considered its view to be generally applicable, and not just in the specific circumstances of *Swisspartners*. And although one could argue that even in a Swiss judicial assistance proceeding not all third parties would be protected (Ex. D at 789 et seq. (*Länzlinger/Atanas, op.cit.*)), this provides no real solution for the time being as it results in even more uncertainties.

24. Given that the Federal Court is the highest court in Switzerland and has been express in its decision (which opinion was shared by the lower instance, too), I have not seen any client representative willing to take the risk of personal criminal liability by knowingly not complying with the new standard, regardless of whether commentators believed it is wrong or not intended as expressly stated. In my expert opinion, unless the Federal Court clarifies or changes its view, a Swiss party in a U.S. civil litigation that is producing documents *voluntarily*, acting reasonably, (i) will redact any information related to a third party (including own employees, but subject to note 3 below) that is not already public prior to production, (ii) it will obtain valid consent

from the third parties affected, or (iii) the parties resort to judicial or administrative assistance. I note that under Swiss law, an employer cannot require its employees to breach Swiss law and submit themselves to the risk of personal criminal liability for the company (see para. 41 below).[3]

25. The following chart taken from Ex A. at 34 (*Fischer/Hondius, op.cit.*) illustrates the current situation:

---

[3] I agree with some of my colleagues that third parties mentioned in a document in a purely incidental manner and that are not affected in their interests (e.g., the clerk in a room reservation confirmation or the hotel) were likely not meant to be protected by the Federal Court's *Swisspartners* decision and, thus, do not have to be redacted. *Cf.* Ex. A at 32 (*Fischer/Hondius, op.cit.*).

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 11 of 171



Philipp Fischer / Deborah Hondius, Article 271 (1) of the Swiss Criminal Code: myth or reality?, in: Jusletter 4 April 2022

[34] The current situation can be summarized in the illustration below:

26.     With regard to (ii), any consent to be relied upon must be well informed, voluntary and explicit. Ex. E at 1.1.3.5.2.4 (*Swiss Federal Criminal Court, Case Reference CA.2019.6 of December 5, 2019*). Insofar consent is to be obtained from employees, Swiss law is hesitant to deem their consent voluntary due to the power imbalance of the employment relationship. As the Swiss Federal Data Protection and Information Commissioner (FDPIC, i.e. the Swiss data protection authority) holds, "employees are very rarely in a position to freely give, refuse or revoke their consent, given the subordinate nature of the employer/employee relationship". *See* Ex. F

11

(*FDPIC, Internet information page "Data processing by the employer"*). It, therefore, has to be ensured that no pressure whatsoever has been exercised upon employees to provide their consent (the company should, for example, not say or imply "We need you to be okay with this, because a foreign court is telling us that we need to produce this information.").

27.     That said, the *Swisspartners* case in my expert opinion calls into question whether the "voluntariness" criteria relied upon for many years (and discussed in para. 13 above) still applies as broadly as it was believed to be by some when considering Art. 271(1) SCC. In *Swisspartners*, the lower instance court held that the criterion of voluntariness "is not very suitable for preventing the circumvention of judicial assistance" (which is what Art. 271(1) SCC is all about). Ex. E at 1.1.1.4 (*Swiss Federal Criminal Court, Case Reference CA.2019.6 of December 5, 2019*). While there still seems to be a certain consensus among commentators that in a classical civil litigation, a party should be permitted to voluntarily produce own documents (eventually save for non-public third-party identifying information as per *Swisspartners*) this is questioned if a party is pursued by a foreign government and, therefore, under pressure to disclose documents. *See* Ex. G at 782 et seq. (*Felix Bommer, ZBJV 159/2023*); *cf. also* Ex. D at 790 et seq. (*Länzlinger/Atanas, op.cit.*).

28.     In my expert opinion, a similar situation exists in the case of SCPAG: This is not a classical civil litigation where two parties have contractually agreed to litigate their disputes in a particular forum and with particular procedural rules – and should therefore not be prevented by Art. 271(1) SCC in doing so subject to their privacy, employment law and secrecy obligations. My understanding is that the case of

SCPAG is rather the case of a company de facto being prosecuted by the U.S. government, even though the proceeding is in the guise of a civil litigation. From a Swiss law point view – which is the only relevant point of view in terms of Art. 271(1) SCC – the proceeding of SCPAG rather resembles an administrative sanctions proceeding (if the Swiss anti-trust authority were to pursue SCPAG, it would do so in an administrative proceeding). Hence, even if one were to disregard the Federal Court's rules set forth in *Swisspartners* and take the view that these restrictions should not apply to pre-trial discovery in a classical civil litigation, this would arguably not stop Art. 271(1) SCC from being applied in the present matter of SCPAG. This is particularly true if SCPAG were to have no interest in producing documents as per the U.S. government request and would only do so to avoid what would likely be qualified as a sanction from a Swiss law point of view. Note that the Swiss Federal Office of Justice in connection with judicial assistance in civil matters, as well, holds that "when the case relates to litigation between a public authority and a private individual, where the public authority is acting in the exercise of public powers, the case cannot be considered to have a 'civil or commercial' nature" and therefore judicial assistance in such matters may not be available. *See* Ex. H at 5 (*International Judicial Assistance in Civil Matters Guidelines, 3rd edition 2003, last partial update on July 1, 2024*).

**Art. 162 and 273 Swiss Criminal Code**

29.     Article 162 SCC reads:

"Any person who betrays a manufacturing or trade secret that he is under a statutory or contractual duty contract not to reveal,

any person who exploits for himself or another such a betrayal,

shall be liable on complaint to a custodial sentence not exceeding three years or to a monetary penalty."

30.     Article 273 SCC reads:

"Any person who seeks to obtain a manufacturing or trade secret in order to make it available to an external official agency, a foreign organisation, a private enterprise, or the agents of any of these, or,

any person who makes a manufacturing or trade secret available to an foreign official agency, a foreign organisation, a private enterprise, or the agents of any of these,

shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year. Any person who betrays a manufacturing or trade secret that he is under a statutory or contractual duty contract not to reveal,

any person who exploits for himself or another such a betrayal,

shall be liable on complaint to a custodial sentence not exceeding three years or to a monetary penalty."

31.     Both provisions protect business and manufacturing secrets of third parties by criminally sanctioning those who do not comply with an obligation to preserve the confidentiality of such secret, even if the obligation is only of a contractual nature (e.g., a Non-Disclosure Agreement, NDA).

32.     In either case, in a pre-trial discovery, a party will have to assess for each such piece of information whether it may be disclosed under the confidentiality obligations it has entered into. In my experience, many business-to-business contracts today contain confidentiality clauses that prohibit the disclosure of confidential information to third parties unless this is necessary for the performance of the contract

14

or required by a valid and binding court order or the like. This makes it in my experience difficult to disclose such information in the context of a *foreign* court or government proceeding that does not relate to the "master" of the secret at issue, as opposed to a disclosure in a *Swiss* court or *Swiss* government proceeding. This is true even where the confidentiality obligation provides for an exemption in case of a court or government disclosure order because in such a case Art. 271(1) SCC would be triggered, again preventing the disclosure.

33.     Art. 273 SCC ("economic espionage") has a somewhat different scope than Art. 162 SCC in that it can apply worldwide (Art. 4(1) SCC) and arguably even if there is no contractual confidentiality obligation. It, however, only protects secrets of *Swiss* companies and businesspersons and it only applies to disclosures to unauthorized *foreign* third parties. Whether the disclosure occurs voluntarily or not (by the custodian of the secret) does not make a difference; Art. 273 SCC is designed to protect the Swiss economy at large – and its secrets.

34.     In practice in pre-trial discovery matters, these provisions usually mean that a Swiss company will have to consider for each document to be disclosed in a foreign proceeding whether such disclosure violates applicable confidentiality obligations, and if so either not produce such document or redact it accordingly. The fact that the information in documents produced in the foreign proceeding is safeguarded by a protective order in my experience usually does not make a difference in the case of *third-party* secrets. A protective order only prevents the onward disclosure of such secrets but does not justify making them known to the parties of the proceeding

15

in the first place, who would be using them for purposes unrelated to the third parties at issue and purposes these third parties usually did not have to expect.

**Data Protection Act (DPA), Part 1**

35.    Art. 62 DPA[4] reads:

> Art. 62 Violation of the professional duty of confidentiality
>
> [1] Any person who, while practising his or her profession, acquires knowledge of secret personal data for the purpose of that profession but thereafter wilfully discloses such data shall on complaint be liable to a fine not exceeding 250,000 francs.
>
> [2] The same penalty shall apply to any person who wilfully discloses secret personal data that has come to his or her knowledge while carrying on an activity for or while training with a person subject to a duty of confidentiality.
>
> [3] The disclosure of secret personal data after ceasing to practise a profession or after completing training is also a criminal offence.

36.    Art. 62 DPA is a special feature of Swiss law because it provides for a universal professional secrecy obligation for every employee with regard to personal data. Personal data is defined to be information that relates to an identified or identifiable individual; this is comparable to the U.S. concept of personally identifiable information (PII). Under Swiss law, personal data is protected also in a business and work context, i.e. the DPA protects personal data of employees even in their capacity as employees, and even when processed by an employer on its own company computer systems. Art. 62 DPA has been designed to criminally sanction the unauthorized disclosure of secret personal data that had been entrusted to a party in a business context (e.g., an employer or a company) with an expectation of confidentiality. Hence, in the case of a document production for the purposes of a litigation proceeding, a company

---

[4] https://www.fedlex.admin.ch/eli/cc/2022/491/en.

16

will have to consider for personal data contained in documents to be produced whether the production of such personal data could trigger this provision and, if necessary, redact such personal data. Note that Art. 62 DPA has been introduced only in September 2023; before that date such protections under Swiss law were narrower.

### Data Protection Act (DPA), Part 2

37.     Art. 6(2) DPA reads:

"The processing must be carried out in good faith and be proportionate."[5]

38.     The principle of proportionality in Art. 6(2) DPA *inter alia* provides that a company shall produce personal data to a third party (whether under a particular secrecy obligation or not) or otherwise process such data only to the extent that this is necessary for the intended purpose and reasonably acceptable to the person affected, i.e. where there is a proportionate relationship between the disclosure and the interference with the individual's privacy (a.k.a. "proportionality in the narrow sense"). *See* Ex. I at 14 (*FDPIC, Memorandum dated 25 June 2021 concerning Swiss Firm Data Processing and Sharing of Information with the U.S. Securities and Exchange Commission*).[6]

39.     For instance, if documents are produced to a U.S. civil litigation for the purpose of serving as evidence, the principle of proportionality in principle requires that personal data that is not necessary for the proceeding is removed. In practice, this is usually implemented by redacting relevant portions of the documents to be produced,

---

[5] https://www.fedlex.admin.ch/eli/cc/2022/491/en.

[6] Note that the source refers to the "old" DPA per September 2023, but this principle remained unchanged: "Data processing must be proportionate (see Art. 4 para. 2 DPA). This means that a data processor may only disclose that data to the SEC that is suitable and necessary to achieve the intended purpose; furthermore, the data processing must be bearable for the data subject, both in terms of its purpose and its means. A violation of the principle of proportionality can be avoided by blackening data."

17

for instance private data, health data and HR data. This applies irrespective of whether a protective order is in place; the protective order is necessary to protect the personal data that has not been redacted. Note that Art. 271(1) SCC nowadays typically already results in the redaction of most of the personal data (except for those who have validly consented), thus going beyond the redactions required as per the principle of proportionality.

### Art. 328 Code of Obligations

40.    Art. 328 Code of Obligations (CO)[7] reads:

> "[1] Within the employment relationship, the employer must acknowledge and safeguard the employee's personality rights, have due regard for his health and ensure that proper moral standards are maintained. In particular, he must ensure that employees are not sexually harassed and that any victim of sexual harassment suffers no further adverse consequences.
> [2] In order to safeguard the personal safety, health and integrity of his employees he must take all measures that are shown by experience to be necessary, that are feasible using the latest technology and that are appropriate to the particular circumstances of the workplace or the household, provided such measures may reasonably be expected of him in the light of each specific employment relationship and the nature of the work."

41.    Art. 328 CO requires that employers in Switzerland protect their employees' privacy, personality, and well-being. This "duty of care" comprises the obligation not to expose employees to potential harm without justification, whereas this is determined from a Swiss perspective. An example of such potential harm could be the risk of an order requiring an employee to travel to the U.S. and testify before a U.S. court against the employee's wishes, should the name of the employee be disclosed to the U.S. proceeding as part of a document production and be considered relevant.

---

[7] https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en.

18

[Signature Page Follows]

19

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on this 12th day of August, 2024.

David Rosenthal

20

# EXHIBIT A

Philipp Fischer / Deborah Hondius

# Article 271 (1) of the Swiss Criminal Code: myth or reality?

## A summary of the practical implications of this Swiss statutory provision in the context of civil proceedings pending outside of Switzerland

When a Swiss individual or legal entity is involved in civil proceedings pending outside of Switzerland, the practical implications of Article 271 (1) of the Swiss Criminal Code (which precludes the conduct of so-called « public authority acts » on Swiss soil) are a frequent topic of interest. This contribution seeks (i) to provide an overview of the practice of the Swiss authorities as regards the scope of this Swiss statutory provision in the context of civil proceedings pending outside of Switzerland and (ii) to present our thoughts as regards the application of Article 271 (1) of the Swiss Criminal Code to specific fact patterns which may arise in the context of cross-border civil litigation.

Category of articles: Articles
Field of Law: Criminal Procedure

Citation: Philipp Fischer / Deborah Hondius, Article 271 (1) of the Swiss Criminal Code: myth or reality?, in: Jusletter 4 April 2022

ISSN 1424-7410, jusletter.weblaw.ch, Weblaw AG, info@weblaw.ch, T +41 31 380 57 77

EDITIONS WEBLAW

## Contents

1. Introduction
2. In which context was Article 271 (1) SCC adopted?
   2.1. The *Jacob-Wesemann* affair and the *Spitzelgesetz*
   2.2. Interpretation of Article 271 (1) SCC by the Swiss authorities
3. Constitutive elements of Article 271 (1) SCC
4. Specific scenarios
   4.1. Notification and transmission of documents
   4.2. Collection of evidence
       4.2.1. Is the request for disclosure of a «coercive» nature?
       4.2.2. Is the information to be produced in evidence at the «free disposal» of the party requested to make the production?
       4.2.3. Obtaining documents from third parties
   4.3. Experts opinions and affidavits
   4.4. Witness hearings and interrogatories
5. Conclusion

## 1.     Introduction

[1] In its decision 6B_216/2020 (dated November 1, 2021, generally referred to as the *Swisspartners* case), the Swiss Supreme Court confirmed a criminal sanction imposed upon the chairman of a Swiss asset management firm for carrying out activities on behalf of a foreign State on Swiss territory without lawful authority (Article 271 (1) of the Swiss Criminal Code, the «SCC»). The relevant individual had made 109 customer files available to the US Department of Justice in the context of the negotiation of a Non-Prosecution Agreement. Whilst it could be anticipated that the transmission of this information would trigger questions under the Swiss statutory confidentiality provisions, it was, at first glance at least, less obvious that these activities would be characterized as a «public authority act» within the meaning of Article 271 (1) SCC. This recent case law illustrates that Swiss courts take a rather expansive view of this criminal provision, which must therefore be carefully considered each time a Swiss individual or legal entity participates, in one form or another, in proceedings pending outside of Switzerland, regardless of their criminal, civil or administrative nature.

[2] This contribution seeks to present a practical approach to the implications of Article 271 (1) SCC and to highlight some of the pitfalls which Swiss-based persons – along with their advisers – should avoid in order to mitigate the risks deriving from this statutory provision in the context of civil proceedings pending outside of Switzerland. For this purpose, this contribution will start by recalling the origin of Article 271 (1) SCC. This overview is important to understand the legislative intent behind this statutory provision. We will then present the constitutive elements of Article 271 (1) SCC. The last section of this contribution is dedicated to a review, from the perspective of Article 271 (1) SCC, of a series of typical situations in which Swiss-based persons might be required to take part in civil proceedings pending outside of Switzerland.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 24 of 171

## 2. In which context was Article 271 (1) SCC adopted?

### 2.1. The *Jacob-Wesemann* affair and the *Spitzelgesetz*

[3] Before 1935, Switzerland had not enacted any specific criminal law protection against breaches of Swiss territorial sovereignty. For example, the law at the time did not preclude foreign police informers and spies from being active on Swiss territory.[1] It was generally held that the legal regime in force at the time was too vague to protect the territorial sovereignty of Switzerland.[2] Moreover, with the widespread political unrest that broke out in Europe after the First World War, Switzerland was increasingly confronted with foreign agents and informers active on its soil.[3] For example, in 1935, Berthold Jacob, a German of Jewish faith, was lured into a trap by a Gestapo agent, Hans Wesemann, and abducted to Germany. This abduction prompted the Swiss Government to issue an emergency decree, the so-called *Spitzelgesetz*, with a view to preserving Switzerland's sovereignty in times of unrest.[4]

[4] The *Spitzelgesetz* precludes the conduct, on Swiss soil, of activities which are the responsibility of a public authority (such as arrest, seizure, or detention) by foreign officials.[5] The personal scope of this act is however not limited to foreign officials. Any person who carries out an activity on behalf of a foreign state on Swiss soil could be subject to criminal prosecution.[6] The wording of the first Article of the *Spitzelgesetz* was transposed into Article 271 (1) SCC at the time the SCC came into force in 1942.[7] The aim of Article 271 (1) SCC was thus to protect Swiss sovereignty against interventions by foreign officials[8]. The scope of Article 271 (1) SCC was expanded in 1950 to cover also activities for a foreign party or other organisations[9], so as to include within the scope of this criminal provision organisations that exercise *de facto* state power.[10]

### 2.2. Interpretation of Article 271 (1) SCC by the Swiss authorities

[5] The Swiss Supreme Court decision n° 114 IV 128 (rendered in 1988) constitutes the first landmark ruling in respect of Article 271 (1) SCC. A Zurich lawyer was convicted for a breach of Article 271 (1) SCC. This lawyer had conducted private investigations in Switzerland on behalf of his client who was involved in criminal proceedings in Australia. In particular, this lawyer had arranged interviews with employees of a bank to clarify the facts of the case by questioning them himself. The outcome of these interviews was filed in the Australian proceedings. In its decision,

---

[1]   Botschaft des Bundesrates an die Bundesversammlung zum Entwurfe eines Bundesgesetzes zum Schutze der öffentlichen Ordnung (May 8, 1933), BBl 1933 I 753 *et seq.*, p.759.

[2]   Josef Outry, Verletzung Schweizer Gebietshoheit durch verbotene Handlungen für einen fremden Staat (Diss. Zurich 1951), p. 31.

[3]   Outry (N. 2), p. 37.

[4]   Botschaft des Bundesrates an die Bundesversammlung zum Entwurf eines Bundesbeschlusses betreffend den Schutz der Sicherheit der Eidgenossenschaft und die Erweiterung der Bundesanwaltschaft (April 29, 1935), BBl 1935 I 742 *et seq.* (quoted: BBl 1935), p. 743.

[5]   BBl 1935, p. 744.

[6]   Yolanda Mc Gough, Verbotene Handlungen für einen fremden Staat (Diss. Zurich 2018), N. 45.

[7]   Mc Gough (N. 6), N. 46.

[8]   Outry (N. 2), pp. 44–45.

[9]   Andreas Donatsch/Marc Thommen/Wolfgang Wohlers, Strafrecht IV, 5th ed., Zurich 2017 in: Daniel Jositsch (Ed.), Zürcher Grundrisse des Strafrechts, p. 343.

[10]  Donatsch/Thommen/Wohers (N. 9), p. 343.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 25 of 171

the Swiss Supreme Court held that private individuals acting on Swiss soil could also fall within the ambit of Article 271 (1) SCC.[11]

[6] In January 2013, the Swiss Federal Office of Justice (the «**FOJ**») issued the 3rd edition of its guidelines on international judicial assistance in civil matters. These guidelines also address the scope of Article 271 (1) SCC by presenting a series of situations in which a Swiss-based person does not have to follow the channels of international judicial assistance in civil matters without triggering the application of Article 271 (1) SCC. In this context, the FOJ distinguishes (i) the «service of documents» and (ii) the «obtaining of evidence».

- As a matter of principle, any document (judicial and extrajudicial) must be served through judicial assistance.[12] Any Swiss-based person serving documents emanating from another State will infringe Article 271 (1) SCC. Exceptions to the obligation of serving such documents through judicial assistance can apply if «the document in question has no legal effect or is not liable to have any legal effects on the addressee»[13]. In addition, the service of documents is allowed when diplomatic or consular agents address documents to an addressee of the same citizenship than the state of origin of the documents without using or threatening any coercive measures.[14]

- The gathering of evidence on Swiss territory by a Swiss-based person for non-Swiss proceedings generally falls within the scope of Article 271 (1) SCC and thus requires international judicial assistance, even if diplomatic officers or consular agents conduct the gathering of evidence.[15] However, when the concerned party is free to cooperate (or not) in such a gathering of evidence, which is in particular the case when the refusal of cooperating only leads to consequences of a procedural nature (*e.g.*, a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage), the channels of international judicial assistance do not necessarily have to be followed.[16] Consequently, for example, a simple invitation to a hearing outside of Switzerland does not presuppose the use of international judicial assistance as long as no coercive measures are mentioned in the invitation or may be implemented if the addressee refuses the invitation.[17]

[7] The most recent development as regards the interpretation of Article 271 (1) SCC is the *Swisspartners* decision mentioned at the outset of this contribution. In its decision n° 6B_216/2020 (dated November 1, 2021), the Swiss Supreme Court held that a Swiss-based person who had made certain information available to the US Department of Justice had infringed upon Article 271 (1) SCC because the relevant documents contained third party information and were thus not «at the free disposal»[18] of the disclosing party. Accordingly, the channels of international judicial assistance (in that case in criminal matters) should have been followed, and the

---

[11]   Vera Delnon/Bernhard Rüdy, Strafbare Beweisführung?, in: ZStrR 116 (1998), pp. 314 et seq., p. 328.

[12]   Swiss Federal Office of Justice, Guidelines on the International Judicial Assistance in Civil Matters, 3rd ed., (the «**FOJ Guidelines**»), p. 6.

[13]   FOJ Guidelines (N. 12), p. 6.

[14]   FOJ Guidelines (N. 12), pp. 10–11.

[15]   FOJ Guidelines (N. 12), p. 32.

[16]   FOJ Guidelines (N. 12), pp. 20–21.

[17]   FOJ Guidelines (N. 12), p. 21.

[18]   Swiss Supreme Court decision n° 6B_216/2020, c. 1.4.2; See also Dominique Müller/Flavio Delli Colli/Susanne Brütsch, Klarere Konturen für Art. 271 Ziff. 1 StGB?, GesKR 1/2022, pp. 115 *et seq*.

4

direct production of this information to the US authorities amounted to a breach of Article 271 (1) SCC, *in addition* to the Swiss confidentiality provisions, which might have been breached as well.

[8] The broad interpretation of Article 271 (1) SCC by the Swiss Supreme Court has generated a certain level of legal uncertainty[19], in particular in respect of the possibility for a Swiss-based person to participate in judicial proceedings pending in common law jurisdictions, where the collection of evidence is generally a duty of the parties and not of the judicial authority.

## 3.　　Constitutive elements of Article 271 (1) SCC

[9] Article 271 (1) SCC protects Swiss judicial sovereignty by making it unlawful for any person or entity to take any action reserved to public authorities in Switzerland.

[10] This statutory provision reads as follows:

> «*Any person who carries out activities on behalf of a foreign State on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official, any person who carries out such activities for a foreign party or organisation, any person who encourages such activities, shall be liable to a custodial sentence not exceeding three years or to a monetary penalty, or in serious cases to a custodial sentence of not less than one year.*»

[11] Article 271 (1) SCC therefore precludes, under certain circumstances, the performance of a «public authority act» on Swiss soil on behalf of a foreign state. Pursuant to this criminal provision, anyone who performs or facilitates such a «public authority act» on Swiss soil, without having been authorized to do so by the relevant Swiss authority, might be subject to criminal prosecution.

[12] A breach of Article 271 (1) SCC may be punished by a monetary penalty and/or imprisonment sanction of up to three years. From a practical perspective, a breach of Article 271 (1) SCC carries a real risk of prosecution, potentially resulting in significant financial penalties and/or imprisonment. Between 1976 and 2017, 35 sanctions related to the infringement of Article 271 (1) SCC have been recorded.[20]

[13] In order to fall within the scope of Article 271 (1) SCC, an act must:

1. fall within the competence of a public authority from a Swiss legal perspective, or, in other words, be an act whose performance is reserved to Swiss authorities pursuant to Swiss law;

2. be made in favour of a foreign state, that is to say in the interest of a non-Swiss public authority, or in connection with proceedings conducted by or on behalf of such an authority (*e.g.*, a non-Swiss court, government body or public official);

3. occur on Swiss territory; and

---

[19] Stefan Fink, Private Zeugenbefragung im Zivilprozess (Diss. Zurich 2015), N. 507.

[20] Markus Husmann, in: Basler Kommentar Strafrecht II, 3rd ed., Basel 2013 (quoted: BSK SCC-Author), Art. 271 N. 1.

Case 1:22-cv-00828-TDS-JEP　Document 248-1　Filed 08/12/24　Page 27 of 171

4. be made without due authorisation by a competent Swiss authority, respectively without reliance on the channels of international judicial assistance.

[14] Prerequisite 4 means that, if the prerequisites 1 to 3 are fulfilled, an authorisation (within the meaning of Article 271 (1) SCC) is to be obtained, respectively the channels of international judicial assistance are to be followed. In practice, the analysis of whether or not prerequisites 2 and 3 are met does not generate significant difficulties. The key question is to analyse prerequisite 1 in order to determine whether the contemplated activity may be characterized as a «public authority act» within the meaning of Article 271 (1) SCC.

[15] According to some Swiss scholars, substantial preparatory acts (such as telephone calls, emails or the like preparing the collation of documents/data or directing a third party – notably a non-Swiss entity from the same group of companies – to prepare the collation of the same) performed on Swiss territory could also fall within the ambit of Article 271 (1) SCC.[21] Conversely, according to the same scholars, merely planning a trip abroad for this purpose from Switzerland (*e.g.*, booking a flight or a hotel) would not constitute an activity which is material enough to qualify as an offence under Art. 271(1) SCC.[22]

[16] The following section will discuss, from the perspective of Article 271 (1) SCC, a series of situations occurring frequently in the context of cross-border civil litigation.

## 4. Specific scenarios

## 4.1. Notification and transmission of documents

[17] In common law jurisdictions, the notification and transmission of judicial documents is generally done by the parties to the proceedings and is thus not characterized as an official act.[23] By contrast, in Switzerland, these tasks are performed by the authority, typically a court in civil proceedings.[24]

[18] As indicated under section 3 above, the Swiss Supreme Court has taken the position that the assessment as to whether a certain activity falls within the ambit of Article 271 (1) SCC (or not) must be made from a Swiss perspective.[25] As a result, in Switzerland, the notification of official communications falls within the ambit of Article 271 (1) SCC, at least if the documents being notified have legal consequences for the recipient. Such notifications must therefore occur through the channels of international judicial assistance.[26]

[19] This scenario bears a significant practical relevance because recent criminal prosecutions for breaches of Article 271 (1) SCC have been triggered by situations in which a Swiss-based person (typically an attorney) received an official communication from a non-Swiss authority (*i.e.*, summonses to appear before foreign courts, foreign claims for payment and foreign

---

[21] BSK SCC-Husmann (N. 20), Art. 271 N. 72.

[22] BSK SCC-Husmann (N. 20), Art. 271 N. 72.

[23] FOJ Guidelines (N. 12), p. 6.

[24] FOJ Guidelines (N. 12), p. 2; Swiss Supreme Court decision (January 22, 1998) n° 124 V 47, c. 3a.

[25] Swiss Supreme Court decision (September 30, 1988) n° 114 IV 128, c. 2c.

[26] No explicit reservation on Article 6 1954 Hague Convention (RS 0.274.12) but not permitted on Swiss territory (see FOJ Guidelines, pp. 10–11); later explicit reservation on Article 10 (a) 1965 Hague Convention (SR 0.274.131).

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 28 of 171

bankruptcy decisions) and forwarded the same to another Swiss-based person.[27] Under the current interpretation of Article 271 (1) SCC, such activities could amount to a breach of this statutory provision.

[20] Two exceptions however apply in this context:

- As mentioned before, if the document being notified does not have any legal implication for the recipient (for example a notification made solely for information purposes), the FOJ accepts that the notification can be made directly, *i.e.*, outside the channels of international judicial assistance.[28]
- In certain areas of the law, international treaties entered into by Switzerland allow the direct notification of official documents, even if the latter have a legal consequence for the recipient.[29]

[21] In this context, it is important to point out that Article 27 (2) (a) of the Swiss Private International Law Act [30] provides that a foreign decision will not be recognized in Switzerland if a party «did not receive proper notice under either the law of its domicile or that of its habitual residence». As a result, if the defendant was entitled to avail himself or herself of the protection of the channels of international judicial assistance in civil matters and the procedure set forth in the relevant treaties (if applicable) was not complied with in the non-Swiss proceedings, the resulting judgement might not be recognized and enforced in Switzerland. This general principle has been re-affirmed in two decisions rendered by the Swiss Supreme Court.[31]

## 4.2.    Collection of evidence

[22] In Switzerland, a civil litigation is typically divided into several phases. During the first phase, parties submit written briefs that set forth to the court the relevant facts, the legal theories involved and the evidence the parties want the court to admit. The taking of evidence, including the examination of documents that the parties have submitted and the hearing of witnesses, takes place after the initial phase is completed. In civil litigation, the taking of evidence is a function undertaken by the judiciary.

---

[27]    SANDRINE GIROUD/DEBORAH HONDIUS, Swiss blocking statute: update on do's and dont's under the threat of criminal sanctions (December 3, 2019) , https://www.lalive.law/swiss-blocking-statute-update-on-dos-and-donts-under-the-threat-of-criminal-sanctions/ (the website was last accessed February 23, 2022).

[28]    FOJ Guidelines (N. 12), p. 6 (with references).

[29]    Swiss Federal Criminal Court decision (October 6, 2017) n° SK.2017.16, c. 4.3.; URS ZULAUF, Kooperation mit dem Ausland: Verrat an der Schweiz?, in: Robert Waldburger/Charlotte Baer/Ursula Nobel/Benno Bernet (Ed.), Wirtschaftsrecht zu Beginn des 21. Jahrhunderts (Bern 2015) pp.1075 et seq., p. 1085.; As illustrations, see for example Article 12 of the Agreement between Switzerland and Italy to supplement the European Convention on Mutual Assistance in Criminal Matters (RS 0.351.945.41) and Article 14 (3) of the Agreement between the Swiss Confederation and the European Community and its Member States to combat fraud and any other illegal activity to the detriment of their financial interests (RS 0.351.926.81).

[30]    A similar provision is set forth in Article 27 para. 2 of the Lugano Convention. This provision only applies to judgments rendered in Lugano Convention Member States (see Article 25 of the Lugano Convention).

[31]    Swiss Supreme Court case law n° 5A_703/2007 of April 6, 2009, para 3.3; Swiss Supreme Court case law n° 5A_544/2007 of February 4, 2008, para 3.2.1.

[23] The collection of evidence for purposes of judicial proceedings is therefore characterized as a «public authority act» from a Swiss legal perspective because it is generally performed by a public authority (typically a court in civil proceedings).[32]

[24] In other words, the conduct of evidence collection exercises on Swiss territory (such as the production of documents or the hearing of witnesses as part of non-Swiss proceedings) may fall within the ambit of Article 271 (1) SCC.

[25] As a preliminary comment, it is worth noting that if the Swiss-based person is *not a party to the proceedings pending outside of Switzerland*, the production of documents must be made through the channels of international judicial assistance, in particular the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (to the extent applicable).

[26] In turn, if the Swiss-based person is *a party to the proceedings pending outside of Switzerland*, the two main criteria (according to the published practice of the Swiss authorities) in order to determine whether or not the relevant activity (which includes the production of documents to be used in the non-Swiss proceedings) constitutes a «public authority act» within the meaning of Article 271 (1) SCC are:

- the coercive nature of the request for the requested person (see subsection 4.2.1 below); and

- whether or not the requested information is at the «free disposal» of the requested person (see subsection 4.2.2 below).

### 4.2.1.    Is the request for disclosure of a «coercive» nature?

[27] If the failure to comply with the request of the non-Swiss authority triggers a sanction, the response to the court order would be characterized as an act falling within the ambit of Article 271 (1) SCC. To the contrary, in the absence of sanctions for non-compliance, the response should not fall within the ambit of Article 271 (1) SCC (subject to the application of the second criterion which is addressed in subsection 4.2.2 below).  As far as civil proceedings pending outside of Switzerland are concerned, the FOJ has considered that:

- The Swiss party is «free» to cooperate (and as such not subject to sanctions) when, following a request of a non-Swiss court to provide evidence in the context of non-Swiss proceedings, a refusal to cooperate leads only to «consequences of a procedural nature (*e.g.*, a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage)».[33] In this case, the Swiss party can produce the requested information directly (*i.e.*, outside the channels of international judicial assistance).

- To the contrary, where the non-compliance leads to sanctions that are not only of a procedural nature, such as a criminal offence of contempt of court (pursuant to the rules applicable in the foreign jurisdiction), then the response to the order of the non-Swiss court may fall within the ambit of Article 271 (1) SCC, unless the response is provided through the channels of international judicial assistance.

---

32    Swiss Supreme Court decision (September 30, 1988) n° 114 IV 128, c. 2.

33    FOJ Guidelines (N. 12), p. 20.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 30 of 171

[28] A series of four decisions issued by the Swiss Federal Department of Justice and Police (the «**FDJP**») (the FOJ is a subdivision of the FDJP) and published in 2016[34] have confirmed the approach summarized above. In these decisions, the Swiss authorities held that the filing of documents by a Swiss party in proceedings pending outside of Switzerland does not constitute a «public authority act» within the meaning of Article 271 (1) SCC if no sanction applies in the event of non-compliance (the application of the second criterion, which is addressed in subsection 4.2.2 below, is reserved).

### 4.2.2. Is the information to be produced in evidence at the «free disposal» of the party requested to make the production?

[29] The second criterion (dealing with the question as to whether the information to be produced in evidence is at the «free disposal» of the party requested to make the production) has recently been emphasized by the Swiss Supreme Court in the *Swisspartners* case referred to above. The Swiss Supreme Court considered that only information that can be «freely disposed of» by the disclosing person may be made available to a non-Swiss authority without a prior authorisation[35] or outside of judicial assistance proceedings. By contrast, information concerning third parties, such as clients of the disclosing person[36], is not necessarily at the «free disposal» of the party requested to produce such information. Therefore, such information may only be produced through the channels of judicial assistance.[37]

[30] Even though the decision was rendered in the context of criminal proceedings pending in the US, the text of the Swiss Supreme Court decision is worded broadly and does not seem to be limited to the production of documents in *criminal* proceedings pending outside of Switzerland.

[31] As an aside, this criterion was already mentioned in the VPB Decision n° 2[38], which made a distinction between the information pertaining to the requested party itself, which can be freely disclosed, and the information pertaining to third parties that is not publicly accessible, which could not be made available to a non-Swiss authority without prior authorisation under Article 271 (1) SCC.

[32] The Swiss authority would probably not consider that this criterion is met if the third party information is of a «purely incidental nature» and if the disclosure of such information in the

---

34 Decision of the Swiss Federal Department of Justice and Police (dated April 10, 2014), published in VPB 1/2016 (January 26, 2016), n° 2016/3 («**VPB Decision n° 1**»), decision of the Swiss Federal Department of Justice and Police (dated February 12, 2014), published in VPB 1/2016 (January 26, 2016), n° 2016/4 («**VPB Decision n° 2**»), decision of the Swiss Federal Department of Justice and Police (dated April 11, 2016), published in VPB 2/2016 (June 30, 2016), n° 2016/7, decision of the Swiss Federal Department of Justice and Police (dated October 27, 2016), published in VPB 3/2016 (December 29, 2016), n° 2016/8.

35 Reference is made here to the «authorisation» (within the meaning of Article 271 (1) SCC) which can be obtained under certain circumstances from the Swiss authorities.

36 Swiss Supreme Court decision (November 1, 2021) n° 6B_216/2020, c. 1.4.2.

37 Swiss Supreme Court decision (November 1, 2021) n° 6B_216/2020, c. 1.4.2. : «In sämtlichen Konstellationen dürfen nur Akten und Informationen herausgegeben werden, über die frei verfügt werden kann. Nur die Amts- oder Rechtshilfeweg bietet ein prozessuales Gefäss, in welchem Geheimhaltungs- und Offenlegungspflichten einander gegenübergestellt und der Spezialitätsgrundsatz gewährleistet werden können [...]. Nicht frei verfügt werden kann über nicht öffentlich zugängliche, identifizierende Informationen über Dritte. [...]» (free English translation: «In all constellations, only files and information that can be freely disposed of may be produced. Only the administrative or judicial assistance channel offers a procedural vessel in which secrecy and disclosure obligations can be set against each other and the principle of speciality can be guaranteed [...]. It is not possible to freely dispose of identifying information about third parties that is not publicly accessible. [...]».

38 VPB Decision n° 2 (N. 34), paras. 11–12.

non-Swiss proceedings is unlikely to affect the rights of the third party. An example would be the situation in which a Swiss-based person who is a party to divorce proceedings pending outside of Switzerland would produce a pay slip (in order to establish his/her revenues) on which the name of the employer would appear.

[33] In light of the above, the situation can thus be summarized as follows:

- It is well established that a party to foreign proceedings may voluntarily submit to the foreign court evidence that is already in the possession of said party in order to support its pleadings, provided that the relevant Swiss entity may freely disclose such information, which means in particular that the disclosure is not inconsistent with third party privacy rights and/or in violation of data protection laws. Should the documents be protected by the Swiss bank secrecy rules, business or trade secret rules and/or data protection rules, then production must be made through judicial assistance in civil matters, unless the data subject has validly waived his/her privacy rights and consented to the production of the relevant information or documents.

- In order to avoid criminal prosecution under Article 271 (1) SCC, Swiss parties to non-Swiss proceedings must review carefully the content of the information whose production is requested (*i.e.*, whether (or not) such information encompasses third party information).

- A unilateral attempt by a foreign court to compel the release of documents or information from Switzerland without the participation or consent of the Swiss authorities would be an infringement of Swiss sovereignty, even if the documents and information concerned are not covered by Swiss bank secrecy or data protection rules. Under Swiss law, to compel a party or a third-party custodian of records in Switzerland to produce information or documents, a foreign court must use the available proceedings for international legal and/or administrative assistance, thereby requesting the competent Swiss authorities to exercise their judicial power.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 32 of 171

[34] The current situation can be summarized in the illustration below:



#### 4.2.3. Obtaining documents from third parties

[35] A question has arisen as to whether a party to proceedings pending outside of Switzerland and requested to produce certain information in these non-Swiss proceedings may obtain such information from third parties, for example former employees or affiliated companies located in Switzerland. In its decision VPB Decision n° 1 (para. 9), the FOJ has held that such a collection of evidence would not be problematic from the perspective of Article 271 (1) SCC, provided the requesting Swiss party does not act «like a court» («wie ein Gericht auftritt») when requesting the information from the third parties.

### 4.3. Experts opinions and affidavits

[36] Swiss lawyers are often asked to provide expert opinions or affidavits on specific legal or factual issues to be presented as evidence in foreign proceedings. In most cases, the concerned practitioner is not appointed by the foreign court, but chosen by the parties to the foreign proceedings.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 33 of 171

[37] Whilst statements made in expert opinions or affidavits could be understood as a sovereign act in a foreign court and thus amount to a taking of evidence, the FDJP has stated that as long as the expert's mandate is regulated by private law and does not originate from a court, the expert's opinion does not require authorisation and is therefore not affected by Article 271 (1) SCC.[39] This also applies if the expert opinion or affidavit is made before a notary.[40]

[38] The path of judicial assistance shall however in principle be followed where the relevant information for the expert opinion or affidavit is to be obtained from third parties.[41]

[39] Following the rendering of the expert opinion or affidavit, the expert may also be required to testify on the same, be it in person or via video conference. Travelling outside of Switzerland to appear at a trial abroad would obviously not fall within the ambit of Article 271 (1) SCC, given no action is taken on Swiss soil.[42] On the other hand – and this may seem contradictory in view of the foregoing – a foreign court may not hear the expert from abroad by video conference in Switzerland without following the path of judicial assistance, as this would be tantamount to the taking of evidence on Swiss soil.

## 4.4. Witness hearings and interrogatories

[40] As indicated above, in order to fall under Article 271 (1) SCC, the offender must act on behalf of or for the account – although not necessarily at the express request – of a foreign state. Acts bearing an official character include, in principle, hearings of witnesses, as they are the court's prerogative, at least from a Swiss perspective.[43]

[41] The path of judicial assistance should thus be followed where witnesses located in Switzerland are to be heard for the purpose of foreign proceedings. A further distinction must however be made based on the procedural position of the person or entity whose hearing is contemplated:

- Individuals or legal entities located in Switzerland standing as parties in the concerned foreign proceedings (*e.g.*, members of the board of directors of the legal entity which is party to the foreign proceedings) are allowed to provide evidence to the foreign authority on a voluntary basis absent any foreign injunction threatening of consequences which are not of a civil nature only in case of non-compliance;[44]

- Any collection of evidence from third parties to the foreign proceedings, *i.e.*, witnesses *stricto sensu* (*e.g.*, former employees of the legal entity which is party to the foreign proceedings) falls under the prohibition provided for under Article 271 (1) SCC. Some Swiss

---

[39] Decision of the Swiss Federal Department of Justice and Police (dated October 27, 2016), published in VPB 3/2016 (December 29, 2016), n° 2016/8, para. 12.

[40] Decision of the Swiss Federal Department of Justice and Police (dated April 11, 2016), published in VPB 2/2016 (June 30, 2016), n° 2016/7, para. 10.

[41] Danielle Gauthey/ Alexander Markus: Zivile Rechtshilfe und Artikel 271 Strafgesetzbuch, in: ZSR/RDS, Vol. 134 (2015) I Book 4, pp. 359 et seq., p. 378.

[42] Decision of the Swiss Federal Department of Justice and Police (dated October 27, 2016), published in VPB 3/2016 (December 29, 2016), n° 2016/8, para. 14.

[43] Swiss Supreme Court decision (September 30, 1988) n° 114 IV 128, c. 2c.

[44] Philipp Fischer/Alexandre Richa, in: Commentaire Romand Code penal II, Basel 2017 (quoted: CR SCC-Author), Art. 271 N. 25.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 34 of 171

scholars however consider that a third party that would provide a statement voluntarily would not fall within the ambit of Article 271 (1) SCC provided that he/she is under no foreign order assorted with coercive measures or sanctions in case of non-compliance.[45]

[42] It derives from the above that judicial assistance proceedings shall be conducted where third parties are to be heard by a foreign Court by video conference or telephone. Where the concerned third party is required in person at trial abroad, Article 271 (1) SCC should not be triggered, as no action occurs on Swiss soil.

[43] The Swiss Supreme Court has not yet decided whether informal meetings with witnesses, for example aiming at gathering information on the factual background of a case, assessing the chances of success of judicial proceedings or preparing for a court hearing, would fall within the ambit of Article 271 (1) SCC. The question is currently being debated among legal scholars. As a matter of principle, informal contacts with possible witnesses should not be problematic from the perspective of Article 271 (1) SCC[46] (a different question is obviously to what extent such informal contacts are in line with the professional rules applicable to lawyers registered in Switzerland). It is only when the activity, if performed in a purely Swiss domestic context, would be characterized as a criminal offence of «usurpation of official functions» (Article 287 SCC), that a criminal liability under Article 271 (1) SCC could be envisioned in an international context.[47] In other words, any act that would be allowed in domestic legal proceedings should also be permitted in cross-border proceedings.[48] That being said, given the current legal uncertainty (and in particular the strict position of the Swiss Supreme Court in the decision ATF 114 IV 128 mentioned under section 2.2 above), such informal interrogatories on Swiss soil could present a risk under Article 271 (1) SCC and caution is thus required.

## 5. Conclusion

[44] Even though Article 271 (1) SCC was enacted in the first half of the 20th century to preclude very specific activities on Swiss soil, the broad wording of this statutory provision and its rather expansive interpretation by Swiss courts and authorities have created a need to take this statutory provision into account each time a Swiss-based individual or legal entity is required to take part, in one form or another, in civil proceedings pending outside of Switzerland. In this context, we can note the following:

- As regards the production of documents, a review of the practice of Swiss authorities shows that the only fact pattern which clearly falls outside the scope of Article 271 (1) SCC is the situation in which a Swiss party to non-Swiss proceedings is to produce documents (i) without such production being preceded by an official order associated with coercive sanctions in case of non-compliance and (ii) provided the relevant documents can be freely disposed of by the Swiss party (meaning in particular that the disclosure is not likely to

---

45 CR SCC-Fischer/Richa (45), Art. 271 N. 37; BSK SCC-Husmann (N. 20), Art. 271 N. 32.

46 Gauthey/Markus (N. 42), p. 376.

47 CR SCC-Fischer/Richa (N. 45), Art. 271 N. 37; BSK SCC-Husmann (N. 20), Art. 271 N. 17.

48 Delnon/Rüdy (N. 11), p. 332.

infringe upon the privacy rights of third parties or produce adverse consequences for such third party).

- The issuance of expert opinions or affidavits falls outside the scope of Article 271 (1) SCC provided the expert's mandate is governed by private law and does not originate from a judicial authority. In turn, the channels of international assistance in civil matters must, as a matter of principle, be followed where the relevant information for the expert opinion or affidavit is to be obtained from third parties.

[45] Outside these situations, it is highly advisable to mitigate the legal risks flowing from Article 271 (1) SCC by (i) approaching the Swiss authority to obtain either an authorisation within the meaning of this statutory provision (respectively a ruling confirming its non-application)[49] or (ii) using the channels of international judicial assistance in civil matters (for example, as regards the collection of evidence, the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters), which constitute efficient tools for the Swiss-based individual or legal entity to obtain legal certainty before cooperating in non-Swiss civil proceedings.

---

Deborah Hondius, attorney-at-law, LALIVE.

Philipp Fischer, attorney-at-law, OBERSON ABELS.

The authors would like to thank Mr. Frederic Ding for his extremely valuable assistance in the preparation of this contribution.

---

[49] In practice, such requests are generally dealt with expeditiously by the Swiss authorities.

14

# EXHIBIT B

[logo]

retour

Swiss Federal Supreme Court
[multilingual text]
Tribunal federal

[logo]

**6B_216/2020**

**Ruling dated November 1, 2021**

**Criminal Law Department**

Staffing
Federal Judge Jacquemoud-Rossari, Presing Judge
Federal Judge Denys,
Federal Judge Muschietti,
Federal Judge Koch,
Federal Judge Hurni, Clerk of the Court Andres.

Parties to the proceedings
A.,
represented by Attorney-at-Law Dr. Lorenz Erni,
Appellant,

*versus*

Office of the Attorney General of Switzerland,
Guisanplatz 1, 3003 Bern, Appellee.

Subject Matter
Prohibited acts for a foreign state (Art. 271 StGB), scope of the binding effect of a rejection decision,

Appeal against the judgment of the Swiss Federal Criminal Court, Appeals Division, of December 5, 2019
(CA.2019.6).

**Background:**

**A.**

**A.a.** The Board of Directors of B._____AG, an asset management company domiciled in Zurich, had its client relationships reviewed in the course of the tax dispute between Switzerland and the USA. The audit revealed that between 2002 and 2012, B._____ AG and its subsidiaries had a certain number of clients who may not have paid tax in the USA in accordance with the rules. Subsequently, A., in his capacity as Chairman of the Board of Directors of B._____AG, A. commissioned a law firm and an employee of B._____AG to compile dossiers of clients suspected of being liable to pay taxes in the USA. In October 2012, B. filed a voluntary disclosure with the U.S. Department of Justice (hereinafter: DoJ). The latter rejected a request to hand over the relevant client dossiers by way of mutual judicial and administrative assistance. With regard to a so-called Non-Prosecution Agreement (hereinafter: NPA), A. finally travelled to the USA in mid-November 2013 and had a lawyer hand over a USB stick containing a total of 109 client dossiers of B._____AG and its subsidiaries to the DoJ—without having an authorization within the meaning of Art. 271 para. 1 StGB (*Strafgesetzbuch* [Swiss Penal Code]) .

**A.b.** On April 28, 2015, the Swiss Financial Market Supervisory Authority (FINMA) filed a report with the Office of the Attorney General of Switzerland against the management of B.AG and any other persons involved.

The Office of the Attorney General of Switzerland sentenced A._____ on September 19, 2017 to an order of summary punishment of 160 per diem rates of CHF 1,650 and a fine of CHF 10,000 for a prohibited act for a foreign state (Art. 271 no. 1 para. 1 StGB).

Following an objection by A., the Office of the Attorney General of Switzerland brought charges on November 17, 2017.

**A.c.** The Criminal Division of the Swiss Federal Criminal Court acquitted A. on May 9, 2018.

**A.d.** On December 4, 2018, the Swiss Federal Supreme Court upheld the appeal lodged by the Office of the Attorney General of Switzerland in criminal matters, overturned the judgment of the Swiss Federal Criminal Court of May 9, 2018 and referred the case back to the Criminal Division of the Swiss Federal Criminal Court for a new decision (proceedings 6B_804/2018).

**B.**

**B.a.** On May 2, 2019, the Criminal Division of the Swiss Federal Criminal Court sentenced A._____ to a fine of CHF 10,000 and ordered him to pay the costs of the proceedings for committing a prohibited act for a foreign state.

**B.b.** On December 5, 2019, the Appeals Division of the Swiss Federal Criminal Court dismissed the appeal lodged by A., confirmed the judgment of the first-instance court and ordered him to pay the costs of the proceedings.

**C.**

A._____ filed an appeal in criminal matters requesting that the judgment of the Appeals Division of the Swiss Federal Criminal Court be set aside and that he be acquitted of the charge of committing prohibited acts for a foreign state. In the alternative, the judgment should be set aside and the case referred back to the Appeals Division of the Swiss Federal Criminal Court for acquittal.

**Recitals:**

**1.**

**1.1.** The appellant contests the guilty verdict and complains that the objective elements charactering the offence set forth in Art. 271 para. 1 para. 1 StGB are not present. In fact, he claims that the client dossiers of the foreign subsidiaries of B._____AG were stored abroad and should have been brought to Switzerland for processing. The 33 client dossiers of B.___ AG were also available electronically not only in Switzerland but also in the Principality of Liechtenstein. In its first judgment of May 9, 2018, the Criminal Division of the Swiss Federal Criminal Court considered this to have been substantiated in light of his statements. By stating that it was questionable whether all the data would have been available abroad and leaving this question open, the first-instance court failed to recognize that the aforementioned findings of the Criminal Division in its first judgment were binding even after the Swiss Federal Supreme Court's remittal. From a legal point of view, the appellant argues that data that is also located abroad for its intended purpose and is not only taken abroad with a view to being handed over to a foreign authority cannot be the object of Art. 271 no. 1 para. 1 para. 1 StGB, as this does not constitute circumvention of mutual administrative and judicial assistance. The delivery of data that is also located abroad as intended does not violate Swiss sovereignty. He should therefore be acquitted.

**1.2.** The lower-instance court first deals in detail with the question of whether it must or may still examine the objective elements charactering the offence following the Swiss Federal Supreme Court's rejection decision. It concludes that the Swiss Federal Supreme Court has not reviewed the objective elements charactering the offence (given that the Office of the Attorney General of Switzerland, which led the appeal in the rejection proceedings, did not make a corresponding request, or given the lack of standing or complaint on the part of the appellant) and that said lower-instance court can still assess it. However, it is fundamentally bound with regard to the facts of the case and the question of the subjective elements charactering the offence as well as the avoidable error of law (judgment p. 7 et seq.). The subject matter of the proceedings was the handover of the compiled client files to the U.S. authorities (judgment p. 17). In this regard, the lower-instance court stated that data from 109 clients had been stored on a USB stick in 105 pdf files. The data had previously been collected from the Cayman Islands, the Principality of Liechtenstein and Switzerland and had also been stored on servers in Switzerland. This means that the data that should have been made available in the Cayman Islands and the Principality of Liechtenstein according to the presentation on mutual judicial assistance was also compiled privately by B.____AG—without a government request. According to the evaluation by the lower-instance court, the Swiss bank documents compiled were allegedly located exclusively in Switzerland in the case of 117 accounts, also in Switzerland in the case of 155 accounts and not in Switzerland in the case of 35 accounts, as per contractual obligations. So-called "reduced files" were entered for clients who had proof that that had already initiated individual disclosure proceedings with the tax authorities. For the other clients, the so-called "full file" were submitted, which meant that the entire bank documents were enclosed (judgment p. 25). Furthermore, the lower-instance court's analysis revealed that the bank documents of 32 clients had to be stored exclusively in Switzerland in accordance with the instructions and that the bank documents of 74 clients had to be stored in Switzerland as well. Only three clients' bank documents had to be stored exclusively abroad (judgment p. 27 et seq.). From a legal point of view, the lower-instance court considered that the data handed over only contained documents relating to clients of the B. Group that were potentially relevant under tax law; the files were deliberately compiled with this in the forefront. These were clearly identifying documents relating to third parties, which B.____AG would not have been able to dispose of freely within the framework of proceedings, even in the domestic sphere. This applies in particular to the client's bank documents, which were made available by B.____AG as part of the contractual relationship. A copy of these had originally been made available to B.____AG as asset manager in Switzerland by the banks. The bank documents had been entrusted to B.____AG, like the corresponding assets, under clear contractual conditions. The handover of the foreign documents to the U.S. authorities involved the risk of tax (criminal) proceedings for the clients. The handover therefore fulfilled the element characterizing the offense of carrying out actions that are the responsibility of a public authority or official. If the U.S. authorities had had to submit a request for mutual judicial and administrative assistance, the Swiss authorities could have decided which documents were to be handed over to the U.S. authorities and subject to which conditions, in particular the e specialty doctrine. The clients concerned would also have been granted procedural rights. The DoJ was aware that, in the context of a request, there would have been a risk that only the dossiers falling under "fraud and the like", but not those of "ordinary" tax evaders, would have been available to the U.S. authorities at relatively short notice. This also showed that the action had been taken in the interest of the foreign authority, which had honored it in the NPA, insofar as the contribution of B.____AG had been qualified as "extraordinary". By submitting the files, the appellant had in effect carried out an act of mutual judicial assistance reserved for the Swiss authorities. This was done for the benefit of a foreign authority. As planned back in Switzerland, the trip was made with the aim of handing over the files to the U.S. authorities, which means that the offense as a whole also had the necessary internal connection (on Swiss territory). The appellant had also acted without state authorization (judgment p. 29 et seq.).

The lower-instance court then considers the appellant's arguments and comes to the conclusion that his objection that there was no circumvention of Swiss mutual judicial and administrative assistance, since the files were also available abroad as intended and were therefore available, is not correct. It states that this leaves open the question of whether all the files would also have been available abroad, which is already questionable due to the need to compile the data in advance. It considers that the constellation to be assessed illustrates that the doctrine, which concludes that the data is available in two countries and that there is an alternative possibility of entry without penalty, is not convincing. If mutual judicial and administrative assistance were necessary for the transfer of the files in each country—which is the rule—the solution mentioned would ultimately lead to the fact that files could always be handed over from one of the countries concerned, bypassing all rules. Particularly in this day and age of global data storage, this would leave any legal protection provided by the laws on mutual judicial and administrative assistance to private autonomy. The appellant's further cited statements in the doctrine would refer to the taking of evidence and the statements would be related to the question of the territorial applicability of the StGB. This doctrine is therefore unhelpful in the present context, as data collection as such was not punished and there is a significant difference between data collection, in which the information remains in one and the same secret area, and disclosure, which puts an end to this protection (area) (judgment p. 30 et seq.). The lower-instance court also rejected the appellant's argument that, since he had voluntarily submitted the data to the U.S. authorities and the persons concerned had consented, he was not liable to

prosecution. It considers that the question of voluntariness does not need to be answered in the present case, since even doctrines that want to apply voluntariness as a criterion excluding the offense rightly limit this to constellations in which no third-party data is disclosed, which is precisely the case in the present case. The argument that the third parties, i.e. the clients, had impliedly consented to the surrender was incorrect; the requirements for valid consent were not met (judgment p. 32 et seq.).

In subjective terms—the lower-instance court continued—the Swiss Federal Supreme Court had ruled that the appellant had acted with intent. There were no grounds for justification. However, the Swiss Federal Supreme Court had bindingly established that the appellant had acted in an avoidable error of law, which was to be taken into account in mitigation.

In summary, the appellant had committed the prohibited acts for a foreign state within the meaning of Art. 271 no. 1 para. 1 StGB (judgment p. 38 et seq.)

**1.3.**

**1.3.1.** In the event of a rejection decision by the Swiss Federal Supreme Court, the instance dealing with the new decision must base its judgment on the legal assessment on which the rejection is based. This is also binding on the Swiss Federal Supreme Court if the matter is referred to it again. As a result of this binding effect, the courts hearing the case again, as well as the parties—apart from any admissible novelties—are prevented from basing the review on facts other than those previously stated or from examining the case from legal perspectives that were expressly rejected or not considered at all in the rejection decision. The new decision of the lower-instance court is therefore limited to the subject matter that results from the considerations of the Swiss Federal Supreme Court as the subject of the new assessment. The proceedings are only restarted to the extent necessary to accommodate the binding considerations of the Swiss Federal Supreme Court (cf. **BGE 143 IV 214** Consideration 5.2.1; **135 III 334** Consideration 2; judgments 6B_59/2020 of November 30, 2020 Consideration 2; each with references). According to case law, appeals against the first judgment of the lower-instance court and which the parties could reasonably be expected to lodge in good faith can no longer be lodge against the second judgment (cf. **BGE 117 IV 97** Consideration. 4a; judgments 6B_824/2016 of April 10, 2017 Consideration 6.2, not published in: **BGE 143 IV 214**; 6B_51/2016 of June 3, 2016 Consideration 2.4; each with references).

**1.3.2.** In its ruling 6B_804/2018 of December 4, 2018, the Swiss Federal Supreme Court only had to assess the legal issues raised by the Office of the Attorney General of Switzerland (hereinafter: the appellee). The latter objected solely to the Swiss Federal Criminal Court's assessment of the subjective elements charactering the offence. On the other hand, it had no reason to criticize the assessment of the objective elements charactering the offence and the underlying factual findings as unlawful or arbitrary, since the Swiss Federal Criminal Court considered the objective elements charactering the offence to be fulfilled. The Swiss Federal Supreme Court ruled out an error of fact and ruled in favor of an avoidable error of law. The Swiss Federal Criminal Court and the Swiss Federal Supreme Court are bound by this legal assessment and the facts on which it is based, which is not disputed. However, in the rejection decision, the Swiss Federal Supreme Court did not examine whether the appellant's conduct also fulfilled the objective elements charactering the offence set forth in Art. 271 no. 1 para. 1 StGB the absence of a corresponding submission by the appellee. The relevant facts of the case were also not the subject of the Swiss Federal Supreme Court's assessment. The lower-instance court as well as the parties correctly assume that the question of the fulfillment of the objective elements charactering the offence is not covered by the binding effect of the rejection decision and therefore may or must still be examined by the lower-instance court. However, they seem to overlook the fact that the factual conclusions of the Swiss Federal Criminal Court relevant to the legal assessment of the objective facts of the case in the judgment of May 9, 2018 were not the subject of the Swiss Federal Supreme Court's rejection decision and are therefore not covered by its binding effect. In other words, the binding effect of the Swiss Federal Supreme Court's rejection decision only covers the facts that were legally relevant at the time for the assessment of the error of fact or law.

The appellant's complaint that the lower-instance court left open the question of whether all the data could have been obtained abroad, disregarding the fact that the Swiss Federal Criminal Court had already ruled in favor of this question in its decision of May 9, 2018 (based on the Swiss Federal Supreme Court's rejection decision), The judgment of the lower court is somewhat unclear insofar as the lower-instance court initially states that it is bound by the facts (judgment p. 17), states in its summary of the facts to be subsumed that the Swiss bank documents compiled were located exclusively in Switzerland in the case of 117 accounts (32 clients), in Switzerland as well in the case of 155 accounts (74 clients), and not in Switzerland in the case of 35 accounts (three clients) on the basis of the contractual obligations (judgment p. 25 and p. 27 et seq. 25 and p. 27 et seq.), in order to finally consider in the legal assessment that it could be left open whether all data would have been available abroad (judgment p. 30). Based on the following legal assessment, it is only relevant that the lower-instance court did not consider the objective elements charactering the offence to be fulfilled with regard to the 35 accounts and three clients whose bank documents were to be stored exclusively abroad (cf. judgment p. 43). Whether the data stored in Switzerland would also have been available abroad can, however, be left open in the case at hand, as this is not relevant in view of the following legal assessment. Moreover, the appellant does not claim that the lower-instance court arbitrarily established the facts of the case, which means that the following legal assessment must be based on the facts established or summarized by the lower-instance court.

**1.4.**

**1.4.1.** Pursuant to Art. 271 no. 1 para. 1 StGB, anyone who performs acts, which are the responsibility of a public authority or official, for a foreign state on Swiss territory without authorization is liable to prosecution. The provision is intended to prevent the exercise of foreign state authority on Swiss territory and to protect the state's monopoly on power and Swiss sovereignty (judgments 6B_804/2018 of December 4, 2018 Consideration 3; 6B_402/2008 of November 6, 2008 Consideration 2.3.2 with reference; cf. also judgment 8G.125/2003 of December 9, 2003 Consideration 1.3; MARKUS HUSMANN, in: *Basler Kommentar, Strafrecht* [Basel Commentary, Criminal Law], Vol. II, 4th Ed. 2019, no. 6 to Art. 271 StGB; GAUTHEY/MARKUS, *Zivile Rechtshilfe und Artikel 271 Strafgesetzbuch* [Civil mutual judicial assistance and Article 271 of the Swiss Criminal Code], ZSR 134/2015 I p. 366; FISCHER/RICHA, in: *Commentaire romand, Code pénal II* [French-language commentary, Criminal Code II], 2017, no. 8 re Art. 271 StGB; YOLANDA MC GOUGH, *Verbotene Handlungen für einen fremden Staat* [Prohibited acts for a foreign state], 2018, p. 9 et seq. margin no. 18). This means that the state is always the bearer of the protected legal interest; private persons can only be indirectly affected (judgment 8G.125/2003 of December 9, 2003 Consideration 1.3; HUSMANN, loc. cit., N. 6 to Art. 271 StGB). A violation of the provision challenges Switzerland's claim that state action on its territory is carried out solely by its institutions. Today, the focus is mostly on the question of the need for administrative and legal assistance for acts in connection with foreign legal systems and proceedings (cf. HUSMANN, loc. cit., no. 8 and no. 27 on Art. 271 StGB; cf. Consideration 1.4.2). An act attributable to an authority or an official—irrespective of whether an official was involved—is any act which, viewed in isolation, i.e. according to its nature and purpose, is characterized as official activity. The decisive factor is therefore not the person of the perpetrator, but the official nature of the act (**BGE 114 IV 128** Consideration 2b with references; HUSMANN, loc. cit., N. 10, 12 and no. 23 on Art. 271 StGB; DAMIAN K. GRAF, *Mitwirkung in ausländischen Verfahren im Spannungsfeld mit Art. 271 StGB* [Participation in foreign proceedings in conflict with Art. 271 StGB], *Unter Berücksichtigung der jüngsten Bewilligungspraxis von EJPD und EfD* [TAKING INTO ACCOUNT THE LATEST APPROVAL PRACTICE OF THE EJPD AND EfD], GesKR 2/2016 p. 171; OESTERHELT/FRACHEBOUD, in: *Kommentar zum Schweizerischen Steuerrecht, Amtshilfe* [Commentary on Swiss tax law, mutual administrative assistance], 2020, § 29 N. 16 et seq.; MC GOUGH, loc. cit. p. 47 et seq. margin no. 103 et seq.; DAVID ROSENTHAL, in: *Handkommentar zum Datenschutzgesetz* [Manual Commentary on the Data Protection Act], Rosenthal/Jöhri [Editions], 2008, no. 6 to Art. 271 StGB). The punishable act must be committed for a foreign state, i.e. in its interest (**BGE 114 IV 128** Consideration 3b; HUSMANN, loc. cit., no. 14 to Art. 271 StGB; GRAF, loc. cit., p. 172; OESTERHELT/FRACHEBOUD, loc. cit., § 29 no. 26; DUPUIS ET AL., *Petit commentaire, Code pénal* [Brief Commentary, Penal Code], 2nd Ed. 2017, no. 14 to Art. 271 StGB). The elements characterizing the offence only cover those acts that are carried out without state authorization. The Departments and the Federal Chancellery decide on the relevant authorizations under Art. 271 Clause 1 StGB to carry out acts on behalf of a foreign state in their respective areas (Art. 31 of the Government and Administrative Organization Ordinance of November 25, 1998 [RVOV; SR 172.010.1; in the version valid until December 31, 2013]; GRAF, loc. cit., p. 172 et seq.; cf. in detail regarding the approvals OESTERHELT/RAFCHE, loc. cit., § 29 no. 34 et seq.; HUSMANN, loc. cit., no. 78 et seq. regarding Art. 271 StGB; FISCHER/RICHA, loc. cit., no. 38 et seq. regarding Art. 271 StGB; MC GOUGH, loc. cit., p. 137 et seq. margin no. 359 et seq.). The act in question must have taken place on Swiss territory. According to prevailing doctrine, it is sufficient that only part of the criminal acts were committed in Switzerland (OESTERHELT/FRACHEBOUD, loc. cit., § 29 no. 22 et seq. and no. 73; FISCHER/RICHA, loc. cit., no. 36 on Art.

271 StGB; ROSENTHAL, loc. cit., no. 34 on Art. 271 StGB; DUPUIS ET AL., loc. cit., no. 13 on Art. 271 StGB).

**1.4.2.** In the case at hand, it is undisputed that the appellant's action, i.e. the transfer of the client dossiers to the DoJ, was carried out in the interests of the USA and for a foreign state, on Swiss territory and without authorization. The controversial issue to be examined is whether the act is reserved for an authority or an official, in other words whether it is official in nature. The qualification of an act as an official act must be based on the Swiss legal interpretation (cf. **BGE 114 IV 128** Consideration 2c; GAUTHEY/MARKUS, loc. cit. p. 368; MC GOUGH, loc. cit, p. 48 para. 105; ROSENTHAL, loc. cit., no. 6 on Art. 271 StGB; HUSMANN, loc. cit., no. 23 and no. 27 on Art. 271 StGB; FISCHER/RICHA, loc. cit., no. 7 on Art. 271 StGB; OESTERHELT/ FRACHEBOUD, loc. cit., § 29 no. 16). The protected legal interest is decisive for the interpretation of the offense. When determining the punishable nature of an act, the question is whether the act in question is capable of endangering the "state sphere of authority" (cf. MC GOUGH, loc. cit., p. 75 margin no. 180; HUSMANN, loc. cit., no. 30 on Art. 271 StGB). The doctrine further specifies the criteria of the prohibited act developed by case law (cf. e.g. HUSMANN, loc. cit., no. 23 et seq. on Art. 271 StGB). However, there is no need to go into this in detail in the present case, as it is largely undisputed in the doctrine that an act that involves a violation or circumvention of Swiss or international administrative or legal assistance law or that lies within the jurisdiction of a Swiss authority or official in accordance with mutual administrative and judicial assistance law is covered by Art. 271 Clause 1 StGB (HUSMANN, loc. cit., no. 27 and no. 31 to Art. 271 StGB; OESTERHELT/FRACHEBOUD, loc. cit., § 29 no. 7 et seq.; ROSENTHAL, loc. cit., no. 1 to Art. 271 StGB; CLAUDIO BAZZI, *Internationale Wirtschaftsspionage* [International economic espionage], 2015, p. 186 et seq. margin no.. 368 et seq.; GAUTHEY/MARKUS, loc. cit., p. 394 et seq.; with regard to private individuals: MC GOUGH, loc. cit., p. 75 et seq. margin no. 181). Circumvention of mutual administrative or judicial assistance by

a Swiss party does not constitute subterfuge within the meaning of Art. 271 Clause. 1 para. 3 StGB, but the original act within the meaning of Art. 271 Clause. 1 para. 1 StGB (cf. GRAF, loc. cit., p. 178 et seq.; HUSMANN, loc. cit., no. 40 on Art. 271 StGB; GAUTHEY/MARKUS, loc. cit., pg. 394 et seq.).

As the lower-instance court rightly points out, there is extensive academic debate as to whether and to what extent the collection of documents with a view to foreign proceedings and their subsequent submission can be punishable (cf. judgment p. 19 et seq.). There is no need to go into detail about this or any other conceivable constellation in the present case. The decisive factor is that the release of information and documents that can only be lawfully released in Switzerland on the basis of a sovereign order affects the legal interest protected by Art. 271 StGB (cf. HUSMANN, loc. cit., no. 40 regarding Art. 271 StGB; BAZZI, loc. cit., p. 188 margin no. 370). In all constellations, only files and information that can be freely disposed of may be released. Only the administrative or legal assistance route provides a procedural framework in which confidentiality and disclosure obligations can be juxtaposed and the principle of specialty can be guaranteed (GAUTHEY/ MARKUS, loc. cit., pg. 396; HUSMANN, loc. cit., no. 45 on Art. 271 StGB; BAZZI, loc. cit., p. 189 et seq. margin no. 373). Identifying information about third parties that is not publicly accessible cannot be freely disposed of (HUSMANN, loc. cit., no. 45 on Art. 271 StGB; cf. *183 wiedergegebenen, unveröffentlichten Verfügungen des Eidgenössischen Finanzdepartements* [183 reproduced, unpublished rulings of the Swiss Federal Department of Finance] [EFD], loc. cit., p. 183, loc. cit., p. 183 et seq.).

**1.4.3.** According to the findings of the lower-instance court, the files handed over by the appellant only contained documents relating to clients of the B. Group that are potentially relevant under tax law. Based on the contractual relationship, B._____AG as asset manager originally received copies of the clients' bank documents from the banks in Switzerland. The bank documents were entrusted to B.AG under clear contractual conditions (cf. judgment p. 29). Consequently, the appellant was not entitled to transmit the documents relating to third parties directly to the DoJ. Rather, the latter would have had to take the mutual administrative and judicial assistance route and request the files from B._____AG as an information carrier based in Switzerland via the competent Swiss authorities. By transmitting the documents directly to the DoJ bypassing the mutual administrative and judicial assistance route, the appellant performed an act for a foreign state that was reserved for the Swiss authorities.
It is unclear to what extent the fact that the data was also stored in a third country as intended should lead to a different assessment. In his argumentation, the appellant overlooks the fact that, according to what has been said, it is not the nature of the data but the preservation of the state's monopoly of power that must be taken into account when determining the punishable nature of his act. The appellant, starting his trip in Switzerland, delivered data entrusted to him or to B.AG concerning third parties, which were at least also located in Switzerland, directly to the DoJ. In doing so, he violated Swiss sovereignty, as the data originating from Switzerland should only have been passed on from Switzerland by the Swiss authorities via the mutual administrative and judicial assistance route in compliance with the relevant legal provisions. Whether it would also have been possible or permissible for the appellant to transfer the data located in a third country to the DoJ from a third country is not relevant here. The e-mail from the Swiss Federal Office of Justice cited by the appellant (complaint p. 10) does not indicate otherwise, as the case in question appears to have involved data that was already in the USA and should have been handed over to the competent authorities there. In the case at hand, it is undisputed that the data was not located in the USA, but (partially) in a third country in addition to Switzerland (cf. also judgment p. 31 et seq.).

The references that the appellant cites can also be understood to mean that it is assumed in each case that the data are also located (besides Switzerland) in the country in which the proceedings are being conducted in which they are to be submitted. GRAF writes the following: "If the information to be disclosed in the foreign proceedings is already located abroad [...], it can be made available without restriction. In this case, according to the present opinion, the companies must even be able to supply the documents either from abroad or from Switzerland if the information [...] is available in both countries, as such data is no longer covered by the protective purpose of Art. 271 StGB." (GRAF, loc. cit., p. 179). There are no indications that "abroad" refers to a country other than the one in which the proceedings are being conducted. Moreover, GRAF does not justify its assessment in detail. The doctrines of ROSENTHAL and HUSMANN can also be interpreted in the same way. While HUSMANN—also without further justification—mainly refers to GRAF and ROSENTHAL (HUSMANN, loc. cit., no. 72 on Art. 271 StGB), ROSENTHAL, in the passage quoted by the appellant, deals with the internal connection and the question of whether the act took place on Swiss territory. He is of the opinion that evidence located in Switzerland is not collected in Switzerland if this evidence or content is available abroad anyway due to its purpose and can therefore be used in the context of the specific collection of evidence abroad (ROSENTHAL, loc. cit., no. 35 to Art. 271 StGB). The present case differs from this example in two respects: On the one hand, this is not about the collection of evidence, but the direct disclosure of data to an authority of a foreign state. On the other hand, the data was not accessed abroad, but was brought abroad from Switzerland. Consequently, the doctrinal opinions cited by the appellant cannot change the above-mentioned assessment that he carried out an act that was reserved for the Swiss authorities, which is why there is no need to go into this in more detail (cf. also the correct statements of the lower-instance court, judgment p. 30 et seq.).

**1.5.**   In summary, the lower-instance court did not violate federal law by also confirming the element of the offense of performing acts that are the responsibility of an authority or a public official and by considering the objective elements charactering the offence set forth in Art. 271  Clause 1 para. 1 StGB to be fulfilled overall. Since the appellant also acted intentionally (cf. judgment p. 38), the conviction for prohibited acts for a foreign state proves to be in conformity with federal law.

**2.**
The appeal must be dismissed.  Given this outcome of the proceedings, the appellant must be ordered to pay the costs of the Swiss Federal Supreme Court (Art. 66 para. 1 BGG (Bundesgerichtsgesetz [Swiss Federal Supreme Court Act])).


**Accordingly, the Swiss Federal Supreme Court recognizes:**

**1.**
The appeal is dismissed.

**2.**
The court costs of CHF 3,000 are imposed on the appellant.

**3.**
The parties and the Swiss Federal Criminal Court, Appeals Division, will be notified of this judgment in writing.


Lausanne, November 1, 2021

On behalf of the Criminal Division of the Swiss Federal Supreme Court

The Presiding Judge: Jacquemoud-Rossari

The Clerk of the Court: Andres



**TRANSPERFECT**

I, Deborah Lüdi Reidy, hereby certify that I am competent to translate from German to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the document entitled "6B_216_2020 01.11.2021 - Tribunal fédéral" from German to English.

_____
Deborah Lüdi Reidy

Sworn to before me this

2 day of August 20 24

_____
Signature, Notary Public

CHRISTINA L SHAHAN
NOTARY PUBLIC
RUTHERFORD COUNTY, NC
My Commission Expires 2/17/28

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 |
WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT C

**Caption**

148 IV66

7. Extract from the judgment of the Criminal Division in the sense of Federal Public Prosecutor's Office (Complaint in Criminal Matters)
6B216/2020 dated November 1st, 2021

## Summary

**Art. 271 No. 1 para. 1 StGB**; prohibited acts for a foreign state.
The offense is intended to prevent the exercise of foreign state power in the territory of Switzerland and to protect the state monopoly of power and Swiss sovereignty (E. 1.4.1). An act that involves a violation or circumvention of Swiss or international administrative or legal assistance law or that lies within the jurisdiction of a Swiss authority or official in accordance with mutual administrative and judicial assistance law is covered by **Art. 271 No. 1 StGB**. The handover of information and documents that may only be lawfully issued in Switzerland upon sovereign order is affected by **Art. 271 StGB** protected legal interests. Affected persons may only hand over files that they may freely dispose of. Non-publicly accessible, identifying information about third parties may not be freely disposed of (E. 1.4.2). The fact that the information to be issued is also stored in a third country as intended does not lead to any other assessment (E. 1.4.3).

**Facts** from page 67

BGE 148 IV 66 p. 67

**A.**

**A.a** The Board of Directors of B. AG, an asset management company domiciled in Zurich, had its client relationships reviewed in the course of the tax dispute between Switzerland and the USA. The audit revealed that between 2002 and 2012, B. AG and its subsidiaries had a certain number of clients who may not have paid tax in the USA in accordance with the rules. Subsequently, A., in his capacity as Chairman of the Board of Directors of B. AG, A. commissioned a law firm and an employee of B. AG to compile dossiers of clients suspected of being liable to pay taxes in the USA. In October 2012

BGE 148 IV 66 p. 68

A. filed a voluntary disclosure with the U.S. Department of Justice (hereinafter: DoJ). The latter rejected a request to hand over the relevant client dossiers by way of mutual judicial and administrative assistance. With regard to a so-called Non-Prosecution Agreement (hereinafter: NPA), A. finally travelled to the USA in mid-November 2013 and had a lawyer hand over a USB stick containing a total of 109 client dossiers of B. AG and its subsidiaries to the DoJ—without having authorization within the meaning of **Art. 271 para. 1 StGB.**

**A.b** On April 28, 2015, the Swiss Financial Market Supervisory Authority (FINMA) filed a report with the Office of the Attorney General of Switzerland against the management of B. AG and any other persons involved.
On September 19, 2017, the Office of the Attorney General of Switzerland sentenced A. to an order of summary punishment of 160 per diem rates of CHF 1,650 and a fine of CHF 10,000 for a prohibited act for a foreign state **(Art. 271 No. 1 para. 1 StGB).**
Following an objection by A., the Office of the Attorney General of Switzerland brought charges on November 17, 2017.

**A.c** The Criminal Division of the Swiss Federal Criminal Court acquitted A. on May 9, 2018.

**A.d** On December 4, 2018, the Swiss Federal Supreme Court upheld the appeal lodged by the Office of the Attorney General of Switzerland in criminal matters, overturned the judgment of the Swiss Federal Criminal Court of May 9, 2018, and referred the case back to the Criminal Division of the Swiss Federal Criminal Court for a new decision (proceedings 6B804/2018).

**B.**

---

**Contents**

Entire document
Summary: <u>German</u> <u>French</u> <u>Italian</u>

<u>Background:</u>

Recitals <u>1</u>

---

**References**

BGE [Decisions of the Federal Supreme Court]: <u>114 IV128</u>

Articles: Art. 271 StGB (*Strafgesetzbuch* [Swiss Criminal Code]), Art. 271 No. 1 para. 1 StGB, Art. 271 No. 1 StGB, Art. 271 No. 1 para. 3 StGB

---

**Navigation**

<u>New search</u>

<u>Find similar key decisions</u>

**B.a** On May 2, 2019, the Criminal Division of the Swiss Federal Criminal Court sentenced A. to a fine of CHF 10,000 and ordered him to pay the costs of the proceedings for committing a prohibited act for a foreign state.

**B.b** On December 5, 2019, the Appeals Division of the Swiss Federal Criminal Court dismissed the appeal lodged by A., confirmed the judgment of the first-instance court and ordered him to pay the costs of the proceedings.

**C.** A. filed an appeal in criminal matters requesting that the judgment of the Appeals Division of the Swiss Federal Criminal Court be set aside and that he be acquitted of the charge of committing prohibited acts for a foreign state. The contingency is to suspend the judgment and

BGE 148 IV 66 p. 69

The matter must be submitted to the appeals chamber of the Federal Criminal Court for the release. The Federal Supreme Court rejected the appeal.

## Recitals:

From the recitals:

**1.** (...)

**1.4**

**1.4.1** According to **Art. 271 No. 1 para. 1 StGB**, anyone who performs acts, which are the responsibility of a public authority or official, for a foreign state on Swiss territory without authorization is liable to prosecution. The provision is intended to prevent the exercise of foreign state authority on Swiss territory and to protect the state's monopoly on power and Swiss sovereignty (judgments 6B804/2018 of December 4, 2018 Consideration 3; 6B402/2008 of November 6, 2008 Consideration 2.3.2 with reference; cf. also judgment 8G.125/2003 of December 9, 2003 Consideration 1.3; MARKUS HUSMANN, in: *Basler Kommentar, Strafrecht* [Basel Commentary, Criminal Law], Vol. II, 4th Ed. 2019, No. 6 to **Art. 271 StGB**; GAUTHEY/MARKUS, *Zivile Rechtshilfe und Artikel 271 Strafgesetzbuch* [Civil mutual judicial assistance and Article 271 of the Swiss StGB], ZSR 134/2015 I p. 366; FISCHER/RICHA, in: *Commentaire romand, Code pénal II* [French-language commentary, StGB II], 2017, No. 8 re Art. 271 StGB; YOLANDA MC GOUGH, *Verbotene Handlungen für einen fremden Staat* [Prohibited acts for a foreign state], 2018, p. 9 et seq. margin no. 18). This means that the state is always the bearer of the protected legal interest; private persons can only be indirectly affected (judgment 8G.125/2003 of December 9, 2003 Consideration 1.3; HUSMANN, loc. cit., N. 6 to **Art. 271 StGB**). A violation of the provision challenges Switzerland's claim that state action on its territory is carried out solely by its institutions. Today, the focus is mostly on the question of the need for administrative and legal assistance for acts in connection with foreign legal systems and proceedings (cf. HUSMANN, loc. cit., No. 8 and No. 27 on **Art. 271 StGB**; cf. Consideration 1.4.2). An act attributable to an authority or an official—irrespective of whether an official was involved—is any act which, viewed in isolation, i.e. according to its nature and purpose, is characterized as official activity. The decisive factor is therefore not the person of the perpetrator, but the official nature of the act (**BGE 114 IV 128** Consideration 2b with references; HUSMANN, loc. cit, N. 10, No. 12 and No. 23 on Art. 271 StGB; DAMIAN K. GRAF, Mitwirkung in ausländischen Verfahren im Spannungsfeld mit **Art. 271 StGB** [Participation in foreign proceedings in conflict with **Art. 271 StGB**], Unter Berücksichtigung der

BGE 148 IV 66 p. 70

jüngsten Bewilligungspraxis von EJPD und EfD [Taking into account the latest approval practice of the EJPD and EfD], GesKR 2/2016 p. 171; OESTERHELT/FRACHEBOUD, in: *Kommentar zum Schweizerischen Steuerrecht, Amtshilfe* [Commentary on Swiss tax law, mutual administrative assistance], 2020, Section 29 N. 16 et seq.; MC GOUGH, loc. cit. p. 47 et seq. margin No. 103 et seq.; DAVID ROSENTHAL, in: *Handkommentar zum Datenschutzgesetz* [Manual Commentary on the Data Protection Act], Rosenthal/Jöhri [Editions], 2008, No. 6 to **Art. 271 StGB**). The punishable act must be committed for a foreign state, i.e. in its interest (**BGE 114 IV 128** Consideration 3b; HUSMANN, loc. cit., No. 14 to Art. 271 StGB; GRAF, loc. cit., p. 172; OESTERHELT/FRACHEBOUD, loc. cit., Section 29 No. 26; DUPUIS ET AL., Petit commentaire, Code pénal [Brief Commentary, Penal Code], 2nd edition 2017, No. 14 to **Art. 271 StGB**). The elements characterizing the offense only cover those acts that are carried out without state authorization. The Departments and the Federal Chancellery decide on the relevant authorizations under **Art. 271 No. 1 StGB** to carry out acts for a foreign state (Article 31 of the Government and Administrative Organisation Ordinance of November 25, 1998 [RVOV; SR 172.010.1; in the version valid until December 31, 2013]; GRAF, op. cit., p. 172 et seq.; for details on the authorisations, see OESTERHELT/FRACHEBOUD, op. cit., Section 29, No. 34 et seq.; HUSMANN, op.

cit., No. 78 et seq. to **Art. 271 StGB**; FISCHER/RICHA, op. cit., No. 38 et seq. to **Art. 271 StGB**; MC GOUGH, op. cit., p. 137). et seq. para. 359 et seq.). The act in question must have taken place on Swiss territory. According to the prevailing doctrine, it is sufficient that only a part of the criminal acts were carried out in Switzerland (OESTERHELT/FRACHEBOUD, loc. cit., Section 29 N. 22 et seq. and N. 73; FISCHER/RICHA, loc. cit., N. 36 to **Art. 271 StGB**; ROSENTHAL, loc. cit., N. 34 to **Art. 271 StGB**; DUPUIS AND OTHERS, loc. cit., N. 13 to **Art. 271 StGB**).

**1.4.2** In the case at hand, it is undisputed that the Appellant's action, i.e. the transfer of the client dossiers to the DoJ, was carried out in the interests of the USA and for a foreign state, on Swiss territory and without authorization. The controversial issue to be examined is whether the act is reserved for an authority or an official, in other words whether it is official in nature. The qualification of an act as an official act must be based on the Swiss legal interpretation (cf. **BGE 114 IV 128** Consideration 2c; GAUTHEY/MARKUS, loc. cit. p. 368; MC GOUGH, loc. cit., p. 48 para. 105; ROSENTHAL, loc. cit., No. 6 on **Art. 271 StGB**; HUSMANN, loc. cit., No. 23 and No. 27 on **Art. 271 StGB**; FISCHER/RICHA, loc. cit., No. 7 on **Art. 271 StGB**; OESTERHELT/ FRACHEBOUD, loc. cit., Section 29 No. 16). The protected legal interest is decisive for the interpretation of the offense.

BGE 148 IV 66 p. 71

When determining the punishable nature of an act, the question is whether the act in question is capable of endangering the "state sphere of authority" (cf. MC GOUGH, loc. cit., p. 75 margin No. 180; HUSMANN, loc. cit., No. 30 on **Art. 271 StGB**). The doctrine further specifies the criteria of the prohibited act developed by case law (cf. e.g. HUSMANN, loc. cit., No. 23 et seq. on **Art. 271 StGB**). However, there is no need to go into this in detail in the present case, as it is largely undisputed in the doctrine that an act that involves a violation or circumvention of Swiss or international administrative or legal assistance law or that lies within the jurisdiction of a Swiss authority or official in accordance with mutual administrative and judicial assistance law is covered by **Art. 271 No. 1 StGB** (HUSMANN, loc. cit., No. 27 and No. 31 to Art. 271 StGB; OESTERHELT/FRACHEBOUD, loc. cit., Section 29 No. 7 et seq.; ROSENTHAL, loc. cit., No. 1 to **Art. 271 StGB**; CLAUDIO BAZZI, *Internationale Wirtschaftsspionage* [International economic espionage], 2015, p. 186 et seq. margin no.. 368 et seq.; GAUTHEY/MARKUS, loc. cit., p. 394 et seq.; with regard to private individuals: Mc gOuGH, loc. cit., p. 75 et seq. margin No. 181). Circumvention of mutual administrative or judicial assistance by a Swiss party does not constitute subterfuge within the meaning of **Art. 271 No. 1 para. 3 StGB**, but the original act within the meaning of **Art. 271 No. 1 para. 1 StGB** (cf. GRAF, loc. cit., p. 178 et seq.; HUSMANN, loc. cit., No. 40 on **Art. 271 StGB**; GAUTHEY/MARKUS, loc. cit., pg. 394 et seq.).

As the lower-instance court rightly points out, there is extensive academic debate as to whether and to what extent the collection of documents with a view to foreign proceedings and their subsequent submission can be punishable. There is no need to go into detail about this or any other conceivable constellation in the present case. The decisive factor is that the release of information and documents that can only be lawfully released in Switzerland on the basis of a sovereign order affects the legal interest protected by **Art. 271 StGB** (cf. HUSMANN, loc. cit., No. 40 regarding **Art. 271 StGB**; BaZZI, loc. cit., p. 188 margin No. 370). In all constellations, only files and information that can be freely disposed of may be released. Only the administrative or legal assistance route provides a procedural framework in which confidentiality and disclosure obligations can be juxtaposed and the principle of specialty can be guaranteed (GAUTHEY/ MARKUS, loc. cit., pg. 396; HUSMANN, loc. cit., No. 45 on **Art. 271 StGB**; BAZZI, loc. cit. page 189 ref. 373). Not freely available

BGE 148 IV 66 p. 72

Identifying information about third parties that is not publicly accessible cannot be freely disposed of (HUSMANN, loc. cit., No. 45 on **Art. 271 StGB**; cf. *183 wiedergegebenen, unveröffentlichten Verfügungen des Eidgenössischen Finanzdepartementes* [183 reproduced, unpublished rulings of the Swiss Federal Department of Finance] [EFD], loc. cit., p. 183, loc. cit., p. 183 et seq.).

**1.4.3** According to the findings of the lower-instance court, the files handed over by the Appellant only contained documents relating to clients of the B. Group that are potentially relevant under tax law. Based on the contractual relationship B. AG, as asset manager originally received copies of the clients' bank documents from the banks in Switzerland. The bank documents were entrusted to B. AG under clear contractual conditions. Consequently, the Appellant was not entitled to disclose the documents relating to third parties directly to the DoJ. Instead, the latter would have had to take the mutual administrative and judicial assistance route and request the files from B. AG as an information carrier based in Switzerland via the competent Swiss authorities. By disclosing the documents directly to the DoJ bypassing the mutual administrative and judicial assistance route, the Appellant performed an act for a foreign state that was reserved for the Swiss authorities.

It is unclear to what extent the fact that the data was also stored in a third country as intended should lead to a different assessment. In his argumentation, the Appellant overlooks the fact that, according to what has been said, it is not the nature of the data but the preservation of the state's monopoly of power that must be taken into account when determining the punishable nature of his act. The Appellant, starting his trip in Switzerland, handed over data entrusted to him or to B. AG concerning

third parties, which were at least also located in Switzerland, directly to the DoJ. In doing so, he violated Swiss sovereignty, as the data originating from Switzerland should only have been passed on from Switzerland by the Swiss authorities via the mutual administrative and judicial assistance route in compliance with the relevant legal provisions. Whether it would also have been possible or permissible for the Appellant to transfer the data located in a third country to the DoJ from a third country is not relevant here. Nothing else results from

BGE 148 IV 66 p. 73

The e-mail from the Swiss Federal Office of Justice cited by the Appellant does not indicate otherwise, as the case in question appears to have involved data that was already in the USA and should have been handed over to the competent authorities there. In the case at hand, it is undisputed that the data was not located in the USA, but (partially) in a third country in addition to Switzerland.

The references that the Appellant cites can also be understood to mean that it is assumed in each case that the data are also located (besides Switzerland) in the country in which the proceedings are being conducted in which they are to be submitted. GRAF writes the following: "If the information to be disclosed in the foreign proceedings is already located abroad [...], it can be made available without restriction. In this case, according to the present opinion, the companies must even be able to hand over the documents either from abroad or from Switzerland if the information [...] is available in both countries, as such data is no longer covered by the protective purpose of **Art. 271 StGB**." (GRAF, loc. cit., p. 179). There are no indications that "abroad" refers to a country other than the one in which the proceedings are being conducted. Moreover, GRAF does not justify its assessment in detail. The doctrines of ROSENTHAL and HUSMANN can also be interpreted in the same way. While HUSMANN—also without further justification—mainly refers to GRAF and ROSENTHAL (HUSMANN, loc. cit., No. 72 on **Art. 271 StGB**), ROSENTHAL, in the passage quoted by the Appellant, deals with the internal connection and the question of whether the act took place on Swiss territory. He is of the opinion that evidence located in Switzerland is not collected in Switzerland if this evidence or content is available abroad anyway due to its purpose and can therefore be used in the context of the specific collection of evidence abroad (ROSENTHAL, loc. cit., No. 35 to **Art. 271 StGB**). The present case differs from this example in two aspects: On the one hand, this is not about the collection of evidence, but the direct disclosure of data to an authority of a foreign state. On the other hand, the data was not accessed abroad, but was brought abroad from Switzerland. Consequently, the doctrine opinions cited by the Complainant regarding the assessment of

BGE 148 IV 66 p. 74,

according to which he performed an action reserved for the Swiss authorities to not change anything, which is why it does not have to be discussed in further detail.



TRANSPERFECT

I, Fernando Castaneda, hereby certify that I am competent to translate from German to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the document entitled "Decision Federal Court (DFC) 148 IV 66" from German to English.

_____
Fernando Castaneda

Sworn to before me this

8th day of August, 2024



_____
Signature, Notary Public

MARIA ISABEL HERMOSILLO MONTERRUBIO
Notary Public, State of Texas
Comm. Expires 04-16-2028
Notary ID 134855012

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT D


| | |
|---|---|
| Document | **SJZ (*Schweizerische Juristen-Zeitung* [Swiss Lawyers' Journal] 118/2022 p. 784** |
| Author | **Andreas D. Länzlinger, Martina Athanas** |
| Title | **Direct transmission of documents and information in the context of foreign civil proceedings** |
| Review of judgment | **6B_216/2020** |
| Pages | **784-793** |
| Publication | **Schweizerische Juristen-Zeitung** |
| Editors | **Omar Abo Youssef (Editor), Pascal Hachem (Editor), Pascal Pichonnaz (Editor), Meinrad Vetter (Editor)** |
| Former editors | **Gaudenz G. Zindel (Editor)** |
| ISSN | **0036-7613** |
| Publisher | **Schulthess Juristische Medien AG** |

SJZ (*Schweizerische Juristen-Zeitung* [Swiss Lawyers' Journal] 118/2022 p. 784

# Direct transmission of documents and information in the context of foreign civil proceedings

## New case law of the Federal Court on Art. 271 StGB and its impact in practice

Dr. iur. Andreas D. Länzlinger, Attorney at Law, Partner, Zurich *

Martina Athanas, MLaw, LL.M. (King's College), Attorney at Law, Zurich**

In the ruling of the Federal Court 6B 216/2020 of November 1, 2021 the Federal Supreme Court had to deal with criminal liability within the meaning of Art. 271 StGB . Although this article agrees with the criticism voiced in practice about the possible effects of the Supreme Court's considerations, it also aims to show that, if interpreted appropriately, they should not restrict the previously unpunished scope of action of private individuals in foreign civil proceedings.

Dans l'arret TF 6B 216/2020 du 1ᵉʳ novembre 2021, le Tribunal fédéral traite de la punissabilité au titre de l'art. 271 CP. La présente contribution se joint aux critiques exprimées dans la pratique quant aux conséquences possibles des considérants de notre Haute Cour, mais s'attelle en même temps à démontrer que ceux-ci, interprètes de manière appropriée, ne devraient pas restreindre la marge de manœuvre non punissable dont jouissaient jusqu'ici les personnes privées dans les procédures civiles à l'étranger.

# I.   Introduction

In the ruling of the Federal Court 6B 216/2020 of November 1, 2021 the Federal Court had to deal with criminal liability within the meaning of Art. 271 StGB[1]. The ruling was expected in the hope that the Federal Court would take the opportunity to limit the vague and much-discussed scope of the criminal provision, which dates back to the Espionage Act, with clear guidelines. This made the disappointment expressed in the specialist literature following the publication of the new leading judgment all the greater. The

---

\*   Dr. iur. Andreas D. Länzlinger, attorney-at-law, is a partner at Bär & Karrer AG in Zurich.
\*\*    Martina Athanas, MLaw, LL.M. (King's College), is an attorney at Bär & Karrer AG in Zurich.

[1] Swiss Criminal Code (StGB) of December 21, 1937 (SR 311.0).

Federal Court expressly refrained from distinguishing between the various constellations conceivable in practice in which the question arises as to whether and under what conditions documents or information located in Switzerland within the meaning of Art. 271 StGB may be introduced into foreign proceedings with impunity. Instead, it contented itself with assessing the complex issue with sweeping and highly summarized considerations, without limiting these to the specific facts of the case, which concerned criminal proceedings before the US Department of Justice (DOJ). In doing so, the Federal Court has not least questioned established *safe harbors* in civil law authority and court practice and has left the advisory practice -

**SJZ 118/2022 p. 784, 785**

at least at first glance - unclear as to whether even the voluntary release of documents by a party to the proceedings in the foreign civil proceedings affecting them Criminal risks within the meaning of Art. 271 StGB exist if these documents identify third parties (e.g. employees). Although this article agrees with the criticism expressed in the doctrine to date, at the same time and in the spirit of finding a pragmatic solution, it aims to show how a practical interpretation of the Federal Court's considerations, viewed in the light of day, should not restrict the previously lawful scope of action of private individuals in cooperating in foreign civil proceedings and that the feared effects of the new case law in this area are therefore probably merely theoretical in nature.

# II. Leading judgment of the Federal Court (BGer 6B 216/2020 of November 1, 2021)

## A. Facts of the case

The Board of Directors of an asset management company domiciled in Zurich, B. AG had its client relationships reviewed in the course of the tax dispute between Switzerland and the United States. The audit revealed that B. AG and its foreign subsidiaries had certain clients in the period between 2002 and 2012 who may not have paid tax in the United States in accordance with the rules. Subsequently, the Board of Directors of B. AG (A.) commissioned a law firm and an employee of B. AG to compile the dossiers of these clients suspected of being liable for tax in the United States and submitted a voluntary disclosure to the *DOJ* in October 2012. The *DOJ* rejected a request to release the relevant customer dossiers through legal and administrative assistance channels. With regard to a so-called *Non-Prosecution Agreement* A. therefore traveled to the United States and had a USB stick with 109 client dossiers handed over to the *DOJ* via his local legal representative. The USB stick handed over by A. to the *DOJ* contained documents relating to clients that had been made available to B. AG by the banks in Switzerland on the basis of a contractual relationship or had been entrusted to B. AG under clear contractual conditions.

The Swiss Financial Market Supervisory Authority (FINMA) filed a criminal complaint against A. The Office of the Attorney General of Switzerland (OAG) convicted A. by summary penalty order for a prohibited act on behalf of a foreign state within the meaning of Art. 271 StGB. Following an objection by A., the OAG brought charges. The Criminal Division of the Federal Criminal Court acquitted A.[2] The Federal Court upheld the OAG's appeal and referred the case back to the Criminal Division of the Federal Criminal Court for a new decision.[3] The Criminal Division of the Federal Criminal Court sentenced A. to a fine of CHF 10,000.00 within the meaning of Art. 271 StGB. Both the Appeals Division of the Federal Criminal Court and the Federal Court then upheld this conviction.[4][5]

## B. From the considerations

### 1. Preliminary note

Within the meaning of Art. 271 StGB, anyone who carries out actions on behalf of a foreign state on Swiss territory without authorization for the benefit of an authority or an official, or who encourages such actions, will be punished.

---

[2] SK.2017.64 dated May 9, 2018.

[3] BGer 6B 804/2018 from 04/12/2018.

[4] BStGer CA.2019.6 of 12/05/2019; BGer 6B 216/2020 of 11/01/2021.

[5] BStGer SK.2018.71 of 05/02/2019.


According to the Federal Court, it was undisputed that A.'s action, i.e. the transfer of the USB stick with the client dossiers to the *DOJ,* was carried out in the interests of a foreign state (the United States), on Swiss territory and without authorization.[6] As a result, the Federal Court upheld the opinion of the lower court, according to which the transportation and forwarding of the incriminated data were to be regarded as one act, which took place partly in Switzerland with the start of the journey in Switzerland and thus as a whole also had the necessary internal connection.[7]

The only disputed point is whether the incriminated act is reserved for an authority or a civil servant and is therefore of an official nature. The qualification of the act as an official act must be based on the Swiss legal interpretation and is independent of whether an official actually takes action. Rather, the focus today is on the question of whether an action in connection with foreign legal systems and procedures requires legal or administrative assistance.[8]

SJZ 118/2022 p. 784, 786

In assessing the disputed question, the Federal Court essentially considered the following:

## 2. The disclosure of information and documents to a foreign state or in foreign proceedings outside the scope of legal or administrative assistance is a criminal offense if they cannot be freely disposed of

The Federal Court held that when determining the punishable nature of an act, the question is whether the act in question is likely to imperil the *"state sphere of authority"*. This is particularly the case if the act is accompanied by a violation or circumvention of Swiss administrative or legal assistance law.[9]

With regard to the act of collecting documents with a view to foreign proceedings and their subsequent submission, the decisive factor is that the disclosure of information and documents that can only be lawfully disclosed in Switzerland on the basis of a sovereign order is covered by Art. 271 StGB StGB. With regard to Art. 271 StGB, the release of files and information in foreign proceedings is only permitted in all constellations if they can be freely disposed of, which is not the case if they do not contain publicly accessible, identifying information about third parties contain.[10]

In justification of this consideration, the Federal Court stated that only the administrative and legal assistance route offered a procedural vehicle in which confidentiality and disclosure obligations were juxtaposed and the principle of speciality was guaranteed.[11]

## 3. The location of the information or documents in a third country does not preclude prosecution

According to the Federal Court, the fact that the relevant information and documents are also located in third countries is irrelevant to the question of criminal liability within the meaning of Art. 271 StGB if the data is brought abroad from Switzerland. However, the Federal Court's considerations are to be understood as meaning that the handing over of data to a foreign authority does not fall within the scope of application of Art. 271 StGB if it is either carried out from a third country (i.e. the entire act is relocated abroad) or if the data is already located in the respective country in which the relevant proceedings are pending.[12]

## C. Conclusion

In light of these considerations, the Federal Court came to the conclusion that A. had performed an act for the benefit of a foreign state, which was the responsibility of a Swiss authority or official, by transferring data entrusted to B. AG concerning third parties, which were at leastalso located in Switzerland, directly to the *DOJ*. A. had thus acted in accordance with Art. 271 StGB the offense.

---

[6] BGer 6B 216/2020 of 11/01/2021 E. 1.4.2.

[7] BStGer CA.2019.6 of 12/05/2019 E. 1.1.3.4; BStGer SK.2017.64 of 05/09/2018 E. 4.2.3.

[8] BGer 6B 216/2020 of 11/01/2021 E. 1.4.2.

[9] BGer 6B 216/2020 of 11/01/2021 E. 1.4.2.

[10] BGer 6B 216/2020 of 11/01/2021 E. 1.4.2.

[11] BGer 6B 216/2020 of 11/01/2021 E. 1.4.2.

[12] BGer 6B 216/2020 of 11/01/2021 E. 1.4.3.

# III. Effects of the new case law on the practice regarding the disclosure of documents and information in the context of foreign civil proceedings

## A. Previous practice of the courts and authorities

In an older decision from 1988, the Federal Court expressed (albeit *obiter dictum*) that the submission of documents and information in foreign proceedings, in contrast to the hearing of witnesses, is a party precaution that does not require official action.[13]

With reference to this case law, the Federal Office of Justice (FOJ) rightly stated in its guidelines on international legal assistance in civil matters (hereinafter referred to as guidelines[14]) that it is not necessary to use legal assistance if a foreign judge, a person commissioned by them or in common law legal systems, the representatives of the parties require a party resident in Switzerland to provide them with evidence where the refusal to cooperate would have purely civil procedural consequences. According to the

The legal assistance procedure must only be followed if (i) the refusal to cooperate by a party to the proceedings leads to sanctions other than procedural sanctions (e.g. the criminal *Contempt of Court*) or if (ii) the person concerned by the request is not a party to the proceedings but a third party (e.g. witnesses or experts).[15]

These guidelines were subsequently confirmed several times by the responsible authorities as part of their approval practice and implemented accordingly. In particular, the *FOJ* came to the conclusion in the published order of April 10, 2014 that the release of documents by a private subject in English civil proceedings does not generally qualify as an act within the meaning of Art. 271, Paragraph 1, Paragraph 1StGB, especially since legal assistance does not apply be bypassed. In this context, it is not necessary to seek legal assistance because the judicial request is addressed to a party to the proceedings and does not threaten any criminal sanctions. It is also irrelevant whether the litigant has to obtain the documents from other group companies in advance, as long as it does not act as a court towards them.[16]

The obligation to adequately protect the interests of third parties in the context of foreign civil proceedings already arose under this practice from criminal law confidentiality provisions and from data protection and labor law legislation.

## B. Interpretation of the case law of the Federal Court

### 1. Preliminary note

Contrary to previous and established practice, the Federal Court draws the boundaries of what is permitted when handing over documents and information to a foreign state or in foreign proceedings essentially on the basis of the criterion of whether the documents and information to be handed over can be freely disposed of. It makes free availability dependent on whether the documents contain non-public, identifying information about third parties.[17]

The criterion of free availability or third-party involvement is not new in that the Federal Court of Justice already stated in its published order of February 12, 2014 in connection with a request for authorization to provide information to a US civil court that between the collection and A distinction must be made between the transmission of one's own information and the collection and transmission of identifying information about third parties, although only in the latter case can the need for authorization within the meaning of

---

[13] BGE 114 IV 128 E. 2c

[14] *FOJ,* Guidelines on International Mutual Assistance in Civil Matters, 3rd A. 2003, available at <https://www.rhf.admin.ch/rhf/de/home/zivilrecht/wegleitungen.html> (last visited on 06/20/2022).

[15] *FOJ* (footnote 14) no. III.A.2.

[16] *FOJ,* Order dated 04/10/2014 regarding "Application for authorization to disclose documents in English civil proceedings (Art. 271, no. 1 StGB)", 2016.3, VPB 1/2016 of 01/26/2015, E. II.7.-9.

[17] 6B 216/2020 of 11/01/2021 E. 1.4.2.


Article 271 StGB be assumed. Similarly, the *Federal Department of Finance (FDF)* also appeared to have previously qualified the supply of non-publicly accessible, identifying data from third parties as an official act in unpublished rulings.[18] Finally, this position is also reflected in Art. 42c para. 1 letter b FINMASA[19], which expressly excludes the direct transmission of non-public information by supervised persons to foreign financial market supervisory authorities from the scope of Art. 271 StGB if the rights of clients and third parties are safeguarded.[20]

With regard to the justification of the Federal Court's case law, according to which third-party interests are only adequately protected in legal or administrative assistance proceedings and that Art. 271 StGB is intended to prevent their circumvention, it appears correct, according to the opinion presented here, that the voluntary release of documents and information by a party in a foreign civil case must be able to remain unpunished even after the federal court judgment, regardless of whether the documents concern third parties (e.g. employees or customers). This is, of course, subject to compliance with the statutory limits that serve to protect confidentiality and data protection (in particular Art. 162 and

**SJZ 118/2022 p. 784, 788**

Art. 273 StGB, Art. 47 BankG[21], the DSG[22] etc.). Finally, the voluntary disclosure of documents and information in civil proceedings is, as is rightly and unanimously held in common practice and the older case law of the Federal Court, purely private action that does not require official action or the use of legal assistance either in domestic or international relations and therefore does not have the character of official action.

The Federal Court appears to follow this approach insofar as it holds that the disclosure of information and documents that can only be lawfully disclosed in Switzerland by order of the sovereign affects the legal interest protected by Art. 271 StGB StGB. To justify the criterion of free availability, the Federal Court also states that the confidentiality interests of third parties can only be set against the disclosure obligations in legal or administrative assistance proceedings. This indicates that the highest court recognizes the previous practice in the case of purely private action in civil proceedings, especially since the submission of documents and information in civil proceedings is generally not based on a sovereign order and therefore there are no disclosure obligations.

In contradiction to this, however, the Federal Court explicitly states that *"in all constellations"* only files and information that can be freely disposed of may be disclosed and - unlike the lower court - refrains from distinguishing between criminal or public law proceedings and civil law proceedings - in which third-party data can only be used for the purposes of the respective proceedings, but not in parallel or downstream proceedings against them. The assumption that the Federal Court also wants to see the criterion of third party involvement applied in civil proceedings is supported by the fact that it has already been used (at least in part) in the practice of Swiss civil law authorities in the past.[23]

It is remarkable that the Federal Court has not only missed the opportunity to clarify previously unresolved issues surrounding the vague scope of application of Art. 271 StGB at the highest level and to draw clear boundaries between what is and what is not permitted. Rather, the Federal Court has - at least at first glance - cast doubt on an established practice and thereby created further legal uncertainty regarding the question of whether criminal risks within the meaning of Art. 271 StGB exist even

---

[18] *EFD (Eidgenössisches Finanzdepartement* [Federal Department of Finance]), Order of 28.2.2014 (unpublished), para. 13; also *EFD,* Order of 10//26/2015 (unpublished), para. 15; *EFD,* Order of 06/23/2015 (unpublished), para. 9. All rulings cited in *Damian K. Graf,* Participation in foreign proceedings in conflict with Art. 271 StGB, Taking into account the recent approval practice of the FDJP and EDF, GesKR 2016 169 et seqq., 183.

[19] Federal Act on the Swiss Financial Market Supervisory Authority (Financial Market Supervision Act, FINMAG) of June 22, 2007 (SR 956.1).

[20] *FOJ,* Order dated 02/12/2024 regarding "Application for authorization to provide information to a US civil court (Art. 271, no. 1 StGB)", 2016.4, VPB 1/2016 of 01/26/2015, E.II.11.f.

[21] Federal Act on Banks and Savings Banks (Banking Act, BankG) of November 8, 1934 (SR 952.0).

[22] Federal Act on Data Protection (DSG) of June 19, 1992 (SR 235.1).

[23] *FOJ* (footnote 18) E. et seq.; see also *Philipp Fischer/Deborah Hondius,* Article 271 (1) of the Swiss Criminal Code: myth or reality? A summary of the practical implications of this Swiss statutory provision in the context of civil proceedings pending outside of Switzerland, Jusletter of 04/04/2022, para. 31.


when a party voluntarily releases documents in foreign civil proceedings. if these affect third parties.

This article is intended to show that the case law of the Federal Court - if it is indeed to be decisive for civil law matters - should, on closer examination, have no (or at least no restrictive) effects on the scope of action of private individuals in foreign civil proceedings, which was previously recognized as exempt from punishment, or that an appropriate interpretation of the criterion of free availability should be consistent with previous practice.

## 2. Interpretation of the criterion of free availability or third-party involvement

As explained above, the Federal Court held in the new leading judgment that in all constellations only documents that a person can freely dispose of may be disclosed in foreign proceedings, which does not apply to identifying information about third parties that is not publicly accessible.

The present case concerned the disclosure of documents relating to bank clients which had been made available to the asset manager by the banks (i.e. by third parties) on the basis of a contractual relationship or had been entrusted to the asset manager under clear contractual conditions.[24] In view of this peculiarity of the facts, it is at least questionable whether a person has access to his own documents, i.e. those that belong to him (e.g. because he created them himself) and which were not made available to him or entrusted to him by a third person can be used freely under the new case law if third parties (e.g. customers or employees) are merely mentioned.

SJZ 118/2022 p. 784, 789

The follow-up question then arises as to whether the Federal Court wants to see the criterion of free availability (provided it also applies to its own documents) applied to all third parties mentioned or only to external ("true") third parties (as opposed to internal third parties such as employees).

As the lower instance, the Federal Criminal Court held that the client data entrusted to it was not *"own data"* whose disclosure is often considered permissible in the doctrine. In addition, handing over the documents in each case entails the risk of criminal tax proceedings against the customers concerned, which means that the criterion of exclusive use of the data in the company's own proceedings is not met.[25] Accordingly, the lower court defined *"own data"* i.e. data in which only own interests exist, which would not apply if information concerning third parties could be used as incriminating material against them in parallel or subsequent proceedings.[26]

The view of the Federal Department of Justice and Police (FDJP) in an unpublished ruling from 2020, according to which the practice that identifying information about third parties can only be transmitted through administrative and legal assistance channels was developed in connection with the transmission of customer and employee data by financial institutions and cannot be applied to the transmission of documents by a party in foreign civil proceedings if this data is only to be used for the purposes of these proceedings and not for pending or potential proceedings by a third party, also rightly points in this direction.[27]

In its first ruling in this case on May 9, 2018, the Federal Criminal Court then restricted the criterion of third party involvement to qualified protected third parties or information relating to third parties that is protected by Swiss *public order* law (i.e. bank customer data, for example), whereby it also included bank employees as covered third parties.[28]

In its most recent ruling, the Federal Court defines documents that can be freely disposed of with regard to Art. 271 StGB not as personal data, but as files and information that are not public and do not identify third parties. Nor does the Federal Supreme Court limit its case law to third parties outside the company or confirm the *Ordre-public case law* of the lower court. Rather, it states that the criterion of third party involvement should be decisive in all constellations. It is therefore conceivable that, in the opinion of the Federal Court, even the direct transmission of data from

---

[24] BGer 6B_2016/2020 of 11/01/2021 E. 1.4.3.

[25] BStGer CA.2019.6 of 12/05/2019 E. 1.1.3.2.

[26] BStGer CA.2019.6 of 12/05/2019 E. 1.1.3.5.2.3.

[27] *Dominique Müller/Flavio Delli Colli/Susanne Brütsch,* Clearer contours for Art. 271 para. 1 StGB?, Discussion of the judgment 6B 216/2020 of the Swiss Federal Court of November 1, 2021 (intended for publication in the Federal Court), GesKR 2022 115 et seqq., 118 et seq.

[28] BStGer SK.2017.64 of 05/09/2018 E. 4.2.5-4.2.7.

one's own area of control, which contains information about third parties (e.g. employees), is covered by Art. 271 StGB.[29]

Taking into account the case law of the Federal Court, there appears to be a fundamental risk of criminal liability within the meaning of Art. 271 StGB if the release of documents or information in the context of a foreign procedure (including civil proceedings) affects third parties or their confidentiality interests (e.g. within the meaning of Art. 162 or Art. 273 StGB, Art. 47 BankG [30]or the data protection legislation).

On the other hand, the fact that a restrictive standard applies in administrative and legal assistance law with regard to the definition of "entitled persons" or "persons entitled to lodge a complaint" and that employees in particular do not benefit from these procedural rights speaks against the application of the supreme court's considerations to the disclosure of internal company or business-related employee data in foreign civil proceedings.[31] In other words, it does not seem appropriate to penalize the voluntary disclosure of third-party identifying data if these third parties do not enjoy procedural protection in administrative or mutual assistance proceedings. Another argument against extending the criterion of third party involvement to employee data is that its introduction in civil proceedings does not generally entail the risk that it will be used as incriminating material against these employees in parallel or subsequent proceedings. In particular,

SJZ 118/2022 p. 784, 790

In particular, the further use of introduced documents that contain confidentiality interests of third parties is regularly prevented in parallel or subsequent proceedings, especially in US civil proceedings, by the issuance of a *Protective Order*.

In summary, according to the opinion presented here, in connection with the offense of Art. 271 StGB, there can be no question of any third party being affected or private individuals can freely dispose of documents or information within the meaning of federal court case law if at least one of the following alternative conditions is met:

The documents to be released do not contain any identifying information about third parties that is not publicly accessible;

there is no risk that identifying information about third parties that is not publicly accessible will be used for pending or potential proceedings of the third parties (or against the third parties) (e.g. because a *Protective Order* prohibits such use in foreign proceedings); [32] affected third parties validly consent to the direct disclosure of their information (i.e. expressly, voluntarily and with full disclosure of any risks and consequences);[33] or the disclosure is made in compliance with the requirements of a legal justification that protects the third parties involved. i.e. expressly, voluntarily and with full disclosure of any risks and consequences); or the disclosure is made in compliance with the requirements of a legal justification that serves to protect the interests of the third parties involved. When disclosing employee data that is subject to the DSG, Art. 6 Para. 2 letter d DSG should be taken into account, according to which the disclosure of personal data in foreign court proceedings is lawful if it is essential for the exercise or enforcement of legal claims and the general data protection principles (i.e. in particular the principle of proportionality) within the meaning of Art. 4 DSG are adhered to.

---

[29] Thus also *Fischer/Hondius* (footnote 23) margin no. 30 et seqq.

[30] See also *Fischer/Hondius* (footnote 23) para. 30 et seqq.

[31] *Markus Husmann*, in: Marcel A. Niggli/Hans Wiprächtiger (eds.), Basler Kommentar, Strafrecht II [Commentary, Criminal Law], Art. 137-392 StGB/Jugendstrafgesetz [Juvenile Criminal Code]), 4th ed., Basel 2019, Art. 271 StGB N 66, with references to *Adrian Bussmann*, in: Marcel A. Niggli/Stefan Heimgartner (eds.), Basler Kommentar [Basel Commentary], Internationales Strafrecht [International Criminal Law], IRSG (*Bundesgesetz über internationale Rechtshilfe in Strafsachen* [Federal law on international legal assistance in criminal matters]) /GwÜ, Basel 2015, Art. 80h IRSG N 10 et seq.; Art. 9a IRSV (*Verordnung über internationale Rechtshilfe in Strafsachen* [Regulation on international legal assistance in criminal matters]); BGE 137 IV 134 E. 6.4.

[32] Thus also *Müller/Delli Colli/Brütsch* (footnote 27) 119; similarly also *Fischer/Hondius*, according to which the Swiss authorities would probably negate the criterion of third party involvement if third party-identifying information is of a purely incidental nature or it is unlikely that the disclosure of such information in foreign proceedings would affect the interests of third parties *(Fischer/Hondius* [footnote 23] para. 32).

[33] *Fischer/Hondius* (footnote 23) para. 32 et seq.; BSK StGB *W-Husmann* (footnote 31) Art. 271 StGB N 45. Even in the context of mutual legal assistance, the consent of the authorized persons enables the surrender (BStGer CA.2019.6 of 12/05/2019 E. 1.1.3.5.2.3). Implied consent, on the other hand, does not meet the requirements for valid consent (BStGer CA.2019.6 of 12/05/2019 E. 1.1.3.5.2.4; BGer 6B_2016/2020 of 11/01/2021 E. 1.2).

## 3. The criterion of voluntariness

A further question of practical relevance is whether - and if so, in which constellations - the established criterion of voluntariness continues to have the effect of precluding prosecution following the most recent Federal Court case law, or whether it is still relevant at all.

With regard to the specific case, the Federal Criminal Court as the lower court answered this question in the negative.[34] In the view of the Federal Criminal Court, the definition of the offense in Art. 271 StGB does not contain any indications that only an act carried out under threat of disadvantages is to be considered an offense with regard to the surrender of documents. According to the Federal Criminal Court, the criterion of voluntariness would also make no sense because the offense protects the legal interest of Swiss sovereignty and therefore - at least in matters of public law - it cannot be at the discretion of a private individual whether they hand over documents via the legal or administrative assistance channel or voluntarily to the attention of a foreign state.[35] The Appeals Division of the Federal Criminal Court upheld this interpretation in its ruling BStGer CA.2019.6 of December 5, 2019 and further upheld in this context that the criterion of voluntariness was not suitable to prevent the circumvention of mutual legal assistance.[36] In view of the explicit reference to matters of public law, it can be assumed that the Federal Criminal Court did not envisage a change in practice in civil matters or did not exclude the effect of voluntariness in civil proceedings, which excludes criminal prosecution.

In contrast, the Federal Court has neither used the criterion of voluntariness to assess whether the transfer of data to the *DOJ* constitutes an act reserved for the Swiss authorities, nor has it expressly denied its motion. Rather, as explained above, the Federal Court primarily considers the criterion of the free availability of the data to be disclosed to be decisive, in all constellations.

The Federal Court only refers to the criterion of voluntariness in passing, namely in E. 1.2, which deals with the statements of the lower court. It states the following:

> *"It [the lower court] considers that the question of voluntariness does not need to be answered in the present case, since even doctrines that want to apply voluntariness as a criterion excluding the offense rightly limit this to constellations in which no third-party data is disclosed, which is the case here."*

This consideration and, in particular, the Federal Court's addition *"rightly"* indicates that, in the opinion of the highest court, the criterion of voluntariness does not lose its validity entirely, but can and must continue to be used as a criterion excluding the offense if the data to be disclosed can be freely disposed of.[37] In the judgment in question, however, the Federal Court did not examine the criterion of voluntariness because it already rejected the criterion of free availability.

Against this background, according to the view expressed here, parties within the meaning of Art. 271 StGB can submit documents and information to foreign civil proceedings without penalty if (i) they can freely dispose of them (because the documents do not identify third parties or the interests of the third parties concerned are not affected, because the information cannot be used in pending or potential proceedings against them or the interests of third parties are adequately protected in another way); and (ii) if the refusal to hand over the documents upon request does not lead to criminal sanctions in the event of an injunction.

---

[34] BStGer SK.2017.64 of 05/09/2018 E. 4.2.4.

[35] BStGer SK.2017.64 of 05/09/2018 E. 4.2.4.

[36] BStGer CA.2019.6 of 12/05/2019 E. 1.1.1.4.

[37] Thus also the *EFD* in its unpublished rulings of 02/28/2014 and 06/23/2015, cited in *Graf* (footnote 19) 183; *Fischer/Hondius*, who have also dealt with the new leading judgment, agree with this view, whereby they recommend examining the criterion of voluntariness before that of free availability *(Fischer/Hondius* [footnote 23] para. 34 et seq.).


## 4. Disclosure of documents by a party to the proceedings *vs.* by third parties

In theory and practice, a distinction has so far been made between the disclosure of documents by a party to proceedings in its own proceedings and by third parties.[38] In particular, it was previously the case that the legal assistance route had to be used in civil proceedings if a person affected by the request to hand over documents was not a party to the proceedings but a third party (e.g. witnesses or experts).[39]

This distinction is also maintained by certain authors in the wake of the Federal Court ruling. Thus, in the opinion of *Fischer/Hondius* persons who submit documents or information outside the channels of legal assistance in foreign civil proceedings in which they are not a party are always at risk of criminal prosecution within the meaning of Art. 271 StGB[40]

However, the Federal Court ruling makes no reference to this distinction. As explained above, the criterion of free availability or third-party involvement should apply in all constellations in the opinion of the Federal Court.

Since the new case law of the Federal Court does not appear to rule out the possibility of a criminal offense in the case of voluntary disclosure of (third-party identifying) documents by parties in foreign civil proceedings, the distinction between parties and third parties can no longer be maintained according to the view expressed here. Accordingly, third parties (such as parties) in foreign civil proceedings may hand over documents and information within the meaning of Art. 271 StGB without penalty under the conditions set out in Titles III.B.2 and III.B.3 above. It should be noted that a third party also satisfies the criterion of free availability if it discloses personal data subject to the DSG to foreign civil proceedings on the basis of Art. 6 para. 2 lit. d DSG

SJZ 118/2022 p. 784, 792

in compliance with its requirements (and the general data protection principles within the meaning of Art. 4 DSG).[41]

In particular, Swiss companies of a multinational group are also deemed to be third parties, which may disclose documents or information to the foreign proceedings of a group company with impunity under the conditions set out above.

---

[38] *FOJ* (footnote 14) no. III.A.2.

[39] *FOJ* (footnote 14) no. III.A.2.

[40] *Fischer/Hondius* (footnote 23) para. 34.

[41] *David Rosenthal/Yvonne Jöhri*, Commentary on the data protection law and other selected provisions, Zurich/Basel/Geneva 2008, Art. 6 DSG N 71; *Urs Maurer-Lambrou/Andrea Steiner, in:* Urs Maurer-Lambrou/Gabor-Paul Blechta (eds.), Basel Commentary, Data Protection Act/Publicity Act, 3rd ed., Basel 2014, Art. 6 DSG N 33.

## 5. Schematic summary

Graphic 1: Checklist regarding the criterion of free availability of the documents and information to be surrendered



**SJZ 118/2022 p. 784, 793**

## C. Measures in the event of a criminal direct transfer

If a person (party to the proceedings or third parties) cannot freely dispose of the documents or information to be released or if cooperation in the foreign proceedings would have to take place in response to a sanctioned request, there is a risk of criminal liability within the meaning of Art. 271 StGB. In this case, the documents and information must be released as part of a mutual legal assistance procedure (i.e. in accordance with the requirements of the Hague Evidence Convention).[42]

Alternatively, or if legal assistance is available but appears to be practically impossible or pointless in individual cases, the FDJP may be requested to grant authorization to hand over the documents or information.[43]

Unlike in the past, the EJDP no longer considers contingent requests for a declaration that a permit is not required for a certain action. The FDJP no longer considers itself competent to issue such declaratory rulings.

# IV. Conclusion

For reasons of legal certainty, it would have been welcome if the Federal Court had taken the opportunity, when assessing the present case, to define the boundaries of the scope of application of Art. 271 StGB in various areas in a supreme court decision or at least to limit its considerations to the specific facts of the case, which concern criminal proceedings. Instead, the Federal Court appears to question the established practice laid down by the FOJ in its guidelines, according to which the voluntary disclosure of documents and information was rightly always (and irrespective of the content of the information) possible without punishment within the meaning of Art. 271 StGB, even in foreign civil proceedings.

---

[42] Convention on the Taking of Evidence Abroad in Civil or Commercial Matters concluded on March 18, 1970 (SR 0.274.132) (cited: Hague Evidence Convention).

[43] BGE 106 Ib 262; *FOJ* (footnote 18) E. I.4; BStGer BB.2012.133 of 04/24/2013 E. 4.2.3; BSK StGB *II-Husmann* (footnote 31) Art. 271 StGB N 86 et seq.; *FOJ* (footnote 14) para. II.E. 1 footnote 33.

According to the opinion represented here, it would have been correct to confirm the *safe harbors* established in civil law courts and authorities practice, since purely private actions do not require official action or the use of legal assistance in either domestic or international relations and therefore, in the absence of an official act, do not require official action Scope of application within the meaning of Art. 271 StGB is not covered. In addition, in the context of civil proceedings, identifying information about third parties is disclosed solely for the purposes of these proceedings, but not for their further use in parallel or subsequent proceedings against such third parties, which is why an additional need for protection of the third parties concerned (outside of the already applicable confidentiality and data protection provisions) is not apparent.

The leading decision of the Federal Court was rightly criticized in the doctrine. However, as this article shows, the concerns expressed are probably of a purely theoretical nature, at least in civil law matters.

According to the view presented here, in accordance with the new federal court case law, both parties to the proceedings and third parties in foreign civil proceedings can submit documents and information without exposing themselves to a criminal risk under Art. 271 StGB if they (i) can freely dispose of these documents (because it does not contain any non-publicly accessible, identifying information about third parties, the information cannot be used in pending or potential proceedings against the third parties concerned, the third parties validly consent to the release or the release meets the requirements of a legal justification [e.g. Art. 6 Para. 2 letter d DSG] is sufficient) and (ii) the release is voluntary (i.e. without threat of criminal sanctions in the event of a violation).

Since the legal provisions for the protection of confidentiality interests (e.g. Art. 162 and Art. 273 StGB, Art. 47 BankG (*Bankgesetz* [Banking Act]) or the DSG) restricted cross-border data exchange even under previous practice, in our opinion the new jurisprudence, if interpreted appropriately, has no practical effect Effects on the scope of action permitted by private individuals in accordance with Article 271 of the Criminal Code when cooperating in foreign civil proceedings.

**SJZ 118/2022 p. 784, 794**



**TRANSPERFECT**

CALIFORNIA AIA... PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

I, Andrew Griffin, hereby certify that I am competent to translate from German to English and that the attached translations are, to the best of my knowledge and belief, a true and accurate translation of the documents entitled below from German to English.

- Andreas D. Länzlinger, Martina Atanas, SJZ 118/2022

_(signature)_

Andrew Griffin

Sworn to before me this

11 day of August 20 24

---

SEE ATTACHED K-S
8-11-2024

Signature, Notary Public

---

Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of **Los Angeles**

On **August 11, 2024** before me, Khalid Oudah Shahwan, a Notary Public ,
(Here insert name and title of the officer)

personally appeared **Andrew Griffin** ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____

Signature of Notary Public                                    (Notary Seal)

```
KHALID OUDAH SHAHWAN
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMMISSION # 2350307
MY COMM. EXPIRES MARCH 5, 2025
```

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other

### INSTRUCTIONS FOR COMPLETING THIS FORM
*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document.

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

# EXHIBIT E

Federal Criminal Court Tribunal pénal fédéral Tribunale penale federale Tribunal penal federal

Case number: CA.2019.6

Judgment of December 5, 2019 Appeals Division

Composition

Federal Criminal Court Judge Olivier Thormann, Presiding Judges Barbara Loppacher and Petra Venetz, Clerk Franz Aschwanden

Parties

A., officially defended by attorney Dr. iur. Lorenz Erni, Erni Caputo, Appellant / defendant

v

Office of the Attorney General of Switzerland, represented by Carlo Bulletti, Chief Federal Public Prosecutor, Respondent / prosecuting authority

Subject matter

Prohibited acts for a foreign state within the meaning of Art. 271 para. 1 . para. 1 StGB

Appeal (in full) of June 4, 2019 against the judgment of the Criminal Division of the Federal Criminal Court SK.2018.71 of May 2, 2019

Facts of the case:

A. Criminal investigation and indictment

The Office of the Attorney General of Switzerland (hereinafter: OAG) conducted a criminal investigation against A. (hereinafter: the defendant) for economic intelligence services (Art. 273 StGB) and prohibited acts for a foreign state (Art. 271 StGB). On November 17, 2017, it filed charges against the defendant with the Criminal Division of the Federal Criminal Court for the latter offence (TPF I [SK.2017.64] pag. 7.100.001 - 008).

B. First judgment of first instance

With judgment SK.2017.64 of May 9, 2018, the Criminal Division (single judge) of the Federal Criminal Court acquitted the defendant for lack of the subjective elements of the offence, with costs and compensation to be borne by the Confederation (TPF I pag. 7.970.001 - 021).

C. Proceedings before the Federal Court; rejection ruling

The Office of the Attorney General of Switzerland lodged an appeal against this ruling in criminal matters with the Federal Court on August 21, 2018 (TPF I pag. 7.980.003 - 008). In its judgment 6B_804/2018 of December 4, 2018, the Federal Court upheld the appeal, set aside the contested judgment and referred the case back to the Criminal Division of the Federal Criminal Court for a new judgment (TPF I pag. 7.980.015 - 023 / TPF I [SK.2018.71] pag. 8.100.001 - 009).

D. Second first-instance judgment

The main hearing in the rejection proceedings (SK. 2018.71) took place on April 17, 2019 at the seat of the Federal Criminal Court in the presence of the defendant and his defence counsel. The verdict (dispositive) of the Criminal Division was opened to the parties in writing on May 2, 2019. It read as follows (TPF II pag. 8.930.002):

"1. A. is found guilty of committing a prohibited act for a foreign state within the meaning of Art. 271 para. 1 para. 1 StGB

2. A. is punished with a fine of CHF 10,000 and, in the event of culpable non-payment, with 60 days' imprisonment.

3. The Canton of Zurich is declared responsible for the execution of the sentence.

4. The procedural costs of CHF 6,100 (incl. court fee of CHF 3,000) are imposed on A.

5. A. is not entitled to compensation.

6. B. AG's motion for compensation is not granted.

This judgment is communicated in full to the Office of the Attorney General of Switzerland and A., and in part to B. AG (dispositive no. 6).

The reasoned judgment was sent on May 21, 2019 (TPF II pag. 8.930.021).

E. Proceedings before the Appeals Division of the Federal Criminal Court

E.1 The third party B. AG filed an appeal with the lower instance on May 13, 2019 within the time limit (TPF II pag. 8.941.001). However, it did not submit a written statement of appeal within the 20-day period since delivery of the reasoned judgment (Art. 399 Para. 3 Swiss Code of Criminal Procedure [StPO, SR 312.0]), but rather communicated it in

---

Decision Information  •  DE • FR • IT • EN

Document : CA.2019.6
Date : December 5, 2019
Published : February 3, 2020
Source : Federal Criminal Court
Status : Published as TPF 2021 1
Subject area : Appeals Division
Object : Prohibited acts for a foreign state within the meaning of Art. 271 para. 1. Para. 1 StGB (Strafgesetzbuch [Criminal Code]) appeal (in full) of June 4, 2019 against the judgment of the Criminal Division of the Federal Criminal Court SK.2018.71 of May 2, 2019

Mark terms

Register of laws

BGG: (Bundesgerichtsgesetz [Act on the Federal Court])   61 78 81 90 95 97 105 106

BStKR: (Reglement des Bundesstrafgerichts über die Kosten, Gebühren und Entschädigungen in Bundesstrafverfahren [Regulations of the Federal Criminal Court on costs, fees and compensation in federal criminal proceedings])   1 5 6 7bis 9

BV (Bundesverfassung [Federal Constitution]):   29 29ª 30 32

ECHR:   6

IRSG (Bundesgesetz über internationale Rechtshilfe in Strafsache [Federal Act on International Legal Assistance in Criminal Matters])   80c

StBOG (Strafbehördenorganisationsgesetz [Federal Authorities])   33 37 38ª 38b 73

StGB (Strafgesetzbuch [Criminal Code])   4 14 17 18 21 47 48ª 50 6

StPO (Strafbehördenorganisationsgesetz [Federal Criminal Authorities]):   3 9 10 21 23 69 82 104 10

BGE (Bundesgerichtsentscheid [Federal Court Decision]) Register

100-IV-155 • 114-IV-128 • 117-IV-97 • 122-I-250 • 123-IV-1 • 129-IV-6 • 134-IV-17 • 135-IV-130 • 136-IV-55 • 139-I-129 • 139-IV-282 • 143-IV-214 • 98-IV-41

Further judgments from 2000 onwards

6B_1077/2014 • 6B_1331/2018 • 6B_368/2017 • 6B_372/201 1 • 6B_402/2008 • 6B_804/2018 • 6S.270/2003

Keyword index

Sorted by frequency or alphabetical defendant • federal court • lower instance • question • criminal division of the federal criminal court • federal criminal court • fine • facts • day • complaint in criminal matters • prohibited acts for a foreign state • place • usa • iceland • defendant • weiler • costs of proceedings • indictment • conduct • bill of indictment... Show all

Decisions of the Criminal Court (BstGer)

SK.2017.64 • SN.2018.18 • SK.2018.71 • CA.2019.6 • CN.201 9 2

a letter dated June 7, 2019 (posted on June 7 2019; received: June 11, 2019) that it will not pursue the appeal lodged against the lower court judgment of May 2, 2019 and will therefore not file a statement of appeal (CAR pag. 1.100.027). As a result of this declaration of withdrawal, the appeal *CA.2019.6* of the third party concerned was written off as irrelevant by decision of the Appeals Division *CA.2019.6* of June 19, 2019 (which from June 21, 2019 is kept in the additional file *CN.2019.2*; CAR pag. 10.300.008) (Art . 403 paragraph 1 letter ☑ c and paragraph 3 **StPO** [analogous]; CAR pag. 10.300.001 - 005). It was determined that dispositive paragraph 6 of the judgment of the Criminal Division *SK.2018.71* of May 2, 2019 has become final as of the date of the decision. This depreciation resolution of June 19, 2019 subsequently remained unchallenged.

In this context, it should also be noted that the third party concerned, B. AG, requested the OAG on June 31, 2018 to pay compensation in the amount of CHF 31,725 for the activities in connection with the file edits relating to the criminal investigation against the defendant for prohibited acts on behalf of a foreign state. By order *SN.2018.18* of November 21, 2018, the Criminal Division of the Federal Criminal Court did not consider the motion for compensation submitted by B. AG for reasons of jurisdiction (TPF I pag. 7.950.001 et seqq.). On December 21, 2018, B. AG lodged an appeal against this with the Federal Supreme Court in criminal matters (TPF I pag. 7.960.003 et seqq.). In its ruling *6B_1331/2018* of November 28, 2019, the Federal Court dismissed the appeal (CAR pag. 4.201.002 et seqq.).

E.2 The defense counsel also filed an appeal on behalf of the defendant on May 14, 2019 (TPF II pag. 8.942.001).

On June 4, 2019, the defendant's notice of appeal followed, with the following motions (CAR pag. 1.100.025):

"1. The judgment of the Criminal Division of the Federal Criminal Court, single judge, of May 2, 2019 is contested in its entirety, i.e. both on the guilt and penalty counts as well as with regard to the consequences of costs and compensation.

2. In the appeal proceedings, the appellant requests an acquittal, payment of the investigation and court costs by the state and the award of appropriate compensation.

3. Requests for evidence are not being made at this time, but are expressly reserved."

E.3 In its submission of June 17, 2019, the OAG did not file a motion to dismiss the defendant's statement of appeal of June 4, 2019, and did not declare a cross-appeal (CAR pag. 2.100.005).

E.4 In a letter dated July 9, 2019, the defendant and the OAG were invited to submit and substantiate motions for evidence by July 30, 2019 (CAR pag. 6.400.001).

In a submission dated July 24, 2019, the OAG stated that it was not submitting any requests for evidence (CAR pag. 6.400.002).

In a submission dated July 29, 2019, the defendant stated that he was not currently filing any motions for evidence. However, should the further course of the proceedings make it necessary to file motions for evidence, this is expressly reserved (CAR pag. 6.400.003).

E.5 The defendant was summoned on August 29, 2019 to appear in person at the appeal hearing on December 5, 2019 at 9:30 a.m. (CAR pag. 7.202.001 et seqq.). The defense counsel received information regarding the appeal hearing by letter dated August 29, 2019 (CAR pag. 7.202.004). The BA was informed in a letter dated August 29, 2019 that it is free to attend the appeal hearing (Art. 405 para. 3 ☑ in conjunction with Art. 337 para. 4 ☑ **StPO**). The BA had previously waived its right to participate in the appeal hearing by telephone on August 5, 2019. It was given the opportunity to submit written motions and a written statement of reasons by September 26, 2019 (Art. 405 para. 4 ☑ **StPO**; CAR pag. 7.203.001).

E.6 In a submission dated September 24, 2019 (CAR pag. 2.100.008), the OAG stated that it was requesting that the appeal be dismissed with costs and compensation. The defendant is to be found guilty and sentenced in accordance with the judgment of the Criminal Division of the Federal Criminal Court *SK.2018.71* of May 2, 2019. For the reasons, reference is made to the considerations of the aforementioned judgment as well as the previous statements of the OAG in this matter, in particular the pleading of April 26, 2018 and the appeal in criminal matters to the Federal Court of August 21, 2018.

E.7 On November 14, 2019, the defendant submitted his 2017 tax return and on November 22, 2019, he submitted the final invoice from the Zurich tax office for state and municipal taxes 2014, the provisional tax invoice for direct federal tax 2017 and the final invoice from the Schaffhausen tax office (tax separation) 2017 for the files (see CAR pag. 6.302.001 - 015).

E.8 On November 25, 2019, the director of proceedings obtained an ex officio extract from the Swiss criminal register concerning the defendant (see CAR pag. 3.402.002 et seq., 6.302.016 et seqq.).

E.9 The defendant and his defense counsel appeared at the appeal hearing on 5 December 2019, 9:30 a.m. As part of the evidentiary proceedings, an interview was conducted with the defendant (CAR pag. 8.402.001 et seqq.). No further motions for evidence were filed, whereupon the evidentiary proceedings were closed. The defense counsel made its plea (CAR pag. 8.200.003 et seqq., 8.300.001 et seqq.); it maintained the motions no. 1 and 2 according to the statement of appeal of June 4, 2019 (see CAR pag. 1.100.026, 8.200.004 and 8.300.017). The defendant then made his closing statement (CAR pag. 8.200.005 et seq.). The court retired to deliberate on the verdict. The judgment was then publicly announced by the presiding judge and summarily substantiated (see CAR pag. 8.200.006 et seq.). The ruling was handed over to the party present.

The Appeals Division considers:

I. Formal considerations

1. Admission / time limits

1.1 Both the defendant's notice of appeal of May 14, 2019 and his statement of appeal of June 4, 2019 were each submitted within the time limit (Art. 399 para. 1 ⚠ -3 ⚠ **StPO**). The appeal is directed against the judgment of the Criminal Division of the Federal Criminal Court of May 2, 2019, which concluded the proceedings in their entirety (see Art. 398 para. 1 ⚠ **StPO**). With this judgment, the defendant was found guilty of prohibited acts for a foreign state within the meaning of Art. 271 no. 1 para. 1 ⚠ **StGB** and punished with a fine of CHF 10,000, with a prison sentence of 60 days for culpable non-payment of the fine. In addition, the defendant was ordered to pay the procedural costs of CHF 6,100.

1.2 The offense charged falls under federal jurisdiction (Art. 23 para. 1 letter h ⚠ **StPO**). The necessary authorization to prosecute a political offence, which includes Art. 271 ⚠ **StGB** is available (see authorization decree of the Head of the Federal Department of Justice and Police FDJP of September 29, 2015, BA pag. 01.02.0005 et seqq.). The defendant in the present criminal proceedings is adversely affected by the conviction of the lower court and has a legally protected interest in its reversal or amendment (Art. 104 para. 1 letter b ⚠ , Art. 111 para. 1 ⚠ and Art. 382 para. 1 ⚠ **StPO**). The Appeals Division of the Federal Criminal Court, consisting of three judges, has territorial and subject-matter jurisdiction to hear the present appeal (Art. 21 para. 1 letter a ⚠ **StPO**; Art. 33 letter c ⚠ , Art. 38a ⚠ and Art. 38b ⚠ Federal Act on the Organization of the Federal Criminal Authorities [Criminal Authorities Organization Act, **StBOG** (*Strafbehördenorganisationsgesetz* [Federal Criminal Authorities])]; *SR* 173.71]). All requirements for the appeal to be accepted have been met. There are no procedural obstacles. The appeal of June 4, 2019 is therefore accepted.

2. Oral proceedings

2.1 With the aforementioned submission of June 17, 2019 (above, letter E.3; CAR pag. 2.100.005), the Office of the Attorney General of Switzerland agreed to the conduct of written proceedings.

2.2 In a letter dated July 2, 2019, the defendant made the following statement regarding the conduct of written proceedings: Pursuant to Art. 406 para. 1 letter a ⚠ **Code of Criminal Procedure** the appeal may be dealt with in written proceedings if only legal issues are to be dealt with. This requirement is not met in the present case, as the question of foreign data raised by the defense also concerns questions of fact (with reference to the pleading notes of the defense of April 17, 2019, para. 9 et seqq.; TPF II pag. 8.721.019 et seqq.). The other requirements set out in paragraph 1 of this provision were obviously not met either. According to Art. 406 para. 2 ⚠ **StPO** written proceedings could also be conducted with the consent of the parties if other requirements were met. However, it was not necessary to go into this in more detail, as the defendant insisted on an oral appeal hearing being held. It was in his interest to present his point of view to the court personally (CAR pag. 2.100.006 et seq.).

2.3 The following is relevant to the decision: The main hearing before the Court of Appeal is in principle oral and therefore within the meaning of Art. 69 et seqq. ⚠ . **CCP** public (see BGE *139 I 129* E. 3.3, with further references). With regard to the fundamental right to a public trial in the presence of the defendant (Art. 6 para. 1 ⚠ Convention for the Protection of Human Rights and Fundamental Freedoms [**ECHR**; *SR* 0.101], Art. 14 para. 1 International Covenant on Civil and Political Rights [ICCPR; *SR* 0.103.2]; cf. art. 30 para. 3 ⚠ Federal Constitution of the Swiss Confederation [**BV**; *SR* 101]), written form is only permissible within certain limits (Niklaus Schmid/Daniel Jositsch, Handbuch des schweizerischen Strafprozessrechts [Handbook of Swiss criminal procedure law], 3rd ed. 2017, p. 700 N 1563 and p. 702 N 1567).

2.4 The written procedure is therefore the exception in appeal proceedings. Art. 406 para. 1 ⚠ **StPO** specifies the cases in which written proceedings may, but need not, be conducted on the initiative of the court of appeal without the consent of the parties. The appeal proceedings can also be conducted in writing under certain circumstances if all parties agree and either the presence of the accused person is not required (letter a) or the appeal against a decision by a single judge is the subject of the proceedings (letter b) (see Markus Hug, in: Andreas Donatsch/Thomas Hansjakob/Viktor Lieber, Kommentar zur schweizerischen Strafprozessordnung [Commentary on the Swiss Code of Criminal Procedure], 2010, N 1 et seq. and N 9 to Art. 406 ⚠ **StPO**, with references; Schmid/Jositsch, op. cit, p. 702 et seq. N 1569 et seqq.).

2.5 Based on the statutory discretion available to the Appeals Division, it appears reasonable and appropriate in the present case to hold an oral appeal hearing - above all because the defendant insists on holding an oral appeal hearing in order to be able to present his position to the court in person.

3. Subject matter and cognition

3.1 This appeal is directed against the judgment of the Criminal Division of the Federal Criminal Court *SK.2018.71* of May 2, 2019. The appeal is in its entirety, i.e. the judgment of the lower court is contested both in terms of guilt and penalty as well as with regard to the consequences of costs and compensation. In the appeal proceedings, the defendant requests an acquittal, payment of the investigation and court costs by the state and the award of appropriate compensation.

Based on the decision already issued by the highest court in the present matter, the motions of the defense and those of the OAG, it must be clarified in advance what cognition the Appeals Division of the Federal Criminal Court has in the context of the

present appeal proceedings. This is an issue of central importance, which is why it must be discussed in detail in advance.

3.2 In its judgment *SK.2018.71* of 2 May 2019, the lower court stated the following on the issue of cognition (E. 1, p. 3):

If the Federal Court upholds an appeal and sends the matter back to the lower court for a new assessment, the latter may only deal with those points that the Federal Court has rejected. The other parts of the judgment would be valid and should be included in the new judgment. It is irrelevant that the Federal Court generally formally sets aside the entire contested judgment with its rejection decision. The decisive factor is not the dispositive, but the material scope of the Federal Court's decision. The new decision is therefore limited to the subject matter that emerges from the Federal Court's considerations as the subject of the new assessment. The proceedings will only be restarted to the extent that this is necessary to take account of the binding considerations of the Federal Court (with reference to BGE *143 IV 214* E. 5.2.1, with references).

Based on this, the lower court held that in its original proceedings it had objectively established a prohibited act for a foreign state and that this legal question was valid in the absence of an appeal to the Federal Court (E. 2.3.1).

3.3 The defendant, on the other hand, takes the view with regard to cognition that the judgment of the Federal Court *6B_804/2018* of December 4, 2018 is only binding with regard to the points expressly assessed, i.e. in two respects: On the one hand, an acquittal should no longer be based on the argument that there was a lack of intent. On the other hand, no mistake as to the wrongful nature of the act should be assumed. In all other respects, however, the sentencing court is completely free. This does not only apply to the possible grounds for justification mentioned in recital 3.4 of the Federal Court judgment. The adjudicating court could also decide differently than in the judgment of May 9, 2018, in particular with regard to the objective facts of the case. As a result of the acquittal in the judgment of May 9, 2018, the defendant was not entitled to appeal against the assumptions and conclusions of the Criminal Division of the Federal Criminal Court in this regard. The Federal Court was therefore also unable to comment on this and the Federal Court judgment is not binding in this respect (with reference to BSK BGG, Stefan Heimgartner/Hans Wiprächtiger, Art. 61 ⚡ **StGB** N 27 et seq.; as well as BSK BGG, Johanna Dormann, Art. 107 ⚡ **StGB** N 18; cf. pleading notes of the defense regarding the main hearing [rejection] of April 17, 2019, TPF II pag. 8.721.017 et seq.; as well as pleading notes of the defense regarding the appeal hearing of December 5, 2019, CAR pag. 8.300.001 - 005).

3.4 The specification and exercise of a court's cognizance in accordance with its intended purpose is essential in terms of the rule of law in connection with the safeguarding of fundamental rights and statutory procedural guarantees. In this context, the guarantee of legal recourse under Art. 29a ⚡ should be mentioned, according to which every person has the right to be judged by a judicial authority in legal disputes. For criminal proceedings, the guarantee of legal recourse is set out in an extended form in Art. 32 para. 3 ⚡ BV, according to which every convicted person has the fundamental right to have the judgment reviewed by a higher court.

The fundamental provision of Art. 32 para. 2 ⚡ **BV** that every accused person must have the opportunity to assert the rights of defense to which they are entitled is also affected or must be taken into account when determining the scope of cognition. The same applies to the right to a fair hearing (Art. 29 para. 2 ⚡ **BV**, Art. 3 para. 2 letter c and Art. 107 para. 1 ⚡ **StPO**) and the associated presumption of innocence (Art. 32 para. 1 ⚡ **BV**, Art. 10 para. 1 ⚡ **StPO**).

In the present constellation, it is ultimately relevant that the parties have a constitutionally guaranteed right to participate in the clarification of the facts. The parties concerned have the right to provide evidence within the procedural deadlines, provided that this is not obviously unsuitable, or to request additional clarification of the facts. They must be given the opportunity to participate in the gathering of evidence and to comment on the results of the evidence (cf. in particular Art. 147 et seqq. ⚡, Art. 184 para. 3 ⚡ and Art. 188 ⚡ ). These claims are intended to ensure that the parties can effectively assert their point of view (see Jörg Paul Müller, Grundrechte in der Schweiz. Im Rahmen der Bundesverfassung von 1999, der UNO-Pakte und der EMRK [Fundamental rights in Switzerland. Within the framework of the Federal Constitution of 1999, the UN covenants and the ECHR], 3rd ed. 1999, p. 522 et seq., with references). It should also be emphasized in this context that the right to be heard is only realized if the authority actually hears the submissions of the parties concerned, examines them carefully and seriously and takes them into account in the decision-making process. This forms the actual core of the right to be heard (Müller, loc. cit., p. 523).

If a court or an appellate instance in criminal proceedings misjudges the cognizance to which it is entitled (e.g. by inadmissibly restricting it), there is a risk that the aforementioned procedural guarantees - and generally the right to a "fair trial" (Art. 6 para. 1 ⚡ **ECHR**, Art. 29 para. 1 ⚡ **BV**, Art. 3 para. 2 letter c ⚡ **StPO**; see Schmid/Jositsch, loc. cit, p. 33 et seqq. N 95 et seqq.; Müller, loc. cit., p. 509 et seqq.) - are violated or undermined.

This context of fundamental rights significance of the question of cognition is of great importance; accordingly, it must be duly taken into account in the further explanations.

3.5 Anyone who participated in the proceedings before the lower instance or was not given the opportunity to participate and has a legally protected interest in the annulment or amendment of the contested decision, in particular the accused person and the public prosecutor's office, is entitled to appeal in criminal matters. The Office of the Attorney General of the Confederation is also entitled to appeal if federal law provides that it or another federal authority must be notified of the decision or if it has referred the criminal case to the cantonal authorities for investigation and assessment (Art. 81 para. 1 letter a ⚡ and b nos. 1 and 3 and para. 2 **BGG**).

According to Art. 105 para. 1 ⊡ **BGG** the Federal Court shall in principle base its judgment on the facts established by the lower court. The determination of the facts may only be challenged in an appeal to the Federal Court if it is manifestly incorrect or based on a violation of the law within the meaning of Art. 95 ⊡ **BGG** and if the rectification of the defect may be decisive for the outcome of the proceedings (Art. 97 para. 1 ⊡ **BGG**).

The Federal Court may not go beyond the requests of the parties (Art. 107 para. 1 ⊡ **BGG**). If the Federal Court upholds the appeal, it will decide the case itself or refer it back to the lower court for a new assessment. It may also refer the case back to the authority that decided as the first instance (Art. 107 para. 2 ⊡ **BGG**).

Decisions of the Federal Court become final on the day they are issued (Art. 61 ⊡ **BGG**).

3.6 The following provisions of the Swiss Code of Criminal Procedure (StPO, *SR* 312.0) are also relevant to the scope of cognizance in these appeal proceedings:

Criminal appeals are admissible against judgments of courts of first instance that have concluded the proceedings in whole or in part. The court of appeal can comprehensively review the judgment in all contested points. An appeal may be lodged against (a) violations of the law, including exceeding and abusing discretion, denial of justice and delay in taking legal action; (b) the incomplete or incorrect establishment of the facts; (c) inappropriateness (cf. Art. 398 para. 1 ⊡ - 3 ⊡ **StPO**).

The appellate court is not bound in its decision by (a) the parties' statements of reasons; (b) the parties' motions, except when assessing civil actions. It may not amend decisions to the detriment of the defendant or convicted person if the appeal has only been lodged in their favor. The right is reserved to impose a more severe penalty on the basis of facts that could not have been known to the court of first instance (Art. 391 para. 1 ⊡ and 2 ⊡ **StPO**).

The court of appeal reviews the judgment of the court of first instance only on the contested points. It may also review uncontested points in favor of the defendant in order to prevent unlawful or unreasonable decisions (Art. 404 ⊡ **StPO**).

3.7 Based on these principles and legal provisions, the following applies with regard to cognition:

3.7.1 If an appeal is upheld, the contested judgment is set aside and the case is referred back to the lower court, this has a cassation effect (Art. 107 para. 2 ⊡ **BGG**). Although formally and according to the wording of the dispositive, the judgment as a whole is overturned, the overturning is generally limited to individual points. Accordingly, the recitals must be consulted in order to determine whether the contested decision has been overturned in whole or in part. If the latter is the case, the contested judgment is deemed to be upheld with regard to the points not objected to and not set aside (BSK BGG, 2nd ed. 2011, Stefan Heimgartner/Hans Wiprächtiger, Art. 61 ⊡ **BGG** N 14; see BGE *122 I 250*, E. (*Erwägung* [recital]) 2.b).

3.7.2 All Federal Court rulings that conclude the proceedings (final rulings) become legally binding in substance. According to the general principles, only the dispositive is legally binding; factual findings and legal considerations, findings on prejudicial legal relationships, other preliminary questions and other legal consequences that logically follow from the grounds of the judgment do not become legally binding on their own. However, if the dispositive expressly refers to a recital, the latter becomes an integral part of the dispositive and becomes legally binding. In contrast, the binding effect is at least de facto stronger in the case of Federal Court rulings that reject a case, because the lower court must adhere to the Federal Court's considerations, otherwise there is a risk of a renewed rejection. Thus, if a decision is overturned, the lower court, which has to rule on the matter again in remittal proceedings, is bound by the decision of the Federal Court (binding effect; see Heimgartner/Wiprächtiger, loc. cit., Art. 61 ⊡ **BGG** N. 17 et seqq., with references).

3.7.3 The Federal Court is also bound by its first judgment in one and the same case in the event of a renewed appeal. The binding effect refers formally only to the dispositive, but its scope can only be determined on the basis of the recitals (cf. BGE *122 I 250*, E. 2; judgment of the Federal Supreme Court *6B_372/2011* of July 12, 2011, E. 1.3.2). Accordingly, instructions from the Federal Court - such as how evidence is to be taken - are also binding for lower courts dealing with a rejection decision. Due to this obligation, it is generally inadmissible for courts that deal with a case again in the context of a rejection to assume a different set of facts or to subsume the case in a way that was explicitly or implicitly rejected in the rejecting decision (cf. Judgment of the Federal Supreme Court *6B_372/2011* of July 12, 2011, E. 1.1.2 para. 1). Although the remittal puts the case in the position it was in before the cantonal judgment was rendered, the point in dispute may neither be extended nor placed on a new legal basis. Since, as a rule, the annulment of a decision is only to be regarded as partial and the decision of the lower court is otherwise upheld (explicitly or implicitly), only the annulled aspect can generally form the subject matter of the dispute again in new appeal proceedings. In this regard, it can only be argued that the instructions of the Federal Court were not followed or that the law was again violated. However, the legal effect only applies insofar as disputed points were decided in the first appeal proceedings. The new decision of the lower court cannot be contested even if a challenge to the first judgment would have been possible and reasonable in good faith. As a rule, no points that could have been raised in the first appeal to the Federal Court can be raised in a renewed appeal (see Heimgartner/Wiprächtiger, loc. cit, Art. 61 ⊡ **BGG** N 26 et seqq.; see BGE *117 IV 97*, E. 4. a).

3.7.4 The authority to which the case is remitted by a cassation judgment is bound by the legal considerations in the rejection decision. If the remitting instance disregards the binding considerations of the Federal Court judgment, this constitutes a denial of justice, which automatically leads to the annulment of the second decision. In this context, the binding nature applies both to points that are not referred back (i.e. that have been "definitively" decided) and to those considerations that describe the referral order (BSK BGG, 2nd ed. 2011, Ulrich Meyer/Johanna Dormann, Art. 107 ⊡ **BGG** N 18).

3.7.5 Similar to the BGE cited by the lower court *143 IV 214* E. 5.2.1, the Federal Court stated in its judgment *6B_372/2011* of July 12, 2011, E. 1.1.2 para. 2: In the new decision, the cantonal court must limit itself to what emerges from the considerations of the Federal Court as the subject of the new assessment. In the event of a cassation of the judgment as a result of an appeal in criminal matters being upheld, the entire proceedings should therefore not be restarted, but only to the extent that this is necessary to take account of the binding considerations of the Federal Court. Within the limits of the prohibition of *reformatio in peius* (see Art. 391 para. 2 ☑ **StPO**), the new decision may also refer to points that were not contested before the Federal Court, provided that the factual context requires this (with reference to BGE *123 IV 1* E. 1; *117 IV 97* E. 4; judgment of the Federal Court *6S.270/2003* of November 28, 2003 3.2.1 and 3.3.1).

3.8 Based on the relevant statutory, constitutional and convention provisions (above, E. 3.4 - 3.6) and the case law of the Federal Court as well as legal doctrine, it must now be specifically analyzed to what extent the relevant ruling of the Federal Court 6B_804/18 of December 4, 2018 has a binding effect (below, E. 3.11). In this context, the appeal in criminal matters by the Office of the Attorney General of Switzerland dated August 21, 2018 and the defense's response to the appeal dated 12 November 2018 must also be taken into account (see E. 3.9 and 3.10 below). With regard to cognition, the lower court rightly referred to the statements in BGE *143 IV 214* E. 5.2.1 (above, E. 3.2). However, it is disputed and must be examined in more detail whether the lower court correctly applied this case law when interpreting the supreme court judgment *6B_804/2018* in the present criminal proceedings.

3.9 In the present criminal proceedings, the OAG filed an appeal in criminal matters against the judgment of the Criminal Division of the Federal Criminal Court *SK.2017.64* of May 9, 2018 (TPF I pag. 7.980.003 et seqq.) on August 21, 2018. The corresponding legal claims in the main proceedings were as follows (TPF I pag. 7.980.004):

"1. The judgment of the Criminal Division of the Federal Criminal Court of May 9, 2018 should be set aside and the defendant should be found guilty of prohibited acts for a foreign state (Art. 271 no. 1 para. 1 ☑ in conjunction with Art. 4 ☑ **StGB**) and to punish him appropriately.

In the alternative: The judgment of the Criminal Division of the Federal Criminal Court of May 9, 2018 should be set aside and the case referred back to the lower court for a new asssessment.

As part of its legal assessment, the OAG stated that, according to the correct legal assessment of the lower court, the defendant had fulfilled the objective elements of Art. 271 para. 1 ☑ **StGB** fulfilled (TPF I pag. 7.980.004). In contrast, the OAG contested the judgment of May 9, 2018 with regard to the legal statements on the subjective facts of Art. 271 para. 1 ☑ **StGB** and their assessment (TPF I pag. 7.980.005 et seq.). In addition, the OAG stated that there were also no grounds for justification or exclusion of guilt (TPF I pag. 7.980.006 et seqq.).

3.10 In his response to the appeal dated November 12, 2018 (CAR pag. 4.102.003 - 009), the defendant filed a motion to dismiss. As part of his reasoning, he first explained in a preliminary remark for what reasons (as had already been explained before the Federal Criminal Court) the objective elements of the offense of Art. 271 no. 1 para. 1 ☑ **StGB** were not fulfilled. In addition, he referred to a contingent justification that had already been asserted in the event that the objective facts were affirmed (CAR pag. 4.102.004 et seq. para. 1). The defendant further stated that the lower court had wrongly rejected the arguments on the objective facts of the case. In the absence of an appeal, the current respondent could not challenge the incorrect conclusions of the lower court with regard to the question of foreign data and voluntariness. They could not be reviewed in the present appeal proceedings either. However, it goes without saying that the defendant fully adheres to the arguments presented before the lower court, which would require an acquittal (CAR pag. 4.102.005 para. 2 et seqq.).

3.11

3.11.1 With regard to the question of the objective facts of the case, there are several connecting factors in the judgment. At the beginning of E. 3.1.2 of its judgment 6B_804/1018 of December 4, 2018, the Federal Court clearly states that, contrary to the opinion of the respondent (response to the appeal, p. 5 et seq. [= CAR pag. 4.102.007 et seq.]), the respondent correctly understood the meaning of the official act for a foreign state as a normative element of the offence (TPF II pag. 8.100.005). In the sentence after the next, however, this statement is somewhat qualified by the phrase "possibly sanctioned":

"Following the voluntary disclosure, the DoJ was advised to first seek legal and administrative assistance in order to obtain the client dossiers. In this respect, the respondent was able to correctly classify the social significance of the - possibly sanctioned - data release." (TPF II pag. 8.100.005)

However, the Federal Court nevertheless comes to the (provisional) conclusion that the respondent's erroneous assumption that he was nevertheless entitled to hand over the customer files does not affect the intent and may at best only justify a mistake as to the wrongful nature of the act (judgment of December 4, 2018; TPF II pag. 8.100.005). December 2018, E. 3.1.2, last sentence; TPF II pag. 8.100.005).

3.11.2 Subsequently, the Federal Court explains when a mistake as to the wrongful nature of the act exists (judgment of December 4, 2018; E. 3.2; TPF II pag. 8.100.005 et seq.). It concludes these fundamental considerations as follows:

"Whether the offender knows that his conduct is contrary to the law or has a vague feeling that he is doing something wrong is a question of fact. The legal question is whether the error was avoidable (judgment *6B_368/2017* of August 10, 2017 E. 4.2 with

reference)." (TPF II pag. 8.100.006)

It is not clear from the statements of the Federal Court in E. 3.3 of its judgment of December 4, 2018 to what extent it was examined in a first step whether a mistake as to the wrongful nature of the act - and consequently prohibited conduct - was present, and to what extent it was examined in a second step (insofar as a mistake as to the wrongful nature of the act is affirmed) whether the mistake as to the wrongful nature of the act was avoidable. Rather, the Federal Court reaches the (double) conclusion in two places - on the one hand already at the beginning, in the second sentence of E. 3.3, and on the other hand towards the end, in the second-last sentence of E. 3.3 of its judgment of December 4, 2018 - each in a single sentence:

"The expert opinions did not provide a sufficient basis for an unavoidable error, as they were incomplete and not reliable with regard to the limits of the criminal conduct."

and/or

"The mistake as to the wrongful nature of the act was therefore avoidable." (TPF II pag. 8.100.006 et seq.)

The Federal Court then comes to a summary, cognition-relevant conclusion (judgment of December 4, 2018, E. 3.3, last sentence; TPF II pag. 8.100.007):

"The lower court violates federal law when it qualifies the knowledge of the prohibition of the standardized conduct as a subjective element of the offence, assumes an unavoidable error of prohibition in the sense of a contingent justification and consequently denies the fulfilment of the subjective element of Art. 271 para. 1 ⚠ **StGB** is denied."

3.11.3 The next consideration of the Federal Court (3.4; TPF II pag. 8.100.007) also relates to the question of cognition and is brief:

"The parties' submissions on any grounds for justification do not need to be addressed in detail here. The lower court did not have to deal exhaustively with the material issues raised. Consequently, the Federal Court cannot review the new legal objections that are admissible per se."

3.11.4 In the final recital (4th; TPF II pag. 8.100.008) of its judgment of December 4, 2018, the Federal Court states in particular:

"The appeal is to be upheld. The judgment of the lower court must be set aside and the case referred back to the lower court for a new decision. The latter will have to re-examine whether the respondent can be accused of an unlawful and culpable act in accordance with the facts."

3.11.5 With regard to the "mistake as to the wrongful nature of the act" addressed by the Federal Court (judgment of December 4, 2018, E. 3.1 - 3.3; TPF II pag. 8.100.004 et seqq.), the question arises as to whether this implicitly presupposes an actually existing prohibition (within the scope of the objective facts) - which means that the objective facts could no longer be examined in the present appeal proceedings. However, according to the Federal Court, this cannot be assumed in the present case. The Federal Court focused heavily on answering the legal questions that were to be assessed solely and exclusively in accordance with the appeal in criminal matters submitted by the OAG on August 21, 2018. The statements of the Federal Court must therefore be interpreted in accordance with the fundamental considerations set out above to the effect that no legally binding decision was made on the objective facts of the case. This interpretation is supported in particular by the passage in the concluding E. 4 of the Federal Court's ruling of December 4, 2018 that the lower court "will have to re-examine whether the respondent can be accused of a factual, unlawful and culpable act." (TPF II pag. 8.100.008)

3.11.6 In summary, the following should be noted regarding the scope of cognizance in the present appeal proceedings:

The Appeals Division of the Federal Criminal Court may - and must - review the objective facts of the case as part of the proceedings *CA.2019.6*. In this sense, the court largely follows the defendant's argumentation (see above E. II. 3.3, or the defense's pleading notes concerning the main hearing [rejection] of April 17, 2019, TPF II pag. 8.721.017 et seq.; see also the defendant's response to the complaint of November 12, 2018, p. 2 et seq.; CAR pag. 4.102.004 et seq.). The objective facts of the case were not reviewed by the Federal Court (due to the lack of a corresponding motion by the OAG, or due to the lack of legitimacy or complaint of the defendant). However, the question of the objective facts of the case was repeatedly raised by the defendant (see above E. II. 2.2, 3.3 and 3.10). In this respect, the defendant has in no way violated his duty to give notice of defects (see Art. 95 et seqq. ⚠ and Art. 106 para. 2 ⚠ **BGG** and Art. 404 ⚠ **StPO**).

In the present case, the defendant is entitled to have the legal question of whether the objective facts of the case are present assessed by a second instance with full cognition. This must apply all the more since January 1, 2019, when the Appeals Division of the Federal Criminal Court was established as a newly created second judicial instance at federal level with full cognizance. The Appeals Division of the Federal Criminal Court was set up precisely for such constellations. It would seem inappropriate and offensive if the present case simply had to be run through the newly created chamber in a largely formal manner.

In the present case, however, the Appeals Division of the Federal Criminal Court is bound in principle with regard to the facts of the case and with regard to the question of the subjective facts of the case and the avoidable mistake as to the wrongful nature of the act. In this respect, reference can be made to the Federal Court ruling of December 4, 2018, E. 3.3, second last and last sentence.

4. Prohibition of *reformatio in peius*

4.1 Finally, the fact that the OAG did not file a cross-appeal is essential for the scope of cognizance. Thus, the principle of the prohibition of *reformatio in peius* (Art. 391 para. 2 ⚠ **StPO**) applies, which must be observed not only with regard to the sentence but also with regard to the legal qualification (BGE *139 IV 282*, E. 2.3 - 2.6, as well as BSK StPO, 2nd ed. 2014, Martin Ziegler/Stefan Keller, Art. 391 ⚠**StPO** N 3 and 3a).

4.2 The OAG charged both the compilation and the submission of the files (cf. TPF I pag. 7.100.003). However, the court of first instance made a binding decision regarding the compilation of the files that this was not already done with contingent intent with regard to the handover to the US authorities (see TPF II pag. 8.930.013, E. 2.3.1, with reference to E. 4.2 of the judgment *SK.2017.64* of May 9, 2018; or TPF I pag. 7.970.010 et seq. E. 4.2.1). The court of appeal is bound by this. The only thing to be assessed is therefore the handover of the compiled customer files to the American authorities.

4.3 Likewise, the lower court's assumption of an avoidable mistake as to the wrongful nature of the act (TPF II pag. 8.930.015, E. 2.4.3 - 2.4.3.2 and 3.2.1 et seq.) as well as the fine of CHF 10,000 and the 60-day substitute custodial sentence (TPF II pag. 8.930.017 et seq., E. 3.3.1 et seqq.; pag. 8.930.020) must be taken into account as a maximum in the event of a guilty verdict.

II. Material considerations

1. Legal assessment

1.1 Objective facts

1.1.1 Basic statements on Art. 271 para. 1 para. 1 ⚠

1.1.1.1 Pursuant to Art. 271 no. 1 para. 1 ⚠ **StGB** it is a punishable offence to carry out acts on Swiss territory without authorization on behalf of a foreign state which, according to the Swiss understanding of the law, are reserved for an authority or an official. The provision is intended to prevent the exercise of foreign state authority on Swiss territory and to protect the state monopoly of power and Swiss sovereignty (judgment of the Federal Supreme Court *6B_402/2008* of November 6, 2008, E. 2.3.2 with further references). "In a constitutional state, those subject to the law may trust that sovereign powers (e.g. arrests, investigations for criminal and tax law purposes) will only be exercised by the competent state organs and in a lawful manner." (Markus Husmann, "Art. 271 Criminal Code - pivotal point in tax disputes, rightly so?", AJP 5/2014). Art. 271 ⚠ **StGB** thus also has the side effect, so to speak, that legal individuals can rely on the rule of law with regard to encroachments on their rights.

1.1.1.2 Any action attributable to an authority or an official is prohibited - regardless of whether an official was involved. This means that any act that is characterized as an official activity in itself, i.e. according to its nature and purpose, is deemed to be an official act. The decisive factor here is not the person of the perpetrator, but only the official nature of the act (BGE *114 IV 128* E. 2b p. 130 with references; Danielle Gauthey/Alexander R. Markus, "Zivile Rechtshilfe und Artikel 271 Strafgesetzbuch [Civil legal assistance and Article 271 of the Criminal Code**]**", ZSR (*Zeitschrift für Schweizerisches Recht* [Journal of Swiss Law]) 2015 I, p. 367: Art. 271 no. 1 ⚠ **StGB** does not constitute a special offense; the perpetrator therefore does not necessarily have to be an official). The Swiss legal interpretation is decisive here, according to which the act is carried out in fulfillment of a public law function (David Rosenthal, in: Handkommentar zum Datenschutzgesetz sowie weiteren ausgewählten Bestimmungen [Hand-written commentary on the Data Protection Act and other selected provisions], 2008, Art. 271 ⚠ **StGB** N 6; Gauthey/Markus, loc. cit., p. 369). It is undisputed that acts of legal and administrative assistance fall under this definition and thus enjoy the protection of the criminal provision, as these norms protect Switzerland's territorial sovereignty and are intended to prevent the Swiss provisions on international legal assistance in criminal and civil matters from being circumvented (Rosenthal, loc. cit, Art. 271 ⚠ **StGB** N 1 and 7; see also the dissertation by Claudio Bazzi, "Internationale Wirtschaftsspionage: eine Analyse des strafrechtlichen Abwehrdispositivs der Schweiz [International economic espionage: an analysis of Switzerland's criminal defense system]"; Series Zürcher Studien zum Strafrecht, Vol. 81, 2015, N 373, regarding "state control"). In this context, circumvention of mutual legal assistance by a Swiss party does not constitute subterfuge in the sense of aiding and abetting, but rather the original act within the meaning of Art. 271 para. 1 para. 1 ⚠**StGB** (Damian K. Graf, "Mitwirkung in ausländischen Verfahren im Spannungsfeld mit Art. 271 [Participation in foreign proceedings in the area of conflict with Art. 271] ⚠ . Taking into account the recent approval practice of the FDJP and FDF", in: GesKR 2/2016, p. 178 para. 3.1).

1.1.1.3 The offense must then be committed on behalf of a foreign state. It is not a prerequisite that the act is useful for the foreign state; it is sufficient that it is intended for it (Gauthey/Markus, loc. cit., p. 382), i.e. that it is in its interest (BGE *114 IV 128*, E. 3b). The fact that the foreign state issues the order to do so is not a *conditio sine qua non* (Graf, loc. cit., p. 176 et seqq. para. 2.3., with further references), but this issuing of the order can become significant when assessing the question of a sovereign act (Gauthey/Markus, loc. cit., p. 381).

1.1.1.4 Particularly in connection with internal company investigations, there is an in-depth discussion among experts as to whether and to what extent the collection of documents with a view to foreign proceedings and their subsequent submission are punishable (BSK StGB, 3rd ed. 2013, Markus Husmann, Art. 271 ⚠ **StGB** N 53 et seqq.). In a nutshell, it is argued that - insofar as Art. 271 ⚠ **StGB** is intended to prevent the circumvention of Swiss legal assistance provisions - it can only be punishable if the submission of the evidence falls within the exclusive competence of the legal assistance authorities (Graf, loc. cit., p. 181). In any case, this must apply if the submission is made voluntarily - i.e. without the threat of criminal sanctions by the foreign state if it is not submitted (Graf, loc. cit., p. 181, with further references in footnote 107; Rosenthal, loc. cit., Art. 271 ⚠ **StGB** N 19). However, this practical and pragmatic distinction already fails to recognize that the factual pressure involved in plea deals should not be

underestimated, such that the criterion of voluntariness is not very suitable for preventing the circumvention of mutual legal assistance (see Graf, loc. cit., p. 182; Bazzi, loc. cit., n. 373). Rather, the decisive factor must be that a parallel assessment is made in relation to proceedings within Switzerland, such that - insofar as a submission can be made in Swiss proceedings by private parties - this must also be possible in an international context (see Philipp Fischer/Alexandre Richa, "U.S. pretrial discovery on Swiss soil", in: Bibliothek zur ZSR, supplement 49, N 127, on the justification of voluntariness as a criterion). For this reason, it is rightly and uniformly held, irrespective of voluntariness, that in all constellations only files and information that can be freely disposed of can be released (Gauthey/Markus, loc. cit., p. 396). This is not the case with "identifying information about third parties" or "non-publicly accessible identifying data of third parties" (BSK StGB, 3rd ed, Markus Husmann, Art. 271 ⚠ **StGB** N 45), because only through administrative and legal assistance can the confidentiality and disclosure obligations be procedurally balanced and the principle of specialty guaranteed (BSK StGB, 3rd ed., Husmann, Art. 271 ⚠ **StGB** N 45, with further references; Gauthey/Markus, loc. cit., p. 396). On the basis of the same *ratio legis*, the further logical consequence is that such non-punishable submissions are only admissible in one's own proceedings, as otherwise the third parties concerned cannot exercise their rights (CR CP, Fischer/Richa, Art. 271 ⚠ **StGB** N 25). In cases of doubt, in particular where the information requested concerns third parties or may serve as evidence in foreign proceedings - the procedure is to be based on administrative or legal assistance (BSK StGB, 3rd ed., Husmann, Art. 271 ⚠ **StGB** N 32).

This clear delineation of which documents may and may not be submitted by a private party is also set out in the model ruling issued by the Federal Department of Finance (FDF) on July 3, 2013 (available at https://www.newsd.admin.ch/newsd/message/attachments /31820.pdf), which allows Swiss banks to participate in voluntary programs with the United States Department of Justice (DOJ). Clause 10 expressly states that customer data can only be transmitted as part of an administrative assistance procedure. The sample ruling of the EFD dated July 3, 2013 is not tailored to the specific constellation at hand or is not directly applicable in casu. However, it is nevertheless illustrative for the interpretation of Art. 271 ⚠ **StGB**.

1.1.1.5 Due to the protected legal interest, there must be an internal connection. The offense must be carried out on Swiss territory, whereby it is an activity offense, such that only the place of action is relevant (Graf, loc. cit., p. 172). It is sufficient if only part of the offense is committed in Switzerland (PC CP, 2017, Fischer/Richa, Art. 271 N 13). The criminal liability of the act can therefore not be avoided by carrying out the final formal act abroad. Art. 271 ⚠ **StGB** therefore only covers those persons who carry out official criminal acts entirely abroad. Thus, the mere fact that the last formal act takes place on foreign territory, although this is sometimes assumed, does not protect against punishment (Gauthey/Markus, loc. cit., p. 134, 382 et seq.; also BSK StGB, 3rd ed., Husmann, Art. 271 ⚠ **StGB** N 64). The interposition of a private intermediary is just as inconsequential (BSK StGB, 3rd ed. 2013, Husmann, Art. 271 ⚠ **StGB** N 64).

1.1.1.6 Due to the clear wording of Art. 271 ⚠ **StGB** any state authorization is exclusive of the offence. With such an authorization, the state expressly permits actions that impair Swiss sovereignty (BSK StGB, 4th ed. 2018, Markus Husmann, Art. 271 ⚠ **StGB** N 78 et seq.).

1.1.2 Examination of the objective facts in the present case

Based on the detailed statements of the defendant, who made and was responsible for all the decisions to be assessed in the present case (BA pag. 13.01.0009, paras. 1-8), as well as on the documents submitted and collected, which largely confirm them, the facts to be subsumed emerge, as will be explained below.

1.1.2.1 Context and strategy of B. AG

1.1.2.1.1 In the context of the tax disputes between the United States and Switzerland, the defendant recognized the risk that the US authorities would also become aware of B. AG's clients due to the data released by the Swiss banks in this context, as he knew that his bank C.-clients' data had already been affected (TPF I pag. 7.930, paragraph 17 et seqq.); At the same time, B. AG's main shareholder, Bank D., came under pressure as a bank itself. The latter demanded that B. AG negotiate a Non Prosecution Agreement (NPA) with the United States Department of Justice (DOJ) (Investigation Report, BA pag. 15.01.0053, para. 14). Bank D. then also concluded such an NPA for itself with the Attorney General of the Southern District of New York in July 2013 (BA pag. 05.00.0033, I *in fine*).

1.1.2.1.2 Based on this initial situation, the defendant ordered that all client relationships of B. AG and its relevant subsidiaries, F., G. and H. (BA pag. 05.00.0033, Exhibit A DOJ) be investigated externally by the law firm E. for corresponding US evidence. Internally, the defendant conducted the investigation with one person, as it was a matter of secrecy and they wanted to avoid a great deal of publicity (BA pag. 12.01.0011, para. 25 et seqq.). For the period 2002-2012, 110 clients were found to be "more likely than not tax compliant" (*recte*: "more likely than not not tax compliant"), i.e. probably not tax compliant (BA pag. 12.01.0007, para. 8-16). Based on this, the defendant initiated a voluntary disclosure by B. AG in October 2012. In this, the facts were brought to the attention of the DOJ in anonymized form (BA pag. 12.01.0007, para. 19-29); by definition, no client or bank details were disclosed.

1.1.2.1.3 In November 2012, the law firm E. wrote to the affected clients on behalf of B. AG and its subsidiaries using a standardized letter. It was pointed out that the shareholder of B. AG, Bank D., had been requested to disclose client information in connection with US tax matters. The addressee was assured that, unless already informed directly by Bank D., he would not be affected. However, it was also stated that current or future requests to B. AG and banking institutions with which it cooperates cannot be ruled out (BA pag. B07.02.001.0004 et seq.: "we cannot exclude the possibility of further treaty requests"). This was linked to the recommendation to seek advice ("encourage you to seek professional tax advice promptly": see, for example, BA pag. B07.02.001.008). According to the defendant, the intention was to encourage the

clients to make a voluntary disclosure to the United States Internal Revenue Service (IRS) (see BA pag. 12.01.0008, para. 1-3; BA pag. 12.01.0010, para. 10-18; BA pag. 13.01.0006, para. 10 et seqq.; cf. also the statements of the defendant on the occasion of the interrogation during the appeal hearing, on the basis of BA pag. B07.02.001.0004 et seq. and BA pag. 12.01.0010, para. 10-18: CAR pag. 8.402.002, para. 33-47 and CAR pag. 8.402.003, para. 1-21). In any case, it was not clear from this letter that the customer documents would be submitted voluntarily to US authorities. On the contrary, reference was made to requests for legal assistance, which prompted one client - who incidentally claims to have rectified his situation - to expressly request advice "if and when the bank in question would become subject of a Treaty Request" (BA pag. B07.02.0007). However, according to the defendant's testimony during the appeal hearing, this client did not receive such advice before the defendant handed over the client data (see CAR pag. 8.402.004, para. 24-27).

1.1.2.1.4 On November 19, 2012, at a meeting with the DOJ, E.'s attorneys presented the interim results of the internal investigation of B. AG and presented possible further steps (TPF I pag. 7.521.014 - 045: PowerPoint presentation). Among other things, a full disclosure of the internal investigation, the identification of the non-tax-compliant clients and the American intervenors who had received commissions was offered (TPF I pag. 7.521.034). With regard to the publication of client names, two "cooperation routes" were identified.

The first "cooperation route" consisted in the fact that, based on an internal "memorandum/legal opinion", which was not yet available at that time (CAR pag. 8.042.011, para. 15-18), the names would be issued directly by B. AG. This would exclude those names that are exclusively related to the Principality of Liechtenstein and the Cayman Islands - although the corresponding state requests for these exceptions had already been prepared by the law firm for the DOJ.

The second, alternative "cooperation route" provided for the release of documents relating to DOJ requests for legal and administrative assistance to all of the countries concerned, including those relating to Swiss data (TPF I pag. 7.521.041 et seq. and 7.521.008).

While it was disclosed in the second variant that it is unclear how many files can be made available by way of legal or administrative assistance, the risk of "large economic and substantial damages" was explained for B. AG with regard to the first variant. According to the presentation, B. AG, i.e. the defendant himself (CAR pag. 8.402.011, para. 9 et seq.), preferred direct surrender, as this would allow the matter to be settled quickly (TPF I pag. 7.521.041). In response to the presentation E./DOJ (TPF I pag. 7 521 014 et seqq.), the defendant confirmed during the interrogation at the appeal hearing that he had seen and approved it (CAR pag. 8.402.010, para. 2-12). He was therefore already well aware at this point that not all of the customer data expected by the DOJ would be released for legal and administrative reasons. The subsequent circumvention of the legal and administrative assistance route therefore just made sense.

1.1.2.1.5 In December 2012, statistical data was submitted and the DOJ instructed B. AG not to send any more information to clients (so-called tipping-off). In January 2013, the defendant was interrogated in the United States, where he was granted free access. In spring 2013, the question of how and to what extent specific customer data could be provided to the US authorities was discussed. According to his testimony, the defendant then instructed his law firm to prepare requests for administrative assistance for the Cayman Islands, the Principality of Liechtenstein and Switzerland; however, the DOJ rejected this approach (BA pag. 12.01.0008, para. 24-26). The DOJ was not satisfied with legal or administrative assistance because only the dossiers falling under "fraud and the like", but not those of "ordinary" tax evaders, would have been available to the US authorities at relatively short notice (Statement B. AG, BA pag. 15.01.0097). They were then at a complete loss, the defendant then testified, which is why he commissioned a second expert opinion as a solution (BA pag. 12.01.0008, para. 26 et seqq.). As explained above, however, the defendant had already been aware beforehand that not all of the client data expected by the DOJ would be released by way of legal and administrative assistance (see E. II. 1.1.2.1.4 *in fine*).

1.1.2.1.6 It is clear from the documents submitted that after detailed discussions - taking into account the time factor and the legal consequences - the DOJ expressed its preference for a voluntary submission of the data (cf. submission of the American lawyer of B. AG; TPF I pag. 7.521.008). The DOJ clearly stated that neither the prosecutors nor the representatives of the IRS were willing to accept this data without a guarantee that it would not violate Swiss law (TPF I pag. 7.521.008; cf. TPF I 7.521.049: "... the issue regarding section 271 needs to be discussed and resolved"). Therefore, the American attorneys of B. AG promised the DOJ the second expert opinion (TPF I pag. 7,521,047).

During the questioning at the first main hearing in the first instance on April 26, 2018, the defendant was asked what the considerations were that led them to commission a further expert opinion. The defendant replied that there had been two considerations. On the one hand, he was of the opinion that the E. report was not an absolutely independent report because E. had accompanied and advised him in this matter. The other side was that the Americans said in the fall of 2013: "Yes, is that really compatible with Swiss law?" Whereupon they received this expert opinion. The answer was exactly the same as he had given before: Would this be an independent opinion from E., or would they be able to obtain a second opinion from an independent third party? To which he said that they would do that, they would find one, there would be no courtesy report. Prof. I. has nothing to do with him. He had known that he was aware of the problem. On the one hand, due to his position as Chairman of the EBK at the time and also due to his professional activities. And he had commissioned the second expert opinion (see TPF I pag. 7.930.012, para. 16-30; or CAR pag. 8.402.090, para. 16-30).

In the interrogation during the appeal hearing, the defendant was asked whether it was correct that the DOJ doubted that the release of the documents was permissible under Swiss law. The defendant replied in summary as follows: No. In September 2012, the DOJ raised the question of whether the J. opinion was an independent opinion, based

on the fact that E. had represented her in these proceedings. This resulted in the need to prepare a second expert opinion at the beginning of October 2012. The second expert opinion was not drawn up because he had any doubts about his actions, but because of the DOJ's statement in Washington. This is the background (see CAR pag. 8.402.008, para. 7-17).

1.1.2.1.7 The two expert opinions of the parties, which the Federal Court analyzed in detail, came to the conclusion - based on different arguments - that surrender does not in principle trigger criminal liability:

1.1.2.1.7.1 In the first expert opinion (BA pag. 15.01.0005 et seqq.), the non-application of Art. 271 🔲 **StGB** is argued in particular with regard to the aspect of obtaining information, the voluntary nature of disclosure, but also the possible elimination of the risk of punishment by obtaining authorization (BA pag. 15.01.0005 et seqq. para. 4.2.3.27 et seq.).

1.1.2.1.7.2 The expert opinion of Prof. I. (BA pag. 15.01.0022 et seqq.) does not rule out the applicability of Art. 271 🔲 **StGB** , but refrains from going into further detail on the question, as the disclosure of the data is in any case justified by an emergency situation, because B. AG would not be able to cope financially with any fine imposed in the ordinary proceedings.

1.1.2.2 Compilation and submission of data

1.1.2.2.1 Subsequently, all documents of the 109 customers concerned were saved on a USB stick in 105 pdf files (see also BA pag. 07.02.0005 et seqq.). These had previously been collected by the Cayman Islands, the Principality of Liechtenstein and Switzerland and were also stored on servers in Switzerland (TPF I pag. 7.930.006; pleading: TPF II pag. 8.721.027, para. 30). This means that the data that should have been made available in the Cayman Islands and the Principality of Liechtenstein according to the presentation on legal assistance was also compiled privately by B. AG - without a government request (see CAR pag. 8.402.010 para. 14-23). According to the evaluation of the Appeals Division, the compiled Swiss bank records were located exclusively in Switzerland in the case of 117 accounts, also in Switzerland in the case of 155 accounts and not in Switzerland in the case of 35 accounts (CAR pag. 8.402.131 et seqq., esp. 145 et seq.). So-called "reduced files" were entered for customers who had demonstrably already triggered individual disclosure proceedings with the tax authorities (BA pag. 07.02.0030). For the remaining clients, the so-called "full file" was submitted, which means that the entire bank documents were also enclosed. According to the list (submission B. AG, BA pag. 07.02.0005 and BA pag. B07.02.001.0001 et seqq.), 47 "reduced" and 62 "full files" were submitted. It should be noted that in some cases a "full file" was also submitted for clients who had disclosed the assets to the IRS, which is consistent with the statement of the defendant, who spoke of approximately 80 clients with their own disclosure (BA pag. 12.01.009, para. 1-15). This also applies to the response of B. AG in the supervisory proceedings, according to which only 31 clients did not cooperate with the authorities, which is why they would not deserve protection (BA pag. 15.01.100, N 15.2; CAR pag. 8.402.019, para.10-18).

1.1.2.2.2 Data was submitted from all clients identified as "more likely" according to the internal investigation, including those that should originally have been made available via the Principality of Liechtenstein and the Cayman Islands (CAR pag. 8.402.012, margin nos. 32-35). A distinction is made between two categories based on the business model and the resulting business relationship. On the one hand, the direct customers of B. AG and, on the other, those who had taken out life insurance policies with foreign subsidiaries, for example, whose capital benefits were then managed by B. AG. B. AG had originally applied for the latter to be sealed and argued that the Swiss authorities were not responsible (BA pag. 07.02.0005 et seqq.). As a result, all BA data was subsequently released (BA pag. 07.02.0021).

1.1.2.2.2.1 It follows from the direct customer contracts with B. AG that Zurich was agreed as the place of jurisdiction. Certain contracts contain an explicit clause regarding "Secrecy and Disclosure of Information" (see, for example, File 5, K.; stored on USB stick BA 07.02.0013). It states that B. AG has a duty of confidentiality, but that this does not apply to the Money Laundering Report Office Switzerland (MROS), the Swiss authorities or in legal proceedings. For bank correspondence, it was generally agreed that the correspondence would be stored at the bank with a copy in favor of B. AG in Zurich or Geneva. The defendant has confirmed that these are standard general terms and conditions that apply to all asset management by B. AG (CAR pag. 8.402.016, para. 29 et seqq.).

1.1.2.2.2.2 It follows from the contractual relationships of G., in which asset management of the cover accounts by B. AG was agreed, that the bank statements were generally made available to the employees of B. AG in Zurich or Geneva (cf. for example File 1, L.; File 43, M.; File 42, N.; each stored on USB stick BA 07.02.0014, File 41). According to the documents, the GTC of B. AG were also an integral part of the contract, which the defendant confirmed (CAR pag. 8.402.018, para. 8-16).

1.1.2.2.3 Examples of full / reduced files and their essential content

1.1.2.2.3.1 "full files":

- B. AG client O. (inactive since 2006); 533-page dossier; cover sheet: with personal details and indication of whether already in an IRS program; client sheet with investment profile showing the origin of the funds, bank details and investment strategy(ies). A-Declaration at F., incl. identity documents; KYC (Know Your Customer; legitimation check of certain new customers to prevent money laundering) of Bank P.; also old versions in each case; account statements; bank orders; correspondence in connection with inheritance (USB stick BA 07.02.0013, File 2).

- G. client Q. (inactive since 2008); 682-page dossier; KYC drawn up in Zurich and proofread by the defendant; application for insurance contract with G., signed in Zurich; bank documents Bank D. for external asset managers; documents on the person and

their business; insurance contract G.; account statements of Bank D. Zurich, addressed to B. AG Zurich (USB stick BA 07.02.0014, File 29).

1.1.2.2.3.2 "reduced files":

- B. AG (only files 70 and 109): for example R. (inactive since 2010): Note on disclosure; KYC B. AG; asset management order in favor of B. AG; KYC and client opening documents of Bank S. and Bank P.; order for bank storage and copy to B. AG; client contract and bank opening documents (USB stick BA 07.02.0013, File 70).

- G.: for example T. (inactive since 2012; 216 pages): Reference to participation in the disclosure program; MEMO KYC created in Zurich; foundation documents; KYC structure chart for Bank AA. account and KYC for the foundation created by the defendant; insurance documents; account opening documents Bank BB.; copies of the documents in each case also sent to B. AG in Zurich (USB stick BA 07.02.0014, File 41).

1.1.2.2.3.3 In this respect, it should be noted in any case: This is identifying data from Classified Information III; sufficient information originating from Switzerland is available for tax proceedings in all four constellations. This also results from a detailed evaluation by the Appeals Division, which was submitted to the defendant, according to which the bank documents of 32 clients were to be stored exclusively in Switzerland in accordance with the instructions, and in any case also in Switzerland for 74 clients. Only for 3 clients were the bank documents to be stored exclusively abroad (CAR pag. 8.402.145 et seqq.).

1.1.2.2.4 Subsequently, on November 21, 2013, the defendant flew to New York and personally delivered the USB stick to his American lawyers with the instruction to submit it to the DOJ (BA pag. 12.01.0009, para. 24-29). He confirmed the handover immediately afterwards by e-mail (TPF I pag. 7.521.060). This procedure is confirmed by the attorneys in a statement, with the clarification that the two USB sticks were handed over to the law firm in New York, forwarded by them to the Washington office and then handed over to the DOJ on December 6, 2013 ("hand delivered", TPF I pag. 7 521 009).

1.1.2.2.5 In May 2014, following negotiations between the US attorneys and the DOJ, an NPA was signed (BA pag. 05.00.0026). The restitution payment of USD 3,500,000 based on this was approved by the judge (BA pag. 05.00.0014 - 0024). The court documents show that B. AG was assessed as a group and that the voluntary disclosure, the extraordinary cooperation and the voluntary adjustment of the business were decisive for the non-prosecution of B. AG and the three subsidiaries. According to the defendant, B. AG earned a gross amount of approx. 15 million with these transactions in the years 2002 to 2012 (CAR pag. 8.402.019, para. 37 et seqq.).

1.1.2.2.6 The Statement of Facts on which the NPA was based (BA pag. 05.00.0033 et seqq.) shows - in agreement with the defendant's statements - the tax-relevant business model:

1.1.2.2.6.1 At the time of the events, B. AG was not only the Group company that offered asset management services, but also the parent company of G. in the Cayman Islands and H. in the Principality of Liechtenstein (see statements of the defendant BA pag. 13.01.005 para. 28 et seqq. with reference to BA pag. 13.01.0024, BA pag. 13.01.0011 para. 4 et seq, TPF I pag. 7.930.002 para. 31 et seqq., TPF I pag. 7.930.004 para. 43 et seq., TPF I pag. 7.930.005 para. 1 et seqq. and 11 et seqq.; see also the presentation E., TPF I pag. 7.521 045 and 017-019).

1.1.2.2.6.2 In addition to asset management, the US tax subjects were also offered opportunities for concealment, either by interposing "sham foundations" or "sham entities" or by taking out life insurance policies whose (cover) accounts were managed by B. AG or another asset manager (BA pag. 13.01.0007, para. 13 et seqq.).

1.1.3 Subsumption

1.1.3.1 The court of first instance made a binding decision regarding the compilation of the files that this was not already done with contingent intent with regard to the handover to the American authorities (above E. I. 3.11.6; cf. in any case the presentation of B. AG, TPF I pag. 7.521.041). The court of appeal is bound by this. The only thing to be assessed is therefore the handover of the compiled customer files to the American authorities.

1.1.3.2 The files submitted contain only documents relating to clients of the B. AG Group that are potentially relevant under tax law; the PDF files were deliberately compiled with this focus in mind. These are clearly identifying documents relating to third parties, which B. AG would not have been able to dispose of freely within the framework of domestic proceedings. This applies in particular to the customer's bank documents, which were made available by B. AG as part of the contractual relationship. Copies of these were originally provided to B. AG as asset manager in Switzerland by the banks. The bank documents, like the corresponding assets, were only entrusted to B. AG under clear contractual conditions. It was therefore not a matter of handing over own documents, which is often considered admissible in the doctrine. The transfer to the US authorities also entailed the risk of (criminal) tax proceedings for the clients. As a result, the second criterion required by the relevant doctrine for the non-punishable disclosure of data - the exclusive use in one's own proceedings - is also not fulfilled.

The surrender thus fulfills the element of the offence of carrying out acts that are the responsibility of an authority or a public official (Art. 271 no. 1 para. 1 🔲 **StGB**).

1.1.3.3 This is not altered by the fact that the US authorities allegedly already had the information to a large extent (TPF II pag. 8.731.005, para. 39 et seqq.). They certainly did not have all the names of the persons concerned or all the information, such that the US authorities should in any case have made a request (cf. the explanations above, E. II. 1.1.2.1.4 - 1.1.2.1.6, regarding requests for legal and administrative assistance or the DOJ's "preferred solution"). This assessment is additionally supported by the fact that the DOJ qualified the contribution of B. AG as "extraordinary" (BA pag. 05.00.0036 et

seq.).

In such a constellation, the Swiss authorities could therefore have decided which documents were to be handed over to the US authorities and under what conditions, in particular the specialty reservation. The clients concerned would also have been granted procedural rights. The DOJ was aware that, in the context of a request, there was a risk that only the dossiers falling under "fraud and the like", but not those of "ordinary" tax evaders, would have been available to the US authorities at relatively short notice (statement by B. AG, BA pag. 15.01.0097). It also follows from this that the act was carried out in the interest of the foreign authority, which honored it in the NPA, insofar as the contribution of B. AG - as already mentioned - was qualified as "extraordinary" (BA pag. 05.00.0036 et seq.).

This also fulfills the element of the offence of acting "for a foreign state" (Art. 271 no. 1 para. 1 🔲 **StGB**).

1.1.3.4 By submitting the files and thus circumventing administrative assistance, the defendant has in effect carried out an act of mutual legal assistance or official act reserved for the Swiss authorities. This was done in favor of a foreign authority. The journey began in Switzerland with the aim of handing over the files to the US authorities, which means that the offense as a whole also has the necessary internal connection (on Swiss territory). The defendant also acted without state authorization (see below, E. 1.1.3.5.2 and E. 1.1.3.5.3 on this and on the question of any consent).

1.1.3.5 Arguments of the defendant

1.1.3.5.1 The defendant claims, as he did before the lower court (TPF I pag. 7.521.004; TPF II pag. 8.721.019 et seq, para. 9-36) that the files were also available abroad (Principality of Liechtenstein) in accordance with their intended purpose and were therefore available; there is therefore no circumvention of Swiss legal or administrative assistance (see CAR pag. 8.300.006 et seqq., N 16 et seqq.). In doing so, he refers in particular to the doctrine of Graf (loc. cit., p. 169 et seqq.). For the following legal considerations, it can be left open whether all files would have been available abroad - which is already questionable due to the necessity of collecting the data in advance.

1.1.3.5.1.1 The doctrine cited with regard to publication refers primarily and fundamentally to the constellation in which the data is supplied from abroad (see Graf, loc. cit., p. 179, para. 3.2: "Relocation of the entire act" abroad). However, this was not the case here, as the data was compiled in Switzerland and then handed over to the DOJ from there.

1.1.3.5.1.2 Equating this constellation (see TPF I pag. 7.925.041, N 51 *in fine*; CAR pag. 8.300.007 et seqq., N 20 et seqq.) - which the doctrine does in general and without giving reasons (Graf, loc. cit, p. 179 para. 3.2) - with the alternative delivery from Switzerland fails to recognize in the present case that a data delivery from the other two jurisdictions concerned (Principality of Liechtenstein and Cayman Islands) would not have been possible without a request from the authorities. This is clear from the documents submitted on the amendment of the Tax Administrative Assistance Act, according to which, in the Principality of Liechtenstein, unnamed taxpayers are now also permitted in so-called group requests for the release of bank files (TPF II pag. 8.721.001 et seqq.; 007), as well as from the presentation made by B. AG to the US authorities, according to which such requests had already been prepared for the two jurisdictions (TPF I pag. 7.521.041 et seq.). These documents were also subsequently handed over to the DOJ without a request for administrative or judicial assistance (CAR pag. 8.402.010, paras. 21-23).

1.1.3.5.1.3 The constellation to be assessed thus illustrates that the doctrine cited, which concludes that the data is available in two countries and that there is an alternative way of entering the data without penalty, has not analyzed this to the last detail.

- If legal or administrative assistance is necessary for the transfer of files in each country - which is the rule - the proposed solution would result in files always being handed over from one of the countries concerned, bypassing all applicable rules.

- Particularly in this day and age of global data storage, this would leave any legal protection of individuals ensured by legal and administrative assistance laws to private autonomy.

1.1.3.5.1.4 The reference to the legal information provided by the Federal Office of Justice (FOJ) in an allegedly comparable case (TPF I pag. 7.925.001) is then not relevant. The crucial difference is that the files in that case were already located in the United States, i.e. in the territory of the authority to which the data was to be handed over after analysis in Switzerland. Nor can the order of the Federal Department of Justice and Police (FDJP) oEr the Federal Office of Justice (FOJ) (VPB 2016 No. 3, pag. 32 et seqq.; cited in Graf, loc. cit., p. 181 et seq. and footnote 108) be used, since on the one hand it concerned the disclosure of internal group information, the "third parties" were group companies and, in addition, an agreement was reached in the English proceedings of the parties, which prevented its use in other proceedings. As explained, this does not apply in the present constellation in two respects: On the one hand, the third parties were clients, and on the other hand, the use of the documents concerning them in their tax proceedings was to be classified as realistic (see above in particular E. II. 1.1.2.1.1 et seqq., 1.1.2.2.3.3, 1.1.3.2 et seq.). In this regard, the doctrine (CR CP, Fischer/Richa, Art. 271 🔲 **StGB** N 25) rightly states that submissions are admissible in own proceedings, but not in those of third parties.

1.1.3.5.1.5 The other doctrinal opinions cited refer to the gathering of evidence (Rosenthal/Jöhri, Handkommentar [Handwritten comments] DSG (*Datenschutzgesetz* [Data Protection Act]) (, Art. 271 🔲 **StGB** N 35: "... can be accessed abroad in the context of the specific collection of evidence"), and the statements are also made in the context of the question of the territorial applicability of the StGB (Rosenthal/Jöhri, loc. cit, Art. 271 🔲 **StGB** N 35 in conjunction with 36 - gl. M. PK StGB, Trechsel/Vest, Art. 271 StGB, 3rd ed. 2018, Trechsel/Vest, Art. 271 StGB N 3). This doctrine is therefore unhelpful in the present

context, since data collection as such was not punished (see above E. II. 1.1.3.1) and there is a significant difference between data collection, in which the information remains in one and the same secret area, and disclosure, which puts an end to this protection (area) (see Pieth, Wirtschaftsstrafrecht [Commercial Criminal Law], 270).

1.1.3.5.1.6 Similarly, the doctrine of Fischer/Richa, (loc. cit. [above, E. II. 1.1.1.4], N 128, 176) does not justify a different result. First of all, the authors state that the person should be careful with regard to any third-party interests and their protection, and also point out significant differences between civil and criminal proceedings in the context of a publication interpreted under civil law (Fischer/Richa, loc. cit. [above, E. II. 1.1.1.4], N 140). The same authors also state in a later commentary that the submission is admissible in own but not in third-party proceedings (CR CP, Fischer/Richa, Art. 271 ⊡ **StGB** N 25).

1.1.3.5.2 With reference to the doctrinal opinions that make such a distinction, the defendant argues in the alternative that the voluntary nature of the submission means that criminal liability does not apply, whereby the consent of the data subjects is asserted with regard to the third-party identifying data (TPF I pag. 7.925.030, paras. 12-16 and paras. 54-66; TPF II pag. 8.721.028 et seq, para. 37 and 48; CAR pag. 8.300.012 et seqq., N 36 et seqq.).

1.1.3.5.2.1 The voluntary nature of the submission is upheld by the DOJ (TPF I pag. 7.925.031 et seq.). Based on the indictment (TPF I pag. 7.100.002, para. 1), it must remain open whether a submission in the context of a negotiation for an NPA can still be considered voluntary, or whether the criterion of voluntariness in such a situation would stand up to a critical assessment (cf. BA pag. 15.01.0096: submission of B. AG regarding the consequences of a refusal to hand over data; critical of the distinction: Graf, loc. cit, p. 183, para. 3.4 *in fine*). This is not least due to the clear statements of the defendant, who has repeatedly pointed out the consequences of a failure to submit ("obstruction of justice"/"constraint") (CAR pag. 8.402.006, para. 29-34 and 009, para. 5-10).

1.1.3.5.2.2 The question of voluntariness in such contexts also does not require an answer in the present case, since even doctrines that want to apply voluntariness as a criterion excluding the offense limit this to constellations in which no third-party data is disclosed (see above E. II. 1.1.1.4). The criticism that the substantive distinction between own and third-party data cannot be understood, as the law on mutual assistance does not make a distinction either (TPF I pag. 7.925.046, with reference to Graf, loc. cit, p. 184) disregards the specialty proviso and the case law on the right of appeal in mutual assistance proceedings, particularly in the present context (cf. BSK StGB, 3rd ed. 2013, Hussmann, Art. 271 ⊡ **StGB** N 32; above E. II. 1.1.1.4).

1.1.3.5.2.3 The disclosure of own data in which only own interests exist generally does not require any special legal protection, since, for example, in the case of mutual legal assistance pursuant to Art. 80c ⊡ of the Federal Act on International Mutual Assistance in Criminal Matters (Mutual Assistance Act, **IRSG**; *SR* 351.1), the consent of the sole authorized party would enable the disclosure. However, this is precisely not the case if third parties can rely on the rule of law in Switzerland. Accordingly, contrary to the defendant's view (TPF I pag. 7.925.042 et seqq., para. 56 et seqq.), the doctrine rightly sets a limit where the submission of third-party data is concerned: i.e. in case of doubt, in particular where the requested information concerns third parties or documents which can be used as incriminating material in parallel or subsequent proceedings (bypassing international mutual legal assistance), which was evidently the objective in the present case.

1.1.3.5.2.4 The defendant claims that the third parties, i.e. the customers, impliedly consented to the surrender (TPF pag. 7.925.048, para. 76 et seq.). In doing so, he relies on a doctrinal opinion regarding the disclosure of employee interrogations (Claudia M. Fritsche, Interne Untersuchungen in der Schweiz: ein Handbuch für regulierte Finanzinstitute und andere Unternehmen [Internal investigations in Switzerland: a handbook for regulated financial institutions and other companies], 2013, pp. 243 et seq.), while with regard to the case of "waivers" he refers to a doctrinal opinion by Hussmann (BSK StGB, 4th ed. 2018, Markus Hussmann, Art. 271 ⊡ **StGB** N 45 *in fine*).

- Criminal law has developed clear rules for consent. These are to be applied - even if one assumes, as the defendant apparently implicitly does, that there is a feature that excludes the facts (cf. CAR pag. 8.300.014 et seqq., N 42 et seqq.); if not directly, then at least by analogy. Consent can only be given for criminal offenses that exclusively protect individual legal interests (BSK StGB, 4th ed. 2018, Marcel Alexander Niggli/Carola Göhlich, before Art. 14 ⊡ **StGB** N 24). The consenting party must be aware of the scope of the waiver declared in the face of the act in question and this must be free of any lack of intent. This requires comprehensive information. The exclusion of wrongdoing then only extends as far as the consent was given (BGE *100 IV 155* E 4; niggli/göhlich, loc. cit., before Art. 14 ⊡ **StGB**, N 40). It therefore follows that, even if one were to assume the possibility of justifiable consent despite the non-individual legal interest protected - for which the doctrine gives good reasons (cf. also E. II.1.1.1.1 in fine above) - this is obviously not the case for several reasons.

- In principle, such consent cannot be given implicitly ("waiver") due to the interests involved, also due to the analogy with the rules of mutual legal assistance. But even if such a conclusion were admissible, the text of the letter to the customers concerned (cf. above, E. II. 1.1.2.1.3) does not allow such a conclusion in the case of silence. On the contrary, an objective reader may rely on the fact that his customer data would be handed over, if necessary, within the framework of the possible legal and administrative assistance requests mentioned, in conjunction with the application of the relevant legal norms. Implied consent would therefore at best have an effect limited to acquiescence in legal assistance.

- From the statements of the defendant (see CAR pag. 8.402.003, para. 6-21 and 8.402.006 para. 29-34) it then follows: If further information was provided to customers, this would mean that taking legal action in the United States would be qualified as an "obstruction of justice", which would have serious consequences. In this respect, as

already explained (see above, E. II. 1.1.1.4), the voluntary nature of any consent can be doubted in such a constellation. If clients were referred to lawyers, they were their own lawyers or US lawyers (see CAR pag. 8.402.006, para. 46 - pag. 8.402.007, para. 22). Even taking into account this additional information, which was not verifiably documented, no information was provided regarding the rights that were waived with the consent. Accordingly, the requirements for valid consent are not met. The personal contacts asserted during the hearing - which were allegedly also documented by notes - do not change this, as the voluntary disclosure was urged on this occasion. However, this loses its added value if the documents were submitted by B. AG (see CAR pag. 8.402.003, para. 36-39).

- Finally, it is clear from the files that even if one were to assume such implicit justifying consent in the present case, at least 31 clients did not cooperate on the basis of B. AG's submission - which was read and approved by the defendant (CAR pag. 8.402.019, para. 6-18) - and therefore even explicitly denied consent (BA pag. 15.01.100, N 15.2).

1.1.3.5.3 Finally, the defendant complains of a violation of the principle of indictment. Nowhere does the indictment claim that the release of the data was subject to authorization because the data also contained identifying information about third parties or employees. The indictment only accuses the defendant of disclosing customer data without authorization. However, the disclosure of customer data is not even authorized under Art. 271 🔲 **StGB** at all (see TPF II pag. 8.721.029 et seq., para. 42 et seqq.; CAR pag. 8.300.014, N 42). Nowhere in the indictment is it stated that even one of the 109 customers did not agree with the data delivery. It would therefore be blatantly contrary to the principle of indictment if anything other than the customer's consent were assumed (CAR pag. 8.300.014, N 44; cf. also CAR pag. 8.300.016, N 47).

1.1.3.5.3.1 The facts described in the indictment are binding on the court. The legal assessment, on the other hand, can be made freely (indictment principle or immutability principle, Art. 9 🔲 in conjunction with Art. 350 para. 1 🔲 **StPO**). If the court considers a legal qualification that differs from that of the public prosecutor, it must, on the basis of the principle of the right to be heard, inform the parties present and give them the opportunity to comment (Art. 344 🔲 **StPO**; Daniel Jositsch, Grundriss des schweizerischen Strafprozessrechts, 3rd ed. 2017, p. 200 et seqq. N 527 and 531).

1.1.3.5.3.2 In the present case, it must first be established that the defendant did not raise a preliminary objection to the indictment at either of the two first-instance hearings (Art. 339 para. 2 letter a 🔲) (TPF I pag. 7.920.002; TPF II 8.720.002).

1.1.3.5.3.3 The indictment (TPF I pag. 7.100.001 et seqq.) accuses the defendant of having handed over "Reduced" and "Full files" to the DOJ, listing all 109 clients, in each case with an indication of which category of documents was handed over. According to the indictment, the client data included the KYC, bank documents and custody account statements. Finally, the accusation is made that the handover took place without the consent of the Finance Department. The subsumed facts are thus clearly and sufficiently defined, which means that the purpose of the indictment is sufficiently fulfilled in legal terms - the defendant knew what the accusation involved. The fact that the transfer of third-party information was only one - albeit the essential - part of this does not change this.

1.1.3.5.3.4 The argument of the defense that the disclosure of client data under Art. 271 🔲 **StGB** cannot be approved at all (TPF II pag. 8.721.029, para. 43) does not appear to be valid and cannot justify a violation of the accusation principle. In this respect, the defense refers to E. 4.2.6 of the judgment *SK.2017.64* of May 9, 2018 (TPF I pag. 7.970.013) and the Federal Council's model ruling of July 3, 2013, dispositive no. 1.2 mentioned therein (see also no. II. 2 of the guidelines for this ruling):

https://www.newsd.admin.ch/newsd/message/attachments/31820.pdf).

Pursuant to Art. 271 para. 1 para. 1 🔲 **StGB** the offense must be committed "without authorization". With the explicit inclusion of this requirement in the facts of the case, if a corresponding state permit is available, there is no longer a violation of the facts, or the norm is not formally violated in the first place. From a dogmatic point of view, it is therefore not a justification, but rather the exclusion of unlawfulness is shifted to the facts themselves. Legal doctrine assumes a broad concept of "authorization" and subordinates to it both individual case authorizations and general authorizations, or even all acts of legal and administrative assistance provided for or permitted under Swiss law (see BSK StGB, 3rd ed. 2013, Markus Husmann, Art. 271 🔲 **StGB** N 50 et seqq., with detailed references). The term "authorization" pursuant to Art. 271 para. 1 para. 1 🔲 **StGB** is therefore by no means limited to the aforementioned model decree issued by the Federal Council on July 3, 2013 or to a corresponding approval by the Federal Department of Finance. Even with regard to this model decree, it should also be noted that, according to its dispositive item. 1.2 Bank client data only (but nevertheless) based on a request pursuant to Art. 26 of the Agreement between the Swiss Confederation and the United States of America of October 2, 1996 on the avoidance of double taxation with respect to taxes on income (*SR* 0.672.933.61) and the Protocol of September 23, 2009 amending the Agreement (cf. *AS 2019 3145, 3143; BBI 2010 235,* 247) may be transmitted to the US authorities.

However, it is undisputed in the present case that the defendant - as stated in the indictment (TPF I pag. 7.100.003) - acted without authorization from the Swiss authorities, or did not even attempt to obtain a corresponding state permit. This is part of the facts to which the court is bound (Art. 9 para. 1 🔲 in conjunction with Art. 350 para. 1 🔲 **StPO**). Whether or not such state authorization would have been possible at all does not change the criminal liability of the conduct.

1.1.3.5.3.5 Insofar as the defendant argues that nowhere in the indictment is it stated that even one of the 109 clients did not consent to the data delivery; it would therefore be blatantly contrary to the principle of the indictment if anything other than the consent of the clients were assumed (CAR pag. 8.300.014, N 44; cf. also CAR pag. 8.300.016, N 47), the following should be noted:

It should be noted at the outset that a state "authorization" pursuant to Art. 271 No. 1 para. 1 **StGB** differs fundamentally from the "consent" of affected individuals or third parties (that acts are carried out pursuant to Art. 271 No. 1 para. 1 **StGB** ). As was explained (above, E. II. 1.1.3.5.3a), if there is a corresponding state "authorization", there is no need for the offence or the norm is not violated in the first place.

The latter is not the case with the "consent" of individuals in relation to Art. 271 no. 1 para. 1 **StGB** (contrary to the defendant, who apparently assumes that the customer's consent excludes the offense: see CAR pag. 8.300.014 et seqq., N 42 et seqq.). The question is only (but nevertheless) whether such "consent" of individuals is at all relevant under criminal law in the context of the offense of state security Art. 271 para. 1(1) **StGB** or is to be qualified as a justification in the sense of a justifying consent due to individual interests that are to be protected reflexively. However, this topic has essentially already been discussed in the comments on the "voluntariness of the submission" (see above, E. II. 1.1.3.5.2 - 1.1.3.5.2.4), to which reference can be made. The topic should be briefly returned to at the level of justification (cf. below, E. II. 1.3.3.).

However, any consent of the individuals (i.e. the customers), even if it were to be considered a justification, would by definition not be listed as a negative criterion in the indictment anyway.

1.1.3.5.4 Accordingly, there is no violation of the accusation principle or the principle of immutability from any point of view.

1.2 Subjective elements of the offense

The Federal Court has definitively answered this question and held with binding force for this court that the defendant acted with intent (judgment of the Federal Court *6B_804/2018*, E. 3.1.2 *in fine*; TPF II pag. 8.100.005). In addition, it should be pointed out once again that the defendant knew that not all of the client data expected by the DOJ would be released for legal and administrative reasons. The circumvention of the legal and administrative assistance route thus made sense (see above, E. II. 1.1.2.1.4 et seq., with explanations) - which additionally supports the Federal Court's finding that the defendant acted with intent.

1.3 Reasons for justification

1.3.1 State of emergency (Art. 17 and 18 **StGB**

)1.3.1.1 What all emergency provisions have in common is the requirement that a legal interest is exposed to an immediate danger that cannot be averted otherwise. However, the danger is only immediate at the last moment, before it might be too late to ward it off. This means that the danger is present or can only be safely averted at the moment (BSK StGB, 4th edition 2019, Marcel Alexander Niggli/Carola Göhlich, Art. 17 **StGB** N 14). A further postponement of the rescue operation would call the rescue operation into question (PK StGB, 3rd ed. 2018, Trechsel/Geth, Art. 17 **StGB** N 5, with further references). The subsidiarity of the defensive act applies absolutely - the danger must therefore not be avertable in any other way (Niggli/Göhlich, loc. cit., Art. 17 **StGB** N 16).

1.3.1.2 Also, what must be tolerated due to legality is not considered a danger. For example, the arrest of a third party by the police must be tolerated (BGE *98 IV 41*, E. 8a; Niggli/Göhlich, loc. cit., Art. 17 **StGB** N 12).

1.3.1.3 According to the defendant's statement, failure to disclose the client files would have resulted in a loss of trust and clients due to the foreseeable consequences, which would have had fatal consequences for B. AG (see TPF II pag. 8.731.004, para. 46 et seq. - pag. 8.731.005, para. 15). In general, he argues that criminal proceedings in the United States would probably have led to the company losing the trust of its customers and would therefore have been in a situation that could have threatened its existence. He himself had witnessed how one of the most reputable banks in Switzerland (Bank CC.) had gone under (TPF II pag. 8.731.004, para. 26 et seqq.).

1.3.1.4 When assessing these statements, it is noticeable that the private expert was apparently not informed in this regard, since - based on the information provided by B. AG - he only mentions the fines in the double-digit million range as threatening his existence (BA pag. 15.01.0036; cf. CAR pag. 8.402.013, para. 42 et seqq. and pag. 8.402.014, para. 1 et seq.). However, the defendant testified at the appeal hearing that he had assumed that Professor I., as an expert in the Swiss financial industry, knew very well that the main asset of a bank or asset management company was the trust of its clients, and that if this trust were to wane, it could threaten the existence of the bank or asset management company (see CAR pag. 8.402.013, para. 46 et seq. and pag. 8.402.014, para. 1 et seq.). The private expert should therefore have identified these aspects on his own initiative and, where appropriate, taken them into account. It is equally relevant that, according to lawyer DD. von E., no coercive measures were even threatened at any time (TPF I pag. 7.521.010 - Summary and Conclusion) and, according to statements by the defendant, no consequences were threatened by the US authorities in the event of non-disclosure (BA pag. 13.01.0010, para. 17-22).

1.3.1.5 It is therefore already questionable whether the existence-threatening consequence corresponded to a realistic assessment. In any case, the emergency privilege would fail due to immediacy. This would exist, if at all, with regard to the initiation of proceedings - which, however, according to doctrine and case law, does not constitute a danger within the meaning of the emergency provisions.

1.3.1.6 The justifying or guilt-excluding state of emergency would then also fail on the grounds of proportionality. If the expert, in addition to the interests of B. AG, also compares the public interest in the settlement of the tax issue only with the interests of the individuals affected by the disclosure (BA pag. 15.01.0036), he already fails to recognize that the emergency norms are applicable to individual goods (Trechsel/Geth, loc. cit, Art. 17 **StGB** N 4), which excludes the invocation of common goods. He also fails to mention that Art. 271 **StGB** protects the state's interests in complying with the rules on legal assistance and secrecy, and thus not individual interests but public

interests associated with them (see above E. II. 1.1.1.1).

### 1.3.2 Mistake as to the wrongful nature of an act (Art. 21 🔳 **StGB**)

The Federal Court has excluded a possible mistake as to the wrongful nature of the act as a ground for justification, as it was avoidable (judgment of the FSC *6B_804/2018*, E. 3.3 *in fine*). Due to the prohibition of *reformatio in peius* (Art. 391 para. 2 🔳 **StPO**), the Court of Appeal is bound by the lower court's finding that an error existed, which must be taken into account to mitigate the penalty (TPF II pag. 8.930.017, E. 3.1.3).

### 1.3.3 Justifiable consent

Art. 271 🔳 **StGB** is intended to prevent the exercise of foreign state authority on Swiss territory and to protect the state monopoly of power and Swiss sovereignty (judgment of the Federal Supreme Court *6B_402/2008* of 6 November 2008, E. 2.3.2). Due to these protected legal interests, the Federal Court has ruled that the justifiable consent of private legal entities (e.g. customers) to a violation of Art. 271 🔳 **StGB** is generally out of the question. Nevertheless, good reasons could also be given for the possibility of a corresponding justifying consent (see above, E. II. 1.1.1.1 *in fine* and Art. 80c 🔳 Federal Act on International Legal Assistance in Criminal Matters [Legal Assistance Act, **IRSG**, *SR* 351.1]). However, we will not go into this in detail here. In the specific constellation at hand, the defendant obviously cannot rely on the fact that the customers ("either expressly or at least impliedly", see CAR pag. 8.300.014, N 44) consented to the disclosure of the customer data for several reasons. This issue has already been dealt with exhaustively in the examination of the objective facts (see above, E. 1.1.3.5.2.4), to which reference can be made. There is therefore no longer any scope for the justification of consent in the present case.

### 1.4 In summary, there is no justification.

### 1.5 The defendant has thus committed prohibited acts for a foreign state within the meaning of Art. 271 para. 1 para. 1 🔳 **StGB**

## 2. Sentencing

### 2.1

2.1.1 The court shall assess the sentence according to the culpability of the offender. It takes into account the previous life and personal circumstances as well as the effect of the sentence on the offender's life (Art. 47 para. 1 🔳 **StGB**). Fault is determined according to the severity of the violation or endangerment of the legal interest concerned, the reprehensibility of the act, the motives and objectives of the defendant and the extent to which the defendant was in a position to avoid the endangerment or violation under the internal and external circumstances (Art. 47 para. 2 🔳 **StGB**).

2.1.2 The concept of culpability within the meaning of Art. 47 🔳 **StGB** is central to sentencing and refers to the entire wrongfulness and culpability of the specific offense. The Federal Court has consistently distinguished between the offense and the perpetrator component. The elements of the offense include the extent of the culpable result, the manner in which this result was brought about, the intent with which the offender acted and his motives. The offender component comprises the previous life, personal circumstances and behavior after the offence and in criminal proceedings, such as remorse, insight and sensitivity to punishment (BGE *134 IV 17* E. 2.1 p. 19 et seq.; *129 IV 6* E. 6.1 p. 20 et seq.; BGE IV 101 E. 2 p. 103 et seqq.).

2.1.3 Pursuant to Art. 50 🔳 **StGB** the court shall, if it is required to give reasons for a judgment, record the circumstances relevant to the imposition of the sentence and their weighting. To assess the seriousness of the culpability, an overall assessment of the circumstances incriminating and exonerating the defendant is required (BGE *136 IV 55* E. 5.5 p. 59 et seq.). When weighting the individual components to be taken into account, the court has considerable discretion - within the ordinary or, if applicable, extraordinary penalty framework (BGE *136 IV 55* E. 5.6 p. 60 et seqq.; *135 IV 130* E. 5.3.1 p. 134 et seq.; judgment of the Federal Supreme Court *6B_1077/2014* of April 21, 2015 E. 4).

2.1.4 The penalty shall be calculated on the basis of the statutory penalty range. The penalty for the basic offense of Art. 271 🔳 **StGB** is a custodial sentence of up to 3 years or a monetary penalty.

### 2.2

2.2.1 In its judgment *6B_804/2018* of December 4, 2018 (E. 3.3, second to last sentence; TPF II pag. 8.100.007), the Federal Court bindingly determined that the defendant committed an avoidable mistake as to the wrongful nature of the act (Art. 21 🔳 sentence 2 **StGB**). Accordingly, in its judgment *SK.2018.71* of May 2, 2019 (E. 2.4.3.2, TPF II 8.930.015 et seq.), the Criminal Division of the Federal Criminal Court also assumed an avoidable mistake as to the wrongful nature of the act. This finding of the Federal Court (or the Criminal Division of the Federal Criminal Court) is also binding for the Appeals Division of the Federal Criminal Court.

2.2.2 In the event of an avoidable mistake as to the wrongful nature of the act, the court shall mitigate the sentence (Art. 21 🔳 sentence 2 **StGB**). The court is not bound by the threatened minimum sentence (Art. 48a para. 1 🔳 StGB) and it may impose a different type of sentence, but is bound by the statutory maximum and minimum sentence (Art. 48a para. 2 🔳 **StGB**).

In its judgment *SK.2018.71* the lower court made use of the aforementioned option under Art. 48a para. 2 🔳 **StGB** to impose a sentence other than the one threatened. In this respect, it decided to impose a fine and set the amount at CHF 10,000 and the corresponding alternative custodial sentence at 60 days (see E.3.3 - 3.4.2, TPF II 8.930.017 et seq.). Since the BA has not filed a cross-appeal, the principle of the prohibition of *reformatio in peius* (Art. 391 para. 2 🔳 ) applies. In sentencing, the Appeals

Division must therefore also take into account the fine of CHF 10,000 imposed by the court of first instance and the substitute custodial sentence of 60 days as a maximum (see above E. I. 4.1 and 4.2).

2.3

2.3.1 The following aspects should be mentioned as part of the factual component:

Given the historical context of the tax dispute between Switzerland and the United States, the defendant was in a delicate situation. He was also under considerable time pressure to find a solution (see CAR pag. 8.402.009, para. 5 et seqq.). These circumstances must be taken into account to reduce the debt. However, the defendant had partially maneuvered himself into a pressure situation (see CAR pag. 8.402.009, para. 5), and the conditions for a state of emergency pursuant to Art. 17 f 🔲 **StGB** were not met.

The defendant alternatively proposed to the DOJ to request the data through legal or administrative assistance channels and obtained legal information regarding the planned data delivery. It is therefore to his credit that he made a certain amount of effort to resolve the issue in accordance with the law, even if he was not entirely consistent in doing so. The defendant also assumed sole responsibility for his actions and protected his employees in terms of labor and criminal law, or rather he took them out of the DOJ's field of fire in this respect (see CAR pag. 8.200.006).

The defendant's fear of being arrested in the United States ("La Guardia Airport") and ending up in prison ("Rikers Island") (see CAR pag. 8.402.006, para. 23 et seqq.) is understandable and also reduces his culpability. On the other hand, the fact that the defendant created a risk for his customers must be taken into account as a counterbalance; he was clearly aware of what the transfer of identifying third-party data could trigger (see also CAR pag. 8.402.18, para. 33 et seq.).

It must also be taken into account that the defendant, indirectly as co-owner of B. AG, was able to achieve considerable savings at the expense of the customer (data), or was able to partially buy his way out of the DOJ (greatly reduced restitution payment, see CAR pag. 8.402.019, para. 43-45).

Overall, the interference with Switzerland's sovereignty by the defendant's conduct (type and amount of data provided to the DOJ) does not appear to be serious. This was also due to the fact that the defendant had made an effort to inform the affected customers about the planned procedure. The fact that, based on the evaluation, 106 instead of 109 customers are affected (cf. CAR pag. 8.402.145 et seqq.) - which corresponds to a reduction of less than 3% - is not capable of bringing about an additional reduction in the penalty. This must be taken into account when determining the specific amount of the fine (see below E. II. 2.4.2).

By contrast, the fact that the defendant acted on the basis of an avoidable mistake as to the wrongful nature of the act (Art. 21 🔲 sentence 2 **StGB**) must be taken into account to mitigate the sentence.

2.3.2 The following should be noted with regard to the offender component:

The defendant has cooperated with the authorities in the present criminal proceedings, which must be taken into account to reduce the sentence. He has no criminal record (CAR pag. 6.302.017); this has a neutral effect. The defendant is not particularly sensitive to punishment. The fact that a conviction represents a new burden for the defendant and "the entire company" (cf. CAR pag. 8.200.006) cannot justify a reduction in sentence in the present case. Apart from this, there are no other elements that increase or reduce the sentence with regard to the offender component.

2.3.3 Taking into account all the above sentencing criteria, the defendant's culpability must be classified as slight.

2.4

2.4.1 The range of penalties for the imposition of a fine is CHF 1 - 10,000 (see Art. 106 para. 1 🔲 ). The court shall assess the fine according to the circumstances of the offender in such a way that the offender suffers the penalty that is appropriate to his culpability (Art. 106 para. 3 🔲 ). The amount of the fine is still primarily determined by fault and secondarily by financial circumstances (BSK StGB I, 4th ed. 2018, Stefan Heimgartner, N. 19 to Art. 106 🔲 ).

2.4.2 According to the defendant's statement, his personal and financial circumstances have not changed since the judgment of the lower instance *SK.2018.71* of May 2, 2019 (see CAR pag. 8.402.002 margin no. 10). It is undisputed that the defendant lives in very good financial circumstances. He earns an annual income of approx. CHF 2 million and has taxable assets of (at least) over CHF 40 million; he has no support obligations (see TPF I pag. 7.930.3; TPF II pag 8.731.2, 8.930.017 E. 3.3.2; CAR pag. 6.302.003 et seqq., 6.302.010 et seqq.).

In view of these factors, a fine of CHF 10,000, as imposed by the lower court, appears appropriate and must therefore be upheld in this amount. The fact that 106 instead of 109 customers are affected due to the evaluation (cf. CAR pag. 8.402.145 et seq., or E. II. 2.3.1 above) does not justify a reduction of the fine, especially as the penalty has already been mitigated (see Art. 21 🔲 sentence 2 and Art. 48a 🔲 **StGB**; E. II. 2.2.2. and 2.3.1 above).

2.5

2.5.1 In the event that the fine is culpably not paid, the court shall impose a substitute custodial sentence of at least one day and at most three months (Art. 106 para. 3 🔲 **StGB**). The law is silent on how the court should calculate the substitute custodial sentence. The court must bear in mind that any substitute custodial sentence should be

imposed on the offender regardless of his financial circumstances and in accordance with his culpability. Financially strong and financially weak convicts should be deprived of their liberty for the same offense for the same length of time. In contrast to the daily rate system, however, the court does not first have to abstractly calculate the duration appropriate to the offense in the form of a number of daily rates. Due to the system, after calculating the fine, it is necessary to clarify the extent to which the offender's financial circumstances have influenced the amount of the fine. Subsequently, a substitute custodial sentence must be imposed in accordance with the elements of the offense and the other elements of the offense (see Heimgartner, loc. cit. [above E. II. 2.4.1], N. 10 to Art. 106 **StGB**).

2.5.2 The defendant's excellent financial circumstances had a considerable influence on the amount of the fine. Accordingly, it would not be justified to make full use of the penalty range provided for the alternative custodial sentence in the same way as the fine. A substitute custodial sentence of 60 days, as determined by the lower court, appears appropriate to the degree of culpability and is not objectionable (see Art. 82 para. 4 **StPO**).

3. Costs and compensation

3.1 Costs of proceedings

3.1.1 The accused person shall bear the costs of proceedings if they are convicted (Art. 426 para. 1 **StPO**). The costs of the appeal proceedings shall be borne by the parties in proportion to whether they win or lose (Art. 428 para. 1 sentence 1 **StPO**). If the appellate instance itself issues a new decision, it shall also decide on the cost regulation issued by the lower instance (Art. 428 para. 3 **StPO**).

The Federal Criminal Court shall issue regulations governing (a) the calculation of procedural costs; (b) the fees; (c) the compensation paid to parties, the official defense, free legal assistance, experts and witnesses (Art. 73 Abs. 1 **StBOG** [*SR* 173.71]). The fee is based on the scope and difficulty of the case, the nature of the proceedings and the financial situation of the parties as well as the costs incurred by the law firm (Art. 73 para. 2 **StBOG**; see Art. 5 Regulations of the Federal Criminal Court of August 31, 2010 on costs, fees and compensation in federal criminal proceedings [**BStKR**; *SR* 173.713.162]). A fee range of CHF 200 - 100,000 applies for each of the following procedures: a. Preliminary proceedings; b Proceedings at first instance; c. Appeal procedure (Art. 73 para. 3 **StBOG**; cf. Art. 6 - 7bis **BStKR**).

The procedural costs include the fees and expenses (Art. 1 para. 1 BStKR). The fees are due for the procedural acts carried out or ordered by the Federal Criminal Police and the Office of the Attorney General in preliminary proceedings, by the Criminal Division in first-instance main proceedings, by the Appeals Division in appeal and revision proceedings and by the Appeals Division in appeal proceedings pursuant to Art. 37 **StBOG** (Art. 1 para. 2 **BStKR**). The expenses include the amounts paid in advance by the Confederation, in particular the costs of the official defense and free representation, translations, expert opinions, participation of other authorities, postage, telephone expenses and other corresponding costs (Art. 1 para. 3 **BStKr**). Flat-rate fees may be provided for simple cases, which also cover expenses (Art. 1 para. 4 **BStKR**). The expenses shall be determined in accordance with the amounts charged to or paid by the Confederation (Art. 9 para. 1 **BStKR**).

3.1.2 In the present case, the appellate instance itself issues a new decision. Since the guilty verdict in the first instance is upheld, the costs ordered by the lower court must also be upheld (see Art. 428 para. 3 **StPO**).

3.1.3 In the present case, the costs of the appeal proceedings consist of a court fee which, in light of the principles mentioned above (see E. II. 3.11 para. 2 above), amounts to CHF 9,000 (including expenses; see Art. 73 para. 1 letter a and b and para. 3 letter c **StBOG**; Art. 1 , 5 , 7b and 9 **BStKR**) and is to be borne by the defendant in accordance with the original provisions.

3.2 Party compensation

No party compensation is awarded (Art. 429 para. 1 **StPO** *e contrario*).

The Appeals Division recognizes:

I. The defendant's appeal of June 4, 2019 against the judgment of the Criminal Division of the Federal Criminal Court *SK.2018.71* of May 2, 2019 is dismissed.

II. The judgment of the Criminal Division of the Federal Criminal Court *SK.2018.71* of May 2, 2019 is upheld. The corresponding dispositive judgment reads as follows:

"1. A. is found guilty of committing a prohibited act for a foreign state within the meaning of Art. 271 para. 1 para. 1 **StGB**

2. A. is punished with a fine of CHF 10,000 and, in the event of culpable non-payment, with 60 days' imprisonment.

3. The Canton of Zurich is declared responsible for the execution of the sentence.

4. The procedural costs of CHF 6,100 (incl. court fee of CHF 3,000) are imposed on A.

5. A. is not entitled to compensation.

6. B. AG's motion for compensation is not granted."

III. Costs

1. The court fee for the appeal proceedings of CHF 9,000 (incl. expenses) is imposed on the defendant (Art. 428 para. 1 in conjunction with Art. 422 and

424 **StPO** [*SR* 312.0]; Art. 73 para. 1 letter a and b and para. 3 letter
c **StBOG** [*SR* 173.71] in conjunction with. Art. 1, 5, 7b und
9 **BStKR** [*SR* 173.713.162]).

2. No party compensation is awarded (Art. 429 para. 1 StPO *e contrario*).

On behalf of the Appeals Division

of the Federal Criminal Court

The Presiding Judge The Clerk

Service on (court document):

- Office of the Attorney General of Switzerland, Mr. Carlo Bulletti, Senior Federal Public
Prosecutor

- Attorney Lorenz Erni

To be notified to:

- Criminal Division of the Federal Criminal Court (*brevi manu*)

- Office of the Attorney General (for execution)

Right of appeal

Appeal to the Federal Court

This judgment may be appealed to the Federal Court in criminal matters within 30 days
of notification of the complete copy. The right of appeal and the other admissibility
requirements are regulated in Art. 78 -81 and 90 et seqq. of the Federal Act on
the Federal Court of June 17, 2005 (**BGG**). The reasoned notice of appeal must be
submitted to the Federal Court, 1000 Lausanne 14.

Shipping: January 20, 2020


**TRANSPERFECT**

I, Andrew Griffin, hereby certify that I am competent to translate from German to English and that the attached translations are, to the best of my knowledge and belief, a true and accurate translation of the documents entitled below from German to English.

- Swiss Federal Criminal Court, Case Reference CA.2019.6 of December 5, 2019

_____
Andrew Griffin

Sworn to before me this

_11_ day of _August_ 20_24_

_____
Signature, Notary Public

SEE ATTACHED K·J
8-11-2024

_____
Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _August 11, 2021_ before me, Khalid Oudah Shahwan, a Notary Public
<span style="display:block; text-align:center">(Here insert name and title of the officer)</span>

personally appeared _Andrew Griffin_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

(Notary Seal)

> KHALID OUDAH SHAHWAN
> NOTARY PUBLIC - CALIFORNIA
> LOS ANGELES COUNTY
> COMMISSION # 2350307
> MY COMM. EXPIRES MARCH 5, 2025

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER

☐ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

# EXHIBIT F

# Data processing by the employer

What are the requirements that employers must meet when processing personal data?



⌄ [Frequently asked questions (selected examples)](#)

## Legal basis

[Code of Obligations of 30 March 1911 (CO)](#)
[Recruitment Act (available in German, French and Italian)](#)

[Recruitment Ordinance (available in German, French and Italian)](#)

## Different phases of the employment relationship

What data are employers allowed to use? What do they have to do?

**In employment relationships governed by private law, the employer is required to process a large amount of personal data of his employees, including sensitive data and employee profiles during the various stages of the employer-employee relationship. However, the employer must protect and respect the personality rights of his employees.**

While the employer is primarily responsible for data protection in the workplace, employees or future employees can also ensure that their data is processed properly and deleted within the prescribed period. Data processing must be carried out within reasonable limits and be proportionate to the purpose. Since the relationship of trust between employer and employee determines the quality of the work done in the company, it is essential that the employer always informs employees precisely of their rights and of the data processing carried out.

In accordance with Article 328 paragraph 1 of the Swiss Code of Obligations (CO), within the employment relationship, the employer must acknowledge and safeguard the employee's personality rights. This provision entails a general duty of assistance on the part of the employer towards its employees, an obligation which is the counterpart of the duty of loyalty assigned to the employee in Article 321a CO. The employer must avoid any infringement of the employee's personality rights that is not justified by the employment contract. Article 328b CO complements the Data Protection Act (FADP) in that it determines the nature of the information that the employer is entitled to process about its employees. In accordance with Article 328b, an employer may handle data concerning an employee only to the extent that such data concern the employee's suitability for the job or are necessary for the performance of the employment contract. This article, which applies specifically to employment contracts, specifies the general principles of data processing, including the principle of proportionality. Under no circumstances may Article 328b CO be derogated from to the detriment of the employee, even if the latter consents (Art. 362 CO).

Outside the framework of Article 328b CO, the processing of data by the employer must be justified for other reasons (such as the consent of the employee, by an overriding private or public interest, or by law, see Art. 31 FADP. However, employees are very rarely in a position to freely give, refuse or revoke their consent, given the subordinate nature of the employer/employee relationship). Employers must also comply with the general principles of data protection so as not to violate the personality rights of their employees (Art. 30 FADP) and expose themselves to legal action (Art. 32 FADP) or, in certain circumstances, to an investigation by the FDPIC (Art. 49 FADP), not to mention other legal remedies provided for in specific legislation (Art. 179ss Criminal Code, Art. 59 EmpA). The court decides in the individual case whether or not the data processing is justified.

Otherwise, the provisions of the Data Protection Act (FADP) apply. The processing of data by private employers is governed mainly by the general principles defined in this area (Art. 6 to 8 FADP), by the provisions on the right to information (Art. 25 and 26 FADP) and by the provisions on the processing of personal data by private persons (Art. 30 et seq. FADP).

The FADP also imposes other obligations on employers in certain circumstances (e.g. Art. 12 FADP: obligation to maintain an inventory of processing activities; Art. 14: obligation to appoint a representative in Switzerland when the private controller has its registered office or domicile abroad; Art. 19 to 21: Duty to provide information when collecting personal data and in the case of automated individual decisions; Art. 22: obligation to carry out a personal data protection impact assessment where the processing operation is likely to result in a high risk to the personality or fundamental rights of the person whose data is processed (the data subject); Art. 24: obligation to report data security breaches).

Employment agencies and service providers are subject to the requirements of the Recruitment Act (RecA) and the related ordinance (RecO), in particular Articles 19 and 47 RecO.

## Frequently asked questions (selected examples)

Transferring personal data abroad

Many employers decide to have their employees' personal data processed abroad to save on costs or for organisational reasons. Data are considered to have been transferred abroad when they have been made accessible to a company or unit based abroad or when they are hosted in a cloud located abroad. According to the FDPIC, employers are responsible for ensuring that the transfer of personal data abroad is permitted . They must also provide full internal information on the transfer of data abroad as well as on the specific data processing carried out abroad and its purposes. This information includes which country the data is exported to and which companies it is transmitted to, as well as the evaluations that are carried out and the purpose behind them. A civil court may be required to decide in specific cases whether the transfer of data is lawful and whether appropriate information has been provided to the people whose data is being processed (data subjects).

cross-border transfer of personal data

Health issues

When recruiting employees, employers are only permitted to ask about the applicant's qualifications or other significant facts relevant to how well they can perform the tasks set out in the employment contract. Employers are not allowed to enquire about an applicant's general health; however, they can ask for a medical report on the applicant's fitness for the job in question. Prior illnesses, surgeries and hospital stays are only relevant in this context if they would have an impact on the applicant's suitability for the position being filled.

The same applies to any benefits or pensions that the applicant has received due to illness, provided that the associated illness does not affect the applicant's ability to perform their new job. The employer can require a medical examination under certain circumstances, for example in occupations where health problems may present significant safety or other risks. In such cases, the doctor is responsible for determining whether the applicant's current or prior illnesses, including any treatments they are currently receiving or have received in the past, are compatible with the job they are applying for. The doctor performing the medical examination is bound by doctor–patient confidentiality. This means that they are only allowed to inform the employer of results that are relevant to the candidate's suitability for the position being filled. They cannot disclose any other information about the candidate's medical history. This rule also applies when the medical examination is carried out by the company's in-house doctor. The doctor's opinion on fitness for work, including any reservations they may have, is then given to the employer for inclusion in the employee's personal file. The medical file, however, remains with the doctor.

## Using fingerprints to monitor access and working time

Biometric systems to record working time and to control system access are becoming increasingly common in some sectors. Sensitive data such as fingerprints should only be used after careful consideration and in an appropriately restricted fashion. Some widely used biometric systems that record working time, control system access and manage tills require employees to identify themselves using their fingerprints. Employees are sometimes required to consent to their fingerprints being recorded in order to conclude or continue an employment contract. Fingerprints and other biometric data are inherently tied to a person and cannot simply be changed if lost. Heightened security requirements therefore apply to the processing of these sensitive personal data. In particular, they may only be processed if the processing is necessary for the intended purpose. In order to prevent unauthorised third-party access to employees' biometric data, the data must not be stored centrally on a server. Instead, it should only be stored on a local medium, e.g. a badge, which must be read at the same time as the fingerprints. It is recommended that only a single fingerprint be processed (rather than the complete set of fingerprints) in line with the principle of proportionality. It would be advisable to offer employees alternatives to biometric methods of recording working time, in order to preserve their freedom of choice. It is primarily a matter of employment law whether an employer is allowed to require an employee to provide fingerprints in order to be hired. Individual employees can go to court to challenge the introduction of biometric time recording systems.

## Remote working

Employment law defines the conditions that allow for employees to work remotely. Remote working nevertheless raises a number of important issues relating to data protection, for example regarding the use of digital communication technologies for conference calls and videoconferencing, as well as the use of data exchange platforms. Employee obligations may change occasionally, but the employer remains responsible for information security and data

protection, even in times of crisis, and is therefore bound by the data processing principles set out in the FADP. This includes the obligation to choose software that adequately guarantees the security of the personal data being processed. The Commissioner is aware that there are IT solutions that enable employers to constantly monitor the behaviour of employees who are working remotely. However, this is generally not permitted under the FADP and furthermore is expressly forbidden under employment law. Finally, the question arises as to whether there is disclosure of data abroad if the employee is working remotely from outside of the country and accesses the company's server in Switzerland from their location abroad, for example in holiday accommodation or, in the case of cross-border commuters, at home. This does not constitute transborder data disclosure within the meaning of the FADP as long as the employee uses a virtual private network (VPN) to access the company's server while abroad, processes the personal data only to the extent that they would normally do so in the company's offices and, most importantly, does not make the data accessible to anyone abroad. The confidentiality of personal data must always be guaranteed, whether employees are working remotely from abroad or in Switzerland.

### Extracts from the debt enforcement register and the criminal records register

In line with the data protection principles, employers can request extracts from the debt enforcement register and the criminal records register only if the employee will be working in a position of trust, or carrying out duties such as managing customer accounts or operating tills or safes. This includes roles in which employees are in contact with or responsible for valuable goods or large sums of money. In these cases, the security of the company takes precedence over the interest in protecting privacy.There is no legitimate interest worthy of protection that would justify a systematic review of an employee's credit rating or whether they have a criminal record.

If extracts from the debt enforcement or criminal records registers contain sensitive data, the data protection principles must be followed strictly. Employers must provide the person concerned with clear and complete information about the data that has been collected and grant them the right to access the data. There must be effective protection from unauthorised data access, the number of parties given authorised access must be restricted as much as possible, and the data must be destroyed as soon as it is no longer required.

### Publishing photos of employees on the intranet or internet

Publishing photos of employees on the company's intranet or on the internet requires the consent of the persons concerned, as a photograph can in some cases be used to determine information about the subject, such as a person's religion or race, or whether they have a physical impairment. Often the publication of photographs serves no practical purpose, especially photos taken at events organised by the employer such as drinks receptions and excursions. It is advisable to first consider whether there is any benefit in publishing employee photos.

### Using artificial intelligence in recruitment

Recruitment processes increasingly involve artificial intelligence. For example, artificial intelligence helps to select applications, while job interviews are recorded on video and then analysed by software. Similarly, in today's workplace automated behaviour and voice analyses are increasingly used in online application processes to draw up detailed profiles. This requires a higher level of data protection. Candidates and recruiters alike have questions about the permitted use of behaviour and voice analysis and the associated legal requirements. The data protection framework that applies to traditional recruitment procedures also applies to these new instruments. Employers may only collect and process the data that is necessary to determine a person's suitability for a particular job, and they must always respect the principles set out in the legislation on data protection. In addition, the vast possibilities of AI-based analyses generally allow for more serious violations of personality rights than conventional job interviews. The principles of recognisability and proportionality must be given particular attention in this context.

## Access to employees' emails

The question of when employers can have access to employees' emails raises a number of issues for both employees and employers. It is not always easy to draw a line between the legitimate interests of employers and the privacy of their employees.

## Recording conversations

Anyone who unlawfully records a conversation may be in violation of the Data Protection Act (DPA), not to mention the Criminal Code (SCC).

## Video surveillance in the workplace

Video surveillance systems can affect the well-being, mental health and productivity of employees, and should therefore only be considered when less invasive measures are genuinely unsuitable.

## Telephone monitoring in the workplace

There are many questions about telephone monitoring in the workplace, and in particular when monitoring is allowed.



## Questions on data protection

Take a look at our FAQ or call our hotline.



## The main provisions

Here you can find out more about changes to the Data Protection Act, which came into force on 1 September 2023.



## Contact



## Infocenter

Here you can download all documents sorted by topics.

✉ Webmaster

Last modification 23.07.2024

https://www.edoeb.admin.ch/content/edoeb/en/home/datenschutz/arbeit_wirtschaft/datenbearbeitung-arbeitgeber.html

# EXHIBIT G


| | |
|---|---|
| Document | **ZBJV 159/2023 p. 760** |
| Author | **Felix Bommer** |
| Title | **The case law of the Federal Court on substantive criminal law in 2022** |
| Review of judgment | **BGE (*Bundesgerichtsentscheid* [Swiss Federal Court Decision]) 148 IV 247, BGE 148 IV 281, BGE 148 IV 393, BGE 148 IV 66, BGE 148 IV 30, BGE 148 IV 292, BGE 148 II 182, BGE 148 IV 1, BGE 148 IV 398, BGE 148 IV 346, BGE 148 I 116, BGE 148 IV 57, BGE 148 IV 39, BGE 148 IV 188, BGE 148 IV 96, BGE 148 IV 409, BGE 148 IV 234, BGE 148 IV 288, BGE 148 IV 170, BGE 148 IV 329, BGE 148 IV 298, BGE 148 IV 113, BGE 148 IV 385** |
| Pages | **760-786** |
| Publication | **Journal of the Bernese Lawyers' Association** |
| Publishers | **Jörg Schmid, Frederic Krauskopf** |
| Former publishers | **Heinz Hausheer, Sibylle Hofer** |
| ISSN | **0044-2127** |
| Publisher | **Stämpfli Verlag AG** |

# The case law of the Federal Court on substantive criminal law in 2022

## Published in volume 148

Prof. Dr. iur. Felix Bommer, Zurich*

ZBJV (*Zeitschrift des Bernischen Juristenvereins* [Journal of the Bernese Lawyers' Association]) 159/2023 p. 760, 762

## I. Criminal Code

## A. General provisions (Art. 1-110 StGB (*Strafgesetzbuch* [Criminal Code]))

## 1. Place of commission in the case of attempted incitement (Art. 8 para. 2 and Art. 24 para. 2 StGB): BGE 148 IV 385

Criminal jurisdiction is always a talking point in participation cases. In BGE 144 IV 265 the Federal Court held, against extensive criticism in the literature, that an act of participation committed in Switzerland with a subsequent main offense committed abroad (i.e. in the case of successful participation) does not establish Swiss criminal jurisdiction for the act of participation. This was a rare opportunity to take a stand on another sensitive issue of the so-called criminal application law (Art. 3-8 StGB). If the act of participation committed in Switzerland fails and the main offense to be committed abroad is not carried out: Does the act of participation then fall under Swiss criminal jurisdiction? The question only arises in the case of unsuccessful incitement to commit a crime because, due to the principle of limited accessoriness, all other forms of unsuccessful participation (attempted incitement to commit misdemeanors and infringements as well as attempted aiding and abetting of any criminal offense) are in any case exempt from punishment. However, this was the issue in the present case: The man convicted by the higher court had tried

---

* I would like to thank BLaw Rachel Gerny for her meticulous corrections.

to get a perpetrator to kill two other people (and himself) in Germany, which did not happen.

According to the grammatical interpretation, the attempt to incite can be classified as having been committed at the place where it was carried out (Art. 8 para. 2 StGB). The investigation into the history of its origins does not lead to any (further) conclusion. From a systematic point of view, an independent connection to the place of the attempted persuasion would be consistent with the national rules on jurisdiction: According to the consensus view, cantonal jurisdiction for attempted incitement is determined in accordance with Art. 31 Paragraph 1 StPO, i.e. by the canton in which it was committed, not by where the main offense was supposed to have been committed. In addition, the Federal Court finds confirmation for this solution in the consideration that in cases of unsuccessful participation there is a lack of any accessoriness and the injustice can be derived solely from the instigator behavior. Finally, the legal policy argument is put forward that Swiss criminal sovereignty is also appropriate in such cases to avoid negative conflicts of jurisdiction (which presupposes that one would otherwise arise, which in turn depends on the national law under which the main offense was supposed to be have been committed). The decisive argument is probably the last one mentioned (dissenting Payer, crimen.ch, November 17, 2022; ibid., Territorialität und grenzüberschreitende Tatbeteiligung [Territoriality and cross-border involvement], Zurich 2021, 87 et seq.): There is no injustice that can be derived from a main offense because no such offense exists. The argument of (actual) accessoriness does not work precisely because the criminal liability of unsuccessful incitement does not follow it; it is broken through, not realized. The legislature has declared the unsuccessful incitement to be an independent injustice in Art. 24 Paragraph 2 StGB ; it refers to the main crime that was not committed, only with regard to its potential injustice and its scope of punishment. Assenting (also) Villard, FP 2023, 217 et seqq., 220.

How this solution can be reconciled with BGE 144 IV 265 would, however, need to be clarified in more detail. In any case, the finding that in the event of successful incitement, i.e. if the killings had been committed in Germany, Swiss criminal jurisdiction would no longer apply according to the practice mentioned above, is somewhat thought-provoking. Expressed on a timeline: As long as the instigator in Switzerland influences the designated main perpetrator without having already provoked his decision to commit the crime, his

actions fall under Swiss criminal jurisdiction. However, as soon as the offender prepares to take action in Germany (attempt), Swiss criminal jurisdiction ceases to apply.

## 2. Sentencing, calculation of the VAT fine in the case of multiple offenses; aggravation and cumulation principle (Art. 49 StGB; Art. 101 para. 1, 4 and 5 MWSTG *(Mehrwertsteuergesetz* [VAT Act]); Art. 9 VStrR (*Verwaltungsstrafrecht* [Administrative criminal law])): BGE 148 IV 96

"It gets expensive in secondary criminal law", one is inclined to say in view of a fine of CHF 4 million (!) for multiple evasion of the import tax owed under MWSTG (Art. 96 para. 4 letter a MWSTG) . Although the Zurich Superior Court reduced it to 2.5 million, it was not upheld by the Federal Court. The difficulties arise from the complicated relationship between the penalty provisions of the MWSTG, the VStrR and the StGB. When several similar penalties (for one or more acts) coincide, the general rule is that the court sentences the offender to the penalty for the most serious offense and increases it appropriately (Art. 49 para. 1 StGB, aggravation principle). However, Art. 9 VStrR makes an exception for fines; they should be able to be imposed cumulatively within the scope of application of administrative criminal law. In turn, Art. 101 para. 1 MWSTG provides for an exception to this exception, and this counter-exception leads back to the general rule: "The explicit exclusion of Art. 9 VStrR in Art. 101 para. 1 MWSTG leads in principle to the applicability of the aggravation principle enshrined in Art. 49 StGB (p. 106 E. 4.5.2). However, this should only apply to the two groups of cases regulated in Art. 101 para. 4 and 5 MWSTG (evasion of import tax and exportation of other offences against a federal tax decree to be assessed by the BAZG (*Bundesamt für Zoll und Grenzsicherheit* [Federal Office for Customs and Border Security]), provided there is ideal competition; several penalties within the area of responsibility of the ESTV (*Eidgenössische Steuerverwaltung* [Federal Tax Administration]), whereby the former is decisive for the present context: Because it restricts aggravation to cases of ideal competition, the Federal Court concludes that the exclusion of the exclusion of Art. 49 StGB does not apply in the remaining area, i.e. that the principle of cumulation applies in cases of real competition. Dissenting Note Holenstein, ASA 90, 773 et seq.

### 3. Outpatient and inpatient therapeutic measure; motion for subsequent order of custody due to futility of inpatient therapeutic measure and motion for original custody due to new offense; unification of proceedings; jurisdiction; principle of strict formality (Art. 59 para. 1 and 4, Art. 62a para. 1 letter b, Art. 62c para. 1 letter a, para. 3 and 4, Art. 63 para. 1, 63 para. 2 and 3, 63b para. 5 and Art. 64 para. 1 StGB; Art. 2 para. 2, Art. 29 et seq, Art. 80 para. 1, Art. 197 para. 1 letter a, Art. 393 and Art. 398 para. 1-3 StPO; Art. 31 para. 1 and Art. 36 para. 1 BV): BGE 148 IV 1

A case with a convoluted procedural and appellate history, which is only reproduced here to the extent necessary to understand the unanswered questions. A previous conviction of the complainant by a higher court for rape (Art. 190 StGB) ( (Art. 187 StGB) resulted in a five-year prison sentence. Its execution was postponed in favor of a measure under Art. 59 StGB . The court of first instance extended this measure by five years at the request of the competent authorities. The higher court appealed by the person concerned instead ordered an outpatient measure (Art. 59 in conjunction with Art. 63 StGB), combined with probation assistance. The enforcement authority did not accept this and revoked the original higher court measure in accordance with Art. 59 StGB and applied to the court of first instance for an order for custody in accordance with Art. 62c para. 4 StGB. No decision was made on this, and two years later the enforcement authority doubled down, revoked the outpatient measure ordered by the superior court and again demanded custody (based on what remains unclear). Shortly afterwards, a new indictment was issued for various sexual offenses, combined with an application for unification of proceedings and custody under Art. 64 StGB. In a separate decision, the court of first instance combined the main proceedings with the pending subsequent proceedings, convicted the appellant of, among other things, defilement (Art. 191 StGB) and dismissed the application for custody. Both sides appealed against this to the Criminal Division of the Superior Court, and the public prosecutor's office also appealed to the Appeals Division, in which it demanded custody. The Criminal Division

declared itself to have comprehensive jurisdiction, including the question of custody; As a result, the Board of Appeal wrote off the proceedings as irrelevant. The public prosecutor's criminal law appeal was directed against this decision, while the appellant argued that the Criminal Division was only responsible for reviewing the (public prosecutor's) application for custody in the main proceedings, while the Appeals Division was responsible for reviewing the application for subsequent custody submitted by the enforcement authorities. The Federal Court uses the confusing procedural situation for a few clarifications:

(1) There is no legally prescribed path that would lead directly from outpatient treatment that has been discontinued due to futility to custody (cf. Art. 63b para. 5 StGB); this had already been stated with the desirable clarity in BGE 143 IV 445.

(2) If an appellate court (i.e. the Superior Court) has to decide on the extension of an inpatient therapeutic measure, the subject matter of the proceedings is limited to this. It cannot order an outpatient measure, as the Superior Court had done, because this presupposes, in the absence of any prospect of success, the prior revocation of the inpatient measure, and the enforcement authority is responsible for this (at least in the cantons of German-speaking Switzerland) (Art. 62c para. 1 letter a StGB). The jurisdiction to order the legal consequences *after* termination of the inpatient therapeutic measure lies with the court of first instance (see BGE 145 IV 167, 172 E. 1.3; on the two models prevailing in Switzerland Bommer, ZBJV 156 [2020] 507 et seqq.)). However, the (legally erroneous) order for the outpatient measure has become legally binding (and not void), which is why it could be revoked by the enforcement authority (see above). This cleared the way for the motion for subsequent custody in accordance with Art. 62c para. 4 StGB. This competes with the motion for ordinary custody in the newly raised criminal proceedings. This is a "special case" not regulated by law (p. 11 E. 3.4.4) of the competition between a measure procedure and a discovery procedure.

(3) The Federal Court precedes the resolution of this conflict with detailed and fundamental considerations on formal strictness (p. 12 et seqq. E. 3.5.1). Of course, they are not relevant

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 100 of 171



to the decision if they are not intended to prevent judicial gaps from being filled and the unregulated question is rather to be answered using the traditional methods of interpreting the law. As a result, the Federal Court protects the unification of proceedings because the same issue is at stake both times: Whether the requirements of a sufficiently poor legal prognosis for custody are met. This means that the court of first instance and the criminal division of the superior court of second instance have jurisdiction, not the appeal division. This solution also makes it possible to review the question of whether an offense giving rise to custody exists at all in the new proceedings.

## 4. Placement of a person subject to a measure in a penal or custodial institution (Art. 59 StGB; Art. 31 para. 1 BV; Art. 5 no. 1 ECHR): BGE 148 I 116

Art. 372 para. 1 StGB obliges the cantons to enforce the judgments of their courts. This requires sufficient facilities with the appropriate institutions, especially those for carrying out inpatient therapeutic measures. Although their shortage has decreased significantly over the last ten years, there are still individual cases of waiting times that threaten to undermine the purpose of the measure. In each case, they are first committed to a penal institution. Art. 59 Para. 3 Sentence 2 StGB even legalizes this procedure "provided that the necessary therapeutic treatment is guaranteed by specialist staff" (which is rarely the case and Switzerland has entered a conviction for violating Art. 5 Para. 1 ECHR, ECHR, Kadusic vs. Switzerland, January 9, 2018, No. 43977/13). It is against this background that the situation underlying the decision must be assessed, namely that no such treatment is ensured and a person subject to a measure is nevertheless placed in a prison due to a lack of space. The Federal Court allows this (only) "as a short-term bridging of an emergency situation" (p. 119 E. 2.3) and, in doing so, crucially depends on the circumstances of the individual case, which makes the formulation of *general* requirements difficult. The intensity of the official efforts and any personal difficulties faced by the person admitted, such as those of a linguistic nature or refusal of therapy or aggressive behavior, must be

taken into account. A look at our own practice reveals more than ten months in prison, which have been approved by the highest courts, in different circumstances and for different reasons. However, the nine-month delay in this particular case was too long: The required Switzerland-wide (not only intra-concordat) search for a suitable place was neither demonstrated, nor were there any individual reasons on the part of the person to be committed that would have precluded a more expedient procedure, and temporary efforts to provide adequate treatment in the emergency setting of the penal system apparently did not take place either. Finally, it is important to consider that placement in a penal institution may be disproportionately long even if the penal authorities make sustained efforts to accommodate the offender. It is based on the concordat and cantonal enforcement planning (on the current situation Brägger, NKrim 1/2022, 48 et seqq.) and can refer to Art. 62c para. 1 letter c StGB: A measure must be revoked if a suitable facility does not exist or no longer exists.

## 5. No order of custody for violations of Art. 2 para. 1 of the Al-Qaida/IS [Islamic State] Act of December 12, 2014 (now repealed, formerly SR 122; Art. 64 para. 1 StGB): BGE 148 IV 398

Custody under Art. 64 para. 1 StGB requires a catalog offense or another "offense punishable by a maximum sentence of five or more years". This would include Art. 2 para. 1 of the Al-Qaida/IS Act itself (criminal liability for participation in and support of the organizations). However, it is also required that the offender has seriously impaired the physical, psychological or sexual integrity of another person through the offense or intended to do so. The Federal Court has already stated in BGE 139 IV 57 that the commission of a (catalogue) offense alone is not sufficient for ordering custody because it is only intended for crimes that are serious in terms of the facts *and consequences*. This does not include the act of Art. 2 para. 1 of the Al-Qaida/IS Act. The decision goes into great detail to justify its decision: The Federal Council had refused to introduce so-called secure accommodation for dangerous people in the federal law on police measures to combat terrorism of September 25, 2020 (AS 2021 565 p. 27; AS 2022 300 p. 1),

which has now come into force, including with the argument that purely preventive custody is not permissible under the title of custody in such cases (BBI 2019 4770). Nor is it appropriate from the point of view of proportionality to classify the participation variant as

justifying custody. We can only agree with this, given the prevailing doctrine, and one can even make it easier for oneself in the justification: "Anyone who participates in a group or organization prohibited under Article 1 on Swiss territory, provides it with personnel or material support, organizes propaganda campaigns for it or its objectives, recruits for it or promotes its activities in any other way" does not impair the physical, psychological or sexual integrity of another person, and certainly not "seriously". He commits an abstract dangerous offense which, by definition, does not result in any danger or injury. Assenting also Lubishtani/Payer, crimen.ch, October 18, 2022.

## 6. External work placement (Art. 77a StGB): BGE 148 IV 292

The work experience represents the third stage in the typical development plan of an executed prison sentence (and not an execution modality that could already be ordered at the beginning). It presupposes that "the prisoner has served part of the prison sentence, usually at least half, and is not expected to escape or commit further crimes" (paragraph 1). In addition, the law provides for a prior stay "of reasonable duration" in an open facility (para. 2), but only "as a rule". For example, a person sentenced to five and a half years' imprisonment for property offenses was able to obtain a work placement without going through the regular prison system. He had served more than half of his sentence in pre-trial custody and after his release had spent several years in freedom without complaint (which was the special feature of the case). Grammatically, the Federal Court bases the exception on the "as a rule" formula in para. 2. There are two considerations here: On the one hand, the stay in an open institution serves to clarify whether the prisoner is able to cope in a more freely managed setting; he has proven this through his legal behavior in freedom. On the other hand, it is recognized that the final stage of the execution of a prison sentence, conditional release, can even be undertaken

**ZBJV 159/2023 S. 760, 770**

from pre-trial custody; This must apply all the more to the preceding phase of the external work placement. Assenting also Brägger, FP 2023, 138 et seqq.

## 7. Use of the prisoner's wages without his consent; health costs not covered by health insurance (Art. 83 para. 2, 380 para. 2 letter a and para. 3 StGB): BGE 148 IV 346

Art. 83 para. 2 StGB provides for a division of the prisoner's wages into two parts: One part is freely available to him for the duration of his deprivation of liberty, while another may not be touched with a view to the time after his release (blocked account). The penitentiary concordat of Latin Switzerland and Vaud law also recognize a further category, the "*compte reserve*"; this is to be used for uncovered medical costs. This is what happened in the present case, in which the complainant was charged more than 2,000 francs, which he defended himself against. He did not find support in the federal court. Art. 83 para. 2 StGB is not an exhaustive regulation. The prisoner's contribution to the costs could therefore not only take the form of the reduced remuneration (Art. 83 para. 1, Art. 380 para. 2 letter a StGB), but further accounts serving specific cost-sharing purposes could be established, especially since the share attributable to them was only 20% (leaving 65% for free disposal and 15% for the blocked account) This is based on Art. 380 para. 3 StGB, according to which the cantons issue more detailed regulations on the cost sharing of the convicted person. However, this is only a competence norm, in parallel with Art. 19 V-StGB-MStG (competence of the cantons to determine the amount and use of remuneration), but in competition with Art. 387 para. 1 letter e StGB (competence of the Federal Council to issue more detailed regulations on the remuneration of prisoners). And for such an intervention in the property guarantee (Art. 26 BV), shouldn't at least the assessment bases be regulated in a formal law, not just in a Vaud regulations??

**ZBJV 159/2023 p. 760, 771**

## B. Special provisions (Art. 111-332 StGB)

## 1. Negligent homicide; breach of duty of care (Art. 117 StGB; Art. 26 para. 2 HMG): BGE 148 IV 39

A doctor had prescribed an antibiotic to a new patient, who obtained it from a pharmacy on the same day and took it. Shortly afterwards, she died as a result of anaphylactic shock triggered by a penicillin allergy. The doctor was acquitted of the charge of negligent homicide

(Art. 117 StGB) by the first two instances, and the Federal Court upheld the acquittal. The judgment focuses on the question of the medical duty of care (Art. 12 para. 3 StGB). The starting point for its more detailed definition is Art. 26 para. 2 HMG, according to which a medicinal product may only be prescribed if the patient's state of health is known. The law does not say what medical efforts are required to determine this. In this respect, only *lex artis* can help. It requires knowledge of the so-called vital data: health condition, allergies, drug intolerances and interaction potential with other active substances (p. 45 E. 2.4.1). During the initial anamnesis, the doctor had asked the patient about allergies, but her information proved to be inaccurate and she had not provided the documents he had "urgently" requested. In view of these circumstances, the doctor could not be accused of having violated Art. 26 para. 2 HMG especially as he was entitled to assume that the patient had an understanding without any indications to the contrary.

The considerations of the Federal Court are an example of the extent to which the question of a breach of the duty of care is a decision that is based on the individual case and cannot be reliably predicted, even where the degree of care to be applied is specified in positive law as in Art. 26 para. 2 TPA. This is not affected by the fact that the denial of a breach of duty of care can be well understood. The only somewhat irritating aspect is the comments on the breach of professional secrecy, which are not relevant to the decision (synopsis and p. 47 et seq. E. 2.4.3). And the fact that the doctor has a guarantor position towards their patient (p. 49) is as true as it is meaningless in this case: The accusation was based on an action, the dispensing of the drug without additional clarification, not on an omission. Or to put it another way: Failure to

exercise *due care* and failure to act as required should not be confused.

## 2. Receiving stolen goods, competition with incitement to the predicate offense (Art. 24, 139 and 160 StGB): BGE 148 IV 393 (change in case law)

For almost 80 years (BGE 70 IV 63), the Federal Court maintained that the instigator of the offense of receiving stolen goods (here, as is often the case with theft, Art. 139 StGB) and subsequent receivers of stolen goods were to be held accountable for *both* offenses. This practice is now being abandoned: The incitement to commit the predicate offense is in unreal competition with subsequent receiving of stolen goods. In the case (large-scale inducement to steal cigarette cartons by employees of a gas station shop over a period of 18 months with an offense amounting to over 400,000 francs), the complainant was only convicted of inciting qualified theft (commercial and gang-related, today Art. 139 para. 3 letter a and b StGB), not also for receiving stolen goods for commercial purposes (Art. 160 Para. 2 StGB). In doing so, the Federal Court has followed through for this case constellation, which, after abandoning the theory of participation in guilt and turning to the aspect of participation in wrongdoing (BGE 100 IV 1), seems like a late conclusion: Because incitement derives its wrongfulness from the wrongfulness of the main offense, the instigator is fully liable for it and the principal offender cannot be the perpetrator of a subsequent receiving of stolen goods ("another"), the latter cannot be charged with aggravating the penalty. The *extent* of participation in the offense, on the other hand, which in this case appears to be greater than that of a "disinterested" incitement, may certainly be taken into account in the sentencing. Only in one point of the reasoning (not in the result) will the judgment have to be read with caution: The fact that the instigator "partecipa in modo sostanziale alla decisione, alla pianificazione e alla preparazione del reato" is precisely *not* true; it is limited to the (entirely self-serving) provocation of the decision to commit the offense. Otherwise, incitement can no longer be distinguished from (co-)perpetration.

## 3. Objective condition of criminal liability for bankruptcy offences; bankruptcy liquidation due to lack of organization (Art. 163-167 StGB; Art. 731b para. 1b para. 3 OR (*Obligationsrecht* [Code of Obligations])): BGE 148 IV 170 E. 3.4.8 et seq.

Criminal liability for a bankruptcy offense (Art. 163 et seqq. StGB) requires as an objective condition for criminal liability that bankruptcy proceedings have been opened. Whether this also includes the dissolution of the company and its liquidation in accordance with the provisions on bankruptcy (Art. 731b para. 1 no. 3 OR) has not yet been decided by the Federal Court. It answers the question in the negative, giving a detailed explanation of the history of the provision and its interpretation in the literature, mainly with the argument that dissolution does not constitute an actual reason for bankruptcy because it occurs independently of an impending insolvency, as is typical for bankruptcy offenses.


## 4. Defamation; statements made to a lawyer (Art. 173 et seqq. StGB): BGE 148 IV 409

The dispute over the construction and delivery of a catamaran once again occupied the Federal Court from the point of view of defamation (see BGE 145 IV 462 and Bommer, ZBJV 156 [2020] 520 et seq.). The customer had accused the contractor of committing criminal offenses (theft, fraud) to his lawyer, which had come to the contractor's attention in various ways. The decision adheres to the practice that in the context of confidential discussions between the client and their lawyer, the latter is to be viewed as a third party within the meaning of Art. 173 StGB . However, in order not to endanger unhindered communication between the two, a defamatory statement of fact should only be assumed if the statement has no connection with the transaction in question and only has the purpose of disparaging the injured party.

ZBJV 159/2023 p. 760, 774

## 5. Act of coercion as an element of sexual coercion and rape; principle of legality; consent and objection solution; international law provisions on sexual criminal law (Art. 189 and 190 StGB; Art. 3 and 8 ECHR; Art. 36 Istanbul Convention): BGE 148 IV 234

The offenses of sexual coercion and rape (Art. 189 et seq. StGB) protect the freedom to decide with whom someone wants to have sexual relations, when, under what conditions and how, in short: sexual self-determination. It is violated if the perpetrator removes the *actual* preconditions for this free decision, namely through physical (violence) or psychological (threat, pressure situation) coercion. It is the perpetrator's means of overriding the will of the victim. From the victim's point of view, these means reflect the reasons for tolerating or performing the sexual act even though she does not want it. This is the current legal situation. In this particular case, as a controversial assessment of the evidence revealed, the defendant had not used any of these means, such that the acquittal in the lower court remained in place. It is not quite clear whether the lack of consent of the complainant (private plaintiff) was to be assumed. Even if this were the case, according to the Federal Court, the accused would not have recognized this, such that criminal liability would not apply due to a lack of intent.

The complainant had also claimed that in view of the provisions of the Istanbul Convention, which requires the criminalization of any non-consensual sexual contact, and the practice of the ECHR, which has established identical penalties (described in detail in the judgment), Art. 189 et seq. StGB should be interpreted in this light and the use of a means of crime should be avoided. The Federal Court rightly rejects this request for two reasons: On the one hand, such requirements are addressed to the national legislator, not to the deciding court; it is left open whether Swiss law meets the requirements of the Istanbul Convention and the practice of the ECHR in this respect. On the other hand, this interpretation is simply contrary to Art. 1 StGB StGB: If the law requires the use of certain means, those who do not use them cannot be punished: the basics of the principle of legality.

ZBJV 159/2023 p. 760, 775

This legal situation will change. On June 16, 2023, the Federal Assembly revised Art. 189 and 190 StGB among other things (BBI (*Bundesblatt* [Federal Gazette]) 2023 1521, referendum deadline expired unused on October 5, 2023; entry into force currently still pending): The basic elements of the offense, insofar as they are of interest here, are now that the offender performs a sexual act or sexual intercourse "against the will of a person" (para. 1 in each case); the use of the means of the offense forms a first qualification (para. 2 in each case; see also the description in BGE 148 IV 329, 343 et seq., E. 5.4.1 et seq., see below).

## 6. Stealthing not a defilement (Art. 191 StGB): BGE 148 IV 329

The accused had removed the condom after consensual sexual intercourse had begun and continued it, although his partner had insisted on its use. In response to the charge of defilement (Art. 191 StGB), the two lower courts had reached an acquittal, which the Federal Court upheld. It assumes, in line with the prevailing opinion, a non-consensual sexual act, because consent to sexual intercourse can be subject to conditions, and if such conditions are "related to the legal interest", their absence renders them invalid. The use of a condom as such a condition has a

direct connection to sexual self-determination. However, there is no incapacity to resist, as required by Art. 191 StGB because this is only understood to mean a "permanent characteristic of the victim (child age, mental disability, etc.) or a temporary physical or cognitive impairment (due to sleep, intoxication, etc.)" (p. 341 E. 5.2). Defilement requires a physical incapacity to resist, not one caused by deception or error. Or to put it another way: Sexual intercourse obtained deceptively in this way is (currently) unpunishable. This finding is also an inevitable consequence of observing the principle of legality, without having to apply a (where does it come from?) principle of content that elements of the offense "must fundamentally be interpreted narrowly" (see p. 338). The aforementioned conduct will now be covered by Art. 190 para. 1 StGB because "continued sexual intercourse [is] no longer consensual" (p. 337 E. 4.3).

ZBJV 159/2023 p. 760, 776

## 7. Exploitation of the dependency of an inmate by a guardian (Art. 192 para. 1 StGB): BGE 148 IV 57

The offense of sexual acts with institutional inmates (Art. 192 StGB) requires that the perpetrator acts "by exploiting the dependency" of their protégé. So two things are needed: a relationship of dependency and its exploitation. Where none exists, the offense does not apply, and likewise where it exists but is not exploited. As clear as this is in theory, the practical difficulties encountered in establishing the dependency relationship are not small. Dependence refers to a one-sided (overly) intense bond between two people and cannot be proven directly. It can only be validly inferred from the circumstances of the offense, but these were clearly evident in the present case: For 16 years, the convicted man had been the preferred caregiver of the injured party, who suffered from multiple physical and mental disabilities with a moderate intellectual disability and lived in a residential group for people with cognitive disorders. What has just been said applies even more to the characteristic of exploitation. Whether this is the case can only be ascertained as the result of an attribution: that it is the dependency that induced the injured party to tolerate or perform the sexual acts. This leads to the question, which can only be answered speculatively, whether they would have occurred even without the inferiority (see p. 63 E. 3.5.3). However, there is no way around this difficulty if one does not want to criminalize any sexual act between two people of the type mentioned (as Art. 193 aStGB (*altes Strafgesetzbuch* [former Criminal Code]), the predecessor of Art. 192 StGB, did until thirty years ago). The Federal Court uses a rule of thumb: The more intense the dependency, the more likely it is to be exploited (p. 65). As plausible as this is, the answer is ultimately difficult to justify. At least "circumstantial evidence" can help, such as the fact that the initiative for the meetings and the sexual acts came from the perpetrator, not from the victim, and that he had imposed a vow of silence on her. Both of these factors spoke *in favor of* exploitation, such that the acquittal at first instance had to be set aside.

ZBJV 159/2023 p. 760, 777

## 8. Endangerment by explosives and toxic gases with criminal intent (Art. 224 para. 1 StGB): BGE 148 IV 247 (Change in case law)

It is a long-standing issue in the law of explosives offenses whether these require a common danger or merely an individual danger. The Federal Court had previously taken the second position and allowed the concrete endangerment of a specific person or of specific third-party property to suffice. It no longer adheres to this view: In a detailed examination of its previous practice and that of the cantonal higher courts, the Federal Criminal Court and the doctrine, it comes to the conclusion that the so-called representation theory captures the specific injustice of this type of offense more precisely (see Stratenwerth, Gemeingefährliche Straftaten, ZStrR 80 [Crimes dangerous to the public, Civil Criminal Law] [1964] 8 et seqq.). What is crucial is that the act puts *randomly selected* people or things in danger - those who, from the perpetrator's point of view, appear to be representatives of the general public. Viewed ex ante, this must always involve a potentially large number of goods at risk; Where only one person can be in danger from the outset, there is no common danger. Where this is the case, however, it does not apply if *as a result* only *one* person or object has been endangered. The beneficiary of this welcome change in case law was a defendant (acquitted in this respect by both lower courts) who had attached a firework rocket to a radar installation in the middle of the night and detonated it. Here only this one thing was at risk from the outset (and destroyed



after the deed was completed), which is why Art. 224 StGB had to be excluded. Assenting Knöpfli, Gefährdung durch Sprengstoffe und giftige Gase in verbrecherischer Absicht [Danger from explosives and toxic gases with criminal intent] (Art. 224 StGB), AJP 2023, 736 et seqq.

## 9. Forgery of documents; form with regard to the conclusion of a new rental agreement (Art. 251 no. 1, Art. 110 para. 4 StGB; Art. 269d, 270 para. 2 OR; Art. 19 para. 1 VMWG (*Verordnung über die Miete und Pacht von Wohn- und Geschäftsräumen* [Ordinance on the rent and leasing of residential and commercial premises])): BGE 148 IV 288

In the event of a housing shortage, the cantons may provide for the use of an official form for the conclusion of a new tenancy agreement (Art. 270 para. 2 OR). The content of this form is regulated

in detail in Art. 19 VMWG. In the case of rent increases, it must contain, among other things, the previous rent and the previous ancillary costs (letter a para. 1). The aim of this provision is to enable the new tenant to challenge the (initial) rent as abusive. The complainant had cited excessive amounts in this regard with the aim of not making the new rents and ancillary costs appear excessive. The Federal Court upholds his conviction for false certification. This can be based on the practice that the necessary generally valid objective guarantees, which determine the truth of the document, can be derived here as elsewhere from statutory provisions which are intended precisely to protect the addressees of the document. Assenting Montini, Droit du bail 2022, 91; Sommer, MietRecht Aktuell 2022, 164 et seqq.

## 10. Racial discrimination; incitement to hatred or discrimination; vilification or discrimination (Art. 261b para. 1 and para. 4 first sentence StGB): BGE 148 IV 113

As part of the 2018 cantonal elections, the Young SVP of the Canton of Bern published a post on its website and on Facebook recommending the election of corresponding candidates because they would seek to prevent planned transit sites for "foreign gypsies". This text was illustrated with a cartoon-like image, which is not printed in the judgment, but is described: a transit area for travelers with obviously smelly garbage and a slightly dark-skinned person defecating in the open. This central part of the picture was embedded in a background consisting of a village with a bell tower and a foreground consisting of a man with a disgusted expression on his face, wearing traditional costume and a cap with a Swiss cross, holding his nose. The following was there to read about: "Millions in costs for construction and maintenance, dirt, feces, noise, theft, etc. Against the will of the local population".

The Federal Court comprehensibly considers the term "foreign gypsies" with detailed justification as a term for a "majority of ethnic groups grouped together under a collective term, namely those of the Roma and Sinti" (p. 121 E. 4.5). However, the text mentioned at the beginning would not in itself be

racially discriminatory. However, this changes with his pictorial illustration: It conveys the message that those affected are "generally unhygienic, disgusting and criminal" (p. 124). This denigrates them as an ethnic group and portrays them as second-class human beings, and this is precisely the disparagement that violates human dignity, as required by paragraph 4. Freedom of expression (Art. 16 BV, Art. 10 ECHR) is not able to counter this, even if it must be given great weight, especially in the context of political disputes. However, it is not clear from the officially published excerpt of the judgment, but only from a reading of the complete version (unpubl. E. 6), why the synopsis also mentions paragraph 1 of Art. 261b StGB. It may therefore be left open here whether the post actually constitutes incitement to hatred or discrimination (see unpubl. E. 6.3). Assenting Barth, AJP 2022, 914 et seqq.

## 11. Racial discrimination; criminal liability of the owner of a social network account for racist comments published by third parties on his page (Art. 261b para. 1 and 4, 1 StGB): BGE 148 IV 188

The respondent had shared a newspaper article critical of Islam on his Facebook page and added his own commentary (neither of which was relevant under criminal law). As a result, numerous comments were received from various authors; some of them were convicted of racial discrimination (Art. 261-Abs. 1 StGB). The Neuchâtel public prosecutor's office also wanted to see the defendant punished because he had failed to remove such racially discriminatory comments from his "pinboard". The Federal Court explains in detail (15 pages) and accurately why

the acquittal verdicts of the two lower courts are correct. In a nutshell: because there is no provision in Swiss criminal law that provides for an obligation to monitor one's own Facebook page and to remove any illegal content.

However, the Federal Court does not appear to be fundamentally opposed to a position of guarantor based on ingerence: Third-party access to one's own Facebook page can be restricted. However,

the respondent did not do this, but rather granted everyone unrestricted access and also raised political issues of a sensitive nature, thus creating the risk that third parties would leave content that violated criminal law. He was only saved from a conviction by the fact that he had no knowledge of this content (p. 201 E. 3.5.1; thus already BGer, May 2, 2008, 6B 645/2007, E. 7.3.4.4.2).

Seen in the light of day, the permissible risk (referred to in the [French] judgment as "social adequacy", p. 199) is thus enriched with a subjective component, even more so: According to the Federal Court's opinion, the operator of a platform has a guarantor position based on ingerence (Art. 11 Para. 2 letter d StGB) and is liable to prosecution under Art. 261ᵇ StGB if he does not delete racially discriminatory content that is known to him or has become known to him. The fact that criminal liability for injunctive relief requires intentional acts does not result from the requirement of ingerence, but from the elements of the offense in Art. 261ᵇ StGB, which only covers such acts. There is more than a slight doubt that this practice, which is not decisive here, could be correct; it can only be hinted at: It is difficult to speak of a "danger" when operating a social media site, as is otherwise typical of ingerence. An operator would also have to maintain a whole army of staff to follow up on information about (actual or apparent) illegal content. Above all, however, the aspect of personal responsibility falls by the wayside; a sensible delimitation of areas of responsibility cannot ignore this. This is because anyone who operates a Facebook page that is accessible to everyone offers nothing more than the *opportunity* to commit a criminal offense. Finally: It is right to examine active involvement as well (p. 187 et seq. E. 3.6.); no one would doubt that an operator who collides with a racist is to be punished as an accomplice to racial discrimination. However, at least according to the prevailing view, this should be done *before* the injunction review, not after it (see p. 201 E. 3.5). But as stated: There is nothing wrong with the result.

## 12. Scope of application of aArt. (*alter Artikel* [former article]) 260ᵗᵉʳ StGB, of Art. 2 para. 1 of the Al-Qaida/IS Act of December 12, 2014 and of Art. 74 para. 4 NDG; compatibility of Art. 2 para. 1 of the Al-Qaeda/IS Act with the requirement of certainty; objective elements of the offense; mistake as to the wrongful nature of an act (Art. 21 StGB): BGE 148 IV 298

The complainant, who was subject to juvenile criminal law at the time of the offense, traveled with her brother from Switzerland to the IS territory in Syria. There she spent several months as a "guardian of home and hearth" in the life of IS, which supported her financially. This adventure lasted from an unspecified date after December 18, 2014 (flight to Istanbul, entry to Syria undetermined) until December 17, 2015, when she managed to flee Syria. At second instance, the complainant was charged with violating Art. 2 para. 1 and 2 in conjunction with Art. 1 letter Art. 1 letter b of the Federal Act of December 12, 2014 on the Prohibition of the Groups "Al-Qaeda" and "Islamic State" and Related Organizations (Al-Qaeda/IS Act; now repealed, formerly SR 122) and sentenced to a conditional prison sentence of ten months (Art. 25 para. 1 JStG). The Federal Court supports this conviction against various objections. What is wrong is that the relevant law was not yet in force at the time of entry. Even if this were correct (time of entry open, see above), the relevant acts of support took place in 2015 and the law came into force at the beginning of 2015 by (valid) emergency legislation. The Federal Court left open whether Art. 260ᵃ StGB (in the version valid until the end of June 2021 with a maximum prison sentence of five years) was also fulfilled (p. 308 E. 4.1). Nor does Art. 74 para. 4 NDG (SR 121) take precedence over Art. 2 of the Al-Qaida/IS Act as a more lenient law: On the contrary, this provision is designed as a successor provision to the Emergency Powers Act, which expired at the end of 2022, and requires the Federal Council to issue a general administrative decree regarding the ban on Al-Qaida and IS, which was (only) issued on October 19, 2022 (BBl 2022 2548). It does not contradict the requirement of certainty if Art. 2 of the Al-Qaida/IS law suffices to describe the activities of the criminal organizations mentioned (as which they are classified in constant practice [Art. 260ᵗᵉʳ StGB], cf. only p. 303 E. 6.2.2 and BGE 145 IV 470, 474 E. 4.4.1) "in

a different way", even if this general clause is "in a certain tension" with Art. 1 StGB (p. 310 E. 7.2). However, this was not relevant because the complainant's actions constituted personal support for the organization, as explicitly stated in Art. 2 para. 1 of the Al-Qaida/IS Law; direct support for violent crimes is not necessary for this. Finally, the objection of a mistake as to the wrongful nature of the act did not apply either (Art. 21 StGB in conjunction with Art. 1 para. 2 letter a JStG); there were no indications of sufficient ignorance. Assenting Lubishtani, crimen.ch, August 9, 2022.

## 13. Prohibited acts for a foreign state (Art. 271 no. 1 para. 1 StGB): BGE 148 IV66

The defendant, Chairman of the Board of Directors of an asset management company, had traveled from Switzerland to the United States against the backdrop of the tax dispute and had handed over a flash drive with data on over 100 clients to the US Department of Justice (DoJ) as part of a voluntary disclosure with a view to a Non Prosecution Agreement (NPA). There were indications that these clients had not taxed assets in the United States in a compliant manner. Unsurprisingly, this was an "act carried out on Swiss territory without authorization on behalf of a foreign state" which "is attributable to an authority or official" (Art. 271 no. 1 para. 1 StGB). This was a classic circumvention of the legal assistance route, because the information involved was "information that can only be lawfully released in Switzerland on the basis of a sovereign order" (p. 66). This affects the legal interest protected by the provision, namely the undisturbed exercise of one's own sovereignty on one's own territory. The conviction was to be upheld by the two lower federal courts.

The decision has given rise to lively discussion and fears that, contrary to previous practice, the Federal Court would now also consider the voluntary disclosure of information and documents for foreign civil proceedings to be covered by the scope of application of Art. 271 StGB (see Länzlinger/Athanas, SJZ 118 [2022] 786 et seqq.; Müller/Delli Colli/Brütsch, GesKR 2022, 115 et seqq.). Even if this concern can be based on individual, somewhat apodictic formulations: the facts at hand could not be further away from

a foreign civil procedure. The defendant had initially (merely) filed a voluntary disclosure, but the DoJ refused to obtain the relevant client information from Switzerland by way of mutual legal assistance, knowing full well the power of the sword of Damocles of future criminal prosecution in the United States. The provision of data by the defendant was the way out of *this* pressure situation. There can be no question of voluntary and civil proceedings. Or to put it another way: The procedure for obtaining an NPA is a very poor example of the transfer of relevant considerations to a civil procedure. On the question of the territorial applicability of the StGB (Art. 3 and 4) Lubishtani, crimen.ch, March 10, 2022.

## II. Secondary criminal law

## 1. Asylum Act (SR 142.31); Violation of the obligation to cooperate in obtaining travel documents; Priority of AsylG (*Asylgesetz* [asylum act]) over the AuG (*Ausländergesetz* [Foreigners Act])/AIG (*Ausländer und Integrationsgesetz* [Foreigner and Integration Act]); Principle of legality (Art. 8 Para. 4 AsylG): BGE 148 IV 281

According to Art. 8 para. 4 AsylG an asylum seeker has the obligation to cooperate in obtaining valid travel documents once an enforceable removal decision has been issued. This obligation takes precedence over the same obligation under the AuG/AIG (Art. 90 letter c, Art. 2 para. 1). However, unlike this standard (Art. 120 para. 1 letter e AuG/AIG) the refusal to cooperate under asylum law is not punishable by law. The conviction based on Art. 120 Paragraph 1 Letter e in conjunction with Art. 90 Letter c AuG/AIG was therefore annulled; this was replaced by a federal court acquittal.

## 2. Federal Act on Administrative Criminal Law (VStrR; SR 313.0); aiding and abetting; Cartel Act (KG *(Kartelgesetz* [Cartel Act]); SR 251) (Art. 1, 2 and 5 VStrR; Art. 25 et seq. StGB; Art. 49a KG): BGE 148 II 182

The Competition Commission had charged three major drug manufacturers with unlawful competition agreements in accordance with Art. 49a para. 1 KG. Various wholesalers were prohibited (in the dispositive) from continuing to carry out relevant "accessory acts" without being sanctioned themselves. They successfully

defended themselves against this in the Federal Administrative Court, and the Federal Court also agreed with them. The accusation that the wholesalers aided and abetted had to fail because such acts of aiding and abetting were "not even rudimentary" (p. 187 E. 3.4.2). Apart from that, the concept of an "accessory" or "accessory act" is foreign to the KG. Art. 5 of the per se applicable VStrR (Art. 57 KG) does indeed recognize it, but the sanctions imposed were not of an administrative criminal law nature (Art. 54 et seq. KG), but of an antitrust law nature (Art. 49a KG). It was therefore out of the question to designate the activities of the wholesalers as "accessory acts" and prohibit them.

## 3. Road Traffic Act (SVG *(Strassenverkehrsgesetz* [Road Traffic Act]); SR 741.01)

### a) General judicial prohibition; public road (Art. 1 SVG , Art. 1 para. 2 VRV *(Verkehrsregelnverordnung* [Traffic Rule Ordinance]), Art. 258 ZPO *(Zivilprozessordnung* [Code of Civil Procedure]); Section 229 aZPO *(alte Zivilprozessordnung* [former Code of Civil Procedure])/LU [Lucerne]; Section 20 UeStG *(Übertretungsstrafgesetz* [Violation Penalty Act]) [/LU]: BGE 148 IV 30

The substantive principle of legality is violated, among other things, "if someone is prosecuted under a criminal provision that has no legal validity" (p. 33 E. 1.3.1). This was the case for a driver who was fined for exceeding the permitted parking time. The parking lot used by her and owned by the Canton of Lucerne constituted a public road within the meaning of Art. 1 para. 1 SVG. Her conduct should therefore have been assessed solely in accordance with the provisions of this decree and its implementing provisions. There was no room for a judicial ban to be issued, the violation of which, as happened, should have been punished with a fine (§ 20 of the Lucerne Violation Penalty Act of September 14, 1976, SRL *(Systematische Sammlung Luzern* [Systematic Collection Lucerne]) No. 300). Convincing enforcement of the principle of legality in a five-man team with a fine of 60 francs.

### b) Prohibition of overtaking on the right on freeways; retroactive effect, lex mitior; gross violation of traffic regulations (Art. 36 Para. 5 letter a VRV; Art. 2 para. 1 and 2 StGB; Art. 90 para. 2 SVG): BGE 148 IV 374

Overtaking on the right on the highway by swerving out and turning back in is and remains prohibited. The revision of the

VRV at the beginning of January 2021 did not change this, on the contrary: Art. 36 Paragraph 5 Sentence 1 now explicitly states that "overtaking on the right by swerving out and turning back in is prohibited". Therefore, the convicted motorist was not helped by the invocation of Art. 2 para. 2 StGB ; the new law was not more lenient. And the classification of the offense as a gross violation of traffic regulations (Art. 90 para. 2 SVG) was not objectionable either. Section 314.3 of Appendix 1 to the Fines Ordinance of January 16, 2019 (OBV *(Ordnungsbussenverordnung* [Fines Ordinance]); SR 314.11), which was also introduced at the beginning of 2021, provides for a fine of 250 francs for overtaking on the right by swerving out and turning back in on motorways. However, it only applies where the maneuver does not involve an increased abstract risk. However, the lower court had rightly found that this was the case. Critical of the latter point Roth, Road traffic 3/2022, 51

## III. References to further federal court decisions relating to criminal law

Without claiming to be exhaustive, the following are references to further decisions of the Federal Court from Volume 148 that may be of importance to those interested in criminal law. For the discussion, please refer to the relevant contributions from the reviewers in the ZBJV.

BGE 148 I 1 Disciplinary measure against a doctor due to the order of an unjustified involuntary placement of a patient in an institution (Art. 426 ZGB; Art. 5 No. 1 letter e ECHR)

BGE 148 I 233 Transfer of personnel files of the Office of the Juvenile Prosecutor of the Canton of Basel-Stadt and of treatment records of the University Psychiatric Clinics of Basel to the Basel State Archives (Art. 13 and 36 BV, Art. 8 ECHR)

BGE 148 II 106 Public procurement: Fine after awarding subcontracts without the approval of the awarding authority; type; statute of limitations. Analogous application of the limitation period pursuant to Art. 49a para. 3 letter b KG

**ZBJV 159/2023 p. 760, 786**

BGE 148 III 1 Appeal to the court after medical care placement; federal law requirements for the procedure (Art. 439 para. 1 no. 1 ZGB)

BGE 148 III 134 Fraudulent substantiation of the insurance claim; standard of proof (Art. 40 VVG)

BGE 148 III 377 Attachment of assets deposited in bank accounts in Switzerland; objection to attachment (Art. 305ᵇ StGB; Art. 9 BV; Art. 271 para. 1 no. 4, Art. 272 para. 1 and Art. 278 SchKG (*Schuldbetreibung und Konkurs* [Debt collection and bankruptcy act]) )


**TRANSPERFECT**

I, Andrew Griffin, hereby certify that I am competent to translate from German to English and that the attached translations are, to the best of my knowledge and belief, a true and accurate translation of the documents entitled below from German to English.

- Felix Bommer, ZBJV 159/2023

Andrew Griffin

Sworn to before me this

_11_ day of _August_ 20 _24_

Signature, Notary Public

SEE ATTACHED
K·S
8-11-2024

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _August 11, 2022_ before me, Khalid Oudah Shahwan, a Notary Public ,
　　　　　　　　　　　　　　　　(Here insert name and title of the officer)

personally appeared _Andrew Griffin_ ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____     (Notary Seal)
Signature of Notary Public

> KHALID OUDAH SHAHWAN
> NOTARY PUBLIC - CALIFORNIA
> LOS ANGELES COUNTY
> COMMISSION # 2350307
> MY COMM. EXPIRES MARCH 5, 2025

---

## ADDITIONAL OPTIONAL INFORMATION

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

### DESCRIPTION OF THE ATTACHED DOCUMENT

_____
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

_____
(Additional information)

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

　_____
　(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

2008 Version CAPA v12.10.07 800-873-9865  www.NotaryClasses.com

# EXHIBIT H



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Swiss Confederation

Federal Department of Justice and Police FDJP

**Federal Office of Justice FOJ**

3rd edition 2003 (last partial update: July 1, 2024)

# International Judicial Assistance
# in Civil Matters

# Guidelines

©2003 by the Private International Law Unit of the Federal Office of Justice FOJ, together with the Division for International Legal Assistance (FOJ), the Directorate of International Law (DFA) and the Office of the Attorney General of Switzerland

Internet: http://www.rhf.admin.ch/dam/data/rhf/zivilrecht/wegleitungen/wegleitung-zivilsachen-e.pdf

# CONTENTS

ABBREVIATIONS ..................................................................................................................... III

FOREWORD - DISCLAIMER ......................................................................................................... 1

I.      GENERAL REMARKS ........................................................................................................ 1

   I.A.   THE CONCEPT OF INTERNATIONAL JUDICIAL ASSISTANCE IN CIVIL MATTERS .............................. 1
   I.B.   ASSISTANCE AND SOVEREIGNTY .............................................................................................. 2
   I.C.   LEGAL BASIS AND APPLICABLE LAW ........................................................................................ 2
      1.   *Hague Conventions* .................................................................................................... 2
      2.   *Bilateral Agreements* ................................................................................................. 3
      3.   *Absence of an agreement* .......................................................................................... 3
      4.   *Applicable Law* .......................................................................................................... 3
      5.   *Principle of Reciprocity* .............................................................................................. 4
   I.D.   CIVIL OR COMMERCIAL MATTER ............................................................................................. 4

II.     SERVICE OF DOCUMENTS ............................................................................................. 6

   II.A.   THE CONCEPT OF SERVICE .................................................................................................... 6
   II.B.   DOCUMENTS THAT MUST BE SERVED BY MEANS OF JUDICIAL ASSISTANCE ................................. 6
   II.C.   COMPETENT AUTHORITIES ...................................................................................................... 7
      1.   *Hague Service Convention* ......................................................................................... 7
         1.1   Forwarding authority .......................................................................................... 7
         1.2   Receiving Authority ............................................................................................ 7
      2.   *1954 Hague Convention* ............................................................................................ 8
      3.   *Absence of an agreement* .......................................................................................... 8
   II.D.   CHANNELS OF TRANSMISSION ................................................................................................ 8
      1.   *Hague Service Convention* ......................................................................................... 8
         1.1   Ordinary Channel (Arts. 2 to 7 Hague Service Convention) ................................. 8
         1.2   Alternative Channels (Arts. 8 to 10 Hague Service Convention) ........................... 9
         1.2.1 Reservations and declarations made by Switzerland ........................................ 9
         1.2.2 Consequences of the Principle of Reciprocity ................................................ 10
      2.   *1954 Hague Convention* .......................................................................................... 10
         2.1   Ordinary Channel (Arts. 1 to 4) ....................................................................... 10
         2.2   Alternative Channels (Art. 1 paras. 3 and 6 1954 Hague Convention) ............... 10
      3.   *Absence of an agreement* ........................................................................................ 11
      4.   *Other Transmission Channels* .................................................................................. 11
   II.E.   REQUIREMENTS FOR THE REQUEST ...................................................................................... 11
      1.   *Hague Service Convention* ....................................................................................... 11
         1.1   Form ................................................................................................................ 11
         1.2   Execution and Languages ................................................................................ 12
         1.3   Protection given to addressees, sanctions ........................................................ 13
         1.4   Grounds for refusing service ............................................................................ 14
         1.5   Costs .............................................................................................................. 15
      2.   *1954 Hague Convention* .......................................................................................... 15
         2.1   Form ................................................................................................................ 15
         2.2   Execution and language .................................................................................. 15
         2.3   Protection for the addressee ............................................................................ 16
         2.4   Costs .............................................................................................................. 16
      3.   *Absence of an agreement* ........................................................................................ 16
   II.F.   SPECIAL QUESTIONS ........................................................................................................... 16
      1.   *Service addressed to foreign states or foreign state-owned companies* ...................... 16
      2.   *Service addressed to Swiss nationals abroad* ............................................................ 16
      3.   *Service of documents which institute proceedings and Recognition of Judgments* ...... 17
      4.   *Address of addressee unknown – Service by Public Notice* ........................................ 17
      5.   *Agreement between the European Community and Switzerland relating to the Free*
         *Movement of Persons, Federal Act on the Free Movement of Lawyers and*
         *Assistance* ............................................................................................................... 18
      6.   *Domicile for service* ................................................................................................. 19
      7.   *Deadline compliance* ................................................................................................ 19

III.     OBTAINING EVIDENCE ........................................................................................................20
  III.A.   FOREWORD ........................................................................................................................20
    1.   Overview....................................................................................................................20
    2.   Cases in which procedures for assistance need not be followed ................................20
  III.B.   THE COMPETENT AUTHORITIES AND TRANSMISSION PROCEDURES ........................................21
    1.   Hague Evidence Convention ......................................................................................21
      1.1   Under Chapter I of the Hague Evidence Convention ......................................... 21
      1.2   Under Chapter II Hague Evidence Convention ................................................. 22
    2.   1954 Hague Convention..............................................................................................22
    3.   Absence of an agreement ...........................................................................................22
    4.   Other channels of transmission ..................................................................................23
  III.C.   REQUIREMENTS FOR THE APPLICATION ...............................................................................23
    1.   Hague Evidence Convention.......................................................................................23
      1.1   Application under Chapter I ............................................................................. 23
        1.1.1 Form ............................................................................................................... 23
        1.1.2 Contents (Art. 3 Hague Evidence Convention) ............................................... 23
        1.1.3 Language and translations (Art. 4 Hague Evidence Convention) .................... 23
        1.1.4 Execution ........................................................................................................ 24
          a. Applicable Law (Art. 9 Hague Evidence Convention) ............................... 24
          b. Obtaining evidence via a person appointed by the authorities addressed
          (Art. 14 para. 3 Hague Evidence Convention) ........................................ 24
          c. The right to refuse to testify / Banking secrecy ...................................... 25
          d. Participation of the members of the court of the requesting authority (Art. 7 Hague
          Evidence Convention) and/or of the parties or of their representatives (Art. 7 Hague
          Evidence Convention) .............................................................................. 25
          e. Grounds for refusal .................................................................................. 25
          f. Costs ....................................................................................................... 26
        1.1.5 Letter of request relating to "*pre-trial discovery*" proceedings ..................... 26
      1.2   Request under Chapter II of the Hague Evidence Convention (Art. 15 to 22 Hague
      Evidence Convention)....................................................................................... 28
        1.2.1 General ........................................................................................................... 28
        1.2.2 Conditions laid down in Article 21 Hague Evidence Convention – Procedural safeguards.................. 28
        1.2.3 Authorisation procedure before the Swiss authorities, and content of the application ........................ 29
        1.2.4 Swiss applications to a foreign country or evidence taken by Swiss diplomatic or
        consular representatives .................................................................................. 30
    2.   1954 Hague Convention .............................................................................................31
      2.1   Basis ............................................................................................................... 31
      2.2   Form and content............................................................................................. 31
      2.3   Language and translation ................................................................................. 31
      2.4   Applicable law ................................................................................................. 32
      2.5   Grounds for refusal .......................................................................................... 32
      2.6   Costs............................................................................................................... 32
      2.7   Obtaining evidence directly by the parties in Switzerland or the diplomatic officers or
      consular agents under the 1954 Hague Convention .......................................... 32
        2.7.1 Activities carried out by the parties in Switzerland ......................................... 32
        2.7.2 Activities carried out by diplomatic officers or consular agents ...................... 32
    3.   Obtaining evidence in the absence of an agreement ...................................................33
  III.D.   SPECIAL ISSUES .............................................................................................................33
    1.   Hearing by video conference........................................................................................33
    2.   Hearing by Telephone .................................................................................................34

CONTACTS...................................................................................................................................35

Modifications of the guidelines......................................................................................................35

## ABBREVIATIONS

| | |
|---|---|
| ACLFA | Administrative Case Law of the Federal Authorities |
| Art. | Article(s) |
| CPC | Civil Procedure Code |
| FDJP | Federal Department of Justice and Police |
| FDFA | Federal Department of Foreign Affairs |
| FOJ | Federal Office of Justice |
| JU | Canton Jura |
| NE | Canton Neuchâtel |
| PILA | Federal Act of 18 December 1987 on Private International Law (SR 291) |
| RSJ | Revue suisse de jurisprudence: Swiss Law Review |
| SCC | Swiss Criminal Code of 21 December 1937 (SR 311.0) |
| SJ | La semaine judiciaire |
| SR | Classified Compilation of Swiss Legislation |
| SZ | Canton Schwyz |
| ZH | Canton Zurich |

## FOREWORD - DISCLAIMER

These Guidelines are intended for practitioners (central authorities, judges, lawyers, diplomatic and consular agents) confronted with questions on international judicial assistance in civil matters. Above all, they provide practical advice and information. However, in addition to this advice, the Private International Law Unit of the Federal Office of Justice FOJ feels it would be useful to give its opinion on certain frequently asked questions which are controversial and which have not yet been ruled on by a court. In such cases, the FOJ is unable to provide any guarantee as to the outcome of the proceedings should such matters arise during litigation brought before a court.

In addition to these Guidelines, we would also recommend you consult the "Guide pratique de l'entraide judiciaire international en matière civile et pénale" (Guide on Judicial Assistance). This guide is updated on a regular basis. It gives practical recommendations with regard to the procedures to follow for Swiss requests abroad on a country-by-country basis (To which authority should the request be addressed? How many copies? In which languages? How long does it take for the request to be executed? etc.).

Finally, the FOJ has put together information which can be downloaded from the Internet on the locally competent Swiss authority to contact in a given case (http://www.elorge.admin.ch).

## I. GENERAL REMARKS

### I.A. The Concept of International Judicial Assistance in Civil Matters

International judicial assistance in civil matters forms part of the law on international civil procedure, which, besides the issue of assistance, deals with questions relating to the international competence of the courts as well as those relating to the recognition and execution of judgements.

The object of international judicial assistance is the provision of support to the authorities or courts of a requesting state by the state to which the request is made, by carrying out procedural or other official acts and communicating the results to the authorities or courts of the requesting state, so that these can be used in specific proceedings (ACLFA 1985 [49/I], p. 93).

Judicial assistance in the normal sense includes the service of judicial and extra-judicial documents as well as the obtaining of evidence.[1] These Guidelines deal with this category of assistance. Judicial assistance in the broader sense includes other official measures in relation to foreign proceedings, such as international judicial assistance (see e.g. Convention of 25 October 1980 on International Access to Justice [SR 0.274.133] and European Agreement of 27 January 1977 on the Transmission of Applications for Legal Aid [SR 0.274.137]), the enforcement of decisions (see e.g. the Convention of 2 October 1973 on the Recognition and Enforcement of Decisions relating to Maintenance Obligations [SR 0.211.213.02], the Convention of 20 June 1956 on the Recovery Abroad of Maintenance [SR 0.274.15]), assistance in connec-

---

[1] Such as local inspections, taking statements from witnesses and parties, production of documents, providing expert opinions, etc.

tion with the abduction of children (c.f. Convention of 25 October 1980 on the Civil Aspects of International Child Abduction [SR 0.211.230.02] ; European Convention of 20 May 1980 on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of Children [SR 0.211.230.01]) and in connection with the application of the law (c.f. European Convention of 7 June 1968 on Information on Foreign Law [SR 0.274.161]).

## I.B.  Assistance and Sovereignty

In terms of Article 271 paragraph 1 of the Swiss Criminal Code (SCC; SR 311.0), it is an offence for anyone to carry out "activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official" as well as for anyone to carry out "such activities for a foreign party or organisation" or to encourage such activities. This provision strikes against acts that violate Swiss territorial sovereignty and which as a consequence cannot be carried out without the permission of the Swiss authorities. According to Article 299 paragraph 1 SCC it is an offence for anyone to violate "the territorial sovereignty of a foreign state, in particular by conducting official activities without authorisation on foreign territory." These provisions express the general principle of international law according to which the sovereignty of any state extends only to its national frontiers; accordingly, the authorities of a state cannot, in principle, exercise their public powers outside their territory.

According to the Swiss view – as well as that of numerous other states – the service of judicial or extra-judicial documents as well as the obtaining of evidence for court proceedings constitute the exercise of public powers (on the subject of service see Federal Supreme Court Decision 124 V 47 [50]). Accordingly, these procedures cannot simply be undertaken from beyond the frontiers of the state concerned without authorisation. The authority in question must therefore resort to the mechanisms of assistance, otherwise it will violate the sovereignty of the state in which it is carrying out these acts. The concept of sovereignty under public international law, however, may come into conflict with the prerogative of the judge appointed in another state which results from his or her jurisdiction to rule on a case. We will examine in greater detail the interaction between sovereignty under public international law and the prerogatives of the judge who has local jurisdiction to rule on the case (see III.A.2, p. 20). Finally, the service of certain documents without resorting to judicial assistance is permitted in certain circumstances (see II.B, p. 6).

## I.C.  Legal Basis and Applicable Law

## 1.  Hague Conventions

The multilateral conventions in the field of international judicial assistance in civil cases are as follows:

- The Hague Convention relating to civil procedure of 1 March 1954 (1954 Hague Convention; SR 0.274.12);
- The Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Service Convention; SR 0.274.131)2; and

- The Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (Hague Evidence Convention; SR 0.274.132).[2]

## 2. Bilateral Agreements

There are also a number of bilateral agreements between Switzerland and certain states that authorise direct contact between *judicial authorities* or which serve to complement the aforementioned Hague Conventions. Switzerland has entered into such agreements with:

- Germany (SR 0.274.181.361),
- Austria (SR 0.274.181.631; with Austria, not only is direct contact between authorities permitted, but also contact between the authority and the addressee of the proceedings),
- Belgium (SR 0.274.181.721),
- France (SR 0.274.183.491),
- Italy (SR 0.274.184.542),
- Luxembourg (SR 0.274.185.181),
- Greece (SR 0.274.183.721),
- Monaco (SR 0.274.185.671),
- Pakistan (SR 0.274.186.231),
- Poland (SR 0.274.186.491),
- Turkey (SR 0.274.187.631),
- Hungary (SR 0.274.184.181),
- the Czech Republic (SR 0.274.187.411),
- Slovakia (SR 0.274.187.411),
- Estonia (SR 0.274.721).

Although there is no such agreement with Liechtenstein, direct contact between authorities has become customary.

## 3. Absence of an agreement

Where there is no international agreement, Switzerland applies as an autonomous right the 1954 Hague Convention to the foreign requests that it receives and Swiss requests to other countries (see Art. 11*a* para. 4 PILA; SR 291).

Where there is no agreement and unless there is an established practice to the contrary, Swiss requests must follow diplomatic channels (see II.D.2.2, p. 10).

## 4. Applicable Law

Judicial assistance in civil matters, which is an area of public international law, falls under federal jurisdiction (Art. 54 para. 1, Art. 122 para. 1 and Art. 166 para. 2 of the Swiss Constitution). There is however only one brief provision at a federal level in Article 11 to 11*c* of the Federal Act of 18 December 1987 on Private International Law (PILA, SR 291). Since acts of judicial assistance in Switzerland are carried out in

---

[2] The application of Hague Service and Evidence Conventions in the various countries is explained in the "Practical Handbook on the operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters" and the "Practical Handbook on the Operation of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters", which can be ordered from *Permanent Bureau, Hague Conference on Private International Law, 6, Scheveningseweg, 2517 KT The Hague, the Netherlands, www.hcch.net; secretariat@hcch.net.*

accordance with Swiss law (see Article 11*a*, para. 1 PILA), the Swiss Code of Civil Procedure (CPC, SR 272) should be referred to when service is effected and evidence obtained.

## 5.     Principle of Reciprocity

Under Article 21 paragraph 1 of the Vienna Convention on the Law of Treaties of 23 May 1969 (SR 0.111), a state that has not established a reservation in respect of a Convention may take advantage of a reservation established by another state in its relations with that state. Article 21 of the Vienna Convention reflects the principle of reciprocity in public international law. The legal effect of a reservation is that it modifies for the reserving party in its relations with other parties the provisions of the treaty to which the reservation relates to the extent of the reservation. The reservation also modifies those provisions to the same extent for these other parties in their relations with the reserving State. Thus in matters of judicial assistance, the Swiss authorities must refrain from conducting proceedings abroad that are not authorised on Swiss territory, due to the reservations made by Switzerland in respect of the aforementioned Hague Conventions. This applies in particular to reservations relating to the methods by which requests are transmitted (see II.D.1.2.1, p. 9 and II.D.2.2, p. 10). Be that as it may, states may renounce to invoke the principle of reciprocity (see II.D.1.2.2, p. 10). It is important to note here that, in an unpublished judgement (5P.225/1996), the Swiss Federal Supreme Court indicated in an *obiter dictum* that direct service by post to a state that was party to Hague Service Convention and which had not made a reservation in this regard was admissible. In this decision, however, the Swiss Federal Supreme Court failed to mention Article 21 of the Vienna Convention. It also failed to indicate if the recipient state had waived its right to invoke the principle of reciprocity.[3]

## I.D.     Civil or Commercial Matter

The aforementioned Hague conventions all apply to "civil and commercial matters". This concept should be defined in the same manner regardless which of the three Hague Conventions applies.

This concept is not defined in the conventions and is the object of some controversy. However, one special commission of the Hague Conference on International Private Law in which Switzerland participated stated in relation to the Hague Service and Evidence Conventions, that the expression "civil or commercial matter" would have to be interpreted autonomously, without exclusive reference to the law of the requesting state or the requested state, and without the joint application of the laws of both states (see Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 3rd edition, Wilson & Lafleur Ltée, Montreal, 2006 ["Handbook Hague Service Convention"], p. 26[4]; see also Art. 31 para. 1 Vienna Convention on the Law of Treaties of 23 May 1969). The Special Commission then considered that bankruptcy law, insurance law, and employment law can also fall within the concept of a "civil or commercial matter" (for Switzerland see Federal Supreme Court Decision 94 III 37 and 96 III 65, in which the Federal Supreme Court accepted that this concept also included the proceedings in relation to debts and bankruptcy when the claims are of a civil nature, as well as Federal Insurance Court Decision

---

3   See also 5A 128/2010 and 5F.6/2010
4   See footnote 2.

1966, 67-73, in which the Swiss Federal Insurance Court stated that it was important to grant assistance in the same manner in the matters relating to social insurance as in civil matters).

The Federal Office of Justice has come around to this point of view and is thus of the opinion that the concept of the "civil or commercial matter" should be understood in the broader sense and need not necessarily correspond to the concept used at a domestic level. It is, however, difficult to give a precise definition of what could be a "civil or commercial" matter in terms of the Hague Conventions. To take a negative approach, it can be said that the Hague Conventions envisage neither a criminal law matter nor a tax matter. Moreover, the fact that in the requesting state the case is designated to be "civil" is of no relevance. Finally, when the case relates to litigation between a public authority and a private individual, where the public authority is act-ing in the exercise of public powers, the case cannot be considered to have a "civil or commercial" nature. The same applies, in general, when an authority brings civil pro-ceedings against an individual in order to safeguard public interests.[5] In litigation where the plaintiff is a private individual and the defendant is the state, in designating an action as "civil or commercial" account may be taken of the fact that it is a case in which the plaintiff is asserting *i*) a *right* (the state does not have a discretionary pow-er) *ii*) *of a pecuniary nature*, even if under national Swiss law this right relates to an administrative matter (in this sense, Federal Insurance Court Decision 1966, 67-73; see also ruling by the Federal Insurance Court K 18/04 of 18 July 2006).

However, a large number of cases in civil matters – in the traditional sense of the term (family law, law of succession, company law, law of contract, intellectual proper-ty law, etc.) – are not necessarily pecuniary in their nature, but nevertheless come within the scope of application of the Hague Conventions. In such cases, when ser-vice is effected, the fact that the requesting authority is an administrative authority (e.g. a guardianship authority) is of no significance.

The FOJ is also of the opinion that in cases in which a state court participates in arbi-tration proceedings (see Articles 184 and 185 PILA), the broad concept of "civil or commercial matters" covered within the meaning of the Hague Conventions on judi-cial assistance shall apply to the court proceedings.[6]

---

[5] E.g.: the procedures introduced by the American administrative authorities, such as the Anti-Trust Division of the Justice Department.

[6] A special commission of the Hague Conference on International Private Law issued a statement on this in January 2003.

## II.A.   The Concept of Service

Most procedural laws provide that in order to allow proceedings to begin the communications to the parties must be served on them or notified to them in order to have legal effect. Service is the transmission of documents by an official method: at the request of a foreign authority, the authorities of a state pass on the documents to the addressee in return for a simple receipt or by means of a special certificate that proves that service has been effected. In the Swiss view, this constitutes an official act (see I.B, p. 2).

Countries with common law legal systems deal with service in a fundamentally different way. According to their law, it is the responsibility of the parties to inform their opponents by serving them with the important documents in the case. Thus there is not necessarily an official act involved. This completely divergent system can be the source of some conflict. When seeking solutions, this different approach will be taken into account.

## II.B.   Documents that must be served by means of Judicial Assistance

The Hague Conventions are directed as much at "judicial documents" as at "extrajudicial documents". A "judicial document" is understood as "*any document that relates to contentious or non-contentious proceedings or the arrest of the assets of a debtor*" (CAPATINA, L'entraide judiciaire internationale en matière civile and commerciale, Recueil des Cours 1983 [179], p. 347). "Extra-judicial documents" include "*documents intended to produce effects beyond any procedure that is ongoing in a court of law*" (CAPATINA, op. cit., p. 348). Extra-judicial documents must, however, emanate from an authority or a judicial officer. Notaries are regarded as judicial officials inasmuch as they undertake a public duty in this particular case.

In general, any judicial or extra-judicial document must be communicated by means of judicial assistance. Indeed, on the one hand, assistance provides a better guarantee that the rights of the addressee will be respected, particularly the right to be heard[7]. On the other hand, from the point of view of public international law, the service of such documents on Swiss territory without passing through the judicial assistance channel constitutes a violation of territorial sovereignty. However, it is accepted that when the document in question has no legal effect or is not liable to have any legal effects on the addressee, the judicial assistance channels need not necessarily be followed (ACLFA 1976 [40/I], p. 105 s.; Circular of 5.12.1956 from the Administrative Commission of the Supreme Court of the Canton of Zurich, RSJ 1957, p. 16).

---

[7]  The fact, for instance, to ask from the requesting State to furnish translations aims to guaranty the right to be heard of the addressee.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 124 of 171

**II.C.    Competent Authorities**

**1.        Hague Service Convention**

*1.1    Forwarding authority*

Article 3 of the Hague Service Convention provides that the authority or judicial officer competent under the law of the state in which the documents originate should forward his request to the Central Authority of the state addressed. It is thus the law of the requesting state that primarily determines the competent authority for forwarding the requests for foreign assistance. It is, however, important to note that it has been accepted that lawyers, to the extent that their law permits them to serve documents, must be regarded as *judicial officers* and hence as persons authorised to approach the Central Authority of the state addressed. Private individuals, however, (for example the parties) are not, in themselves, authorised to approach the Central Authority directly, even if, under their law, they are entitled to serve documents (Explanatory Report by Taborda Ferreira, Acts and Documents of the 10th session (1964), Volume III, Service of Process, p. 368; the competent authorities in each country can be found on the website of the Hague Conference on International Private Law).

The competent Swiss authorities forward their requests abroad via the Central Authority of the requested State.[8] However, they address their requests to the competent authority or court in the place where the relevant proceedings are taking place (e.g.: "to the competent civil court ..."). As previously mentioned, Switzerland has concluded bilateral agreements with certain countries that permit direct contact between authorities (see I.C.2, p. 3). For additional information, please consult the Guide on Judicial Assistance.

*1.2    Receiving Authority*

Article 2 of Hague Service Convention provides for the designation of central authorities that are responsible for receiving requests for assistance. Article 18 paragraph 3 of the Hague Service Convention permits states to designate more than one Central Authority.

In Switzerland, the receipt of requests from foreign states and the processing of these is a cantonal responsibility. Accordingly, there are 26 cantonal Central Authorities. These authorities ensure, on the one hand, that the requests conform to the formal requirements of Hague Service Convention or any other provisions that must be taken into consideration, and, on the other hand, that judicial assistance does not clearly appear to be excluded for any other reason. If there is no reason to do otherwise, they take the action required. If a request does not satisfy the requirements of the Service Convention, the Central Authority informs the requesting authority without delay (Art. 4 of the Service Convention).

Since it can prove very difficult for the requesting state to know which of the 26 central cantonal authorities has jurisdiction, the FOJ is also designated to be a Central Authority to which requests may be addressed irrespective of where they may have

---

8    JU, NE, SZ (for all requesting authorities, apart from courts) and ZH require that outgoing requests be transmitted via the central cantonal authority. This authority transmits them to the Central Authority of the state addressed.

to be executed. The jurisdiction of the FOJ is secondary. It does not subject the requests to any examination before passing them on to the competent cantonal authorities, but it consults with the Cantons and provides any coordination that may be necessary. Please note that the FOJ has created a database listing all the competent authorities in Switzerland (http://www.elorge.admin.ch).

For Swiss requests addressed to foreign states, see the Guide on Judicial Assistance.

## 2.     1954 Hague Convention

The 1954 Hague Convention does not provide for the designation of central authorities. Under Article 1 paragraph 1 of the 1954 Hague Convention, requests for assistance must follow "consular" channels. This means that foreign authorities – this can be a lawyer if, under the law of the requesting state, he is entitled to serve documents – send the documents to be served to the consulate, embassy or other representation of its country in Switzerland. This representation addresses a request to the FOJ, which in turn passes it on to the competent cantonal authority (see Art. 11 PILA; Ordinance of 17.11.1999 on the Organisation of the FDJP [SR 172.213.1].

Requests from Swiss authorities must also pass through the FOJ (see Art. 11 PILA; Ordinance of 17.11.1999 on the Organisation of the FDJP [SR 172.213.1].The FOJ passes these on to the relevant Swiss representation in the receiving state, which in turn passes the requests on to the authority designated by the receiving state (Art. 1 para. 1 1954 Hague Convention; see Guide on Judicial Assistance).

In relation to incoming or outgoing requests for assistance, the FOJ confines itself to examining whether these comply with the formal requirements of the applicable international conventions and ensuring that international judicial assistance does not appear to be excluded for any other reason.

## 3.     Absence of an agreement

Where there is no international agreement, Switzerland applies the 1954 Hague Convention to any foreign requests and Swiss requests to other countries (see Art. 11*a* para. 4 PILA; I.C.3, p. 3). Reference is therefore made to the comments made in II.C.2, p. 8.

Swiss requests made to foreign states must, in the absence of contrary practices, follow diplomatic channels (see II.D.2.2, p. 10). For a description of the procedure applicable in each country, reference is made to the Guide on Judicial Assistance.

## II.D.   Channels of Transmission

## 1.     Hague Service Convention

## *1.1     Ordinary Channel (Arts. 2 to 7 Hague Service Convention)*

As already indicated, under Article 2 of the Hague Service Convention, each contracting state must designate a Central Authority that has the task of receiving and dealing with requests for service from another contracting state. The Hague Service Convention only requires the creation of a Central Authority for the purpose of *receiv-*

*ing* requests for service. Thus a request that is being sent is not required to pass through the forwarding country's own Central Authority.[9] The authority designated as competent according to the law of the requesting state (see II.C.1.1, p. 7) addresses its request to the Central Authority of the requested state.

### 1.2 Alternative Channels (Arts. 8 to 10 Hague Service Convention)

#### 1.2.1 Reservations and declarations made by Switzerland

In addition to the ordinary channel, the Hague Service Convention, in its Articles 8 to 10, provides for alternative channels for effecting service.

Switzerland has, however, made reservations to Articles 8 and 10.

Thus in relation to Article 8 of the Hague Service Convention, Switzerland permits service of documents through consular or diplomatic agents only with regard to persons who are nationals of the originating state (see ACLFA 1968-1969 [34/15], p. 34).[10] If that is not the case, the ordinary channel has to be followed. Consular and diplomatic agents are not permitted in any case to resort to coercive measures in order to effect service.

With regard to Article 10 of the Hague Service Convention, Switzerland declares its opposition to *direct service abroad by postal channels* as provided for in letters a), b) and c) of that Article. Nevertheless, it sometimes happens that documents are sent directly from abroad to parties resident in Switzerland. This occurs primarily from countries with common law legal systems, in which the service of documents is the responsibility of the parties and not of the authorities. In other words, and contrary to the Swiss view, such a procedure is not necessarily considered an official act in those countries. The recipient of documents served in this way can notify the matter to the Federal Department of Foreign Affairs (FDFA). If Swiss sovereignty is violated, the FDFA will instruct the relevant Swiss Embassy to intervene with the originating authorities and explain that this method of service is punishable under Article 271 of the Swiss Penal Code.[11,12] *It should, however, be noted that the inadmissibility of direct service by mail in Switzerland does not automatically invalidate the service of the document as part of the foreign proceedings. It may, however, have repercussions with regard to whether the judgment will be recognised.*[13] At any rate, the FDFA regularly gives notice that errors in the service of documents can under Swiss law result in the non-execution of foreign civil judgments (see II.F.3, p. 17). Occasionally, service is effected again by means of judicial assistance.

Finally, Article 9 of the Hague Service Convention provides for the use of consular channels, that is, the ordinary channel stipulated in Article 1 of the 1954 Hague Convention (see II.D.2.1, p. 10). With regard to this, Switzerland has also designated the cantonal central authorities as recipient authorities for requests from abroad.

---

[9]  For Switzerland, see footnote 8.

[10]  However, if the addressee of the document is a national of both the requesting state and the state receiving the request, service by consular or diplomatic agents is not permitted. It remains possible if the addressee is a national of the requesting state and a third state.

[11]  See I.B, p. 7

[12]  However, only an intentional act is unlawful, and it is practically impossible to prove that an act was intentional.

[13]  See also II.F.3, p. 23

### 1.2.2 Consequences of the Principle of Reciprocity

In application of the *principle of reciprocity*, the Swiss reservations may be invoked by the recipient state in relation to requests for service coming from Switzerland, even if the recipient state has not made the same reservations (see I.C.5, p. 4). Thus, the Swiss authorities may not use the transmission channels in respect of which Switzerland has stipulated reservations. Recipient states may, however, waive their right to invoke the principle of reciprocity. The Guide on Judicial Assistance mentions several options open to the Swiss authorities (as the FOJ's primary recommendation or as an alternative channel of transmission), depending on the state in question, to use channels that Switzerland has objected to but which may be nonetheless used when the requested state has refused to invoke the principle of reciprocity. For example, according to the FOJ's primary recommendation, in relations between Switzerland and *Ireland, Canada* and *India* it is permitted for requests for service coming from Swiss authorities to be sent via the FOJ to the competent Swiss representation. The Swiss representation serves the documents on the addressees by registered mail with acknowledgement of receipt. In matters between Switzerland and the *United States of America*, the cantonal central authorities can address their request to the competent Swiss representation, which in turn serves the documents directly on the addressee (see Federal Supreme Court Decision 109 III 100; for the requirements in relation to form, see II.E.1.1, p. 12).

## 2. 1954 Hague Convention

### 2.1 Ordinary Channel (Arts. 1 to 4)

The 1954 Hague Convention provides for the service of documents via the consular channel (Art. 1).

This means that the competent foreign authorities address their requests to the consulate, embassy or any other representation of their country in Switzerland. This representation forwards the request to the Federal Office of Justice, which, in turn, forwards it to the relevant cantonal authority.

Requests from a Swiss authority are addressed to the FOJ, which forwards them to the competent Swiss representation in the receiving state, which, in turn, sends them on to the authority designated by the recipient state (Art. 1 para. 1 1954 Hague Convention).

### 2.2 Alternative Channels (Art. 1 paras. 3 and 6 1954 Hague Convention)

First of all, the states that are parties to the 1954 Hague Convention may declare that they wish to use the diplomatic channel instead of the consular channel (Art. 1 para. 3). In such a case, requests from Switzerland must be addressed to the FOJ, which forwards them to the Swiss representation in the receiving state, which, in turn, forwards the request to the foreign affairs department of the receiving state. The latter sends the request on to the competent local authority.

Moreover, Article 6 of the 1954 Hague Convention permits direct service by mail to an addressee resident abroad, or via the competent judicial or public officials of the recipient country, or, alternatively, through diplomatic or consular agents. *Although Switzerland has not made any specific reservation in relation to this, it does not permit service by mail on its own territory.* However, Switzerland permits service by dip-

lomatic or consular agents as provided for in the Hague Service Convention, that is to say, if the addressee is a national of the state of origin of the documents (see ACLFA 1968-1969 [34/15], p. 34 and footnote n°10 above). The consular or diplomatic agents are not permitted to make any use of coercive measures.

Just as is the case under the Hague Service Convention, the *principle of reciprocity* applies under the 1954 Hague Convention. Thus the Swiss authorities may not use channels for service abroad that are not permitted in Switzerland (see I.C.5, p. 4).

### 3. Absence of an agreement

Where there is no international agreement, Switzerland applies the provisions of the 1954 Hague Conventions to requests received from abroad and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA; I.C.3, p. 3). Switzerland also accepts the service of documents by consular or diplomatic agents on the requesting country's own nationals. Finally, Switzerland does not accept direct service from abroad by mail.

Swiss requests to other countries must, unless there is a contrary custom, for example in favour of consular channels, follow diplomatic channels (see II.D.2.2, p. 10). Direct service by mail is permitted only if the recipient state accepts this form of service. For a description of the procedure applicable to each country, please see the Guide on Judicial Assistance.

### 4. Other Transmission Channels

All Hague Conventions authorise states to enter into bilateral agreements that provide more favourable conditions. As a result, direct correspondence between requesting and recipient authorities or courts in certain countries remains possible (see I.C.2, p. 3).

Diplomatic channels can always be used (see II.D.2.2, p. 10), even where a convention provides for a quicker means of service. Where the Hague Service Convention applies, its Article 9 paragraph 2 provides for a special rule in this regard.

### II.E. Requirements for the Request

### 1. Hague Service Convention

#### *1.1 Form*

Article 3 of the Hague Service Convention provides for the use by contracting states of a model form for requesting the service of judicial or extra-judicial documents. The text printed on the form must include a version in either English or French.[14] It consists of three parts, the request for service, a certificate containing the details of execution, and a summary of the document being served (Art. 7 para. 1 Hague Service Convention). The blanks corresponding to the printed text are completed either in the language of the state receiving the request, or in English or French (Art. 7 para. 2 Hague Service Convention). Some states require, in our opinion wrongfully, that the

---

[14] Under article 7 the Hague Service Convention, the additional printing of the text in one or more official languages of the requesting state (state of origin) is permitted.

printed text and/or the responses be written in their language (Guide on Judicial Assistance).

The model form and the documents to be served are to be sent in duplicate (Art. 3 para. 2 Hague Service Convention). The authentication of the documents or any similar formality is not required (Art. 3 para. 1 Hague Service Convention). Regarding the necessity to join the translation of the exhibits, see II.E.1.2, p. 12.

When the alternative channels of service provided for in Articles 8 and 10 Hague Service Convention are used (see II.D.1.2, p. 9), the model forms do not need to be used, and no translation is required. It should, however, be noted that if the addressee is unable to understand the nature and significance of the documents served, this may pose problems should the judgment be recognised abroad (violation of the right to be heard)[15] and this may remain a problem even where the receiving state permits the use of the alternative channels for service. Accordingly, it is recommended that the Hague Service Convention forms are used for the alternative channels as well (at least the section "Summary of the document to be served" of the model form [pp. 3 and 4]) or that a translation of the documents in the language of the recipient state is enclosed, in order to ensure that the addressee is informed of the nature of the documents served. The Hague Conference on Private International Law adopted a recommendation to this effect in 2003 and 2009 (see points 65 - 68; point 31). The FOJ recommends that the form be completed in the language of the requested state.

### 1.2 Execution and Languages

The Swiss authorities effect the service of documents requested by a foreign state, on the first occasion and in the absence of any special requests by the requesting state, by "informal delivery" to the addressee. Simple delivery is covered by Article 5 paragraph 2 of the Hague Service Convention. The translation of the documents to be served is not necessary for this mode of service; service is effected, as a general rule, by registered mail or by judicial act.[16] This form of service is, however, permitted only if the addressee accepts service (Art. 5 para. 2 Hague Service Convention). If the addressee refuses to accept service by simple delivery, the Central Authority or the competent cantonal court will make a note of this on the certificate and will notify the requesting state that formal service has to be effected. For formal service, however, the Swiss authorities require the translation of the documents into German, French, or Italian, depending on the region in question, before attempting to service the document again (see the Swiss reservation to Art. 5 para. 3 of the Hague Service Convention). In order to guarantee the right of the addressee as provided by Article 5 paragraph 2 of the Hague Service Convention to refuse service by simple delivery and to require a translation, it is advisable to inform the addressee in an appropriate manner. The FOJ has thus recommended the cantonal authorities to inform addressees of their rights at the moment of service and to fix, where appropriate, a short period within which to exercise such rights. For example, if service is effected by mail, an accompanying letter or a notice on the envelope could inform addressees of their rights and the way in which they should be exercised. Simple service by the

---

[15] However, the judgment will not have to be recognised abroad in each Swiss procedure.

[16] Delivery of a "judicial document" is regulated in the general terms and conditions of the Swiss Post Office and its information brochure. Article 138 CPC on the form in which judicial documents are served states in paragraph 1: "The summons, rulings and decisions are served by registered mail or by other means against confirmation of receipt".

procedure used for court documents is not sufficient to allow addressees to exercise rights.

With regard to Swiss requests to other countries, it is recommended to consult the Guide on Judicial Assistance to find the requirements specified by the recipient country. Certain countries require the immediate translation of the documents to be served and will therefore not proceed in the first instance with service by simple delivery.

The requesting authority can demand that service be made formally from the beginning either according to one of the forms prescribed by the law of the receiving state (Art. 5 para. 1 let. a Hague Service Convention), or according to a special form prescribed by the law of the requesting state (Art. 5 para. 1 let. b Hague Service Convention). In the latter case, the demand will only be met if the required form is compatible with the law of the receiving state. If a request is made for formal service or if this form of service proves to be necessary due to the refusal of the addressee to accept service, the requesting state may have to pay the resultant costs (Art. 12 para. 2 Hague Service Convention; see II.E.1.5, p. 15).

It is important to note that the effects of the impossibility or refusal of service are not governed by the Hague Service Convention. It is not easy to answer the question as to which law – that of the requested state or that of the requesting state – service is to be considered to be legally valid. The Swiss Federal Supreme Court has attempted to answer this question (SJ 2000, p. 89 et seq.). In the view of the FOJ it is generally the law of the requested state that should apply, unless the law of the requesting state imposes particular requirements to be met. In the latter case, in the view of the FOJ, it will be up to the requesting authority to request a special form of service (Art. 5 para. 1 let. b Hague Service Convention).

With regard to a foreign request for service in Switzerland, the authority effecting service must complete *the relevant certificate in every case, even if it is not enclosed with the request.*

### 1.3 Protection given to addressees, sanctions

Articles 15 and 16 of the Hague Service Convention provide for a mechanism intended to protect the defendant who has not received a served document.[17] The aim of Article 15 is therefore to ensure rights of defence (Report by TABORDA FERREIRA, Acts and Documents of the 10th session (1964), Volume III, Service of Process, p. 93).

Article 15 of the Hague Service Convention deals with the service of a summons or equivalent document in accordance with the provisions of the Convention when the defendant fails to appear.

Article 15 therefore provides in its first paragraph that when a summons or equivalent document has to be transmitted abroad for the purpose of service, under the provisions of the Hague Service Convention and the defendant fails to appear, the court is required to *defer judgment* until it is established that *the document was either served in accordance with the methods prescribed by the internal law of the state addressed*

---

[17] With reference to Article 15 of the Hague Service Convention see also Article 26 paragraph 3 Lugano Convention (Convention of 30 October 2007 on jurisdiction and the recognition and enforcement of decisions in civil and commercial matters (SR 0.275.12, revised version of the Convention of 16 September 1988 on jurisdiction and the enforcement of judgments in civil and commercial matters).

(Art. 15 para. 1 let. a Hague Service Convention), *or the document was actually delivered to the defendant or to his residence by another method provided for by the Hague Service Convention* (Art. 15 para. 1 let. b). The first possibility envisages cases where service has been effected in accordance with Article 5 paragraph 1 let. a of the Hague Service Convention. The second possibility is aimed at cases of transmission in accordance with Article 5 paragraph 1 let. b of the Hague Service Convention as well as cases where alternative channels of transmission (see II.D.1.2, p. 9) are used. In this second case, it is not sufficient that the alternative channels of transmission or a method of transmission peculiar to the requesting state (Art. 5 para. 1 let. b Hague Service Convention) was used, it is also necessary for *service to be effected on the defendant in person or at least at his residence* (Report of TABORDA FERREIRA, op. cit., p. 95). With regard to alternative channels of transmission, the reservations made by contracting states in relation to certain methods of transmission should be taken into account. In addition, the court may only defer judgement, whatever the situation, if service has been effected in sufficient time for the defendant to be able to defend himself.

Article 15 paragraph 2 of the Hague Service Convention qualifies the protection given by the first paragraph to the extent that it allows contracting states to declare that their courts may give judgment irrespective of paragraph 1, subject to the conditions, however, that *i)* the document has been transmitted by one of the methods provided for by Hague Service Convention *ii)* that a period of not less than six months has elapsed and *iii)* that no certificate has been obtained despite every reasonable effort being made by the competent authorities. Switzerland has not made any declaration in terms of Article 15 paragraph 2 of the Hague Service Convention. This option is, however, open to any Swiss court through the application of the principle of reciprocity (see I.C.5, p. 4) when service should have taken place in a state which has made such a declaration.

If, however, a judgment has been given against a defendant who has not been able to appear, the defendant may, under Article 16 of the Hague Service Convention, request the court to relieve him of the effects of failing to appeal against the judgment within the given time. Article 16 does not, however, apply to judgments relating to the status or capacity of persons (Art. 16 para. 4 Hague Service Convention).

*1.4   Grounds for refusing service*

If the Central Authority concludes that the provisions of the Hague Service Convention have not been complied with, Article 4 of the Convention mandates that the Central Authority promptly inform the applicant.

Furthermore, service may be refused if the document does not relate to a civil or commercial matter (Art. 1 para. 1 Hague Service Convention; see I.D, p. 4), if a particular form is required that is contrary to the law of the state addressed (Art. 5 para. 1 let. b), or if the execution of service is such that it would infringe upon the sovereignty or security of the state addressed (Art. 13 para. 1). The term "sovereignty" must be interpreted restrictively. It cannot be understood as being equivalent to public policy. In this sense, Article 13 paragraph 2 of the Hague Service Convention indicates that the execution of a request may not be refused solely on the ground that the law of the state addressed claims exclusive jurisdiction over the subject matter of the action or does not permit the action upon which the application is based. In

other words, these grounds are not considered relevant to the sovereignty of the state addressed.[18]

### 1.5   Costs

In principle, no charges may be made for services relating to the service of documents relating to judicial assistance (Art. 12 para. 1 Hague Service Convention). There is, however, an exception for cases requiring the involvement of a judicial officer or the use of a particular method of service (Art. 12 para. 2 let. a and b Hague Service Convention). Moreover, bilateral agreements may provide different rules (see I.C.2, p. 3).

## 2.   1954 Hague Convention

The 1954 Hague Convention served as the basis for the Hague Service Convention of 1965. The requirements and conditions applicable to the service of documents under the Hague Service Convention were largely restated and differ from those contained in the 1954 Hague Convention only in a few points. Only these differences are considered below.

### 2.1   Form

Requests for service based on the 1954 Hague Convention need not be transmitted in a standardised form.

Under Article 1 paragraph 1 of the 1954 Hague Convention, the consul's request must indicate the authority issuing or forwarding the document, the names and capacities of the parties, and the address of the addressee. In addition, the nature of the document in question must be mentioned, i.e. it should state the subject matter of the action and describe in detail the documents to be served (e.g.: legal claim, response to the claim, judgment on the evidence; Art. 1 para. 1 1954 Hague Convention). The request shall be in the language of the requested authority. A receipt should always be attached to the request. If service must be effected in a special form (e.g. according to the law of the requesting state), it is advisable to request this expressly and to justify the request (Art. 3 1954 Hague Convention).

### 2.2   Execution and language

Here too, service can be effected either by simple delivery (Art. 3 1954 Hague Convention together with Art. 2 1954 Hague Convention; without translation; see II.E.1.2, p. 12), subject to refusal by the addressee, or by formal service (with certified[19] translation; in Switzerland either in German, French or Italian, depending on the place of execution of the request, see Federal Supreme Court Decision 103 III 69). With regard to simple delivery, it should be borne in mind that the FOJ is of the opinion that it is advisable to inform the addressee of his right to refuse service if the documents have not been translated (see II.E.1.2, p. 12). The court is not obliged to complete the certificate; a receipt signed by the addressee is sufficient.

---

[18]   On the subject of third party debt orders see A. R. MARKUS, Drittschuldners Dilemma, in: Rechtsetzung und Rechtsdurchsetzung, Festschrift für Franz Kellerhals zum 65. Geburtstag, Stämpfli Verlag Bern 2005; also appeared in: BlSchK, 2005, H 1, p. 1 ff.

[19]   This means certification that the translation is complete and correct.

*2.3    Protection for the addressee*

In contrast to the Hague Service Convention, the 1954 Hague Convention does not provide any mechanism for the protection of the rights of the defendant.

*2.4    Costs*

The execution of the request for service may not give rise to the right to the reimbursement of costs, unless service is made forcibly or if a special form is required (Art. 7 para. 2 Hague Service Convention). Moreover, bilateral agreements may provide different rules (see I.C.2, p. 3).

## 3.    Absence of an agreement

Where there is no international agreement, Switzerland applies the provisions of the 1954 Hague Conventions to requests received from abroad and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA; see also Art. 11*a* para. 1 - 3 PILA).

With regard to requests made by Switzerland to other countries, reference is made to the [Guide on Judicial Assistance](#). It is, however, worth noting that, in relation to costs, Swiss representations in those states where no agreement exists in this regard will request the Swiss authority to guarantee a refund in the event that charges are made.

## II.F.    Special Questions

## 1.    Service addressed to foreign states or foreign state-owned companies

In the case of service addressed to foreign states (including embassies and consulates) or to foreign state-owned companies, Article 16 of the [European Convention on State Immunity applies](#) (SR 0.273.1). Under paragraph 4 of this provision, the periods for entering into the proceedings and the methods of appeal against a judgment by default begin to run two months after the service of the document or the judgment with the department of foreign affairs of the state addressed. In addition, the courts having jurisdiction may not assign a period shorter than two months from the receipt of the documents by the department of foreign affairs (Art. 16, para. 5). These rules, which are in keeping with normal practices, should also be respected outside the scope of application of the said Convention.
The FOJ is willing to provide support and explanation of the procedures in the different countries.

## 2.    Service addressed to Swiss nationals abroad

Reference should be made to the explanations on alternative channels for affecting service addressed to Swiss nationals abroad by Swiss diplomatic or consular representatives. These can be found under II.D.1.2.1, p. 9, II.D.2.2, p. 10, II.D.3, p. 11 and on the pages relating to each country in the [Guide on Judicial Assistance](#). For requirements regarding translation and form and the explanations under II.E.1, p. 11 and II.E.2, p. 15 apply mutatis mutandis.

If the Swiss citizen has more than one nationality, i.e. is also a national of the requested state, the ordinary channel should be followed; the Swiss consular or diplo-

matic representative may not serve documents (for exceptions see II.D.1.2.2, p. 10). If the Swiss citizen is also a national of a third state, the Swiss consular or diplomatic representative is permitted to serve documents.[20]

Besides the alternative channels described, there are further ways of serving documents listed on the pages referring to each country.

## 3. Service of documents which institute proceedings and Recognition of Judgments

The Hague Conventions do not regulate the legal effects of serving documents.

Furthermore, the regulations that govern the service of documents in relation to the main proceedings are not necessarily the same as those applied in relation to the recognition procedure, in which, as a condition for the recognition of a judgment, it must be ensured that the document instituting the proceedings was duly served (see for the respective requirements e.g. Art. 27 para. 2 let. a PILA; but see also Art. 34 no 2 of the Convention of 30 October 2007 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters [LugC[21], SR 0.275.12] and the declaration issued by Switzerland on Article III para. 1 of Protocol 1;[22]). Thus, as we have already indicated, although the USA does not object to the service of documents on its territory by diplomatic agents, the subsequent judgment will not necessarily be recognised, for example, when the documents have been served in a language that the addressee did not understand (see II.E.1.1, p. 12). For the precedents and doctrine relating to these questions in Switzerland, which are not always consistent, see for example DUTOIT, Commentaire de la loi fédérale du 18 décembre 1987, 4th ed., Basel 2005, no 8 ad Art. 27 ; HONSEL/VOGT/SCHNYDER/BERTI (edit.), Basler Kommentar, Internationales Privatrecht, 2nd edition, Basel 2007, no 9 ff ad Art. 27 ; GIRSBERGER/HEINI/KELLER/KREN KOSTKIEWICZ/SIEHR/VISCHER/VOLKEN (edit.), Zürcher Kommentar zum IPRG, 2nd ed., Zurich 2004, no 74 ff ad Art. 27; Federal Supreme Court Decision 122 III 439 (447 f) also published in SRIEL 1998, p. 441 with a commentary by I. SCHWANDER; Federal Supreme Court Decision 135 III 623, with a commentary by I. SCHWANDER in AJP/PJA 1/2010, p. 110 ff; Federal Supreme Court judgment 4A_161/2008 (01.07.2008), already with a consideration on LugC of 2007; Supreme Court judgment 5A_544/2007 (04.02.2008); F. DASSER / M. FREY, Übergangsrechtliche Stolpersteine des revidierten Lugano-Übereinkommens, in: Jusletter 11 April 2011, margin no 18 ff.; Aargau Cantonal Supreme Court, 17.12.1999, SRIEL 2001, p. 224.

## 4. Address of addressee unknown – Service by Public Notice

When the address of the addressee of service is unknown, the Hague Conventions do not apply (Art. 1 para. 2 Hague Service Convention; Art. 1 para. 1 1954 Hague Convention). Therefore, when an authority wishes to proceed with service by means of public notice in a foreign country, it is recommended in principle to follow diplomatic channels. In addition, as the obligation to grant assistance no longer follows from a convention, the state addressed is free to decide whether it cooperates or not. It

---

[20] See footnote 10
[21] Revised version of the Convention of 16 September 1988 on jurisdiction and the enforcement of judgments in civil and commercial matters
[22] See also Art. 27 no 2 LugC 1988 in conjunction with Art. 63 LugC

should be noted here that the Swiss Civil Procedure Code permits the authorities to proceed with a public notice in Switzerland when the address of the addressee is unknown and cannot be ascertained despite making reasonable enquiries or when service is impossible (see Art. 141 CPC).

To the knowledge of the FOJ, the central cantonal authorities do not automatically refuse to proceed with publication in response to a request from a foreign authority when the address of the addressee is unknown, but prefer to investigate the matter. Furthermore, in general, the Swiss authorities do not reject requests that have not followed diplomatic channels, but which have followed a channel provided for by the Conventions.

In the opinion of the FOJ, a Swiss or a foreign authority may proceed with the publication of notices addressed to an indeterminate number of persons whose identities are unknown (notice to creditors, appeal for beneficiaries of a will) by addressing their request to their representation in the country of publication. The representation is then charged with arranging publication.

5. **Agreement between the European Community and Switzerland relating to the Free Movement of Persons, Federal Act on the Free Movement of Lawyers and Assistance**

With the entry into force on 1 June 2002 of the Agreement between Switzerland on the one hand, and the European Community and its member states on the other relating to the free movement of persons (SR 0.142.112.681) and the Federal Act on the Free Movement of Lawyers (SR 935.61; Lawyers' Act), a lawyer domiciled in the territory of the European Union may, under certain conditions, represent clients in Switzerland. Against this background, several judicial authorities have asked the FOJ whether the new law permits them to effect service without using the assistance channels.

First of all, it should be noted that this legislation does not regulate questions of assistance. Furthermore, under Article 140 of the Swiss Civil Procedure Code, the court may instruct parties with domicile or registered office abroad to provide a domicile for service in Switzerland.

There are two different cases: either a party domiciled in Switzerland is represented in a Swiss court by a lawyer whose registered office is on EU territory, or both the party and his or her legal representative are domiciled on EU territory.

In the first case, the FOJ is of the opinion that the assistance channels do not have to be followed. Indeed, due to the fact that the party concerned by service is domiciled in Switzerland, service made to his or her lawyer (see Art. 137 CPC) has no effect abroad and consequently is not capable of undermining the sovereignty of the state in which the lawyer has his or her registered office. Postal service to the lawyer for the parties is, as a result, permissible in such a case.

In the second case, due to the fact that the party is domiciled abroad, service has legal effects abroad and is, as a result, capable of infringing on the sovereignty of the state involved. It is advisable, therefore, to follow the assistance channels. It should be recalled that there are bilateral agreements between Switzerland and the coun-

18

tries bordering it that permit direct correspondence between authorities (see I.C.2, p. 3).

## 6. Domicile for service

Under Article 140 of the Swiss Civil Procedure Code, the court may instruct parties with domicile or registered office abroad to provide a domicile for service in Switzerland. This instruction should also include a reference to what happens if a domicile for service is not provided (see Art. 141 CPC: Public notice) and has legal effects, so notice of this should be served abroad via judicial assistance channels (see e.g. Federal Insurance Court ruling K 18/04 of 18 July 2006).

## 7. Deadline compliance

Submissions to the Swiss authorities must be filed no later than the last day of the limitation period with the relevant authority (e.g. the court dealing with the case) or by handing over documents to Swiss Post, a diplomatic mission or consular office of Switzerland for forwarding to the court (see Art. 143 CPC). When setting the limitation period the relevant authority can, provided it has the discretion to do so, take account of particular circumstances in the state in which service is effected (e.g. poor or unreliable postal service; nearest Swiss representation is in another country).

### III.A.  Foreword

**1.      Overview**

In addition to requests for service of documents, which in practice account for two thirds of all applications, judicial assistance in civil proceedings also includes requests made in order to obtain evidence (letters of request). The object of such applications is for example to obtain statements from witnesses, the production of documents, or an expert opinion.

The 1954 Hague Convention deals with requests relating to obtaining evidence in Chapter II: "Letters of request". The Hague Evidence Convention is devoted exclusively to this subject. It makes provision for obtaining evidence by means of letters of request (Chapter I), on the one hand, and through diplomatic or consular officers and through commissioners (Chapter II), on the other.

**2.      Cases in which procedures for assistance need not be followed**

According to international law, each state is obliged to respect the territorial sovereignty of other states. The territorial sovereignty of a state can, however, occasionally come into conflict with the judicial jurisdiction of the court in another state. It is generally accepted that a party domiciled in one state may come under the jurisdiction of another state. In relation to obtaining evidence, taking account of the judicial jurisdiction of a foreign court has, depending on the scenario, the following consequences.

The act of a foreign judge or a person appointed by him or, as permitted under the common law system, of the representatives of the parties coming to Switzerland to carry out legal procedures *always* constitutes an official act that may only be carried out in accordance with the rules relating to judicial assistance. Failing to do so is regarded as a violation of Swiss sovereignty whether or not the persons affected by these legal procedures are willing to cooperate.

In cases where a foreign judge or a person appointed by him or her or the representatives of the parties in common law systems do not come to Switzerland, but require a party domiciled in Switzerland to provide evidence (for the limits see Federal Supreme Court Decision 114 IV 128[23]), to fill in a questionnaire, or to appear before a foreign court, the submission of a letter of request to the Swiss authorities is not necessarily required. Letters of request are therefore not necessary in the event that a refusal to cooperate leads only to consequences of a procedural nature (e.g. a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage). The party concerned is free to cooperate. The *service* of this type of invitation must, however, be carried out according to the proper procedure for judicial assistance.

---

[23]   For the somewhat controversial discussion of the practice of the Federal Supreme Court, see for example DOROTHEE SCHRAMM, Entwicklungen bei der Strafbarkeit von privaten Zeugenbefragungen in der Schweiz durch Anwälte für ausländische Verfahren, AJP 2006 p. 491 ff., additional comments on p. 494

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 138 of 171

Where non-compliance by a party to the proceedings leads to sanctions that are not of a procedural nature (e.g. the criminal offence of *contempt of court*) the procedure for judicial assistance must be followed and thus a letter of request is required. This is because only the Swiss authorities may apply coercive measures on Swiss territory.

In the event that the person to whom the invitation is directed is *not a litigant*, but a *third party* (witness, expert), he or she may not be regarded as being subject to the judicial jurisdiction of the court involved. In such cases, the legal proceedings must be carried out according to the proper procedure for judicial assistance. The mere invitation to go abroad does not have to follow the procedure for judicial assistance, provided, however, that it is not accompanied by any kind of coercive measure or that such a measure will not automatically result in the event of a refusal.

### III.B.  The competent authorities and transmission procedures

### 1.  Hague Evidence Convention

#### 1.1  Under Chapter I of the Hague Evidence Convention

In Chapter I, which governs letters of request, Article 1 paragraph 1 of the Hague Evidence Convention provides that the judicial authority of a contracting state may request by letters of request the competent authority of another state to perform any judicial act. The FOJ is of the opinion that the application for judicial assistance must in fact be issued by an *authority* and not by a private person, such as a lawyer. This interpretation follows from the text of the Convention.[24] It also provides for the limitation of any possible abuse by those receiving a request to the extent that the authority in question may proceed to filter the evidence required according to its relevance to the case at issue. Swiss authorities may only refuse an application within the limits of Article 12 of the Hague Evidence Convention.

The request for judicial assistance is sent to the Central Authority of the state addressed (the receiving authority), where applicable, via the Central Authority of the requesting state.[25] The central cantonal authority of the place in which the request is executed is therefore the receiving authority when the application comes from a foreign country. Such applications may, however, be lodged with the FOJ, which will transfer them to the competent central cantonal authority.

Swiss applications are transferred to the Central Authority designated by the state addressed (see the Guide on Judicial Assistance) or directly to the executing authority if there is a bilateral agreement allowing direct communication between authorities (see I.C.2, p. 3).

In the event that an authority receives an application for the execution of which it is not competent, it is required under Article 6 of the Hague Evidence Convention to forward the application without delay to the competent authority.

---

[24] In contrast to the Hague Service Convention, the Hague Evidence Convention does not mention "judicial officers".

[25] In Switzerland, the following cantons require that requests be filed via the central cantonal authority: JU, NE, SZ (for all requesting authorities apart from courts) and ZH.

## 1.2 Under Chapter II Hague Evidence Convention

The requesting authority will generally be the authority dealing with the case in the requesting state. Under Article 17 of the Hague Evidence Convention, however, it is sometimes the parties or their representatives who file the request by attaching the relevant court decision relating to the appointment of a commissioner to take evidence.

As under Chapter I of the Hague Evidence Convention, the application for judicial assistance shall be sent to the Central Authority of the state addressed (receiving authority) if applicable via the Central Authority of the requesting state.[26] The central cantonal authority of the place in which the request is executed is therefore the receiving authority when the application comes from a foreign country. Such applications may, however, be lodged with the FOJ, which will transfer them to the competent central cantonal authority. Under Articles 15 to 17 of the Hague Evidence Convention, where FDJP authorisation is necessary, we recommend sending a copy of the application to the FOJ in order to accelerate the decision process (see III.C.1.2, p. 28).

Swiss applications are transferred to the (Central) Authority designated by the state addressed. The explanations provided by the contracting states should be referred to.

In the event that an authority receives an application for the execution of which it is not competent, it is required under Article 6 of the Hague Evidence Convention to forward the application without delay to the competent authority.

## 2. 1954 Hague Convention

Letters of request must be issued by a *judicial authority*, in the same way as stipulated in the Hague Evidence Convention.

The foreign judicial authority must send its application to the diplomatic representation of its nation in Switzerland. The diplomatic representation will send the application to the FOJ, which, in turn, will send it to the competent cantonal authority.

A Swiss request must be sent to the FOJ, which will send it to the competent Swiss diplomatic representation in the country of destination, which, in turn, will send it to the authority designated as being competent by the country of destination in accordance with Article 9 of the 1954 Hague Convention. For detailed information, see the Guide on Judicial Assistance.

## 3. Absence of an agreement

Where there is no international agreement, Switzerland applies the 1954 Hague Convention to foreign requests and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA).

Swiss requests, if there is not a contrary custom, follow diplomatic channels (see, II.D.2.2, p. 10). See also the Guide on Judicial Assistance.

---

[26] See footnote 25.

### 4.     Other channels of transmission

See II.D.4, p. 11.

### III.C.   Requirements for the Application

### 1.     Hague Evidence Convention

*1.1    Application under Chapter I*

#### 1.1.1  Form

The Hague Evidence Convention does not require the use of a standard form for the application. In order to avoid omitting any information in the application, it is, however, recommended to use the example provided on our website based on the model proposed by the Hague Conference on Private International Law.[27]

#### 1.1.2  Contents (Art. 3 Hague Evidence Convention)

In accordance with Article 3 of the Hague Evidence Convention, the letter of request must specify the following:

- The requesting authority and, if possible, the requested authority;
- The names and addresses of the parties, and, if applicable, of their representatives;
- The nature and the purpose of the proceedings, and a summary of the case;
- The evidence to be obtained or other judicial act to be performed.

If appropriate, the letters of request shall also specify:

- The names and addresses of the persons to be questioned;
- The questions to be put to these persons, or a statement of the subject matter about which the persons are to be questioned;
- The documents or other property to be inspected;
- Any request for the evidence to be given on oath or affirmation and, if necessary, any special form to be used;
- Any special procedures required in accordance with Article 9 of the Hague Evidence Convention;
- Any additional indications based on the model available on the Internet following the model proposed by the Hague Conference on Private International Law (see the User's Guide 1970, p. 69 f.).

No legalisation or analogous formality is required.

#### 1.1.3  Language and translations (Art. 4 Hague Evidence Convention)

Each contracting state must accept letters of request written in French or in English, or with an attached certified[28] translation in one of these languages, unless a reservation prevents it from doing so.

---

[27]  See Practical Handbook on the operation of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matter, Antwerp – Apeldoorn 1984 [hereinafter: Practical Handbook Hague Evidence Convention], p. 69 f.; see footnote 2.

[28]  This means certification that the translation is complete and correct.

Switzerland has issued a reservation in accordance with which the letters of request and their annexes must be written in German, French or Italian or translated into one of these languages, depending on where the request is executed.

For letters of request intended for a foreign country, please refer to the [Guide on Judicial Assistance](#).

### 1.1.4 Execution

*a. Applicable Law (Art. 9 Hague Evidence Convention)*

In general, the execution of a letter of request is carried out in accordance with the law of the requested authorities. In Switzerland this means the cantonal laws on the administration of justice and the Swiss Civil Procedure Code, in accordance with Article 122 of the Federal Constitution.

The requested court shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by authorities of its own country or of requests made by parties in internal proceedings (Art. 10 Hague Evidence Convention).

When the application of the law of the requesting state is requested (Art. 9 para. 2 Hague Evidence Convention), the request shall be met unless the form is incompatible with the law of the state addressed or if its application is not possible due to practical difficulties.

This means that affidavits, which should be provided with the witness' statements and which are often required in the US instead of an oath, can be approved without problem. It should be noted that the witness must consent to this. If the witness is unwilling, he or she cannot be forced to act.

*Cross-examination* may also be admissible. In such cases, however, the Swiss judge remains in control of the questioning and must intervene when he or she considers it necessary. It is in particular the judge's responsibility to inform the witness of the right to refuse to give evidence or of prohibitions to give evidence. The judge is also the only person authorised to use coercive measures against the witness.

When, on request of the requesting state, a special form is used, the said state must meet the expenses thereof (Art. 14 para. 2 Hague Evidence Convention).

*b. Obtaining evidence via a person appointed by the authorities addressed (Art. 14 para. 3 Hague Evidence Convention)*

Authorities that receive but are not in a position to execute a letter of request may instruct an authorised person to do so. In particular, when a request is sent to countries with a system of common law, the requested court may be unable to execute the letter of request by itself because, according to its procedural rules, it is the parties' responsibility to gather the evidence.

In accordance with Article 14 paragraph 3 of the Hague Evidence Convention, the requested authorities may, in such a situation, authorise a qualified person to execute the letter of request if the requesting authority agrees. By giving its consent, the requesting authority declares itself willing to meet the ensuing costs (see III.C.1.1.4f, p. 26).

*c.* *The right to refuse to testify / Banking secrecy*

The person to be questioned or who is requested to produce documents may claim to be exempt or prohibited from providing evidence, either on the basis of the law of the state addressed, or of the law of the requesting state (Art. 11 Hague Evidence Convention).

It should be noted that Article 47 paragraph 5 of the Federal Act of 8 November 1934 on Banks and Savings Banks (SR 952.0) makes a reservation in favour of federal and cantonal provisions relating to the duty to inform the authority and to testify in court. Bankers, who are essentially required to cooperate, are subject to Article 166 paragraph 2 of the Swiss Code of Civil Procedure as confidants of professional secrets. They may refuse to cooperate if they can show credibly that the interest in protecting confidentiality outweighs the interest in establishing the truth (limited right of refusal). The judge in this case weighs up the interests and decides on a case-by-case basis if the disclosure duty outweighs professional confidentiality and if banking secrecy should be lifted.

*d.* *Participation of the members of the court of the requesting authority (Art. 8 Hague Evidence Convention) and/or of the parties or of their representatives (Art. 7 Hague Evidence Convention)*

If the requesting authority wishes that certain of its court officers witness the execution of a letter of request, it must ask the authority in charge of the execution for preliminary authorisation (Art. 8 together with Art. 35 para. 2 let. c Hague Evidence Convention; reservation by Switzerland). The parties and/or their representatives may also be present at the execution of the letter of request if they so desire (Art. 7 Hague Evidence Convention).

In our view, in such cases the foreign requesting authority and/or the parties and/or their representatives must be able to intervene if they so desire. The Swiss judge, however, remains the master of the proceedings and the only person authorised to take coercive measures against the person addressed by the letter of request. He may furthermore remind the witness of his or her right to refuse to give evidence or that he or she is forbidden to give evidence.

*e.* *Grounds for refusal*

The authorities addressed may only refuse a request in the following cases:

- Where the case is not civil or commercial in nature (see I.D, p. 4);
- If the application does not fulfil the formal requirements (Art. 3 Hague Evidence Convention) or was not sent with the required translation (Art. 4 Hague Evidence Convention). In this case, the requesting authority should first of all be asked to complete its application (Art. 5 Hague Evidence Convention);
- If the authenticity of the application is unclear (generally, the fact that the application has been sent through the proper channels is sufficient proof of its authenticity; see also the different agreements on the abolition of legalisation on foreign public documents that have been ratified by Switzerland; SR 0.172.030.3/.037.43);
- If the execution of the application is not within the jurisdiction of the courts (Art. 12 para. 1 let. a Hague Evidence Convention; e.g. in the event that an amount of money needs to be collected in Switzerland and that the parties themselves have to act by way of forcible execution);
- If the state addressed is of the opinion that the execution of the application is liable to violate its sovereignty (e.g. coercive measures ordered in support of foreign

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 143 of 171

decisions that influence the proceedings) or its security (Art. 12 para. 1 let. b Hague Evidence Convention);

- If the requested form of execution of the application is contrary to the legislation of the state addressed (before finally refusing the application, the foreign country should be asked if the requesting court accepts the execution being carried out in the forms authorised by the laws of the state addressed; Art. 9 Hague Evidence Convention).

### f. Costs

It is not possible in principle to charge any costs for the services carried out to the requesting state (Art. 14 para. 1 Hague Evidence Convention). The state addressed, however, may claim the reimbursement of compensation paid to experts and interpreters, and of costs ensuing from the enforcement of a special procedure called for by the requesting state, in accordance with Article 9 paragraph 2 of the Hague Evidence Convention.

Once the authority addressed has authorised a person to initiate the obtaining of evidence according to Article 14 paragraph 3 of the Hague Evidence Convention (see III.C.1.1.4b, p. 24), and has obtained consent of the requesting authority after indicating the approximate amount of the costs, it has the right to charge the requesting authority for the costs engendered. The consent of the requesting authority implies an obligation to reimburse the costs that result from using the services of a third party. If the requesting authority does not give its consent, it will not be liable for these costs.

It is provided in Article 26 of the Hague Evidence Convention that each contracting state may, in the event that it is so liable in terms of its constitution, invite the requesting state to reimburse the execution costs of the letter of request, and in relation to the summons, the expenses due to the person who gives evidence and who makes a record of the judicial enquiries. When a state makes use of this provision, any other contracting state can invite this state to reimburse the aforementioned costs.

It should be emphasised that the aforementioned provision must be regarded as an exception. As a rule, the costs are settled as indicated above, in accordance with the provisions of Article 14 of the Hague Evidence Convention.

In relation to Switzerland, the special terms of Article 26 of the Hague Evidence Convention are not applicable, as there is no corresponding constitutional provision. In the event that another contracting state relies on Article 26 of the Hague Evidence Convention, it must first indicate its pertinent constitutional provision. Switzerland could, in this case, demand reciprocity.

### 1.1.5 Letter of request relating to "*pre-trial discovery*" proceedings

The Swiss Civil Procedure Code imposes an obligation to produce exhibits that are likely to be relevant to the case. Persons who are not party to the proceedings may be exempt from this obligation provided they can claim the total or limited right to refuse to give evidence (see Art. 160 ff. CPC). It is incumbent upon the judge to decide which documents need to be produced.

The states with common law legal system have a stage in the proceedings called "*pre-trial discovery*", which takes place after the commencement of the action but before the main hearing. According to the American "discovery" system, each party has the obligation to inform the opposing party of all information that is relevant to the

case, the concept of relevance being interpreted in the broadest sense. This stage of the proceedings is conducted largely without judicial intervention. The judge only intervenes if the parties fail to reach an agreement, in particular if one of the parties fails to collaborate. The judge may, in this case, use coercive measures.

For the majority of countries in Europe, including Switzerland, the relevance and the specification of the facts to be established in civil proceedings must meet very demanding requirements. This is why Article 23 of the Hague Evidence Convention makes it possible for contracting states to declare that they will not execute a letter of request filed by states governed by common law relating to a pre-trial discovery of documents. Switzerland, without completely excluding assistance in the context of a pre-trial discovery, reserves the right, according to the conditions established below, to refuse requests for assistance that have such proceedings as their objective.

Switzerland therefore executes applications by foreign countries for judicial assistance formulated in the framework of pre-trial discovery, but always requires *i)* that applications be sent to Switzerland by a competent foreign court and not directly by the parties concerned, and *ii)* that applications precisely describe the evidence required and the purpose for which it is requested. Requests that are formulated in general terms and require the opposing party to indicate the documents in his or her possession with the aim of obtaining information that bears no relation to the case or to attempt to discover evidence to substantiate a claim ("*fishing expeditions*") are rejected. In other words, this means that applications by foreign countries for judicial assistance relating to pre-trial discovery are dealt with in the same way as internal Swiss applications for the production of documents.

A direct and necessary relationship therefore needs to exist between the request and the proceedings pending abroad. The letter of request must prove to be sufficiently relevant on a factual level.

The request will be refused if a person is asked to indicate the exhibits relating to the case that are or were in his or her possession or care, or over which he or she has or had a power of disposal. The same holds true when a person is expected to submit any document other than those stated in the application for judicial assistance. The aim is to prevent the party who bears the burden of proof to shift his or her obligation to the opposing party, or even to a third party.

Such letters of request must not, however, damage the interests of the persons concerned that are worthy of protection. This provision, which is a general clause in itself[29], is intended to take the banking and professional secrecy that is characteristic of Swiss law into consideration, without however leading to an automatic refusal of applications for judicial assistance based on a pre-trial discovery procedure.

---

[29] Article 156 CPC: Safeguarding legitimate interests, reads "The court shall take appropriate measures to ensure that taking evidence does not infringe the legitimate interests of any parties or third party, such as business secrets."

### 1.2 Request under Chapter II of the Hague Evidence Convention (Art. 15 to 22 Hague Evidence Convention)

#### 1.2.1 General

As mentioned above, in accordance with Article 271 paragraph 1 SCC, those persons who carry out activities on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official, are committing an offence (see I.B, p. 2). Thus, unless they have authorisation, foreign parties who proceed with the hearing of witnesses or obtaining evidence on their own initiative in Switzerland are liable to be punished (the ordinary preparation of a case[30] by a lawyer has, however, always been possible without authorisation). This situation presents certain disadvantages for countries, such as the United States, which consider that the parties have authority to obtain evidence.

The Hague Evidence Convention compensates for this disadvantage by providing in its Articles 15, 16 and 17 that diplomatic or consular officials and court-appointed commissioners may take procedural steps in preparation for a trial, subject to certain conditions (Art. 21 Hague Evidence Convention). In conformity with these provisions, Switzerland has made use of its right to issue a reservation in relation to this provision whereby the aforementioned persons need to obtain authorisation with the Federal Department of Justice and Police before executing procedural steps in preparation for a trial.

#### 1.2.2 Conditions laid down in Article 21 Hague Evidence Convention – Procedural safeguards

Article 21 of the Hague Evidence Convention imposes the following conditions:

- The consular representative or commissioner can take any evidence insofar as the procedural steps considered are compatible with the law of the state of execution and accord with the authorisation granted (for foreign applications relating to this issue, see III.C.1.2.3, p. 29). Under the same conditions, he may also examine a witness under oath or solemn declaration (Art. 21 let. a Hague Evidence Convention).
- With the exception of the cases in which the person specified by the procedural measure is a national of the state in which the proceedings have begun, any request to appear or to give evidence must be written in the language of the place where the evidence is taken or be accompanied by a translation into such language (Art. 21 let. b Hague Evidence Convention).
- The summons must indicate the fact that the person concerned may be assisted by his counsel, and that he is not obliged to appear or to participate in the evidence-taking. The person in question is therefore free not to cooperate at all or to interrupt the taking of evidence (Art. 21 let. c Hague Evidence Convention). The consular or diplomatic official or the commissioner may not take any coercive measures against the witness. Article 18 Hague Evidence Convention, however, provides that states may declare that foreign persons authorised to take evidence may apply to the competent authority to obtain the assistance required to carry out such acts by using coercive measures. Switzerland has made no declaration in relation to this subject, which makes it impossible to force the persons specified

---

[30] Obtaining of evidence taken into consideration in terms of the place of residence of the witnesses, etc.

by the procedural steps to collaborate in terms of Chapter II of Hague Evidence Convention. In the event of a refusal to collaborate, the only available procedure is the one provided for in Chapter I of the Hague Evidence Convention.

- In contrast to the proceedings under Chapter I of the Hague Evidence Convention, the evidence is to be taken, as a rule, according to the procedures provided for by the law of the requesting court. However, if the specified procedures are against the law of the state of execution, they may not be used.
- Cross-examination is also authorised, during which the witness is examined by the lawyers of both parties (Art. 21 let. d Hague Evidence Convention). For applications sent to Swiss authorities, see III.C.1.2.3, p. 29.
- The person to be heard may invoke, as in the context of a letter of request according to Chapter I of the Hague Evidence Convention, a privilege (Art. 21 let. e, together with Art. 11 Hague Evidence Convention).

### 1.2.3 Authorisation procedure before the Swiss authorities, and content of the application

In Switzerland, a foreign request for obtaining evidence is subject to prior authorisation by the FDJP (see the Swiss reservation in this respect as well as our Fact sheet, according to Articles 15 to 17 Hague Evidence Convention.

Foreign applications must, however, first be addressed to the Central Authority of the canton where evidence will be taken (see the Swiss reservation); they (and the enclosures) must be submitted in the official language of this canton. To speed up the procedure, we recommend you send a copy at the same time to the Federal Office of Justice FOJ, Private International Law Unit, 3003 Bern. After examining the request, the central cantonal authority forwards the application to the FOJ, indicating, if need be, whether it is opposed to granting the authorisation or if it would like the authorisation to have certain accompanying conditions. When the procedural conditions and safeguards according to Article 21 Hague Evidence Convention are met, the FDJP grants the authorisation. An advance of fees will, however, be necessary beforehand (Art. 5 and 13 of the Ordinance on Costs and Remuneration in Administrative Proceedings [SR 172.041.0]; CHF 100 to 5000).

If cross-examination is intended, there are two possible approaches. First, a sole commissioner can be appointed – for example, a neutral person – who will chair the taking of evidence and will see to it that the examination by the lawyers of the parties is conducted in accordance with Swiss law (no coercion, reminder of exemptions or any prohibition from giving evidence). In this case only one authorisation will be given. Second, it is also possible that each agent is appointed commissioner. In this case, authorisation will be granted to each person to conduct the examination.

The application for authorisation must:
- Briefly describe the nature and subject matter of the proceedings;
- Indicate the amount in controversy; this is necessary in order to fix the amount of the advance on procedural costs. The decision on the authorisation will be taken only after payment of the advance on procedural costs.
- Indicate the identity and the address (fax number, e-mail included) of the litigants;
- Indicate the identity and the address (fax number, e-mail included) of the counsels of the litigants;
- Indicate the form of, and the grounds for, the intended procedural formalities; it is recommended to describe in sufficient detail the modalities of the procedural formalities to insure that the authorisation will cover all the procedural formalities en-

visaged. If possible, the name and address of all participants in the procedural formalities should figure in the application;

- Indicate the name and address of the persons involved in the intended procedural formalities;
- Indicate the name and address of the person or persons who are to supervise the evidentiary proceedings if the application is one under Article 17 of the Hague Evidence Convention. Under Articles 15 and 16, on the other hand, all consular or diplomatic officials in the relevant embassy or consular agency will be given authorisation to supervise the taking of evidence;
- Propose a date for the intended taking of evidence. The request should be filed two months before the proposed date.

In addition, the application has to include a copy of the court decision appointing the commissioner.

Before sending the application, it is recommended that written confirmation is requested from prospective witnesses to the effect that they are cooperating of their own accord, that they know they cannot be subjected to any coercive measures, cannot be forced to participate or to appear and have the right to refuse to give evidence on the basis of privileges both under the law of the state addressed and of the state of origin (Art. 21 Hague Evidence Convention). In the event that the person concerned subsequently does not wish to cooperate, the entire procedure will have been unnecessary while having generated costs.

Finally, the application need not be made by the foreign court; it may be made by a party or its attorney. The application should then be accompanied by a power of attorney or by an authorisation of the foreign court. As mentioned, the application needs to be accompanied by the court decision appointing the commissioner.

The Federal Department of Justice and Police must serve the authorisation. In order for this service to be made in time it is suggested that the applicant designate a person in Switzerland who will accept service of the authorisation. In the absence of such an agent for service, the authorisation will have to be served through the channels of judicial cooperation, which unavoidably prolongs the proceedings.

### 1.2.4 Swiss applications to a foreign country or evidence taken by Swiss diplomatic or consular representatives

The FOJ refers to the declarations made by the contracting states on the Hague Evidence Convention. The explanations under III.C.1.2.2, p. 28 should be referred to for conditions and procedural safeguards laid down by Article 21 of the Hague Evidence Convention.

Generally speaking, the Swiss embassies and consulates (Swiss diplomatic or consular representatives) may take evidence in civil and commercial matters from Swiss citizens and other individuals they represent if the host country permits (Article 15 Hague Evidence Convention).

Evidence in civil and commercial matters may only be taken by a Swiss diplomatic officer or consular agent from host state's citizens or from citizens of other countries (Art. 16 Hague Evidence Convention) if the competent authorities of the host state have given their permission, unless the host state has declared that evidence may be taken without its prior permission.

The FOJ is willing to provide support and explanation of the procedures in the different countries. In order to ensure coordination with the Swiss diplomatic and consular representatives and that they are properly instructed, it is recommended that the FOJ is contacted in good time.

## 2. 1954 Hague Convention

### 2.1 Basis

Chapter II of the 1954 Hague Convention served as the basis for Chapter I of the Hague Evidence Convention, which is why only the differences between the two conventions will be dealt with below. For further information see III.C.1.1.1 - 1.1.4, p. 23 et seq.

Chapter II of the Hague Service Convention is new. There is no corresponding chapter in the 1954 Hague Convention. For the obtaining of evidence by private persons or by diplomatic officers and consular agents in the context of the 1954 Hague Convention, see III.C.2.7, p. 32.

### 2.2 Form and content

As in the case of the Hague Evidence Convention, no form is provided by the 1954 Hague Convention. Furthermore, the 1954 Hague Convention does not indicate what information is required for the application. We recommend using the model on our webpage for the Hague Evidence Convention based on the model used by the Hague Conference on Private International Law (see also Practical Handbook Evidence Convention 1970, p. 69 et seq.).

### 2.3 Language and translation

Requests for judicial assistance are in principle to be made in the language of the authority (i.e. the court) requested to execute them, or must be accompanied by a certified[31] translation in that language (Art. 10 1954 Hague Convention). Unless otherwise stated by a bilateral agreement (see I.C.2, p. 3), foreign applications must be in the language of the canton executing the request. Unlike Article 4 paragraph 3 of the Hague Evidence Convention, Article 10 of the 1954 Hague convention does not invite a contracting state which has more than one official language to specify by declaration the language in which the request or the translation thereof shall be expressed for execution in the specified part of its territory. Switzerland has thus made no declaration; Swiss authorities consequently receive from time to time letters written in one of the Swiss official languages, but not in the one of the place of execution. In such cases, the FOJ recommends executing the request nonetheless, if possible, and inviting the requesting authority to draw up its request in the official language of the place of execution in future. In the case of Swiss requests to a foreign country, please consult the Guide on Judicial Assistance.

---

[31] This means certification that the translation is complete and correct.

## 2.4 Applicable law

In accordance with Article 14 paragraph 1 of the 1954 Hague Convention, the authorities addressed apply their own law. When the requesting state calls for the request to be executed in accordance with its own law, its request will only be rejected if the required form is contrary to the legislation of the state addressed.

## 2.5 Grounds for refusal

These are the same as those indicated in the Hague Evidence Convention (see III.C.1.1.4e, p. 25).

## 2.6 Costs

As a rule, judicial assistance is free of charge. However, contrary to what is established by the Hague Evidence Convention, expenses paid to witnesses as well as costs due to the appearance of a witness can be charged. Furthermore, as in the Hague Evidence Convention, expenses paid to experts as well as costs resulting from the application of foreign law to execution are subject to reimbursement (Art. 16 para. 2 1954 Hague Convention; however, for Austria, see the supplementary agreement of 26 August 1968; SR 0.274.181.631, Art. 7 para. 2).

## 2.7 Obtaining evidence directly by the parties in Switzerland or the diplomatic officers or consular agents under the 1954 Hague Convention

### 2.7.1 Activities carried out by the parties in Switzerland

The taking of evidence by a person appointed commissioner is one of the main innovations of the Hague Evidence Convention. The 1954 Hague Convention, on the other hand, does not authorise this. Consequently, Article 271 of the Swiss Criminal Code (SCC) remains fully applicable.[32]

Authorisations under Article 271 SCC are granted only in exceptional cases. Authorisation is not granted unless judicial cooperation is theoretically possible (i.e. when there is no ground for refusal) and in the event that it appears practically impossible, or even absurd, to require Switzerland's public authorities to assist in the matter (see Administrative Case Law of the Federal Authorities 1997 [61/82], p. 789 f.).[33]

### 2.7.2 Activities carried out by diplomatic officers or consular agents

Article 15 of the 1954 Hague Convention authorises foreign requesting authorities to have their requests executed directly by diplomatic officers or consular agents in the state of execution if an agreement between the interested states expressly permits this or if the state in the territory where the letters of request are to be executed does not object. Switzerland has not entered into an agreement of this type and does not, as a general rule, permit diplomatic officers or consular agents to obtain evidence on its territory (ACLFA 1968-1969 [34/15], p. 31).

In those countries in which procedural actions are to be taken by the parties rather than by the court, the Swiss Embassies and Consulates may, with the consent of the

---

[32] See also I.B, p. 7
[33] For example, if a foreign court requests an on-site inspection.

host country, invite Swiss and foreign nationals to appear for questioning or may question those individuals in their homes. The diplomatic and consular officers of Switzerland must not, however, use coercive measures.

### 3. Obtaining evidence in the absence of an agreement

In the absence of an agreement, the Swiss authorities apply the 1954 Hague Convention to foreign requests and to Swiss requests to other countries (see Art. 11*a* para. 4 PILA and also Art. 11*a* paras. 1 - 3 PILA).

As a general rule, requests must be translated.

For costs relating to foreign requests, see Article 16 of the 1954 Hague Convention. In relation to Swiss requests to other countries, for the countries where there is no agreement in relation to this matter the FOJ will request a guarantee from the Swiss authority that any costs that are charged will be reimbursed.[34]

In the absence of contrary practices or agreements, Swiss requests made to foreign countries follow diplomatic channels (see II.D.2.2, p. 10). For information on the position in specific countries, reference is made to the Guide on Judicial Assistance.

Switzerland does not generally permit diplomatic officers and consular agents to obtain evidence on its territory (ACLFA 1968-1969 [34/15], p. 31; see III.C.2.7.2, p. 32.

As reciprocity is usually required between countries without a mutual agreement, neither is it generally possible for Swiss diplomatic officers and consular agents to obtain evidence in another state.

### III.D. Special Issues

### 1. Hearing by video conference

The conduct of a hearing by a foreign authority or foreign lawyers by video conference of witnesses or parties who are physically[35] located in Switzerland constitutes an act by a public authority on Swiss territory, and as such is therefore illegal unless authorised.

Under the Hague Evidence Convention, several case scenarios can be envisaged.

First, the authorities and the agents for the parties may participate at a hearing of the party and/or third parties that is conducted by a Swiss judge (Art. 7 and 8 Hague Evidence Convention). Such participation is possible under the same conditions as when the authority and/or the parties are physically present in Switzerland (see III.C.1.1.4d, p. 25). In particular, the Swiss judge remains master of the proceedings and is the only person with the authority to order coercive measures.

---

[34] The entry "Kostengutsprache nötig" in the Guide indicates that such a guarantee will need to be obtained.

[35] Unlike the case where the parties are required to fill in a questionnaire, a hearing by video conference is interactive. The questions asked and the answers given are therefore to be regarded as a whole and consideration should be given to the location of the persons concerned (see Alexander R. Markus, Neue Entwicklungen bei der internationalen Rechtshilfe in Zivil- und Handelssachen, RSDA 2002, p. 65 et seq., who deals with the problem of hearings by video conference and by telephone).

One can equally imagine recourse to video conference techniques in terms of Chapter II of the Hague Evidence Convention. Authorisation is in this case subject to the same conditions as in the "traditional" cases of authorisation (see III.C.1.2, p. 28). However, the fact that the persons are not in the same location suggests that an identification procedure is required.

The costs related to a hearing by video conference can be charged to the requesting state (Art. 9 para. 2, Art. 14 para. 2 Hague Evidence Convention).

Since 2022 (initially as an exception during the COVID-19 pandemic and as a rule since July 2024), the FDJP has also applied Chapter II of the 1970 Hague Convention to hearings by videoconference that take place in the context of proceedings in a non-contracting state. The provisions in question are only applied here by analogy, based on Art. 271 para. 1 SCC and Art. 31 para. 1 of the Government and Administration Organisation Ordinance (RVOV; SR 172.010.1).

## 2. Hearing by Telephone

Under the Hague Evidence Convention, a hearing by telephone is conceivable under the same conditions as a hearing by video conference. However, the problem of identifying the parties is even more pronounced in the case of a telephone hearing than in the case of a video conference hearing. In addition, the formal aspect of a normal hearing, which encourages the witness to respond carefully to the questions asked, is lacking in the case of a telephone hearing.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 152 of 171

## CONTACTS

If you have any questions, please contact:

- The Federal Office of Justice FOJ, Private International Law Unit, 3003 Bern, Tel.: +41 58 463 88 64; Fax: +41 58 462 78 64; E-mail: ipr@bj.admin.ch or
- The Federal Office of Justice, Division for International Legal Assistance, 3003 Bern, Tel.: +41 58 462 11 20; Fax: +41 58 462 53 80; E-mail: irh@bj.admin.ch.

## Modifications of the guidelines

July 1, 2024: III.D.1: Taking of evidence by video-link outside of the 1970 Hague Convention

# EXHIBIT I



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

EDÖB-A-C0633401/2

**Memorandum**

**dated 25 June 2021**

**concerning**

**Swiss Firm Data Processing and Sharing of Information
with the U.S. Securities and Exchange Commission**

Feldeggweg 1, 3003 Berne
Phone +41 58 463 74 84, Fax +41 58 465 99 96
www.edoeb.admin.ch



**Table of Contents**

| | | |
|---|---|---|
| *1.* | *Introduction* | 3 |
| 1.1 | Starting Point | 3 |
| 1.2 | Summary of SEC Examination Authority and Process | 3 |
| 1.3 | Relevant Legal Basis | 5 |
| *2.* | *Legal Analysis* | 5 |
| 2.1 | Applicability of the FADP | 5 |
| 2.2 | Cross-border Disclosure: Introduction | 6 |
| 2.3 | Cross-border Transfers based on Art. 42c para. 1 FINMASA | 7 |
| 2.3.1 | Introduction | 7 |
| 2.3.2 | Preservation of the Principle of Specialty and Confidentiality | 7 |
| 2.3.3 | Preservation of the Rights of the Clients and Third Parties | 8 |
| 2.4 | Cross-border Transfers under Art. 6 para. 2 FADP | 8 |
| 2.4.1 | General Comments | 8 |
| 2.4.2 | Consent | 9 |
| 2.4.3 | Contract | 10 |
| 2.4.4 | Data Processing in the Context of an Employment Relationship | 12 |
| 2.4.5 | Overriding Public Interest | 12 |
| 2.4.6 | Conclusion regarding Art. 6 para. 2 FADP | 13 |
| 2.5 | Data Protection Principles | 14 |
| 2.5.1 | General Comments | 14 |
| 2.5.2 | Evidence of the Collection of Personal Data | 14 |
| 2.6 | Breach of Professional Confidentiality | 15 |
| 2.7 | Conclusions | 16 |

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 156 of 171



## 1. Introduction

### 1.1 Starting Point

On 22 December 2020 the Federal Data Protection and Information Commissioner (FDPIC) was contacted by the U.S. Securities and Exchange Commission (SEC) and asked whether the FDPIC could provide guidance with regard to the question if and how Swiss-domiciled entities registered with the SEC may transfer books and records containing personal data to the SEC as part of the SEC's inspection and examination program. More precisely, the SEC would like to know whether and – if yes – under which conditions Swiss data protection law permits a cross-border transfer of personal data to the SEC in the course of an examination process conducted by this authority. The FDPIC offered to answer this question in the form of a short memorandum for the attention of the SEC. On 9 February 2021 the SEC provided the FDPIC with a "Summary of SEC Examination Authority and Process". The findings of this summary (see below 1.2) form the basis for the subsequent legal analysis (see below 2.). On 31 May 2021, the FDPIC delivered a first version of the memorandum. This version dated 25 June 2021 is the final one.

This memorandum reflects the FDPIC's view of the relevant aspects of Swiss data protection. As the FDPIC is only competent to interpret Swiss data protection law, it cannot be discussed whether or under which conditions a transfer of personal data to the SEC is compatible with other Swiss laws. In particular, it must be left open whether or under which conditions criminal law allows the transfer of personal data covered by the protection of secrets under criminal law[1]. Finally, but the Swiss courts are competent to decide in a legally binding way about the interpretation of Swiss data protection law.

### 1.2 Summary of SEC Examination Authority and Process

In its "Summary of the SEC Examination Authority and Process" the SEC states as follows:

*"Pursuant to the U.S. law, certain firms must retain certain books and records and provide them directly to the U.S. Securities and Exchange Commission ("SEC") upon request. These firms include Swiss-based firms or branches that are registered, required to be registered, or otherwise regulated by the SEC as investment advisers, broker-dealers, clearing agencies, and transfer agents. The universe of Swiss-based registrants currently includes 66 investment advisers, 1 broker-dealer, and 7 broker-dealer branch offices. There are 10 Swiss-based investment advisers with pending applications for SEC registration. The SEC also expects 2 Swiss-based security-based swap dealers to register by the end of 2021. The SEC may also request information from Swiss-based entities that are not registered with the SEC, including audit firms, in furtherance of examinations of SEC registrants or in other limited circumstances.*

*Examples of relevant U.S. laws include Section 204 of the Investment Advisers Act of 1940 ("Advisers Act"), which gives the SEC the authority to request and examine the books and records of an SEC regulated investment adviser. Section 17 of the Securities Exchange Act of 1934 ("Exchange Act") provides the same authority in connection with SEC registered broker-dealers, clearing agencies, transfer agents, and other types of SEC regulated entities. Various rules, including Rule 204-2 of the Advisers Act and Rule 17a-4 of the Exchange Act, require firms to make and keep certain records and provide copies thereof to SEC staff upon request.*

*As part of the examination process, SEC staff typically sends the entity a letter notifying it of the examination and containing an initial request list that identifies certain information or documents that SEC staff will review as part of the examination. As the examination progresses, staff sends the entity additional requests for information and documents, as needed. U.S. securities laws re-*

---

[1] Namely bank-client and business confidentiality.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 157 of 171



*quire entities to provide requested documents promptly to SEC staff, unredacted. In practice and as a courtesy, SEC staff asks that entities provide requested documents, including those containing personal data, no later than two weeks from the date of the request. SEC staff requests these books, records, and other materials to evaluate compliance with U.S. legal obligations and to prevent and/or enforce against potential illegal behavior. Failure to provide information promptly as requested would generally violate the firm's regulatory requirements, would be deemed to be impeding an examination, and might result in an enforcement referral or, if severe, an enforcement action.*

*The SEC does not conduct routine or cycle examinations. Instead, the SEC uses a risk-based approach to selecting examination candidates and scope areas for each examination. For example, SEC staff examines approximately 15 percent of all (domestic and international) SEC registered investment advisers (RIAs) each year. The selection of firms to examine is based on a risk-based assessment. SEC staff considers a number of potential risk factors, such as, among others, products and services offered, prior examination observations and conduct, disciplinary history of associated individuals or affiliates, changes in leadership or other personnel, and, in the context of RIAs, whether a RIA has access to investor assets. As a result, the determination of whether to examine a firm is evaluated year to year. Once SEC staff selects a firm for examination, we conduct an additional risk assessment at the firm level to determine the scope of the examination (that is, selecting particular areas of the business for review). Therefore, aside from certain requests for background information (e.g., organizational charts) that are standard requests in each exam, the scope of the examination (and consequently the documents requested) varies from firm to firm depending on the firm's business model and associated risks.*

*Depending on the scope of the particular examination of an entity, information requested during an examination focuses on a wide range of information, including office policies, procedures, organizational charts, employee lists, director details, board meeting minutes, employee disciplinary history, employment applications/questionnaires, employee personal trading records, financial transaction records, customer complaints, customer agreements, internal communications, and documents relating to service providers such as consultants and auditors (see Attachment A for some examples of SEC staff requests). Many of these records include personal data, which is needed to assess compliance with a number of requirements under the U.S. securities laws. It is the SEC's practice to limit the type and amount of personal data it requests during examinations to targeted requests based on risk and related to specific clients and accounts, and employees. That said, some degree of personal data of employees and clients (both individual and institutional) regardless of their physical location or nationality is crucial to assessing compliance with many obligations under the U.S. laws, such as the existence of conflicts of interest and whether clients are treated fairly. The requested information may include follow-up requests regarding some limited administrative or criminal proceedings and sanctions information that constitute "sensitive personal data" under the Swiss Federal Act on Data Protection that have already been reported to the SEC as part of the registration and reporting regimes.*

*SEC examinations are non-public. Information, data, and documents received by the SEC are maintained in a secure manner and, under strict US laws of confidentiality. Information about individuals cannot be onward shared save for certain uses publicly disclosed by the SEC, including in an enforcement proceeding, pursuant to a lawful request of the U.S. Congress or a properly issued subpoena, or to other regulators who have demonstrated a need for the information and provide assurances of confidentiality. Information from SEC examinations is also subject to provisions of the U.S. Freedom of Information Act that protect confidential information. The SEC uses what it obtains solely for its own lawful, regulatory purpose and is subject to audit by the US Government Accountability Office and other governmental oversight."*


### 1.3 Relevant Legal Basis

The relevant Swiss legal bases are the Federal Act on Data Protection of 19 June 1992 (FADP; CC 235.1), the Ordinance to the Federal Act of Data Protection of 14 June 1993 (DPO; CC 235.11), the Federal Act on the Swiss Financial Market Supervisory Authority of 22 June 2007 (FINMASA; CC 956.1), as far as it refers to aspects of data protection, as well as Switzerland's Federal Code on Private International Law of 18 December 1987 (CPIL; CC 291).

The current FADP was recently subject to a total revision; it is foreseen that the revised version – the Federal Data Protection Act of 25 September 2020 (Revised FADP; published in the Swiss Federal Gazette 2020, p. 7639 ss.) – will come into force in the course of 2022. In the context of this memorandum, the legal situation under the Revised FADP will be considered where necessary.

As explained further below, there are situations where the General Data Protection Regulation (GDPR) applies, even though the company processing the data is domiciled in Switzerland (see below 2.1). However, this memorandum focuses on Swiss law and does not consider the GDPR, the interpretation of which is primarily a task of the competent data protection authorities and courts in the EU.

## 2. Legal Analysis

### 2.1 Applicability of the FADP

The FADP applies to the processing of personal data pertaining to natural persons and legal persons (see Art. 2 para. 1 FADP). The Revised FADP applies – as the GDPR – but to the processing of personal data pertaining to natural persons (see Art. 1 Revised FADP). Personal data is all information relating to an identified or identifiable person (see Art. 3 let. a FADP). Processing means any operation with personal data, irrespective of the means applied and the procedure, and in particular the collection, storage, use, revision, disclosure, archiving or destruction of data (see Art. 3 let. e FADP).

If a firm is domiciled in Switzerland and processes personal data in Switzerland, infringements of personality rights resulting from the processing of personal data are governed, at the option of the injured party, by the FADP even if the person whose data is processed (the data subject) is domiciled abroad (see Art. 139 para. 3 and para. 1 let. b CPIL). Consequently, the FADP can also apply if a Swiss-domiciled entity processes personal data of U.S. residents or EU residents. Furthermore, if a controller or processor established in Switzerland processes personal data of natural persons who are in the EU, there are certain situations where the GDPR applies (see Art. 3 para. 2 GDPR).

In certain cases, the FADP does not apply, even though personal data are processed (see Art. 2 para. 2 FADP). It does, in particular, not apply in the case of one of the following pending proceedings (see Art. 2 para. 2 let. c FADP): pending civil proceedings, criminal proceedings, international mutual assistance proceedings and proceedings under constitutional or under administrative law (with the exception of administrative proceedings of first instance). The idea of the legislator was that, in these situations, the relevant procedural law assures data protection. In cases where Swiss-domiciled entities are required to transfer personal data to the SEC as part of the SEC's examination program, there are no pending proceeding in the sense of Art. 2 para. 2 let. c FADP[2]. There are not any other reasons excluding the application of the FADP either. Consequently, the FADP applies.

---

[2] See Du Pasquier/Menoud, in: Watter et al. (eds.), Finanzmarktaufsichtsgesetz / Finanzmarktinfrastrukturgesetz, 3. ed., Basel 2019, Art. 42c N 30, regarding the transfer of information based on Art. 42c para. 1 FINMASA.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 159 of 171



## 2.2 Cross-border Disclosure: Introduction

The cross-border disclosure of data is ruled by Art. 6 FADP. Disclosure means making personal data accessible, for example by permitting access, transmission or publication (see Art. 3 let. f FADP).

Under Swiss law, personal data may not be disclosed abroad if the privacy of the data subjects would be seriously endangered thereby, in particular due to the absence of a legislation that guarantees adequate protection (see Art. 6 para. 1 FADP). The FDPIC publishes a (non-binding) list of the states whose legislation ensures an adequate level of data protection (Art. 7 DPO)[3]. In his opinion, the U.S. legislation does not guarantee an adequate protection of the privacy as required by the FADP[4].

According to the FADP, anyone who processes personal data must not unlawfully breach the privacy of the data subjects in doing so (Art. 12 para. 1 FADP). If there is a data transfer to a country without a legislation that guarantees adequate data protection (see Art. 6 para. 1 FADP), the privacy of the data subject is, as a rule, unlawfully breached.

In general, a breach of privacy is unlawful unless it is justified by the consent of the injured party, by an overriding private or public interest or by law (see Art. 13 para. 1 FADP). With regard to data transfers to a country without a legislation guaranteeing an adequate data protection (see Art. 6 para. 1 FADP), the legislator has created a special rule: Such a data transfer is allowed but in one of the following special situations mentioned in Art. 6 para. 2 FADP:

    a.   sufficient safeguards, in particular contractual clauses, ensure an adequate level of protection abroad;

    b.   the data subject has consented in the specific case;

    c.   the processing is directly connected with the conclusion or the performance of a contract and the personal data is that of a contractual party;

    d.   disclosure is essential in the specific case in order either to safeguard an overriding public interest or for the establishment, exercise or enforcement of legal claims before the courts;

    e.   disclosure is required in the specific case in order to protect the life or the physical integrity of the data subject;

    f.   the data subject has made the data generally accessible and has not expressly prohibited its processing;

    g.   disclosure is made within the same legal person or company or between legal persons or companies that are under the same management, provided those involved are subject to data protection rules that ensure an adequate level of protection.

Private entities that want to disclose personal data to the SEC, must make sure that each envisaged disclosure meets the requirements of Art. 6 FADP. Otherwise, they risk to be liable for damages[5]. It is in their responsibility to make sure that Art. 6 FADP is observed, not in the responsibility of the SEC[6].

---

[3]   See <u>Transborder data flows (admin.ch)</u>.

[4]   See also the FDPIC's policy paper on the transfer of personal data to the USA and other countries lacking an adequate level of data protection within the meaning of Art. 6 para. 1 Swiss FADP, available under: <u>Transborder data flows (admin.ch)</u>. Regarding the GDPR, see Court of Justice of the European Union, judgement C-311/18 "Facebook Ireland and Schrems" of 16 July 2020.

[5]   See MAURER-LAMBROU/STEINER, in: Maurer-Lambrou/Blechta (eds.), Basler Kommentar Datenschutzgesetz/Öffentlichkeitsgesetz, 3. ed., Basel 2014, Art. 6 N 13.

[6]   SEC employees that process personal data can only be held responsible under the FADP, if the FADP applies to the processing of data by them. Provided that the FADP applies under private international law, the scope of the FADP is limited to the processing of data by private persons or federal bodies (see Art. 2 sec. 1 FADP; also see Art. 2 sec. 1 Revised FADP). "Private persons" are those persons that process data in the context of a matter which is itself governed by private law. The FDPIC assumes that the SEC's supervisory activities are governed by foreign public law. Consequently, if and to the extent SEC employees act within the scope of their supervisory activities, they are not private individuals within the meaning of the FADP and the FADP does not apply.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 160 of 171



Nonetheless, if there is a special legal basis in Swiss law (a legal basis outside the FADP) that permits a transfer of data to a country without an adequate level of data protection, data processors are not bound by Art. 6 FADP and may transfer the data under the specific conditions set up by the special legal basis. Whether such a special legal basis exists, is examined below (see below 2.3).

According to the Revised FADP, there is no unlawful breach of privacy (see Art. 30 para. 1 Revised FADP) if personal data are disclosed abroad and the Swiss Federal Council has determined that the legislation of the relevant State or international body guarantees an adequate level of protection (see Art. 16 para. 1 Revised FADP). In the absence of such a decision by the Federal Council, personal data may be disclosed abroad only if appropriate protection is guaranteed by certain legal instruments (e.g. an international treaty or data protection provisions of a contract, see Art. 16 para. 2) or in specific exceptions, e.g. with an explicit consent of the data subject (see Art. 17 para. 1 Revised FADP).

## 2.3 Cross-border Transfers based on Art. 42c para. 1 FINMASA

### 2.3.1 Introduction

Persons and entities that under the financial market acts require to be licensed, recognized, or registered by the Financial Market Supervisory Authority as well as collective capital investments are subject to financial market supervision and consequently to the Financial Market Supervision Act (see Art. 3 FINMASA). Financial market supervision has the objectives of protecting creditors, investors, and insured persons as well as ensuring the proper functioning of the financial market (Art. 4 FINMASA). The supervising authority is the Swiss Financial Market Supervisory Authority (FINMA) (Art. 5 FINMASA).

The cooperation with foreign bodies is ruled by the Art. 42 ss. FINMASA. Art. 42c FINMASA allows for the direct transmission of non-public information by supervised parties. According to Art. 42c para. 1 FINMASA, supervised parties – i.e. supervised persons and entities in the sense of Art. 3 FINMASA – may transmit non-public information to the foreign financial market supervisory authorities responsible for them and to other foreign entities responsible for supervision provided that

    a.    the conditions set out in Art. 42 para. 2 FINMASA are fulfilled (see further below 2.3.2)
    b.    and that the rights of clients and third parties are preserved (see further below 2.3.3).

Transmissions under Art. 42c FINMASA may be made spontaneously or in response to a request from a foreign authority or entity. Art. 42c FINMASA applies but when information is transmitted from Switzerland to another country[7].

### 2.3.2 Preservation of the Principle of Specialty and Confidentiality

Art. 42 para. 2 FINMASA requires that the information received by the foreign financial market supervisory authority is used exclusively to implement financial market law, or is forwarded to other authorities, courts or bodies for this purpose (principle of specialty). Furthermore, the requesting authority is bound by official or professional secrecy, notwithstanding provisions on the public nature of proceedings and the notification of the general public about such proceedings (principle of confidentiality).

FINMA publishes a list of financial market supervisory authorities to which it has provided administrative assistance in the past[8]. The courts have additionally ruled that specific authorities on the list meet the conditions regarding the principles of specialty and confidentiality or met them in a specific case at

---

[7]   See FINMA, Circular 2017/6 Direct transmission, N 3 and 4.

[8]   See https://www.finma.ch/en/supervision/cross-sector-issues/direktuebermittlung/.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 161 of 171



the time the decision was made[9]. If an authority appears on the list, supervised parties may assume that it meets the conditions regarding the above-mentioned principles of specialty and confidentiality[10].

The SEC appears on this list, and the FINMA has recently confirmed that there are currently no indications that a transfer of non-public information to the SEC in the course of an examination process conducted by this authority would not be allowed based on Art. 42c para. 1 let. a FINMASA. However, according to Art. 42c para. 1 let. b FINMASA, such transfer is allowed but if the rights of clients and third parties are preserved. As far as this provision concerns aspects of Swiss data protection, the FDPIC is competent to interpret it.

### 2.3.3 Preservation of the Rights of the Clients and Third Parties

Art. 42c para. 1 let. b FINMASA requires that the rights of clients and third parties are preserved if non-public information is transmitted to a foreign financial market supervisory authority. "Clients" are the natural persons and legal entities FINMASA and the financial market law are intended to protect, namely creditors, investors and insured persons[11]. In the literature, the view is expressed that the holder of the customer secret should be the "client"[12]. "Third parties" are to be understood as all other natural persons and legal entities that are mentioned in the information to be transmitted or can be identified from it, including employees of supervised parties, authorized representatives and beneficial owners[13].

As far as the rights of clients and third parties are concerned, the relevant FINMA circular states that supervised parties must, inter alia, preserve business and bank-client confidentiality, data protection and rights pertaining to employment relationships[14]. From the point of view of data protection, Art. 42c para. 1 FINMASA is consequently not a legal basis justifying a transfer of personal data to a country without an adequate level of data protection (see Art. 13 para. 1 FADP and above 2.2). It only recalls that a cross-border disclosure must be compatible with the FADP, namely with Art. 6 FADP. Private entities that are required to transfer personal data to the SEC based on Art. 42c para. 1 FINMASA therefore have to respect the conditions set up by Art. 6 para. 2 FADP (see below 2.4).

### 2.4 Cross-border Transfers under Art. 6 para. 2 FADP

### 2.4.1 General Comments

According to Art. 6 para. 2 let. a FADP personal data may be transmitted to a country without an adequate level of data protection if sufficient safeguards, in particular contractual clauses, ensure an adequate level of protection abroad.

The Swiss-U.S. Privacy Shield cannot be considered as a sufficient safeguard in the sense of Art. 6 para. 2 let. a FADP: First of all, it is not possible for authorities to be certified under the Swiss- or under the EU-U.S. Privacy Shield. Secondly, the Court of Justice of the European Union has rendered on 16 July 2020 the decision "Schrems II" according to which the EU-US Privacy Shield can no longer

---

[9]   Ibid, N 20.

[10]  Ibid, N 21.

[11]  FINMA, Circular 2017/6 Direct transmission, N 16.

[12]  See DU PASQUIER/MENOUD, in: Watter/Bahar (eds.), Basler Kommentar Finanzmarktaufsichtsgesetz/Finanzmarktinfrastrukturgesetz, 3. ed., Basel 2019, Art. 42c N 31.

[13]  FINMA, Circular 2017/6 Direct transmission, N 17.

[14]  Ibid, N 30.


be considered as an "adequacy" mechanism to protect cross-border transfers of personal data to the USA. In the view of the FDPIC this is also the case for the Swiss-U.S. Privacy Shield[15].

The FDPIC generally welcomes efforts to create a transfer tool in the sense of Art. 6 para. 2 let. a FADP. However, according to applicable Swiss law, the creation of such a tool is not mandatory if a disclosure of personal data can be justified by one of the other conditions mentioned in Art. 6 para. 2 FADP. In the present case, this could be the consent of the data subject in the specific case (let. b), a contract (let. c) or an overriding public interest (let. d) (see below 2.4.2 ss.).

### 2.4.2 Consent

In the absence of a legislation that guarantees adequate protection, personal data may be disclosed abroad if the data subject has consented in the specific case (Art. 6 para. 2 let. b FADP). If the consent of the data subject is required for the processing of personal data, such consent is valid only if given voluntarily on the provision of adequate information ("informed consent"). Additionally, consent must be given expressly in the case of processing of sensitive personal data or personality profiles (Art. 4 para. 5 FADP). According to the Revised FADP, the consent to a transfer of data to a country without an adequate level of data protection must always be given expressly (see Art. 17 para. 1 let. a Revised FADP). Provided that the data subject has been adequately informed, consent can be given by way of a single declaration of consent but, in principle, also by accepting general terms and conditions.

A data subject's consent must be given voluntarily (Art. 4 para. 5 FADP). In practice, the data subject often does not have a choice. According to the comments of the Swiss Federal Council regarding the draft of the current FADP, a consent is not invalid because of the mere fact that a data subject that does not give his or her consent is confronted with a disadvantage. A consent is but invalid if there is no connection between the disadvantage and the purpose of the data processor or if the disadvantage is disproportionate with regard to this purpose[16]. Similarly, Art. 7 (4) GDPR states that when assessing whether consent is freely given, utmost account shall be taken of whether, inter alia, the performance of a contract, including the provision of a service, is conditional on consent to the processing of personal data that is not necessary for the performance of that contract. If a customer consents to a processing purpose that is not necessary for the performance of the contract, such consent is not freely given in case that the denial of the consent would lead to the denial of services[17].

In the present case, a firm subject to SEC supervision cannot offer its services to customers if it is not willing to transfer customer data required by SEC in the case of an examination process. Anyone operating in a foreign market must comply with the rules there[18]. Failure to provide information to the SEC would generally violate the firm's regulatory requirements, would be deemed to be impeding an examination, and might result in an enforcement referral or, if severe, in an enforcement action[19].

---

[15] See the FDPIC's policy paper on the transfer of personal data to the USA and other countries lacking an adequate level of data protection within the meaning of Art. 6 para. 1 Swiss FADP, available under: Transborder data flows (admin.ch).

[16] Botschaft zur Änderung des Bundesgesetzes über den Datenschutz (DSG) und zum Bundesbeschluss betreffend den Beitritt der Schweiz zum Zusatzprotokoll vom 8. November 2001 zum Übereinkommen zum Schutz des Menschen bei der automatischen Verarbeitung personenbezogener Daten bezüglich Aufsichtsbehörden und grenzüberschreitende Datenübermittlung dated 19 February 2003, Swiss Federal Gazette 2003 p. 2101 ss., p. 2127; MAURER-LAMBROU/STEINER, in: Maurer-Lambrou/Blechta (eds.), Basler Kommentar Datenschutzgesetz/Öffentlichkeitsgesetz, 3. ed., Basel 2014, Art. 4 N 16f.

[17] See EDPB Guidelines 05/2020 on consent under Regulation 2016/679, Version 1.1, adopted on 4 May 2020, N 25 ss., in particular N 33.

[18] See Botschaft zum Finanzmarktinfrastrukturgesetz (FinfraG) dated 3 September 2014, Swiss Federal Gazette 2014 p. 7483 ss., p. 7620.

[19] Summary of SEC Examination Authority and Process; see above 1.2.



Therefore, if a customer that is informed about the fact that his data can be transferred to the SEC, gives his consent to such a data processing, such consent is voluntarily given and valid, even though the firm would not have been prepared to enter into a contract if the customer had not consented.

However, if and to the extent data processing is necessary for the performance of the contract, the data processor has, in general, an overriding private interest to process the data (see also Art. 13 para. 1 FADP) such that the consent of the data subject is not necessary. Furthermore, a given consent may be revoked at any time. Of course, should the data processing be necessary for the performance of the contract, the contract could be terminated after the revocation of consent. With regard to Swiss firms subject to SEC supervision, this would, however, mean that they could not transfer data of former customers to the SEC when required to do so. The question is whether a transfer of customer data to the SEC can be justified by contract (Art. 6 para. 2 let. c FADP; see below 2.4.3).

### 2.4.3 Contract

In the absence of a legislation that guarantees adequate data protection, personal data may be disclosed abroad if the processing is directly connected with the conclusion or the performance of a contract and the personal data is that of a contractual party (Art. 6 para. 2 let. c FADP). According to Art. 17 para. 1 let. b Revised FADP personal data may be disclosed abroad if the disclosure is directly connected with the conclusion or the performance of a contract 1. between the controller and the data subject, or 2. between the controller and its contracting partner in the interest of the data subject[20].

Art. 6 para. 2 let. c FADP applies but if personal data of a contractual party is processed. Customers of the firms supervised by the SEC are contractual parties to these firms.

Furthermore, data processing must be directly connected with the conclusion or the performance of a contract. This means, e.g., that data must be processed for the purpose of the conclusion or performance of the contract and not on the occasion of the conclusion or performance of a contract[21]. A processing of data in the sense of Art. 6 para. 2 let. c FADP need not be imperative for the conclusion or performance of the contract. However, it must be typical for the relevant contract or at least lie within the range of expectation of the contractual partner[22]. A typical example for such data processing is the checking of the creditworthiness of the contractual partner with a credit agency or the disclosure of data by travel companies to transport companies in the context of international transport services.

The question is whether a transfer of customer data to the SEC is directly connected with the performance of the relevant contract. From a strict point of view, such disclosure is not made for the purpose of the performance of the contract, but because the relevant firm has been required to disclose the customer data in the course of a SEC examination process. Nonetheless, the record-keeping, reporting and inspection obligations provided for by U.S. law are preconditions for the registration of a Swiss firm with the SEC and for rendering the relevant services. Failure to provide information to the SEC would generally violate the firm's regulatory requirements, would be deemed to be impeding an examination, and might result in an enforcement referral or, if severe, in an enforcement action[23]. In Swiss doctrine, it is controversial whether an invocation of contract as a basis of justification is possible in case that the contract in question has been terminated. However, after the termination of the contract

---

[20] The GDPR provides for analogous provisions, see Art. 49 (1) (b) and (c).
[21] See ROSENTHAL, in: Rosenthal/Jöri (eds.), Handkommentar zum Datenschutzgesetz, Zurich/Basel/Geneva 2008, Art. 13 N 39.
[22] Ibid, Art. 13 N 39. Different: Botschaft zur Änderung des Bundesgesetzes über den Datenschutz (DSG) und zum Bundesbeschluss betreffend den Beitritt der Schweiz zum Zusatzprotokoll vom 8. November 2001 zum Übereinkommen zum Schutz des Menschen bei der automatisierten Verarbeitung personenbezogener Daten bezüglich Aufsichtsbehörden und grenzüberschreitende Datenübermittlung dated 19 February 2003, Swiss Federal Gazette 2003 p. 2101 ss., p. 2129, according to which the processing must be imperative for the conclusion or performance of the contract.
[23] Summary of SEC Examination Authority and Process, see above 1.2.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 164 of 171



the justification of contract is often of particular relevance because here the data processor must, in principle, have the possibility to process the data of his contractual partner even against his will and therefore without his consent[24]. In the view of the FDPIC, a data processor has, in principle, a legitimate interest to transfer the data of his contractual partner to a foreign supervisory authority requiring the data, even after the termination of the contract. Consequently, a transfer of data of present or former customers to the SEC could be justified by Art. 6 para. 2 let. c FADP.

Art. 6 para. 2 let. c FADP does, however, not justify any transfer of data to any supervisory authority. Whether a justification exists, must be decided on the basis of the specific circumstances of the individual case by carefully weighing up the interests involved[25]. Otherwise, there would be a risk that Swiss data protection law could be undermined by excessive foreign disclosure requirements. The starting point for weighing the interests of the data processor and the data subject can be whether the foreign provisions are comparable with analogous Swiss regulations and whether the foreign authorities to which the data is disclosed provide comparable protection of the confidentiality of the data as the Swiss authorities[26]. The FINMA has powers over Swiss supervised entities comparable to those of the SEC[27]. In order to implement the financial market acts, the FINMA may also itself carry out direct audits of supervised persons and entities abroad or have such audits carried out by audit agents (see Art. 43 para 1. FINMASA). Furthermore, according to Art. 42c para. 1 let. a FINMASA, supervised parties may only transmit non-public information to the foreign financial market supervisory authorities responsible for them if the conditions set out in Art. 42 para. 2 FINMASA are fulfilled. This means, on the one hand, that the information is used exclusively to implement financial market law, or is forwarded to other authorities, courts or bodies for this purpose (Art. 42 para. 2 let. a). On the other hand, the requesting authorities have to be bound by official or professional secrecy, notwithstanding provisions on the public nature of proceedings and the notification of the general public about such proceedings (Art. 42 para. 2 let. b FINMASA)[28]. As mentioned above, the SEC is listed on the list of financial market supervisory authorities to which the FINMA has provided administrative assistance. The supervised parties may therefore assume that the SEC meets the conditions mentioned in Art. 42 para. 2 FINMASA (see above 2.3.2). In view of the fact that the SEC complies with the requirements of Art. 42 para. 2 FINMASA, it can be assumed that the SEC provides sufficient protection of the confidentiality of the customer data and the supervised parties have therefore, in principle, an overriding private interest to disclose such data to the SEC if they have been required to do so (see Art. 13 para. 1 FADP). If the FINMA may provide administrative assistance and transmit personal data under these conditions, then it must, in principle, be possible for supervised parties to transmit personal data under the same conditions. Consequently, the transfer of customer data to the SEC can be based on Art. 6 para. 2 let. c FADP provided that, in the individual case, there are not any overweighing interests of the data subject that do not allow the disclosure. It is the responsibility of the relevant Swiss firm to analyze whether there could be such overweighing interests of the data subject and, in case of doubt, to obtain the consent of the relevant customer, if possible, or to refuse the disclosure, if necessary.

At this point, it is expressly left open how a disclosure of personal data that is protected by secrets under criminal law (in particular bank-client confidentiality) can be justified under criminal law, i.e. whether a consent is necessary or whether a disclosure can be justified otherwise. If criminal law requires consent, personal data may not be transferred to the SEC without such consent.

---

[24]  See ROSENTHAL, in: Rosenthal/Jöhri (eds.), Handkommentar zum Datenschutzgesetz, Zurich/Basel/Geneva 2008, Art. 13 N 44.

[25]  See RAMPINI, in: Maurer-Lambrou/Blechta (eds.), Basler Kommentar Datenschutzgesetz/Öffentlichkeitsgesetz, 3. ed., Basel 2014, Art. 13 N 26, regarding Art. 13 para. 2 FADP.

[26]  Ibid, Art. 13 N 19, regarding Art. 13 para. 1 FADP.

[27]  See in particular Art. 29 FINMASA.

[28]  The reservation of Art. 42 para. 2 let. b FINMASA is necessary to take into account the rules of the U.S. Freedom of Information Act that require U.S. regulatory agencies to provide the public with regular notice in the media of proceedings that have been instituted and to publish the documents used to justify them (DU PASQUIER/MENOUD, in: Watter/Bahar (eds.), Basler Kommentar Finanzmarktaufsichtsgesetz/Finanzmarktinfrastrukturgesetz, 3. ed., Basel 2019, Art. 42 N 86).

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 165 of 171



### 2.4.4 Data Processing in the Context of an Employment Relationship

Further above it was discussed whether consent (Art. 6 para. 2 let. b FADP) could be a possible legal basis for a cross-border disclosure (see above 2.4.2). However, a data subject's consent must be given voluntarily (see Art. 4 para. 5 FADP). The FDPIC assumes that if the disclosure of employee data to the SEC is provided for in the employment contract, the data subject cannot voluntarily consent to the data processing in question. Data subjects might, for certain reasons, be forced to work in the relevant business, and the consequence of not consenting to the data processing – i.e. the loss of a possibility to find a job with a SEC registrated employer – is not tolerable for such persons. Consequently, data processing provided for in an employment contract, cannot be justified by consent.

The question arises whether a disclosure of employee data to the SEC can be based on another legal basis mentioned in Art. 6 para. 2 FADP. This presupposes first of all that the employer is allowed to process the relevant data about the employee. Art. 328b of the Swiss Code of Obligations (CO) states that the employer may handle data concerning the employee only to the extent that such data concern the employee's suitability for his job or are necessary for the performance of the employment contract.

Data necessary for the performance of the employment contract are all personal data concerning the employee, the processing of which is objectively necessary in order to fulfill a legitimate interest of the employer or employee in connection with the performance of the employment contract. On the one hand, this includes those data that an employer needs for the fulfillment of its legal and contractual obligations. Consequently, data disclosures to authorities within the scope of legal obligations of the employer are among those required for the performance of the employment contract[29]. On the other hand, this includes all data that the employer needs to process in order to fulfill its own legitimate interests[30]. This also includes, e.g., the defense against claims by third parties – including authorities – against the employer domestically or abroad which are based on facts in which the employee was or is involved within the framework of his employment relationship[31]. Legitimate interests of an employer in the processing of employee data may still exist after termination of an employment relationship[32]. In the opinion of the FDPIC, a disclosure of employee data to the SEC can be necessary for the performance of the employment contract, in which case data processing is compatible with Art. 328b CO.

If data in the sense of Art. 328b CO is disclosed abroad, Art. 6 FADP must be observed. In the absence of legislation that guarantees adequate protection, personal data may be disclosed abroad if the processing is directly connected with the conclusion or the performance of a contract and the personal data is that of a contractual party (Art. 6 para. 2 let. c FADP). This applies to all private contractual relationships, including those under labor law[33]. On the basis of the foregoing, the FDPIC assumes that a transfer of employee data to the SEC is, in principle, justified by Art. 6 para. 2 let. c FADP. Nevertheless, it must be examined in each individual case whether there really is an overriding private interest of the data processor that justifies the disclosure (see above 2.4.3). Employee data may also be disclosed to the SEC if there is an overriding public interest (see Art. 6 para. 2 let. d FADP and below 2.4.5).

### 2.4.5 Overriding Public Interest

In the absence of a legislation that guarantees adequate protection, personal data may be disclosed abroad if disclosure is essential in the specific case in order to safeguard an overriding public interest

---

[29] EPINEY/CIVITELLA/ZBINDEN, Datenschutzrecht in der Schweiz, Freiburger Schriften zum Europarecht Nr. 10, 2009 (available under: Microsoft Word - Cahier10 (unifr.ch)), p. 35 and 36.

[30] ROSENTHAL, in: Rosenthal/Jöhri (eds.), Handkommentar zum Datenschutzgesetz, Zu- rich/Basel/Geneva 2008, Art. 328b OR N 38 and N 39.

[31] Ibid, Art. 328b OR N 39.

[32] Ibid, Art. 328b OR N 27 and N 40.

[33] See ibid, Art. 328b OR N 16, with regard to Art. 13 para. 2 let. a FADP.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 166 of 171



(Art. 6 para. 2 let. d FADP). According to Art. 17 para. 1 let. c Revised FADP such disclosure abroad is allowed if it is "necessary" in order to safeguard an overriding public interest.

Art. 6 para. 2 let. d FADP concerns individual cases and does not justify the systematic and regular disclosure of data. The FDPIC understands that SEC requests are not regular or predictable, even though it is not excluded that large SEC regulated Swiss firms might receive several requests.

The existence of an overriding public interest must be proven under the specific circumstances. A purely hypothetical interest is not sufficient[34]. Examples of overriding public interests include security as well as combating of fraud and money laundering. In Swiss doctrine, an overriding public interest is also considered possible in the event that a company is required by foreign law to disclose business records, for example in the context of supervision by a foreign regulatory authority[35]. Furthermore, with Art. 42c para. 1 FINMASA, the legislator has, in principle, advocated direct transmissions to the SEC. The FDPIC therefore assumes that a transfer of personal data to the SEC is, in principle, justified by an overriding public interest. It can be based on Art. 6 para. 2 let. d FADP provided that, in the individual case, there are not any overweighing interests of the data subject that do not allow the disclosure.

With regard to client data, the FINMA considers the FDPIC's approach to be compatible with the special protection of client confidentiality under Art. 43 para. 3bis FINMASA – the so called "private banking carve out". This special protection of client confidentiality is tailored to on-site inspections and has no implication on cross-border transfers of client data under Art. 42c FINMASA. Furthermore, the FDPIC expressly leaves open how a disclosure of personal data that is protected by secrets under criminal law (in particular bank-client confidentiality) can be justified under criminal law, i.e. whether a consent is necessary or whether a disclosure can be justified otherwise. If criminal law requires consent, personal data may not be transferred to the SEC without such consent (see above 1.1 and 2.4.3).

### 2.4.6    Conclusion regarding Art. 6 para. 2 FADP

The FDPIC generally welcomes efforts to create a transfer tool in the sense of Art. 6 para. 2 let. a FADP as such tools can provide adequate data protection and create legal certainty.

He is, however, of the opinion that – from the perspective of data protection – a cross-border transfer of data to the SEC can be justified either by contract (Art. 6 para. 2 let. c FADP; see above 2.4.3 and 2.4.4) or by an overriding public interest (Art. 6 para. 2 let. d FADP; see above 2.4.5), provided that, in the individual case, there are not any overweighing interests of the data subject that do not allow for the disclosure. It is the duty and responsibility of the relevant Swiss firm to analyze whether there could be such overweighing interests of the data subject.

A data transfer to the SEC can also be justified by the consent of the data subject (Art. 6 para. 2 let. b FADP; see above 2.4.2). Provided that the data subject has been adequately informed, consent can be given by way of a single declaration of consent but, in principle, also by accepting general terms and conditions. A given consent can, however, be revoked at any time. In case data processing has been accepted by general terms and conditions and is later on revoked, the contract between the Swiss firm and its customer must be terminated as the record-keeping, reporting and inspection obligations provided by U.S. law are preconditions for rendering the relevant services. Once the contract is terminated, consent can no longer serve as a legal basis for record keeping or a disclosure of data to the SEC.

---

[34]  See also Botschaft zum Bundesgesetz über die Totalrevision des Bundesgesetzes über den Datenschutz und die Änderung weiterer Erlasse zum Datenschutz dated 15 September 2017, Swiss Federal Gazette 2017 p. 6941 ff., p. 7042.

[35]  See ROSENTHAL, in: Rosenthal/Jöhri (eds.), Handkommentar zum Datenschutzgesetz, Zurich/Basel/Geneva 2008, Art. 13 N 31.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 167 of 171



The FDPIC expressly leaves open how in cases of personal data protected by other Swiss laws a disclosure to the SEC can be justified. In particular, it must be left open under which conditions criminal law allows the transfer of personal data covered by the protection of secrets under criminal law. If criminal law requires consent, personal data may not be transferred to the SEC without such consent.

## 2.5 Data Protection Principles

### 2.5.1 General Comments

Even if a cross-border data transfer is compatible with Art. 6 FADP, a data processor must always observe the fundamental data protection principles mentioned in Art. 4, 5 and 7 FADP; otherwise the transfer is contrary to data protection.

Data processing must be proportionate (see Art. 4 para. 2 FADP). This means that a data processor may only disclose that data to the SEC that is suitable and necessary to achieve the intended purpose; furthermore, the data processing must be bearable for the data subject, both in terms of its purpose and its means. A violation of the principle of proportionality can be avoided by blackening data.

Another important principle is that the collection of personal data must be evident to the data subject (see Art. 4 para. 4 FADP). Under the Revised FADP, it does no longer suffice that the collection of data is evident to the data subject; rather the controller is obliged to inform the data subject appropriately about the collection of personal data (see Art. 19 para. 1 Revised FADP). The principle of evidence in Art. 4 para. 4 FADP as well as the obligation to inform in Art. 19 Revised FADP only apply if data are collected, but not if they are processed in another way. However, Art. 4 para. 2 FADP as well as Art. 6 para. 2 Revised FADP state that data processing must be carried out in good faith, which can mean that in certain situations not only the collection of personal data but also other forms of data processing must be made transparent (see full details below 2.5.2 ss.).

According to Art. 5 FADP anyone who processes personal data must make certain that it is correct. Moreover, personal data must be protected against unauthorized processing through adequate technical and organizational measures (Art. 7 para. 1 FADP).

### 2.5.2 Evidence of the Collection of Personal Data

According to Art. 4 para. 4 FADP, the collection of personal data and in particular the purpose of its processing must be evident to the data subject. The decisive factor is whether a (fictitious) average addressee or customer can recognize on the basis of the specific circumstances in the individual case that data is being collected, from whom and for what purpose, and to whom they are forwarded[36].

With regard to the point in time at which the data collection must be evident, it must, in principle, be evident at the time the data collection occurs; at the very least, it must be possible to foresee the exact time at which certain data will be collected. If, however, it is not reasonable for the data processor to indicate the exact point in time of the acquisition (namely because this would cause a great deal of effort), the later collection of data can be made evident in advance by corresponding general references or contractual provisions. Yet the more sensitive the personal data in question, the more likely it is that the data processor can be expected to make it evident at the time of the collection[37].

The Swiss firms subject to supervision by the SEC collect data at the beginning or in the course of the contractual relationship with their customer. The collection of the data and the purpose of its pro-

---

[36] Bundesamt für Justiz, Bundesgesetz über den Datenschutz, Änderung vom 24. März 2006: Häufig gestellte Fragen zur Umsetzung bei der Datenbearbeitung durch Private, 30.11.2007 (available under: Datenschutz (admin.ch), p. 2.

[37] Ibid, p. 2.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 168 of 171



cessing – also a possible disclosure to the SEC – is in general made evident by corresponding contractual provisions. The question is whether also the processing of personal data in the case of a specific request by the SEC (i.e. the preparing, compiling and the intended disclosure of the data) must be made transparent. It can be argued that, at the time of a request by the SEC, the supervised Swiss firm is already in possession of the relevant data, which means that there is generally no collection of data and Art. 4 para. 4 FADP consequently does not apply. On the other hand, according to Art. 4 para. 2 FADP data processing must be carried out in good faith. This provision is likely to contain a general obligation to inform the data subjects about the processing of their data whenever this is necessary in view of the circumstances and based on a loyal and trustworthy conduct[38]. However, if the SEC requests personal data the collection of which has taken place in an earlier stage and in compliance with Art. 4 para. 4 FADP, Art. 4 para. 2 FADP generally does not oblige the supervised Swiss firm to inform the data subject that these data are now actually processed due to a request by the SEC, even if it is sensitive personal data[39] or personality profiles[40]. Where the data processor wants to obtain the consent of the data subject for a specific data transfer, Art. 4 para. 5 FADP provides that data subject must be informed of the intended data transfer in an adequate way (see above 2.4.2).

The Revised FADP aims at strengthening the evidence of the collection of personal data. According to Art. 19 para. 1 Revised FADP, the controller informs the data subject appropriately about the collection of personal data. At the time of collection, the controller shall provide to the data subject all information that is required in order for the data subject to assert his rights according to this Act and to ensure transparent processing of data. He shall, if applicable, also inform about the recipients or the categories of recipients to which personal data is disclosed (Art. 19 para. 2 let. c FADP), and if personal data is disclosed abroad, the controller informs the data subject of the name of the State or international body and, as the case may be, the safeguards according to Art. 16 para. 2 or the applicability of one of the exceptions provided for in Art. 17 (Art. 19 para. 4 FADP). However, Art. 19 Revised FADP regulates – as Art. 4 para. 4 FADP – but the information on data collection and does not oblige to inform about every form of data processing. Also the Revised FADP states that data processing must be carried out in good faith (see Art. 6 para. 2 FADP), but the question whether a specific intended data transfer to the SEC must be made transparent to the data subject, can be answered in the same way as under current law.

### 2.6    Breach of Professional Confidentiality

The question is whether a Swiss firm employee who transfers personal data to the SEC can be liable to prosecution under the FADP or the Revised FADP. According to Art. 35 para. 1 FADP, anyone who without authorization willfully discloses confidential sensitive personal data or personality profiles that have come to their knowledge in the course of their professional activities where such activities require the knowledge of such data is, on complaint, liable to a fine. The same penalties apply to anyone who without authorization willfully discloses confidential sensitive personal data or personality profiles that have come to their knowledge in the course of their activities for a person bound by professional confidentiality or in the course of training with such a person (Art. 35 para. 2 FADP).

Art. 35 FADP only applies with regard to sensitive personal data or personality profiles. Sensitive data is data on 1. religious, ideological, political or trade union-related views or activities, 2. health, the intimate sphere or the racial origin, 3. social security measures or 4. administrative or criminal proceedings and sanctions (see Art. 3 let. c FADP). Other personal data such as e.g. financial data are not covered by this provision. The scope of application of Art. 35 FADP is therefore narrower than that of Art. 74 Swiss Federal Act on Banks and Savings Banks of 8. November 1934 (CC 952.0) which pro-

---

[38]  EPINEY/CIVITELLA/ZBINDEN, Datenschutzrecht in der Schweiz, Freiburger Schriften zum Europarecht Nr. 10, 2009 (available under: Microsoft Word - Cahier10 (unifr.ch)), p. 23.

[39]  Such as, e.g., data on administrative or criminal proceedings and sanctions.

[40]  Art. 14 para. 1 FADP states that the controller of the data file is obliged to inform the data subject of the collection of sensitive personal data or personality profiles. This provision does not apply where there is no collection of such data, but another form of data processing.



tects bank-client confidentiality. A personality profile is a collection of data that permits an assessment of essential characteristics of the personality of a natural person (see Art. 3 let. d FADP).

According to Art. 35 FADP, only the disclosure of confidential data is punishable. Data is confidential in the sense of this provision if it is neither in the public domain nor generally accessible, the person concerned wants to keep the data confidential, and his or her interest in secrecy is an objectively legitimate one[41]. The disclosure must be unauthorized. In any case, this is not the case if the disclosure complies with data protection requirements[42]. Furthermore, the data must be disclosed willfully.

In view of the limited scope of application of Art. 35 FADP, the FDPIC expects that employees of Swiss firms that transfer data to the SEC are only exceptionally liable to prosecution.

Under the Revised FADP, a person shall be liable on complaint to a fine of up to 250'000 Swiss Francs if he willfully discloses confidential personal data of which he has gained knowledge while exercising his profession which requires the knowledge of such data (Art. 62 para. 1 Revised FADP). The same penalty applies to anyone who willfully discloses confidential personal data of which he has gained knowledge in the course of his activities for a person bound by a confidentiality obligation or in the course of training with such a person (Art. 62 para. 2 Revised FADP).

The Revised FADP extends the protection of secrecy to all types of personal data. Again, the decisive factor is that the data is confidential.

It cannot be excluded that a firm employee will cite this provision as a reason not to transfer personal data to the SEC. However, the FDPIC assumes that a disclosure of data that is compatible with the Revised FADP is not punishable. Furthermore, the data must be disclosed willfully.

## 2.7    Conclusions

The SEC would like to know whether and – if yes – under which conditions – Swiss data protection law allows Swiss-domiciled entities registered with the SEC to transfer personal data to the SEC in the course of an examination process conducted by this authority.

The U.S. legislation does not guarantee an adequate protection of the privacy as required by the FADP. A transfer of personal data to the SEC must therefore be justified under Art. 6 para. 2 FADP. The FDPIC generally welcomes efforts to create a transfer tool in the sense of Art. 6 para. 2 let. a FADP. He is, however, of the opinion that – from the perspective of data protection – a disclosure of data to the SEC can, in principle, be justified either by the consent of the data subject (Art. 6 para. 2 let. b), by contract (Art. 6 para. 2 let. c) or by an overriding public interest (Art. 6 para. 2 let. d FADP) (see above 2.4.6, with further references).

The FDPIC expressly leaves open how in cases of personal data protected by other Swiss laws a disclosure to the SEC can be justified. In particular, it must be left open under which conditions criminal law allows the transfer of data covered by the protection of secrets under criminal law. If criminal law requires consent, then personal data may not be transferred to the SEC without such consent.

Even if a cross border data transfer is compatible with Art. 6 FADP, a data processor must always observe the fundamental data protection principles mentioned in Art. 4, 5 and 7 FADP; otherwise the transfer is contrary to data protection. According to Art. 4 para. 4 FADP, the collection of personal data and in particular the purpose of its processing must be evident to the data subject. The collection of the data and the purpose of its processing – also a possible disclosure to the SEC – is, in general,

---

[41]  See Botschaft zum Bundesgesetz über den Datenschutz (DSG) dated 23 March 1988, Swiss Federal Gazette 1988 II p. 413 ss., p. 485.

[42]  ROSENTHAL, in: Rosenthal/Jöhri (eds.), Handkommentar zum Datenschutzgesetz, Zurich/Basel/Geneva 2008, Art. 35 N 14.

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 170 of 171



made evident by corresponding contractual provisions. If the SEC requests personal data the collection of which has taken place in an earlier stage and in compliance with Art. 4 para. 4 FADP, the supervised Swiss firm is generally not obliged to inform the data subject that these data are now actually processed due to a request by the SEC, even if it is sensitive personal data or personality profiles. In the view of the FDPIC, the legal situation is the same under the Revised FADP (see above 2.5).

The question is whether a Swiss firm employee who transfers personal data to the SEC can be liable to prosecution under the FADP or the Revised FADP for a breach of professional confidentiality. In view of the limited scope of application of Art. 35 FADP, the FDPIC expects that employees of Swiss firms that transfer data to the SEC are only exceptionally liable to prosecution under the FADP. Under the Revised FADP, which extends the protection of secrecy to all types of personal data, it cannot be excluded that a firm employee will cite Art. 62 Revised FADP as a reason not to transfer personal data to the SEC. However, the FDPIC assumes that a disclosure of data that is compatible with the Revised FADP is not punishable. Furthermore, the data must be disclosed willfully (see above 2.6).

The Commissioner:

Adrian Lobsiger

Case 1:22-cv-00828-TDS-JEP   Document 248-1   Filed 08/12/24   Page 171 of 171