IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3  FEDERAL TRADE COMMISSION, et al.,) CASE NO. 1:22CV828
                                    )
4          Plaintiff,               )
                                    )
5          vs.                      )
                                    )
6  SYNGENTA CROP PROTECTION AG,     )
   SYNGENTA CORPORATION, SYNGENTA   )
7  CROP PROTECTION, LLC, and        )
   CORTEVA, INC.                    )
8                                   )  Winston-Salem, NC
           Defendants.             )  August 15, 2024
9  _____

10

11                  TRANSCRIPT OF THE **MOTIONS HEARING**
                   BEFORE THE HONORABLE JOI E. PEAKE
12                 UNITED STATES MAGISTRATE JUDGE

13

14  APPEARANCES:

15  For the FTC Plaintiffs:     PHILIP KEHL, ESQ.
                                ALLYSON M. MALTAS, ESQ.
16                              FEDERAL TRADE COMMISSION
                                400 7th Street SW
17                              Washington, DC 20024

18
    For the State Plaintiffs:   COLIN P. SNIDER, ESQ.
19                              NEBRASKA ATTORNEY GENERAL'S OFFICE
                                2115 State Capital
20                              Lincoln, Nebraska 68509

21
    For the Defendants:
22  Syngenta:                   JAMES McCLAMMY, ESQ.
                                BENJAMIN MILLER
23                              DAVIS POLK & WARDWELL, LLP
                                450 Lexington Avenue
24                              New York, NY 10017

25

```
 1   APPEARANCES:  (Continued)

 2                                   PATRICK M. KANE, ESQ.
                                     FOX ROTHSCHILD LLP
 3                                   230 N. Elm Street, Suite 1200
                                     Greensboro, North Carolina 27401
 4
     Corteva:                        DAVID MARRIOTT, ESQ.
 5                                   MAXIMILIAN AUERBACH, ESQ.
                                     CRAVATH, SWAINE & MOORE, LLP
 6                                   825 Eighth Avenue
                                     New York, NY 10019
 7
                                     MARK E. ANDERSON, ESQ.
 8                                   MCGUIREWOODS LLP
                                     501 Fayetteville Street, Suite 500
 9                                   Raleigh, North Carolina 27601

10

11   Transcriber:                   BRIANA L. CHESNUT, RPR
                                     Official U.S. Court Reporter
12                                   P.O. Box 20991
                                     Winston-Salem, North Carolina 27120
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

**THE COURT:** All right. And we are here for pretrial motion day. And as it turns out, there's only one matter left on today. So we'll go straight into it. And I'll ask my law clerk to call the case that's on the calendar this morning.

**LAW CLERK:** Now calling the case of Federal Trade Commission, et al., v. Syngenta Crop Protection AG, et al., Case No. 22CV828. The matter is on for a hearing on pending motions.

**THE COURT:** And as is my usual practice for my benefit, but also so we have it for the recording, I'm just going to ask everyone who is here to announce their representations for the record, and then we'll see who's primarily going to be speaking as well.

So I am going to start with the Plaintiff, and if you all would just let me know who's here and then who's going to be handling things today.

**MR. KEHL:** Sure. Hi. Good morning, Your Honor.

**THE COURT:** Good morning.

**MR. KEHL:** Philip Kehl on behalf of the FTC, and I'll be primarily speaking.

**THE COURT:** All right.

**MS. MALTAS:** Allyson Maltas on behalf of the FTC.

**THE COURT:** All right.

**MR. SNIDER:** Colin Snider on behalf of the State of

Case 1:22-cv-00828-TDS-JEP    Document 257    Filed 08/22/24    Page 3 of 113

1  Nebraska.

2         THE COURT:  Okay.  And you are representing all of

3  the State entities as well; is that correct?

4         MR. SNIDER:  Yes, I will be speaking for them.

5         THE COURT:  Okay.  Very good.

6         All right.  And then for the Defendants?

7         We'll start here.

8         Yes, sir.

9         MR. MARRIOTT:  Good morning, Your Honor.  David

10  Marriott, Cravath, Swaine & Moore, for Corteva.

11         THE COURT:  Okay.

12         MR. AUERBACH:  Good morning, Your Honor.  Maximilian

13  Auerbach, Cravath, Swaine & Moore, for Corteva, and I'll

14  primarily be speaking on our behalf.

15         THE COURT:  All right.  And I'm just making sure I

16  have everybody here.  It's Mr. Auerbach?

17         MR. AUERBACH:  Yes, Auerbach.

18         THE COURT:  Okay.

19         MR. ANDERSON:  And good morning, Your Honor.  Mark

20  Andersen with McGuireWoods also for Corteva.

21         THE COURT:  Okay.  Very good.

22         MR. ANDERSON:  Thank you.

23         THE COURT:  All right.  Yes, sir.

24         MR. McCLAMMY:  Hi.  Good morning, Your Honor.  Jim

25  McClammy of Davis Polk on behalf of the Syngenta Defendants,

1  and I will be primarily speaking on behalf of Syngenta this

2  afternoon -- this morning.

3          **THE COURT:**  Okay.  Very good.

4          **MR. MILLER:**  Good morning, Your Honor.  Benjamin

5  Miller from Davis Polk & Wardwell on behalf of Syngenta.

6          **THE COURT:**  Okay.

7          **MR. KANE:**  Good morning, Judge.  Patrick Kane from

8  Fox Rothschild for Syngenta.

9          **THE COURT:**  Very good.

10          All right.  I appreciate you all doing that.  And

11  then, as you know because we're recording, the record is much

12  easier to make for the court reporter if you announce your

13  representations again when you're standing to speak.  They can

14  usually figure it out, but it's helpful when we're trying to go

15  back if we need to make a transcript.

16          So we are here on some pending motions to compel and

17  to check in on discovery.  Just so everyone knows what to

18  expect or what I am intending, I thought it would be helpful,

19  once the motions were filed, to go ahead and have an

20  opportunity to just let you all be heard, to tell me what you

21  think is most important or point me in the right direction.

22          My intent, at least right now, is just to get that

23  information and to give you some preliminary guidance as to

24  what I'm thinking or what I might be most interested or

25  concerned about or how I think maybe it could get resolved and

then give you all another opportunity to talk through that or
to see if you can make progress on that.  If there are
particular things that may be helpful for me to make a call on,
I can do that.  But my intent today is to have set this early
to go ahead and just do a preliminary feedback for you.

I would ordinarily do this by phone, but there are a
lot of you, and it's a little harder to keep up with that on a
phone hearing.  But I am open to the possibility of doing these
in the future by phone, particularly where we're just doing a
preliminary check-in.

So I do want to have the benefit, though, of your
argument and your expertise in pointing me to what you think I
need to know, and then I'll just give you my thoughts on that.

I know there is a motion to seal.  I think we're
still waiting for Corteva's motion to seal.  What I want to do
on that is just make the record so that we can have a
sufficient record for me to make the findings I need to make,
which are, I think, contained in the written motion, but it's
helpful while you're here to go ahead and do that.

So we can take care of anything that's pending.  And
then anything that remains we can come back and do at the next
hearing.  I think there's one set in October.  So we can take
care of that then.

So that's my preliminary thought or intent.
Before -- they are the Plaintiffs' motions, but before we dive

1  in, let me just see if there's anything in terms of how we're

2  proceeding today or anything else I need to know about before

3  we dive in.

4          Mr. Kehl, is there anything that we need to address

5  otherwise?

6          **MR. KEHL:**  No, Your Honor.  We would just note that

7  there are four issues across the two motions.

8          **THE COURT:**  Right.

9          **MR. KEHL:**  One of them is common.

10          **THE COURT:**  Right.

11          **MR. KEHL:**  So we would propose starting with the

12  issues unique to Syngenta.

13          **THE COURT:**  Right.

14          **MR. KEHL:**  But we're open to however the Court would

15  prefer.

16          **THE COURT:**  I think it makes sense -- I think it's --

17  Issues One, Two, and Four are just Syngenta, and then Issue

18  Three looks like the one that was consistent across for

19  Syngenta and Corteva.

20          So I think what my intent or what might be most

21  helpful to me would be to address each one one at a time, do

22  One, Two, and Four, and then we'll take the final issue that

23  overlaps.  But I'll hear from them if they've got anything else

24  they wanted to suggest on that.

25          **MR. MARRIOTT:**  Your Honor, I think that's fine by us.

1  When it comes time for Issue Three, my young colleague here Max

2  Auerbach did all the hard work so he will be speaking for us.

3          **THE COURT:**  All right.  Very good.  All right.  Thank

4  you, Mr. Marriott.

5          Mr. McClammy, for Syngenta?

6          **MR. McCLAMMY:**  That's fine with us, Your Honor.

7          **THE COURT:**  All right.  Very good.

8          So, Mr. Kehl, if you want to go ahead and dive in and

9  let me know how you want to proceed with those issues, I am

10  happy to hear from you.

11          **MR. KEHL:**  Great.  Thank you, Your Honor.

12          **THE COURT:**  All right.

13          **MR. KEHL:**  So Philip Kehl on behalf of the Government

14  Plaintiffs.

15          I think I'll first start with Syngenta Crop

16  Protection AG discovery, which I'll refer to as AG in this

17  hearing.

18          **THE COURT:**  Okay.  Uh-huh.

19          **MR. KEHL:**  And then move on to the search terms and

20  then the one U.S. custodian, Andrew Fisher.

21          **THE COURT:**  Okay.

22          **MR. KEHL:**  So AG is a Defendant in this case, but

23  Syngenta has opposed producing any documents from this Swiss

24  parent.  At the motion to dismiss stage, Syngenta argued that

25  the complaint had not sufficiently alleged that AG was involved

1   in implementing Syngenta's loyalty program, which is called Key

2   AI, or Key Active Ingredient.  The Court's denying the motion

3   to dismiss rejected this argument.  But in resisting discovery

4   from AG, Syngenta now recycles these very same arguments,

5   arguing that there is a limited nexus between its Swiss parent

6   and the Key AI program.

7           Syngenta's opposition essentially asks the Court to

8   decide a disputed factual issue, the extent of AG's oversight

9   over Key AI in the U.S., by denying Plaintiff's evidence on

10  AG's role.  But the limited discovery that Plaintiffs seek,

11  just three custodians and any relevant central files, is

12  relevant and proportionate to the needs of the case.

13          As described in our motion, these custodians are John

14  Parr, former president of AG -- and he's referenced in

15  paragraph 111 of the complaint -- Jeff Rowe, the president of

16  AG, who we've shown oversees the work of the U.S. business; and

17  David Scott with third-party relations at AG, who is also

18  referenced in paragraph 11 of the complaint.  For these

19  individuals, we do not have pretrial discovery -- pretrial

20  complaint discovery, excuse me.  Syngenta did not produce their

21  custodial files as part of the investigation.  And although we

22  don't have their custodial files currently, we've made a robust

23  showing of relevance for these individuals with information

24  from other sources.

25          Syngenta apparently wants to hold Plaintiffs to the

1  impossible standard of needing to show unique information in

2  custodial files which we do not currently have.  This is far

3  beyond the proportionality standard of the federal rules.

4          By contrast to this showing of relevance, Syngenta

5  has not shown -- has not demonstrated the burden of producing

6  documents from AG.  Syngenta did not meet this burden in the

7  motion to compel briefing.  And the Court should disregard

8  Syngenta's late-filed Rosenthal -- procedurally proper

9  Rosenthal declaration.

10          But even if the Court considers that declaration,

11  Syngenta did not meet this burden.  The declaration and

12  Syngenta's arguments do not address the U.S. case law that has

13  addressed this issue.  And these cases have concluded that

14  discovery from a Swiss entity can occur under the federal

15  rules.  We point the Court in our reply to *EFG Bank* where the

16  court, in fact, remarks that there are no cases to the

17  contrary.  *Belparts* is another example of a court ordering

18  discovery from a Swiss entity under the federal rules.  That

19  case was decided in 2022, post-dating the *Swisspartners*

20  decision on which Mr. Rosenthal puts great weight in his

21  declaration.

22          **THE COURT:**  So outline for me how you think that

23  analysis works.  Do I do the analysis that is in the cases that

24  otherwise were cited where we look, is there an actual conflict

25  with Swiss law, and then we go through the balancing?  Is that

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1 the framework that you would contend would apply to that?

2         **MR. KEHL:**  So, Your Honor, we don't even reach that

3 stuff.

4         **THE COURT:**  Okay.

5         **MR. KEHL:**  There's no conflict.

6         **THE COURT:**  So that's the analysis, but you contend

7 we don't reach the balancing because there is no conflict?

8         **MR. KEHL:**  Correct.

9         **THE COURT:**  Okay.

10         **MR. KEHL:**  Correct.

11         **THE COURT:**  And you contend there's no conflict

12 because why?

13         **MR. KEHL:**  Because there's nothing in Swiss law that

14 prohibits document discovery within the control of the entity

15 to occur within the United States.  This is the conclusion of

16 *EFG Bank*.  This is the conclusion of *Belparts*, that this

17 discovery can occur consistent with Swiss law.  Therefore,

18 there is no conflict.

19         **THE COURT:**  Is that your contention, that it is

20 voluntary, that they can make it only if it's voluntary or

21 because there's not a threat of criminal prosecution?  Is that

22 the analysis?

23         **MR. KEHL:**  So the case law latches onto this

24 voluntary concept.

25         **THE COURT:**  Right.  So talk me through how you get to

1  that point.

2         MR. KEHL:  Yeah.  So they concluded that even an

3  order, like an order, for instance, on a motion to compel, if

4  Syngenta is ordered by this Court to produce documents from

5  Switzerland, that would, nonetheless, be what is called a

6  voluntary production under Swiss law because that production --

7  that order does not come with the threat of criminal sanctions.

8         THE COURT:  Okay.  That's how you get that there's no

9  actual conflict --

10        MR. KEHL:  Correct.

11        THE COURT:  -- because it would be voluntary unless

12 there is a threat of criminal prosecution?

13        MR. KEHL:  Correct.

14        THE COURT:  Okay.

15        MR. KEHL:  And the Swiss Department of Justice, this

16 is Exhibit I to the Rosenthal declaration, the Department of

17 Justice at page 20 in Exhibit I recognizes this and says:

18 "Letters of requests are...not necessary in the event that a

19 refusal to cooperate leads only to consequences of a procedural

20 nature" as would a grant of this motion to compel.

21        THE COURT:  Repeat that for me.

22        MR. KEHL:  Sure.  This is, again, at page 20 of

23 Exhibit I to the Rosenthal declaration.

24        THE COURT:  Okay.

25        MR. KEHL:  "Letters of request are therefore not

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  necessary in the event that a refusal to cooperate leads only

2  to consequences of a procedural nature (e.g., a factual claim

3  of the other party is accepted as true or the loss of the right

4  to prove the claim at a later stage.)"

5          **THE COURT:**  So that actually leads me to another sort

6  of line of inquiry with you.  If I were looking for

7  alternatives or a way to limit this even potential conflict

8  with the Swiss law or the concerns that they've raised about

9  Swiss law, what options or alternatives do you have?

10          I mean, do you have some fact or issue that you

11  want -- propose be taken as proven or some stipulation that you

12  would ask them to enter into in lieu of providing these

13  documents?  Or is there some broader inquiry of documents from

14  the U.S. side that you would propose?

15          **MR. KEHL:**  I understand the question, Your Honor.  I

16  think we would like to give it some thought on the evidentiary

17  question.

18          **THE COURT:**  Uh-huh.

19          **MR. KEHL:**  But as to the question of a path forward

20  --

21          **THE COURT:**  Right.

22          **MR. KEHL:**  -- even if the Court, for instance,

23  credits the Rosenthal declaration, we think all this leads to

24  is the need to redact key things like PII, HR data, health data

25  that we're not interested in.  You know, the Rosenthal

1  declaration has not made a showing that this means AG needs to

2  redact executives' emails about company business.  Those are,

3  nonetheless, within the control of the Swiss -- of the Swiss

4  entity and can be produced freely consistent with *EFG Bank* and

5  *Belparts*.

6          So we think redacting the PII is one potential path

7  forward.  And, you know, the Rosenthal declaration describes in

8  paragraphs 38 and 39 that what's implicated by Swiss law is

9  this sort of private data, like HR and health data.  And he

10 notes in paragraph 34 that what the Swiss statutes mean in

11 practice is that you often have to redact PII.

12         We think this is a very reasonable path forward, will

13 not prevent the production of business documents, but if

14 someone's phone number is in there, then they might have to

15 redact that.

16         And Syngenta has not substantiated the burden -- the

17 idea that it would be unduly burdensome to have to review the

18 documents with an eye towards redacting any PII.  You know,

19 they've put in no information on the cost of doing so, the

20 number of documents implicated, that sort of thing.

21         So we think that -- we'll consider the proposal that

22 you've made, Your Honor, but we think there's -- even with

23 discovery from Switzerland, there is a path forward in terms of

24 redacting the PII.

25         **THE COURT:**  I want to make sure I'm following, too.

1          So the Exhibit I, what's the document number on the

2    bottom of that document?

3          **MR. KEHL:**  So this is Document 248.

4          **THE COURT:**  Is that the public version?

5          **MR. KEHL:**  Yes.

6          **THE COURT:**  So --

7          **MR. KEHL:**  And it's at page 20 of the exhibit.  The

8    same -- I will say, Your Honor, the same exhibit -- the same

9    point is cited in our reply brief as well --

10         **THE COURT:**  Okay.

11         **MR. KEHL:**  -- in a string cite following *EFG Bank* and

12   *Belparts*.

13         **THE COURT:**  All right.  I'm pulling it up this way

14   just to make sure I can follow.

15         All right.  And the paragraphs you're referring to

16   about the PII, where are those?

17         **MR. KEHL:**  So that is in the declaration itself --

18         **THE COURT:**  Uh-huh.

19         **MR. KEHL:**  -- if you look at paragraph 38 --

20         **THE COURT:**  Okay.

21         **MR. KEHL:**  -- and 39.

22         So in 39, he writes:  "In practice, this is usually

23   implemented by redacting relevant portions of the documents to

24   be produced, for instance, private data, health data, and HR

25   data."

1          **THE COURT:**  Okay.  And is that -- that is -- as far

2     as you're aware, that's the extent to which you believe -- even

3     if there is any information that's protected by Swiss law, that

4     would be the extent of it?

5          **MR. KEHL:**  That's our read of the declaration, yes,

6     Your Honor.

7          **THE COURT:**  Okay.

8          **MR. KEHL:**  And, again, we don't think that current

9     employees or employees are third parties under Swiss law.

10          **THE COURT:**  Uh-huh.

11          **MR. KEHL:**  But even if we credit Mr. Rosenthal's

12     unsupported opinion that they are --

13          **THE COURT:**  Okay.

14          **MR. KEHL:**  -- I think the extent of what we're

15     talking about here is just redacting things like health data.

16          **THE COURT:**  Okay.

17          **MR. KEHL:**  And, again, at page -- paragraph 34 of

18     that same declaration, in practice, in pretrial discovery

19     matters, these provisions usually mean that a Swiss company

20     will have to consider each document disclosed -- and I'm

21     skipping over some words here -- and then redact accordingly.

22          **THE COURT:**  Okay.  All right.  So I'm going to make

23     sure I understand your train of thought -- or your argument

24     here.

25          So there's -- the first argument is there's no actual

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  conflict, that this is the structure that we use, but there's

2  no actual conflict, so I should just apply the ordinary burden

3  analysis?

4                   **MR. KEHL:**  Correct.

5                   **THE COURT:**  The second sort of thought would be even

6  if we are -- if there is an actual conflict, we can avoid the

7  conflict by just having them redact the PII, and that would

8  then avoid any potential conflict with actually being required

9  to disclose that information?

10                   **MR. KEHL:**  Correct.

11                   **THE COURT:**  Okay. So what if there is other

12  information or the contention is just redacting the PII is not

13  going to be sufficient? Do you go further into that, or what

14  would be the argument for still requiring the production here?

15                   **MR. KEHL:**  Yeah. So we think the other -- you know,

16  company executives emailing about company business is not

17  third-party information.

18                   **THE COURT:**  Okay.

19                   **MR. KEHL:**  And so that -- we don't think the conflict

20  applies there.

21         You know, they were ordered to -- the Swiss entities

22  were, again, ordered to produce documents in U.S. cases. We've

23  pointed the Court to two of them. Those parts contain the

24  string cites of many others. So this is what has happened in

25  the past, and so we, again, do not think there is a conflict as

1   to sort of the meat of the documents, the company business.

2           **THE COURT:**  Okay.

3           **MR. KEHL:**  And I would also add, Your Honor, that our

4   motion doesn't just seek custodial files but also seeks any

5   non -- relevant noncustodial files.

6           **THE COURT:**  Right.  So the three custodians and then

7   just the general repository?

8           **MR. KEHL:**  We --

9           **THE COURT:**  Okay.

10      (Indiscernible cross-talk.)

11          **MR. KEHL:**  -- could possibly be any confidentiality

12  concerns as to the central repositories.

13          **THE COURT:**  Okay.  So you don't think that there

14  could be anything in the central repository that would be

15  protected by these Swiss law protections?

16          **MR. KEHL:**  I guess I will say, you know, if for

17  whatever reason the central repository contains someone's

18  health data -- but, again, those are corporate files --

19          **THE COURT:**  Okay.

20          **MR. KEHL:**  -- not files associated with any one

21  individual.

22          **THE COURT:**  Okay.  So what you're proposing then is,

23  as to those three custodians and the noncustodial files in the

24  central repository, running all of the same searches that are

25  otherwise being run; is that right?

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1          **MR. KEHL:**  That is our current proposal, yes.

2          **THE COURT:**  Is there a way of narrowing that to

3   get -- just as to this Defendant -- to get any more

4   specifically as to what you want for this Defendant?

5          **MR. KEHL:**  I think we're open to that possibility.

6          **THE COURT:**  Okay.

7          **MR. KEHL:**  That was not something that was offered by

8   Syngenta during the meet-and-confer process.

9          **THE COURT:**  Right.  They may not be interested in

10  that at all.  I'm just trying to see what the issues are here.

11         So what are you most interested in from them?  I

12  mean, what's the most important or most relevant part that

13  you're looking for?

14         **MR. KEHL:**  I would say there's two main issues.

15         **THE COURT:**  Okay.

16         **MR. KEHL:**  I would say it's a document about, you

17  know, agreements that are led and negotiated by the Swiss

18  entity, including the ones that we've alleged in the complaint.

19         **THE COURT:**  The one with Corteva?

20         **MR. KEHL:**  That's correct.  Yeah.

21         **THE COURT:**  Uh-huh.

22         **MR. KEHL:**  And then separately, there's a document --

23  I don't believe the White Book is currently under -- sought to

24  be sealed by Syngenta.  So I'll just mention that.

25         You know, documents reflecting a pattern of oversight

1 by the Swiss entity of the loyalty program's operation in the

2 U.S. So the White Book is one example of this. We want to

3 discover more. And since those appear to be generated by the

4 Swiss entity, obtain, you know, those documents, but also the

5 executives' analysis and discussion of those documents and the

6 practices and the policies.

7        **THE COURT:** Okay. Would you be able to get the bulk

8 of that information from the U.S. entity side?

9        **MR. KEHL:** I think we just don't know.

10        **THE COURT:** Just don't know. Right.

11        **MR. KEHL:** It is hard to -- you know, like I said, we

12 don't have these files.

13        **THE COURT:** Right.

14        **MR. KEHL:** So we don't know what's in them. It looks

15 like there's interesting information in them.

16        **THE COURT:** Uh-huh.

17        **MR. KEHL:** And so that's why we've sought this

18 discovery.

19        **THE COURT:** So I guess the thought is, in addition to

20 whatever word searches or keyword searches that you're doing

21 with the U.S. -- and I'm going to refer to the other Syngenta

22 entities as the U.S. entities as opposed to the AG. If --

23 could you also, in addition to those word searches, get copies

24 of all of the communications between those three individuals at

25 AG and the folks they were working with in the U.S. to see if

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 20 of 113

1  other communications maybe weren't captured in the keyword

2  search, but you could get at it that way?

3          **MR. KEHL:**  Well, again, so those would be the

4  communications with the U.S. --

5          **THE COURT:**  Right.

6          **MR. KEHL:**  -- folks.  So, you know, to the extent

7  there's independent discussion in Switzerland -- and, you know,

8  Syngenta pointed to evidence -- or suggested that the U.S.

9  individuals don't know about the White Book.

10         **THE COURT:**  Oh, okay.

11         **MR. KEHL:**  And so that suggests that there's some

12  independent analysis going on over in Switzerland, and that's

13  what's motivating us.

14         **THE COURT:**  Okay.  Is there a way to address this

15  whether by stipulation -- you know, we talked about that -- in

16  lieu of production or taking some fact or precluding

17  evidence -- you know, I wouldn't want them to produce evidence

18  to counter the assertions that you're making that they haven't

19  given you the opportunity to have discovery on.

20         Does that get at the issue or the concern in some

21  way?  Is there a way to come at it that way?

22         **MR. KEHL:**  Like I said, we'll consider it.  I mean,

23  it's possible.  I mean, part of the rationale for discovery is

24  that you don't know what you don't know.

25         **THE COURT:**  Right.

1        **MR. KEHL:**  And so it's hard to stipulate to facts,

2    you know, where we don't have a full picture of the

3    information.

4        **THE COURT:**  Is there evidence that you have some

5    indication that they might want to use or that you would want

6    to preclude them from being able to use if you're not given

7    access to the information that you're looking for here?

8        **MR. KEHL:**  I mean, to the extent that they want to

9    introduce evidence that they say purports to show that AG is

10   not involved --

11       **THE COURT:**  Right.

12       **MR. KEHL:**  -- in the operation of the U.S. loyalty

13   program, we would want --

14       **THE COURT:**  I mean, it makes sense to preclude them

15   from showing that if they haven't given you the discovery on

16   that; right?

17       **MR. KEHL:**  Yeah.  So we anticipate that they'll

18   probably move for summary judgment on Syngenta Crop Protection

19   AG's role in the case.

20       **THE COURT:**  Right.

21       **MR. KEHL:**  And so we need to be positioned to address

22   that motion with discovery from that entity.

23       **THE COURT:**  All right.  Anything else before I go

24   over and hear from Mr. McClammy?

25       **MR. KEHL:**  Nothing else on this issue.

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 22 of 113

1          **THE COURT:**  Right, still just on the AG issue.

2          Mr. McClammy?

3          **MR. McCLAMMY:**  Thank you, Your Honor.

4          **THE COURT:**  Good morning.

5          **MR. McCLAMMY:**  Again, for the record, Jim McClammy

6     from Davis Polk on behalf of Syngenta.

7          I'm just trying to think, because there's a number of

8     issues raised by the FTC in connection with this, on how best

9     to kind of proportion -- I think I would like to start first

10    with the idea that we've tried to prevent them from getting

11    discovery with respect to the issues that are kind of core to

12    this case, which is whatever role Syngenta AG may have played

13    with respect to things going on here in the United States.

14          **THE COURT:**  Uh-huh.

15          **MR. McCLAMMY:**  And I think that's just absolutely

16    incorrect.  We do believe that there are hurdles that prevent

17    direct discovery in this case from Syngenta AG, but that's not

18    to say that we're preventing them from getting the discovery as

19    to what they at least asserted to us is important, which is

20    what is the impact that AG has had on the actions that are

21    being taken here in the United States.

22          It shouldn't be enough to say, well, maybe some

23    executives in Switzerland were having a discussion and maybe

24    they said things about the United States.  If that was never

25    conveyed to folks here, then it has no impact on how the U.S.

1 business is being run.  We think that there will be plenty of

2 support or lack of support if you're looking at the U.S.

3 documents and record.

4         And we would be happy to consider, for example,

5 adding, you know, search terms that tie to communications with,

6 you know, folks in Switzerland based on information that we got

7 and collected here in the United States and the custodians that

8 we are -- we're working with already as part of discovery.  If

9 there was a story to be told about involvement from Switzerland

10 directing things here in the United States, it will be in those

11 documents.

12         You know, it was mentioned that there's a lack of

13 understanding or knowledge of the White Book.  That's because

14 it's not being used in the way that they think it is being

15 used.  If it was being used in direct actions here in the

16 United States, folks would be aware of it.  We cited to

17 testimony in our papers that refute that.

18         Again, I think the clearest answer is if there is

19 something to be had in this story of there being direction as

20 to how the U.S. business is being run, it's not discovered by

21 broad reaching -- you know, far-reaching discovery of the Swiss

22 entity itself.  It can be found in the number of different ways

23 with the searches that we're running, the custodians that we

24 have here in the United States.

25         **THE COURT:**  What about this concern, though, that the

1  Swiss entity is more involved in -- you know, as contracting on
2  some of these things, or at least my understanding is that they
3  were signatory on one of the agreements that's at issue or
4  otherwise having some larger intent that is then communicated?
5  And maybe it's in pieces or parts, but it raises some concern
6  that the Plaintiff just has to accept Syngenta's representation
7  on that without letting them have any discovery on that.

8        **MR. McCLAMMY:**  And I think that last piece of it,
9  Your Honor, is the key piece of the idea that we would not be
10 letting them have any discovery on that.  I think we would be
11 letting them have discovery on that.  And there's going to be
12 discovery, for example, the Corteva agreement --

13       **THE COURT:**  Wasn't the contention that, well, with
14 the competitive agreement, you just get it from Corteva?  That
15 seems like you're avoiding providing discovery about that.

16       **MR. McCLAMMY:**  I would say you would get both from
17 Corteva -- there is a way to test exactly what's being said
18 back and forth by looking at that.  And if there is no "there"
19 there, that would kind of uncover that.  And then you would
20 also have the U.S. custodians and the U.S. collection to test
21 that against as well.

22       So to the extent that there are folks --

23       **THE COURT:**  So I understand that argument if the idea
24 is we think you can get it from other places, so don't come to
25 us.  That still sounds like you're saying, though, Don't come

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  to us.  And so I don't know if I can accept the initial premise

2  that we're not withholding discovery or we're providing

3  discovery.

4          If the argument is we're not going to provide it,

5  here's why, we can talk about that.  But it seems like if

6  you're saying get it someplace else that you're not consistent

7  with the idea that we are providing the discovery as AG.

8          **MR. McCLAMMY:**  As AG, I think that is correct, Your

9  Honor.  But the thought is it may not be a now thing, for

10 example.  If you get the discovery from the U.S. Syngenta

11 entities, that is, that you get discovery, for example, from

12 Corteva, you will either see that there really is no "there"

13 there, as we've been saying kind of all along, or you'll have

14 more of a basis to kind of have more targeted issues.  And we

15 can at least think about that in a different context than the

16 broad, far-reaching kind of like U.S.-style discovery that they

17 are seeking to get from a Swiss entity.  And I think there are

18 a number of concerns that we have, including that it puts

19 individuals at Syngenta AG at risk of, you know, criminal

20 prosecution.

21         **THE COURT:**  So that's a separate issue, and I want to

22 explore that, and we'll come to that.

23         I think it might make sense to do some more targeted

24 search than just the same general search terms that you agree

25 to on the U.S. entities.  It seems like they're looking for

1 something more specifically that you all may be able to come to

2 some agreement on. But I think the first step of that is the

3 idea that AG is a party. Judge Schroeder left them in.

4 They're subject to discovery, and so I don't think the initial

5 starting point is get it from someplace else, not from us,

6 unless there's some reason why we have to be going through that

7 analysis.

8         Do you understand where I'm going with that?

9         **MR. McCLAMMY:**  I completely agree, Your Honor.

10        **THE COURT:**  Okay.

11        **MR. McCLAMMY:**  I think that ties into a bit of the

12 burden argument here, is does it make sense to have this broad,

13 kind of like, far-reaching discovery of what's not even

14 necessarily completely tied to the U.S. business and

15 communications with the U.S in what they're seeking as it is

16 kind of like drafted kind of like now.

17        But the impact of all of this -- I mean -- and it

18 starts with the fact that at paragraph 3 of their complaint,

19 they call this an enforcement action.  That triggers the

20 application of Article 271.

21        It is a huge burden to have to try to figure out how

22 to navigate and provide information even, quote/unquote,

23 voluntarily in that situation.

24        **THE COURT:**  Okay.  So I'm going to let you talk me

25 through -- I asked him to talk me through how he did that

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1 analysis.  So I want you to talk me through how you do that

2 analysis.

3          We start with is there an actual conflict.  Is that

4 the analysis that you're doing?

5          **MR. McCLAMMY:**  Yes.

6          **THE COURT:**  Okay.  And so tell me why there's an

7 actual conflict with Swiss law.

8          **MR. McCLAMMY:**  I think it starts with two things --

9          **THE COURT:**  Okay.

10          **MR. McCLAMMY:**  -- one of which is that this is just

11 not regular way civil litigation.  This is, as they deemed it,

12 an enforcement action.  And that is one of the main concerns

13 and, as set forth in the declaration, one of the main focuses

14 of the Swiss statute.

15          **THE COURT:**  Okay.

16          **MR. McCLAMMY:**  It ties into the concepts of

17 sovereignty.

18          **THE COURT:**  Uh-huh.

19          **MR. McCLAMMY:**  And this being an enforcement action

20 will raise the issue as to whether or not the discovery that's

21 being asked for here could even be considered something that

22 they can voluntarily kind of like agree to.

23          And the risks are substantial, and that is the key.

24 If there is a potential for this -- and I have seen other cases

25 where parties have sought guidance and have gotten it wrong,

1 and it subjects them to criminal consequences in Switzerland.

2 So it's a lot to ask of the folks in Switzerland to say, okay,

3 to some of this discovery if there is the possibility of

4 applying this.

5          **THE COURT:**  But the criminal prosecution you're

6 talking about there is different than this idea of it's

7 voluntary if there is not a threat of criminal prosecution as

8 part of this proceeding; right?

9          **MR. McCLAMMY:**  That is correct, Your Honor.  But I

10 would say, as set forth in the declaration, the concept of what

11 is voluntary --

12          **THE COURT:**  Uh-huh.

13          **MR. McCLAMMY:**  -- is not as clear-cut as to whether

14 or not it's just, quote/unquote, noncriminal consequences here

15 in the United States.  And as set forth in the declaration,

16 this concept of there being consequences in an enforcement

17 action can, I think, be enough to trigger the application.

18          **THE COURT:**  Say that again.

19          **MR. McCLAMMY:**  The idea that there can be even just

20 kind of procedural consequences in an enforcement action can

21 be--

22          **THE COURT:**  Even if it's just a civil enforcement

23 action?

24          **MR. McCLAMMY:**  That's exactly right, Your Honor.

25          **THE COURT:**  Okay.  So I think that if we get to that

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1   point, that's going to require another deep dive into Swiss

2   law, but can we avoid that here?  Is it necessary to do that?

3   Are there ways we can get the information that they need

4   without creating that potential conflict or that crisis, as you

5   will?

6           **MR. McCLAMMY:**  I think that there is, Your Honor.

7   And part of the insistence that we go directly to AG was

8   surprising to us.  We didn't think that this was going to be as

9   controversial as it necessarily turned out to be here.  But our

10  experience in dealing with and what we're aware of with U.S.

11  regulators, the FTC, the DOJ is that oftentimes they will use

12  the fact that there are custodians here in the United States

13  that may have some of the same information as the way to go

14  about getting the information that they need.

15          **THE COURT:**  So if we're doing that, I think there's

16  maybe a couple of different ways to get it.

17          First off, if there is anything else like the White

18  Book or some other document that doesn't have any individual

19  information, if there are other documents that are particularly

20  relevant to that issue in terms of the involvement or in the

21  role and the development of those issues of AG, are those

22  things that you could specifically provide rather than doing

23  search terms?

24          I mean, we always go to search words now.  But before

25  we were searching documents with search terms, we were just

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

finding the documents or finding the particular things that

were responsive to the discovery requests.

Are there things like that that you could provide

instead?

**MR. McCLAMMY:** I think certainly, to the extent that

those things are here in the United States, we could absolutely

search for and produce those.

**THE COURT:** But it's a hard no on whether you could

get those from AG?

**MR. McCLAMMY:** That -- it would be -- my concern is

that that would come with the potential for significant

consequence, and we'd have to take a firm no on that.

**THE COURT:** So if we -- you know, of course, if we

get to that point and I'm going through the analysis, then we

get to whether we order it anyway and how we deal with that.

But, again, trying to look at if that's the case or

if that's the thing that's most important to your client, then

what stipulation or finding would be appropriate to make

instead? Is there something that we can say, in light of you

not providing any of that, in order to not provide that

information, we will take some matters as not contested at

least for, say, summary judgment purposes, that there would be

at least an agreement that you'll not contend that AG, you

know, wasn't involved in some way or wasn't part of or didn't

have some guidance, or whatever it may be, that is appropriate

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1   in order to avoid the need for that discovery?

2           **MR. McCLAMMY:**  And we've given a lot of thought to

3   that, Your Honor.  I think the hardest thing that we have in

4   trying to fashion something along those lines is that we just

5   don't see that you wouldn't be able to find enough here in the

6   United States to support, you know, the theory.  If it is the

7   case that folks from Switzerland are directing how things are

8   done here in the United States with respect to the loyalty

9   program, there's going to be evidence of that here in the

10  United States.

11          **THE COURT:**  So I think what I would be looking at is

12  sort of a two-pronged approach on this.  The first would be

13  giving them wide access to anything on the U.S. side, all of

14  the communications between those folks at AG and the people

15  that they designate here without as many sort of restrictions

16  or parameters on the search terms or -- I mean, it may be a

17  little more wholesale access to all of the communications

18  between Mr. Parr, Mr. Rowe, and Mr. Scott, and any of the folks

19  here in the U.S.

20          And so that may be part of it is that they get more

21  access than they otherwise would or will consider things

22  relevant that otherwise might not be, at least for their

23  preliminary look, to see what all the communications were.

24          The second part of the prong would be I can't see

25  letting AG take a position on something factually that is

1 inconsistent with what they're trying to get discovery about.

2 I mean, you can't hide from it, the discovery, but then still

3 take a factual position that's contrary to that that they don't

4 have the ability to explore or contest.

5 And so I think it would be -- it would need to be

6 both of those. And so it seems to me that the two ways we come

7 at this -- we can do sort of a full conflict of international

8 law and interlocutory appeals on getting this information from

9 a Swiss company, and we can go that route if we have to. But

10 it seems to be more in everybody's interest to try and come at

11 it another way because the result of that may still be getting

12 that information from AG or requiring that information from AG.

13 If we come at it another way, I think they, as I

14 said, get a more fulsome review of all of those communications

15 that they are concerned about, but also -- that you're sort of

16 pointing to. But, also, we've got to figure out how to make

17 sure that AG is not then using that as a way to contest or put

18 the burden on them to say there's no genuine issue of material

19 fact on this because we haven't shown them the information that

20 they need.

21 **MR. McCLAMMY:** And on that, Your Honor -- and perhaps

22 we can address it in stages. It would be hard for me to fathom

23 where the issue is there's a lot that's happening in

24 Switzerland that's directing what's happening in the U.S. We

25 do the U.S. discovery and it shows zero, and they still get to

1  say, even though you've shown that there's been no substantive

2  interaction between Switzerland and the U.S. with respect to

3  the loyalty program on the U.S. side, we still think that

4  there's something to happen on the Swiss side that would

5  demonstrate that they were, in fact, substantively engaged in

6  how these loyalty programs were run.

7      **THE COURT:**  So I think if the genuine issue of fact

8  is just with regard to the interaction with the folks in the

9  U.S., then that may be a separate issue than saying more, I

10  don't know, broadly Swiss company didn't do anything; Swiss

11  company didn't have any guidance about this; Swiss company

12  wasn't involved in this at all.  I mean, I don't think you can

13  say those things and then not do any discovery about that.

14      **MR. McCLAMMY:**  I think for sure the saying of "they

15  didn't have any guidance at all on this," we couldn't ask the

16  Court to say or find that.

17      **THE COURT:**  Uh-huh.

18      **MR. McCLAMMY:**  But even if they had a bunch of

19  communications, like we really wish that the U.S. would be

20  something different -- if they never conveyed that to the folks

21  in the U.S. that are running these programs, I think we do get

22  to take advantage of the fact that nothing was conveyed from

23  Switzerland to the U.S. with respect to these programs.

24      **THE COURT:**  So I'm still concerned or hesitant about

25  the extent to which you would want to make some factual sort of

conclusion on that without having -- let them have any

discovery. But that may be what there is room for you all to

work through, because it sounds to me like if there were no

conflict-of-law issue here, then all of this would be fair game

for discovery, and we would be doing the searches, and we

wouldn't get to, well, you can find it someplace else because

they would be equally responsible for doing the searches.

If there is this concern that, no, we can't or won't

do this kind of discovery, then, as I said, if that's really

where we're going, I think you all need to figure out what can

we give instead that is significant in terms of all of the

communications and some stipulations that would maybe avoid the

concern that the Plaintiff has. It can be just for this case.

It doesn't have to be a broader stipulation, but just for

purposes of you won't raise these particular issues or these

particular sort of factual issues. Because you'll -- you're

not going to provide the discovery on that.

I think that seems to be a way to get at this. It

may be that there are some that you're less comfortable with

conceding; but that if I give you the choice, I'm going to take

these factual findings and make these factual findings or I'm

going to order you to do this discovery, then you'll take the

factual findings rather than to do the discovery. If we're

going to get it to that, I can give you that choice before we

go through the whole analysis of what the conflict-of-law issue

1 might be.  But that -- even if you did it not as a stipulation

2 but that you won't oppose a request for the Plaintiff to have

3 some determination not be an issue in this case so that we

4 could take away the concern that you all are using this

5 discovery issue as a way to shield documents that then you

6 could take a contrary position on without giving them the

7 benefit of the discovery.

8             **MR. McCLAMMY:**  Understood, Your Honor.

9             **THE COURT:**  Okay.

10             **MR. McCLAMMY:**  And we would be happy to take a look

11 at it.  It may be that that's something that could be revisited

12 after they've seen some of the documents and communications,

13 because it may be that even they, after seeing what we have

14 here in the United States, will be comfortable enough with the

15 fact that they've gotten a sense -- a good enough sense of,

16 like, the universe of documents and the universe of what the

17 relationship was between Switzerland and the United States that

18 it's not even an issue anymore.

19             **THE COURT:**  And it does not seem like you're as

20 concern -- or you would have as much problem with the idea that

21 they may get sort of a less screened batch of all of the

22 communications with those individuals just to satisfy that

23 concern.

24             **MR. McCLAMMY:**  That is right, Your Honor.  It would

25 certainly be more work on our part, but we would be willing to

1  do that work.

2        **THE COURT:**  Okay.  All right.

3        **MR. McCLAMMY:**  With the understanding that we'd still

4  be looking for things that are tied to this case and things

5  that are communications back and forth between Switzerland, for

6  example, that have nothing to do with the Key AI program or the

7  products that are kind of like at issue and may not be

8  considered relevant.

9        **THE COURT:**  Well, I think that I would leave that as

10 part of additional discussion with you all because, as I said,

11 my scope of what may be relevant is a lot broader in that

12 context because what we've narrowed it to with the

13 communications between these individuals -- I understand they

14 may have communications about a lot of things, but I think that

15 my sense is that's just -- I would want you all to be open to

16 much broader or less tailored screening of those communications

17 because I think it would be in lieu of getting the documents on

18 the other end.

19        **MR. McCLAMMY:**  Understood, Your Honor.

20        **THE COURT:**  All right.  Let me go back over there to

21 Mr. Kehl, and then we'll see if there is anything else on this

22 one.

23        Mr. Kehl?

24        **MR. KEHL:**  Yes, Your Honor.

25        **THE COURT:**  Okay.  So, obviously, today I'm not going

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 37 of 113

1  to go through a whole Swiss law/conflict-of-law analysis.  I

2  think if we get there, we get there, but I would rather deal

3  with it another way.  I think it's faster for the case to deal

4  with it another way.  I mean, If we get to the point where I've

5  ordered it and then they appeal to Judge Schroeder and to the

6  Fourth Circuit, then we've lost the timeline that we have

7  worked so hard to set up here.  We can do that if we have to,

8  but let's see if there is a way to get at it some other way.

9          The things that I've suggested so far would be a much

10  broader pull of all of the communications between at least

11  those three individuals and folks that you identified here on

12  the U.S. side or anybody here on the U.S. side, and you can

13  negotiate maybe if there is any restrictions on that or what

14  the scope of the restrictions would be on that in terms of

15  which ones of those communications they're pulling or how broad

16  a look of that.

17          I know that doesn't get you everything, but at least

18  to make sure that there's not something sort of hiding in there

19  that's maybe not picked up with a keyword search.

20          And then, secondly, looking at this issue that I

21  think you're most concerned about, which is them taking a

22  position in summary judgment briefing that you can't refute

23  because you didn't get the discovery that you needed.  And if

24  it's just a matter of what are the communications, I think the

25  communications will speak for themselves, and you'll have a

1 chance to depose to people here on the U.S. side, if nothing

2 else.

3          But if there are other parts of that that you would

4 want, as I said, either stipulation or, if they can't stipulate

5 to it, an order of the Court in lieu of a discovery order or in

6 lieu of further litigating the conflict-of-law issue, then we

7 can make those determinations, at least for purposes of summary

8 judgment determination, for issues that we would not be raised

9 or in dispute at that stage.

10          It seems like there's room for you all to at least

11 have discussions about that. As we're thinking through, is

12 there anything else that you would want me to raise or anything

13 else you would want to talk through about that?

14          **MR. KEHL:** I guess I just want to be clear that AG is

15 a Defendant in this case.

16          **THE COURT:** Right.

17          **MR. KEHL:** And so the communications are one piece of

18 this.

19          **THE COURT:** Right.

20          **MR. KEHL:** But, you know, AG could be independently

21 liable and, you know --

22          **THE COURT:** Right.

23          **MR. KEHL:** -- that could occur or evidence that goes

24 to that liability could be found outside of communications.

25          **THE COURT:** They would still have to have been

1  involved in this program in the U.S. in some way; right?

2         **MR. KEHL:**  And so that's where I think, at the very

3  least, the central files get in where there could be

4  information like the updates to the White Book or that sort of

5  thing.

6         **THE COURT:**  Well, again, it may be that there are

7  ways that you -- rather than a search of the central

8  repository, can you ask for specific things like that, that

9  they may be able to provide specific things as opposed to

10 general searches?

11        I don't know if there is or not, and I don't know if

12 they would be able to do that in lieu of some of the other

13 preclusions on that.  But if the issue is more specifically

14 what they did involved in the actual program, are there ways

15 that you can get at that with a specific request as opposed to

16 a search and if that's something that they might be able to

17 provide on that?

18        **MR. KEHL:**  We'll consider that.  Thank you.

19        **THE COURT:**  All right.  Anything else that you would

20 be looking for or that would be helpful as you are negotiating

21 that further?

22        **MR. KEHL:**  Yes.  I think, Your Honor, you're -- what

23 you've latched on to goes to the second issue, which is the

24 search terms and the fact that they are, in fact, restricting,

25 we think unduly, discovery from the U.S. entity.  And so we --

1  you know, we want to make sure we get search terms about the

2  Key AI program.  This is the program that they harp on.

3          **THE COURT:**  Sort of going into the next issue; right?

4          **MR. KEHL:**  Yes.

5          **THE COURT:**  We can talk about that, but I think -- I

6  take your point.  As we talk about some of these other issues,

7  that's going to be informed by the fact that you're not getting

8  all the discovery that you otherwise are looking for from AG.

9  And so we may need to do broader discovery from the U.S.

10 entities in order to make sure we're capturing things fully.  I

11 think that's fair.  I understand that.

12         They can -- if they want to pick this as the thing

13 that they're most concerned about, then we'll find other ways

14 to work around it.  It may mean, though, that those other ways

15 are broader than they otherwise would have been.  And I think

16 that that is also reflected in my notion of if you want all of

17 the communications with these folks, you may get that more

18 broadly than what you otherwise would in a more targeted

19 search, because we're trying to make sure you have that

20 information.

21         **MR. KEHL:**  Yeah.  Even without the application of

22 search terms, obviously.

23         **THE COURT:**  Right.  Right.  Exactly, even without the

24 application of search terms.

25         I don't know how big a pool of documents that will

1  be, and I think that's been part of you all having the

2  negotiation process in terms of how many documents are these,

3  can they review them, and what, if any, sort of restrictions or

4  parameters should we put on that.  But I think that is a way of

5  getting at the information that would otherwise be broader than

6  what we would do, but we'll do in lieu of trying to get the

7  documents directly from AG.

8         So I think, as we're talking through the three

9  prongs -- let me make sure I have them all.  You're going to

10 maybe get a broader array of all of the communications between

11 those three folks and the folks here in the U.S. that you can

12 get on the U.S. side of things and maybe get more specific

13 documents that you can request without running search terms

14 from AG.  So if they've got -- if you've got particular

15 documents you're looking for, it's possible that that's

16 something that you all could include in the negotiation.

17        And then you're going to look at evidentiary

18 stipulations or, if not agreements, things that are -- will not

19 be opposed if they're requested from the Court to address the

20 particular issues that you're most concerned about for summary

21 judgment where they're taking a position that you can't refute

22 because you haven't been able to get the discovery that you

23 need.  And that's really what I am looking for.

24        If it's communications or involvement with the folks

25 in the U.S., I think you get those under the first part of

1  that.  But if these are the specific things that we're

2  concerned that AG is going to take a factual position on or say

3  that we can't establish factually, and the only reason we can't

4  do that is because they are denying the discovery, so linking

5  that narrowly but also sort of specifically to things that may

6  be appropriate to make a finding on.

7         And then, fourth, and this is really separate, will

8  be the issue that it may also color some of the other discovery

9  to the extent that we need to make sure that we're getting all

10 of the things that could reflect the involvement of AG or the

11 program or the policy or the guidance since we're trying to

12 capture it more broadly on the U.S. side.

13        Is that -- that's -- those seem to be the issues as

14 I'm coming at it.  Is there anything else that you want to

15 raise as to those things that I have identified?  Any other

16 concerns that you have about them?

17        **MR. KEHL:**  I think that captures it well, Your Honor.

18 Nothing else.

19        **THE COURT:**  All right.  Let me go back to

20 Mr. McClammy on that.

21        So I've got those as my sort of general preliminary

22 guidance, my talking points, to try and give to you all to work

23 through this.  As I indicated to him, if not getting the

24 documents from AG or doing search terms with AG is sort of the

25 hard no, the hill that you're going to die on, then we're going

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  to have to come at in other ways.  And I would hope that you

2  all would be able to work that out along those lines.

3          MR. McCLAMMY:  Yes, Your Honor.

4          THE COURT:  Anything else as to those things I've

5  raised that you think would be helpful to address today that

6  you want some guidance on that would be helpful?

7          MR. McCLAMMY:  I don't think so, Your Honor.  I think

8  that we've covered it well.

9          THE COURT:  So on that, I think you all understand

10  sort of where I'm going with that.  If you can't reach some

11  sort of agreement, then I'll do this conflict-of-law analysis

12  and the balancing, and we get to where we get.  And if it's an

13  order to produce documents, then we'll -- I'll enter that

14  order, and you all can appeal it, and it is what it is.

15          But if there are ways to avoid that, then certainly I

16  think that would be preferable.  And I would ask you both to

17  try to do something that would keep this case on track and

18  would get the most important parts at the end results that

19  you're each looking for, if we can find a way to get there.

20          And, Mr. McClammy, if your client -- if your client

21  can't stipulate but is at least willing to say, in exchange for

22  not doing this discovery against AG, we won't oppose whatever

23  the finding is for purposes of summary judgment -- and it

24  wouldn't even be a finding against your client.  It would be

25  a -- something that's taken as not in dispute or is not being

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 44 of 113

contested for purposes of summary judgment -- then we can do it

that way just so that they can make that choice to not oppose

something if they are -- or to agree not to rely on some

particular argument for summary judgment purposes in order to

avoid the concern regarding discovery.

          **MR. McCLAMMY:**  Understood, Your Honor.

          **THE COURT:**  All right.  Anything else as to that

before we move on to the next issue, Mr. McClammy?

          **MR. McCLAMMY:**  I don't think so.

          **THE COURT:**  All right.  So, Mr. Kehl, the next

issue -- and so what I'm going to do to just to give you all

some parameters on that -- obviously, I want you to continue to

meet and confer about that.  What I will intend to do before we

conclude is set a further schedule that would give you an

opportunity to give me a joint status report and then

subsequent motion to compel that's narrowed, a response and a

reply that we'll get done before the October hearing so that if

there is something still in dispute, it's ready to be actually

resolved at the hearing in October.

       So that's the plan and the intent for where we're

going to go on this, and we'll work out the details of that

when we get to the end of the morning.

       Mr. Kehl, let me let you move on to the second part

of this.

          **MR. KEHL:**  Okay.  So the second part, Your Honor, is

1  the search terms.

2          THE COURT:  Right.

3          MR. KEHL:  And so I guess just to table set, we've --

4  both parties have used the term "relevant product market" --

5          THE COURT:  Okay.

6          MR. KEHL:  -- in their briefing.  This is just an

7  antitrust term of art --

8          THE COURT:  Okay.

9          MR. KEHL:  -- that refers to the group of products

10  that are economic substitutes and are used to assess the

11  anticompetitive effects of a given restraint.

12          So I guess just with that out of the way, I think the

13  first and most important thing to keep in mind -- and I think,

14  Your Honor, you've picked up on the fact that they're trying to

15  unduly limit discovery from the U.S. entity with -- through the

16  application of overly restrictive search terms -- is that

17  Syngenta is only proposing to review documents that contain

18  explicit and direct references to the three Syngenta AIs that

19  are alleged as product markets in the complaint.  But documents

20  do not need to mention the product market to be relevant to an

21  antitrust case.

22          And, additionally, the parties have agreed, you know,

23  subject to the ongoing discussions in this motion, to search

24  from a very -- a relatively narrow and discrete pool of

25  relevant custodians.  So we're looking at less than fewer than

1  40 custodians and relevant central files.  We're not applying

2  these search terms across the entire company.  They are being

3  applied across locations that are known to contain relevant and

4  responsive information.  And the search terms don't expand the

5  universe of documents collected.  They only serve to limit the

6  collection of documents from those relevant searches.

7        Because a document doesn't need to explicitly

8  reference the product market to be responsive, we proposed some

9  additional search terms to ensure that relevant documents don't

10 slip through the cracks.

11        So, first, we have our terms related to the Key AI

12 program.  And Syngenta repeatedly argues that this case is

13 about one rebate program.  That program is the Key AI program.

14 We think it's clear that they should run searches to look for

15 documents about the Key AI program.

16        Additionally, documents about market dynamics might

17 not explicitly reference particular products.

18        **THE COURT:**  So I'll tell you, you had me on the first

19 part, the Key AI loyalty program.  I was a little more

20 reluctant once I saw your second group of search terms.  It

21 looks pretty broad.  I mean, I'm not sure how that is going to

22 get anything except, you know, almost all their documents.  So

23 I had some concerns about the breadth of that second part.

24        **MR. KEHL:**  So I guess a few responses there.

25        **THE COURT:**  Uh-huh.

1        **MR. KEHL:**  We have search terms about competitive

2   conditions generally.  One of the things we allege in the

3   complaint is that what we call the traditional distribution

4   channel is uniquely important to crop protection products

5   suppliers.  So documents that discuss the importance of the

6   traditional distribution channel aren't going to necessarily

7   reference mesotrione or another particular --

8        **THE COURT:**  No, I understand sort of the concern

9   about just having it reference the three particular active

10  ingredients.  I think, though, the financial or profit or loss

11  or business analysis, that's just not specific distribution

12  channel.  I mean, those are really broad sorts of terms.

13       **MR. KEHL:**  Right.  We took those terms without change

14  from the terms that Syngenta proposed and ran in the

15  investigation.

16       **THE COURT:**  Okay.  And you all know a lot more about

17  that part than I do.  What is it that you're trying to get then

18  that's different than what you got from the investigation?

19       **MR. KEHL:**  Well, there may be different custodians --

20       **THE COURT:**  Okay.

21       **MR. KEHL:**  -- that haven't had those terms applied,

22  and those terms were applied to documents that concluded in

23  2021 or thereabouts.

24       **THE COURT:**  Right.

25       **MR. KEHL:**  So we're trying to catch up in time as

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1    well.

2           And I raise that just to highlight that, you know,

3    this is their burden to demonstrate the burden, and they've

4    used these terms before.  We thought it would be efficient to

5    continue to use the terms that they've used in the past.

6           And then, finally, on this point about, you know, the

7    breadth of these terms -- and their hit count reports don't

8    even address this -- is they're doing this in a two-stage

9    process.  So these are at stage one.  And then you get the

10   collection that might hit on financials and competitive

11   conditions, but then there are many other terms that are

12   further going to call that set.  So when they point to hit

13   counts, those hit counts are just of step one and don't account

14   for step two.

15           **THE COURT:**  Some of the step two are pretty broad

16   too, though.  I mean, I'll put it this way.  It may be

17   appropriate if that's what they used before.  And we can hear

18   from them about that.  But even if I open up this idea that,

19   you know, we're not going to do it as initial limited -- as

20   initially limited just to the three AIs, there would be a place

21   for searches that are related to the loyalty program or that

22   otherwise pull documents that don't refer just to those three

23   AIs.

24           It may also be that there needs to be some

25   negotiation about the breadth of some of the other search terms

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 49 of 113

1  if it's really truly overly inclusive.  It may not be.  It may

2  be that they did this during the preinvestigation and it

3  worked, and so it's not overly inclusive.  But that was a

4  concern I had when I saw the second group of terms.

5          **MR. KEHL:**  Understood.

6          I guess one last point.  I would point Your Honor to

7  the *FTC v American Screening* case we cite in our reply --

8          **THE COURT:**  Okay.

9          **MR. KEHL:**  -- where the court looks at hit counts

10  there.  And there the hit counts were on the order of

11  7 million, you know, significantly more than what they've put

12  forward here.

13          **THE COURT:**  Right.  And, you know, when we get to the

14  concern being hit counts -- I mean, you all do this all the

15  time.  So I'm sure that you all can find ways to then figure

16  out how it's overinclusive or what is it -- if it's some

17  specific -- one of those terms that is pulling too many

18  documents that aren't relevant, or if, in fact, they really are

19  all relevant, and there's just that many documents, and you

20  figure out how to address that.

21          So I am sure that if you get further in the

22  discussion or the negotiation to the hit count issue and trying

23  to make this manageable, that that's something you all can

24  address and work out.

25          Okay.  Anything else as to the search terms issue?

 1          **MR. KEHL:**  No, thank you, Your Honor.

 2          **THE COURT:**  All right.  Mr. McClammy?

 3          **MR. McCLAMMY:**  Thank you, Your Honor.

 4          I think with respect to the search terms, and I think

 5  some of this may just have been driven by, you know, some of,

 6  like, the timing --

 7          **THE COURT:**  Okay.

 8          **MR. McCLAMMY:**  -- I'm hopeful that we can reach some

 9  kind of an agreement on this.

10          **THE COURT:**  Right.

11          **MR. McCLAMMY:**  I think the fact is that it's been

12  requested that, you know, kind of like all those search

13  terms -- one, two, three, and four -- would be applied.  I

14  think -- as a compromise, I think we would agree, even though I

15  think sometimes loyalty, just standing alone, may be too broad.

16          **THE COURT:**  Uh-huh.

17          **MR. McCLAMMY:**  But I think we can probably agree that

18  we could broaden that search term and review and produce the

19  documents.

20          The concern we have with the others is that they are

21  just too broad and not necessarily tied to the things that

22  would be relevant to this case, bringing in things from all of

23  the business lines.

24          **THE COURT:**  Well, now, of course -- so I guess

25  there's a couple issues with that.  If it's just -- if it

            22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  brings in so many that then there's just too many to review and

2  there's too many that are irrelevant, then that's -- you know,

3  how do we navigate the numbers and how do we get it down to

4  something that's pulling relevant documents?

5          If it's pulling so many that are relevant, then we

6  got to figure out, okay, well, how do we do this in terms of

7  the burden and the time and the management of all of it.

8          And so, on the one hand, I understand the -- these

9  are really broad, and we're going to pull in things that aren't

10 relevant.  On the other hand, I think that that's part of, you

11 know, maybe negotiating it into -- so that you're not overly

12 restricting it from the outset, too.

13         **MR. McCLAMMY:**  Understand, Your Honor.

14         Quite frankly, we just haven't been able to run all

15 of these terms over what will be the new broader universe.  As

16 has been stated, you know, we are expanding the date range.  We

17 have different custodians.  We have pulled in a substantial

18 amount of additional documents already to be reviewed.  So this

19 is all on top of that.  I just want to make sure that the

20 context is understood there.

21         **THE COURT:**  Right.  And I guess that goes to -- and

22 maybe you can help explain this idea that these were the search

23 terms that Syngenta proposed or used during the precomplaint

24 investigation.

25         Is there something different now, or what's the

1  change on that?

2       **MR. McCLAMMY:**  At the time of the investigation, one

3  of the things that has changed is that we had no idea

4  necessarily what the investigation was targeting.  The

5  complaint has focused that.  And, like, we believe that the

6  discovery should be focused, you know, where the complaint is

7  focused.

8       The investigation was much broader.  They have a wide

9  range of information already, you know, based on what has been

10  produced.  It's hard for us to see why they wouldn't be able

11  to, for example, take from some of what they have and come up

12  with more targeted searches.  If they believe there are things

13  in the, for example, P&L reporting that they would like to see

14  going forward, we'd be happy to entertain a discussion about

15  that.

16       **THE COURT:**  So then just giving you my sort of

17  preliminary thoughts, and I think you've probably gathered this

18  from my conversation with Mr. Kehl anyway, but it seems more

19  than reasonable to include as part of the initial search terms

20  the Key AI and the loyalty program as things that would get

21  communications or documents that don't specifically have one of

22  the names of the ingredients in it as part of the initial pull

23  to be able to then determine relevance.  And most of those

24  documents that have some reference to the Key AI or the loyalty

25  program would appear to be relevant at least potentially.  So

1    I'll leave it at that.

2          On the financial -- looking for the word "financial"

3    or looking for "profit and loss" or "budget," I mean, a

4    budget -- it seems to me that those could potentially be very

5    broad and maybe in the ordinary negotiation pull things that

6    are too many hits to then be able to be of any real value.

7          On the other hand, if they've got something that's

8    more targeted about the product -- the market or the

9    distribution -- and now I've lost the particular that Mr. Kehl

10   gave me -- but the particular distribution chain or

11   distribution line that would be more clearly relevant or at

12   least potentially relevant, that seems reasonable that those

13   would be part of the initial pull.

14         And then if you do additional searches on those or

15   you figure out ways to narrow it down, those are the

16   conversations you all can have.  They don't want 3 million hits

17   because that's not going to do anybody any good, but how we get

18   that narrowed down into something that makes sense and is

19   manageable.

20         But to the extent I can move everybody off of a

21   position that would involve just as an initial search only

22   pulling the things with the AIs in it, I think that's -- it's

23   pretty reasonable to broaden that initial search, and then let

24   you all have continued discussions about how to do that in a

25   way that's effective.

1          **MR. McCLAMMY:**  That makes sense, Your Honor.

2          **THE COURT:**  Okay.  All right.  Mr. Kehl, anything

3    else that you would need to address on that?

4          **MR. KEHL:**  I would just say briefly there was one

5    comment that Mr. McClammy made that suggests they may not have

6    pulled documents yet --

7          **THE COURT:**  Okay.

8          **MR. McCLAMMY:**  -- which to run these search terms.  I

9    would just say, you know, to do this effectively we do need to

10   have discussions about the hit counts, and that requires them

11   to have collected the documents.  So I would just flag that

12   point.

13         **THE COURT:**  Okay.  So, Mr. McClammy, are the

14   documents collected to be able to run the --

15         **MR. McCLAMMY:**  I want to be clear that at the time we

16   were doing some of this we did not have them all yet.

17         **THE COURT:**  Okay.  We do now?

18         **MR. McCLAMMY:**  We do.  And we were running the, you

19   know, searches as a proxy.  So what's in Mr. Miller's

20   declaration kind of sets out some numbers for this, but those

21   were on a more limited time frame and without applying the

22   second tranche.

23         **THE COURT:**  Okay.

24         **MR. McCLAMMY:**  But that gives you a sense that if

25   that's on a more limited time frame, then it's going to be even

1  beyond that if we're looking at, you know, adding years to

2  that.  But we can pursue --

3          **THE COURT:**  Do that now?

4          **MR. McCLAMMY:**  We can, sure, run the search terms and

5  have a more focused discussion.

6          **THE COURT:**  Okay.  That sounds like, you know,

7  understood that it wasn't there yet or it wouldn't have been at

8  the time.  This is an ongoing process.  Good to make sure it is

9  moving forward as a process and that we're at the point now

10  where you can run those kinds of searches to then see what

11  you're getting and have the negotiations and discussions on

12  that.

13          All right.  That's helpful to Mr. Kehl as well.

14          Anything else, Mr. Kehl, on that one before we move

15  on?

16          **MR. KEHL:**  No, Your Honor.

17          **THE COURT:**  Okay.  And, again, as with the others, I

18  think there's lots of room for you all to take the discussion

19  here and have some further negotiations and discussions and

20  potentially resolve that one as well.

21          Do you want to jump to Number 4?

22          **MR. KEHL:**  Sure, yes.

23          **THE COURT:**  Okay.

24          **MR. KEHL:**  So Number 4 was (indiscernible/paper

25  shuffling over microphone) Andrew Fisher.

1          **THE COURT:** Uh-huh.

2          **MR. KEHL:** Mr. Fisher was a custodian in the

3 investigation. Mr. Fisher was put up by Syngenta in litigation

4 about azoxystrobin as someone with knowledge about that

5 brand -- this is one of the AIs in that complaint -- as

6 knowledgeable about that brand and as someone with knowledge

7 about the post-patent strategy of which the Key AI program is a

8 part.

9          Mr. Fisher is now a commercial unit head to

10 commercially develop and implement brand and product strategy

11 plans within a particular geographic region. So we think

12 Mr. Fisher is clearly a relevant custodian. And Syngenta

13 essentially develops no burden arguments as to collecting and

14 reviewing his files, which makes sense because, again, he was a

15 custodian in the investigation.

16          The crux of their argument is that he implements the

17 plans of others, and that's somehow less relevant to then the

18 ones who developed the plans. But we've pointed the Court to

19 several cases that recognize that both implementation and

20 development of these sort of core plans of the company that we

21 allege are anticompetitive are relevant. And so we request

22 that he be added as a custodian.

23          **THE COURT:** What I think I'll do on this one is hear

24 from Mr. McClammy so I can understand better why they don't

25 want to include him as a custodian, and then we'll see where we

1  are on that one.

2        Mr. McClammy?

3        **MR. McCLAMMY:**  Your Honor, I think the best answer to

4  that is that it's not so much that we are focused on not

5  including him as a custodian as much as it was trying to figure

6  out why they would need him as a custodian for the entirety of

7  the period that they're seeking.

8        He was a custodian before.  You know, during a

9  certain time period, he was in a relevant position, a product

10  marketing lead for one of the AIs from 2015 through 2017.  I

11  think we would agree to including him for that period of time.

12  He went in then from 2017 through 2018 to a role in digital

13  solutions marketing, which is tied more to, you know, a purely

14  digital marketing role where he would develop marketing

15  materials, conduct advertising, commercial activities in the

16  digital realm.  So we can see how kind of like continually the

17  period on to that.

18        And for the role -- for the commercial unit piece of

19  it, we think that we have custodians sufficiently to cover

20  already any of the information, and that adding kind of like

21  the duplicative nature of that, it didn't seem like that made

22  sense to us to have him in for the entire period.

23        But, as I said, if -- for the period of time for

24  which they're referencing the deposition, he was in that -- he

25  was in that marketing lead role, and we would be willing to

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1    include him for that role.

2              **THE COURT:**  So my thought on that is it sounds like

3    he was relevant for at least part of the time, and there's

4    plenty of reasons why they would want him included as a

5    custodian.  If the concern is that there's less relevant

6    documents or no relevant documents later, then presumably there

7    just won't be hits on the documents later.  I mean, they won't

8    show up in the searches.

9              So my preliminary thought, just based on what we've

10   talked about today, would be to include him, to run all of the

11   searches for the whole time period.  And then if there are an

12   unusually high number of returns that are not relevant because

13   some term is hitting for him on something that is pulling some

14   digital thing that's not at all related to this, then you can

15   look at proposing with them or negotiating, like, okay, let's

16   pull out this term for searching him because we're get too many

17   irrelevant hits with that term, as opposed to precluding him as

18   a custodian or cutting off the time frame on him.

19             So that would be my preliminary thought.  There may

20   be ways to get at the concern if it's -- there's too many

21   irrelevant documents.  But, otherwise, I don't see a reason not

22   to go ahead and just include him for the time period on that.

23             **MR. McCLAMMY:**  Understood, Your Honor.

24             **THE COURT:**  Okay.  All right.  Anything else we need

25   to address as to that, Mr. Kehl?

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1          **MR. KEHL:**  Nothing else as to Mr. Fisher.

2          **THE COURT:**  Now, we're on Number 3, which is the

3  data-related requests that also includes the motion to compel

4  as to Corteva.  What I will do is hear from you on the Syngenta

5  motion first; but then before I get too deeply into it, I'll

6  hear from you on the Corteva part as well, and then I can get

7  the responses from both of them before we go too far.  It seems

8  like they're related enough so that it makes sense to have

9  everybody part of that conversation.  Is that correct?

10          **MR. KEHL:**  I agree, Your Honor.

11          **THE COURT:**  Okay.

12          **MR. KEHL:**  I would say at the outset I'll make our

13  case for why this is relevant, and that applies really to both

14  Defendants.

15          **THE COURT:**  Okay.

16          **MR. KEHL:**  When we get to the burden arguments, I'll

17  go one by one because those are more particular.

18          **THE COURT:**  Okay.

19          **MR. KEHL:**  So Plaintiffs have requested a broad scope

20  of data from the Defendants for several reasons.  The first is

21  that -- and this, again, goes into this relevant product market

22  idea that we've been discussing.

23          **THE COURT:**  Uh-huh.

24          **MR. KEHL:**  Data on AIs other than the ones alleged in

25  the complaint as the relevant product markets can be useful to

serve as benchmarks to demonstrate the competitive effects or damages of the conduct. So you would look at an AI subject to the restraint and compare it against an AI that might be out of the loyalty program, for instance.

This is a recognized exercise in antitrust cases. In the *Peanut Farmers Antitrust Litigation*, for instance, the plaintiffs alleged a market of runner peanuts, and the court granted a motion to compel non-runner peanuts, you know, data on products that are outside the market that the plaintiffs had proposed.

**THE COURT:** Okay. But that's from them, not just other -- like a third-party request. It's their other products that are not in the loyalty program.

**MR. KEHL:** Correct.

**THE COURT:** Uh-huh.

**MR. KEHL:** And there are other cases to this. We point the Court to some secondary sources in other cases as well, you know, granting motions to compel, benchmarking data, or recognizing the relevance of this benchmarking data from products outside the, quote/unquote, relevant market.

**THE COURT:** Okay.

**MR. KEHL:** The data are also relevant to the Defendants' market definition arguments.

**THE COURT:** Uh-huh.

**MR. KEHL:** So, you know, starting first with

22cv828 FTC v Syngenta -- Motions Hearing -- 8/15/24

1  Syngenta, Syngenta hasn't really narrowed or proposed a more

2  narrow market than just, you know, foundational herbicides or

3  things of that nature.  So we want data on Syngenta's

4  herbicides and fungicides to assess any claims, any -- when

5  they do come -- when there does come a time when they propose a

6  relevant market, we'll have the data on the products that fall

7  within those broad bundles so we can assess the claims.

8          **THE COURT:**  Now -- and you may get to this when

9  you're talking about burden, but just so that I'm clear, when

10  you talk about data, is there some specific document or

11  database or piece of data that you're looking for?  Or how is

12  it that this is existing somewhere?

13          I mean, we're not asking them to go collect and

14  create something.  So what is it that you're asking for when

15  you talk about the data?

16          **MR. KEHL:**  Sure.  That's a great question.

17          **THE COURT:**  Okay.

18          **MR. KEHL:**  So we understand these data to reside in

19  something that's called an SAP database --

20          **THE COURT:**  Okay.

21          **MR. KEHL:**  -- which is a common -- a common sort of

22  database that companies like this use for their transactional

23  data all the time.

24          **THE COURT:**  Okay.

25          **MR. KEHL:**  And they're going to be querying -- both

1  Syngenta and Corteva are going to be querying these databases
2  anyway.  So they're going to put in whatever AIs they've agreed
3  to put into that database and get the data that comes out,
4  again, not creating data, just the data that exists in the
5  ordinary course.
6           **THE COURT:**  And you do that by the AI?
7           **MR. KEHL:**  They could better speak to that.
8           **THE COURT:**  Okay.  Whether a product or an AI
9  exactly, but you put that -- you search it -- at least your
10  understanding is you're going to search it by a particular AI
11  or a particular product, and then it's going to generate what
12  for you?
13          **MR. KEHL:**  Then it would generate data fields --
14          **THE COURT:**  Okay.
15          **MR. KEHL:**  -- that contain information like sales,
16  costs; it could be one request seeks it on a monthly basis,
17  another seeks it as transactional data which is, like, each
18  transaction; margin.  Those would be at a high -- and price
19  information.  At a high level, those would be the sorts of
20  categories that are sought.
21          **THE COURT:**  Okay.  And so if there are 60 AIs or 70,
22  depending on which number I'm looking at in the briefing --
23  and, again, this is probably forecasting ahead to burden, but
24  what sort of volume of information is it that you're looking
25  at?  Have you gotten this information for, say, the three that

1  are at issue?

2          **MR. KEHL:**  We have from the period in the

3  investigation.

4          **THE COURT:**  Okay.

5          **MR. KEHL:**  I think we have, I think, three from

6  Syngenta and eight from Corteva --

7          **THE COURT:**  Okay.

8          **MR. KEHL:**  -- AIs that were run in the databases.

9          And they are, as I understand it, sort of

10  automatically generated Excel spreadsheets.

11          **THE COURT:**  Okay.

12          **MR. KEHL:**  Syngenta, in its opposition, says they may

13  have to locate product SKUs to do this -- to do the input to

14  know what to pull.  But, again, they say they may have to.

15          And we also just don't know -- they don't

16  substantiate those in terms of is it an automated process to

17  generate the product SKUs.  They've developed the list of AIs.

18  Can they plug that list in and then get the list of SKUs and

19  then plug the list of SKUs into the database?  They haven't

20  done anything to suggest that that is not the case other than

21  general claims that this is just hard.

22          And, you know, we think that's insufficient

23  substantiation of the burden of making this pull.

24          **THE COURT:**  So the fields that you want them to

25  include, do you already have an understanding from the past

 1  then of what the fields are?  That's not something that we need

 2  to dive too deeply in?

 3          **MR. KEHL:**  So the fields are not the subject to the

 4  motion --

 5          **THE COURT:**  Okay.

 6          **MR. KEHL:**  -- other than just the -- I mean, what I

 7  would call the AIs of the products to be inputted.

 8          **THE COURT:**  Right.

 9          **MR. KEHL:**  And the dispute is about --

10          **THE COURT:**  Which ones you input?

11          **MR. KEHL:**  Which ones you input.  But the fields

12  would be the same regardless of what you input.

13          **THE COURT:**  Because the fields were set for the

14  precomplaint investigation?

15          I mean, I guess if there were some issue there, I can

16  hear about it, but, otherwise, that's not the concern?

17          **MR. KEHL:**  And consistent with our RFPs and the like,

18  yes.

19          **THE COURT:**  Consistent with what?

20          **MR. KEHL:**  Consistent with the RFPs that have now

21  been -- I think we added fields.

22          **THE COURT:**  Right.  You included them in there, but

23  that's -- as I'm trying to understand where the dispute is or

24  where things could get narrowed, that doesn't seem to be the

25  issue, as far as you're aware?

1          **MR. KEHL:**  Correct.  Yes.

2          **THE COURT:**  Okay.  So I understand as to Syngenta you

3  want all of the AIs marketed as fungicides or herbicides;

4  right?  That's -- because that's the "what is the market" idea?

5          **MR. KEHL:**  Yeah.  Plus two others.

6          **THE COURT:**  That's what I was going to get to next,

7  then, right.

8          So the first thing was all of the fungicides and

9  herbicides because that's what you contend that they are at

10  least potentially contending would be the relevant market.

11          **MR. KEHL:**  Yes.

12          **THE COURT:**  And then you also asked for these other

13  two particular AIs.  What are those about?

14          **MR. KEHL:**  So I don't believe I can get into that in

15  open court.

16          **THE COURT:**  Okay.  Gotcha.

17          **MR. KEHL:**  So -- but the rationale is explained in

18  our briefing --

19          **THE COURT:**  Okay.

20          **MR. KEHL:**  -- which highlights how Syngenta has used

21  these AIs in the past.

22          **THE COURT:**  Gotcha.  Okay.  But essentially still

23  with the larger issue that they are potentially either

24  benchmarks or part of the market -- with the relevant market.

25          **MR. KEHL:**  Part of the broad swath of products that

                22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

Defendants contend comprise the relevant market.

        **THE COURT:**  Right.  You don't contend that it's the relevant market, but you understand them to contend it's part of the relevant market?

        **MR. KEHL:**  This is -- they might try to pick and choose permutations of that broad category, but that's the broad category.

        **THE COURT:**  The broad category --

        **MR. KEHL:**  So they might ultimately say it's some subset of herbicides.

        **THE COURT:**  Okay.

        **MR. KEHL:**  But herbicides are the category.

        **THE COURT:**  The herbicides and fungicides and the two that you added on?

        **MR. KEHL:**  Yes.

        **THE COURT:**  Okay.  And one of the ones that was an AI identified here you wanted to go earlier.  Is there something you wanted to address with that?

        **MR. KEHL:**  So that addresses -- the time frame is basically based on when the AIs were added to the loyalty program.

        **THE COURT:**  But the only one you have a dispute about --

        **MR. KEHL:**  So in terms of going back to 2002, we have a dispute about that.

1          **THE COURT:** Okay. Right. So you wanted to go back

2   to 2002 because?

3          **MR. KEHL:** For the AIs that were in the loyalty

4   program from the beginning so that we can assess the data as it

5   relates to -- you know, look at cost and margin data for

6   loyalty AIs from the period that they were added to the loyalty

7   program.

8          **THE COURT:** Okay.

9          **MR. KEHL:** And we don't understand Syngenta to be

10  making what we call a burden argument about going back in time.

11  As with the inputs we've discussed, you know, if you say -- if

12  you do the query back to 2002 or 2015, we think it's probably

13  the same query.

14         **THE COURT:** So I'm not sure if I'm completely

15  following exactly what you want about what. So to take a step

16  back, as to the three AIs that are identified in the complaint,

17  what are they agreeing to and what is it that you still want

18  that you don't have?

19         **MR. KEHL:** We're not moving to compel on those three

20  AIs with the exception of time frame.

21         **THE COURT:** So that's what -- right. So that's what

22  I am trying to get at.

23         **MR. KEHL:** Yes.

24         **THE COURT:** So let's take the three in the complaint

25  sort of each one at a time.

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

```
1            MR. KEHL:  Sure.
2            THE COURT:  So you've got the as -- and I'm not going
3   to be able to do that -- azox --
4            MR. KEHL:  Azoxystrobin.
5            THE COURT:  The azoxystrobin.  Okay.  So what do you
6   have on the azoxystrobin?
7            MR. KEHL:  So we want -- so for azoxystrobin, it's
8   2012 to present.
9            THE COURT:  You want 2012 to present?
10           MR. KEHL:  Correct.  And they've proposed 2015 to
11   present.
12           THE COURT:  And why as to the azoxystrobin do you
13   think you need 2012 to 2015?
14           MR. KEHL:  So the exact date is in our papers, but I
15   believe it was sometime in the 2013 or 2014 time frame that
16   azoxystrobin was added to the loyalty program.
17           THE COURT:  Okay.
18           MR. KEHL:  And so we want data from how the market
19   and how Syngenta performed prior to adding it to loyalty and
20   then after adding it to loyalty.
21           THE COURT:  Okay.  So as to the azoxy, you want --
22   the part that's in dispute is 2012 to 2015?
23           MR. KEHL:  Yes.
24           THE COURT:  Okay.  And then the next one I've got is
25   the mesotrione.
```

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1          **MR. KEHL:**  I think it's mesotrione.

2          **THE COURT:**  Okay.  The mesotrione.

3          **MR. KEHL:**  So that's the same rationale as the

4     azoxystrobin.  It was added to loyalty in about 2013 to 2014.

5     And so we want to capture some data from before that time

6     period, and we want to capture after the time period.

7          **THE COURT:**  And they're agreeing to 2015 on?

8          **MR. KEHL:**  Correct.

9          **THE COURT:**  And so what you have in dispute there is

10    2012 to '15?

11         **MR. KEHL:**  Correct.

12         **THE COURT:**  Okay.  And then you've got the

13    metolachlor.

14         **MR. KEHL:**  Metolachlor.

15         **THE COURT:**  Okay.  The metolachlor.

16         **MR. KEHL:**  And so we think that was in loyalty from

17    the beginning, and so we want data back to 2002 so that we have

18    the picture of metolachlor in loyalty.

19         **THE COURT:**  So that would be 2002.  And they are

20    giving you 2015.

21         **MR. KEHL:**  Right.

22         **THE COURT:**  So you want the 2002 on.

23         So do you need, though, all of those years before?

24    Does the same -- a few years before give you the same sort of

25    capture, because you would be able to see 2012 on for all of

1 them, what it looked like before loyalty and then what it

2 looked like after loyalty?

3       **MR. KEHL:**  Well, it wouldn't give us the before

4 loyalty for metolachlor.

5       **THE COURT:**  Right, because it goes all the way back

6 to -- so tell me that time frame again.  What does from the

7 beginning mean?

8       **MR. KEHL:**  Yeah.  I don't think we know the exact

9 date yet when the program started.

10       **THE COURT:**  Okay.

11       **MR. KEHL:**  But we think it could be -- and I don't

12 want to throw out a number.

13       **THE COURT:**  So I'll throw it out because I have no

14 idea.  So if the program started -- the loyalty program started

15 in 2004, then you want the metolachlor data from 2002 because

16 it was before the loyalty program started?

17       **MR. KEHL:**  Correct.

18       **THE COURT:**  Okay.  So that's why you go back to 2002?

19       **MR. KEHL:**  Yes.

20       **THE COURT:**  And 2002 is when metolachlor first

21 started being marketed?

22       **MR. KEHL:**  I'm not sure about that.

23       **THE COURT:**  Why 2002, I guess?

24       **MR. KEHL:**  We picked a cutoff.

25       **THE COURT:**  Okay.  So that's the beginning for your

1  purposes.  As far as you know, that's at least before it was

2  added to the -- before the loyalty program even started?

3         MR. KEHL:  That's our working understanding, Your

4  Honor.

5         THE COURT:  Okay.  All right.  So I have those three.

6  Then you have what I'll call the other herbicides and

7  fungicides plus two; right?  So that's the next category.  So

8  that's the other herbicides and fungicides plus the two that

9  you want to add or include with that -- that you're including

10 in that group.

11        And then that group, what's the date range that you

12 want?

13        MR. KEHL:  So, in general, it's 2012 to present.

14        THE COURT:  2012?

15        MR. KEHL:  Yes.

16        THE COURT:  Okay.  So the only one that you're

17 looking for the 2002 is the metolachlor?

18        MR. KEHL:  Metolachlor and also abamectin and lambda.

19        THE COURT:  Okay.

20        MR. KEHL:  Which we understand were similar to

21 metolachlor in terms of when they were added to the loyalty

22 program.

23        THE COURT:  All right.  And then the rest of them

24 2012 to present?

25        MR. KEHL:  Correct.

1          **THE COURT:**  And then that's based on what as to the

2    2012?

3          **MR. KEHL:**  It's -- well, it's based on all the

4    reasons we've offered for why we want the data.  So we want to

5    have a fulsome --

6          **THE COURT:**  Because they are not in the loyalty

7    program?

8          **MR. KEHL:**  Well, some of them are.  Some of them are

9    on patent.  Some of them are in loyalty.  Some of them are off

10   patent and not in loyalty.  And so we want to have a full set

11   of comparators.  We want to be able to assess Defendants'

12   market definition arguments.

13         And I think crucially -- we haven't gotten to this

14   yet, Your Honor -- is they haven't ruled out using any of

15   these.

16         **THE COURT:**  Right.  And I understand that, and I'll

17   let you go ahead address that point, too.  Before we do -- and

18   you can definitely come back to that, but before we do, I just

19   want to make sure I'm tracking exactly what it is that you're

20   wanting still that they are not providing.

21         And as to the azoxy and the meso, it would be the

22   2012 to 2015.  As to the metolachlor, it's 2002 on.  And then

23   as to the other fungicides and herbicides, it's anything

24   because you're not getting anything on those, but specifically

25   what you're looking for is 2012?

1          **MR. KEHL:**  With two exceptions.

2          **THE COURT:**  With the two exceptions.  And as to those

3     two, you want those back to 2002?

4          **MR. KEHL:**  Yes.

5          **THE COURT:**  And I understand benchmarks and market as

6     the rationale for those, but I will let you go ahead and

7     address that further, including as to the issue that I think

8     you were getting ready to raise.

9          **MR. KEHL:**  We've discussed, you know, the affirmative

10    need to have benchmarks.  The affirmative need to be able to

11    use data to test their market claims.

12         **THE COURT:**  Okay.

13         **MR. KEHL:**  And there's also the notion that they

14    haven't ruled out using any subset of their AIs as benchmarks

15    themselves.  And so, you know, they say that they'll provide it

16    as part of the expert discovery rules under Rule 26, but I

17    guess that's why we're moving to compel.  We want to have --

18         **THE COURT:**  Right, the same thing.

19         **MR. KEHL:**  We want to be on equal footing to them.

20    And, you know, they might -- what they're saying is they

21    identify comparators that are good for them.  Then we'll get

22    those comparators, but we won't get the other comparators they

23    didn't pick to compare those comparators.

24         **THE COURT:**  Right.  If I were to say, If you don't

25    provide this, then you can't use any of them; we're going to

1   make it equal, so you can choose, provide it or it's -- you
2   can't use it for an expert or for anything, and it's precluded,
3   then what of that do you still think you need affirmatively?  I
4   mean, that takes out the other herbicides and fungicides
5   groups; right?  If we're all equal and nobody gets to use
6   those, then nobody gets to use those.
7           **MR. KEHL:**  So that would be a definite
8   improvement --
9           **THE COURT:**  Right.
10          **MR. KEHL:**  -- from the current state of play.  But we
11  would still -- we would want some comparators ourselves.
12          **THE COURT:**  So you'd still want the comparators.  But
13  if you don't get them, then they shouldn't get to use them?
14  Essentially, that's your second -- your sort of fallback
15  position, essentially?
16          **MR. KEHL:**  That's our fallback position.
17          **THE COURT:**  Does that address the 2012 to 2015 issue,
18  or is that a different issue?
19          **MR. KEHL:**  I see the time frame as a distinct one.
20          **THE COURT:**  It's distinct?
21          **MR. KEHL:**  Yes.
22          **THE COURT:**  So tell me about that.  So what is it
23  about the time frame that you're getting that's different than
24  the comparators?
25          **MR. KEHL:**  No, I guess that's right, I mean, if we're

Case 1:22-cv-00828-TDS-JEP    Document 257    Filed 08/22/24    Page 75 of 113

1  talking about them using the --

2          **THE COURT:**  Right, them using it or not using it.

3          **MR. KEHL:**  We also wouldn't want to be in a position

4  where they use some historical data that we did not.

5          **THE COURT:**  Right.  Right.  I can still keep the

6  analysis of those separate in terms of whether we go back and

7  whether it's more relevant to go back for the time frames for

8  those three that are at issue versus these other comparators or

9  not.  But it's -- in all of those instances, your fallback is,

10 well, if you're not getting that information, they shouldn't be

11 able to use any of that information; right?

12         **MR. KEHL:**  Correct.

13         **THE COURT:**  Okay.  Before I go to Syngenta, why don't

14 you go ahead and tell me about Corteva since that overlaps and

15 I want to let them be heard together on this as well.

16         **MR. KEHL:**  So the overall rationale, Your Honor, I

17 would say still applies.  You know, we want the information for

18 benchmarking purposes.  We want the information to test their

19 theories of the market, and we want to make sure that we're on

20 an even playing field.

21         Corteva has gone a little further than Syngenta in

22 that they proposed a compromise offer of some additional AIs.

23 They haven't currently specified exactly which AIs are in that

24 group, but based -- and this is set out in our reply brief.

25         Based on the way they have defined that proffer of

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 76 of 113

1  the market and the corresponding compromised additional AIs

2  that would come in, it's been inconsistent with their past

3  assertions of the market that they've made to the courts of --

4  you know, for instance, their offer would exclude an AI that

5  they highlighted in their motion to dismiss briefing as one

6  they think is in the market.

7       And we recognize that they're not under an obligation

8  to define the market at this stage, but because, you know, the

9  sands may be shifting, it gives us some pause to be limited to

10 a group of AIs that then they can change their mind and offer

11 up, you know, additional AIs that they think are, in fact, in

12 the market.

13      **THE COURT:**  So if we adopted their proposal,

14 you're -- as I would sort of understand your position, your

15 first position is you want all of the AIs, but if not, if we

16 adopt their compromise proposal, then you at least want it to

17 be with the agreement and understanding that that's the market,

18 at least that's their -- the broadest that they will propose

19 that the market could be, and they won't propose any broader

20 market?

21      **MR. KEHL:**  Yeah, I think that's right.  But, again,

22 we would -- we do affirmatively want the additional AIs.

23      **THE COURT:**  Right.  I mean, I think there is still

24 the concern or the issue that if they are picking and choosing,

25 they are picking and choosing some that may be to their benefit

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  as opposed to sort of maybe a neutral pull.

2          MR. KEHL:  Exactly.

3          THE COURT:  Yeah.  Do you need to tell me about any

4  of the particulars there?  This is the one that had -- your

5  request is any products containing herbicide or insecticide and

6  your request is from 2012 to present; is that right?

7          MR. KEHL:  It's, in general, 2012 to present.  I

8  believe it's --

9          THE COURT:  2010 for one of them.

10          MR. KEHL:  2010 for rimsulfuron.

11          THE COURT:  And that's one of the AIs.  So, again, if

12  we're breaking it down --

13          MR. KEHL:  That's one of the relevant AIs.

14          THE COURT:  One of the three relevant AIs, right.

15          So if we're breaking it down as to the acetochlor,

16  you have everything on that one, or do you need to go back

17  further on that one?

18          MR. KEHL:  I don't believe they have agreed to go

19  back to 2012.

20          THE COURT:  That's why I was going through this

21  again.  So same issue; they are giving you 2015?

22          MR. KEHL:  I think they're at 2016.

23          THE COURT:  Okay.

24          MR. KEHL:  But there's, again, a delta between when

25  the products -- when we think the products may be subject to

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

loyalty or when we think the products might, you know, be

useful comparators and when they're willing to produce the

data.

**THE COURT:** So you wanted 2012. They are giving you

2016 for the oxamyl.

**MR. KEHL:** For oxamyl and acetochlor.

**THE COURT:** Okay. So for the oxamyl, it's the same,

which would be you want 2012; they're giving you 2016.

**MR. KEHL:** And, again, this sort of gets into burden,

Your Honor.

**THE COURT:** Right.

**MR. KEHL:** You know, we think it's just simpler if,

you know, some AIs come in now that were in and others

weren't -- we think it's probably just simpler to pick a

date --

**THE COURT:** Right.

**MR. KEHL:** -- and then use that date.

**THE COURT:** Right. Although for the rimsulfuron,

you're wanting back to 2010.

**MR. KEHL:** Because of the unique circumstances for

that active ingredient.

**THE COURT:** And, you know, if it's a burden issue,

they can tell us it's easier to pull specific dates for

specific ones. So I can let them tell me about that.

But for that one, you want 2010. On that one,

1   they're also giving you starting at 2016; is that right?

2           MR. KEHL:  I believe that's right, yes.

3           THE COURT:  And then, fourth, you want the other

4   herbicides and insecticides.

5           MR. KEHL:  For Corteva, it's --

6           THE COURT:  And the nematicides as well?

7           MR. KEHL:  Yes.

8           THE COURT:  And that one you're wanting 2012 forward?

9           MR. KEHL:  Yes.

10          THE COURT:  And that's just sort of to pick a

11  consistent date?

12          MR. KEHL:  Yes.

13          THE COURT:  As to that one, it looks like this is the

14  one where there were maybe 72 of the herbicides and 14 of the

15  insecticides/nematicides.

16          Is that -- generally, so they're 60 for Syngenta and

17  maybe 80-some for Corteva, as far as you're aware?

18          MR. KEHL:  As far as we're aware, yes.

19          THE COURT:  Okay.  And I think I understand the

20  argument here, and I can hear from them.  I don't think -- I

21  don't see other questions I had specifically, but anything else

22  you wanted to add before I go hear from them on this?

23          MR. KEHL:  Just one point to highlight --

24          THE COURT:  Of course.

25          MR. KEHL:  -- for Corteva.

1          We've discussed Syngenta's unsubstantiated burden

2   arguments.  Corteva doesn't really explain the burden of doing

3   the data pull at all.

4          **THE COURT:**  Okay.

5          **MR. KEHL:**  All they say is that some data doesn't

6   exist.  That's not a burden argument.  That's an argument about

7   the state of the database.  And as we acknowledge in our reply,

8   we're not asking them to recreate data that don't exist, just

9   pull the data that do.

10          **THE COURT:**  Is that the issue with data before 2015

11  being sort of lost in a conversion, or is that Syngenta's?

12          **MR. KEHL:**  That was Syngenta's issue.  I can address

13  that, too.

14          **THE COURT:**  Sure.  I want you to address all of it.

15          I mean, I think that if the data doesn't exist or the

16  data doesn't exist in a way that is accurate or complete --

17  that doesn't exist in a way that is accurate or is incomplete

18  in a way that makes it inaccurate, then I think -- I mean, I

19  understand the concern or the problem.  I don't think we want

20  them to produce data that is not accurate and then try to

21  figure out what's going on with that.

22          If it's just not complete, we don't have all the

23  fields, I mean, that may be a different issue.  If it's we

24  don't have all the data so what pops up in the fields isn't

25  actually right, you know, I think that's just kind of one of

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 81 of 113

1 those that it is what it is.  But I don't think that we can use

2 data that's not accurate or rely on it.  You may know more what

3 the issue is.  So let me let you address that.

4 **MR. KEHL:**  So Syngenta says the historic data has

5 inaccuracies, but what I would say is that they've been very

6 vague about the extent to which there are inaccuracies and

7 where those inaccuracies manifest.

8 So if you look -- in their opposition, for instance,

9 they say that certain cost data may present inaccuracies, and

10 that's the only example they give.  And as we've discussed,

11 we're requesting data that is beyond cost and different types

12 of cost data that may not have the inaccuracies.  But they

13 don't identify any issues with price data, with margin data,

14 with sales data, that sort of thing.

15 And so, you know, it's really just their say-so at

16 this point that the data are inaccurate.  And, you know, as the

17 party resisting discovery, we think they have the obligation to

18 substantiate this.

19 I would say it's a fairly unusual claim to make to

20 decide to preclude producing data.  They point to one case on

21 this point.  But in that case, the party resisting discovery --

22 I would say that case is more about the burden of producing the

23 data than the inaccuracy in question.  The party there put in

24 an affidavit that to pull the data -- they were a restaurant

25 group -- to pull the data -- they would have to shut down

1  restaurants to do the data pull.  I mean, that's the sort of
2  clear articulation of a burden that impacts the bottom line
3  that courts credit and that we don't have here.
4          So I would just say -- I would say the argument about
5  the data being inaccurate at this point is just very vague at a
6  high level and unsubstantiated, and we don't agree that that's
7  a valid reason to decline to produce it.
8          **THE COURT:**  Okay.  I will hear from them, and then
9  I'll come back and see where we are.
10         All right.  Mr. McClammy, I am going to go to you
11 first as to Syngenta, and then I'll come to Mr. Auerbach for
12 Corteva.
13         **MR. McCLAMMY:**  Understood.  And if it's okay with
14 Your Honor, when we were discussing this issue, Mr. Auerbach
15 had prepared to kind of give a broader --
16         **THE COURT:**  Okay.
17         **MR. McCLAMMY:**  -- discussion here.
18         **THE COURT:**  I'm happy to do that.  I can hear from
19 him.  And then I just want to make sure I come back to you and
20 address some of those more specific things as to Syngenta.
21         **MR. McCLAMMY:**  Absolutely.  Happy to do that, Your
22 Honor.
23         **THE COURT:**  Okay.  Mr. Auerbach, you're up.
24         **MR. AUERBACH:**  Thank you, Your Honor.
25         I think it's important to level-set here what this

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  dispute is really about.  It's about, from Corteva's

2  perspective, what one market participant, defending a complaint

3  with limited allegations, is obligated to produce.

4          As Your Honor is aware, as to Corteva, they only

5  challenge three of our active ingredients; yet, they're seeking

6  discovery on, by their admissions, 60 active ingredients:  all

7  herbicides, all insecticides, all nematicides.

8          Their complaint also alleges and our answer admits

9  that the first time one of these relevant AIs was in a relevant

10 loyalty program was 2016.  That's the reason for the 2016

11 response period that we've agreed to; yet, they're seeking data

12 from 2012 forward for some active ingredients and 2010 for

13 further active ingredients.

14         **THE COURT:**  So 2016 was when each of the three

15 Corteva -- let me make sure I have that list here -- the

16 rimsulfuron, the oxamyl, and the acetochlor were in a loyalty

17 program.

18         **MR. AUERBACH:**  No, Your Honor.  2016 is when

19 acetochlor was added to a relevant loyalty program.

20         **THE COURT:**  Okay.

21         **MR. AUERBACH:**  And I believe oxamyl and rimsulfuron

22 were both added in 2017.

23         **THE COURT:**  Okay.  Oxamyl in 2017 and rimsulfuron in

24 2017.  So they were not in the loyalty program before that?

25         **MR. AUERBACH:**  They were not in the accused loyalty

1  programs before that.

2          **THE COURT:**  Were they in some other loyalty program?

3          **MR. AUERBACH:**  This verges on confidentiality, but

4  they were in another program.  Rimsulfuron was, yes.

5          **THE COURT:**  Okay.  So if we're trying to get a

6  picture of what it looked like not in a loyalty program, what

7  we would go back to?

8          **MR. AUERBACH:**  I'm not sure for rimsulfuron and

9  oxamyl.  For oxamyl, it might not need to be much farther back

10  because the FTC at least has identified a predecessor loyalty

11  program that oxamyl was on.

12          **THE COURT:**  So oxamyl may only go back to, say, 2015

13  or 2016.  Rimsulfuron you don't know?

14          **MR. AUERBACH:**  Not 100 percent sure for rimsulfuron.

15          **THE COURT:**  Okay.  And acetochlor?

16          **MR. AUERBACH:**  Acetochlor I believe is 2016.

17          **THE COURT:**  Okay.  So if we were trying to go back to

18  capture sort of the time period just for comparison purposes

19  for what it was like before or not in a loyalty program, maybe

20  go back an extra year or two except for rimsulfuron, whenever

21  it may have been; is that right?

22          **MR. AUERBACH:**  Yes, Your Honor.

23          And to be clear, the DuPont programs -- Corteva, of

24  course, is a product of the DuPont and Dow merger.  The DuPont

25  programs are not mentioned in the complaint.  It's the Corteva

1 programs that are challenged here.  So we also don't really

2 view the predecessor DuPont programs as particularly relevant

3 to the present action.

4          **THE COURT:**  Okay.  So I'll go ahead and let you sort

5 of finish that -- continue where you were.  But my question, I

6 guess at some point we'll come back to, is whether we need to

7 go back to some period of time before 2016 to capture for any

8 of them the time period before they were in a loyalty program

9 and whether that's appropriate.

10          **MR. AUERBACH:**  Understood, Your Honor.  We can

11 definitely give that some additional thought as to the three

12 AIs that they have brought claims to.

13          **THE COURT:**  Right.

14          **MR. AUERBACH:**  But the main point here is that

15 they're seeking many AIs that they have not accused.  They have

16 not accused any wrongdoing as to these AIs.  And we think a

17 request for discovery that is so untethered to the allegations

18 in the complaint is disproportionate to the needs of the case.

19          Despite that, however, we have offered what we think

20 is a fairly broad compromise in this sort of market-based

21 proposal that Plaintiffs were describing.  We think that this

22 compromise meets their concerns about receiving market

23 definition discovery.  We think it meets their concerns about

24 receiving benchmark discovery.  And we don't think it's

25 cherry-picking to our benefit because it's a principled

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  approach.

2         So to just provide some background on what this

3  approach is --

4         **THE COURT:**  Okay.

5         **MR. AUERBACH:**  -- every AI is assigned to a site of

6  action group.  That's essentially how it targets the pest and

7  kills it.  For acetochlor, this is Group 15.  For rimsulfuron,

8  this is Group 2.  For oxamyl, it's a little different because

9  it's an insecticide, but the code here is Group 1, and there's

10 a 1A and 1B.  It would include both here.  And then the second

11 vector is just within -- whether they're in the same group,

12 they're also used on the same crops and pests as the three

13 relevant AIs.

14        By our count, this generates 19 Corteva AIs, but it

15 generates a lot more AIs that are not found in Corteva

16 products.  By our estimation, that's roughly 47 active

17 ingredients where discovery would be best sought from third

18 parties and not Corteva.

19        So we have a principled approach here that we think

20 yields a lot of useful AIs to them, and we think it's useful

21 for both market definition and for the benchmarking exercise.

22        For market definition, we don't think they're

23 actually entitled to any discovery beyond the three for market

24 definition.  We specifically cite to the *Asacol* case.  I think

25 the important principle from the *Asacol* case that's relevant

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  here is that market definition discovery is discovery on the

2  market.  It is not discovery from limited data of one market

3  participant.  And that's the gravamen of what they're seeking

4  here.

5          But even still, their primary complaint with our

6  market-based proposal is that it excludes certain AIs that may

7  compete with the relevant AIs.  The particular example that

8  they used -- and they mentioned this AI but not by name -- is

9  flumetsulam.  In our motion to dismiss briefing, we had noted

10  that flumetsulam and acetochlor have some overlap in uses and

11  are potential substitutes for one another.  But flumetsulam is

12  a Group 2 herbicide.  So even though it would be excluded from

13  discovery if we're only looking at Group 15 herbicides, like

14  acetochlor, flumetsulam actually still comes in on our proposal

15  because we're offering Group 2 herbicides with respect to

16  rimsulfuron.

17          **THE COURT:**  Okay.  So is this a proposal that you all

18  have made subsequent to the briefing?  Because the last I saw

19  in the briefing there was a group of eight not a group of 19.

20  Is this something new?

21          **MR. AUERBACH:**  The number 19 is new from the

22  briefing.  We did discuss with Plaintiffs our proposal of

23  groups and crops and pests.  We understood that they weren't

24  going to agree to it regardless of what the particular AIs

25  were.  So we stopped the conversation there.

1    **THE COURT:**  So this would be the 19 Corteva AIs that
2    would include the one that you identified in the motion to
3    dismiss or that you've previously identified as a -- any of the
4    ones you've previously identified as a potential competitor or
5    market?

6    **MR. AUERBACH:**  It would include this particular AI
7    that we mentioned in our motion to dismiss briefing.  I can't
8    speak to necessarily every AI that we've mentioned in the past.
9    But to the point about unfairness and cherry-picking, we're not
10   presently intending to go beyond this market definition.  We're
11   also not intending to be limited to this market definition.
12   The point here is that --

13   **THE COURT:**  I mean, you can't -- that's the problem,
14   though, right.  If you're going to limit it to this, then I
15   think at the very least I'm going to limit you to this.  You
16   wouldn't be able to then use other of your data to come -- make
17   a different market comparison.  If you're going to reserve the
18   right to do that, then it's hard to understand why that
19   wouldn't be available to them as well.

20   **MR. AUERBACH:**  Well, part of the issue is we are
21   defending the allegations here.  We will need to know from the
22   volumes of discovery that they are receiving from third parties
23   what kind of claims they may be making as to other active
24   ingredients.  So there is a responsive element to this, and
25   it's not just we're trying to hide the ball here.  We also need

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  to know what the scope of the case is before we get to the

2  point of fully defining the relevant market.

3          But the point I was trying to make is the relevant

4  market we're proposing for purposes of this discovery dispute,

5  wherein we don't think that the relevant market should be

6  definitely decided, covers most of the herbicides that are

7  going to be really close substitutes for the relevant

8  herbicides.

9          And I think that also dovetails with the benchmarking

10 point.  For the benchmarking analysis that Plaintiffs seek --

11 there's obviously a sliding scale of how relevant a given

12 benchmark is.  For example, Plaintiffs are willing not to seek

13 fungicides as a benchmark for Corteva, and they're willing not

14 to seek insecticides or nematicides as a benchmark for

15 Syngenta.

16         The closer to the relevant active ingredient --

17 another active ingredient is, the better the benchmark.  The

18 closest benchmarks would be generic versions of the same active

19 ingredients.  That is discovery that will come from generic

20 third parties, not from us.  What we're offering is probably

21 the next closest benchmark, which is products that operate in

22 the same way as the relevant products.  And among the 19

23 products we're offering, we understand that some have been on

24 loyalty and gone off.  We understand that some have never been

25 on loyalty.

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1          So they are receiving the benchmark -- the analysis

2     that they say they need, but what we're not hearing is any

3     specific other AIs that are being left out by our proposal here

4     that will materially prejudice the Plaintiffs.

5          **THE COURT:**  So if I were to give you the choice,

6     though, and say, look, if we adopt this more limited pull, then

7     we can make it a more limited pull, but then you're precluded

8     from using any other broader market definition or data, or we

9     just go ahead and include all of them, we'll figure out what

10    the burden is, but you'll do all the AIs that they're looking

11    for, and then we'll leave it open for whatever you may want use

12    in the future, which one would you pick?

13         **MR. AUERBACH:**  I think a preclusive remedy would be

14    premature at this point.

15         I just want to return to a point I made about the

16    *Asacol* case and market definition discoveries about the

17    aggregate market.  There are a lot of subpoenas pending already

18    in this case from distributors who sell all kinds of AIs from

19    generic manufacturers who make a number of AIs.  Those

20    documents are yet to come in.  We don't know how Plaintiffs

21    intend to use them.

22         As I said before, I do think there will be a need for

23    us to consider if we need to go and look at other data based on

24    the claims being brought against us from the record in this

25    case.

1    **THE COURT:**  But wouldn't they want to look at that

2  same other data, too?  I mean, once they get that

3  information -- you know, they're subpoenaing from third

4  parties, and they want to compare it to these same other AIs as

5  well.  Wouldn't that work the same way?

6    **MR. AUERBACH:**  Well, we think the third parties will

7  be the primary comparators here.  We don't know that they need

8  this -- what's supposed to be kind of market-wide data from

9  Corteva itself, particularly when we're offering what we think

10  are a good set of benchmarks and a principled market-based

11  limitation on what our discovery burden is going to be.

12    **THE COURT:**  Talk to me about the burden.  How hard is

13  it to pull this information?

14    **MR. AUERBACH:**  So I think there's a bit of an

15  overemphasis on the collection burden, which I can discuss.

16  But there's also a review burden here.  When we expand the

17  scope of AIs by 20 times from the three that are in the

18  complaint and then expand the time period by several years, we

19  end up with much larger datasets.  We have to review those

20  datasets before they are produced to Plaintiffs.  That is

21  burdensome.

22    And beyond just the, you know, ordinary course

23  document review, these are documents that could potentially be

24  used against us in a litigation.  So we'll have to make sure

25  our witnesses are prepared on those documents.  We will have to

1  know very well what information they contain on those other

2  AIs.  So we're particularly concerned with the forward-looking

3  burden.

4          I mean, there's a number of databases here that

5  Plaintiffs are aware of from the investigation phase.  In

6  Corteva's case, it is not one SAP database.  So to the extent

7  we could run a query in a single database to go back further,

8  we're not saying that that is burdensome.  But Corteva is a

9  post-merger entity.  In the investigation we had to go back and

10 find older databases from Dow, older databases from DuPont.

11 And the data requests here request types of data that are a

12 little bit broader.  So there's also an unknown in terms of how

13 far back you have to go into these predecessor entities to

14 identify the data being sought here.

15         **THE COURT:**  Okay.  That's helpful.

16         Anything else before I hear from Mr. McClammy as to

17 any specific Syngenta issues?

18         **MR. AUERBACH:**  I don't think so, Your Honor.  Thank

19 you.

20         **THE COURT:**  All right.  Thank you.

21         Mr. McClammy?

22         **MR. McCLAMMY:**  Thank you, Your Honor.

23         On behalf of Syngenta, I think I can say the approach

24 that Mr. Auerbach has outlined is one that I think makes sense.

25         **THE COURT:**  Uh-huh.

1          **MR. McCLAMMY:**  The idea that it's every AI regardless

2     of its application that kind of falls within the scope of

3     discovery, we think it's just simply way too broad and it isn't

4     going to bring about anything meaningful.

5          We would be willing to --

6          **THE COURT:**  I am going to give you sort of that same

7     thought, though, because I understand your idea that this is so

8     broad and completely unrelated.  They're trying to figure out

9     where the market is and where you contend the market is.  If we

10    say, okay, you know, you create a subset that you say that this

11    is the market and we agree the market can't be any broader than

12    this, then I think that's a different conversation or

13    discussion.

14         If you're still -- want to keep the option of

15    defining the market more broadly, then it seems like the data

16    is the same like they might get from a third party or somewhere

17    else to try to figure out, okay, well, what is the comparator

18    and how does this work in terms of what's in the market or

19    what's not in the market.

20         **MR. McCLAMMY:**  So I think I would be happy to have

21    that discussion with them.  I think that's been among kind of

22    like the challenges, and maybe it's a chicken-and-egg thing,

23    because I don't think we've heard from them kind of exactly why

24    they think, you know, looking at every AI somehow or another is

25    a good comparator, you know, for an herbicide for grow crops,

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  for example.

2          **THE COURT:**  Well, I guess --

3          **MR. McCLAMMY:**  I think we can come up with -- I'm

4  sorry, Your Honor.

5          **THE COURT:**  I was going to say I understand this idea

6  of maybe coming up with something.  As I understand it, the

7  concern on their side has been, even when you're making those

8  proposals, that you're not stil willing to say this is the

9  broadest that we will define the market.

10          **MR. McCLAMMY:**  So I think from our perspective, if we

11  have a framework to say, for example -- and we can propose what

12  the Syngenta AIs would be under this framework to say that it's

13  this pest, similar application, similar crop.  We think that

14  this creates, you know, the relevant -- you know, the broader

15  kind of like scope, relevant AIs that are Syngenta AIs.

16          We think it would also bring in third-party AIs.  And

17  I think with the understanding that if we use that framework

18  and, you know, operating with the understanding that the

19  Syngenta, the Corteva, and the third-party AIs that fall within

20  that kind of like framework would be that relevant universe, I

21  think we can live with that.

22          **THE COURT:**  And, you know, I'm not going to say that

23  the Plaintiffs have to agree that that's the relevant market

24  because, obviously, I think they are going to have a narrower

25  market than you all are going to propose.  But I think that for

1 the discovery purposes what I'm sort of concerned about is this

2 idea that you're going to give them some or try to come up with

3 hopefully a principled sort of group but then still hold out

4 the possibility that you may want to include something else in

5 that group later without having disclosed that.

6          That's going to affect our timeline, if we stay on

7 this timeline, and that also has the feel of the

8 cherry-picking; we're only going to give you what we want to

9 give you, and then we'll come back and find some more later, if

10 we decide that would help us more.

11          And that's not how we're going to do the discovery

12 here.

13          **MR. McCLAMMY:**  I understand that, Your Honor.

14          **THE COURT:**  Okay.

15          **MR. McCLAMMY:**  And perhaps if it were easy and

16 perhaps if it weren't so voluminous, maybe we would have come

17 at this differently.  And we've tried to explain, you know, the

18 burden.  This is not just pushing a button.  There is actually

19 a lot of manual work that goes into figuring out exactly which

20 products and which, you know, product IDs and then which SKUs

21 kind of relate to a particular AI, because it's not just that

22 you have it all by AI; it's that you have it by product.  And

23 then, you know, the products come in different sizes, so they

24 all have different SKUs.  Someone has to enter all of that in

25 to get it from, you know, one table for, you know, one

1 particular bit of information, another table for another bit of

2 information.

3          It is a labor-intensive, time-consuming process.  And

4 the broader you go, the more likely you are inserting errors

5 into that process that are going to have to be

6 checked/corrected before you come up with what you think is a

7 reasonable and usable data set.  And that's for the data that

8 we have in the SAP system, for example, from 2015 to the

9 present that we think is reliable.  Going back beyond that, you

10 have the additional complications of you even have to have

11 someone locate some of the underlying kind of like data to

12 figure out where it is, and it may not be complete.

13          **THE COURT:**  So let me give you a couple of thoughts

14 on that.

15          So I think when you're talking about the burden from

16 2015 forward, I think that's a fair conversation for you all to

17 have.  And I asked them about fields.  I mean, I don't know.

18 Maybe there are some fields that you're having to go to some

19 other database to get that they'll say, well, we don't need

20 that, at least not as an initial request.  Let's just limit it

21 this way in order to reduce the burden so you don't have to go

22 to three different databases.

23          Or maybe there's some other way that you all can have

24 a conversation about what the actual burden is for these are

25 the steps that we're going to have to do and this is why it's

1  just not push a button and pull this, here's where the most

2  time intensive part of it is, so that you all can sort of

3  figure that out for maybe not narrowing the number of AIs that

4  way, but maybe narrowing what it is that you're having to do to

5  pull that information or how you're putting it together.

6         As to the number of AIs, I think it makes sense to

7  have a conversation with each other about what is a principal

8  way on which you would define the market.  And they may have

9  some other AIs that they think should be included in that or

10  some other groups that they think should be included in that,

11  but at the very least then -- and I think I've made it pretty

12  clear my thought on this -- that you wouldn't go any broader

13  than that once you all have had a conversation.  And it's not

14  just a one-sided, this is the offer.  It's, okay, here are the

15  ones, and here's the reasons along the lines that Mr. Auerbach

16  is talking about of the groups that they're in and the

17  particular market that they're in in terms of the type of

18  protection that they give or the type -- whether it's a flower

19  or crop or whatever it is.  And that you can have that

20  conversation to come up with some number that's maybe more than

21  the eight but less than the 60 that will be ones that you can

22  live with for this is the universe that we have that we can use

23  to work with in defining the market and that they feel like is

24  not a cherry-picked group but has a principal reason and that

25  they can know they are not going to be looking at any other

1  data that you might be coming up with later.

2          That seems like a conversation you all can still

3  have.

4          **MR. McCLAMMY:**  Yes, I think that's right, Your Honor.

5          **THE COURT:**  And then if there are particular things

6  that are particularly burdensome, like getting this one

7  particular field requires going to three different databases,

8  then talk about that because that may be something that you all

9  can at least not do for all of the ones on the list and come

10 back a second time if you need to go through that.

11         With the before 2015, that one is an interesting

12 thing to me because, on the one hand, you know, if you push the

13 button and it's pulling from an incomplete set in a way that

14 makes the numbers inaccurate, then I understand that's a

15 problem.  But I think that you all probably need to have a

16 conversation that's a little more specific about what exactly

17 the problem is, and you may have been getting ready to tell me

18 some more about that.

19         I don't know if there is something else that you

20 wanted to add on that part.

21         **MR. McCLAMMY:**  No, I think that's it.  And we're

22 happy to have, I guess, perhaps a more detailed conversation.

23 But it really is the case that, you know, because of changes in

24 systems, that the information kind of prior to that period is

25 information that we just don't think we could, you know, within

1  any reasonable amount of effort get to any point where we could

2  say that the output is going to be reliable, even if we could

3  get the output.

4      **THE COURT:**  So it may be that when you're talking

5  about burden, you can do more the group of AIs from 2015

6  forward.  And then maybe do that extra effort, or whatever you

7  have to do, if you can, to figure out exactly what you can get

8  and what's accurate, what's not accurate, for the three that

9  are at issue.

10     As to those, to get back to 2012, if you can, or

11  figure out what you can get back before 2015.  I think that

12  might be a reasonable conversation you all could have, too.

13  And those limited ones that are actually the specific ones at

14  issue here, those may involve more work to figure out what you

15  can get and what different resources you can go to to get an

16  accurate picture from 2012 forward.

17     I don't know what it looks like from 2002 forward on

18  the -- I mean, I don't -- which one was the one --

19     **MR. McCLAMMY:**  The metolachlor?

20     **THE COURT:**  Right.  Whether you have access to

21  anything that goes back that far or what that looks like.

22     **MR. McCLAMMY:**  That's definitely one of the

23  difficulties we have is that --

24     **THE COURT:**  Right.

25     **MR. McCLAMMY:**  -- we just don't have -- and

1  especially because of how, you know, business units had -- were

2  different and the concept of cost and the breakdown and all

3  that, it would be difficult -- you know, the cost is very much

4  tied to the margin issue that they say they're interested in.

5  So I think from our standpoint -- and that wouldn't be data

6  that we would want to rely on.

7          **THE COURT:**  It would or would not?

8          **MR. McCLAMMY:**  Would not.

9          **THE COURT:**  Right.

10          **MR. McCLAMMY:**  And I think we can find, you know,

11  proxies for that in some of the third-party data sources as

12  well, including information that may go back even further than

13  2002 for some of these products that provide, I think, a

14  sufficient kind of proxy for, you know, this when you combine

15  that with what we would be able to produce from 2015 to the

16  present.

17          **THE COURT:**  And so it may be that you pull what you

18  do have or what you're able to do so that you can talk about it

19  specifically with Plaintiffs' counsel to say this is what we're

20  getting when we try and go back to 2002, this is why it's not

21  reliable so that they have a little more specific understanding

22  of what it is and what the problem is or what's going on with

23  that.

24          So what my thought is -- and I'll still make sure

25  I've heard from everybody else.  But just sort of a preliminary

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1 thought on this, it seems like to me that there's room to go

2 back on the three AIs for each Defendant that are specifically

3 at issue in this case.  And if there's reasons why you all

4 can't go back to 2012 or 2002, or the date before they were in

5 the loyalty program, then you all have a more specific

6 conversation about what it is that's the problem or why you

7 can't or this is what we can get just as to those.

8          As to the other herbicides, fungicides, insecticides

9 that I -- it seems reasonable try to come up with a principled

10 group that is as broad as each of the Defendants would contend

11 they will go for trying to define the market, but then that

12 would preclude using others later in the case, at least is my

13 preliminary sort of guidance to you.  That seems reasonable to

14 me, that you wouldn't still hold out using one that you're

15 refusing to pull and provide as a comparator.

16          And so what that looks like -- whether you all say,

17 you know what, we'll just give you all of it because we don't

18 want to mess with deciding now what the market is and then you

19 all tell us, and we'll contest that or object to whatever it

20 is, once we get to that point.  Or if you say, okay well, we'll

21 come up with this.  They may say it's still a smaller market,

22 but you're at least giving them the comparators that you

23 contend would be ones that you might potentially use or the

24 market you might potentially use, again, not restricting you

25 from going narrower than that or using other third parties or

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  redefining the market.

2         So I'm not going to pin either of you down on that.

3  But it does seem, just as a general principle, reasonable to me

4  that if you all are going to say, no, the comparators are a

5  smaller number here for what the market is, these are the only

6  ones that would be even possibly relevant for what the data

7  would be for comparison, that then you don't come back later

8  with something else new or different that they haven't had the

9  chance to view or receive.

10         Now, where they go with that in terms of wanting more

11  or trying to find other ones that they think should be included

12  in the market, I think that's part of a discussion that you all

13  can continue to have as well and maybe be able to reach some

14  resolution of it, or at least narrow it down so that when we

15  come back, you've gotten most of that out of the way and taken

16  care of.  And then we'll have more of a sense specifically if

17  there is some particular piece that's left and what the dispute

18  might be about that.

19         So that's my general thought on that just for things

20  you all can discuss.

21         Is there -- I don't remember if there's anything else

22  Mr. Clammy as to Syngenta in particular that we might need to

23  address or consider that might be helpful to get some guidance

24  on?

25         **MR. McCLAMMY:**  I don't think so, Your Honor.  I think

Case 1:22-cv-00828-TDS-JEP   Document 257   Filed 08/22/24   Page 103 of 113

1  we are happy to have the conversation as you have outlined it.

2          **THE COURT:**  All right.  Before I go back to

3  Plaintiff, Mr. Auerbach, anything else you wanted to add for

4  Corteva?

5          **MR. AUERBACH:**  No, Your Honor.  We think your

6  guidance is clear.

7          **THE COURT:**  All right.

8          All right.  So, Mr. Kehl, I think I've tried to give

9  them some guidance for coming back to have some additional

10  conversations with you.  I can't promise that I would tell

11  them, You have to provide all of your data for all of your AIs

12  that they have disclaimed any intent to rely on as a

13  comparator, because that starts to feel broader than is

14  necessary once they make that decision that they're going to

15  disclaim relying on it as a comparator.

16          If they're still holding out that they're going to

17  include it as a comparator, then maybe it's a different

18  discussion to have, particularly in terms of, okay, what's the

19  burden here and how do we reduce that burden?  And I think, as

20  I said, you all have those kinds of conversations all the time.

21  So I'm sure that you can figure out ways to alleviate where the

22  particular burdens might be in order to get the things that

23  you're most interested in in a way that balances all of those

24  things out.

25          Anything else that would be helpful to get guidance

1  on for that while we're here?

2          MR. KEHL:  I would just flag, Your Honor, that with

3  the comparator issue, there's, I guess, maybe two separate

4  issues.

5          THE COURT:  Okay.

6          MR. KEHL:  So what are products in the market is one

7  issue.

8          THE COURT:  Uh-huh.

9          MR. KEHL:  And then separate from that is, you know,

10 we affirmatively want to use the comparators for demonstrating

11 anticompetitive effects or damages.

12         THE COURT:  Okay.

13         MR. KEHL:  And the AIs that may be useful for that

14 purpose --

15         THE COURT:  Uh-huh.

16         MR. KEHL:  -- could be outside the now broader set

17 that they are proposing to include.

18         We understand the guidance.  It's very helpful.  I

19 did just want to flag that issue.

20         THE COURT:  So it seems like that's still part of a

21 conversation you all could have, because if it's limited to a

22 specific or particular product or AI that you anticipate you

23 want to do a comparison on, then there may be enough basis to

24 say, okay, that's relevant for that reason.  It's a little

25 harder to say that all of their products that they have

1  otherwise disclaimed relying on are going to be subject to

2  discovery.  See if maybe one of them has something that would

3  be a damages issue.

4          But if you narrow that down and say, okay, here's the

5  ones where we think it might be relevant or would potentially

6  provide that information for -- I guess it would be comparator

7  for the impact or the damages as opposed to the market, then I

8  think that's something that we could have a conversation --

9  first that you all could have a conversation about, looking at

10 what the burden is.

11         And, you know, in that sense in some ways it's

12 thinking about it the same way if this was a third-party

13 subpoena and you're trying to get market information or impact

14 and data information on a third party.  What's the burden on

15 them of providing that?  What can we do to reduce that burden?

16 I mean, in some ways that is sort of what you're looking for

17 from these Defendants here is these other products and how that

18 impacts and how -- or what the market was.

19         And so we can look at it in that context, too, or you

20 all can have that conversation in that context, too, where it's

21 not we're having discovery about all of their other products

22 just to fish around and see if there is some other problem that

23 we can find; it's more specifically as to how it affects the

24 particular showing that you're going to have to make in this

25 case.

1          As with any subpoena like that, we're going to look

2     at what's the burden going to be and how hard is this for them

3     to get that.  And so we can have that same analysis for any of

4     the ones that they are disclaiming any reliance on.  And then

5     it's just, okay, well, would you be entitled to it anyway?  Is

6     there some burden on it that I would need to take into account?

7          But I will tell you this, I would need a much more

8     fulsome showing to require them to provide that information or

9     go undertake that burden if it's something that they are

10    disclaiming any reliance on.  And so it's not to say it's

11    completely precluded that you might be able to get that

12    information.  I would just need to know more specifically what

13    it is and exactly why I should still put them to that burden.

14         Does that help answer that question or provide

15    additional guidance?

16         **MR. KEHL:**  Understood.  Yes, Your Honor.

17         **THE COURT:**  All right.  Anything else along that that

18    may be helpful to address?

19         **MR. KEHL:**  I did just want to note that this is the

20    first time we've heard this -- we appreciate the compromise

21    offer from Syngenta, but it's the first time we've heard it.

22    And with Corteva, we heard the offer in the abstract.  This is

23    the first time that a number has been thrown out, and we still

24    don't know the AIs in particular.

25         **THE COURT:**  Right.  And I think that is consistent --

1  as I said from the very outset, it looks like there's more room

2  for you all to still have some additional conversations on

3  this, which is why I did not intend to come in here

4  definitively resolving or ordering these things.  My intent

5  today, and how you should take all of what I've said today, is

6  preliminary thoughts and guidance to help you all move the

7  negotiations or discussions along.  And then I can revisit

8  those things as I need to or as you sort of provide additional

9  authority for me.  So it is just that; it is guidance at this

10  point for you all to continue having those conversations.

11        I'm glad we came to do this today.  I think it's

12  probably moved those conversations on a lot more quickly than

13  they otherwise might have, but I'm still going to anticipate

14  then having you come back around, attempt to resolve those, see

15  how far we get, and then we can hear everything again when we

16  come for October -- or anything that's left when we come in

17  October.

18        Anything else as to that or that we would need to

19  address, Mr. Kehl?

20        **MR. KEHL:**  No, Your Honor, thank you.

21        **THE COURT:**  All right.  As to the motion to seal,

22  what I think I may do is the information that's set out in the

23  motion, I'm still going to need a separate motion to seal for

24  Corteva.  And so what I may do is wait in October and have the

25  showing on the record.  And to the extent anybody wants to make

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1  any objection to that, they will have an opportunity to do it

2  that way between now and then so that we can have the findings

3  as to all of the things that are requested to be sealed when we

4  come for the hearing in October.

5          So what I will do now is the motion to seal is filed.

6  Everything is still under temporary seal based on the local

7  Rule 5.5 report and the preliminary showing you've made.  And I

8  think there's a sufficient basis for at least the temporary

9  seal for that period of time, given this is a discovery dispute

10 that's not related to dispositive motions, and there is at

11 least the showing that this part is related to sensitive

12 business information and commercial information that's not

13 public.

14         But what I'll do is anticipate having you make that

15 for the record when we come back for the hearing in October.

16 So the motions to seal -- the one that's filed will just stay

17 pending.  And Corteva will still need to file its motion to

18 seal consistent with the local Rule 5.5. report.  If there's

19 anything else that needs to be sealed between now and then,

20 we'll take care of all of that when we come back in October.

21         So the motions will all remain pending at this point.

22 What I anticipate is this -- now I need to look at a calendar.

23 We come back October 24th.  And I'm just going to work

24 backwards from there.  That means by October 17th I need to

25 have a joint status report regarding the status of these

1 discovery disputes and whether there is still anything

2 remaining.

3          That means that working back from there, if there are

4 any legal issues that you all still want me to resolve, let's

5 put the September 13th date for any supplemental motion or

6 briefing.  And in particular there, if we're not going to be

7 able to resolve the issue regarding the Swiss law, then I would

8 want you to make sure and address if there is anything else or

9 give me something specific there for where we are as well as

10 any other briefing that you all think I need.

11          So, essentially, if there is something else that you

12 all haven't been able to reach an agreement on and if there is

13 a legal issue that you want me to resolve, then I want you to

14 file a supplemental brief by September 13th and then the

15 response would be September 27th and the reply September 4th --

16 excuse me -- October 4th.  And then by -- then you all need to

17 meet and confer -- or continue meeting and conferring and give

18 me a final joint status report October 17th.

19          So, essentially, what I want you all to have is a

20 briefing schedule to the extent there are legal issues that you

21 want me to address or resolve that you think are still going to

22 be pending for me to address and then a final joint status

23 report October 17th.

24          So that gives you between now and September 13th to

25 meet and confer to see if you can reach a preliminary issue on

Case 1:22-cv-00828-TDS-JEP    Document 257    Filed 08/22/24    Page 110 of 113

1 these things.  And then, if not, if you need to do another

2 round of briefing on it, you can do that.  On the one hand, I

3 don't need you to rebrief everything that you've briefed

4 before.  On the other hand, I think we've hopefully sort of

5 narrowed and clarified what some of the issues might be.  And

6 if it is an issue, particularly as to AG, I think I want a

7 really clear explanation on both sides as to how you all think

8 the analysis works and what the Swiss law is that you think

9 would apply and how it applies.  I don't want you to have to do

10 that if you can resolve it otherwise; but if you think you need

11 me to resolve that, then I want some helpful briefs and

12 analysis on that.  And so I will give you that time frame so

13 you can provide that to me.

14          Hopefully that's clear enough.

15          Mr. Kehl, is that clear for you all?  Is there

16 anything else that I can do, or anything else you would suggest

17 on how we proceed?

18          **MR. KEHL:**  Nothing else from me, Your Honor.  Thank

19 you.

20          **THE COURT:**  All right.  And then, Mr. McClammy,

21 anything else?

22          **MR. McCLAMMY:**  Nothing else from us, Your Honor.

23          **THE COURT:**  Okay.  All right.  And, Mr. Auerbach,

24 anything else for your client?

25          **MR. AUERBACH:**  Nothing further.

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24

1          THE COURT:  Okay.  And, Mr. Marriott, anything else

2   just generally in terms of the schedule?

3          MR. MARRIOTT:  No, Your Honor, thank you very much.

4          THE COURT:  Very good.

5          All right.  I think that covers what we were on for

6   today.  If we need to resolve anything further, we'll hear it

7   on October 24th.  And if there is anything else in the

8   meantime, certainly go ahead and bring that to my attention so

9   that we can address it if we need to with a telephone

10  conference before, and then if not, at the hearing on the 24th.

11         All right.  We'll go ahead and adjourn court.

12      (END OF PROCEEDINGS.)

13

14                           ******

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   MIDDLE DISTRICT OF NORTH CAROLINA

3   CERTIFICATE OF TRANSCRIBER

4

5           I,  Briana L. Chesnut, Official United States Court

6   Reporter, certify that the foregoing transcript is a true and

7   correct transcript of the proceedings produced solely from an

8   audio recording to the best of my ability in the above-entitled

9   matter.

10          Dated this 22nd day of August 2024.

11

12

13                      _Briana L. Chesnut_

14          _____

15          Briana L. Chesnut, RPR
            Official United States Court Reporter

16

17

18

19

20

21

22

23

24

25

22cv828 FTC v Syngenta  -- Motions Hearing  -- 8/15/24