IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:22-cv-828

FEDERAL TRADE COMMISSION, et al.,

    Plaintiffs,

  v.

SYNGENTA CROP PROTECTION AG, et al.,

    Defendants.

**BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR C. SCOTT HEMPHILL**

**Oral Argument Requested**

# TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES ........................................................iii

INTRODUCTION ................................................................................. 1

NATURE OF THE MATTER ...................................................................... 2

STATEMENT OF FACTS .......................................................................... 3

QUESTION PRESENTED.......................................................................... 3

ARGUMENT ..................................................................................... 4

    I.      Expert Testimony Generally.................................................................. 4

    II.     Hemphill's Proffered Opinions Are Not Reliable.................................. 5

       A.   Hemphill is an advocate........................................................... 7

       B.   Hemphill's market definition opinions cannot be supported by his "Appendix C" because he lacks expertise in agronomy................ 10

       C.   Hemphill's market definition opinions are unreliable because they rest on a non-standard, outcome-oriented version of the Hypothetical Monopolist Test ........................................................... 12

           1.   The Hypothetical Monopolist Test................................................ 13

           2.   Hemphill's flawed application of the Hypothetical Monopolist Test ..................................................................................... 15

       D.   Hemphill's methodology cannot reliably distinguish between competitive and anticompetitive market outcomes and is therefore unreliable ............................................................... 19

       E.   Hemphill's "ordinary price competition" opinion is *ipse dixit* not based on accepted economic standards ........................................ 24

III.   Hemphill's Proffered Opinions Are Not Relevant Because They Do Not "Fit" the Matters To Be Tried and Do Not Proffer a Testable Standard to Apply ............................................................. 26

CONCLUSION ................................................................................................. 30

CERTIFICATE OF WORD COUNT ................................................................ 33

CERTIFICATE OF SERVICE .......................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*In re Air Crash Disaster*,
  737 F. Supp. 427 (E.D. Mich. 1989) ............................................................7

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling
  Co.*,
  690 F.2d 411 (4th Cir. 1982)...................................................................... 21

*Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*,
  2009 WL 5842051 (E.D. Va. Jan. 6, 2009)................................................. 11

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
  582 F.3d 1227 (11th Cir. 2009)................................................................... 26

*Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.*,
  85 F. App'x 964 (4th Cir. 2004) ..................................................................5

*Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*,
  144 F.4th 238 (4th Cir. 2025) ..................................................................... 11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*,
  509 U.S. 209 (1993).............................................................................. 1, 9

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014).......................................................................6

*Buckley v. Deloitte & Touche USA LLP*,
  888 F. Supp. 2d 404 (S.D.N.Y. 2012) ..........................................................6

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994)........................................................................ 13

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000)............................................................. 20, 26

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001)..................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)............................................................ 4, 5, 14

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) .................................................4

*Elliott v. Versa CIC, L.P.*,
349 F. Supp. 3d 1004 (S.D. Cal. 2018) .......................................7

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009)............................. 18

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025).................................. 16, 17

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997).......................................................... 5, 24

*Green v. Bd. of Cnty. Comm'rs*,
2006 WL 6861763 (E.D. Okla. Apr. 12, 2006) ......................... 7, 8

*Holesapple v. Barrett*,
5 F. App'x 177 (4th Cir. 2001) ................................................ 24

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs.*,
2005 WL 1396940 (S.D. Ohio June 13, 2005)............................. 27

*Kaufman v. Motorola, Inc.*,
2000 WL 1506892 (N.D. Ill. Sept. 21, 2000) ............................. 27

*Kentucky v. Marathon Petroleum Co.*,
464 F. Supp. 3d 880 (W.D. Ky. 2020)......................................... 21

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) .................................*passim*

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).............................................................. 4, 5

*Ky. Speedway, LLC v. NASCAR, Inc.*,
588 F.3d 908 (6th Cir. 2009) .................................................................. 14

*In re Lipitor (Atorvastatin Calcium)*,
892 F.3d 624 (4th Cir. 2018) ............................................................... 5, 12

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003) .................................................................7

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) .................................................... 14

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
982 F.3d 113 (2d Cir. 2020) ................................................................... 24

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) ...................................................................6

*Oglesby v. Gen. Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) ............................................................. 4, 11

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) .................................................................... 19

*Perry v. United States*,
755 F.2d 888 (11th Cir. 1985) ............................................................... 13

*In re Pharm. Benefit Managers Antitrust Litig.*,
2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ............................................ 20

*Pierce v. N.C. State Bd. of Elections*,
2025 WL 2841008 (E.D.N.C. Sept. 30, 2025) ....................................... 19

*Schor v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006) ................................................................. 27

*SMD Software, Inc. v. EMove, Inc.*,
945 F. Supp. 2d 628 (E.D.N.C. 2013) ................................................... 11

*In re Trasylol Prods. Liab. Litig.*,
709 F. Supp. 2d 1323 (S.D. Fla. 2010) ....................................................7

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
  29 F.3d 137 (4th Cir. 1994)......................................................................6

*United States v. Cortez*,
  205 F. Supp. 3d 768 (E.D. Va. 2016) .................................................. 30

*United States v. Hudak*,
  156 F.4th 405 (4th Cir. 2025) ...............................................................5

*United States v. Lupton*,
  620 F.3d 790 (7th Cir. 2010)................................................................ 30

*United States v. Powers*,
  59 F.3d 1460 (4th Cir. 1995).............................................................. 26

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
  98 F. Supp. 2d 729 (W.D. Va. 2000)............................................. 18, 19

*Victus, Ltd v. Collezione Europa U.S.A., Inc.*,
  26 F. Supp. 2d 772 (M.D.N.C. 1998) .................................................. 17

*Viterbo v. Dow Chem. Co.*,
  646 F. Supp. 1420 (E.D. Tex. 1986) .....................................................7

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000).............................................................................4

*In re Wellbutrin XL Antitrust Litig.*,
  133 F. Supp. 3d 734 (E.D. Pa. 2015) .................................................. 20

*Wright v. United States*,
  280 F. Supp. 2d 472 (M.D.N.C. 2003) ................................................ 11

*Yates v. Ford Motor Co.*,
  2015 WL 3448905 (E.D.N.C. May 29, 2015)....................................... 30

## Other Authorities:

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (5th ed.) ..................................... 16, 18

C. Scott Hemphill & Philip J. Weiser, *Beyond* Brooke Group*: Bringing Reality to the Law of Predatory Pricing*, 127 Yale L.J. 2048 (2018) ....................................................................................... 1, 2, 9

Fed. R. Evid. 104 ......................................................................................5

Fed. R. Evid. 702 ...........................................................................*passim*

John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 Am. Econ. Rev. 672 (2014) ..................................................................... 28

Kline Group, *Effectiveness of U.S. Crop Protection Company Channel Incentives* (Jan. 2019) .................................................. 25

N.Y. Rules of Pro. Conduct ...................................................................8

Defendants submit this brief in support of their Motion to Exclude Expert Testimony of Professor C. Scott Hemphill.

<u>**INTRODUCTION**</u>

Hemphill is a law professor with a personal crusade to change antitrust law. Just a month ago, Hemphill's expert testimony for the FTC was rejected, largely because of his bias. The court in *FTC v. Meta Platforms, Inc.* said of Hemphill, "**[i]t was almost as if the FTC had put one of its own lawyers on the stand**." 2025 WL 3458822, at \*26 (D.D.C. Dec. 2, 2025). Hemphill's inability to be objective is as problematic in this case as it was in *Meta*. His status as an advocate and a *de facto* member of Plaintiffs' legal team renders his opinions inadmissible and disqualifies him from serving as Plaintiffs' expert.

Hemphill's crusade dates back to at least 2018, when he co-authored an article criticizing the Supreme Court's decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp,* 509 U.S. 209 (1993)—including the price-cost test— and urging that *Brooke Group* be circumvented in antitrust challenges to loyalty rebate programs. *See* C. Scott Hemphill & Philip J. Weiser, *Beyond* Brooke Group*: Bringing Reality to the Law of Predatory Pricing*, 127 Yale L.J. 2048, 2048, 2050, 2077 (2018). Hemphill's co-author was Philip J. Weiser,

current Attorney General for the State of Colorado and counsel of record for Plaintiff Colorado in this case. *Id.*

Unsurprisingly, Hemphill was engaged by Plaintiffs before this lawsuit was filed. He reviewed legal issues with lawyers for Plaintiffs, and he was involved in drafting the complaint. And while Hemphill purports to be independent, the team that helped write his reports includes ***employees*** of a party to this case: FTC staff lawyers and economists.

Hemphill's legal advocacy pervades his proffered "economic" opinions. His analysis starts with conclusions reached before he helped draft the complaint (including that Defendants' loyalty rebate programs are anticompetitive) and works backwards, eschewing standard antitrust methodology in his quest to change settled law. Hemphill's opinions should be excluded.

## NATURE OF THE MATTER

Plaintiffs challenge Defendants' loyalty rebate programs under federal and state laws. Hemphill is Plaintiffs' sole expert on liability. Defendants move to preclude all of Hemphill's proffered testimony.

## STATEMENT OF FACTS

Hemphill is a law professor who has twice previously testified for the FTC as an economist. (Ex. A (Hemphill Rep.) ¶ 1, App. A (CV)). He holds degrees in law and in economics, (*id.*), but has never held a professional position focused solely on economics, (Ex. B (Hemphill Nov. 20-21 Dep. Tr.) at 28).

Hemphill was retained "to provide an economic analysis of the competitive effects of [Defendants'] . . . loyalty programs," "including an assessment of monopoly power and market power relevant to an analysis of that conduct, and whether [Defendants] [have] likely harmed competition through the programs." (Ex. A ¶ 8). He opines that Defendants "possess[] monopoly power and market power" within narrow, single-AI relevant product markets. (*Id.* ¶¶ 10-16). Further, he opines that "the challenged loyalty programs impeded competition from lower-priced generic products." (*Id.* ¶ 17).

## QUESTION PRESENTED

Should Professor Hemphill be precluded from offering expert testimony in this case?

## ARGUMENT

### I. Expert Testimony Generally.

Expert testimony must meet four requirements for admissibility: (1) the witness' knowledge must help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony must be based on sufficient facts or data; (3) the testimony must come from reliable principles and methods; and (4) the witness must reliably apply the principles and methods to the case facts. Fed. R. Evid. 702.

These are "exacting standards." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). Even if an expert is qualified to proffer an opinion, that opinion is not necessarily admissible. *See, e.g.*, *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Trial judges have "a special obligation" to ensure expert testimony is both reliable and relevant. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). They have a duty to prevent the admission of unreliable expert testimony, which entails a separate inquiry "from determinations of weight and credibility." *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025), *cert. denied*, 2025 WL 2949599 (U.S. Oct. 20, 2005). As Rule 702's drafters recently explained, "many courts have held that the critical questions

of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee notes to 2023 amendment.

The party proffering expert testimony must demonstrate that it is "relevant" and "reliable," *United States v. Hudak*, 156 F.4th 405, 409 (4th Cir. 2025), "by a preponderance of proof," *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *see also* Fed. R. Evid. 104(a).

## II. Hemphill's Proffered Opinions Are Not Reliable.

In *Daubert*, the Supreme Court charged trial judges with acting as gatekeepers against the admission of unreliable expert opinions. *See Kumho*, 526 U.S. at 142. Unreliable expert testimony includes "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also* Fed. R. Evid. 702 advisory committee's notes to 2000 amendment ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.").

Courts must examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy." *Bourne ex rel. Bourne v. E.I.*

*DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004) (per curiam). Expert testimony is admissible only if it "is the product of reliable principles and methods" "reliably applied . . . to the facts of the case." *In re Lipitor (Atorvastatin Calcium)*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting Fed. R. Evid. 702). But when expert testimony "neglects the factual underpinnings and reliable methodology that make opinion testimony useful," it should be excluded. *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 414 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013); *see also Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) (expert opinion "based on assumptions which are speculative and are not supported by the record" is inadmissible). Similarly, when an expert proffers a theory that has not been and cannot be tested, it should be excluded. *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017). An expert's opinion is not reliable unless it articulates an accepted test *and* applies the case facts to that test. *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014).

Under these standards, Hemphill's opinions are inadmissible. They are arguments of an advocate, not the reliable opinions of an independent expert. Hemphill's advocacy directs the contours and conclusions of his opinions. Because he starts from his personal belief that Defendants' rebate programs

are unlawful (as alleged in the complaint he helped draft), his analysis bends to this inevitable result, regardless of methodology, economics, or reality.

### A.     Hemphill is an advocate.

"An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).  Thus, although an expert does not have to be *unbiased*, he cannot be an *advocate* for a cause.  *See, e.g.*, *Elliott v. Versa CIC, L.P.*, 349 F. Supp. 3d 1004, 1006-07 (S.D. Cal. 2018) (excluding witness as "an advocate for a cause" rather than an "objective expert"); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1351 (S.D. Fla. 2010) (same); *Green v. Bd. of Cnty. Comm'rs*, 2006 WL 6861763, at \*1 (E.D. Okla. Apr. 12, 2006) (same); *In re Air Crash Disaster*, 737 F. Supp. 427, 430 (E.D. Mich. 1989) (same)*; Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1425 (E.D. Tex. 1986) (same), *aff'd*, 826 F.2d 420 (5th Cir. 1987).

This deficiency doomed Hemphill's opinions in *Meta*.  There, as here, Hemphill was the FTC's purported economic expert.  There, as here, Hemphill assisted the FTC pre-suit.  There, as here, Hemphill opined that the defendant had monopoly power in an unrealistically narrow product market.  Because of Hemphill's role as legal advocate, the court noted that it was unlikely Hemphill

"could have approached his task with an open mind" and expressed "doub[t] that he weighed the evidence objectively."  2025 WL 3458822, at *26.

So too here.  Hemphill was engaged as an expert before Plaintiffs sued, and he helped draft the complaint.  (Ex. B at 8, 283).  The team involved in drafting his reports includes employees of the FTC—a party.  (*Id.* at 20).

Hemphill's role as a legal advocate for Plaintiffs, his inability to separate his legal opinions from his "economic" opinions, and his lack of independence from Plaintiffs are further illustrated by his provision of "fused legal and economic" advice to the State of Colorado in its ***ongoing*** antitrust litigation accusing Google of monopolization.  (*Id.* at 50).  As a New York lawyer rendering legal advice to Colorado, Hemphill has professional duties— including one of "uncompromised loyalty"—to Colorado; this relationship further impairs his independence as an "economist" in this case.  *See, e.g.,* N.Y. Rules of Pro. Conduct r. 5.8(a); Preamble [2].

In fact, before Hemphill's retention in this case, Hemphill and AG Weiser (then a law professor) authored an article advocating for targeting rebate programs like Defendants' as anticompetitive.  They encouraged antitrust enforcers to be "creative" in seeking to impose liability in cases governed by *Brooke Group'*s price-cost test and advocated for exempting loyalty rebates

from the test. *See* Hemphill & Weiser, *supra,* at 2073. Their partnership has continued into this case, through which they seek to further their stated goal.[1] *See, e.g.*, D.E. 112 at 13 (Plaintiffs' argument that "the price-cost test does not apply here").

Hemphill is not serving as an independent economic expert; he is working with Plaintiffs as an advocate for what they believe should be changes to antitrust law. Indeed, Hemphill admitted his "hostility going back two decades to the *Brooke Group* predatory pricing rule." (Ex. B at 362). His status as part of Plaintiffs' legal team is further shown by the FTC's directions to Hemphill not to answer questions about *his role in the FTC's legal strategy*. (*See, e.g., id.* at 46-47 (directing Hemphill not to answer questions about his involvement in the decision of any Plaintiff to bring this case); *id.* at 55 (directing Hemphill not to answer whether he has "offered any views on legal issues in this case to lawyers for the plaintiffs in this case")).

The *Meta* court's observation that it is "almost as if" Hemphill is "one of the [FTC's] own lawyers" resonates here, too. Hemphill's role as an advocate disqualifies him as an "independent" expert. As shown below, the impact of

---

[1] Hemphill's and Weiser's article was published in May 2018; the FTC's civil investigation then commenced in November 2018.

his advocacy on his proffered *ipse dixit* opinions renders those even more unreliable.

**B.    Hemphill's market definition opinions cannot be supported by his "Appendix C" because he lacks expertise in agronomy.**

Hemphill purports to support his narrow "Single AI" market definition through Appendix C of his opening report, which opines on the "distinctive features" of Defendants' at-issue AIs.  (Ex. A, App. C ¶ 2).  Because Hemphill admits he is not qualified to give these opinions, they should be excluded.

Appendix C purports to describe agronomic properties of Defendants' AIs supposedly valued by growers.  (*See, e.g.*, *id.* § C.3).  But Hemphill concedes that he is not an expert in (i) "the distinctive features of crop protection products that are valued by growers," (Ex. B at 14); (ii) "crop protection product chemistries," (*id.* at 12-13); (iii) "the relative efficacy of crop protection products," (*id.* at 13); (iv) "interchangeability" of active ingredients for growers' uses, (*id.* at 15); or (v) "farming," (*id.* at 17).  He further admits he did not bring any separate subject-matter expertise to bear in compiling Appendix C, instead "drawing on . . . published materials [and] documents, in the record."  (*Id.* at 13).

Expert testimony is only permitted when the witness is qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. Where, as here, a proffered expert disclaims qualification in the domains on which he opines—agronomy, crop protection chemistry, product efficacy, and interchangeability—the opinions are inadmissible.  *Oglesby*, 190 F.3d at 250; *see also Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 254 (4th Cir. 2025) (affirming exclusion of opinion when expert admitted he lacked expertise in relevant industry); *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 2009 WL 5842051, at *2 (E.D. Va. Jan. 6, 2009) (excluding opinion when expert had "no relevant experience directly related to" products at issue); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) (excluding opinion when expert admitted he was not qualified on aspects of procedure at issue); *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 640 (E.D.N.C. 2013) (excluding putative expert with no specialized knowledge who reviewed "training materials" and "product demonstrations" to render opinions).

In short, Professor Hemphill is not qualified to opine on the agronomic topics in Appendix C, and, at a minimum, that portion of his report must be excluded, including any broader opinions that rely upon Appendix C.

**C.** **Hemphill's market definition opinions are unreliable because they rest on a non-standard, outcome-oriented version of the Hypothetical Monopolist Test.**

Hemphill tries to bolster his Appendix C-based single-AI market opinions through supposed use of the Hypothetical Monopolist Test ("HMT"). (*See, e.g.*, Ex. A §§ 3.2.2-.3; *id.* ¶ 164; Ex. B at 81-83). But rather than use an accepted version of that test, Hemphill used a self-created version manufactured to confirm his desired conclusions.[2] The Fourth Circuit has cautioned that such "[r]esult-driven analysis" "undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor*, 892 F.3d at 634. And courts have repeatedly determined that a methodology employed to bolster a preconceived conclusion is not reliable.[3] *See, e.g., Claar v. Burlington*

---

[2] Hemphill purports to conduct an HMT for acetochlor and rimsulfuron in his reply report but admits the data is ill-suited to that analysis. (Ex. B at 85-87). In particular, the data does not encompass all potential substitutes. (*Id.* at 425-27).

[3] Hemphill's purported other bases are his conclusory and misguided analysis of Defendants' conduct and documents. That analysis also fails, as explained below, and is not part of his basis for concluding that the analysis is "complete" such that no consideration of broader markets is warranted. (Ex. C (Hemphill Reply Rep.) ¶ 19; *see also* Ex. B at 84 (Hemphill has not "rule[d] out the existence of other broader markets that contain other AIs")).

*N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994); *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985).

### 1. The Hypothetical Monopolist Test

The HMT is an analytical tool adopted from the antitrust merger context that is sometimes used to define markets in monopolization cases. The HMT seeks to identify the set of products over which a hypothetical monopolist that controls every product in the candidate market could profitably impose a small but significant and non-transitory increase in price ("SSNIP"). D.E. 160 at 27. The HMT requires an iterative approach in which an expert begins with a candidate product market and tests whether a hypothetical monopolist could profitably impose a SSNIP for those products. *Id*. If products outside the candidate market are taking sales from the hypothetical monopolist, then a hypothetical monopolist could not profitably impose a SSNIP over the candidate market—meaning the candidate market is too narrow to be an appropriate antitrust market. The candidate market expands until a SSNIP would be profitable or, in other words, until all reasonably interchangeable substitutes are included. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012). For the HMT, prices of products outside the candidate market must be held constant to isolate the effect of the SSNIP

on sales in the candidate market. (Ex. D (FTC's 2023 Merger Guidelines) § 4.3.A, at 41-42 ("For the purpose of analyzing [the HMT], the terms of sale of products outside the candidate market are held constant.")).

If an expert fails to reliably apply the HMT to the facts of a case, his opinion should be excluded. *In re Live Concert*, 863 F. Supp. 2d at 987; *see also* Fed. R. Evid. 702(d) (requiring that an expert's opinion reflect "a reliable application of the [expert's] principles and methods"). Without a proper market analysis, an expert will "impermissibly predetermine[] the results." *In re Live Concert*, 863 F. Supp. 2d at 988.

The Sixth Circuit affirmed exclusion of an expert's economic opinion because the version of the HMT used "to define the markets did not meet the *Daubert* criteria." *Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 916-18 (6th Cir. 2009). There, the expert did not analyze "whether a price increase at a particular point in time would result in consumer substitution of an alternative product," but rather opined that the HMT was satisfied for a product because average prices and demand of that product increased over the same period. *Id*. at 918. The court criticized the expert's "own version" of the HMT, a version that had not been tested, had not been subjected to peer review, had no controlling standards, had no demonstrable showing of support

within the scientific community, and was produced solely for purposes of the litigation. *Id.* Because the expert used a new test, created solely for litigation, the district court properly excluded him. *Id.*

### 2. Hemphill's flawed application of the Hypothetical Monopolist Test

Like the expert excluded in *Kentucky Speedway*, Hemphill did not perform the standard HMT. Hemphill reasons that, because Defendants reduced prices in response to generic entry by at least a small but purportedly significant amount, generics and Defendants' products constitute the relevant antitrust market—notwithstanding change in prices of products that Defendants' contemporaneous documents identify as competitive to those in Hemphill's "candidate market." (*See, e.g.,* Ex. A ¶¶ 163-87). This misapplication of the HMT is unreliable.

Most importantly, Hemphill failed to hold constant prices and other terms of sales of other substitutable products. This is a requirement when performing the HMT. (Ex. D § 4.3.A, at 41-42 ("For the purpose of analyzing [the HMT], the terms of sale of products outside the candidate market *are held constant.*" (emphasis added))); *see also FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 827 (S.D. Tex. 2025) ("A properly conducted HMT requires a reliable data set, *while holding everything constant* apart from an increase in

price for the product being tested." (emphasis added)); Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 536 (5th ed.) ("Begin by characterizing product A as a 'provisional['] market. Then ask whether a 'significant' price increase by a hypothetical A monopolist—*assuming everything else remains constant*—would maximize its profits. If so, A is the market." (emphasis added)).

This Court recognized as much, explaining that "if the price of one incumbent product drops significantly in response to new entry, *while the prices of other incumbents do not*, then that first incumbent product, plus the new entrant, is very likely a market." D.E. 160 at 32 (quoting Areeda & Hovenkamp, *supra*, ¶ 561b2) (emphasis added). Hemphill acknowledges that a true HMT *is supposed to hold constant* "the price and other terms of trade of products." (Ex. B at 421). Yet Hemphill does not claim that "the prices of other incumbents do not" drop in response to generic entry. Even worse, he rejects the relevance of evidence that they *did drop*. This approach is contrary to this Court's reasoning, caselaw, and the DOJ's and FTC's *Merger Guidelines*.

This was no trivial mistake; it goes to the reliability of the single-AI markets Hemphill has defined. One of the methodology's key steps is to define "the magnitude of a 'significant' price increase," *Victus, Ltd v. Collezione*

*Europa U.S.A., Inc.*, 26 F. Supp. 2d 772, 785 (M.D.N.C. 1998), which can only be done by holding everything else constant.  Appropriate application of the HMT *requires this constancy* because only then can increased prices in the candidate product market be isolated as the determinative factor for consumer substitution.  *See Tempur Sealy*, 768 F. Supp. 3d at 827-28.

Exacerbating the problem, the record evidence shows that prices of other crop protection products outside Hemphill's proposed markets *decreased significantly* when generics entered.[4]  Confronted with this reality, Hemphill complained that there is no "perfect, clean test" because "the real world doesn't hold those other products constant."  (Ex. B at 126).  But rather than excusing Hemphill from this requirement, his complaint confirms that his HMT fails to satisfy it.  By ignoring prices of other products, Hemphill had no basis to determine whether price decreases by Defendants were driven by generic entry rather than competition from a range of other substitutable products exhibiting similar price trends or other cost and demand factors.  Nor did he have a basis to determine whether a SSNIP in products containing an at-issue

---

[4] (*See* Ex. C ¶ 20 (opining that to the extent a price drop in response to entry of generics "indicates a degree of substitutability for products containing [that] particular Syngenta AI, that is not enough to warrant inclusion in the relevant market in this matter because it is entirely consistent with an AI-only market satisfying the [HMT]").

AI would be unprofitable because of the now lower prices of products containing other AIs. *See* Areeda & Hovenkamp, *supra*, ¶ 530a.

"[W]hen performing an economic analysis, it is imperative to identify alternative hypotheses to the proposed hypotheses." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 736 (W.D. Va. 2000) (excluding antitrust expert testimony, reasoning "[i]t is improper to conclude that a company . . . has market power by pointing to its price increases without further testing of alternative hypotheses"); *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *7 (S.D.N.Y. Sept. 30, 2009) ("The Court is excluding [the expert's] testimony on the relevant product market because, among other reasons, of its insufficient factual basis and its unreliability, i.e., his methodology does not consider meaningfully whether . . . other products[] are reasonable substitutes."), *aff'd sub nom.*, *Am. Banana Co. v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010). The analysis requires controlling for other potential causes of an observed outcome to test a hypothesis. *See Pierce v. N.C. State Bd. of Elections*, 2025 WL 2841008, at *39 (E.D.N.C. Sept. 30, 2025) ("[A]n expert needs to control for other relevant variables to infer a causal relationship."). But Hemphill did not control for other cost or demand factors that may have caused his observed price

increases, rendering his analysis unreliable.  (*See* Ex. B at 504-05).  Nor did he control for confounding factors other than generic entry that could account for price decreases.  (*Id.* at 494).  He "merely pointed" to a price change "as an indication that [Defendants] possessed monopoly power without further investigation as to how the price [change] occurred."  *See Va. Vermiculite*, 98 F. Supp. 2d at 737.

Because Hemphill's market definition opinions rest on his flawed and biased HMT, and he has failed to consider the alternative hypothesis of broader markets, his opinions are unreliable and should be excluded.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.").

> **D.  Hemphill's methodology cannot reliably distinguish between competitive and anticompetitive market outcomes and is therefore unreliable.**

Hemphill concedes that rebates can be procompetitive and that generics have entered, resulting in "intense" price competition and declining prices, such that "competition from the generic constrained [Defendants'] ability to exercise market power."  (Ex. C ¶ 72).  He nonetheless insists that generic entry would be still greater and prices even lower absent rebate programs.  But his methodology cannot explain how the rebate programs are "anticompetitive"

when "intense" price competition constraining Defendants' exercise of market power arose with the programs in place. Nor does he specify the level of prices, innovation, and generic entry and sales that would exist without the rebates. Thus, he provides no testable methodology to guide the factfinder's determination whether the rebate programs have caused anticompetitive effects that would warrant judicial intervention in the market. This deficiency is another basis for exclusion.

A reliable expert economic opinion must distinguish between lawful (competitive) and unlawful (anticompetitive) conduct. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding an opinion on antitrust impact in loyalty rebate case as unreliable because it failed to "separate lawful and unlawful conduct"); *In re Pharm. Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017) (excluding an expert because his test did not "distinguish between unlawful and lawful explanations"). This methodology requires analysis of a counterfactual or "but-for" world in which the alleged anticompetitive conduct did not occur. *See In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 757 n.36 (E.D. Pa. 2015) (excluding plaintiffs' economic expert because he "failed to analyze when and whether the generic manufacturers would have entered the market but for the

[agreement alleged to be anticompetitive]"). Without analysis of the degree to which the actual world varies from the but-for world, an expert opinion provides no basis to determine whether observed market outcomes fall below a competitive standard.

In addition, an expert must show the *effects* of the alleged anticompetitive conduct by comparing it to a baseline. An expert opining on purported antitrust injury must show a connection between "allegedly anticompetitive behavior and harm to consumers." *Kentucky v. Marathon Petroleum Co.*, 464 F. Supp. 3d 880, 892 (W.D. Ky. 2020); *see also Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*, 690 F.2d 411, 414 (4th Cir. 1982).

Hemphill's opinions omit the necessary analysis to determine whether the alleged anticompetitive effects would have occurred absent the allegedly anticompetitive rebate programs; they are therefore unreliable. Hemphill acknowledges that "[l]oyalty programs may or may not harm competition," and "there are loyalty programs that are harmless." (Ex. A ¶ 23; Ex. B at 363). He also agrees that just because a supplier's loyalty program targets a particular set of products does not mean those products comprise a relevant antitrust market. (Ex. B at 382-83).

And yet, Hemphill never provides a baseline to compare against his analysis of the at-issue conduct here—i.e., what the market would have looked like but-for Defendants' rebate programs. While Hemphill purports to apply an "analytical framework" to assess the competitive effects of Defendants' rebates, that framework cannot distinguish between competitive and anticompetitive outcomes. This flaw is magnified by Hemphill's concessions that the allegedly harmed markets are highly competitive. For example:

- There is "intense competition between branded and generic products" as shown by "branded price decreases in response to" the generic entry, (Ex. C ¶¶ 72-74);

- "[C]ompetition from the generic constrained [Defendants'] ability to exercise market power," (*id.* ¶ 72);

- There has been "substantial generic penetration," which is one of the "anticipated effects of unfettered competition," (Ex. A ¶¶ 162, 184); and

- Defendants' rebate programs have not prevented price competition from "becom[ing] highly intense," (*id.* ¶ 399).

Hemphill's "analytical framework" doesn't explain why these events occurred, whether they were causally related to the rebate programs, how much more

competition would occur in the but-for world, or what the relation is between these facts and the purported anticompetitive effects. Simply declaring that conduct is anticompetitive is not an admissible expert opinion, particularly given these concessions.

Other concessions further vitiate the reliability of Hemphill's methodology. He admits that "competition among distributors is vigorous." (*Id.* ¶ 391, n.511; *see also id.* ¶ 87 (acknowledging "strong competition among distributors"); *id.* ¶ 287 (same)). He further admits that "high degrees of distributor competition mean that only modest consideration is needed to secure distributor loyalty." (Ex. C ¶ 253; *see also* Ex. A ¶ 260 ("A corollary effect of competition among distributors is to reduce the payment needed to induce the distributor to accept an exclusionary arrangement over manufacturer competition.")). Hemphill uses this asymmetrically to explain why distributors agree to loyalty in return for rebates from Defendants. But it also means that generics can offer "only modest consideration . . . to secure distributor loyalty." (Ex. C ¶ 253). How, then, do Defendants' rebate programs impermissibly foreclose generics when a "modest" sum from the generics will secure distribution? Because Hemphill's framework provides no way to answer

this question, it cannot distinguish between procompetitive and anticompetitive conduct. It is thus unreliable.

At bottom, Hemphill provides no standard for a factfinder to weigh record evidence to determine whether the rebate program has actually caused anticompetitive harm. Such a non-falsifiable opinion is unreliable and should be excluded.

### E. Hemphill's "ordinary price competition" opinion is *ipse dixit* not based on accepted economic standards.

Hemphill opines that Defendants' rebate programs are "not ordinary price competition." (Ex. A ¶ 54). But he does not define "ordinary price competition," and this conclusion is just his own say-so.

An expert must connect his opinions to data by something other than *ipse dixit*. *See Joiner*, 522 U.S. at 146; *Holesapple v. Barrett*, 5 F. App'x 177, 180 (4th Cir. 2001) (per curiam). An opinion based solely on the expert's conclusion, rather than being supported by published studies and derived from a sound scientific method, should be excluded. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d 113, 124 (2d Cir. 2020) (per curiam).

That is the problem here. To conclude the rebate programs are not ordinary price competition, Hemphill identifies several factors. (Ex. A § 4.6).

But he cites no economic theory or published studies supporting the relevance of most of these factors as proper to evaluate whether Defendants' rebate programs constitute "ordinary" price competition versus something else. Hemphill's opinions are also at odds with record evidence showing that loyalty rebate programs constitute industry-standard price competition used by a range of manufacturers (branded and generic) in the industry. (*See, e.g.*, Ex. E, Kline Group, *Effectiveness of U.S. Crop Protection Company Channel Incentives* (Jan. 2019) (detailing incentive programs of manufacturers)).

Nor do Hemphill's smattering of factors withstand scrutiny. Some of the factors (e.g., rebates are not "ordinary price competition" because they "serve to exclude generic competitors"; rebates are not ordinary price competition because they "share profit" with distributors) apply equally to any form of price competition. (Ex. A ¶¶ 395-96). Hemphill concedes that one of his factors, the "complexity" of a loyalty program, is insufficient alone to determine whether a rebate constitutes price competition. (Ex. B at 383). All he could say was that "you have to look at a lot of different things." (*Id.*). This *ipse dixit* is not sufficient to show when price competition is "ordinary" or not, and it is therefore unreliable.

### III. Hemphill's Proffered Opinions Are Not Relevant Because They Do Not "Fit" the Matters To Be Tried and Do Not Proffer a Testable Standard to Apply.

Independent from the reliability inquiry, an expert may offer opinion testimony only if his knowledge will "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Expert testimony, even if reliable in some way, is inadmissible if not connected to the issues to be determined at trial. *United States v. Powers*, 59 F.3d 1460, 1472 (4th Cir. 1995); *see also Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1233-34 (11th Cir. 2009). Hemphill's opinions fail this standard.

For antitrust liability, an expert's analysis must incorporate all relevant circumstances, and a hypothetical market must be grounded in "economic reality." *Concord Boat*, 207 F.3d at 1056. Otherwise, an expert's opinions are just speculation. *Id.* at 1057. Thus, for an antitrust expert, "economic theory alone does not make his opinions admissible." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025). After all, "an expert does not have license to simply disregard reality and base a 'necessary link' in his theory on guesswork or speculation." *Id.* at 964 (quotation omitted).

When observed market outcomes could be consistent with both competitive and anticompetitive outcomes, economic theory alone provides

insufficient guidance to assess harm to competition. *See J.B.D.L. Corp. v. Wyeth-Ayerst Labs.*, 2005 WL 1396940, at \*20 (S.D. Ohio June 13, 2005) (excluding experts who relied solely on "economic theory" for opinions that the defendants' conduct "'crossed the line' between legal profit maximization and illegal supracompetitive pricing," without accounting for lawful bases in the record for observed price increases). This is equally true when assessing vertical conduct that allegedly excludes a defendant's rivals. While "a creative economist could imagine unusual combinations of costs, elasticities, and barriers to entry that would cause injury in the rare situation," such theories do not support antitrust liability where, as here, "rivals continue to sell." *Schor v. Abbott Labs.*, 457 F.3d 608, 612-13 (7th Cir. 2006). That is, experts cannot rely on predictions of economic theory without accounting for the specific market circumstances at issue in the case. *Kaufman v. Motorola, Inc.*, 2000 WL 1506892, at \*2 (N.D. Ill. Sept. 21, 2000) ("[R]eliability of an economic theory is tested by comparing it to reality.").

Hemphill opines that Defendants' rebates are anticompetitive, in part, because they are a mechanism to exclude generics by "shar[ing] monopoly profits" with distributors. (Ex. A ¶¶ 50-53, *id.* § 4.1). Hemphill admits that Defendants' rebates are significant "payments" to Defendants' direct

customers.  (*See id.* ¶ 100).  But to avoid the commonsense conclusion that these payments are a *procompetitive* way to reduce prices, Hemphill contends they are illicit "sharing" of monopoly profits "to secure distributors' acceptance" of the rebate programs to the detriment of generic competitors.  (*Id.* ¶ 257).  As support, Hemphill cites an academic paper that presented a theoretical model of a manufacturer's incentives to share profits with downstream retailers *where no entry has occurred*, in order to prevent such entry.  (*Id.* ¶ 264 n.285 (citing John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 Am. Econ. Rev. 672 (2014))).  Extending this theory, Hemphill opines that, given the intense competition among distributors, there is some threshold level of participation in the rebate programs by distributors that make an individual distributor's decision not to participate in those programs irrational.  (Ex. C ¶ 214 ("[I]f other distributors have accommodated [generics]," "compliance for an individual distributor is not rational.")).

Hemphill's theories have nothing to do with the facts of this litigation and bend in the face of undisputed facts:

First, at odds with a key assumption of his theoretical model, Hemphill concedes that significant entry *has* occurred.  (*See, e.g.*, *id.* § 3.3.3).  To sidestep

this fact, Hemphill invokes unexplained "economic logic" to opine that the model is only about "impeding entry," not "complete exclusion" of rivals. (*Id.* ¶ 203). He provides no basis for his suggestion that the model he used could be applied even when the model's conditions are not satisfied.

Second, the conditions of his theory not satisfied, Hemphill attempts to hedge, reasoning that so long as "enough" distributors participate in a rebate program, generic entrants are "impaired in [their] effort[s] to reach consumers." (*Id.* ¶ 201). Yet, Hemphill concedes that although some distributors have accommodated generics, other distributors have still "compli[ed]"—compliance that would be *irrational under his own theory*. (Ex. B at 160-64).

Hemphill's theory also lacks a sufficient limiting principle to make it useful. When asked how much "accommodation" by distributors of generics would be enough to avoid competitive harm, Hemphill deployed the shortcomings of his theory as a shield, testifying that "the exact degree of accommodation" is "not . . . numerically set out in the underlying theory." (*Id.* at 161-62). Hemphill's theorizing is an inadequate basis for expert testimony; it is classic *ipse dixit* that should be excluded.

Without providing a usable test, Hemphill's *theory* is simply that. "At the end of the day, it is a conclusion of fiat rather than evidence." *Klein*, 766 F. Supp. 3d at 967. That is not just unhelpful; it encroaches on this Court's role. "The only legal expert in a federal courtroom is the judge." *United States v. Lupton*, 620 F.3d 790, 800 (7th Cir. 2010). In other words, "[t]estimony that merely states a legal conclusion as to the meaning or application of a rule or statute is not 'helpful,' as required by Rule 702." *United States v. Cortez*, 205 F. Supp. 3d 768, 776 (E.D. Va. 2016); *see also Yates v. Ford Motor Co.*, 2015 WL 3448905, at *8 (E.D.N.C. May 29, 2015). To be a true expert, Hemphill needs to provide a standard that can be used to decide the issues. Instead, he simply states what he wants the result to be. That is inadmissible.

## CONCLUSION

For these reasons, Professor Hemphill's proffered expert opinions should be excluded.

Dated: December 19, 2025

Respectfully submitted,

*s/Patrick M. Kane*

Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC  27401
Telephone:  336.378.5200
Facsimile:  336.378.5400

Charles S. Duggan*
charles.duggan@davispolk.com
James I. McClammy*
james.mcclammy@davispolk.com

Michael Scheinkman*
michael.scheinkman@davispolk.com
David B. Toscano*
david.toscano@davispolk.com
Alison B. Miller*
alison.miller@davispolk.com
Daniel J. Thomson*
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

*s/Mark E. Anderson*

**MCGUIREWOODS LLP**
Mark E. Anderson (NC Bar No. 15764)
Armina A. Manning (NC Bar No. 60436)
manderson@mcguirewoods.com
aamanning@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Telephone: (919) 755-6600
Fax: (919) 755-6699

**BALLARD SPAHR LLP**
Jason A. Leckerman*
Emilia McKee Vassallo*
Thomas W. Hazlett*
Elizabeth P. Weissert*
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-8500
Fax: (215) 864-8999
LeckermanJ@ballardspahr.com
McKeeVassalloE@ballardspahr.com
HazlettT@ballardspahr.com
WeissertE@ballardspahr.com

**CRAVATH, SWAINE & MOORE LLP**
Wes Earnhardt *
Jesse Weiss*
Margaret T. Segall *
Two Manhattan West

Jesse Solomon*
jesse.solomon@davispolk.com
Benjamin M. Miller*
benjamin.miller@davispolk.com
DAVIS POLK & WARDWELL LLP
1050 17th Street, NW
Washington, DC 20036
Telephone: (202) 962-7133

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC*

375 Ninth Ave
New York, New York 10001
Telephone: (212) 474-1000
Fax: (212) 474-3700
wearnhardt@cravath.com
jweiss@cravath.com
msegall@cravath.com

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendant Corteva, Inc.*

<u>**CERTIFICATE OF WORD COUNT**</u>

The undersigned hereby certifies that the foregoing brief complies with Local Rule 7.3(d) in that it contains fewer than 6,250 words as reported by word processing software.

This the 19th day of December 2025.

*/s/Patrick M. Kane*

Patrick M. Kane

# CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I caused to be served upon counsel of record for the parties in this action via email the Brief in Support of Defendants' Joint Motion to Exclude Expert Testimony of Professor C. Scott Hemphill.

*s/ Patrick M. Kane*
Patrick M. Kane (NC Bar No. 36861)
