# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN,<br><br>        Plaintiffs,<br><br>    v.<br><br>SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.,<br><br>        Defendants. | Case No. 1:22-cv-00828-TDS-JEP<br><br>**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE EXPERT TESTIMONY OF PROFESSOR C. SCOTT HEMPHILL** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 2

I.      PROFESSOR HEMPHILL IS AN EMINENT ECONOMIST ............................... 2

II.     PROFESSOR HEMPHILL'S OPINIONS ............................................................... 3

        A.      The Relevant Markets ................................................................................. 3

        B.      Foreclosure and Harm to Competition ........................................................ 5

LEGAL STANDARD................................................................................................................ 6

ARGUMENT............................................................................................................................. 7

I.      DEFENDANTS' ALLEGATIONS OF BIAS ARE UNFOUNDED
        AND UNTRUE ....................................................................................................... 7

II.     PROFESSOR HEMPHILL RELIABLY APPLIES ACCEPTED
        METHODOLOGY IN DETERMINING THAT DEFENDANTS'
        LOYALTY PROGRAMS HARM COMPETITION ............................................... 11

        A.      Professor Hemphill Relies on Accepted Economic Theory ....................... 11

        B.      Professor Hemphill's Opinions "Fit" the Facts of This Case ..................... 13

III.    PROFESSOR HEMPHILL UTILIZES SOUND METHODOLOGY
        THAT RELIABLY IDENTIFIES ANTICOMPETITIVE
        BEHAVIOR AND HARM ..................................................................................... 15

IV.     PROFESSOR HEMPHILL'S MARKET DEFINITION ANALYSES
        ARE ADMISSIBLE ............................................................................................... 18

        A.      Professor Hemphill is Qualified to Opine on Appendix C......................... 18

        B.      Professor Hemphill's Implementations of the Hypothetical
                Monopolist Test Conform with Accepted Methodologies and
                Are Reliably Applied.................................................................................. 20

CONCLUSION ........................................................................................................................ 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*,
690 F.2d 411 (4th Cir. 1982) ...................................................................................... 16

*B & R Supermarket, Inc. v. Visa, Inc.*,
2024 WL 4252031 (E.D.N.Y. Sept. 20, 2024) .......................................................... 21

*BorgWarner, Inc. v. Honeywell Int'l, Inc.*,
750 F. Supp. 2d 596 (W.D.N.C. 2010) ..................................................................... 18

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................................................... 3

*CareFirst of Maryland v. Johnson & Johnson*,
2025 WL 3497098 (E.D. Va. Dec. 15, 2025) ........................................................... 13

*CIMC Vehicles Grp. v. Direct Trailer, LP*,
2013 WL 12137320 (S.D. Tex. Mar. 28, 2013) ......................................................... 9

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ................................................................................. 16

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993) ................................................................................................... 7

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ................................................................................................. 20

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
2022 WL 254348 (N.D. Cal. Jan. 27, 2022) ............................................................... 8

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................................... 20

*Est. of Thompson v. Kawasaki Heavy Indus., Ltd.*,
933 F. Supp. 2d 1111 (N.D. Iowa 2013) .................................................................... 8

Case 1:22-cv-00828-TDS-JEP    Document 441    Filed 04/22/26    Page 3 of 37

*FDIC v. Dellen*,
2012 WL 12887407 (C.D. Cal. Oct. 18, 2012) ........................................................ 7

*FTC v. Surescripts, LLC*,
424 F. Supp. 3d 92 (D.D.C. 2020) ......................................................................... 8

*FTC v. Edwards Lifesci. Corp.*,
2026 WL 228723 (D.D.C. Jan. 9, 2026) ............................................................... 21

*FTC v. Penn St. Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) .................................................................................. 20

*FTC v. Sanford Health*,
926 F.3d 959 (8th Cir. 2019) ................................................................................ 20

*FTC v. Shkreli*,
581 F. Supp. 3d 579 (S.D.N.Y. 2022) ..................................................................... 2

*FTC v. Staples, Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) ....................................................................... 21

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ................................................................... 23

*FTC v. Vyera Pharms., LLC*,
2021 WL 5279465 (S.D.N.Y. Nov. 12, 2021) .......................................................... 2

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ............................................................................................. 12

*Harris v. Kijakazi*,
2022 WL 541438 (M.D.N.C. Feb. 23, 2022) .......................................................... 22

*Holesapple v. Barrett*,
5 F. App'x 177 (4th Cir. 2001) ............................................................................. 13

*Hosp. Auth. v. Momenta Pharms., Inc.*,
333 F.R.D. 390 (M.D. Tenn. 2019) ....................................................................... 16

*In re American Express Anti-Steering Rules Antitrust Litigation*,
2015 WL 4645240 (E.D.N.Y. Aug. 4, 2015) ............................................................ 3

iii

*In re Live Concert Antitrust Litigation*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................................ 21

*In re Loestrin 24 Fe Antitrust Litig.*,
433 F. Supp. 3d 274 (D.R.I. 2019) .............................................................................. 15

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
982 F.3d 113 (2d Cir. 2020).......................................................................................... 13

*In re Pharm. Benefit Managers Antitrust Litig.*,
2017 WL 275398 (E.D. Pa. Jan. 18, 2017).................................................................. 16

*In re Processed Egg Prods. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D. Pa. 2015)............................................................................. 19

*In re Wellbutrin XL Antitrust Litig.*,
133 F. Supp. 3d 734 (E.D. Pa. 2015)............................................................................ 16

*In re Zetia (Ezetimibe) Antitrust Litig.*,
2022 WL 4362166 (E.D. Va. Aug. 15, 2022) .......................................................... 18

*J.B.D.L Corp v. Wyeth-Ayerst Labs.*,
2005 WL 1396940 (S.D. Ohio June 13, 2005).......................................................... 15

*Kentucky Speedway, LLC v. NASCAR, Inc.*,
588 F.3d 908 (6th Cir. 2009) ...................................................................................... 23

*Kentucky v. Marathon Petroleum Co.*,
464 F. Supp. 3d 880 (W.D. Ky. 2020) ....................................................................... 16

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Ca. 2025) ....................................................................... 15

*Liberty Mut. Ins. Co. v. B. Frank Joy Co.*,
424 F.2d 831 (D.C. Cir. 1970) ...................................................................................... 9

*McWane v. FTC*,
783 F.3d 814 (11th Cir. 2015)................................................................................. 8, 21

*Mountain Valley Pipeline, LLC v. 0.32 Acres of Land*,
127 F.4th 427 (4th Cir. 2025) ...................................................................................... 6

iv

*Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*,
   2012 WL 8503238 (S.D.W. Va. May 3, 2012) ........................................................... 7

*Optronic Techs., Inc, v. Ningbo Sunny Electronic Co.*,
   20 F.4th 466 (9th Cir. 2021) ................................................................................. 20

*Peco Pallet, Inc. v. Northwest Pallet Supply Co.*,
   2018 WL 10602201 (N.D. Ill. Oct. 25, 2018) ........................................................ 19

*Robinson v. D.C.*,
   75 F. Supp. 3d 190 (D.D.C. 2014) ........................................................................... 7

*Schor v. Abbott Labs*,
   457 F.3d 608 (7th Cir. 2006) ................................................................................. 15

*United Healthcare Servs., Inc. v. Cephalon, Inc.*,
   2019 WL 2994660 (E.D. Pa. July 8, 2019) ............................................................... 2

*United States v. Bazaarvoice, Inc.*,
   2014 WL 203966 (N.D. Cal. Jan. 8, 2014) .............................................................. 21

*United States v. H & R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) .......................................................................... 21

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................................. 18

*United States v. Moreland*,
   437 F.3d 424 (4th Cir. 2006) ............................................................................... 6, 7

*Verma v. Walmart, Inc.*,
   2023 WL 6516921 (M.D.N.C. Oct. 5, 2023) ............................................................. 7

*Victus, Ltd. v. Collezione Europe U.S.A. Inc.*,
   26 F. Supp. 2d 772 (M.D.N.C. 1998) ..................................................................... 20

*Virginia Vermiculite Ltd. v. W.R. Grace & Co.*,
   98 F. Supp. 2d 729 (W.D. Va. 2000) ...................................................................... 23

**Rules**

Fed. R. Evid. 702 .......................................................................................................... 6, 7, 9

Fed. R. Evid. 702, advisory committee's note (2023) ........................................................ 6

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (5th ed. 2025) ........................... 4

Bruce H. Kobayashi, *The Economics of Loyalty Discounts and Antitrust Law in the United States*, 1 COMP. POL'Y INT'L 115 (2005) ............................................... 12

Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 ANTITRUST L.J. 701 (2010) ........................................................ 23

David Spector, *Loyalty Rebates: An Assessment of Competition Concerns and a Proposed Rule of Reason*, 1 COMP. POL'Y INT'L 89 (2005) .................................... 12

Elizabeth Granitz & Benjamin Klein, *Monopolization by "Raising Rivals' Costs": The Standard Oil Case*, 39 J. L. & ECON. 1 (1996) ................................................ 12

John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals,* 104 AM. ECON. REV. 672 (2014) ......................... 12, 13

John Simpson & Abraham L. Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305 (2007) ................................. 12

Malcolm B. Coate & Jeffrey H. Fisher, *A Practical Guide to the Hypothetical Monopolist Test for Market Definition*, 4 J. COMP. L. & ECON. 1031 (2008) ........ 20

Patrick DeGraba and John Simpson, *Loyalty Discounts and Theories of Harm in the Intel Investigations*, 2 J. OF ANTITRUST ENFORCEMENT 170, 176 (2014) ........ 14

Steven C. Salop & David T. Scheffman, *Raising Rivals' Costs*, 73 AM. ECON. REV. 267 (1983) ....................................................................................................... 12

U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023) .................... 4, 20

Case 1:22-cv-00828-TDS-JEP    Document 441    Filed 04/22/26    Page 7 of 37

# PRELIMINARY STATEMENT

Professor C. Scott Hemphill reliably opines on key issues in this case, including the contours of relevant markets, Defendants' market power, and the anticompetitive harm resulting from Defendants' "loyalty" programs. Professor Hemphill's opinions are grounded in highly regarded economic theory and scholarship; they are robustly supported by economic analysis and the documentary and testimony evidence produced in this case, including Defendants' own testimony and documents.

Defendants argue that the Court should exclude Professor Hemphill's opinions as unreliable and irrelevant. There is no basis to do so. Defendants' principal attack tries to leverage the recent *FTC v. Meta Platforms* decision, where the district court criticized Professor Hemphill. This attempted *credibility* attack—based on a wholly different case and different opinions—has no bearing on the *admissibility* of Professor Hemphill's opinions, which apply standard methodologies to the facts of this case. Defendants have no support for their fanciful tale about Professor Hemphill's relationship with the FTC and alleged "advocacy." Professor Hemphill's opinions are grounded in reliable methodologies and are supported by the record facts. Professor Hemphill's opinions are also relevant: they are directed precisely to the issues of market definition and foreclosure at the heart of Plaintiffs' claims. There is no basis for exclusion.

## I.   PROFESSOR HEMPHILL IS AN EMINENT ECONOMIST

Defendants do not challenge Professor Hemphill's qualifications as an economist. Nor could they. Professor Hemphill is the Alfred B. Engelberg Professor of Law and Economics at NYU School of Law. He holds a Ph.D. in economics from Stanford University and a M.Sc. in economics from the London School of Economics. His academic research focuses on the economics of competition. His scholarship has been published in leading peer-reviewed economic journals, including the Journal of Economic Perspectives and the Journal of Health Economics. His work has been cited by the U.S. Supreme Court, the California Supreme Court, and numerous federal trial and appellate courts. *See* Brief ISO Defendants' Joint Motion to Exclude Expert Testimony of Professor C. Scott Hemphill (hereinafter "Br.") Br. Ex. A, App'x A.

Professor Hemphill is an experienced testifying expert, and numerous courts have judged his expert opinions to be reliable. *See, e.g., FTC v. Vyera Pharms., LLC*, 2021 WL 5279465, at *4 (S.D.N.Y. Nov. 12, 2021); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 641–42 (S.D.N.Y. 2022); *United Healthcare Servs., Inc. v. Cephalon, Inc.*, 2019 WL 2994660, at *14 (E.D. Pa. July 8, 2019). He was appointed as a neutral economics expert by U.S. District Judge Nicholas Garaufis of the Eastern District of New York. *See In re American*

---

[1] Exhibit citations are typically to the last three digits of the Bates number or, if it does not contain a page-specific Bates number, to a relevant pin-cite, such as "slide," "tab," or deposition page-and-line range.

*Express Anti-Steering Rules Antitrust Litigation*, 2015 WL 4645240, at *6 (E.D.N.Y. Aug. 4, 2015).

## II.    PROFESSOR HEMPHILL'S OPINIONS

### A.    The Relevant Markets

Professor Hemphill opines that for each of the Defendants' active ingredients that are directly at issue in this case ("AIs"), there is a relevant antitrust market for the AI itself and for crop protection products containing the AI. He bases his opinion on a rigorous economic analysis of the facts in the case and a well-supported application of the "Hypothetical Monopolist Test" (or "HMT").

Professor Hemphill analyzes a wide range of ordinary course evidence to form his opinions. He evaluates the structure of Defendants' loyalty programs, which track (and punish)—at the AI level—sales by distributors and retailers of competing, same-AI products. Br. Ex. A ¶¶ 294–99 (Syngenta); ¶¶ 307–10 (Corteva). He also assesses record evidence describing Defendants' focus on generic competition for specific AIs, and on AI-level generic entry. *See id.* § 3.2.2 (summarizing documents). These economic factors are relevant to defining relevant markets under *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

Professor Hemphill further concludes, based on evidence from market participants—Defendants, manufacturers of generic pesticides, distributors, and official statements of the Environmental Protection Agency—that each AI has distinct

characteristics. *See* Br. Ex. A ¶ 209 ("distinctive benefit to growers"); *id.* App'x C (citing dozens of documents and witnesses' testimony about distinct characteristics).

Professor Hemphill implements the HMT as part of his analysis. The HMT is a tool used in antitrust cases to identify the boundaries of a relevant market. The HMT asks whether a hypothetical monopolist controlling the products in a proposed market could profitably increase price above a competitive level. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 530 (5th ed. 2025) (relevant market should not be expanded if the "loss of sales is not so great as to make the price increase unprofitable"); *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.3A (2023) ("Merger Guidelines").

Professor Hemphill uses multiple types of commonly accepted evidence and approaches in his HMT analysis. First, he analyzes a series of natural experiments around generic entry, Br. Ex. A § 3.2.3, and supply shocks, *id.* §§ 3.2.4, 3.2.5. Using Defendants' own documents and available pricing data, Professor Hemphill determines that prices for branded products featuring each of the six AIs fell substantially when and because generic versions entered. *E.g.*, *id.* ¶¶ 170, 176, 181, 192, 197–98; Ex. C ¶ 197.

Second, Professor Hemphill relies on Defendants' own documents foreseeing that enormous price decreases would be required to compete with generics. *E.g.*, Br. Ex. A § 3.2.2.

Finally, where data are available, Professor Hemphill undertakes a calculation-based approach to the HMT for some of the AIs. Br. Ex. C App'x C (recapture rate

4

analysis). This exercise calculates the approximate profitability of an increase in price by a hypothetical monopolist using data on prices, costs, and customer behavior.

### B. Foreclosure and Harm to Competition

After identifying the relevant antitrust markets, Professor Hemphill opines that Defendants' loyalty programs excluded lower-priced generic rivals, resulting in higher prices for farmers and reduced innovation. Br. Ex. A §§ 4.8–4.9. Specifically, he found that Defendants possess market power in the relevant markets and reap monopoly profits that are uniquely threatened by generic entry. Br. Ex. A §§ 3.4, 4.2. Exploiting the fact that generic entrants need access to the traditional distribution channel to compete effectively, Defendants entered into agreements with most distributors, capping generic sales at a low level in exchange for end-of year payments. Br. Ex. A ¶51; §§ 4.3–4.4. Distributors broadly participate in the programs, foreclosing generics from the most efficient and effective path to market. Br. Ex. A § 4.7. Relying on widely accepted economic theory and scholarship, Professor Hemphill concludes that the loyalty programs impede generic entry and expansion, resulting in fewer generic sales and fewer generic market participants. Br. Ex. A § 4.8.

This foreclosure of generic products results in supra-competitive prices and suffocates innovation. Professor Hemphill opines that prices would be lower in a "but-for world" without loyalty programs based in part on Defendants' own analyses of what would happen in a world with unimpeded generic competition. *See* Br. Ex. A. § 4.9. For example, Syngenta ███████████████████████████████████████

5



. *See* Ex. 1 at slide 4 (and notes), Ex. 2 at -601;[2] *see also* Br. Ex. A. ¶¶449, 452–53, nn.620–23 (Syngenta executives anticipated ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Corteva too feared a ▮▮▮▮▮▮▮▮ on rimsulfuron prices and margins if generic competition were unimpeded. *See* Ex. 3 at -310; Ex. 4 at -944; Br. Ex. A ¶157. *Accord* Ex. 5 at -027; Br. Ex. A ¶447 n.612 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

Professor Hemphill also examines empirical evidence showing that even limited generic entry resulted in lower prices. Br. Ex. A § 3.2.3, ¶¶453-454; *see also, e.g.,* Ex. 6 at slide 33. Record evidence further shows that, due to Defendants' loyalty programs, generic firms were deterred from introducing novel products. *Id.*

## LEGAL STANDARD

Admissibility of an expert's opinion under Federal Rule of Evidence 702 is a question distinct from whether the expert has the "correct" view of "contested sets of facts." Fed. R. Evid. 702, advisory committee's note (2023). The "correct inquiry at the admissibility stage" is solely "whether the expert's methodology was reliable and was based on sufficient facts or data[.]" *Mountain Valley Pipeline, LLC v. 0.32 Acres of Land*, 127 F.4th 427, 435 (4th Cir. 2025); *see also United States v. Moreland*, 437 F.3d 424, 431

---

[2] Syngenta used this ▮▮▮▮▮ study to guide its post-patent strategy programs for other AIs, confirming that it is broadly applicable. Br. Ex. C ¶339.

6

(4th Cir. 2006) ("The court need not determine that the proffered expert testimony is irrefutable or certainly correct."); *Verma v. Walmart, Inc.*, 2023 WL 6516921, at *2 (M.D.N.C. Oct. 5, 2023) (Schroeder, J.) ("Proponents need not show by a preponderance that their experts are correct, but rather that 'their opinions are reliable.' " (citation omitted)). Once Rule 702 is satisfied, admissible expert testimony "is subject to [v]igorous cross-examination, [and] presentation of contrary evidence." *See Moreland*, 437 F.3d at 431 (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993)).

**ARGUMENT**

**I.      DEFENDANTS' ALLEGATIONS OF BIAS ARE UNFOUNDED AND UNTRUE**

Perhaps recognizing the weakness of their substantive attacks on Professor Hemphill's actual work in this case, Defendants reserve much of their memorandum (and invective) for the claim that a district court's decision in an unrelated case somehow proves that Professor Hemphill is biased in ***this case***. Even if true (which it is not), this attack is wholly improper for a *Daubert* motion.[3] Claims of bias of qualified experts should be addressed using "rigorous cross examination, not [] exclusion." *See, e.g.*, *FDIC v. Dellen*, 2012 WL 12887407, at *4 (C.D. Cal. Oct. 18, 2012); *Robinson v. D.C.*, 75 F. Supp. 3d 190, 201 (D.D.C. 2014) (attacks on bias and credibility are issues for cross-examination, not a reason to strike an expert); *Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 2012 WL 8503238, at *1 (S.D.W. Va. May 3, 2012) (explaining it is

---

[3] Nor do any of Defendants' cases (Br. at 7) lend support. Their cited authorities involve blatant advocates who were not qualified as experts or failed to conduct any analysis.

7

"well-settled that [a]n expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination") (internal citation omitted). Defendants' arguments are also false. To be clear, the FTC respectfully rejects Judge Boasberg's statements regarding Professor Hemphill's testimony in the *Meta* litigation, and that decision is on appeal to the D.C. Circuit. But setting aside what did or did not occur in *Meta*, Defendants provide no support for their claim that Professor Hemphill is biased or an "advocate" against Defendants ***in this case***.[4]

First, the idea that Professor Hemphill is driving Plaintiffs' legal strategy because he is "hostil[e] . . . to the *Brooke Group* predatory pricing standard" (Br. at 9) is baseless. The FTC has (successfully) challenged multiple similar loyalty schemes over the years, and in so doing advocated that the rule of reason, not the price-cost test, should apply to those programs. *See, e.g.*, *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 102 (D.D.C. 2020) (finding FTC has met its burden under rule of reason in assessing loyalty contracts); *McWane, Inc. v. FTC*, 783 F.3d 814, 833 (11th Cir. 2015) (agreeing that the rule of reason is governing standard for exclusive dealing claims). This action is a standard antitrust case with a standard antitrust theory—not a "crusade" pushed by a professor.

---

[4] References to another court's assessment of an expert create a risk of unfair prejudice that usually substantially outweighs any probative value. *See Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2022 WL 254348, at *6 (N.D. Cal. Jan. 27, 2022); *cf. Est. of Thompson v. Kawasaki Heavy Indus., Ltd.*, 933 F. Supp. 2d 1111, 1152 (N.D. Iowa 2013) (excluding such references as a distraction when focus should be on case at issue).

Moreover, it is not "prejudging" the facts or outcome for Professor Hemphill to apply an economic theory discussed in his scholarship to the facts of this case.[5] Experts are both allowed and expected to have preexisting viewpoints related to their expertise; it would be difficult to understand how they are an "expert" in anything if they did not. *See, e.g., Liberty Mut. Ins. Co. v. B. Frank Joy Co.*, 424 F.2d 831, 832 (D.C. Cir. 1970) ("[D]isinterestedness is not required of expert witnesses any more than it is required of ordinary witnesses."); *CIMC Vehicles Grp. v. Direct Trailer, LP*, 2013 WL 12137320, at *8 (S.D. Tex. Mar. 28, 2013) ("Federal Rule of Evidence 702 contains no objectivity requirement.").

Unsurprisingly, Defendants' experts do the same. Syngenta's economic expert Mr. Orszag has written prolifically that a so-called "Circle Principle" is the singular way to approach market definition; he testified that he has applied this purported principle in "virtually every single one" of the cases in which he served as an economic expert, ***as he did in this one***. *See* Ex. 8 (Orszag Dep.) at 96:24–98:8.[6]

Finally Professor Hemphill's retention, his role in this case, and the role of Plaintiffs' attorneys in working with him are all also standard fare in a large-scale

---

[5] Defendants nowhere mention that Professor Hemphill testified directly that he did not prejudge this matter. *See* Ex. 7 (Hemphill Dep. II) at 347:21–365:8 (explaining that despite views in *Brooke Group* article, not all loyalty programs raise anticompetitive concerns).

[6] Not surprisingly, Mr. Orzsag opines that when the Circle Principle is applied to this case, Plaintiffs' proposed markets fail.

antitrust case.[7] The FTC retained Professor Hemphill pursuant to the agency's usual process, and on a usual timeline. He did not engage in any advocacy nor affirmatively seek employment with the FTC prior to retention. Ex. 9 (Hemphill Dep. I) at 8:25–10:4; Ex. 7 at 283:2–284:16. The FTC did not seek his input on whether to bring a lawsuit, and he did not offer an opinion either way.[8] Ex. 9 at 47:13–25; Ex. 7 at 283:2–284:16. He reviewed the complaint prior to filing: this is both expected and appropriate for a plaintiffs' expert, and Defendants do not identify any authority otherwise.

Moreover, it is not unusual for the attorneys representing any party (and indeed sometimes employees of a party) to provide documents, data and information to the testifying expert for his consideration.[9] Like Professor Hemphill, Syngenta's expert Mr. Orszag received documents and information from party lawyers. *See* Ex.8 (Orszag Dep.)

---

[7] Defendants also fail to show how AG Weiser being Professor Hemphill's co-author is relevant or supports their argument that Professor Hemphill is an "advocate." Nor have they explained how the *Google* case on which Professor Hemphill was also retained bears any resemblance to this case, or why any duty owed to Colorado would be relevant here.

[8] Defendants' claim that Plaintiffs instructed Professor Hemphill not to answer questions about "legal strategy" (Br. at 9) is highly misleading. The agreed-upon Protective Order in this case prevents discovery on communications with experts, and all Parties have invoked this provision during discovery to protect non-discoverable information. Stipulated Protective Order, Doc 202, at ¶12. Despite those protections, Professor Hemphill confirmed that he did not give legal advice to Plaintiffs. Ex. 9 at 48:2–18.

[9] Defendants seem to imply that it is inappropriate for the in-house attorneys representing government agencies to provide support to outside experts because those agencies are a "party." Br. at 8. Applying this standard would mean that the government would have to hire outside counsel to represent them for expert purposes, at tremendous expense to taxpayers and with no apparent benefit to the public or the adversarial process.

10

12:20–16:16; 18:20–19:6; 36:20–38:1 (describing working process with Econic and Davis Polk).

## II. PROFESSOR HEMPHILL RELIABLY APPLIES ACCEPTED METHODOLOGY IN DETERMINING THAT DEFENDANTS' LOYALTY PROGRAMS HARM COMPETITION

Defendants present two inconsistent arguments challenging Professor Hemphill's opinion that Defendants' loyalty programs exclude generic competition and result in anticompetitive harm. First, Defendants allege that Professor Hemphill relies solely on *ipse dixit* and cites no academic support or published study. *See* Br. at 24–25. Then, Defendants argue (and implicitly concede) that Professor Hemphill *did* rely on economic theory but incorrectly applied it to the facts of the case. Br. at 26–30. These contradictory arguments fail.

### A. Professor Hemphill Relies on Accepted Economic Theory

Professor Hemphill relies on established economic learning regarding loyalty programs and rigorous analysis of the evidence in this case to conclude that Defendants' harmed competition and consumers by conditioning payments to distributors on the exclusion of generic product. Br. Ex. A. §§ 4.1–4.6; Ex. C §§ 3–4.

Professor Hemphill's analytical framework is based on articles published in leading economic journals showing that when an incumbent monopolist induces a substantial portion of the efficient distribution channel to exclude rival manufacturers, the incumbent can protect its dominant position, foreclose rivals, and harm competition. Br. Ex. A § 4.1; Ex. C §§ 4.1.1–4.1.2. As Defendants acknowledge (Br. at 28), Professor

11

Hemphill relies on John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals,* 104 AM. ECON. REV. 672 (2014) ("Asker Bar-Isaac") (Ex. 10), a peer-reviewed economic article that examines "the upstream exclusionary effect of vertical practices that create rents for downstream retailers without carrying a contractual obligation for exclusivity" using "periodic lump-sum payments to retailers" such as loyalty payments. *Id*. at 672. He also relies on literature teaching that "exclusive contracts can inefficiently deter entry if buyers are downstream competitors, even in the absence of scale economies and even if breach is possible."[10] Professor Hemphill further relies on studies explaining how loyalty payments pose an anticompetitive risk not present in other pricing programs, and explaining how near-exclusivity can consign rivals to higher cost, less effective means of distribution.[11]

Professor Hemphill's application of established economic learning to the facts of this case contrasts starkly with the *ipse dixit* cases cited by Defendants. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 145–46 (1997) (failure to link studies to facts of the case);

---

[10] Br. Ex. A ¶¶259–60, 391 nn.282–83, 509 (citing John Simpson & Abraham L. Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305 (2007)); *see also* Br. Ex. C ¶193.

[11] *See, e.g.*, Br. Ex. C ¶¶217 (citing Bruce H. Kobayashi, *The Economics of Loyalty Discounts and Antitrust Law in the United States*, 1 COMP. POL'Y INT'L 115 (2005)); Br. Ex. A ¶264 & Ex. C ¶¶216–17, 366 (citing David Spector, *Loyalty Rebates: An Assessment of Competition Concerns and a Proposed Rule of Reason*, 1 COMP. POL'Y INT'L 89 (2005)); Br. Ex. A ¶355 (citing Elizabeth Granitz & Benjamin Klein, *Monopolization by "Raising Rivals' Costs": The Standard Oil Case*, 39 J. L. & ECON. 1 (1996)); Br. Ex. A ¶355 (citing Steven C. Salop & David T. Scheffman, *Raising Rivals' Costs*, 73 AM. ECON. REV. 267 (1983)).

*Holesapple v. Barrett*, 5 F. App'x 177, 180 (4th Cir. 2001) (per curiam) (failure to link experience to facts of the case); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d 113, 124 (2d Cir. 2020) (per curiam) (opinions were not supported by cited studies). Defendants may disagree with Professor Hemphill's conclusions regarding loyalty payments, but that is not grounds for exclusion. *See CareFirst of Maryland v. Johnson & Johnson*, 2025 WL 3497098, at *3 (E.D. Va. Dec. 15, 2025) (focus of Daubert analysis should be on "principles and methodology employed by the expert, not the conclusions reached" (citation omitted)).

**B. Professor Hemphill's Opinions "Fit" the Facts of This Case**

Defendants next argue that since ***some*** generic entry has occurred in certain of the AI markets at issue here, Professor Hemphill has misapplied *Asker Bar-Isaac*, which they (wrongly) claim describes only "a manufacturer's incentives to share profits with downstream retailers where no entry has occurred." Br. at 28.

Defendants misunderstand the model described in *Asker Bar-Isaac*, in which the monopolist can exclude rivals by locking up every buyer. The authors assume for "expositional ease" that each buyer can serve the whole market, which means that a rival's access to a single retailer can be fatal to the scheme. Ex. 10 at 674, 678. However, as Professor Hemphill has explained, the model can properly be extended to more complex, real-world scenarios. *See* Br. Ex. C ¶¶203–205; Ex. 9 at 160–167. Basic economic reasoning shows that a single distributor buying from a market entrant would not disrupt a profitable monopolizing strategy if that single distributor has only a niche

position or limited capacity. *Id*. This logic is confirmed by the academic literature. *See* Ex. 11 (Patrick DeGraba and John Simpson, *Loyalty Discounts and Theories of Harm in the Intel Investigations*, 2 J. OF ANTITRUST ENFORCEMENT 170, 176 (2014) (an incumbent seller can still "monopolize a large portion of the market" by "sign[ing] exclusive contracts with buyers who collectively ha[ve] market power with respect to a group of customers")).

More importantly, Professor Hemphill does not rely solely on "economic theory." Br. at 26. By applying this framework to the facts at hand, Professor Hemphill shows that no important distributor has deviated from exclusivity for any significant length of time, ensuring sufficient foreclosure of the distribution channel, Br. Ex. A § 4.7, including explaining why ███████ decision to decline Syngenta's loyalty offer had little market impact, Br. Ex. C § 4.3. Professor Hemphill clarifies that while limited generic entry led to a significant reduction in prices, Br. Ex. A § 3.2.2, both the scope of entry and the price decline were smaller than what would have occurred absent the loyalty programs challenged here, Br. Ex. A ¶¶453–54. He also evaluates evidence demonstrating that Defendants intend their loyalty programs to be a mechanism for profit sharing with distributors, Br. Ex. A ¶396, and that they enforce compliance through a mix of profit opportunities and penalties—through carrots and sticks, Br. Ex. A §§ 4.4.4–4.4.5. All of this is wholly consistent with the economic literature upon which he relies and market dynamics in the crop protection industry.

14

Thus, Professor Hemphill's analysis is nothing like that in *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Ca. 2025), or *J.B.D.L Corp v. Wyeth-Ayerst Labs.*, 2005 WL 1396940, at *20 (S.D. Ohio June 13, 2005), where the challenged experts relied on theories contradicted, not supported, by the record evidence. And, while Defendants imply that *Schor v. Abbott Labs* deals with the validity of expert opining on vertical restraints, that case is not about admissibility of expert testimony at all. 457 F.3d 608, 612–13 (7th Cir. 2006) (affirming dismissal of case for failure to adequately plead a claim of "monopoly leveraging" for pharmaceutical products).

Defendants' claim that Professor Hemphill's theory lacks a sufficient limiting principle is irrelevant. Determining the exact level of distributor participation required for competitive harm to occur is unnecessary given the reams of evidence proving that these Defendants have in fact succeeded in excluding generics from the relevant markets. *See* Br. Ex. A §§ 4.8–4.9; *see also* Ex. 12 at -317 (Corteva loyalty program doing an "A+ job of blocking generics"); Ex. 13 at slide 11 ████████████████████████ ████████████ ). Also, assertions that a theory lacks a limiting principle go to the testimony's weight, rather than admissibility. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 324 (D.R.I. 2019).

## III. PROFESSOR HEMPHILL UTILIZES SOUND METHODOLOGY THAT RELIABLY IDENTIFIES ANTICOMPETITIVE BEHAVIOR AND HARM

Defendants assert that Professor Hemphill's methodology fails to distinguish competitive from anticompetitive behavior; that it does not offer a "testable

15

methodology" (Br. at 20), analysis of a "but-for world" (*id.*), or comparison to a baseline (Br. at 21–22). This is simply wrong.

First, Professor Hemphill does specify and evaluate a "but-for world"—a world without loyalty conditions—utilizing, among other evidence, Defendants' own analyses of price-drops absent a loyalty program or following removal of an AI from loyalty; empirical evidence of price-drops following and caused by limited generic entry; and distributors' own models of price effects in a world with no loyalty program. *See, e.g.*, Br. Ex. A ¶¶ 446–56 (Defendant analyses and empirical evidence); *id.* ¶ 447 n.612 (distributor model). He concludes that excluding generics "has resulted in higher prices and less innovation in the Syngenta and Corteva AI markets, compared to a but-for world without the challenged conduct." Br. Ex. A. ¶ 446. This but-for world analysis is reliable. *See Hosp. Auth. v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 402 (M.D. Tenn. 2019) (testimony is reliable when based on sufficient facts and data, grounded in reliable principles and methods, and applied reasonably to the facts of the case).[12]

---

[12] Professor Hemphill's opinions are thus unlike those at issue in Defendants' cases. *See In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 738, 757 n.36 (E.D. Pa. 2015) (no analysis of but-for world); *Kentucky v. Marathon Petroleum Co.*, 464 F. Supp. 3d 880, 892 (W.D. Ky. 2020) (failure to control for concededly relevant factors); *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*, 690 F.2d 411, 414 (4th Cir. 1982) (failure to control for abnormal conditions); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056–57 (8th Cir. 2000) ("ignored inconvenient evidence"); *In re Pharm. Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017) ("did not consider any other factors").

16

Second, Professor Hemphill's acknowledgement that limited generic entry and some muted competition led to a reduction in prices (Br. Ex. A §§3.2, 4.9; Br. at 19–24) does not "vitiate the reliability" of his methodology, as Defendants claim. Br. at 23. This is wholly consistent with the economic literature, his methodology, and his opinions. Limited generic entry in a market does not prove that relevant markets were competitive. (Br. at 22–23).[13] Furthermore, contrary to Defendants' representation, Professor Hemphill concludes that the programs' anticompetitive effects "depend[] on impeding entry, not complete exclusion of rivals." Br. Ex. C ¶203. He evaluates foreclosure based on program caps and distributors' broad compliance, and distributors' testimony that they likely would sell more generic products absent loyalty programs. Br. Ex. A §§ 4.7–4.8; Br. Ex. C §§ 4.3.3–4.3.4. And he explains that Defendants' assertion that generics could offer consideration to secure distributor loyalty (Br. at 23) is incorrect because generic rivals cannot earn monopoly profits, and therefore cannot make comparably attractive offers to distributors. Br. Ex. A § 4.5. Moreover, the fact that limited generic entry results in lower prices is the exact reason that Defendants engaged in their restrictive loyalty schemes— they sought to avoid wholesale entry and even further erosion of prices.

---

[13] Defendants' references to Professor Hemphill's report are often taken out of context, and occasionally, misquoted. Professor Hemphill describes the head-to-head competition between branded products and their generic equivalents as intense because even limited generic entry significantly lowered prices, and specifically notes that price declines left prices above competitive levels. Br. Ex. C § 3.3.3.

17

Third, the claim that Professor Hemphill does not specify with precision the prices that would prevail in a competitive market is meaningless. A but-for world is inherently hypothetical; an expert's approximation of one is relevant and admissible. As the D.C. Circuit explained, "[t]o require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (per curiam) (en banc).

Finally, Defendants' argument that an alternative methodology (one they do not detail) is superior to the methods that Professor Hemphill employed goes to weight rather than admissibility. *See In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 4362166, at *13–14 (E.D. Va. Aug. 15, 2022) ( argument that expert failed to employ the best methodology was not a basis for exclusion albeit suitable for cross-examination); *BorgWarner, Inc. v. Honeywell Int'l, Inc.*, 750 F. Supp. 2d 596, 615 (W.D.N.C. 2010) ("*Daubert* and *Kumho Tire* do not make the perfect the enemy of the reliable; an expert need not use the best method of evaluation, only a reliable one").

## IV. PROFESSOR HEMPHILL'S MARKET DEFINITION ANALYSES ARE ADMISSIBLE

### A. Professor Hemphill is Qualified to Opine on Appendix C

As Defendants concede, Appendix C to Professor Hemphill's report is a collection of evidence that he relies upon in opining about the relevant markets in this case. Br. at 10. As all economists do, Professor Hemphill reviewed and considered this record evidence in rendering his opinion, specifically here that there are "distinctive

18

characteristics" of each AI. Br. at 10. He does not conduct an agronomic analysis. There is no basis to argue that Professor Hemphill has exceeded his expertise by reviewing this record evidence and he is not required to have any specialized knowledge about the industry to conduct his economic analyses. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 422 (E.D. Pa. 2015) (rejecting Daubert challenge, explaining that "an economist not only should, but must, examine the factual record to arrive at his opinion"); *Peco Pallet, Inc. v. Northwest Pallet Supply Co.*, 2018 WL 10602201, at *3 (N.D. Ill. Oct. 25, 2018) (rejecting challenge to qualifications and holding "[t]here is no hard and fast rule requiring that an expert, such as an economist, have specialized knowledge regarding the industry on which he offers his opinions").[14]

Defendants' economists have taken the same approach. None claims expertise in agronomy or crop protection, nor do Defendants assert that they need to in order to provide ***economic*** analysis. *See* Ex. 14 ¶ 36 (Snyder compares chemical "formulation" and "quality" of various crop protection products); Ex. 15 ¶¶ 53, 116, 173 (Hill opines on the characteristics of acetochlor, oxamyl, and rimsulfuron).

---

[14] In contrast, Defendants' cases (Br. at 11) involve experts' disclaimer of the relevant expertise (which Professor Hemphill did not do) or ***lack*** of expertise (which Defendants do not assert).

19

**B. Professor Hemphill's Implementations of the Hypothetical Monopolist Test Conform with Accepted Methodologies and Are Reliably Applied**

Defendants' claim that Professor Hemphill's HMT is not "an accepted version of" the test is neither economically sound, nor a legal basis for exclusion. Br. at 12.[15] First, and contrary to Defendants' assertion, there is not a single correct way to implement the HMT. The HMT can be implemented using a variety of evidence and via multiple qualitative and quantitative approaches. *See* Merger Guidelines § 4.3.C (HMT can involve "interpret[ing] the qualitative ***and*** quantitative evidence" (emphasis added)); Malcolm B. Coate & Jeffrey H. Fisher, *A Practical Guide to the Hypothetical Monopolist Test for Market Definition*, 4 J. COMP. L. & ECON. 1031, 1039, 1041, 1044–48 (2008) (Ex. 16). This variety in approach makes sense given that the "hypothetical monopolist" analysis "must be resolved 'on a case-by-case basis, focusing on the 'particular facts disclosed by the record.' " *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992)).

Courts consistently credit HMTs performed with an assortment of qualitative evidence. *See FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019) (HMT satisfied

---

[15] Plaintiffs are not required to conduct an HMT in order to prove a properly defined relevant market. It is only one way to demonstrate market definition, along with other analysis like the *Brown Shoe* factors. *See, e.g.*, *Optronic Techs., Inc, v. Ningbo Sunny Electronic Co.*, 20 F.4th 466, 482 (9th Cir. 2021) ("[T]here is no requirement to use any specific methodology in defining the relevant market."); *FTC v. Penn St. Hershey Med. Ctr.*, 838 F.3d 327, 345 (3d Cir. 2016) (HMT is not "the only test"). In fact, one of the cases cited by Defendants holds that "testimony from an economist is not necessary" for market definition." *Victus, Ltd. v. Collezione Europe U.S.A. Inc.*, 26 F. Supp. 2d 772, 786 (M.D.N.C. 1998).

by "claims data and testimony"); *McWane,* 783 F.3d at 829 (with only record evidence and without "a cross-elasticity of demand study"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 122 (D.D.C. 2016) (with "record evidence" and "testimony"); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011) (with "business documents," "testimony," "and the analyses of the parties' expert economists"); *FTC v. Edwards Lifesci. Corp.*, 2026 WL 228723, at *17–18 (D.D.C. Jan. 9, 2026) (with "testimony" and "ordinary course documents"); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *29 (N.D. Cal. Jan. 8, 2014) (with "trend[s] among top retailers," "customer testi[mony]," "documents," evidence of "head-to-head competition," and arithmetic).

Professor Hemphill conducted a reliable HMT analysis using multiple accepted approaches. His analysis includes use of record evidence (natural experiments and internal documents) and arithmetic-based ("recapture rate") methods. Defendants employ inflammatory language to describe their criticisms of his approach, but nothing they raise justifies exclusion of his opinion. Rather, it may be tested on cross-examination. *B & R Supermarket, Inc. v. Visa, Inc.*, 2024 WL 4252031, at *10 (E.D.N.Y. Sept. 20, 2024) (denying motion to exclude expert who allegedly did not apply "accepted" HMT methodology).[16]

---

[16] Defendants' citation to *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012), is curious given that the expert there improperly used a SSNIP test to define an *overinclusive* market without "meaningfully consider[ing] any narrower definition of the market[.]"

Defendants do not meaningfully challenge Professor Hemphill's recapture rate method used for acetochlor and rimsulfuron. In a footnote, (Br. at 12 n.2), Defendants complain that the available data—which was introduced into the case and relied on *by their own experts*—could have been more encompassing. *Id.* ("[T]he data does not encompass all potential substitutes."). But Defendants do not challenge those data as insufficient or unreliable.[17]

As for his record evidence-based methods, Defendants argue that Professor Hemphill failed to "control for confounding factors" or to "hold constant" prices of other substitutable products to confirm that an observed decline in prices was caused by the entry of generic rivals. Br. at 15–19. Defendants' criticism ignores that Professor Hemphill robustly supported his conclusion by relying on *Defendants' own documents* that attribute the price decline to generic entry and isolated the timing of entry. *Supra*, p. 17. Professor Hemphill also ruled out head-to-head competition between acetochlor and metolachlor, which Defendants claim is an alternative cause, using a natural experiment. *Supra* p. 4. Finally, Professor Hemphill noted that, after generic entry prompted these price declines, Defendants set their prices based on generic prices while generic manufacturers set their prices based on Defendants' branded prices. Br. Ex. A, ¶¶186-187.

---

[17] In any event, Defendants have waived any challenge to the arithmetic-based HMTs by failing to brief the issue meaningfully. *Harris v. Kijakazi*, 2022 WL 541438, at *5 n.5 (M.D.N.C. Feb. 23, 2022).

This is evidence that the prices of other AIs played little if any role in determining price at that point.[18]

Defendants claim that Professor Hemphill should have "held constant" the prices of other branded products because "evidence" suggests that prices of crop protection products outside of the proposed AI-only markets "decreased significantly" when generics entered. Br. at 15–17. This "evidence" is not documentary evidence and Defendants' own statements (which is what Professor Hemphill relies on), but instead consists of Mr. Orzsag's analysis, which Professor Hemphill explains is unreliable. Br. Ex. C. ¶¶78–80. Moreover, Defendants' attempt to assert a "requirement" to hold constant is inconsistent with economics and the law, given that doing so is feasible only for a subset of quantitative evidence. *See* Br. Ex. C at ¶81 (explaining role of "hold constant" assumption when using recapture rates and margins to conservatively calculate predicted price increase in a prospective merger case); Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 ANTITRUST L.J. 49, 70–71 & n.81 (2010) (merger simulation models estimate the price response of other products, instead of holding their prices fixed) (Ex. 17); *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 826–27 (S.D. Tex. 2025) (describing after a full evidentiary hearing the use

---

[18] Professor Hemphill's robust analysis is nothing like *Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009) and *Virginia Vermiculite Ltd. v. W.R. Grace & Co.*, 98 F. Supp. 2d 729 (W.D. Va. 2000), where all the expert did was observe that for the product at issue both price and demand increased over time.

of hold constant applied to an arithmetic approach called "critical loss analysis").[19] To the extent that Defendants believe that Professor Hemphill should have discounted their own words in deference to a cherry-picked data analysis by their own paid expert, they should explore that on cross-examination.

## CONCLUSION

Professor Hemphill's opinions are admissible. Defendants' credibility challenges, though spurious, can be pursued on cross-examination. The Court should deny Defendants' motion.

---

[19] Defendants misleadingly assert that Professor Hemphill "acknowledges that a true HMT" (regardless of whether it is arithmetic) "is supposed to hold constant 'the price and other terms of trade of products.'" Br. at 16. Professor Hemphill actually made clear that "hold constant" applies to "numerical application[s] of the HMT[.]" Ex. 9 at 121:24–123:19.

Dated:  February 20, 2026

Respectfully submitted,

 /s/ Allyson M. Maltas
ALLYSON M. MALTAS
Deputy Chief Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3646
Email: amaltas@ftc.gov

JOSEPH R. BAKER
ROBERT Y. CHEN
ELIZABETH A. GILLEN
LAUREN B. PATTERSON
MICHAEL J. TURNER

*Attorneys for Plaintiff Federal Trade Commission*


/s/ Nicole S. Gordon
NICOLE S. GORDON
Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94610
Telephone: (415) 510-4400
Email: nicole.gordon@doj.ca.gov

*Attorney for Plaintiff State of California*

/s/ Conor J. May
ARIC J. SMITH
CONOR J. MAY
Assistant Attorneys General
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 9th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Aric.Smith@coag.gov
        Conor.May@coag.gov

*Attorneys for Plaintiff State of Colorado*

/s/ Paul J. Harper
PAUL J. HARPER
Assistant Attorney General, Antitrust
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
Telephone: (312) 814-3000
Email: paul.harper@ilag.gov

ALEX KAPLAN
RYAN CAUGHEY
ADAM CARLIS
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Email: akaplan@susmangodfrey.com
        rcaughey@susmangodfrey.com
        acarlis@susmangodfrey.com

BETSY ARONSON
REBEKAH G.S. GREENE
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
Email: baronson@susmangodfrey.com
        rgreene@susmangodfrey.com

*Attorneys for Plaintiff State of Illinois*

/s/ Noah Goerlitz
NOAH GOERLITZ
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 725-1018
Email: noah.goerlitz@ag.iowa.gov

*Attorney for Plaintiff State of Iowa*

/s/ Jennifer Linsey
JENNIFER LINSEY
CHRISTI FOUST
JESSE MOORE
Deputy Attorneys General
SCOTT BARNHART
Chief Counsel and Director of Consumer Protection
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (463) 261-7401
Email: jennifer.linsey@atg.in.gov
        christi.foust@atg.in.gov
        jesse.moore@atg.in.gov
        scott.barnhart@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

/s/ Katherine Moerke
KATHERINE MOERKE
ELIZABETH ODETTE
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 296-3353
Email: katherine.moerke@ag.state.mn.us
        elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

Case 1:22-cv-00828-TDS-JEP    Document 441    Filed 04/22/26    Page 33 of 37

/s/ Justin McCully
JUSTIN MCCULLY
Assistant Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: Justin.McCully@nebraska.gov

ALEX KAPLAN
RYAN CAUGHEY
ADAM CARLIS
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Email: akaplan@susmangodfrey.com
        rcaughey@susmangodfrey.com
        acarlis@susmangodfrey.com

BETSY ARONSON
REBEKAH G.S. GREENE
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
Email: baronson@susmangodfrey.com
        rgreene@susmangodfrey.com

*Attorneys for Plaintiff State of Nebraska*

/s/ Rachel K. Sowray
RACHEL K. SOWRAY
Senior Assistant Attorney General
Economic Justice Section
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 689-0249
Email: Rachel.Sowray@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

/s/ William Shieber
Austin Kinghorn
Deputy Attorney General for Civil Litigation
WILLIAM SHIEBER
Senior Staff Attorney, Antitrust Division
PAIGE ETHERINGTON
Assistant Attorney General
Office of the Attorney General of Texas
300 West 15th Street, 7th Floor
Austin, TX 78701
Telephone: (512) 463-1710
Email: William.Shieber@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

/s/ Hamilton Millwee
HAMILTON MILLWEE
Assistant Attorney General
Office of the Attorney General of
Tennessee
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

/s/ Luminita Nodit
LUMINITA NODIT
Assistant Attorney General,
Antitrust Division
Washington State Office
of the Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104
Telephone: (206) 254-0568
Email: Lumi.Nodit@atg.wa.gov

*Attorney for Plaintiff State
of Washington*

/s/ Caitlin M. Madden
CAITLIN M. MADDEN
LAURA E. MCFARLANE
Assistant Attorneys General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

# CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the foregoing brief contains fewer than 6,250 words, excluding the caption, table of contents, table of authorities, signature lines, certificate of compliance, and certificate of service.

Dated: February 20, 2026

/s/ Elizabeth A. Gillen
ELIZABETH A. GILLEN
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3364
Email: egillen@ftc.gov

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., <br><br> Defendants. | Case No. 1:22-cv-00828-TDS-JEP <br><br> **CERTIFICATE OF SERVICE** |

I, Allyson M. Maltas, an attorney, certify that on February 20, 2026, I caused to be served upon counsel of record for Defendants via email and/or secure file transfer protocol a true and correct copy of the following:

- Plaintiffs' Brief in Opposition to Defendants' Joint Motion to Exclude Expert Testimony of Professor C. Scott Hemphill;
- The Declaration of Allyson M. Maltas In Support of Plaintiffs' Opposition Brief; and
- The exhibits to Plaintiffs' Opposition Brief.

*/s/ Allyson M. Maltas*
Allyson M. Maltas
