# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN,

          Plaintiffs,

          v.

SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.,

          Defendants.

Case No. 1:22-cv-00828-TDS-JEP

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND TESTIMONY OF LOREN K. SMITH**

**Oral Argument Requested**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

NATURE OF THE MATTER ................................................................................2

DR. SMITH'S YARDSTICKS................................................................................3

I.  Overview.................................................................................................3

II.  Smith's "Yardstick Sources"..................................................................4

    A.  The Corteva Yardstick AI............................................................5

    B.  The Syngenta Yardstick AIs.........................................................7

        i.  Paraquat and Abamectin. ..................................................8

        ii.  Lambda Cyhalothrin ("Lambda")....................................9

        iii.  Azoxystrobin...................................................................11

        iv.  Mesotrione. ....................................................................12

QUESTION PRESENTED...................................................................................14

LEGAL STANDARD .........................................................................................14

ARGUMENT ......................................................................................................15

III.  Smith's Yardsticks Are Unreliable Because They Are Based on Smith's Unfounded Assumptions and Non-Expert Interpretation of Record Evidence.................................................................................................17

    A.  Smith's Approach to the Yardstick Analysis Is Unprecedented, Untested and Unreliable...................................................................17

    B.  Smith Failed to Demonstrate the Comparability of his Yardsticks to the But-For World. ..................................................................18

    C.  The Wide Range of Variability Among Smith's Yardsticks Underscores Their Unreliable Foundation........................................20

IV.  Empirical Data Refutes Smith's Assumptions. ...........................................21

CONCLUSION ...................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

CDW LLC v. NETech Corp.,
906 F. Supp. 2d. 815 (S.D. Ind. 2012) ...............................................................15

Cont. Packaging, Inc. v. Cent. Garden & Pet Co.,
2011 WL 13162306 (N.D. Ga. Mar. 31, 2011) ...................................................20

Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993) ............................................................................................14

Everett Financial v. Primary Residential Mortgage, Inc.,
2017 WL 90366 (N.D. Tex. Dec. 19, 2016) ........................................................15

Gen. Elec. Co. v. Joiner,
522 U.S. 136 (1997) ............................................................................................14

In re Live Concert Antitrust Litig.,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................................16, 18, 22

In re Restasis Antitrust Litig.,
335 F.R.D. 1 (E.D.N.Y. 2020) ............................................................................17

Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,
387 F. Supp. 2d 794 (N.D. Ill. 2005) ............................................................15, 22

Moehrl v. The Nat'l Assoc. of Realtors,
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ...............................................15, 22

Nease v. Ford Motor Co.,
848 F.3d 219 (4th Cir. 2017) ..............................................................................14

Oglesby v. Gen. Motors Corp.,
190 F.3d 244 (4th Cir. 1999) ..............................................................................14

Sardis v. Overhead Door Corp.,
10 F. 4th 268 (4th Cir. 2021) ..............................................................................14

ZF Meritor, LLC v. Eaton Corp.,
696 F.3d 254 (3d Cir. 2012) ...............................................................................20

ii

**Statutes & Rules**

Fed. R. Evid. 702 ...................................................................................... passim

**Other Authorities**

American Bar Association, Proving Antitrust Damages: Legal and
Economic Issues ...........................................................................................17


Daniel L. Rubinfeld, <u>Antitrust Damages</u>, Chapter 14, <u>in</u> RESEARCH
HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, (Einer Elhauge
ed., 2012) .............................................................................................3, 15, 18

iii

**CITATION CONVENTIONS**

**Parties**

| | |
|---|---|
| Corteva | Corteva, Inc. |
| Syngenta | Syngenta Crop Protection AG, Syngenta Corporation and Syngenta Crop Protection, LLC |
| Defendants | Syngenta Crop Protection Ag, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc. |
| FTC | Federal Trade Commission |
| Plaintiff States | State of California, State of Colorado, State of Illinois, State of Indiana, State of Iowa, State of Minnesota, State of Nebraska, State of Oregon, State of Tennessee, State of Texas, State of Washington, and State of Wisconsin |
| Plaintiffs | Federal Trade Commission, State of California, State of Colorado, State of Illinois, State of Indiana, State of Iowa, State of Minnesota, State of Nebraska, State of Oregon, State of Tennessee, State of Texas, State of Washington, and State of Wisconsin |

**Expert Reports**

| | |
|---|---|
| Smith Report | Expert Report of Loren Smith, dated August 22, 2025 |
| Orszag Report | Expert Rebuttal Report of Jonathan Orszag, dated October 3, 2025 |
| Thurman Rebuttal | Expert Rebuttal Report of Walter N. Thurman, dated October 3, 2025 |
| Smith Reply | Expert Reply Report of Loren Smith, dated October 31, 2025 |

iv

**Expert Depositions**

| | |
|---|---|
| Smith Tr. | Expert Deposition of Loren Smith Transcript, dated December 4–5, 2025 |

**Investigative Hearings**

| | |
|---|---|
| Vance Hr'g Tr. | Investigative Hearing of Spencer Vance (Albaugh) Transcript, dated May 28-29, 2025 |

**Fact Depositions**

| | |
|---|---|
| Wichert Tr. | 30(b)(1) Deposition of Rex Wichert (Syngenta) Transcript, February 25-26, 2025 |
| Fisher Tr. | 30(b)(1) Deposition of Robert Fisher (Syngenta) Transcript, dated March 25-26, 2025 |
| Cecil Tr. | 30(b)(1) Deposition of Jeff Cecil (Syngenta) Transcript, dated March 31-April 1, 2025, |
| Vance Dep. Tr. | 30(b)(6) Deposition of Albaugh (Spencer Vance ) Transcript, dated May 28–29, 2025 |

## INTRODUCTION

Plaintiffs' expert Dr. Loren K. Smith claims to use a "standard yardstick analysis" to calculate alleged disgorgement and damages purportedly owed by Corteva and Syngenta to the Plaintiff States. But his analysis is far from "standard." Specifically, he attempts to estimate what farmgate (grower) prices and manufacturer net sales (profits) would be if the at-issue Corteva and Syngenta AIs were not a part of their respective loyalty programs. But to do that, he relies entirely on figures that he plucks from anecdotal Syngenta documents and a non-party's deposition testimony. These are unreliable yardsticks in their own right and demonstrably refuted by <u>actual</u> empirical data, which shows that the prices of the AIs Smith considers stay the same or increase after they are removed from their loyalty offering, contradicting what Smith concludes from his anecdotal sources. Smith's analysis is unreliable on multiple levels and should be excluded.

<u>First</u>, for all the economic window dressing in his reports, Smith does remarkably little analysis of his own. At bottom, his yardsticks are simply numbers he uncritically lifts from his "yardstick sources", comprising, for each of his five Syngenta yardsticks, a single out-of-context excerpt from a Syngenta document; and for his only Corteva yardstick, a non-party deponent testifying to what he recalled happened to an AI's prices after Corteva divested the AI and it was removed from Corteva's loyalty program. Critically, none of these sources show the <u>actual</u> prices of an AI after it comes off its loyalty program; most are projections; and most do not discuss (even hypothetically) an AI's post-loyalty prices. Worse, none of the sources disclose, and Smith acknowledged he does not know, what principles and methods were used to derive the prices he pulls from them. Yet he

1

makes no effort to validate the figures or correct them to account for confounding factors. Instead, he simply assumes that each somehow removed confounding factors—a key step in a yardstick analysis to ensure that all of the price impacts are actually due to the removal of the alleged unlawful conduct—despite no indication that any source did so (or if they attempted to, how they did so). Smith justifies these inferential leaps by explaining that, in his view, he is, "as a professional economist," "better position[ed] than [the Court] to draw inferences about [his yardstick sources]." (Smith Tr. (Ex. 9) at 159:12–18.) But Rule 702 requires an expert's inferences to be based on reliable methods, not on his ipse dixit. (Infra Section III.A.)

Second, for three of his yardstick AIs—the only AIs that in fact have come out of a Defendant's loyalty program—there is empirical data showing what actually happened to prices in the real world post-loyalty. This data shows the actual prices of these AIs post-loyalty stayed the same or increased, contrary to what Smith posits. Smith criticizes the data because it may be impacted by confounding factors, yet he failed to check his assumptions, and his criticism only underscores a disabling defect in his own far more anecdotal yardsticks, for which he also did nothing to exclude confounding factors. (Infra Section III.B.)

**<u>NATURE OF THE MATTER</u>**

Plaintiff States seek damages (for two Plaintiff States) and disgorgement of purported "ill-gotten gains" (for all Plaintiff States) from Defendants for assumed violations of federal and state laws. They proffer Smith to opine on the amounts of

purported damages and disgorgement owed by each Defendant. Defendants move to preclude Smith's testimony.

**DR. SMITH'S YARDSTICKS**

I.      <u>Overview</u>

Smith was assigned by the Plaintiff States to calculate monetary remedies purportedly owed by each Defendant if their respective loyalty programs were found to be unlawful. Specifically, he was asked to assume that the State Plaintiffs prevail on their claims and to calculate (i) each of Syngenta's and Corteva's profits to be disgorged to all Plaintiff States supposedly under "applicable laws,"[1] and (ii) damages each allegedly owes to Illinois and Nebraska. To do that, he purports to employ the "yardstick" method, which, <u>when done right</u>, measures damages "by obtaining a 'but-for price' from a [comparable market] that closely approximates the market in which the violation occurred" to provide a close approximation of "what the price of the [defendant's] product would be if the wrongful behavior had not occurred." (<u>See</u> Daniel L. Rubinfeld, <u>Antitrust Damages</u>, Chapter 14, <u>in</u> RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, (Einer Elhauge ed., 2012), (Ex. 11) 380–381 (cited in Smith Report (Ex. 1) ¶ 30 & n.27).)[2]

Smith begins by identifying evidence (his "yardstick sources") that he interprets as approximating the impact on the AI's manufacturer net sales and farmgate (grower) prices of removing an AI from Syngenta's or Corteva's loyalty program. (Smith Report (Ex. 1)

---

[1] Plaintiff States also asked Smith to calculate disgorgement "for all 50 United States" (Smith Report (Ex. 1) ¶ 8.)

[2] Hereinafter, "<u>Antitrust Damages</u>".

3

¶¶ 30–31.) Each "yardstick source" pertains to a "yardstick AI", consisting of five Syngenta AIs and one (former) Corteva AI. (Id. at Appendix G, ¶¶ 120–127.) Smith then derives from each source an estimated farmgate price (for damages) or manufacturer net sales (for disgorgement) effect, stated in percentage terms.[3] (Id. at ¶ 44–45.) The result is a wide range of supposed effects—ranging from 3 to 60 percent for the purported farmgate price effects; and 20 to 99 percent for the purported net sales effects. (Id. at tbls. 2 & 3.) He then takes the median for each—31 percent for the farmgate price effect and 33 percent for the manufacturer net sales effect—to estimate, respectively, his alleged damages and disgorgement amounts for each Defendant. (Id. at tbls. 2, 3, 12, 13, 14, 19 & 20.)

## II.     Smith's "Yardstick Sources"

Smith's claimed monetary recovery hinges on the figures he derives from his "yardstick sources". As he put it, those sources "feed into [his] damages and disgorgement analyses" such that "if [he] did not have any of the document excerpts . . . or the snippet of testimony" that he uses as his "sources of yardsticks, [he] would not have the numbers stated in Tables 2 and 3" of his reports, which are the linchpin of his calculations. (Smith Tr. (Ex. 9) at 277:24–278:21.) As described below, however, his estimates are the product

---

[3] Where a yardstick source, according to Smith, provides a farmgate price estimate but not a manufacturer net sales estimate, or vice versa, Smith uses a formula to estimate the latter from the former, or vice versa. (See Smith Report (Ex. 1) ¶¶ 39–40.) The formula he uses for this purpose is based on an estimate of an 86 cents-per-dollar pass-through rate, which he derives from an econometric model based on a multiple regression analysis, and a ratio for each AI comparing manufacturer and farmgate prices. (Id.) His pass-through regression is notably the only econometric analysis he undertakes, i.e., the one part of his opinion that is based on economic work and not non-expert inference and assumption. Where Smith errs is not in the formula derived from his regression but in the estimates to which the formula is applied, for the reasons explained herein.

4

not of any reliable economic analysis but his own non-expert interpretation of each source, each of which rests on a shaky (at best) foundation.

### A.   The Corteva Yardstick AI.

Smith's oxyfluorfen yardstick, the only (former) Corteva AI among the bunch, is derived entirely from the testimony of Spencer Vance, an executive at a generic supplier who testified vaguely that the price of branded oxyfluorfen "came down about 50 percent" after the AI came off Corteva's loyalty program.  (Smith Tr. (Ex. 9) at 309:12–18.)  From that snippet of testimony, Smith derives a 50 percent farmgate price effect and a corresponding 99 percent net sales effect, the largest such effect that he uses for deriving his net sales median.  Smith made several baseless assumptions about Vance's testimony to include it as a yardstick.

First, he assumed that Vance had a reliable source for his "about 50 percent" estimate.  But Vance does not reveal anything about how he derived his estimate, where it came from, or what data it is based upon; and Smith acknowledged he does not know what Vance used as his source.  (Id. at 314:23–315:7.)

Second, Smith assumed that by "about 50 percent" Vance meant exactly 50 percent. Smith acknowledged he does not know what specific number Vance had in mind.  (Id. at 317:4–13.)  But if Vance meant something less, it reduces Smith's yardstick, and if he meant just one percentage point more, it would result in an "impossibly large manufacturer net sales reduction."  (Id. at 313:6–15.)  In other words, if Vance had in mind 51 percent, Smith's formula would project oxyfluorfen sales as negative once removed from Corteva's program—an outcome Smith himself recognizes is impossible and so should be discarded.

5

Third, Smith assumed that Vance attributed the entirety of his "about 50 percent" estimate to what Vance believed to be the effect of removing oxyfluorfen from Corteva's program. But Vance's testimony suggests that is not the case. In answering the question about what happened to oxyfluorfen's prices post-loyalty, Vance identified two factors, the removal of "the loyalty programming" and the removal of "brand support in the marketplace." (Id. at 302:25–303:19; see also Vance Hr'g Tr. (Ex. 5) 191:16–24.) Smith acknowledged that he has no idea what Vance meant by "brand support", admitted it could be a confounding factor, and acknowledged that he did not know "how much of [the] reduction, if any, [Vance] was attributing to" it. (Id. at 319:10–18.)

Fourth, Smith assumed that Vance had accounted for other factors that may have impacted whatever price information Vance had in mind as the basis for his vague testimony. (See Smith Reply (Ex. 4) ¶ 85.) But Smith does not know if Vance did anything to account for such factors, and admitted he does not "know if Mr. Vance saw prices moving in whatever direction that he saw them moving in and [just] assumed that it was based on the effect [of] loyalty removal and not something else," without doing anything to isolate the impact. (Smith Tr. (Ex. 9) at 320:11–321:2.) Indeed, Vance's testimony indicates it is unlikely Vance did any analysis, testifying that his company does not "ever run models" to estimate the impact of loyalty removal on product sales. (Vance Hr'g Tr. (Ex. 5) at 196:4–8.)

Fifth, Smith adopts oxyfluorfen as a yardstick even though Vance testified that it was an "extreme example", not representative of the likely impact he believes loyalty removal might have on other products. (Id. 213:16–22.) Smith dismisses that testimony

6

by interpreting Vance to mean only that oxyfluorfen is used on specialty crops—yet another of Smith's unsupported assumptions, as Vance did not testify that this is what he meant (Smith Tr. (Ex. 9) at 328:12–16.)  In any event, an "extreme example" is not a reliable yardstick.

Finally, there is empirical data in the record showing that oxyfluorfen's prices increased after it came off Corteva's loyalty program.  (Thurman Rebuttal (Ex. 3) ¶ 25.)  Smith casts the data aside on the assumption that this vastly different outcome from what Vance recalled is due to confounding factors, but he does not know that to be true and he did nothing to check his assumption.  (Smith Reply (Ex. 4) ¶ 13.)

      **B.**      **<u>The Syngenta Yardstick AIs</u>.**

The rest of Smith's yardsticks are based on documents relating to one of five Syngenta AIs, each addressed below.  Here, also, Smith makes unsupported assumptions to derive his yardsticks.  Critically, for each Syngenta yardstick, Smith assumes that the business people who created these documents were "directly isolating the impact of [Syngenta's loyalty] program" and "therefore are separating whatever other confounding factors are impacting previous events." (Smith Tr. (Ex. 9) at 113:20–23.)  But he admitted he does not know if any of them did so, and if they did, how, what tools they used, what confounding factors were eliminated, or what assumptions they made; and that, as far he knows, no "econometric tools were used by the individuals who prepared the pricing analyses and any of the sources" he relies upon for his yardsticks.  (<u>Id.</u> at 274:12–19.)  Nor did Smith use econometric tools himself to "ascertain whether any of the pricing

7

information [he] rel[ies] upon in [his] reports is impacted by confounding factors." (Id. at 274:6–11.)

For each yardstick, Smith makes several additional unsupported assumptions, while ignoring contrary evidence.

        i.      <u>Paraquat and Abamectin</u>.

Smith's paraquat and abamectin yardsticks are both taken from a single email projecting what might happen if Syngenta removed each AI from its loyalty program. (Smith Report (Ex. 1) ¶ 125.) Smith assumes that the projections are derived from a methodology that allows him to approximate the actual impact of their removal on farmgate prices and net sales, from which he derives for each of paraquat and abamectin a farmgate price effect of ▮▮▮▮ percent respectively, and a manufacturer net sales effect of ▮▮▮▮ ▮percent. (Id. at tbls. 2 & 3.) But the document reveals nothing about how the estimates were derived and what assumptions were made. Nor did Smith consider the deposition testimony of one its authors, who testified that it reflected a ▮▮▮▮▮▮▮▮▮▮ (Cecil Tr. (Ex. 8) at 127:9–18; Smith Tr. (Ex. 9) at 200:1–23.)

Moreover, both paraquat and abamectin in fact came off Syngenta's loyalty program, such that, like oxyfluorfen, there is empirical data to ascertain what <u>actually</u> happened to their prices post-loyalty. (<u>See</u> Thurman Rebuttal (Ex. 3) ¶ 35.) The data shows the opposite of what was predicted in the ▮▮▮▮▮ email that Smith uncritically adopts, revealing that, for each AI, prices ▮▮▮▮▮▮▮▮▮▮▮▮▮. (<u>Id</u>. ¶¶ 36–40.) Smith dismisses the data as unreliable, attributing the price trend (as with oxyfluorfen)

entirely to confounding factors, but again did nothing to confirm his assumptions. (Smith Reply (Ex. 4) ¶ 51.)

ii.    Lambda Cyhalothrin ("Lambda").

For his lambda yardstick, Smith relies on a retrospective Syngenta analysis ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████, which Smith assumes is due entirely to █████ being on Syngenta's loyalty program. He further assumes that the differential provides an accurate approximation for what would happen if lambda ████████████████████████, from which he derives a ██ percent farmgate price effect, the largest of his farmgate effects—in other words, he assumes lambda would have experienced the same price trend as ████████████████████████████████, such that the ██ percent differential can reliably be used as a yardstick from which to calculate damages and disgorgement for both Defendants. (Smith Tr. (Ex. 9) at 165:9–25.) Under Smith's model, the purported██ percent farmgate effect predicts a reduction in manufacturer net sales of <u>over</u> ██ <u>percent</u>, which Smith concedes is "impossibly large" because it implies that Syngenta would make negative sales in the but-for world. (Smith Report (Ex. 1) ¶ 50.) Purportedly to be "conservative," Smith excludes that implausible figure from his estimates from which he derives his median net sales yardstick, but he refused to admit that such a result casts any doubt on the validity of this yardstick, or on his overall approach of deriving yardsticks

9

from his non-expert interpretation of anecdotal evidence.  (See Smith Tr. (Ex. 9) at 183:3–15.)

Smith makes several unsupported assumptions about the document.  For one, he assumes that the competitive conditions for ██████████████ are essentially identical, such that the impact of generic entry on both would also be identical but-for Syngenta's loyalty program.  However, he did not check this assumption.  (See Smith Tr. (Ex. 9) at 173:19–174:9.)  And there is good reason to doubt it.  For example, at the time of generic entry for each AI, ██████ competed with many more widely adopted AIs than did ██████████ meaning generic versions of ██████ launched into a far more crowded, competitive field.  (See Orszag Op. (Ex. 2) ¶ 293.)  Further, he assumes that none of the differential is due to any other confounding factors, even though the document itself notes ████████████████████████████████████████████ ████████████████████████████████████████ (Smith Report (Ex. 1) fig. G.3.)  Indeed, Smith chose to ignore testimony from the author of the study explaining that "innovat[ing] three or four times throughout the lifecycle of" ██████ ████████████████████████████████████████ shown in the document.  (Wichert Tr. (Ex. 6) at 113:13–23.)  In other words, Smith again substitutes his interpretation of the document for the explanation of its author.

Piling on assumptions, he speculates that ██████████████ were selected to provide an objective comparison of an AI on Syngenta's loyalty program and a comparable AI not on its program, pronouncing that it is "implicit" that the author "selected AIs that are useful for comparison" to show the effectiveness of Syngenta's program.  (Smith Tr.

10

(Ex. 9) at 156:5–15.)  But, again, his interpretation is in conflict with the author's testimony explaining that the AIs were selected for a different purpose—██████████████████████ ████████████████████████████████ (Wichert Tr. (Ex. 6) at 113:13–23.) Remarkably, Smith admitted he has no idea what the author meant by ████████████ meaning he does not know for what purpose the document on which he bases his largest farmgate yardstick was prepared.  (Smith Tr. (Ex. 9) at 149:3–11.)

Finally, Smith appears to have assumed that ████████████ was not on a ████████ ████████ during the time frame analyzed, but at his deposition, when confronted with the fact that he did not address that assumption in his reports, nor the evidence from Corteva's expert indicating its falsity, he testified that he did not know if it was right and that it did not actually matter to his analysis.  (Id. at 362:9–16.)  That makes no sense, since Smith also claims that the document reflects the purported price gap between two AIs – one with and one without a loyalty program.

        iii.       <u>Azoxystrobin</u>.

For azoxystrobin, Smith relies on snippets from two slides from a nearly 50-page deck relating to a Syngenta product marketing plan created in 2014 to derive a ██ percent farmgate price reduction, one of his largest.  (Smith Report (Ex. 1) ¶ 121.)  The slides analyze ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ (Id. fig. G.2)  As is plain from the document's face, this is <u>not</u> a yardstick for the "but-for" world in which the loyalty program is absent and competitive conditions are unchanged.  Instead, it reflects a scenario

11

where ███████████████████████████████████████████

████ because competitive conditions are dispositively different.

Moreover, the document posits ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████ (Id.) The testimony Smith cites from the document's author further confirms that Syngenta's loyalty program is only one of many elements of Syngenta's post-patent strategy. (Fisher Tr. (Ex. 7) at 215:22–25; 216:2–9; Smith Reply (Ex. 4) ¶ 55 & n.73).) Confronted with this fundamental gap between the ███████████████ soundbite and the "but-for" world Smith invokes, Smith admitted he knows nothing about how the analysis was prepared, "what data [was] used," or what prices (manufacturer or farmgate) it analyzed. (Smith Tr. (Ex. 9) at 143:11–25). Nor did he "evaluate the assumptions that [were] used" to prepare it. (Id. at 144:12–19.) But that did not stop him from speculating that "the price decline may be exactly the same" because this scenario "sort of looks a lot like the Key AI program not being in existence." (Id. at 125:21–126:24 (emphasis added).) In other words, Smith's yardstick rests on what he imagines the "but-for" world "sort of looks … like," not the scenario Syngenta analyzed in the sole document he cites. That is again pure ipse dixit posing as yardstick analysis.

iv. Mesotrione.

For this yardstick, Smith uses a Syngenta presentation he describes as a ████████

██████████████████████████████████████████████

██████████ (Smith Report (Ex. 1) ¶ 124.) In other words, the presentation on its face

12

is not analyzing what might happen if mesotrione were removed from Syngenta's loyalty program. At the outset, then, Smith is relying on assumption to jump from the document to the conclusion that it is an appropriate measurement of the but-for world.

Specifically, the document relates to a negotiation over the supply of technical mesotrione and ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ Nonetheless, Smith <u>interprets</u> the document to be a proxy for the but-for world, once again applying his non-expert assumptions to anecdotal evidence. To make matters worse, Smith not only assumes ██████████████████████████████████ when it does not say so, but also makes the <u>additional</u> unfounded assumption that <u>100 percent</u> of the difference between the ████████████████████████████████████████████.

Based on his speculative interpretation of this document alone, Smith calculates a ████ percent reduction in manufacturer price and a ██ percent reduction in manufacturer sales. (Smith Report (Ex. 1) ¶¶ 125, 127; Smith Tr. (Ex. 9) at 94:5–10.)). As with his other yardsticks, Smith did not examine or consider the differences between mesotrione and his other yardsticks or the at-issue AIs across many factors (demand, cost, competition, etc.), just assuming comparability, instead of demonstrating it. (Smith Tr. (Ex. 9) at 173:3–7 (post-patent price history); 170:2–171:3 (market dynamics); 169:5–9 (competition); 169:10–13 (costs of production)).

13

## QUESTION PRESENTED

Should Dr. Smith be precluded from offering expert testimony regarding purported damages and disgorgement when his analysis is based entirely on his non-expert interpretation of anecdotal record evidence and his results conflict with the available empirical data?

## LEGAL STANDARD

Under Federal Rule of Evidence 702, trial judges act as gatekeepers to "ensure that any and all scientific testimony ... is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). "With respect to reliability, the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir. 2017) (quoting Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in original)). "[T]o the extent an expert makes inferences based on the facts presented to him, the court must ensure that those inferences were 'derived using scientific or other valid methods.'" Sardis v. Overhead Door Corp., 10 F.4th 268, 281 (4th Cir. 2021). Those methods must be both reliable and reliably applied to the facts. Fed. R. Evid. 702. And "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 147 (1997).

14

**ARGUMENT**

Under standard yardstick methodology—as explained by the source invoked by Smith—"the comparable market product [chosen for the yardstick] should reflect the same degree of competition, the same costs, and the same demand conditions that would have prevailed in the" but-for world, i.e., "the market at issue had there been no wrongful behavior." See Antitrust Damages (Ex. 11), p. 380.

"[I]f an appropriate yardstick is available, it is important to take account [of] any differences in cost and extent of competition between the yardstick market and the market at issue in the but-for world." (Smith Tr. (Ex. 9) at 85:16–22.) "For a particular yardstick analysis to be considered reliable, the plaintiff bears the burden of demonstrating the comparability of the proposed yardsticks." Moehrl v. The Nat'l Assoc. of Realtors, No. 19-cv-01610, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023); see also Everett Financial Inc. v. Primary Residential Mortgage, Inc., No. 3:14-CV-1028-D, 2017 WL 90366, at *7 (N.D. Tex. Dec. 19, 2016) ("[T]he proponent of a yardstick estimate . . . must demonstrate a reasonable similarity between the business [at issue] and the business to which it is being compared."). Failure to demonstrate such comparability renders a yardstick analysis unreliable under Rule 702. See, e.g., Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 813 (N.D. Ill. 2005) (excluding testimony where expert failed to examine "factor[s] that would bear upon the question of comparability"); CDW LLC v. NETech Corp., 906 F. Supp. 2d 815, 824 (S.D. Ind. 2012) ("A yardstick approach is an acceptably reliable method under Daubert . . . only if the benchmarks (or yardsticks) are sufficiently comparable that they may be used as accurate predictors of what the target would have

15

done."); <u>In re Live Concert Antitrust Litig.</u>, 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012) (excluding analysis where the plaintiffs did not meet their burden of establishing the yardstick's comparability).

Smith's opinions fail to satisfy these basic standards of reliability for yardsticks. His analysis is based entirely on anecdotal documents and a snippet of non-party testimony, not empirical data showing what actually happened to his yardstick AI's prices when any came off its loyalty program—though such data was available to him for half of his yardsticks. That is bad enough, but Smith also fails to establish that his yardsticks are actually comparable to the but-for world for either Defendant. Instead, he assumes that the authors of his "yardstick sources" did the work for him. But he does nothing to understand how the estimates he derives were created, what assumptions were used, what data they were based upon, or what was done, if anything, to eliminate confounding factors. Indeed, several of his "sources" were discussed in the depositions of their actual authors, yet Smith does not rely on that testimony in forming his initial opinions—and, after being confronted with them, he does not change his opinions. In other words, Smith credits his own interpretation of the documents over the explanations provided under oath by their authors.

To wit, Smith assumes that each source provides a reasonable approximation of the but-for world, but fails to verify these assumptions. Compounding that error, he ignores evidence on the face of his sources, in some cases from their authors, which suggests his core assumptions are wrong. And he ignores real-world data showing what actually happened to prices for his yardsticks post-loyalty. Rule 702 demands more. Accordingly, Smith's opinions should be excluded.

16

**III.** **Smith's Yardsticks Are Unreliable Because They Are Based on Smith's Unfounded Assumptions and Non-Expert Interpretation of Record Evidence**

  **A.** **Smith's Approach to the Yardstick Analysis Is Unprecedented, Untested and Unreliable.**

A yardstick methodology typically uses real-world data to approximate the unknown. See In re Restasis Antitrust Litig., 335 F.R.D. 1, 15 (E.D.N.Y. 2020) (explaining a yardstick approach examines "the actual prices and quantities that occurred in a similar market that was not affected by defendant's behavior" (emphasis added)); (American Bar Association, Proving Antitrust Damages: Legal and Economic Issues, pt. II ch. 4 subsec. C ("The yardstick approach often requires data about the proxy market participant's sales and profits, or prices paid. These data serve as a proxy to reflect what the plaintiff's experience would have been but-for the illegal conduct and, as such, when compared to the plaintiff's actual experience can provide a means to measure the damages suffered.").) Smith's approach is different. Four of his yardsticks are projections. One is a snippet of non-party deposition testimony. And the only yardstick that uses retrospective data, lambda, fares no better. It gives Smith a net sales result that is "impossible", and the two AIs on which the yardstick is based (███████████████) were chosen (according to the person who chose them) ███████████ —meaning the document was not prepared under circumstances intended to approximate anything remotely close to the but-for world. (See supra Section II.B.ii.)

This approach to deriving yardsticks is as unreliable as it is unprecedented. Smith himself acknowledged he is "not aware of articles or treatises which describe a methodology for determining damages based upon a yardstick analysis where the

yardsticks are derived predominantly from projections rather than actual data"; nor "of any case in which a determination of damages and disgorgement in the hundreds of millions of dollars was derived from numbers taken from excerpts of a handful of ordinary course documents and a snippet of deposition testimony." (Smith Tr. (Ex. 9) at 279:19–280:1; 281:7–282:7.)[4] Yet that is what he does here. Smith's unprecedented expansion of the yardstick methodology should be rejected.

**B.** **Smith Failed to Demonstrate the Comparability of his Yardsticks to the But-For World.**

Smith's yardsticks are unreliable because he cannot show that any is a reasonably comparable proxy for the but-for world for either Defendant. And he does not even try to make such a showing. But identifying a "comparable" yardstick is critical to ensuring that the supposed price effects derived from the yardstick are not impacted by confounding factors—otherwise, it is impossible to say what amount, if any, of the difference between prices in the yardstick market and those in the defendant's market is due to the alleged anticompetitive conduct. See, e.g., In re Live Concert, 863 F. Supp. 2d at 975 (excluding analysis that failed to "account for any other possible explanations for" price disparities).

Smith admits he did no econometric analysis to isolate confounding factors from any yardstick source, nor does he know if the sources' authors did so. (Smith Tr. (Ex. 9) at 274:6–11.) Instead, many of the sources identify confounding factors on their face—for

---

[4] The single piece of literature Smith cites for his approach says nothing about using projections as yardsticks. (Smith Report (Ex. 1) ¶ 30 n.27 (citing Antitrust Damages, pp. 378–393, at 381–82).) Rather, it states that it is "essential" that yardsticks be "as similar as possible," which "requires that one take into account any cost, demand, or competitive differences" between them. Antitrust Damages, at 381.

example, Vance (oxyfluorfen) identified "brand support in the market"; the azoxystrobin source identified ███████████████████████████████████; and the lambda source indicated that one reason for ████████████████████████████ ████████████████████████████. (<u>Supra</u> Sections II.A, IIB.ii, iii.) Smith contends he need not account for these (or any other) confounding factors because the business people who created his sources know how to reliably isolate the impact of their own program.[5] (Smith Reply (Ex. 4) ¶ 13.) Even if true, that does not mean any of them actually isolated any such impact. To the contrary, there is good reason to doubt that such "isolating" work was done. That is so even assuming the relevant business personnel were capable of doing it, which remains unproven. (<u>Supra</u> Section II.A, IIB.ii, iii.)

Moreover, as Smith acknowledges, even knowledgeable business people can "make predictions about the impact of business decisions that end up not being accurate." (Smith Tr. (Ex. 9) at 236:19–237:2.) His own source provides one example—Vance's company lost millions of dollars from bad bets.[6] (Vance Dep. Tr. (Ex. 10) at 130:7–11.) That is one reason why, in a situation such as this where yardsticks are based upon the work of others, it is critical that the expert check the work, understand its assumptions, and ensure the

---

[5] Smith admitted that his azoxystrobin and lambda yardsticks estimate the impact of post-patent strategies broadly, including the components other than loyalty rebates. (Smith Reply ¶¶ 53, 55.) Smith is therefore admittedly overestimating damages and disgorgement based on these yardsticks.

[6] Vance also testified that, in his view, it was "almost impossible to estimate" the impact of removing corn and soybean AIs from a loyalty program (<u>see</u> Smith Reply ¶ 47a); whereas some of Smith's yardsticks rely on other sources that he interprets as doing just that. In other words, his own sources are in disagreement as to the feasibility of undertaking the types of analysis he simply he assumes they reliably undertook.

output was arrived at reliably.  Cf. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012) (affirming exclusion of yardstick analysis where the expert did not himself "construct an offense free world based on actual financial data, but instead relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based"); see also Cont. Packaging, Inc. v. Cent. Garden & Pet Co., No. 1:08-CV-03492, 2011 WL 13162306, at *6 (N.D. Ga. Mar. 31, 2011) (collecting cases and holding that an expert's "blind reliance on [prepared] projections . . . [and] failure to conduct any independent research as to the reliability of his assumptions requires exclusion of that expert's report and testimony"). Smith did none of that, rendering his yardstick analysis unreliable.

C.  **The Wide Range of Variability Among Smith's Yardsticks Underscores Their Unreliable Foundation.**

Underscoring the shakiness of his assumptions, Smith's yardstick percentages vary widely from yardstick to yardstick.  His purported manufacturer net sales effects range from █ to █ percent, a difference of nearly █ percentage points, while his purported farmgate price effects range from █ to █ percent, a difference of █ percentage points. (Smith Report (Ex. 1) tbls. 2 & 3.)  In other words, one of his yardsticks supposedly tells him the purported farmgate price effect that would result from removing an at-issue AI from its loyalty program is █ percent; and another says it is █ percent; in between are percentages from █ percent to █ percent. (Id.)  As noted above, Smith excludes one of his yardsticks because it predicts an "impossibly large" net sales impact.  And minor changes

20

to at least one other yardstick also leads to an impossibly large net sales impact. (Smith Tr. (Ex. 9) at 313:6–15.)

The wide variability among the yardsticks further underscores that Smith is not measuring a reliable but-for world from any of his anecdotal yardstick sources.[7] Smith attempts to overcome this variability by picking the median for his calculations. (Smith Reply (Ex. 4) ¶ 32.) But taking the median of six unreliable estimates does not transform them into a reliable one.

## IV.     **Empirical Data Refutes Smith's Assumptions**

Smith's reliance on anecdotal documents and testimony for his yardsticks is all the more remarkable because empirical data shows what happened to the prices of three of his yardstick AIs after they came off their respective loyalty programs. In each case, the data shows post-loyalty prices increased or stayed the same—contrary to Smith's anecdotes. (Supra Sections II.A, B.ii.)   Thus, for the only yardsticks that have data, Smith's analysis is "0-for 3".

In his opening report, Smith does not mention post-loyalty pricing data.[8] He addresses it for the first time in his reply, claiming it may be impacted by confounding

---

[7] Smith also acknowledged he did not even try to determine whether any at-issue AIs is more comparable to the low end of his range or the high end—again revealing that his yardstick analysis is not grounded in comparability. For example, with respect to Corteva, he admitted he did not do "any economic analysis demonstrating that the economic circumstances for acetochlor, rimsulfuron or oxamyl are more similar to paraquat [at a purported ▮ percent price effect] than they are to lambda [at a purported ▮ percent price effect]." (Smith Tr. (Ex. 9) at 293:7–13.)

[8] At his deposition, Smith acknowledged he did no econometric work not disclosed in his opening report, meaning he did not even attempt to verify whether the data supported the inferences he draws from his sources. (See Smith Tr. (Ex. 9) at 265:17–22.)

21

factors, and faulting Defendants' experts for not <u>disproving</u> his theory. The burden, however, is on Smith to show his yardsticks are reliable. <u>Moehrl</u>, 2023 WL 2683199, at *4 ("The proponent of the expert bears the burden" on showing reliability (citation omitted.))

Smith's assertion that the empirical data may be influenced by confounding factors is, in reality, a confession—it "simply provides another reason to exclude his 'Yardstick' analysis, which similarly fails to account for" such factors. <u>See</u> <u>In re Live Concert</u>, 863 F. Supp. 2d at 976; <u>Loeffel</u>, 387 F. Supp. 2d at 812 ("Absent the requisite showing of comparability, a damage model . . . is impermissibly speculative and conjectural."). That the data diverges from Smith's unsupported inferences is unsurprising and confirms his yardsticks are not reliable proxies for the but-for world.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that Dr. Smith's testimony, reports and opinions be excluded.

22

Respectfully submitted this 19th day of December, 2025,

/s/ Patrick M. Kane
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC  27401
Telephone:  336.378.5200
Facsimile:  336.378.5400

Charles S. Duggan*
charles.duggan@davispolk.com
James I. McClammy*
james.mcclammy@davispolk.com
Michael Scheinkman*
michael.scheinkman@davispolk.com
David B. Toscano*
david.toscano@davispolk.com
Alison B. Miller*
alison.miller@davispolk.com
Daniel J. Thomson*
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL
LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

Jesse Solomon*
jesse.solomon@davispolk.com
Benjamin M. Miller*
benjamin.miller@davispolk.com
DAVIS POLK & WARDWELL
LLP
1050 17th Street, NW
Washington, DC 20036

/s/ Mark E. Anderson
**MCGUIREWOODS LLP**
Mark E. Anderson (NC Bar No. 15764)
Armina A. Manning (NC Bar No. 60436)
manderson@mcguirewoods.com
aamanning@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Telephone: (919) 755-6600
Fax: (919) 755-6699

**BALLARD SPAHR LLP**
Jason A. Leckerman*
Emilia McKee Vassallo*
Thomas W. Hazlett*
Elizabeth P. Weissert*
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-8500
Fax: (215) 864-8999
LeckermanJ@ballardspahr.com
McKeeVassalloE@ballardspahr.com
HazlettT@ballardspahr.com
WeissertE@ballardspahr.com

**CRAVATH, SWAINE & MOORE LLP**
Wes Earnhardt *
Jesse Weiss*
Margaret T. Segall *
Two Manhattan West
375 Ninth Ave
New York, New York 10001
Telephone: (212) 474-1000
Fax: (212) 474-3700
wearnhardt@cravath.com
jweiss@cravath.com
msegall@cravath.com

23

Telephone: (202) 962-7133

*Specially appearing under L.R. 83.1(d)

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC*

*Attorneys for Defendant Corteva, Inc.*

24

**CERTIFICATE OF WORD COUNT**

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) in that it does not exceed 6,246 words, excluding the exempted portions, as reported by word processing software.

/s/ Mark E. Anderson
Mark E. Anderson

25