# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., <br><br> Defendants. | Case No. 1:22-cv-00828-TDS-JEP <br><br> **DEFENDANT CORTEVA'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br><br> **Oral Argument Requested** |

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE MATTER ........................................................................... 1

II. STATEMENT OF UNDISPUTED FACTS ................................................... 5

    A. Overview of Crop Protection Products. ............................................. 5

        i. Crop Protection Product Categories. ...................................... 5

        ii. Farmers Substitute Among Many Different Crop Protection Products—with Diverse AIs—to Target Particular Pests and Crops. .............................................................. 6

        iii. Past DOJ Enforcement Activity Confirms Corteva's View of Market Definition. ................................................................. 18

    B. Crop Protection Product Manufacturing and Distribution. ............... 19

        i. Basic Manufacturers. ............................................................. 19

        ii. Generic Manufacturers. ......................................................... 21

        iii. Crop Protection Product Distribution. ................................... 23

    C. Crop Protection Loyalty Rebate Programs. ...................................... 24

        i. Loyalty Rebate Programs Are Common, Particularly in this Industry. ....................................................................... 24

        ii. Corteva's Loyalty Rebate Programs. ..................................... 25

        iii. Distributor Participation (and Non-Participation) in Corteva's Loyalty Programs. ................................................. 31

        iv. Generic Sales of Products Containing the At-Issue AIs. ........ 35

III. QUESTIONS PRESENTED ......................................................................... 37

IV. LEGAL STANDARD ................................................................................... 38

i

V.    ARGUMENT ..................................................................................................... 39

    A.    Summary Judgment Is Required Because No Reasonable Factfinder Could Find in Favor of Plaintiffs' "AI-Only" Antitrust Markets. ............... 39

        i.    Plaintiffs Have Failed to Proffer Evidence Supporting AI-Only Markets. ..................................................................... 41

        ii.    Evidence of Farmer Preferences and Behavior Refutes Plaintiffs' Markets. ................................................................. 42

        iii.    Plaintiffs Have Not Put Forward Any Other Material Evidence to Substantiate Their Alleged AI-Only Markets.............. 51

    B.    Plaintiffs' Claims Are Subject to—and Fail Under— the Price-Cost Test......................................................................... 62

        i.    Principles of the Price-Cost Test. ...................................... 63

        ii.    Undisputed Evidence Shows That Price is the Predominant Mechanism of the Alleged Exclusion. ............................. 65

    C.    Plaintiffs' Claims Fail Under the Full Rule of Reason Test. ....................... 74

        i.    There Is No Evidence That Corteva's Loyalty Agreements Constitute Anticompetitive Conduct. ................................ 74

        ii.    There Is No Evidence That Corteva's Loyalty Agreements Cause Anticompetitive Injury......................................... 81

    D.    Summary Judgment Is Warranted on the Alleged Violations of State Law. ............................................................... 87

VI.    CONCLUSION .............................................................................................. 90

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Addax Energy SA v. M/V Yasa H. Mulla,
 2018 WL 10470917 (E.D.Va. 2018) ........................................................ 38, 50

Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,
 836 F.3d 1171 (9th Cir. 2016) .................................................................. 81

Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,
 592 F.3d 991 (9th Cir. 2010) .................................................................... 69

Anderson v. Liberty Lobby, Inc.,
 477 U.S. 242 (1986) .................................................................................. 51

Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.,
 275 F. Supp. 3d 957 (W.D. Wis. 2017) ................................................... 88

Atl. Richfield Co. v. USA Petroleum Co.,
 495 U.S. 328 (1990) ............................................................................ 70, 75

BanxCorp v. Bankrate, Inc.,
 847 F. App'x 116 (3d Cir. 2021) .............................................................. 54

Berlyn, Inc. v. Gazette Newspapers, Inc.,
 223 F. Supp. 2d 718 (D. Md. 2002), aff'd, 73 F. App'x 576 (4th Cir.
 2003) ........................................................................................................ 41

Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,
 509 U.S. 209 (1993) ................................................................ 64, 65, 69, 70

Caller–Times Pub. Co. v. Triad Commc'ns, Inc.,
 826 S.W.2d 576 (Tex. 1992) .................................................................... 88

Cargill, Inc. v. Monfort of Colo., Inc.,
 479 U.S. 104 (1986) .................................................................................. 70

Cascade Health Sol. v. PeaceHealth,
 515 F.3d 883 (9th Cir. 2008) .......................................................... 69, 70, 72

Celotex Corp. v. Catrett,
 477 U.S. 317 (1986) .................................................................................. 5

Case 1:22-cv-00828-TDS-JEP   Document 453   Filed 04/24/26   Page 4 of 107

Chavez v. Whirlpool Corp.,
113 Cal. Rptr. 2d 175 (Cal. App. 2001)...................................................................89

Chuck's Feed & Seed Co. v. Ralston Purina Co.,
810 F.2d 1289 (4th Cir. 1987)...............................................................................86

Clark v. Flow Measurement, Inc.,
948 F. Supp. 519 (D.S.C., 1996)............................................................................41

Comes v. Microsoft, Corp.,
646 N.W.2d 440 (Iowa, 2002) ...............................................................................88

Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039 (8th Cir. 2000)................................................................... 64, 67, 70

Consul, Ltd. v. Transco Energy Co.,
805 F.2d 490 (4th Cir. 1986)..................................................................................61

Cottom v. Town of Seven Devils,
30 F. App'x 230 (4th Cir. 2002) .............................................................................68

Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,
111 F.4th 337 (4th Cir. 2024) ..........................................................................72, 73

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
504 U.S. 451 (1992) ...................................................................................3, 39, 41

Eisai, Inc. v. Sanofi Aventis U.S., LLC,
821 F.3d 394 (3d Cir. 2016)...........................................................................passim

Freeman Indus., LLC v. Eastman Chem. Co.,
172 S.W.3d 512 (Tenn. 2005)................................................................................89

FTC v. Cardinal Health, Inc.,
12 F. Supp. 2d 34 (D.D.C. 1998) ...........................................................................41

FTC v. Meta Platforms, Inc.,
No. 20-cv-3590, 2025 WL 3458822 (D.D.C. Dec. 2, 2025) ...............................passim

FTC v. Syngenta Crop Protection AG,
711 F. Supp. 3d 545 (M.D.N.C. 2024)................................................................passim

FTC v. Tempur Sealy Int'l, Inc.,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ....................................................................58

FTC v. Thomas Jefferson Univ.,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ..................................................... 53, 58

Golden Boy Promotions LLC v. Haymon,
    No. 15-cv-3378, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017) ..................................... 61

In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.,
    44 F.4th 959 (10th Cir. 2022) ...................................................... 64, 67, 80, 86

In re Live Concert Antitrust Litig.,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ..................................................... 58

In re Mylan N.V. Sec. Litig.,
    666 F. Supp. 3d 266 (S.D.N.Y. 2023) ..................................................... 74

Int'l Wood Processors v. Power Dry, Inc.,
    792 F.2d 416 (4th Cir. 1986) ...................................................... 41, 44

It's My Party, Inc. v. Live Nation, Inc.,
    811 F. 3d 676 (4th Cir. 2016) ..................................................... passim

Kanne v. Visa,
    723 N.W.2d 293 (Neb. 2006) ..................................................... 88

Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.,
    No. 3:11-cv-622, 2012 WL 1155218 (E.D. Va. Apr. 5, 2012), aff'd sub
    nom. Kolon, 748 F.3d 160 ..................................................... 85

Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.,
    748 F.3d 160 (4th Cir. 2014) ..................................................... 80, 86

LePage's, Inc. v. 3M,
    324 F.3d 141 (3d Cir. 2003) (en banc) ..................................................... 72, 78

Major League Baseball Props., Inc. v. Salvino, Inc.,
    542 F.3d 290 (2d Cir. 2008) ..................................................... 39

Marin Cnty Bd. of Realtors, Inc. v. Palsson,
    549 P.2d 833  (Cal. 1976) ..................................................... 88

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ..................................................... 38

McWane, Inc. v. FTC,
    783 F.3d 814 (11th Cir. 2015) ..................................................... 76

Mylan Pharm., Inc. v. Warner Chilcott Public Ltd. Co.,
   No. 12–cv–3824, 2015 WL 1736957 (E.D.Pa. 2015)...................................................61

NicSand, Inc. v. 3M Co.,
   507 F.3d 442 (6th Cir. 2007) (en banc)..................................................................64, 67

Nw. Med. Lab'ys, Inc. v. Blue Cross & Blue Shield of Or., Inc.,
   794 P.2d 428 (Or. 1990)..........................................................................................88

Ohio v. Am. Express Co.,
   585 U.S. 529 (2018) ..........................................................................................passim

Oksanen v. Page Mem'l Hosp.,
   945 F.2d 696 (4th Cir. 1991)...................................................................................39

Pac. Bell Tel. Co. v. linkLine Commc's, Inc.,
   555 U.S. 438 (2009) .................................................................................................70

Panag v. Farmers Ins. Co. of Wash.,
   204 P.3d 885 (Wash. 2009)......................................................................................88

People v. College Hills Corp.,
   435 N.E. 2d 463 (Ill. 1982) .....................................................................................88

People v. N. Ave. Furniture & Appliance, Inc.,
   645 P.2d 1291 (Colo. 1982) (en banc) .....................................................................88

PepsiCo v. Coca-Cola,
   315 F.3d 101 (2d Cir. 2002).....................................................................................41

Reilly v. Apple Inc.,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) ...................................................................89

Roland Mach. Co. v. Dresser Indus., Inc.,
   749 F.2d 380 (7th Cir. 1984)...................................................................................79

Rumple v. Bloomington Hosp.,
   422 N.E.2d 1309 (Ind. Ct. App. 1981).....................................................................88

Sandoz, Inc. v. United Therapeutics, Corp.,
   No. 3:19-cv-10170, 2020 WL 697137 (D.N.J. Feb. 4, 2020)....................................54

SmithKline Corp. v. Eli Lilly & Co.,
   427 F. Supp. 1089 (E.D.Pa. 1976), aff'd, 575 F.2d 1056 (3d Cir. 1978),
   cert. denied, 439 U.S. 838 (1978) ............................................................................73

Spahr v. Leegin Creative Leather Prod., Inc.,
No. 2:07-cv-187, 2008 WL 3914461 (E.D. Tenn. 2008)............................................. 88

State v. Alpine Air Prods., Inc.,
490 N.W. 2d 888 (Minn. Ct. App. 1992) ..................................................... 88

Tampa Elec. Co. v. Nashville Coal Co.,
365 U.S. 320 (1961) ............................................................... 74, 86

Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.,
57 F.3d 1317 (4th Cir. 1995)........................................................ 38, 39

Thunander v. Uponor, Inc.,
887 F. Supp. 2d 850 (D. Minn. 2012) .................................................. 89

United States v. Aluminum Co. of Am.,
148 F.2d 416 (2d Cir. 1945) ............................................................ 50

United States v. Dentsply Int'l, Inc.,
399 F.3d 181 (3d Cir. 2005)......................................................... 76, 78

United States v. E.I. du Pont de Nemours & Co.,
351 U.S. 377 (1956) ................................................................. 39

United States v. Eastman Kodak Co.,
63 F.3d 95 (2d Cir. 1995)............................................................. 49

United States v. Google,
687 F. Supp. 3d 48 (D.D.C. 2023) ..................................................... 81

United States v. Int'l Harvester Co.,
274 U.S. 693 (1927) ................................................................. 50

United States v. United States Sugar Corp.,
73 F.4th 197 (3d Cir. 2023)........................................................... 47

Viamedia, Inc. v. Comcast Corp.,
951 F.3d 429 (7th Cir. 2020).......................................................... 87

Victus, Ltd. v. Collezione Europa U.S.A., Inc.,
26 F. Supp. 2d 772 (M.D.N.C. 1998)................................................... 41

Virgin Atl. Airways Ltd. v. Brit. Airways PLC,
257 F.3d 256 (2d Cir. 2001)....................................................... 67, 72, 83

ZF Meritor, LLC v. Eaton Corp.,
    696 F.3d 254 (3d Cir. 2012)......................................................................................passim

**Statutes & Rules**

7 U.S.C. § 136(q)(1)(F) ........................................................................................... 5

7 U.S.C. § 136a(a) ................................................................................................... 5

7 U.S.C. § 136a(c) ................................................................................................... 5

Cal. Bus. & Prof. Code § 17200 ............................................................................ 89

Colo. Rev. Stat. § 6-4-119 ..................................................................................... 88

Fed. R. Civ. P. 56(a) ........................................................................................ 38, 47

Ind. Code § 24-5-0.5-1, et seq. .............................................................................. 89

Iowa Code § 553.2.................................................................................................. 88

Iowa Code § 714.16................................................................................................ 89

Neb. Rev. Stat. § 59-829........................................................................................ 88

Or. Rev. Stat. § 646.715 ........................................................................................ 88

Tex. Bus. & Com. Code § 15.04 ........................................................................... 88

**Other Authorities**

U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines § 2.4.B
    (2023) .................................................................................................................. 84

viii

# **CITATION CONVENTIONS**

**Parties**

| | |
|---|---|
| Corteva | Corteva, Inc. |
| Syngenta | Syngenta Crop Protection AG, Syngenta Corporation and Syngenta Crop Protection, LLC |
| Defendants | Syngenta Crop Protection Ag, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc. |
| FTC | Federal Trade Commission |
| Plaintiff States | State of California, State of Colorado, State of Illinois, State of Indiana, State of Iowa, State of Minnesota, State of Nebraska, State of Oregon, State of Tennessee, State of Texas, State of Washington, and State of Wisconsin |
| Plaintiffs | Federal Trade Commission, State of California, State of Colorado, State of Illinois, State of Indiana, State of Iowa, State of Minnesota, State of Nebraska, State of Oregon, State of Tennessee, State of Texas, State of Washington, and State of Wisconsin |

**Expert Reports**

| | |
|---|---|
| Hemphill Report | Expert Report of C. Scott Hemphill, dated August 22, 2025 |
| Smith Report | Expert Report of Loren Smith, dated August 22, 2025 |
| Hill Report | Expert Rebuttal Report of Nicholas Hill, dated October 3, 2025 |
| Grey Report | Expert Rebuttal Report of Timothy Grey, dated October 3, 2025 |
| Thurman Rebuttal Report | Expert Rebuttal Report of Walter N. Thurman, dated October 3, 2025 |
| Hemphill Reply Report | Expert Reply Report of C. Scott Hemphill, dated October 31, 2025 |
| Smith Reply Report | Expert Reply Report of Loren Smith, dated October 31, 2025 |
| Hill Supplemental Disclosure | Excerpted Expert Supplemental Disclosure of Nicholas Hill, dated November 14, 2025 |

**Expert Depositions**

| | |
|---|---|
| Hemphill Tr. | Expert Deposition of C. Scott Hemphill Transcript, dated November 20–21, 2025 |
| Smith Tr. | Expert Deposition of Loren Smith Transcript, dated December 4–5, 2025 |

x

**Fact Depositions**

| | |
|---|---|
| Menagh Tr. | 30(b)(1) and 30(b)(6) Deposition of Source Dynamics (Patrick Menagh) Transcript, dated January 14–15, 2025 |
| Drexel Tr. | 30(b)(1) and 30(b)(6) Deposition of Drexel (Stanley Bernard) Transcript, dated February 19–20, 2025 |
| Helm Tr. | 30(b)(1) and 30(b)(6) Deposition of Helm (David Schumacher) Transcript, dated March 6–7, 2025 |
| Wilbur Ellis Tr. | 30(b)(6) Deposition of Wilbur-Ellis (Willie Negroni) Transcript, dated April 21–22, 2025 |
| NuFarm Tr. | 30(b)(6) Deposition of Nufarm (Ken Barham) Transcript, dated May 21–22, 2025 |
| Albaugh Tr. | 30(b)(6) Deposition of Albaugh (Spencer Vance) Transcript, dated May 28–29, 2025 |
| Simplot Tr. | 30(b)(6) Deposition of Simplot (Randy Semadani) Transcript, dated June 3–4, 2025 |
| Helena Tr. | 30(b)(6) Deposition of Helena (Ward Bloodworth) Transcript, dated June 12–13, 2025 |
| Growmark Tr. (Vol. I) | 30(b)(6) Deposition of Growmark (Jeff Bunting) Transcript (Vol. I), dated June 17, 2025 |
| Growmark Tr. (Vol. II) | 30(b)(6) Deposition of Growmark (Jeff Bunting) Transcript (Vol. II), dated June 18, 2025 |
| CNI Tr. | 30(b)(6) Deposition of CNI (Greg Fowler) Transcript, dated June 18 & 20, 2025 |
| Tenkoz Tr. | 30(b)(6) Deposition of Tenkoz (Jeff Cole) Transcript, dated June 25–26, 2025 |

Case 1:22-cv-00828-TDS-JEP    Document 453    Filed 04/24/26    Page 12 of 107

| | |
|---|---|
| Nutrien Tr. | 30(b)(1) and 30(b)(6) Deposition of Nutrien (Douglas Keith Baioni) Transcript, dated June 26–27, 2025 |
| Van Diest Tr. | 30(b)(6) Deposition of Van Diest Supply (John Van Diest) Transcript, dated July 14–15, 2025 |
| Valent Tr. | 30(b)(6) Deposition of Valent (Geoffrey Quick) Transcript, dated July 15, 2025 |
| Winfield Tr. | 30(b)(1) and 30(b)(6) Deposition of Winfield (Kyle Maple) Transcript, dated July 15–16, 2025 |
| BASF Tr. | 30(b)(6) Deposition of BASF (Brady Spangenberg) Transcript, dated July 17–18, 2025 |
| Bayer Tr. | 30(b)(6) Deposition of Bayer (Robert Shrick) Transcript, dated July 22–23, 2025 |
| Gavin Brothers Tr. | 30(b)(6) Deposition of Gavin Brothers Farm (Matt Gavin) Transcript, dated July 25, 2025 |
| CHS Tr. | 30(b)(6) Deposition of CHS (Dean Hendrickson) Transcript, dated July 31–August 1, 2025 |

**Other**

| | |
|---|---|
| AstraZeneca-Novartis Complaint | Complaint, In the Matter of Novartis AG, AstraZeneca PLC, and Syngenta AG, Docket No. C-3979, United States of America Before Federal Trade Commission, dated November 1, 2000. |
| Decision and Order | Decision and Order, In the Matter of Novartis AG, AstraZeneca PLC, and Syngenta AG, Docket No. C-3979, United States of America Before Federal Trade Commission, dated December 15, 2000 |

| | |
|---|---|
| Competitive Impact Statement | Competitive Impact Statement, <u>United States et al v. The Dow Chemical Company and E.I. du Pont De Nemours and Company</u>, Case No. 1:17-cv-01176, dated June 15, 2017 |
| Email from M. Turner to C. Gianotti | Email from M. Turner to C. Gianotti, et al. re: Corteva's Responses and Objections to Plaintiffs' First Set of Interrogatories - FTC v. Syngenta et al. (M.D.N.C.), dated July 3, 2025 |
| Amended Complaint | Amended Complaint (Dkt. 149) |
| Plaintiffs' Opposition | Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss (Dkt. 112) |
| AI | Active ingredient |
| DOJ | Department of Justice |
| EPA | Environmental Protection Agency |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| CDO | Corporate Distributor Offer |
| CRPIVM | Crops, Range & Pasture and Industrial Vegetation Management |
| ADAMA | ADAMA Agricultural Solution |
| Albaugh | Albaugh, LLC |
| AMVAC | AMVAC Chemical Corporation |
| BASF | BASF Corporation |
| Bayer | Bayer CropScience LP |
| CNI | Chem-Nut Inc. |

xiii

| | |
|---|---|
| CHS | CHS, Inc. |
| Drexel | Drexel Chemical Company |
| FMC | FMC Corporation |
| Growmark | Growmark, Inc. |
| Helena | Helena Agri-Enterprises, LLC |
| Helm | Helm Agro US, Inc. |
| Simplot | J.R. Simplot Company |
| Kynetec | Kynetec USA Inc. |
| Nufarm | Nufarm Ltd. |
| Nutrien | Nutrien AG Solutions |
| Rotam | Rotam AgroSciences Limited |
| Source Dynamics | Source Dynamics LLC |
| Summit | Summit Agro USA LLC |
| Tenkoz | Tenkoz Inc. |
| Valent | Valent U.S.A. LLC |
| Van Diest | Van Diest Supply Company |
| Wilbur-Ellis | Wilbur-Ellis Company LLC |
| Winfield | WinField United |

## I.  NATURE OF THE MATTER

At the motion to dismiss stage, the Court was required to accept Plaintiffs' allegations as true.  But discovery is now complete.  And Plaintiffs have not followed through with evidence to support that which they alleged.  For example:

(i)    The Court allowed Plaintiffs to proceed to discovery on their theory of single-AI markets because Plaintiffs alleged the AIs at issue have unique attributes that leave farmers without adequate substitutes.  FTC v. Syngenta Crop Protection AG, 711 F. Supp. 3d 545, 569 (M.D.N.C. 2024).  But unrebutted evidence refutes that allegation, demonstrating that farmers substitute between numerous products with different AIs to treat the same pests on the same crops in virtually identical ways.

(ii)   The Court refused to dismiss Plaintiffs' claims under the price-cost test because Plaintiffs alleged Corteva had engaged in non-pricing mechanisms to compel distributors to achieve loyalty thresholds, including by making threats to withhold supply or take other forms of retribution.  Id. at 579.  But Plaintiffs have no evidence of anything like that ever happening.  To the contrary, unrebutted evidence shows distributors have chosen to achieve loyalty rebates (or not) based solely on the above-cost price reductions the rebates provide.

(iii)  In denying Corteva's rule of reason arguments, the Court credited Plaintiffs' allegation that Corteva's loyalty programs denied entry to generic manufacturers.  Id. at 579–84.  But the unrebutted evidence shows numerous

1

well-heeled generic manufacturers have entered (and more have demonstrated the capability to enter) with products containing each of the AIs at issue.

(iv)   Likewise, the Court credited Plaintiffs' allegation that, but for the loyalty programs, prices to farmers would be lower. Id. at 569. But there is no evidence farmers are paying supra-competitive prices due to Corteva's loyalty program (or, for that matter, any evidence from farmers at all, who Plaintiffs inexplicably chose not to discover, despite this case ostensibly being about harm to farmers). The only evidence is that prices rise, not fall, when AIs leave loyalty, and loyalty rebates are passed on to farmers in the form of lower retail prices.

The list goes on. Put simply, Plaintiffs have failed to substantiate the allegations in their Amended Complaint with evidence and, therefore, have failed to create a triable issue of fact. Each of Plaintiffs' claims should be dismissed for the following reasons:

**Plaintiffs' Market Definition Fails.** An antitrust plaintiff's threshold burden is to define the relevant markets in which the defendant allegedly has market power and harmed competition. Plaintiffs' "AI-only" markets do not encompass, as they must, "the area of effective competition". Ohio v. Am. Express Co., 585 U.S. 529, 543–44 (2018). Instead, the undisputed record shows Plaintiffs' proffered markets (i) exclude products farmers actually use as substitutes; (ii) fail an application of the Brown Shoe factors; (iii) are predicated on purported hypothetical monopolist tests that hinge on unreliable and untested assumptions; and (iv) ignore numerous Corteva business records showing Corteva views a

2

range of AIs as close competitive substitutes. Plaintiffs' failure to allege markets matching "commercial realities" requires summary judgment on all claims. <u>Eastman Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451, 482 (1992). (<u>Infra</u> at Section V.A.)

**The Price-Cost Test Governs and Corteva Has Not Priced Below Cost.** It is a fundamental precept of antitrust law that price-cutting, though it may "exclude" less efficient rivals, is procompetitive and not to be condemned in the absence of predatory below-cost prices. As explained herein, the Supreme Court repeatedly has warned against mistaken inferences in challenges to price-cutting conduct, because price cutting is the very conduct the antitrust laws are intended to encourage and protect. For that reason, courts across the country—heeding the Supreme Court's edict not to act as central planners—treat above-cost rebates as lawful when the rebate itself is the predominant mechanism of alleged exclusion. Stated differently, the so-called price-cost test applies "where a pricing practice itself operates as the exclusionary tool, regardless of how the plaintiff styles its allegations", and immunizes conduct if prices are above cost. <u>Syngenta</u>, 711 F. Supp. 3d at 572.

The unrebutted evidence shows this is such a case. Corteva's loyalty programs give distributors the option to earn a rebate if they buy a specified percentage of their AI purchases from Corteva. There is no requirement the distributors buy anything from Corteva at all. That is not how the contracts work. Instead, distributors simply have the option each year to achieve a loyalty rebate, or not, depending on what makes economic sense for them. Some distributors achieve loyalty for some AIs in some years and not for

3

different AIs in other years. Some distributors have chosen not to attempt to achieve loyalty at all.

But, critically, there is no evidence any distributor considered anything other than the loyalty rebates in making those decisions. There is no evidence Corteva secured participation in its loyalty program by canceling supply contracts, delaying access to new products, withholding product allocation during supply shortages, refusing private label products to non-participating distributors, or threatening to do any of those things. None of those things <u>ever</u> happened. Lower prices (in the form of rebates) is the only mechanism enticing distributors to achieve loyalty, and therefore, there is no triable issue on whether the price-cost test applies to Plaintiffs' claims—it does. Because Plaintiffs concede they cannot show below cost pricing, the price-cost test "short-circuits Plaintiffs' antitrust claims." <u>Id.</u> at 570. (<u>Infra</u> at Section V.B.)

**<u>Even Under the Rule of Reason, Plaintiffs Claims Fail.</u>** But even if the price-cost test does not apply, and the Court assesses Plaintiffs' claims under the rule of reason, summary judgment still would be warranted because the rule of reason requires a showing both that Corteva engaged in anticompetitive conduct and that the alleged conduct "harmed competition, not just a competitor." <u>Syngenta</u>, 711 F. Supp. 3d at 581. Plaintiffs cannot show anticompetitive conduct because the undisputed evidence demonstrates Corteva's loyalty program is nothing more than above-cost price-cutting, the very essence of competition. Plaintiffs cannot show competitive harm because there is no evidence of supra-competitive prices, reduced output, or stunted innovation. Plaintiffs have not even attempted to meet their burden by eliciting facts as to why each of the handful of important

4

distributors buys what it does each year.  Nor did Plaintiffs seek discovery from farmers.  The only facts in the record—that the loyalty program discounts largely are passed through to farmers who, therefore, enjoy lower prices (rather than higher prices) due to the loyalty program—disprove the harm Plaintiffs attempt to conjure.  (Infra at Section V.C.)

## II.  STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed as to Corteva.  In past submissions, and in their expert reports, Plaintiffs sometimes have treated Corteva and Syngenta as if they are the same companies, with identical practices and identical facts.  They are not.  To proceed to trial against Corteva, Plaintiffs must identify triable issues of material fact as to Corteva.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### A.  Overview of Crop Protection Products.

#### i.  Crop Protection Product Categories.

Crop protection products are used by farmers to control agricultural pests and are vital to the modern production of foodstuffs, feedstuffs, and non-food crops such as cotton.  (Hemphill Report (Ex. 1) ¶¶ 59, 61.)  Pursuant to FIFRA, crop protection products sold in the United States must be registered with the EPA and have EPA-approved labeling specifying the applications for which the product may be used, and when and how often to apply it.  (7 U.S.C. § 136a(a), (c); id. § 136(q)(1)(F); see also FIFRA Webpage (Ex. 88).)

Crop protection products are categorized as herbicides (targeting weeds), insecticides (targeting insects), nematicides (targeting nematodes, a microscopic worm), or fungicides (targeting fungi).  (Hemphill Report (Ex. 1) ¶ 59.)  They may be further categorized by their mode of action (how the product's AI inhibits or kills the targeted

5

pest), site of action (where the AI binds or interacts), and their chemical families.  (See, e.g., Herbicide Mode of Action at 1 (Ex. 108); IRAC Classification Scheme (Ex. 109).)

### ii. Farmers Substitute Among Many Different Crop Protection Products—with Diverse AIs—to Target Particular Pests and Crops.

Farmers choose among many different crop protection products to achieve the same agronomic outcomes and frequently consider products with different AIs as suitable for managing the same pest control problem in the same conditions.  Those facts are not in dispute.

As summarized in this Section, Corteva has presented overwhelming agronomic and market-based evidence on farmer choices and buying behavior—consisting of the opinions of a PhD agronomist (Dr. Grey), EPA-approved labels, industry-standard farmer purchasing data, and independent academic analyses—that demonstrates each AI has numerous competitive substitutes.  Products with many different AIs share the same functional attributes as one another, are labeled for the same uses by the EPA, and actually are used by farmers for the same applications in fierce competition with one another.  (Infra Sections II.A.ii(1)–(4).)  Conversely, sometimes products containing the same AI are labeled for different uses, meaning it would be illegal to use one product in the same way as the other, and, thus, such products (despite having the same AI) are not substitutes for one another at all.  (Id.)  All of this unrebutted evidence reveals a fundamental truth: Farmers make purchasing decisions based on which products treat the pest they are targeting on the crops they are growing, and have many options of products to choose from when making those decisions.  Not surprisingly, both the FTC and DOJ previously have

6

defined relevant antitrust markets based on just that—what products treat specific pests on specific crops—tacitly rejecting the AI-only market approach taken by Plaintiffs here. (Infra Sections II.A.ii(1), II.A.iii.)

Plaintiffs' failure of proof on this issue is striking, especially when compared to the allegations in the Amended Complaint. Plaintiffs adduced no evidence from farmers at all. Plaintiffs did not subpoena farmers for documents; they did not depose any farmer; they conducted no surveys to determine farmer behavior or preferences; and they did not analyze industry-standard, third-party data on farmer purchasing behavior, except in response to Defendants' expert reports. Plaintiffs also have proffered no agronomic expert. Plaintiffs' only merits expert, Professor C. Scott Hemphill, disclaimed agronomic expertise, repeatedly disavowed offering agronomic opinions, and admitted he had no basis to challenge the opinions of Corteva's expert agronomist, Doctor Grey. (Hemphill Tr. (Ex. 9) at 314:17–315:1, 329:16–22, 331:22–332:4.) In short, Corteva's evidence, summarized below, stands unrebutted.

### (1) Pre-Emergence Herbicides for Corn.

Corn must be protected from grasses and other broadleaf weeds before those threats emerge. (Residual Herbicides (Ex. 95).) Farmers choose among many different crop protection products to do so. In particular, Group-15 herbicides (so-called because they share the same mode of action)—including acetochlor, s-metolachlor, metolachlor, and dimethenamid-P ("dimethenamid")—each inhibit the growth of grasses and broadleaf weeds in corn before they emerge. (Grey Report (Ex. 5) ¶ 59.) Products labeled for this use by the EPA include Surpass NXT (acetochlor), Dual II Magnum (s-metolachlor),

7

Acuron (s-metolachlor), and Outlook (dimethenamid). (See Surpass Label (Ex. 79); Dual II Magnum Label (Ex. 71); Acuron Label (Ex. 65); Outlook Label (Ex. 78).)

Contrary to Plaintiffs' allegation in the Amended Complaint, it is undisputed that each of those products, among others, have nearly identical attributes as Corteva's acetochlor products. (See Grey Report (Ex. 5) ¶¶ 61–62 tbl. 4.) Each is designed to act at germination; each activates with modest moisture; each is used for robust residual control of annual grasses and small-seeded broadleaf weeds on corn; each is effective for immediate control; and each has a strong activity level against weeds. (Id.) Plaintiffs have no basis to contest those facts. (Hemphill Tr. (Ex. 9) at 485:2–11.)

The FTC previously recognized and relied upon the interchangeability of those products in defining the relevant antitrust market for this industry, a recognition it inexplicably fails to consider in this case. Specifically, in 2000, the FTC investigated a proposed merger of AstraZeneca's and Novartis's agricultural businesses. (Decision and Order (Ex. 62) at 1.) After investigating the merger, the FTC concluded that, absent a divestiture, the merger would harm competition. (FTC Clears Merger (Ex. 93).) Critically, the FTC reached that conclusion because it determined AstraZeneca's acetochlor products competed closely with Novartis's metolachlor products in a "market for pre-emergence grass herbicides for use on corn". (AstraZeneca-Novartis Complaint (Ex. 61) ¶¶ 9–11.) It further found AstraZeneca's acetochlor products were the "second choice for most growers who use Novartis' metolachlor herbicides" and specifically identified dimethenamid products as another option in the market for pre-emergence grass herbicides for corn. (Id.)

8

The FTC relied on a finding that acetochlor products competitively discipline metolachlor products as its basis for ultimately approving the merger. (FTC Clears Merger (Ex. 93).) Specifically, the FTC concluded "[b]y requiring [the divestiture of acetochlor to Dow (now Corteva)], the Commission will ensure that competition is preserved for farmers who need these products", which, the FTC stated, would prevent the new company (Syngenta) from unilaterally raising metolachlor prices. (Id.) Thus, the only reason Syngenta exists in its current form, and the only reason Corteva has acetochlor products at all, is because the FTC determined that putting metolachlor products with Syngenta and acetochlor products with Corteva would preserve competition. This would make no sense unless metolachlor products compete in a relevant antitrust market with acetochlor products, which of course they do. (Id.)

To this day, metolachlor and dimethenamid products remain close substitutes for and compete closely against Corteva's acetochlor products, as Plaintiffs' expert has been forced to admit. (Hemphill Tr. (Ex. 9) at 412:3–12; see also Hemphill Reply Report (Ex. 7) ¶ 20) Farmer-level data collected by a third-party data collection service, Kynetec, confirm growers frequently switch to products containing metolachlor, s-metolachlor, and dimethenamid when they stop or materially reduce their usage of Corteva's acetochlor products. (See Hill Report (Ex. 4) ¶ 101 & fig. 18, ¶ 105 & fig. 19.)

Consistent with that data, Corteva's ordinary course business documents recognize its acetochlor products compete closely with products containing other AIs. An internal Corteva document titled "Corn Positioning" identifies ███████████████

█████████████████████████████████

9

as competitors of Corteva's acetochlor products Resicore and Kyro. (CRTVA-CPL-00995684 (Ex. 34) at 2.) ███████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████ (CRTVA-CPL-01063847 (Ex. 36) at slides 20–21.)

Contrary to Plaintiffs' suggestion that metolachlor and dimethenamid are competitors to acetochlor only in a "broad" sense, (see Hemphill Reply Report (Ex. 7) § 3.1.1), Corteva has found that ██████████████████████████████

██████████████. (CRTVA-CPL-01096235 (Ex. 38) at "Competitive Set" tab.) In a 2018 strategy document, Corteva details "areas of opportunity" with respect to its competitors, describing ██████████████████████████

███████████████████████████████████████████████████ (FTC-CTVA_00002698 (Ex. 52) at "Competitive Analysis" tab.)

Corteva explicitly calculates and assesses its market share relative to these products for business planning. For example, ████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████ (FTC-CTVA_00531831 (Ex. 57) at slide 8.)

Industry participants likewise recognize Group-15 (and other) AIs as competitive substitutes for acetochlor. ██████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

10

██████████████████  ███████████████████████████████████

██████████████████████████████████  And another manufacturer

testified "all the Group 15 herbicides are effective herbicides that compete and are

effectively used in corn". (Valent Tr. (Ex. 26) at 109:16–110:3.) A third-party presentation

about corn pre-herbicides observed ████████████████████████████

████████████████████████████████  and growers who have  ████████████████

████████████████████████████████████████████████████████████

███████████. (CRTVA-CPL-01151823 (Ex. 40) at slide 3).

Industry and academic sources also recognize products containing other AIs are

substitutes for acetochlor. For example, the 2020 Weed Control Guide for Ohio, Illinois,

and Indiana—which was compiled by multiple independent universities—identifies

metolachlor, dimethenamid, and other AIs as providing comparable weed control to

acetochlor on corn for several common weed types. (Herbicide Management Strategies

(Ex. 91) at 38–39.) A 2023 field study in New York found products containing acetochlor,

s-metolachlor, and dimethenamid provided 94–100 percent control of common

lambsquarters on field corn. (Herbicide Options (Ex. 97).)

> **(2)** **Herbicides for Grasses and Broadleaf Weeds on Specialty Crops.**

Farmers need to protect so-called specialty crops—including tree nuts, grapes, stone

fruits, citrus fruits, potatoes, and tomatoes—from both pre- and post-emergence grasses

and broadleaf weeds. (See, e.g., Pest Management Guidelines (Ex. 110).) Farmers choose

among many different crop protection products to do so. In particular, rimsulfuron,

11

oxyfluorfen, flumioxazin, and indaziflam are available to and used by farmers to treat those types of weeds on specialty crops.  (Grey Report (Ex. 5) ¶ 52.)  Products labeled for this purpose by the EPA include Matrix (rimsulfuron), Goal/GoalTender (oxyfluorfen), Alion (indaziflam), and Chateau (flumioxazin).  (<u>See</u> Matrix Label (Ex. 74); Goal Label (Ex. 72); GoalTender Label (Ex. 73); Alion Label (Ex. 66); Chateau Label (Ex. 70).)

Products containing these other AIs share a number of the same characteristics as Corteva's rimsulfuron product, Matrix.  For example, they are all easy to use; control a broad spectrum of weeds; are broadly usable across a variety of soil conditions; and many have comparably low use rates.  (Grey Report (Ex. 5) ¶ 57 & tbl. 3.)

Each of those products is a closer substitute for Matrix than other rimsulfuron-containing herbicides not labeled for specialty crops.  (Hemphill Tr. (Ex. 9) at 488:24–489:15.)  Farmer-level data shows farmers frequently substitute with products containing oxyfluorfen, flumioxazin, and indaziflam when they stop or materially reduce their usage of Matrix, more so than they substitute with generic alternatives to Matrix.  (Hill Report (Ex. 4) ¶ 141 & fig. 29.)

Consistent with that data, Corteva's business documents reflect that it views its Matrix rimsulfuron products as competing with products containing other AIs, █████████ ████████████████████████████████████████████████████████ █████████████████████  (FTC-CTVA_00504526 (Ex. 56) at -526–30.)  It describes these products as closer competitors to Matrix than generic alternatives.  A presentation titled "Product Portfolio Strategy" for Matrix ████████████████████ ████████████████████████████████████████████████████████



(FTC-CTVA_00371800 (Ex. 53) at slide 6.)

(CRTVA-CPL-01096235 (Ex. 38) at "Competitive Set" tab.)

(FTC-CTVA_00371800 (Ex. 53) at slide 6.)

(FTC-CTVA_00503568 (Ex. 55) at -578.)

(Id.)

Industry participants also recognize other AIs as competitive substitutes for rimsulfuron. A Valent representative testified Valent considers the prices of products containing rimsulfuron, indaziflam, isoxaben, oxyfluorfen, and penoxsulam when setting the price of its flumioxazin product. (Valent Tr. (Ex. 26) at 119:2–120:15.) And a BASF witness confirmed BASF tracks Matrix as a competitor to BASF's specialty herbicides in the western tree, nut, vine, and citrus segments, which are based on non-rimsulfuron AIs. (BASF Tr. (Ex. 27) at 217:11–218:9.)

Industry and academic sources similarly recognize products containing other AIs as suitable for the same applications in the same conditions as rimsulfuron. The University of California Cooperative Extension recommends treatments of Matrix, Chateau (flumioxazin), Pindar (penoxsulam and oxyfluorfen), and Alion (indaziflam) for pre-emergent and residual control of fleabane and marestail in orchards. (Weed Control Considerations (Ex. 94).) Similarly, two weed control trials found both rimsulfuron and a premix of penoxsulam and oxyfluorfen to provide 100 percent weed control of hairy fleabane in California almond orchards. (Season-Long Weed Control (Ex. 92) at 837–38.)

### (3)  <u>Nematicides on Potatoes</u>.

Potato growers must protect their crops from nematodes, a type of microscopic worm. (<u>See</u> Biosecurity Risks (Ex. 96).) Farmers choose among multiple nematicidal options to do so, including: oxamyl, metam sodium ("metam"), 1,3-dichloropropene ("dichloropropene"), fluopyram, ethoprop, and spirotetramat. EPA-labeled products for these uses include Vydate C-LV (oxamyl), Vapam (metam), Telone II (dichloropropene), Velum Prime (fluopyram), Mocap (ethoprop), and Movento (spirotetramat). (<u>See</u> Vydate Label (Ex. 83); Vapam Label (Ex. 81); Telone Label (Ex. 80); Velum Label (Ex. 82); Mocap Label (Ex. 75); Movento Label (Ex. 76).) Although oxamyl's single biggest use is as a potato nematicide, only twenty-one percent of potato growers use an oxamyl product. (Hill Report (Ex. 4) ¶ 165 & fig. 38)

Products containing these other AIs share a number of the same characteristics as Corteva's oxamyl product, Vydate C-LV. (Grey Report (Ex. 5) tbl. 6.) For example, metam

14

and dichloropropene all control broad spectra of nematodes at both the larval and adult life stages. (Id.)

The non-oxamyl products listed above are closer substitutes for Vydate C-LV, which is labeled for cotton and potatoes, than Vydate L (a different Corteva oxamyl product), which is labeled across a range of vegetable and specialty crops. (See Vydate C-LV Label (Ex. 83) at 1, 6; Vydate L Label (Ex. 84) at 1, 10–37.) Indeed, it would be illegal to use Vydate C-LV as a substitute for Vydate L due to their distinct approved uses, despite both products containing oxamyl. (Hemphill Report (Ex. 1) App. C ¶¶ 60, 63.) For that reason, Professor Hemphill conceded "[Vydate] L and [Vydate] C-LV aren't substitutes on their current labels at all, so certainly there are other products that are closer substitutes . . . [o]ther products with different AIs". (Hemphill Tr. (Ex. 9) at 491:4–15.)

Farmer-level data confirm that when treating nematodes on potatoes, farmers frequently use many different AIs in addition to oxamyl—most notably metam, dichloropropene, and fluopyram. (Hill Report (Ex. 4) ¶¶ 185–86 & fig. 45.)

The market consequences of a prolonged oxamyl supply disruption underscore this cross-AI substitutability. A catastrophic accident in 2014 at a Texas facility halted DuPont's domestic oxamyl production, and oxamyl sales declined sharply and did not recover to prior levels even after supply resumed in 2017. (Hemphill Report (Ex. 1) App. C ¶ 58; Hill Report (Ex. 4) ¶¶ 157–58 & fig. 32.) Contemporaneously, sales of non-oxamyl alternatives increased, reflecting durable switching by growers to other AIs for potato nematode control. (Hill Report (Ex. 4) ¶¶ 159–60 & fig. 33.)

15

Corteva's ordinary-course documents position Vydate alongside those alternatives. For example, a PowerPoint presentation titled "Nematicides" describes ███████ ████████████████████████████████████████████████████████ as "competitive products." (See CRTVA-CPL-01724079 (Ex. 46) at slide 31.) ████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ (See CRTVA-CPL-01096235 (Ex. 38) at "Competitive Set" tab; CRTVA-CPL-01096232 (Ex. 37) (stating objective of worksheet is to identify "like products or similar products, but should be those we are competing with for share").) A DuPont presentation lists ███████ ████████████████████████████████ as "major competitors" to Vydate to treat nematodes on potatoes. (CRTVA-CPL-01712399 (Ex. 45) at slide 30.)

███████████████████████████████████████████████████
████████ ██ ██████ ██ ██████ ████████ ██████ ██████████ ██
████████████████████████████████████████████████████
█████████████████████████████████ ████
████████████████

Industry and academic sources concur that fumigants and non-fumigants are used as alternative tools to manage nematode pests. A 2020 Pest Management Strategic Plan for potatoes in Oregon, Washington, and Idaho, published by Oregon State University, recognizes that both fumigants and non-fumigants can be used to control nematode pests on potatoes. (Pest Management Plan (Ex. 112) at 34.) An extension service provided by Washington State University supports an online "Potato Crop Protection Guide," most

16

recently updated in 2025, that identifies ethoprop, spirotetramat, dichloropropene, and oxamyl as available nematicides for potatoes. (Nematicides Guide (Ex. 100).)

### (4) Insecticides on Cotton.

Cotton growers looking to protect their crops from insects have multiple options to do so, including oxamyl, acephate, flonicamid, acetamiprid, and bifenthrin. EPA-labeled products for these uses include Vydate C-LV (oxamyl), Carbine (flonicamid), Orthene (acephate), Assail (acetamiprid), and Brigade (bifenthrin). (See Vydate Label (Ex. 83); Carbine Label (Ex. 69); Orthene Label (Ex. 77); Assail Label (Ex. 67); Brigade Label (Ex. 68).)

Products containing these AIs share a number of the same characteristics as Vydate C-LV. They are all fast-acting and control a broad spectrum of insects at both the larval and adult life stages. (Grey Report (Ex. 5) tbl. 5.)

Again, it is undisputed that products with diverse AIs would be a closer substitute for Vydate C-LV to treat insects on cotton than Vydate L. (See Hemphill Tr. (Ex. 9) at 490:17–491:11.) And, in fact, farmer-level data show when growers stop or materially reduce their usage of Vydate C-LV on cotton, they frequently switch to products with other AIs used for the same insect pests and timings, including acephate, flonicamid, acetamiprid, and bifenthrin. (Hill Report (Ex. 4) ¶¶ 192–93 & figs. 47 & 48.)

Consistent with that data, Corteva's business documents reflect that it views Vydate C-LV as competing with products containing other AIs. A PowerPoint presentation titled "Cotton Insecticides" describes ███████████████████████████████ ██████████████████████████████████████████ as insecticide options to

17

███████████████████████████████████████████.  (CRTVA-CPL-01112928 (Ex. 39) at slide 39.)   A DuPont presentation lists ████████████████████ ██████████████████████████ as "major competitors" to Vydate that can be used to treat insects on cotton.  (CRTVA-CPL-01712399 (Ex. 45) at slide 30.)

Industry participants likewise recognize non-oxamyl insecticides as competitive substitutes for oxamyl.  ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████  The corporate representative for Tenkoz likewise testified there is "a long list" of insecticides that compete with oxamyl, including acephate and imidacloprid.  (Tenkoz Tr. (Ex. 23) at 444:5–14.)

This testimony also aligns with the EPA's assessment that, in the event of heightened oxamyl regulations, "most growers currently relying on oxamyl as an insecticide would switch to one of many alternative pesticides. These alternatives can likely be used in a manner to achieve similar control to oxamyl; thus, yield effects are not anticipated and pest control costs are unlikely to increase." (EPA Memorandum (Ex. 90) at 2.)  The EPA further determined the most commonly used alternatives to oxamyl include "acephate . . ., dicrotophos, neonicotinoids (imidacloprid, thiamethoxam, and clothianidin), and numerous synthetic pyrethroids." (Id. at 13.)

### iii. Past DOJ Enforcement Activity Confirms Corteva's View of Market Definition.

Corteva Agriscience was formed in 2019, when DowDuPont spun off its agricultural division following their merger.  In its 2017 oversight of the DowDuPont merger, DOJ took

18

the same approach as the FTC in defining relevant antitrust markets for crop protection chemicals based on agronomic use. (See supra Section II.A.ii(1).) There, DOJ found direct competition between Dow's and DuPont's portfolios of broadleaf herbicides for winter wheat notwithstanding that they included different AIs. (Competitive Impact Statement (Ex. 63) at 2, 9.) DOJ concluded these portfolios, which included the AIs chlorsulfuron and metsulfuron-methyl on the one hand, and halauxifenmethyl and florasulammix on the other, "compete head-to-head for the development, manufacture, and sale of broadleaf herbicides for winter wheat." (Id. at 9.) They further found this competition "benefited farmers through lower prices, more effective solutions, and superior service." (Id.)

That finding is entirely consistent with the record here—farmer purchasing data, agronomic evidence, EPA labels, and industry documents—which all show substantial substitution across AIs within the same agronomic applications. Antitrust markets organized around pre-emergent grass and weed control on corn, grass and weed control on specialty crops, nematode control on potatoes, and insect control on cotton align with both DOJ's and the FTC's established enforcement principles in the crop protection industry and the competitive realities growers face.

**B. Crop Protection Product Manufacturing and Distribution.**

**i. Basic Manufacturers.**

"Basic manufacturers" research and develop innovative crop protection chemicals and products, and then invest in product stewardship, so as to bring those products to market and educate farmers on their proper and safe usage. (See, e.g., Pesticide Misconceptions (Ex. 86); Product Stewardship (Ex. 106).)

19

Basic manufacturers operating in the United States include Corteva, BASF, Bayer, FMC, Syngenta, and Valent.  (See, e.g., Hemphill Report (Ex. 1) ¶ 64; Valent Tr. (Ex. 26) at 16:11–17:4.)  Basic manufacturers such as Corteva provide a range of services in conjunction with their sale of crop protection products.  (See Product Stewardship (Ex. 106) ("[Corteva] provid[es] information for safe and responsible use of our products through training, education, and product literature, enabling success for our customers and building confidence with consumers."); Generic Pesticides (Ex. 87).)  Those services include (i) performance guarantee programs that insure farmers against product performance issues; (ii) formulation and delivery technologies that make field application easier or improve crop safety; (iii) support to distributors and retailers in their efforts to educate farmers about effective use of crop protection products; safety awareness training materials; and (iv) field support for farmers along with information, education, and best practice training programs.  (See, e.g., Gavin Brothers Tr. (Ex. 29) at 61:8–23 (testifying that he considers the recommendations from his Corteva and Syngenta representatives and values being able to talk to them about the usability of a product); CRTVA-CPL-01531449 (Ex. 41) at -455 (offering a "Respray Policy" to customers).)  The services that basic manufacturers like Corteva provide are valued throughout the supply chain.  (See Winfield Tr. (Ex. 25) at 43:4–44:4 ("Q. And why has WinField continued to participate in the Corteva loyalty program?  A. We see the value that both the Corteva organization, their R&D platform, their products, their dependable supply, product quality.  All those items that I just mentioned bring value to a farmer and a retailer.  And we think it's in the best

20

interest of those two parties, the retailer and the farmer, for us to support the Corteva AIs that we're talking about.").)

When a basic manufacturer develops a novel AI, it typically will obtain patent protection over the innovation.  (Hemphill Report (Ex. 1) ¶ 75.)  It must also register the product with the EPA, which requires submission of data regarding the potential toxicity and environmental impact of the AI, and entitles the manufacturer to a period of data exclusivity during which time other manufacturers cannot rely on the same data in securing approval of their own product.  (Id. at ¶ 76.)  Although generic manufacturers can submit their own data studies to support their registration, they nearly always opt to pay data compensation to the primary registrant, as demonstrated by the generic entrants to acetochlor, rimsulfuron, and oxamyl.  (See, e.g., Source Dynamics Tr. (Ex. 11) at 246:17–247:5 (testifying that Source Dynamics paid ███████ in data compensation to Corteva for reliance on oxamyl data, a "reasonable" amount for the small company).)

### ii.      Generic Manufacturers.

Once a pesticide's patent exclusivity expires, other manufacturers can market generic versions of that pesticide, provided they meet certain requirements, including the payment of data compensation fees that may be required under FIFRA.  (Hemphill Report (Ex. 1) ¶¶ 79–80.)  "A finished generic product incorporates technical AI that is typically sourced from manufacturers outside the United States," of which there is ample supply. (Id. at ¶ 243.)

There are a number of generic firms that specialize in the commercialization of generic crop protection products.  Many are large global companies with significant scale

21

and access to technical AIs, including the at-issue Corteva AIs, from a range of sources. Helm is a global chemical company headquartered in Germany with operations in over thirty countries; its crop protection business generates approximately 300 million euro in revenue annually. (See Press Release (Ex. 98); Helm Tr. (Ex. 14) at 36:18–25.) █████

██████████████████████████████████████████████

████████████████████████████████ (See Drexel (Ex. 107); █████████████

███████) Nufarm is a global generic pesticide producer that operates in over 100 countries, with three manufacturing facilities in the United States. (See NuFarm Worldwide (Ex. 89).) In 2024, NuFarm's crop protection revenue was $2.9 billion globally, with over $1.2 billion from North America. (See Nufarm FY24 Results (Ex. 111) at 14.) Albaugh operates in over eighty countries, with twelve manufacturing facilities worldwide. (See Albaugh Facilities (Ex. 101).) Its crop protection portfolio includes over fifty AIs, including each of the Corteva AIs at issue. (See Albaugh Listings (Ex. 102).) AMVAC is the largest operating subsidiary of American Vanguard Corporation, a publicly listed agrochemical company, and operates four manufacturing facilities across the U.S. in Alabama, California, Idaho, Oregon, and Missouri. (See About AMVAC (Ex. 103); Manufacturing (Ex. 104).) In 2024, AMVAC generated over $228 million in net crop protection sales in the U.S. alone. (See AMVAC 10-K (Ex. 99) at 22.)

Although generic products are based on the same AIs and formulations as their branded counterparts, they often are imperfect substitutes in terms of reliability, quality, and the level of stewardship that generics offer as compared to basic manufacturers. ██

██████████████████████████████████████████████

22

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Another distributor testified similarly, noting "the [basic] manufacturers historically have been a much more reliable supplier." (Growmark Tr. (Vol. II) (Ex. 21) at 82:11–18.)  Another explained there is "dependability of product supply, product quality, product support from Corteva" and other basic manufacturers, while generics can have "question marks from a product quality, as well as a product support perspective."  (Winfield Tr. (Ex. 25) at 61:2–15; <u>id.</u> at 374:3–375:3 (noting basic manufacturers are "more dependable supplier[s]" and have "better quality" products than generic suppliers); <u>see also</u> Van Diest Tr. (Ex. 12) at 43:14–44:5 (explaining that working with a basic manufacturer provides "peace of mind" compared to working with a generic manufacturer since there is an expectation that the basic manufacturer will provide assistance if there is an issue with its products).)

### iii.    Crop Protection Product Distribution.

"Typically, crop protection products are distributed through the so-called traditional channel:  manufacturers sell to distributors, which sell to retailers, which sell to growers." (Hemphill Report (Ex. 1) ¶ 85.)  There are five national distributors—Nutrien, Tenkoz (a buying group that acts collectively on behalf of twelve regional distributors), Winfield, Helena, and Simplot.  (<u>Id.</u> at ¶ 86.)  Those five distributors account for at most eighty-one percent of crop protection sales, though this number is likely overstated, and none individually account for more than twenty-five percent.  (<u>Id.</u> at n.51.)  The remaining sales

23

are made through regional distributors, cooperatives, and the so-called "alternative channel"—a mix of direct sales to independent retailers or growers, low-service brokers—and through online retailers such as the Farmers Business Network.  (Id. at ¶¶ 86, 94.)

### C. Crop Protection Loyalty Rebate Programs.

#### i. Loyalty Rebate Programs Are Common, Particularly in this Industry.

Loyalty programs are a common form of price-cutting used by firms in a range of industries.  (Hemphill Tr. (Ex. 9) at 363:2–14.)  "Loyalty discounts often take the form of so-called 'first-dollar' discounts, where the customer receives a price reduction on all units purchased if it meets the specified share requirement."  (Beyond Brooke Group (Ex. 105) at 2074.)  Loyalty discounts are typically procompetitive.  (Hemphill Tr. (Ex. 9) at 363:11–14.)

Loyalty rebate programs have long been a part of the crop protection landscape in the United States.  Six of the top seven basic manufacturers offer loyalty rebate programs with features strikingly similar to Corteva's.[1] ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████     █████████████████████████

Similarly, ██████████████████████████████████████

███████████████████████████████████████████████

---

[1] ██████████████████████████████████████████████
███████████████████████████████████

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ) ■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

Distributors view the loyalty programs of other basic manufacturers as similar to Corteva's. (See, e.g., Tenkoz Tr. (Ex. 23) at 448:23–450:21 (testifying that the basics manufacturers' loyalty programs have similar elements and are managed in the same way by Tenkoz); Growmark Tr. (Vol. II) (Ex. 21) at 106:25–108:21 (explaining that BASF and FMC loyalty programs are similar to Corteva's and are similarly managed by Growmark).)

As a general matter, basic manufacturers "are always competing for that acre where they have entries, even if it is a different active ingredient." (Wilbur Ellis Tr. (Ex. 15) at 222:21–223:9.) And the record is clear loyalty rebates are one way basic manufacturers compete with each other on price for distributors' business. ■■■■■■■■■■■■■■■■■■■ ■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■.) Distributors actively compare the loyalty programs manufacturers offer and make purchasing decisions based on the relative offers. (See, e.g., Winfield Tr. (Ex. 25) at 308:16–23; ■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■ )

### ii. Corteva's Loyalty Rebate Programs.

Corteva's loyalty rebate offering, which includes its CRPIVM program and its CDO program, is one among a number of incentive programs enable distributors to earn rebates on Corteva crop protection products. Others include pre-season business-plan incentives,

early-pay discounts, goal and target rewards, inventory protection, and grower- and retailer-focused programs. (See, e.g., Simplot Tr. (Ex. 18) at 339:18–340:1 (testifying that the CDO contains many types of rebates not linked to AI-based loyalty); Winfield Tr. (Ex. 25) at 131:16–21 ██████████████████████████████████████ ██████████████; Tenkoz Tr. (Ex. 23) at 466:17–467:9 (same); ████████████████ ████████████████; ████████████████████████████ Each of those initiatives is a mechanism for Corteva to compete on price.

The CRPIVM program is a share-based program under which participating distributors earn rebates by attaining specified "loyalty level" thresholds for defined AI groupings over the course of a program year. (See, e.g., CRTVA-CPL-02493007 (Ex. 48) ████████ CRPIVM Loyalty Program Agreement).) ████████████████████████ ███████████████████████████████████████ (Id.) ████████████



(See

26

CRTVA-CPL-01604319 (Ex. 43) at "Terminology" and "EU Definition" tabs). If the distributor meets the pre-determined loyalty level, then certain purchases will qualify for rebate payments.



The CDO is also entirely voluntary and non-exclusive. (See CRTVA-CPL-02496874 (Ex. 50) at -875, -881 2020–2021 CDO).)

(CRTVA-CPL-02493554 (Ex. 49) at -557, -562–65 2020–2021 CDO).)

Participation by a distributor in Corteva's loyalty program is entirely voluntary and based on contracts agreed to by the parties. (CRTVA-CPL-02493007 (Ex. 48)

The relevant contracts, once executed, do not obligate a distributor to make any purchases from Corteva. Rather, the contracts provide distributors with an option: If a distributor chooses to purchase enough of qualifying crop

protection products from Corteva in a given year, then the distributor will earn a rebate on qualifying purchases made that year.  (See, e.g., CHS Tr. (Ex. 30) at 111:8–23 ("I would say at times [that the program] has a target that you have to maximize to earn the rebate.  So there isn't something that you unilaterally have to go do per se.  So it is an option. . . . We don't have to participate and we don't have to maximize it."); Winfield Tr. (Ex. 25) at 40:6–18 (testifying that Corteva would "publish a list of AIs and brands" and Winfield would "receive rebate payments" if "overall sales" reach a "particular percent threshold").)

Only Corteva is bound to do anything by this arrangement—if the distributor achieves the loyalty threshold, then Corteva must pay the rebate; if the distributor does not achieve the loyalty threshold, it has no impact on the already-made sales and the distributor has no obligations to Corteva.  (██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ )

Thus, although Corteva's loyalty agreements are renewable on an annual basis, they are never binding on the distributor, only on Corteva.  If a distributor receives a better offer during the course of a year—or, for any other reason, chooses not to achieve a loyalty rebate that year—it is free to take its business elsewhere without penalty or other repercussion.  (████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ ; Simplot Tr. (Ex. 18) at 105:3–4 ("[W]e negotiate with Corteva every single year."); Winfield Tr. (Ex. 25) at 42:15–19 ("Q.  Has WinField ever considered not participating in the Corteva loyalty program? . . . A.  Probably most every year.").)

28

The loyalty program contracts are separate and distinct from a distributor's supply agreement with Corteva, which themselves have no volume commitments. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

Corteva's loyalty offerings are non-exclusive. (CRTVA-CPL-02493007 (Ex. 48) at -007 ███████████████████████████████████████████████████████

████████████████████████████████████████████████ see also, e.g., Growmark Tr. (Vol. II) (Ex. 21) at 105:17–21 (confirming Growmark's participation in Corteva's loyalty program does not require that Growmark purchase a certain amount of products from Corteva).)  Eligibility for rebates turns only on the purchasing benchmarks contained in the offer.  (See Winfield Tr. (Ex. 25) at 40:6–18 (affirming that Winfield receives rebate payments based on the percentage of sales of a particular AI).)

The vast majority of rebates earned by distributors are passed through to farmers in the form of lower retail prices.  According to regression analyses from the State Plaintiffs' own damages expert, Dr. Loren Smith, eighty-six percent of changes in manufacturer net prices, which include price reductions from loyalty rebates, are passed on to farmers in the retail prices they pay for Corteva crop protection products.  (See Smith Report (Ex. 2) ¶ 40; Smith Tr. (Ex. 10) at 55:2–58:6.)

Distributor testimony corroborates loyalty rebates are passed through to farmers. For example, ██████████████████████████████████████████

████████████████████████████ Winfield testified it incorporates anticipated rebates

29

into wholesale prices to retail, (Winfield Tr. (Ex. 25) at 41:18–22), and loyalty rebates "are a part of the actual net pricing of the product offering from the basic manufacturer," (id. at 313:4–6). ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ Wilbur-Ellis, which receives apportioned loyalty rebates as a Tenkoz member, explained "growers are benefitting from [Wilbur-Ellis's] low-cost position in rebate programs" because Wilbur-Ellis "price[s] at the lowest cost point, which includes the rebate calculations," and growers are "receiving portions of what [Wilbur-Ellis] would receive as rebates at the time of transaction." (Wilbur Ellis Tr. (Ex. 15) at 351:20–352:21.)

Thus, as multiple distributors testified, Corteva's loyalty programs are a mechanism by which Corteva competes on price, which ultimately benefits farmers, in the form of lower prices. (See Winfield Tr. (Ex. 25) at 41:5–15, 86:7–19; Wilbur Ellis Tr. (Ex. 15) at 351:20–352:21); ██████████████████████████████████████

Corteva's loyalty contracts are directed at more than one AI in a particular program. But the undisputed evidence shows the products linked in the program are complementary, treating different pests typically in the same region, and thus are likely to be purchased by the same farmers. There is no evidence any crop protection product linked in the program is one a rival (including a generic) could not produce and supply. Nothing prevents a rival from packaging together products with the same AIs that are included in each program and

offering a similar collection of products. (<u>See</u> Hemphill Tr. (Ex. 9) at 376:12–21, 377:6–378:1.)



(<u>See</u> CRTVA-CPL-00135647 (Ex. 32) at -651.)

(<u>See</u> <u>id.</u>)

There is no evidence that the linking of AIs or the timing of payments is why any distributor has chosen to achieve loyalty thresholds.

### iii. Distributor Participation (and Non-Participation) in Corteva's Loyalty Programs.

Distributors freely and voluntarily make the decision each year whether to participate in a loyalty program and/or achieve a loyalty rebate.

Representatives from ███ and Simplot testified their companies revisit the decision to participate in loyalty each year and negotiate the terms annually. (███████████████████████████████████████ ; Simplot Tr. (Ex. 18) at 104:25–105:4 ("[Simplot] negotiate[s] [the loyalty agreement] with Corteva

31

every single year.").) Distributors like ███ and Wilbur-Ellis also testified they consider a host of factors when considering whether to renew their loyalty agreements each year, including profitability of participation and whether other manufacturers are able to provide better offers, and will decline to participate if doing so would be better for their business. (██████████████████████; Wilbur Ellis Tr. (Ex. 15) at 235:9–14 (agreeing Wilbur-Ellis "sometimes . . . leaves the loyalty earnings on the table because another supply situation can be more lucrative").) Winfield further considers the profitability of participating in loyalty on an AI-by-AI basis. (See Winfield Tr. (Ex. 25) at 42:18–43:12.)

After this deliberation, distributors sometimes choose not to achieve loyalty rebates. For example, Simplot does not aim to meet loyalty on rimsulfuron or oxamyl, so it can sell its own private-label products freely. (Simplot Tr. (Ex. 18) at 103:13–17.) ███████ ████████████████████████████████████████████████████. (Hemphill Report (Ex. 1) at ¶ 142 & fig. 27.) ████████████████████ ████████████████████████████ (Id.) ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████. (Hemphill Tr. (Ex. 9) at 558:6–21; Hemphill Report (Ex. 1) at ¶ 142 & fig. 27 (showing distributor non-participation from year to year).)

Some distributors have chosen not to achieve loyalty thresholds specifically because they preferred to source crop protection products from generic manufacturers instead. (See, e.g., Growmark Tr. (Vol. II) (Ex. 21) at 42:2–10 (Growmark sourced generic rimsulfuron over Matrix due to difference in price); ████████████████████

32

████████████████████████████████████████████████

████████████████████████ .)

The only consequence of a distributor not achieving a loyalty threshold is that they will not receive the corresponding rebate. (See ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ )

There is no evidence, whatsoever, that Corteva ever has retaliated against a distributor for not achieving loyalty. Plaintiffs do not have a single example of Corteva cutting off supply, cancelling distribution contracts, withholding products during supply shortages, denying the distributor private label products, or threatening to do anything of the sort. As but one example to the contrary, Simplot has suffered no ill-consequences from announcing it will not participate in loyalty for rimsulfuron and oxamyl. Indeed,

████████████████████████████████████████████████

████████████████████████████████████████ (CRTVA-CPL-01052861 (Ex. 35) ("2022–2023 Insecticide Pact Loyalty Rewards: ████ ").) Internal documents also reflect that Corteva and ████████████████████████

████████████████████████████████████████████████

████████████████████████████████

Distributors further testified that their supply of Corteva products is <u>not</u> contingent on or threatened by whether or not they participate in Corteva's loyalty program. Winfield affirmed it could "purchase and sell Corteva products without participating in the loyalty program." (Winfield Tr. (Ex. 25) at 43:14–17.) ████████ Wilbur-Ellis, and Growmark's

representatives confirmed Corteva has never told their companies that they must participate in the loyalty program in order to have access to Corteva's products. (█████████ ██████████; Wilbur Ellis Tr. (Ex. 15) at 233:22–234:11; Growmark (Vol. II) Tr. (Ex. 21) at 106:14–18.)

Distributors also unanimously testified that Corteva has never threatened to cut off or limit supply. (See, e.g., Growmark Tr. (Vol. II) (Ex. 21) at 106:19–23 ("Q. Has anyone at Corteva ever threatened to terminate Growmark's authorized status as a distributor of its products if it stopped participating in the loyalty program? A. No."); Tenkoz Tr. (Ex. 23) at 464:24–465:2 ("Q. Has Corteva ever threatened to pull supply if Tenkoz did not meet [its] loyalty threshold? A. No."); ████████████████████ ███████████████████████████ ████████████████████████.)

The same is true of access to private labels. Not a single distributor testified that access to private label products is contingent on achieving loyalty thresholds. (See, e.g., Tenkoz Tr. (Ex. 23) at 464:17–22 ("Q. Does Corteva's ability to provide Tenkoz with acetochlor for its private-label products have anything to do with Tenkoz's performance under its loyalty program? A. No.").) Professor Hemphill could not identify any example where Corteva withheld private label products (or threatened to) from a non-participating distributor. (Hemphill Tr. (Ex. 9) at 564:17–22.)

Far from "punishing" "disloyal" distributors, Corteva routinely grants exceptions, paying loyalty rebates to distributors even when they do not meet the applicable loyalty threshold. For example, Corteva paid loyalty rebates to █████████ in ████, even though

it did not qualify for the rebates. ████████████████████████████ ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ )

Ultimately, every distributor testified that they choose to participate (or not participate) in Corteva's loyalty program based on the economic benefits the rebates themselves provide—i.e., lower prices—not out of fear of non-price retaliation or penalties. Many distributors like CHS, Growmark, Wilbur-Ellis, ██████ and Nutrien affirmed that they participate in the loyalty program to receive rebates, and that doing so is good for their bottom line. (See CHS Tr. (Ex. 30) at 111:17–112:5; Growmark (Vol. I) Tr. (Ex. 21) at 238:17–239:4; Wilbur Ellis Tr. (Ex. 15) at 220:10–222:20; ████████████████████ .) Winfield, ████████, Tenkoz, and ████ further testified that they use the rebate payments to lower sale prices and remain competitive in the marketplace. (See Winfield Tr. (Ex. 25) at 43:4–44:4; ██████████████████████████ ; Tenkoz Tr. (Ex. 23) at 83:15–84:3; ████ ████████████████ .)

### iv. Generic Sales of Products Containing the At-Issue AIs.

Each of the at-issue AIs has seen generic entry and expansion—with and without Corteva's loyalty programs in place. Plaintiffs' expert acknowledged there has been generic entry for all three Corteva AIs. (See Hemphill Tr. (Ex. 9) at 521:2–6.) Albaugh, for example, sells rimsulfuron, oxamyl, and acetochlor products in the traditional channel. (See Albaugh Tr. (Ex. 17) at 121:9–122:15.) Similarly, Source Dynamics offers twenty-four and forty-two percent oxamyl products that compete against Corteva's Vydate

35

products.  (See Source Dynamics Tr. (Ex. 11) at 32:7–33:8.)  Nufarm's representative testified that it competes in the specialty herbicide, insecticide, and nematicide markets both with products containing Corteva's AIs and other AIs.  (See Nufarm Tr. (Ex. 16) at 33:3–9, 201:10–23, 241:7–10, 257:3–24.)

The EPA first registered rimsulfuron in 1994, data exclusivity expired in 2004, and the compound patent expired on April 7, 2009.  (Hemphill Report (Ex. 1) at ¶ 78 fig. 5.) DuPont included rimsulfuron in its loyalty program in 2010, and DowDuPont later added rimsulfuron to the CRPIVM in 2017.  (Id. at App. C ¶ 47.)  Generic entry occurred nonetheless:  Adama and Cheminova registered and began selling straight rimsulfuron products in 2010 and 2011; there was additional generic entry by Rotam in 2016 and Nufarm in 2017.  (Id. ¶¶ 177, App. C ¶ 53.)

For some AIs, generic entry has occurred prior to Corteva's inclusion of the AI in its loyalty program.  Conversely, in some cases, there have been long periods when legal protection for an AI has expired, yet there was no meaningful generic entry, notwithstanding the lack of a loyalty program covering the AI.  For example, oxamyl was first registered with EPA in 1974, and its patent expired in 1989.  (Id. at fig. 5.)  There was no Corteva loyalty program for oxamyl until 2017.  (Id. at fig. 10.)  Yet, unencumbered by legal restrictions and without any Corteva loyalty program, generic manufacturers did not sell generic oxamyl products until 2017.  (Id. at fig. 7.)  Similarly, the EPA first registered acetochlor in 1994, and its EPA data exclusivity expired in 2004.  (Id. at fig. 5.)  There was no loyalty program for acetochlor until 2016, (id. at fig. 10),  yet the first generic acetochlor

36

product did not become available until 2018, with generic volumes increasing thereafter, even in the presence of a Corteva loyalty program, (id. at fig. 7).

## III.    QUESTIONS PRESENTED

A.    **Market Definition.**  Whether Plaintiffs' single-AI market definition fails as a matter of law where the undisputed evidence establishes that (i) products with different AIs compete closely with products containing the at-issue Corteva AIs; (ii) the FTC and DOJ previously relied upon cross-AI-competition to define relevant antitrust markets based on agronomic use; (iii) Plaintiffs' proffered market does not satisfy any of the Brown Shoe factors; and (iv) Corteva's ordinary course documents reflect that it competes in broader markets than the one Plaintiffs identify?

B.    **Price-Cost Test.**  Whether Plaintiffs' claims fail as a matter of law under the price-cost test where the undisputed evidence establishes that (i) distributors have no obligation to achieve annual loyalty thresholds and often choose not to; (ii) Corteva never imposed (or threatened) non-price penalties to induce any distributor to achieve loyalty thresholds; (iii) distributors pursued loyalty rebates solely to obtain rebates that would lower the price of Corteva products; and (iv) Corteva has not engaged in below cost pricing?

C.    **Rule of Reason.**  Whether Plaintiffs' claims fail as a matter of law under the rule of reason where the undisputed evidence establishes that Corteva's loyalty agreements (i) are non-exclusive; (ii) impose no purchase obligations on any distributor; (iii) are at most of one-year duration; (iv) are not enhanced by any extra-contractual penalties, threats, or enforcement; (v) result in lower prices to farmers; (vi) do not

substantially foreclose generic manufacturers; and (vi) have not raised prices, reduced output or stunted innovation?

D. **State Law Claims.** Whether State Plaintiffs' state antitrust law and consumer-protection claims fail as a matter of law where such claims are co-extensive with defective federal antitrust law claims and/or require independent proof of deceptive conduct, of which there is none in the undisputed record?

## IV. <u>LEGAL STANDARD</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>It's My Party, Inc. v. Live Nation, Inc.</u>, 811 F. 3d 676, 681 (4th Cir. 2016). To defeat summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . , [rather,] the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986) (emphasis and internal quotation marks omitted). "To successfully defeat a motion for summary judgment, a nonmoving party cannot rely on 'mere belief or conjecture, or the allegations and denials contained in his pleadings.'" <u>Addax Energy SA v. M/V Yasa H. Mulla</u>, 2018 WL 10470917, at *8 (E.D.Va. 2018). "The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." <u>Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.</u>, 57 F.3d 1317, 1323 (4th Cir. 1995).

Summary judgment is of "particular importance" in "antitrust law, because it helps to 'avoid[] wasteful trials and prevent[] lengthy litigation that may have a chilling effect on pro-competitive market forces.'" Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (alterations in original) (internal quotations omitted). "[B]ecause of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization." Thompson Everett, 57 F.3d at 1322. "[T]he very nature of antitrust litigation encourages summary disposition of such cases when permissible." Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 708 (4th Cir. 1991) (internal quotations omitted).

## V.    ARGUMENT

### A.    Summary Judgment Is Required Because No Reasonable Factfinder Could Find in Favor of Plaintiffs' "AI-Only" Antitrust Markets.

An antitrust plaintiff's threshold burden is to define the relevant market in which the challenged conduct is alleged to harm competition. "Plaintiff faces here the initial challenge of identifying exactly what market [the] defendant is accused of monopolizing." It's My Party, 811 F.3d at 681. "The FTC bears the burden of proving the product market's bounds." FTC v. Meta Platforms, Inc., No. 20-cv-3590, 2025 WL 3458822, at *19 (D.D.C. Dec. 2, 2025). The relevant market must reflect the "'commercial realities' faced by consumers," Kodak, 504 U.S. at 482, and must include all reasonably interchangeable products, United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). Plaintiffs' proffered markets do not satisfy their threshold burden.

Plaintiffs allege artificially narrow markets, gerrymandered to include only each at-issue AI.[2] Those purported markets are at odds with the FTC's (and DOJ's) prior stances on market definition in this industry. The FTC previously examined one of the products at issue here—acetochlor—and determined not only that it competes with products based on different AIs, but also that it was the "second choice for most growers who use" metolachlor products, placing it in a relevant antitrust market with that AI and at least one other. (Supra Section II.A.ii(1).) DOJ has taken a similar approach. (Id.; supra Section II.A.iii.) This Court previously observed that "each antitrust dispute" must be considered "on a case-by-case basis." Syngenta, 711 F. Supp. 3d at 569. True. But, with discovery complete, there simply is no basis for the FTC to apply an approach that is different from the one it took there. The appropriate market definition question remains the same: What products do farmers view as substitutes for treating particular pests on particular crops? For acetochlor, the evidence remains indisputable: Acetochlor competes with metolachlor (and other AIs) in a market for crop protection products used to treat pre-emergent broadleaf weeds on corn.

Plaintiffs' current markets exclude real-world substitutes for no good reason. None of the assumptions they rely upon, most coming from Professor Hemphill's highly flawed and incomplete analysis, creates a material issue of disputed fact. Because Plaintiffs'

---

[2] For each AI, Plaintiffs allege both a "component" market and a market based on finished products that contain the AI. However, Professor Hemphill acknowledged that the difference between the alleged component markets and the "finished product" markets is "a distinction ultimately without a difference," (Hemphill Tr. (Ex. 9) 72:8–17), meaning that, for each AI, they both rise or fall on the same arguments and evidence.

40

alleged markets are disconnected from "commercial reality," summary judgment should be granted in Corteva's favor. It's My Party, 811 F.3d at 680; Victus, Ltd. v. Collezione Europa U.S.A., Inc., 26 F. Supp. 2d 772, 786–87 (M.D.N.C. 1998); Berlyn, Inc. v. Gazette Newspapers, Inc., 223 F. Supp. 2d 718, 728–29 (D. Md. 2002), aff'd, 73 F. App'x 576 (4th Cir. 2003).

### i. Plaintiffs Have Failed to Proffer Evidence Supporting AI-Only Markets.

The relevant market is "the area of effective competition," or the "arena within which significant substitution in consumption or production occurs." Am. Express, 585 U.S. at 543. It "must include all reasonably interchangeable products." Syngenta, 711 F. Supp. 3d at 566 (citation omitted). There is "no more definite rule" than that the relevant market must comprise the products "reasonably interchangeable by consumers for the same purposes." See Int'l Wood Processors v. Power Dry, Inc., 792 F.2d 416, 430 (4th Cir. 1986) (quotations omitted). Products are "reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" PepsiCo v. Coca-Cola, 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted). The best evidence of substitutability is consumer behavior. See FTC v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 46 (D.D.C. 1998); see also Kodak, 504 U.S. at 472–73; Clark v. Flow Measurement, Inc., 948 F. Supp. 519, 527 (D.S.C., 1996). "[Farmer] substitution is the relevant inquiry" for defining markets here. (Hemphill Tr. (Ex. 9) at 403:3–8.)

In their pleadings, Plaintiffs recognized the need to support their markets with evidence of farmer preferences and behavior, and promised to do so by proving that the

Corteva AIs have "characteristics that make each AI unique in the marketplace, that alternatives are not considered by farmers as suitable, and that farmers prefer specific AIs." Syngenta, 711 F. Supp 3d at 569.

But Plaintiffs adduced no farmer-level evidence whatsoever in support of their markets—they did not interview, survey, depose, or subpoena a single farmer. Nor did Plaintiffs follow through on their promise to demonstrate the uniqueness of the Corteva AIs. Plaintiffs have no agronomic evidence and, remarkably, do not even proffer an expert witness qualified to opine on that topic. As a result, Plaintiffs have failed to carry their burden.

It is Plaintiffs' burden to prove a relevant product market. Because a relevant product market depends on consumer behavior and preferences, and Plaintiffs have no evidence that the Corteva AIs in fact have "characteristics that make each AI unique in the marketplace, that alternatives are not considered by farmers as suitable, [or] that farmers prefer specific AIs", that alone requires summary judgment in Corteva's favor. Syngenta, 711 F. Supp. 3d at 569.

### ii. Evidence of Farmer Preferences and Behavior Refutes Plaintiffs' Markets.

Despite Plaintiffs' evidentiary failings, the record includes farmer-level purchasing data—because Corteva introduced it. And there is expert agronomic testimony available to the Court—because Corteva has proffered an expert agronomist, Dr. Grey. That undisputed evidence shows the opposite of what Plaintiffs alleged in the Amended Complaint.

Corteva's AIs are not without substitutes; to the contrary, numerous products with different AIs treat the same pests on the same crops. Plaintiffs do not dispute, nor can they, that multiple AIs can serve the same crop protection purposes as acetochlor, rimsulfuron, and oxamyl. Notably, Plaintiffs have not even attempted to show that what farmers view as an economic substitute is anything different from what farmers view as a functional substitute. Because there is no evidence that there is a difference between functional substitutability and economic substitutability in the crop protection industry, that alone requires summary judgment in Corteva's favor.[3] Am. Express, 585 U.S. at 543–44 (holding that "the relevant market must correspond to the commercial realities of the industry" and "courts should combine different products or services into a single market when that combination reflects commercial realities") (citations and quotations omitted).

But Plaintiffs' failings do not stop there. Undisputed data show that farmers substitute away from the at-issue Corteva AIs to products with different AIs—in some cases more than they substitute between Corteva's products and their generic alternatives. There are many use cases where it is actually illegal to substitute between products containing the same AI. Thus, Plaintiffs' alleged markets are fundamentally flawed in that they simultaneously include more distant alternatives to Corteva's products (including some

---

[3] This standard does not require Plaintiffs to prove a negative, i.e., that these substitutes are not in the relevant market. Rather, Plaintiffs carry the burden of identifying the "area of effective competition," Am. Express, 585 U.S. at 543, which requires them to "include all reasonably interchangeable products". Syngenta, 711 F. Supp. 3d at 566.

43

products that legally cannot be substitutes at all), but <u>exclude</u> products that farmers actually use as closer substitutes.  Such markets cannot create a triable issue of fact:

**Acetochlor.**  Corteva's acetochlor products are primarily used to inhibit the growth of grasses and certain broadleaf weeds in corn before they emerge.  (<u>Supra</u> Section II.A.ii(1).)  Many other products—including other Group-15 herbicides like metolachlor and dimethenamid—do the same thing in virtually the same way.  (<u>Supra</u> Section II.A.ii(1).)

Farmer-level purchasing data demonstrates that growers in fact use those non-acetochlor products as "reasonably interchangeable" substitutes with acetochlor and switch between them.  <u>See</u> <u>Int'l Wood</u>, 792 F.2d at 430.  Growers frequently use products containing metolachlor and dimethenamid to combat pre-emergent growth of grasses and broadleaf weeds on corn.  (Hill Report (Ex. 4) ¶¶ 67, 71, 107.)  When growers who had been using Corteva's acetochlor products stop or materially reduce that usage, they switch far more frequently to branded and generic metolachlor products (nearly half of the time) than to generic acetochlor products (less than ten percent of the time).  (<u>Id.</u> at ¶¶ 101–06.)  Growers switch to dimethenamid about as frequently as they switch to generic acetochlor. (<u>Id.</u>)[4]

---

[4] Although this might seem counterintuitive, there is a well-known phenomenon of certain consumers preferring branded alternatives (which they trust) to generic versions of the same product (which they view as less trustworthy).  A common example is consumers who cannot find Tylenol often prefer to buy Advil rather than generic acetaminophen.  (<u>See</u> Hemphill Tr. (Ex. 9) at 581:5–20.)

Metolachlor products are the very products the FTC identified as close competitors to, and in the same relevant market as, acetochlor products. The FTC also previously concluded that acetochlor was the second best option for growers that use metolachlor. (<u>Supra</u> Section II.A.ii(1).) The grower-level data in this case shows that the FTC's prior conclusions remain valid—metolachlor and acetochlor remain each other's closest substitutes. When metolachlor and dimethenamid products are included in the market, Corteva's share drops below ██████████. (Hill Report (Ex. 4) ¶ 109.)

**<u>Rimsulfuron (Matrix)</u>.** Matrix, Corteva's rimsulfuron product labeled for specialty crops, is used (predominantly in California) on specialty crops such as tree nuts and grapes to treat a variety of grasses and broadleaf weeds. (<u>See</u> Matrix Label (Ex. 74) at 3; Hill Report (Ex. 4) ¶ 118 & fig. 22.) Many other AIs—including oxyfluorfen, flumioxazin, and indaziflam—are used in a similar way. (<u>Supra</u> Section II.A.ii(2); Grey Report (Ex. 5) ¶¶ 52, 57, tbl. 3; <u>see also</u> FTC-CTVA_00375940 (Ex. 54) at p. 18 ███████████ ████████████████████████████████████████████ ████████████████.)

The majority of growers who stopped or materially reduced using Matrix switched to Goal/GoalTender (oxyfluorfen), Alion (indaziflam), and Chateau (flumioxazin), rather than to generic versions of Matrix. (Hill Report (Ex. 4) ¶¶ 115, 141–46.) When just these products are included in the market, Corteva's market share drops below ████████ percent. (<u>Id.</u> at ¶ 149.)

**<u>Oxamyl</u>.** Corteva's oxamyl products (chiefly, Vydate C-LV and Vydate L) are most often used to treat nematodes on potatoes and insects on cotton. (<u>See</u> Oxamyl Facts

45

(Ex. 85))   Many other products—including flonicamid, acephate, acetamiprid, and bifenthrin—do the same thing in a similar way.  (<u>Supra</u> Sections II.A.ii(3)–II.A.ii(4).)

Grower-level data shows that growers who stop or materially reduce their usage of Corteva's oxamyl products rarely switch to generic oxamyl products.  (<u>See, e.g.</u>, Hill Report (Ex. 4) ¶¶ 155, 187.)  For example, cotton growers who were previous Corteva oxamyl customers switched to generic oxamyl only one percent of the time after stopping or materially reducing their Corteva oxamyl usage.  (<u>Id.</u> at ¶¶ 192–93.)  Instead, such growers predominantly switched to products containing other AIs, including flonicamid, acephate, acetamiprid, bifenthrin, novaluron, imidacloprid, thiamethoxam, and sulfoxaflor.  (<u>Id.</u>)  Potato growers also switched to products containing other AIs for treating nematodes, including Telone (dichloropropene), Metam, and Velum (fluopyram).  (<u>Id.</u> at ¶¶ 186, 189.)  When these products are included in the market, Corteva's market share drops to ▮▮▮ percent.  (<u>Id.</u> at ¶ 197.)

EPA labeling underscores the implausibility of Plaintiffs' proposed markets.  Vydate C-LV is labeled to treat nematodes on potatoes, whereas Vydate L is not; therefore, using Vydate L for that purpose would be unlawful.  (<u>See</u> <u>supra</u> II.A.ii(3).)  Thus, for potato nematode control, other nematicides such as metam or fluopyram are closer substitutes for Vydate C-LV than Vydate L is.  Nonetheless, Plaintiffs define a market that (i) includes all oxamyl products even though switching among them would be illegal; and (ii) excludes products with other active ingredients to which oxamyl users actually switch, merely because those products do not contain oxamyl.  (<u>See</u> Hemphill Tr. (Ex. 9) at 491:4–15

46

(conceding that Vydate L and Vydate C-LV are not substitutes for each other, even though both contain oxamyl, and there are products with other AIs that are better substitutes).)

Absurd markets like the ones Plaintiffs propose cannot create a triable issue of fact; "[n]o party can expect to gerrymander its way to an antitrust victory without due regard for market realities." It's My Party, 811 F.3d at 683; United States v. United States Sugar Corp., 73 F.4th 197, 205 (3d Cir. 2023) (rejecting "purely self-serving" market definition). In It's My Party, a Plaintiff defined the concert promotion market as including only "major amphitheaters" which "have a capacity of 8,000 or more, actually sell 8,000 or more tickets, and [are] in use only from May to September". 811 F.3d at 683. The Fourth Circuit rejected this definition as "gerrymandered", and "akin to defining a market to include tennis players who have won more than three Olympic gold medals and finding that only Venus and Serena Williams fit the bill." Id. Here, Plaintiffs' approach is equally flawed. Just as "[a]rtists who prefer amphitheaters may nonetheless turn to a lower-priced substitute", so too might growers using a product with one AI choose an alternative product with a different AI. Id. In fact, many do.

Because they have no grower-level evidence to put forward in support of their proposed markets, Plaintiffs, through Professor Hemphill, undoubtedly will try to undermine the third-party grower data. Those critiques have no merit. Criticizing Defendants' data is not the same as producing evidence to meet their burden. See Fed. R. Civ. P. 56(a). And, in all events, their critiques ring hollow:

First, Professor Hemphill relies on the same flawed reasoning that Judge Boasberg recently criticized in Meta, when rejecting Professor Hemphill's proposed market in that

47

case.  There, like here, Professor Hemphill argued data showing consumer switching had no bearing on the market definition analysis because of the so-called "Cellophane fallacy," which may occur when a product is already priced at supra-competitive levels, such that a further price increase will cause substitution to products that are in reality distant substitutes to the defendant's product.  Meta, 2025 WL 3458822, at *27; (Hemphill Report (Ex. 1) ¶¶ 128–29.)  This argument suffers from the same flaws here that Judge Boasberg identified in Meta.  By invoking the Cellophane fallacy, Professor Hemphill assumes Corteva has enough market power to sustain supra-competitive prices, before first defining the relevant market, Am. Express, 585 U.S. at 543 n.7 ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.").  But that assumption is based upon the premise that Corteva has enough market power to sustain supra-competitive prices, which depends on him first defining the relevant market, and the circularity continues.  As Judge Boasberg observed, that criticism puts the "cart before the horse" by assuming the answer to the very question market definition is supposed to address—i.e., whether there is a well-defined market in which the defendant has exercised monopoly power to harm competition.  Meta, 2025 WL 3458822, at *27.

Beyond its circularity, there are a number of other reasons to reject Professor Hemphill's Cellophane fallacy theory.  For one thing, the Cellophane fallacy cannot explain why the data show growers substituting more frequently to AIs outside the alleged market than to the generic AIs within it.  Cf. id. at *26 ("Start with the evidence that Cellophane does not threaten. It would not affect the order of substitution, which shows that the closest substitutes for Meta's apps are YouTube and TikTok.").  In addition, as already discussed,

48

the substitutes found in the data have virtually identical attributes as the at-issue Corteva AIs (see supra Sections II.A.ii(1)–II.A.ii(4)), and, therefore, are not the type of distant substitutes with which the <u>Cellophane</u> fallacy is concerned. <u>United States v. Eastman Kodak Co.</u>, 63 F.3d 95, 105 (2d Cir. 1995) (holding the <u>Cellophane</u> fallacy is implicated in "a comparison of two highly-differentiated products" and finding the fallacy did not apply where the substitute at issue was of "comparable quality" and an "excellent substitute").

Further, the <u>Cellophane</u> fallacy requires switching to occur when prices of the defendant's product are elevated to supra-competitive levels. But here, the switching data shows frequent switching to products outside Plaintiffs' alleged markets, ██████████

████████████████████████████████████████████████

███████████████████████████████████ (Hemphill Tr. (Ex. 9) at 444:10–22.).[5]

<u>Second</u>, in his report, Professor Hemphill speculated that growers may be switching to AIs outside of the alleged markets for reasons unrelated to economic substitution, such as for resistance management (<u>i.e.</u>, alternating between multiple AIs in case the targeted pests become resistant to one) or because they are using different products on different plots of land on the same farm. (Hemphill Reply Report (Ex. 7) ¶ 134.) But at his

---

[5] Relatedly, Professor Hemphill argues that the data suffers from a "suppression effect" bias, <u>i.e.</u>, that the loyalty programs have excluded generics such that consumers have no choice but to switch to more distant substitutes when they choose to switch. (Hemphill Reply Report (Ex. 7) ¶ 25.) That theory, too, improperly puts the cart before the horse—it assumes the loyalty programs cause anticompetitive exclusion in a relevant market before defining the relevant market. The theory also fails because it cannot explain why the data show more frequent switching to other AIs even during times when Professor Hemphill claims there were "meaningful" generic competitors. (<u>See</u> <u>id</u>. at ¶ 91.)

deposition, Professor Hemphill conceded he did nothing to investigate the reasons for the switching, and his alternative hypotheses are based entirely on rank speculation. (Hemphill Tr. (Ex. 9) at 463:3–464:9 (admitting he is "not sure" and "does not have a thought on" how "using the same products in the same year for the same crops" could be explained by "effective resistance management"); id. at 466:9–14 (admitting he does not know how the switching data "accounts for plot size" on a farm).) A party seeking to overcome a summary judgment motion cannot rely on mere conjecture. Addax Energy, 2018 WL 10470917, at *8. The switching data stands unrebutted and refutes Plaintiffs' claim the relevant markets can be properly limited to the at-issue AIs.

It is no mystery why Plaintiffs seek to ignore rather than embrace actual substitution data. As explained above, when just some of the data-identified substitutes are included in the market, Corteva's market shares drop to levels well below the threshold at which substantial market power is even plausible, much less inferable; and it makes claims of monopoly power unsustainable. By adding only the closest obvious substitutes, Corteva's market shares drop to ███ percent for acetochlor, ██████ percent for rimsulfuron, and ████ percent for oxamyl. (See Hill Report (Ex. 4) ¶ 109 & fig. 21 (acetochlor), ¶ 149 & fig. 31 (rimsulfuron), 197 & fig. 49 (oxamyl).) That is not even close to high enough to create a triable issue of fact as to market power. United States v. Int'l Harvester Co., 274 U.S. 693, 709–10 (1927) (finding a firm with sixty-four percent market share lacked monopoly power); United States v. Aluminum Co. of Am., 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.) (concluding "it is doubtful whether sixty or sixty-four percent [market share]

50

would be enough [for monopoly power]; and certainly thirty-three per cent is not"); <u>Meta</u>, 2025 WL 3458822, at *39 (summarizing market share holdings).

### iii. Plaintiffs Have Not Put Forward Any Other Material Evidence to Substantiate Their Alleged AI-Only Markets.

Plaintiffs' other market arguments fare no better. In denying Corteva's motion to dismiss on the issue of market definition, the Court credited Plaintiffs' allegations that (i) each AI-market satisfies <u>Brown Shoe</u> factors because each has "distinct characteristics and uses" and "industry or public recognition"; (ii) Corteva's "prices would fall significantly upon entry of a generic of the same AI", enough to show that each AI-only market passes the hypothetical monopolist test; and (iii) the scope of the loyalty programs shows that "[Corteva] view[s] the market as including only one AI but not others". <u>Syngenta</u>, 711 F. Supp. 3d at 569. Professor Hemphill relies on the same claims to support his proposed markets. (<u>See</u> Hemphill Report (Ex. 1) at § 3.2) But, again, Plaintiffs have no factual support for those allegations, leaving them far short of the evidentiary basis they need to survive summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

### (1) Plaintiffs cannot show their alleged markets satisfy any _Brown Shoe_ factor.

At the pleadings stage, Plaintiffs alleged their markets satisfy two of the seven <u>Brown Shoe</u> factors. The evidence shows they satisfy none.

Plaintiffs asserted the at-issue AIs have "distinct characteristics and uses" that are valued by growers. (Plaintiffs' Opposition at 54.) Plaintiffs have adduced no evidence in

51

support of that claim—not from any growers nor from any agronomist—and the undisputed evidence refutes it. (See generally supra Section II.A.ii.)

Plaintiffs also alleged each at-issue AI has industry or public recognition as a separate economic entity. But Plaintiffs adduced no evidence showing industry participants recognize any of the at-issue AIs as separate economic entities. Professor Hemphill acknowledged his reports do not offer any separate analysis of this factor. (Hemphill Tr. (Ex. 9) at 432:15–23.) The only evidence in the record—summarized supra Sections II.A.ii(1)–II.A.ii(4)—establishes academic and industry participants view each Corteva AI as simply one option among many to combat particular pests on particular crops.

As to the remaining Brown Shoe factors, Plaintiffs do not even claim to meet any, nor is there evidence demonstrating the alleged markets satisfy them. For his part, Professor Hemphill agreed "nowhere in any of [his] reports" does he "list the Brown Shoe factors and then apply the evidence in this case to" them. (Hemphill Tr. (Ex. 9) at 431:8–432:14.) Nor could he. There are no distinct customers or specialized vendors for the at-issue Corteva AIs; the relevant customers—whether it be distributors or farmers—purchase a wide range of products containing other AIs, not merely those at issue; and the at-issue AIs have not been shown to be especially sensitive to price changes. Plaintiffs have not come close to satisfying Brown Shoe's requirements.

> **(2)** **The evidence does not support Plaintiffs' attempt to demonstrate their markets through the hypothetical monopolist test.**

Plaintiffs alleged their proposed markets are supported by the hypothetical monopolist test ("HMT"), which asks whether a hypothetical monopolist of candidate

52

products could impose a small but significant price increase ("SSNIP") on those products without losing so many sales to alternative products to render the price increase unprofitable. See Syngenta, 711 F. Supp. 3d at 587. Equally important, an HMT is no more reliable than the data underpinning it. Without due consideration of those "commercial realities," the test is an exercise in arbitrariness. See, e.g., FTC v. Thomas Jefferson Univ., 505 F. Supp. 3d 522, 553 (E.D. Pa. 2020) (rejecting FTC's use of HMT when econometrics underpinning use did not align with "commercial realities"); Meta, 2025 WL 3458822, at *39 ("[W]hether a hypothetical monopolist could profitably raise prices—and therefore where the product market's borders lie—depends on which alternatives consumers would turn to and how readily they would do so.").

Here, Plaintiffs' supposed "HMTs" for each market are based on incomplete and faulty data, rendering them unreliable and an insufficient basis to survive summary judgment. Through Professor Hemphill, Plaintiffs claim to demonstrate the alleged markets pass the HMT based on his analyses of the supposed effects of generic entry on rimsulfuron and oxamyl prices, and in the case of acetochlor, the price effects of a supply shock. But Professor Hemphill's analyses are rife with unfounded assumptions and errors. Most notably, he fails to account for confounding factors that could have impacted the price trends he identifies. Professor Hemphill does not even attempt to perform any regression that might isolate the cause of any of the alleged price effects. That failure is not a mere evidentiary dispute to be decided at trial. Because a price increase must be "significant" to satisfy the HMT, Professor Hemphill's admitted inability to show how much of the observed price effects are due to generic competition (or supply shocks), as opposed to

53

other confounding factors, is conclusively fatal to Plaintiffs' attempt to demonstrate their markets based on a supposed HMT.  BanxCorp v. Bankrate, Inc., 847 F. App'x 116, 120–21 (3d Cir. 2021) (holding that an increase or decrease in a product's price subsequent to the entry of another product in the market "cannot establish cross-elasticity of demand" if the "evidence lacks necessary information about the prices of potentially substitutable products and the demand for such products.") (quotation omitted); Sandoz, Inc. v. United Therapeutics, Corp., No. 3:19-cv-10170, 2020 WL 697137, at *10 (D.N.J. Feb. 4, 2020) (rejecting evidence of price correlation because it lacked "further context").

Professor Hemphill's HMTs also are arbitrary.  For example, were one to apply his approach to a hypothetical market containing branded acetochlor and metolachlor, but not generic acetochlor, it would pass the HMT.  (Hill Supplemental Disclosure (Ex. 3) fig. 5.) According to Professor Hemphill, one should "stop there", meaning that one should conclude the relevant market in which branded acetochlor competes should not include generic acetochlor.  That is, of course, absurd—everyone agrees branded crop protection products compete to some degree with their generic alternatives.  But that conclusion would be the logical consequence of Professor Hemphill's approach—thus, under Professor Hemphill's approach, the market you find depends entirely upon what question you ask first.  But other courts have been rightly skeptical of such approaches to market definition, rejecting proposed markets that "coincidentally fit plaintiff's precise circumstances" and claims.  It's My Party, 811 F.3d at 683.

There are many other fatal flaws in his approach:

54

**Acetochlor.** Plaintiffs previously claimed that their alleged markets would satisfy the HMT based on evidence showing Corteva's prices for the at-issue AIs fell significantly upon entry of a generic version of the same AI. (Plaintiffs' Opposition at 42.) However, that theory has been disproven. It is undisputed that at least three generic acetochlor competitors entered the market between 2018 and 2021, yet Professor Hemphill finds, contrary to Plaintiffs' allegation, that "a price decrease by the brand is not observed." (Hemphill Report (Ex. 1) ¶ 162.) Under Plaintiffs' own logic—where market definition depends on price movement upon generic entry—Plaintiffs' acetochlor-only market fails. [6]

Unable to substantiate the theory Plaintiffs set forth in the Amended Complaint, Professor Hemphill attempts to pivot, arguing the HMT is satisfied by evidence that the prices of acetochlor products increased during a period of supply constraint, purportedly without a corresponding increase in the price of products containing metolachlor. (See Hemphill Report (Ex. 1) § 3.2.5.) However, Professor Hemphill admitted he did nothing to investigate whether his price analysis was impacted by confounding factors (such as industry-wide supply shocks); whether other AIs saw similar price increases around the same time; whether the price of acetochlor increased by an amount equivalent to a SSNIP; whether another AI that is included in the premixes he examined (atrazine) may have driven some or most or all of the price increases he observed; or even whether the price increase

---

[6] Professor Hemphill theorizes that this lack of a price decrease shows the particular effectiveness of the loyalty programs as to acetochlor. (Hemphill Report (Ex. 1) ¶¶ 162 & n.158, 197.) The theory is entirely incoherent. Acetochlor is the only alleged market in which, according to Professor Hemphill and Plaintiffs, Corteva lacks monopoly power, yet somehow it is also the only alleged market in which Corteva's purported market power is substantial enough to entirely block the price effects of generic entry. That is nonsensical.

55

was profitable. (Hemphill Tr. (Ex. 9) at 510:24–511:4, 391:23–392:4, 406:11–15, 429:25–430:18.) Professor Hemphill did nothing to show the analysis suggested anything about a supposed acetochlor-only market. On top of those fatal flaws, his analysis is woefully incomplete because it excludes nearly seventy percent of acetochlor products and nearly ninety percent of metolachlor products. When the analysis is expanded to include all such products, the prices of acetochlor and metolachlor—the two products the FTC previously recognized as each other's closest substitutes—are far more closely aligned during the time frame in question. (See Hill Report (Ex. 4) ¶¶ 86–89.)

**Rimsulfuron.** Professor Hemphill's analysis of rimsulfuron prices fares no better. For one thing, it is undisputed generic rimsulfuron entered the market as early as 2011, but Professor Hemphill does not observe a price decrease for Matrix until ▮▮▮. (Hemphill Report (Ex. 1) ¶ 180.) He claims that is because "meaningful" entry did not occur until ▮▮▮; but he never explains why this entry was meaningful but the earlier entry was not. Even if one accepts Professor Hemphill's say-so that only the ▮▮▮ entry counts, Professor Hemphill's own calculated Matrix prices did not fall "upon" such "meaningful" entry, but rather stayed the same or went up over the next three years. (See Hemphill Report (Ex. 1) fig. 14; Hemphill Tr. (Ex. 9) at 448:19–449:21.) Thus, here, too, Plaintiffs failed to deliver on their promise to demonstrate "that [Corteva's] prices would fall significantly upon entry of a generic of the same AI." Syngenta, 711 F. Supp. 3d at 569.

When Matrix's prices did fall—three years after generic entry—it coincided with a steep drop in demand for almonds, the primary crop Matrix treats, and thus a drop in demand for Matrix. Professor Hemphill once again did no econometric work whatsoever

to try to isolate the purported impact of generic entry (three years earlier) versus other confounding factors such as lower almond demand (at the time of the price decrease). Because he did not do that work, he cannot say what amount of the observed price effect (if any) is due to generic entry (three years earlier) versus other factors, such as depressed almond demand. At his deposition, Professor Hemphill noted no expert did such an analysis,[7] but pointing to what other experts did not do does not help the party with the burden of proof.

Professor Hemphill claims to find support in Corteva documents noting generic entry as a factor in the decrease of Matrix's prices in that time frame. However, the question is not whether generic entry contributed to Matrix price decreases. Instead, the relevant question is whether generic entry accounted for enough of the price decrease for it to meaningfully support a HMT. The documents indisputably do not answer that question. Moreover, other Corteva documents, which Professor Hemphill simply ignores, show almond prices <u>also</u> impacted Matrix's prices, underscoring the multiplicity of factors that may have affected Matrix's prices in that time frame. (<u>See, e.g.</u>, CRTVA-CPL-00654723 (Ex. 33) ███████████████████████████████████████████████████████████████████████████████████████ Given that undisputed evidence, it was incumbent upon Professor Hemphill to untangle the effects and show that the magnitude of the price impact

---

[7] <u>See</u> Hemphill Tr. (Ex. 9) at 494:17–23 ("Q. And you, in fact, did not do an analysis as to the change in almond prices and its impact on rimsulfuron price, correct? A. I don't believe any expert in this matter has done an analysis of the kinds that you're describing.")

caused by generic entry satisfied the HMT.  His admitted failure to do so renders Plaintiffs' empirical analysis of Matrix prices no better than surmise and insufficient as a matter of law to support Plaintiffs' alleged rimsulfuron market.  See Meta, 2025 WL 3458822, at *35 ("Hemphill, who put forward this theory, admitted that he could not measure whether users faced significant price differences."); FTC v. Tempur Sealy Int'l, Inc., 768 F. Supp. 3d 787, 828 (S.D. Tex. 2025) (finding "the suggested findings by the FTC derived from its HMT have been considered and found unpersuasive, given that the model's parameters and inputs appear designed to produce the outcome sought, without accord to market realities", and that [i]nstead, those realities are better addressed according to the Brown Shoe indicia"); Thomas Jefferson Univ., 505 F. Supp. 3d at 553 (rejecting FTC's use of HMT when econometrics underpinning use did not align with "commercial realities"); In re Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012) (excluding the plaintiff's expert's market definition because expert "did not reliably apply the SSNIP methodology to the facts of this case").

**Oxamyl.**  Professor Hemphill relies on data showing Rotam's generic oxamyl product decreased in price and volume after Corteva re-entered the market and that Corteva eventually decreased its price as well.  (Hemphill Report (Ex. 1) ¶¶ 190–91 figs. 15 & 16.) Yet, undisputed evidence shows products based on other AIs saw increasing sales over the same period, indicating farmers were switching from oxamyl to alternative products based on different AIs.  (See Hill Report (Ex. 4) ¶¶ 181–84.) Additionally, ReTurn's market share was decreasing steadily before Corteva's entry, which suggests market forces other than Corteva contributed to ReTurn's decline.  Instead of investigating that switching and

58

attempting to explain how it reconciles with his claim of a narrow oxamyl-only market, Professor Hemphill again keeps his blinders on, performing no regression or other analysis that could attempt to isolate the effects of confounding factors.  That is not a reliable HMT.

### (3) The evidence does not support Plaintiffs' claim that Corteva views the market as being limited to each at-issue AI.

Finally, the evidence does not support Plaintiffs' claim that Corteva itself recognizes the market as being limited to each at-issue AI.  Plaintiffs and Professor Hemphill principally rely on the scope of the loyalty program for this contention, arguing that it shows Corteva views generic products as uniquely competitive threats.  (See Hemphill Report (Ex. 1) § 3.2.1.)  The Court previously credited this allegation as plausible. Syngenta, 711 F. Supp. 3d at 569.

Plaintiffs again come up short.  As an initial matter, not all of Corteva's loyalty programs are based on a single AI.



(Winfield Tr. (Ex. 25) at 340:5–11.)  This rebate is paid on Corteva's

. (CRTVA-CPL-01865982 (Ex. 47) at -984, -993; CRTVA-CPL-01669623 (Ex. 44) (listing products for

).  So, it is not the case that Corteva's share-based rebate programs are always based on a specific AI.

More broadly, as that example shows and as Professor Hemphill acknowledged, "a supplier might consider a number of factors when designing a loyalty program for a product or group of products." (Hemphill Tr. (Ex. 9) at 378:17–24.) And "the mere fact that a supplier designs a loyalty program to target a particular set of products", "all by itself, . . . does not automatically deliver the conclusion that [the targeted products are] the closest competitors." (Id. at 380.) In turn, "that mere fact, by itself, doesn't mean that those products together comprise a relevant market." (Id.) As Professor Hemphill testified, "[t]here are plenty of examples" where the existence and design of a loyalty program says nothing at all about the relevant market. (Id.) Given those realities, it was incumbent on Plaintiffs to put forward evidence demonstrating the design of Corteva's loyalty program here is a reflection of a relevant market limited to generic alternatives of the at-issue AIs. That evidence does not exist in this record.

As discussed above, and as this Court has held, the market inquiry appropriately turns on an analysis of demand—and, in particular, "the cross-elasticity of demand for the product and its alternatives". Syngenta, 711 F. Supp. 3d at 566. How Corteva designs its loyalty programs as a supplier—which could be based on any number of factors—does not meaningfully assist in that analysis.

This is particularly true because numerous Corteva normal course business documents identify products based on different AIs as robust competitive threats to the at-issue AIs. (See supra Section II.A.ii) (citing and summarizing such documents).) According to Professor Hemphill, in the normal course of business, "firms are responding and strategizing around their understanding of consumer substitution," such that their

internal documents reflect "informed observers with profits on the line reacting to competitive constraints that are built up from consumer substitution." (Hemphill Tr. (Ex. 9) at 469:6–14.) Those admissions are fatal to Plaintiffs' proposed AI-only markets because, on the one hand, numerous Corteva business documents identify products with different AIs as competitive threats, whereas, on the other hand, <u>no</u> Corteva document suggests Corteva competes <u>only</u> with generics versions of its AIs. Thus, under Plaintiffs' own logic, summary judgment should be granted. <u>See, e.g.</u>, <u>Mylan Pharm., Inc. v. Warner Chilcott Public Ltd. Co.</u>, No. 12–cv–3824, 2015 WL 1736957 (E.D.Pa. 2015), at *9 ("Years of internal marketing documents further confirm tetracyclines are reasonable substitutes for one another."); <u>Meta</u>, 2025 WL 3458822, at *32 ("Because market definition depends on competition, courts . . . pay particular attention to which products and companies a firm considers its competitors.").

There simply is no evidence Corteva designs its loyalty program as it does because it views its AI-based products as competing in a market comprised <u>only</u> of generic alternatives. To be sure, Corteva's products do compete with their generic equivalents— and the loyalty program does exist as a mechanism for Corteva to compete on price against all alternatives, including generics—but, as the undisputed data and Corteva documents make plain, Corteva products also compete closely with products based on different AIs. Those must be in the market. <u>See</u> <u>Golden Boy Promotions LLC v. Haymon</u>, No. 15-cv-3378, 2017 WL 460736, at *10 (C.D. Cal. Jan. 26, 2017) (granting summary judgment for the defendants where the plaintiff's expert "fail[ed] to encompass all economic substitutes of the product"); <u>Consul, Ltd. v. Transco Energy Co.</u>, 805 F.2d 490, 495 (4th Cir. 1986)

61

(warning that the exclusion of competitive substitutes can result in a market being drawn "too tightly" and can create an "illusion of market power where none may exist").

## B. Plaintiffs' Claims Are Subject to—and Fail Under—the Price-Cost Test.

Plaintiffs avoided the price-cost test at the pleadings stage by promising to adduce evidence showing the threat of non-price penalties was the predominant reason why distributors earn loyalty rebates from Corteva, and, in turn, is why generics are purportedly excluded from the alleged markets. But Plaintiffs have adduced none of the evidence they promised—there is no evidence Corteva ever has withheld supply from distributors who do not comply with loyalty; that Corteva favored loyal distributors in times of short supply (or that short supply allocation is something that happens regularly enough to impact sourcing decisions); that Corteva withheld private label products from disloyal distributors; or that Corteva threatened any of these things.

When asked in discovery to disclose any specific example of any of those things happening, Plaintiffs responded with a single example, Gar Bennett, a small regional distributor in California. (Email from M. Turner to C. Gianotti (Ex. 64).) Plaintiffs did not even seek to depose Gar Bennett during discovery, thus failing to substantiate their only specific example. And the documentary evidence cited by Plaintiffs shows Gar Bennett ███████████████████████████████████████████████████ ████████████████ (Hemphill Tr. (Ex. 9) at 555:1–7.)

The undisputed evidence shows that distributors seek to achieve loyalty thresholds—or not—based entirely upon the price reductions the rebates provide. To be

clear, no distributor has any obligation to achieve loyalty during any year—and, during many years, many distributors have chosen not to. As a result, the loyalty programs are not <u>de</u> <u>facto</u> exclusive dealing arrangements. (<u>See</u> <u>infra</u> Section V.C.) However, <u>even assuming the loyalty programs somehow operate as de facto exclusive dealing arrangements</u>, the only mechanism enticing distributors to purchase sufficient Corteva products to achieve loyalty is the lower prices (via rebates) they can obtain by doing so. As a result, the price-cost test applies, and summary judgment must be granted in Corteva's favor.

### i.      Principles of the Price-Cost Test.

Whether the price-cost test applies to a loyalty program like Corteva's turns on whether price or non-price mechanisms are shown to be the predominant reason why rivals are purportedly excluded from the market. <u>See</u> <u>ZF Meritor, LLC v. Eaton Corp.</u>, 696 F.3d 254, 275 (3d Cir. 2012). The price-cost test applies "where a pricing practice itself operates as the exclusionary tool, regardless of how the plaintiff styles its allegations." <u>Syngenta</u>, 711 F. Supp. 3d at 571–72. By contrast, the full "rule of reason" applies "where there are mechanisms beyond price-cutting that exclude competition by imposing unilateral costs on competitors." <u>Id.</u> "[L]oyalty discount arrangements may be pure (or nearly pure) pricing schema, and in such situations, the price-cost test applies neatly." <u>Id.</u> at 574. Even where some minor non-price mechanism is at play, the price-cost test still applies "when price is the clearly predominant mechanism of exclusion." <u>ZF Meritor</u>, 696 F.3d at 275.

"[W]here the price-cost test is applied, alleged conduct may only be illegal if the price is set below the cost." <u>Syngenta</u>, 711 F. Supp. 3d at 570. That standard reflects a

core principle of the antitrust laws, repeatedly affirmed by the Supreme Court, that "[l]ow prices that are still above-cost are generally procompetitive because 'the exclusionary effect of prices above a relevant measure of cost generally reflects the lower cost structure of the alleged predator, and so represents competition on the merits.'" Id. (quoting Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223 (1993)). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." Id. (quoting Brooke Group, 509 U.S. at 223.)

Many courts have recognized that price rebates "exemplif[y] vigorous price competition," which should be "strenuously protect[ed]" from antitrust attack, absent evidence they cross the line into the rare case of predatory below-cost pricing. In re EpiPen Mktg., Sales Pracs. & Antitrust Litig., 44 F.4th 959, 1000 (10th Cir. 2022); see also NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir. 2007) (en banc); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1061 (8th Cir. 2000).

The logic of those opinions is straightforward. The goal of antitrust law is to protect competition (not competitors), with the ultimate aim being lower prices for consumers, which are brought about by vigorous efforts by suppliers to increase their own sales by lowering their prices. If a competitor is "excluded"—meaning unable to make sales—because it is unable to match a lower price offered by its rivals, then, although the competitor has been harmed, competition has not. Rather, competition has done its job: The victorious rival has lowered its price (to the benefit of consumers) as the mechanism to win the sales. That is the outcome antitrust law protects and encourages. The only

64

exception is if a rival temporarily lowers its prices to below its costs with the goal of eliminating rivals so that it can then raise its prices above competitive levels once the rivals are gone. That is why predatory pricing cases require a showing of <u>both</u> below-cost pricing <u>and</u> evidence that the predator can recoup its losses in the future. <u>Brooke Grp.</u>, 509 U.S. at 222–24.

There is no evidence of anything like that happening here. Corteva has been forced to lower its prices—via loyalty rebates—as the mechanism to win sales from branded and generic manufacturers. Corteva is not alleged to have lowered its prices below its costs. Thus, competition has done its job: Corteva has been forced to lower its prices (to the benefit of farmers) to win the sales it has made. To be sure, generic manufacturers would prefer <u>not</u> to face price competition from Corteva—and that is why they would prefer to see the loyalty program enjoined—but protecting generic manufacturer profits at the expense of lower prices to farmers would be antithetical to the purposes and goals of antitrust law.

### ii. Undisputed Evidence Shows That Price is the Predominant Mechanism of the Alleged Exclusion.

The undisputed record shows that distributors participate in Corteva's loyalty program only to receive the lower costs the rebates provide. Those rebates are the sort of robust price competition that the Supreme Court and courts across the country have recognized should be protected from antitrust attack.

65

**(1)    <u>There is no evidence that distributors achieve loyalty thresholds for any non-price reason.</u>**

The Court declined to apply the price-cost test on Corteva's motion to dismiss because Plaintiffs promised evidence showing that Corteva used a range of non-price threats and penalties to coerce distributors into "complying" with its loyalty programs. <u>Syngenta</u>, 711 F. Supp. 3d at 576. Specifically, Plaintiffs alleged that the evidence would demonstrate "that [Corteva has] threatened to retaliate against disloyal distributors by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage", and that Corteva "followed through on [those] threats by refusing to sell pesticides or limiting sales of an insecticide" to some distributors. <u>Id.</u> (internal quotations and citations omitted).[8]

Plaintiffs relied on such allegations to argue that Corteva's loyalty offers should not be considered short term, despite their one-year renewal terms and lack of any binding obligation on distributors, which the Court otherwise found would count in favor of Corteva on its motion. <u>Id.</u> at 579. Because of Plaintiffs' alleged threats and penalties, the Court concluded that Plaintiffs had sufficiently pleaded "that [Corteva's] threats to restrict supply are effective deterrence against non-compliance" that "factors into distributors' purchasing" decision. <u>Id.</u> at 577.

The evidence on this issue has not turned out as Plaintiffs promised it would.

---

[8] Plaintiffs do not allege, nor could they, that there is a horizontal agreement among distributors to all participate in Corteva's loyalty program. (Hemphill Report (Ex. 1) ¶ 256 ("The agreements at issue in this matter are 'vertical' agreements between defendant manufacturers and their distributors.").)

As an initial matter, there are numerous examples of distributors choosing not to achieve loyalty thresholds in some years. (See supra Section II.C.iii.) There is no evidence that any of those distributors suffered any negative repercussions from those decisions. They simply did not earn the rebates that otherwise would have been available to them— which is purely a pricing issue.

In addition, undisputed evidence establishes that, when distributors have chosen to earn loyalty rebates, they did so only to obtain the lower prices the rebates provide. Every distributor that was asked about its reasons for participating in Corteva's loyalty program testified that it did so to obtain Corteva products at a discount. (See supra Section II.C.iii.) No distributor testified to the contrary.

Plaintiffs do not have a single example of Corteva threatening distributors with any non-price consequence for not achieving loyalty, or of Corteva in fact imposing non-price consequences on a distributor that did not achieve loyalty, or of distributors believing there would be non-price consequences for not achieving loyalty. There is no non-price mechanism.

As a result, the price-cost test applies here. See, e.g., Concord Boat, 207 F.3d at 1058 (holding that the price-cost test applies where the evidence showed that "[n]obody forced the boatmakers" to accept the challenged contracts but rather that "[t]hey accepted [the] contracts because they . . . got their discounts if they bought a lot"); Virgin Atl. Airways Ltd. v. Brit. Airways PLC, 257 F.3d 256, 259 (2d Cir. 2001) (applying price-cost test to "incentive agreements with corporate client and travel agencies"); NicSand, 507 F.3d at 448 (applying the price-cost framework to de facto exclusive dealing agreement[s]"

67

where retailers typically sold one brand at a time and barriers to switching suppliers were high); see also In re EpiPen, 44 F.4th at 986 (applying predatory pricing framework to "substantial" rebate programs "where buyers instigated exclusivity to obtain lower prices").

Professor Hemphill repeats Plaintiffs' allegation that Corteva "induce[s] distributor compliance via a variety of penalties." (Hemphill Report (Ex. 1) ¶ 52.) But, when pressed, he admitted that he "did not disclose any evidence of Corteva ever refusing to sell products to a distributor". (Hemphill Tr. (Ex. 9) at 539:24–540:5.) He was unable to point to any evidence showing that Corteva favored distributors who had achieved loyalty during time periods of short supply, (id. at 544:18–20; 546:7–21), or to any evidence that short supply is common enough that it impacts any distributors' sourcing decisions. (Id. at 548:2–4.) Nor could he provide a single example of "a distributor losing access to Corteva private label products as a consequence of not meeting loyalty thresholds", (id. at 564:17–22.). In fact, Professor Hemphill admits that he did not seek systematically to examine why the major distributors did or did not choose to achieve loyalty in any particular year. (Id. at 561:5–14.) Plaintiffs cannot manufacture an issue of fact by having their expert merely repeat unsubstantiated allegations from the Amended Complaint. Cottom v. Town of Seven Devils, 30 F. App'x 230, 236 (4th Cir. 2002) ("[A] party cannot assure itself of a trial merely by trotting out an expert's naked conclusion about the ultimate issue in the case.") (internal quotations, alterations, and citations omitted).

During the motion to dismiss briefing, Plaintiffs also alleged that Corteva's loyalty program foreclosed the market for a "substantial duration" through "yearly renewals and

68

threat of retaliation", including "cutting off supply" and "deferring rebates into subsequent years conditioned on further compliance with meeting market-share".  See Syngenta, 711 F. Supp. 3d at 577–78; Am. Compl. ¶ 172.  But as the distributors testified, "yearly renewals" and "deferring rebates" pending "further compliance with meeting market-share" are simply pricing mechanisms—distributors can choose to exercise those options (or not) depending on whether it is worth it to them to earn the lower prices the additional rebates would provide.  And, as already explained at length, there is no evidence of any threats of retaliation or cutting off of supply.  As a result, the price-cost test applies.

Plaintiffs concede that there is no allegation—let alone evidence—that Corteva has priced below cost.  See Syngenta, 711 F. Supp. 3d at 570 (citing Plaintiffs' Opposition at 43).  Thus, summary judgment must be granted for Corteva.  See Brooke Grp., 509 U.S. at 223–24.

### (2) There is no evidence that the alleged bundling features of Corteva's loyalty programs are a non-price mechanism of exclusion.

There also is no triable issue on Plaintiffs' claim that the "bundling features" of Corteva's loyalty offers are a non-price mechanism of exclusion.  Bundled rebates are "endemic . . . in many spheres of normal economic activity" as a form of procompetitive price-cutting.  See Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394, 405 n.35 (3d Cir. 2016).  For that reason, courts have endeavored to carefully separate "normal economic" price-cutting via bundled rebates from the rare case of exclusionary bundling.  Id.; see also Cascade Health Sol. v. PeaceHealth, 515 F.3d 883, 896 (9th Cir. 2008); Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 997 (9th Cir. 2010).

69

Plaintiffs' bundling allegations do not create a triable issue of fact.

First, allegedly exclusionary bundled rebates still are subject to the price-cost test if price remains the primary mechanism of alleged exclusion. See Eisai, 821 F.3d at 409; Concord Boat, 207 F.3d at 1060–61; Cascade Health, 515 F.3d at 906 (applying "discount attribution standard" for bundled rebates).

Supreme Court precedent compels this result. The Supreme Court has made clear that lower prices are procompetitive and benefit consumers "regardless of how those prices are set", reinforcing time and again that the mechanism used to lower prices does not matter so long as the result is lower (above-cost) prices, "regardless of the type of antitrust claim involved". Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990)). It has applied this edict to reject challenges to "vertical, maximum price-fixing schemes" (id. at 331); "volume rebates" designed to "raise [] list prices on generic prices", (Brooke Grp., 509 U.S. at 231); "price squeezes", (Pac. Bell Tel. Co. v. linkLine Commc's, Inc., 555 U.S. 438, 442 (2009)); and "price-cost squeezes", (Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 108 (1986)). Again, "regardless of the type of antitrust claim involved", Atl. Richfield, 495 U.S. at 340, lower prices cannot be anticompetitive, no matter how they are set, so long as the prices remain above cost.

The same law applies to claims involving bundled rebates, so long as pricing is the primary mechanism of alleged exclusion. Stated differently, to avoid the application of the price-cost test based on the "bundling features" of Corteva's loyalty offers, Plaintiffs would need to show not only that the bundling feature is a non-price mechanism of exclusion (which they cannot do), but also that it is the "predominant" exclusionary mechanism. ZF

70

Meritor, 696 F.3d at 275 (emphasis added).  Plaintiffs have no such evidence.  For example, no distributor testified that they achieve loyalty (when they do) because of any bundled aspect of the loyalty offers.  (See supra Section II.C.iii.) ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Even if a distributor's incentive to comply is amplified by the prospect of earning a rebate on more than one product, that still is a price lowering mechanism, not a non-price exclusionary practice, and the price-cost test governs it.  Eisai, 821 F.3d at 409.

Third, even if the Court were to reject application of the price-cost test to Plaintiffs' bundling theory (which it should not), Plaintiffs' claims still would fail because every test that courts have used to analyze bundled rebates requires evidence that the bundled rebate excluded rivals from the market because rivals are not able to supply all the products in the bundle.  That is, under any theory, there must be evidence that the bundle includes both contestable products (those that the rival could compete for absent the bundle) and non-contestable products (those over which the defendant has an entrenched, dominant position), such that the rebate requires customers that want a discount on the non-contestable product to also buy the contestable product from the defendant, thereby

71

preventing rivals from challenging those contestable sales.  See, e.g., id. at 405 (noting that

the foreclosure test used by the Third Circuit is limited "to cases in which a single-product

producer is excluded through a bundled rebate program offered by a producer of multiple

products . . . ")[9]; Cascade Health, 515 F.3d at 909 ("[T]he primary anticompetitive danger

posed by a multiproduct bundled discount is that such a discount can exclude a rival who

is equally efficient at producing the competitive product simply because the rival does not

sell as many products as the bundled discounter."); Virgin Atl., 257 F.3d at 271 (dismissing

bundled rebate claim in part because there was no evidence showing which of the flight

routes that were allegedly incontestable "were bundled with more competitive" routes); cf.

Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337, 357 (4th Cir. 2024)

("In the case before us, [one product in Duke's bundle is] the product of electric power that

both Duke and NTE sought to provide to Fayetteville after 2024, when Fayetteville could

terminate its 2012 Power Supply Agreement with Duke", whereas the other is "the pre-

2024 product of electric power that Duke alone could sell to Fayetteville under its 2012

Power Supply Agreement.  And, we can say, even more inculpatory of Duke's conduct,

[the bundle] also includes Duke's purchase of excess electric power from Fayetteville's

Butler Warner plant, again which NTE could not offer.").

---

[9] The Third Circuit's foreclosure test—first established in LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) (en banc)—has been roundly criticized and the Third Circuit, by its own account, has joined most courts in declining to apply it.  See Eisai, 821 F.3d at 405 n.35 (citing various sources of criticism).

Here, those tests would require evidence that, for example, Corteva has a monopoly on products containing an AI in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with Matrix, say ▮▮▮▮▮▮▮ such that generic suppliers would be unable to compete against Matrix because of Corteva's monopoly over ▮▮▮▮▮. There is no evidence of anything like that. There is no evidence about the demand conditions of the other AI products in the at-issue loyalty offers at all. Professor Hemphill himself concedes this point. Though he was assigned to address liability comprehensively on all issues, he admits that he did not do any "separate monopoly power inquiry as to those other AIs" in Corteva's offerings. (Hemphill Tr. (Ex. 9) at 377:17–378:1.) As a result, Professor Hemphill (and Plaintiffs) could not possibly say that the alleged bundles include products that are "must haves" for distributors, but ones that generic rivals cannot offer.

Put differently, Plaintiffs' claims focus exclusively on the three Corteva AIs at issue; there is no evidence whatsoever about any other AIs. As a result, there is none of the required evidence that those other AIs are so competitively significant (and locked up by Corteva) that they prevent generics from competing with the three AIs at issue. Cf. Duke Energy, 111. F.4th at 357 (explaining that rivals were competing to supply energy that Defendant had "packaged" with energy that only Defendant could supply, thus hindering rivals from competing on the basis of efficiency); SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089 (E.D.Pa. 1976), aff'd, 575 F.2d 1056 (3d Cir. 1978), cert. denied, 439 U.S. 838 (1978) (concluding that that the defendant's rebate plan had anticompetitive effects because "by linking its most powerful cephalosporin products, Keflin and Keflex, to its unpatented product, Kefzol, [it] has unlawfully used its monopoly power to foreclose

73

competition in and to exclude competition from the cephalosporin market"). There is no evidence that an equally efficient rival on one product is impeded in competition on that product because Corteva had "packaged" that product with another in its loyalty program. Thus, any supposed "bundling" claim must fail.

### C. Plaintiffs' Claims Fail Under the Full Rule of Reason Test.

If the price-cost test applies, the analysis ends there because Plaintiffs do not allege that Corteva prices below cost. (Supra Section V.B.)

Plaintiffs' claims also fail even if the Court were to analyze them under the full rule of reason framework that applies to allegations of non-price-based exclusive dealing. Like the price-cost test, the full rule of reason requires that Plaintiffs prove market power in legally cognizable, relevant antitrust markets, which they cannot do for the reasons explained above. But even accepting Plaintiffs' markets as viable for the sake of argument, summary judgment still would be required for two additional, independent reasons: First, Plaintiffs cannot show that the "loyalty agreements constitute anticompetitive conduct"; and second, Plaintiffs cannot show that the loyalty agreements "caused antitrust injury." Syngenta, 711 F. Supp. 3d at 580.

#### i. There Is No Evidence That Corteva's Loyalty Agreements Constitute Anticompetitive Conduct.

"A threshold requirement for any exclusive dealing claim is necessarily the presence of [express or de facto] exclusive dealing." See ZF Meritor, 696 F.3d at 282. Even then, exclusive dealing agreements "are presumptively procompetitive and lawful" absent proof that they "foreclose competition in a substantial share of the market". In re Mylan N.V.

74

Sec. Litig., 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).  Corteva's loyalty offers are neither exclusive dealing arrangements nor anticompetitive, and Plaintiffs have failed to create a triable issue of fact.

First, it is undisputed that Corteva's loyalty agreements are not expressly exclusive. By their terms, there is no purchasing requirement in them.  Even after executing a loyalty agreement, the distributor has no obligation to do anything with respect to Corteva's products—it can buy all, some, very few, or none of its product needs in a given year from Corteva, with no contractual consequences whatsoever flowing from that choice other than triggering (or not) a contractual right to the rebates associated with the applicable thresholds.  (Supra Section II.C.iii.)  The agreements are one-sided in the distributor's favor, imposing obligations only on Corteva:  If the distributor chooses to achieve loyalty thresholds in a given year, Corteva must pay the associated rebates; if the distributor chooses not to, then it simply does not have a contractual right to the rebates associated with the thresholds it chose not to achieve.  (Supra Section II.C.iii.)

Second, Corteva's loyalty offers are not de facto exclusive either.  To demonstrate de facto exclusivity, it is not enough for Plaintiffs to show that distributors achieve loyalty to get the rebates that the program offers.  As the Third Circuit has explained, customer loyalty secured by "the threat of a lost discount . . . is a far cry from" anticompetitive conduct and cannot, as a matter of law, establish de facto exclusive dealing.  Eisai, 821 F.3d at 407.  That is because "securing" customer sales by offering an above-cost price

75

rebate is the essence of price competition, protected by decades of Supreme Court precedent from antitrust attack.  Id. at 408; Atl. Richfield, 495 U.S. at 338–340.

Rather, for voluntary purchases to be treated as de facto exclusive, there must be evidence of some meaningful threat or penalizing conduct by the defendant beyond the loss of a discount—such as a threat to withhold the supply of products that only the defendant can provide—that coerces customers into purchasing all (or substantially all) of their needs of the product from the defendant.  See Eisai, 821 F.3d at 406 (noting that "[t]he threat to cut off supply" of key products was the critical factor in cases finding de facto exclusivity, since it "provided customers [with] no choice but to continue purchasing from the defendants").  For example, in ZF Meritor, "[p]laintiffs introduced evidence that compliance with the market penetration targets was mandatory because failing to meet such targets would jeopardize the OEMs' relationships with the dominant manufacturer of transmissions in the market".  696 F.3d at 278.  Similarly, in United States v. Dentsply Int'l, Inc., the Third Circuit found that the defendant's purchase orders were de facto exclusive where the defendant coerced distributor compliance through "threat[s] to stop supplying its product".  399 F.3d 181, 194 (3d Cir. 2005).  And in McWane, Inc. v. FTC, the Eleventh Circuit found de facto exclusivity where the challenged program was "unilaterally imposed by fiat upon all distributors" by way of the defendant informing customers that if they did not buy substantially all of their pipe fittings from the defendant, they would be "cut off" from the defendant's supply "for up to three months".  783 F.3d 814, 821, 834 (11th Cir. 2015).

76

The record here is entirely devoid of any evidence even remotely comparable to the facts at issue in those cases. As shown above, there is no evidence whatsoever that Corteva _ever_ threatened to cut off supply to any distributor if it did not achieve loyalty, much less that it made widespread threats to many distributors sufficient to "coerce" widespread compliance. (Supra Section II.C.iii.) Even Professor Hemphill acknowledged this point. (Hemphill Tr. (Ex. 9) at 564:17–22.) Nor is there evidence that Corteva used any other non-price penalties to convince distributors to achieve loyalty. (Id.) There is nothing remotely like the facts at issue in ZF Meritor, where the plaintiffs "introduced evidence that not only were the rebates conditioned on the OEMs meeting the market penetration targets, but so too was Eaton's [the dominant supplier's] continued compliance with the agreements", meaning that if the OEMs that distributed Eaton's products missed the program's market share targets, they "would have a big risk of cancellation of the contract, price increases, and shortages if the market [was] difficult." 696 F.3d at 277. To the contrary, here, many distributors have in fact not achieved loyalty over the years, and it is indisputable that no adverse consequences ensued; nor have such consequences been threatened. (Supra Section II.C.iii.)

Based on the evidence actually adduced, the facts here are far more like those at issue in Eisai. In Eisai, the record showed that "customers did not risk penalties or supply shortages for terminating the [defendant's] Program or violating its terms"; rather, "[t]he consequence of not obtaining the seventy-five percent market share threshold or meeting the formulary requirements was not contract termination" but simply not earning the larger discounts off the wholesale price for the defendant's product. 821 F.3d at 406–07. It also

77

showed that "[i]f a customer chose to terminate the contract entirely, it could still obtain Lovenox [the product at issue] at the wholesale price. In fact, nothing in the record demonstrates that a hospital's supply of Lovenox would be jeopardized in any way or that discounts already paid would have to be refunded." Id. Based on that evidence, the court concluded that "unlike in LePage's, Dentsply, and ZF Meritor, Lovenox customers had the ability to switch to competing products"; "[t]hey simply chose not to do so," meaning the defendant's discounting program was not de facto exclusive and not anticompetitive under the rule of reason. Id. at 407–08.

So, too, here. The record shows that the only consequence for a distributor's failure to achieve loyalty is the loss of a contractual right to the rebate associated with the applicable loyalty threshold. (Supra Section II.C.iii.) The distributor that chooses not to sign a loyalty agreement or not to achieve a loyalty threshold can still buy all the product it wants from Corteva at the wholesale price. The facts here are even further removed from de facto exclusive dealing than in Eisai, because, here, unlike there, (i) Corteva often pays the loyalty rebate even when distributors fail to achieve a loyalty threshold; (ii) many distributors have chosen to switch to competing products; and (iii) distributors can receive various other rebates unrelated to the loyalty program. (Supra Section II.C.iii.)

Third, even if the loyalty offers were deemed de facto exclusive (contrary to the undisputed record), they could not be anticompetitive because they are of, maximum, one year duration, (see supra Section II.C.ii), meaning that, at a minimum, every year a distributor can decide to not participate in the loyalty program and take a better offer from

78

a Corteva rival.[10]  In reality, the "duration" of the loyalty offers are less than their one year terms (they are of no duration, in effect), because, as discussed above, a distributor can make the choice of whether to achieve loyalty or not at <u>any</u> time during the year.  But even if the distributor was somehow committed to achieving the thresholds, the contract duration is only for one year, a duration not remotely long enough to foreclose rivals from having the opportunity to compete for the distributor's business.  <u>See</u> <u>Roland Mach. Co. v. Dresser Indus., Inc</u>., 749 F.2d 380, 395 (7th Cir. 1984) (holding that "[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful").

In its motion to dismiss decision, this Court found that "while the length of the agreements is facially one year, the alleged yearly renewals and threat of retaliation are claimed to have a longer-term effect."  <u>Syngenta</u>, 711 F. Supp. 3d at 577.  But discovery has disproven any "threat of retaliation", (<u>supra</u> Section II.C.iii); and without such threats, there is no possibility that one year (at most) exclusivity can meaningfully impact the opportunities available to rivals.

---

[10] That some rebate payments are deferred and that distributors may not receive those deferred rebates in subsequent years if they do not meet the applicable loyalty thresholds in those years does not alter the analysis.  The percentage of rebate deferred is variable and can be small.  For example, ██████████████████████████████████████████████████ ██████████████████████████████████ (CRTVA-CPL-00135647 (Ex. 32) at -652.) ████████████████████████████████████ ████████████████████████████████ (<u>Id.</u> at -654.) In any event, a subsequent payment is simply an additional price reduction, whether received in the year the rebate is earned or in a later year.  This is nothing like the payments in <u>ZF Meritor</u>, where Eaton paid millions up front to OEMs and maintained a standing threat to claw back those payments—and to cut off future supply—if the OEMs listed Eaton's rival in their data books.  696 F.3d at 265.

79

Fourth, even if one were to assume (contrary to the undisputed evidence) that Corteva's loyalty programs are both de facto exclusive and of sufficient duration (they are neither), summary judgment still should be granted because Corteva's loyalty agreements have none of the characteristics of unlawful exclusive dealing, see Syngenta, 711 F. Supp. 3d at 580 (quoting ZF Meritor, 696 F.3d at 271):

**No Substantial Market Power.** In properly defined antitrust markets, Corteva lacks market power. See Kolon, 748 F.3d at 174. Even in Plaintiffs' flawed markets, Corteva indisputably has no monopoly power in acetochlor, by far the largest of the Corteva AIs at issue. (Hemphill Report (Ex. 1) ¶ 14.)

**No Anticompetitive Foreclosure or Effects.** Plaintiffs have no evidence of substantial foreclosure or other anticompetitive effects—at most, the evidence shows that Corteva wins sales by offering better products at lower prices. See Eisai, 821 F.3d at 407. Generic manufacturers have entered all three of Plaintiffs' flawed markets (and many more generic manufactures compete in properly defined markets) and Plaintiffs have no evidence as to whether or by how much generic share would increase absent the loyalty programs. The only evidence is that the rebates from the loyalty programs are passed through to farmers, resulting in lower (not higher) prices for consumers. When AIs are removed from loyalty, the only evidence remaining shows that prices increase or stay the same, not fall.

**Short Contract Duration and Freely Terminable.** The contracts at issue are of short duration (at most one year), and freely terminable (by not achieving loyalty during a given year). See In re EpiPen, 44 F.4th at 988–99.

80

**Widespread Use By Competitors.** Loyalty programs similar to Corteva's are nearly ubiquitous. Plaintiffs have no explanation for why Corteva's loyalty programs should be enjoined whereas virtually identical programs of third parties have not even been challenged. See id. at 989.

### ii. There Is No Evidence That Corteva's Loyalty Agreements Cause Anticompetitive Injury.

Plaintiffs also put forward no evidence showing that the loyalty agreements cause anticompetitive injury. Competitive injury requires a showing of harm to the competitive process, not just to individual competitors, for example, in the form of supra-competitive prices, reduced output or stunted innovation. Am. Express, 585 U.S. at 549.

To survive summary judgment, claims of competitive harm must be more than speculative or based on untested and unproven assumptions. See, e.g., United States v. Google, 687 F. Supp. 3d 48, 81 (D.D.C. 2023) (granting summary judgment, in part, because "[s]peculation that [defendant's] conduct 'can reasonably be expected,' 'might,' or 'could potentially'" harm rivals "is not evidence of anticompetitive effects in the relevant markets"). "[A]necdotal speculation and supposition are not a substitute for evidence, and . . . evidence decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment." Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1174 (9th Cir. 2016).

Plaintiffs' claims fail because they are based entirely on anecdotal speculation, conjecture, and claims of harm to competitors, not proof that Corteva's loyalty agreements caused harm to competition. At the motion to dismiss stage, the Court held that Plaintiffs

adequately alleged antitrust injury by alleging that the loyalty agreements (1) "lead to supracompetitive prices for end-consumers", (2) "exacerbate[] the already high costs to enter the market by locking up access to the most efficient channel of distribution", (3) "substantially foreclose" generic suppliers and "have caused generics to exit or never enter the market", (4) by their design, prevent pass through of the rebates to farmers, and (5) "have stunted innovation".  Syngenta, 711 F. Supp. 3d at 577, 583.  The evidence does not support any of these claims.

First, there is no evidence that Corteva's loyalty programs have caused supra-competitive pricing for any at-issue AI, or supra-competitive margins for Corteva.  After months of exhaustive fact and expert discovery, Plaintiffs still have not identified the "competitive" price or margin in any alleged relevant market.  Nor has Professor Hemphill.  At his deposition, he acknowledged that he did not analyze, does not know and is not offering an opinion on what the competitive price or margin is for any of the at-issue AIs.  (Hemphill Tr. (Ex. 9) at 445:7–16.)  If Plaintiffs cannot even say—and their economist did not analyze—what the competitive price or margin is, they cannot show that current prices or margins are above competitive levels due to the challenged loyalty offers.  Am. Express, 585 U.S. at 547–48 (rejecting antitrust claim where the plaintiff failed to offer any reliable measure of competitive transaction price or profit margins).

In the one example in the record where Plaintiffs have analyzed a Corteva product removed from loyalty, farmer-level data shows that the actual farmgate price of that AI, oxyfluorfen, increased by ████████ after Corteva removed it from its loyalty program.  (Thurman Rebuttal Report (Ex. 6) ¶ 25.)  Plaintiffs do not offer a competing analysis of the

82

data available for prices of oxyfluorfen or any other benchmark AI before and after is removal from loyalty. (Smith Tr. (Ex. 10) at 275:9–14.) Plaintiffs' damages expert, Dr. Smith, concedes that the average price per pound of Goal-branded oxyfluorfen products increased after those products were removed from Corteva's loyalty program. (Smith Reply Report (Ex. 8) ¶ 85 & fig. 1.) Dr. Smith asserts that the trend might not be meaningful because the data might be impacted by confounding factors causing prices to move in various directions, (id.), but "hypothetical assumptions cannot serve as a substitute for actual market data" on summary judgment. Virgin Atl., 257 F.3d at 264. Plaintiffs have no evidence that loyalty programs lead to higher prices. If the claim they seek to take to trial is that prices go up when products go on loyalty and go down when they come off, there should be data to support it. Am. Express, 585 U.S. at 547–48. There is not. The only evidence shows precisely the opposite.

Second, there is no evidence supporting Plaintiffs' claim that the loyalty offerings exacerbate entry barriers. Numerous generic manufacturers—well-heeled multinational companies each capable of supplying broad swaths of the market—have entered with products containing each of the at-issue AIs. (See supra Section II.C.iv.) Each of those companies already has received EPA approval, paid any data fees, and actually made sales to distributors in the United States. They face no barriers. And those generic manufacturers took all those steps in full awareness of—and during the active operation of—the loyalty program. Cf. Eisai, 821 F.3d at 406 ("But Eisai does not offer evidence demonstrating that fixed costs were so high that competitors entering the market were unable to obtain a cardiology indication.").

Third, for similar reasons, the undisputed evidence refutes Plaintiffs' baseless allegation that the loyalty agreements have "substantially foreclosed" generic suppliers. There has been generic entry in each alleged markets. For rimsulfuron, Professor Hemphill identifies a number of entrants and describes their entry as "meaningful". (Hemphill Tr. (Ex. 9) at 444:10–22.) And for oxamyl, the primary generic entrant came into the market before Corteva re-entered that market. (Hemphill Report (Ex. 1) ¶ 188.) For acetochlor, Professor Hemphill concedes both that generics have entered and that Corteva does not have monopoly power. (Hemphill Rep. (Ex. 1) App. C.6 ¶¶ 14 & fig. 7.)

Whether there would be more generic entry without the loyalty agreements is not material to this motion. The question, as Professor Hemphill acknowledged, is not the number of entrants but the level of competitive pressure in the market. (Hemphill Tr. (Ex. 9) at 523:12–17 ("[I]t's ultimately a question of increased, you know, generic competitive pressure rather than the numerosity of the generics that is driving that.").) There is no question that generics have exerted, and continue to exert, significant competitive pressure on Corteva's loyalty programs. That is true both of the generics that have entered the alleged markets and, as Professor Hemphill acknowledges, the ones that could enter readily if they chose to, of which there are many. (Hemphill Tr. (Ex. 9) at 522:2–6, 522:21–523:5.) "[A] 'perceived potential entrant can stimulate competition among incumbents,' including to 'expand output' and 'lower product prices.'" (Hemphill Reply (Ex. 7) ¶ 95 n.139 (quoting U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines § 2.4.B (2023).) The "threat of new entrants" can cause a firm to be "too hemmed-in by competition . . . to have sufficient latitude to sustain supra-competitive price

84

increases." (Id.) There is ample undisputed evidence that generics have entered, can enter, and that their potential entry serves as a disciplining force in the market whether or not they actually enter.

Plaintiffs ignore the undisputed evidence of competitive entry and pressure in the real world and seek to prove their case by pointing to a simple numerical calculation of the volume of AI sales that are subject to Corteva's loyalty agreement in each alleged market, as calculated by Professor Hemphill. (Hemphill Report (Ex. 1) fig. 28.) As a matter of law, however, such a "counting" analysis does not say anything meaningful on the question of foreclosure. "In analyzing the amount of foreclosure, [a court's] concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer. For example, if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted— even if a competitor remains unable to increase its market share." Eisai, 821 F.3d at 403. Here, Plaintiffs skip the relevant question—are customers "free to switch to a different product" despite the loyalty programs—and rely entirely on a simple calculation of purported foreclosure shares. That is not enough to defeat summary judgment. Id.; see also Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co., No. 3:11-cv-622, 2012 WL 1155218, at *15 (E.D. Va. Apr. 5, 2012), aff'd sub nom. Kolon, 748 F.3d 160 (finding foreclosure calculation exaggerated where agreements could not "be classified as 'exclusive' or 'multi-year'", "imposed no obligation on customers to purchase from" the defendant, and customers "did business" with competitors).

85

Likewise, Plaintiffs cannot avoid summary judgment by pointing to the fact that some generic firms have exited or chosen not to enter the United States market with generic versions of the at-issue AIs. Firms may exit or choose not to enter markets all the time for a wide range of reasons. Firms exiting a market alone says nothing about the impact of alleged exclusionary conduct. In re EpiPen, 44 F.4th at 986 ("[S]uccessful elimination of a rival alone is an insufficient condition to prove harm to competition."). Those normal market dynamics are just as—if not far more—consistent with robust competition driving commercial decision making than with supposed foreclosure. To be sure, Corteva's lower (but above-cost) prices might be an important reason why it makes the sales it does. But that is simply competition on the merits. Plaintiffs have insufficient evidence that any firm's exit from the market, or decision not to enter, was due to something other than Corteva's lower prices. Cf. Eisai, 821 F.3d at 407.

Moreover, as with the unsupported claim of supra-competitive pricing, Plaintiffs and Professor Hemphill have made no attempt to analyze what they claim the competitive level of entry or generic competition should be. (Hemphill Tr. (Ex. 9) at 445:10–25, 455:2–6, 524:14–21.) Without that, they cannot possibly establish the generic presence that exists is lower than the generic presence that would exist without the loyalty programs, and certainly cannot establish any suppressed generic presence is "substantial". Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1987) ("[T]he plaintiff must show that 'the opportunities for other traders to enter into or remain in that market must be significantly limited' by the exclusive-dealing arrangement." (quoting Tampa Electric, 365 U.S. at 328)); Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co., 748 F.3d

86

160, 176 (4th Cir. 2014) (affirming summary judgment where Plaintiff "failed to show what 'proportionate volume of commerce' in the entire relevant market was foreclosed by DuPont's supply agreements." (quoting Tampa Elec., 365 U.S. at 329)).

Fourth, Plaintiffs' bald claim that the loyalty programs prevent pass through of the rebates to farmers is squarely refuted by the State Plaintiffs' own damages expert, who put the pass through rate of net prices, which includes all rebates, at eighty-six percent, a number that indicates a highly competitive market and makes clear the loyalty rebates translate substantially into lower prices for farmers. (Supra Section II.C.ii.)

Fifth, Plaintiffs have no evidence whatsoever on their claim that innovation has been stunted. Professor Hemphill barely pays lip service to the contention. It is squarely contradicted by the undisputed fact that most basic manufacturers—the innovators in this industry—have loyalty programs. (Supra Section II.C.i.)

Sixth, Plaintiffs offer no evidence to answer the most fundamental competitive question—what is the output effect of the challenged conduct? Here, there is ample evidence the loyalty programs increase output, but the Court need not take account of that evidence to determine Plaintiffs have not shown an adverse output effect. There is no such evidence.

**D.      Summary Judgment Is Warranted on the Alleged Violations of State Law.**

Where the "analysis under the state antitrust statutes tracks federal antitrust law, . . . the federal antitrust analysis controls whether the state antitrust claims survive." Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 449 (7th Cir. 2020). Every state competition law in

question, with the exception of Tennessee, is expressly harmonized with federal antitrust

law and fails for that reason.[11]  Thus, summary judgment is warranted on Plaintiffs' state

law claims for the same reasons that their Sherman Act claims fail.

Nor is there any reason to think that the result under the antitrust laws of Tennessee,

the only Plaintiff State to not have expressly linked its antitrust law to federal statutes,

---

[11] Often, this harmonization is codified by statute.  See, e.g., Colo. Rev. Stat. § 6-4-119; Iowa Code § 553.2; Neb. Rev. Stat. § 59-829; Or. Rev. Stat. § 646.715; Tex. Bus. & Com. Code § 15.04.  But the relevance of federal antitrust analysis on analogous state law claims is universally recognized by courts applying those laws.  See, e.g., People v. College Hills Corp., 435 N.E. 2d 463, 470 (Ill. 1982) ("[T]he Sherman Act provide[s] guidance" for interpreting "the Illinois Antitrust Act") (Illinois); Rumple v. Bloomington Hosp., 422 N.E.2d 1309, 1315 (Ind. Ct. App. 1981) (explaining that the Indiana Antitrust Act is "modeled after section 1 of the [Sherman Act], and has been interpreted consistent with federal law interpreting [the Sherman Act]") (Indiana); State v. Alpine Air Prods., Inc., 490 N.W. 2d 888, 894 (Minn. Ct. App. 1992) ("Minnesota courts have consistently held that Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law.") (Minnesota); Ashley Furniture Indus., Inc. v. Packaging Corp. of Am., 275 F. Supp. 3d 957, 969–70 (W.D. Wis. 2017) ("Wisconsin courts traditionally look to federal law to interpret substantive violations of the Wisconsin antitrust statutes.") (Wisconsin); Panag v. Farmers Ins. Co. of Wash., 204 P.3d 885, 894 (Wash. 2009) (en banc) (noting it was the "intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts . . . interpreting the various federal statutes dealing with the same or similar matters") (Washington); Nw. Med. Lab'ys, Inc. v. Blue Cross & Blue Shield of Or., Inc., 794 P.2d 428, 433 (Or. 1990) (explaining that "[w]e look to federal caselaw—and after reviewing federal caselaw, we interpret ORS 646.725") (Oregon); People v. N. Ave. Furniture & Appliance, Inc., 645 P.2d 1291, 1295–96 (Colo. 1982) (en banc) ("[F]ederal decisions construing the Sherman and Clayton Acts" are "entitled to careful scrutiny in determining the scope of the state antitrust statute".) (Colorado); Caller–Times Pub. Co. v. Triad Commc'ns, Inc., 826 S.W.2d 576, 580 (Tex. 1992) ("Because . . . the Texas Antitrust Act is comparable to section 2 of the Sherman Antitrust Act, we look to federal law interpreting section 2 of the Sherman Act for guidance".) (Texas); Kanne v. Visa, 723 N.W.2d 293, 297 (Neb. 2006) (stating that when Nebraska antitrust uses language "similar to the language of a federal antitrust law, the courts of this state in construing such [provisions] shall follow the construction given to the federal law by the federal courts") (citations omitted) (Nebraska); Marin Cnty Bd. of Realtors, Inc. v. Palsson, 549 P.2d 833, 835 (Cal. 1976) ("A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law.  Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.") (California); Comes v. Microsoft, Corp., 646 N.W.2d 440, 446 (Iowa, 2002) (stating that the state harmonization statute is "designed to achieve uniform application of the state and federal laws prohibiting monopolistic practices") (Iowa).

88

would be any different.  See Spahr v. Leegin Creative Leather Prod., Inc., No. 2:07-cv-187, 2008 WL 3914461, at *13 (E.D. Tenn. 2008) (noting that "every Tennessee case decided under the [Tennessee Trade Practices Act] has relied heavily on federal precedent"); Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 523 (Tenn. 2005) (noting that, like other antitrust regimes, Tennessee requires a showing of "anticompetitive conduct").

State Plaintiffs California, Indiana and Iowa cannot sustain their consumer protection claims on this record.  California contends Corteva's loyalty program violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, which "prohibits any unlawful, unfair, or fraudulent business act or practice."  This claim fails for the reasons discussed supra:  California alleges no conduct distinct from their (flawed) antitrust claim.  See Chavez v. Whirlpool Corp., 113 Cal. Rptr. 2d 175, 184 (Cal. App. 2001) (UCL does not condemn conduct which is already "deemed reasonable and condoned under the antitrust laws"); Reilly v. Apple Inc., 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 2022) (UCL claims are "derivative" of failed allegations of antitrust violations, where, as here, they "fall[] with those claims").

The consumer fraud claims brought by Indiana and Iowa fare no better.  Ind. Code § 24-5-0.5-1, et seq.; Iowa Code § 714.16.  Both of those statutes require a showing of deceptive conduct.  Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 874 (D. Minn. 2012) (applying both Indiana and Minnesota law).  Plaintiffs have no evidence of deception. Accordingly, the Court should grant summary judgment for Corteva on all state law claims.

89

## VI.    <u>CONCLUSION</u>

For the reasons stated above, Corteva is entitled to summary judgment on all of Plaintiffs' claims.

90

Respectfully submitted this 19th day of December, 2025,

/s/ Mark E. Anderson

**MCGUIREWOODS LLP**
Mark E. Anderson (NC Bar No. 15764)
Armina A. Manning (NC Bar No. 60436)
manderson@mcguirewoods.com
aamanning@mcguirewoods.com
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Telephone: (919) 755-6600
Fax: (919) 755-6699

**BALLARD SPAHR LLP**
Jason A. Leckerman*
Emilia McKee Vassallo*
Thomas W. Hazlett*
Elizabeth P. Weissert*
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-8500
Fax: (215) 864-8999
LeckermanJ@ballardspahr.com
McKeeVassalloE@ballardspahr.com
HazlettT@ballardspahr.com
WeissertE@ballardspahr.com

**CRAVATH, SWAINE & MOORE LLP**
Wes Earnhardt *
Jesse Weiss *
Margaret T. Segall *
Two Manhattan West
375 Ninth Ave
New York, New York 10001
Telephone: (212) 474-1000
Fax: (212) 474-3700
wearnhardt@cravath.com
jweiss@cravath.com
msegall@cravath.com

*Specially appearing under L.R. 83.1(d)

*Attorneys for Defendant Corteva, Inc.*

91

**CERTIFICATE OF WORD COUNT**

I hereby certify that the foregoing brief complies with Local Rule 7.3(d) in that it does not exceed 24,824 words, excluding the exempted portions, as reported by word processing software.

/s/ *Mark E. Anderson*
Mark E. Anderson

92