# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.,<br><br>Defendants. | Case No. 1:22-cv-00828-TDS-JEP |

**REPORT OF C. SCOTT HEMPHILL**

**August 22, 2025**

**HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL EYES ONLY**

* * *

protection products containing three different active ingredients (AIs): azoxystrobin, mesotrione, and metolachlor. Plaintiffs further allege that Syngenta maintained monopolies and restrained trade in markets for the component AIs. This conduct thwarted competition from rival producers of generic crop protection products containing the Syngenta AIs, to the detriment of growers.

7. Plaintiffs similarly allege that Corteva entered restrictive contracts with distributors in the form of loyalty programs. These programs restrained trade and allowed Corteva to maintain monopolies or protect market power over finished crop protection products containing three different AIs: rimsulfuron, oxamyl, and acetochlor. Plaintiffs further allege that Corteva maintained monopolies or protected market power, and restrained trade, in markets for the component AIs. This conduct likewise thwarted competition from rival producers of generic crop protection products containing the Corteva AIs, to the detriment of growers.

### 1.3. Assignment

8. I have been asked by the plaintiffs in this matter to provide an economic analysis of the competitive effects of Syngenta's and Corteva's loyalty programs pertaining to the six AIs enumerated above, including an assessment of monopoly power and market power relevant to an analysis of that conduct, and whether Syngenta and Corteva have likely harmed competition through the programs.

### 1.4. Materials relied upon

9. In forming my opinions, I have relied on my professional training in economics, academic research, and teaching, and my prior government and consulting experience. In my analysis, I rely on public information, the ordinary course documents of Syngenta, Corteva, and other firms, deposition and investigational hearing testimony, economic theory, and empirical analysis based on data provided in discovery by the defendants and others. I reserve the right to supplement these opinions in light of additional information that becomes available to me.

### 1.5. Summary of opinions

10. I have reached the following conclusions:

11. *Monopoly power*: Syngenta possesses monopoly power and market power within a relevant antitrust market for finished crop protection products containing azoxystrobin; within a relevant antitrust market for finished crop protection products containing mesotrione; and within a relevant antitrust market for finished crop protection products containing metolachlor.

12. For each of these three AIs, Syngenta likewise possesses monopoly power and market power within a relevant market for the AI included as a component of finished crop-protection products.

13. In each of these markets, Syngenta has held monopoly power and market power since at least 2018.

14. Corteva possesses monopoly power and market power within a relevant antitrust market for finished crop protection products containing rimsulfuron, and within a relevant antitrust

market for finished crop protection products containing oxamyl. Corteva possesses market power within a relevant antitrust market for finished crop protection products containing acetochlor.

15. For each of these three AIs, Corteva likewise possesses monopoly power and/or market power within a relevant market for the AI included as a component of finished crop-protection products.

16. In each of these markets, Corteva has held monopoly power and/or market power since at least 2018.

17. *Competitive effects*: As to each AI, the challenged loyalty programs impeded competition from lower-priced generic products, thereby preserving the relevant defendant's market power. As to each AI, exclusion of generics has resulted in higher prices and less innovation than would have prevailed absent the relevant defendant's loyalty program.

18. In this report, I describe my opinions and the bases for them.

### 1.6. Overview of report

19. Consumers benefit from competitive markets. The pressure of rivalry encourages lower prices and greater innovation (among other benefits), which benefit consumers. An important source of competition is new entry. Antitrust law promotes competition and benefits consumers by protecting the playing field for new entrants and preventing firms with market power from suppressing competition by impeding competitive threats.

20. In the crop protection industry, a basic manufacturer's exclusive right to market a new pesticide is often protected, for a period of time, by one or more patents. Generally, patent protection provides an incentive to innovate, thereby justifying the manufacturer's initial risky investment. In addition, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) sets up important incentives for both basic manufacturer innovation and generic competition.[2] To promote innovation, FIFRA provides so-called data protection to basic manufacturers for a limited period of time. To promote generic competition, the statute sets out a procedure for generic approval by relying on the data once the period of protection expires.

21. Upon loss of legal exclusivity, generic products enter the market and competition ensues. When competition arrives, prices fall, making generic entry an important source of savings. Together, patents and FIFRA set a balance between innovation and competition—a balance that is vulnerable to disruption by efforts to retain exclusivity beyond the statutorily mandated period.

22. A firm engages in anticompetitive conduct when it takes actions, other than competition on the merits, to preserve its market power or "monopoly power" in a relevant antitrust

---

[2] *See* Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136-136w-8. Herbicides are omitted from the Act's title but within the scope of the Act.

market.[3] Loyalty programs can impede competition and preserve market power by foreclosing opportunities for rivals.

23. Loyalty programs may or may not harm competition, depending on the circumstances. This overall question, whether a firm has maintained its monopoly or preserved market power through its contracting practices, can be broken down into four subsidiary economic inquiries:

24. [1] Examining the firm's possession of market power, such that the firm is capable of harming competition through its conduct. If a firm has no such power, its conduct is likely to be ineffectual. If it does:

25. [2] Examining whether the exclusionary conduct enabled the firm to preserve its position. The answer to this question is likely yes when the conduct materially affects most or all rivals in the market. If it does:

26. [3] Examining whether competition and consumers of the relevant products have likely been harmed as a result of the preservation of market power. If yes:

27. [4] Examining whether the conduct has procompetitive benefits for those consumers, dependent upon the conduct for their achievement, that are large enough to overcome these harms.

28. Defendants each make crop protection products containing various AIs that are effective in the control of different pests. Syngenta makes fungicides containing azoxystrobin, corn herbicides containing mesotrione, and herbicides containing metolachlor. Corteva makes herbicides containing rimsulfuron, insecticides containing oxamyl, and herbicides containing acetochlor.

29. The defendants also supply AIs to other basic manufacturers for use in finished products. Syngenta supplies mesotrione to Corteva and Bayer and metolachlor to Corteva. In addition, Corteva has a joint venture with Bayer for technical acetochlor production.

30. Plaintiffs' complaint alleges that Syngenta's and Corteva's loyalty programs harmed competition in the markets for finished crop protection products containing each of these AIs. My report addresses the four questions set out above, which are relevant to an evaluation of these allegations.

31. In Section 3, I examine the first question, defendant's possession of substantial market power, as to each of the six AIs. Demonstrating market power is important in order to establish the existence or likelihood of adverse consequences from the conduct under scrutiny. If a firm has no such power, then the removal of competitive threats, even if successful, is unlikely to disrupt competition. On the other hand, if a firm possesses substantial market power, then efforts to suppress competitive threats have a prospect of

---

[3] As I discuss below, when I use the term "monopoly power" in this report, I mean a substantial degree of market power. Whether a firm possesses monopoly power is ultimately a legal categorization. This categorization is commonly informed by economic evidence about the possession of substantial market power that is protected by significant barriers to entry.

relaxing competitive constraints, thereby allowing the firm to maintain its power and cause harm to competition and consumers through its conduct.

32. Monopoly power is closely related to market power—in particular, it represents a substantial degree of market power.

33. To address this question, I define a set of relevant antitrust markets for this case. Market definition is not an end in itself, but a tool that helps to frame and focus the analysis of competitive threats. The point of market definition is to identify a set of products as to which monopolization could inflict harm upon consumers.

34. Market definition is often analyzed using the following hypothetical question. If a single firm controlled all the suppliers within the proposed market, instead of competitive supply, would that firm be able to profit by raising its price or otherwise worsening the terms on which it deals with its customers? If the answer is yes—because constraints outside the market are not powerful enough to prevent the exercise of market power—then the proposed market qualifies as a relevant market.[4]

35. I conclude that for each of the six AIs, there is a relevant market for crop protection products containing the AI. The participants in each market are Syngenta or Corteva, generic manufacturers, and (for some AIs) one or more additional basic manufacturers, which often source the AI from a defendant.

36. This conclusion is supported by several kinds of economic evidence. First, the scope of the loyalty program indicates the scope of the market. The program targets and limits the penetration of generic products containing a particular AI. The program design indicates that control of the set of products containing the AI is a locus of market power and a "franchise" worth protecting. This design, which ignores other AIs, also indicates that generic products containing the AI pose an unusually potent competitive threat.

37. Defendant strategy documents centered on competition at the AI level further support this conclusion. For each AI, the set of products containing the AI is recognized by the incumbent as a set of profitable products worth protecting, and generic entry is recognized as a potent competitive threat that would reduce those profits, notwithstanding the existence of other AIs.

38. The third source of supportive evidence is the observed effects of limited entry by generic products containing the AI that does occur despite the loyalty programs. Given that low generic penetration is the anticipated and observed effect of the loyalty program, a significant effect from entry by even a close substitute is by no means assured. In this respect this inquiry is a one-sided test; the absence of an effect does not imply that generic competition is unimportant. Nevertheless, we observe for some AIs that limited generic entry provokes substantial price reductions by the brand. As to two AIs, oxamyl and

[4] As I discuss in Section 3, the analysis properly focuses on constraints at the competitive level—that is, constraints that would operate if the market were not already monopolized. When a market is already monopolized, even poor substitutes (at the competitive level) may appear to be viable alternatives.

acetochlor, additional empirical evidence is available that further supports my conclusions about the scope of the market.

39. The relevant market consists of all product chemistries containing the AI. Distinct chemistries on the same "product ladder" are substitutes from the grower's standpoint. The distinct chemistries are all subject to competitive pressure from generic AI, including chemically identical generic product, tank mixes assembled by growers that include the generic product, and competition from products that are not chemically identical. In addition, the commonality of competitive dynamic among distinct chemistries supports their collective consideration within the same relevant market.

40. For each product in the market, the AI is a key component and distinctive source of value. The value of a component AI is rooted in its distinctive functionality and use. Each of the six AIs provides a distinctive benefit to growers that other AIs do not replicate. For each of the six AIs, this commonality underpins the substitutability among different rungs on the product ladder and the common importance of generic competition for the various chemistries within the market.

41. I further conclude, based on the same evidence, that for each of the six AIs there is a relevant market for the AI included as a component of a finished crop-protection product. This second set of markets offers an alternative way to frame the same underlying economic facts relevant to defendants' conduct.

42. I also show that the United States is the appropriate geographic scope of each relevant market.

43. I next show that Syngenta and Corteva have monopoly power in the relevant markets. The evidence of each incumbent's competitive significance includes its persistently high share of each market. I employ a variety of ordinary-course measures to assess competitive significance. I calculate shares using both quantity and revenue measures, using first-party data provided in discovery and third-party data from a leading data analytics provider.

44. My preferred measure is quantity based, using a metric employed by defendants to measure compliance with the loyalty program thresholds, and drawing upon invoice data from market participants. On this measure, as of 2023, the relevant defendant's market share ranges between [redacted] and [redacted] in the five markets in which a defendant is alleged to possess monopoly power. Over the period between 2018 and 2023, the minimum share for any AI is 61%; for most years and most AIs, defendant's share is substantially higher. In the final market, acetochlor, Corteva's market share is [redacted] as of 2023, and has ranged between [redacted] and [redacted] during this period.

45. Market shares based on manufacturer revenue are consistent with these calculations, albeit generally higher. I also calculate shares based on acres treated and grower expenditures. Defendant's market shares on these measures, too, are persistently high.

46. In each market, defendant's high share is protected by significant entry barriers. To bring a generic product to market, a manufacturer must expend substantial time and resources. These costs include compensation to the basic manufacturer for use of the latter's data. A rational generic producer must anticpate adequate volume and revenue to justify this time and expense. Achieving the requisite level of sales depends on adequate access to

customers, which is provided by the traditional distribution channel. Owing to defendants' conduct, generic producers lack such access, raising a substantial barrier to entry.

47. The conclusion that each defendant possesses monopoly power is also supported by direct evidence of its exercise. Much of the evidence supporting my conclusions about market definition takes the form of direct evidence, including the evidence of higher prices and defendant profits in the absence of generic entry.

48. In addition, each defendant's effective exclusion of generic producers is direct evidence that it possesses substantial market power. A firm without such power would lack the incentive and ability to exclude—that is, it would not find it profitable to undertake the costly exclusionary action. An important cost here is the loyalty payments made to distributors as an inducement to loyalty. If the defendant had no monopoly power, the loyalty programs would be an ineffective form of exclusionary conduct, as other firms remaining in the market would effectively constrain it, or because new challengers would readily emerge.

49. In Section 4, I take up the second question: whether Syngenta's and Corteva's exclusionary conduct has enabled them to preserve their market position. The answer is yes.

50. Loyalty payments are an established strategy for manufacturers to secure near-exclusivity and deprive rivals of effective distribution, thereby protecting monopoly profits. Syngenta and Corteva share monopoly profits with distributors by means of the payments, which serves as an inducement to secure the distributors' acceptance of the arrangement. The defendants pay for compliance with their loyalty programs on a "first dollar" basis, which confers a strong incentive on a distributor to attain the threshold.

51. Syngenta and Corteva have a strong incentive to impede competition from generic manufacturers, because competition from generic manufacturers poses a threat to their profits. Loyalty programs are an effective way to address this threat because the rivals need access to the traditional distribution channel in order to compete effectively. Utilizing alternative channels or building a parallel distribution system from scratch is infeasible, higher cost, or less effective.

52. The loyalty programs induce distributor compliance with a low level of permitted generic sales. They induce compliance by sharing monopoly profits via complex and contingent loyalty payments, which are retained to a substantial degree as distributor profit, and via profitable private label opportunities. The programs also induce distributor compliance via a variety of penalties, including loss of other marketing payments, loss of supply allocation for products in short supply, and outright refusal to sell products. And while substantial portions of the loyalty payments themselves are retained as distributor profit, distributors are incentivized to obtain them even to the extent they must be passed through, because they need access to branded products on competitive terms.

53. As a result of these inducements, distributors generally find it unprofitable to abandon loyalty by accommodating a generic manufacturer and selling more than the "headroom" allowed by a loyalty program. A rational distributor will weigh the benefit of participation against the benefit of defection and conclude that participation is the more profitable course.

54. The loyalty programs are not ordinary price competition. This conclusion is supported by the evidence indicating that the loyalty programs serve to exclude generic competitors. Moreover, documents and testimony describe the programs as a means to share profit with distributors in return for loyalty. The programs' timing (introduced coincident with generic entry) and design are also inconsistent with ordinary price competition. The Syngenta loyalty program also creates an unusual incentive for other manufacturers to purchase high-priced technical AI in order to [redacted].

55. The programs secure compliance from the great majority of traditional distributors, foreclosing to generics the most efficient and effective path to market for generics. This reduces the addressable market for generics relative to what would otherwise occur.

56. In Section 4, I also analyze the third question. Foreclosure of distribution has impeded generic entry and expansion, resulting in fewer generic sales and fewer generic market participants. Exclusion of generics has harmed consumers in the form of higher prices and less innovation, compared to unfettered competition—that is, competition without the restraint imposed by the loyalty programs.

57. The foregoing evidence supports the conclusion that the defendants' actions to preserve monopoly power have harmed competition and consumers.

58. As for the fourth question, I will evaluate assertions of procompetitive justifications by defendants and their experts, if any, in a subsequent report.

## 2. Industry Background

### 2.1. Crop protection products

59. Pesticides are chemicals that eliminate or control unwanted pests. Crop protection products are pesticides that, as the name suggests, are used to protect crops. There are three main types of crop protection products, each of which targets a different type of pest: herbicides, insecticides, and fungicides.

60. Herbicides constitute the majority of crop protection sales, as shown in Figure 1, which reports U.S. sales in 2024 by type of pesticide. These sales are measured at the "farmgate"—that is, at the retail level—using the FarmTrak dataset collected by Kynetec, a data analytics company.[5]

**FIGURE 1: SALES OF CROP PROTECTION PRODUCTS BY TYPE OF PESTICIDE, 2024 (UNITED STATES)**

[redacted]

Notes: FarmTrak data. *See* Crop Protection Sales Workpaper.

61. In the United States, the crops with the largest grower expenditures are corn, soybeans, wheat, and cotton.[6] These four crops accounted for 72% of harvested acres, according to a 2022 U.S. Department of Agriculture census, and in 2024, accounted for 74% of crop

---

[5] [redacted]

[6] *See* Crop Protection Sales Workpaper.

protection product sales.[7] Crop protection products are also used to protect a variety of specialty crops, including a variety of fruits, vegetables, and nuts.[8] Crop protection products for specialty crops typically sell at a premium and provide a higher margin for manufacturers.[9] Figure 2 summarizes U.S. crop protection product sales by crop.

**FIGURE 2: SALES OF CROP PROTECTION PRODUCTS BY CROP, 2024 (UNITED STATES)**

[redacted]

Notes: FarmTrak data. *See* Crop Protection Sales Workpaper.

62. Each crop protection product contains one or more AIs. The AI is the chemical that kills or controls a pest. AIs are combined with other substances to make a finished product. There are two types of finished products. A "straight product" or "straight formulation" contains a single AI; a "mixture" contains two or more component AIs. There are two types of mixtures. "Premixes" are mixtures prepared by the manufacturer. "Tank mixes" are mixtures prepared by the grower (or an agent working on the grower's behalf), by

[7] *See* U.S. Dep't of Agric., Nat'l Agric. Statistics Serv., Census of Agriculture, Vol. I, Table 1 (2022) (reporting fraction of acres harvested of corn for grain, corn for silage or greenchop, wheat for grain, soybeans for beans, and cotton to total harvested cropland acres); Crop Protection Sales Workpaper.

[8] Schumacher (C.E.O., Helm; former Dow, WinField) IH Tr., at 26:1–4 ("We generally use the word specialty market like fruits and vegetables, tree nuts and vines, those type of crops."); *id.*, at 128:22–25 (describing "specialty row crop" as "cotton, fruit and veggies, and tree nut and vine"); Gertz (C.E.O., Sipcam U.S.A.; former Dow, WinField) IH Tr., at 136:23–137:9 ("There are some specialty crops in the Midwest. Sugar beet would be a really good example of that.").

[9] *See, e.g.*, CRTVA-CPL-00160186, at slide 4 (6/11/2020 Corteva presentation: "US Crop Protection") (showing 2020 margin of [redacted] for specialty crops, [redacted] for corn herbicides, and [redacted] for soybean herbicides).

purchasing and combining multiple finished crop protection products before making a single spray application.[10]

63. Crop protection products differ in their effectiveness along various dimensions. Some are effective against one type of pest but not another. Among herbicides, some are effective against "broadleaf" weeds but not grasses, and vice versa.[11] Some products are tolerated by (and hence usable on) one crop but fatal to another.[12] Some are particularly well suited for the soil in one part of the United States, but not another.[13] These and other differences limit the usefulness of a given product as a suitable alternative for a grower with a particular pest problem to solve.

64. Basic manufacturers such as Syngenta and Corteva develop new crop protection products. The four largest firms, measured by U.S. sales, are Bayer, BASF, Syngenta, and Corteva. Figure 3 reports U.S. sales by manufacturer in 2024. As shown in the figure, each of the leading firms had sales of approximately [redacted] or more.

---

[10] *See* Canady (C.E.O., Atticus) IH Tr., at 24:16–25 (noting that distributors and retailers are not authorized to sell tank mixes; a tank mix is not something "a company would sell" because "that would be circumventing the EPA [registration requirements]. The only time you can do it is actually a farmer . . . puts it in their tank, but a distributor or retailer or manufacturer like us could not sell that because that would be circumventing the EPA registration process.").

[11] A broadleaf weed has a main vein in the center plus smaller branching veins. Grassy weeds have parallel veins. *See* Univ. of Minn. Extension, Annual Broadleaf Weeds, extension.umn.edu/weed-identification/annual-broadleaf-weeds#broadleaf-weed-characteristics-838060. For example, mesotrione is effective against broadleaf weeds, while metolachlor and acetochlor are effective against grasses. *See* Appendix C; Sections C.2, C.3, and C.6.

[12] A prominent example is mesotrione, which is tolerated by corn but not by soybeans. *See* Appendix C; Section C.2.

[13] For example, metolachlor is particularly well suited for southern soils, while acetochlor is particularly well suited for northern soils. *See* Appendix C; Sections C.3, C.6.

**FIGURE 3: SALES OF CROP PROTECTION PRODUCTS BY LEADING MANUFACTURER, 2024 (UNITED STATES)**

[redacted]

Notes: FarmTrak data. *See* Crop Protection Sales Workpaper.

65. In this matter, the plaintiffs have alleged anticompetitive conduct pertaining to crop protection products containing three Syngenta AIs.

66. *Azoxystrobin* is a fungicide that controls mildew and other fungal diseases. It is applied to a broad range of crops, particularly corn and soybeans, and to a lesser degree wheat.[14]

67. *Mesotrione* is a herbicide that controls broadleaf weeds. It provides both pre-emergent weed control, meaning that it is used to kill weeds before they sprout, and post-emergent weed control.[15] It is used mainly on corn, usually in conjunction with another herbicide, such as metolachlor or acetochlor, that targets grasses.[16]

---

[14] *See* SYT_REBATELIT_00038101, at slide 3 (12/1/2017 Syngenta presentation: "Azoxystrobin 2018-2023 US Product Marketing Plan") [redacted]

[15] *See* Syngenta Crop Protection, Inc., Petition for Extension of Protection Period for Mesotrione Exclusive Use Data 3 (Jan. 15, 2009), www.epa.gov/sites/default/files/2014-04/documents/mesotrione-petition.pdf (describing preemergence and postemergence control by mesotrione).

[16] *See* Gesse (Head of Herbicide Product Mktg., Syngenta) Dep. Tr., Vol. I, at 123:15–125:5 (describing uses of mesotrione).

68. *Metolachlor*[17] is a herbicide that is effective mainly on grasses.[18] It is pre-emergent[19] and broad-spectrum, meaning that it kills a wide variety of plants.[20] Metolachlor's typical use is corn and soybeans, with potential application to dozens of other crops.[21] Some metolachlor premixes are used mainly on corn, others mainly on soybean. It can be made safe for corn by a so-called safener that selectively protects the crop from damage.[22]

69. The plaintiffs have also alleged anticompetitive conduct pertaining to crop protection products containing three Corteva AIs.

70. *Rimsulfuron* is a herbicide that is effective on a wide range of grasses and certain broadleaf weeds.[23] It is applied to specialty crops such as almonds, grapes, pistachios, and potatoes, primarily as a straight product.[24]

---

[17] As I explain in Appendix C, EPA has registered two variants of metolachlor. Syngenta products contain S-metolachlor (often called "SMOC"), as do many generic products. An older variant that I refer to as "old metolachlor" is used in some generic products. I distinguish these variants where relevant to my analysis, generally in footnotes.

[18] It is also effective on a subset of broadleaf weeds known as small-seeded broadleaf weeds. *See* CX2487-027, SYT_REBATELIT_00302569 (10/15/2015 Syngenta presentation: "Corn herbicide active ingredient review") (discussing major weeds controlled); [redacted]

[19] *See* Wichert (Customer Mktg. Manager, Syngenta) IH Tr., at 175:9–176:8 (describing uses of metolachlor). Metolachlor is sometimes also used as part of post-emergent treatments, and in this context is being used to prevent emerging weeds. *See* [redacted] SYT_REBATELIT_00757701, at 73–83 (10/28/2016 Syngenta Presentation: "Power of S-Metolachlor Magnum Brands") (describing pre-emergent activity).

[20] *See*, *e.g.*, SYT_REBATELIT_00635277, 277 (1/12/2018 Syngenta promotional document: 2018 BroadAxe Dimetric Sell Sheet) (highlighting broad-spectrum application of BroadAxe); SYT_REBATELIT_03208832, at 838, 840 (2021 Syngenta Product Guide, Solutions from Planting to Harvest") (same, for Lumax EZ and Acuron Flexi); SYT_REBATELIT_00615043, 045 (8/1/2016 Monsanto promotional document: "Roundup Ready Plus, 2016 Weed Management Recommendations and Incentives") (same, for Dual Magnum).

[21] *See* CX2508-010, -022–25, SYT_REBATELIT_00300623 (12/2014 Syngenta presentation: "s-moc Product Marketing Plan 2015-2019") (describing typical application to row crops such as corn, soybeans, and cotton); [redacted]

[22] *See, e.g.*, Bunting (V.P. Crop Protection, Growmark) Dep Tr., Vol. I, at 88:12–25 ("So there's all kinds of options in the marketplace that's a safened version of metolachlor or there's also an unsafened. And some crops need the safener, like corn, so it doesn't cause crop injury.").

[23] *See* FTC-CTVA_01117477, 482 (6/25/2021 Corteva presentation: "Tree and Vine Herbicide Review").

[24] *See* CRTVA-CPL-00963068, at slide 9 (8/16/2025 Corteva presentation: "Tree and Vine Herbicide Review") (presenting the applicability of Matrix SG). In addition, rimsulfuron is applied to corn, generally as a component of a premix with other AIs such as mesotrione. *See* CRTVA-CPL-00960056, at slides 16–17, 28, 30–32, 43–49 (8/5/2020 Corteva presentation: "Crop Protection Products for Corn, Alfalfa and Dry Beans").

71. *Oxamyl* is an insecticide and nematicide that controls a broad spectrum of insects and nematodes.[25] It is used mainly on potatoes, with substantial use on cotton and various vegetables and fruits.[26]

72. *Acetochlor* is a herbicide effective on grasses.[27] It is applied to crops both pre-emergence and post-emergence. Acetochlor is mainly used on corn, though it is also used on soybeans and is labeled for a variety of additional crops, including cotton, peanuts, sorghum, and sugar beets.[28] As with metolachlor, acetochlor can be made safe for corn by using a safener.[29]

73. Figure 4 reports U.S. retail sales of crop protection products containing each AI.

[25] *See* CRTVA-CPL-00813357, at slides 12–13 (5/15/2006 DuPont presentation: "Lannate & Vydate Biology"); CRTVA-CPL-00857562, at slide 9 (11/7/2019 Corteva presentation: "Vydate C-LV and Vydate L Presentation").

[26] *See* CRTVA-CPL-00153421 (3/3/2020 Corteva spreadsheet: "2015-2019 AgroTrak Oxamyl Use"); CRTVA-CPL-00661242 (3/31/2023 Corteva spreadsheet: "Oxamyl – Crop x Country"); Leifker (Carbon Mktg. Leader, Corteva) IH Tr., at 53:2–5 (explaining that potatoes and vegetables are the two "big" crops on which oxamyl is used); CX3166-004–005 (undated Rotam presentation: "2017 Budget Business Development Oxamyl") (cotton, potato, vegetables, fruit trees); CX1564-009, FTC-CTVA-CID_00002812 (10/29/2019 Kline report: "Nematicides 2018: United States Market Analysis and Opportunities") (detailing oxamyl usage). The oxamyl active ingredient is approved by the EPA for use on many crops. *See* CRTVA-CPL-00053481, 484 (Oct. 20, 2017, letter from Michael Walsh (EPA) to Patricia Devine (DuPont)) (listing apples, apples (nonbearing), bananas, cantaloupe, carrots, celery, cherry (nonbearing), citrus fruits, citrus fruits (nonbearing), cotton, cucumber, eggplant, garlic, ginger, honeydew melons, onions (dry bulb), peach (nonbearing), peanuts, pear, pear (nonbearing), peppers, peppermint, pineapple, plantain, potato, pumpkin, spearmint, squash, sweet potato, tobacco, tomato, watermelons, and yams).

[27] *See* CRTVA-CPL-00082491, at slide 2 (10/12/2021 Corteva presentation: "Nitrogen Stabilizers & Row Crop Herbicides Active Ingredients"). Acetochlor also provides control for annual sedges and certain broadleaf weeds. *See id.*

[28] *See* CRTVA-CPL-00082491, at slide 2 (10/12/2021 Corteva presentation: "Nitrogen Stabilizers & Row Crop Herbicides Active Ingredients") (providing product overview and listing labeled crops, which "vary by geography"); *see also* GF-5223, "Enversa" herbicide (EPA Reg. No. 62719-775), U.S. Env't Prot. Agency, Pesticides Prod. & Label Sys, www3.epa.gov/pesticides/chem_search/ppls/062719-00775-20231219.pdf (listing labeled crops).

[29] *See* CRTVA-CPL-00082491, at slide 2 (10/12/2021 Corteva presentation: "Nitrogen Stabilizers & Row Crop Herbicides Active Ingredients").

**Figure 4: Sales of Crop Protection Products Containing Each AI, 2024 (United States)**

[redacted]

Notes: FarmTrak data. *See* Crop Protection Sales Workpaper. Premixes containing both mesotrione and metolachlor as component AIs, or both mesotrione and acetochlor, are included in the sales of each component. Rimsulfuron sales are limited to products labeled for use on specialty crops. FarmTrak data on oxamyl may undercount sales.

74. In addition to finished products, defendants also sell technical grade AI.[30] The technical grade product can be sold to other manufacturers or distributors for formulation into their own products.[31] The technical grade product is not used by growers.[32]

## 2.2. Manufacturer exclusivity and generic entry

75. A manufacturer that develops a new AI has two forms of legal protection that enable it to lawfully exclude competition: patents, and so-called data exclusivity under FIFRA. First,

---

[30] *See* Gesse (Head of Herbicide Product Mktg., Syngenta) Dep. Tr., Vol. I, at 226:22–227:6 (stating that Syngenta sells technical to and buys technical from other basic manufacturers, including Corteva). Basic manufacturers generally synthesize products in-house, while generics source from a variety of companies. *See* Vance (President, Albaugh N.A.) IH Tr., at 67:16–21.

[31] *See* SYT_REBATELIT_00639828, 829 (10/23/2017 Syngenta internal memo: "Syngenta to Supply DuPont with Unsafened S-metolachlor") (stating that DuPont will be purchasing S-metolachlor formulated product from Syngenta to [redacted]); Weikel (Head of National Accounts & Customer Service, Syngenta) Dep. Tr., Vol. II, at 580:10–581:10 (discussing S-metolachlor supply agreement with DuPont).

[32] *See* U.S. Env't Prot. Agency, Chapter 4: Types of Label Reviews 5 (Dec. 2011), www.epa.gov/sites/default/files/2017-10/documents/chap-04-dec-2011.pdf (stating that technical labels should include a statement such as "For Manufacturing or Formulating Use Only").

a novel AI is typically protected by a "compound" or composition of matter patent.[33] In addition to the compound patent, basic manufacturers also hold other patents covering technology such as product formulation or manufacturing processes, which are sometimes referred to as "residual" patents.[34] Unlike the compound patent, a generic need not necessarily infringe these residual patents to bring a product containing the AI to market, but generics nonetheless assess this residual IP when making product entry decisions as innovating around this IP is sometimes difficult.[35]

76. Second, the basic manufacturer is protected by a period of data exclusivity". The relevant data describes the potential toxicity and environmental impact of the AI.[36] The data is submitted by the basic manufacturer to the U.S. Environmental Protection Agency as a condition for approval of the AI. The length and expense of the approval process varies depending on the potential for harmful effects. For example, in 2002, Syngenta reported costs for metolachlor of [redacted].[37] In 2018, Corteva reported costs for acetochlor of approximately [redacted].[38]

77. Data exclusivity lasts for ten years, and can be extended by three years under certain circumstances. During the exclusivity period, other manufacturers cannot rely on the data in securing approval of their own product.[39] This exclusivity has a rough analogy in the exclusivity enjoyed by branded producers in the pharmaceutical industry, which for a limited period prevents generic drug makers from relying on the brand's safety and efficacy studies as part of an application for regulatory approval. Compared to patent protection alone, data exclusivity often extends the period of protection before generics enter the market.

---

[33] *See* Tudor (Mktg. Head, Syngenta AG) Dep. Tr., Vol. I, at 40:23–41:7.

[34] *See* Tudor (Mktg. Head, Syngenta AG) Dep. Tr., Vol. I, at 40:23–41:7, 46:21–47:7.

[35] [redacted]

[36] U.S. Env't Prot. Agency, Pesticide Registration Manual, Chapter 1 - Overview of Requirements for Pesticide Registration and Registrant Obligations, www.epa.gov/pesticide-registration/pesticide-registration-manual-chapter-1-overview-requirements-pesticide#toxicity ("When EPA determines that a pesticide product can be registered for use, the Agency has concluded that the use of the pesticide product will not cause unreasonable adverse effects to humans or the environment when applied according to the label directions and restrictions.").

[37] CX2835-024, SYT_REBATELIT_04520487 (3/20/2002 Syngenta presentation: Syngenta Generics Strategy).

[38] The Corteva figure reflects the amount that it, along with its partner Bayer, reported in its Statement of Claim against generic manufacturer Sharda in March 2018, minus adjustments for inflation [redacted]. *See* FTC-CTVA-CID_00007352, 397–405 (5/8/2019 Statement of Claim of Acetochlor Registration Partnership In the Matter of the Arbitration with Sharda Cropchem Ltd.) (calculating [redacted] in "total compensable data costs, adjusted for inflation, interest, the cost of capital, and a premium").

[39] As a formal matter, the basic manufacturer could grant permission to the generic, but the resulting reduction in collective profits makes that outcome unlikely.

78. Figure 5 reports the expiration dates of the compound patent and data exclusivity for the six AIs. The patents expired between 1988 and 2014. Data exclusivity expired between 1984 and 2014. For three of the AIs (mesotrione, metolachlor, and acetochlor), data exclusivity extended the duration of legal exclusivity.[40] For all six AIs, legal protection expired by 2014.

**FIGURE 5: EXPIRATION OF LEGAL PROTECTION FOR THE SIX AIS**

| | Active Ingredient [A] | Patent Number(s) [B] | Patent Expiration [C] | First EPA Registration [D] | Date First Registered [E] | Data Exclusivity Expiration [F] | Expiration of Legal Protection [G] |
|---|---|---|---|---|---|---|---|
| | **Syngenta AIs** | | | | | | |
| [1] | Azoxystrobin | 5,602,076 | 2/11/2014 | 100-1093 | 2/7/1997 | 2/7/2010 | 2/11/2014 |
| [2] | Mesotrione | 5,006,158 | 4/9/2008 | 100-1131 | 6/4/2001 | 6/4/2014 | 6/4/2014 |
| [3] | Metolachlor | 5,002,606 | 3/26/2008 | 100-815 | 3/14/1997 | 9/15/2009 | 9/15/2009 |
| | **Corteva AIs** | | | | | | |
| [4] | Rimsulfuron | 5,393,733 | 4/7/2009 | 352-555 | 12/15/1994 | 12/15/2004 | 4/7/2009 |
| [5] | Oxamyl | 3,530,220; 3,658,870 | 4/25/1989 | 352-372 | 4/4/1974 | | 4/25/1989 |
| [6] | Acetochlor | 3,547,620 | 12/15/1988 | 66478-1; 66478-2 | 3/11/1994 | 3/11/2004 | 3/11/2004 |

Notes: *See* Expiration of Legal Protection Workpaper. Oxamyl was registered before the critical date for data exclusivity under FIFRA, and thus lacks an entry for expiration. *See* 7 U.S.C. § 136a(c)(1)(F)(i) (granting ten years of exclusive use for pesticides containing AIs registered after September 30, 1978).[41]

79. After data exclusivity expires, a generic manufacturer may rely on the data in preparing its own application to EPA. However, the generic must compensate the basic manufacturer for use of the data relied upon.[42] The obligation to pay compensation expires 15 years after a particular data submission.[43] After that date, a generic can use the data without

---

[40] In the case of metolachlor, data exclusivity ended when the EPA concluded that a claimed three-year extension was not warranted. Letter from Lois Rossi, Director, Registration Div., Off. of Pesticide Programs, U.S. Env't Prot. Agency, to John Abbott, Syngenta Crop Protection, LLC (Sept. 15, 2009), www.epa.gov/sites/default/files/2014-04/documents/s-metholachlor-response.pdf (denying Syngenta petition for extension of exclusive use data protection).

[41] The entry for metolachlor reflects S-metolachlor. For old metolachlor, U.S. Patent No. 3,937,730 expired on 2/10/1993; EPA registration (100-587) occurred on 4/1/1977. Old metolachlor, like oxamyl, was registered before the critical date for data exclusivity. For further details about S-metolachlor and old metolachlor, *see* Appendix C.

[42] The generic may cite all the data previously submitted to EPA, 40 C.F.R. § 152.86, or it may seek only to rely on specific, or "selective," previous studies, 40 C.F.R. § 152.90. Technically the payment is made to the registrant as opposed to the manufacturer.

[43] *See* 7 U.S.C. § 136a(c)(1)(F)(iii).

compensation. However, the basic manufacturer has ongoing obligations to refresh its data submissions, which give rise to new and ongoing obligations for generic firms to pay compensation.[44]

80. The generic product, once approved, typically enters the market at a lower price and takes sales from the basic manufacturer. This competition also places downward price pressure on the basic manufacturer's offering, which may result in a broad or targeted price cut by the basic firm, the introduction of a low-price "fighting brand," or a reduction in the distributor price (in some instances funded through "fighting funds" provided by the manufacturer).

81. Market participants recognize this dynamic. For example, [redacted] Market participants also report an increase in downward pricing pressure as the number of generics increases.[47]

82. [redacted][48] Figure 6 reproduces Syngenta's analysis of generic entry. In the chart, "year zero" denotes the first year of generic entry. [redacted]

---

[44] *See* 7 U.S.C. § 136a(c)(2)(B) (noting that in the event that the "[EPA] Administrator determines that additional data are required to maintain in effect an existing registration of a pesticide," each registrant of the pesticide is required to submit updated data, or share the cost in developing such data).

[45] CX2100-080, SYT_REBATELIT_00220759 (12/07/2015 Syngenta presentation: "NA PPS Guide").

[46] CX2037-004, SYT_REBATELIT_00062354 (12/18/2015 Syngenta presentation: "Meso[trione] PPW [Post Patent] Workshop 2015").

[47] *See* CX2418-041, SYT_REBATELIT_00024081 (5/7/2015 Syngenta presentation: "2016 Pricing Guidance - US Fungicides") [redacted]; CX1770-007, CRTVA-CPL-00819717 (3/14/2022 Corteva presentation: "Crop Protection Lifecycle Management Playbook") [redacted]; Hawkins (President, Syngenta) IH Tr., at 37:24–38:5 [redacted]; Cecil (Head of Mktg., Syngenta) IH Tr., at 105:16–105:20 [redacted]; Carpino [redacted]; *see also* Gertz (C.E.O., Sipcam U.S.A.; former Dow, WinField) IH Tr., at 112:22–113:21 (noting that with "a lot of entrants in . . . the devaluation could really pick up a lot of speed . . . . The more people get in, the more people fight").

[48] CX2441-005, -015, SYT_REBATELIT_00350778 (4/23/2015 Syngenta presentation: CSC Presentation on Aframe Plus Allocation) [redacted].

[redacted].[49] The average market price dropped by slightly more. [redacted]

**FIGURE 6: SYNGENTA ANALYSIS OF GENERIC ENTRY**

Syngenta post patent management strategy vs. competitors

[redacted]

Notes: SYT_REBATELIT_01133840, at slide 5 (6/2014 Syngenta presentation: "Crop Protection and Seedcare lifecycle management, Plains CU").

83. For each Syngenta AI and Corteva AI, there has been generic entry. Figure 7 summarizes the timing and source of generic entry for each AI. For five of the six AIs, generic entry was limited, as I discuss in more detail later in this report. The exception is oxamyl, where the generic was alone on the market prior to entry by the brand, due to unusual circumstances discussed in Section 3.

[49] CX2441-015, SYT_REBATELIT_00350778 (4/23/2015 Syngenta presentation: CSC Presentation on Aframe Plus Allocation).

**FIGURE 7: LIMITED GENERIC ENTRY FOR THE SIX AIS**

| AI | Year | Manufacturer |
|---|---|---|
| **Syngenta** | | |
| [1] Azoxystrobin | 2014 | Willowood |
| [2] Mesotrione | 2016 | Rotam |
| [3] Metolachlor | 2017 | UPL |
| **Corteva** | | |
| [4] Rimsulfuron | 2016 | Rotam |
| [5] Oxamyl | 2017 | Rotam |
| [6] Acetochlor | 2018 | Sharda |

Notes:
[1]: SYT_REBATELIT_00028939, at slide 8 (1/14/2015 Syngenta presentation: "2015 – 2019 US Azoxystrobin Marketing Plan") (noting generic entry in 2014); SYT_REBATELIT_00038101, at slide 31 (12/1/2017 Syngenta presentation: "2018–2023 US Product Marketing Plan") (listing Willowood as a [redacted]"). *See also* Generic Entry Workpaper (showing 2014 as the first year of generic sales using FarmTrak data).
[2]: CX2278-004, SYT_REBATELIT_00211633 (3/21/2016 Syngenta presentation: "Mesotrione Update") (noting that Rotam was the first generic to apply for an EPA registration); *see also* Generic Entry Workpaper (showing 2016 as the first year of generic sales using FarmTrak data). Adama and Cheminova entered in 2010 and 2011 but were not successful. *See* Appendix C.
[3]: CX2511-005, -055, SYT_REBATELIT_00117169 (noting generic entry in 2017 by UPL); *id.* at -056 (noting other entrants). *See also* Generic Entry Workpaper (showing 2017 as the first year of generic sales).[50]
[4]: CX1613-012, FTC-CTVA_00300904 (10/17/2017 Corteva presentation: "Matrix") (noting imports by Rotam of rimsulfuron beginning in 2017 and limited sales by other generics in the early 2010s). *See also* Generic Entry Workpaper (showing 2010 as the first year of generic sales by Adama and 2016 for Albaugh/Rotam).
[5]: Chavez (Regional Head N.A., Rotam) IH Tr., at 178:4-179:21 (testifying that Rotam entered in 2017); Swanson (Global Product Manager, Corteva) IH Tr., at 259:1-15 (same). *See also* Generic Entry Workpaper (showing 2017 as the first year of generic sales).
[6]: CX1306-013, FTC-CTVA_00003831 (11/2/2018 Corteva presentation: "Corn Herbicides") [redacted]. FarmTrak data indicates that Sharda sales of acetochlor products began in calendar year 2019. *See also* Generic Entry Workpaper (showing 2019 as the first year of generic sales).

84. Given these effects, defendants have a strategic imperative to delay competition from generics and reduce its effectiveness. In evaluating the impact of generic entry on

[50] The table entry reflects generic entry of S-metolachlor. Generic entry of old metolachlor occurred in or around 2002 from Drexel, Sipcam, and Cedar/Adama. *See* CX2511-056, SYT_REBATELIT_00117169 (reporting 2002 "launch date" by Drexel and Adama); Comment by Scott A. Pace, Chairman, Metolachlor

[redacted]

### 2.3. Distribution of crop protection products

85. Typically, crop protection products are distributed through the so-called traditional channel: manufacturers sell to distributors, which sell to retailers, which sell to growers. Figure 8 is a Syngenta chart illustrating the structure of the traditional channel. As shown in the chart, some distributors are integrated with retailers rather than selling to them. The channel also includes cooperative distributors that act on behalf of member retailers.

FIGURE 8: SYNGENTA ANALYSIS OF THE TRADITIONAL CHANNEL

**Syngenta Crop Protection Channel Structure**

[redacted]

Notes: CX2619-005, SYT_REBATELIT_00841166 (8/2022 Syngenta presentation: "CP Channel Strategy Evolution (Wholesale)").

86. *Distributors*. Distributors can be categorized based on their geographic scope of operation. Five national distributors—Nutrien AG Solutions ("Nutrien"), Tenkoz, WinField United,

---

Task Force, U.S. Env't Prot. Agency Dkt. No. EPA-HQ-OPP-2014-0772 (Feb. 20, 2015), www.regulations.gov/document/EPA-HQ-OPP-2014-0772-0016 (noting generic entry in 2002 and 2003). *See also* Generic Entry Workpaper (showing 2004 as the first year of generic sales of old metolachlor). For further details about S-metolachlor and old metolachlor, *see* Appendix C.

Helena, and J.R. Simplot—handle the great majority of crop protection sales made through distributors.[51] Tenkoz is technically not a distributor, but a buying group that acts collectively on behalf of its membership of 12 regional distributors.[52] Beyond these five, independent regional distributors and cooperatives handle the remainder.[53] Figure 9 reports the share of the traditional channel accounted for by each distributor type, as calculated by Kline & Company, a market research firm that focuses on crop protection distribution.

---

[51] [redacted]. The individual share of each firm, calculated from Kline data in the Leading Distributors Workpaper, is as follows: Nutrien (25%); Tenkoz (25%); WinField (16%); Helena (9%); and Simplot (6%). Kline uses external sales of the distributors. Thus, for sales made by a distributor integrated into retailing, Kline is reporting retail-level sales rather than distributor-level sales, resulting in some overweighting of such sales if used for the purpose of evaluating the size of the distribution business. For Syngenta and Corteva, these five distributors accounted for between 64% and 92% of the six AIs based on manufacturer revenue. *See* Distributor Channel Workpaper.

[52] Tenkoz has a cooperative structure where the members are shareholders. *See* Cole (President, Tenkoz; former Valent) Dep. Tr., Vol. I, at 24:10–25:7. The members compete with one another for sales. *See* Cole (President, Tenkoz; former Valent) IH Tr., at 62:15–17. WinField is owned by Land O'Lakes, a cooperative of dairy farmers. *See* Maple (V.P. of Ag Business Alliances, WinField) Dep. Tr., Vol. I, at 24:7–25.

[53] Cooperatives, which include Growmark, IAP, CHS, and CNI, vary in their ownership and functionality. CX4776–032, CNIAG-00085045 (2/2022 Kline Report: "Leading Distributors in the U.S. Crop Protection Industry"). Growmark, IAP, and CNI are owned by independent retailers. *See* Fowler (Sr. V.P., CNI) IH Tr., at 44:15–45:18; Menagh (C.E.O., Source Dynamics; former Syngenta, IAP) Dep. Tr., Vol. I, at 22:9–23:18; Bunting (V.P. Crop Protection, Growmark) Dep. Tr., Vol. I, at 17:8–24 ("So our cooperative structure, we are owned by our member companies, who would be the retail outlets for our products that are being sold to producers and farmers."). CHS is a grower cooperative that is integrated into retail. *See* CX4776–057, CNIAG-00085045 (2/2022 Kline Report: "Leading Distributors in the U.S. Crop Protection Industry"). Some cooperatives (for example, Growmark) function as distributors, while others (for example, IAP) serve as a buying group on behalf of retailers, with the retailer members receiving products directly from the manufacturer.

**FIGURE 9: SHARE OF THE TRADITIONAL CHANNEL BY TYPE OF DISTRIBUTOR, 2021 (UNITED STATES)**




Notes: CX4776-032, CNIAG-00085045 (2/2022 Kline Report: "Leading Distributors in the U.S. Crop Protection Industry"). For further detail, *see* CPP Sales by Distribution Category Workpaper.

87. [redacted].[54] Distributors and manufacturers generally describe strong competition among distributors.[55]

---

[54] [redacted]

[55] *See* Bodily (Area Lead, Corteva) IH Tr., at 91:16–24 ("The marketplace is extremely competitive, and [redacted]"); Langkamp (Head of Key Account Mgmt. & Customer Service, Syngenta) IH Tr., at 23:3–12 [redacted]; Negroni (Sr. V.P. Product Innovation & Supplier Relations, Wilbur-Ellis; former Helena) Dep. Tr., Vol. II, at 329:20–330:17 ("Q. Why didn't the distribution partners just jack up the retail price, then? A. Because it's a competitive market, and we lack discipline. We can't -- we would -- I would love to say we can price higher than where a product is not priced appropriately from a supplier, but there's always someone willing to sell for cheaper, sell for less."); Van Vooren (former Corteva) Dep. Tr., Vol. I, at 76:7–24 ("This business is highly competitive . . . ."); Bishop (Area Leader, Corteva) Dep. Tr., Vol. I, at 69:25–70:16 ("All three segments of the channel, distributor, retailer and grower are highly competitive . . . ."); Bunting (Crop Protection Div. Manager, Growmark) IH Tr., at 102:12–21.

***

92. A minority of retail sales of crop protection products are made by "independent" retailers, which are neither integrated distributor-retailers nor cooperatives. Independent retailers account for approximately 10% of the retail locations nationwide.[67] Some independent retailers make purchases from a single distributor; others purchase from multiple distributors.[68]

93. Retail profit margins in 2023 were 26% for crop protection products, 22% for fertilizers, 15% for seeds, and 20% for retail level services.[69] Executives at integrated distributor-retailers testified that the retail sale of crop protection products is highly competitive.[70]

94. *Alternative channel*. In addition to the traditional distributor channel, a relatively small quantity of crop protection products is sold in a different way. The so-called alternative channel is a mix of "direct" sales to independent retailers or growers, sales to low-service brokers (which typically sell to retailers), and sales to online retailers.[71] The alternative channel is utilized by generic as opposed to basic manufacturers.[72] The available evidence

---

Wilbur-Ellis, a Tenkoz member, is an additional integrated distributor-retailer. *See also* CX4776-058, CNIAG-00085045 (2/2022 Kline report: "Leading Distributors in the U.S. Crop Protection Industry"). The exceptions are GreenPoint AG and Keystone Cooperative.

[67] CX2408-056, SYT_REBATELIT_00962358 (9/2021 Kline market research presentation: "Leading Distributors in the U.S. Crop Protection Industry: A Strategic Market Analysis") (independent retail category has declined from 25% of retail locations in 2008 to 10% in 2020); *see also* Chavez (Regional Head N.A., Rotam) IH Tr., at 87:2–10 (stating that "true independents" not affiliated with a buying group "maybe" constitute "2 or 3 percent").

[68] *See*, *e.g.*, [redacted].

[69] SYT_REBATELIT_03294633, at slide 37 (8/2023 Context Presentation for Syngenta: "U.S. Ag Retailer Study").

[70] *See* [redacted] Burlingham (Dir. Generic Crop Protection, Nutrien) IH Tr., at 97:9–13 (describing retail competition as "vigorous").

[71] *See* Langkamp (Head of Key Account Mgmt. & Customer Service, Syngenta) IH Tr., at 18:18–20:11.

[72] *See* Weikel (Head of National Accounts & Customer Service, Syngenta) Dep. Tr., Vol. I, at 30:3–21 ("Q. [redacted] Swanson (Global Product Manager, Corteva) IH Tr., at 60:22–61:12 [redacted] Feauto (Channel Lead Distribution Strategy, Corteva) IH Tr., 71:14–71:19 [redacted]. One qualification is that branded products may be sold into the alternative channel because an entity downstream of the basic manufacturer, such as a distributor or retailer, chooses to do so. *See* Feauto (Channel Lead Distribution Strategy, Corteva) IH Tr., at 70:20–71:7 ("[A] manufacturer like Corteva or Bayer, Syngenta, so on, would sell to a distributor, and that distributor may sell to a broker in which the product actually went through a distributor but then it was brokered off and sold to something that wouldn't necessarily be a retailer.").

indicates that approximately 10% of crop protection products by sales is sold using the alternative channel.[73]

## 2.4. Loyalty programs

95. The defendants are acutely aware of generic entry with respect to a particular AI, given the effect of unfettered generic entry on profits. In response, each defendant has developed a "post-patent" strategy to blunt the impact of generic entry. Loyalty programs are a central element of the post-patent strategy.

96. The introduction of a loyalty program for a particular AI typically coincides with the timing of anticipated generic entry. Often, anticipated entry reflects the expiration of legal protection upon the loss of patent or data exclusivity, whichever is later. Figure 10 reports the timing of legal protection expiration, limited generic entry, and inclusion in the loyalty program for the six AIs.

73 [redacted] *see also* CX2378-005, SYT_REBATELIT_00731710 (8/3/2020 Syngenta presentation: "Alternative Channel Exercise") [redacted]

**FIGURE 10: INCLUSION IN LOYALTY PROGRAM FOR THE SIX AIS**

| | | Expiration of Legal Protection [A] | Limited Generic Entry [B] | Inclusion in Loyalty Program [C] |
|---|---|---|---|---|
| | **Syngenta AIs** | | | |
| [1] | Azoxystrobin | 2014 | 2014 | [redacted] |
| [2] | Mesotrione | 2014 | 2016 | [redacted] |
| [3] | Metolachlor | 2009 | 2017 | [redacted] |
| | **Corteva AIs** | | | |
| [4] | Rimsulfuron | 2009 | 2016 | 2017 |
| [5] | Oxamyl | 1989 | 2017 | 2017 |
| [6] | Acetochlor | 2004 | 2018 | 2016 |

Notes: Dates are calendar years.
[A]: *See* Figure 5 (Expiration of Legal Protection for the Six AIs).
[B]: *See* Section 3.2.3 (limited generic entry) and Figure 7 (Limited Generic Entry for the Six AIs).
[C]: *See* Section 4.4.1 (inclusion in loyalty program).[74]

97. Syngenta's loyalty program is called Key AI. Corteva's main loyalty program was known as the CRPIVM Loyalty Program until 2023, when it was renamed the Active Ingredient Support Program.[75] The programs are similar in their requirements for compliance and structure of payment.

98. [redacted]

[74] The metolachlor entry reflects S-metolachlor. For old metolachlor, legal protection expired in 1993, and limited generic entry occurred around 2002. For further details about S-metolachlor and old metolachlor, *see* Appendix C.

[75] The acronym CRPIVM stands for Crops, Range & Pasture and Industrial Vegetation Management. As discussed in Section 4, Corteva also has a second loyalty program called the Corporate Distributor Offer that provides additional payments.

[76] [redacted]

[77] [redacted]

***

124. The test is devised to identify a set of products that are sufficiently substitutable that the buyers of those products would be significantly worse off purchasing those products from a single profit-maximizing monopolist than they would be purchasing them from multiple firms that compete against each other. Having identified a candidate set of products, the test evaluates how customers respond to a small but "significant," and "non-transitory" increase in price above a competitive level. If a sufficient number of users substitute to products outside of the purported market to render the price increase unprofitable, then the answer to the question is "no." In economic terms, the demand for the product is sufficiently "elastic" to merit the inclusion of additional substitutes within the relevant market.[104]

125. This fundamental approach is often used in horizontal merger cases. The focus on a hypothetical monopolist is central to the analytical approach taken in the Merger Guidelines, which is employed by economists at the Department of Justice and Federal Trade Commission.[105]

### *3.1.3. Market definition in the assessment of exclusionary conduct*

126. As their name suggests, the Guidelines are directed to mergers in the first instance. The Guidelines have further utility as a source of insight for assessing market power in exclusionary conduct inquiries, where many of the same economic questions arise.[106]

127. That said, market definition in a case in which exclusionary conduct is already occurring differs from the typical analysis conducted in a horizontal merger in one meaningful respect. In a typical merger case, the merger has not yet occurred, and the usual question is whether a hypothetical monopolist would profitably impose a small increase above the

---

[104] Economists use the concept of elasticity of demand to express the change in quantity demanded by consumers that is associated with a particular change in price or other terms of trade. For example, the price elasticity is the percentage change in quantity demanded divided by the percentage change in price, expressed in absolute value. For example, if a 1% increase in price results in a 3% decrease in quantity, the elasticity equals 3. Higher elasticities reflect greater consumer responses to a price increase. Total revenue is maximized where the price elasticity of demand is 1. Where the consumer response is associated with an elasticity smaller than 1, demand is said to be inelastic. Further price increases would increase revenue.

[105] *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines § 4.3.A (2023).

[106] *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines § 4.3 n.81 (2023) (noting how the hypothetical monopolist test "can be adapted for similar purposes in cases involving" monopolization); *see also* Organisation for Economic Co-operation and Development, *Roundtable on Market Definition: Note by the United States*, DEP'T OF JUST. 1, 2 (2012), www.justice.gov/sites/default/files/atr/legacy/2012/08/22/286279.pdf (discussing the use of market definition analysis in non-merger cases, including single-firm exclusionary conduct and agreements in restraint of trade); Jonathan B. Baker & David Reitman, *Research Topics in Unilateral Effects Analysis*, in RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW 25, 29 (Einer Elhauge eds., 2012) (explaining how models gleaned from the merger guidelines "may be precursors to a more thorough quantitative assessment of unilateral effects claims using the simulation methods discussed in the next section.").

current prevailing (competitive) price in a proposed relevant market.[107] In an exclusion case, by contrast, the challenged conduct has already occurred, and the plaintiff is alleging that the defendant is already charging a supracompetitive price on customers.[108]

128. In such a situation, it is inappropriate to evaluate competition by assessing the profitability of a further price increase above the prevailing price.[109] As price increases, even poor substitutes look increasingly attractive to consumers. Moreover, a profit-maximizing monopolist will raise price to a point at which demand is elastic, even if market demand is inelastic at the lower competitive price. Evaluating the degree of substitution if price is pushed even higher would paint a misleading picture of the relevant market and market power.[110]

129. Pointing to substitution at the elevated price, and erroneously concluding that substitution to other goods at that price shows an absence of market power, is a fundamental analytical mistake. Such an assertion supports the erroneous conclusion that the hypothetical monopolist test has not been satisfied, and the further error that the market must be broadened to include additional products. The error is so famous that it has its own name: the *Cellophane* fallacy.[111]

130. The guiding question remains: would the hypothetical monopolist profitably set prices above the competitive level? A further difficulty, however, is that the relevant values in the

---

[107] The statement in text presumes that the pre-merger price is a good estimate of the price that would exist absent the transaction. That is often but not always the case. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4. 3.B (2023).

[108] *See* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2025).

[109] *See* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2025).

[110] *See* W. Kip Viscusi et al., ECONOMICS OF REGULATION AND ANTITRUST 326–2727 (5th ed. 2018); Serdar Dalkir & Frederick R. Warren-Boulton, *Prices, Market Definition, and the Effects of Merger: Staples-Office Depot* (1997), in 4 THE ANTITRUST REVOLUTION: ECONOMICS, COMPETITION AND POLICY 52, 57 (J.E. Kwoka & L.J. White, eds., 2004).

[111] *See e.g.*, U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.3.B (2023); W. Kip Viscusi et al., ECONOMICS OF REGULATION AND ANTITRUST 326 (5th ed. 2018) ("An important point can be illustrated by an economic error made by the Court in the cellophane case. A high degree of substitution by consumers between two products must exist at *competitive* prices for the two products to be placed in the same market. Cellophane was indeed a close substitute for other wrapping materials at the going high price for cellophane. However, cellophane's price contained a monopolistic margin over its marginal cost. A rational monopolist would, in fact, raise price until its product became a good substitute for alternatives."); Serdar Dalkir & Frederick R. Warren-Boulton, *Prices, Market Definition, and the Effects of Merger: Staples-Office Depot* (1997), in 4 THE ANTITRUST REVOLUTION: ECONOMICS, COMPETITION AND POLICY 52, 57 & n.6 (J.E. Kwoka & L.J. White, eds., 2004) ("This point has come to be known as the 'cellophane fallacy' after the Supreme Court's decision in *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956). In that case, du Pont was accused of monopolizing the cellophane market. The Court reasoned that cellophane had many substitutes and the company's share of flexible wrapping materials did not warrant a monopoly ruling. In so doing, the Court failed to recognize that had du Pont sold cellophane at a competitive price (instead of the monopoly price) there would not have been many similarly priced substitutes.").

competitive market are typically unknown if the market already has been monopolized or otherwise altered by anticompetitive conduct. Because the competitive market is not generally observed, the "price increase" methodology used in merger cases—which evaluates whether a hypothetical monopolist would increase prices above current levels—is generally not usable in monopoly maintenance cases.[112]

131. In light of this limitation, market definition analysis in monopolization cases draws upon a range of relevant evidence to answer the key question: whether a single firm controlling the candidate market would likely have the ability to impose higher prices on customers compared to a scenario with additional competition.[113] I turn to this evidence in the next section.

### 3.2. For each AI, there is a relevant market for crop protection products containing the AI

132. In this section, I assess economic evidence bearing on the appropriate product markets within which to evaluate the effects of defendants' loyalty programs. I conclude that for each AI, there is a relevant market for crop protection products containing the AI.[114] The basis for this conclusion includes the following.

133. *The scope of exclusionary conduct*. Targeted exclusion of a particular set of products suggests that the targets are an unusually potent competitive threat and that the incumbent and targets, taken together, are capable of exercising market power. Here, the scope of each loyalty program focuses on branded products containing a particular AI by targeting generic products containing that AI. This evidence is discussed in Section 3.2.1.

134. *Evidence identifying the locus of market power and competitive threat*. Syngenta's and Corteva's internal analyses directly identify, as to a particular AI, products containing the AI as a source of profits worth protecting. Moreover, the analyses directly identify generic versions as a competitive threat and anticipate (and model) lower profits in the event of unfettered entry. This evidence is discussed in Section 3.2.2.

135. *Empirical examination of limited market entry*. A third type of evidence arises from instances of limited entry within the monopolized market. As discussed above, the competitive market is not generally observed. Nevertheless, for some of the six AIs, limited entry elicits a price decrease by the brand in response. This evidence, which both supports

---

[112] Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2025) ("For this question [raised by monopolization cases] the 'price increase' methodology developed in the Merger Guidelines . . . is not the correct one for monopolization cases . . . .").

[113] *See* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2025) ("[A]lternative indicia of market power should be explored.").

[114] For rimsulfuron, the relevant market is finished rimsulfuron products labeled for specialty crops. As explained in Appendix C, rimsulfuron products that lack such a label are poor substitutes. As I discuss below, this market also accords with the scope of Corteva's loyalty program, [redacted]

my conclusions about the relevant market and constitutes direct evidence of the exercise of market power, is discussed in Section 3.2.3.

136. *Additional empirical evidence*. As to two AIs, oxamyl and acetochlor, additional empirical evidence is available. For oxamyl, an unusual set of circumstances led to the generic entering the market first, and the brand later. Entry by the brand took share from the generic and resulted in price decreases by both firms, demonstrating the closeness of competition and absence of competitive constraint from products outside the market. For acetochlor, prices increased in the wake of supply constraints without being disciplined by competition from other AIs. This evidence is discussed in Sections 3.2.4 and 3.2.5, respectively.

137. Finally, in Section 3.2.6, I further explain the basis for my conclusion that the relevant market appropriately includes the full set of chemistries containing the AI. This conclusion relies in part on the role of each AI as a key component and distinctive source of value. The value of a component AI is rooted in its distinctive functionality and use, as each of the six AIs provides a distinctive benefit to growers that other AIs do not replicate.

### *3.2.1. The scope of the loyalty program indicates the scope of the market*

138. For each AI, the scope of the loyalty program is the set of finished products containing the AI. The share calculation used to determine compliance measures the quantity of AI in formulated products, both brand and generic, that contain the AI.[115] This calculation, combined with a minimum threshold to receive a payment or avoid a penalty, pointedly targets and limits the extent of penetration by generic products containing the AI. Defendants' documents describe the function of the program as limiting generic penetration of finished products containing the AI.[116]

139. [redacted] For example, [redacted]

---

[115] *See, e.g.*, CX2494-001, -007, SYT_REBATELIT_01039451 [redacted] *see also id.* at -008 [redacted]

[116] *See* CX2100-042, -086, -097, SYT_REBATELIT_00220759 (12/7/2015 Syngenta presentation: "Post-Patent Guide") [redacted] CX1173-010–11, FTC-CTVA_00372803 (6/7/2020 Corteva presentation: "Generic Defense Strategies") [redacted] *see also* CX2523-003, -010, -025, SYT REBATELIT 01039640 (1/14/2014 Syngenta presentation: "North America Post Patent Update") [redacted]

[redacted].[117] This approach preserves the targeting of products containing generic AI.

140. The scope of the loyalty program is narrow, in that it does not extend to products with other AIs [redacted]. For example, when Syngenta set up the Key AI program for metolachlor, it confined the program to metolachlor. It did not include other AIs with the same mode of action such as acetochlor. This treatment is evidence in favor of a narrow scope of market.

141. The economic significance of these points is twofold. First, they indicate that control of the set of products containing the AI is a locus of market power and a source of profits worth protecting. Second, they indicate that generic products containing the AI pose a competitive threat to the incumbent branded firm—and indeed an unusually potent competitive threat.

142. Taken together, these points indicate that a hypothetical monopolist that controlled both the branded products and the generic products containing a particular AI would profitably set a higher price compared to unfettered competition. The implication is that the market is no broader than the set of finished products containing the AI.

143. The same analysis applies to the scope of the market for metolachlor[118] and rimsulfuron,[119] details of which are set out in the margin.

---

[117] CX2565-009, SYT_REBATELIT_00894882, (1/10/2018 Syngenta spreadsheet: "2017 Key AI Redemption Calculator v5 Final - Distributor 09-2") [redacted]

[118] Consistent with a metolachlor market that includes both isometric variants (old metolachlor and S-metolachlor), the Syngenta loyalty program includes both for purposes of calculating the degree of loyalty. *See*, *e.g.*, SYT_REBATELIT_02954796, at Tab "Metolachlor" (1/19/2024 Syngenta spreadsheet: "2024 Key AI Redemption Calculator-Distributor-Jan 2024 v1"). A unit of old metolachlor counts as [redacted] of a unit of S-metolachlor, consistent with its difference in effectiveness. *See* SYT_REBATELIT_02954796, at Tab "Metolachlor" Column J (1/19/2024 Syngenta spreadsheet: "2024 Key AI Redemption Calculator-Distributor-Jan 2024 v1") (using a discount rate of [redacted] to convert old metolachlor to S-metolachlor for purposes of calculating loyalty compliance). *See also* CX2535-054–055, SYT_REBATELIT_00080339, [redacted] (treating isomers together for purposes of adherence calculations); CX2492-006, SYT_REBATELIT_01039365 [redacted] (showing the same); NUTR_00001599, 604 (10/1/2017 PY 2018 Marketing Agreement between Syngenta and Nutrien); [redacted] That inclusion supports the conclusion that both versions are properly included within the relevant market.

[119] Consistent with a rimsulfuron market limited to finished products labeled for specialty crops, [redacted]

### *3.2.2. Defendants analyze generic entry at the AI level as a potent competitive threat*

144. In this section I draw on evidence that for each of the six AIs, defendants recognize, first, that the set of products containing the AI is a a collective source of profits worth protecting from erosion, and second, that generic entry on products containing the AI is a competitive threat that would reduce those profits. This recognition underpins the decision, discussed in the previous section, to implement a loyalty program targeting generic entry. The evidence takes the form of internal analyses focused on the existence of the generic threat and likely impact of generic competition, including calculations of the lost profits that would result from unfettered generic competition as to that AI.

145. A typical example is a 2015 Syngenta strategy document [redacted][120] Other analyses similarly focus on defense against generics at the AI level.[121] Below I describe similar internal analyses for each AI.

---

[redacted]

[120] *See* CX2100-042, -086, -097, SYT_REBATELIT_00220759 (12/7/2015 Syngenta presentation: "Post-Patent Guide") [redacted]; *see also* CX2523-003, -010, -025, SYT_REBATELIT_01039640 (1/14/2014 Syngenta presentation: "North America Post Patent Update") [redacted].

[121] CX2835-020, -022, -026, -029, SYT_REBATELIT_04520486 (3/20/2002 Syngenta presentation: "Generics Strategy") (identifying generic firms that pose a threat as to each AI, and listing a broad set of strategies to enable [redacted]); CX2293-006, -037-062, SYT REBATELIT 00606841 (3/22/2005 Syngenta presentation: "Post-patent Strategy: Product Handbook") ([redacted]); CX2523-003, -005, -010, -025, SYT REBATELIT 01039640 (1/14/2014 Syngenta presentation: "North America Post Patent Update") ([redacted]); CX1770-008, CRTVA-CPL-00819717 (3/14/2022 Corteva presentation: "Crop Protection Lifecycle Management Playbook") [redacted]

146. The internal analyses support the conclusion that, absent generic entry, the price of products containing the AI would be significantly higher. This demonstrates that unfettered competition from the generic would constrain the defendant's ability to exercise market power. A corollary observation is that other products on the market were not fully effective in constraining the exercise of market power.

147. These observations answer the question posed by the hypothetical monopolist test. The defendant, as sole producer within the market, is able to charge prices substantially higher in the absence of competition from generic products. This demonstrates that a hypothetical monopolist controlling both sets of products would profitably set a higher price for the generic product, the branded product, or both. That is, it would charge a price significantly above the competitive level obtained when these products competed with one another. Therefore, the candidate market of finished products containing the AI satisfies the hypothetical monopolist test.

148. *Azoxystrobin*. In 2015, a Syngenta marketing plan [redacted]"[122] [redacted].[123]

149. *Mesotrione*. In 2015, Syngenta [redacted].[124] [redacted].[125] [redacted].[126]

---

[redacted]

[122] CX2518-016, -027, SYT_REBATELIT_00301940 (10/6/2015 Syngenta presentation: "2015-2019 U.S. Product Marketing Plan").

[123] CX2518-034, SYT_REBATELIT_00301940 (10/6/2015 Syngenta presentation: "2015-2019 U.S. Product Marketing Plan") ("[redacted]"); *see also* CX2418-041, SYT REBATELIT 00024078 (5/7/2015 Syngenta presentation: "2016 Pricing Guidance – U.S. Fungicides") ([redacted]); CX2432-013, SYT_REBATELIT_00027207 (4/13/2015 Syngenta presentation: "2015-04-13 AFrame Plus Allocation – CSC [Commercial Steering Committee] (3 (1)") [redacted]

[124] *See generally* CX2100-037–051, SYT_REBATELIT_00220759 (12/7/2015 Syngenta presentation: "Post-Patent Guide"); *see also* CX2037-003–007, SYT_REBATELIT_00062354 (12/15/2015 Syngenta document: minutes of U.S. mesotrione Post Patent Workshop).

[125] CX2037-003, SYT_REBATELIT_00062354 (12/15/2015 Syngenta document: minutes of U.S. mesotrione Post Patent Workshop).

[126] CX2037-004, SYT_REBATELIT_00062354 (12/15/2015 Syngenta document: minutes of U.S. mesotrione Post Patent Workshop).

150. Similarly, in 2015, prior to generic entry, Syngenta analyzed that [redacted] It predicted [redacted].[128] Syngenta estimated that [redacted][129] Moreover, Syngenta documents [redacted].[130]

151. The same attention to mesotrione competition is reflected in [redacted].[131] One example is Syngenta's [redacted]."[132]

152. The competitive importance of generic mesotrione is also visible in Syngenta's analysis of its supply agreement with Corteva. As previously discussed, Corteva's Resicore product contains mesotrione supplied by Syngenta. Syngenta documents reflect discussions that [redacted] would be a lower selling price for Resicore and, as a further consequence, increased price pressure on Syngenta's [redacted].

153. In 2017, Syngenta assessed that [redacted].[133] Syngenta modeled the consequences if it

---

[127] SYT_REBATELIT_00114479, at slide 50 (1/6/2015 Syngenta presentation: "U.S. Product Marketing Plan – Mesotrione-BIR 2015 – 2019").

[128] SYT_REBATELIT_00114479, at slide 50 (1/6/2015 Syngenta presentation: "U.S. Product Marketing Plan – Mesotrione-BIR 2015 – 2019") (featuring slide "BIR-MESO Product Marketing Plan – Margins" [redacted]

[129] SYT_REBATELIT_00114479, at slide 50 (1/6/2015 Syngenta presentation: "U.S. Product Marketing Plan – Mesotrione-BIR 2015 – 2019") [redacted]

[130] CX2045-020, SYT_REBATELIT_00517181 (6/3/2015 Syngenta presentation: "Leading through innovation") [redacted]

[131] *See, e.g.*, CX2114-058, SYT_REBATELIT_00549959 (1/7/2019 Syngenta presentation: "Mesotrione and Bicyclopyrone (HPPD), 2019-2024 U.S. Product Marketing Plan – Peer Review Version").

[132] SYT_REBATELIT_00529971, at slide 3 (7/20/2018 Syngenta presentation: "Mesotrione Strategy Update").

[133] The analysis was based on a [redacted] *Compare* CX2105-026, SYT_REBATELIT_00200409 (10/19/2017 Syngenta presentation: "[redacted]") [redacted], *with* CX2073-004, SYT_REBATELIT_00147460 (10/15/2017 internal Syngenta email from Parr to Hawkins et al.) [redacted]

[redacted].[134]

154. Syngenta also modeled [redacted].[136]

155. *Metolachlor*. In 2019, Syngenta assessed that [redacted].[138]

156. Likewise, a 2020 strategy review focused on [redacted].[139] The analysis predicted [redacted] Syngenta projected that, [redacted]41 The review also estimated the effect of a

---

[134] CX2105-023, SYT_REBATELIT_00200409 (10/19/2017 Syngenta presentation: [redacted]

[135] *See* CX2105-024, SYT_REBATELIT_00200409 (10/19/2017 Syngenta presentation: [redacted]

[136] [redacted] CX2105-023, SYT_REBATELIT_00200409 (10/19/2017 Syngenta presentation: [redacted]

[137] SYT_REBATELIT_00159827, at slide 6 (11/7/2019 Syngenta presentation: "U.S. Soybean Herbicide Product Marketing Plan – 2020-2025 Executive Summary") [redacted]; *see also* SYT_REBATELIT_01794766, 767 (11/4/2020 Syngenta presentation: "2021 Global S-MOC AI Post Patent Strategy") [redacted] 1 – \$324/\$498 ≈ 34.9%.

[138] SYT_REBATELIT_00159827, at slide 6 (11/7/2019 Syngenta presentation: "U.S. Soybean Herbicide Product Marketing Plan – 2020-2025 Executive Summary") [redacted]

[139] SYT_REBATELIT_00131198, at slides 3, 7 (5/18/2020 Syngenta presentation: "SMOC Pricing Scenarios") [redacted]

[140] SYT_REBATELIT_00131198, at slides 3, 7 (5/18/2020 Syngenta presentation: "SMOC Pricing Scenarios").

[141] SYT_REBATELIT_00131198, at slides 5, 9 (5/18/2020 Syngenta presentation: "SMOC Pricing Scenarios") [redacted]

[redacted].[142] The analysis concluded that [redacted].[143]

157. *Rimsulfuron*. Corteva documents recognize high profits from its straight rimsulfuron product (Matrix) labeled for specialty crops and reflect the concern that generic competition would dissipate these profits.[144] [redacted]

158. In 2021, Corteva predicted that generic rimsulfuron sold by [redacted] could lead to a further price decline, beyond its existing level, [redacted][147]

159. *Oxamyl*. In a 2017 analysis of oxamyl competitive pressure, Corteva only discussed competition from generic oxamyl (as opposed to other AIs).[148] Another 2017 document illustrates the contrast between potent competition from generics and less concerning

---

[142] SYT_REBATELIT_00131198, at slides 3, 7 (5/18/2020 Syngenta presentation: "SMOC Pricing Scenarios") (focused on Syngenta products containing S-metolachlor).

[143] SYT_REBATELIT_00131198, at slides 3, 6–7, 10 (5/18/2020 Syngenta presentation: "SMOC Pricing Scenarios") [redacted]

[144] *See* CX1483-001, FTC-CTVA_00310886 (2/2/2018 internal Corteva email from Feauto to Doran et al.) [redacted] CX1609-003, FTC-CTVA_00578154 (4/21/2017 Corteva presentation: [redacted] CX1235-001, FTC-CTVA_00371019 (7/1/2020 internal Corteva email from Van Vooren to Bodily et al.) [redacted]

[145] CX1222-001, FTC-CTVA_00058310 (4/8/2020 internal Corteva email from Van Vooren to Leifker et al.) [redacted]

[146] CRTVA-CPL-01793910, 944 (3/26/2021 Corteva Presentation: "U.S. Crop Protection 5-Year Plan") [redacted]

[147] *See* CX1551-005, FTC-CTVA_01103766 (6/30/2021 Corteva presentation: "Market Dynamics"); *see also* CX1543-001, FTC-CTVA_01105204 (7/9/2021 Corteva email from Bodily to Baudler) [redacted].

[148] CX1574-016–020, FTC-CTVA_00251173 (11/13/2017 Corteva Presentation: "Shaping the Future: Fumigants: Vydate and Telone") (discussing Rotam ("Return" products), Solera/Source Dynamics, Willowood, and Aceto).

competition from other AIs given the unique applications of oxamyl.[149] [redacted] [151]

160. *Acetochlor*. Corteva documents reflect an expectation that even limited generic acetochlor entry would introduce significant new competition and lower prices. [redacted] [156]

### *3.2.3. For some AIs, limited generic entry has provoked a price decrease by the basic manufacturer*

161. The potency of generic competition as a constraint can also be observed in the effects of limited generic entry as to some of the six AIs. This evidence supports my opinion about the relevant markets for assessing defendants' conduct, and further constitutes direct evidence that the scrutinized firm wields substantial market power within that market.

162. A generic launches its product at a substantial price discount to the brand. The extent and effects of limited generic entry vary by AI. This is unsurprising. After all, low generic

---

[149] CX1575-022, FTC-CTVA_00410611 (6/9/2017 Corteva presentation: "Oxamyl Supply Chain Strategy Workshop") [redacted]

[150] CX1165-003, FTC-CTVA_00195826 (4/1/2020 Corteva presentation: "2020 – 2023 Marketing Plan FISH'N: Fungicides, Insecticides, Specialty Herbicides & Nematicides") [redacted]

[151] CRTVA-CPL-01793910, 944 (3/26/2021 Corteva presentation: "U.S. Crop Protection 5-Year Plan – 'Road to #1'") [redacted]

[152] CX1305-057, FTC-CTVA_00002698, at Tab "Risk Assessment" (11/28/2018 Corteva spreadsheet: "2018.19 Corn Herb Category Strategy Workbook").

[153] CX1305-057, FTC-CTVA_00002698, at Tab "Risk Assessment" (11/28/2018 Corteva spreadsheet: "2018.19 Corn Herb Category Strategy Workbook").

[154] CX1305-057, FTC-CTVA_00002698, at Tab "Risk Assessment" (11/28/2018 Corteva spreadsheet: "2018.19 Corn Herb Category Strategy Workbook").

[155] CX1595-003, FTC-CTVA_00291086 (3/19/2020 Corteva presentation: "Acetochlor Defense Update").

[156] FTC-CTVA_00105505, at Tab "Category Summary" (5/1/2019 Corteva spreadsheet: "U.S. Crop Protection Pricing Initiative MASTER").

penetration is the anticipated and observed effect of the loyalty program.[157] Given this, a responsive price decrease by the brand, or other anticipated effects of unfettered competition such as substantial generic penetration, may or may not be observed. Indeed, for one of the markets with limited generic entry—acetochlor—a price decrease by the brand is not observed. In this respect, and as discussed above, the observed effects of limited generic entry is a one-sided test; the absence of an effect does not imply that generic competition is unimportant.

163. Where a branded price drop is observed, the observed effects of generic entry support the conclusion that, absent generic entry, the price of products containing the AI was significantly higher. This demonstrates that competition from the generic constrained the defendant's ability to exercise market power. A corollary observation is that other products on the market were not fully effective in constraining the exercise of market power. The generic offers incremental competition, above and beyond the level of competitive discipline that would exist if generic entry were absent.

164. These observations answer the question posed by the hypothetical monopolist test. Compared to the observed price, a hypothetical monopolist controlling the generic would profitably set a higher price for the branded product, generic product, or both. A fortiori, compared to the even lower competitive price, a hypothetical monopolist would do the same. Thus, the collection of products containing the AI (brand plus generic) satisfies the test and is a relevant market. Evidence from entry also constitutes direct evidence that the scrutinized firm within the proposed market has market power.

165. For four AIs, the branded firm responded to limited generic entry by substantially reducing its own price. The lower branded price of azozystrobin, mesotrione, and rimsulfuron can be observed empirically in FarmTrak data. For metolachlor, [redacted] (For oxamyl, instead of limited generic entry, the generic entry came first, as I discuss in the next section.) I describe this evidence for each AI in turn.[158]

---

[157] Moreover, in response to generic entry, a branded firm may choose to maintain price and focus on a subset of price inelastic customers, rather than respond with a discount.

[158] For acetochlor, I am not aware of a brand price decrease in response to generic entry. *See* CX1135-013, FTC-CTVA_00291487 (3/12/2020 Corteva presentation: "Bulk Fill Program Update") [redacted]. *See, e.g.*, CRTVA-CPL-00138090, 090–91 (8/4/2020 email from Bouck (Corteva) to [redacted]. As discussed in the text, the lack of an observed price decrease is not surprising given the continued operation of Corteva's loyalty program, the goal and effect of which was to limit the penetration of generics and thus the need for price competition. [redacted] FTC-Rotam-00016104, 104–05 (7/29/2019 internal Rotam email from Slaveck to Borgogni et al.) (noting Rotam's zero forecast to Bayer for acetochlor for the 2020 PY due to "Corteva's loyalty program causing significant market access issues for all non-Corteva and non-Bayer brands containing acetochlor"); Schumacher (C.E.O, Helm; former Dow, WinField) IH Tr., at 93:15–19 (confirming that distributors have said they were not purchasing generic acetochlor "because of the small amount of head space").

166. *Azoxystrobin*. In 2014, Willowood entered with three azoxystrobin products: a straight product in the same concentration as Syngenta's Quadris and Abound,[159] a premix with propiconazole in the same concentrations as Quilt Xcel,[160] and a premix with thiabendazole for which there is no matching Syngenta product chemistry.[161]

---

[159] Willowood entered with a product called Azoxy 2SC. Syngenta's Quadris, Abound, and Aframe all have the same concentration of azoxystrobin (22.9%). *Compare* EPA, Registration No. 89442-21, at 3 (reporting chemical composition for Azoxy 2SC), www3.epa.gov/pesticides/chem_search/ppls/089442-00021-20141217.pdf *with* EPA, Details for Abound Flowable Fungicide, at Alt Brand Name tab and Chemical tab (reporting chemical composition of Quadris, Abound, and Aframe), ordspub.epa.gov/ords/pesticides/f?p=PPLS:8:11272153460716::NO::P8_PUID,P8_RINUM:31021,100-1098. For Aframe, [redacted]. *See* CX2327-009, SYT_REBATELIT_00026401 (12/11/2015 Syngenta presentation: "Aframe (Quadris Fighting Brand), Aframe Plus (Quilt Xcel Fighting Brand)") [redacted] *see also* SYT_REBATELIT_00028939, slide 11 (1/14/2015 Syngenta presentation: "2015-2019 US Azoxystrobin Marketing Plan") [redacted]

[160] Willowood entered with a product called Azoxyprop XTRA. Syngenta's Quilt Xcel and Aframe Plus have the same concentration of azoxystrobin (13.5%) and propiconazole (11.7%), and [redacted]. *See* CX2327-009, SYT_REBATELIT_00026401 (12/11/2015 Syngenta presentation: "Aframe (Quadris Fighting Brand), Aframe Plus (Quilt Xcel Fighting Brand)") [redacted] *compare* EPA, Registration No. 87290-56, at 4 (reporting chemical composition for Azoxyprop XTRA), www3.epa.gov/pesticides/chem_search/ppls/087290-00056-20140815.pdf *with* EPA, Details for Quilt Xcel Fungicide, at Alt Brand Name tab and Chemical tab (reporting chemical composition of Quilt Xcel and Aframe Plus), ordspub.epa.gov/ords/pesticides/f?p=PPLS:8:::::P8_PUID,P8_RINUM:494334,100-1324.

[161] Willowood entered with a product called AzoxyTeb. SYT_REBATELIT_00038101, at slide 31 (12/1/2017 Syngenta presentation: "Azoxystrobin, 2018-2023 US Product Marketing Plan") [redacted] Syngenta filed a lawsuit claiming that Willowood's entry was in violation of certain Syngenta azoxystrobin manufacturing process patents (as distinct from compound patents, which had expired February 11, 2014). *See Syngenta Crop Protection, LLC v. Willowood, LLC*, No. 1:15-cv-274 (M.D.N.C. filed Mar. 27, 2015); CX2556-007, SYT_REBATELIT_01050013 (Expert Report of Benjamin S. Wilner, Ph.D., *Syngenta Crop Protection, LLC v. Willowood, LLC*, No. 1:15-cv-274 (M.D.N.C. Aug. 19, 2016)) (report of expert proffered by Syngenta to opine upon damages incurred by Syngenta as a result of Willowood azoxystrobin entry, noting expiration of compound patents and allegation of infringement of manufacturing process patents). The litigation of that lawsuit included testimony, some of which is cited here, regarding the impact of generic azoxystrobin entry on the prices of crop protection products containing azoxystrobin.

167. Willowood entered at a substantial discount to the branded product.[162] This difference is reflected in the farmgate price of Willowood's straight product in late 2015, which was [redacted] lower than Quadris. Its generic version of Quilt Xcel was [redacted] lower.[163]

168. Following generic entry, Syngenta lowered the price of its corresponding straight products and premixes. The decrease is reflected in farmgate prices. Figure 11 reports the farmgate price for Syngenta's Quadris and Abound straight goods and for the Quilt Xcel and Quilt premixes relative to 2013, the year before generic entry. Between 2013 and 2017, the prices of Quadris and Abound decreased by [redacted] respectively,[164] and the prices of Quilt Xcel and Quilt each decreased by [redacted].[165] Prices continued to decline until 2018. After 2018, Quadris, Abound, and Quilt Xcel prices remained stable (with some variation); Quilt's price increased.

---

[162] CX2432-003, SYT_REBATELIT_00027207 (4/13/2015 Syngenta Commercial Steering Committee presentation: "2015-04-13 AFrame Plus Allocation - CSC (3 (1)") [redacted]

[163] [redacted] *See* SYT_REBATELIT_01031749, 751, 755 (undated 2015–2016 Syngenta presentation: "Aframe (Quadris Fighting Brand), Aframe Plus (Quilt Xcel Fighting Brand)") (featuring multiple graphs tracking farmgate pricing for straight and premix azoxystrobin products); *see also* CX2562, SYT_REBATELIT_00909398, Fisher (Digital Ag Solutions Mktg. Manager, Syngenta) Dep. Tr., at 87:20–91:8 *in Syngenta Crop Protection, LLC v. Willowood, LLC,* No. 1:15CV274 (M.D.N.C. Sept. 8, 2017) (discussing Syngenta farmgate prices compared to those of Willowood's azoxystrobin products).

[164] Quadris: 1 – [redacted] Abound: 1 – [redacted]

[165] Quilt Xcel: 1 – [redacted] Quilt: 1 – [redacted]

**FIGURE 11: PRICE OF SYNGENTA AZOXYSTROBIN PRODUCTS**

[redacted]

Notes: FarmTrak data. *See* Pricing Workpaper.

169. The price decrease can also be seen in Syngenta's documents, which report the manufacturer's net price for Quadris, Abound, Quilt Xcel, and Quilt between 2014 and 2017. For Quadris and Abound, the documents show a decrease of [redacted] respectively, over the same period.[166] For the Quilt Xcel and Quilt premixes, the price decrease is [redacted] respectively.[167]

---

[166] SYT_REBATELIT_00117763, at slide 45 (11/25/2015 Syngenta presentation: "Azoxystrobin Tech. (Amistar Tech.) 2016-2021 US Product Marketing Plan") [redacted] [redacted] [redacted]; SYT_REBATELIT_03206798, slide 54 (12/1/2018 Syngenta presentation: "Azoxystrobin 2019-2024 US Product Marketing Plan") [redacted]

[167] SYT_REBATELIT_00117763, at slide 45 (11/25/2015 Syngenta presentation: "Azoxystrobin Tech. (Amistar Tech.) 2016-2021 US Product Marketing Plan") [redacted] SYT_REBATELIT_03206798, slide 55 (12/1/2018 Syngenta presentation: "Azoxystrobin 2019-2024 US Product Marketing Plan") [redacted] Other Syngenta documents also describe azoxystrobin prices falling following generic entry. *See, e.g.*, Langkamp (Head of Key Account Mgmt. & Customer Service, Syngenta) IH Tr., at 131:3–9, 140:12–141:22 [redacted]

170. Syngenta documents and testimony [redacted].[168] For example, Syngenta identified [redacted].[169] Syngenta also assessed that its [redacted].[170] Syngenta executives likewise testified about the effect of generic azoxystrobin entry in the context of litigation against Willowood. Generic entry, by [redacted].[171]

---

[168] CX2029, SYT_REBATELIT_00903040, Cecil (Head of Mktg., Syngenta) Dep. Tr., at 71:21–72:2 *in Syngenta Crop Protection, LLC v. Willowood, LLC,* No. 1:15cv274 (M.D.N.C. July 13, 2016) [redacted] SYT_REBATELIT_00026881, slides 10–11 (1/12/2015 Syngenta presentation: CSC slides, "Topic: Aframe/Aframe Plus AZT Fighting Brand") [redacted] SYT_REBATELIT_00778105, at slide 3 (12/3/2019 Syngenta presentation: "CST Business Case Approval, Requested Decision: Price Increase") [redacted] CX2515-003–004, SYT_REBATELIT_00093107 (1/15/2016 Syngenta presentation: "Aframe/Aframe Plus AZT Fighting Brand") [redacted]; CX2325-006, SYT_REBATELIT_00025545 (12/13/2019 Syngenta presentation: "Solo Azoxystrobin Business Case Overview") [redacted]; CX2516-004, SYT_REBATELIT_00024977, at Tab "Decision Log" (12/16/2019 Syngenta spreadsheet: "Commercial Steering Team Notes, Actions, Decisions") [redacted]; Langkamp (Head of Key Account Mgmt. & Customer Service, Syngenta) IH Tr., at 131:3–9, 140:12–141:22 [redacted]

[169] CX2532-004–009, SYT_REBATELIT_00982150 (Syngenta Supplemental Objections and Responses to Willowood's Second Set of Interrogatories (7/7/2016), in Syngenta Crop Protection, LLC v. Willowood, LLC, No. 1:15CV274 (M.D.N.C. Sept. 8, 2017) ) [redacted]; SYT_REBATELIT_00026881, slide 9 (1/12/2015 Syngenta presentation: CSC slides, "Topic: Aframe/Aframe Plus AZT Fighting Brand") [redacted].

[170] SYT_REBATELIT_00117754, at slide 6 (11/25/2015 Syngenta presentation: "Azoxystrobin Tech. (Amistar Tech.) 2016-2021 US Product Marketing Plan") [redacted].

[171] CX2520, SYT_REBATELIT_01029438 Cecil (Head of Mktg., Syngenta) Trial Tr., Day 2, at 145:10–146:13, *in Syngenta Crop Protection, LLC v. Willowood, LLC,* No. 1:15CV274 (M.D.N.C. Sept. 6, 2017); *see also* CX2660, SYT_REBATELIT_01045052, Fisher (Digital Ag Solutions, Mktg. Manager, Syngenta) Trial Tr., Day 3, at 151:6–152:13 *in Syngenta Crop Protection, LLC v. Willowood, LLC,* No. 1:15CV274 (M.D.N.C. Sept. 8, 2017) [redacted] CX2432-013, SYT_REBATELIT_00027207 (4/13/2015 Syngenta presentation: "2015-04-13 AFrame Plus Allocation – CSC [Commercial Steering Committee] (3 (1)") [redacted]

171. *Mesotrione*. In 2016, Rotam and other generic manufacturers entered using mesotrione sourced from Chinese manufacturers.[172] Rotam introduced a straight product,[173] equivalent to Callisto, and in 2017, added premixes that matched Syngenta's Lexar and Lumax (metolachlor and atrazine), Callisto Xtra (atrazine), and Camix (metolachlor), as well as Bayer's Harness Max (acetochlor) and a premix with acetochlor and atrazine for which there is not a branded product with the same chemistry.[174] Shortly after Rotam's entry, additional generic manufacturers entered with straight and premix products.[175] The generics did not sell through distributors, given the distributors' adherence to the loyalty program threshold of [redacted] that was in place at the time. Instead, the generics made some sales by selling to brokers who in turn sold to farmers.[176]

172. The generics entered at a substantial discount to the branded product.[177] This discount is reflected in the farmgate price of Rotam's straight product in 2016, which was [redacted] lower than Callisto.[178] Its entry made significant inroads, with [redacted] in grower expenditures in 2016, compared to [redacted] for Callisto.[179]

---

[172] [redacted] Gesse (Head of Herbicide Product Mktg., Syngenta) Dep. Tr., Vol. I, at 223:20–224:11 ("All of the U.S. mesotrione today I believe is produced in China and imported to the U.S."). Rotam's first sale of Bellum occurred in December 2015. *See* FTC-Rotam-00000018 (two transactions dated 12/9/2025 to customer 4042 for Rotam's mesotrione product, Bellum).

[173] CX2278-004, SYT_REBATELIT_00211632 (3/21/2016 Syngenta Presentation: "Mesotrione Update") (describing Rotam's entry with Bellum, a straight product).

[174] See FTC-Rotam-00000018 (Undated Rotam data spreadsheet: "Relevant Products Sales 2015-2020—Masked Customers"); CX3164-002, FTC-Rotam-00000010 (Undated Rotam spreadsheet: "Basic products Info – Specifications") (featuring mesotrione/S-metolachlor premix); Chavez (Regional Head N.A., Rotam) IH Tr., at 196:22–197:20, 201:17–23 (discussing Rotam's straight mesotrione product Bellum and premixes Vilify and Durus).

[175] SYT_REBATELIT_00042382, at Tab "Mesotrione" (9/26/207 Syngenta spreadsheet: "2017 Key AI Redemption Calculator") (listing generic mesotrione offerings by Willowood, UPL, Rotam, Helm, and Drexel); CX2684-001, SYT_REBATELIT_01240860 (8/10/2016 internal Syngenta email from Fister to Langkamp et al.) [redacted] SYT_REBATELIT_00061491, at slide 8 (2/10/2017 Syngenta presentation: "CSC Business Case Approval: MESO Straight Goods Price Adjustment") (describing 17 generic end-use product registrations).

[176] *See* SYT_REBATELIT_00061491, at slide 8 (2/10/2017 Syngenta presentation: "CSC Business Case Approval: MESO Straight Goods Price Adjustment") [redacted] SYT_REBATELIT_00125302, 302 (2/9/2017 Syngenta document: "Q&A's Callist price adjustment") [redacted]

[177] *See* Chavez (Regional Head N.A., Rotam) IH Tr., at 109:2–7; SYT_REBATELIT_00125302 (2/9/2017 Syngenta document: "Q&A's Callisto price adjustment") ("Many of these companies are selling directly to brokers at prices far below our brands.").

[178] Rotam's farmgate price was $424 per gallon, compared to $512 per gallon for Callisto. *See* Mesotrione Workpaper. 1 – $424/$512 ≈ 17.3%.

[179] *See* Mesotrione Workpaper.

173. Following Rotam's entry, Syngenta decreased the price of Callisto.[180] The decrease is reflected in farmgate prices. Figure 12 reports the farmgate price of Callisto between 2012 and 2022 relative to 2015, the year before generic entry. Between 2015 and 2019, the price decreased by [redacted], with most of that drop occurring between 2015 and 2017.[181]

**FIGURE 12: PRICE OF SYNGENTA MESOTRIONE STRAIGHT PRODUCT (CALLISTO)**

[redacted]

Notes: FarmTrak data. *See* Pricing Workpaper.

174. The Callisto price decrease can also be seen in Syngenta's documents, which reflect a [redacted] manufacturer net price decrease [redacted] after Rotam's entry.[182]

175. Syngenta's premix products did not experience a similar price decline. Instead, Syngenta documents indicate that [redacted]

---

[180] Explorer was launched at the time of generic entry. Langkamp (former Head of Key Account Mgmt., Syngenta) Dep. Tr., Vol. I, at 229:20–230:13 [redacted]

[181] [redacted]

[182] CX2044-026, SYT_REBATELIT_00136704 (5/27/2015 Syngenta presentation: "North America 2016 Pricing Strategy Summary (ROC review)") [redacted]; CX2517-006, SYT_REBATELIT_00036944 (2/10/2017 Syngenta presentation: "CSC Business Case Approval: MESO Straight Goods Price Adjustment") [redacted]; CX2394-001, SYT_REBATELIT_00055869 (2/10/2017 internal Syngenta email from Langkamp to Anderson et al.) [redacted].

[redacted].[183] For example, a 2017 pricing study reported that [redacted]."[184] The same study likewise reported that [redacted].[185] These observations from Syngenta's documents are corroborated in FarmTrak data. Figure 13 shows the share of mesotrione treated acres from sales of straight mesotrione product across manufacturers. The share captured by straight mesotrione was decreasing through 2015 and grew from [redacted] in 2016 to [redacted] in 2020.

---

[183] CX2555-011, SYT_REBATELIT_00559306 (6/14/2018 Syngenta presentation: "2017 Acuron Use Report") [redacted]; Gesse (Head of Herbicide Product Line, Syngenta) IH Tr., at 114:23–116:15 (discussing CX2114-050); CX1633-009, FTC-CTVA_00004804 (12/14/2018 Corteva presentation: "Corn Herbicides – The Road to #1") [redacted].

[184] SYT_REBATELIT_00149496, at slide 3 (9/6/2017 Syngenta presentation: "Halex GT Pricing Study, Final Report") [redacted].

[185] SYT_REBATELIT_00149496, at slide 10 (9/26/2017 Syngenta presentation: "Halex GT Pricing Study, Final Report") [redacted].

**FIGURE 13: SHARE OF MESOTRIONE TREATED ACRES FROM STRAIGHT PRODUCT**

[redacted]

Notes: FarmTrak data. *See* Mesotrione Share Workpaper.

176. A 2020 Syngenta analysis reports that [redacted].[186] Other planning documents following generic entry noted Syngenta's [redacted].[187]

[186] *Compare* SYT_REBATELIT_00114479, at slide 50 (1/6/2015 Syngenta presentation: "US Product Marketing Plan – Mesotrione-BIR, 2015-2019") [redacted], *with* SYT_REBATELIT_00037919, at slide 10 (6/1/2020 Syngenta presentation: "US Corn Herbicides 2020-2025 US Product Marketing Plan, Executive Summary") [redacted].

[187] SYT_REBATELIT_00037592, at slides 11, 13 (12/13/2017 Syngenta presentation: "Corn Herbicides 2018-2023 US Product Marketing Plan") [redacted].

177. *Rimsulfuron*. In 2016, Rotam entered, followed by Nufarm in 2017.[188] Both firms offered a straight product labeled for specialty crops in the same concentration as Matrix.[189]

178. The generics entered at a substantial discount to Matrix's manufacturer net price.[190] The generics did not sell through major distributors, given the distributors' adherence to the loyalty program. Instead, the generics made some sales through smaller distributors and retailers in California and the Pacific Northwest.[191] For example, between 2016 and 2018, Rotam primarily sold its product to a single customer, Gar Tootelian, in California. In 2018, Gar Tootelian informed Rotam that it could no longer purchase rimsulfuron from Rotam because of the loyalty program.[192] Likewise, Nufarm made few sales.[193]

179. [redacted]

---

[188] CX3168-001, FTC-Rotam-00003565 (3/18/2021 Rotam document: "Rotam USA, Rimsulfuron Sales History 2015-2020") ("Product (Hinge) launched May 2016"); FTC-SUMMIT_00147247, 259 (10/12/2017 internal Summit Agro email from Branly to himself) (announcing introduction of "Nufarm's newest herbicide Grapple" on October 11, 2017). In the FarmTrak data, Nufarm's sales begin in 2018. *See* Generic Entry Workpaper.

[189] Rotam's Hinge and Nufarm's Grapple both contain 25% rimsulfuron, the same as Matrix. *Compare* Matrix Label (Mar. 16, 2017), www3.epa.gov/pesticides/chem_search/ppls/000352-00768-20170316.pdf (containing 25% rimsulfuron and labeled for weed control in tree nuts and other specialty crops), *with* Grapple Label (Oct. 12, 2016), www3.epa.gov/pesticides/chem_search/ppls/071368-00121-20161012.pdf (same) *and* Rotam 2016 Rimsulfuron 25% SG Label (June 2, 2016), www3.epa.gov/pesticides/chem_search/ppls/083100-00040-20160602.pdf (same).

[190] *See* FTC-CTVA_00139651, at Tab "Matrix Comparison 2 (2)" (10/25/2016 Corteva spreadsheet: "Matrix Comparison") (comparing the price of Corteva's Matrix (manufacturer net price of [redacted]) to generic Hinge ([redacted])); CX3168-001, FTC-Rotam-00003565 (3/18/2021 Rotam document: "Rotam USA, Rimsulfuron Sales History 2015-2020") (showing a price of $6.99 for Hinge in 2016); CX1460, FTC-CTVA_00917874 (11/15/2017 internal Corteva email from Bennett to Feauto et al.) (reporting Grapple prices less than [redacted]).

[191] Chavez (Regional Head N.A., Rotam) IH Tr., at 160:11–161:17, 163:25–164:18 (describing impediments to generic rimsulfuron purchases posed by loyalty programs and eventual purchases from Gar Tootelian); *see also* FTC-CTVA_00434761 at slide 32 (11/21/2016 DuPont presentation: "North America IR") [redacted]

[192] CX3168-002, FTC-Rotam_00003565 (Rotam USA – Rimsulfuron Sales History 2015-2020); [redacted] During this period, the loyalty program was run by DowDuPont.

[193] Barham (V.P. Sales Crop Protection, Nufarm) IH Tr., at 221:7–222:11, 225:19–227:19.

[194] FTC-CTVA_00453237, 239 (3/8/2018 internal Corteva email from Hemman to Feauto et al.) [redacted]; CX1609-003, -023 (FTC-CTVA_00578154) (4/21/2017 DuPont presentation: "Matrix Market Defense") (observing that Matrix share dropped below [redacted] for first time with generic product entering market, [redacted]);

[redacted]

180. Following generic entry, Corteva decreased the price of Matrix. The price decrease is reflected in farmgate prices. Figure 14 reports the farmgate price of Matrix between 2012 and 2022 relative to 2015, the year before generic entry. [redacted].[196] Other third-party data and Corteva's own data show price decreases of similar magnitude.[197]

FTC-CTVA_01070166 (10/27/2017 internal Corteva email from Van Vooren to Hemman et al.) (discussing generic competition to Matrix: [redacted]).

[195] FTC-CTVA_01073809, 810 (9/13/2017 internal Corteva email from Van Vooren to Hemman et al.).

[196] [redacted]

[197] *See* CRTVA-CPL-2829562 (EZ Trak data) (showing Matrix WDG prices falling from [redacted] per pound in [redacted] to [redacted] per pound in [redacted], a [redacted] decline, in the USDA Western Region; information on prices for Matrix SG is not available in the dataset); *also compare* FTC-CTVA_01086443, 446 ([redacted] Corteva presentation: [redacted] Matrix Strategy & Net Downs") (showing a total net price of [redacted] per acre for PY 2020 in California), *with* CRTVA-CPL-00100648, at slide 4 ([redacted] Corteva presentation: "[redacted] methoxy and rim strategy update") (showing a total net price of [redacted] for PY [redacted] in California).

**FIGURE 14: PRICE OF CORTEVA RIMSULFURON STRAIGHT PRODUCT (MATRIX SG)**

[redacted]

Notes: FarmTrak data. *See* Pricing Workpaper.

181. The price decrease can also be seen in Corteva's documents, which describe manufacturer price decreases in response to generic entry.[198] [redacted]

182. By January [redacted], generic sales of rimsulfuron in California—where most rimsulfuron is sold—were largely flat, and Corteva executives attributed declining Matrix sales in

---

[198] CX1284-005, -015–016, FTC-CTVA_01089774 ([redacted] Corteva presentation: "[redacted] Matrix Strategy"); CX1547-002, FTC-CTVA_00373110 ([redacted] email from Nate Feauto to Douglas Van Vooren et al.) [redacted]

[199] CX1547-002, FTC-CTVA_00373110 (8/31/2018 email from Nate Feauto to Douglas Van Vooren et al.). [redacted] CX1547-003, FTC-CTVA_00373110 (8/31/2018 Corteva document) (showing potential 9% loyalty payment for rimsulfuron, and an additional 6% "Western Loyalty" for 100% loyalty level).

[200] CX1284-005, -015–016, FTC-CTVA_01089774 (9/23/2020 Corteva presentation: "2021 Matrix Strategy").

significant part to generic rimsulfuron products sold by two distributors: [redacted]

183. *Metolachlor*. In 2017, UPL and other manufacturers entered with generic products.[202] These products were offered at a substantial discount to Syngenta's products. For example, UPL priced its straight product at a discount of [redacted] compared to Syngenta's.[203] In 2020, a Syngenta analysis found that generics were pricing their straight product at a [redacted] discount to Syngenta's.[204]

184. [redacted].[205] Both figures are indications of substantial generic penetration, given that the technical sales were made to other generic producers and a distributor.[206]

185. In 2020, in response to generic entry and following the strategy review discussed in a previous section, Syngenta [redacted].[207] Accordingly, a Syngenta [redacted]

---

201 [redacted]

202 [redacted] Schumacher (Exec. V.P. Crop Solutions Div., Helm) Dep Tr., Vol. I, at 63:14–18.

203 In particular, the comparison is between UPL's unsafened straight product (Moccasin) and Syngenta's fighting-brand unsafened straight product (Medal). SYT_REBATELIT_00159827, at slide 7 (11/7/2019 Syngenta presentation: "US Soybean Herbicide Product Marketing Plan") [redacted]; [redacted]

204 The comparison here is between the generic unsafened product and Medal. SYT_REBATELIT_00545190, at slide 29 (5/12/2020 Syngenta presentation: "2020-2025 Product Marketing Herbicide Product Plan KAM") [redacted]; Gesse (Head of Herbicide Product Mktg., Syngenta) Dep. Tr., Vol. I, [redacted]

205 828-FTC-UPL-00000002, [redacted]

206 [redacted]

207 Gesse (Head of Herbicide Product Line, Syngenta) IH Tr., at 191:21–192:6 [redacted]

[redacted].[208]

186. *Price-setting*. For azoxystrobin, mesotrione, and metolachlor products, the evidence shows that Syngenta [redacted], and that generic azoxystrobin, mesotrione, and metolachlor manufacturers set their prices based on the price of Syngenta products. For example, after entry:

- Syngenta [redacted].[209] Likewise, testimony from generic producers indicates that they set price for their azoxystrobin products based on the price of other azoxystrobin products, as opposed to other fungicides.[210]

- Syngenta discussed [redacted].”[211] Moreover, generic mesotrione manufacturers base their pricing decisions on the pricing of other mesotrione products.[212]

- Post-entry, Syngenta [redacted].[213]

---

[208] As [redacted]. CX2136-024, SYT REBATELIT 00117950 (5/22/2020 Syngenta presentation: “Herbicides – 2021 Pricing”); see also CX2151-010, SYT REBATELIT 00859053 (10/7/2020 Syngenta presentation: “OMNI Brand Strategy”) [redacted]; Gesse (Head of Herbicide Product Line, Syngenta) IH Tr., at 191:22–192:6 [redacted].

[209] CX2029, SYT_REBATELIT_00903040, Cecil (Head of Mktg., Syngenta) Dep. Tr., at 55:4–18 *in Syngenta Crop Protection, LLC v. Willowood, LLC*, No. 1:15cv274 (M.D.N.C. July 13, 2016) [redacted]; *see also* SYT_REBATELIT_00026881, at slide 2 (1/2015 CSC Meeting Minutes, Topic: “Aframe/Aframe Plus AZT Fighting Brand”) [redacted]

[210] Schumacher (C.E.O., Helm; former Dow, WinField) IH Tr., at 154:21–155:10; [redacted]

[211] SYT_REBATELIT_00026988, at slide 1 (2/15/2017 Syngenta presentation: “CSC Business Case Approval: MESO Straight Goods Price Adjustment”) [redacted]

[212] Schumacher (Exec. V.P. Crop Solutions Div., Helm) Dep. Tr., Vol. I, at 67:7–68:14; [redacted] Chavez (Regional Head N.A., Rotam) IH Tr., at 59:24–61:2.

[213] CX2723-013, SYT_REBATELIT_02824540 (08/2023 Syngenta presentation: “SMOC Pricing Strategy”); *see also id.* at CX2723-014 [redacted] Gesse (Head of Herbicide Product Line, Syngenta) Dep. Tr., Vol. I., at 174:16–177:9 [redacted]

187. For rimsulfuron and oxamyl products, the evidence shows that Corteva set its prices based on [redacted]

- [redacted]

- [redacted]

### *3.2.4. For oxamyl, entry (by the basic manufacturer) took share and reduced prices*

188. In this section, I discuss evidence specific to the oxamyl market. In this market, competition took an unusual form. The usual sequence of entry—brand, then generic—was reversed. Rotam generic entered first, followed by Corteva's product. The closeness of competition between branded and generic oxamyl products can be observed in the competitive interaction between the generic firm and Corteva upon Corteva's (re-)entry into the market.

189. Due to a catastrophic plant accident, oxamyl sales ceased for approximately two years in the mid-2010s.[216] In 2017, Rotam reintroduced a 24% concentration straight oxamyl

---

[214] CX1284-005, 015–16, FTC-CTVA_01089774 (9/23/2020 Corteva presentation: "2021 Matrix Strategy") (showing Corteva price changes for rimsulfuron-based Matrix product); Chavez (Regional Head N.A., Rotam) IH Tr., at 161:18–24 (confirming that Rotam priced its own rimsulfuron product based on Matrix's pricing); [redacted]

[215] *See, e.g.*, FTC-CTVA_00486412 (11/15/2018 internal Corteva email from Swanson to Miller et al.) [redacted] CX3166-032, 037, 039, 041, 043, [redacted] CX1616-002, FTC-CTVA_00058219 (3/6/2020 internal Corteva email from Garrett to Leifker et al.) [redacted] CX1200, FTC-CTVA_00286316 (9/30/2019 internal Corteva email from Swanson to Bodily et al.) [redacted] *See also* FTC-CTVA_00282507 (4/2/2018 internal Corteva email from Swanson to Garrett) (discussing relative prices of oxamyl products); FTC-CTVA_00282502 (3/29/2018 internal Corteva email from Swanson to Garrett et al.) [redacted]; CX1187-001, FTC-CTVA_00059636 (10/30/2019 internal Corteva email from Swanson to Garrett et al.) [redacted]

[216] The details are discussed in Appendix C.

product, beating Corteva's equivalent product to market by seven months.[217] The product garnered significant sales.[218]

190. When Corteva relaunched its product in early 2018, it set the price at a discount to the Rotam list price, and to the branded price prior to exit.[219] The Corteva product immediately displaced Rotam sales, as shown in Figure 15, which reports the volume of 24% oxamyl products between 2017 and 2020. For this analysis, I use manufacturer data rather than FarmTrak, as the latter appears to understate oxamyl sales, particularly as to Rotam.

---

[217] Rotam made its first sales of a 24% concentration product, called Return, in May 2017, and Corteva reintroduced its brand equivalent, Vydate L, in January 2018.

[218] In 2017, Rotam sold approximately 54,000 gallons. *See* Oxamyl Workpaper. *See also* Chavez (Regional Head N.A., Rotam) IH Tr., at 189:25–190:11 (estimating nearly 60,000 gallons sold before re-entry of branded product).

[219] Corteva received regulatory approvals for Vydate L in December 2017. FTC-CTVA_00449559 (12/20/2017 internal Corteva email from Swanson to Arens) ("we did get Vydate L new source registered and expect to be selling in January"). Corteva accepted orders starting in January 2018, FTC-CTVA_00092151, 152–153 (1/5/2018 internal Corteva email from "US Crop Protection Marketing News"), [redacted] FTC-CTVA_00448274, 275 (12/20/2017 internal Corteva email from Frazier to Swanson) (approving [redacted] per gallon list price). In October 2018, Corteva announced a price change to [redacted] per gallon. FTC-CTVA_00116601 (10/30/2018 internal Corteva email from Garrett to Urbanowski et al.) (announcing relaunch of Vydate L); FTC-CTVA_00116604 (10/30/2018 draft announcement to customers) (announcing [redacted] per gallon price, retroactive to October 1, 2018 orders); *see also* FTC-CTVA_00282332 (10/15/2018 internal Corteva email from Swanson to Doran) [redacted] FTC-CTVA_00116618 (10/11/2018 internal Corteva email from Swanson to Doran) [redacted]

**FIGURE 15: QUANTITY OF CORTEVA AND GENERIC OXAMYL STRAIGHT PRODUCT (24% CONCENTRATION)**

[redacted]

Notes: Invoice data from manufacturers. *See* Oxamyl Workpaper.

191. Rotam subsequently reduced the price of the generic product. Figure 16 reports the price of Corteva and generic 24% oxamyl between 2017 and 2020. Upon Corteva's re-entry, Rotam initially maintained similar pricing to its launch price, but garnered far fewer sales. By mid-2018, Rotam gradually began to drop the price at which it sold Return, and made more significant price declines of 23% between 2018 and 2019 and a further 9% between 2019 and 2020; sales volumes remained low despite the declining price.

192. In October 2018, Corteva also lowered the price of Vydate L by approximately [redacted].[220] Corteva documents attributed this price cut in part to generic competition.[221]

---

[220] Corteva reduced the price of Vydate L from [redacted] per gallon to [redacted] per gallon. *See* Oxamyl Workpaper. *See also* FTC-CTVA_00680255, 257 (11/1/2018 internal Corteva email from "US Crop Protection Marketing News") (noting new [redacted] price).

[221] *See* FTC-CTVA_00403900, at slide 2 (10-2018 Corteva presentation: "Vydate L") [redacted] *see also* FTC-CTVA_00282401 (9/6/2018 internal Corteva email from Swanson to Garrett et al.) [redacted]

[redacted]

Notes: Invoice data from manufacturers. *See* Oxamyl Workpaper.

### *3.2.5. For acetochlor, prices increased in response to a negative supply shock*

193. In this section, I discuss evidence specific to the acetochlor market. In this market, [redacted], production experienced substantial supply constraints. In this environment of constrained supply, acetochlor prices increased.

194. [redacted] Further details are set out in the Appendix. Bayer documents describe an environment of [redacted].[222] Bayer employees evaluated possible steps to relieve the

[222] *See, e.g.*, FTC-Bayer-00001629_0001, 007 (08/2022 Bayer presentation: "Acetochlor Supply Overview") [redacted] FTC-Bayer-00001939_0001, 003 (11/17/2023 Bayer Presentation: [redacted] ("Opportunity to grow acetochlor net sales [redacted]; CX3442-004, FTC-Bayer-00001942_0001 (11/2022 Bayer presentation: "Selective Chemistry LRP 2023-2030") ("[redacted]").

capacity constraint but did not contemplate large increases.[223] A [redacted].[224]

195. [redacted]

196. Capacity constraints are a well-recognized setting for the exercise of market power. Where market demand is relatively inelastic and supply by rival firms is inelastic (as would be the case when rival firms reach capacity constraints), a firm can exercise market power even with a relatively small share of the market.[226] Wholesale electricity markets are a famous and well-studied example.[227]

---

[223] FTC-Bayer-00001939_0001, 008 (11/17/2023 Bayer presentation: "[redacted]").

[224] *See* CRTVA-CPL-01350126 (04/13/2021 email string between Tavarez (Corteva) and [redacted]); CRTVA-CPL-00256564, 564–565 (04/16/2021 email from Tavarez (Corteva) to Swanson (Corteva) et al.) [redacted] CRTVA-CPL-02918516 [redacted] FTC-Bayer-00001944_0001 (02/09/2023 email from Gierse (Bayer) to Schrick (Bayer) et al.) (describing "reliability downtimes at [redacted] plant" and concluding that [redacted]; CRTVA-CPL-00166019 (08/30/2023 email from Comer (Tenkoz) to Bishop (Corteva) et al.) [redacted]; FTC-Bayer-00001629_0001, 007–008 (08/2022 Bayer presentation: "Acetochlor Supply Overview") (describing Bayer "Acetochlor availability for US market at [redacted]

[225] CRTVA-CPL-01356313, at slide 4 (04/2022 Corteva presentation: [redacted]

[226] *See e.g.*, Jeffrey Church & Roger Ware, INDUSTRIAL ORGANIZATION: A STRATEGIC APPROACH 124–27 (McGraw-Hill 2000); Jean Tirole, THE THEORY OF INDUSTRIAL ORGANIZATION 209–18 (MIT Press 1988).

[227] Severin Borenstein, *The Trouble With Electricity Markets: Understanding California's Restructuring Disaster*, J. ECON. PERSPECTIVES, Winter 2002, at 191, 200 ("[I]n a market with no demand elasticity and strict production constraints, a firm with even a small percentage of the market could exercise extreme market power when demand is high.").

197. During the period of acetochlor supply constraint, the price of acetochlor finished products increased substantially. This "aggressive" price increase is reported in Bayer documents.[228] It is also visible in farmgate prices. Figure 17 reports year-on-year changes in the farmgate price of four leading Corteva and Bayer acetochlor products from 2022 to 2024.[229] The average price increase for these products was [redacted] in 2022 and [redacted] in 2023, before leveling out in 2024. This price increase is evidence of substantial market power over acetochlor products.

**FIGURE 17: PRICE CHANGE OF ACETOCHLOR AND METOLACHLOR PRODUCTS, 2022 TO 2024**

[redacted]

Notes: *See* Acetochlor Workpaper. Prices are calculated using grower expenditures and units from FarmTrak data. Year-over-year changes in price are calculated relative to the prior year; for example, 2022 shows the price change between 2021 and 2022.

198. By contrast, metolachlor, another corn herbicide, did not see a similar price increase. Figure 17 reports the year-on-year price change of three leading Syngenta metolachlor

---

[228] *See* FTC-Bayer-00002072_0001 (7/24/2024 Hoffmann (Bayer) to Silva (Bayer) forwarding 07/23/24 email from Hoffman) [redacted]

[229] In this analysis, I focus on two acetochlor chemistries with substantial sales where acetochlor predominates in the value of the finished product, namely the straight product and the atrazine premix. In 2021, among straight acetochlor products, Warrant had the highest grower expenditures. Among acetochlor premixes with atrazine, three products had higher expenditures than the rest: [redacted] These two chemistries have analogous metolachlor products, as discussed below. *See* Acetochlor Workpaper.

products with analogous chemistries during the same period.[230] In 2022, these prices increased but by a smaller amount, and in 2023 they decreased. This difference is consistent with conclusion that the competitive forces driving acetochlor prices are different from those driving metolachlor prices, and thus that the acetochlor market need not be broadened to include metolachlor products.

### *3.2.6. The relevant market consists of all product chemistries containing the AI*

199. In this section, I further examine the relationship between two types of products within each relevant market: straight products and premixes. Four of the six AIs—azoxystrobin, mesotrione, metolachlor, and acetochlor—feature a substantial set of premixes.[231] Generic AI, whether marketed as a straight product or as a component in a premix, provides important competition to straight product and premixes offered by the brand. This competition takes multiple forms:

- First, and most obviously, the generic straight product competes with the branded straight product.
- Second, the generic AI is incorporated into premixes that compete with chemically identical brand premixes. The premix may be offered by a generic firm or marketed by another basic manufacturer using technical AI from the generic firm.
- Third, the generic straight product is incorporated by growers into tank mixes that replicate the effect of premixes and thereby compete with chemically identical brand premixes.
- Fourth, products containing generic AI (whether straight product, premix, or tank mix) compete with branded products containing the AI that are not chemically identical.

200. I conclude that the relevant market appropriately includes the full set of chemistries containing the AI. This conclusion is supported by evidence of substantial substitution among distinct chemistries on the "product ladder." It is further supported by evidence of competitive dynamics that are shared by all of the distinct chemistries: a common threat posed by generic AI, and a common preservation of the defendant's market power by means of the loyalty program.

201. *Product ladder*. The distinct chemistries containing an AI offered by the brand are arrayed along and collectively constitute a "product ladder" or "brand ladder." The different chemistries each solve a particular set of grower problems and offer differentiated means to solve them. In the Appendix, I identify and discuss the product ladders offered by Syngenta and Corteva for the AIs in which premixes play an important role.

---

[230] The chemistries are straight S-metolachlor and a premix with atrazine. Among straight metolachlor products, Dual II Magnum and Dual Magnum had the highest expenditures, and among metolachor premixes with atrazine, Bicep II Magnum had the highest. *See* Acetochlor Workpaper.

[231] The rimsulfuron market consists largely of straight products, plus a recently introduced premix. To the extent the premix is arguably significant, the discussion in this section applies. The oxamyl market consists of straight products.

202. The distinct chemistries within a ladder are substitutes from a grower's standpoint. Generic competition affects the entirety of the ladder, by means of the four forms of competition discussed above. In the Appendix, I present evidence of substantial substitution among the distinct chemistries and the impact of generic competition throughout the ladder.

203. As I also discuss there, the evidence of substitution and competition extends to product chemistries at the top of the ladder. Some such chemistries contain additional AIs that remain under patent protection or data exclusivity. They have no exact generic counterpart and cannot be replicated using a tank mix. For these chemistries, generic competition from non-identical chemistries within the market is nevertheless a significant competitive force.

204. The foregoing evidence of substantial substitution among distinct chemistries containing the AI supports their collective consideration within the same relevant market.

205. Moreover, the distinct chemistries are subject to similar competitive dynamics. They all experience competitive pressure in the form of competition from generic AI. The threat comes in the various forms discussed above, including tank mixing that replicates chemistries not currently offered in a generic finished product.[232] Moreover, the loyalty program preserves the defendant's market power as to all of them.

206. Where distinct products are subject to competitive conditions, it is common practice to aggregate them for convenience within the same market.[233] Here, the commonality of competitive dynamic among distinct chemistries supports their collective consideration within the same relevant market.

207. For metolachlor, products within the market are not all substitutes. There are two ladders, one for corn products and one for soybean products. Due to toxicity and differences in labeling, the two sets of premixes are not substitutable. For these, the analysis above applies at the product ladder level and supports collective consideration within the same market. Further, the commonality of competitive dynamic, across the two product ladders, supports their collective consideration within an overall metolachlor market. The acetochlor market has a similar feature, and the same analysis applies.

208. *The AI as a shared component*. For each product in the market, the AI is a key component and distinctive source of value. This commonality underpins the substitutability among different rungs on the product ladder and the common importance of generic competition for the various chemistries within the market.

209. The value of a component AI is rooted in its distinctive functionality and use. Here, each of the six AIs provides a distinctive benefit to growers that other AIs do not replicate. For a particular grower need, it is often the case that products containing one AI are better

[232] The collection within a single loyalty program of multiple chemistries containing the AI is further evidence that the brand faced a similar competitive threat across the distinct chemistries.

[233] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.3.D.4 (2023) ("[W]hen the competitive conditions for multiple relevant markets are reasonably similar, it may be appropriate to aggregate the products in these markets into a 'cluster market' for analytic convenience, even though not all products in the cluster are substitutes for each other.").

suited than products containing another AI. Some of the distinctive benefits of each AI, as described by the manufacturer or other observers, are summarized in the Appendix.

210. The AI component is a consistent contributor of value to finished products and a consistent and stable component of price. Each premix on the ladder is a bundle of component AIs. The price of the bundle is, to a substantial degree, the sum of the components. This makes sense, given that a farmer can often buy the component AIs separately to make a tank mix.

211. The premix price is not a strictly linear combination of the components. There are factors that drive the price higher or lower. Complementarities (including convenience) from joint delivery support a higher price. Bundling of two components, each of which reflects market power, can be a source of downward pricing pressure.[234] But in rough terms, the components are separable and the value of a premix generally corresponds to the sum of its parts.

212. This is reflected, for example, in a Syngenta analysis that set a premix price based on the [redacted][235] To set the price on a new premix, Syngenta [redacted][236] Bayer has likewise used component pricing to evaluate the price of premixes.[237]

213. Moreover, a component approach to pricing is embedded in defendants' real-world pricing. For example, for each year from 2018 to 2024, the farmgate price for Syngenta's Callisto Xtra product (atrazine, mesotrione) is within [redacted] of the sum of the price of the constituent AIs.[238]

214. The stable value of the AI component as a price contributor to finished branded products is further evidence of the common threat posed by generic competition, which would erode

---

[234] Preston R. McAfee & John McMillan et al., *Multiproduct Monopoly, Commodity Bundling, and Correlation of Values*, 104 Q.J. ECON. 371, 374 (1989). An example is corn premixes that bundle mesotrione and metolachlor, given Syngenta's substantial market power over each.

[235] *See* Gesse (Head of Herbicide Product Mktg., Syngenta) Dep. Tr., Vol. I, at 141:4–141:12 [redacted] *see also id.* at 202:18–203:6 (describing CX2747-005, [redacted]

[236] CX2747-005, SYT_REBATELIT_01806406 (03/17/2021 Syngenta presentation: "Acuron GT Pricing"). In 2024, during an internal audit on crop protection pricing, Syngenta [redacted] *See* SYT_REBATELIT_02915321 & SYT_REBATELIT_02915324, at slide 8 (2/27/2024 Syngenta presentation: "2024 NPI Value Based Pricing / Brand Ladder Examples").

[237] *See* FTC-Bayer-00002989_0001, 001 (4/26/2021 internal Bayer email from Rittemann to Whritenour) (in pricing a premix of 2,4-D, mesotrione, and acetochlor, assigning value of [redacted] for 2,4-D (Enlist One/ DUO), [redacted] for mesotrione, and [redacted] for acetochlor (straight Warrant)).

[238] *See* Component Workpaper. This calculation is based on the price per pound of AI in the leading branded straight good products.

this contribution across the board. Thus, this evidence further supports the conclusion that the set of product chemistries containing the AI is an appropriate scope for market analysis.

### 3.3. For each AI, there is a relevant market for the AI included as a component of finished crop-protection products

215. A complementary approach to market definition, supported by the evidence, is to analyze a market for the component AI included in a finished crop protection product. A premix is a bundle of component AIs; a straight product includes a single component AI. Whether contained in a premix or a straight product, the component AI is an identifiable source of value that makes a stable contribution to the price and performance of the finished product. A hypothetical monopolist of the component AI, just like a hypothetical monopolist of the corresponding finished product market, would profitably raise the price (direct and implicit) of the component AI above the competitive level.

216. As with the finished product market described in the preceding section, the existence of a relevant AI component market is strongly supported by Syngenta's and Corteva's loyalty programs themselves.[239] [redacted] In this sense, a component market even more closely tracks defendants' conduct than the finished products market.

217. Similarly, defendants' recognition of the AI as a source of profits, and generic competition at the AI level as an existential threat, supports characterization of the relevent market as the AI itself included as a component of a finished product. The marketing plans, generic defense strategies, and lifecycle management plans discussed previously all are focused on the set of products containing the AI, and in particular on combating a nascent generic ability to manufacture and market that AI following expiration of patent or data exclusivity specific to that AI.[240] Whether contained in a premix or a straight product, it is the AI that is the source of profits that would be eroded by generic entry, and that is the competitively significant source of value.

218. Further, as mentioned above, an AI component market is consistent with the value of the component AI being rooted in its distinctive functionality and use. As noted, each of the six AIs provides a distinctive benefit to growers that other AIs do not replicate.

219. Finally, the observed empirical evidence described above previously fully supports the existence of an AI component market.[241] This can be seen directly in the price of a straight product, which directly represents the value of the AI component. For a premix, the implicit price of the AI component is not directly visible but can be inferred from the price of straight product and from the the price of technical AI, both of which are sold externally.

---

[239] *See* Section 3.2.1.

[240] *See* Section 3.2.2.

[241] *See* Sections 3.2.3 to 3.2.5.

***

**FIGURE 19: CORTEVA MARKET SHARES BASED ON QUANTITY OF AI**

[redacted]

Notes: Invoice data from manufacturers. *See* Market Shares Workpaper. The years refer to program years. Market share in terms of pounds of AI for included products. Rimsulfuron shares are calculated for products labeled for specialty crops. Private label products supplied by Corteva are attributed to Corteva.

237. The foregoing market share calculations reflect defendants' competitive significance in both markets for finished products containing each Syngenta and Corteva AI and in markets for the AI included as a component of a finished crop-protection product. In each market, an appropriate measure of competitive significance is the quantity of AI supplied.

238. *Market shares by acres treated*. I also calculate market shares by acres treated. The lowest Syngenta share for any Syngenta AI in any year is [redacted]. In most years, the Syngenta share exceeds [redacted]. For rimsulfuron and oxamyl, the lowest Corteva share in any year is [redacted] In most years, the Corteva share is substantially higher and exceeds [redacted]. For acetochlor, the Corteva share varies between [redacted] and [redacted]. The full set of results are included in Appendix D.

239. *Market shares by manufacturer revenue*. In Appendix D, I also report shares based on manufacturer revenue. Defendant market shares based on revenue are consistent with and generally higher than market shares based on quantity. The lowest Syngenta share for any AI in any year is [redacted]. For most AIs in most years, the Syngenta share is [redacted] or higher. For rimsulfuron and oxamyl, the lowest share for either AI is any year is [redacted]. For most AIs in most years, the Corteva share is [redacted] or higher. For acetochlor, the Corteva share ranges between [redacted] and [redacted].

240. *Market shares by grower expenditure.* In Appendix D, I also report shares based on grower expenditure using FarmTrak data. The lowest Syngenta share for any AI in any year is [redacted]. For most AIs in most years, the Syngenta share is [redacted] or higher. For rimsulfuron and oxamyl, the lowest Corteva share for either AI in any year is [redacted]. For most years, the Corteva share is [redacted] or higher. For acetochlor, the Corteva share ranges between [redacted] and [redacted].

### 3.5. Barriers to entry

241. For each of the relevant markets, there are substantial barriers to entry and expansion. To bring a generic product to market, a manufacturer must expend substantial time and resources. Crucially, the generic firm also needs access to customers, which is provided by the traditional distribution channel. Owing to defendants' conduct, generic producers lack such access, restricting generic producers from addressing enough of the market to make entry worthwhile. In this section, I discuss these points in further detail.

242. *Bringing a generic product to market*. To bring a generic product to market, the firm must source the technical AI, formulate the product (either itself or having a toll manufacturer do so), and secure regulatory approval for the finished product. This is typically a multi-year process, with the amount varying depending on the product.[255]

243. A finished generic product incorporates technical AI that is typically sourced from manufacturers outside the United States.[256] The technical AI must be registered with the EPA. If the generic firm's source does not already have registration, as is typically the case, registration poses a significant barrier to entry.

244. [redacted].[257] This process is time consuming, requiring ten months or more.[258]

245. Moreover, as noted in Section 2, the generic producer must pay data compensation to the basic manufacturer. As a condition for EPA considering the application, an irrevocable offer of compensation must be made.[259] The level of compensation depends on the costs of the work undertaken by the basic manufacturer.[260] Compensation may be apportioned

---

[255] *See*, *e.g.*, [redacted] Barham (V.P. Sales Crop Protection, Nufarm) IH Tr., at 172:7–173:21 [redacted].

[256] *See* Vance (President, Albaugh N.A.) IH Tr., at 67:16–21 (basic manufacturers generally synthesize products in-house, while generics source from a variety of companies); *id.* at 67:16–68:13 (generic product could come from a multitude of suppliers; there is little difference between the end product and the branded product); *id.* at 138:20–139:2 (overseas source for acetochlor); [redacted] Schumacher (C.E.O., Helm; former Dow, WinField) IH Tr., at 27:20–28:2 (Helm generally sources its products internationally); Fowler (Sr. V.P., CNI) IH Tr., at 36:5–21 (companies can source AI from India, China, Vietnam, Israel, and Eastern Europe). A company that formulates a crop protection on behalf of the registrant is sometimes referred to as a "toll manufacturer." *See*, *e.g.*, Schumacher (C.E.O., Helm; former Dow, WinField) IH Tr., at 28:15–29:14.

[257] [redacted]

[258] An application that uses the "Cite-All" data method, which involves citing (and offering to pay data compensation for) all studies conducted by the originator, takes approximately 9 to 10 months; an alternative data method called "selective citation" takes longer. *See* Gertz (C.E.O., Sipcam U.S.A.; former Dow, WinField) IH Tr., at 101:2–104:1 (nine months for federal registration); [redacted]

[259] *See* 7 U.S.C. § 136a(c)(1)(F)(iii); *BASF Corp. v. Willowood, LLC*, No. 18-cv-00268, 2019 WL 1436936, at *1 (D. Col. Feb. 14, 2019) ("[T]he applicant must undertake a binding commitment to financially compensate the original data submitter for the use of its data."); [redacted]).

[260] The amount paid is set by agreement, with binding arbitration if the parties are unable to agree. *See* 7 U.S.C. § 136a(c)(1)(F)(iii). The compensation set by arbitration is based on the tests employed and a portion of the costs of those tests. *See also* 7 U.S.C. § 136a(c)(1)(F) (requiring original registrant to provide EPA

based on the number of other entrants or the share of sales the entrant is expected to capture.[261] The amount of the compensation is determined through negotiation or, failing that, arbitration.[262]

246. Generic manufacturers are free to prepare and submit their own data.[263] In practice, however, most firms choose to use the basic manufacturer's data as the less expensive option, either by paying data compensation or waiting for the compensation period to expire.[264] The compensation obligation expires 15 years after its data submission.[265] However, the basic manufacturer has ongoing data obligations which in turn place ongoing payment obligations on generic firms that rely on the basic manufacturer's data.

247. The basic manufacturer often demands a high level of data compensation. For example, in 2002, Syngenta calculated an "approximate claim" of [redacted] against the next metolachlor entrant.[266] In 2018, Corteva demanded more than [redacted] for

---

with "a full description of the tests made and the results thereof upon which the claims are based"); *see also Thomas v. EPA*, 473 U.S. 568, 590 (1985) (describing FIFRA as compensating the original registrant for the costs of generating the data it used for its submission in noting that the 1978 FIFRA amendments serve as "a pragmatic solution to the difficult problem of spreading the costs of generating adequate information regarding the safety, health, and environmental impact of a potentially dangerous product").

[261] *See* Vance (Dir. of Customer Engagement, Albaugh) Dep. Tr., Vol. II, at 440:19–441:16 (describing per capita share approach); Wasson (former President, Corteva) Dep. Tr., Vol. I, at 308:20–310:16 (contrasting per capita with the market share based approach); Hawkins (President, Syngenta) Dep. Tr., Vol. II, at 342:15–20 ("There is a formula. So it's based on, you know, the life of the data, the cost of the data. The number of registrants sometimes is a factor in it."); [redacted] FTC-SD-00000763 (10-31-2019 internal Solera Source Dynamics email from Stojic to Bastian et al.) (describing per capita and market share approaches to data compensation calculation).

[262] *See* 7 U.S.C. § 136a(c)(1)(F)(iii) ("The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph."); [redacted]

[263] *See* 40 C.F.R. § 152.92 ("An applicant may demonstrate compliance for a data requirement by submitting a valid study that has not previously been submitted to the Agency.").

[264] Syngenta's Responses and Objections to Government Plaintiffs' Interrogatory Nos. 14–16, at 12–20 (7/17/2025) ("Nearly every generic registrant chooses to rely on data submitted previously by the original registrant, because this option is substantially less expensive, less risky, and substantially faster than the generic generating its own data."); Vance (Dir. of Customer Engagement, Albaugh) Dep. Tr., Vol. II, at 442:9–19 (data compensation "is not required, but it absolutely is the best financial outcome, because to go generate all that data yourself is way more expensive than what the outcome of a data compensation negotiation is going to be"); [redacted]

[265] *See* 7 U.S.C. § 136a(c)(1)(F)(iii); Canady (C.E.O., Atticus) IH Tr., at 233:10–234:22 ("One of the conditions is data only has a 15-year compensable life. It doesn't mean that you don't need to cite the data. It means you don't have to pay for the data."); [redacted]

[266] *See* CX2835-024, SYT_REBATELIT_04520487 (3/20/2002 Syngenta presentation: "Syngenta Generics Strategy") (listing estimated compensation values for each AI).

acetochlor.[267] The amounts ultimately paid by generic entrants are generally lower than the amount sought due to negotiations and arbitration decisions. Demanding a high compensation level is a means to delay or deter generic entry.[268] It is also a means to induce exit where the basic manufacturer waives accrued data compensation payments in exchange for exit by the generic.[269]

248. Data compensation poses a significant barrier to generic entry.[270] In some cases, a generic firm has chosen to delay entry until after the compensation period expires because the cost

[267] Corteva sought compensation in conjunction with its partner Bayer. *See* FTC-CTVA-CID_00007352, 367, 390–91 (undated arbitration document: "ARP [Acetochlor Registration Partnership] Statement of Claim") (Sharda submitted its original application to EPA in September 2016 with data compensation arbitration still ongoing in May 2018); *id.* at 398 (describing claim, in 2018, for approximately [redacted] in external data costs), 400 (describing claim, in 2018, for approximately [redacted] in regulatory management costs).

[268] *See* CRTVA-CPL-01671255 (5/31/2019 internal Corteva email from Feauto to Messner et al.) [redacted] I would hate to lower loyalty levels to let generics get back in the game, when we potentially could be so close to pushing them completely out."); CX1201-001, FTC-CTVA_00286408 (10/28/2019 internal Corteva email from Bodily to Swanson et al.) ("I have had several distributors press me on the idea that we need to 'press' our generic competitors for data comp on rimsulfuron. That doing this would make the business less attractive and several would likely drop out of the business."); Swanson (Global Product Manager, Corteva) IH Tr., at 294:19–297:10 (discussing CX1201); CX1212-001, FTC-CTVA_00491149 (10/29/2019 internal Corteva email from Swanson to Loy) ("If we can bring any pressure to those yet not settled, it would be appreciated. . . . [redacted] CX1593-001, FTC-CTVA_00743195 (1/29/2018 internal Corteva email from Messner to Timmerman) ("Where do we stand on the [acetochlor] data compensation discussion? Is there anything we can do here to create a delay?").

[269] *See* Gertz (C.E.O., Sipcam U.S.A.; former Dow, WinField) IH Tr., at 127:13–130:22 (describing Syngenta strategy to waive data compensation in exchange for generic's exit); *see also* CX1201-001, FTC-CTVA_00286408 (10/29/2019 internal Corteva email from Swanson to Bodily) (Bodily: "we need to 'press' our generic competitors for data comp on rimsulfuron . . . doing this would make the business less attractive and several would likely drop out . . ."; Swanson: "[redacted] Sometimes (like oxamyl) they decide the investment is too rich and get out . . .").

[270] *See* [redacted]

is prohibitive.[271] For example, high compensation for acetochlor delayed generic entry until 2018.[272]

249. The generic firm must also formulate the product. Once formulation is complete, the manufacturer must obtain registration for the finished product from the EPA and also each state in which the product is to be sold. Registration requires a demonstration of safety and efficacy.[273] This is generally accomplished by citing the existing studies of another firm, typically the basic manufacturer, with the potential for data compensation depending on the formulated product.[274]

250. Taken together, the duration and expense of this process pose a substantial barrier to entry. A rational generic producer must anticipate adequate volume and revenue in order to justify this time and expense.[275] Greater volume is also a source of significant economies of scale, including learning by doing.[276] Achieving the requisite level of sales depends in part on adequate access to customers, discussed next.

---

[271] *See* Vance (President, Albaugh N.A.) IH Tr., at 128:1–12 (explaining that the "high" cost of data compensation as a consideration of whether to enter in acetochlor); [redacted] We have our fully loaded cost of goods. We can see what is our margin, what market share do we think we can achieve. And also it goes back to the data compensation. How much will it take us to invest to get into this molecule with regards to the compensable data as our best estimate owed to the basic manufacturer."); Wasson (former Corteva) Dep. Tr., Vol. I, at 83:19–84:22 (stating that generics will often wait until studies have expired to enter the market due to data compensation costs).

[272] On acetochlor's high data compensation costs, *see* [redacted] Schumacher (C.E.O., Helm; former Dow, WinField) IH Tr., at 144:25–145: 23 (describing "extremely high" data compensation for acetochlor); CX1563-008, FTC-CTVA_00726907 (6/2015 Corteva spreadsheet: "CP GBU Annual Planning Guidance") (product lifecycle analysis for acetochlor stating that "[d]ata compensation remains a large barrier in the US," but projecting that it would drop to "moderate" in the five-year period following 2016).

[273] *See* 40 C.F.R. § 152.86 (providing for "cite-all method" of seeking registration and requiring acknowledgment of reliance on data including that on the properties and effects of the pesticide, at § 152.86(d)(2)); *id.* § 152.85 (describing applicability of "formulator's exemption" to data requirements including data "on the applicant's product itself, including the safety or efficacy of the product").

[274] As with technical registration, the entrant is free to conduct its own studies instead, but this alternative is almost always more expensive. *See* Vance (Dir. of Customer Engagement, Albaugh) Dep. Tr., Vol. II, at 442:9–19 ("[T]o go generate all that data yourself is way more expensive than what the outcome of data compensation negotiation is going to be.").

[275] *See, e.g.*, Vance (President, Albaugh N.A.) IH Tr., at 165:8–167:25 (describing factors taken into account when considering entry, including "the economic return on investment numbers. And those are data comp and cost of goods versus estimated selling price and then margin.").

[276] *See, e.g.*, SYT_REBATELIT_00189692, 703 (5/31/2013 Syngenta presentation: "S-Metolachlor Post Patent Strategy Update") [redacted]

251. *Access to the traditional channel*. Manufacturers reach customers through distributors. As discussed in detail in Section 4, the distributors provide access to a large set of customers without the manufacturer needing to manage a large number of separate relationships. They also provide logistical capabilities (including transportation, storage, and credit) to reach those customers, and the convenience of one-stop shopping. Distributors provide these capabilities in a more cost effective manner than a manufacturer could achieve on its own. Reproducing these capabilities is very difficult, requiring a large investment and multiple years. Accordingly, generic manufacturers have testified that access to the traditional channel is necessary for effective entry.[277]

252. As discussed in Section 4, defendants' loyalty programs deny generic firms access to the traditional channel, confining their potential sales to a low level. This limitation raises a barrier to entry and expansion. It also reinforces other barriers to entry by making scale harder to achieve. As a consequence, a generic firm is less likely to have the anticipated sales necessary to undertake the costly and time-consuming approval process. An illustration of the intersection of these points is an analysis Syngenta performed in setting its initial loyalty thresholds. [redacted].[278]

253. The existence of significant barriers to entry in the relevant markets for the six AIs is confirmed by the observed low penetration of generic products. I understand that defendants have argued that the existence of entry, however limited, shows that there are no significant barriers to generic entry. To the contrary, the evidence shows that the loyalty programs have confined generic firms to a small part of each market. The same is true of evidence, discussed in Section 4, that generic firms exited or did not enter on account due to the barriers to entry set up and reinforced by the loyalty programs.

---

Vance (President, Albaugh N.A.) IH Tr., at 159:16–161:9 (discussing suspensions requiring formulation expertise); Gertz (Sipcam) IH Tr., at 219:5–221:24 (explaining the importance of logistics and how scale offers efficiencies); [redacted]

[277] *See, e.g.*, [redacted] Vance (Dir. of Customer Engagement, Albaugh N.A.) Dep. Tr., Vol. I., at 148:14–149:19 (explaining that Albaugh could not stay in business selling just through the alternative distribution channel because "you would have to beef up your credit and your collection and your logistics organization, because you would be making many more much smaller shipments to potentially much higher credit risk customers. I think we would go bankrupt in the transition.").

[278] *See* CX2835-024, 031, 046 SYT_REBATELIT_04520486 (4/5/2002 Syngenta presentation: "Generics Strategy"); Ripato (former Wilbur-Ellis, Tenkoz, Syngenta) Dep. Tr., Vol. I, at 166:16–169:14 ("Do you take these break-even share percentages into account as you're thinking about where to put loyalty thresholds? . . . A. To say we ignored them would be a misstatement. . . .").

### 3.6. Direct evidence of monopoly power

254. The conclusion that each defendant possesses monopoly power is also supported by direct evidence of its exercise. Much of the evidence discussed above in support of my conclusions about market definition also constitutes direct evidence. This includes evidence of higher defendant prices and profits in the absence of generic entry.

255. In addition, each defendant's effective exclusion of generic producers is direct evidence that it possesses substantial market power. A firm without such power would lack the incentive and ability to exclude—that is, would not find it profitable to undertake the costly exclusionary action. An important cost here is the sizeable loyalty payments made to distributors as an inducement to loyalty. (The size of these payments is discussed in Section 4.) If the defendant had no monopoly power, these payments would not be profitable. More generally, if the defendant had no monopoly power, the loyalty programs would be an ineffective form of exclusionary conduct, as other firms remaining in the market would effectively constrain it, or because new challengers would readily emerge.

## 4. Competitive Effects

### 4.1. Loyalty payments are an established strategy for protecting monopoly profits

256. The agreements at issue in this matter are "vertical" agreements between defendant manufacturers and their distributors. Some vertical agreements induce distributors to sell the manufacturer's products on an exclusive or near-exclusive basis. Such agreements can harm competition and consumers by depriving rivals of effective distribution. The rivals are forced to use more expensive and less effective means to reach customers or forgo entry entirely.

257. The literature identifies a variety of harmful exclusionary strategies. One such strategy is for the manufacturer to implement agreements that share its monopoly profits with distributors, as an inducement to secure the distributors' acceptance of the arrangement.[279] The mechanism by which monopoly profits are shared can take various forms.[280] By participating in the exclusion of rival manufacturers, the distributor protects the monopoly position of the incumbent manufacturer. This increases the rents that accrue at the manufacturer level in the industry. To protect this flow of rents in the future, the manufacturer shares them with the distributor. Under this arrangement, the distributor has a stake in the profits created by excluding a rival of the manufacturer, and thus an interest in preserving monopoly profits.

258. This strategy reflects the established proposition that many vertical arrangements exist to align the interests of manufacturers and distributors, and upstream and downstream firms

---

[279] *See* John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 AM. ECON. REV. 672 (2014); John Simpson & Abraham L. Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305, 1317–18 (2007).

[280] *See* John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 AM. ECON. REV. 672, 672 (2014) (describing a variety of vertical contracting practices that support profit sharing, including loyalty payments, slotting fees, resale price maintenance, and market allocation arrangements).

more generally.[281] In some cases, the alignment serves to increase consumer willingness to pay, and thus can be beneficial to both consumers and manufacturers. However, the vertical alignment of interests is not necessarily beneficial to consumers. Instead, the distributor firm may provide benefits to manufacturers that, while benefiting the manufacturer, are harmful to consumers.

259. Put another way, this strategy introduces a wedge between the interests of distributors and the interests of growers, who prefer greater manufacturer competition. Distributors lack a strong incentive to protect manufacturer competition so long as they share in the manufacturer's benefit from reduced competition.[282] Distributors are benefited by the manufacturer's exclusionary conduct. The distributor's provision of exclusionary services to the manufacturer simultaneously produces a flow of benefits to the distributor. The very fact that exclusion protects monopoly profits means that there is an accumulation of benefits that are available to be shared.

260. In assessing the effectiveness of an exclusionary arrangement, one significant issue is the presence of competition among distributors in downstream markets. Competition among distributors causes them to pass through part of the benefit of manufacturer competition to their customers. This dynamic further reduces the distributor's interest in manufacturer competition. A corollary effect of competition among distributors is to reduce the payment needed to induce the distributor to accept an exclusionary arrangement over manufacturer competition.[283]

261. The vertical contracts at issue in this matter are loyalty programs. Under these programs, the manufacturer makes payments to distributors that purchase a sufficiently large share—that is, a large percentage—of products containing the covered AI from the manufacturer, rather than a rival. [redacted]

---

[281] *See, e.g.*, Ward Bowman, *The Prerequisites and Effects of Resale Price Maintenance*, 22 U. CHI. L. REV. 825, 840–43 (1955) (explaining RPM as a means to pay retailers for service provision); Lester Telser, *Why Should Manufacturers Want Fair Trade?*, 3 J.L. & ECON. 86, 89–96 (1960) (defending RPM as a means to induce service provision by retailers); Benjamin Klein & Kevin Murphy, *Vertical Restraints as Contract Enforcement Mechanisms*, 31 J.L. & ECON. 265, 267, 271–76 (1988) (arguing that RPM induces dealer performance where an explicit contract is infeasible by conferring a quasi-rent on performing dealers).

[282] *See, e.g.*, Michael D. Whinston, LECTURES ON ANTITRUST ECONOMICS 149 (MIT Press 2008); John Simpson & Abraham L. Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305, 1318 (2007); John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 AM. ECON. REV. 672, 681 (2014).

[283] See, e.g., John Simpson & Abraham L. Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305, 1306 (2007); John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 AM. ECON. REV. 672, 682–83 (2014); Jose Miguel Abito & Julian Wright, *Exclusive Dealing with Imperfect Downstream Competition*, 26 INT'L J. INDUS. ORG. 227, 232 (2008); Enrique Ide, Juan-Pablo Montero & Nicolás Figueroa, *Discounts as a Barrier to Entry*, 106 AM. ECON. REV. 1849, 1864 (2016).

[redacted].[284]

262. Payment on a first-dollar basis provides a large one-time benefit for crossing the loyalty threshold. This confers a strong incentive for a distributor to attain the threshold if it otherwise would fall short. Put the other way around, the arrangement imposes a large one-time penalty for falling short of the loyalty threshold. After all, if the distributor falls below the threshold, it loses the payment as to all purchases.

263. [redacted]. However, the economic effects of a loyalty payment differ from an ordinary discount that applies regardless of the quantity purchased. An ordinary discount lacks the large one-time penalty that kicks in if the purchaser fails to achieve the threshold. An ordinary volume discount for purchases above a threshold similarly lacks the one-time penalty that characterizes the loyalty payments at issue here.

264. Loyalty payments are a recognized means for a manufacturer to share monopoly profits with distributors, thereby securing near-exclusivity and depriving rivals of effective distribution.[285] Moreover, the effects of a loyalty program, where the required share of purchases is high, are closely analogous to exclusive dealing arrangements. The economic literature recognizes that a first-dollar payment conditioned on compliance with a high share target often is, in substance, de facto exclusive.[286]

265. A loyalty payment offered to a distributor is different from loyalty programs offered to a final consumer, such as a supermarket loyalty program for shoppers. Such programs are missing the key feature of concern here—distributors have the opportunity to share in manufacturer profits by excluding other manufacturers, at consumer expense. Here, the incumbent manufacturer can form a coalition with distributors, at least implicitly, to extract monopoly profits from consumers.

266. The foregoing discussion implies four relevant questions for evaluating whether a loyalty program effectively restrains competition. *First*, does competition from rival manufacturers pose a threat to profits? The existence of a threat confers an incentive on the incumbent manufacturer to avoid that competition by engaging in exclusionary conduct.

267. *Second*, do rivals need access to the targeted channels of distribution in order to compete effectively? Access is important where alternative channels, or building a parallel distribution system from scratch, is infeasible, higher cost, or less effective.

---

284 [redacted]

285 *See*, *e.g.*, John Asker & Heski Bar-Isaac, *Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals*, 104 AM. ECON. REV. 672, 672–73 (2014).

286 *See*, *e.g.*, David Spector, *Loyalty Rebates: An Assessment of Competition Concerns and a Proposed Rule of Reason*, 1 COMP. POL'Y INT'L 89, 98 (2005).

268. The success of an exclusionary strategy stems from denial of the most effective means of distribution. It is not necessary to block all possible means of distribution. It is enough to cover customers' preferred means of securing supply of the product in question. Doing so raises the costs (or reduces the benefits) of using the rivals' product, placing them at a disadvantage.[287]

269. This is a familiar point in the economic analysis of denials of distribution. One famous example is Microsoft's actions in the 1990s to restrict the distribution of Netscape's internet browser by manufacturers of personal computers (among other outlets). The manufacturers were not the only means for a software maker to reach end users, as Microsoft noted, but the key economic point was that Microsoft had blocked the "cost efficient ones."[288]

270. *Third*, does the incumbent manufacturer, instead of competing on the merits, provide inducements to adhere to the loyalty threshold? The inducements may include payments that share monopoly profits with compliant distributors, as well as penalties (both threatened and imposed) for disloyalty.

271. *Fourth*, do distributors find it more profitable to comply with the loyalty program than to accommodate the rival? The answer is yes where rivals are unable to overcome the distribution restrictions by offering the distributor an even better deal.

272. I conclude that for defendants' loyalty programs in the six AI markets, the answer to each question is yes, and therefore that the programs restrain competition. The next four sections discuss the basis for this conclusion in greater detail.

### 4.2. Syngenta and Corteva have an incentive to impede competition from generic manufacturers

273. The first question is whether competition from rival manufacturers poses a threat to profits. Such competition furnishes an incentive to avoid that competition by engaging in exclusionary conduct.

274. This question is easily easily answered in the affirmative. As discussed in Section 3, unfettered competition from lower-priced generics takes sales from the branded manufacturer and typically stimulates the manufacturer to cut its own prices. Both effects reduce branded firm profits.

275. The branded firm can avoid lost profits by impeding the entry of generic competitors. By excluding the generic in whole or in part, the branded firm can sell a higher volume and at a higher price. By "avoid," I mean avoid to some degree. The branded firm comes out ahead by slowing generic entry and expansion, even if entry cannot be prevented entirely.

---

[287] *See* Steven C. Salop & David T. Scheffman, *Raising Rivals' Costs*, 73 AM. ECON. REV. 267, 267 (1983).

[288] For example, Whinston (2001) explains why Microsoft could have hobbled Netscape's ability to compete without blocking all means of distributing browsers. *See* Michael D. Whinston, *Exclusivity and Tying in* U.S. v. Microsoft*: What We Know, and Don't Know*, J. ECON. PERSPECTIVES, Spring 2001, at 63, 75–76.

***

**FIGURE 23: SYNGENTA LOYALTY PAYMENTS BY AI AND DISTRIBUTOR**

[redacted]

Notes: *See* Loyalty Payments Workpaper (Syngenta). For each distributor, information available on loyalty payments by program year for the Syngenta AIs are: [redacted] Figure shows average annual Syngenta loyalty payments between PY 2019 and PY 2023.

323. The above figures include retail program loyalty payments received by [redacted] that are included in [redacted] distributor marketing agreement and contingent on distributor-level loyalty, but exclude retail-program payments made to independent retailers or to integrated distributor-retailers such as [redacted] Thus, they tend to understate both the magnitude (as to integrated distributor-retailers) and the breadth (as to independent retailers) of the incentives created by Syngenta's Key AI program.

*4.4.2.2. Corteva*

324. [redacted]

325. [redacted]

---

[369] *See, e.g.*, FTC-CTVA_00476947, 948 [redacted] Crop Production Services CRPIVM Loyalty Program between Dow AgroSciences and [redacted]) [redacted] *see also* Arens (Mktg. Programs Financial Consultant, Corteva) Dep. Tr., Vol. I, at 105:23–109:12 [redacted]

[redacted]

326. [redacted]

327. [redacted]

---

[370] *See, e.g.*, CRTVA-CPL-02890997, 001, 004 ([redacted] Amendment to [redacted] CRPIVM Loyalty Program between Corteva and [redacted]) [redacted] *See* CRTVA-CPL-02488991, 996–001 ([redacted] PY2024 AI Support Program Offer between Corteva and [redacted]

[371] [redacted]

[372] *See, e.g.*, CRTVA-CPL-00000028, 032 [redacted] CRPIVM Loyalty Program between Corteva and [redacted] *see also* Messner (Global Portfolio Leader, Corteva) Dep. Tr., Vol. I, at 103:19–104:4 [redacted]

[373] [redacted]

[374] The CDO [redacted]

[375] CRTVA-CPL-00000215, 223 [redacted] Corporate Distributor Offer between Corteva and [redacted]. In [redacted] CDO, [redacted]

[redacted]

328. Figure 24 reports the average annual loyalty payment over this period by AI and distributor. As observed for the Syngenta AIs, Corteva's loyalty payments range widely from more than [redacted] to less than [redacted]. As a percentage of the distributors' purchases, the payments can be as low as [redacted] for acetochlor loyalty payments to certain distributors to well-over [redacted] for AIs in loyalty with relatively low sales, [redacted].[377]

**FIGURE 24: CORTEVA LOYALTY PAYMENTS BY AI AND DISTRIBUTOR**

[redacted]

Notes: *See* Loyalty Payments Workpaper (Corteva). The numbers in the figure reflect the average annual payments made by Corteva to leading distributors for each AI for PY [redacted] through PY [redacted] [redacted].

#### ***4.4.3. Distributors retain the payments as additional profit***

329. The loyalty payments to distributors are retained in substantial part as additional profit, as opposed to being passed through to purchasers in the form of lower prices. This section explains the basis for this conclusion.

330. I understand that Syngenta and Corteva contend to the contrary that distributors do not retain the loyalty payments as profit but instead pass through the payments to purchasers due to competition among the distributors. If the payment is passed through in its entirety, defendants' thinking goes, then there is no benefit from loyalty compliance or penalty for noncompliance, thereby rendering the exclusionary strategy ineffective. Defendants' contention is incorrect in multiple respects.

331. Defendants' claim is extreme because it requires complete pass-through. Partial pass-through is not enough to eliminate the benefit of compliance, since distributors would still

---

[376] For this calculation, I include the part of a CRPIVM payment [redacted]

[377] *See* Loyalty Payments Workpaper for each program year by AI and distributor.

***

**FIGURE 26: DISTRIBUTOR COMPLIANCE WITH SYNGENTA LOYALTY**

| | | 2016 [A] | 2017 [B] | 2018 [C] | 2019 [D] | 2020 [E] | 2021 [F] | 2022 [G] | 2023 [H] |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | | | | | | | | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Notes: Numbers in the table reflect reported key AI shares for each distributor, AI, and program year. **Numbers in bold** indicate that the distributor met the loyalty threshold. Numbers in grey boxes indicate that the reported shares did not meet the loyalty threshold for that program year. *See* Loyalty Compliance Workpaper for sources by distributor and program year. "Pass" for [redacted] in 2021 through 2023 refers to [redacted]; *see* Semadeni (Simplot) Dep. Tr., Vol. I, 40–41. [redacted] met this condition through 2023 crop year. SYT_REBATELIT_03133445 (10/24/2022 Syngenta internal email from Hussam to Brooks) [redacted] SYT_REBATELIT_02975061 (10/20/2023 Syngenta internal email from Colburn to Weikel et al.) [redacted]

422. As for Syngenta's retail Key AI thresholds, compliance is similarly widespread: a 2021 Syngenta analysis concluded that between [redacted] of retail sales qualify for retail Key AI payments.[563]

423. Turning to the Corteva AIs, the distributors met the acetochlor loyalty thresholds in every year between PY 2017 and PY 2023. For rimsulfuron and oxamyl, compliance varied by distributor. Tenkoz fell short of the rimsulfuron loyalty thresholds by less than one

percentage point in PY 2018 and PY 2023. Helena's rimsulfuron compliance fluctuated over this period, and it did not meet the oxamyl thresholds starting in PY 2020. Growmark did not meet the rimsulfuron threshold starting in PY 2019 (except for PY 2022) and did not participate as to oxamyl. [redacted].[564]

[563] SYT_REBATELIT_00063122, at slide 9 (5/29/2020 Syngenta presentation: "2021 Retail Program Key A.I. Incentive") [redacted] Weikel (Head of National Accounts & Customer Service, Syngenta) Dep. Tr., Vol. II, at 555:14–556:21, 557:10–17 (testifying regarding slide 9 of SYT_REBATELIT_00063122 that [redacted]

[564] *See* Section 4.4.5; *see also* [redacted]

**FIGURE 27: DISTRIBUTOR COMPLIANCE WITH CORTEVA LOYALTY**

[redacted]

Notes: Numbers in the table reflect reported key AI shares for each distributor, AI, and program year. **Numbers in bold** indicate that the distributor met the loyalty threshold. Numbers in grey boxes indicate that the reported shares did not meet the loyalty threshold for that program year. *See* Loyalty Compliance Workpaper for sources by distributor and program year. For rimsulfuron and oxamyl, Corteva added these AIs to its loyalty program in 2018. [redacted]

424. Most distributors rarely miss the loyalty thresholds. The most notable recurring loyalty threshold misses have occurred with respect to Simplot, due to Simplot's unique strategy surrounding its Innvictis line of products, as discussed in Section 4.4.5. [redacted] have also missed several Corteva thresholds, which Corteva has addressed in each circumstance by examining the circumstances of the breach to determine whether mitigating factors were present, so as to justify an exception, or whether to punish the breach. I return to the question of exceptions below.

***

433. Distributors recognize that exceptions are not freely granted, but instead require additional "quid pro quo" from the distributor, such as advance purchase commitments.[584]

### *4.7.3. The resulting foreclosure is substantial*

434. Distributors' compliance with the loyalty thresholds has resulted in substantial foreclosure. To measure the effectiveness of the loyalty program, I have calculated the foreclosure share in each market. For each AI, for the numerator, I calculate the quantity of defendant product made through loyal distributors—that is, distributors that meet or exceed the loyalty threshold. [redacted] For mesotrione, metolachlor, and acetochlor, I count sales by manufacturers that were supplied technical AI by the defendant, which were granted favorable ("neutral") treatment under the loyalty programs.[585] For the denominator, I calculate total quantity of product sold by all manufacturers. To measure quantity, I use the quantity of AI contained in finished products. This is the same approach used to calculate market shares, and in accordance with defendants' methodology for calculating loyalty. The quotient is the foreclosure share.[586] I make this calculation for PY 2018 through PY 2023, the range of years for which I have data.

435. Figure 28 reports the foreclosure share by AI and year. The share of sales foreclosed, across all AIs and years, is [redacted] or more. A high share follows from the facts that each AI has a loyalty threshold of [redacted] or more, which is adhered to by the great majority of the traditional channel, a channel that accounts for the great majority of sales. These high foreclosure shares are evidence that generic manufacturers have been excluded from the most cost-effective path to market.[587]

---

[584] [redacted] Semadeni (Simplot) Dep. Tr., Vol. II., at 272:20–273:4 ("Typically with Syngenta, if an exception was granted, there was something in return such as buying more product or so forth . . . more product in the next year, that type of nature.").

[585] In the Foreclosure Shares Workpaper, I also report the foreclosure share if these sales and the Bayer acetochlor sales are excluded from the numerator of the calculation.

[586] Compared to the market share calculation in Section 3, the foreclosure calculation has the same denominator. The numerator is smaller because it does not include defendant sales outside of loyal distributors, and larger in the case of acetochlor because it includes Bayer sales under the acetochlor partnership.

[587] These foreclosure shares do not account for foreclosure of independent retailer sales created by Syngenta's retail Key AI program.

FIGURE 28: FORECLOSURE SHARES

| Program Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| **Syngenta** | | | | | | |
| Azoxystrobin | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Mesotrione | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Metolachlor | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Corteva** | | | | | | |
| Rimsulfuron | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Oxamyl | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Acetochlor | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Notes: *See* Foreclosure Shares Workpaper. Foreclosure shares are calculated using invoice data from manufacturers, measured by quantity of AI in finished products. Shares include sales through loyal distributors of product made by defendant and by manufacturers that were supplied by the defendant in the relevant year(s). Acetochlor share includes Bayer sales made under its acetochlor partnership with Corteva, which counted toward acetochlor compliance. Rimsulfuron shares focus on products containing rimsulfuron that are labeled for specialty crops. "Loyal" distributors include [redacted] in the program years when the distributors met the loyalty requirements.[588]

## 4.8. Foreclosure of distribution has impeded competition from generic manufacturers

436. When a manufacturer succeeds in denying its rivals access to the most efficient forms of distribution, the likely result is to impede competition from those rivals. In this section, I discuss evidence that in fact this has occurred. The limited headroom available to generic manufacturers has capped, at a low level, their opportunity to make sales. In addition, the limited headroom has deterred entry and induced exit of generic firms.[589]

437. Syngenta's and Corteva's loyalty programs impose a tax on working with generics that artificially limits their opportunities. As an illustration, recall the earlier discussion of Syngenta's analysis during negotiations over mesotrione supply to Corteva.[590] Here, Syngenta recognized that [redacted]

[588] In addition to the distributors discussed in the text, I have access to data in discovery for [redacted], which achieved loyalty with Corteva as to [redacted]. These sales are included in the foreclosure shares for [redacted]. *See* Foreclosure Shares Workpaper.

[589] A further adverse effect is to induce the generic firm to source its AI from Syngenta or Corteva in an effort to avoid the headroom, resulting in a more expensive product. As an illustration, Summit Agro developed a private label product with metolachlor sourced from Syngenta and another such product with acetochlor sourced from Corteva. [redacted]

[590] *See* Section 4.6.

***



August 22, 2025

C. Scott Hemphill

Date

* * *

## Appendix C: Syngenta and Corteva AIs

### *C.1. Azoxystrobin*

1. *Mode of action*. Azoxystrobin inhibits respiration in fungal cells.[1] Respiration is the process by which mitochondria within the cells produce a source of energy used by the cell.[2] Without respiration, dormant fungal spores are unable to become active and grow.[3]

2. *Distinctive features that are valued by growers*. First, azoxystrobin is effective for an unusually long period of time, due in part to its greater absorption by the plant, such that the fungicide reaches the untreated side of the leaf.[4] Second, it has a so-called greening effect—a delay in yellowing of leaves, resulting in higher crop yields.[5] Third, azoxystrobin is xylem mobile, meaning that the fungicide travels through the plant's xylem vessels (its water-conducting tissues), protecting parts of the plant that weren't directly sprayed.[6]

---

[1] This is broadly true of Group 11 strobilurin fungicides. *See* National Library of Medicine, National Center for Biotechnology Information, Azoxystrobin Compound Summary, pubchem.ncbi.nlm.nih.gov/compound/Azoxystrobin (describing azoxystrobin as an "inhibitor of mitochondrial respiration").

[2] *See* Springer, Mitochondrial Respiration (Jan. 1, 2016), link.springer.com/referenceworkentry/10.1007/978-3-540-29807-6_136. The source of energy is adenosine triphosphate, or ATP. Inhibition is accomplished by disrupting "electron transport." *See* SYT_REBATELIT_01278205, at 205 (2/17/2005 Memorandum from Manying Xue (EPA Chemist) regarding Azoxystrobin).

[3] *See* FTC GMK 2024____00008175, 180 (6/25/2018 Helmstar Plus Technical Product Sheet) (explaining that azoxystrobin works by inhibiting cellular respiration, which "leads to inhibition of germination of fungal spores.").

[4] *See* SYT_REBATELIT_00205432, at slides 36–37 (1/2014 Syngenta presentation: "Lifecycle; Post Patent; And Key AI Management") (illustrating that azoxystrobin's translaminar movement allows for internal protection of the crop leaves); *see also* CX2617-032, SYT_REBATELIT_04490896, (12/18/2006 Syngenta presentation: "The Quadris Story") ("Product moves with water flow and has the ability to move fully throughout a leaf or plant"); Eichorn (Head of Sales, Syngenta) Dep. Tr., Vol. I, at 168:25–171:11 (describing CX2617 as highlighting some of the "unique chemical properties of azoxystrobin").

[5] CX2520, SYT_REBATELIT_01029438, Cecil (Head of Mktg., Syngenta) Trial Tr., Day 2, at 96:20–97:9, *in Syngenta v. Willowood*, No. 1:15CV274 (M.D.N.C. Sept. 6, 2017) (azoxystrobin "gives you a greening effect of the crop so that it is able to produce longer in the season . . . [t]herefore, it has a higher yield for the farmer").

[6] *See* SYT_REBATELIT_00262290 (10/27/2006 Syngenta presentation: "Azoxystrobin vs. Pyraclostrobin"). On xylem mobility, see Mary Burrows et al., *Fungicide Use in Field Crops: Classification, Risks, Use & Economics*, Montana State University Extension, at 8 (7/2017), store.msuextension.org/publications/AgandNaturalResources/MT201705AG.pdf ("*Xylem mobile***:** Fungicide moves in the xylem tissues of the plant, which conduct water from roots upward" (emphasis in original)); Pesticide Environmental Stewardship, *Fungicide Terms to Know*, pesticidestewardship.org/resistance/fungicide-resistance/fungicide-terms-to-know/ ("*Xylem mobile fungicides* move upward in plants and outward to the periphery of leaves with water through the xylem, the water-conducting tissue of the plant." (emphasis in original)).

***

### *C.4. Rimsulfuron*

45. *Mode of action*. Rimsulfuron inhibits the activity of an enzyme called ALS,[115] which is needed for the production of certain amino acids.[116] Crops metabolize the herbicide quickly and are thus unharmed.[117]

46. *Distinctive features that are valued by growers*. Rimsulfuron has distinctive features that are valued by growers. It is easy to apply, controls an unusually broad spectrum of weeds, has a low use rate, and can be used on a variety of soil conditions.[118]

47. *Regulatory history*. In 1994, Corteva's predecessor secured EPA registration for rimsulfuron.[119] In 2009, the composition of matter patent expired.[120] Corteva's exclusive data use period expired in 2004.[121] Thus, since 2009, the single Corteva rimsulfuron product chemistry with a specialty label—Matrix—has been subject to generic entry. In 2010, DuPont included rimsulfuron in its loyalty program.[122] In 2017, shortly after the

---

[115] Acetolactate synthase, also known as acetohydroxyacid synthase ("AHAS"). *See* CRTVA-CPL-00957623, at slides 11–12 (1/28/2024 Corteva presentation: "Pick Your Q") ("Rimsulfuron is absorbed through the plants leaves [sic] and translocated to the growing point of the plant. Rimsulfuron acts by inhibiting the action of acetolactate synthase (ALS), also known as acetohydroxyacid synthase (AHAS).").

[116] The enzyme catalyzes the production of the amino acids valine, leucine, and isoleucine. *See* CX1567-014, FTC-CTVA_00850655 (4/16/2020 Corteva presentation: "Nitrogen Management & Row Crop Herbicides") (describing how rimsulfuron's mode of action allows it to "weed[] by inhibition of acetolactate synthase ALS . . . , an enzyme in the biosynthetic pathway of the amino acids leucine, isoleucine and valine"); CX1570-006, FTC-CTVA_01100435 (8/12/2020 Corteva presentation: "Matrix SG vs Mission WDG") (identifying rimsulfuron's mode of action as "ALS inhibitor").

[117] *See* CRTVA-CPL-00956440, at slides 16, 20 (9/20/2013 DuPont presentation: "2014 Tree Fruit Enterprise: Integrated Weed Management") (describing rimsulfuron-based Matrix as having "[e]xceptional crop safety due to rapid metabolism").

[118] *See* Leifker (Carbon Mktg. Leader, Corteva) IH Tr., at 47:24–49:21; CX1570-006–08, -013–14, -016, FTC-CTVA_01100435 (8/12/2020 Corteva presentation: "Matrix SG vs Mission WDG"); CX1553-09–13, FTC-CTVA_00371800 (1/17/2014 DuPont presentation: "2014 Product Portfolio Strategy") (comparing MATRIX only to other herbicides, repeatedly highlighting its multiple application methods including microsprinklers, lack of soil restrictions, broad range of crops, post-emergence weed activity in addition to pre-emergence weed activity, and low use rate).

[119] *See* Figure 5 (Expiration of Legal Protection for the Six AIs).

[120] *See* Figure 5 (Expiration of Legal Protection for the Six AIs); *see also* U.S. Patent No. 5393733 (issued Feb. 28, 1995) (stating "[t]he portion of the term of this patent subsequent to Apr. 7, 2009 has been disclaimed").

[121] *See* Figure 5 (Expiration of Legal Protection for the Six AIs).

[122] *Compare* WIN0153212 (11/23/2010 email from Edsten (DuPont) to Card (WinField)) (sharing a "planned strategic agreement for 2011 and the SU partnership addendum"), *with* WIN0158330, at slides 45–50 (2/27/2009 WinField presentation: "February 2009 Rebate Accrual Presentation") (describing SU Strategy and loyalty, including on "non-generic pressure SU's" like rimsulfuron, including Matrix).

Dow-DuPont merger, the merged firm added rimsulfuron to its PY 2018 loyalty program, as part of its Specialty Herbicide offer within DowDuPont's CRPIVM program.[123]

48. *Corteva product chemistries*. Corteva sells a straight product labeled for specialty crops under the Matrix brand. Matrix was approved in 1995.[124] Growers of specialty crops also tank mix Matrix with AIs that control other weeds.[125] Corteva does not sell rimsulfuron premixes labeled for specialty crops.

49. Corteva also has registrations for rimsulfuron products labeled for use on corn, including a straight product under the Resolve brand, and a number of premixes labeled for corn. These products lack a label for specialty crops.[126]

50. Growers value rimsulfuron more highly as an herbicide for specialty crops than as a herbicide for corn.[127] Accordingly, a sole seller of rimsulfuron for specialty crops can charge a higher price for its specialty use than for its corn use by engaging in price discrimination between the two types of growers.

51. To sustain the higher price to specialty growers, growers of specialty crops must be unable to readily substitute to a lower priced product labeled for corn. This separation is achieved through a label on Resolve that omits the specialty crops.[128] This labeling makes it unlawful to sell or use Resolve for specialty crops.[129] Corteva's corn premixes similarly lack

---

[123] *Compare* CX1600-003, FTC-CTVA_00009386 (5/3/2017 Corteva document: executed Corteva-[redacted] 2016-2017 CRPIVM program) (not including any rimsulfuron in any loyalty offers), *with* CX1601-002, FTC-CTVA_00438316 (2/26/2018 Corteva document: executed Corteva-[redacted] 2017-2018 CRPIVM program) (including rimsulfuron in the [redacted] offer).

[124] *See* DuPont Matrix Herbicide (EPA Reg. No. 352-556), U.S. Env't Prot. Agency, Pesticides Prod. & Label Sys., ordspub.epa.gov/ords/pesticides/f?p=PPLS:8:4893354659931::NO::P8_PUID,P8_RINUM:4824,352-556 (first registered on December 15, 1994).

[125] *See* FTC-CTVA_00375265, at slides 4, 11 (DuPont presentation: "2016 Matrix Market Assessment") (showing tank mix partners and features of tank mix active ingredients compared to Matrix).

[126] Corteva's Realm Q (premix with mesotrione) and Resolve Q lack a label for specialty crops. *See* Realm Q Label, s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Realm_Q_Label1c.pdf (labeled only for corn); Resolve Q Label, s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/DuPont_Resolve_Q_Herbicide1d_Label.pdf (same).

[127] For specialty crops, EZ Trak data show farmers paying $[redacted] per ounce for Matrix. [redacted]

[128] Matrix's label includes corn in California in addition to specialty crops. *See* Matrix Label, s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/DuPont_Matrix_SG2o_Herbicide_Label.pdf. This choice does not defeat effective price discrimination, however, because it is unprofitable for a grower to use the more expensive Matrix herbicide in the lower value corn use.

[129] *See* FIFRA § 12(a)(1)(b) (unlawful for any person to distribute or sell any registered product if claims made for it as part of the sale substantially differ from any claims made for during registration) and FIFRA § 12(a)(2)(G) (unlawful to use any registered pesticide in a manner inconsistent with its labeling).

labelling for specialty crops and in any event are unsuitable for specialty crops given the additional AIs included in the premixes.

52. The evidence indicates that this market segmentation is effective. Resolve sells at a substantially lower price compared to Matrix[130] and has very low sales.[131] As for rimsulfuron corn premixes, I am unaware of evidence that they are used to a substantial (or indeed any) degree on specialty crops, which is unsurprising given the unlawfulness of doing so and their unsuitability for that use.

53. *Limited generic entry*. The possibility of generic entry on rimsulfuron first arose in 2009. The first generics, Adama and Cheminova, entered in 2010 and 2011.[132] These firms were not successful.[133] In 2016, Rotam entered, as noted/discussed in Section 3.

---

[130] *See* CRTVA-CPL-00961101, at slide 20 (8/12/2021 Corteva presentation: "Corn Herbicides, California") (marking Resolve SG as "no longer marketed by Corteva"); FTC-CTVA_00506635, at Tab "Corn" (10/87/2015 Corteva spreadsheet: "Herbicide - Distributor Cost Calculator") (showing Resolve SG at [redacted] and Matrix SG at [redacted]/unit for distributors).

[131] *See* CRTVA-CPL-00961101, at slide 20 (8/12/2021 Corteva presentation: "Corn Herbicides, California") (marking Resolve SG as "no longer marketed by Corteva"); CX1424-001–02, FTC-CTVA_00137473 (6/17/2019 internal Corteva email from McGuire to Feauto) [redacted] Chavez (Regional Head N.A., Rotam) IH Tr., at 175:24–176:16 (describing how rimsulfuron is a "complementary chemistry" to other herbicides for corn, and explaining that Rotam was unable to find a market for a standalone rimsulfuron product for corn).

[132] *See* CX1613-012, -014, FTC-CTVA_00300904 (3/13/2019 Corteva presentation: "Matrix") (showing initial generic imports in 2009); ADAMA_000002 (Pruvin straight rimsulfuron product registered in February 2009); [redacted] CX1553-006, FTC-CTVA_00371800 (1/17/2014 DuPont presentation: "2014 Product Portfolio Strategy") (showing Pruvin expenditures in 2010 and Solida expenditures in 2011); FTC-CTVA_00581039, at Tab "Import Data – AUG," rows 247-257 (11/15/2016 Corteva spreadsheet: "SU Import and EZTrak Charts Thru End of AUG 2016") [redacted] *MANA Introduces New Pruvin Herbicide*, AGNEWS (Sep. 17, 2009), news.agropages.com/News/NewsDetail---1645.htm. *See also* Generic Entry Workpaper (Adama sales beginning in 2010 and FMC (Cheminova) sales beginning in 2011).

[133] *See* CX1553-004, -014, FTC-CTVA_00371800 (1/17/2014 DuPont presentation: "2014 Product Portfolio Strategy") [redacted] FTC-CTVA_00434100, at slide 33 (10/20/2015 DuPont presentation: "North America IR") [redacted]; FTC-CTVA_00434718, at slide 27 (12/16/2015 DuPont presentation: "North America IR") [redacted]

### *C.5. Oxamyl*

54. *Mode of action*: Oxamyl inhibits the activity of an enzyme called AChE,[134] which breaks down a chemical that transmits nerve impulses.[135] Without the enzyme, the targeted organism builds up too much of the chemical, causing uncontrolled transmission of the nerve impulses, which results in paralysis or death.[136]

55. *Distinctive features that are valued by growers*. First, oxamyl can be sprayed directly onto crops to control nematodes in the soil, unlike other nematicides, which must be applied at the root level or mixed into the soil.[137] Second, oxamyl has a comparatively low impact on beneficial bacteria and fungi in the soil[138] and superior crop safety.[139] Third, oxamyl is fast acting and controls a broad spectrum of nematodes and insects, at both larval and adult stages of life.[140]

56. Corteva markets oxamyl as uniquely providing the grower with a combination of insect control, nematode control, and plant health and growth benefits, which a grower may

---

[134] AChE is also known as acetylcholinesterase. *See* CRTVA-CPL-00813357, at slide 18 (5/15/2006 DuPont presentation: "Lannate – Vydate Biology Training").

[135] The chemical is called acetylcholine. *See* CRTVA-CPL-00813357, at slide 18 (5/15/2006 DuPont presentation: "Lannate – Vydate Biology Training").

[136] *See* CRTVA-CPL-00813357, at slide 18 (5/15/2006 DuPont presentation: "Lannate – Vydate Biology Training").

[137] *See* Leifker (Carbon Mktg. Leader, Corteva) IH Tr., at 55:6–55:12 (one of the advantages of oxamyl versus other AIs is the "unique ability to be able to spray it over the plants and still control the nematodes in the soil," which "[n]o other product . . . can do"); Chavez (Regional Head N.A., Rotam) IH Tr., at 185:22–187:9 ("[I]t can be used as a soil treatment, it can be used . . . when the crop is actually growing, it can be applied through water, it can be applied as a foliar treatment. . . . it's a very diverse insecticide."); CX1575-022, FTC-CTVA_00410611 (6/9/2017 Corteva presentation: "Oxamyl® Supply Chain Strategy Workshop") ("Oxamyl will remain unique nematicide for certain applications and therefore successfully defend market share" relative to other AIs, but intra-oxamyl market share "uncertain . . . due to generics entering the market").

[138] *See* CRTVA-CPL-01121663 (DuPont pamphlet: "Technical Information Update: Impact of Vydate C-LV (oxamyl) on soil micoorganisms") ("As opposed to fumigants that sterilize the soil and kill other microorganisms, such as bacteria and fungi, along with the nematodes, Vydate® C-LV selectively targets plant-feeding nematodes, thus minimizing any impact on the balance of the soil ecosystem, including beneficial microorganisms.").

[139] *See* CRTVA-CPL-01724079, at slide 31 (5/2021 Corteva presentation: "Nematicides") (chart showing competitive products, with Vydate having a green "crop safety" rating).

[140] *See* CRTVA-CPL-00813357, at slides 4, 12–14 (5/15/2006 DuPont presentation: "Lannate – Vydate Biology Training"); CRTVA-CPL-00857562, at slides 8 (11/7/2019 Corteva presentation: "Insecticide/Nematicide") "Broad spectrum pest control," including "Chewing insects," "Sucking insects," and "Nematodes").

otherwise need to target with three separate products.[141] With respect to plant benefits, oxamyl stimulates growth, increases photosynthesis, and increases yield.[142]

57. *Regulatory history*. In 1974, Corteva's predecessor DuPont secured EPA registration for oxamyl.[143] In 1989, oxamyl's composition of matter patent expired.[144] Thus, since 1989, Corteva's oxamyl franchise has been subject to generic entry.

58. Prior to 2014, DuPont was the sole producer of oxamyl, which it manufactured in a single location.[145] In November 2014, the DuPont plant suffered a catastrophic accident, and oxamyl production ceased.[146] DuPont effectively exited the oxamyl market once its inventory of branded products was substantially exhausted by July 2015.[147] Upon DuPont's exit, no firm sold oxamyl for approximately two years.[148]

59. In 2017 and early 2018, DuPont reintroduced, and Rotam launched, oxamyl products. In 2017, Corteva added oxamyl to the [redacted] of its CRPIVM program.

---

[141] *See* CRTVA-CPL-01089899, at slide 5 (10/1/2019 Corteva presentation: "Vydate C-LV and Vydate L") ("No other product in agricultural provides the inimitable combination of insect control, nematode control, and plant health benefits that Vydate does. To get all of the perks Vydate offers, you would have to buy three products (Vydate is three products in one!)"); CRTVA-CPL-00857562, at slide 4 (11/7/2019 Corteva presentation: "Insecticide/Nematicide") (same); CRTVA-CPL-01090625, at slides 2 (9/2019 Corteva presentation: "Vydate C-LV Technical Attributes") ("Vydate has a unique combination of features and attributes that make it a highly valuable tool in modern agriculture today.").

[142] *See* CRTVA-CPL-01089248, at slide 11 (5/2017 DuPont presentation: "DuPont Vydate C-LV"); CRTVA-CPL-01090630, at slide 22 (9/16/2019 Corteva presentation: "Vydate 101 Virtual Training") ("Vydate often promotes plant growth . . . even in the absence of pest pressure").

[143] *See* Figure 5 (Expiration of Legal Protection for the Six AIs); CX1566-005, FTC-CTVA_00811817 (3/31/2020 EPA Oxamyl Interim Registration Review Decision) (noting that oxamyl was first registered in 1974).

[144] *See* Figure 5 (Expiration of Legal Protection for the Six AIs).

[145] *See* FTC-CTVA_00341444, at slide 4 (10/30/2017 DuPont presentation: "SC Portfolio Review") ("Oxamyl Tech sole-sourced from La Porte up to 2014"); CRTVA-CPL-01027951, 952 (10/25/2017 internal Corteva emails from Lindsey to Doran et al.) (stating that DuPont had "no history competing against generics" prior to 2017); CX1644-002, FTC-CTVA_00437018 (6/8/2017 email from Hemman (DuPont) to Uchoa (McKinsey) & Bracy (DuPont) et al.) (Vydate had "no generic competition").

[146] *See* U.S. Chem. Safety & Hazard Investigations Bd., DuPont La Porte Facility Toxic Chemical Release Final Report 7 (June 2019), www.csb.gov/dupont-la-porte-facility-toxic-chemical-release-/ (describing November 15, 2014 accident).

[147] *See* CRTVA-CPL-00784810 (5/3/2017 DuPont spreadsheet: "Vydate Copy Combined Mgmt Report_OTD vs. OTG_Graphics_May2017DIBM_RemainCO_20170503") ([redacted] *see also* FTC-CTVA_00254795 (6/17/2015 internal DuPont email from Lindsey to internal distribution lists) (excluding products with supply issues, including "Vydate brands (no product)"); FTC-CTVA_00250789 (11/16/2015 internal DuPont email from Hemman to Lindsey et al.) (referencing "1/2 year of Vydate supply in 2015").

[148] *See* FTC-Rotam-00040771 (7/4/2019 internal Rotam email from Chavez to Lemaigre et al.) ("After the explosion, DuPont continue to tell the Ag community they would be 'back in the Vydate business very soon', that never happened until Rotam registered 'Return'").

60. *Corteva product chemistries*. Corteva sells two straight oxamyl products under the Vydate brand: Vydate L (registered in 1974) and Vydate C-LV (registered in 1989).[149] The two products differ in concentration and crop labeling.[150] Vydate L contains 24% oxamyl and is labeled for a variety of fruits and vegetables, but not potatoes, cotton, or peanuts.[151] Vydate C-LV contains 42% oxamyl and is labeled for potatoes, cotton, and peanuts, but not fruits and vegetables.[152] The higher concentration of Vydate C-LV permits a lower use rate, and the product is easier to handle.[153]

61. Under their current labels, the 24% and 42% concentrations of oxamyl are poor substitutes. They are labeled for different crops and are used on different crops. [redacted]

62. [redacted] This would be accomplished by expanding the Vydate C-LV label to include the fruits and vegetables on Vydate L's label, which would allow fruit and vegetable growers to utilize Vydate C-LV's benefits.[155]

63. But for the different label, and the unlawfulness of off-label use as a deterrent to such use, the two products would be closer substitutes. As a practical matter, a grower could use less of the 42% concentration or more of the 24% concentration interchangeably. Under these

---

[149] *See* CRTVA-CPL-01090630, at slide 3 (11/20/2018 Corteva presentation: "Vydate 101 Virtual Training").

[150] *See* CRTVA-CPL-00487435 (6/13/2022 internal Corteva email from Garrett to Bird) (stating that "main difference" between Vydate L and Vydate C-LV is that they are labeled for different crops and they have different oxamyl concentrations); CRTVA-CPL-00153431 (4/2/2020 internal Corteva email from Garrett to Ratterman) (same).

[151] *See* Vydate L Label, s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/DuPont_Vydate_L1p_InsecticideNematicide_Label.pdf.

[152] *See* Vydate C-LV Label, s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/DuPont_Vydate_C-LV_InsecticideNematicide_Label1l.pdf. Both products are labeled for tobacco.

[153] *See* CRTVA-CPL-00348865 (6/9/2022 internal Corteva email from Ramos to Bird) (Vydate C-LV "has a lower use rate," and "it handles much better than [Vydate] L").

[154] *See* FTC-CTVA_00486412 (11/15/2018 internal Corteva email from Swanson to Herbert and Doran) [redacted]

[155] *See* FTC-CTVA_00486635 (10/15/2018 internal Corteva email from Swanson to Doran) [redacted]; CRTVA-CPL-01090807 (11/18/2019 internal Corteva email from Garrett to Fipps) [redacted] FTC-CTVA_00116792, at slide 3 (10/29/2018 Corteva presentation: "Vydate L") [redacted]*; see also* Menagh (C.E.O., Source Dynamics; former Syngenta, IAP) Dep. Tr., Vol. II, at 385:17–386:1 (discussing generic producer Solera's efforts to do the same).

circumstances, price would tend to equilibrate between the two concentrations. That close substitution would support considering the two strengths within an overall oxamyl market.

64. Competitive conditions between the two are similar: in each, Corteva competes with one or more generic entrants.

65. *Generic entry*. In April 2017, Rotam launched its 24% product, called Return.[156] In January 2018, DowDuPont relaunched its 24% product, Vydate L.[157] On a second (42%) concentration, DuPont relaunched Vydate C-LV in May 2017, while Rotam launched its generic equivalent, called Return XL, in October 2017.[158]

66. On the 42% oxamyl concentration, Corteva relaunched prior to Rotam's launch. The available evidence does not show Rotam's entry having an effect. Rotam entered with its Return XL at a net price lower than Vydate C-LV, but did not garner significant sales.[159]

67. In April 2018, Solera Source Dynamics entered the market with Vy-king 42 and in April 2019 with Vy-king 24.[160] In January 2018, Atticus entered the market with a 24% oxamyl

[156] *See* Notice of Pesticide Registration, Oxamyl 24% SL (4/7/2017), www3.epa.gov/pesticides/chem_search/ppls/083100-00053-20170407.pdf; CX3164-002, FTC-Rotam-00000010 (3/16/2021 Rotam spreadsheet: "Rotam product list") (stating that EPA registered Return on April 7, 2017).

[157] *See* CRTVA-CPL-00610235, 238 (1/5/2018 internal Corteva email from US Crop Protection Marketing News to Mantey et al.) ("We are pleased to announce that orders [for Vydate L] can be placed as of this afternoon, January 5, 2018").

[158] *See* CRTVA-CPL-01086964 (10/2/2017 internal Corteva email from Swanson to Garrett) ("Vydate CLV started being supplied to the market May 2017"); CX3164-002, FTC-Rotam-00000010 (3/16/2021 Rotam spreadsheet: "Rotam product list") (stating that that EPA registered Return XL on Oct. 6, 2017).

[159] *See* CRTVA-CPL-01086964 (10/2/2017 internal Corteva email from Swanson to Garrett) ("Vydate CLV returned to the market with a [redacted] FTC-CTVA_00247203, at Tab "FlatFile" (showing "Distributor Net Down" of $[redacted] for Vydate C-LV products); [redacted] *see also* [redacted]

[160] *See* FTC-SD-00000352, at Tab "Sheet1," cells H19, H22 (6/18/2024 Source Dynamics spreadsheet: "Item #3 Covered Products Registration Data").

formulation but withdrew its registration and exited the market in 2019.[161] Simplot entered via its Innvictis subsidiary with a Vypera L product in 2021 and Vypera C-LV in 2022.[162]

### *C.6. Acetochlor*

68. *Mode of action*. Acetochlor is a seedling shoot growth inhibitor.[163] Its mode of action, like metolachlor, is to inhibit the synthesis of VLCFAs.[164]

69. *Distinctive features that are valued by growers*. First, acetochlor provides a strong degree of control upon application—that is, with unusual immediacy—given its relatively short half-life and low level of soil absorption.[165] Second, it provides a distinctively strong level of activity against the weeds upon which it is effective.[166] Third, acetochlor is unusually effective on germinating weeds because it can activate with low moisture levels.[167] These

---

[161] *See* Notice of Pesticide Registration, A127.01 "Ventas L" (Jan. 19, 2018), www3.epa.gov/pesticides/chem_search/ppls/091234-00053-20180119.pdf; [redacted] CRTVA-CPL-01671255 (5/31/2019 internal Corteva email from Feauto to Messner et al.) ("Atticus, just today, has submitted for voluntary registration termination, so they will no longer be a threat in the future as Dan noted.").

[162] Innvictis entered with an Innvictis private label using supply from Rotam. *See* [redacted].

[163] *See* FTC-CTVA_00221565, at slide 20 (10/23/2019 Corteva presentation: "Weed Science Basics") (listing and describing characteristics of seedling shoot inhibitors); CRTVA-CPL-01108150, at slide 46 (7/20/2020 Corteva presentation: "2020 AI Regulatory Dashboards") (listing characteristics of acetochlor).

[164] *See* CRTVA-CPL-01453233, 250 (3/2021 Kansas State University paper: "Herbicide Mode of Action") (discussing VLCFA inhibitors, including acetochlor and S-metolachlor).

[165] *See* [redacted]; *see also* CX1559-003–004, FTC-CTVA_00102479 (10/2/2016 Dow presentation: "University Technical Information") (noting acetochlor products "generally have sharper weed control early in the season when compared to metolachlor products").

[166] *See* CX1559-003–004, FTC-CTVA_00102479 (10/2/2016 Dow presentation: "University Technical Information") (highlighting higher weed control scores for certain grasses by acetochlor); FTC-CTVA_00325375, at slide 4 (2004 presentation: "Acetochlor selectivity and efficacy") (on the crops tested, "[g]ram for gram Acetochlor is slightly more active than Dual Gold (metolachlor)"); FTC-Rotam-00001118, at slide 55 (10/15/2019 Rotam presentation: "Noram Business Review – Business Update & September 2018 Results") ("Shorter Residual than MOC, but better weed control profile"); [redacted].

[167] *See* CRTVA-CPL-00570101, at Tab "Chem Details – AI and Safener" (6/13/2013 Dow spreadsheet: "Acetochlor Comparison Charts") (describing acetochlor attributes that are "favorable for availability to germinating weeds" including needing less water to activate).

distinctive attributes make acetochlor particularly well-suited for the soil and weather of the northern United States, though it is used elsewhere as well.[168]

70. *Regulatory history*. Prior to 1994, ICI and Monsanto—predecessors in interest of Corteva and Bayer, respectively—each sought separately to register acetochlor. ICI and Monsanto joined forces in 1992, forming the Acetochlor Registration Partnership (ARP).[169] In 1994, Acetochlor was registered with EPA.[170] ARP continues to hold and support the U.S. registration of technical acetochlor for its current partners, Corteva and Bayer.[171]

71. The acetochlor compound patent expired in 1988.[172] ARP's acetochlor data exclusivity period expired in 2004.[173] Though generic entry was legally permissible at this time, testimony from generic firms indicates that they did not seek technical registrations of acetochlor because of high anticipated data compensation costs.[174] These high costs were due to extensive water monitoring and toxicology studies required by EPA to approve acetochlor registration and to expand its uses to additional crops and geographies.[175] As

---

[168] *See* Chavez (Regional Head N.A., Rotam) IH Tr., at 139:15–140:10 ("[W]here we will position our acetochlor market is to the north in heavier soils, in areas where . . . they need it for the weed control that they desire."); Canady (C.E.O., Atticus) IH Tr., at 305:20–307:2 ("Geographically, acetochlor is kind of mid Midwest, North in the cooler markets, the cooler soils, and then S-metolachlor dominates in the South.").

[169] *See* CRTVA-CPL-02851172, 175–78 (9/1/1992 Acetochlor Registration Partnership Agreement between Monsanto Company and ICI Americas, Inc.). The parties agreed to seek joint Acetochlor registrations from EPA and states and share costs and ownership rights in data developed for registrations in the United States.

[170] *See* Figure 5 (Expiration of Legal Protection for the Six AIs).

[171] ICI Americas, Inc. changed its corporate name to Zeneca during a corporate reorganization, and in 2001 Dow acquired Zeneca's acetochlor business during the merger of Novartis AG and Zeneca, which formed Syngenta. CX1554–007, FTC-CTVA_00574748 (4/30/2019 Corteva presentation: "Acetochlor Competitive Intel Update"); CRTVA-CPL-02851230, 232 (6/1/1997 Amendment to Acetochlor Registration Partnership Agreement between Zeneca Inc. and Monsanto Company) ("The Parties acknowledge that since the date that the Parties entered into the Agreement, ICI Americas Inc. has changed its corporate name to ZENECA Inc. in light of a corporate reorganization"). Bayer acquired Monsanto in 2018.

[172] *See* Figure 5 (Expiration of Legal Protection for the Six AIs).

[173] *See* Figure 5 (Expiration of Legal Protection for the Six AIs).

[174] [redacted] Vance (Dir. Of Customer Engagement, Albaugh) Dep. Tr., Vol. I, at 69:8–69:18; 157:24–158:19 (explaining that Albaugh did not pursue acetochlor technical due to high data compensation costs); Chavez (Regional Head N.A., Rotam) IH Tr., at 137:5–137:23 (describing how "prohibitive" data compensation costs for acetochlor "kept that molecule really proprietary")

[175] FTC-CTVA-CID_00007352, 362–66, 372–81 (5/8/2019 Statement of Claim of Acetochlor Registration Partnership In the Matter of the Arbitration with Sharda Cropchem Ltd.) (describing EPA concerns and data required to address those concerns). Due to EPA toxicological concerns, acetochlor has been subject to limitations on the types of soil and proximity to ground water on which it can be used. FTC-CTVA-CID_00007352, 364, 372–73 (5/8/2019 Statement of Claim of Acetochlor Registration Partnership In the Matter of the Arbitration with Sharda Cropchem Ltd.)

noted in Section 2, a generic registering a technical AI is required to pay data compensation for any data it relies upon that was submitted in the last 15 years.[176] Several of the expensive studies began to reach the 15-year expiration in the late 2010s, which corresponded with the first generic entry.[177] In 2016, Corteva added acetochlor to its loyalty program.

72. *Corteva product chemistries*. Corteva's acetochlor products are focused on corn. Corteva combines acetochlor with AIs, such as mesotrione, clopyralid, and atrazine, that kill broadleaf weeds. Because these additional AIs are toxic to soybeans and other crops, these premixes are mainly applied to corn. Corteva's corn premixes include Resicore (with mesotrione and clopyralid), SureStart (with flumetsulam and clopyralid), and Keystone and Fultime (with atrazine), and various variants. Corn premixes represent approximately [redacted] of Corteva's acetochlor sales.[178]

73. Corteva also sells straight acetochlor products under the Surpass brand that are used primarily on corn. These products are not labeled for soybeans or cotton.[179]

74. In 2023 and 2025, respectively, Corteva registered a straight product and premix for soybeans.[180] These product formulations encapsulate the acetochlor to allow for extended release. This approach is useful on soybeans and other crops that are otherwise harmed by acetochlor.[181] Based on the data available to me, I do not observe significant sales thus far.[182]

75. Figure 33 describes the various Corteva product chemistries and their year of registration.

---

[176] 7 U.S.C. § 136a(c)(1)(F)(iii) (for 15 years following the date of submission of data, EPA will consider only those data for a new applicant if that applicant has offered to compensate the original registrant) .

[177] *See* CX1563-008, FTC-CTVA_00726906 (6/25/2015 Corteva spreadsheet: "CP GBU Planning Guidance") (noting high data compensation costs as barrier to entry at the "Acetochlor" tab, but also noting that for "CY + 5yr", there will be "moderate DC" and predicting generic entry by 2016/2017).

[178] [redacted]

[179] These products also lack the encapsulation that makes certain other straight acetochlor products more suitable for soybeans.

[180] The straight product is called Enversa and the premix is called Enclosa. *See* Notice of Pesticide Registration, GF-5223 "Enversa" (Dec. 19, 2023), www3.epa.gov/pesticides/chem_search/ppls/062719-00775-20231219.pdf; Notice of Pesticide Registration, Enclosa (May 23, 2025), www3.epa.gov/pesticides/chem_search/ppls/062719-00782-20250523.pdf.

[181] Encapsulation also permits a longer window of crop growth during which the product may safely be applied. *See* CRTVA-CPL-00078308, at slide 16 (6/7/2023 Corteva presentation: "Resicore XL Incident – Scenario Review & Recommendation) ("Why Capsule Encapsulation? – Better Crop Safety, Greater Tank-Mixing Compatibility (especially with fertilizer); Wider application window (Corn: ~12" (V5) → 24" (V8))").

[182] *See* Appendix C Workpaper.

**FIGURE 33: CORTEVA'S ACETOCHLOR PRODUCT CHEMISTRIES**

| | Brand Name [A] | Additional AIs [B] | Year of Registration [C] |
|---|---|---|---|
| **Corn Premixes** | | | |
| [1] | Resicore Rev/XL | mesotrione; clopyralid | 2022 |
| [2] | Kyro | topramezone; clopyralid | 2022 |
| [3] | Resicore | mesotrione; clopyralid | 2016 |
| [4] | SureStart II | flumetsulam; clopyralid | 2014 |
| [5] | Keystone LA NXT | atrazine | 2013 |
| [6] | Keystone NXT | atrazine | 2013 |
| [7] | Fultime NXT | atrazine | 2013 |
| [8] | SureStart | flumetsulam; clopyralid | 2007 |
| [9] | Keystone LA | atrazine | 2002 |
| [10] | Keystone | atrazine | 2001 |
| [11] | Fultime | atrazine | 2001 |
| **Corn Straight Products** | | | |
| [12] | Surpass NXT | | 2013 |
| [13] | Surpass 7E | | 1998 |
| [14] | Surpass 20-G | | 1996 |
| [15] | Surpass EC | | 1994 |
| **Soybean Products** | | | |
| [16] | Enclosa | cloransulam | 2025 |
| [17] | Enversa | | 2023 |

Sources: *See* Product Chemistries Workpaper.

76. *Partnership with Bayer*. As discussed above, the predecessor in interest of Corteva (ICI) and the predecessor of Bayer (Monsanto) jointly secured acetochlor product registration. During the same period, the partners also entered into agreements regarding acetochlor production that continue in operation today. [redacted][183]

[183] [redacted]

77. [redacted]

78. [redacted]

79. *Limited generic entry*. In 2018, Sharda entered but was not successful.[188] Helm and Rotam also began sourcing and selling private-label acetochlor products from Bayer in 2018, but

---

[redacted]

184 [redacted]

185 [redacted]

186 [redacted]

187 *See* Bayer Acetochlor Workpaper.

188 Sharda faced formulation issues. *See, e.g.,* CX1115-005, FTC-CTVA_00290647 (12/2019 Corteva presentation: "Generic Acetochlor Update – WCB") (noting that Sharda "lost momentum with previous formulation issues"); Schumacher (Exec. V.P. Crop Solutions Div., Helm) Dep. Tr., Vol. I, at 140:23–141:5 (describing "significant formulation problems" that Sharda faced); *see also* [redacted]

made little headway.[189] AMVAC entered with a novel acetochlor-topramezone premix product in 2021, [redacted].[190]

80. *Product ladder*. The available evidence indicates that the different acetochlor formulated products are close substitutes for growers. New product chemistries containing the AI take sales from existing product chemistries containing the AI. [redacted] Moreover, Corteva appears to view acetochlor products in a collective fashion. For example, in its 2021 agreement to supply acetochlor to AMVAC for an AMVAC corn premix, [redacted][193] The shared relevance of these premixes, for purposes of evaluating the competitiveness of Corteva's offer, confirms substantial substitution among them.

81. The various acetochlor product chemistries—corn premixes, soy premixes, and straight products—are subject to similar competitive conditions. The generic threat arose in all three segments, including [redacted][194] Corteva recognized a

---

[189] *See* Schumacher (C.E.O., Helm; former Dow, WinField) IH Tr., at 93:7–22 (describing how distributors told Helm they could not support Helm on acetochlor and could not purchase generic acetochlor due to the small amount of headspace); FTC-Rotam-00016104, 005 (7/29/2019 internal Rotam email from Slaveck to Borgogni et al.) (forecasting zero acetochlor purchases from Bayer and explaining that "Corteva's loyalty program causing significant market access issues for all non-Corteva and non-Bayer brands containing acetochlor"); [redacted]

[190] [redacted]

[191] *See* FTC-CTVA_00531831, at slide 8 (3/27/2019 Corteva presentation: "Acetochlor and Chlorimuron-ethyl Innovation Case Studies") (discussing Fultime, Keystone, SureStart, and Resicore).

[192] [redacted]

[193] [redacted]

[194] [redacted] *see also* CX1594-001, FTC-CTVA_00338811 (5/2/2018 internal Dow email from Bennis to

threat that extended to all segments, [redacted].[195]

VanSloten et al.) ([redacted]

[195] CX1589-004–005, at rows 188–206, FTC-CTVA_00664015 [redacted]

## Appendix D: Market shares

1. *Market shares by acres treated.* Figure 34 reports, for each Syngenta AI, Syngenta shares based on treated acres using FarmTrak data. The lowest Syngenta share for any AI in any year is [redacted] For most AIs in most years, the Syngenta share is [redacted] or higher.

**FIGURE 34: SYNGENTA MARKET SHARES BASED ON TREATED ACRES**

| | 2017 [A] | 2018 [B] | 2019 [C] | 2020 [D] | 2021 [E] | 2022 [F] | 2023 [G] | 2024 [H] |
|---|---|---|---|---|---|---|---|---|
| [1] Azoxystrobin | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [2] Mesotrione | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [3] Metolachlor | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Source: FarmTrak data. *See* Market Shares Workpaper.
Notes: The years refer to program years. [redacted]

2. Figure 35 reports, for each Corteva AI, Corteva shares based on treated acres. For rimsulfuron and oxamyl, the lowest share for either AI in any year is [redacted] For most years, the Corteva share is [redacted] or higher. For acetochlor, the Corteva share ranges across years between [redacted] and [redacted]

**FIGURE 35: CORTEVA MARKET SHARES BASED ON TREATED ACRES**

[redacted]

Notes: FarmTrak data. *See* Market Shares Workpaper. The years refer to program years. FarmTrak data on oxamyl may undercount sales.

3. *Market shares by manufacturer revenue.* To calculate market shares for each AI based on manufacturer revenue, I use invoice data from manufacturers collected in discovery. For each manufacturer, I calculate total revenue of all formulated products containing the AI.[1] These calculations are made for PY 2018 through PY 2023, the range of years for which I received sufficiently complete data in discovery.[2]

4. A total revenue approach more heavily weights premixes relative to straight products. The reason is that part of the premix revenue is attributable to the additional AIs. One

[1] For rimsulfuron, I limit the calculation to products within the market definition—that is, products labeled for specialty crops.

[2] *See* Section 3.4.