# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.,**<br><br>**Defendants.** | Case No. 1:22-cv-00828-TDS-JEP |

**EXPERT REPORT OF LOREN K. SMITH, PH.D.**
**August 22, 2025**

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

***

- A 2017 internal Corteva email chain discussed price negotiations with an independent distributor that wanted Corteva to reduce the price of rimsulfuron to match the generic price of [redacted]. A Corteva employee noted that the [redacted] figure would be [redacted] less than the price they currently charged to other distributors.[32] This statement indicates that Corteva was able to charge [redacted] to the other distributors, implying that competition with generics could reduce the price of rimsulfuron by [redacted].
- In a [redacted]

35. I have seen several other examples where Syngenta and Corteva consider the impact of generic entry on prices, sales, and margins in their documents and testimony.[35] There still are other examples that indicate a significant impact of the loyalty programs on prices and sales, but the precise measure of those impacts is unclear.[36]

---

32 FTC-CTVA_00917874 (11/15/2017 internal Corteva email from Bennett to Feauto et al.).

33 SYT_REBATELIT_00159827, at slide 6 (11/7/2019 Syngenta presentation: [redacted]").

34 SYT_REBATELIT_00159827 at slide 1 (11/7/2019 Syngenta presentation: "[redacted]").

35 *See, e.g.*, SYT_REBATELIT_04491565, at slide 17 (Syngenta Presentation: "[redacted]); and SYT_REBATELIT_00903039 (Cecil Deposition in Willowood), 75:2-8 ([redacted]); CX1165-003, FTC_CTVA_00195826 (4/1/2020 Corteva presentation: 2020 – 2023 Marketing Plan FISH'N: Fungicides, Insecticides, Specialty Herbicides & Nematicides) (studying the impact of generic entry on Oxamyl margins); FTC-CTVA_00003831, at slide 3; and SYT_REVATELIT_00114479, slide 50 ([redacted]).

36 *See, e.g.*, SYT_REBATELIT_04491565, at slide 17 (Syngenta presentation: [redacted]"); SYT_REBATELIT_00903040, 060 (Cecil (Head of Mktg., Syngenta) Dep. Tr., at 75:2-8 *in Syngenta Crop Protection, LLC v. Willowood, LLC*, No. 1:15cv274 (M.D.N.C. July 13, 2016)); CX1165-003, FTC-CTVA_00195826 (4/1/2020 Corteva presentation: "2020 – 2023 Marketing Plan FISH'N: Fungicides, Insecticides, Specialty Herbicides & Nematicides")

36. Although I do not include additional examples in my yardstick analysis of disgorgement and damages that do not specifically quantify the effects of the removal of a loyalty program, I identify these internal Syngenta and Corteva documents here as examples indicating the significant impact on manufacturer prices and profits and farmgate prices from increased generic competition. The impact addressed in these examples aligns with the significant disgorgement and damages from the removal of loyalty programs that discourage or thwart generic entry and growth. Indeed, several of the studies referenced above evaluate the impact of generic entry in the presence of a loyalty programs which likely would understate the impact of generic entry that would occur in the absence of loyalty programs. [37]

### 2. Using Yardsticks to Construct the But-For Net Sales and Prices that Imply Disgorgement and Damages

37. **Estimating Farmgate Price Changes Associated with Manufacturer Price Changes, and Vice Versa.** The examples in Table 1 contain information on prices or sales at one level of the supply chain—e.g., retail prices (farmgate) or distributor sales. I use standard economic logic and empirical evidence to link economic outcomes across levels in the supply chain so that as much of the information in Table 1 as possible can be used to inform my disgorgement analysis, which applies to manufacturer profit, and my damages analysis, which applies to end-use grower

(studying the impact of generic entry on Oxamyl margins); FTC-CTVA_00003831, at slide 3 (Corteva presentation: "Corn Herbicides – The Road to #1"); and SYT_REBATELIT_00114479, at slide 50 (Syngenta presentation "[redacted]).

[37] *See, e.g.*, SYT_REBATELIT_04491565, at slide 17 (Syngenta presentation: "[redacted]"); SYT_REBATELIT_00904039, 060 (Cecil (Head of Mktg., Syngenta) Dep. Tr., at 75:2-8 *in Syngenta Crop Protection, LLC v. Willowood, LLC,* No. 1:15cv274 (M.D.N.C. July 13, 2016)) ([redacted]); CX1165, FTC-CTVA_00195826, at slide 2 ( 04/1/2020 Corteva presentation: "2020 – 2023 Marketing Plan FISH'N: Fungicides, Insecticides, Specialty Herbicides & Nematicides") (studying the impact of generic entry on Oxamyl margins); CX1306, FTC-CTVA_00003831, at slide 3 (Corteva presentation "Corn Herbicides – The Road to #1"); SYT_REBATELIT_00114479, at slide 50 (Syngenta presentation: "[redacted]).

welfare. Put simply, a cost or price increase at one level of the supply chain affects prices further down the supply chain, and thus information on changes in prices or costs within a supply chain can be used to infer price or cost changes elsewhere in the supply chain.

38. I develop an economic framework to measure the likely effects at one level of a supply chain based on a stated effect at another. Specifically, I assess the pass-through of increases in manufacturer prices to farmgate prices. Pass-through is a standard economic indicator that measures how much of a given change in price or cost at a wholesale level (here, manufacturer prices) is ultimately reflected in a change in price at the retail level (here, farmgate prices). Pass-through can vary by market and industry,[38] so its significance is an empirical question.

39. I use the available data to directly estimate the pass-through rate of crop protection products using an econometric technique called multiple regression analysis.[39] A multiple regression analysis estimates the average relationship between one variable—e.g., manufacturer price —and another variable—e.g., farmgate price, while controlling for the influence of other variables. Here, I am interested in estimating the association between farmgate prices and manufacturer prices, while controlling for other factors that may impact farmgate price levels, such as factors that similarly affect economic outcomes for all crop protection products in a given year, and unobserved differences across manufacturers or products or products that affect economic outcomes across all years.

40. The pass-through estimate I rely on for my baseline disgorgement and damages calculations measures in dollars the change in farmgate price that is associated with a change in manufacturer price. I control for (i) unobserved factors that may impact farmgate prices that vary across products but are constant over time and (ii) unobserved factors that may impact farmgate prices that vary over time but are constant across products. This is known to economists as a fixed

---

[38] For example, David Besanko, Jean-Pierre Dubé & Sachin Gupta, *Own-Brand and Cross-Brand Retail Pass-Through*, 24 MARKETING SCIENCE 123 (2005) estimate pass-through rates for grocery goods by category, finding pass-through rates that most often are between 0 and 1 (*see*, *e.g.*, p. 132, Figure 2).

[39] *See* Jeffrey Wooldridge, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, Chapter 3.2, (5th ed. 2013).

effect regression. In this regression, covariation in manufacturer and farmgate price from one period to the next allows for the estimation of pass-through. Controlling for unobserved factors about products and time that differentially affect farmgate prices is important because farmgate prices vary significantly across products and over time. This fixed effect regression implies that a one dollar increase in the manufacturer price is associated with an $0.86 increase in the farmgate price.[40]

41. I understand that Professor Hemphill opines that the structure and implementation of the loyalty programs likely limits the pass-through of loyalty payments to end-use growers.[41] Although I do not have an independent opinion on the extent of pass through of loyalty payments, I note that, as a matter of economics, my pass-through regression estimates do not contradict Professor Hemphill's opinion on the pass-through of loyalty payments. My regressions measure the pass-through of manufacturer price changes to farmgate prices, on the whole, which may be caused by factors beyond loyalty payments. So, loyalty payments indeed may not be passed through to any significant degree, while the overall pass-through of manufacturer price changes may be significant.[42]

42. Defendants explicitly have acknowledged that changes in manufacturer prices impact farmgate prices. For example:

---

[40] I have also estimated additional specifications of my pass-through regression. *See* Appendix E Tables E.1 and E.2 for further technical detail on the regressions. I also have evaluated the sensitivity of my disgorgement and damages analysis to changes in the pass through of manufacturer price changes to farmgate prices. *See* tables Table 23 and Table 24 in Appendix F.1.b.

[41] *See* Hemphill Report, Section 4.4.3.

[42] Note that even if the marginal contribution of loyalty payments on pass-through is null or negligible, overall pass-through may still be significant, even above 100%, because it is well known that pass-through rates under imperfect competition can range from below 100% to well above 100%. *See, e.g.*, RBB Economics, COST PASS-THROUGH: THEORY, MEASUREMENT, AND POTENTIAL POLICY IMPLICATIONS 26,",https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/320912/Cost_Pass-Through_Report.pdf (last accessed August 18, 2025).

- A 2015 Syngenta document entitled "US Pricing and Programs: Transparency and Effectiveness" notes that "[redacted]."[43]

- A 2017 Syngenta document entitled "DAS Mesotrione" assumes "[redacted]"[44]

- A 2022 Corteva document entitled "2022/23 MY Pricing Revies US Crop Protection" notes that "[redacted] of programs pass through to drive grower pricing."[45]

43. Although not always explicit, Syngenta's and Corteva's consideration of pass-through tends to assume that [redacted].

44. Recall that the main goal of my pass-through estimate is to relate existing assessments of the impact of the loyalty programs, mainly from Syngenta and Corteva, on the farmgate price of an AI and use it to estimate the price effect of the loyalty programs on the manufacturer price of that AI, and vice versa. More precisely, I use the pass-through rate to translate a given price impact that is implied by a Syngenta or Corteva internal assessment—e.g., a [redacted] reduction in farmgate prices—to an associated percent reduction in manufacturer prices. Making this calculation requires one more measure—the ratio of farmgate prices to manufacturer prices. The example below illustrates how measuring the ratio of farmgate prices to manufacturer prices aids my calculations.

---

43 CX2438-011, 014–018, SYT_REBATELIT_00138349 (Syngenta presentation: "US Pricing and Programs: Transparency and Effectiveness").

44 CX2105, SYT_REBATELIT_00200412, at slide 5 (Syngenta Presentation: "DAS Mesotrione").

45 CX1832, CRTVA-CPL-00817660, at slide 9 (07/27/2022 Corteva Presentation: "2022/23 MY Pricing Review US Crop Protection"). *See also*, *e.g.*, SYT_REBATELIT_00117190, at slide 1 ([redacted]).

***

87. Fifth, the FarmTrak data I rely on [redacted]. However, I do see sales of these products into Illinois and Nebraska in Corteva's sales data. [redacted] my damages figures are understated.

88. Sixth, I do not calculate any disgorgement or damages for Syngenta's sales of technical mesotrione to Corteva or Bayer. I understand that these sales were [redacted]). To the extent that an [redacted], my analysis is conservative in favor of Syngenta and Corteva.

89. Finally, the disgorgement and damages results do not reflect interest that would have accrued on profits or damages over a 10-year (for Syngenta) or 8-year (for Corteva) period.



Loren K. Smith, Ph.D.
August 22, 2025