# Exhibit 251

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

————————————————————————
                              :
IN RE CROP PROTECTION   :
PRODUCTS LOYALTY        : Case No.
PROGRAM ANTITRUST       : 1:23-MD-3062-TDS-JEP
LITIGATION              :
————————————————————————:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Tuesday, November 18, 2025

Deposition of NICHOLAS HILL, PH.D., taken at the law offices of Cravath Swaine & Moore LLP, 1601 K St NW, Washington, DC, beginning at 8:59 a.m., EST, before Ryan K. Black, Registered Professional Reporter, Certified Livenote Reporter and Notary Public in and for the District of Columbia.

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 2 of 72

behalf of the defendants in the U.S. Sugar case; is that right?

A.   Correct.

Q.   And that one is probably even longer ago, so if you remember, did you propose two alternative markets there as well?

A.   I don't think there I defined a market. But I think I calculated shares in alternative candidate markets.

Q.   Did you propose two alternative geographic markets in that case?

A.   I don't recall exactly what it wa -- there -- there were certainly alternatives.

The -- I think, as I recall, I objected to plaintiffs' defined narrow -- what I thought was an excessively narrow candidate market in the Southeast, and then a narrower one that was -- or, maybe they had a Georgia-only one, and then they had a southeast one.

I thought both were too narrow, as I recall.

Q.   And in response you proposed alternatives to those two markets; is that right?

A.   I think I calculated shares in those broader areas.  But I don't think I defined a

market.

Q.   Okay.

A.   And just to be clear, that was geographic, I think.  I don't recall that we disagreed on product being sugar.

Q.   But it's possible to have two valid markets, one broader and one narrow; is that right?

A.   Correct.

Q.   So is it your opinion that market definition should be based on the tastes and choices of consumers?

A.   I think that's fair.  That's -- it should be based on demand.

Q.   And what is your basis for this opinion?

A.   I mean, that's the way we've always done it in market -- I -- that's how it's done in antitrust.  I don't know.

Q.   Is there any particular economic literature that -- that you can point to or --

A.   I don't think you could find an economic source that doesn't talk about it in those terms.

I think -- the guidelines, once upon a time, would have said it explicitly.  I don't know if the new guidelines say it that way.  But

the -- usually supply responses are not considered.

Again, you're asking would a monopolist raise price or would consumers, by themselves, defeat it? If not, then you move on to considering responses by rival suppliers.

Q. Is it your view that Professor Hemphill's assessment of market definition is not persuasive because he looks to the structure of the loyalty programs, which are designed by producers?

A. I mean, I think it's a much broader question. I -- I -- there's a -- all the evidence in my report is the reasons I don't think his market definition is correct.

Q. But is it your opinion that the structure of the loyalty programs is not relevant to the question of market definition?

A. I wouldn't say it's not relevant. You can certainly look at it. But I think the totality of the evidence means that there's -- the markets he defines are improperly defined.

Q. And is -- your view that market definitions should be based on the tastes and choices of consumers, is that based in any legal

products consumers would turn to if they stopped or reduced using one of Corteva A -- Corteva's AIs; is that right?

A. Who did they? So that -- I was trying to estimate diversions by saying, "When I see a grower from one year to another targeting a set of pests that are associated with acetochlor, say, and they stopped using acetochlor -- Corteva acetochlor, say, what other product did they use in the year?" That's the stopper.

And then the reducer is they were using X amount of acetochlor in year one. They reduced it by 50 percent. What other AIs did they use more of?

Q. And for each -- I'll -- I'll use acetochlor as an example. I'll direct you to Footnote 107 of your report, CX0008, on Page 49.

A. I'm there.

Q. So for each -- again, I'll use acetochlor as a -- as an example, but I think this is the same for each active ingredient. You define a material reduction to be at least a 5 percentage point reduction in use; is that right?

A. That's correct.

Q.    And it's the same for Matrix?

A.    That's my recollection, yes.

Q.    And it's the same for oxamyl?

It's the same for oxamyl, right?

A.    That's my belief, yes.

Q.    Okay.  And so in assessing these stoppages or reductions, you did not attempt to measure or assess which shorten in response to a price increase; is that right?

A.    Correct.

Q.    And so what you've termed "grower diversions" or "switches" here are substitutions that you've identified in the abstract; is that right?

A.    So I disagree.  I mean, as in Penguin, we're trying to learn about diversion, and we do it using methodologies that don't involve price changes.

Q.    But you didn't do anything here to assess the reasons a particular grower stopped using a Corteva product; is that right?

A.    That's right.  The same as in Penguin. Like, I don't know -- in Penguin some of them weren't even necessarily switches.  It was just I saw who was the winner and who was the runner-up.

So I was just trying to estimate how frequently one was number one and one was number two.

Q.   And you didn't do anything to assess the reasons a grower reduced their use of Corteva products?

A.   Correct.

Q.   And would you agree there could be a number of reasons a grower purchased less than the prior year?

A.   There could be.

In fact, I think I say that somewhere.

Q.   Yeah.  I think in Footnote 106 on Page 47 --

A.   Yes.

Q.   -- you write, "The amount of corn herbicides a grower requires may drastically change due to factors unrelated to substitution"; is that right?

A.   Yeah.

Q.   And what other -- what other reasons might a grower change their needs in terms of the amount of corn herbicides they require?

A.   If you changed the amount of corn you're growing, you may change from one level to another.  So that may affect the level.

should definitely be in there, and the others should not be.  But the others could but, but glyphosate would certainly be something you'd want to include.

But what I did was I limited it to the ones that seemed to be the closest substitutes.  And then I asked, "Among those, what does diversion look like?"

So it's conservative in that sense that if I -- if I say, "What is total diversion to other acetochlor," I'm likely to overstate that by excluding these other substitutes.  Because some of those -- some of those might be not switches.  They switched for some other reason.  But some of them may be legitimate switches, and I've just missed it.

So my total diversion to other acetochlor -- or, other metolachlor will tend to be overstated.  Like, relatively I can compare them.  But in absolute terms, I know that they're all likely overestimates.

Q.   So your assessment of stoppers and reducers does not control for a crop rotation, does it?

A.   It doesn't.

Q.   And it doesn't control for resistance management?

A.   It doesn't.  I don't see any reason to think I need to control for those.

Q.   And it doesn't control for decreased demand for a particular product?

A.   I think it does control for that.

And actually, it controls for crop rotation.  Because, remember, I'm doing from one year to the next.  So if your cro -- I'm -- I'm asking if you look at corn and targeting a particular set of pests, what were you using in one year, and what were you using in the next year?

So if you're -- if the concern is, well, I do corn the first year and I do tobacco the second year and then I do corn the third year. or soy, whatever it is, I would just discard those as switchers so they wouldn't be in the sample.

Q.   And you didn't do anything to control for environmental conditions that may impact a grower stopping or reducing a certain product?

A.   Again, I don't have any reason to believe that affects my results, as with all of

these but -- I mean, environmental reasons changed.  Then -- it would depend on the environmental reason, I guess.

Q.  And I think -- as we've discussed previously, you worked on the U.S. Sugar case on behalf of the defendants in that matter?

A.  Correct.

Q.  Do you remember that?

And did the experts in that case present switching analyses?

A.  I don't have any recollection of that.  I think we argued mostly about guppies, but . . .

Q.  So you don't recall that you criticized DOJ's expert, Dr. Rothman, switching analysis in the U.S. Sugar case for failing to explore reasons for switching?

A.  I don't recall the context at all.

If you have it, I can take a look at it.  I haven't read that report in a while.

Q.  And the Court there accepted your opinions over Dr. Rothman's in that case; is that right?

A.  The broader opinions, yes.  But I don't have any recollection of this switching issue.

Q.  So in what -- in your experience, what

common waterhemp, foxtail, lambsquarter, giant ragweed, and redroot pigweed.

Q.    And Figure 19 of your report, CX0008, on the next page, represents reducer diversions from Corteva acetochlor products, right?

A.    Correct.

Q.    And here you have a sample size of 135. And you agree this is not a particularly large sample size; right?

A.    I think this is a perfectly sufficient sample size. I don't have concerns about the sample size.

Q.    Is it your view after completing your stopper and diversion assessment for -- from Corteva acetochlor products that it's a relatively small number of growers who stopped or reduced their acetochlor use from one year to the next?

A.    Say -- can you just repeat the question again? Sorry.

Q.    I'm trying to get a sense of, you know, let's look at stopper diversions. You had a hu -- 110 samples. Does this reflect that there are only 110 growers who stopped using a Corteva acetochlor product and diverted to one of these

other substitutes?

A.    This is of people who -- there's 110 samples where they were using Corteva acetochlor in the previous year.  And then the next year, they were -- in both years they were targeting at least one main Corteva acetochlor pest.  And then in the next year they targeted the same pest, and then used one of these substitutes.

If they used glyphosate in the second year, then I would not include that.  Even though to the point about it being conservative, you could include glyphosate and say, "Oh, well there's actually additional substitution."

You're overstating total substitution to these, but your -- your relative substitution is fine, but you may be overstating the percentage substitution.

Q.    And you decided to group all Corsta -- Corteva acetochlor products together here; is that right?

A.    Correct.

Q.    And you looked for switches from all Corteva acetochlor products to non-Corteva products; is that right?

A.    Correct.

Q. And would you agree this may have led to overstating the degree of switching?

A. No.

Q. So I want to look at your actual diversion matrices in Appendix D?

A. Sure.

Q. So Figure 68 on Page D-16 of your report, CX008, represents a diversion matrix among stoppers for acetochlor; is that right?

A. So not quite. This is -- well, the -- the first row is people who are stopping Corteva acetochlor, and then the other rows are for other products.

Q. Okay. Understood.

A. And, again, it's not just stoppers because I'm -- if they switched -- if the Corteva user switches to using glyphosate, they would be excluded. So it's stopped using the "From" product and started using one of the "To" products to target at least one main acetochlor pest.

Q. So just looking at the first row here, "From Product," "Corteva acetochlor" -- do you see that?

A. Yes.

Q. And -- and --

A. It's late, and I -- I may not have the formula right in my head.

Q. And -- and assuming that formula's correct, the predicted price increase would be about 3 percent; is that right?

A. 2 to 3 percent using -- which is what we're doing here. I think this is just a GUPPI calc -- I think Dr. Hemphill uses a GUPPI calculation. I don't -- I don't recall exactly how he did it, but that's -- my rule of thumb for GUPPI is, roughly, diversion by margin by one half, if you assume linear demand.

Q. And that's how you determine whether that candidate market would satisfy the hypothetical monopolist test?

A. That's what Dr. Hemphill did here, yes.

Q. I'd like to go to Paragraph 11 of -- of your supplemental report, CX0009.

A. Yes. I'm there.

Q. You write that "a candidate market including all acetochlor products, all metolachlor products, and all dimethenamid products would pass Dr. Hemphill's hypothetical monopolist test and also include the closest

substitutes for Corteva acetochlor."

But that doesn't mean in -- in your opinion that a narrower market wouldn't also pass the hypothetical monopolist test, does it?

A. Yeah. Using Dr. Hemphill's methodology -- and, again, in all of this -- remember that my diversions are excluding diversions to other products, so they may be overstating diversion.

But taking that as given, if you take Dr. Hemphill's approach, the fact that the broader market passes -- in -- in fact, I mean, I -- the table is saying, using Dr. Hemphill's methodology, a narrower market of just branded acetochlor and branded metolachlor passes. And Dr. Hemphill in his report, using his methodology, says, look, you pass using branded acetochlor and other acetochlor.

So, yeah, the fact that the broader market passes the HMT using Dr. Hemphill's methodology doesn't mean that a narrower market can't also pass.

Q. And you go on to write that the candidate market would closely -- "resemble closely the market that the FTC defined in the Novartis and AstraZeneca merger." And this is a

merger between two branded manufacturers; is that right?

A.   That's my understanding.

Q   Not a branded and generic?

A.   That's my understanding, correct.

Q.   And you'd agree that the purpose of defining the market is a means to assessing the effects on competition, right?

A.   Correct.

Q.   And that market definition should be tailored to the conduct at issue; is that right?

A.   Yeah.  That makes sense.

Q.   And so in this -- for --

A.   Well, no.  I mean, market definition still has to identify -- so, yes, you have to think about what you're trying to do.  But ultimately the question is what are the close substitutes, and how does that feed into the competitive effects analysis?

So, yes, but with qualifications.

Q.   And so in the -- in the Novartis and AstraZeneca merger, the competitive effects of a merger between two branded chemical companies with product overlaps in broader markets was being assessed; is that right?

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 17 of 72

# Exhibit 252

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**    **Maureen Ohlhausen, Acting Chairman**
**Terrell McSweeny**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| China National Chemical Corporation, | )    **Docket No. C-4610** |
|    a corporation. | ) |

## COMPLAINT

Pursuant to the Clayton Act and the Federal Trade Commission Act, and its authority thereunder, the Federal Trade Commission ("Commission"), having reason to believe that Respondent China National Chemical Corporation ("ChemChina"), a corporation subject to the jurisdiction of the Commission, has agreed to acquire Syngenta AG ("Syngenta"), a corporation subject to the jurisdiction of the Commission, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

## I. RESPONDENT

1. Respondent ChemChina is a corporation organized, existing and doing business under, and by virtue of, the laws of the People's Republic of China, with its office and principal place of business located at No. 62 Beisihuanxilu, Haidian District, Beijing 100080, People's Republic of China. ADAMA Agricultural Solutions Ltd. ("ADAMA") is a wholly-owned subsidiary of ChemChina, doing business as ADAMA. ADAMA is a corporation organized, existing and doing business under, and by virtue of, the laws of Israel, with its corporate office and principal place of business located at Golan Street, Airport City 7019900, Israel. ADAMA manufactures, formulates and sells agricultural chemical products in the U.S.

2. Syngenta is a corporation organized, existing and doing business under, and by virtue of, the laws of Switzerland, with its office and principal place of business located at Schwarzwaldallee 215, Basel, Switzerland 4058.

3. Respondent and Syngenta are corporations who, either directly or through owned subsidiaries, are engaged in, among other activities, the manufacture, formulation, and sale of agricultural crop protection chemicals including formulations based on the active ingredients paraquat, abamectin, and chlorothalonil.

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 19 of 72

4.   Respondent and Syngenta are corporations and at all times relevant herein have, either directly or through their subsidiaries, been engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and Section 4 of the FTC Act, as amended, 15 U.S.C. § 44.

## II.  THE PROPOSED ACQUISITION

5.   Pursuant to an Agreement and Plan of Merger ("Merger Agreement") dated February 2, 2016, ChemChina has agreed to cause China National Agrochemical Corporation Saturn (NL) B.V., an indirect wholly owned subsidiary of ChemChina, to submit a public tender offer for all publicly held registered shares and American Depository Shares of Syngenta at an offer price of $465 per share, for total consideration of up to $43 billion in cash ("Acquisition").  The Acquisition is subject to Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## III.  THE RELEVANT MARKET

6.   For purposes of this Complaint, the relevant lines of commerce in which to analyze the Acquisition are formulated crop protection products based on the active ingredients paraquat, abamectin, and chlorothalonil.  Formulated crop protection chemicals are based on key active ingredients that are diluted from a concentrated technical grade and formulated by the Respondent, Syngenta, and other chemical companies for application in the fields.  Paraquat is an herbicide, which controls weeds and other vegetation.  Abamectin is an insecticide, which controls insects and related pests.  Chlorothalonil is a fungicide, which controls fungus.

7.   Paraquat is a non-selective "burndown" herbicide, which means it does not discriminate between the weeds it controls and crops.  It is used to clear fields prior to the growing season.  Paraquat does not have the resistance issues of alternatives such as glyphosate and is significantly less expensive than other alternatives.

8.   Abamectin is an insecticide used to kill mites, psyllid, and leafminers.  It is used primarily in citrus and tree nut crops.  Available alternatives to abamectin are either significantly more expensive because they are patent-protected or less effective.

9.   Chlorothalonil is a broad-spectrum fungicide used primarily in peanuts and potatoes.  Chlorothalonil is particularly effective because, unlike most fungicides, it operates with four modes of action and is critical for resistance management among growers.

10. For purposes of this Complaint, the relevant geographic area in which to analyze the effects of the Acquisition on the paraquat, abamectin, and chlorothalonil formulated crop protection chemical markets is the United States.  The U.S. Environmental Protection Agency requires that manufacturers register both the technical active ingredient and the formulated products for sale in the United States under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 et. seq.  This registration requirement limits market access to a set of products consistent with U.S. regulatory requirements.

2

## IV.  MARKET STRUCTURE

11. The markets for formulated crop protection products using the active ingredients paraquat, abamectin, and chlorothalonil in the United States are highly concentrated.  Syngenta is the market leader in each of the three product markets, while ADAMA is either the largest or the second largest generic supplier.  Post-Acquisition, the combined share of the Respondent and Syngenta would be over 60% in formulated crop protection products with the active ingredient paraquat.  ADAMA is the generic market leader in formulated crop protection products with the active ingredient abamectin and post-Acquisition, the combined market share would be approximately 80%.  ADAMA is the second largest generic supplier of formulated crop protection products with the active ingredient chlorothalonil, and post-Acquisition the combined market share would be over 40%.

## V.  EXPANSION AND ENTRY BARRIERS

12. Entry into the relevant markets is not likely to be sufficient to counteract the anticompetitive effects of the Acquisition.  New generic crop protection entrants typically forecast and ultimately achieve minimal market penetration while ADAMA, in contrast, has successfully maintained significantly higher market shares for an extended period of time.  No new entrant is likely to become as robust a competitor as ADAMA is today for formulated crop protection products based on the active ingredients paraquat, abamectin, and chlorothalonil.

## VI.  EFFECTS OF THE ACQUISITION

13. The effects of the Acquisition, if consummated, may be to substantially lessen competition in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, by eliminating actual, direct, and substantial competition between ChemChina and Syngenta in the relevant markets.  Specifically, the Acquisition would remove an important competitive constraint on ADAMA, thereby increasing the likelihood that the merged entity will unilaterally exercise market power in the relevant markets and that customers in the United States would be forced to pay higher prices or accept reduced service for crop protection formulations based on the active ingredients paraquat, abamectin, and chlorothalonil.

## VII.  VIOLATIONS CHARGED

14. The allegations contained in Paragraphs 1 through 13 above are hereby incorporated by reference as though fully set forth here.

15. The Acquisition described in Paragraph 5, if consummated, would constitute a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

16. The Acquisition described in Paragraph 5, if consummated, would constitute a violation of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.

3

17. The Merger Agreement described in Paragraph 5 constitutes a violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

**WHEREFORE, THE PREMISES CONSIDERED,** the Federal Trade Commission on this fourth day of April, 2017, issues its complaint against said Respondent.

By the Commission.


Donald S. Clark
Secretary

SEAL:

4

# Exhibit 253

## Filed Under Seal

# Exhibit 254

## Filed Under Seal

# Exhibit 255

**From:** Feauto, Nate [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F11E9845BD3D436490464DA86A152D44-OS7741]
**Sent:** 2/22/2021 6:01:06 PM
**To:** Van Vooren, Douglas ███████████████████████
**Subject:** RE: RESPONSE NEEDED: AMT Planning Session Pre-Work

Thanks Doug!

**From:** Van Vooren, Douglas ███████████████████████████
**Sent:** Sunday, February 21, 2021 7:21 PM
**To:** Feauto, Nate ████████████████████████; Loewen, Brittany ████████████████████
**Subject:** RE: RESPONSE NEEDED: AMT Planning Session Pre-Work

Doug VanVooren

████████████

**From:** Feauto, Nate ████████████████████
**Sent:** Thursday, February 18, 2021 8:59 AM
**To:** DL - US Account Managers - Crop Protection <DL-USAccountManagers-CropProtection@corteva.com>
**Cc:** Loewen, Brittany ██████████████████████████; Messner, Ryan ██████████████████████████; Feauto, Nate ████████████████████████
**Subject:** RESPONSE NEEDED: AMT Planning Session Pre-Work
**Importance:** High

AMT,

We are looking forward to having our 1 & 5 Year Planning sessions with you for both Distributor and Retail next week. As a reminder, the Distributor session is on Monday afternoon (2/22) and the Retail session is on Tuesday afternoon (2/23). These meetings will be a very small amount of 'tell' from myself and Brittany, and the bulk of these will be collecting input from you. This is your chance to get you opinions and thoughts documented prior to us going into and developing the strategy for 2021/22 with our planning teams.

We appreciate your high level of engagement in these, and to help kick-start the engagement we have a few questions for each channel of focus listed below that we would like your input on prior to the meetings next week. ***Please send your input/answers back to Brittany and myself by Monday (2/22) at 9AM EST***…this way we can pull all the input together and be able to spend ~10 minutes on each and be able to share with the team the collective feedback. This will hopefully spur better discussions in the short amount of time we have together. Thanks all!





**Retail Pre-Work Questions:**

Thanks,

**Nate Feauto**
US Marketing Lead – Distribution Strategy

**CORTEVA** agriscience™

9330 Zionsville Road, Indianapolis, IN 46268

Twitter | LinkedIn | www.corteva.com

Confidential Treatment Requested by Corteva

FTC-CTVA-CID_00005767

CX1517-003

# Exhibit 256

**Filed Under Seal**

# Exhibit 257

**Filed Under Seal**

# Exhibit 258

**Filed Under Seal**

# Exhibit 259

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

FEDERAL TRADE )
COMMISSION, STATE OF )
CALIFORNIA, STATE OF )
COLORADO, STATE OF )No.
ILLINOIS, STATE OF )1:22-cv-828-
INDIANA, STATE OF IOWA )TDS-JEP
STATE OF MINNESOTA, )
STATE OF NEBRASKA, )
STATE OF OREGON, STATE )
OF TENNESSEE, STATE OF )
TEXAS, STATE OF )
WASHINGTON, and STATE )
OF WISCONSIN, )
Plaintiffs, )
)
vs. )
)
SYNGENTA CROP )
PROTECTION AG, SYNGENTA )
CORPORATION, SYNGENTA )
CROP PROTECTION, LLC., )
and CORTEVA, INC., )
Defendants. )
)
———————————————————————— )
)
———————————————————————— )
IN RE CROP PROTECTION )No.
PRODUCTS LOYALTY )1:23-md-3062-
PROGRAM ANTI TRUST )TDS-JEP
LITIGATION )
———————————————————————— )

VIDEOTAPED DEPOSITION OF
SCOTT LANGKAMP
New York, New York
Thursday, April 3, 2025

Reported By:
CATHI IRISH, RPR, CRR, CLVS

Case 1:22-cv-00828-TDS-JEP   Document 454-12   Filed 04/24/26   Page 33 of 72

LANGKAMP

products come off patent, there's a risk to their level of sales?

A.    It's new competition coming in and when new competition comes in, there is a risk.

Q.    And the new competition coming in is generic manufacturers supplying the same active ingredient that has come off patent; is that correct?

A.    That's one category.

Q.    But that's the category of competition that's implicated by a product coming off patent; correct?

A.    Yes.

Q.    Did Syngenta's key AI program, in addition to helping maintain Syngenta's sales of off patent products, help maintain Syngenta's margins of those products?

A.    No.

Q.    Why do you say that?

A.    Because in the tenure that I had in key account management we had significant price decline on a number of

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 34 of 72

LANGKAMP

our later lifecycle molecules so margins would be damaged.

Q. And did those price declines coincide with the expectation of generic entry or generic entrant?

MR. MCCLAMMY: Objection to form.

THE WITNESS: Can you ask again?

BY MR. KEHL:

Q. Did those price declines coincide with generic entry?

A. It was in reaction to -- would be reacting to a competitive price.

Q. Reacting to a competitive price from a generic manufacturer; correct?

A. Potentially, yeah.

Q. Do you recall Syngenta's mesotrione containing products reacting to the entry of generic mesotrione products?

A. I do.

Q. Have you had heard the phrase brand ladder before?

A. I have.

Q. Have you heard the phrase mesotrione brand ladder before?

LANGKAMP

A.    I have.

Q.    Did the price response you've just described include products up and down the mesotrione brand ladder?

A.    At the time that I was at Syngenta, the price reactions were specific, I believe, to the straight goods mesotrione products, Callisto and Explorer.  Callisto Xtra may have been in the same situation.

Q.    Does the price that Syngenta charges for Callisto influence the price of other products containing mesotrione that might have other active ingredients within those products?

A.    It definitely impacted the price of our fighting brand, Explorer.  The other, Halex GT may have been impacted by that.  It includes glyphosate, so that may have been impacted but many of our corn herbicide mixtures had new technology.  Bicyclopyrone was the active ingredient and they were less affected.

Q.    Do you recall Syngenta's

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 36 of 72

# Exhibit 260

## Filed Under Seal

# Exhibit 261

## Filed Under Seal

# Exhibit 262

## Filed Under Seal

# Exhibit 263

| From: | Swanson, Lars |
|---|---|
| To: | Garrett, Matthew (M); Kinsell, Sara (SM) |
| Sent: | 9/6/2018 10:03:56 PM |
| Subject: | RE: Vydate Forecast |

Thanks Matt-

When we look at total numbers we should consider more growth in 2019 than what these changes reflect. Talked with Doran also, lets hold close to what's been in the plan for 2019 (ok to come down some say ~$1mm and /reflect build out balance in the downsides

Vydate CLV today totals 221Mgals in EDI, ~60% of the last full year and 75% of the two before. Total CLV plan should be at least 290, I would put the additional in 2.5s. That is the preferred pack size and most substitutable. 2.5s typically were ~160 to 170 Mgals and we know we did not meet 2.5 demand this year. We should see a lift in loyalty I believe (we'll see shortly the reported sales).

Vydate L is a wildcard. I think we lost more than we realize to generics and the additional loyalty/counting return L will lift 2019. Let's add 10Mgals in 2.5s. (can put in equivalent downside until see 2018 loyalty % reports).

With the above see where that gets us vs PLM, if we need to add a bit more 2.5s in either lets do that so we're between ████████

Thanks,

Lars Swanson
Category Leader - Insecticides
Corteva Agriscience™, agriculture division of DowDuPont
Lars.D.Swanson@DuPont.Com
████████████████

**From:** Garrett, Matthew (M) <MGarrett@dow.com>
**Sent:** Thursday, September 06, 2018 5:01 PM
**To:** Swanson, Lars <Lars.D.Swanson@dupont.com>; Kinsell, Sara (SM) <SMKinsell@dow.com>
**Subject:** [EXTERNAL] Vydate Forecast
**Importance:** High

For 2019, here is what I am forecasting:

<u>C-LV</u>
- **2.5s**: 128,000 GA for 2019 (thus far in 2018 we are at 100,000 GA. I don't expect there to be much more sales other than a few last minute CA cotton purchases. Assuming that is 3,000 GA, the 2019 forecast would be up 25% for this pack size)
- **250s**: 98,000 GA (Currently at 78,500 so far this year. Whatever we get in the next three weeks will be it. I am assuming 10,000 GA more, meaning we would be up on this pack size next year by about 10,000 GA or 11% Given the shift away from this pack size to bulk, I think this would be a success for 2019.)
- **Tank Truck**: 50,000 GA (At 18,000 for the year. We have three tanks being built, so assuming we put product in to them before the end of the year, 3 TLs amounts to 12,000 GA more, or 30,000 for the year. This means we would be up 20,000 GA next year, or 40%. This is the wild card. If we want to up the 2019 forecast, let's do it here—I see some upside in this pack size but am not too confident.)

Another key aspect worth mentioning is I have discussed 2019 with Kevin Cochrane today. For 2018 he forecasted 100,000 GA and thinks he will come in at 83-85,000. Next year he is shooting for 100,000 GA total again, almost all of which is C-LV. So, from another lens, the 50,000 GA in tank truck sales is half of Kevin's

forecast. (Hitting this will be largely contingent on regaining Frank Teig's business via Helena.)

This equates to 276,000 GA of C-LV. ████████████████████████████████████████████.

L

- **200L**: 27,000 for 2019. (This year we are at 16,000. People hate this pack size and I do not expect any more sales. If we can sell 9,000 GA more next year (56%) that will be walk-off homerun status.
- **2.5s:** 103,000 GA for 2019. (We are at only 67,800 for the year. With no active markets, not expecting much more for the year. Assuming we get a few more random sales, this would be 42% volume growth next year. This is also ambitious.)

This equates to 130,000 GA of L. ███████████████████████████████

Combined, this is $34MM in Vydate sales for 2019.

It is possible I am off on my assumptions from now until Dec. 31. If so and we sell more than I think, that will cut into the growth expected in 2019. That being said, this forecasts growth in every pack size next year, with significant jumps in tank truck sales and L, both of which are our key business focuses.

For 2020, I have inputted a little over 5% growth compared to 2019 for C-LV (290,000 GA) and flat compared to 2019 for L. Everything I have mentioned in this email is captured in IBP.

What are your thoughts or suggestions?

Thanks,


**Matt Garrett**
Product Manager: Fumigants

Corteva Agriscience™, Agriculture Division of DowDuPont
████████████  ████████████
9330 Zionsville Road, Indianapolis, IN 46268

Confidential Treatment Requested by Corteva

# Exhibit 264

**From**: Dominik H. Hoffmann [dominik.h.hoffmann@bayer.com]
**Sent**: 7/24/2024 12:14:02 AM
**To**: Gabriel P Silva [gabriel.psilva@bayer.com]
**Subject**: FW: Acetochlor / selective background

FYI, my note to antonio

**From:** Dominik H. Hoffmann <dominik.h.hoffmann@bayer.com>
**Date:** Tuesday, July 23, 2024 at 6:54 PM
**To:** Antonio Smith Jr <antonio.smithjr@bayer.com>
**Subject:** Acetochlor / selective background

Hi Antonio,



ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

Best
Dominik

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00002072_0002

CX3464-002

# Exhibit 265

| | |
|---|---|
| **From:** | Feauto, Nate |
| **To:** | Leifker, Bob |
| **CC:** | Feauto, Nate |
| **Sent:** | 4/16/2019 4:11:41 PM |
| **Subject:** | FW: Matrix 18/19 Strategies & Net Down (Account Manager Call) |
| **Attachments:** | Matrix Nets by Region.xlsx |

Bob,

This is the only communication that was sent.  Please see the highlighted sentence below…its is also in the net down I provided all AMs attached.  It is a 3% retail EDI competitive nationwide, no qualifiers…as simple as that.

Thanks,
Nate

**From:** Feauto, Nate (N) <Feauto@dow.com>
**Sent:** Friday, August 31, 2018 9:45 AM
**To:** Van Vooren, Douglas (D) <DDVANVOOREN@dow.com>; Webster, Gregory (GB) <GBWebster@dow.com>; Feil, Phil (P) <pfeil@dow.com>; Urbanowski, Mark (K) <MKURBANOWSKI@dow.com>; Puck, Dan (D) <dwpuck@dow.com>; MOLPUS, JOHN M <john.m.molpus@dupont.com>; Goodwin, Scott (S) <SSGOODWIN@dow.com>; Inman, Trent (T) <TWINMAN@dow.com>; FRANKLIN, ALISON W <alison.w.franklin@dupont.com>; ROOKAIRD, LONA <lona.rookaird@dupont.com>; HEMMAN, MICHAEL T <mike.hemman@dupont.com>; BODILY, REDGE <redge.bodily@dupont.com>; DOERR, MICHAEL DAVID <michael.d.doerr@dupont.com>
**Cc:** Doran, Jon (J) <JTDoran@dow.com>; Stauffer, Marney (MH) <mhstauffer@dow.com>; Feauto, Nate (N) <Feauto@dow.com>; HAY, JAMES R. <james.r.hay@dupont.com>
**Subject:** Matrix 18/19 Strategies & Net Down (Account Manager Call)
**Importance:** High

All,

Thanks for your time and participation this morning.  Hopefully the detail shared will help with your rollouts of our Fall Herbicide Stocking, including Matrix, Goal2XL and GoalTender.  Below I have provided in bullet format what was discussed, including the top concerns from the past market year, the top asks from our channel partners going into 18/19, and our plans for 2018/19 as it relates to the Matrix business.  As mentioned on the call, we are aligning our strategies and tactics for Matrix to the reality of the product and where it fits in the product life cycle.  This means that ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Also attached to the message is a net down sheet for Matrix.  For those that were not able to make the call (and those that were able to, but still have questions), please don't hesitate to reach out to talk through things. Thanks all, and have a great holiday weekend!



CX1547-001



Thanks,

**Nate Feauto**
**Corteva Agriscience™, Agriculture Division of DowDuPont™**
U.S. Category Leader: Specialty Herbicides/Fungicides, & Telone Fumigants
Office: ████████
Mobile: ████████

Confidential Treatment Requested by Corteva

FTC-CTVA_00373111

████████

# Document Produced as Native

Confidential Treatment Requested by Corteva

FTC-CTVA_00373112

CX1547-003



*Western = CA/AZ/WA/OR/ID/NV*

2/3 of Matrix sales in Northern Plains go to RDO...taken care of through TruChoice

ND/SD, WI, MI, FL, Northeast markets will be handled locally against generics

DOW RESTRICTED

CX1547-004

# Exhibit 266

| | |
|---|---|
| **From:** | LINDSEY, MARK A |
| **To:** | Urbanowski, Mark (K) (DOW); HAY, JAMES R.; HEMMAN, MICHAEL T; WILLIAMS, ALISON L.; Swanson, Lars |
| **CC:** | Lind, Mike (M) (DOW) |
| **Sent:** | 11/20/2017 1:31:46 PM |
| **Subject:** | RE: Insecticide Loyalty Feedback from Tenkoz Board Meeting |

This is basically what Rip has said since I met with them in June and, at least prior to merge, I reported all of this to our leadership team and since our merger have been direct about fast tracking Vydate discussions with our accounts. We have a ton of this stuff to sell in Q4. To my knowledge, we have still yet to hear similar statements from any of our other accounts, but I believe we have been moderately aggressive at best, in bringing Vydate front and center with the exception of what has been done by Mike Doerr and team in the PNW. So, the odds are we will hear something similar and that will likely be from Helena and/or CNI. I am going to re-send or send for the first time maybe to some of you, the communications I have had with Rip and will make additional comments in that or those emails I will send. It is important to note that we are NOT getting the same message from either Simplot or WECO….as I have been told and actually have read a correspondence from Bill Hume. I sort of expected you would have heard this straight from Rip while he was with you last week.

The last thing we need is too many cooks in the kitchen, but having everyone on this DL intimately familiar with Tenkoz positions is critical and every day counts. My position is that I can be an advisor and teammate for the next few weeks before retirement, but believe Mark is now in the best position to guide forward….especially, as you see, Rip is talking about overall insecticide loyalty and not just Vydate brands. Lastly, Rip did not bring up these concerns when we met with them prior to their October board meeting. We discussed specific Western initiative with him via Tenkoz and he was most helpful with guidance. You will see more on that in next email from me.

*Mark A. Lindsey*
DuPont Crop Protection
North America Key Account Team Leader
8295 Tournament Dr. Suite 300
Memphis, Tn. 38125
Email: mark.a.lindsey@dupont.com



**From:** Mark Ripato ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, November 16, 2017 2:56 PM
**To:** Urbanowski, Mark (K) (DOW) <MKURBANOWSKI@dow.com>
**Cc:** Lind, Mike (M) (DOW) <MWLIND@dow.com>; LINDSEY, MARK A <Mark.A.Lindsey@dupont.com>; Jeff Cole ▮▮▮▮▮▮▮▮▮▮▮▮; Matt Comer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** [EXTERNAL] RE: Insecticide Loyalty Feedback from Tenkoz Board Meeting

Thanks.

Mark

Confidential Treatment Requested by Corteva

FTC-CTVA_00883235
CX5041-001

**From:** Urbanowski, Mark (K) [mailto:MKURBANOWSKI@dow.com]
**Sent:** Thursday, November 16, 2017 3:47 PM
**To:** Mark Ripato <mripato@tenkoz.com>
**Cc:** Lind, Mike (M) <MWLIND@dow.com>; LINDSEY, MARK A <Mark.A.Lindsey@dupont.com>; Jeff Cole ███████████████; Matt Comer ██ █g█████████████
**Subject:** RE: Insecticide Loyalty Feedback from Tenkoz Board Meeting

*Mark – thanks for the note and the short answer is "no" you haven't missed anything and all of the loyalty componentry is not fully-baked yet.   As in the past, as new information is known, we will do our best to adjust to the market needs.*

*Some valid and serious concerns in your note.  Let me double back with Jon Doran and Lars Swanson on this. We might like to get on the phone to get some more background to come up with best solution.*

*Really appreciate your interactions this week with 2 key groups of our new company and more so your guidance and discussion on these two important actives.*

*Back in touch soon on this and other topics.    Thanks!*

# Mark Urbanowski

National Account Manager
███████████████    mkurbanowski@dow.com

**Dow AgroSciences LLC**
9330 Zionsville Road, 308 3E
Indianapolis, IN 46268

www.dowagro.com

**DOW** **Dow AgroSciences** | *Solutions for the Growing World*

NOTICE: This e-mail message (including all attachments) from Dow AgroSciences LLC is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachments. Thank you.

**From:** Mark Ripato ███████████████████████
**Sent:** Thursday, November 16, 2017 2:56 PM
**To:** Urbanowski, Mark (K) <MKURBANOWSKI@dow.com>
**Cc:** Lind, Mike (M) <MWLIND@dow.com>; LINDSEY, MARK A <Mark.A.Lindsey@dupont.com>; Jeff Cole ███████████████; Matt Comer ████████████████████
**Subject:** ████████ Loyalty Feedback from Tenkoz Board Meeting

> This email originated from outside of the organization.

Guys, I'd like to use this note to progress the dialogue on the insecticide loyalty programs:

- Have you finalized the ██████████████████████?   I acknowledge that I may have missed them.   Please let me know if you have sent them and if not, when you expect to have them wrapped up.
- ████████████████████████████████████████████████████████████████████████████████████████████████
- Product specific issues and comments
    - ████████████████████

Confidential Treatment Requested by Corteva

FTC-CTVA_00883236
CX5041-002



This is a much more explainable, friendly approach that could still accomplish your objectives. Furthermore, this could help offset one of the two concerns I expressed to Rajan's leadership team, as well as to Jim's team, earlier this week. That being the industry watching whether you intend to execute with a carrot or a stick. I suggested all of your merging predecessors over the years have attempted to execute with a stick. I believe the industry is watching to see if you will do the same. I challenged Rajan's team to try executing with humility, the carrot, to see how powerful it could be. This case would be a good test. Simply acknowledge that Dupont could've provided better counsel during the outage, then earn the support/share back. I suspect the channel will stay with you anyway, given your local support and expertise with this product, but why send out the initial message of, "If you don't, we're going to beat you!"…..which reinforces the "arrogance of size based power" that I explained earlier in the week. If it doesn't work, you can strap us back to a post and get the whip out next season. In my opinion, what you have to lose is much less than you could gain in the

Confidential Treatment Requested by Corteva

FTC-CTVA_00883237

CX5041-003

benefit of the initial post merger perception in the western U.S.
- Beyond that, are you really sure you can supply the demand in 2018?

Please let me know how you want to proceed.

Thanks,
Mark

Confidential Treatment Requested by Corteva

FTC-CTVA_00883238

CX5041-004

# Exhibit 267

**Filed Under Seal**

# Exhibit 268

| From: | HUF, SCOTT JOHN |
|---|---|
| To: | HAY, JAMES R. |
| Sent: | 5/28/2015 3:18:12 AM |
| Subject: | RE: Methomyl Import Data and Commentary |

Thanks Jim. Good background.

Back from a few days in Singapore this morning at the AP core team. Rik was there for a couple of days as was Blair there so good to be able to connect with them. I told Blair we need to figure out a way to get him to Canada to meet the talent there! Might be easier said than done in the new system, but still worth trying down the track.

An hour ago, just got off the phone with Russ Putland to discuss all things sales team, KAM's also in fact. He seems a 'goer' just need to spend good time with him to see how he operates and his level of knowledge with all customers and all team. Like him though that he is direct.

He is worried about the transition gap between Frederic and I. Not the only one of course Jim……but I told him it is what it is and keep copying Frederic, you and I on emails he wants action on. Frederic and I are going to have to keep pretty tight with you on left field urgent things that arise.

I have to be careful that I am not seen to be making decisions pre the official start.…plus not being there, dangerous as well, so will not be doing that!

Apart from that, all well really.

Regards
Scott


**Scott Huf|** Australia and New Zealand Business Director | DuPont Crop Protection
███████████████ | ███████████ * scott.j.huf@dupont.com
Please visit our Australian website at cropprotection.dupont.com.au
Please visit our New Zealand website at www.cropprotection.dupont.co.nz

---

**From:** HAY, JAMES R.
**Sent:** Thursday, May 28, 2015 12:11 PM
**To:** HUF, SCOTT JOHN
**Subject:** RE: Methomyl Import Data and Commentary

No problem…  as a start, Mark is the KAM leader (leads the Key Acct Mgmt team) – most KAMs report directly to him, but there are a few in the BU's…  including the two KAMs in Canada (Boyd and Dennis) they report to Frederic (you) and get almost all of their guidance from him – as we and our customer evolve to more regional I can see a growing role for Mark to pull together the NA KAM's as a team…    Steve Ball is our Competitive/Market Intelligence guy – both Mark and Steve are in Memphis.    BTW Mark is relatively new to his role (since Aug 2014), prior to that he was the Speciality BU Marketing Mgr…

Hope you're well…
Jim

---

**From:** HUF, SCOTT JOHN
**Sent:** Wednesday, May 27, 2015 6:48 PM
**To:** HAY, JAMES R.
**Subject:** FW: Methomyl Import Data and Commentary

Jim,

Confidential Treatment Requested by Corteva

When we get a chance to connect, it would be good for me to understand who all these people are in the NALT and their responsibilities and reach.

**Scott Huf**| Australia and New Zealand Business Director | DuPont Crop Protection

( Office ████████████ E ████████████ * scott.j.huf@dupont.com
Please visit our Australian website at cropprotection.dupont.com.au
Please visit our New Zealand website at www.cropprotection.dupont.co.nz

---

**From:** LINDSEY, MARK A
**Sent:** Thursday, May 28, 2015 5:36 AM
**To:** NA-US-CROP-WILM--NALT_EMAIL_LIST
**Cc:** BALL, STEVEN L; WRIGHT, JOHN M; SLOAN, DARIN C; BRACY, WILLIAM; LUE, GODFREY
**Subject:** FW: Methomyl Import Data and Commentary

## NALT:

If you would indulge me……



Most of that, most of you know. What you may not know is the general belief I hold and many industry experts hold is that once share drops below 80%-85%, the very people (our distribution in general) who have supported our strategies all along for many years, may throw in the towel. Now, a lot has changed in our industry from 15 - 20 years ago when that thinking really took root. Generics are often times a distributor's competitor and distribution knows all too well now what happens to markets value before the towel even hits the canvas, so, let's just all agree that <u>generics are emboldened when they see they are able to capture 15%-20% molecular share</u>.

So, these facts, coupled with the fact that almost every generic molecule is showing import increases this year, larger than most, what does that tell us? That tells us **(1)** <u>Generics see opportunity in the correction that is taking place in commodity prices</u> of broad acre crops and **(2)** That <u>we are at a share tipping point</u> in a number of our segments. We have projects or project like work on going that will address a number of strategies and tactics that will eventually improve DuPont value propositions in the medium term and the same projects to address 2016 strategy and tactical improvements. Our most pressing 2016 challenges are HARMONY EXTRA, FINESSE, AFFINITY BRANDS, AND AGSURF STRATEGY. All the rest are manageable and not in dire need of a deep dive for a host of reasons that are positive for DuPont

So, why am I spending the time to tell you all of this  - **(1)** Because there is information here that some (even one) of you didn't know and you need to know **(2)** To make sure we all understand that changing market or segment conditions have consequences and our projects are dealing with these current facts as we do our work and **(3)** Just to make sure we all have the right perspective……we don't have much more share that we can give up if we believe we are at a tipping point, and clearly I am asking you to believe that.

Confidential Treatment Requested by Corteva

What you did not hear me say is that we need to cut prices so we don't lose more share. That could be a recommendation from our work, but it is not today. There is no set up here……I just want us all to feel the importance of this again, the same way we felt it before the good times (commodity prices and product launches) came along in 2010 – 2013 and before we divested products from our portfolio that gave us more relevancy in certain segments (Finesse comes to mind).

I appreciate your support, leadership and your team's support and active engagement with these projects. I especially appreciate Robert stepping up and providing a good share of the leadership needed to see these project through to completion

*Mark A. Lindsey*
DuPont Crop Protection
North America Key Account Team Leader

████████████████████████
████████████████

Email: mark.a.lindsey@dupont.com
Office: ███████████
Cell: ██████████

---

**From:** BALL, STEVEN L
**Sent:** Wednesday, May 27, 2015 11:38 AM
**To:** MARES, JOSEPH T
**Cc:** LINDSEY, MARK A; ETHERIDGE, ROBERT E; REIMERS, JOHN; FEELEY, SALLY HART; SLOAN, DARIN C; Hume, Bill L
**Subject:** Methomyl Import Data - Through end of April 2015 [Total U.S.]

Just received the April import data for methomyl. As the left chart shows we are on track to exceed generic imports of prior years. As right chart shows methomyl market is roughly a million pound A.I. market with 2014 season DuPont capturing ████ share. Understand issues with other insecticides the methomyl market may hit 1.2 million lbs for the season. The 2015 season is still in play so DO NOT over read the share represented for 2015 between generic and branded Lannate. Generics are reported the month they hit the docks in the U.S. while DuPont sales are OTG hence a slight mismatch on timing as we monitoring during the season but by end of season will be good measurement. For month of April Rotam imported @ 72,500 lbs of Nudrin 90 so roughly enough for 75,000 – 150,000 acres with CIF value (COGs, Insurance and Freight which is self declared) of $12.30/lb of product they have plenty of pricing flexibility with our DL price of $30/lb. As we all know the import data tells us how much but not which crops or gegoraphic area within U.S.

Confidential Treatment Requested by Corteva

Steve

_____

Steve Ball | DuPont Crop Protection | Market Research and Competitive Intelligence Manager |
███████████████████ | ██████████████
(901) ██████████████████████ cell | <u>steven.l.ball-1@dupont.com</u>

Confidential Treatment Requested by Corteva

FTC-CTVA_00250783
CX5109-004

# Exhibit 269

**Filed Under Seal**

# Exhibit 270

**Filed Under Seal**

# Exhibit 271

## Filed Under Seal

# Exhibit 272

**Filed Under Seal**

# Exhibit 273

**Filed Under Seal**

# Exhibit 274

**Filed Under Seal**

# Exhibit 275

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION
Case No. 1:22-cv-00828-TDS-JEP
- - - - - - - - - - - - - - - - - - - - - x
FEDERAL TRADE COMMISSION, STATE
OF CALIFORNIA, STATE OF COLORADO,
STATE OF ILLINOIS, STATE OF
INDIANA, STATE OF IOWA, STATE OF
MINNESOTA, STATE OF NEBRASKA,
STATE OF OREGON, STATE OF
TENNESSEE, STATE OF TEXAS, STATE
OF WASHINGTON, and STATE OF
WISCONSIN,

                              Plaintiff,

        - against -

SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION, SYNGENTA
CROP PROTECTION, LLC., and
CORTEVA, INC.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF
BOB LEIFKER
New York, New York
Wednesday, May 21, 2025
REPORTED BY:
SARA KILLIAN, RPR, RCR

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 69 of 72

B. Leifker

could.

Q.      Sure.  Yeah.

MS. SEGALL:  Object to form.

Q.      Okay.

A.      If they choose.  So they have the choice of doing that or not doing that.

Q.      Okay.

And what did you mean by hold the market?

A.      Hold our volume or our units.

Q.      Would it also be to hold the price of Vydate in place as much as possible?

MS. SEGALL:  Object to form.

B. Leifker

A.      No, I wouldn't interpret that comment that way.

Q.      Okay.

In the third paragraph, you say:  Our Vydate CLV net is around $86 a gallon while generics have been confirmed at $50 a gallon.

Do you see that?

A.      Yes, sir.

Q.      So in this sentence, are you comparing the price for Corteva-branded oxamyl Vydate with the price for generic oxamyl?

A.      Yes.

Q.      Okay.

B. Leifker



MS. SEGALL:  Object to form.

Case 1:22-cv-00828-TDS-JEP    Document 454-12    Filed 04/24/26    Page 72 of 72