# Exhibit 276

## Filed Under Seal

# Exhibit 277

## Filed Under Seal

# Exhibit 278

## Filed Under Seal

# Exhibit 279

**Filed Under Seal**

# Exhibit 280

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

- - - - - - - - - - - - - - - - - - -x

FEDERAL TRADE COMMISSION, et al.,

                  Plaintiffs,       Case No.

         v.                1:22-cv-00828-TDS-JEP

SYNGENTA CROP-PROTECTION AG,
SYNGENTA CORPORATION,
SYNGENTA CROP-PROTECTION, LLC,

    and

CORTEVA, INC.,

                  Defendants.

- - - - - - - - - - - - - - - - - - -x

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

CONTINUED VIDEO-RECORDED DEPOSITION OF

C. SCOTT HEMPHILL

VOLUME II

New York, New York

Friday, November 21, 2025

Reported by:
Jeffrey Benz, CRR, RMR
Job No. 47055

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 6 of 168

If the elevated price which is giving rise to the Cellophane Fallacy were dis-elevated, then the -- to the extent those -- the price had fallen from the elevated price, it would reduce the concerns articulated by the Cellophane Fallacy, correct?

MR. TURNER: Objection to form.

A. I mean, if there was no source of a Cellophane Fallacy to begin with, there would not be a Cellophane Fallacy concern.

Q. Yeah, and -- and if there was a Cellophane Fallacy concern to begin with, but then it were eliminated, in other words, the price fell, then the Cellophane Fallacy would go away, correct?

A. I don't know what you have in mind by "eliminated." If the price was at the competitive level rather than an elevated level, i.e., if there was no supracompetitive pricing to begin with, then, as I said, the absence of a source of a Cellophane Fallacy would mean that there is no Cellophane Fallacy.

Q. If you can turn to paragraph 88 of your reply report, please.

A. Reply report.

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC
Page: 443
Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 7 of 168

Q.   The October 31 report.

A.   Yes, I'm at 88.

Q.   The first sentence of that paragraph reads, In my initial report, I showed that limited generic entry of rimsulfuron products provoked a price response from Corteva.

Do you see that?

A.   Yes.  I think Professor Snyder finds that as well.

Q.   And so you and Professor Snyder would agree that there was limited generic entry of rimsulfuron, ███████████████████████ ██████████████████████████   correct?

A.   I believe that he -- he in substance agrees with what I've set out in the sentence.

Q.   ████████████████████████ █████████████████████████████████ ██████████████████████

MR. TURNER:  Object to form.

A.   Yeah, ████████████████████ ███████████████████████████████, which I, you know, make use of.

Q.   Now step back for a second.  In your -- in any of your reports, you don't define what the perfectly competitive price of any of

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC
Page: 444
Case 1:22-cv-00828-TDS-JEP   Document 454-13   Filed 04/24/26   Page 8 of 168

the products containing the active ingredients would be, correct?

MR. TURNER: Object to form.

A. I think it's true here, as usually for monopoly maintenance cases, that I don't observe the perfectly competitive price level.

Q. And it's -- it's not just that you don't observe it, you also don't seek to define it yourself, correct?

A. I'm not offering an opinion about what the perfectly competitive price level would be.

Q. You also don't offer an opinion as to what margin Corteva would earn in a perfectly competitive world, correct?

A. I agree that there's not an opinion of that kind, yes.

Q. Turning back to the rimsulfuron opinions for a second in the limited generic entry you see. You did not attempt to quantify the extent to which prices remained at a -- above a perfectly competitive level in light of the generic entry, correct?

A. As to the quantification of that extent, it was not necessary to my opinions, and I did not make a calculation of that kind.

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC                                    Page: 445
Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 9 of 168

MR. TURNER: Object to form.

A. You said 2011 before. Do you mean -- sorry.

I -- I don't have an understanding of that one way or the other. We can go look, but as I -- as I sit here, whether it's both before and after, it would not be surprising, but it's -- but I don't have an understanding.

Q. All right. So you don't know whether his analysis of the -- of switching for rimsulfuron expands both before and after 2019?

MR. TURNER: Object to form.

A. It is taken into account in my reports, but as I sit here, I don't remember the exact date range of his switching analysis. I recall him often doing large sets of years beyond what was warranted. But whether here he included years before 2019, we would have to -- to check, to run that down. But as I sit here, I don't remember the exact year range, no.

Q. Now, this price change in farmgate prices that you set forth in Figure 14 in 2019, you attribute to the generic rimsulfuron entry, correct?

A. I don't agree with all the

characterization there, but the price response by the brand I think is attributable to a limited generic entry, as reflected in the documents and the data.

Q. So generic entry led to the price of Matrix to fall, in your opinion, correct?

A. Limited generic entry was a source of the branded price response, yes.

Q. And so at least some of what you say are the supracompetitive prices that undergird the Cellophane Fallacy were eliminated upon the generic entry in 2019, correct?

MR. TURNER: Object to form.

A. I mean, my opinion is the price is elevated in the actual world relative to the but-for world. It's possible that in 2016 it was even more elevated as to Matrix.

Q. But you would agree that at least some portion of the -- of what you believe are supracompetitive prices was eliminated by the generic entry that you said caused a price effect in 2019, correct?

MR. TURNER: Object to form.

A. I'm not sure if I agree. Can you ask that again?

Q. ████████████████████

████████████████████

████████████████████

████████████████████

████████████████████

A.   I'm -- yeah, I'm open to the -- to the idea that, you know, the price decrease that we observe in response to limited generic entry makes the Cellophane Fallacy less extreme.

Q.   Okay.  ████████████████████

████████████████████

████████████████████ it would be less problematic to conduct a diversion analysis to products outside of the single AI market you define --

MR. TURNER:  Object --

Q.   -- given that the Cellophane Fallacy has been reduced in some way?

A.   No --

MR. TURNER:  Object to form.

A.   -- I disagree with that.

Q.   So you're saying there was -- is it your opinion --

A.   I can explain.

Q.   Well, let me just see if I understand.

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC
Page: 452
Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 12 of 168

# Exhibit 281

*Highly Confidential - Outside Counsel's Eyes Only*

Excerpt from Snyder Rebuttal Report Backup Materials

Case 1:22-cv-00828-TDS-JEP   Document 454-13   Filed 04/24/26   Page 14 of 168

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | group_var | company_type | total_quan | share_pct | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| 2 | PRIVATE LABEL | PRIVATE LABEL | | | | | | | | |
| 3 | BAYER | BASIC | | | | | | | | |
| 4 | SYNGENTA | BASIC | | | | | | | | |
| 5 | GENERIC | GENERIC | | | | | | | | |
| 6 | CORTEVA | BASIC | | | | | | | | |
| 7 | | | | | | | | | | |

*Highly Confidential - Outside Counsel's Eyes Only*

Excerpt from Snyder Rebuttal Report Backup Materials

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 15 of 168

| | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 16 of 168

|  | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | combined_info | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| 2 | WARRANT (L) (BAYER) BASIC * | | | | | | | | |
| 3 | DEGREE XTRA (BAYER) BASIC ** | | | | | | | | |
| 4 | HARNESS XTRA (6L) (BAYER) BASIC ** | | | | | | | | |
| 5 | RESICORE (L) (CORTEVA) BASIC *** | | | | | | | | |
| 6 | FULTIME NXT (CORTEVA) BASIC ** | | | | | | | | |
| 7 | SURESTART (L) (CORTEVA) BASIC *++ | | | | | | | | |
| 8 | ARREST CS (SHARDA) GENERIC * | | | | | | | | |
| 9 | FEARLESS XTRA (L) (HELM) GENERIC ** | | | | | | | | |
| 10 | RECITE (L) (SHARDA) GENERIC *** | | | | | | | | |
| 11 | VOLLEY ATZ (L) (TENKOZ) PRIVATE LABEL ** | | | | | | | | |
| 12 | VOLLEY ATZ NXT (TENKOZ) PRIVATE LABEL ** | | | | | | | | |
| 13 | VOLLEY (L) (TENKOZ) PRIVATE LABEL * | | | | | | | | |
| 14 | | | | | | | | | |
| 15 | | | | | | | | | |

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 17 of 168

| | J | K | L | M | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | group_var | company_type | total_quan | share_pct | 2004 | 2005 |
| 2 | CORTEVA | BASIC | | | | |
| 3 | GENERIC | GENERIC | | | | |
| 4 | FMC | BASIC | | | | |
| 5 | PRIVATE LABEL | PRIVATE LABEL | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 18 of 168

*Highly Confidential - Outside Counsel's Eyes Only*

Excerpt from Snyder Rebuttal Report Backup Materials

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 19 of 168

| | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |

|   | Q | R | S | T | U | V | W | X | Y |
|---|------|------|------|------|------|------|------|------|------|
| 1 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |

Case 1:22-cv-00828-TDS-JEP   Document 454-13   Filed 04/24/26   Page 20 of 168

Case 1:22-cv-00828-TDS-JEP   Document 454-13   Filed 04/24/26   Page 21 of 168

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | combined_info | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| 2 | PRUVIN (DF) (ADAMA) GENERIC | | | | | | | | |
| 3 | TETRIS SG (ATTICUS) GENERIC | | | | | | | | |
| 4 | GRAPPLE (WDG) (NUFARM) GENERIC | | | | | | | | |
| 5 | REVOLT (WDG) (INNVICTIS) PRIVATE LABE | | | | | | | | |
| 6 | TRAMPA (WSG) (WESTLINK AG) PRIVATE L | | | | | | | | |
| 7 | KASAI (WSG) (ALTAMONT) PRIVATE LABEL | | | | | | | | |
| 8 | MATRIX SG (CORTEVA) BASIC | | | | | | | | |
| 9 | MATRIX (WDG) (CORTEVA) BASIC | | | | | | | | |
| 10 | MATRIX FNV (CORTEVA) BASIC | | | | | | | | |
| 11 | | | | | | | | | |

*Highly Confidential - Outside Counsel's Eyes Only*

Excerpt from Snyder Rebuttal Report Backup Materials

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 22 of 168

|   | J | K | L | M | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |

*Highly Confidential - Outside Counsel's Eyes Only*

Excerpt from Snyder Rebuttal Report Backup Materials

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | firm_type | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| 2 | Corteva | | | | | | |
| 3 | Generic | | | | | | |
| 4 | Private Lab | | | | | | |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | legend | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| 2 | Vydate C-LV (Corteva) Basic | | | | | | |
| 3 | Vydate L (Corteva) Basic | | | | | | |
| 4 | Vy-King 42 (Solera) Generic | | | | | | |
| 5 | Return (Albaugh) Generic | | | | | | |
| 6 | Vypera C-LV (Albaugh/Innvictis) Private La | | | | | | |
| 7 | Return XL (Albaugh) Generic | | | | | | |
| 8 | Vypera L (Albaugh/Innvictis) Private Label | | | | | | |
| 9 | Ventas 42% C-LV (Atticus) Generic | | | | | | |
| 10 | Ventas 24% L (Atticus) Generic | | | | | | |
| 11 | Vy-King 24 (Solera) Generic | | | | | | |

# Exhibit 282

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

- - - - - - - - - - - - - - - X

FEDERAL TRADE                          :

COMMISSION, et al.,                    :

            Plaintiffs,      :

vs.                                    : 1:22-cv-00828-TDS-JEP

SYNGENTA CROP PROTECTION       :

AG, et al.,                            :

           Defendants.       :

- - - - - - - - - - - - - - - X

IN RE CROP PROTECTION          : 1:23-md-3062-TDS-JEP

PRODUCTS LOYALTY PROGRAM       :

ANTITRUST LITIGATION           :

- - - - - - - - - - - - - - - X

*** HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY ***

Volume II

VIDEOTAPED 30(b)(6) DEPOSITION

OF BAYER CROPSCIENCE LP by ROBERT SCHRICK

Wednesday, July 23, 2025

Raleigh, North Carolina

Reported by:  Christine A. Taylor, RPR

Everest Job No.:  42668

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 26 of 168

A.   Yes.  Yes.

Q.   Okay.  So Mr. French writes, ███████

██████████████████████████████████

████████████████████████████████ ███

██████████████████████████████████

████████████████████████████ ████

████████████████████████████████████

██████████████ ██████████████████

█████████████████████ "

Do you see that?

A.   I do.

Q.   Okay.  Okay.  ███████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████

MR. KING:  Object to form.

MS. GIANOTTI:  Object to form.

THE WITNESS:  Would you repeat the

question?  I'm sorry.

BY MS. CLAIR:

Q.   Sure.  Actually, I'll strike it.

It's a confusing question.  So that's fine.  I'll

strike that.

Okay.  So we can set this document to the side.  And we've just been discussing this particular program at retail, and I recall you noting earlier that this was just one among several incentive programs used with retailers, and one of several incentive programs overall used by Bayer; is that right?

A.   Yes.

Q.   As we look to the distributor partner level, does Bayer offer a key AI incentive program to distributors that's structured in the same way as this retail level key AI incentive program?

A.   Not to my knowledge.

Q.   Does Bayer offer some different types of incentive programs to distributors?

A.   Yes.

Q.   ███████████████████

███████████████████████████████

██████████████████████

███   ███████████████████

█████████   ██████████████████

██████████████████████████   █████████

██████████████████████████████

██████████████████████████



# Exhibit 283

## Filed Under Seal

# Exhibit 284

## Filed Under Seal

# Exhibit 285

**Filed Under Seal**

# Exhibit 286

## Filed Under Seal

# Exhibit 287

## Filed Under Seal

# Exhibit 288

FEDERAL TRADE COMMISSION

In the Matter of:        )     File No. 1910031
Pesticides.              )


                                Wednesday, June 9, 2021
                                Via Zoom Videoconference

            The above-entitled matter came on for
investigational hearing, pursuant to notice, at 9:00
a.m. Eastern Standard Time, for the testimony of:

                        JOHN GERTZ

Reported by:  Deborah Wehr, RPR

any -- does the effect of loyalty programs increase the cost of distribution?

A.  I don't know that it necessarily does.  I don't, because at the end of the day as a distributor, if I'm thinking like a distributor, whether it's water, gasoline or oil, I'm going to move so many millions of gallons.  I need logistics to move so many millions of gallons.  And whether the product is clear, white, opaque, black, blue, doesn't matter.  I still got to move millions of gallons, and that's not changing.  So I think the logistical cost and the operational costs are pretty consistent regardless of whether you are dealing Syngenta, acetochlor, whether you are dealing -- you know, the only thing that would drive a really big advantage in efficiency is if you have a substantial reduction in volume that you need to apply per acre.

So for example, if we had a product that would control weeds and we needed to apply one gallon per acre versus the same product -- versus a different product that it was only a half of a gallon per acre, now we can look at it and say, okay, I only need half of the logistical cost in movements to service the same number of acres.

Q.  What about to Sipcam, does having to sell to a

lot of different distributors increase your costs?

    A.  It does.  So at the end of the day, for us to have to serve -- I use the buzz words.  To be foreclosed from the high-efficiency, large-volume distributors, to be relegated to independents or tier 2 or whatever you want to call it and everything, you are not going to get the economies of scale from Sipcam to do what we want to do.  Because, for example, if I knew I had a location that I was shipping to on Tuesday and Thursday of every single week, period, no questions asked, what I would do is either go to a freight carrier and say I'm going to run this lane twice a week just like clockwork; I want the best deal possible on this.  Or I would say I ain't going to work with a freight carrier; I'll go buy a truck myself because I can recover the cost in six months with a truck.

      That's where you don't get that efficiency if you are selling two truckloads over here in Kansas and then three truckloads in Iowa and four truckloads in, you know, Oklahoma.  You are getting real spread out and you don't have that repeatable thing that you can really drive that efficiency on, you know.

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 39 of 168

Q. Did you shop this product around to
distributors?

A.  We did, yes, ma'am.

[redacted]

[redacted] he [redacted]

Q.  Are you aware of any other AIs that might have had a similar story?  Were you approached as a distributor?

A.  Yeah, you know, as a distributor, what I remember AIs, it wouldn't be so much like AI -- so for example when I was at Primera, you know, there were several people in the turf and ornamental industry that were very interested in sulfentrazone when it went off patent.  Sulfentrazone is not Syngenta.  But whenever something is about to come off patent, as distributor, you will get the full assortment of generic

Case 1:22-cv-00828-TDS-JEP     Document 454-13     Filed 04/24/26     Page 41 of 168

Gertz

6/9/2021

manufacturers that are going come to you and talk to you potentially about entering a given product. So I had a lot of people come to me and say, hey, John, you know, we were kind of thinking about maybe entering the sulfentrazone market, but as you know, we are not going to enter the market if we don't have kind of a good customer and known volume, otherwise basically we are going to spend money and sell nothing. So for us to consider moving forward with it, I would like to ask you, John, if we did come out with a sulfentrazone generic, would you have an interest in working with us on that?

So you get a lot of what I will call pre-conversation conversations right before a product goes generic with everyone about, you know, can I lock you up as a customer before I even do my registration? Because everybody has gotten very wise in the generic industry in the United States. Everybody has gotten very wise to this, which is, be careful what you actually move forward with in a generic me-too registration, because if you don't get the market share you think you are getting, you can find yourself very quickly spending 3, 5, $11 million and getting a big goose egg for it.

And typically the people that make the business

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 42 of 168

# Exhibit 289

## Filed Under Seal

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 43 of 168

# Exhibit 290

| | |
|---|---|
| **From:** | LINDSEY, MARK A |
| **To:** | HEMMAN, MICHAEL T; Bracy, Patrick; HAY, JAMES R. |
| **Sent:** | 9/1/2017 5:23:58 PM |
| **Subject:** | 1 - Really need you to look at this and reply asap |

Patrick, I have made a number of updates since yesterday when I shared with you

████████████████████████████████████████████████████████████████
██████████████████.. There is no doubt that they have made some sort of commitment to Rotam.....certainly still planning "majority" support for DowDuPont but we have to get this dance started now to start drawing out information and preparing for negotiations. The fact is, this message really needs to be sent to all accounts……….████████████████████████████████████████

████████████████████████████████████████████████████████████
██████████

████████████████████████████████████████████████████████████.

The messages I am delivering here is

1. We will come at this as a merged company – They are familiar with Dow model
2. We are the brand and we will act like a brand leader – Market Responsible, but will protect the brand – Vast majority of share – It sure as hell won't be ████for Vydate
3. We will not be competitive, product to product, on net price. We must maintain a premium to maintain value, but we are better for you given all offerings in play
4. You see the markets that are core to us……plan to sell less generic here and focus on secondary markets with the higher %
5. You are a market leader – We are the market leader – Let's talk and make something uniquely ██████

*Mark A. Lindsey*
DuPont Crop Protection
North America Key Account Team Leader
8295 Tournament Dr. Suite 300
Memphis, Tn. 38125
Email: mark.a.lindsey@dupont.com

████████████



**From:** LINDSEY, MARK A
**Sent:** Wednesday, August 30, 2017 3:59 PM
**To:** Bracy, Patrick <Patrick.Bracy-1@dupont.com>
**Subject:** I will explain when we talk

# Mark:

Confidential Treatment Requested by Corteva

As a merged Dow DuPont organization, I am now able to provide (with completeness) the following information. First, two important asides:



- While the following information pertains to Vydate and Lannate brands, much will also be intended for our Matrix brand

When I met with you in June, you said you would like to see a **concept** from me regarding our Vydate brand plans for 2018, but that we should have final plans ready for implementation before October board meeting. I offer the following points for your consideration, conceptually. Obviously, loyalty % and Premium % are figures that we still need to align upon, but I have offered principles for your understanding.

1. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Confidential Treatment Requested by Corteva

[Text redacted]

Mark A. Lindsey
DuPont Crop Protection
North America Key Account Team Leader
8295 Tournament Dr. Suite 300
Memphis, Tn. 38125
Email: mark.a.lindsey@dupont.com





Confidential Treatment Requested by Corteva

FTC-CTVA_00251374
CX1602-003

# Exhibit 291

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., <br><br> Defendants. | Case No. 1:22-cv-00828-TDS-JEP |

### REPLY REPORT OF LOREN K. SMITH, PH.D.
### OCTOBER 31, 2025

### HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL EYES ONLY

TABLE OF CONTENTS

**I.    Introduction**......................................................................................................1

    A.  Assignment ...............................................................................................1

    B.  Summary of Opinions..............................................................................2

**II.   Methods and Findings Endorsed by Defense Experts**...........................................8

    A.  Defense Experts' Criticisms Are Not About Methodology and Instead Focus on Differences in Our Opinions About Inputs ...............................................................9

    B.  Defense Experts Accept My Estimate of Pass-Through ......................................9

    C.  Mr. Orszag Endorses Paraquat and Abamectin as Yardsticks .......................................12

**III.  My Yardsticks Are Logical and Reasonable** ........................................................12

    A.  Defense Experts Misunderstand or Misrepresent My Yardstick Analysis......................13

        1.  My Yardstick Inputs Need Not Match the Characteristics of the Six AIs to Inform the Impact of the Challenged Loyalty Payments..........................................13

        2.  Variability Across My Yardstick Inputs Does Not Undermine My Approach........16

        3.  Mr. Orszag's Claims About My Inferences on Mesotrione Are Misinformed and Unsupported ......................................................................................17

        4.  Prospective Analyses Are Fundamental to the Economic Assessment of Competition Cases...........................................................................19

        5.  My Consideration of Purported Consumer Benefits of the Challenged Loyalty Programs Is Appropriate ...........................................................19

    B.  It Is Reasonable to Use Yardsticks Based on One Party's Challenged Loyalty Program to Estimate Disgorgement and Damages Related to the Other Party's Products............22

    C.  The Estimates Used in My Yardstick Analysis Are Reliable........................................23

        1.  Testimony on How the Removal of the Loyalty Program Impacted Oxyfluorfen Pricing Is Informative for My Yardstick Analysis...................................23

        2.  Internal Assessments of How Removing Paraquat and Abamectin from Syngenta's Key AI Program Would Impact Prices Are Reliable for My Yardstick Analysis ...26

        3.  Ordinary Course Documents Assessing the Value of Syngenta's Post-Patent Strategy Are Informative for My Yardstick Analysis..............................28

    D.  I Consider My Yardstick Evidence on Disgorgement and Damages in the Context of a Broader Record that Strongly Indicates Such Impacts..................................34

        1.  The Defendants' Documents and Testimony Laud the Price and Profit Impact of the Challenged Loyalty Programs ....................................................34

        2.  Defense Experts Acknowledge a Profit Impact of the Challenged Loyalty Programs .......................................................................................35

**IV. Defense Experts' Empirical Findings Are Unreliable** .......................................................**36**

    A.  The Drawbacks to Empirical Studies Focused on Data Only From the Event Being Studied Are Well Understood to Economists ..................................................................37

    B.  Defendants' Empirical Analyses Do Not Properly Account for Confounding Factors ..39

    C.  Apart From Overlooking Confounding Factors, Defense Experts' Empirical Analyses Are Misleading for Other Reasons ....................................................................................46

        1.  The Price of Syngenta's Paraquat and Abamectin Products Decreased After the Loyalty Programs Were Removed ...........................................................................47

        2.  Corteva's and Syngenta's Share of Sales Relative to Generics Decreased After Oxyfluorfen, Paraquat, and Abamectin Were Removed From Loyalty Programs ..50

**Appendix A : Materials Relied Upon** .............................................................................................**58**

## I. INTRODUCTION

### A. ASSIGNMENT

1. I submitted an initial report on August 22, 2025 providing my estimates of the ill-gotten gains made by Defendants Syngenta and Corteva due to the loyalty programs, that are alleged to be anticompetitive by Plaintiffs in this matter.[1] I also estimated the extent of compensatory damages due to growers and other end-use consumers who may have overpaid, specifically for the states of Illinois and Nebraska.

2. I have been asked by counsel for the Plaintiff States to assess and respond to the critiques offered by Defense experts regarding my initial report. This Reply Report provides a response to these critiques. In particular, I will respond to Defense expert opinions on disgorgement and damages, including:

   - Syngenta expert Jonathan Orszag asserts in his report that my disgorgement and damages analyses are "overstated and unreliable," focusing his critique on the six yardsticks I use. Mr. Orszag applies proposed "corrections" to my analysis and concludes from his revised analysis that my use of yardsticks results in no disgorgement or damages.[2]

   - Corteva expert Professor Walter N. Thurman also focuses his critique on my use of yardsticks. First, he asserts they are not comparable to the three Corteva active ingredients identified in the complaint in ways "important to the functional and economic application of crop protection products."[3] He states my failure to consider these differences makes my yardsticks "not useful."[4] Second, he points to my reliance on documentary evidence from the

---

[1] I am retained by the Plaintiff States in this action, who are California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin.

[2] Expert Rebuttal Report of Jonathan Orszag, October 3, 2025 ("Orszag Rebuttal Report").

[3] Rebuttal Expert Report of Walter N. Thurman, October 3, 2025 ("Thurman Rebuttal Report"), ¶ 10.

[4] *Id.*

1

case record, rather than on *ex post* data prices and sales, as "vague and subject to interpretation,"[5] further stating this provides an "unreliable basis" for estimating disgorgement and damages.[6] Professor Thurman then makes proposed adjustments to these yardstick inputs and, like Mr. Orszag, he concludes my assessment of disgorgement and damages are "reduced to zero."[7] Additionally, he asserts that my analysis fails to account for important features of the crop protection industry and provides his interpretations of my estimate of the pass-through rate of increases in manufacturer prices to farmgate prices.

- Lastly, a third expert, Professor Edward A. Snyder, offers an interpretation of my pass-through rate estimate as being inconsistent with Professor Hemphill's opinion that any pass-through of the challenged loyalty payments is limited.[8]

3. My work in this matter is ongoing. I reserve the right to supplement my analyses and conclusions should any additional information be provided to me after the submission of this report.

### B. SUMMARY OF OPINIONS

4. Defense Experts, principally Mr. Orszag and Prof. Thurman, raise concerns about inputs to my disgorgement and damages calculations. For the reasons provided in this report, Defense Experts' concerns are not persuasive and do not change any of my opinions on my disgorgement and damages calculations. As stated in my initial report, I estimate that approximately ▮ million of Syngenta's profits and approximately ▮ of Corteva's profits should be disgorged.[9] I also estimate damages to end-use growers in Nebraska to be approximately ▮ and approximately ▮ for end-use growers in Illinois for crop protection products containing the Six AIs.[10] Defense Experts criticisms of my calculations are deeply flawed for the reasons stated below.

---

5   *Id.,* ¶ 11-12.
6   *Id.*
7   *Id.*
8   Expert Rebuttal Report of Edward A. Synder, October 3, 2025 ("Snyder Rebuttal Report").
9   Expert Report of Loren K. Smith, August 22, 2025, ¶ 14 ("Smith Report").
10  *Id.*

5. Defense Experts largely agree with my methods and economics fundamentals for calculating disgorgement and damages. In particular, three experts—Mr. Orszag, Prof. Thurman, and Prof. Snyder—affirmatively cite my estimate of pass-through of manufacturer price changes to price changes realized by end-use growers. They agree with my assessment of economic pass-through, but they are wrong that my analysis contradicts Prof. Hemphill's opinion. I explained in my initial report, and I explain further in this report, why they are wrong.

6. Mr. Orszag also endorses my use of the removal of the challenged loyalty payments from paraquat and abamectin as inputs for my yardstick analysis. Mr. Orszag believes data surrounding the removal of the challenged loyalty payments from paraquat and abamectin supports a finding of zero damages and disgorgement. As I explain in this report, Mr. Orszag's (and Prof. Thurman's) empirical assessment of paraquat and abamectin has several fundamental flaws that render it unreliable. Removal of paraquat and abamectin from the challenged loyalty programs coincided with important confounding events, for which Defense Experts do not adequately account. By contrast, the internal Syngenta assessment of the removal of loyalty payments from paraquat and abamectin that I rely on isolates the impact of the challenged loyalty payments from confounding factors and thus is more reliable for the assessment of disgorgement and damages than Defense Experts' empirical analyses.

7. Defense Experts' criticisms of my disgorgement and damages analyses focus mostly on their alternative interpretations of the ordinary course of business assessments and testimony I use as inputs for my yardstick analysis. As I explain in more detail below, many of Defense Experts' criticisms amount to claims that the inputs for my yardstick analysis do not closely-enough match the characteristics of the at-issue AIs. These straw-man critiques misunderstand my analysis and the purpose of a yardstick analysis. The goal is not to identify AIs that treat the same crops or that are sold in the same geographies. Rather, the goal is to understand the price and sales impact of the challenged loyalty programs. The yardstick inputs I use for my analysis provide reasonable and reliable estimates of those impacts.

8. Prof. Thurman raises a concern that my yardstick inputs present a wide range of estimated price and sales impacts. That variation is neither surprising nor troubling. Data used to estimate damages and disgorgement often vary in their implied effect. Although larger variance generally

widens the range of statistical confidence around measures of central tendency, such as the median values I use to estimate disgorgement and damages, variance in data does not imply bias. Moreover, I have taken appropriate steps to carefully limit the influence of outliers in my data, which is a common concern when using a small sample of data in estimation. In particular, I use median values, as opposed to mean values, to estimate disgorgement and damages, because medians are generally less impacted by extreme observations in data. And I make additional adjustments to ensure conservative disgorgement and damages estimates. The overall effect of those decisions is to give Defendants the benefit of the range of estimated price and sales impacts.

9. Mr. Orszag raises the concern that, in my use of a mesotrione study as a yardstick input I assume that absent the challenged loyalty payments Syngenta ███████████████████ ███████████████████. The basis for Mr. Orszag's concern is unclear. The study I rely on characterizes ███████████████████ ███████████████████ ███████████████████ Mr. Orszag also claims that my use of Syngenta's mesotrione study contradicts Prof. Hemphill's use of other documents surrounding mesotrione. As I explain further below, the documents I rely on demonstrate the impact of the challenged loyalty payments and cannot directly be compared to the negotiation documents referenced in Prof. Hemphill's initial report.

10. Prof. Thurman claims that I only should use AIs as yardstick inputs after they have been removed from the challenged loyalty payment programs, because only then can the impact of the challenged loyalty programs be reliably assessed. This is a remarkable critique, as prospective analyses are a fundamental part of the assessment of competition matters. Moreover, AIs for which the challenged loyalty payments have been removed may be hampered by what economists call selection bias. That is, AIs that are removed from loyalty payment programs may have been removed because those AIs had reached the end of their market life-cycle, had been supplanted by new or alternative products, or had otherwise reduced in relevance such that the loyalty payments no longer were having their desired impact. Therefore, AIs that have been removed from loyalty payment programs may have measured impacts that are biased toward

zero relative to the impact of the challenged loyalty programs on AIs that remain on the programs.

11. Prof. Thurman also claims that I should have considered purported procompetitive impacts of the challenged loyalty payment programs in my calculation of damages. Prof. Thurman raises two main benefits he says I should have considered: (i) avoidance of free-riding, and (ii) increased investment incentives. I note that Prof. Thurman offers no calculations of these purported benefits. Nonetheless, my consideration of purported benefits[11] of the challenged loyalty programs is appropriate, because:

- *Avoidance of free-riding*: This claimed benefit mainly centers around application services Corteva supplies to growers. I have seen no evidence that such services are linked to the challenged loyalty payments. Indeed, record evidence, including testimony, indicates that such services are an important part of competition among crop protection product manufacturers, including generic manufacturers, many of whom do not have loyalty programs like Corteva's. Moreover, none of the documents I use as inputs into my yardstick analysis mention the avoidance of costs associated with grower services as an offsetting benefit of removing the challenged loyalty payments.

- *Increased investment incentives*: Prof. Thurman has cited no record evidence linking Corteva's investments to the challenged loyalty programs. The economic literature describes as ambiguous the relationship between exclusionary contractual provisions like the challenged loyalty payments and investment. This is because, although such contractual provisions secure higher profits for the investing firm, competition from generic producers also drives innovation and investment.

12. Mr. Orszag and Prof. Thurman claim that it is inappropriate to use yardstick inputs considering the impact of Syngenta's loyalty payment program in assessing the impact of Corteva's loyalty payment program, and vice versa. I disagree. First, although both experts claim that the loyalty

---

[11]   I understand Prof. Hemphill provides a detailed assessment of Defense Experts' procompetitive benefit claims in his Rebuttal Report. *See* Rebuttal Report of C. Scott Hemphill, October 3, 2025.

payment programs differ too much to be compared, neither expert claims that the programs differentially affect the metrics that are key to my analysis—pricing and sales. Second, I understand that the allegation is that both programs similarly harm competition and raise prices to end-use growers. For purposes of my analysis, I assume the Plaintiffs' allegations are true, and thus it is appropriate for me to consider the impact of the challenged loyalty payment programs to have similar impacts.

13. The complaints of Defense Experts do not undermine my yardstick inputs, which are reliable. In particular,

- *Testimony on the impact of oxyfluorfen's removal from Corteva's loyalty payment program is reliable*. Several confounding factors happened when or shortly after Corteva removed oxyfluorfen from its loyalty payments program that make a post-hoc empirical study of its removal challenging. Defense Experts make no effort to control for those facts. However, Mr. Vance's testimony was precisely about the impact of the removal of oxyfluorfen from Corteva's loyalty program, and thus the testimony is not subject to the same concerns. Nor does Mr. Vance's recognition that oxyfluorfen is an extreme example because it applies to specialty crops undermine my analysis in any way. His testimony remains a useful datapoint for my analysis because (i) like oxyfluorfen, several of the at-issue AIs are applied to specialty crops, and (ii) my analysis relies on a median of a distribution of impacts, and medians are understood to limit the impact of outlier observations (to the extent that oxyfluorfen is an outlier observation; I note that the oxyfluorfen yardstick is similar in magnitude to azoxystrobin and lambda cyhalothrin).

- *Internal assessments of the impact of the removal of loyalty payments on the prices and sales of paraquat and abamectin are reliable.* Mr. Orszag endorses paraquat and abamectin as yardstick inputs. The only question is whether the internal studies I use are more reliable than observations on data following their removal from loyalty payments programs. Mr. Orszag claims that "[i]t should go without saying that real world outcomes are more reliable than predictions." But that is not what Mr. Orszag measures. He measures a change in price trends not accounting for other factors and events that may have contemporaneously impacted paraquat and abamectin prices and sales. As I explain below, Syngenta's internal studies

6

isolate the impact of the challenged loyalty payment programs in a way that Mr. Orszag's study of data does not, and thus these internal studies are reliable.

- *Ordinary course of business studies of the impact of the challenged loyalty payments are reliable*. Defense Experts object to my use of studies for lambda cyhalothrin, azoxystrobin, and mesotrione that Syngenta has been using to make business decisions as inputs for my yardstick analysis. I explain why each of these studies is useful below, but at a high level, in my opinion, internal assessments of the price and sales impacts of the challenged loyalty programs are useful for the study of disgorgement and damages because those internal assessments are based on industry knowledge and experience, and are used to make meaningful business decisions.

14. My yardstick analysis is supported by the basic economic logic that Defendants would not construct and fiercely defend the challenged loyalty programs unless they significantly impacted their profits, and the analysis also is supported by a broad record of evidence on the price, sales, and profit impacts of the challenged loyalty payments.

- In addition to the documents and testimony I use for my yardstick analysis, there are many ordinary course documents lauding the ability of the challenged loyalty payments to maintain higher prices and profits than would occur in their absence.

- Defense Experts also acknowledge that the challenged loyalty payments have allowed Syngenta and Corteva to maintain higher prices and profits than would have occurred in their absence.

- Data are consistent with the challenged loyalty payments allowing the Defendants to maintain higher prices than they would have been able to maintain in their absence.

15. The Defense Experts' retrospective empirical assessments of paraquat, abamectin, and oxyfluorfen are unreliable. It is widely known to economists that retrospective studies of an event without the use of an applicable control may be tainted by confounding factors. Each of the AIs studied by the Defendants had profound confounding events that occurred coincidentally with the removal of the challenged loyalty payments. Defense Experts did not appropriately address these confounding events, rendering their empirical assessments unreliable.

7

16. With respect to oxyfluorfen, the Defense Experts' findings are particularly striking because Mr. Vance testified (two times) that prices of branded oxyfluorfen fell significantly (by 50%) following the removal of Corteva's loyalty payments. So, a finding of no price impact in the face of that testimony should raise questions in their minds about their assessment of the data—but apparently not. My review of the record finds evidence of downward price effects as well as a significant shift in sales from branded oxyfluorfen to generic oxyfluorfen following the removal of branded oxyfluorfen from Corteva's loyalty program.

## II.     METHODS AND FINDINGS ENDORSED BY DEFENSE EXPERTS

17. Defendants Syngenta and Corteva submitted reports from three experts who respond to aspects of my initial report's assessment of disgorgement and damages. Despite their disagreements with my conclusions, Defense Experts accept or endorse several of my methodologies and assumptions. This section describes these points of apparent agreement. In particular:

- Defense Experts generally do not raise concerns about the yardstick approach or the economic logic and techniques I use to calculate disgorgement and damages. Instead, their critiques focus on their evaluation of the documents and testimony that are inputs into my calculations—their opinions on the reliability and applicability of those inputs are incorrect.

- Three of the Defense Experts affirmatively cite my estimate of pass-through of wholesale price changes to prices charged to end-use growers. They incorrectly interpret my pass-through estimates as supporting a point they want to make in rebuttal to Prof. Hemphill—i.e., they opine that my estimates contradict Prof. Hemphill's opinion that the challenged loyalty payments are retained in significant part rather than being fully passed through to end-use growers. Defense Experts have misinterpreted my pass-through estimate, which is consistent with Prof. Hemphill's analysis.

- Mr. Orszag affirms that my choice of paraquat and abamectin as yardsticks is appropriate. Mr. Orszag's affirmation of my choice of these AIs is selective and self-serving, because he believes empirical evidence following the removal of the challenged loyalty payments from paraquat and abamectin shows the loyalty payments had no impact on Syngenta's sales or

prices.[12] I explain below why as a matter of both basic economic logic and econometrics Mr. Orszag's opinion is incorrect.

### A. DEFENSE EXPERTS' CRITICISMS ARE NOT ABOUT METHODOLOGY AND INSTEAD FOCUS ON DIFFERENCES IN OUR OPINIONS ABOUT INPUTS

18. My initial report provides a detailed discussion of my assumptions and methodology for calculating damages and disgorgement based on a collection of yardsticks for assessing a but-for world where Syngenta's and Corteva's loyalty programs did not exist. Defense Experts do not criticize the methods I use to calculate disgorgement and damages. Rather, they critique the quality of information I use as inputs into my yardstick analysis. That is, their criticisms are about the reliability of the information I use, not my methods. Indeed, Defense Experts adopt my methods for calculating damages and disgorgement based on their own opinions on my yardstick analysis inputs.[13]

### B. DEFENSE EXPERTS ACCEPT MY ESTIMATE OF PASS-THROUGH

19. As part of the calculation of damages and disgorgement in my initial report, I estimated the pass-through of changes in wholesale pesticide prices (i.e., manufacturer prices) to pesticide prices paid by end-use growers (i.e., farmgate prices).[14] Three Defense Experts endorse my estimated pass-through rate.[15]

---

[12] Prof. Thurman also opines that data indicate that the challenged loyalty programs had no impact on Syngenta's sales or pricing. For example, he states in relation to his Figure 13: "Because no decline in these manufacturer net sales, manufacturer net prices, and farmgate prices is observed in the available data following the removal of a loyalty program for any of these three active ingredients—in fact, increases were observed—I set these values to a zero percent reduction." Thurman Rebuttal Report, ¶ 61.

[13] *See*, e.g., Orszag Report, § VIII.C; Thurman Report, § IV.C.

[14] Smith Report, ¶¶ 38-40.

[15] *See*, e.g., Snyder Rebuttal Report, ¶ 152; Orszag Rebuttal Report, ¶ 150; Thurman Rebuttal Report, ¶ 14.

20. I note, however, that Professors Snyder and Thurman misinterpret my estimated pass-through rate as implying significant pass-through of the challenged loyalty payments.[16] As I explained in my initial report, my pass-through rate estimate measures the extent to which changes in manufacturer prices lead to changes in farmgate prices. The price changes estimated in this regression may occur for a variety of reasons beyond the challenged loyalty payments. Hence, despite Professors Snyder's and Thurman's claims to the contrary, my pass-through estimates do not provide any information specifically about the pass-through of the challenged loyalty payments. By contrast, Mr. Orszag acknowledges that I do not "estimate pass-through rates for loyalty payments specifically."[17] He does, however, assert that my pass-through estimate "suggests either the pass-through rate for the share-based discounts is high or the share-based discounts are relatively modest in size . . . ."[18] Mr. Orszag neither explains his logic for this claim, nor does he support it. In any event, his economic logic is flawed, as it is the variation in loyalty payments relative to other price variation, not the relative size of the loyalty payments themselves, that affects the extent to which they impact pass-through. The overall pass-through rate of manufacturer price changes may be significant even if there is no pass-through of loyalty payments specifically. Thus, my estimated pass-through rate does not contradict Prof. Hemphill's opinion that the challenged loyalty payments are retained in significant part rather than being fully passed through to end-use growers.

21. Economic literature on loyalty payments demonstrates that a manufacturer's use of loyalty payments does not necessarily equate to a reduction in the manufacturer's price. Rather, loyalty payments can be used as a tool to allow the manufacturer to maintain supracompetitive prices, as is alleged in this case.[19] A higher initial price enabled by the loyalty program would increase the

---

[16]  Snyder Rebuttal Report, ¶ 152; Thurman Rebuttal Report, ¶ 14.

[17]  Orszag Rebuttal Report, ¶ 150.

[18]  Orszag Rebuttal Report, n. 109.

[19]  *See* Patrick DeGraba and John Simpson, "Loyalty discounts and theories of harm in the Intel investigation," *Journal of Antitrust Enforcement*, Vol. 2, No. 1 (2013), pp. 170-202 at p. 171. The authors explain that lump-sum loyalty payments specifically facilitate supra-competitive pricing for end-consumers. If the payments were implemented as a simple reduction of per unit input prices, the intermediate buyer may end up passing some of the reduced cost on to

net manufacturer price, offsetting any reduction in net manufacturer price from the payment itself. In my initial report, I estimated the pass-through rate using net manufacturer prices, where payments had been subtracted from the initial pre-payment price. In my damages and disgorgement analyses, I applied the pass-through rate to project the extent to which the overall impact of the loyalty programs on manufacturer prices would be passed on to end-use growers. I did not measure or opine on the extent to which the loyalty payments specifically are passed-through.

22. To demonstrate this point, consider the following simple example. Assume a manufacturer decreased its gross (pre-payment) price by $8 per unit on widgitphosate and introduced a loyalty program under which it issued a $2 per unit loyalty payment to distributors. The overall impact might be viewed as a decrease in the net manufacturer price $10 per unit. Further, suppose that there was a coinciding reduction in how much a farmer pays for widgitphosate of $8.60, consistent with an 86 percent pass-through rate. This outcome does not necessarily imply that the loyalty payment itself is passed through at the same 86 percent rate. In a scenario where the $8 gross price decrease and the $2 loyalty payment are both passed on at identical rates of 86 percent, the gross price increase induces a $6.88 decrease in the farmgate price while the loyalty payment lowers the price the farmer pays by $1.72, yielding a $8.60 overall price decrease and 86 percent overall pass-through rate. However, the same 86 percent overall pass-through rate could occur in a scenario where the payment is passed through at a significantly lower rate. For example, if the distributor passed through 100 percent of the $8 pre-payment price decrease but only 30 percent of the $2 loyalty payment, it still would result in an $8.60 decrease in prices.[20]

---

consumers through competitive mechanisms. The lump-sum payment is less likely to be passed on to end consumers. The authors further note that "discounts based on a seller's share of a buyers' purchases" effectively act as lump-sum payments if they are paid retroactively. *Ibid.,* at pp. 173-175. *See also*, John Asker & Heski Bar-Isaac, Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals, Vol. 104, No. 2 *Am. Econ. Rev.* 672 (2014).

[20] This example demonstrates the flaw in Mr. Orszag's logic that my pass-through estimate implies that the pass-through of loyalty payments is significant or that the loyalty payments themselves are small. As can be seen in the example, it is the relative size of the changes in the pre-payment price and the loyalty payment, not the size of the loyalty payment itself, that matters.

Both scenarios are consistent with an 86 percent overall pass-through rate of the $10 decrease in the net manufacturer price. The analyses in my initial report are agnostic to the pass-through rate of the loyalty payments and consider only the pass-through to the farmer of the manufacturer price changes, and thus, contrary to Prof. Thurman's and Prof. Snyder's opinions, my opinion does not contradict Prof. Hemphill's opinion that the challenged loyalty payments are unlikely to significantly be passed through to the benefit of end-use growers.

### C.  MR. ORSZAG ENDORSES PARAQUAT AND ABAMECTIN AS YARDSTICKS

23.  Mr. Orszag selectively endorses my use of paraquat and abamectin as yardsticks. In particular, Mr. Orszag states "Dr. Smith and I agree that Abamectin and Paraquat are appropriate yardsticks when assessing the price and manufacturer net sales effect of Syngenta's Key AI program."[21]

24.  I applied the same economic logic when selecting paraquat and abamectin to be inputs into my yardstick analysis as I did for oxyfluorfen, lambda cyhalothrin, mesotrione, and azoxystrobin— i.e., that reliable documents provided quantifications of price or sales impacts from removal of the challenged loyalty payments. Nonetheless, Mr. Orszag objects to my use of all of my yardstick inputs other than paraquat and abamectin. Those objections cannot be based on my economic logic or methodology, because I applied the same logic and methodology to selecting them as I did to paraquat and abamectin.

### III.  MY YARDSTICKS ARE LOGICAL AND REASONABLE

25.  Defense Experts' principal disagreement with my damages and disgorgement calculations is that they do not agree the yardsticks provide a reasonable approximation of the relevant but-for world. In this section, I demonstrate that, despite criticisms from Mr. Orszag and Professor Thurman, my yardsticks are reasonable and reliable in their approximation of the relevant but-for world.

---

[21]  Orszag Rebuttal Report, ¶ 285.

## A.  DEFENSE EXPERTS MISUNDERSTAND OR MISREPRESENT MY YARDSTICK ANALYSIS

26. Prof. Thurman states that I do not "explicitly" define the but-for world that is relevant to my damages and disgorgement calculation. Although I did indeed define the relevant but-for world in my initial report,[22] for avoidance of doubt I restate the relevant but-for world here as **a world where the challenged loyalty programs do not exist**.

### 1.  My Yardstick Inputs Need Not Match the Characteristics of the Six AIs to Inform the Impact of the Challenged Loyalty Payments

27. Mr. Orszag and Prof. Thurman claim that, when considered in isolation, each yardstick input to my analysis does not match the characteristics of the six AIs. This exercise misunderstands my analysis. The aim of my yardstick analysis was not to identify AIs that are applied to the same crops in the same geographies as the six AIs. Rather given that we do not observe the but-for world in which the six AIs were never included in Defendants' loyalty programs, the point of collecting multiple yardsticks that reasonably approximate the impact of the programs is to provide a range of estimated impacts of the challenged loyalty payments from which I can estimate the impact of the removal of those schemes from the six AIs. It is a feature of this analysis that each yardstick is different, not a reason for concern.

28. Prof. Thurman, and to a lesser extent Mr. Orszag, suggest that there are a multitude of factors for AIs that may affect the extent to which the challenged loyalty programs affect Syngenta's and Corteva's prices and profitability. In particular, Prof. Thurman opines that I should have considered the following factors in my analysis and, presumably, used only yardsticks that aligned with the subject AIs on each of these factors.

- Product (i.e., insecticide, herbicide, etc.): Defense Experts have not analyzed nor claimed that, for example, the at-issue loyalty programs have different profit and price impacts on

---

[22] *See*, e.g., Smith Report, ¶ 28 ("Accordingly, I estimate the difference in the profits Syngenta and Corteva earned and the profits they would have earned in a but-for world where their loyalty programs were removed.")

13

herbicides than they do insecticides. And I have seen no economic evidence demonstrating such a difference.

- Crop: Defense experts have not analyzed nor measured the extent to which the crops treated by the six AIs are systematically different than the collection of crops treated by the AIs represented in my yardsticks—in fact, both the six AIs and my yardstick AIs are, collectively, applied to a wide range of crops. Even if Defense experts had analyzed this comparison, they would further need to establish that the identified differences (if any) impact the effectiveness of a loyalty program and that this impact necessitates an adjustment to my yardsticks. Defense experts have provided no such analyses. Hence, they offer no convincing reason to adjust my damages and disgorgement estimates to account for differences in the distribution of crops collectively covered by my yardstick inputs and the six AIs.

- Geography: Defense Experts have not analyzed nor claimed that, for example, the at-issue loyalty programs have different profit and price impacts on crop protection products used in North Carolina than they do on crop protection products used in Indiana. Moreover, both my yardsticks and the six AIs are applied in a wide range of geographies. Hence, Defense Experts offer no convincing reason to adjust my damages and disgorgement estimates to account for differences in the geographies covered by my yardstick inputs and the six AIs.

- Economic importance to the basic manufacturer: Defense Experts have not analyzed nor claimed that, for example, the at-issue loyalty programs have different profit and price impacts on crop protection products that are relatively more important to the basic manufacturer's bottom line. And I have seen no economic evidence demonstrating such a difference. Nor have they attempted to quantify any effect such purported importance would have on price and volume.

- Number of suppliers and products for each active ingredient: Defense experts have not analyzed the extent to which the number of products or suppliers affect the impact of the at-issue loyalty programs. And, if the at-issue loyalty programs preserve monopoly power as alleged, it is not clear that the number of products or suppliers would affect the impact of the programs on prices and profits. Put another way, the count of suppliers may not mean much

in terms of differential potential impact of the challenged loyalty programs if the programs are significantly limiting any potential entrant's pathways to market, as has been alleged in this case.

- Product life cycle: Defense experts have not analyzed the degree to which time since patent and FIRFA exclusivity expiration affects the impact of the at-issue loyalty programs. One hypothesis might be that the impact of the at-issue loyalty programs dissipates over time following the loss of exclusivity, which would make the use of older products among my yardsticks conservative in favor of Syngenta and Corteva. There is no reason to believe product life cycle has a material effect on my analysis or that it would require anything other than an upward adjustment to my disgorgement and damages calculations.

29. Defense Experts have not tested whether any of the above factors actually affect my disgorgement and damages estimates. In some cases, where economists have sufficient information, they can control for various factors that potentially would impact a variable of interest. I have done that in my own work.[23] However, in some cases, such as here, the available information is less plentiful but more specific. The prudent path in such circumstances is to evaluate the available information fully but conservatively, and in concert with other record evidence, as I have done.

30. Importantly, neither Prof. Thurman nor Mr. Orszag identify any differences between my yardsticks and the six AIs that would be expected to create a directional bias in my disgorgement and damages estimates. I see no reason why the constraints to explicitly control for differences in the factors Prof. Thurman and Mr. Orszag opine that I should have considered would cause biases in my disgorgement and damages estimates. The fact that Defense Experts do not claim that my lack of consideration of certain AI characteristics has caused bias in my disgorgement

---

[23] *See*, e.g., "Do Retail Mergers Affect Competition? Evidence from Grocery Retailing," (with Dan Hosken and Luke M. Olsen), *Journal of Economics and Management Strategy*, Vol. 27, Iss. 1, pp. 3-22, Spring 2018. *See also*, e.g., "Can Entry or Exit Event Studies Inform Horizontal Merger Analysis? Evidence from Grocery Retailing," (with Dan Hosken and Luke M. Olsen), *Economic Inquiry*, Vol. 54, Iss. 1, pp. 342-360, January 2016.

15

and damages calculations lends credence to my opinion that my disgorgement and damages calculations are in many ways conservative in favor of Syngenta and Corteva.

31. Defense Experts reject their own criticisms in their empirical studies of abamectin and paraquat. Although Prof. Thurman goes through a detailed discussion of how my assessment should control for various product differences, in his assessment of paraquat and abamectin, he controls for none of them.[24] And paraquat and abamectin significantly differ on many of these dimensions, for example:

- Product: paraquat is a herbicide and abamectin is an insecticide;

- Crop: paraquat is applied to corn and abamectin is applied to specialty crops;

- Geography: paraquat is geographically diffuse and abamectin is applied in California and Florida;

- Economic importance: paraquat has more than double the net revenue of abamectin during the relevant time period;

- Product life cycle: paraquat is a much older product and has been off patent protection for much longer than abamectin.

Nonetheless, Prof. Thurman sets his objections aside when studying the impact of the removal of these Syngenta's products from the at-issue loyalty program and inferring that the loyalty programs had no impact on prices and net revenues. And Mr. Orszag also does not control for these differences in his empirical study of the removal of paraquat and abamectin from Syngenta's Key AI program.

## 2. Variability Across My Yardstick Inputs Does Not Undermine My Approach

32. Prof. Thurman highlights variability of impacts implied by my yardstick inputs as a drawback of my analysis. No so. Considering several yardsticks with a range of values increases my confidence that the impacts of the Defendants' challenged loyalty programs fall within that

---

[24] Thurman Rebuttal Report, Figures 3-6.

range. And, I have taken prudent steps to make the best use of the available data. For example, I use the median value among my yardstick inputs to estimate the impact of the challenged loyalty payments because median is less influenced by outliers than other measures of central tendency.[25] My use of medians instead of means is conservative in favor of Syngenta and Corteva; if I had used the mean value of my distribution of yardstick inputs, my disgorgement estimate would have been higher and my estimates for damages would have been materially unchanged.[26]

### 3. Mr. Orszag's Claims About My Inferences on Mesotrione Are Misinformed and Unsupported

33. Mr. Orszag claims that although the challenged loyalty payments ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████[27] Mr. Orszag's objections to my inferences on mesotrione are misinformed and unsupported.[28]

34. First, it is unclear what Mr. Orszag is basing his claim. I assume that but-for the challenged loyalty payments, the price of mesotrione would have fallen to the level of generic suppliers. ███████████████████████████████████

---

[25] *See*, generally, *e.g.,* Jeffrey Wooldridge, *Introductory Econometrics, A Modern Approach*, 5th Edition (South-Western, Cengage Learning, 2013), pp. 705 and 733.

[26] *See* Smith Report. Comparing Table 12 to Table 27, using the mean yardstick value increases total disgorgement by $\frac{\$1,533M+\$158M}{\$965M+\$100M} - 1 = 59$ percent. Comparing Tables 19 and 20 to Table 28, using the mean yardstick value decreases total damages by $\frac{\$400M+\$45M+\$213M+\$51M}{\$409M+\$46M+\$217M+\$53M} - 1 = 2$ percent.

[27] Orszag Rebuttal Report, ¶ 311.

[28] For example, ████████████████████████████████████ ██████████████████████████ *See*, e.g., CX2865 Syngenta email, June 9, 2017, ██████████████████████ █████████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████

████████ The document does not say that ████████████████████████████████ ████████████████████████████████[29] Moreover, slide 10 of the document clearly identifies as a ████████████████████████████████████████ ████████████████████████████ ████████████████████████████████████ ████████████████████████ Hence, even if Mr. Orszag supported his claimed reasons for a branded price premium—quality, reliability, production capacity, and production experience—which he did not, those factors may be accounted for in the ████████████ ████████████████████████████ even setting aside the influence of the challenged discount programs.

35. Second, Mr. Orszag assumes Syngenta's mesotrione would be ████████████████████ ████████████████████████████████████[31] However, this claim is contradicted by record evidence indicating that some generic AIs have quality that is at least as good as the brand. For example, ████████████████████████████ ████████████████████████.[32] And, again, my analysis allows for premium pricing over Chinese mesotrione.

---

[29] CX2105, slide 6.

[30] CX2105, slide 10. Kevin Gesse prepared this slide in collaboration with Jeff Cecil. Gesse IH Tr. 48:24-49:3. He sent this presentation to Cecil and Charles Flippin, Syngenta's Head of Post Patent Life Cycle Management. Flippin Dep. Tr. 12:30-17:14, See also SYT_REBATELIT_01140305. Mr. Gesse is Syngenta's Head of the Herbicide Product Line. Gesse Dep Transcript 9:12-15. In this role, he is responsible for developing marketing, pricing direction, and strategy for Syngenta's herbicide product line. *Id.* at 13-23. His role also requires the development of five-year marketing strategies for Syngenta. Gesse IH Tr. 31:19-32:7. Within his role at Syngenta he also runs yearly analyses to determine if there is a need for changes to the key AI program. Gesse IH Tr. 33:4-8. Finally, Mr. Gesse's testimony in his investigational hearing confirms the accuracy of my reading of the document. *See* Gesse IH Tr. 57:24-58:21.

[31] Orszag Rebuttal Report, ¶ 308.

[32] ████████████████████████████; *see also* CX4699 (NUTR_LIT_00078068) (Nutrien manager explaining that "at the end of the day when growers see the generics perform as well as the branded and they have no mixing issues the branded product is not worth the premium"); *see also*, FTC-CTVA_00219165 (In 2017 Brian Timmerman, Corteva's Vice

### 4. Prospective Analyses Are Fundamental to the Economic Assessment of Competition Cases

36. Prof. Thurman claims that because some of the AIs were never removed from loyalty programs, they are not appropriate yardsticks.[33] This makes no sense. Prospective analysis is fundamental to the assessment of competition issues because often appropriate retrospective data does not exist. For example, under Prof. Thurman's standard that only events that actually occurred should be studied to inform the likely impacts of a potential constraint on competition, antitrust authorities around the world should rely solely on retrospective analyses of previous mergers to assess mergers prospectively. That is, I hope obviously, not how such things work. In addition, as I discuss in Section **Error! Reference source not found.** below, retrospective analyses of price movement by Prof. Thurman (and Mr. Orszag) do not properly account for the influence of confounding factors.

### 5. My Consideration of Purported Consumer Benefits of the Challenged Loyalty Programs Is Appropriate

37. Prof. Thurman claims that I do not, but I should, account for the value the programs provide to farmers in my assessment of damages. Prof. Thurman's claimed benefits fall into two main categories: (i) services provided by Corteva to growers that would not be provided to the same extent but-for the challenged loyalty programs because generic manufacturers would free ride on those benefits; and (ii) investment in innovations that depend on Corteva's ability to realize profits from those investments that are preserved by the challenged loyalty programs.[34]

38. First, in their respective discussions of the purported benefits of the challenged loyalty payments, both Prof. Thurman and Mr. Orszag implicitly concede that Syngenta secures greater profit by suppressing generic sales, claiming it increases Syngenta's incentive to invest in consumer-

---

President of Crop Protection Acceleration, then a Global Business Leader at Dow DuPont, emailing Ramiro De La Cruz, Head of Crop Protection at Dow Dupont, that Nutrichem, a generic manufacturer, could provide sufficient volumes of quality mesotrione for their Resicore product).

[33] *See*, e.g., Thurman Rebuttal Report, ¶ 11.a.

[34] Thurman Rebuttal Report, ¶ 64.

welfare-enhancing services.[35] It is illogical to then conclude that disgorgement is zero as both Prof. Thurman and Mr. Orszag do. And if the elevated prices that cause those increased profits are illegal as alleged, Defense Experts' claims of zero damages also do not make sense.

39. Second, setting aside my treatment of any such benefits from the challenged loyalty programs is appropriate for at least the following reasons.

40. *Free-riding on services*:

- First, although Prof. Thurman asserts loyalty-payment-program-dependent benefits Corteva provides to consumers, he does not attempt to quantify those asserted benefits, nor does he suggest a method for doing so.

- Second, it is unclear that the services Prof. Thurman claims as benefits depend in any way on the challenged loyalty provisions. Indeed, evidence indicates that Corteva provides services such as application training, regardless of whether the relevant AI is on a challenged loyalty program.[36] Moreover, I understand that these services are not unique to Corteva, and other

---

[35]  See, e.g., Thurman Rebuttal Report, ¶ 64; Orszag Initial Report, ¶ 35.

[36]  *See*, e.g., Wasson (former President, Corteva) Dep. Tr., Vol. I, at 51:21–54:25 (Corteva has provided stewardship services, including "training on how the product is supposed to be used," **for every AI in its portfolio** and would not stop providing such services) [emphasis added].



CX1361-004, FTC-CTVA_00788142

*See, e.g.,* CX1361, FTC-CTVA-00788142

.

20

basic manufacturers provide similar services in the absence of the challenged loyalty payment programs[37] and that generics do as well.[38]

- Finally, none of the documents I rely on for my damages calculations,[39] which contemplate the removal of loyalty programs, mention, let alone quantify the effect of, the discontinuation of any program benefits referenced in the Thurman Rebuttal Report.[40] This indicates the loss of such programs and their associated costs is not an important consideration when evaluating the removal of loyalty payment programs.

41. *Dampened investment incentives*:

- First, although Prof. Thurman asserts Corteva's investment incentives would be dampened in the absence of the challenged loyalty payments, he does not support his assertion with any record evidence. Prof. Thurman also does not attempt to quantify those asserted benefits, nor does he suggest a method for doing so.

- Second, Prof. Thurman theorizes that by restricting competition from generics through the challenged loyalty payment programs, "Corteva can reasonably expect to sell enough product to recover its investments," which, in turn, spurs greater innovation. However, as a matter of

---

[37]    *See*, e.g., Schrick (Strategic Account Lead, Bayer) Dep. Tr., Vol. I, at 191:14–193:17 (agreeing that Bayer provides stewardship at a "very high level . . . to ensure [its crop protection products] are properly . . . applied, either by an applicator or by the grower."); *id.*, Vol. II, at 418:9–17 (Bayer discontinued its retail-level AI-based loyalty program in 2023); 449:9–14 (Bayer does not offer a distributor-level key AI loyalty program).

[38]    *See*, e.g., Deposition of Dean Hendrickson (Vice President of Crop Protection/Seed Marketing and Business Development, CHS), July 31, 2025, pp. 92-93. (Q. Is it important for CHS to sell generic crop protection products? A.Yes. Q. Why? A. Similarly, as these companies are moderately significant, as large typically, then the top six, if you will, but they are doing research and development related to new off patent for generic formulations which are important to us, and same thing, they're going to have a level of success in the marketplace with or without us and we'd rather prefer to be part of it than on the outside looking in.")

[39]    *See* Smith Report, Appendix G.

[40]    *See* Thurman Rebuttal Report, ¶ 64.

economics, competition also can spur innovation.[41] That is, whether the challenged loyalty payments increase or dampen innovation depends on the particular circumstances of the markets where Corteva and Syngenta compete, and Prof. Thurman has done nothing to show the circumstances here support his claim of increased innovation from the challenged loyalty payments.

### B. IT IS REASONABLE TO USE YARDSTICKS BASED ON ONE PARTY'S CHALLENGED LOYALTY PROGRAM TO ESTIMATE DISGORGEMENT AND DAMAGES RELATED TO THE OTHER PARTY'S PRODUCTS

42. Defense Experts note that my assessment does not account for any differences across Corteva's and Syngenta's loyalty programs.[42] My use of yardstick inputs from both parties to estimate the impact of the challenged loyalty programs for the six AIs is appropriate for at least the following reasons.

43. First, although, Prof. Thurman and Mr. Orszag suggest that I should account for differences in the impacts of the Corteva and Syngenta loyalty programs, neither Prof. Thurman nor Mr. Orszag suggest how those impacts likely would differ. That is, neither expert claims that one program is likely to have a larger impact on prices or sales than the other.[43]

---

[41] *See, e.g.*, Richard Gilbert, *Looking for Mr. Schumpeter: Where Are We in the Competition–Innovation Debate?*, Innovation Policy and the Economy, Volume 6, 205–06 (2006) (concluding that there is no clear evidence of a single "optimal degree of competition" to promote innovation, and that "we remain far from a general theory of innovation competition," and instead clarifying that factors like "industry characteristics, technological opportunities, and appropriability" must be taken into account for each given market); Ilya R. Segal & Michael D. Whinston, *Antitrust in Innovative Industries*, American Economic. Review, 1703, (2007) ("We also show that, in some cases, . . . policies that protect entrants necessarily raise the rate of innovation."); Carl Shapiro, *Competition and Innovation: Did Arrow Hit the Bull's Eye?*, The Rate and Direction of Inventive Activity Revisited, 361, 370, 376–382 (Josh Lerner & Scott Stern eds., 2011); Philippe Aghion et al, *Competition and Innovation: an Inverted-U Relationship,* The Quarterly Journal of Economics, 701-728 (2005).

[42] *See*, e.g., Orszag Rebuttal Report, ¶ 280; Thurman Rebuttal Report, ¶ 20.

[43] Mr. Orszag claims that Corteva's loyalty program is in some ways more restrictive than Syngenta's, but he does not suggest specifically that Corteva's loyalty program therefore has a greater impact on prices and profits than Syngenta's. (Orszag Rebuttal Report, ¶ 280.)

44. Second, it is my understanding that although there are small differences in the execution of the programs, e.g., ███████████████████████████████████ highlighted by Mr. Orszag,[44] the core elements of the programs that are alleged to have caused anticompetitive harm are the same—that loyalty payments are made to customers who purchase a high share of an AI from Syngenta or Corteva, which is alleged by Plaintiffs to significantly limit competition from generics.[45] To the degree that this allegation is proven true for both parties, I would expect the economic impact of the programs on competition to be similar.

45. I note that Mr. Orszag also claims that my reliance on a Corteva yardstick input to estimate damages and disgorgement for Syngenta is somehow inconsistent with Prof. Hemphill's opinions, because (according to Mr. Orszag) Prof. Hemphill claims there are material differences between Corteva's and Syngenta's challenged loyalty programs.[46] That critique omits that Prof. Hemphill considers the impact of Syngenta's and Corteva's loyalty payment programs together when opining that the "[e]xclusion of generics has resulted in higher prices and less innovation,"[47] noting that "given defendants' substantial market power within each AI market, basic economic theory and examples of generic penetration as to other AIs support the expectation that unfettered generic competition results in lower prices,"[48] and that "[l]imiting the effectiveness and extent of generic competition is the goal and effect of the defendants' loyalty programs."[49] These opinions are consistent with the competitive impact of Syngenta's and Corteva's loyalty payment programs being similar.

---

[44] Orszag Rebuttal Report, ¶ 280.

[45] Amended Complaint, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG, et al.*, No. 1:22-cv-00828, Dec. 23, 2022 ("Complaint").

[46] Orszag Rebuttal Report, ¶ 280.

[47] Hemphill Initial Report, § 4.9.

[48] Hemphill Initial Report, ¶ 447.

[49] Hemphill Initial Report, ¶ 448.

C.  THE ESTIMATES USED IN MY YARDSTICK ANALYSIS ARE RELIABLE

1.  **Testimony on How the Removal of the Loyalty Program Impacted Oxyfluorfen Pricing Is Informative for My Yardstick Analysis**

46.  Prof. Thurman raises several "key features" of oxyfluorfen's history that he claims "make(s) the oxyfluorfen experience not comparable to Corteva's active ingredients at issue in this case."[50] As with most of Prof. Thurman's objections to my analysis, he makes no claim that the differences in oxyfluorfen's history causes a bias in my results. Rather, he claims oxyfluorfen's "complicated" history "should raise warnings about its comparability with the but-for world experiment of banning loyalty pricing for the three at-issue Corteva active ingredients."[51] Recall that my analysis assumes liability, which implies the at-issue loyalty payments are causing anticompetitive harm.[52] Hence, the salient part of oxyfluorfen's "complicated" history is that at some point it was removed from Corteva's loyalty program. Prof. Thurman has provided no analysis and I have seen no evidence that the other parts of oxyfluorfen's "complicated" history somehow increased (or decreased) the impact of the removal of Corteva's loyalty program. Hence, I see no reason that oxyfluorfen's history should cause me to exclude it as a yardstick input into my analysis of disgorgement and damages.

47.  Mr. Orszag claims that oxyfluorfen is an "inappropriate yardstick" because, in deposition, Mr. Vance referred to it as an "extreme example."[53] Although Mr. Orszag further claims that I did

---

[50]  Thurman Rebuttal Report, ¶ 29.

[51]  Thurman Rebuttal Report, ¶ 30.

[52]  Documentary evidence confirms that Corteva's oxyfluorfen loyalty program restricted generic oxyfluorfen supply. *See, e.g.,* ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████ FTC-CTVA_00136612.

[53]  Orszag Rebuttal Report, ¶ 282.

not "attempt to adjust for the 'extreme' character" of oxyfluorfen, he does not provide any explanation as to what aspect of oxyfluorfen is "extreme" beyond the quote from Mr. Vance's deposition testimony. Mr. Orszag's criticism is incorrect because:

a. First, during his testimony in the investigational hearing, Mr. Vance explained that the decrease in brand price for oxyfluorfen is "a bit of a unique case" because it is primarily sold in the specialty segment.[54] Although he expected that the price drop after removal from loyalty would be less for AIs used on corn and soybeans than specialty crops, Mr. Vance admitted that he did not know by how much or how to estimate it.[55] In fact, Mr. Vance stated that it would be "almost impossible to estimate [the price reduction in corn and soybeans]."[56] However, a 50 percent decrease in branded price with increased generic penetration is not unheard of in the crop protection industry, even for corn and soybean products. For example, in the case of Callisto (a straight mesotrione product that is used for corn), Prof. Hemphill estimates that the brand price fell by ■ percent between 2015 and 2019 following Rotam's entry in 2016.[57]

b. Second, some of the AIs that I study—namely, rimsulfuron and oxamyl—are used for specialty crops, as is oxyfluorfen. Including an AI used for speciality crops among my yardsticks therefore makes sense.

c. Third, as noted above, I use the median impact estimate in my disgorgement and damages, rather than relying solely on oxyfluorfen or using some other methodology that might give it extra weight.

48. In my initial report, I relied upon the deposition testimony of Spencer Vance, an executive at generic pesticide manufacturer Albaugh LLC, to establish a 50% yardstick for the farmgate price

---

[54] Vance IH Tr., at 197:7-8.

[55] Vance IH Tr., at 197:11-15.

[56] Vance IH Tr., at 197:15–18.

[57] Hemphill Initial Report, ¶¶ 172–173. This number is based on the calculation presented in footnote 181.

of oxyfluorfen following its removal from the Corteva loyalty program.[58] Mr. Vance offered that testimony first in his IH deposition and then again as the designated corporate representative at a deposition in this case.[59] Professor Thurman and Mr. Orszag question my reading of Mr. Vance's testimony, claiming that it is unclear whether Mr. Vance was referring to a 50 percent reduction in farmgate prices or manufacturer prices.[60] Mr. Vance's testimony indicates that I am correct that he was referring to grower (i.e., farmgate) prices.[61]

49. Moreover, evidence from the record of oxyfluorfen price declines following removal from Corteva's program is consistent with Mr. Vance's testimony about prices falling. For example,

[62]

50. For the reasons provided above, my oxyfluorfen yardstick input is reliable. Moreover, if the oxyfluorfen yardstick were to be removed from my analysis, it would no longer be appropriate to rely on the median effect of the remaining yardsticks. The strength of median as a measure of

---

[58] Smith Initial Report, ¶ 123. Mr. Vance is the director of customer engagement and a board member for the generic pesticide supplier Albaugh, a supplier of generic oxyfluorfen products. Vance Dep. Tr., at 11:7-10, 15:2-8, 33:14-20. Prior to his current role, Mr. Vance was President of North America for Albaugh from roughly 2014-2023. Vance Dep. Tr., at 11:23-25, 12:21-13:7. As President for North America, Mr. Vance had responsibility for overseeing Albaugh's finances, the development and marketing of crop protection products, pricing, sourcing decisions, and sales strategies. *Id.* at 25:11-16, 26:22-33:13.

[59] Vance IH Tr. June 7, 2021 and Vance Dep. Tr. May 28, 2025.

[60] Thurman Rebuttal Report, ¶¶ 23-24. Orszag Rebuttal Report, FN 551.

[61] *See*, e.g., Vance IH Tr. 196-97 (Q. In terms of, we talked a little bit about how Albaugh's **price to a grower** may change or not based on how it sells and whether there's a loyalty program, and I want to ask a question that's similar but a little different. **How would a price to a grower, how does the price to a grower change** when there is no loyalty program? A. If we use oxyfluorfen as an example, that's the most recent one we have where it was in a Corteva bundle. The brand price came down about 50 percent. Q. Okay. A. If we were selling at $40, they were $80, and the price per gallon came down to $40. Q. And you said that Albaugh's price did about the same? A. Yeah, we just sold a lot more units. Q. And so in terms of the **price growers are paying**, if they were buying the branded product, that price is changing? A. Yes. (emphases added)

[62] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

central tendency is that it often is less likely to be skewed by outliers. However, if oxyfluorfen is removed as a yardstick, the median would ignore the salience of 40 percent of the remaining options that are higher (and lower) than the median when oxyfluorfen is included. That is, when oxyfluorfen is removed, as opposed to mitigating the influence of outliers, the median would ignore the influence of a more substantial part of the distribution of observations. Hence, I would rely on an alternative measure of central tendency that takes fuller account of the distribution of observations, such as the mean.[63]

### 2. Internal Assessments of How Removing Paraquat and Abamectin from Syngenta's Key AI Program Would Impact Prices Are Reliable for My Yardstick Analysis

51. As noted above, Mr. Orszag agrees that paraquat and abamectin are appropriate yardsticks for the price and net sales impacts of the removal of the Defendants' loyalty programs. However, Mr. Orszag favors the use of a retrospective look at data to Syngenta's own assessment of the likely impact of the removal of the Key AI program on these metrics. Mr. Orszag is incorrect in this case for at least three reasons:

- First, as I explain further below, it is well-known to economists that isolating the impact of a single factor on economic outcomes is challenging and especially suspect when studying data that only cover the event of interest.[64] Here, there are numerous confounding factors that make isolating the impact of the removal of the Key AI program on paraquat and abamectin prices and net sales dubious.[65] Defendants' Experts do not account for those factors when reaching their opinions, which supports my opinion.

- Second, by contrast, the parties' ordinary course of business assessments reflect a comparison of expected economic outcomes with and without the challenged loyalty

---

[63] I have calculated alternative disgorgement and damages estimates based on the mean yardstick after the removal of oxyfluorfen. *See* Workpapers. To assist the factfinder, I also calculated disgorgement and damages under the mean yardstick approach in my initial report. *See* Smith Report, Tables 27 and 28.

[64] *See,* generally, Jeffrey Wooldridge, *Econometric Analysis of Cross Section and Panel Data*, 1st Edition (The MIT Press, 2001), Chapter 1, Section 1.1.

[65] See discussion in Section IV.B below.

payments. This approach isolates the impact of these programs in a way that ex-post observations cannot.

- Third, even if it turned out that for whatever reason, in contrast to Syngenta's own understanding, the Key AI program was not preserving higher prices and net sales for paraquat and abamectin, it would not imply that Syngenta's forecasts of impacts do not provide more useful information about likely outcomes for the at-issue AIs. That is, the at-the-time forecasts of what would happen to paraquat and abamectin prices and net sales were based on Syngenta's understanding of the impacts of the Key AI program, which was based on Syngenta's experience implementing the program.[66] If those forecasts turned out to be wrong for paraquat and abamectin, it does not mean the forecasts do not provide useful information on what is likely to happen with respect to the at-issue AIs. Especially since Syngenta's understanding of the likely impact of the removal of the Key AI program for paraquat and abamectin is consistent with other Syngenta documents and internal studies, which Syngenta has been using to make business decisions.

### 3. Ordinary Course Documents Assessing the Value of Syngenta's Post-Patent Strategy Are Informative for My Yardstick Analysis

52. Defense Experts criticize my use of ordinary course of business documents as inputs to my yardstick assessment of disgorgement and damages. In this section, I explain that these documents provide insights into the impact of the at-issue loyalty programs. The business documents are reliable and instructive for my calculations because they provide apt information that Defendants used to support their own business decisions.

---

[66] Syngenta's internal assessments of the impact of removing paraquat and abamectin from Syngenta's Key AI program are contained in an email from Syngenta Global Marketing Head Rob Neill that reports on Mr. Neill's discussion with Syngenta Head of North America Marketing Jeff Cecil. *See* Smith Initial Report ¶ 125 (discussing CX2524-001, SYT_REBATELIT_00156997 (3/10/2017 internal Syngenta email from Neill to Boin)). Mr. Cecil's responsibilities as Head of North America Marketing included oversight of pricing, portfolio development, and related strategies. Cecil Dep. Tr., at 11:15-24, 12:5-13:24.

28

### a. *Lambda Cyhalothrin*

53. As I noted in my initial report, the ordinary course document showing the impact of Syngenta's post-patent strategy on prices for lambda cyhalothrin versus ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████[67] I also showed evidence that Syngenta has presented this specific case study to its distributors.[68]

54. In my initial report, I employ a ██ percent price reduction yardstick for lambda cyhalothrin, based on Syngenta's internal slide deck.[69] When I attempted to extrapolate this yardstick to an implied net sales reduction, the inputs and formulas led to a calculated net sales reduction of ██ percent. I therefore omitted the lambda cyhalothrin yardstick from my disgorgement analysis because ████████████████████████████████████. I noted in my initial report that this decision was conservative in favor of Syngenta and Corteva with respect to total disgorgement.[70] This is because ████████████████████████████████████ ████████, the calculation suggests that the ██ percent farmgate price reduction would likely lead to a very large reduction in sales, and adding a yardstick input reduction in sales greater than the median reduction in sales of 33 percent used in my disgorgement calculation necessarily increases the median reduction in sales and thus disgorgement.

---

[67] Smith Initial Report, ¶ 55, n.50. The case study's co-author is Rex Wichert. As of 2014 (the case study's date) Dr. Wichert was a post-patent strategy manager in Syngenta's product lifecycle management group. Wichert Dep. Tr., at 20:8-20:11. In this role, Dr. Wichert's responsibilities included developing strategies for maximizing the value of Syngenta products and planning for generic competition. *Id*. at 20:12-23:11; Wichert Investigational Hearing Tr., at 16:15-17:1.

[68] *Id.* See, e.g., CX2034, SYT_REBATELIT_00230176, at 045(1/2014 Syngenta presentation to ████████████████████████████████████ ████████████████████████████████████████████████████████ SYT_REBATELIT_00616601, at slides 20–21 notes (11/2014 Syngenta presentation [to ████████]: "Leading through innovation").

[69] *See* Smith Initial Report, ¶ 122.

[70] *See* Smith Initial Report ¶ 50.

### b. *Azoxystrobin*

55. Mr. Orszag claims that Syngenta █████████████████████████████

████████████████████████████████████████████████████████████

███████████████████[71] And, he concludes that "████████████████████

███████████████████████████████████[72] I note, however, that when

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████████

█████████

---

[71]   Orszag Rebuttal Report, ¶ 300.

[72]   *Id.*

[73]   Fisher Dep. March 25, 2025 at 215:22-25, 216:2-9 ███████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████

[74]   *See* Wichert IH Tr. at 63:6:14 ████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████ ); *Id.* at 64:8-65:2 ██████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████ *See* Jeff Cecil First Dep. 252:16-253: ████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████



56. Other evidence confirms that to the extent that challenged loyalty payment schemes prevent generic competition as alleged, the schemes preserve high prices and profits across product portfolios.[75]

57. In addition to his criticism of the azoxystrobin yardstick, Mr. Orszag also argues that azoxystrobin seed treatments should be excluded from my disgorgement calculations.[76] Mr. Orszag makes no attempt to quantify the impact that seed treatments have on my disgorgement estimates.[77] As a robustness check, I identified the set of azoxystrobin seed products and re-ran

---

*See also* Fowler IH Tr. at 92–93, 244 (stating that brand ladder, value-added products, fighting brands, and private labels are "very dependent upon the loyalty aspect of the key active [ingredient]. . . . So to maintain their share across that entire ladder, they've got to have a loyalty program . . . to keep that ladder intact" and that if loyalty programs were to go away "[y]ou would probably see that brand ladder effort go away").

[75] *See* Deposition of Michael Boden (former Syngenta executive), April 8, 2025, 104:2-15 ("Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also*, Barham IH Tr. at 268-69 ("My perspective and what I have heard in just more anecdotal conversations is there's a general fear to break loyalty because the loyalty programs stack a brand ladder on top of each other, generally speaking. You have the base product or the single AI product and there's a mixture on top of that. And then most of the time there's even another mixture that comes in on top of that that's probably a proprietary AI of some type that's mixed with the old AI. So they can't break that loyalty bundle while they still -- their perception is while they still may have access to the top of the innovation in that brand ladder, which is something that a post-patent company can't match. While they still may have access, the perception is they are going to be in an inferior position because they are going to miss out on that AI loyalty payment which is paid across that brand ladder. That's the significant benefit they have by participating in the loyalty programs is the perception of the access to the new technology at the most competitive price.") *See also* CX2432, SYT_REBATELIT_00027207 at Slide 16 (note) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[76] Orszag Rebuttal Report ¶ 316.

[77] *See* Orszag Rebuttal Report ¶¶ 314-316.

my disgorgement analysis excluding those products.[78] The seed treatment products have little bearing on my disgorgement estimates. Excluding these products from the disgorgement calculation reduces Syngenta's disgorgement by less than one percent.[79]

### c.    Mesotrione

58. I use an ordinary course of business document where Syngenta ██████████████████
██████████████████████████████████████.[80] This document indicates Syngenta is able to ██████████████████████████████████████████████
██████████████████████.[81] Mr. Orzsag makes several incorrect claims about this document and my use of it.

- First, he claims that "the Key AI rebate program is never mentioned in the Syngenta document" on which I rely. This is plainly incorrect. As Prof. Thurman notes in his rebuttal report, slides 9 and 10 of this document describes the Key AI program as ██████
██████████████████████████████████.[82]

- Second, he claims the ██████████████████████████████████████
██████████████████ This also is incorrect. The document characterizes the $40/kg price only as "requested." Moreover, slide 10 of the document describes as another ██████
██████████████████████████████████████████
██████████████████████████.[83]

---

[78]    Mr. Orszag did not provide a list of seed treatment products that he believes should be dropped. I identified seed treatment products using fields native to the Syngenta profit and loss data and by reviewing Syngenta's workbooks evaluating distributors' compliance with the azoxystrobin loyalty program.

[79]    Dropping these products reduces Syngenta's disgorgement ██████████████████
██████████████████████ My damages calculations for both defendants and my disgorgement calculation for Corteva are not affected.

[80]    CX2105.

[81]    CX2105 at slide 9 and 10.

[82]    CX2105 at slide 9 and 10.

[83]    CX2105 at slide 6 and 10. *See also* Fn. 29, *supra*.

32

- Third, he claims the contemplated mesotrione price impacts are not applicable to other Syngenta AIs because ███████████████████████████████████████████ ███████████████████████████████████████████████████████████[84] Mr. Orszag provides no assessment or opinion on the direction of any bias created by this difference.

59. Despite Mr. Orszag's claims to the contrary, the mesotrione document ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████. In particular, slide 10 of the document notes that ████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████[85]

60. Mr. Orszag also claims that Prof. Hemphill's analysis indicates that the price impact of the Key AI program is significantly smaller than the estimate that I use in my analysis, which is ███ percent.[86] Specifically, Mr. Orszag attempts to apportion a share of the price impact to ████████ ███████████████████████████████. He selectively takes a number referenced by Prof. Hemphill as the price of technical mesotrione ███████████████████████████ ████████████████████████████ ████████—and combines it with numbers from my report—which are based on Syngenta's internal analysis in October 2017.[88] Mr. Orszag calculates the contribution of the loyalty program as the difference between ████████ ████████████████████████████████████████████████████████████████ ███████ divided by the difference between ██████████████ (both from Syngenta's October

---

[84] Orszag Rebuttal Report ¶ 310.

[85] CX2105 at slide 10.

[86] Orszag Rebuttal Rep., ¶ 312.

[87] *See* Hemphill Initial Report, ¶ 406; CX2459-001. Prof. Hemphill also notes that Syngenta ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. *See* Hemphill Initial Rep., ¶ 405.

[88] *See* CX2105.

33

analysis); this calculation yields a share of ▮ percent that Mr. Orszag purports to be attributable to the loyalty program, and ▮ percent of the ▮-percent price impact is ▮ percent.[89]

61. Mr. Orszag's application of numbers from one document to an analysis in another document is not reliable. The numbers in the two documents referenced by Mr. Orszag are not directly comparable. One set of numbers comes from Syngenta's internal analyses in October 2017, while the other set comes from external facing negotiations in December 2017.[90] As one example of a potentially material difference in the assumptions contemplated in the two documents, the negotiations in December 2017 contemplated a delay ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.[91] The same delay is not evident in the October 2017 analysis.[92]

62. I rely on Syngenta's internal analysis in October 2017 rather than its December 2017 ▮▮▮ ▮▮▮ for multiple reasons. First, Syngenta's October analysis assesses effects on both technical mesotrione sales and farmgate prices while the December offer only reports technical prices as part of the supply negotiations. In other words, I rely on Syngenta's contemporaneous analysis linking the changes in technical prices to changes in farmgate prices. If I relied instead on the December offer, I would need to make additional assumptions about the pass-through of changes in technical prices (which differ from wholesale prices) to farmgate prices. I don't need to make those assumptions when I rely on the October 2017 analysis. Second, as discussed above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[93] According to Syngenta's analysis, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮. To be conservative, rather than comparing ▮▮▮▮▮, I

---

[89] Orszag Rebuttal Report, ¶ 312.

[90] *Compare* CX2105 *with* CX2459.

[91] CX2459 at -002.

[92] CX2105.

[93] CX2105 at slide 10.

compared the scenario where Syngenta would charge ███ with the scenario where Syngenta would ███████████████████.

### D. I CONSIDER MY YARDSTICK EVIDENCE ON DISGORGEMENT AND DAMAGES IN THE CONTEXT OF A BROADER RECORD THAT STRONGLY INDICATES SUCH IMPACTS

#### 1. The Defendants' Documents and Testimony Laud the Price and Profit Impact of the Challenged Loyalty Programs

63. As discussed above, Syngenta's ordinary course of business presentations document that its challenged loyalty programs elevate prices and increase profits. One prominent example of this is their study comparing pricing of lambda cyhalothrin, which was on Syngenta's loyalty program, ███████, which was not, following patent expiry. This presentation not only was used internally, but I was also presented to Syngenta's distributor and retailer business partners.[94]

64. It is noteworthy that Syngenta's apparent understanding of the impact of the challenged loyalty programs continued through the removal of certain products from the programs, including paraquat and abamectin. That is, Defense Experts' claims that the challenged loyalty programs cause prices and profits to decrease such that damages and disgorgement should be zero is directly contradicted by Syngenta's ongoing promotion of the loyalty programs following paraquat's and abamectin's removal from them.

65. Indeed, a Syngenta document depicts the ███████████████████ ████████████████████████████ ███████████████████████████ █████████████████████████ ██████████████████████████

---

[94] *See, e.g.*, CX2034 at 005-006, SYT_REBATELIT_00230175, (1/2014 Syngenta presentation to ████████████████████ ████████████████████████████ SYT_REBATELIT_00616601, at slides 20, 21 & slide notes (11/2014 Syngenta presentation to ████████████████ ").



". The slide notes that ▇▇▇▇ and the speaker notes for the slide state that ▇▇▇▇ [95]

66. Further, other market participants, including distributors, acknowledge both the intent and impact of these programs. For example, the distributor CHI notes in an internal presentation that the "intent" of suppliers' loyalty programs "is to keep margins and market share at pre generic levels."[96] They further explain that "[o]nce a loyalty program is put in place suppliers tend to get complacent, especially around brand vs. generic price points. The effect on thinking seems to be 'we're paying you to be loyal so just disregard that cheap generic price'. This is the 'golden handcuffs' effect."[97]

### 2. Defense Experts Acknowledge a Profit Impact of the Challenged Loyalty Programs

67. Both Mr. Orszag and Professor Thurman acknowledge the challenged loyalty programs have created significant monetary benefits for Defendants. Professor Thurman says that the programs "incentivize product innovations for active ingredients after expiry of patent and regulatory restrictions" and that, "without its at-issue loyalty program, Corteva would be incentivized to (1) provide less application expertise to growers … and (2) innovate less."[98]

68. Mr. Orszag notes in his initial report that Syngenta's loyalty payments may reduce the extent to which generic sellers benefit from (i.e., free ride on) certain investments made by Syngenta, thereby increasing the incentive to make such investments.[99]

---

[95] SYT_REBATELIT_0027207 at slide 16.
[96] CX4629 at 005.
[97] CX4629 at 012.
[98] Thurman Rebuttal Report, ¶ 64.
[99] Orszag Initial Report, ¶ 35.

36

69. Both Prof. Thurman and Mr. Orszag implicitly concede that Syngenta secures greater profit by suppressing generic sales, claiming it increases Syngenta's incentive to invest in consumer-welfare-enhancing services.

## IV. DEFENSE EXPERTS' EMPIRICAL FINDINGS ARE UNRELIABLE

70. This section addresses Defense Experts' claims that (i) an empirical assessment of a time series of data for a few AIs is more reliable for the assessment of damages than my yardstick analysis, and (ii) that their assessment of prices and sales following the removal of a challenged loyalty payment program reliably demonstrates a lack of any impact. To address these claims, this section proceeds as follows.

- First, I explain why before-and-after studies of data like those conducted by Defense Experts are well-understood to produce unreliable results without careful controls for contemporaneous factors that can influence and obscure the observed data.

- Second, I explain why the Defense Experts' attempts to account for contemporaneous factors that likely confound their studies are inadequate.

- Third, I show that, even setting aside the well-known issues with assessing a time series of data for a single AI in isolation, Defense Experts' evaluations of data are skewed in favor of showing no impact of the challenged loyalty payment programs. Reasonable alternative analyses of those same data show price and sales impacts that are consistent with the ordinary course of business assessments I use as inputs into my disgorgement and damages analyses.

### A. THE DRAWBACKS TO EMPIRICAL STUDIES FOCUSED ON DATA ONLY FROM THE EVENT BEING STUDIED ARE WELL UNDERSTOOD TO ECONOMISTS

71. The Defense Experts criticize my reliance on documentary sources predicting the effects of loyalty program removals in my yardstick analysis. They argue that I should have instead used observed data on the price and sales of AIs after they were removed from the loyalty

37

programs.[100] In Mr. Orszag's words: "It should go without saying that real world outcomes are more reliable than predictions."[101]

72. Contrary to Mr. Orszag's claim, "real world" data are often less informative than predictions relied on to make business decisions. Observed data often cause incorrect conclusions about the impact of an event, because real-world events often occur in concert with a host of other events and other factors that can influence the same outcomes of interest. This limitation inherent to the analysis of data is an important area of focus in the field of econometrics, which provides a variety of tools to address the existence of such confounding factors.[102] The literature specific to the use of yardsticks to calculate antitrust damages also highlights the importance of properly controlling for other factors.[103] As I discuss in the next section, the Defendants' retrospective analyses of data fail to properly implement such controls, rendering their conclusions unreliable.

73. I prefer the documentary evidence predicting the effect of loyalty program removal that I relied on in my initial report over Defense Experts' retrospective evaluations of data. These predictions isolate program effects because they reflect expected outcomes with and without loyalty programs in an otherwise identical environment. Further, I understand the predictions reflect

---

[100] *See* Orszag Rebuttal Report, ¶286. *See also* Thurman Rebuttal Report ¶12 and ¶65.

[101] *See* Orszag Rebuttal Report, ¶286.

[102] *See* Jeffrey Wooldridge, *Econometric Analysis of Cross Section and Panel Data*, 1st Edition (The MIT Press, 2001), p. 3. "The notion of **ceteris paribus**—that is, holding all other (relevant) factors fixed—is at the crux of establishing a **causal relationship**. Simply finding that two variables are correlated is rarely enough to conclude that a change in one variable causes a change in another. This result is due to the nature of economic data: rarely can we run a controlled experiment that allows a simple correlation analysis to uncover causality. Instead, we can use econometric methods to effectively hold other factors fixed." *See also,* James H. Stock and Mark W. Watson, *Introduction to Econometrics*, 3rd Edition, (Pearson, 2011), p. 8. "Observational data pose major challenges to econometric attempts to estimate causal effects, and the tools of econometrics to tackle these challenges… Much of econometrics, and much of this book, is devoted to methods for meeting the challenges encountered when real-world data are used to estimate causal effects."

[103] *See*, e.g., Daniel Rubinfeld, *Antitrust Damages,* Chapter 14, in Einer Elhauge, ed., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (Edward Elgar, 2012), 378-393, at p. 381. "With either the forecasting or the dummy variable approach, it is essential to account for the effects of noncollusive variables on price. If these variables are not taken into account, it is quite possible that damages will be biased and highly inaccurate."

assessments by industry participants who are charged with understanding the programs' impacts, based on their expertise, past experience, and research.[104] Hence, Mr. Orszag's claim that "[i]t goes without saying that real world outcomes are better than predictions" is not true when analysis of the data does not isolate the impact being considered.[105] And in some cases, such as here, documents that better isolate the relevant impacts are more useful for estimating disgorgement and damages.

## B. DEFENDANTS' EMPIRICAL ANALYSES DO NOT PROPERLY ACCOUNT FOR CONFOUNDING FACTORS

74. Prof. Thurman presents retrospective analyses of prices for paraquat, abamectin, and oxyfluorfen that do not account for the influence of other events that appear to have influenced the prices he studies, independent of the effects of removing the loyalty programs. To the extent these events did influence prices for the yardstick AIs—either upwards or downwards--they would need to be accounted for in any ex-post assessment of prices. Prof. Thurman does not do so and therefore his conclusions from the data are unreliable.

---

[104] For example, for the presentation [DAS MESOTRIONE], was prepared by Syngenta representative Kevin Gesse, who is the Head of Herbicide Product Marketing. Gesse First Dep. 9:12-15. In this role, he is responsible for developing marketing, pricing direction, and strategy for Syngenta's herbicide product line. *Id.* at 13-23. His role also requires the development of five-year marketing strategies for Syngenta. Id. at 16:2-12. That within his role at Syngenta he runs yearly analyses to determine if there is a need for changes to the key AI program. Gesse IH Tr. 33:4-16. Similarly, Syngenta's internal study on paraquat's and abamectin's removal from the Key AI program illustrates this point. Jeff Cecil, Head of Syngenta's North American Marketing, oversees Syngenta's pricing strategies, including rebate offerings for Syngenta's U.S. crop protection products. Cecil First Dep. 11:15-13:25, 19:16-20:6. Cecil has 30 years of industry experience with Syngenta. Cecil First Dep. 13:25-14:5. Rob Neill, Syngenta AG's Head of Marketing sought Cecil's analysis of the business implications of paraquat's and abamectin's removal from the Key AI program. Cecil First Dep. 123:13-125:4. Cecil limited his analysis accordingly. 131:19-132:20. Neill ultimately represented those conclusions as the ▮▮▮▮▮▮▮▮ of the financial and market impact of paraquat's and abamectin's removal from Key AI. CX2524. SYT_REBATELIT_00156997 (3/10/2017 internal Syngenta email from Neil to Boin).

[105] *See* Orszag Rebuttal Report, ¶286.

75. Similarly, Mr. Orszag's retrospective price analyses for paraquat and abamectin also fail to account for such factors. Mr. Orszag presents a regression analysis to support his finding that following the removal of abamectin and paraquat in 2017 from Syngenta's Key AI program, prices did not decline relative to pre-existing trends.[106] He states these regressions "…confirm the visual evidence I presented [earlier in report] with statistical tests supporting the same conclusions."[107] He reaches this conclusion by comparing predicted prices from his regression for the period following removal from the loyalty program, against an index of actual prices. He states "…if the Key AI rebates program were anticompetitive, one would expect to see actual prices falling below the predicted values after the AIs were removed from the program, indicating that the Key AI rebates program allowed Syngenta to charge supra-competitive prices."[108] He then concludes based on this comparison that prices were not elevated due to the programs.

76. Importantly, although superficially more sophisticated than a visual evaluation of data, Mr. Orszag's regression analysis does not include variables to control confounding factors, such as those described below, that complicate a comparison of prices during the post-2017 period. In fact, there are no "controls" (or co-variates) featured in his regression model at all. Instead, prices are predicted solely based on actual prices for the pre-2018 period and nothing else.

77. Moreover, these analyses rely on an assumption that trends immediately preceding the removal of the program would have persisted throughout the period being studied if the loyalty program had remained in place. This assumption is unverifiable. My analysis does not suffer from this unverifiability concern because the documents I use directly assess the impact of the challenged loyalty payment schemes.

---

[106] Orszag Rebuttal Report, Appendix D section D. He also concludes that shares of generic supplies for these products did not increase either. *Id.* ¶ 382.

[107] *Id.*

[108] *Id.* ¶ 385.

78. It is well known that when evaluating a time series of data it is difficult to account for confounding factors, including factors that cannot be directly observed or measured.[109] Here, in the period following the removal of paraquat, abamectin, and oxyfluorfen from the Defendants' loyalty payment programs, there were several events that profoundly impacted supply chains in ways that likely impacted prices and sales, confounding Defense Experts' empirical evaluations of data for paraquat, abamectin, and oxyfluorfen.

79. For example, it is well-documented that US EPA regulations for paraquat meaningfully changed and affected supply chains following the removal of paraquat from Syngenta's loyalty payment scheme. In the ordinary course of business document I used to establish the yardstick for paraquat, a Syngenta employee indicates that ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[109] *See, e.g.,* Jeffrey Wooldridge, *Introductory Econometrics, A Modern Approach*, 5th Edition (South-Western, Cengage Learning, 2013), p. 665, which discusses difficulties in forecasting a variable based on prior data when confounding factors alter the trend established earlier in time ("Deterministic trends can also produce poor forecasts if the trend parameters are estimated using old data and the process has a subsequent shift in the trend line. Sometimes, exogenous shocks—such as the oil crises of the 1970s—can change the trajectory of trending variables. If an old trend line is used to forecast far into the future, the forecasts can be way off.").

██████ ”[110] Deposition testimony addresses the importance of these EPA regulatory changes as well.[111]

80. In fact, such confounding factors were prominent enough for paraquat that Defense Expert Professor Snyder concluded that he could not isolate the impact of the challenged loyalty payment scheme on economic outcomes for paraquat.[112] According to Professor Snyder, these confounding factors include new safety and other EPA restrictions implemented in 2019.[113]

---

[110] CX2524, SYT_REBATELIT_00156997 ██████████████████  ██████████████████ ) In addition, documents indicate that these regulatory requirements resulted in product cost increases on other manufacturers. *See*, e.g., CNIAG-00245186. Email from Bert Crosson (Regional Account Manager at Amvac Chemical Corp.) regarding "Thoughts on new Paraquat packaging concepts 2020." ("As you are well aware, all paraquat suppliers will be required to make some changes to current small volume packaging to conform with specific closed handling requirements being mandated by the EPA." "The added cost/gallon of the closed handling valves, custom jug and added product costs will be an estimated $4/gallon over a 265 gal tote.")

[111] *See*, e.g., Deposition of Kevin Gesse (Syngenta) IH, November 16, 2021, 196:17-197:2, ██ ████████████████████████████ ) (emphasis added).

[112] Snyder Rebuttal Report, ¶ 131 n.226.

[113] Snyder Rebuttal Report, ¶ 131 n.226. In responding to analyses submitted by Professor Hemphill, he states: "In December 2016, the EPA introduced new safety restrictions (many of which were implemented in 2019), including specialized training, new warning statements on product labels, new transfer and handling requirements, and restricting use to certified applicators. The EPA completed its registration review for paraquat in June 2021, and its decision included changes to application methods, mitigation measures, and product label changes. **EPA actions, therefore, represent a confounding factor for understanding the impact of paraquat's status under Syngenta's loyalty program.** For this reason, I have not focused on paraquat here." (emphasis added)

Accordingly, for these reasons, he states that he has "not focused on paraquat" in his analyses addressing opinions of Prof. Hemphill.[114]

81. Increased regulations within China influenced the price of AIs, including paraquat and abamectin, shortly after paraquat and abamectin were removed from Syngenta's loyalty payment programs, by raising the price of active ingredients for manufacturers who imported into the US.[115] Costs of these raw materials were expected to be around 15% higher across a number of AIs during 2019 as China was expected to "…continue to conduct environmental inspections to address the effects of their current product production practices."[116] Additionally, US import tariffs issued on crop protection products from China destined for the U.S. created additional price volatility including increases.[117]

82. In addition to the ongoing regulatory changes in China, evidence also shows that the COVID pandemic significantly impacted supply chains and market outcomes in pesticide markets, which

---

[114] *Id.*

[115] *See*, e.g., CNIAG-00014570, Email from Greg Fowler ("Advisor to the CEO" at CNI Ag) to CNI executives and managers, February 22, 2017 ("China – two things taking place. The Chinese EPA is forcing plants to match output with water treatment capacity cutting volume by as much as half. At the same time glufosinate is being increasingly used to replace paraquat as the Chinese supply peters out. So demand in the US is almost doubling while supply out of China is being cut by some significant percentage… **The net effect: the US market will be short at some point in the near term. Bayer will not be able to supply at some point which will negate the loyalty program**." (emphasis added)

[116] SYT_REBATELIT_00037947 at Slide 5 (Syngenta's 2019 Pricing Guidance – US Herbicides, May 2018). *See also*, Fowler Dep. Ex. 19 (distributor CNI's "2018 Crop Protection Market Assumptions" slide deck) at Slide 19 (linking China's continuing "enforce[ment] [of] pollution regs that are causing plants to reduce production or quit altogether" to generics pricing, including paraquat prices) and at Slide 30 ("China is the center of our business. As much as 65% of everything we sell is China sourced. Any issues that affect production in China will impact our supply and pricing…Paraquat – moving to low $20's"). *See also*, Syngenta, "Supply Market Intelligence, November 2017," SYT_REBATELIT_00640102 at slide 15 ██████████████████████ ████████████████████████████████████████ ████████████████████████

[117] *See, e.g.,* CX4516 CNI (distributor) document, September 2018, "2019 CP MARKET ASSUMPTIONS at -005. ("With all crop protection materials that are sourced from China now under the threat of a 25% tariff as of October 1, prices will have to go up to account for this action.")

would confound any inferences based on data from 2020 onward, including for paraquat, abamectin, and oxyfluorfen. Consistent with this, in response to price volatility during 2020, effective October 1, 2020, Syngenta ███████████████████████████

███████████████████████████ ██ █████████████████████

███████████████████████████████████████████

███████████ ██ ███████████████████████████

███████████████████████████████ ██████████

Curiously, Mr. Orszag points to the influence of COVID when assessing AIs other than my

---

[118] SYT_REBATELIT_01140729 slide 14. *See also* Deposition of Kevin Gesse (Syngenta) IH, November 16, 2021, 197:8-22 ████████████████████████

████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

███████████████████████████████████

██████████████████████████

[119] *See,* e.g., CNIAG-00170777 (Fowler Dep. Ex. 33), at Slide 5 (distributor CNI's "2023 Crop Protection Assumptions" slide deck) (identifying "China Challenges" including that "Covid lockdowns continue to create unexpected, unpredictable supply issues"). *See also,* ████

████████████████████████████████

████████████████████████████████████

████████████████████). *See also,* Deposition of John Parr (Syngenta), July 10 2025, 52:17-23 ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

█████████████████████ ")

[120] *See* CX2877 at -005.

yardsticks,[121] but he does not account at all for the confounding effects of COVID in his retrospective assessment of paraquat and abamectin data.[122]

83. Volatile fluctuations in the cost of chemical imports from China continued beyond the early stages of the COVID pandemic, and may have played a role in the price trends that Prof. Thurman observes in 2022 and 2023 for paraquat and abamectin. For example, in July 2023, the price of Chinese paraquat increased by over 30 percent month-over-month. In August 2023, the price of Chinese abamectin fell by 23 percent.[123]

84. For oxyfluorfen, in addition to removal of the loyalty program taking place only months before the beginning of the COVID pandemic,[124] there were other key changes and events that could have influenced the supply and pricing of oxyfluorfen products in the market.[125] This includes the transfer of marketing rights of Goal-branded oxyfluorfen products from Corteva to Nufarm in September 2020. Professor Thurman discusses the transfer of marketing rights as well as other

---

[121] For example, in discussing analyses from Professor Hemphill relating to Syngenta's AIs in the Complaint he states a decline in generic suppliers' shares "…was likely due to global changes in supply and demand conditions following the COVID-19 pandemic… resulting in oversupply and a glut that led generic suppliers to reduce supply after that." Orszag Rebuttal Report, ¶ 173. Mr. Orszag also identifies the COVID period on some of his graphs involving the Complaint AIs. *See*, e.g., Orszag Rebuttal Report, Figure 22. Professor Thurman does not mention COVID in his report.

[122] *See*, e.g., Orszag Rebuttal Report, Figures 29 (for abamectin) and 31 (for paraquat).

[123] *See*  .

[124] Removal of Goal-branded oxyfluorfen products from the Corteva's loyalty program took place in September 2019. Thurman Rebuttal Report. The COVID pandemic began in the U.S. during early 2020. *See*, e.g., American Hospital Association, January 31, 2020, "U.S. declares coronavirus a public health emergency, CDC updates guidance" available at: https://www.aha.org/news/headline/2020-01-31-us-declares-coronavirus-public-health-emergency-cdc-updates-guidance.

[125] *See*, e.g., ADAMA_025921 at 929 (noting a 9% increase for oxyfluorfen in a single month due to a "huge explosion in Xiangshui that shorted raw material); FTC-Van Diest-00015564 (Adama Insights newsletter describing "key raw material shortage" for oxyfluorfen "due to Xiangshui explosion" and noting "supply short & prices increasing").

events preceding this, concluding: "[t]he history is complicated and should raise warnings about its comparability with the but-for world experiment of banning loyalty pricing for the three at-issue Corteva active ingredients."[126] However, in the testimony I rely on, Mr. Vance was directly asked about the effects of the removal of the loyalty program, whereas Mr. Thurman's evaluation of price data does not evaluate the program change specifically.[127]

85. **Figure 1**, below, shows the average price per pound of active ingredient for the Goal-branded oxyfluorfen products. The price fluctuations observed in the data coincide with known confounding events. Following the divestiture to Nutrichem in 2015, the average price per pound of oxyfluorfen declined over the next several years, bottoming out in 2018 and 2019 right before the loyalty program was discontinued. The average price per pound of oxyfluorfen then increased in 2020 and after, but as noted above this increase coincides with both the start of the COVID pandemic and the transfer of marketing rights to Nufarm. In the presence of these major changes to the market, one cannot reasonably look at the average price trend to assess the impact of the loyalty program removal. One needs to consider whether the removal of the loyalty program reduced prices relative to what they would have been if the loyalty program had continued past 2019 in the presence of these other factors. Due to the way in which these other factors coincide with the timing of the loyalty program removal, it is dubious that one could isolate the impact of the loyalty program removal in the observational data. This is one reason why Mr. Vance's testimony on which I rely is so useful—it provides a market participant's assessment of the price impact of the loyalty program removal that cannot reasonably be

---

[126] Thurman Rebuttal Report ¶30.

[127] Thurman Rebuttal Report ¶23, providing a quote from the Vance May 28-29, 2025 deposition: ("Q. Has Albaugh ever sold products with an AI that was part of a loyalty program but then that AI was removed from the loyalty program? A. Yes. The first one that comes to mind is oxyfluorfen. Q. And what effect did removal of oxyfluorfen have from a loyalty. A. So that's a Corteva product, was a Corteva product. The business ultimately got sold to Nutrichem, our 20 percent owner. They decided to market it through one of our competitors, Nufarm, and it came out of the Corteva loyalty program. Prior to it being in the program, we struggled to sell 30, 40,000 gallons. It is sold almost all exclusively in California on nuts and fruit trees. And after it […] came out of the loyalty program, the price very quickly went to about 50 percent of what it was and had more demand than we could supply. I think that year we sold 120,000 gallons and we peaked out at about 180,000 gallons.").

estimated with observed data.



C.   APART FROM OVERLOOKING CONFOUNDING FACTORS, DEFENSE
EXPERTS' EMPIRICAL ANALYSES ARE MISLEADING FOR OTHER
REASONS

86. As I described in the preceding sections, the Defense Experts' analyses using observed data from the end of the loyalty programs for oxyfluorfen, paraquat, and abamectin are not reliable means to assess the impact of those loyalty programs because they fail to properly control for other

47

factors affecting the prices and net sales of these products. That said, appropriate adjustments to the time-trend analysis presented by Prof. Thurman in his rebuttal report shows observable declines in price and declines in the Defendants' share of observed sales after the loyalty program, contrary to Prof. Thurman's and Mr. Orszag's observations.

### 1. The Price of Syngenta's Paraquat and Abamectin Products Decreased After the Loyalty Programs Were Removed

87. In Figure 6 of his rebuttal report, Prof. Thurman presents a graph showing the weighted average net price per gallon of Syngenta's paraquat products, and concludes that the removal from the loyalty program increased the price of Syngenta's paraquat offerings.[128] He arrives at this conclusion by finding a net price increase for paraquat by comparing the average net price over the five-year period from 2012 to 2016 to the average net price over the six-year period from 2018 to 2023. The price increase he attributes to the loyalty program removal is driven by a sharp increase in net price in 2022, five years after the loyalty program removal, and after numerous other confounding events potentially and actually impacted the markets where paraquat was sold.[129] Prof. Thurman makes no attempt to explain why an inference that depends on data so far from paraquat's removal from Syngenta's loyalty payment scheme is valid.

88. The wide time windows that Prof. Thurman uses in his comparison obscures the fact that the net price per gallon of paraquat decreased shortly after the loyalty program ended. For example, a more reasonable two-year time window before and after the loyalty program removal shows that removal of the loyalty program coincided with a decrease in the net price per gallon of paraquat from ▮▮▮▮ for 2015-2016 to ▮▮▮▮ for 2018-2019. This observed nominal price decrease of approximately ▮ percent is larger than the ▮ percent reduction in the manufacturer price of paraquat that I used as a yardstick in my initial report.[130] Put differently, using Prof. Thurman's

---

[128] Thurman Rebuttal Report ¶40 and Figure 6.

[129] See supra, Section IV.B, for a discussion of some of the more important confounding factors that occurred during the relevant time period.

[130] Note however that I would not expect these price changes to match the predictions used in my yardstick analysis, due to confounding factors that remain uncontrolled for using this type of simple graphical analysis. I consider my yardstick analysis to provide the more reliable estimate of the loyal program impact.

data during a more relevant period would support my opinions regarding paraquat and, if anything, indicates they are conservative.

89. Prof. Thurman's analysis also overlooks the fact that Syngenta's products differ in the amount of the active ingredient included. Specifically, Syngenta introduced a new formulation of its paraquat product, Gramoxone 3.0, in 2019 that had a higher concentration of paraquat than its prior version, Gramoxone 2.0. Although Gramoxone 3.0 was more expensive per gallon than Gramoxone 2.0, it was less expensive per pound of included active ingredient (i.e., paraquat).[131] The two-year average net price per pound of Syngenta's paraquat fell by approximately ▮ percent from ▮ per pound in 2015-2016 to ▮ in 2018-2019, which is larger than the ▮ percent price decline I use in my yardstick analysis.[132]

90. Similarly, Figure 4 in Prof. Thurman's rebuttal report purportedly demonstrates an increase in the net price of Syngenta's abamectin products after the loyalty program removal. As with paraquat, Prof. Thurman attributes to the loyalty program removal price increases that occurred several years later, using a six-year post-program-removal comparison window.[133]

91. His net price average for abamectin includes several products that are not conducive to an assessment of the loyalty program impact. He includes Minecto Pro—a premix product combining abamectin with cyantraniliprole introduced in 2017—in his post-period price average.[134] The price of Minecto Pro is of limited benefit in estimating the effect of the loyalty

---

[131] When Gramoxone 3.0 was introduced in 2019, its average price was ▮ per gallon and ▮ per pound of paraquat. Gramoxone 2.0 averaged ▮ per gallon and ▮ per pound of paraquat in the same year. Calculated based on Syngenta sales data and information from EPA labels, *see* Workpapers.

[132] Note however that I would not expect these price changes to match the predictions used in my yardstick analysis, due to confounding factors that remain uncontrolled for using this type of simple graphical analysis. I consider my yardstick analysis to provide the more reliable estimate of the loyal program impact.

[133] *See* Thurman Rebuttal Report, ¶ 37 and Figure 4.

[134] Syngenta, "Minecto Pro Insecticide Label," accessed October 31, 2025, https://www.syngenta-us.com/current-label/minecto_pro, p. 1. See also, "EPA approves Syngenta's Minecto Pro insecticide for specialty, vegetable crops," Farm Progress, February 22, 2017, accessed October 31, 2025, https://www.farmprogress.com/insects/epa-approves-syngenta-s-minecto-pro-insecticide-for-specialty-vegetable-crops.

program on the price for abamectin because its introduction coincides with the loyalty program removal and its second active ingredient is still under patent.[135] He also includes Epi-Mek, a product that was discontinued in 2016, prior to the loyalty program removal. Internal Syngenta correspondence indicates that █████████████████████████████████████████ ██████████.[136] It would not be correct to attribute the pricing of Epi-Mek in 2016 to the loyalty program. Prof. Thurman's analysis also includes Clinch, an ant bait that lacked a generic alternative.[137] The lack of generic alternatives to Clinch makes it inapt for analyzing the price impact of the at issue loyalty programs. Due to these issues, Minecto Pro, Epi-Mek, and Clinch are not informative of the price impact of the loyalty program.

92. The fourth product in Prof. Thurman's abamectin price graph is Agri-Mek, which faces generic competition and was sold both during and after the program ended. These characteristics make Agri-Mek a more useful lens for assessing the loyalty program impact. I compare prices using a two-year post-program window, rather than Prof. Thurman's six-year comparison window. The price per fluid ounce of Agri-Mek decreased after the loyalty program ended, from █████ in 2015-2016 to █████ per unit in 2018-2019, a █ percent price decrease, as shown in **Figure 3**

---

[135] *See* Global Agriculture, "Global Agrochemical Patent Expires in 2026: New Opportunities in Insecticides and Herbicides," accessed October 29, 2025, https://www.global-agriculture.com/crop-protection/global-agrochemical-patent-expiries-in-2026-new-opportunities-in-insecticides-and-herbicides/.

[136] SYT_REBATELIT_00595826 ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████)."

[137] *See* CNIAG-00237357. "Unfortunately there is no generic of Clinch. The price you're getting on that item from Simplot doesn't follow any programming that Syngenta has in the market. They don't program it heavy since they don't have a close competitor." ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████ The lack of a generic for Clinch appears to be due in part to its proprietary packaging. *See* FBN_00045675. "The biggest obstacle is the 'bag'. Syngenta's Clinch Bag is double-sealed and has a vent inside of it to prevent moisture from building up that could result in bloating and possible leaking. Also, Syngenta's bag has a handle opening for ease of carrying. To source this bag at this 11 hour and in season makes landing on the moon in 1969 child's play."

below.[138] This ▮ percent price decline is consistent with my ▮ estimate and it likely understates the true impact of the loyalty program, in part because confounding factors may be depressing the pre-period price. For example, Syngenta correspondence suggests that it ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬ deflates the pre-period 2-year average price, leading to a smaller estimate of the loyalty program impact.

93. In sum, for the reasons given in the previous section, I consider my yardstick analysis based on Syngenta's ordinary course of business assessment of the impact of the removal of their loyalty payment scheme from abamectin and paraquat to be more reliable than a retrospective look at abamectin and paraquat prices. Notwithstanding this opinion, when considered over more reasonable time periods and for more appropriate groups of products, the prices of paraquat and abamectin decreased according to Defense Experts' data and methods following their removal from Syngenta's loyalty payment schemes in amounts that are broadly consistent with the Syngenta assessments on which I rely.

### 2. Corteva's and Syngenta's Share of Sales Relative to Generics Decreased After Oxyfluorfen, Paraquat, and Abamectin Were Removed From Loyalty Programs

94. In Figure 3 and Figure 5 of his rebuttal report, Prof. Thurman claims to show that Syngenta's net sales of abamectin and paraquat increased after the removal of the loyalty program.[140] To assess

---

[138] For comparison, the documents I considered in my yardstick analysis predicted a ▮ percent decrease in manufacturer net price for abamectin. Again, I would not expect this observed price decrease to match those from my yardstick analysis because the observed price of Agri-Mek is likely influenced by factors other than the loyalty program removal. I consider my yardstick measure to be more reliable than the observational data for the purpose of calculating disgorgement and damages.

[139] *See* SYT_REBATELIT_00595826.

[140] *See* Thurman Rebuttal Report, ¶36, ¶ 39, Figure 3, and Figure 5.

the loyalty program impact, it is more informative to look at the trend in Syngenta's share of all net sales relative to similar generic products containing the same active ingredients. As discussed above, Syngenta's net sales of paraquat and abamectin likely were influenced by market factors unrelated to the loyalty programs. Generic products are exposed to some of those same factors; for example, fluctuations in the level of demand for abamectin and paraquat products generally. If both Syngenta's sales and the generics' sales increased due to such common factors, Syngenta's share of sales may remain stable or even fall. If Syngenta's share falls despite its increase in raw sales, it implies that some factor caused it to lose sales relative to the generics. A drop in Syngenta's share coinciding with a product's removal from the loyalty program is consistent with my conclusion that the removal reduced Syngenta's net sales relative to what they would have been had the program remained in place. However, other confounding factors could still be at play.

95. Figure 5 of Prof. Thurman's report shows an increase in sales of paraquat after the loyalty program removal. In contrast, **Figure 2** shows that Syngenta's share of net sales for straight-good paraquat products observed in the FarmTrak data declined following the loyalty program removal. As described above, this observation indicates that removing paraquat from the loyalty program may have reduced Syngenta's sales relative to what they would have been if paraquat had remained on the program, affirming the prospective assessments I relied upon in my yardstick analysis.

52

**FIGURE 2: SYNGENTA'S SHARE OF NET SALES OF STRAIGHT PARAQUAT PRODUCTS OBSERVED IN THE FARMTRAK DATA**



For this analysis, I include the following Syngenta-manufactured products: Gramoxone Inteon, Gramoxone SL 2.0, Gramoxone SL 3.0, and Cyclone SL 2.0. I exclude several other Syngenta-manufactured products—Cyclone Concentrate, Cyclone Max, Gramoxone Extra, Gramoxone Max, and Starfire— from this analysis, consistent with Prof. Thurman's approach. Prof. Thurman also includes Gramoxone SL is included in his analysis, but it does not appear in the FarmTrak data.

In addition to the Syngenta products referenced above, the generics considered in this analysis include: Blanco (L) (H), Parazone 3SL (H), Boa (2.5L) (H), Quik-Quat 300, Quik-Quat (L) (H), Paraquat 3SL (H), Helmquat 3SL (H), Devour (L) (H), Para-Shot 3.0 (H), Bonedry (L) (H), Paraquat Concentrate (H), Firestorm (L) (H), and Bonfire (L) (H).

53

96.  **Figure 3** below shows Syngenta's net sales of ████████████████████████
████████████████████████████████████████.[141] Syngenta's share ████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████[142] Syngenta's share ██████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████

97.  Despite these year-to-year fluctuations, Syngenta's share remained in the ████████ percent range in the first few years after the loyalty program was removed, in contrast to Prof. Thurman's finding that Syngenta's net sales increased sharply during this time. The sizable increase in net sales of abamectin that Prof. Thurman documents in Figure 3 of his rebuttal report may be driven by other common market conditions that also affected the generics.[143]

---

[141]  Note that I drop Syngenta abamectin products other than ██████████████████████ in calculating this share. Also, note that FarmTrak data includes ████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████

[142]  *See* SYT_REBATELIT_00595826.

[143]  Prof. Thurman's calculation of post-loyalty program abamectin sales are also inflated by the inclusion of Minecto Pro, which, as discussed above, is a premix product containing another AI.

54

**FIGURE 3: SYNGENTA'S AGRI-MEK AND EPI-MEK SALES AS A SHARE OF NET SALES OF STRAIGHT LIQUID ABAMECTIN PRODUCTS OBSERVED IN THE FARMTRAK DATA**



The generics considered in this analysis are: Borrada (L), Abacus (L), Abacus V, Abacus V6, Abamectin 0.15EC, Abamectin 0.7SC, Abba 0.15 EC, Abba Ultra, Enterik 0.15 LV, Enterik 0.7 SC, Zoro (L), Amavi SC, Reaper 0.15 EC, Reaper Advance, Reaper Clearform, Abamex (L), Agmectin 0.15 EC, Timectin 0.15 EC AG, Temprano (L), and Averland FC.

98. **Figure 4** presents the share of net sales of oxyfluorfen products observed in the FarmTrak data for the Goal and GoalTender products, which were part of Corteva's loyalty program. These products' share of total oxyfluorfen sales dropped precipitously after it was removed from the Corteva loyalty program in 2019, from over 90 percent share prior to removal down to less than 60 percent share two years after removal. There was no similar decline in share associated with the 2015 divestiture of oxyfluorfen to Nufarm. This figure indicates that the removal from the loyalty program may have caused a substantial loss of sales. However, there still may be other factors contributing to this decline, including the transfer of marketing rights to Nufarm the year after removal from the loyalty program.

55



99. As I described in Section IV.B, the yardstick I used in my Initial Report is an appropriate measure to isolate the price impact of the loyalty program removal. By contrast, the oxyfluorfen price trends observed in available data fail to isolate that impact because they cannot be separated from major confounding factors and events. However, even if one were to accept the premise that the loyalty program removal did not lead to a decline in the price of Goal-branded oxyfluorfen products, the decline in revenue share for these products after the loyalty program was removed is consistent with significant disgorgement and damages. Intuitively, the decline in brand share following the removal of Syngenta's loyalty program demonstrates that consumer choice was restricted by the loyalty program and absent those restrictions, many consumers shifted to purchase generics. And, as a matter of economics, the restriction on customers' ability

56

to purchase generic oxyfluorfen products increased Syngenta's profit while harming consumer welfare.

100. The source of disgorgement under this hypothetical fixed-price scenario is clear: Corteva would have sold more of its oxyfluorfen products at the same price than it would have without the loyalty program. The source of damages to end-use growers follows from the distributors having purchased more of the Goal-branded oxyfluorfen and less generic oxyfluorfen than they would have without the loyalty program. The loyalty program restricts the supply of generics available for purchase by end-use growers in the downstream market. Hence, some end-use growers who would prefer to purchase the generic product at the prevailing generic price would switch to the Goal-branded product at a higher price point. The additional expenditure by the end-use growers would equal the price differential between Goal-branded products and the generics times the quantity that shifted from generic to branded. Not all of this extra expenditure would represent damages because some of the consumers who shift to the Goal-branded oxyfluorfen may have been willing to pay a lesser premium for the Goal-branded products absent the generic supply restriction. A rough estimate of the damages would be about half of the excess end-use grower expenditures.

101. In theory, one could calculate damages and disgorgement for this type of scenario using the data on branded prices, generic prices, and generic quantity shares of sales with and without the challenged loyalty programs. For example, assume that I use reference AIs to establish yardsticks for the decline in brand share relative to generics after loyalty program removal. I could estimate the amount of at-issue branded pesticide that would have been purchased absent the loyalty program by assuming that the total quantity of all products for the at-issue AI sold in a given year is fixed, and multiplying that total quantity by median yardstick post-loyalty program share. The difference between that estimated quantity and the observed quantity of branded products sold represents the excess quantity attributable to the loyalty program.

102. It would be economically justified to estimate damages and disgorgement stemming from the loyalty programs even if one were to assume that the loyalty programs have no impact on price. Disgorgement could be estimated by multiplying the excess quantity times the Defendant's

57

observed price for the at-issue product and its observed profit margin on the at-issue product. This methodology is consistent with the way I calculated damages in my Initial Report.[144]

103. Damages could be estimated by multiplying the excess quantity times the observed price differential between branded and generic products, divided by two. Damages under these alternative assumptions may be larger than those I estimated because I effectively would be assuming that the brand does not attempt to compete on price, in which case the gap between branded and generic prices may be large and a significant proportion of end use growers may shift purchases to generics.

104. Notwithstanding the above alternative damages formulation, the yardstick evidence I relied upon in my Initial Report provides reliable evidence that the loyalty programs inflate pesticide prices, and the observed data relied upon by Mr. Orszag and Dr. Thurman are insufficient to conclude otherwise. Moreover, the above formulation of damages requires a larger number of inputs and assumptions than my damages calculations. Hence, the methodology I used in my initial report is the best approach to estimate damages and disgorgement in this case.

Loren K. Smith, Ph.D.
October 31, 2025

---

[144] Smith Report, Appendix C.

## APPENDIX A: MATERIALS RELIED UPON

---

CASE MATERIALS

Amended Complaint, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG et al.*, Case No. 1:22-cv-00828, December 23, 2022.

Barham (Vice President of Sales Crop Protection, NuFarm) IH. Tr.

Bernard (Vice President of Growth and Development, Drexel) Dep. Tr.

Boden (former Syngenta executive) Dep. Tr.

Cecil (Head of North American Marketing, Syngenta) Dep. Tr., Vol I.

Expert Rebuttal Report of Edward A. Snyder, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG et al.*, Case No. 22-CV-00828, October 3, 2025.

Expert Rebuttal Report of Jonathan Orszag, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG et al.*, Case No. 1:22-cv-00828-TDS-JEP, October 3, 2025.

Expert Report of Loren K. Smith, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG et al.*, Case No. 22-CV-00828-TDS-JEP, August 22, 2025, including workpapers.

Fisher (Head of South and East Coast Sales, Syngenta) Dep. Tr.

Fowler (Advisor to the CEO, CNI Ag), Dep. Tr.

Fowler (Advisor to the CEO, CNI Ag), IH Tr.

Flippin (Head of Product Lifecycle Management, Syngenta) Dep. Tr.

Flippin (Head of Product Lifecycle Management, Syngenta) IH. Tr.

Gesse (Head of Herbicide Product Mktg., Syngenta) Dep. Tr., Vol. I.

Gesse (Head of Herbicide Product Mktg., Syngenta) IH. Tr.

Hendrickson (Vice President of Crop Protection/Seed Marketing and Business Development, CHS), Dep Tr.

Rebuttal Expert Report of Walter N. Thurman, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG et al.*, Case No. 22-CV-00828-TDS-JEP, October 3, 2025.

Rebuttal Report of C. Scott Hemphill, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG et al.*, Case No. 22-CV-00828-TDS-JEP, October 3, 2025.

Report of C. Scott Hemphill, *Federal Trade Commission, et al., v. Syngenta Crop Protection AG, et al.*, Case No. 1:22-cv-00828, August 22, 2025.

Schrick (Strategic Account Lead, Bayer) Dep. Tr., Vol. I.

Schrick (Strategic Account Lead, Bayer) Dep. Tr., Vol. II.

Vance (Director of Customer Engagement, Albaugh) Dep. Tr.

Vance (Director of Customer Engagement, Albaugh) IH. Tr.

Wasson (former President, Corteva) Dep. Tr., Vol 1.

Wichert (Manager for Post-Patent Strategy, Syngenta) Dep. Tr.

Wichert (Manager for Post-Patent Strategy, Syngenta) IH. Tr.

---

## PRODUCED DOCUMENTS

828-FTC-UPL-00004975
828-FTC-UPL-00004975
828-FTC-UPL-00031638
828-FTC-UPL-00031929
ADAMA_025921
CNIAG-00014570
CNIAG-00022268
CNIAG-00022270
CNIAG-00170777
CNIAG-00231456
CNIAG-00237357
CNIAG-00245186

CX1361, FTC-CTVA-00788142

CX2034, SYT_REBATELIT_00230176

CX2105

CX2432, SYT_REBATELIT_00027207

CX2459

CX2524, SYT_REBATELIT_00156997

CX2865

CX2877

CX4516

CX4699, NUTR_LIT_00078068

FBN_00045675

FTC-CTVA_00136612

FTC-CTVA_00219165

FTC-Drexel-00004421

FTC-Van Diest-00015564

NFM-00001037

NUTR_LIT_00078068

SYT_REBATELIT_00230175

SYT_REBATELIT_00595826

SYT_REBATELIT_00616601

SYT_REBATELIT_00640102

SYT_REBATELIT_01140729

---

ACADEMIC ARTICLES AND BOOKS

John Asker and Heski Bar-Isaac, "Raising Retailers' Profits: On Vertical Practices and the Exclusion of Rivals," *American Economic Review*, Vol. 104, No. 2 (2014): 672.

Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?",  in THE RATE AND DIRECTION OF INVENTIVE ACTIVITY REVISITED, 361, 370, 376–382 (Josh Lerner & Scott Stern eds., 2011).

Daniel Hosken, Luke M. Olson, and Loren K. Smith "Do Retail Mergers Affect Competition? Evidence from Grocery Retailing," *Journal of Economics and Management Strategy*, Vol. 27, Iss. 1 (Spring 2018): 3-22.

Daniel Hosken, Luke M. Olson, and Loren K. Smith "Can Entry Or Exit Event Studies Inform Horizontal Merger Analysis? Evidence from Grocery Retailing," *Economic Inquiry*, Vol. 54, Iss. 1 (January 2016): 342-360.

Daniel Rubinfeld, *Antitrust Damages*, Chapter 14, in RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, ed. Einer Elhauge (Edward Elgar, 2012).

Ilya R. Segal and Michael D. Whinston, "Antitrust in Innovative Industries," *American Economic Review*, Vol. 97, No. 5 (2007): 1703-1730.

James H. Stock and Mark W. Watson, INTRODUCTION TO ECONOMETRICS, (3rd ed. Pearson, 2011).

Jeffrey Wooldridge, ECONOMETRIC ANALYSIS OF CROSS SECTION AND PANEL DATA, 1st Edition (The MIT Press, 2001).

Jeffrey Wooldridge, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH (5th ed. 2013).

Patrick DeGraba and John Simpson, "Loyalty discounts and theories of harm in the Intel investigations," *Journal of Antitrust Enforcement*, Vol. 2, No. 1 (2013): 170-202.

Philippe Aghion, Nick Bloom, Richard Blundell, Rachel Griffith and Peter Howittt, "Competition and Innovation: an Inverted-U Relationship", *The Quarterly Journal of Economics*, 701-728 (2005).

Richard Gilbert, "*Looking for Mr. Schumpeter: Where Are We in the Competition–Innovation Debate?" Innovation Policy and the Economy*, Vol. 6, (2006): 205-206.

## PUBLICLY AVAILABLE

American Hospital Association, "U.S. declares coronavirus a public health emergency, CDC updates guidance," January 31, 2020, https://www.aha.org/news/headline/2020-01-31-us-declares-coronavirus-public-health-emergency-cdc-updates-guidance.

EPA product labels (selected)

Farm Progress, "EPA approves Syngenta's Minecto Pro insecticide for specialty, vegetable crops," February 22, 2017, accessed October 31, 2025, https://www.farmprogress.com/insects/epa-approves-syngenta-s-minecto-pro-insecticide-for-specialty-vegetable-crops.

Global Agriculture, "Global Agrochemical Patent Expires in 2026: New Opportunities in Insecticides and Herbicides," accessed October 29, 2025, https://www.global-agriculture.com/crop-protection/global-agrochemical-patent-expiries-in-2026-new-opportunities-in-insecticides-and-herbicides/.

Syngenta, "Minecto Pro Insecticide Label," accessed October 31, 2025, https://www.syngenta-us.com/current-label/minecto_pro.

## DATA

FarmTrak Data (listed in workpapers)

All materials cited in footnotes to this report.

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.,**<br><br>**Defendants.** | Case No. 1:22-cv-00828-TDS-JEP |

**ERRATA TO EXPERT REPORT AND REPLY REPORT OF LOREN K. SMITH, PH.D.**

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

The following text replaces ¶ 124 of the Expert Report of Loren K. Smith, Ph.D, dated August 22, 2025.

124. The fourth yardstick for the farmgate price reduction comes from a Syngenta analysis of potential changes to its contract for technical sales of mesotrione to Dow AgroSciences.[81] The document indicates that ███████████████████████████████████. Alternatively, it considers a scenario where ███████████████████████ to ██████.[82] In either scenario, ████████████████████████████ ███████████████████████████████████████[83] The document ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████[84] ████████████████████████ ████████████████████ The analysis shows that █████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████[85] (See Figure G.5 below.) Based on these projections, I establish a ████████████████████ ████████████████.

---

[81] CX2105, SYT_REBATELIT_00200412 (Syngenta Presentation: "DAS Mesotrione").

[82] CX2105, SYT_REBATELIT_00200412, at slide 3 (Syngenta Presentation: "DAS Mesotrione").

[83] CX2105, SYT_REBATELIT_00200412, at slides 6 and 7 (Syngenta Presentation: "DAS Mesotrione").

[84] *See also* CX2105, SYT_REBATELIT_00200412, at slide 9 (Syngenta Presentation: "DAS Mesotrione") describing "Key AI Program" as a ████████████████████████

[85] CX2105, SYT_REBATELIT_00200412, at slide 5 (Syngenta Presentation: "DAS Mesotrione"). ████████████████████████████████ ████████████

The following text replaces paragraph 34 of the Reply Report of Loren K. Smith, Ph.D, dated October 31, 2025.

34. First, it is unclear on what Mr. Orszag is basing his claim that I assume that but-for the challenged loyalty payments, the price of mesotrione would have fallen to the level of generic suppliers. █████████████████████████████████████████████ ████████████████████████ ████. The document does not say ███████████████ ████████████████████████████████████████.[29] Moreover, slide 10 of the document clearly identifies as a ███████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████ █████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████ Hence, even if Mr. Orszag supported his claimed reasons for a branded price premium—quality, reliability, production capacity, and production experience—which he did not, those factors may be accounted for in the ███████████████████████ ██████████████████████████████ even setting aside the influence of the challenged discount programs.

The following text replaces footnote 38 of the Reply Report of Loren K. Smith, Ph.D, dated October 31, 2025.

---

[29]  CX2105, slide 6.

[30]  CX2105, slide 10. Kevin Gesse prepared this slide in collaboration with Jeff Cecil. Gesse IH Tr. 48:24-49:3. He sent this presentation to Cecil and Charles Flippin, Syngenta's Head of Post Patent Life Cycle Management. Flippin Dep. Tr. 12:30-17:14, See also SYT_REBATELIT_01140305. Mr. Gesse is Syngenta's Head of the Herbicide Product Line. Gesse Dep Transcript 9:12-15. In this role, he is responsible for developing marketing, pricing direction, and strategy for Syngenta's herbicide product line. *Id.* at 13-23. His role also requires the development of five-year marketing strategies for Syngenta. Gesse IH Tr. 31:19-32:7. Within his role at Syngenta he also runs yearly analyses to determine if there is a need for changes to the key AI program. Gesse IH Tr. 33:4-8. Finally, Mr. Gesse's testimony in his investigational hearing confirms the accuracy of my reading of the document. *See* Gesse IH Tr. 57:24-58:21.

[38] See, e.g., Deposition of Dean Hendrickson (Vice President of Crop Protection/Seed Marketing and Business Development, CHS), July 31, 2025, pp. 92-93. (Q. Is it important for CHS to sell generic crop protection products? A. Yes. Q. Why? A. Similarly, as these companies are moderately significant, as large typically, then the top six, if you will, but they are doing research and development related to new off patent for generic formulations which are important to us, and same thing, they're going to have a level of success in the marketplace with or without us and we'd rather prefer to be part of it than on the outside looking in.") See also Bernard (Drexel) dep. at 415:14-416:12.

Loren K. Smith, Ph.D.
December 3, 2025

2

# Exhibit 292

**Filed Under Seal**

# Exhibit 293

## Filed Under Seal

# Exhibit 294

## Filed Under Seal

# Exhibit 295

**Filed Under Seal**

# Exhibit 296

## Filed Under Seal

# Exhibit 297

## Filed Under Seal

# Exhibit 298

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No. 1:22-cv-00828

- - - - - - - - - - - - - - - - - - - - - - - x

FEDERAL TRADE COMMISSION,
STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF ILLINOIS,
STATE OF INDIANA, STATE OF
IOWA, STATE OF MINNESOTA,
STATE OF NEBRASKA, STATE OF
OREGON, STATE OF TENNESSEE,
STATE OF TEXAS, STATE OF
WASHINGTON, and STATE OF
WISCONSIN,

                              Plaintiffs,


SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION,
SYNGENTA CROP PROTECTION,
LLC, and CORTEVA, INC.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

DEPOSITION OF JON PARR

Thursday, July 10, 2025

AT:  9:08 a.m.

Taken at:


Davis Polk & Wardwell LLP

5 Aldermanbury Square

EC2V 7HR

London

United Kingdom


Court Reporter:
Georgia Gould
Accredited Real-time Reporter

Q.   That's the title of row 2 in the column "Priorities", right, of this table?

A.   Yep.

Q.   The second column of this table is "Description", right?

A.   Yes.

Q.   Okay.

And the description of the priority post-patent management, do you see where it says in the first bullet: ███████████████████████████████ ████████████████████████████████████████ ██████████████████████████?

A.   I read that, yes.

Q.   What are the commercial operations referenced here?

A.   The -- well I think sometimes context is very important and the context of this slide, let's be clear, is -- is the U.S. business talking to global about what they're doing.  This is them telling us, so I want to be very clear about that.  And I think what they're saying here is that they need themselves to, you know, have -- have a clear plan that -- as to the way they're managing the -- you know, the ████ molecules there, all of which were going off-patent at a similar time.  So that they could, you know, have a consistent approach to that and

communicate to people what they were trying to achieve and how they were trying to achieve that.

Q. Communicate to global or communicate to people in the U.S?

MR. DUGGAN: Objection to form. You can answer.

A. Well, it says if I read it: "Understood by commercial operations," which means really their own team, the sales team, the marketing teams locally. And distribution partners. Which is the distribution players in the U.S. through whom they sell their projects and -- and get them to where they're needed, which is on the farm.

BY MR. CHEN:

Q. Do you see the third column in this table titled "Actions" and under "Actions" the first bullet, Crop Protection Asset Committee and SEC ████ ███████████████████████████████?

A. I see that, yes.

Q. Do you know what the SEC is --

A. Yes.

Q. -- that is referred to here?

A. Sorry, I talked over you. Apologies for that.

Q. No.

A. The Syngenta executive committee.

Q.   And the Syngenta executive committee of course is a global committee, right?

A.   Absolutely.  Which at this time I was not on.

Q.   Okay.  You eventually joined the executive committee; right?

A.   The following year, yes, 2015.

Q.   Okay.

The third and fourth bullets -- well, let's start with third bullet. ███████████████████ ███████████████████████  In context does this refer to generic entry in ████████████

A.   Yes, I can read that.

Q.   And do you take it to mean generic entry?

A.   I don't know for sure what it means.  But, you know, with my knowledge of the -- of the business and everything else, that would be my assumption.

Q.   Okay. █████████████████████████ ████████████████████████████████ ██████████████████████████████?

A.   I don't have a recollection of that to be honest, Mr. Chen.  I -- I mean ████████████ was sold in probably 100 countries around the world of which the U.S. was one.  Patents fall at various different times in various different countries, I mean this is a level of detail that I just couldn't -- wouldn't be able to

absorb.  So I don't recollect it but I can read that on the slide here.

Q.  Okay.  You have no reason to doubt that the U.S. business would know that what they reported to you was accurate?

A.  Absolutely not.  They would know.

Q.  Okay.

The next bullet, you see where it refers to ████████ distribution loyalty agreements in place in the ██████████████

A.  Yes.

Q.  What did you take that to mean?

A.  It's not something that I would have given a great deal of thought to.  This was a local matter. I would take it to mean that there's a reassurance coming from the -- from the -- from the North American team, from the U.S. team if you like, that -- that they are, you know, managing the relationship vis-a-vis the change of status of this product with their -- with their distribution partners in -- in the normal professional way that they would.

But it's not a matter that, either in the CPAC frankly, in this crops and assets strategy team, or even subsequently I would've dived into.

Q.  But CPAC and SEC approved this post-patent

strategy, right?  That's what it says on the slide.

MR. DUGGAN:  Objection to form.

A.    The slide says that the CPAC and the SEC approved this but at this time our company had a lot of committees and there was -- there was a huge lack of clarity as to where decisions were actually being made. I believe that -- that the manifestation of the word "approved" here means that they received the input and they supported it, and they would've -- they would've wished good luck to the North American team with implementing their strategy.  They may have made some comments on it but the responsibility for that strategy would rest solely with the North American team.

BY MR. CHEN:

Q.    You testified earlier that the CPAC was your team at this time, right?

A.    Correct.

Q.    So you received this input from the United States that they were implementing distribution loyalty agreements?

A.    We saw this set of slides, yes.

Q.    You said you supported it as a CPAC?

A.    We supported the presentation as a whole. We -- we probably didn't even give consideration to the individual action lines on this one slide of many.

I mean the level of detail here is -- is enormous.

Q. Does distribution loyalty agreements refer to the Key AI program in the United States?

A. I do not know for sure but I would assume it probably does.

Q. What else could it refer to?

A. I -- I don't know because at this time I wasn't -- I wasn't heavily responsible. I was very -- this presentation is February, two months after I took up this role so I was on a huge learning curve at this moment and I was much more concerned about understanding the R&D and the supply functions and the marketing function around our products than I was about the -- the geographic business units, who were all running themselves and for whom I was not in any way accountable in this role.

Q. Let me turn to page 016.

A. Yep, I'm there.

Q. This is a slide titled "North America Financial Year 2014 Sales Outlook", is that right?

A. Yes, it is -- it actually stands for "Full Year" in our jargon but it amounts to the same thing.

Q. Full year, okay. Very good.

Is this an example of the North American business rather reporting their finances up to global?

A.   I actually would say no, it isn't but let me qualify that.  It of course is them providing some information to us but they had no accountability to the crops and assets team for their business performance. So we had no responsibility for their business performance.  So this is absolutely a for information and context slide.

Q.   Okay.

Maybe let me just ask you about the financial functions later.

The North American business reported to your CPAC team here about the crop protection seed care business in North America, right?

A.   Reported in the sense of provided updates and information, not reported in the sense of line management accountability, yes.

Q.   Okay.  They provided updates and information about downside driven by ▇▇▇▇▇▇▇▇ right?

A.   Yes, that's what it says.

Q.   Okay.  And you see there's a reference to a full review plan for February.  Would that have been a full review conducted by your team?

A.   No, that -- that -- my reading of that Mr. Chen, is that's a review that they planned to conduct.  I mean I could be wrong but that's the way it

Q.   I'd like to show you what will be marked for identification as exhibit Parr 16.

A.   Okay.

Q.   Also, marked CX2874.

(Exhibit 16 marked for identification)

Q.   This is a bit of a larger document so I anticipate it will take a second to load in.

A.   Okay.  Okay, it's arrived.

Okay, so now I can see it and I see that there's 133 pages of it.  Do you want to direct me to any part of it in particular to preread?

Q.   Let's take the approach we did for the last document.  We'll go page-by-page.

A.   Mm-hm.  Sure.

Q.   Let's start with the cover email.

A.   Yes.

Q.   This is a May 2015 email from Annette Rueckert to various folks including, Mr. Hawkins, Mr Goggin, and you are copied here?

A.   Yes.

Q.   This is directed at regional directors and the regional implementation leads; right?

A.   Mm.

Q.   And Ms. Rueckert attaches what she described as the latest version of the ███████████████████████ ,

A.    Yes.

Q.    What was the ████████████████████████████?

A.    I honestly can't remember, but what I do remember is that we had plenty of help from consultants at this time.  And 170-odd page documents is symptomatic of having too many consultants in the organization.  But yes, that --

Q.    Fair enough.

Do you remember looking at an agenda for a global commercial leadership team meeting, you had been assigned I think a few sessions relating to ████

A.    Absolutely.  I mean, it's mandated from the CEO.  This -- this ████ thing was gonna drive efficiency, drive out cost from our business, and -- and so on.

So, you know, it was one of those edits that we -- we really had to embrace this concept of -- of improving efficiency in the -- in the organization.

And that meant, you know, finding common ways of doing things, leveraging scale and so on and so forth.  And, you know, one aspect of it was in marketing, but it was probably not the biggest aspect, I think the supply chain and -- and others had bigger opportunity.

But yes, trying to capture best practice and

share it was -- was pretty much a theme in -- in all areas.  But, you know, marketing was no -- no exception, and I -- we haven't looked into it yet, but I'm assuming that's what this is about.

Q.  Okay.

The CEO you were referring to, was it Mr. Fyrwald at this time?

A.  No, it wasn't, it was Mike Mack.

Q.  Say that again for me, I'm sorry.

A.  Apologies, it was Mike Mack, M-A-C-K.

Q.  Okay.

Let's turn to page 003.  This is the title slide of the █████████████ .

A.  Oh right, yes, got it.

Q.  Okay.

And this reflects -- well, there's a notation that says "Basel, May 2015" on here.  Does that mean this presentation was written in Basel?

A.   It was probably compiled by Annette Rueckert, and it was probably contributed to by the regional marketing teams as well as the global marketing team. And my recollection is that the U.S. team was by far the most sophisticated marketing team we had, and almost certainly made an outsized contribution to this.

That being said, I don't think any of the

regional teams would've spent very much time looking into this. It was more a -- you know, a thoughts repository than it was something that anybody could realistically expect a marketing team to use other than perhaps for reference.

Q. You don't think that the regional teams would've spent time looking into it, but do you know that they did not look into it?

A. No, of course I don't know what everybody was doing everywhere, but I do know what the -- I do know what the reaction would be to a presentation of this length. I mean these were busy guys. So this -- this would've been put on a shelf and, you know, some of the templates in it I'm sure would prove to be very useful, so it would be used as a reference document. It's not -- it's not anything more than that, nor could it be, because the decision-making rights were not with global, they were with the local teams.

In fact, just to underline what I've said, actually it says "reference document" on the -- on the title sheet there.

Q. Okay. Let turn to page 049.

A. There must be somewhere I can type in the page number, is there, and get there in one go?

Q. I -- I confess I don't know what it looks like

on your end.

A.   Yeah, I got it.  Right, we're on 49, yes.

Q.   Okay.

And this is the subsection of the █████████ reference document concerning post-patent strategy and defense; right?

A.   Yes.

Q.   And the title is -- states: "Core Marketing activities - Detailed guidance & WoW".

What does WoW stand for?

A.   I believe it stands for ways of working.

Q.   Ways of working.  Okay.

Can you please turn to page 051, just two pages forward.

A.   Yes, sure.  Okay, we're there.

Q.   This is a slide titled: "People involved - Post Patent Strategy & Defense"; right?

A.   Yes.

Q.   And it says: who leads post patent strategy and defense?  Global APM.  What is a global APM?

A.   I don't know.  Something product manager, I would think.

Q.   Head of asset and product platform management, does that sound right?

A.   I don't know what the A stands for so I'm not

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 138 of 168

gonna guess, but I am willing to guess that PM stands for "project manager".

Q.   Okay.  PPD manager is post-patent defense manager?

A.   I would assume so.

Q.   And global CPS manager, that's global crop protection asset manager; is that right?

A.   Yeah.  I hate the word "asset" because it really doesn't shed much light.  It really means product managers, marketing product managers, crop protection marketing product managers.

Q.   Okay.

And was that function renamed "product manager" after, at some point later?

A.   After I got my hands on it, yes.

Q.   Fair enough.  I gather you did not like your title as global head of global crops and assets?

A.   No, I did not.

Q.   Okay.

I'm gonna ask you to read some very small font here, right above the -- right below the green line, rather, it says:

Right?

A.   Yes, I see that.

Q.   Okay.

Let's turn to the -- or let's turn to the next page.

A.   Yes.

Q.   This a slide titled: ███████████████ ███████████████████████████  Right?

A.   Yes, I see that, yes.

Q.   Do you recognize what's being depicted in the graph on the top-right of this slide?

A.   Yes, it's a kind of cartoon graphic, isn't it. I mean, that's all you can say about it.  And, yes, it basically says -- yes, it's a cartoon graphic of -- of the -- of the -- of -- of a -- of a small part of the life cycle management of a product.  Or a part --

Q.   It was a graphic of -- sorry, go ahead.

A.   Sorry, it's not small, it's probably half the lifespan, if not two-thirds of the lifespan of a product.

Q.   Okay.

And that two-thirds represented here is the period after generic product introduction; right?

A.   That's what it says, yeah, absolutely.

Q.   There's a notation that says ██████ here, it's the cartoonish part of this graph, I imagine.

# Exhibit 299

**Filed Under Seal**

# Exhibit 300

## Filed Under Seal

# Exhibit 301

**SYNGENTA CORPORATION**
**CREDIT REFERENCE OVERVIEW**

## COMPANY BACKGROUND

Syngenta AG ("Syngenta") is a world-leading agribusiness. Syngenta is a leader in crop protection, and ranks third in the high-value commercial seeds market. Sales in 2016 were approximately US $12.8 billion. Syngenta employs more than 27,000 people in 90 countries. The company is committed to sustainable agriculture through innovative research and technology.

Syngenta Corporation, a Delaware company, is an indirect wholly owned subsidiary of Syngenta AG, a world leading agribusiness. Syngenta Corporation is the ultimate parent company or is a majority owner for Syngenta AG's operations in the US. Its subsidiaries are engaged in the discovery, development, manufacture and marketing of crop protection and seed products for use in agriculture. The discovery, development, and manufacturing activities of the Company's subsidiaries in the US have application on a worldwide basis, while their marketing activities are confined to the United States and Canada.

Syngenta AG is a public company headquartered in Basel, Switzerland and its shares are traded on the stock exchanges of Zurich and New York.

## SYNGENTA AG: FACTS AND FIGURES

- World leading company focused solely on agribusiness
- A market leader in each region it serves
- More than 27,000 employees worldwide of which 4,200 are North American employees
- Selected financial information:

2016 Sales $ Billions by Territory:

| NAFTA | EAME | LATAM | APAC | L&G | TOTAL |
|-------|------|-------|------|-----|-------|
| 3.2 | 3.8 | 3.3 | 1.8 | .7 | 12.8 |

More detailed financial and other information on Syngenta AG can be found on its website http://www.syngenta.com

## SYNGENTA CORPORATION FACTS AND FIGURES

**Leadership**
- Jeffrey Rowe, COO of Syngenta Corporation, Syngenta Crop Protection LLC, Syngenta Seeds; President of Greenleaf Genetics LLC
- Vern Hawkins, President, Syngenta Corporation and Syngenta Crop Protection, LLC,
- Scott Reasons, Head, Turf and Landscape North America
- Scott Langkamp, Head Vegetables North America

1                                                                 Revised 4/04/17

- Scott Valentine, President, Syngenta Flowers, LLC.

Syngenta Corporation does not release its financial statements as they are company confidential.

**Affiliate Companies**

### *Syngenta Crop Protection, LLC*

This wholly owned subsidiary develops, manufactures, and sells herbicides, insecticides, fungicides, and seed treatments. These products are designed to improve crop quality and yields through control of major plant diseases, weeds and pests. The business is headquartered in Greensboro, NC and operates other sites as follows:

Sales Offices: Des Moines, IA; Cordoba, TN; Roseville, CA; Canonsburg, PA.

Regional Technical Centers (engaged in crop related field development): Champaign, IL; Hudson, NY; Leland, MS; Visalia, CA.

Manufacturing Sites: St. Gabriel, LA, Omaha, NE. The company's wholly owned subsidiary, GB Biosciences LLC, operates manufacturing facilities at Greens Bayou, TX.

### *Syngenta Seeds, LLC*

This wholly owned subsidiary grows, develops and sells seeds that produce corn, sugarbeets, oilseeds (collectively, field crops), vegetables and flowers. The Seeds division is third globally in field crops and second in vegetables and flowers. It is a complementary division to Crop Protection and is expected to play an increasing role in delivering the commercial value of Syngenta's crop traits, including biotech-based traits.

This business is headquartered in Minnetonka, Minnesota with sales offices located in Longmont, CO (Sugarbeets division), Boise, ID (Vegetables division)

### *Syngenta Flowers, LLC.*

Formerly the Fischer group, this company sells flowers in 20 countries. It has a strong record in marketing and innovation and a product range highly complementary to the existing flowers unit, with leading positions in geraniums, poinsettias, and New Guinea impatiens. This business is headquartered in Gilroy, CA.

2 <span style="float:right">Revised 4/04/17</span>

HIGHLY CONFIDENTIAL

*Syngenta Corporation*

Syngenta's corporate entities provide services to the group including legal, finance, investor relations, communications, and government affairs. Syngenta's offices are located in Wilmington, DE and Washington DC.


**ADDRESSES OF MAJOR LOCATIONS – UNITED STATES**

**Syngenta Corporation**
Ste. 100, Shipley Bldg., Concord Plaza
3411 Silverside Road
Wilmington, DE  19810
800-759-4500
302-425-2000
Tax ID#52-2274691

**Syngenta Crop Protection, LLC**
- Headquarters
  Syngenta Crop Protection, LLC
  410 Swing Road
  Greensboro, NC  27409
  336-632-6000
  Tax ID#56-2001572

- GB Biosciences LLC
  2239 Haden Road
  Houston, TX  77015
  713-453-7281
  Tax ID#34-1507195

**Syngenta Seeds, LLC**
**Headquarters**
Syngenta Seeds
11055 Wayzata Boulevard
Minnetonka, MN  55305
612-656-8600
Tax ID#41-1292617

**Syngenta Flowers, LLC.**
- Headquarters
  2280 Hecker Pass Highway
  Gilroy, CA  95020
  408-847-7333

3                                                                 Revised 4/04/17

Tax ID#59-2461407

•

**TRADE REFERENCES**

• **Syngenta Crop Protection, LLC**
Waterborne Environmental, Inc.　　　　Gibbs & Soell, Inc.
897B Harrison Street SE　　　　　　　600 Third Avenue
Leesburg, VA  20175　　　　　　　　Sixth Floor
703-777-0005　　　　　　　　　　　New York, NY  10016
Patrick Holden, CEO　　　　　　　　Seth Miessen, Principle & CFO
holdenp@waterborne-env.com　　　　212-697-2600
　　　　　　　　　　　　　　　　smiessen@gscommunications.com

Green Plains Wood Rivers, LLC
7874 South 140th Road
Wood River, NE  68883
308-392-3133
Attn:  Michael Brooks
Michael.brooks@gpreinc.com

Martin Williams Advertising
150 South 5th Street, Suite 900
Minneapolis, MN  55402
(Email to accounting preferred) remittance@martinwilliams.com
Main Office Number: 612-340-0800

Lee Container
275 Chambers Blvd
P.O. Box 575
Homerville, GA  31634
Attn: Credit Department
912-487-4200

• **Syngenta Seeds, LLC**
　　　　　　　　　　　　　　　　Fax:  252-931-5973
NACCO Materials Handling Group, Inc.　Requests accepted only by email or fax
d/b/a Yale Materials Handling Corp.
1400 Sullivan Drive　　　　　　　　Amerigas
Greenville, NC  27858　　　　　　　P. O. Box 371473
Attn:  Eric Ratcliffe, Collection Analyst　Allegheny, PA  15250-7472
Email: eric.ratcliffe@nmhg.com　　　509-488-2312
Phone:  252-931-5616

4　　　　　　　　　　　　　　　　　　　　　　　Revised 4/04/17

Estes Express Lines-Boise
P.O. Box 25612
Richmond, VA  23260-5612
208-333-9462

- **Syngenta Flowers, LLC.**
  Lucas Greenhouses
  214 Whig Road
  Monroeville, NJ  08343
  Contact:  George Lucas
  856-881-0234
  Fax:  856-881-2502

  Pacific Coast Recycling, Inc.
  5895 Obata Way
  Gilroy, CA  95020
  408-848-6811
  Attn:  Joyce Norris
  Joyce.n@pacificcoastrecycling.com

  Millstadt Greenhouses
  6627 State Route 158
  Millstadt, IL  62260-1741
  618-476-7200
  Fax: 618-476-3878

- **Corporate**
  Ashford Capital Managament
  3801 Kennett Pike
  Suite B-107
  PO Box 4172
  Wilmington, DE 19807

## BANK REFERENCE

Bank of America
New York, NY

All Credit Reference requests must be submitted online through www.bankvod.com

5                                                    Revised 4/04/17

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345247
CX2933-005

## CREDIT INFORMATION

| Dun & Bradstreet | Numbers | Ratings |
|---|---|---|
| Syngenta Corporation: | 00-799-4572 | 1R3 |
| Syngenta Crop Protection: | 96-661-6633 | 1R3 |
| Syngenta Seeds: | 00-696-2427 | 1R3 |
| Syngenta Flowers, LLC. | 00-716-1537 | 1R4 |

### Corporate Credit Ratings-Short Term

**Moody's**
Syngenta AG          P1

**Standards & Poor's**
Syngenta AG          A1

### Corporate Credit Ratings-Long Term

**Moodys**
Syngenta AG          A2

**Standards & Poors**
Syngenta AG          A+

## TRADE, CREDIT AND/OR FINANCIAL RELATED INQUIRIES

The groups within Syngenta Corporation's subsidiaries that are authorized to commit the company to the purchase of goods and/or services provide the primary interface in conveying information to and agreeing credit terms with suppliers. In the unusual event that there should be a need for financial or other information over and above that customarily made available to suppliers, the matter may be referred to Syngenta Corporation's treasury office referenced below:

Henry P. Graef
Treasurer
Syngenta Corporation
Ste. 100, Shipley Bldg., Concord Plaza
Wilmington, DE 19810

6
Revised 4/04/17

**SYNGENTA CANADA Inc.**
**CREDIT REFERENCE OVERVIEW**

## COMPANY BACKGROUND

Syngenta AG ("Syngenta") is a world-leading agribusiness. Syngenta is a leader in crop protection, and ranks third in the high-value commercial seeds market. Sales in 2016 were approximately US $12.8 billion. Syngenta employs more than 27,000 people in 90 countries. The company is committed to sustainable agriculture through innovative research and technology.

Syngenta Canada Inc. is an indirect wholly owned subsidiary of Syngenta AG. The Corporation is the ultimate parent company and is a majority owner for Syngenta AG's operations in Canada. It is involved in the marketing and distribution of crop protection and seed products for use in agriculture.

Syngenta AG is a public company headquartered in Basel, Switzerland and its shares are traded on the stock exchanges of Zurich and New York.

## SYNGENTA AG: FACTS AND FIGURES

- World leading company focused solely on agribusiness
- A market leader in each region it serves
- More than 27,000 employees worldwide of which approximately 4,200 are North American employees
- Selected financial information:

2016 Sales US$ Billions by Territory:

| NAFTA | EAME | LATAM | APAC | L&G | TOTAL |
|-------|------|-------|------|-----|-------|
| 3.2 | 3.8 | 3.3 | 1.8 | .7 | 12.8 |

More detailed financial and other information on Syngenta AG can be found on its website http://www.syngenta.com

## SYNGENTA CANADA FACTS AND FIGURES

**Leadership**
- Jay Bradshaw, President and CEO, Syngenta Canada Inc.
- Chris Legge, Head Finance, Syngenta Canada Inc.

Syngenta Canada does not release its financial statements as they are company confidential.

1                                                                 Revised 4/04/17

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345249
CX2933-007

.

**Syngenta Canada Address**
140 Research Lane, Research Park
Guelph, Ontario N1G4Z3
Tel: (519) 836-5665
Fax: (519) 823-8439

GST # 89399 7387RT0001
QST #1019684373 TQ0001

**Syngenta Canada**

Accounts Payable Inquiries (519) 837-5326

**TRADE REFERENCES**

Future Transfer Transport
c/o John Lansink
281 Tillson Ave.
Tillsonburg ON  N4G 5X2
(519) 842-7600

Bison Transport
1001 Sherwin Road
Winnipeg, MB  R3H 0T8
(800) 363-0003

Quarry
c/o Izabela Skrzek
144 King St N.
St. Jacob's ON  N0B 2N0
(519) 664 2999

**BANK REFERENCE**

HSBC Canada
70 York Street
Toronto, ON  M5J 1S9

2

Revised 4/04/17

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345250
CX2933-008

<u>**Corporate Credit Ratings-Short Term**</u>

**Moody's**
Syngenta AG                          P1

**Standards & Poor's**
Syngenta AG                          A1

<u>**Corporate Credit Ratings-Long Term**</u>

**Moodys**
Syngenta AG                          A2

**Standards & Poors**
Syngenta AG                          A+

<u>**TRADE, CREDIT AND/OR FINANCIAL RELATED INQUIRIES**</u>

The groups within Syngenta Canada Inc. that are authorized to commit the company to the purchase of goods and/or services provide the primary interface in conveying information to and agreeing credit terms with suppliers.  In the unusual event that there should be a need for financial or other information over and above that customarily made available to suppliers, the matter may be referred to Syngenta Canada's treasury office referenced below:

Henry P. Graef
North America Regional Treasurer
Syngenta Corporation
Ste. 100, Shipley Bldg., Concord Plaza
Wilmington, DE  19810

3                                                             Revised 4/04/17

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345251
CX2933-009

# Syngenta Contract Addendum

This Addendum (the "Addendum") is made as of the date of last signature below to the Hotel Agreement (the "Hotel Agreement") between the [INSERT LEGAL ENTITY NAME OF HOTEL FROM THE HOTEL CONTRACT] (the "Hotel") and Syngenta [INSERT LEGAL ENTITY OF APPLICABLE SYNGENTA DIVISION] ("Syngenta") regarding Syngenta's scheduled event(s) on [INSERT DATES OF EVENT] (the "Event"). In consideration of the mutual promises and covenants contained herein, the parties agree as follows:

This Addendum along with the Hotel Agreement (as amended, hereinafter jointly referred to as the "Agreement") represents the entire agreement between the parties regarding the Event and supersedes any and all other agreements, either oral or in writing with respect to the subject of this Agreement. In the event of any conflict between the terms of the Hotel Agreement and this Addendum, the terms of this Addendum shall control.

**Incompatible Groups:** Hotel represents that at the time of signing this Addendum it has not and further represents that it will not book any other competing group or any affiliates/subsidiaries of such competing group (as defined below) at the Hotel during the dates of the Event. For purposes of this clause, a competing group shall include bookings related to any of the following competitors of SYNGENTA (including affiliates or subsidiaries of such competitors). Competitors to note:

| | | |
|---|---|---|
| Abbott & Cobb | Ernst Benary of America, Inc. | Peterson |
| ADM | Express Seed | Pfister |
| AgReliant Genetics | Fides Oro | Phillips |
| Agrigold | FMC Corporation | Pioneer |
| AgVenture | Fontanelle | Prairie Brand |
| Albaugh, LLC | FS | Pro Harvest |
| American Takii, Inc. | Gold Country | Pro Seed |
| AmVac Chemical Corp. | Golden Acres | Producers |
| Aris | Gowan, Inc. | Proven Winners, LLC |
| Arysta LifeScience Corporation | Great Lakes | Pureline |
| Asgrow – A Monsanto Company | Greatlakes Hybrids | REA |
| Ball Horticulture Company | Green Fuse Botanicals, Inc. | Renk |
| Ball Seed Company | GroLink | Rijk Zwaan |
| BASF Corporation | Harris Moran | Rotam |
| Bayer | Hogemeyer | Rupp |
| Beck's | Hubner | Sakata Seed |
| Beck's Seed Co | Hughs | Selecta Biosciences, Inc. |
| Becks | Illinois Seed Foundation | Seminis Vegetable Seeds, Inc. – Monsanto Company |
| Bejo | Jung | Sipam Srl |
| Betaseed | Koppert | Specialty |
| Biobest | Kruger | Specialty Hybrids |
| Bonnie Plants | Legacy | Stewart |
| Broadbeck's Seed | Legend | Stine |

0

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345252
CX2933-010

| | | |
|---|---|---|
| Brotherton | Lewis | Stine Seed Company |
| Burpee | LG Seeds | Stone |
| Centest | Makhteshim Agan Industries | Stone Seed – Monsanto Company |
| Channel | Mana | Strike |
| Channel Seed Co | Mershmans | Suntori |
| Cheminova A/S | Midland | Superior |
| Crookham | Monsanto Company | Taylor |
| Croplan | Mustang | Titan Pro |
| Dairyland | Mycogen | Trelay |
| DeKalb | North Star Genetics | United Phosphorus Limited |
| Dekalb – A Monsanto Company | NuFarm Limited | Valent |
| DeRuiter Vegetable Seeds – A Monsanto Company | Nunhems | Vilmorin |
| Dow AgroSciences | NuTech | W. Atlee Burpee & Co. |
| Drexel Chemical Co. | OHP | Wensman |
| Dümmen | Origene | Willcross |
| DuPont | Orsetti | Wycoff |
| Ecke Ranch | PanAmerican Seed | Wyffels Hyrids |
| Enza Zaden | Partners | |

In the event that Hotel breaches this clause, SYNGENTA shall have the option to terminate this Agreement without liability to Hotel and Hotel shall return to Syngenta any deposits or payments already made by Syngenta.  In the event that SYNGENTA elects to terminate the Agreement and then decides to proceed with the Event at an alternative location, Hotel shall also pay any and all fees and costs associated with transfer to the alternative location.  In the event that SYNGENTA decides, in its sole discretion, to proceed with the Event at the Hotel, then Hotel shall take additional measures requested by SYNGENTA to ensure that the competing group and its events are accommodated in areas of the hotel as separated as possible from the SYNGENTA group and its events and Hotel will also provide SYNGENTA additional compensation the substance and nature of which will be agreed upon by the parties and which may include but is not limited to credits, discounts, additional amenities provided at no charge, et.  The remedies listed in this clause shall be in addition to any other damages or remedies available to SYNGENTA as a result of Hotel's breach of this clause.

**Renovation:**  Hotel will promptly notify Syngenta of any significant construction or remodeling to be performed in Hotel during the Event.  If Syngenta reasonably determines that such construction or remodeling may have a negative impact on the Event, Syngenta may cancel this Agreement without liability of any kind and Hotel shall return to Syngenta any deposits or payments already made by Syngenta.

**Food & beverage/room rental attrition:**  Syngenta agrees to provide a minimum of 80% of the banquet food and beverage minimum listed in the Hotel Agreement (excluding tax and service charge).  Should SYNGENTA's banquet food and beverage revenue fall below this amount, SYNGENTA will be responsible for the difference between the minimum banquet food and beverage revenue and the actualized food and beverage revenue, plus any applicable taxes required by law less any revenues received by Hotel as a result of efforts to mitigate its damages.  Hotel shall undertake all reasonable efforts to resell any unused food and beverage services/function

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345253

CX2933-011

space and will credit those revenues against any damages resulting from reduction in size or revenue of the Syngenta Event.

**Cancellation:** Syngenta may cancel the Event at any time without cause upon written notice to the Hotel. Hotel shall undertake all reasonable efforts to resell any unused or canceled function space and any unused or canceled guest rooms, and will credit those revenues against any damages (including but not limited to liquidated damages, penalties, etc.) resulting from cancellation of the Event by Syngenta. Syngenta shall pay actual damages incurred by Hotel (not to exceed the maximum amounts calculated pursuant to Table 1 below), if any, directly resulting from Syngenta's cancellation without cause (less space and/or rooms resold) provided that Hotel provides timely proof of its efforts to mitigate such damages and proof that space and rooms being held for the Event remained unsold (including but not limited to a copy of the city ledger or daily occupancy report).

Maximum cancellation damages will be calculated as follows:
Table 1:

| Date of signing to 60 days prior to event: | 40% of guestroom revenues and room rental including applicable state and local taxes |
|---|---|
| 59 days - 30 days prior to event | 60% of guestroom revenues and room rental including applicable state and local taxes |
| 29 days - 15 days prior to event | 70% of guestroom revenues, room rental and food and beverage revenue including applicable state and local taxes |
| 14 days or less | 80% of guestroom revenues, room rental and food and beverage revenue including applicable state and local taxes |

**Attrition and resale:** SYNGENTA has the option to reduce up to 20% of the contracted room block without penalty up to 60 days prior to the contracted Event dates (the contracted room block less any such reduction is referred to as the "Final Room Block"). SYNGENTA agrees to pay actual damages incurred by Hotel (not to exceed 80% of the cumulative Final Room Block), if any, directly resulting from Syngenta's reduction in size of the event (less rooms resold) provided that Hotel provides timely proof of its efforts to mitigate such damages and proof that rooms being held for the Event remained unsold (including but not limited to a copy of the city ledger or daily occupancy report).

Every attempt will be made by Hotel to mitigate the damages by reselling the rooms and meeting space. In addition, in calculating attrition damages, the following additional terms will apply:
- All reservations booked over the contracted dates regardless of how they are made from Syngenta will be considered as part of the contracted block. If requested, Syngenta will provide back up to the Hotel verifying the guest is part of the contracted block.
- Any guarantee no-shows, cancellation and early departure fees collected will be deducted from the damages owed.
- For any date that the Hotel achieves 98% occupancy of available rooms for sale during the official event dates, Syngenta will receive credit for full achievement of the contracted block for that day.
- Hotel shall provide appropriate documentation for actual occupancy during the event dates.

**Rebooking:** Notwithstanding any other provisions of this Agreement, no damages for cancellation or reduction in size of the Event shall be owed by Syngenta provided that Syngenta agrees to hold event(s) which

2

cumulatively generate revenues comparable to the revenues lost by the Hotel as a result of the Event cancelled or reduced in size (measured by expected revenues to Hotel) within one (1) year of the cancelled Event.  In the event that Syngenta does not rebook the Event within one year, Hotel shall bill for any damages owed after the 1 year rebooking window expires and Syngenta will pay undisputed damages within 30 days of receipt of invoice.

**Date change:**
Should Syngenta choose to change the dates of its Event (the "Original Event"), the parties agree that the date change will not be treated as a cancellation and Syngenta will not be liable for any damages for cancellation or reduction in size of the Original Event (including but not limited to liability for unsold guest rooms on the original event dates) provided that:
1. The Original Event is rebooked at Hotel on mutually agreeable dates (the "Rescheduled Event"); within 1 month of the original event dates.
2. The revenue projected for the Rescheduled Event remains the same or greater than the revenue projected for the Original Event.

Should more than one date change occur for the Event or the above conditions are not met, Hotel will be entitled to seek damages as outlined under the applicable cancellation clause of this Agreement.

**Impossibility:**  The following clause replaces any force majeure or impossibility clause in the Hotel Agreement: "The performance of the Agreement by either party is subject to acts of God, war, government regulation, disaster, fire, strikes, civil disorder, curtailment of transportation facilities or other similar cause beyond the control of the parties making it inadvisable, illegal or impossible to hold the Event or provide the facility.  This Agreement may be terminated without penalty or other liability for any one or more of such reasons by written notice to the other party.  In the event of termination of the Agreement by a party pursuant to this clause, Hotel shall promptly return to Syngenta any deposits or payments previously made by Syngenta."

**Space warranty:**  Hotel warrants that it shall provide the specific room/function space listed in the Agreement and shall not move the Event to any other location without the prior written permission of Syngenta.  Hotel warrants that it shall provide hereunder all conference, banquet, reception, and function space(s) properly equipped and maintained including proper heating and air conditioning when and where necessary, lighting, and proper chairs and tables.  All rooms and function space(s) shall be provided by Hotel in such condition as would normally be provided by a first-class hotel.

**No walk clause:**  Hotel shall walk other groups and guests before it will walk any attendee associated with the Syngenta event.  In the event that Hotel, despite the foregoing clause, should walk any Syngenta attendee, Hotel will consult with the Syngenta meeting planner prior to relocation to another hotel.  Hotel will provide (1) accommodations at a comparable hotel acceptable to Syngenta within 5 miles of Hotel at no charge to the guest or Syngenta; (2) transportation to and from the alternate hotel; (3) provide accommodations for the attendee at the Hotel in an upgraded room at the earliest possible date and (4) Syngenta will receive credit for the displaced room for purposes of calculating pickup relating to this Agreement.

**Complimentary room night policy:**  The Hotel shall provide Syngenta with one (1) complimentary room night for every 30 room nights occupied on a cumulative basis by the Syngenta's attendees over the dates established.  Complimentary rooms may be assigned by Syngenta to individuals in any manner over the actual conference dates or applied to the Master Account.  Syngenta agrees to notify Hotel of the Syngenta's election relating to complimentary room nights prior to arrival.

3

HIGHLY CONFIDENTIAL

SYT_REBATELIT_04345255

CX2933-013

**Billing, additional charges and deposits:** No additional charges beyond those stated in the Agreement will be incurred by Syngenta for work performed or services or items provided by Hotel, unless Hotel shall have first obtained prior written consent from an authorized representative of Syngenta. Notwithstanding anything in the Hotel Agreement, if a deposit has been paid, all or some of the deposit paid by Syngenta may be refundable in the event of cancellation or reduction in size of the Event (subject to the terms of this Addendum).

**Payment arrangements:** Any scheduled or request for payment must be done via an itemized invoice. Any credit card on file requires signed invoice approval by the card holder or authorized card signatory prior to any transaction taking place.

**Payment by credit card or company check:** If direct billing has not been approved or if Group wishes to pay any portion of its obligation by credit card or company check, new Federal regulations require Group to VERBALLY provide a credit card number, including the 3 or 4 digit security code on the back of the card directly to the Hotel Accounting Department. Hotels/Resorts can no longer accept written authorization forms or emails containing credit card numbers. Group Contact will call the Accounting Department and verbally relay the credit card information to: Name_____ Phone_____

**Indemnification:** The following clause replaces any indemnification provisions in the Hotel Agreement which are hereby deleted and replaced with the following: "Each party to this Agreement shall indemnify, defend and hold harmless the other party and its officers, directors, agents, employees, and owners from and against any and all demands, claims, damages to persons or property, losses and liabilities, including reasonable attorneys' fees arising out of or caused by the indemnifying party's negligence or willful misconduct in connection with the provision and use of Hotel as contemplated by this Agreement. Each party's obligation under this section is subject to the following conditions: The indemnitee shall give the indemnitor prompt written notice of any such claim so as not to prejudice the Indemnitor, and shall cooperate in the defense of such claim at the indemnitor's expense. Further, each party agrees that the indemnitor shall have sole control over the defense or settlement of any such claim, action, or proceeding, including, but not limited to, the right to select defense counsel, and that neither the indemnitee nor its officers, directors, employees, agents, or contractors shall enter into any agreement with respect to such claim, action or proceeding for which indemnification is or may be sought without receipt of the indemnitor's prior written approval. The indemnitee shall have the right to retain separate counsel at its sole expense. Such separate counsel shall function solely to advise the indemnitee and shall have no right to control the defense of any lawsuit or to effect any settlement, other than at the indemnitee's sole expense."

**Insurance:** The following clause replaces any insurance clause in the Hotel Agreement: "Both parties shall carry appropriate insurance adequate to protect itself against any claims arising from activities at the Hotel during the Event."

**Confidentiality:** All information disclosed by Syngenta to Hotel (including but not limited to its employees, subcontractors or related parties) in any manner (or to which Hotel may have access) that is in any way related to its business and/or products is confidential ("Confidential Information") and shall remain the property of Syngenta. Hotel acknowledges that it may have access to Confidential Information during the course of or in connection with the Event. Hotel shall treat all Confidential Information confidentially and shall not disclose or use it in any manner except as permitted by Syngenta in writing. The confidentiality obligations set forth in this paragraph shall survive any expiration or termination of this Agreement.

**Cancellation by hotel:** Except in the event of a qualifying force majeure event, Hotel shall not cancel the Event. In the event the hotel breaches this Agreement by canceling the Event, Syngenta shall be entitled to pursue any

4

HIGHLY CONFIDENTIAL

and all available rights and remedies including but not limited to recovery of all damages, liabilities and increase in costs of meeting, food and beverage, guestrooms and ancillary charges arising from such cancellation.  In addition, at the request of Syngenta, Hotel shall find a comparable hotel or better within a 5 mile radius for the group to have the conference at no additional cost to SYNGENTA over the dates already agreed upon within this Agreement and Hotel shall pay for all additional travel costs, marketing and labor costs associated with the relocation of the Event to another hotel or venue.  Syngenta's election to require the Hotel to assist in finding an alternative hotel in the event of Hotel's cancellation, shall be without prejudice to any other right or remedy afforded to Syngenta under this Agreement and will not affect any rights or remedies, which have arisen prior to or as a result of such cancellation.

IN WITNESS WHEREOF, the parties to this Agreement have executed this Addendum through their authorized representatives.

[INSERT HOTEL LEGL ENTITY]                           [INSERT APPLICABLE SYNGENTA LEGAL ENTITY}

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____           Date: _____

5

SYT_REBATELIT_04345257
CX2933-015

*SYNGENTA CONTRACT ADDENDUM INSTRUCTION FOR USE:*

- *The attached addendum can be incorporated into the hotel agreement or attached. The terms should only exist in the agreement or the addendum.*
- *Insert applicable information in the highlighted yellow areas or the following addendum document.*
- *After you have filled in the highlighted areas, save the completed addendum (follow pages 1-4) as a PDF before sending to hotel for signature.*
- *Inert the following bolded text at the bottom of the hotel agreement above the signature line before sending to hotel along with addendum.*
- *Save as a PDF before sending to hotel.*

**This contract/agreement is subject to the terms of the attached addendum hereto and incorporated herein by this reference. In the event of a conflict between the terms of the agreement and the terms of the addendum, the terms of the attached addendum shall prevail.**

0

# Exhibit 302

## Filed Under Seal

# Exhibit 303

**Filed Under Seal**

# Exhibit 304

UNITED STATES DISTRICT COURT

EASTERN DIVISION OF ARKANSAS

CENTRAL DIVISION

Case No. 4:22-cv-1287-BSM

- - - - - - - - - - - - - - - - - - - - x

STATE OF ARKANSAS, ex rel,

TIM GRIFFIN, ATTORNEY GENERAL,

                    Plaintiff,

        - against -

SYNGENTA CROP PROTECTION AG,

SYNGENTA CORPORATION, SYNGENTA

CROP PROTECTION, LLC., and

CORTEVA, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - x

CONTINUED VIDEOTAPED DEPOSITION OF

ROSS WEIKEL

New York, New York

Wednesday, March 19, 2025

REPORTED BY:

SARA KILLIAN, RPR, RCR

R. Weikel

distributors.

Q.     Okay.

So rather than reduce the Key AI threshold for █████ for ████████████ ██████████ , you lowered prices on some of your █████ brands; is that correct?

MR. McCLAMMY:  Objection to form.

A.     Yeah, we never had a formal decision on -- on the question around the threshold share, but we did decide to lower prices.

Q.     That was accepted by █████ as an appropriate response to their request for changing the Key AI threshold for █████ ?

MR. McCLAMMY:  Objection to form and foundation.

A.     You'd have to ask them how they felt about it.

Q.     And did they accept the marketing agreement for 2024 that included these changes to the incentives that lowered prices for certain█████ products?

A.     They would have signed the

R. Weikel

marketing agreement and then there would have been a separate marketing incentive agreement around the ▮▮▮▮▮ products that they also would have signed.

Q.     And we've been talking about ▮▮▮▮▮

Were -- did that separate marketing incentive agreement around the ▮▮▮▮▮ products that ▮▮▮▮▮ signed, was that also extended to ▮▮▮▮▮▮▮▮▮▮▮▮ that by from Syngenta?

A.     I would expect so, yes.

Q.     Do you know so?

A.     I'm fairly certain it did.  It would have been ▮▮▮ distributors who were buying those products.  I don't know if -- there would have been distributors who may not be buying those products that might not have gotten an incentive.

Q.     Does your team determine the Key AI qualifying thresholds that will be included in marketing agreements that you're negotiating?

A.     When -- if a customer has

Case 1:22-cv-00828-TDS-JEP     Document 454-13     Filed 04/24/26     Page 165 of 168

R. Weikel

questions and wants to negotiate any part of their contract, including the Key AI threshold, they would have that conversation with me and my team. The -- all the final contracts are signed by Vern Hawkins, so he would be the final decision on what we would do on a contract.

Q. So just to kind of get my head around the negotiating process here for each growing year for a marketing agreement that would contain a Key AI, does Syngenta propose that initially to the distributors?

A. I would say for most of our agreements, we would ask the customer for changes that they would like to see from the prior year. One of the things that we -- that most or our customers tell us they like is our consistency of programs, consistency of approach. And so because we've gotten that feedback, we typically start with a -- what is the customer looking for, are there things in the offer, incentives that they think would be better for them. So those -- those would be the places we would start.

Case 1:22-cv-00828-TDS-JEP    Document 454-13    Filed 04/24/26    Page 166 of 168

R. Weikel

And then we would also make adjustments to the size targets based on, you know, growth targets based on where we see market growth, so we would adjust growth targets to be in line typically with our own internal growth targets. So if we're looking for a -- you know, if they have a fungicide growth target in their agreement, plant performance, grow crop fungicide, whatever you want to call it, we would look at our -- how our marketing team sees that area as. You know, if they see that growing at 7%, then we're going to try to make sure we have a growth target for the customer -- sorry, I'll slow down -- of around 7% or so as well.

So we will -- there are parts, particularly on growth target type things, where we will make a proposal and then on structural and things like that, we will look for feedback.

Q. And after you've gotten that, that feedback from a customer that you just described, does Syngenta then send a draft

# Exhibit 305

**Filed Under Seal**