FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| STATE OF CALIFORNIA, | ) | |
| STATE OF COLORADO, | ) | |
| STATE OF ILLINOIS, | ) | |
| STATE OF INDIANA, | ) | |
| STATE OF IOWA, | ) | |
| STATE OF MINNESOTA, | ) | |
| STATE OF NEBRASKA, | ) | |
| STATE OF OREGON, | ) | Case No. 1:22-cv-00828-TDS-JEP |
| STATE OF TENNESSEE | ) | |
| STATE OF TEXAS, | ) | **MEMORANDUM OF LAW IN** |
| STATE OF WASHINGTON, | ) | **SUPPORT OF THE** |
| and | ) | **SYNGENTA DEFENDANTS'** |
| STATE OF WISCONSIN, | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYNGENTA CROP PROTECTION AG, | ) | |
| SYNGENTA CORPORATION, | ) | |
| SYNGENTA CROP PROTECTION, | ) | |
| LLC, | ) | |
| and | ) | |
| CORTEVA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

NATURE OF THE MATTER ............................................................... 1

UNDISPUTED FACTS........................................................................ 7

I.   THE CROP PROTECTION INDUSTRY ....................................... 7

     A.   Syngenta Delivers Valued Products, Backed by Full-Service Support, to American Farmers ................................7

     B.   Branded Crop Protection Products Differ from Generic Versions in Upfront Cost, Composition, and Performance ........................................................................8

     C.   Distribution of Crop Protection Products........................... 13

     D.   Products Containing the Syngenta AIs Compete Against Products Containing Different AIs ....................... 17

II.   SYNGENTA'S KEY AI REBATE PROGRAM............................ 20

     A.   Key AI Rebates Reward Distributors and Retailers for Voluntarily Purchasing Syngenta Products ................. 22

III.   SALES OF GENERIC PRODUCTS WITH THE SYNGENTA AIs ARE SUBSTANTIAL........................................ 30

QUESTIONS PRESENTED................................................................. 33

LEGAL STANDARD......................................................................... 33

ARGUMENT .................................................................................. 34

I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFFS' FEDERAL ANTITRUST CLAIMS................................................................................. 34

     A.   The Price-Cost Test Applies Because, as a Matter of Law, Price Is the Predominant Mechanism of Exclusion .......................................................................... 35

i

B. In Any Event, Plaintiffs' Antitrust Claims Do Not Survive the Full Rule of Reason ......................................... 62

II. SYNGENTA IS ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIMS ................................................. 100

A. The State Plaintiffs' State Law Antitrust Claims Fall in Tandem with Their Federal Antitrust Claims ............ 100

B. Syngenta Is Entitled to Summary Judgment on the Consumer Protection Claims Brought by California, Indiana and Iowa ............................................................. 101

III. THE COURT SHOULD DISMISS ALL OF PLAINTIFFS' CLAIMS AGAINST SYNGENTA CROP PROTECTION AG AND SYNGENTA CORPORATION AS A MATTER OF LAW ....................................................................................... 103

CONCLUSION ................................................................................... 108

APPENDIX A – Table of Exhibits............................................................. i

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.,*
690 F.2d 411 (4th Cir. 1982) ................................................................... 91

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
592 F.3d 991 (9th Cir. 2010) ....................................................... 44, 45, 98

*AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC,*
638 S.W.3d 198 (Tex. 2022) ................................................................... 100

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................. 33

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.,*
300 F.3d 620 (5th Cir. 2002) ................................................................... 63

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.,*
171 F. Supp. 3d 1092 (D. Colo. 2016) .................................................... 100

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ................................................................................. 36

*Barr Labs, Inc. v. Abbott Labs,*
978 F.2d 98 (3d Cir. 1992) ................................................................. 56, 57

*Belmora, LLC v. Bayer Consumer Care AG,*
338 F. Supp. 3d 477 (E.D. Va. 2018), *rev'd in part on other grounds,*
987 F.3d 284 (4th Cir. 2021) ................................................................... 64

*Bepco, Inc. v. Allied-Signal, Inc.,*
106 F. Supp. 2d 814 (M.D.N.C. 2000)...................................................... 92

*Berghausen v. Microsoft Corp.,*
765 N.E.2d 592 (Ind. Ct. App. 2002) ..................................................... 100

*Berlyn, Inc. v. Gazette Newspapers, Inc.,*
223 F. Supp. 2d 718 (D. Md. 2002), *aff'd,* 73 F. App'x 576
(4th Cir. 2003) ........................................................................................ 64

*Blewett v. Abbott Lab'ys,*
86 Wash. App. 782 (Wash. Ct. App. 1997) ............................................ 100

iii

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ....................................................................... *passim*

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ................................................... 65, 69, 82, 84

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................... 91

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ............................................................ 39, 91

*Chicoine v. Wellmark, Inc.*,
  894 N.W.2d 454 (Iowa 2017) ............................................. 100

*Cogan v. Harford Mem'l Hosp.*,
  843 F. Supp. 1013 (D. Md. 1994) ......................................... 64

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ..................................... 37, 56, 98

*Consul, Ltd. v. Transco Energy Co.*,
  805 F.2d 490 (4th Cir. 1986) .................................................. 63

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) ........................................ 91, 95, 97

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ............................................. 101

*DeSoto Cab Co., Inc. v. Uber Techs., Inc.*,
  2020 WL 10575294 (N.D. Cal. Mar. 25, 2020) ................... 57, 58

*DSM Desotech Inc. v. 3D Sys. Corp.*,
  749 F.3d 1332 (Fed. Cir. 2014) ......................................... 76, 81

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ............................................................... 37

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
  2014 WL 1343254 (D.N.J. Mar. 28, 2014), *aff'd*, 821 F.3d 394
  (3d Cir. 2016) ............................................................. 62, 91, 95

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394 (3d Cir. 2016) ........................................... *passim*

iv

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd in part on other grounds*,
  67 F.4th 946 (9th Cir. 2023) ................................................................ 100

*In re EpiPen Antitrust Litig.*,
  545 F. Supp. 3d 922 (D. Kan. 2021), *aff'd*, 44 F.4th 959
  (10th Cir. 2022) ....................................................... 37, 38, 46, 49

*FTC v. Advoc. Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ................................................... 88

*FTC v. Meta Platforms, Inc.*,
  2025 WL 3458822 (D.D.C. Dec. 2, 2025) ............................. *passim*

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) .................................................... 85

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) ........................................ 84

*FTC v. Sanford Health*,
  926 F.3d 959 (8th Cir. 2019) .................................................. 88

*FTC v. Tempur Sealy Int'l, Inc.*,
  768 F. Supp. 3d 787 (S.D. Tex. 2025) ..................... 76, 78, 79, 86

*Graham v. VCA Antech, Inc.*,
  2016 WL 5958252 (C.D. Cal. Sept. 12, 2016), *aff'd sub nom. Graham v.
  VCA Animal Hosps., Inc.*, 729 F. App'x 537 (9th Cir. 2018) ................... 102

*Hannah's Boutique, Inc. v. Surdej*,
  112 F. Supp. 3d 758 (N.D. Ill. 2015) ..................................... 100

*Hixson v. Moran*,
  1 F. 4th 297 (4th Cir. 2021) ................................................. 95

*Heath Consultants, Inc. v. Precision Instruments, Inc.*,
  247 Neb. 267 (Neb. 1995) .................................................... 100

*Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.*,
  158 F. App'x 413 (4th Cir. 2005) .......................................... 101

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) ................................................. 57

v

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .................................................. 64, 76, 78, 79

*Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*,
456 F. Supp. 831 (D. Del. 1978) ................................................. 107

*Jeandron v. Bd. Of Regents of Univ. Sys. Of Md.*,
510 F. App'x 223 (4th Cir. 2013) ............................................ 107

*Jones v. City of McMinnville*,
244 F. App'x 755 (9th Cir. 2007) ............................................ 100

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
847 F.3d 1221 (10th Cir. 2017) ............................................... 104

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007) ................................................ 86

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) ................................................ 100

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................ 37, 38

*McWane Inc. v. FTC*,
783 F.3d 814 (8th Cir. 2015) .............................................. 47, 55, 59, 60

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
238 F. Supp. 2d 1024 (N.D. Ill. 2003), *aff'd*, 354 F.3d 661
(7th Cir. 2004) ................................................................. 89, 90

*NicSand Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) (en banc) .................................. 37, 39, 41, 48

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*
670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ...... 64

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004) .................................... 105

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......................................................... 63, 65, 92

*Omega Env't, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ............................................. 92, 94

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) .......................................................... 57

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
  555 U.S. 438 (2009) ...................................................................... 36

*In re Pennsylvania Title Ins. Antitrust Litig.*,
  648 F. Supp. 2d 663 (E.D. Pa. 2009) ....................................... 108

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) .................................................. 64, 68

*Prentice v. Title Ins. Co. of Minnesota*,
  500 N.W.2d 658 (Wis. 1993) ..................................................... 100

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt., LLC*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) ....................................... 106

*Realcomp II, Ltd. v. F.T.C.*,
  635 F.3d 815 (6th Cir. 2011) ...................................................... 63

*Reilly v. Apple Inc.*,
  2022 WL 1215305 (N.D. Cal. Apr. 25, 2022) ........................... 102

*Republican Nat'l Comm. v. Google LLC*,
  742 F. Supp. 3d 1099 (E.D. Cal. 2024) .................................... 103

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*,
  199 F. Supp. 2d 362 (M.D.N.C. 2002) ................................. 57, 91

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ...................................................................... 56

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) .................................................... 104

*In re Se. Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014) ....................................................... 86

*Spahr v. Leegin Creative Leather Prods., Inc.*,
  2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ........................ 100

*Spectrum Pharms., Inc. v. Burwell*,
  824 F.3d 1062 (D.C. Cir. 2016) ................................................... 10

*Stiles v. Walmart, Inc.*,
  639 F. Supp. 3d 1029 (E.D. Cal. 2022) ...................................................... 90

*In re Surescripts Antitrust Litig.*,
  608 F. Supp. 3d 629 (N.D. Ill. 2022) ........................................................ 59

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................................. 92

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ................................................................................... 108

*United States v. Dentsply Int'l*,
  399 F.3d 181 (3d Cir. 2005) ..................................................................... 46

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .................................................................... 91

*United States v. United States Sugar Corp.*,
  73 F.4th 197 (3d Cir. 2023) ................................................................. 76, 84

*Worldwide Basketball & Sports Tours v. NCAA*,
  388 F.3d 955 (6th Cir. 2004) .................................................................... 85

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) .............................................................. *passim*

### STATUTES & RULES

7 U.S.C. § 136 *et seq.* ................................................................................... 9

7 U.S.C. § 136a(c)(3)(B) ............................................................................... 11

21 U.S.C. § 355(j)(2)(A) ............................................................................... 10

Clayton Act § 3, 15 U.S.C. § 14 ............................................................. 34, 63

FTC Act § 5, 15 U.S.C. § 45 ................................................................... 34, 64

Sherman Act § 1, 15 U.S.C. § 1 .............................................................. 34, 63

Sherman Act § 2, 15 U.S.C. § 2 .............................................................. 34, 63

California Cartwright Act § 16700 *et seq.* ........................................... 100, 101

Cal. Bus. & Prof. Code § 17200 ................................................................. 101

viii

Colorado Antitrust Act §§ 6-4-104, 6-4-105 ...................................................... 100

Illinois Antitrust Act, 740 ILCS 10/3.............................................................. 100

Indiana Antitrust Act, Ind. Code Ann. §§ 24-1-2-1, 24-1-2-2 ........................ 100

Iowa Code Ann. § 714.16(2)(a) ...................................................................... 103

Iowa Competition Law, Iowa Code Chapter 553 ........................................... 100

Minnesota Antitrust Law, Minn. Stat. Ann.

   §§ 325D.51, 325D.52, 325D.53 ................................................................. 100

Nebraska Consumer Protection Act, Neb. Rev. Stat. Ann.

   §§ 59-1602-1605 ...................................................................................... 100

Oregon Antitrust Law, O.R.S. §§ 646.705-836 ............................................. 100

Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.* ...... 100

Texas Antitrust Act, Tex. Bus. & Com. Code Ann. §§ 15.05(a)-(b) ............. 100

Washington Consumer Protection Act, RCW §§ 19.86.030-040 .................. 100

Wisconsin Antitrust Law, Wis. Stat. Ann. §§ 133.03, 133.14, 133.16 ........ 100

Fed. R. Civ. P. 56(a) .................................................................................... 33

Fed. R. Evid. 702 ........................................................................... 41, 65, 82

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
   Antitrust Principles and Their Application* (5th ed.) ................................. 86

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

## NATURE OF THE MATTER[1]

Plaintiffs brought this unprecedented case attacking as anticompetitive the inclusion of certain active ingredients ("AIs")—azoxystrobin, mesotrione and metolachlor (the "Syngenta AIs")—in an industry-standard rebate program that unquestionably *reduces* prices for customers of Syngenta's crop protection products containing these AIs.

As the Court presaged two years ago, the operative question is whether Syngenta's Key AI rebate program is predominantly based on price.[2]  If so, precedent dictates that Syngenta's competition with its rivals through above-cost prices is precisely the conduct that the antitrust laws exist to promote. This Court allowed this case to proceed to discovery based on Plaintiffs' commitment to provide *evidence* that Syngenta's customers are conscripted annually into participation in its year-long Key AI program by coercive, *non-price* features.  Plaintiffs cannot provide that promised evidence.  After extensive discovery,[3] the facts have been adduced and are not materially disputed.  Distributors and retailers voluntarily choose to participate in the Key AI rebate program and to satisfy its rebate thresholds in response to the

---

[1] Unless noted, emphasis has been added to quotations, and internal quotations, brackets, citations, footnotes, and deposition objections have been omitted.

[2] D.E. 160 at 56.

[3] In discovery coordinated with other actions, Syngenta produced 1.5 million documents, and 82 witnesses were deposed.

1

financial incentive of lower prices and grower demand for Syngenta products. As one retailer testified, "[T]his lawsuit is asinine because Syngenta is not telling us what to sell.  Our customers are telling us what to provide them."[4] The purported "exclusion" of generics is predominantly—if not exclusively—based on price.  It is now clear that Plaintiffs cannot prove their claims, and Syngenta is entitled to summary judgment.

The price-cost test applies because Plaintiffs have not shown—and cannot show—that any of the supposedly non-price coercive features alleged in their Complaint are, in fact, coercive.

The undisputed record shows that loyalty discounts are not barriers to generic entry.  More than a dozen generic entrants compete against Syngenta for each of the three Syngenta AIs, and collectively control ▮▮▮▮▮▮▮▮▮▮ of each of Plaintiffs' alleged single-AI markets.  Market participants and experts alike have acknowledged the "significant inroads" generic suppliers have made and that the market is "oversupplied" with generic products. Growers confirm that generics are readily available.  And Plaintiffs' own liability expert unambiguously concedes there is "intense competition between branded and generic products" containing the Syngenta AIs that "constrained [Syngenta's] ability to exercise market power," and that the Key

---

[4] Ex. 18 (Sittler (Stone's Farm Supply) Dep.) 25:16-19.

AI program has not prevented price competition from "becom[ing] highly intense."

Discovery has disproved Plaintiffs' allegations that the loyalty discounts are anything other than completely voluntary. Distributors and retailers *choose annually* whether to participate and do so anew every year, and at any point during the year they may *choose* whether to satisfy a particular threshold. The rebate is earned on an AI-by-AI basis—thus, the *only* consequence of not meeting the threshold is that a customer may not receive a rebate for that particular AI for that year which is, as a matter of law, only a price effect. Syngenta does not, nor is it alleged to, claw back any previously earned rebates. As to the Complaint's sole allegation that Syngenta "threatened" to terminate one distributor's supply to coerce compliance, that distributor testified that it chose to meet Syngenta's thresholds because it *wanted* the rebates. When it later decided otherwise, it stopped participating altogether. This is the essence of competition on the merits.

The undisputed record also guts Plaintiffs' contention that the Syngenta-Corteva supply agreements for mesotrione and s-metolachlor represent a "non-price mechanism of exclusion" that cause customers to purchase the associated Corteva products instead of generic products. No

3

evidence shows that Corteva products with Syngenta-sourced AIs have any impact on the alleged effects of the loyalty rebate program whatsoever.

For these reasons, the price-cost test governs Plaintiffs' antitrust claims challenging Syngenta's inclusion of azoxystrobin, mesotrione and metolachlor in its Key AI rebate program. Those claims fail under this test because there is no allegation, much less evidence, that Syngenta prices these AIs below cost.

The Court need go no further than the price-cost test to dispose of Plaintiffs' antitrust claims.[5] But summary judgment is also warranted under the full rule of reason. The uncontroverted evidence shows no harm to competition. Again, Plaintiffs' liability expert concedes that Syngenta's "ability to exercise market power" is "constrained" by price competition with generics, which is "intense." He further acknowledges that "the retail sale of crop protection products is highly competitive" and competition among distributors is "vigorous." There is no basis for this Court to intervene in this well-functioning marketplace and declare illegal industry-standard means of competing.

---

[5] "The price-cost test is a 'specific application of the rule of reason' when applied in the context of exclusive dealing." D.E. 160 at 35 n.7 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277 (3d Cir. 2012)). As shorthand, this brief refers to the full rule of reason as simply the "rule of reason."

4

Plaintiffs' claims also fail under the rule of reason for the independent reason that Plaintiffs have not defined cognizable relevant markets. Plaintiffs' contrived single-AI markets defy law, logic, and the real world experiences of the American farmers who purchase crop protection products. To define product markets limited to each of the three Syngenta AIs, Plaintiffs must demonstrate that *only* the generic version of that AI is a reasonably interchangeable substitute. That does not align with the commercial and agronomic realities reflected in the record evidence. Uncontroverted evidence from manufacturers, distributors, retailers, an agronomist, and growers demonstrates that growers look for real-world solutions to real-world challenges, not myopically at a particular AI. Declarations from multiple growers show they favor Syngenta products over generic versions, and regularly substitute across products with different AIs in Syngenta's and competitor's portfolios based on which product best addresses their needs, not the underlying chemical composition. Defendants' documents evidence intense competition beyond the confines of Plaintiffs' single-AI markets. By analogy, reasonable consumers do not select only between bug repellants with the same chemical ingredient, nor limit their evaluation of painkillers to Tylenol and its generic versions. They ask what products can solve their challenges, whether that challenge is mosquitos, headaches, or pre-emergence corn fungi. In response, Plaintiffs rely on

5

conclusory, preconceived assertions from the same expert whose advocacy for a similarly blinkered market alleged by the FTC was resoundingly rejected just weeks ago as "contradicted by evidence."[6] All of the *factual* evidence in the robust record here—including uncontroverted evidence from growers who purchase the products—shows vigorous competition beyond the narrow confines of a single AI.

Plaintiffs' state law claims also should be dismissed. Most fail for the same reasons that the federal claims fail. The remainder fail, as a matter of law, for reasons specific to the particular claims, as set forth below.

Finally, all claims against Syngenta Crop Protection AG and Syngenta Corporation should be dismissed because neither entity "directs, controls, or encourages" any aspect of the Key AI rebate program.

---

[6] *FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *28, 35 (D.D.C. Dec. 2, 2025) (rejecting C. Scott Hemphill's market definition).

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

<u>**UNDISPUTED FACTS**</u>[7]

## I.  THE CROP PROTECTION INDUSTRY

### A.  **Syngenta Delivers Valued Products, Backed by Full-Service Support, to American Farmers**

Syngenta Crop Protection AG ("SCPAG") is one of the world's leading agricultural technology companies, headquartered in Switzerland.[8]  The company's U.S. agribusiness is Syngenta Crop Protection, LLC ("Syngenta").[9]

Syngenta develops innovative products used by American farmers who grow the nation's food supply.[10]  Its crop protection products—herbicides, insecticides, and fungicides—protect crops from weeds, insects, or disease that decrease "yield" at harvest.[11]

The substance in a crop protection product that controls the targeted pest is commonly referred to as the "active ingredient" or "AI."[12]  Though an

---

[7] For the Court's convenience, Appendix A contains a Table of Exhibits.  Exhibits cited in this brief without an accompanying description are identified by Bates numbering in the Table of Exhibits, and citations are typically to the last three digits of the Bates number.

[8] Ex. 1 (Tudor Decl.) ¶ 5.

[9] *Id.*

[10] Ex. 2 (Syngenta (Hawkins) Dep.) 248:6-249:22.

[11] D.E. 81 ¶¶ 41-42.  As the Court considers this motion, it may take judicial notice of facts such as the chemical composition (AIs) and manufacturers of crop protection products through reference to the EPA's Pesticide Product Labeling System, a searchable database of product labels accepted by the EPA.  *See* https://ordspub.epa.gov/ords/pesticides/f?p=PPLS:1 (searches include product/brand name, company name, and chemical name (active ingredients)); *see also Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 227 (4th Cir. 2013).

[12] *Id.* ¶ 43; Ex. 3 (Hawkins Decl.) ¶ 9; Ex. 4 (Heiniger Rebuttal Rep.) ¶ 17.

7

AI may be sold individually in "technical-grade" form, the AI alone cannot be applied directly to crops; it must be formulated or "finished" with at least one inert ingredient before application.[13]  Plaintiffs' claims relate to finished products containing three AIs developed by Syngenta: the fungicide azoxystrobin and the herbicides mesotrione and metolachlor.[14]

Globally, Syngenta annually invests well over a billion dollars toward innovating crop protection products.[15]  These efforts include developing new AIs, combining existing AIs to create new products, and developing new formulations that improve qualities such as delivery.[16]

### B. Branded Crop Protection Products Differ from Generic Versions in Upfront Cost, Composition, and Performance

#### 1. Branded Manufacturers Like Syngenta Incur Significant Costs to Develop Crop Protection Products

Syngenta competes aggressively against other "branded" or "basic" manufacturers—which focus on the research and development ("R&D") of

---

[13] D.E. 81 ¶ 44.

[14] Plaintiffs define markets for "metolachlor" that include both "old metolachlor" and a newer, more effective version called "s-metolachlor."  Ex. 5 (Hemphill Rep.) ¶ 28; Ex. 4 (Heiniger Rebuttal Rep.) ¶ 5 n.5.  Syngenta currently sells products containing only s-metolachlor.  This brief uses "metolachlor" and "s-metolachlor" accordingly.

[15] Ex. 2 (Syngenta (Hawkins) Dep.) 248:6-249:2 ("well over" billion/year invested in R&D).

[16] Id. 202:8-24; Ex. 6 (Moricle Dep.) 55:3-13.

8

new AIs and new products.  These "R&D Companies" include Corteva, BASF, Bayer, FMC, and Valent.[17]

This competition includes developing new AIs to help growers solve particular problems.  An R&D Company must research, develop, test, and register with the Environmental Protection Agency ("EPA") a new AI and products with that AI, which on average costs $300 million and takes over 12 years.[18]  Only two out of every 100,000 chemical compounds clear these hurdles.[19]

To incentivize these expenditures, federal law affords R&D Companies certain exclusive rights to their innovations under patent laws and the Federal, Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*[20]  A patent protects a new AI or any unique process to manufacture it for 20 years.[21]

An R&D Company also obtains exclusivity over the detailed toxicity, environmental impact, and other data FIFRA requires a registrant to submit to the EPA before it may sell or distribute a new crop protection product in

---

[17] Ex. 5 (Hemphill Rep.) ¶ 64; Ex. 33 (Syngenta (Hawkins) Dep.) 338:12-339:24; Ex. 7 (Gesse Dep.) 226:22-227:2; Ex. 8 (Syngenta (Cecil) Dep.) 18:19-23.

[18] Ex. 2 (Syngenta (Hawkins) Dep.) 248:6-249:2; Ex. 9 (Wichert Decl.) ¶ 4.

[19] Ex. 9 (Wichert Decl.) ¶ 5.

[20] D.E. 81 ¶¶ 50-52.

[21] *See* Ex. 5 (Hemphill Rep.) ¶ 75; D.E. 81 ¶ 51.

9

the United States.[22]  The first registrant to develop an AI must assume the risk of paying to conduct its own studies to generate this data.[23]  To encourage innovation, FIFRA provides the original registrant the exclusive right to cite the data for 10 years.[24]

### 2.    Bringing a Generic to Market Is Much Cheaper

When an AI's or product's patent and FIFRA data exclusivity expire, other manufacturers may register their own generic or "post-patent" versions by citing an R&D Company's data.[25]  Today, there are 21 generic suppliers selling finished products containing one or more of the Syngenta AIs.[26]

Generic products are almost never identical to their branded counterparts.[27]  Unlike the federal pharmaceutical laws, which require generic pharmaceutical drugs to be chemically identical to their branded counterparts,[28] under FIFRA, a generic need only be "substantially similar"

---

[22] D.E. 81 ¶ 52.

[23] Ex. 10 (Source Dynamics (Menagh) Dep.) 463:10-464:14.

[24] D.E. 81 ¶ 53.

[25] *Id.* ¶ 49; Ex. 9 (Wichert Decl.) ¶ 11.  Generic companies also always have the right and ability to develop their own data, including while the original registrant's data is under exclusivity.  Ex. 9 (Wichert Decl.) ¶ 10.

[26] *See* Ex. 11 (FRE 1006 summary exhibit).

[27] Ex. 9 (Wichert Decl.) ¶ 12; Ex. 12 (CHS (Hendrickson) Dep.) 34:6-36:14; Ex. 14 (Growmark (Bunting) Dep.) 82:19-85:6; Ex. 4 (Heiniger Rebuttal Rep.) ¶ 68.

[28] *See Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1066 (D.C. Cir. 2016) (a generic drug must be "equivalent in all material respects to the pioneer drug") (citing 21 U.S.C. § 355(j)(2)(A)).

10

in "composition and labeling" and may differ in ways that would not

"significantly increase the risk of unreasonable adverse effects on the

environment."[29]  Accordingly, generic crop protection products frequently

have different inert ingredients and compositions when compared to branded

products.[30]  Distributors and growers widely perceive branded products as

having "better quality," "superior performance," and more "reliable

inventory" than generics.[31]

It is dramatically cheaper to bring generics to market.  First, generic

suppliers conduct comparatively "very little" R&D because they focus on

selling cheaper versions of R&D Companies' products.[32]

---

[29] 7 U.S.C. § 136a(c)(3)(B); *see also* Ex. 9 (Wichert Decl.) ¶ 12.

[30] Ex. 4 (Heiniger Rebuttal Rep.) ¶ 72.

[31] Ex. 16 (Porter Decl.) ¶ 6; Ex. 17 (Foster Decl.) ¶ 3; *see also, e.g.*, Ex. 4 (Heiniger Rebuttal Rep.) ¶¶ 73-74 (describing "profound disappointment" many growers experience when using generic versus branded products); Ex. 18 (Stone's Farm Supply (Sittler) Dep.) 56:20-59:3, 112:3-24 (hearing complaints from multiple customers about unusable generic metolachlor); Ex. 15 (Helena (Bloodworth) Dep.) 327:8-328:1 (branded suppliers are better equipped to respond to "unpredictable event[s]" in the growing season, which "can save a crop for the growers"); Ex. 19 (Nutrien (Baioni) Dep.) 416:4-24 (observing "generics experiencing interruptions to supply of particular AIs more frequently than the basics" due to their reliance on Chinese-sourced material); Ex. 20 (Bentzinger Dep.) 95:14-96:8 ("steer[ing] away from" generics on his farm even though "it's a little cheaper" because "we don't trust that stuff very much … You don't have confidence in it.").

[32] *See* Ex. 21 (Ripato Dep.) 269:4-12; Ex. 10 (Source Dynamics (Menagh) Dep.) 328:21-329:3; Ex. 22 (Helm (Schumacher) Dep.) 318:16-319:3; Ex. 23 (Winfield (Maple) Dep.) 371:16-372:18.

11

Second, to "encourag[e] generic entry,"[33] FIFRA reduces entry cost by allowing generic registrants to cite an R&D Company's registration data in exchange for "data compensation."[34] Generic suppliers nearly always opt to pay data compensation rather than conducting their own studies because it is substantially cheaper and faster.[35] Data compensation is not a barrier to generic entry. To obtain registration, a generic registrant need only assert that it has "offered" to pay data compensation; actual payment typically comes much later.[36] Thus, generic suppliers can obtain EPA approval and begin selling the product before ever paying a single dollar in data compensation.[37] Further, data compensation payments reflect a small fraction of a generic product's revenue and of Syngenta's costs to develop and bring to market a new AI.[38]

---

[33] Ex. 24 (Plaintiffs' RFA responses) at 13.

[34] *Id.*; Ex. 9 (Wichert Decl.) ¶ 12.

[35] Ex. 5 (Hemphill Rep.) ¶ 246 (citing generic testimony); Ex. 9 (Wichert Decl.) ¶ 15.

[36] Ex. 9 (Wichert Decl.) ¶ 13-14.

[37] *Id.* ¶ 13 (providing examples of generics that obtained EPA approval 3-6 years before first data compensation payment and/or settlement on final compensation).

[38] *See id.* ¶ 4 (SCPAG typically spends "several hundred million dollars" to develop and launch new AIs); ████████████████████████████████ *Compare* Ex. 27 (FRE 1006 summary exhibit) (Albaugh sold $110 million of azoxystrobin products since 2018, Helm sold $27.9 million of mesotrione products since 2018) *with* Ex. 28 (Albaugh Azoxystrobin Data Comp. Agreement) (███ million in data compensation), Ex. 29 (Helm Mesotrione Data Comp. Agreement) (███ million in data compensation).

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

### C. Distribution of Crop Protection Products

Syngenta sells its products to distributors, which sell to retailers, which sell to growers—the "traditional channel."[39] Competition among distributors and retailers is "strong,"[40] routinely resulting in pass through of lower prices to growers.[41] The top nationwide distributors are: Helena, Nutrien, Simplot, Tenkoz (which is a buying group of regional distributors and retailers such as CHS, Van Diest ("VDSC"), and Wilbur-Ellis), and Winfield United.[42] Several top distributors are vertically integrated with retailers.[43] These integrated retail chains ("IRCs") distribute 61% of crop protection products in the United States.[44]

Syngenta's products come with a wide array of services at each level of the distribution chain to support proper selection and use.[45] Services include training on agronomic planning and proper storage and handling for

---

[39] Ex. 5 (Hemphill Rep. ¶ 85); Ex. 30 (Orszag Rep.) ¶ 8.

[40] Ex. 5 (Hemphill Rep.) ¶¶ 87, n.55, 287; Ex. 31 (Nutrien (Baioni) Dep.) 36:12-37:1 ("vigorous" distributor competition).

[41] *See infra* n.80.

[42] Ex. 5 (Hemphill Rep.) ¶ 86 n.51 (citing Ex. 32 ("2/2022 Kline Report: Leading Distributors in the U.S. Crop Protection Industry"); *see also* Ex. 32 at 8, 30.

[43] Ex. 5 (Hemphill Rep.) ¶ 91 n.65 (listing Nutrien, Helena, Simplot, Growmark, Wilbur-Ellis, and CHS).

[44] Ex. 5 (Hemphill Rep.) ¶ 85.

[45] Ex. 2 (Syngenta (Hawkins) Dep.) 250:7-251:16; *see also* Ex. 65 (Syngenta (Weikel) Dep.) 675:15-686:21 (describing distributor services, including grower financing, price protection, inventory protection, product recycling, and complaint handling); Ex. 35 (Eichorn Dep.) 451:18-452:13 (describing retailer services).

13

distributors and retailers, and "application planning," "valu[able]" sales representative recommendations, and respray assurance for growers.[46] Respray assurance and warranties, through which Syngenta supports growers facing misapplied or underperforming products, are particularly important for many growers whose ████████████████████████████ ████████████████ "[47] These growers trust that if Syngenta's products do not perform or there is "a worst-case crop damage," "Syngenta … will make things right," while recognizing that they are "probably not going to get any help from a generic company."[48] Collectively, these services are so critical to growers that some have stated "[e]ven if a generic product is cheaper, the lack of service and risk of failure is not worth it."[49] For example, Matthew Porter, a grower in Maine, stated that "[k]nowing that a manufacturer stands behinds its products gives [him] confidence in the brand and factors into [his] purchasing decisions" selecting branded over generics.[50]

---

[46] Ex. 36 (Nichols Decl.) ¶ 13; Ex. 17 (Foster Decl.) ¶ 4; Ex. 37 (Robison Decl.) ¶ 15; *see also supra* n.45; Ex. 38 (Aug. 2023 Syngenta presentation: "U.S. Ag Retailer Study") at 53 (listing retailer services).

[47] ████████████████████████████████; *see also* Ex. 31 (Nutrien (Baioni) Dep.) 198:18-199:2; Ex. 39 (VDSC (Van Diest) Dep.) 43:14-44:5; Ex. 17 (Foster Decl.) ¶ 4 ("With generics, there is no support if we have issues; you get what you pay for.").

[48] Ex. 39 (VDSC (Van Diest) Dep.) 43:14-44:5; Ex. 31 (Nutrien (Baioni) Dep.) 198:18-199:2.

[49] Ex. 41 (Strickland Decl.) ¶ 10; *see also* Ex. 37 (Robison Decl.) ¶ 15.

[50] Ex. 16 (Porter Decl.) ¶ 6.

Generic suppliers sell in both the traditional and alternative channels without these services.  Ultimately, growers buy products through both channels.[51]

### 1. Syngenta Uses the Traditional Channel to Provide Services

Selling through the traditional channel enables Syngenta to provide distributors and retailers these support services so they can sell Syngenta's products effectively to growers, who demand these services.[52]

Because growers' yield "across the whole farm" can be at risk, growers "will not compromise" the quality of their crop protection products or on the "reliab[ility]" of supply.[53]  An Idaho grower, for example, explained he will not use generic s-metolachlor because he cannot "risk a mishap on a key crop … from which it would be too hard to recover."[54]

---

[51] Ex. 45 (Miller Decl.) ¶ 11; Ex. 36 (Nichols Decl.) ¶ 12; *see also* Ex. 42 (Bole Dep.) 86:19-87:23 (bought from both local retailer and FBN); Ex. 43 (Gavin Dep.) 37:17-22.

[52] *See supra* nn.45, 46; Ex. 59 (Ward Decl.) ¶¶ 21-22 ("We typically plan to earn Syngenta's Key AI rebate…because our grower demand is heavily branded.").

[53] *See* Ex. 44 (Wiggins Decl.) ¶ 10; Ex. 17 (Foster Decl.) ¶ 3; *supra* n.46.

[54] Ex. 17 (Foster Decl.) ¶ 3; *see also* Ex. 59 (Ward Decl.) ¶ 8 ("Our customers seek out branded products, particularly during the growing season, including because of recognized efficacy and yield benefits."); Ex. 45 (Miller Decl.) ¶ 5 ("branded product companies provide superior support and stand behind their products…Syngenta backs their products by visiting our fields and may offer a rescue treatment"); Ex. 37 (Robison Decl.) ¶ 15; Ex. 16 (Porter Decl.) ¶ 6; Ex. 41 (Strickland Decl.) ¶ 10.

15

Based on training provided by Syngenta, retailers offer growers expert agronomic advice on Syngenta's products, allowing growers to make more informed choices.[55]  In purchasing crop protection products that treat a specific crop and pest, "[g]rowers choose a product, not an active ingredient."[56]

### 2. Generic Suppliers Sell Products in the Traditional and Alternative Channels

A large percentage of generic sales run through the traditional channel,[57] where R&D Companies compete vigorously against generic suppliers for sales to these distributors.[58]  Generic suppliers also sell directly

---

[55] *See* Ex. 15 (Helena (Bloodworth) Dep.) 329:23-330:25 (Syngenta provides Helena with "product training…weed control-type training [and] education, [and] general agronomic trainings … to educate [their] sales force so [Helena] can hopefully help educate the grower to [achieve] … better yields over time"); Ex. 46 (Tenkoz (Cole) Dep.) 118:25-119:13 (Syngenta has a "great training program").

[56] Ex. 47 (Heiniger Dep.) 25:20-25; *see also* Ex. 21 (Ripato Dep.) 328:14-329:11 (describing recommendations made by retailers to growers); Ex. 39 (VDSC (Van Diest) Dep.) 193:1-9 (retailers who receive agronomic advice from basic suppliers' sales representatives might make them a more confident and more successful seller); Ex. 31 (Nutrien (Baioni) Dep.) 240:7-15 (product recommendation "boils down to agronomics…who has the best fit for the agronomics need, regardless of whose brand is on the product").

[57] *See* ███████████████████████████████████████ ███████████████████████████████████████ Ex. 10 (Source Dynamics (Menagh) Dep.) 294:3-14 (relying on traditional channels).

[58] *See* ████████████████████████ *see also* Ex. 39 (VDSC (Van Diest) Dep.) 39:7-19 (sales of meso, s-moc, and azoxystrobin products have "trend[ed] away from…the branded product to the generic").

to growers, retailers, brokers, and through e-commerce,[59] which they view as expanding.[60]  However, generic products are sold without the services that many growers expect.[61]  Distributors and retailers highly value these services[62] because they are one of "several factors" that make some growers "hesitant to widely adopt generic products."[63]

### D. Products Containing the Syngenta AIs Compete Against Products Containing Different AIs

The undisputed record rebuts the notion that branded products closely compete only with their generic versions.

---

[59] Ex. 5 (Hemphill Rep.) ¶ 94; *see also* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Ex. 62 (Wilbur-Ellis (Negroni) Dep.) 77:25-78:12 ("many routes to market" and "growers can buy from any supplier, retailer, wholesale, direct marketing, web direct channel").

[60] *See* Ex. 10 (Source Dynamics (Menagh) Dep.) 427:12-429:5 ("[A]s the broker business has grown in the marketplace…our broker business has probably grown over the years."); Ex. 21 (Ripato Dep.) 251:17-25 ("secondary channel" is growing); Ex. 57 (Orszag Rebuttal Rep.) ¶ 190, n.385 (collecting distributor testimony regarding expanding nontraditional channels).

[61] *See* Ex. 51 at 5 (two routes to market of "traditional high services sales" versus transactional model with few services); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[62] *See supra* n.61; Ex. 53 (Ripato Dep.) 57:8-22 (generics "aren't staffed and they don't have the pockets to be able to help us service the customer the way that the branded companies do").

[63] Ex. 41 (Strickland Decl.) ¶ 10; *see also* Ex. 54 (Toevs Decl.) ¶ 3; ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 43 (Gavin Dep.) 59:20-63:6 (testifying that unlike Syngenta, generics do not offer product performance assurances).

Growers purchase crop protection products to treat a particular pest on a particular crop.[64] Growers do not typically select crop protection products based on which AI(s) they contain; rather, growers generally "think in terms of brand name or name of the product" and the "weed control" and "resistance" it exhibits.[65] For example, Porter Farms "recently switched away" from Syngenta's azoxystrobin products, Quadris Top and Elatus, to Bayer's Velum Rise, which does not contain azoxystrobin.[66] Because a variety of AIs serve the same purpose,[67] growers not only choose between products containing the Syngenta AIs and same-AI generic products, but growers also substitute other-AI branded and generic products.[68]

---

[64] Ex. 58 (Robberts Dep.) 85:3-85:23; Ex. 16 (Porter Decl.) ¶ 5 (chooses products based on price, efficacy, yield, manufacturer support); Ex. 45 (Miller Decl.) ¶ 3 (same).

[65] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Ex. 41 (Strickland Decl.) ¶ 5 ("In choosing which products to purchase to fit a particular need on the farm, we will consider multiple products that may contain different active ingredients...."); Ex. 16 (Porter Decl.) ¶¶ 5-6 ("In choosing products, we consider a number of factors" and "we do consider both branded and generic options."); *supra* n.56.

[66] Ex. 16 (Porter Decl.) ¶ 7; *see also* Ex. 17 (Foster Decl.) ¶ 9 (switching from Syngenta s-metolachlor products to metribuzin or BASF's non-metolachlor products).

[67] Ex. 59 (Ward Decl.) ¶ 19 (many chemistries to choose from for same need); Ex. 4 (Heiniger Rebuttal Rep.) ¶¶ 62-67 (summary of alternative AIs); *see also* Ex. 23 (Winfield (Maple) Dep.) 432:2-436:15 (products with multiple AIs within same functional category); Ex. 60 (Albaugh (Vance) Dep.) 536:19-537:9 (considers herbicides that kill same kind of weed to be competitors); Ex. 40 (Wilbur-Ellis (Negroni) Dep.) 68:14-69:10 (when making recommendations for a grower's needs, multiple AIs to address that pest spectrum).

[68] *See, e.g.*, Ex. 36 (Nichols Decl.) ¶ 6 (grower using Trivapro, noting availability of alternatives from BASF, and lack of trust in generic azoxystrobin or propiconazole);

18

Similarly, distributors and retailers testified that growers substitute to numerous AIs for the Syngenta AIs,[69] and switch, for example, from Syngenta's s-metolachlor products to Bayer products containing thiencarbazone, isoxaflutole, and acetochlor-atrazine.[70]

Syngenta likewise views competition as being among different AIs.[71] For example, in planning its marketing of s-metolachlor products, Syngenta analyzed competition from non-metolachlor crop protection products from ███████████████████████████[72] It is "common" for Syngenta to lower the price of products with one Syngenta AI in response to competition from products

---

Ex. 59 (Ward Decl.) ¶ 6 (discussing BASF alternatives to Syngenta products); Ex. 63 (Bonin Dep.) 74:14-90:9 (uses products with different AIs for same agronomic needs); Ex. 43 (Gavin Dep.) 87:12-88:17 (same).

[69] *See, e.g.*, Ex. 14 (Growmark (Bunting) Dep.) 212:1-214:9; Ex. 50 (Tenkoz (Cole) Dep.) 435:3-437:15, 501:13-507:23 (same); Ex. 21 (Ripato Dep.) 319:22-322:2 (same); Ex. 19 (Nutrien (Baioni) Dep.) 493:1-494:9 (can use Bayer's trifloxystrobin as a substitute or alternative to Syngenta's azoxystrobin); ████████████████████ ████████████████ etitors" for BASF's fungicides include Syngenta azoxystrobin products).

[70] Ex. 14 (Growmark (Bunting) Dep.) 232:12-239:10; *see also* Ex. 18 (Stone's Farm Supply (Sittler) Dep.) 78:13-79:11 (discussing competitor products for s-metolachlor); ███████████████████████████████████████████

[71] Ex. 65 (Syngenta (Weikel) Dep.) 624:16-626:13 (most growers would substitute Syngenta products with those ██ BASF, Bayer, or Corteva); Ex. 66 at 9 (Syngenta F&I document noting "very competitive market" including from ████████████ ██████████████████████████████ *See also, e.g.*, Ex. 5 (Hemphill Rep.) ¶ 148, n.122 (citing Ex. 67, which describes competition faced by azoxystrobin products); *id.* at ¶¶ 7-8, 21 (citing Ex. 68, which describes competition faced by mesotrione products from other AIs).

[72] Ex. 69 at 15; *see also* Ex. 70 at 15 (Syngenta Mesotrione Marketing Plan for Mesotrione BIR noting impact of ███████████████████████████ ███████████████ ) on Syngenta's ██████████████

19

with other AIs.[73]  Generic suppliers likewise recognize competition among different AIs.[74]  Market participants widely group crop protection products into functional market segments by crop and timing of application (e.g., pre-emergent corn herbicides).[75]

## II.  SYNGENTA'S KEY AI REBATE PROGRAM

To incentivize purchases of Syngenta products by distributors and retailers in the highly competitive crop protection industry, Syngenta offers annual voluntary rebates, including a share-based loyalty discount program: "Key AI."  Distributors and retailers choose whether and to what extent they participate in Key AI each year.

---

[73] Ex. 19 (Nutrien (Baioni) Dep.) 458:6-459:11; *see also* Ex. 71 (adjusting price of azoxystrobin product Quilt Xcel in response to price change by BASF Headline AMP product with pyraclostrobin and metconazole); ███████████████████████████████████████ .

[74] *See, e.g.*, Ex. 73 at PDF p. 56 (describing acetochlor and metolachlor ("MOC") as "Coke vs Pepsi"); ████████████████████████████████ Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 90-96 (analyzing switching in FarmTrak Data and Stratus Surveys).

[75] *E.g.*, Ex. 76 at 6, 9 (Syngenta "2021 East Heartland" business plan); Ex. 21 (Ripato Dep.) 302:13-303:19; Ex. 23 (Winfield (Maple) Dep.) 432:2-436:15; Ex. 19 (Nutrien (Baioni) Dep.) 490:14-491:18 (Nutrien organizes its business into functional segments); Ex. 77 (product recommendations for growers grouped by functional categories).

Rebate programs are common in the crop protection industry, with both branded and generic suppliers offering a vast assortment of rebates, such as loyalty, volume, purchase timing, and growth target rebates.[76]

Share-based rebates like Syngenta's Key AI program have been offered by all top R&D Companies—namely, Syngenta, Corteva, Bayer, BASF, Valent, and FMC.[77] Even generic suppliers offer share-based loyalty programs. ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████.[78] Gowan similarly offers a loyalty program that pays rebates to distributors that purchase or sell a "target loyalty" of 90% of all products with hexythiazox (a post-patent insecticide AI) from Gowan.[79] Distributors and retailers view loyalty rebates as a way to

---

[76] *See, e.g.*, Ex. 78 (Hemphill Rebuttal Rep.) ¶¶ 12-13; ████████████████ ██████████ ; ██████████████████████████ Ex. 60 (Albaugh (Vance) Dep.) 513:13-25-514:25; *see also* Ex. 53 (Ripato Dep.) 187:20-188:13 (if loyalty programs were removed, "you're going to have to restructure the entire industry. You're going to lose service at the retail level. You'll lose service at the basic manufacturer level.").

[77] *See, e.g.*, Ex. 152 (Helm (Schumacher) Dep.) 51:10-53:12; ████████████ ██████ Ex. 14 (Growmark (Bunting) Dep.) 104:6-20, 106:24-107:20, 145:22-146:9 (loyalty programs have existed for "roughly 20 years").

[78] ████████████████████████████████

[79] ████████████████████████████████████████ ████████████████

compete in a "hypercompetitive" industry by passing on "a lot," "most," or a "significant amount of the rebates" to growers.[80]

### A. Key AI Rebates Reward Distributors and Retailers for Voluntarily Purchasing Syngenta Products

Syngenta annually offers Key AI rebates to certain larger distributors—referred to as "Key Accounts"—through negotiated individual "Marketing Agreements,"[81] which include brand bonus incentives, growth rebates, activity support bonuses, forecasting rebates and early cash commitments—some of which are premised on qualifying for Key AI and some of which target competing AIs/brands.[82]

---

[80] *See, e.g.*, Ex. 56 (Wilbur-Ellis (Negroni) Dep.) 348:8-349:14; Ex. 12 (Hendrickson Dep.) 73:10-74:4; ███████████████████ Ex. 19 (Nutrien (Baioni) Dep.) 468:5-469:14 (margin from Syngenta enables Nutrien to provide and indirectly fund services); Ex. 21 (Ripato Dep.) 312:11-313:7 (Tenkoz's services partially enabled by rebates).

[81] Ex. 82 (Syngenta (Weikel) Dep.) 13:9-14:12; 58:25-59:6; Ex. 15 (Helena (Bloodworth) Dep.) 276:6-277:12 (annual negotiations are a "give-and-take" with Syngenta).

[82] *See, e.g.*, ███████████████████); Ex. 86 at -321-322, -325-326 (other rebates, including ███████████████████████████████; Ex. 34 (Syngenta (Hawkins) Dep.) 222:11-223:13 (Syngenta offers "a whole host of incentives" including stocking, "Key AI," "new product growth," "business support" incentives).

Syngenta annually offers a Key AI incentive as one of many rebates available to all retailers, regardless of size.[83] The same rebate terms are available to every retailer.[84]

### 1. The Purpose, History, and Mechanics of the Key AI Rebate

In 2001, following the merger of Novartis's and AstraZeneca's agricultural divisions, Syngenta's U.S. business designed the Key AI program[85] to compete against other manufacturers' share-based rebates, which were common.[86] The Key AI program has always been completely voluntary and is continually improved through customer feedback.[87] The rebate is offered at the AI level to reward distributors and retailers for supporting Syngenta's full product lines and because the alternative—a rebate based on functional market segments—would be administratively

---

[83] Ex. 30 (Orszag Rep.) Figure 1 (retailers of all sizes participate), Figure 3 (showing "Retailers' Purchases of Key AI Qualification Products for At-Issue AIs Varied Widely"). The retail program requires a minimum purchase of $100,000 of specified products across Syngenta's portfolio. Ex. 87 (2024 retail program) at -652.

[84] Ex. 88 (Boden Dep.) 366:2-18; Ex. 8 (Syngenta (Cecil) Dep.) 245:25-246:9.

[85] Ex. 3 (Hawkins Decl.) ¶¶ 3-5; Ex. 2 (Syngenta (Hawkins) Dep.) 23:14-24:13.

[86] Ex. 2 (Syngenta (Hawkins) Dep.) 23:14-24:13; Ex. 152 (Helm (Schumacher) Dep.) 52:21-53:12 (first share-based, AI-based loyalty program was Monsanto); Ex. 89 (Syngenta (Langkamp) Dep.) 359:8-361:6 (Monsanto implemented incentive programs like Key AI in "late '90s or 2000").

[87] Ex. 3 (Hawkins Decl.) ¶¶ 13-14; *see also* Ex. 30 (Orszag Rep.) Figure 1 (reflecting millions of dollars in price concessions).

23

infeasible, requiring Syngenta to track the specific purpose for which a product was sold.[88]

The basic mechanics of the Key AI rebate are the same for distributors and retailers. For each Syngenta AI, eligibility for certain rebates depends on a customer's net sales of a minimum percentage of products with the AI being formulated using Syngenta-sourced technical (the "threshold").[89] For example, to qualify for rebates on s-metolachlor in 2024, ▇▇▇▇ had to sell ▇▇▇▇ of products containing s-metolachlor sourced from Syngenta and could sell ▇▇▇ from another manufacturer (the "open space" or "head space").[90]

If Key AI rebates are properly earned under the terms of the rebate, they are paid and are not subject to repayment.[91] The only consequence of not meeting the threshold for a certain AI is ineligibility for the Key AI rebates on products containing that AI for that year; eligibility for other rebates on products containing that AI, and eligibility for rebates—including

---

[88] Ex. 3 (Hawkins Decl.) ¶¶ 11-14.

[89] Non-Syngenta branded products formulated using technical Syngenta supplied by other manufacturers are not included in the calculation; products sold by distributors under their own private labels and products Syngenta toll manufactures for other suppliers count towards the threshold (along with Syngenta branded products); all other products do not count toward meeting the threshold. *See, e.g.,* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. 87 (2024 retail program).

[90] ▇▇▇▇▇▇▇▇

[91] *See infra* nn.92-93.

24

Key AI rebates—on products containing other AIs, is unaffected.[92] A distributor or retailer can decide, at any time, not to pursue these rebates—or not to pursue the rebate for one AI, while pursuing the rebate for another.[93] Syngenta's marketing agreements with distributors state that a distributor qualifies for rebates on an "Active Ingredient by Active Ingredient basis."[94] The Key AI incentive in the retail program similarly states that "[r]etailers must achieve the stated [threshold] for each active ingredient ('AI') to qualify for that AI's incentive."[95]

The thresholds are set annually to reflect customer feedback and market conditions—such as available supply, competitive pressure, or demand for products with the AI due to cross-AI competition.[96] The thresholds for distributors and retailers generally decrease over time.[97]

---

[92] Ex. 90 (Syngenta (Fisher) Dep.) 496:23-497:7.

[93] *See, e.g.*, Ex. 40 (Wilbur-Ellis (Negroni) Dep.) 103:23-104:19 (Wilbur-Ellis received incentives for other AIs when they chose not to meet ▮▮▮▮ and ▮▮▮▮ thresholds in 2024); Ex. 19 (Nutrien (Baioni) Dep.) 450:11-17 ("[I]f Nutrien does not meet a threshold share for one particular AI, it is still eligible to receive a rebate payment for a different AI").

[94] *See, e.g.*, ▮▮▮▮

[95] *See, e.g.*, Ex. 87 at -648.

[96] *See* Ex. 19 (Nutrien (Baioni) Dep.) 434:13-435:3; ▮▮▮▮ Ex. 3 (Hawkins Decl.) ¶¶ 13-14.

[97] *See* ▮▮▮▮ *compare* Ex. 91 at -964 (Wilbur-Ellis 2018 marketing agreement) *with* Ex. 92 at -631 (Wilbur-Ellis 2024 marketing agreement).

When Syngenta's customers have no longer found value in participating in Key AI for certain AIs, Syngenta has removed those AIs from the program.[98]

Because distributors negotiate their marketing agreements with Syngenta, distributors often customize the Key AI rebate, including thresholds.[99]  For example, ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████.[100]  With ██████ Syngenta agreed to █████████████████████████ ████████████████████████████████████████ ███████████████████████.[101]

### 2. Distributors and Retailers Choose to Participate in Key AI to Receive Rebates and Pass Through Savings to Growers

Key AI rebates are voluntary.  Distributors and retailers "are not bound," but instead "choose to participate," including choosing whether or not to meet any given threshold.[102]  Those who choose to meet thresholds do so in

---

[98] Ex. 93 (Syngenta interrogatory responses) at 28-30; Ex. 8 (Syngenta (Cecil) Dep.) 66:5-67:5.

[99] *See, e.g.*, Ex. 5 (Hemphill Rep.) ¶ 294; Ex. 19 (Nutrien (Baioni) Dep.) 433:3-435:3; Ex. 50 (Tenkoz (Cole) Dep.) 495:11-496:1.

[100] Ex. 94 at -390, -392, -397 (CNI 2018 marketing agreement).

[101] ████████████████████████████████████

[102] ███████████████████████████████████ Ex. 96 at -259; Ex. 19 (Nutrien (Baioni) Dep.) 429:25-432:2; Ex. 157 (Boden Dep.) 221:18-222:4.

26

order to receive Key AI rebates, "because it is more profitable to do so,"[103] and to satisfy grower demand for Syngenta products.[104] The payment of money is the only consideration that Syngenta provides to distributors and retailers that increases business for Syngenta by satisfying a share threshold.[105] It is the receipt of the rebate payments, and the resulting effect on the bottom line, that motivates distributors and retailers to satisfy the thresholds.[106] At the same time, other distributors and retailers have chosen not to meet some or all of the Key AI thresholds for various reasons.[107]

---

[103] Ex. 31 (Nutrien (Baioni) Dep.) 130:25-132:7, 135:3-20; *see also* Ex. 62 (Wilbur-Ellis (Negroni) Dep.) 139:11-15 ("It is more profitable [to participate in Syngenta's loyalty program] or else [Wilbur-Ellis] wouldn't be participating."); Ex. 111 (VDSC (Van Diest) Dep.) 281:9-282:5 (choosing to remain loyal on ▮▮▮▮▮▮ because "it makes no financial sense to miss, while moving to other AIs"); Ex. 18 (Stone's Farm Supply (Sittler) Dep.) 51:9-52:17 ("no incentive for us to carry" generics where they make less money).

[104] *See supra* n.52; *see also* Ex. 50 (Tenkoz) (Cole) Dep.) 413:12-414:10 (Tenkoz "ha[s] to provide what [their] customers want," which is branded products, which "happen[]" to have accompanying rebate programs).

[105] *See, e.g., supra* n.89; Ex. 53 (Ripato Dep.) 192:12-15 (only consequence of not meeting threshold is missing rebate); Ex. 31 (Nutrien (Baioni) Dep.) 81:10-16.

[106] *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 96 at -259 ("Participating in loyalty-type programs is a choice, yet results have shown it is generally better to be in than out."); ▮▮▮▮▮▮▮▮▮▮▮▮▮

[107] *See, e.g.,* Ex. 40 (Wilbur-Ellis (Negroni) Dep.) 230:5-231:3 (Wilbur-Ellis does not participate where sourcing from generics is more profitable and "decided not to participate in [Syngenta's lambda-cyhalothrin] loyalty program…based on the profitability metrics"); Ex. 153 (Winfield (Maple) Dep.) 119:21-120:19; ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 161-64, 187, Figures 24-26; *see also* ▮▮▮▮▮▮▮▮▮▮▮▮▮

27

When distributors or retailers miss Key AI thresholds, including changed market dynamics, limited supply, or increased competitive demand, Syngenta often grants "exceptions" and pays out full or partial rebates.[108] These exceptions allow Syngenta to "buil[d] trust" and "continue partnership" with distributors and retailers.[109] Exceptions are ██████████████ ████████████████████████████████████████████ [110] Some distributor marketing agreements include ████████████████████████████ ████████.[111]

Distributors and retailers who choose to not participate in Key AI remain able to purchase and sell Syngenta products, receive Syngenta services, or contract with Syngenta.[112] There is no evidence that distributors

---

██████████████ Ex. 98 at 2 (showing Wilbur-Ellis's failure to meet "negotiated threshold").

[108] *See, e.g.,* ████████████████████████████ Ex. 50 (Tenkoz (Cole) Dep.) 491:21-494:10; Ex. 19 (Nutrien (Baioni) Dep.) 446:7-447:7. In some cases, exceptions are pre-negotiated. *See* Ex. 40 (Wilbur-Ellis (Negroni) Dep.) 118:23-120:11.

[109] Ex. 82 (Syngenta (Weikel) Dep.) 249:3-253:19.

[110] *Id.* 114:23-115:11; Ex. 65 (Syngenta (Weikel) Dep.) 669:24-670:11 ████ ████████████████████████████████████████ ████████████████████████████████ *; see also, e.g.,* Ex. 99 (██████████████████████████████████); Ex. 100 (████████████████████████████████████).

[111] Ex. 19 (Nutrien (Baioni) Dep.) 439:6-441:17 (Nutrien ████████████████████████████████████████).

[112] *See, e.g.,* Ex. 56 (Wilbur-Ellis (Negroni) Dep.) 456:5-22, 465:23-466:8; Ex. 53 (Ripato Dep.) 191:19-192:25; Ex. 14 (Growmark (Bunting) Dep.) 165:16-166:15 (no recollection of disruption of supply or to Syngenta-Growmark relationship due to missed ████████████ threshold); Ex. 15 (Helena (Bloodworth) Dep.) 298:3-

or retailers are coerced into meeting any Key AI threshold.[113]  On the contrary, large numbers of retailers do not satisfy Key AI thresholds every year.[114]

Distributors and retailers pass through savings earned through Key AI rebates, benefitting growers with lower prices.[115]

_____

300:2 (no retaliation from Syngenta for failing to meet lambda-cyhalothrin threshold); Ex. 50 (Tenkoz (Cole) Dep.) 489:6-491:19 (where Tenkoz has not met thresholds, there has been no retaliation, threats to cut supply, or consequences other than not receiving the rebate).

[113] *See* Ex. 62 (Wilbur-Ellis (Negroni) Dep.) 119:4-18, 133:15-135:19; Ex. 15 (Helena (Bloodworth) Dep.) 291:7-12 (IRC testifying it is not forced or required to participate in Key AI); Ex. 14 (Growmark (Bunting) Dep.) 168:9-24 (same).

[114] Ex. 57 (Orszag Rebuttal Rep.) ¶ 187.

[115] Ex. 8 (Syngenta (Cecil) Dep.) 132:4-132:13 (retailers and distributors use Key AI "as an opportunity to impact their price at the grower level"); Ex. 18 (Stone's Farm Supply (Sittler) Dep.) 120:5-121:23 (prices are reduced for growers the year following receipt of a Key AI rebate); Ex. 56 (Wilbur-Ellis (Negroni) Dep.) 348:8-349:14 ("[A] significant amount of the rebates are passed on to the growers[.]"); ███████████ Ex. 21 (Ripato Dep.) 331:25-335:1 (distribution channel members often pass Key AI rebates to growers either "in price or in discounted services"), 365:11-25 ("[T]he farmer's price would actually go up if you remove loyalties."); Ex. 97 (Simplot (Semadeni) Dep.) 214:1-215:4 (parts of rebates are passed through to growers); ███████████ Ex. 153 (Winfield (Maple) Dep.) 102:20-103:6, 313:2-6 (Winfield's pricing to retailers is based on loyalty rebates); Ex. 19 (Nutrien (Baioni) Dep.) 429:9-17 ("Key AI affect[s] the pricing that Nutrien is able to offer its customers.").

## III. SALES OF GENERIC PRODUCTS WITH THE SYNGENTA AIs ARE SUBSTANTIAL

For *each* of the three Syngenta AIs, there are at least a dozen generic

suppliers who sell more than two dozen products.[116]

| Syngenta AI | Current Loyalty Threshold [117] | Date Added to Loyalty Program [118] | Patent Expiration | FIFRA Expiration | Generic Suppliers (2024) [119] | Generic Products (2024) [120] |
|---|---|---|---|---|---|---|
| Azoxystrobin (fungicide) | 92% | 2013-2014 | 2014 | 2010 | 14 [121] | 29 [122] |
| Mesotrione (herbicide) | 92% | 2014-2015 | 2008 | 2014 | 12 [123] | 29 [124] |
| Metolachlor (herbicide) | 90% | 2001-2002 | 2008 | 2009 | 13 [125] | 43 [126] |

---

[116] *See* D.E. 160 at 8. This chart adds to the chart in the Court's motion to dismiss opinion: (1) citations to the record and (2) two columns noting for each AI the number of generic suppliers selling products containing that AI and the number of generic products, as of 2024.

[117] 2024 loyalty threshold. *See, e.g.*, Ex. 86 at -319; ███████████ *But see* Ex. 5 (Hemphill Rep.) ¶ 301 (there has been variation (e.g., lower distributor thresholds) for ███████); Ex. 102 at -579; Ex. 103 at -815.

[118] *See* Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 358, 360, 362.

[119] Ex. 57 (Orszag Rebuttal Rep.) ¶ 241.

[120] *Id.*

[121] *Id.* ¶¶ 131, 241; *see also* Ex. 104 at 8; Ex. 105 at 31-33; Ex. 5 (Hemphill Rep.) Appendix C ¶ 8.

[122] Ex. 57 (Orszag Rebuttal Rep.) ¶ 131, 241.

[123] *Id.* ¶¶ 131, 241; *see also* Ex. 106 at 2.

[124] Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 131, 241.

[125] *Id.* ¶¶ 131, 241; *see also* Ex. 107 at 56 (listing generic registrations); Ex. 108 at 2 (Comment by Scott A. Pace, Chairman, Metolachlor Task Force, EPA (Feb. 20, 2015)); Ex. 5 (Hemphill Rep.) Appendix C ¶ 37.

[126] Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 131, 241.

This growth occurred while Syngenta has offered Key AI rebates for these three AIs.



Generics have, according to Plaintiffs' liability expert, made "significant inroads."[127]  UPL had revenue of more than $394 million in what it deemed one of its "low year[s]."[128]  Albaugh's and Atticus's sales data show each sold

---

[127] Ex. 5 (Hemphill Rep.) ¶¶ 172, 184; *see also* Ex. 53 (Ripato Dep.) 181:16-182:11 (if purpose of loyalty rebates is to prevent generics from reaching farmers, "it's failed miserably because [generics have] grown dramatically over the last 20 years").

[128] Ex. 26 (UPL (Menon) Dep.) 288:16-290:7.

31

more than $120 million of products containing the Syngenta AIs in 2023.[129]

Other market participants have described the current environment as

"hypercompetitive," "very crowded" and "oversupplied" with generic

products.[130]

 As Plaintiffs' liability expert opined, this record shows there is "intense

competition between branded and generic products" containing the Syngenta

AIs, and the Key AI program did not prevent price competition for other AIs

in the program from "becom[ing] highly intense."[131]  Numerous growers

testified that they can purchase generic products if they want.[132]

---

[129] Ex. 27 (FRE 1006 summary exhibit) (summing Atticus and Albaugh sales for 2023).

[130] Ex. 31 (Nutrien (Baioni) Dep.) 294:12-296:18; *see also* Ex. 50 Tenkoz (Cole) Dep. 477:12-478:3 ("For mesotrione…there's probably plus or minus 15 registrants … We don't need 15 sources of mesotrione, so we try to pick the suppliers that are best for our business"); Ex. 53 (Ripato Dep.) 32:2-38:16 (Tenkoz members must pass rebates on in a market "oversupplied at all levels right now" that "[has] been for many years"); Ex. 40 (Wilbur-Ellis (Negroni) Dep.) 158:4-21 (market supply is not constrained but oversupplied and "very competitive" with "a significant amount of product out there"); Ex. 26 (UPL (Menon) Dep.) 353:5-354:11 ("fierce" competition across entire crop protection supply chain); Ex. 60 (Albaugh (Vance) Dep.) 532:15-533:18 (entire crop protection industry is "mature" with "a lot of competitors" and "a lot of chemistries"); Ex. 13 (Growmark (Bunting) Dep.) 38:19-39:11 (competition among distributors is "pretty intense" and "very competitive"); ██████████ ████████████████████████████████████████████ Ex. 12 (CHS Hendrickson Dep.) 73:10-74:4 (ag industry is "hypercompetitive").

[131] Ex. 5 (Hemphill Rep.) ¶ 399; Ex. 115 (Hemphill Reply) ¶ 74.

[132] *See, e.g.,* Ex. 37 (Robison Decl.) ¶ 4 ("We have never not been able to receive the product we wanted, including when we choose to buy generics."); Ex. 54 (Toevs Decl.) ¶ 3 ("generic alternatives are readily available"); Ex. 36 (Nichols Decl.) ¶ 6 ("While we could source generic azoxystrobin … we choose not to …."); Ex. 41 (Strickland Decl.) ¶ 9 ("Generic options are readily available to us."); Ex. 44 (Wiggins Decl.) ¶¶ 7, 8, 11 ("I could buy cheaper alternatives," "the generic version

32

## QUESTIONS PRESENTED

I.     Should Plaintiffs' federal antitrust claims be dismissed under the "price-cost test" because Key AI rebates constitute predominantly price-based competition and Plaintiffs do not allege Syngenta prices below cost?

II.    Should Plaintiffs' federal antitrust claims be dismissed under the rule of reason because Plaintiffs have not properly defined cognizable product markets, and Syngenta lacks market or monopoly power in any properly defined product market?

III.    Should Plaintiffs' federal antitrust claims be dismissed under the rule of reason because Plaintiffs cannot establish that including the Syngenta AIs in the Key AI rebate program harms competition?

IV.    Should the State Plaintiffs' state law claims be dismissed because each fails as a matter of law on the record facts?

V.    Should Plaintiffs' claims against Syngenta Crop Protection AG and Syngenta Corporation be dismissed because neither "directs, controls, or encourages" any aspect of the Key AI rebate program?

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" under the applicable law. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is

---

is widely available," "I buy Syngenta because they perform consistently and deliver the results we require, and not because competing products … are unavailable.").

"genuine" only if there is a sufficient evidentiary basis that would permit a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.* at 248.

## ARGUMENT

Because each of Plaintiffs' claims is legally deficient, Syngenta is entitled to summary judgment dismissing the amended complaint in full.

## I. THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFFS' FEDERAL ANTITRUST CLAIMS

Plaintiffs' federal claims under the Sherman Act (§§ 1 and 2), Clayton Act (§ 3), and the FTC Act (§ 5) all advance the same antitrust theory:  The inclusion of azoxystrobin, mesotrione, and metolachlor in Syngenta's loyalty rebate program is a *de facto* exclusive dealing arrangement that unlawfully "exclude[s] generic manufacturers from the market … thereby leading to supracompetitive prices for farmers."  *See* D.E. 160 at 1.  Plaintiffs allege "single-AI" product markets for each of these three Syngenta AIs.[133]

At the pleading stage, the Court reasoned that the viability of those claims depends on whether discovery yields support for the underlying allegations.  The Court explained that discovery would determine whether the price-cost test or rule of reason governs and whether the evidence supports Plaintiffs' alleged product markets and allegations of harm to

---

[133] For each AI, Plaintiffs' liability expert purports to define two relevant markets: a finished product market and a market for the "component" of a finished good.  Ex. 5 (Hemphill Rep.) ¶¶ 6, 11-12.

34

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

competition. D.E. 160 at 55-56. Discovery has now conclusively proven that the price-cost test applies, Plaintiffs' alleged single-AI product markets are not viable, and there is no anticompetitive harm. Plaintiffs have failed to meet their burden at every turn, warranting summary judgment on all of Plaintiffs' federal claims.

### A. The Price-Cost Test Applies Because, as a Matter of Law, Price Is the Predominant Mechanism of Exclusion

The uncontroverted facts in the fully developed record confirm that the price-cost test governs because "price is the clearly predominant mechanism of [the alleged] exclusion." *ZF Meritor*, 696 F.3d at 275

As the Court recognized, Plaintiffs do not allege that Syngenta sells products below cost once the Key AI rebates are applied. D.E. 160 at 33. This is fatal to Plaintiffs' antitrust claims under the price-cost test. *Id.* (Plaintiffs' concession "that the complaint does not allege prices below cost…would seemingly short-circuit Plaintiffs' antitrust claims if the price-cost test applies").

### 1. Governing Law

Loyalty or "market share" discounts or rebates challenged as *de facto* exclusive dealing are not unlawful on their face, but instead are analyzed under the rule of reason. *See* D.E. 160 at 34-36. Where price is the "clearly predominant mechanism of exclusion," the rule of reason standard is applied

35

through the "price-cost test." *See id.* at 35 n.7 and 42-43 (quoting *ZF Meritor*, 696 F.3d at 277). The principles underlying this test extend to share-based discounts and rebates, i.e., "when a company offers discounts in exchange for purchasing a certain percentage of goods from that company." *Id.* at 38-41 (reviewing cases).

A bedrock principle on which the price-cost test rests is that "[c]utting prices to increase business is the very essence of competition." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 451 (2009); *see also, e.g., Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers ***regardless of how those prices are set*....**"). As this Court explained, "competitors should generally be enabled to cut prices to a certain extent—even to increase market share," and "[l]ow prices that are still above-cost are generally procompetitive." D.E. 160 at 34 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993)).

The price-cost test also rests on the principle that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." D.E. 160 at 34 (quoting *Brooke Grp.*, 509 U.S. at 223). On this settled foundation, courts have upheld as procompetitive above-cost share-based rebates and discounts that—like Syngenta's Key AI rebates—lack coercive non-price features. *See*

36

*id.* at 38-44 (citing *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 400, 406 (3d Cir. 2016); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1044, 1058-59, 1062-63 (8th Cir. 2000); *In re EpiPen Antitrust Litig.*, 545 F. Supp. 3d 922, 1016-17 (D. Kan. 2021), *aff'd*, 44 F.4th 959 (10th Cir. 2022); *NicSand Inc. v. 3M Co.*, 507 F.3d 442, 448, 453 (6th Cir. 2007) (en banc)).

"[M]istaken inferences" in an antitrust case premised on price-cutting "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." D.E. 160 at 45 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); *see also Brooke Grp.*, 509 U.S. at 226-27. Thus, for example, the Supreme Court in *Matsushita* rejected an attempt "to prove [an] antitrust conspiracy 'through evidence of rebates and other price-cutting activities.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 478 (1992) (quoting *Matsushita*, 475 U.S. at 594); *see also* D.E. 160 at 34-35 (collecting cases).

The test for when a share rebate or discount **might** be anticompetitive is well-developed. If the "pricing practice is clearly doing the work of exclusion," the price-cost test applies. D.E. 160 at 45. Under the price-cost test, challenged conduct is illegal only when a defendant prices below cost. *See id.* at 34-35 (citing *ZF Meritor*, 696 F.3d at 272). "More in-depth factual analysis is unnecessary because we know that 'the balance always tips in favor of allowing above-cost pricing practices to stand.'" *Eisai*, 821 F.3d at

37

409 (quoting *ZF Meritor,* 696 F.3d at 273). Indeed, even an "***entrenched***

***monopolist's*** use of loyalty rebates is lawful as long as the prices being

charged are not predatory—that is price is not below cost." *EpiPen*, 44 F.4th

at 1003.

### 2. Key AI Is Quintessentially a Pricing Practice

Syngenta's Key AI rebates "cu[t] prices in order to increase business,"

and thus are "the very essence of competition." *Matsushita*, 475 U.S. at 594.

Under the Key AI rebate program, the payment of money is the ***only***

consideration that Syngenta provides to distributors and retailers that

"increase business" for Syngenta by satisfying a share threshold.[134]

Here, the uncontroverted evidence shows that "price is the clearly

predominant mechanism" that drives distributors and retailers to meet the

thresholds that unlock rebates. *See ZF Meritor*, 696 F.3d at 275. By design,

the Key AI rebate program uses share-based thresholds to give every

distributor and retailer, regardless of size, a price-based incentive to sell

more Syngenta products by keeping the dangling "carrot" of a discount in

reach of each.[135] Syngenta's payments to distributors and retailers are, as a

---

[134] *See supra* n.105; *see also* D.E. 81 ¶ 6 (describing rebates as "incentive payments").

[135] *See supra* nn.83, 89; *see also* Ex. 109 (Lackey Dep.) 45:5-14 ("any distributor or retailer who is interested in participating" may do so); Ex. 110 (Kraskouskas Dep.) 20:17-23 ("any retailer or distributor with a contract to supply [Syngenta's] goods can participate" in Syngenta's full market programs).

matter of law, "nothing more than price reductions." *NicSand,* 507 F.3d at 452; *see also Brooke Grp.*, 509 U.S. at 239 (explaining that a product's "net price … was determined not only by list prices, but also by a wide variety of discounts and promotions to consumers and by rebates to wholesalers.").

As with all competition, each sale of Syngenta products comes at its competitors' expense—and it is in this pro-competitive sense that the Key AI rebate program entails price-based "exclusion" of its competitors' sales. This form of "exclusion" is encouraged by the antitrust laws, which do not "protect competitors from the loss of profits due to such price competition." *Brooke Grp.*, 509 U.S. at 223 (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986)).

Discovery has confirmed that when distributors and retailers satisfy the thresholds—and therefore buy from Syngenta rather than generics or other branded manufacturers—they do so in response to grower demand for Syngenta products and to obtain rebate payments.[136] They are motivated to satisfy the thresholds by the receipt of rebates, and the resulting effect on their bottom line.[137] Some distributors and retailers have expressed reluctance to satisfy thresholds, but explained they nevertheless sought to

---

[136] *See supra* n.104.

[137] *Id.*

meet them because of the importance of the rebate payments.[138]  This highlights that the mechanism in the Key AI program that incentivizes distributors and retailers to strive "to increase business" for Syngenta—and thereby "exclude" generics—is ***price***.

The Court initially acknowledged Plaintiffs' allegations that "Defendants' [alleged] threats to restrict supply are effective deterrence against noncompliance" with Key AI rebate thresholds.  D.E. 160 at 50.  But the record is devoid of evidence that any distributor or retailer complied with Key AI thresholds because of any threat of supply restriction.  *See infra* Point I.A.3.f.  Further, the uncontroverted evidence shows that Syngenta's falling out with two distributors—the focus of Plaintiffs' allegations of threats of supply restriction—did not result from any terms of the Key AI rebate program, which Plaintiffs ask this Court to enjoin.

Given the Key AI program's lack of a "stick" that compels compliance, Plaintiffs have doubled down on their novel theory that the program's monetary "carrot" is not a matter of price.  Plaintiffs' liability expert, Professor Hemphill, posits that Syngenta's rebates are outside the

---

[138] *See, e.g.*, Ex. 111 (VDSC (Van Diest) Dep.) 281:9-282:21 (choosing to meet loyalty on ████████ to avoid loss, which made "no financial sense," while it explored moving to generic pyraclostrobin).

boundaries of what he dubs "ordinary price competition"[139] because Syngenta "shar[es] monopoly profits with distributors by means of [rebate] payments, which serve[] as an inducement to secure the distributors' acceptance of [a near-exclusivity] arrangement."[140]  Hemphill thus continues a crusade he launched in 2018 against application of the *Brooke Group* price-cost test to loyalty rebates.  *See* C. Scott Hemphill & Philip J. Weiser, *Beyond Brooke Group: Bringing Reality to the Law of Predatory Pricing*, 127 YALE L.J. 2048, 2074-77 (2018).

Regardless, Plaintiffs cannot have it both ways by arguing distributors are, on the one hand, coerced through non-price mechanisms, and, on the other, complicit in sharing purported monopoly profits.  Neither Hemphill's opinions nor his advocacy for legal reform (to the extent they are different) should detract from the force of the legal precedent under which Syngenta's payments to distributors and retailers are, as a matter of law, "nothing more than price reductions."  *See supra* Point I.A.2 (quoting *NicSand*, 507 F.3d at 452 and citing cases).

---

[139] *E.g.*, Ex. 5 (Hemphill Rep.) ¶ 54.  Hemphill's co-author is the Attorney General of Plaintiff State of Colorado, who signed Plaintiffs' amended complaint.  Syngenta has moved separately to exclude the opinions proffered by Hemphill under Federal Rule of Evidence 702.

[140] Ex. 5 (Hemphill Rep.) ¶ 50.

### 3. Key AI Lacks any Non-Price Mechanism of Exclusion

Key AI is a fully voluntary rebate program. Under the program, the *only* consequence of not meeting a Key AI threshold for a specific AI is that a distributor or retailer does not qualify that year for Key AI rebates purchases for Syngenta products containing that AI.[141]

Key AI's voluntary nature is highlighted by the uncontroverted testimony of distributors and retailers that whether to satisfy Key AI thresholds is a choice—and one driven by grower demand and the incentive of a discount, not any non-price features.[142] Similarly, distributor and retailers consistently testified that they are not "forced" or "required" to meet the thresholds by any non-price feature, including because "Syngenta is not telling us what to sell. Our customers [growers] are telling us what to provide them."[143]

---

[141] *See supra* nn.112-113.

[142] *See supra* nn.52, 103-106.

[143] *See, e.g.*, Ex. 23 (Winfield (Maple) Dep.) 389:25-390:14 ("Q. Does Syngenta force WinField to participate in Key AI? A. No. Q. Does Syngenta require WinField to participate in Key AI? A. No. Q. Does Syngenta force WinField to meet the Key AI thresholds in any given market year? A. No. … Q. Does Syngenta require WinField to meet the Key AI thresholds in a given market year? … A. No."); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 14 (Growmark (Bunting) Dep.) 168:9-24 (similar); Ex. 19 (Nutrien (Baioni) Dep.) 431:10-432:2 (similar); Ex. 18 (Sittler (Stone's Farm Supply) Dep.) 25:16-19 ("[T]his lawsuit is asinine because Syngenta is not telling us what to sell. Our customers are telling us what to provide them.").

42

On this record, Plaintiffs cannot escape the price-cost test through proof of any "non-price mechanism of exclusion" identified by this Court or otherwise. *See* D.E. 160 at 48-49.

On the contrary, each factor identified by this Court supports applying the price-cost test, and the record confirms that distributors and retailers comply with rebate thresholds (to the extent they choose to) predominantly, if not exclusively, to obtain a lower price.

- *First*, neither distributors (which sign negotiated marketing agreements) nor retailers (which do not) are obligated to purchase **any** Syngenta product—much less satisfy any rebate threshold. Distributors and retailers remain free to purchase as much generic product as they choose.

- *Second*, Key AI's duration is only one year. Distributors negotiate with Syngenta annually and consider whether they want to sign a marketing agreement each year.[144] The retail program offering the Key AI rebate to retailers is likewise annual.

- *Third*, Syngenta does not claw back, or threaten to claw back, previously earned rebates and Plaintiffs do not allege otherwise.

- *Fourth*, the Key AI rebate is earned on an AI-by-AI basis and does not bundle or tie unrelated products—and Plaintiffs do not allege otherwise.

- *Fifth*, distributors and retailers expect and value Syngenta's industry-standard rebate program. Enjoining Syngenta from including the Syngenta AIs in Key AI would leave Syngenta at a competitive disadvantage.

---

[144] Ex. 50 (Tenkoz (Cole) Dep.) 492:11-493:6; ███████████████

43

- *Sixth*, no threat of supply restriction coerced distributors and retailers into compliance with Key AI thresholds. The situations in which Syngenta has parted ways with distributors reflect compliance with thresholds only to obtain rebates, followed by decisions no longer to comply in order to focus on generic products—demonstrating choice, not coercion.

### a.  Key AI Does Not Obligate Customers to Purchase Any Syngenta Product

Key AI imposes no purchase obligation on distributors or retailers. Key AI does "not contractually obligate [Syngenta's] customers to buy anything from [Syngenta]" at all, let alone any "set percentage" of product. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 995, 997 n.2 (9th Cir. 2010) (cited by D.E. 160 at 60).

The Key AI program merely sets a voluntary condition—the share threshold—that distributors and retailers can meet to qualify for rebates. For each of azoxystrobin, mesotrione and s-metolachlor, Key AI conditions eligibility for certain rebates on a customer's sales of a minimum percentage of Syngenta products among the customer's total sales of products containing the AI.[145] The only consequence of not satisfying the threshold for a certain AI is ineligibility for the Key AI rebates on products containing that AI for that year.[146] Eligibility for other rebates on products containing that AI, and

---

[145] *See supra* n.89, 92.

[146] *See supra* nn.92-93.

44

eligibility for rebates—including Key AI rebates—on products containing other AIs, is unaffected.[147]

Nor is the Key AI program exclusive. It leaves distributors and retailers free to "choose at anytime to forego the discount" altogether and "purchase from a generic competitor." *Allied Orthopedic*, 592 F.3d at 997. A distributor or retailer can decide, at any time, not to pursue rebates—or not to pursue the rebate for one AI, while pursuing the rebate for other AIs.[148] Syngenta routinely pays out full or partial rebates to its customers even when they miss loyalty thresholds.[149]

### b. Key AI Is a Short-Term Program

Syngenta's Key AI program has a one-year duration.[150] In cases alleging exclusion, "courts have weighed short duration in determining anticompetitive effects." D.E. 160 at 53-54 (collecting cases). "[S]hort, easily terminable exclusive agreements are [unlikely to have anticompetitive effects because] a competitor can simply wait for the contracts to expire or make

---

[147] *Id.*

[148] *See supra* nn.92-93, 103-107.

[149] *See supra* n.108.

[150] *See supra* nn.81, 83, 89.

45

alluring offers to initiate termination." *In re EpiPen*, 44 F.4th at 988 (collecting cases).[151]

Plaintiffs have argued that "looking to the practical effect of agreements demonstrates 'long-term foreclosure,'" D.E. 160 at 48, because (as to some AIs) the Key AI program's incentives "have been in place year after year for two decades." D.E. 112 at 28 (citing *United States v. Dentsply Int'l*, 399 F.3d 181, 194 (3d Cir. 2005)). Plaintiffs' argument about the "practical effect" of the program misses that (i) compliance with Key AI thresholds over time is far from universal or uniform, with distributors Pinnacle and Simplot having completely opted out, and in any event, (ii) the uncontroverted evidence shows that continued participation in the program over time results predominantly from the price incentive. Thus, Plaintiffs' argument elides "whether price clearly predominates over other mechanisms of exclusion in this case." D.E. 160 at 45. Where, as here, price provides the predominant "economic incentive," the antitrust laws do not condemn the "practical effect" of customers continuing to respond to the price incentive over time.

---

[151] Here, Key AI is nonexclusive. *See supra* nn.92-93; *see also* Ex. 111 (VDSC (Van Diest) Dep.) 282:6-21 (moving to different AI (e.g., BASF's pyraclostrobin), would not affect loyalty); *see also* Ex. 101 (Eichorn Dep.) 221:16-223:11 (same).

46

### c. Syngenta Cannot Clawback Key AI Rebates

Once Key AI rebates are earned, Syngenta has no contractual or practical ability to "retract unpaid rebates or claw back [rebates] from prior years." D.E. 160 at 48 (citing *McWane Inc. v. FTC*, 783 F.3d 814, 820-21 (8th Cir. 2015)); *see ZF Meritor*, 696 F.3d at 265.[152] Plaintiffs do not, and cannot, contend otherwise.

This fact distinguishes *McWane* and *ZF Meritor*. In *McWane* the defendant warned distributors that they "might lose" accrued but unpaid rebates, and enforced that threat. 783 F.3d at 821. In *ZF Meritor*, the defendants' agreements with original equipment manufacturers, or "OEMs"—which had a minimum term of five years—provided that "if an OEM did not meet its market-share penetration target for one year, Eaton could require repayment of all contractual savings." 696 F.3d at 265, 277. The absence of these features leaves Key AI eligible for the price-cost test.

### d. Key AI Does Not Bundle or Tie

Plaintiffs do not, and cannot, allege that Syngenta's Key AI program bundles or ties multiple unrelated Syngenta products or AIs. Marketing agreements provide that a distributor qualifies for a rebate on an "Active Ingredient by Active Ingredient basis."[153] The retail program provides that

---

[152] *See supra* nn.92-93.

[153] *See supra* n.94.

47

"[r]etailers must achieve the stated [threshold] for each active ingredient ('AI') to qualify for that AI's incentive."[154] Syngenta's administers the program accordingly,[155] so missing a threshold for one AI does not disqualify a distributor or retailer for a Key AI rebate for other AIs.[156] Thus, there is no dispute that Key AI is a single-product rebate. As such, it is susceptible to the price-cost test. *See ZF Meritor*, 696 F.3d at 274 n.11.

### e. Loyalty Rebates Are Common in the Crop Protection Industry

Key AI offers an incentive common in the industry and valued by many distributors and retailers, factors bearing on whether to apply the price-cost test. *See* D.E. 160 at 48 (citing *NicSand*, 507 F.3d at 456). In *NicSand*, the Court upheld 3M's up-front payments under the price-cost test in part because in the relevant industry, retailers insisted on up-front payments before changing suppliers. 507 F.3d at 452. Thus, "by offering up-front discounts to the retailers," 3M "was merely offering them something that, generically speaking, they already insisted on receiving." *Id.* In *ZF Meritor*, on the other hand, the court declined to apply the price-cost test where conduct was "***not*** a common practice in the industry." 696 F.3d at 277.

---

[154] *See supra* n.95.

[155] *See supra* nn.92-93.

[156] *Id.*

48

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

While Plaintiffs have sued only Syngenta and Corteva, all top R&D Companies, and even some *generic* suppliers, have had share-based loyalty rebate programs.[157] The "widespread use" of "rebate agreements" in the crop protection industry "does not suggest [Syngenta] acted anticompetitively" but rather "demonstrates the market was functioning properly." *In re EpiPen*, 44 F.4th at 989. Under these circumstances, Plaintiffs seek to deprive Syngenta—but not all other suppliers—of a method of competing that is common in the industry. Intervening in the market by enjoining Syngenta from including the three AIs at issue in Key AI would leave Syngenta at a competitive disadvantage.

The uncontroverted evidence shows that rebates are critical to many distributors' and retailers' business models in a "hypercompetitive" industry, including to (i) support their valuable (but expensive) services to growers, including agronomic recommendations, scouting, product application, and financing,[158] (ii) pass "significant" rebates to growers in "price or in discounted services,"[159] and (iii) compete with the distributors that pass on the rebates to customers.[160] Without Key AI, distributors and retailers may

---

[157] *See supra* n.77-79.

[158] *See supra* n.80.

[159] Ex. 56 (Wilbur-Ellis (Negroni) Dep.) 348:8-349:14; Ex. 19 (Nutrien (Baioni) Dep.) 333:14-334:9; *see also supra* n.80.

[160] *See supra* n.115.

49

need to "restructure the entire industry" because free services—which are subsidized by Key AI and other rebate payments—would be unprofitable.[161]

### f. Compliance with Key AI Thresholds Is Not Driven by any Threat of Supply Reduction

In its motion to dismiss decision, the Court concluded that Plaintiffs' allegations "plausibly support the claim that [Syngenta's supposed] threats to restrict supply are effective deterrence against noncompliance." D.E. 160 at 50. But the discovery record is devoid of evidence that distributors or retailers comply with Key AI rebate thresholds because of any threat to restrict supply.[162]

Discovery has confirmed that the only consequence under Key AI for missing the threshold for an AI is ineligibility for Key AI rebates on *that* AI for *that* year, and that Syngenta often grants exceptions to distributors.[163] This is demonstrated by a record replete with instances of distributors and

---

[161] Ex. 53 (Ripato Dep.) 187:20-188:13.

[162] No antitrust concern is raised by a customer's noncompliance with thresholds, which means it is *accommodating* generics, or by a customer's declining to participate in the rebate program, which eliminates any incentive to limit generic product purchases.

[163] *See supra* nn.92, 108.

retailers falling short of Key AI thresholds[164]—indeed, every year numerous retailers of all sizes do not satisfy the thresholds.[165]

Plaintiffs focus on the circumstances under which distributors Pinnacle and Simplot parted ways with Syngenta.[166] But what is missing from the circumstances of those breakups is any evidence of *compliance* with thresholds *caused by* any threat by Syngenta to terminate the business relationship.

To the contrary, when Pinnacle "pursu[ed]" rebate thresholds, it did so because "the more rebates you get, the lower your cost goes down."[167] There is no evidence of any threat of termination, much less evidence that Pinnacle *complied* with thresholds *because* of any such threat. Instead, there is evidence that Pinnacle did *not* comply with any Key AI threshold in 2017.[168] As Pinnacle testified, it participated in loyalty programs, including Syngenta's, ███████████████████████████████████████

---

[164] *See supra* n.107.

[165] Ex. 57 (Orszag Rebuttal Rep.) ¶ 187, Figures 24-26 (listing large retailers who choose not to participate in Key AI).

[166] Simplot subsequently acquired Pinnacle.

[167] Ex. 112 (Pinnacle/Simplot (Steffeck) IH) 100:12-23.

[168] *See* Ex. 113 at -001 (Pinnacle 2017 Marketer Key AI Share Form); *see also* Ex. 112 (Pinnacle/Simplot (Steffeck) IH) 124:2-127:5. Pinnacle did not achieve the threshold share to qualify for rebates on all █ Key AIs, including azoxystrobin (██████████████); mesotrione (██████████████; and s-metolachlor (██████████).

[169] ██████████████████████████

51

███████████████████████████████████████████████████████

███████████████████.[170]  Regardless of why Syngenta stopped directly

supplying Pinnacle,[171] it is irrelevant to Pinnacle's *prior* compliance with the

thresholds—which is Plaintiffs' alleged means of "exclusion" and which was

not the result of any threat to supply.

Likewise, there is no evidence of any threat to terminate Simplot for

failing to meet Key AI, much less that to the extent Simplot complied with

Syngenta's Key AI rebate thresholds, it did so in response to any such

threat.[172]  While Plaintiffs alleged that "Syngenta's cessation of its marketing

agreement with Simplot" was an  "example[] of retaliation by Syngenta" for

failure to "sufficiently support[] products included in Syngenta's loyalty

programs,"[173] Simplot itself directly rejected that allegation, testifying: "I'm

---

██ ██ ███

[171] Plaintiffs contend that Pinnacle's split from Syngenta represented "retaliation by Syngenta" for Pinnacle's failure to sufficiently "suppor[t] products included in Syngenta's loyalty programs." Ex. 114 (Plaintiffs' interrogatory responses) at 33. To the contrary, the split resulted from the parties' strategic differences. *See, e.g.,*

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

████████  But the Court need not address the reasons for the split to determine that Pinnacle's *compliance* with Key AI thresholds was not motivated by any threat of supply restriction.

[172] Ex. 97 (Simplot (Semadeni) Dep.) 98:13-19 (supply "wasn't one of the top issues I was worried about").

[173] Ex. 114 (Plaintiffs' interrogatory responses) at 33.

52

not sure either one cut off either one. I think we just quit doing business together."[174]

### 4. Other Factors Support Applying the Price-Cost Test to the Key AI Program

The remaining factors identified by the Court—aggravation of barriers to entry, exclusion of competitors from marketing materials, and the Syngenta-Corteva supply agreements—also favor applying the price-cost test.

### a. Barriers to Entry Are Low and Key AI Does Not Aggravate Them

The Court identified as a potential obstacle to applying the price-cost test Plaintiffs' allegations that Key AI "exacerbates the already high costs to enter the market by locking up access to the most efficient channel of distribution." D.E. 160 at 50. Assuming that factor is relevant to whether "price is the clearly predominant mechanism of exclusion," *see ZF Meritor*, 696 F.3d at 274, discovery has conclusively *dis*proved that the cost of generic entry is "high" and that Key AI rebates "exacerbat[e]" entry costs.

Plaintiffs allege the crop protection industry has "capital, technical, regulatory and legal barriers" that include "[1] obtaining registration from the EPA, [2] developing manufacturing processes and sourcing active ingredient, and [3] paying data compensation costs to the initial active

---

[174] Ex. 97 (Simplot (Semadeni) Dep.) 76:1-10; 98:20-99:2.

ingredient registrant." D.E. 160 at 49. But those are not significant entry barriers, either individually or in the aggregate. Plaintiffs' insistence that barriers to entry are high is belied by the substantial generic entry that has in fact occurred.[175]

The alleged barriers are low and easily hurdled. Plaintiffs insist that EPA registration is a significant entry barrier. D.E. 160 at 49. But the uncontroverted evidence shows registering a generic crop protection product with the EPA (and state regulators) is a low-cost, one-time requirement that takes relatively little time.[176] One generic supplier estimated—consistent with testimony by other generic suppliers—that EPA registration costs $11,000 to $15,000 and state approval takes "ten days to a year."[177]

Plaintiffs also allege "developing manufacturing processes and sourcing active ingredient" are significant entry barriers. D.E. 160 at 49. But most generic suppliers do not build their own manufacturing facilities to synthesize technical-grade AI, and instead outsource this step to overseas

---

[175] Ex. 115 (Hemphill Reply) ¶ 74.

[176] *See, e.g.*, Ex. 22 (Helm (Schumacher) Dep.) 319:25-320:16 (costs of EPA registration are $250K for a technical-grade AI that requires additional trial work, $100,000 for a formulated product, and $25,000 for a generic product "repack");

[177] Ex. 60 (Albaugh (Vance) Dep.) 438:3-16. The same generic supplier estimated that state registrations for generic products typically cost less than $600 and take "two to three weeks" to be approved. *Id.* 438:17-439:19.

54

manufacturers, usually in China or India.[178]  One generic supplier (Helm) estimated that one-time "formulation development" costs are approximately $75,000 for a straight product, and $300,000 or $400,000 for a product containing three AIs.[179]  For context, Helm's sales from 2018 to 2023 were $9.5 million for azoxystrobin and $27.9 million for mesotrione.[180]  Unlike in *McWane*, where the high cost of contracting out (domestic) manufacturing left the entrant unable to exert price pressure on the incumbent, 783 F.3d at 831, here generic entrants' (foreign) outsourcing of manufacturing has resulted in "intense" price competition with Syngenta that has "constrained [Syngenta's] ability to exercise market power."[181]

Plaintiffs' last alleged entry barrier, "paying data compensation costs" to Syngenta, is likewise insignificant.  D.E. 160 at 49.  The data necessary for a generic to register products containing a Syngenta AI for sale in the United States costs relatively little.  By statutory design, data compensation *facilitates* rather than impedes entry; Congress provided for data compensation to "streamline the registration process" and "*eliminate* a

---

[178] *Id*. 443:13-444:4; Ex. 152 (Helm (Schumacher) Dep.) 37:12-39:12; ███████ ███████████████████████████ Ex. 151 (Solera/Source Dynamics (Menagh) Dep.) 33:25-34:7; *see also* Ex. 117 (Rotam (Chavez) IH) 44:5-45:22 (uncommon for a generic to manufacture on its own).

[179] Ex. 22 (Helm (Schumacher) Dep.) 326:11-327:23.

[180] *See* Ex. 27 (FRE 1006 summary exhibit).

[181] Ex. 115 (Hemphill Reply) ¶¶ 72, 74.

significant barrier to entry." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1015 (1984). Plaintiffs concede that Congress's "objective" in providing for data compensation was to "***encourage*** generic entry."[182]

Here, the record confirms that many generic suppliers of products containing the Syngenta AIs successfully paid Syngenta for data in order to enter the market more cheaply and quickly—and in most cases made such payments only *after* they began selling the products in question. The generic suppliers that sell products containing these AIs paid Syngenta a fraction— often a single-digit percentage—of Syngenta's investment in developing and bringing to market a new AI.[183]

The prerequisites for generic entry are, as a matter of law, not significant. That Plaintiffs' proffered barriers are low is conclusively demonstrated by the ease with which entrants have surpassed them. Entry barriers are "significant" only if a "potential competitor would have difficulty entering in order to challenge a firm that is [allegedly] charging supracompetitive high prices." *Concord Boat Corp.*, 207 F.3d at 1059. Evidence of "continued entry of competition" proves that entry barriers are not sufficiently high to pose antitrust concern. *Barr Labs, Inc. v. Abbott*

---

[182] *See* Ex. 24 (Plaintiffs' RFA responses) at 13.

[183] *See supra* n.38 (Albaugh and Helm's data compensation of ███ and ███ million are fractions of Syngenta's investment).

*Labs*, 978 F.2d 98, 114 (3d Cir. 1992); *see also DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, 2020 WL 10575294, at \*4 (N.D. Cal. Mar. 25, 2020) (concluding that entry by four competitors to Uber in a three-year period reflected low barriers to entry).[184]

For instance, in *R.J. Reynolds Tobacco Company v. Philip Morris Incorporated*, Judge Bullock concluded that "rapid expansion of new entrants into the retail cigarette market"—from 0.6% in 1996 to 4.1% in 2001—"weigh[ed] against the existence of continuing high entry barriers." 199 F. Supp. 2d 362, 383-84 (M.D.N.C. 2002). Similarly, in *International Distribution Centers, Inc. v. Walsh Trucking Co.*, the Second Circuit held there were not high barriers to entry where one carrier entered and existing carriers expanded their operations. 812 F.2d 786, 792 (2d Cir. 1987). Here, there is no dispute that the generic suppliers have achieved shares of the alleged single-AI markets that are multiple times the percentages in *R.J. Reynolds*—namely, ▇ in 2022 for azoxystrobin products, ▇ in 2022 for mesotrione products, and ▇ in 2021 for metolachlor/s-metolachlor products.[185] A dozen or more generic suppliers compete against Syngenta as

---

[184] In contrast, significant barriers to entry are associated with a lack of entry. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir. 2021).

[185] Ex. 57 (Orszag Rebuttal Rep.) ¶ 167. Plaintiffs' liability expert estimated **even higher** generic shares—as high as ▇ for metolachlor in 2021. *See* Ex. 5 (Hemphill Rep.) ¶ 235 Figure 18. But Syngenta's economic expert corrected Hemphill's errors to obtain the figures quoted above. *See* Ex. 115 (Hemphill Reply)

to **each** of the Syngenta AIs.[186]  This is more than 12 times the number of entrants signaling low barriers to entry in *International Distribution*, and at least triple the number of entrants signaling low barriers to entry in *DeSoto Cab*, 2020 WL 10575294, at *4.

Further, generic entrants have thrived.  Generic suppliers gained an additional ▮ share of sales of products containing azoxystrobin (from ▮ to ▮ between 2018 and 2022.[187]  Generics gained an additional 14% share of sales of mesotrione products (from ▮ to ▮ between 2018 and 2023.[188]  And generics gained an additional ▮ share of sales of s-metolachlor/metolachlor products (from ▮ to ▮ between 2018 and 2021.[189]  While these shares subsequently declined to different extents, there was no barrier to generic entrants achieving them.  Nor could Plaintiffs blame Key AI for the declines, because there was no change in Key AI's structure or operation for the Syngenta AIs after 2021 other than ▮ thresholds.[190]

---

¶¶ 178-80 (arguing that even if his figures are wrong, he overestimated generic penetration).  While generic shares have subsequently fallen, there was no barrier to generics achieving these peaks.

[186] *See supra* nn.120-126.

[187] Ex. 57 (Orszag Rebuttal Rep.) ¶ 170 & Figure 22.

[188] *Id.* ¶ 170 & Figure 22.

[189] *Id.* ¶ 171 & Figure 22.

[190] *Compare* Ex. 149 (2024 retail program) *with* Ex. 148 (2021 retail program); *Compare* ▮▮▮ *with* Ex. 150 (▮ 2021

58

Plaintiffs' liability expert (Professor Hemphill) admits generic suppliers have "made significant inroads" selling products containing the relevant AIs.[191] He observes that "the evidence shows branded price decreases in response to" generic entry for the Syngenta AIs, and concedes that "[t]his is evidence that competition from the generic constrained [Syngenta's] ability to exercise market power" and that "these price responses show *intense* competition between branded and generic products containing an AI."[192] These concessions preclude, as a matter of law, any finding that barriers to entry are competitively significant.

In any event, Key AI does not "aggravat[e]" barriers to entry. D.E. 160 at 48. Robust generic entry, and the resulting "intense competition between branded and generic products" containing the Syngenta AIs,[193] materialized while these AIs have been in Key AI. This further distinguishes this case from the exclusive dealing arrangements in *Surescripts* or *McWane*. In *Surescripts*, the court found that a monopolist's loyalty program had become a "self-reinforcing barrier to entry for smaller competitors" where the rebate

---

marketing agreement). The one exception for the Syngenta AIs is that █████ s-metolachlor threshold ██████████████████████ *Compare* Ex. 158 (2021 █████ marketing agreement) *with* Ex. 159 (2022 █████ marketing agreement).

[191] Ex. 5 (Hemphill Rep.) ¶¶ 172, 184.

[192] Ex. 115 (Hemphill Reply) ¶¶ 72, 74.

[193] *Id.* ¶ 74.

required both sides of a two-sided market to *only* use the monopolist's product, which prevented entrants from gaining critical mass on either side of the market. 608 F. Supp. 3d at 645-46 (N.D. Ill. 2022). In contrast, the crop protection industry is not a two-sided market with indirect network effects, such that generics cannot enter. In *McWane*, only a ***single*** rival had managed to enter, gained no more than 5-10% market share, and "***had no effect on McWane's prices***." 783 F.3d at 820, 822, 830-31. Here, Plaintiffs' own liability expert has conceded the opposite on every point.

### b.    Syngenta Customers Are Free to Promote Competitors' Products

Plaintiffs do not allege that Syngenta has ever required customers to "exclude competitors from marketing materials." D.E. 160 at 49 (citing *ZF Meritor*, 696 F.3d at 278). Nor is there evidence that Syngenta has ever done so. This further supports application of the price-cost test.

### c.    Syngenta's Supply Agreements with Corteva Are Not a Non-Price Mechanism of Exclusion

Syngenta has agreements with Corteva to supply technical-grade mesotrione and formulated products containing s-metolachlor to Corteva.[194] There is no evidence that these agreements "enhanc[e] the [allegedly]

---

[194] *See* Ex. 118 at -065; Ex. 119 at -981, -985, 000-001; Ex. 120 at -316.

exclusive effect" of Key AI. D.E. 160 at 51. These agreements therefore provide no basis to depart from the price-cost test.

Under the mesotrione supply agreements, SCPAG supplies Corteva with technical-grade mesotrione as an input into finished products.[195] The agreements provide that ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.[196]

Under the s-metolachlor supply agreement, Syngenta Crop Protection, LLC supplies Corteva with finished products containing s-metolachlor.[197] The agreement provides that ███████████████████████████ ████████████████.[198]

It is puzzling that Plaintiffs would attack agreements that expand the variety and volume of competing products that are not subject to the allegedly "exclusionary" effect of Key AI thresholds—and that thereby increase distributors' and retailers' options for satisfying them. And, in any event, there is zero evidence that these agreements—one of which is global (*i.e.*, extends beyond the relevant geographic market)[199] and the other of

---

[195] Ex. 118 at -065, -069, -084–085); Ex. 119 at -981, -985, -000-002.

[196] *See* Ex. 118 at -091; Ex. 119 at -006.

[197] *See* Ex. 120 at -316.

[198] *See id.* at -322.

[199] *See* Ex. 118 at -065, -085.

61

which pertains to only three products out of 92 with that AI (or its older analog)[200]—have any impact on the alleged effects of the Key AI program. *See Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *32 (D.N.J. Mar. 28, 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016).

### 5. Under the Price-Cost Test, the Absence of Below-Cost Pricing Is Fatal to the Federal Antitrust Claims

Because Key AI rebates are predominantly, if not exclusively, price-based, they are governed by the price-cost test, which assigns liability only if "price is set below the cost." D.E. 160 at 35 (citing *Brooke Grp.*, 509 U.S. at 222). Plaintiffs' antitrust claims cannot survive the price-cost test. As this Court recognized, Plaintiffs do not allege below-cost pricing, a "concession" that "short-circuit[s] Plaintiffs' antitrust claims if the price-cost test applies." *Id.* Therefore, summary judgment dismissing Plaintiffs' antitrust claims is warranted.

### B. In Any Event, Plaintiffs' Antitrust Claims Do Not Survive the Full Rule of Reason

Because the price-cost test is determinative here, the Court need not further consider Plaintiffs' antitrust claims. But if the Court were to apply the full rule of reason, *see* D.E. 160 at 55-56, Plaintiffs' federal antitrust claims would fail as a matter of law.

---

[200] Ex. 119 at -981, -002; Ex. 121 (FRE 1006 summary exhibit).

### 1.   Plaintiffs' Single-AI Relevant Product Markets Are, as a Matter of Law, Too Narrow

On the pleadings, the Court accepted Plaintiffs' alleged "narrow" single-AI relevant product markets as plausible.  D.E. 160 at 31.  But the Court deferred to "another day," "after the facts develop," whether those market definitions are cognizable.  *Id.* at 32.  That day has come, and there is no need to weigh the evidence, because the uncontroverted evidence shows that the narrow single-AI product markets advanced by Plaintiffs are not cognizable as a matter of law.[201]  Consequently, Plaintiffs' claims that Syngenta possesses above ■ market share for each of the Syngenta AIs do not withstand scrutiny because they are premised on Plaintiffs' improperly narrow markets.[202]

"Proof of a relevant market is the threshold requirement" for Plaintiffs' federal antitrust claims.  *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) (Sherman Act § 2); *see Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (Sherman Act § 1); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 625 (5th Cir. 2002) (Clayton Act § 3); *Realcomp II, Ltd. v.*

---

[201] In the amended complaint, Plaintiffs alleged two relevant product markets for **each** AI:  a single-AI finished product market (with growers as the consumers) and a single AI technical-grade product market (with manufacturers as the consumers). *See* D.E. 160 at 22.  But Plaintiffs have abandoned the technical product markets and, in their place, Plaintiffs' liability expert advances component product markets (with growers as the consumers).  Ex. 5 (Hemphill Rep.) ¶ 215.

[202] *See* Ex. 57 (Orszag Rebuttal Rep.) ¶ 111 (citing Hemphill Rep. ¶ 229).

63

*F.T.C.*, 635 F.3d 815, 827 (6th Cir. 2011) (FTC Act § 5). "Courts begin with a preliminary inquiry into market definition because it serves as the frame through which the court analyzes monopoly power and substantial market foreclosure." D.E. 160 at 21.

"A relevant product market must include all reasonably interchangeable products." *Id*. at 24. "[R]easonable interchangeability…is generally determined according to the cross-elasticity of demand for the product and its alternatives." *Id.* (citing *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016)). Because growers are the consumers in the markets proffered by Plaintiffs, the relevant question of substitution is "the reasonable interchangeability of use" by growers. *Id.* at 21.

Courts regularly enter summary judgment where, as here, the record undermines an antitrust plaintiff's proposed product market definition as a matter of law. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002); *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.* 670 F. Supp. 1313, 1318 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987).[203]

---

[203] In addition, courts regularly grant summary judgment where an antitrust plaintiff fails to adduce any admissible expert testimony on product market definition. *See*, *e.g., Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 n.3 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003); *Belmora, LLC v. Bayer Consumer Care AG*, 338 F. Supp. 3d 477, 487 (E.D. Va. 2018), *rev'd in part on other grounds*, 987 F.3d 284 (4th Cir. 2021); *Cogan v. Harford Mem'l Hosp.*, 843 F. Supp. 1013, 1020 (D. Md. 1994). As shown in Defendants' motion to exclude Professor

64

### a. Branded Products with Other AIs Are Reasonably Interchangeable with the Syngenta AIs

As the Supreme Court has explained, "courts should combine different products or services into a single market when that combination reflects commercial realities." *Am. Express*, 585 U.S. at 544. Thus, "the boundaries of the relevant market must be drawn with sufficient breadth…to recognize competition where, in fact, competition exists." *Brown Shoe v. United States*, 370 U.S. 294, 326 (1962).

The uncontroverted evidence demonstrates the commercial reality that products containing the Syngenta AIs compete vigorously, including on price, not only with generics containing the same AI, but also with products containing other AIs. This is shown by testimony from growers, retailers, distributors, and manufacturers; Syngenta's (and Corteva's) internal documents; and pricing data, among other evidence.

**Grower Testimony**. "The best evidence of what consumers consider as substitutes often comes from consumers themselves." *Meta*, 2025 WL 3458822, at *19.

Here, growers' own words show they routinely choose crop protection products based on functionality, performance and price, and not on the

---

Hemphill's testimony, his product market definitions are inadmissible under Rule 702. This is an independent basis to dismiss Plaintiffs' antitrust claims.

65

presence of a particular AI.[204]  For example, Reginald Strickland, a seventh-generation farmer in North Carolina, explained his farm evaluates "any available products that could treat the pests [it] encounter[s]" and "determine[s] which crop protection products…best serve [its] needs at the right price."[205]  Bill Miller, co-owner of a family farm in Nebraska, attested that he selects "the product that offers the best value, considering performance, support, and price," without regard to AIs.[206]  Matthew Porter, owner of a sixth-generation family farm in Maine, said he considers "a number of factors" when choosing products "including price, efficacy, yield, and manufacturer support."[207]  A corn/soybean farmer (who also worked previously at two distributors and Syngenta), testified that in his grower experience, products containing azoxystrobin, mesotrione, and s-metolachlor "absolutely" compete with products that do not contain Syngenta AIs.[208]  In contrast, *no* grower testified that *only* products containing one of the Syngenta AIs are substitutes for a product containing that AI.  This is a

---

[204] *See supra* n.64.

[205] Ex. 41 (Strickland Decl.) ¶ 4; *see also* Ex. 58 (Robberts Dep.) 83:18-85:23 (choosing products based on their price and which weed or pest they control).

[206] Ex. 45 (Miller Decl.) ¶ 3.

[207] Ex. 16 (Porter Decl.) ¶ 5.

[208] Ex. 21 (Ripato Dep.) 308:4-12, 316:20-318:14; 319:7-322:9.

gaping hole in Plaintiffs' case, which depends on the narrow single-AI product markets concocted by their liability expert.

Growers routinely view branded products—regardless of AI—as closer substitutes to each other than to generics containing the same AI, particularly for higher-value applications.  Mr. Robison explained that in treating potatoes on his 7,300-acre Idaho farm, the substitutes to the Syngenta products are *other* AIs from BASF and Bayer for fungicides and from BASF for herbicides, and that his farm "rel[ies] heavily on these branded options for their proven reliability."[209]  Mr. Toevs stated that when his family farm in Idaho "choose[s] [its] crop protection products for the year, [he] prefers to stick with branded options" because the "savings are not significant enough to justify switching" and the "quality and consistency of a branded product is worth the price."[210]  Mr. Toevs explained he selected Syngenta's Quilt Xcel for the first application, and, as a substitute, he would have used a Bayer product containing prothioconazole.[211]

Uncontroverted grower testimony shows that the characteristic of crop protection products most valued by growers is the ability to defend specific crops against specific threats—and that reasonably interchangeable products

---

[209] Ex. 37 (Robison Decl.) ¶¶ 7-10.

[210] Ex. 54 (Toevs Decl.) ¶ 3.

[211] Ex. 54 (Toevs Decl.) ¶ 9.

with different AIs provide similarly effective defenses.[212]  Idaho farmer Matt

Robison chooses between Syngenta's Boundary (s-metolachlor and

metribuzin) and BASF's Prowl (pendimethalin) for use on potatoes.[213]  Mr.

Toevs declared that his family farm chooses competitively priced wheat

fungicides from among Syngenta's Quadris (azoxystrobin), Syngenta's Quilt

Xcel (a mixture of azoxystrobin and propiconazole), Syngenta's Miravis Ace (a

mixture of pydiflumetofen and propiconazole), Bayer's ProStar (flutolanil),

BASF's Twinline (pyraclostrobin), and/or a generic chlorothalonil.[214]

Where, as here, consumers view the market as broader than alleged,

the court may grant summary judgment in favor of defendants on market

definition.  In *PepsiCo, Inc. v. Coca-Cola Co.*, the Second Circuit defined the

relevant product market as fountain syrup generally, rejecting the plaintiff's

alternative of fountain syrup delivered by certain distributors (independent

food service distributors, or "IFDs") to certain customers.  *See* 315 F.3d at

106-07.  On summary judgment, the court concluded that "fountain syrup

delivered by bottler distributors was an 'acceptable substitute' for fountain

syrup delivered by IFDs" because "none of the numerous customers who were

---

[212] *See supra* nn.64-65; Ex. 4 (Heiniger Rebuttal Rep.) ¶¶ 62-67 (alternative AIs can provide similar agronomic benefits).

[213] Ex. 37 (Robison Decl.) ¶ 10.

[214] Ex. 54 (Toevs Decl.) ¶ 9.

deposed or submitted affidavits for the summary judgment motion said that the availability of delivery via IFDs was determinative of its choice of fountain syrup." *Id.* at 106. Therefore, there was no basis to limit the market by type of distributor and customer. *Id.*

In addition to this direct evidence of consumer substitution, application of the *Brown Shoe* factors disproves Plaintiffs' narrow "single AI" markets. The Supreme Court in *Brown Shoe* identified several factors that serve as "evidentiary proxies" for consumer substitution (D.E. 160 at 28): (1) "industry or public recognition," (2) the products' "peculiar characteristics and uses," (3) "distinct customers," (4) "distinct prices [and] sensitivity to price changes," and (5) "specialized vendors" and "unique production facilities." *Meta*, 2025 WL 3458822, at *28 (quoting *Brown Shoe*, 370 U.S. at 325). Each factor demonstrates product markets far broader than Plaintiffs' single-AI markets.

**Industry or Public Recognition**. This factor evaluates whether industry participants view the proposed market as a "separate economic entity." *Id.* at *32. This is significant because "economic actors usually have accurate perceptions of economic realities." D.E. 160 at 26.

There is no industry or public recognition of Plaintiffs' single-AI markets. In contrast, the extensive discovery record shows that industry participants—including Syngenta, other R&D Companies, distributors and

retailers—uniformly identify other AIs among the substitutes for each Syngenta AI.

The ordinary course documents and testimony of distributors and retailers confirms they recommend other AIs for the Syngenta AIs and often consider switching between competing products containing different AIs.[215] Broad substitution among AIs by growers is recognized by other branded and generic manufacturers too.[216] Surveys also show that the Syngenta AIs compete within multi-AI segments.[217]

Syngenta's "own conduct and recognition of the market," *id.*, unequivocally show that competition to satisfy grower demand, including based on price, exists between the Syngenta AIs and products containing other AIs. Syngenta's ordinary-course documents prove that Syngenta considers rival brands using different AIs to be close substitutes for its branded products.[218] This reality is embedded in Syngenta's "brand ladders," which are central to Syngenta's strategy of competing through innovation and pricing.

---

[215] *See supra* nn.67-69.

[216] *Id.*

[217] *See* Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 116-118.

[218] *See, e.g.*, Ex. 123 (North America pricing strategy slide deck) at 19; Ex. 124 (herbicide pricing guidance slide deck) at 8; Ex. 125 (corn herbicide competitive profiles side deck) at 3-9; Ex. 57 (Orszag Rebuttal Rep.) Figures 1-5.

70

Each brand ladder organizes products targeting specific use cases or containing a specific AI along a series of "rungs" that correspond to Syngenta's strategic positioning of the products.[219]  The products on the top rungs are more expensive and innovative, and the products on the bottom rungs are more economical.[220]  Syngenta's brand ladders often encompass Syngenta products with different AIs and position Syngenta products alongside competitor products containing different AIs at each rung of the ladder.  By way of example, below is a brand ladder for corn herbicides with Syngenta products containing s-metolachlor and mesotrione as compared to competitor products with a variety of other AIs.[221]

---

[219] Ex. 65 (Syngenta (Weikel) Dep.) 479:11-25 ("On a brand ladder, we're typically building different combinations of products that have different performance, and trying to … create different levels of value at different price points … different combinations of different active ingredients would be a common way to think about it."); Ex. 34 (Syngenta (Hawkins) Dep.) 176:22-178:10 (a brand ladder is typically a set of brands differentiated based on AI, price point, service level, or value proposition).

[220] Ex. 34 (Syngenta (Hawkins) Dep.) 177:22-178:10; Ex. 157 (Boden Dep.) 110:5-10 (Syngenta's low-cost "fighting brands" cheaper than other Syngenta products higher on the brand ladder); Ex. 65 (Syngenta (Weikel) Dep.) 478:11-479-6 ("Brand ladder means selling lots of different price points to the market to service … different grower needs, different grower price points.").

[221] Ex. 126 at 14.  The Callisto products contain mesotrione but not s-metolachlor. The other Syngenta products all contain s-metolachlor.

71



Competition between the Syngenta AIs and other AIs is also reflected in Syngenta's marketing materials—including materials aimed at growers—which expressly target branded products containing other AIs.[222] Syngenta's marketing highlights uses for which growers substitute competing products—

---

[222] *See, e.g.*, Ex. 127 at -377 (detailing in ███████████ marketing plan detailing the need to highlight advantages of s-metolachlor versus ████████ Ex. 128 at 2-4 (detailing in 2019 marketing material ███████ ████ Ex. 129 at 2 (advertising Syngenta's ████████ ██████████████████████████████████ ████████████████████████████ ).

72

e.g., "herbicides for corn," not "s-metolachlor products."[223] Thus, Syngenta's exemplar "2021 East Heartland CU Business Plan" focused on "corn herbicides" and "soybean herbicides," reflecting grower substitution of products within that particular geographic market.[224]

Syngenta undisputedly designed the Key AI rebate program on an AI-by-AI basis to reward distributor and retailer support for its full portfolio and due to administrability concerns.[225] To the extent Syngenta's design of the Key AI rebate is relevant, Plaintiffs' argument that the scope of the Key AI rebate is probative of market definition backfires because Syngenta has other rebates, including share-based rebates, that target competing brands based

---

[223] *See, e.g.,* Ex. 130 at 1 (detailing future growth strategy in markets grouped by product type (e.g., herbicide) and crop (e.g., corn)).

[224] Ex. 76 at 6, 9 (detailing Syngenta's "2021 East Heartland" business plan via functional segments of market, e.g., "corn herbicides" and "soybean herbicides"); *accord* Ex. 131 at 91-94, 131-33 (detailing internal 2020 market data via focus upon on functional segments, including noting where different competitors made "gains" or "losses" in spaces like ██████████ and ██████████. Ex. 132 at -842 (comparing ████████ ██████████ by examining Syngenta's ████████████████████████████████████; Ex. 133 at 3 (detailing 2017 competitive response for Syngenta's ████████████████ by reference to competitors ████████████████████████████████; Ex. 134 at 6, 8-9 (reviewing Syngenta's 2016 portfolio of corn herbicides based on ████████████████████████████████████████████████

[225] *See supra* n.88.

on other AIs.[226]  Thus, Syngenta's own conduct includes rebates that cover "individual AIs" and rebates that cover rival AIs; this supports the conclusion that Syngenta "view[s] the market as including [not] only one AI but [also] others."  D.E. 160 at 32.

Plaintiffs' advocacy of single-AI relevant markets in the face of numerous ordinary-course Syngenta documents showing much broader competition among products containing multiple AIs conflicts with Plaintiff FTC's longstanding position—on which it has prevailed in multiple cases— that a defendant's ordinary-course business documents should play an important role in defining markets.  *See, e.g., FTC v. Tapestry, Inc.,* 755 F. Supp. 3d 386, 430 (S.D.N.Y. 2024) ("[W]hen determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."); *FTC v. Kroger Co.,* 2024 WL 5053016, at *18 (D. Or. Dec. 10, 2024) ("[T]he ordinary course documents before the Court show that Kroger and Albertsons view each other as strong, even primary, competitors."); *FTC v. IQVIA Holdings Inc.,* 710 F. Supp. 3d 329, 362-63 (S.D.N.Y. 2024) ("Courts regularly consider ordinary course documents when defining the relevant market."); *FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34, 49 (D.D.C. 1998) ("The Defendants' documents show that the merging

---

[226] *See supra* n.82.

parties clearly viewed their economic competition to be from their fellow drug wholesalers, and not from the other sources as suggested by the Defendants at trial.").

In addition, the DOJ repeatedly has defined functional crop protection product markets rather than formalistic, AI-specific markets. *See, e.g.,* Competitive Impact Statement at 8-12, *United States v. Bayer AG*, No. 1:18-cv-01241 (D.D.C. May 29, 2018) (DOJ defining product markets as "foundational herbicides" and "nematicidal seed treatments for corn, cotton, and soybeans");[227] Competitive Impact Statement at 5-6, *United States v. The Dow Chem. Co.*, No. 1:17-cv-01176 (D.D.C. June 15, 2017) (DOJ defining the product markets as "broadleaf herbicides for winter wheat" and "insecticides for chewing pests").[228] The FTC similarly recognized that various non-Syngenta AIs are reasonably interchangeable with metolachlor and azoxystrobin when, in evaluating the merger between the agricultural businesses of AstraZeneca and Novartis—the transaction creating Syngenta[229]—it proffered product markets of "herbicides applied prior to weed emergence for control of grassy weeds in corn" (comprising the AIs metolachlor, acetochlor, and dimethenamid) and "foliar fungicides" for six

---

[227] Ex. 160.

[228] Ex. 161.

[229] *See* Ex. 3 (Hawkins Decl.) ¶ 3.

different crops (comprising the AIs azoxystrobin and trifloxystrobin).[230] Indeed, the FTC ordered the parties to divest acetochlor so that the merger did not "combin[e] two of the three closest substitutes in the market" and trifloxystrobin because it was a "direct competitor[]" with azoxystrobin.[231]

The FTC cannot "gerrymander its way to an antitrust victory." *It's My Party*, 811 F.3d at 683; *see also Meta*, 2025 WL 3458822, at *17-34 (rejecting the government's unduly narrow product market); *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 814-830 (S.D. Tex. 2025) (same); *United States v. United States Sugar Corp.*, 73 F.4th 197, 203-05 (3d Cir. 2023) (affirming rejection of the government's unduly narrow product market).

**<u>Peculiar Characteristics and Uses</u>**. This factor assesses whether "different products have physical or functional differences that make them less likely to be interchangeable." *Meta,* 2025 WL 3458822, at *29. It is "not enough to find ***some*** difference between products"—because "any two products will have differences." *Id.*; *see also DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1339 (Fed. Cir. 2014) ("For products to be substitutes for one another, they need not be identical or fungible."). The key inquiry is

---

[230] Ex. 162 (Complaint, *In the Matter of Novartis AG, et al.*, Dkt. No. C-3979 (Nov. 1, 2000)) at 2-3.

[231] *Id.* at 2, 3-4; Ex. 163 (Decision and Order, *In the Matter of Novartis AG, et al.*, Dkt. No. C-3979 (Nov. 1, 2000)) at 9-11, 11-14.

how "important [any] differences are in the context" of the overall market. *Meta*, 2025 WL 3458822, at *29.

Market participants testified to the substitutability of products containing different AIs. Wesley Ward of Harvey's Fertilizer & Company—which operates 14 retail stores—explained that for each of the Syngenta AIs, "there are many different chemistries that growers can choose from to serve the same need."[232] For instance, to address the issue of powdery mildew on wheat crops, Harvey has recommended to growers that they either use Syngenta's Quadris (which contains azoxystrobin), Syngenta's Miravis Ace or Bayer's Prosaro (neither of which contain azoxystrobin).[233]

From an agronomic perspective, the Syngenta AIs "do NOT have distinctive features that are not found or replicated in other alternative product AIs."[234] Each has other AI alternatives that can replicate the same control to achieve similar agronomic benefits and efficacy.[235]

**Distinct Customers**. Courts also evaluate whether customers in the alleged product market are distinct from customers outside it. When the same customers evaluate and switch among the very products a plaintiff

---

[232] Ex. 59 (Ward Decl.) ¶ 19.

[233] *Id.*

[234] Ex. 4 (Heiniger Rebuttal Rep.) ¶ 62.

[235] *Id.* ¶¶ 64-66.

seeks to separate, the distinct customers factor weighs decisively against a narrow market.

This was the case in *FTC v. Tempur Sealy*. There, the court rejected the FTC's proposed market of "premium mattresses"—defined as mattresses priced above $2,000—because mattresses "priced above and below $2,000 [were] sold ***at the same stores***," which "belie[d] any idea that those above $2,000 have a distinct customer base." 768 F. Supp. 3d at 822. Testimony from store owners also confirmed "no distinct group of customers exists" because shoppers routinely "compare[d] across mattresses priced above and below $2,000 when shopping for a mattress." *Id.*

The Fourth Circuit reached a similar conclusion in *It's My Party*. Affirming summary judgment for the defendant, the court held that plaintiff's proposed market of "major amphitheaters" for performing artists failed because plaintiff could not show "that amphitheaters ***are the only place certain artists*** are willing to perform, irrespective of the monetary or logistical advantages of other concert locations." 811 F.3d at 682-83. To the contrary, the record showed that "artists regularly perform at both amphitheaters and non-amphitheaters, and any artist dissatisfied with [defendant's] conditioning of amphitheaters could simply perform at another venue." *Id.* at 683.

78

Here too the undisputed evidence shows that there are no customers for products containing the Syngenta AIs that are "distinct" from customers for products containing other AIs. As in *Sealy*, where "premium" mattresses were sold "at the same stores" as lower cost mattresses, crop production products with and without the Syngenta AIs move through the same distribution chain—manufacturers to distributors to retailers—and those distributors and retailers will typically carry both categories of products. 768 F. Supp. 3d at 822. And the ultimate purchasers are the same: growers.[236]

Most important, growers behave like the consumers in *Sealy* and the artists in *It's My Party*. They "compare across" products containing the at-issue AIs and products without them when selecting crop protection products for the same use case, *Sealy*, 768 F. Supp. 3d at 822, and they "regularly" switch between them based on price, performance, and agronomic needs, *It's My Party*, 811 F.3d at 683. For example, Matthew Porter of Porter Farms attested that his farm "recently switched away" from using Syngenta's Quadris Top and Elatus products (both mixtures containing azoxystrobin) to instead use Bayer's Velum Rise product (a mixture of fluopyram and penflufen) as a fungicide for the farm's potato crops.[237] Boyd Foster, a farmer

---

[236] Ex. 57 (Orszag Rebuttal Rep.) ¶ 100.

[237] Ex. 16 (Porter Decl.) ¶ 7.

79

with over 15 years of experience, explained that his farm uses Syngenta's
Boundary and Dual products (both containing Syngenta AIs) for potato
herbicide applications, but "[a]s an alternative" his farm will also substitute
to BASF's Prowl or Outlook products (which do not contain a Syngenta AI), or
a metribuzin product (also not a Syngenta AI).[238]

**Distinct Prices and Sensitivity to Price Changes**.  It is undisputed
that products containing each Syngenta AI do not have meaningfully distinct
prices compared to interchangeable alternatives.

The products at the top of Syngenta's brand ladder for each Syngenta
AI are closer to the prices of competing brands with different AIs than to
generic products with the same AIs, while the prices at the bottom are closer
to generic prices.  Syngenta's economic expert, Mr. Jonathan Orszag,
determined that "[t]he prices of major Syngenta CPPs are closer to CPPs
supplied by Corteva, BASF and Bayer (most of them without at-issue AIs)
than to generic CPPs with at-issue AI[s]."[239]

Similarly, price sensitivity weighs against Plaintiffs' single-AI relevant
markets because the evidence indicates significant cross-elasticity of demand

---

[238] Ex. 17 (Foster Decl.) ¶¶ 1, 9.
[239] Ex. 57 (Orszag Rebuttal Rep.) ¶ 100.

80

between each of the Syngenta AIs and products with other AIs.[240]  *See DSM*,
749 F.3d at 1343 ("[T]he sensitivity of customers to price reflects the basic
economic test of cross elasticity of demand.").

The prices of products with the Syngenta AIs move in response to
changes in the prices of products with other AIs.[241]  For example, a research
firm engaged by Syngenta to evaluate the "competitive impact of price
changes" for ███████, ████████████████████████████████████████,
concluded that a ████ price increase by █████████ would result in losses of
revenue mostly to ████████████, a ██████████████████████████████████
███████████████████████████████, and vice versa.[242]  Sure enough, when ████
reduced the farmgate price of ███████████ the following year, Syngenta
responded by reducing the price of █████████.[243]

Distributors recognize this price competition among AIs too.  For
instance, in 2021, Syngenta reduced the prices of its mesotrione products in
response to planned entry by products containing other AIs.[244]  ██████████
████████████████████████████████████████████████████████████████████

---

[240] *See* Ex. 57 (Orszag Rebuttal Rep.) ¶ 100, Figures 12-13; Ex. 135 at 2; Ex. 67 at 57.

[241] *See supra* n.240.

[242] Ex. 136 at 2.

[243] Ex. 71 at 4.

[244] ████████████████████████████████████████████████████

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER



"245, 246

### b. Plaintiffs' Expert Opinions <u>Cannot Overcome the Record Facts</u>

Plaintiffs do not deny this abundant uncontroverted evidence of substitution between products containing the Syngenta AIs and products containing other AIs—including Syngenta's contemporaneous documents and testimony from growers, distributors, retailers and an expert agronomist (Dr. Heiniger). Instead, Plaintiffs proffer a liability expert (Professor Hemphill) who insists that the Court must blind itself to any evidence of relevant product markets broader than Plaintiffs' gerrymandered single-AI markets. Because Plaintiffs' expert is wrong as a matter of law, his proffered testimony is no obstacle to a grant of summary judgment based on the overwhelming record evidence of much broader relevant markets.[247]

---

[245] ████████████████████████████████████

[246] The final two *Brown Shoe* factors provide no support for Plaintiffs' single-AI markets. There are no unique production facilities for the Syngenta AIs (other AIs are produced with similar processes in similar production facilities) or specialized vendors (products with and without the Syngenta AIs travel through the same distribution channels). *See supra* nn.39, 57; Ex. 22 (Helm (Schumacher) Dep.) 328:14-330:8 (listing toll manufacturers that manufacture multiple AIs).

[247] Independently, Hemphill's proffered testimony cannot block summary judgment because it is inadmissible under Rule 702. *See supra* n.203.

82

Plaintiffs' liability expert is C. Scott Hemphill, a New York University law professor with a J.D. and a Ph.D in economics—and no agricultural expertise. As explained in Defendants' motion to exclude his testimony, Hemphill is an antitrust legal crusader who has testified as an "economist" for plaintiffs, including the FTC, in a handful of cases. A federal judge recently described Hemphill's testimony for the FTC at a bench trial in a monopolization case as "almost as if the FTC had put one of its own lawyers on the stand." *Meta*, 2025 WL 3458822, at *26.

Although Hemphill advocates for narrow single-AI markets, ***he does not deny the existence of broader product markets***. Rather, he concedes that broader markets "typically" exist,[248] acknowledges that evidence of price declines for products containing other AIs in response to generic entry "might well support the existence of an additional broader market,"[249] and takes "no position" on whether broader markets exist here.[250] He nonetheless insists that these broader markets are irrelevant.

Hemphill urges one, and only one, reason this Court should ignore the ubiquitous evidence of product markets broader than his single-AI markets:

---

[248] Ex. 115 (Hemphill Reply) ¶ 19.

[249] *Id.* ¶ 20.

[250] *Id.* ¶ 171 n.263 ("I take no position on whether 'broader markets' may also exist.").

his claim that his narrow markets satisfy the hypothetical monopolist test ("HMT").[251]  Hemphill insists that "[i]f a relatively narrow market satisfies the [HMT], then ***the analysis is complete*** even if (as is typically the case) there exist other products outside the market that also compete."[252]

Hemphill's claim that his narrow market definitions "complete" the relevant market analysis is wrong, as a matter of law, for two reasons.  First, as this Court has explained, "[c]ourts employ a variety of methods to determine if a product market is properly constituted," including the HMT, which is "an aid" in making the determination.  D.E. 160 at 26-27.  It would be legal error to ignore evidence of a broader market merely because a narrower market supposedly satisfies this "aid."  *See United States v. United States Sugar Corp.*, 73 F.4th 197, 206 (3d Cir. 2023) ("The District Court did not err by considering facts on the ground rather than relying upon HMT analysis."); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 293 n.3 (D.D.C. 2020) ("The *Brown Shoe* practical indicia may indeed be old school … [b]ut *Brown Shoe* remains the law, and this court cannot ignore its dictates.").

---

[251] *See* Ex. 140 (Hemphill Dep.) 83:9-85:19.

[252] Ex. 115 (Hemphill Reply) ¶ 19; *see also* Ex. 140 (Hemphill Dep.) 83:20-84:8 (he has not "ruled out the existence of other broader markets that contain other AIs").

Second, Hemphill has **mis**applied the HMT as a matter of law.[253]  This

Court has described the HMT as follows:

> The court begins by hypothesizing that every good as alleged in
> the ["candidate"] product market is under the control of a
> hypothetical monopolist.  Under such conditions, if the
> hypothetical monopolist could profitably impose a small but
> significant and nontransitory increase in price ("SSNIP"), then
> the product market is properly defined.  By contrast, the product
> market is improperly defined when the hypothetical monopolist
> imposes the SSNIP unprofitably because the alleged market does
> not include reasonably interchangeable goods—i.e., goods that
> consumers will shift demand toward in light of the SSNIP.

D.E. 160 at 27.  Misapplication of the HMT constitutes legal error.  *See, e.g.,*

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 345 (3d Cir. 2016); *see*

*also Worldwide Basketball & Sports Tours v. NCAA*, 388 F.3d 955, 959-60

(6th Cir. 2004) ("[W]hile a district court's conclusion concerning what

constitutes the relevant market is subject to the clearly erroneous standard of

review, the district court's formulation of the market tests may be freely

reviewed on appeal as a matter of law").

A fundamental requirement of the HMT is that prices of potential

substitute products outside the candidate market are held constant.  *See, e.g.,*

---

[253] The HMT was designed as a predictive test for use in analyzing proposed
mergers **prospectively**, which is how courts (and enforcement agencies) generally
use it.  *See* D.E. 160 at 27-28 (citing three proposed merger cases and a non-merger
case in which the court of appeals held that the district court misapplied the HMT);
*see also* DOJ & FTC, *Merger Guidelines* § 4.3, at 39.  Some courts also have used it
in alleged monopolization cases.  *See Merger Guidelines* § 4.3, at 41 n.81.

85

*In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 n.3 (6th Cir. 2014) (HMT

"assum[es] the terms of sale of all other products are held constant") (quoting

Merger Guidelines); *Sealy*, 768 F. Supp. 3d at 827 ("A properly conducted

HMT requires a reliable data set, while holding everything constant apart

from an increase in price for the product being tested…."); *In re Live Concert

Antitrust Litig.*, 247 F.R.D. 98, 123 n.19 (C.D. Cal. 2007) (explaining that

under the then-current Merger Guidelines, application of the HMT required

that "the terms of sale of all other products remained constant").[254]

Similarly, as this Court explained, "if the price of one incumbent product

drops significantly in response to new entry, ***while the prices of other

incumbents do not***, then that first incumbent product, plus the new

entrant, is very likely a market." D.E. 160 at 32 (quoting Areeda &

Hovenkamp ¶ 561b2).

Hemphill's application of the HMT comes down to observing that in the

real world, the prices of Syngenta products containing each Syngenta AI

dropped in response to generic entry, and interpreting that "price response

---

[254] *See also Merger Guidelines* § 4.3.A, at 42 ("For the purpose of analyzing [the candidate market under the HMT], ***the terms of sale of products outside the candidate market are held constant***."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 536 (5th ed.) ("Begin by characterizing product A as a 'provisional['] market. Then ask whether a 'significant' price increase by a hypothetical A monopolist—***assuming everything else remains constant***—would maximize its profits. If so, A is the market.")

[to suggest] closeness of competition, which is evidence that a hypothetical monopolist that controlled all products containing [an] AI…would profitably set a[n] at least SSNIP higher price."[255]  But in the real world, prices of other products containing other AIs *also* dropped after generic entry.[256]

Thus, the real-world data on which Hemphill's application of the HMT depends does *not* hold constant prices of products outside of his single-AI candidate market.  Confronted with this, Hemphill complained that there is no "perfect, clean test" because "[t]he real world doesn't hold those other products constant."[257]  But rather than excusing Hemphill from this requirement, his complaint confirms that his HMT fails to satisfy it—and undermines his insistence that his HMT requires the Court to ignore the evidence of broader markets.[258]

The uncontroverted facts show that the products outside the candidate markets whose prices declined significantly upon generic entry are reasonably interchangeable with the Syngenta AIs.  *See supra* Point I.B.1.a. Because Hemphill's HMT concededly ignores these price declines, the test

---

[255] Ex. 140 (Hemphill Dep.) 129:21-130:15.

[256] Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 83-84, Figures 6-7.

[257] Ex. 140 (Hemphill Dep.) 125:14-126:16.

[258] There are statistical techniques that allow economists to hold variables constant, but Hemphill did not employ them.  Ex. 140 (Hemphill Dep.) 124:17-126:16; Ex. 141 (Hemphill Dep.) 492:23-493:6.

87

cannot exclude that "the hypothetical monopolist imposes the SSNIP unprofitably because the alleged market does not include reasonably interchangeable goods—i.e., goods that consumers will shift demand toward in light of the SSNIP." D.E. 160 at 27.[259] In particular, the undisputed evidence that prices of products containing other AIs declined upon generic entry destroys any expectation that pre-entry prices of Syngenta products containing each AI at issue would prevail in the hypothetical event that products containing the AI were (again) monopolized. To the contrary, their lower prices make the products containing other AIs more attractive to growers than they were when Syngenta had a legal monopoly over products containing each Syngenta AI. Yet Hemphill's HMT is oblivious to this competitive dynamic.

Because Hemphill's HMT fails to account for the substitution between products containing different AIs, it is particularly inappropriate for him to wield the test to attempt to block this Court's consideration of product markets any broader than his narrow single-AI markets.

---

[259] *See also FTC v. Sanford Health*, 926 F.3d 959, 964 (8th Cir. 2019) (upholding market definition under HMT where "the undisputed testimony was that there are no functional substitutes" for the hypothetically monopolized services available to the customer (insurer) within the geographic area); *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 474 (7th Cir. 2016) (upholding HMT where there was "strong, not equivocal" evidence that "[t]ypically patients seek hospital care in their own communities").

Hemphill's approach is akin to the expert testimony in *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, which the Seventh Circuit dismissed as "armchair economics" because the expert failed to provide "econometric evidence of any kind" to assess demand substitution. 354 F.3d 661, 664 (7th Cir. 2004) (Easterbook, J.). In *Menasha*—as here—the plaintiff alleged a narrow market underlying an exclusive dealing claim. *Id.* at 663-64. As support, the plaintiff's economic expert—like Hemphill—considered only the economic effects of competition on products within the plaintiff's alleged market while disregarding whether potential competitors outside of the market also were affected. *Id.* at 665. The Seventh Circuit affirmed the district court's grant of summary judgment on product market for the defendant because the plaintiff's expert—like Hemphill—had failed to seriously grapple with substitutes. *Id.* at 665-66.

Under these circumstances, Hemphill's opinions rest almost exclusively on conclusory statements that conflict with the undisputed facts. In *Brooke Group*, the Supreme Court explained that "when indisputable record facts contradict or otherwise render" an expert's "opinion unreasonable, it cannot support a jury's verdict" as a matter of law. 509 U.S. at 242. Courts have applied that principle to enter summary judgment for a defendant when the opinion of the plaintiff's expert contradicts the factual record. For instance, the district court in *Menasha* entered summary judgment for the defendant—

89

who had pointed to "ample evidence in the record" of reasonable substitutes—because the plaintiff had "failed to provide a factual basis sufficient to justify its delineation of the relevant market." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1034 (N.D. Ill. 2003), *aff'd*, 354 F.3d 661 (7th Cir. 2004) (citing *Brooke Grp.*, 509 U.S. at 242); *see also Stiles v. Walmart, Inc.*, 639 F. Supp. 3d 1029, 1048-50 (E.D. Cal. 2022) (granting summary judgment in favor of defendant on market definition, explaining that because "the undisputed evidence contradict[ed] [the] expert's opinions, no trial is necessary to determine what weight to give those opinions; judgment may be granted as a matter of law" (citing *Brooke Grp.*, 509 U.S. at 242)).

In short, Hemphill's opinions contradict the factual record, which renders Hemphill's "opinion unreasonable" and legally insufficient to prove Plaintiffs' narrow markets. *Brooke Grp.*, 509 U.S. at 242. "[A]ntitrust theory and speculation cannot trump facts." *FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109, 116 (D.D.C. 2004), *case dismissed,* 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004).

*     *     *

In sum, Plaintiffs cannot carry their burden of proving that their single-AI product markets are legally cognizable, leaving their allegation that Syngenta possesses improper market or monopoly power in those alleged

90

markets—Plaintiffs' only evidence of market or monopoly power—irrelevant and insufficient.

### 2. Plaintiffs Cannot, as a Matter of Law, Show Harm to Competition

#### a. Governing Law

The plaintiff in a monopolization case, "upon whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001); *see also*, *e.g.*, *R.J. Reynolds*, 199 F. Supp. 2d at 387 ("[I]n cases involving vertical non-price restraints,…anticompetitive effects must be proven."). This requires Plaintiffs to prove that Key AI has "reduce[d] output or raise[d] prices to consumers." *Cont'l Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 516 (4th Cir. 2002).[260]

The plaintiff's burden includes proving that the alleged anticompetitive effects are, in fact, "attributable to anticompetitive conduct by [the defendant] as opposed to…other factors." *Eisai*, 2014 WL 1343254, at *32; *see also Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.,* 690 F.2d 411, 414 (4th Cir. 1982) (requiring proof of an injury "that flows

---

[260] To the extent the Court requires Plaintiffs to demonstrate an antitrust injury distinct from the rule of reason analysis, à la *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), and *Cargill*, 479 U.S. 104, Plaintiffs' federal antitrust claims would fail that test for the reasons in this subsection.

from that which makes defendants' acts unlawful"). "[A]t the summary judgment stage," an expert's theories of foreclosure and assumptions "cannot serve as a substitute for actual evidence." *Eisai*, 821 F.3d at 407.

"Under [the rule of reason], an exclusive dealing arrangement is unlawful only if its 'probable effect' is to substantially lessen competition in the relevant market," D.E. 160 at 34 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961)), "rather than [to] merely disadvantage rivals." *Eisai*, 821 F.3d at 403 (quoting *ZF Meritor*, 696 F.3d at 271).[261] "Exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 829 (M.D.N.C. 2000) (quoting *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)).

### b.      Discovery Has Disproved Plaintiffs' Allegations

This Court permitted Plaintiffs' antitrust claims to proceed to discovery based on "indirect and direct" allegations of "harm to competition." D.E. 160 at 56; *see also Am. Express*, 585 U.S. at 542 (explaining that a plaintiff can make the requisite showing of harm to competition "directly or indirectly"). Plaintiffs alleged that including the Syngenta AIs in the Key AI program causes indirect harm to competition by foreclosing a "substantial part of the

---

[261] Courts apply the rule of reason to exclusive dealing claims in the same manner "regardless of the antitrust statute at issue." D.E. 160 at 57.

market," resulting in "the widespread failure of generics to enter the market." D.E. 160 at 65. Plaintiffs alleged that including the Syngenta AIs in the Key AI program causes direct harm to competition through "reduced choices for farmers, higher prices for farmers, and less[ens] innovation," and argued that Syngenta's discounts "do not get passed on to farmers." *Id.* at 57.[262]

Because discovery has disproved these allegations, Plaintiffs' claims fail under the rule of reason. There simply is no proof that including the Syngenta AIs in the Key AI rebate program has harmed competition. To the contrary, the uncontroverted evidence shows intense price competition between Syngenta and dozens of generic entrants with substantial market penetration, prompting significant declines in prices for growers, as even Plaintiffs' liability expert concedes.[263]

Discovery has demolished Plaintiffs' allegation of indirect harm to competition purportedly shown by a "widespread failure of generics to enter the market." D.E. 160 at 65. No fewer than a dozen generic suppliers offer products containing ***each*** of the Syngenta AIs, including premixes that Plaintiffs consider to be "innovative."[264] These generic suppliers have achieved penetration of Plaintiffs' single-AI markets as high as ▮ for

---

[262] Plaintiffs do not allege that Key AI has reduced output.

[263] *See* Ex. 140 (Hemphill Dep.) 92:1-15.

[264] *See supra* nn.119, 121, 123, 125; Ex. 57 (Orszag Rebuttal Rep.) ¶ 267.

93

azoxystrobin, ■■■ for mesotrione, and ■■■ for s-metolachlor/metolachlor within the past several years, and currently account for roughly ■■■■ of sales for each AI.[265] This robust competition has developed notwithstanding the inclusion of the Syngenta AIs in the Key AI program.

These undisputed numbers disprove Plaintiffs' assertions that the Key AI program "severely limit[s] generic firms' market access," resulting in "very limited access to the market." D.E. 112 at 1, 8; *see also*, *e.g.*, D.E. 81 ¶ 3 (alleging that the Key AI program "marginalize[s] competitive generic products"). Further, this generic penetration "preclude[s] a finding that [alleged] exclusive dealing is an entry barrier of any significance." *Omega Env't*, 127 F.3d at 1164 (reaching that conclusion based on "actual entry and expansion" of a competitor from 6% to 8% market share).

Plaintiffs' allegation of "widespread failure of generics to enter the market," D.E. 160 at 65, is not rescued by their allegations of only *three* generic suppliers that decided against offering, or continuing to offer, a product containing a Syngenta AI.[266] There is no evidence that the inclusion

---

[265] Ex. 57 (Orszag Rebuttal Rep.) ¶¶ 170-171. Hemphill estimated ***even higher*** figures. *See* Ex. 5 (Hemphill Rep.) ¶ 235, Figure 18 (estimating shares as high as ■■■ for metolachlor in 2021). But Syngenta's economic expert, Mr. Orszag, corrected errors made by Plaintiffs' expert to obtain the figures quoted above. *See* Ex. 115 (Hemphill Reply) ¶¶ 178-80 (declining to acknowledge his errors but arguing that even if his figures are wrong, he overestimated generic penetration).

[266] *See* Ex. 5 (Hemphill Rep.) ¶¶ 440-42 (Rotam, NuFarm, and Helm).

94

of the AI in the Key AI program was the principal or sole cause of the generic's decision—much less that **an anticompetitive aspect** of the Key AI program was the cause. *See Eisai,* 2014 WL 1343254, at *32. In any event, evidence regarding so few market actors is immaterial at summary judgment. *See Eisai*, 821 F.3d at 404 (holding that "a few dozen hospitals out of almost 6,000 in the United States" that were "prevented" by the challenged discounts from purchasing a generic product was "not enough to demonstrate 'substantial foreclosure'"—particularly if a hospital's failure to switch to a generic "was due to price, *i.e.,* the loss of the discounts offered by the [challenged] Program."). These generic decisions—affecting a few products and three manufacturers out of the more than one hundred generic products containing these AIs produced since 2018—are immaterial and cannot preclude summary judgment. *See Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021) (affirming grant of summary judgment because alleged fact dispute was immaterial).

Discovery likewise has disproved Plaintiffs' allegation of direct harm through higher prices for farmers. *See generally Cont'l Airlines,* 277 F.3d at 516. There is no dispute that prices **paid by growers** for Syngenta's products containing the Syngenta AIs have declined significantly in response

95

to generic entry.[267]  Of course, Key AI discounts on each of the Syngenta AIs began around the time of generic entry.  The declines in prices paid by growers dovetail with testimony by distributors and growers that Syngenta's rebates are passed through by distributors and retailers.[268]  Indeed, Plaintiffs' liability expert cites evidence that distributors rely on Key AI rebates to compete on price with other distributors—which confirms that distributors use the rebates to lower their prices.[269]  Hemphill elsewhere insists that distributors "pass through only a portion" of rebates, but that vague claim—which neither of Plaintiffs' experts quantifies—cannot controvert the evidence of significant pass through.[270]

Discovery also has undermined Plaintiffs' allegation that any attempt by generic suppliers to access traditional distributors "would be futile in the presence of the loyalty programs."  D.E. 160 at 63.  Plaintiffs' liability expert has acknowledged that, as the uncontroverted evidence shows, distribution of crop protection products is highly competitive, and that "high degrees of distributor competition mean that only *modest* consideration is needed to secure distributor loyalty."[271]  In fact, two distributors—Pinnacle and (after

---

[267] *See supra* n.263

[268] *See supra* nn.80, 115.

[269] Ex. 5 (Hemphill Rep.) ¶ 372.

[270] Ex. 115 (Hemphill Reply) ¶ 257; Ex. 122 (Orszag Reply) ¶¶ 8-9.

[271] *Id.* ¶ 253.

96

acquiring Pinnacle) Simplot—no longer participate in Syngenta's Key AI program in order to focus on distributing generic products, including products that compete against the Syngenta AIs.[272] And other distributors do not always satisfy Key AI thresholds for the Syngenta AIs.[273] Likewise, every growing season, large numbers of retailers fail to satisfy Key AI thresholds.[274]

Plaintiffs' allegation that including the Syngenta AIs in the Key AI program "reduce[s] choices for farmers" or results in "less innovation" is another casualty of discovery. D.E. 160 at 57. Market participants describe the current environment as "very crowded" and "oversupplied" with generic products.[275] There is zero evidence in the record that when growers, including the MDL plaintiffs in the parallel action, wish to purchase generic versions of products containing the Syngenta AIs, they are unable to access them—let alone that an anticompetitive aspect of Syngenta's rebate program is directly responsible for such a "reduce[d] output" of generic products.[276] *See Cont'l Airlines,* 277 F.3d at 516.

---

[272] *See supra* n.171; Ex. 97 (Simplot (Semadeni) Dep.) 198:3-201:17 ("W[e] wanted the freedom to offer more brands…and to grow Innvictis").

[273] *See supra* n.107.

[274] *See supra* n.114.

[275] *See supra* n.130.

[276] *See* Ex. 37 (Robison Decl.) ¶ 4 ("We have never not been able to receive the product we wanted, including when we choose to buy generics."); Ex. 44 (Wiggins Decl.) ¶¶ 8, 11 ("generic atrazine and mesotrione" are "widely available"); Ex. 41 (Strickland Decl.) ¶ 9 ("Generic options are readily available to us."); Ex. 54 (Toevs

97

Where, as here, distributors and retailers demonstrably "are free to switch to a different product in the market but ***choose*** not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share." *Eisai*, 821 F.3d at 403.  Indeed, the Ninth Circuit has affirmed summary judgment on analogous facts.  *See Allied Orthopedic*, 592 F.3d at 995-97.  In *Allied Orthopedic*, the defendant offered "substantial discounts to customers that actually purchased a high percentage of their…requirements from" the defendant under a program that did not "contractually obligate [its] customers to buy anything from [it]," leaving its customers free to "choose at any time to forego the discount offered by [the defendant] and purchase from a generic competitor." *Id*. at 995-97; *see also Concord Boat Corp.*, 207 F.3d at 1059 (finding no substantial foreclosure at summary judgment because defendant's customers "were free to walk away from the discounts at any time, and they in fact switched to [competitor products] at various points when that manufacturer offered superior discounts.").

---

Decl.) ¶ 3 (same); Ex. 59 (Ward Decl.) ¶15 ("I am not aware of any instance where a grower who wanted a generic product was unable to get it."); Ex. 58 (Robberts Dep.) 95:14-22; Ex. 42 (Bole Dep.) 81:1-84:1; Ex. 142 (Yeargin Dep.) 142:17-143:9; Ex. 63 (Bonin Dep.) 30:18-31:11; Ex. 143 (Gavin Brothers (Shows) Dep.) 96:2-4 ("Has Gavin Brothers, LLC ever sought out a generic product and been unable to acquire it?" "Not to my knowledge."); Ex. 61 (Jones Planting's interrogatory responses) at 11; Ex. 139 (Deline's interrogatory responses) at 13.

98

### c. Plaintiffs' Expert Testimony Does Not Controvert the Evidence That There Is No <u>Harm to Competition</u>

All of this uncontroverted evidence forces Plaintiffs' liability expert (Professor Hemphill) to acknowledge that generic suppliers have "made significant inroads," and that substantial decreases in Syngenta's prices "in response to" generic entry "show ***intense*** competition between branded and generic products containing an AI" and show "that competition from the generic ***constrained*** [***Syngenta's***] ***ability to exercise market power***."[277] Hemphill further concedes that, as to other AIs, the Key AI program has not prevented price competition from "becom[ing] highly intense."[278]

Plaintiffs proffer Hemphill's testimony that absent the inclusion of the Syngenta AIs in the Key AI program, prices would be "lower" and generic penetration would be "higher."[279]  But Hemphill's proffered testimony on these points presents no triable issue of fact.  Hemphill fails to specify how much lower prices would be or how much higher generic penetration would be—let alone sponsor any methodology for doing so.  Such untestable *ipse dixit* cannot block summary judgment.

---

[277] *See supra* nn.181, 192.

[278] *See supra* n.131.

[279] *See, e.g.*, Ex. 115 (Hemphill Reply Rep.) ¶ 337.  Plaintiffs' damages expert (Dr. Smith) is unavailing on these issues.  Smith expressly disclaims opining on liability issues and, indeed, his opinions rest on the assumption that Defendants are liable. Ex. 144 (Smith Rep.) ¶ 10.

## II. SYNGENTA IS ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIMS

### A. The State Plaintiffs' State Law Antitrust Claims Fall in Tandem with Their Federal Antitrust Claims

The State Plaintiffs' state law antitrust claims should be dismissed on the same grounds as Plaintiffs' federal antitrust claims.

Each state law antitrust claim "re-alleges and incorporates by reference" the same allegations as the federal antitrust claims, *see* D.E. 81 (Counts V-XVI), and the governing statutes require them to be interpreted consistent with federal antitrust law.[280]

---

[280] *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1048 (N.D. Cal. 2021), *rev'd in part on other grounds*, 67 F.4th 946 (9th Cir. 2023) (California Cartwright Act § 16700 *et seq.* (Count V ¶ 214)); *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 171 F. Supp. 3d 1092, 1104 n.3 (D. Colo. 2016) (Colorado Antitrust Act §§ 6-4-104, 6-4-105 (Count VI ¶¶ 218, 223)); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 765 n.7 (N.D. Ill. 2015) (Illinois Antitrust Act, 740 ILCS 10/3 (Count VII ¶ 227)); *Berghausen v. Microsoft Corp.*, 765 N.E.2d 592, 594 (Ind. Ct. App. 2002) (Indiana Antitrust Act, Ind. Code §§ 24-1-2-1, 24-1-2-2 (Count VIII ¶ 228)); *Chicoine v. Wellmark, Inc.*, 894 N.W.2d 454, 462 (Iowa 2017) (Iowa Competition Law, Iowa Code Chapter 553 (Count IX ¶ 230)); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (Minnesota Antitrust Law, Minn. Stat. §§ 325D.51, 325D.52, 325D.53 (Count X ¶¶ 236, 241, 244)); *Heath Consultants, Inc. v. Precision Instruments, Inc.*, 247 Neb. 267, 271-72 (Neb. 1995) (Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602-1605 (Count XI ¶ 248)); *Jones v. City of McMinnville,* 244 F. App'x 755, 759 (9th Cir. 2007) (Oregon Antitrust Law, O.R.S. §§ 646.705-836 (Count XII ¶ 250)); *Spahr v. Leegin Creative Leather Prods., Inc.*, 2008 WL 3914461, at *13 (E.D. Tenn. Aug. 20, 2008) (Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.* (Count XIII ¶ 259)); *AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC*, 638 S.W.3d 198, 201 (Tex. 2022) (Texas Antitrust Act, Tex. Bus. & Com. Code §§ 15.05(a)-(b) (Count XIV ¶ 262)); *Blewett v. Abbott Lab'ys*, 86 Wash. App. 782, 787 (Wash. Ct. App. 1997) (Washington Consumer Protection Act, RCW 19.86.030-040 (Count XV ¶¶ 267, 268)); *Prentice v. Title Ins. Co. of Minnesota*, 500 N.W.2d 658, 662 (Wis. 1993) (Wisconsin Antitrust Law, Wis. Stat. §§ 133.03, 133.14, 133.16 (Count XVI ¶ 276)).

Thus, the state law antitrust claims should be dismissed for the same reasons as the baseless federal antitrust claims. *See Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.,* 158 F. App'x 413, 422 (4th Cir. 2005) (affirming summary judgment on state law antitrust claims because they "fail for the same reasons that the analogous federal claims fail").

**B. Syngenta Is Entitled to Summary Judgment on the Consumer Protection Claims Brought by California, <u>Indiana and Iowa</u>**

Summary judgment is also appropriate on the three consumer protection claims asserted by California, Indiana and Iowa, respectively.

### 1. <u>California Unfair Competition Law</u>

California alleges that Syngenta's loyalty rebate program violates California's Unfair Competition Law ("UCL"), which prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; *see also* D.E. 81 ¶ 215. California has not established any such practice.

*First*, California's claim that the Key AI rebate is an "unlawful" practice is derivative of, and must fall with, Plaintiffs' federal and state antitrust claims. "To be unlawful under the UCL, the [challenged conduct] must violate another borrowed law." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). Here, just as the federal antitrust and California Cartwright Act claims against Syngenta fail because they involve

101

the same meritless allegations and legal theories, *see supra* Point II.A., so too does any theory that Syngenta engaged in an "unlawful" practice under the UCL fail for lack of a predicate violation.

*Second*, there is no evidence that Syngenta has engaged in any "fraudulent" practice. Conduct is "fraudulent" under the UCL if it involves "representations [that] were false or were likely to have misled reasonable consumers." *Graham v. VCA Antech, Inc.*, 2016 WL 5958252, at *13 (C.D. Cal. Sept. 12, 2016), *aff'd sub nom. Graham v. VCA Animal Hosps., Inc.*, 729 F. App'x 537 (9th Cir. 2018). California does not claim, nor is there any evidence, that Syngenta engaged in any acts that were misleading. Additionally, because the Key AI rebate program is offered to Syngenta's distributors and retailers, not the growers who are the ultimate end users of Syngenta's products, Syngenta could not have possibly misled *consumers* about Key AI, as the UCL requires. *See Reilly v. Apple Inc.*, 2022 WL 1215305, at *7 (N.D. Cal. Apr. 25, 2022) ("Though the UCL does not define consumer, the CLRA [California Legal Remedies Act]—which often serves as a predicate to UCL claims—defines consumer as 'an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes.'").

*Third*, there is no evidence that Syngenta has engaged in any "unfair" practice proscribed by the UCL. Syngenta's conduct does not offend any

102

"legislatively declared policy" within California, as there is no specific legislative prohibition on share-based rebates, and, as discussed above, the Key AI rebate program does not violate any state (or federal) antitrust law. *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1115 n.6 (E.D. Cal. 2024). Nor does any "harm to the consumer" outweigh "the utility of the conduct." *See id.*; *see also supra* Point I.B.2.

The analogous claims under Indiana and Iowa law fail for the same reasons. *See* D.E. 160 at 84-85 (acknowledging that Indiana's DCSA covers the same type of "unfair" practices as California's UCL); Iowa Code Ann. § 714.16(2)(a) (prohibiting "unfair practice" undertaken with "the intent that others rely upon the concealment, suppression, or omission in connection with the … sale … of any merchandise.").

## III. THE COURT SHOULD DISMISS ALL OF PLAINTIFFS' CLAIMS AGAINST SYNGENTA CROP PROTECTION AG AND SYNGENTA CORPORATION AS A MATTER OF LAW

The Court should dismiss all claims against SCPAG and Syngenta Corporation because the record undisputably shows that neither has any involvement in, much less control over, the Key AI rebate program, which is administered solely by Syngenta. Indeed, if the Court were to enter an

103

injunction barring Key AI, there are **no steps** either entity would need to take to comply with that injunction.[281]

"Antitrust law doesn't recognize guilt by mere association, imputing corporate liability to any affiliated company unlucky enough to be a bystander to its sister company's alleged misdeeds." D.E. 160 at 69-70 (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015)). Rather, as Plaintiffs acknowledge, an affiliate must "control[], dictate[], or encourage[]" its affiliate's anticompetitive conduct to a sufficient degree to constitute "coordinated activity." *Id.* at 71 (quoting *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237-38 (10th Cir. 2017)).[282]

There is no dispute that the Key AI rebate program was developed and is administered solely by Syngenta, the entity responsible for the Syngenta Defendants' U.S. crop protection business.[283] Neither SCPAG nor Syngenta Corporation played a role in developing the initial idea for the rebate program or refining it for introduction into the marketplace.[284] In the two

---

[281] *See* Ex. 1 (Tudor Decl.) ¶¶ 27-29; Ex. 145 (Quain Decl.) ¶¶ 7-10.

[282] The same result would hold even if the test for "coordinated activity" was that an affiliate play some "role" or "participate[]" in the liable affiliate's allegedly anticompetitive conduct. *See* D.E. 160 at 71.

[283] Ex. 3 (Hawkins Decl. ¶ 15).

[284] *Id.*; Ex. 1 (Tudor Decl. ¶¶ 6, 22, 27-29); Ex. 145 (Quain Decl. ¶ 10).

104

decades since its launch, every aspect of Key AI—from negotiation of terms with Key Account distributors, to setting of threshold levels, to determination of whether to grant exceptions—has been implemented exclusively by Syngenta personnel.[285]  None of Plaintiffs' allegations of "coordinated activity" has been borne out by the completed record.

First, the uncontroverted evidence disproves that SCPAG controls, directs, or encourages the Key AI program.  While SCPAG reviews Syngenta's budget ***as a whole***, this review—unlike in *Nobody in Particular Presents, Incorporated v. Clear Channel Communications, Incorporated*—does not extend to the "plans" Syngenta implements to meet its budget, nor does SCPAG exercise full control over the funding of the U.S. business.[286]  *See* 311 F. Supp. 2d 1048, 1071-72 (D. Colo. 2004).  "[A]t no point during [the budget] process are local crop protection teams told what business strategies to use to meet budget projections."[287]

Second, the uncontroverted evidence likewise disproves that SCPAG sets the "'generic defense' strategy" in the United States.  D.E. 160 at 71-72 (quoting D.E. 81 ¶ 36).[288]  The so-called "White Book" that underlies these

---

[285] Ex. 3 (Hawkins Decl. ¶¶ 15).

[286] Ex. 1 (Tudor Decl.) ¶¶ 6, 18-21.

[287] *Id.* ¶ 20.

[288] *Id.* ¶¶ 24-26.

allegations is not used to direct post-patent strategy in the United States, let alone with respect to the Key AI rebate program in particular; all U.S. Syngenta employees that were asked about the White Book testified that they were either unfamiliar with it altogether or were aware of it by name but "ha[d] not read" it, had not "used it," and were unaware of others doing so.[289]

Nor does the mesotrione supply agreement between SCPAG and Corteva indicate that SCPAG controls, dictates, or encourages the Key AI rebate program. *See* D.E. 160 at 72. SCPAG was involved in negotiating the agreement, and signed it, specifically because ███████████████ ██████████████████████████████████████[290] The arm's-length negotiation of a single agreement to supply one form of technical AI to one manufacturer for one product can hardly amount to the "calling [of] the shots on [] daily decisions" required to impute liability for the Key AI rebate program to SCPAG. *Reading Int'l, Inc. v. Oaktree Cap. Mgmt., LLC*, 317 F. Supp. 2d 301, 324-25 (S.D.N.Y. 2003).

---

[289] Ex. 25 (Wichert Dep.) 243:22-25; Ex. 146 (Flippin Dep.) 291:24-293:16; Ex. 8 (Syngenta (Cecil) Dep.) 23:18-24:9, 26:14-23, 32:2-17.
[290] Ex. 1 (Tudor Decl.) ¶¶ 13-17.

106

Syngenta Corporation should also be dismissed.  It is not responsible for *any* commercial activity.[291]  Instead, it provides back-office non-commercial support functions to Syngenta's U.S. entities across areas such as federal government affairs, legal, insurance, treasury services, tax, trade compliance, and security.[292]  An affiliate's provision of operational services to a subsidiary as a matter of "administrative convenience and economy" is not "a manifestation of control" by the affiliate.  *Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F. Supp. 831, 846 (D. Del. 1978).

At the pleading stage, the Court highlighted allegations that, (1) "at the time of the complaint, the same individual served as the president of both Syngenta Corporation and Syngenta Crop Protection, LLC," and (2) "a Syngenta Corporation executive manages Syngenta's contacts with Corteva regarding the [mesotrione supply] agreement."  D.E. 160 at 71-72.  While Plaintiffs strain to highlight certain overlapping areas between Syngenta Corporation and Syngenta, these overlaps reflect nothing more than a typical dispersion of activities across entities within the same corporate family.

As to the first allegation, the sharing of corporate directors among affiliates cannot alone give rise to antitrust liability because it is "typical of"

---

[291] Ex. 145 (Quain Decl.) ¶ 8.

[292] *Id.* ¶¶ 7-9.

107

any corporate affiliate relationship.  *See United States v. Bestfoods*, 524 U.S. 51, 70 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."); *In re Pennsylvania Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009) (director overlap is "typical" for affiliated companies).  And the second allegation is based on a single email sent by a Syngenta employee,[293] who was not then and has never been employed by Syngenta Corporation.[294]

In sum, the record demonstrates that neither SCPAG nor Syngenta Corporation directs, controls, or encourages the Key AI rebate program.

## CONCLUSION

For all these reasons, the Court should enter summary judgment dismissing all of Plaintiffs' claims against the Syngenta Defendants.

Date: December 19, 2025

*s/Patrick M. Kane*
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200

---

[293] *See* Ex. 114 (Plaintiffs' interrogatory responses) at 43-46 (citing Ex. 147); Ex. 145 (Quain Decl.) ¶ 11.

[294] Ex. 145 (Quain Decl.) ¶ 12.

PO Box 21927 (27420)
Greensboro, NC  27401
Telephone:  336.378.5200
Facsimile:  336.378.5400

Charles S. Duggan*
charles.duggan@davispolk.com
James I. McClammy*
james.mcclammy@davispolk.com
Michael Scheinkman*
michael.scheinkman@davispolk.com

David B. Toscano*
david.toscano@davispolk.com
Alison B. Miller*
alison.miller@davispolk.com
Daniel J. Thomson*
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

Jesse Solomon*
jesse.solomon@davispolk.com
Benjamin M. Miller*
benjamin.miller@davispolk.com
1050 17th Street, NW Washington, DC
20036
DAVIS POLK & WARDWELL LLP
Telephone: (202) 962-7133

*Specially appearing under L.R. 83.1(d)


*Attorneys for Defendants Syngenta Crop Protection
AG, Syngenta Corporation, and Syngenta Crop
Protection, LLC*

109

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.3(d)(1), I certify that the foregoing brief is less than 25,000 words, excluding the caption, table of contents, table of authorities, signature lines, certificate of compliance, and certificate of service.

Dated:  December 19, 2025

/s/ *Patrick M. Kane*
Patrick M. Kane (NC Bar No. 36861)

i

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

## APPENDIX A – TABLE OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| 1. | Declaration of Ioana Tudor (Syngenta Crop Protection AG), dated December 19, 2025 |
| 2. | Excerpts from the transcript of the deposition of Vern Hawkins, in his personal capacity and as corporate representative of the Syngenta Defendants, dated July 21, 2025 |
| 3. | Declaration of Vern Hawkins (Syngenta Crop Protection, LLC), dated December 19, 2025 |
| 4. | Expert Rebuttal Report of Ron Heiniger, dated October 3, 2025 |
| 5. | Expert Report of C. Scott Hemphill, dated August 22, 2025 |
| 6. | Excerpts from the transcript of the deposition of Lisa Moricle, in her personal capacity, dated May 29, 2025 |
| 7. | Excerpts from the transcript of the deposition of Kevin Gesse, in his personal capacity, dated April 15, 2025 |
| 8. | Excerpts from the transcript of the deposition of Jeff Cecil, in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 31, 2025 |
| 9. | Declaration of Rex Wichert (Syngenta Crop Protection, LLC), dated December 19, 2025, attaching:<br><br>• Exhibit A, a document titled "AgbioInvestor: Time and Cost of New Agrochemical Product Discovery, Development and Registration"<br><br>• Exhibit B, a document titled "Syngenta: Our industry, 2016" |

| Exhibit Number | Description |
|---|---|
| | • Exhibit C, a screenshot of a webpage from Bayer AG titled "Bringing Crop Protection Products to the Market" |
| 10. | Excerpts from the transcript of the deposition of Pat Menagh, in his personal capacity and as corporate representative of Source Dynamics, dated January 15, 2025 |
| 11. | FRE 1006 Summary Exhibit regarding Generic Manufacturers Selling Syngenta AIs in 2024 |
| 12. | Excerpts from the transcript of the deposition of Dean Hendrickson, in his personal capacity, dated July 31, 2025 |
| 13. | Excerpts from the transcript of the deposition of Jeff Bunting, in his personal capacity and as corporate representative of Growmark, Inc., dated June 17, 2025 |
| 14. | Excerpts from the transcript of the deposition of Jeff Bunting, in his personal capacity and as corporate representative of Growmark, Inc., dated June 18, 2025 |
| 15. | Excerpts from the transcript of the deposition of Ward Bloodworth, in his personal capacity and as corporate representative of Helena Agri-Enterprises, LLC, dated June 13, 2025 |
| 16. | Declaration of Matthew Porter (Porter Farms), dated November 20, 2025 |
| 17. | Declaration of Boyd Foster (Vista Valley), dated November 11, 2025 |
| 18. | Excerpts from the transcript of the deposition of Christopher Sittler, in his personal capacity and as corporate representative of Stone's Farm Supply, dated July 1, 2025 |

| Exhibit Number | Description |
|---|---|
| 19. | Excerpts from the transcript of the deposition of Keith Baioni, in his personal capacity and as corporate representative of Nutrien Ag Solutions, Inc., dated June 27, 2025 |
| 20. | Excerpts from the transcript of the deposition of Gary Bentzinger, in his personal capacity, dated July 11, 2025 |
| 21. | Excerpts from the transcript of the deposition of Mark Ripato, in his personal capacity, dated July 2, 2025 |
| 22. | Excerpts from the transcript of the deposition of Dave Schumacher, in his personal capacity and as corporate representative of Helm Agro US Inc., dated March 7, 2025 |
| 23. | Excerpts from the transcript of the deposition of Kyle Maple, in his personal capacity and as corporate representative of Winfield United and Winfield Solutions, LLC, dated July 16, 2025 |
| 24. | Plaintiffs' Responses and Objections to Syngenta Defendants' Second Set of Requests for Admission, dated July 21, 2025 |
| 25. | Excerpts from the transcript of the deposition of Rex Wichert, in his personal capacity, dated February 25, 2025 |
| 26. | Excerpts from the transcript of the deposition of Sunil Menon, in his personal capacity and as corporate representative of UPL NA, Inc., on June 6, 2025 |
| 27. | FRE 1006 Summary Exhibit regarding Generic Manufacturers' Sale of Syngenta AIs 2018-2023 |

| Exhibit Number | Description |
|---|---|
| 28. | Azoxystrobin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Albaugh, LLC, dated October 12, 2025, bearing Bates SYT_REBATELIT_02066786 |
| 29. | Mesotrione Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Helm Agro US, Inc, dated December 21, 2017, bearing Bates SYT_REBATELIT_00284391 |
| 30. | Expert Report of Jonathan Orszag, dated August 22, 2025 |
| 31. | Excerpts from the transcript of the deposition of Keith Baioni, in his personal capacity and as corporate representative of Nutrien Ag Solutions, Inc., dated June 26, 2025 |
| 32. | "February 2022 Kline Report," slide deck titled "Leading Distributors in the U.S. Crop Protection Industry: A Strategic Market Analysis," dated February 2022, bearing Bates CNIAG-00085045 |
| 33. | Excerpts from the transcript of the deposition of Vern Hawkins, in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 5, 2025 |
| 34. | Excerpts from the transcript of the deposition of Vern Hawkins in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 4, 2025 |
| 35. | Excerpts from the transcript of the deposition of Jamie Eichorn, in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 7, 2025 |

| Exhibit Number | Description |
|---|---|
| 36. | Declaration of Joel Nichols (Seven Springs Farm), dated October 23, 2025 |
| 37. | Declaration of Matthew Robison (Robison Farms), dated November 20, 2025 |
| 38. | "August 2023 Syngenta Presentation," slide deck titled "U.S. Ag Retailer Study," dated August 2023, bearing Bates SYT_REBATELIT_03294633 |
| 39. | Excerpts from the transcript of the deposition of John Van Diest, in his personal capacity and as corporate representative of Van Diest Supply Company, dated July 14, 2025 |
| 40. | Excerpts from the transcript of the deposition of Willie Negroni, in his personal capacity and as corporate representative of Wilbur-Ellis, dated April 21, 2025 |
| 41. | Declaration of Reginald Strickland (Strickland Farms), dated October 30, 2025 |
| 42. | Excerpts from the transcript of the deposition of Chris Bole, in his personal capacity, dated July 22, 2025 |
| 43. | Excerpts from the transcript of the deposition of Matt Gavin, in his personal capacity, dated July 25, 2025 |
| 44. | Declaration of Clint Wiggins (Wiggins Watermelons), dated October 22, 2025 |
| 45. | Declaration of William Miller, dated November 19, 2025 |
| 46. | Excerpts from the transcript of the deposition of Jeff Cole, in his personal capacity and as corporate representative of Tenkoz, Inc., dated June 25, 2025 |
| 47. | Excerpts from the transcript of Ron Heiniger, dated November 6, 2025 |

| Exhibit Number | Description |
|---|---|
| 48. | Excerpts from the transcript of the deposition of Stanley Bernard, in his personal capacity and as corporate representative of Drexel Chemical Company, dated February 20, 2025 |
| 49. | Excerpts from the transcript of the deposition of Kenneth Barham, in his personal capacity and as corporate representative of NuFarm, dated May 21, 2025 |
| 50. | Excerpts from the transcript of the deposition of Jeff Cole, in his personal capacity and as corporate representative of Tenkoz, Inc., dated June 26, 2025 |
| 51. | Slide deck titled "Retail Strategy Evolution," dated June 2019, bearing Bates SYT_REBATELIT_03545559 |
| 52. | Excerpts from the transcript of the deposition of Amy Yoder, in her personal capacity and as corporate representative of Farmers Business Network, Inc., dated July 22, 2025 |
| 53. | Excerpts from the transcript of the deposition of Mark Ripato, in his personal capacity, dated July 1, 2025 |
| 54. | Declaration of Ritchey Toevs (Famous Idaho Potatoes), dated November 13, 2025 |
| 55. | Excerpts from the transcript of the deposition of John Appel, in his personal capacity and as corporate representative of Farmers Business Network, dated July 22, 2025 |
| 56. | Excerpts from the transcript of the deposition of Willie Negroni, in his personal capacity and as corporate representative of Wilbur-Ellis, dated April 22, 2025 |
| 57. | Expert Rebuttal Report of Jonathan Orszag, dated October 3, 2025 |

| Exhibit Number | Description |
|---|---|
| 58. | Excerpts from the transcript of the deposition of Brett Robberts, in his personal capacity, dated July 14, 2025 |
| 59. | Declaration of Wesley Ward (Harvey's Fertilizer & Gas Company), dated November 26, 2025 |
| 60. | Excerpts from the transcript of the deposition of Spencer Vance, in his personal capacity and as corporate representative of Albaugh LLC, dated May 29, 2025 |
| 61. | Jones Planting's Responses and Objections to Syngenta Defendants' First Set of Interrogatories, dated June 11, 2025 |
| 62. | Excerpts from the transcript of the deposition of Willie Negroni, in his personal capacity, dated January 16, 2025 |
| 63. | Excerpts from the transcript of the deposition of Peter Bonin, in his personal capacity, dated July 18, 2025 |
| 64. | Excerpts from the transcript of the deposition of Greg Fowler, in his personal capacity and as corporate representative of ChemNut, Inc., dated June 20, 2025 |
| 65. | Excerpts from the transcript of the deposition of Ross Weikel, in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 19, 2025 |
| 66. | Slide deck titled "2021 F&I Initial Price/Volume direction," dated March 12, 2020, bearing Bates Syngenta_FTC_00775553 |
| 67. | Slide deck titled "Azoxystrobin Tech. (Amistar Tech.) 2015-2019 US Product Marketing Plan," bearing Bates SYT_REBATELIT_00301940 |

| Exhibit Number | Description |
|---|---|
| 68. | Slide deck regarding "Corn Herbicides," bearing Bates SYT_REBATELIT_00540735 |
| 69. | Slide deck titled "Soybean Herbicides – US Product Marketing Plan 2023-2028," dated August 2022, bearing Bates SYT_REBATELIT_01778349 |
| 70. | Slide deck titled "US Product Marketing Plan – Mesotrione-BIR 2015-2019," bearing Bates SYT_REBATELIT_01793681 |
| 71. | Slide deck regarding "2016 Fungicide Program," bearing Bates SYT_REBATELIT_00490293 |
| 72. | Exhibit intentionally omitted |
| 73. | Document titled "Noram Business Review," bearing Bates FTC-Rotam-00001118 |
| 74. | April 12, 2023 email from Zackary Wilbanks to ROC's@drexchem.com regarding "HEFTY SEED CO. - BALTIC, SOUTH DAKOTA," bearing Bates FTC-Drexel-00002505 |
| 75. | Exhibit intentionally omitted |
| 76. | Syngenta "2021 East Heartland" slide deck, dated August 19, 2020, bearing Bates Syngenta_FTC_00834768 |
| 77. | File titled "Corn 'Pre' Recommendations," bearing Bates FTC-Van Diest-00006721 |
| 78. | Expert Rebuttal Report of C. Scott Hemphill, dated October 3, 2025 |
| 79. | Wilbur-Ellis slide deck titled "CP Active Ingredient Strategy," dated September 2020, bearing Bates WECSUB_00022336 |

ix

| Exhibit Number | Description |
|---|---|
| 80. | May 16, 2022 email from Randy Semadeni to Craig White regarding "Re: 2 things," bearing Bates SGS-FTC-000042389, and attaching a slide deck titled "Supplier Strategy_RJS_05.03.22.pptx," bearing Bates SGS-FTC-000042390 |
| 81. | UPL "Annual Loyalty Incentive" document regarding the Assail-Allegiance Program, bearing Bates 828-FTC-UPL-00003099 |
| 82. | Excerpts from the transcript of the deposition of Ross Weikel, in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 18, 2025 |
| 83. | Simplot September 12, 2022 email from Jason Roberts to Jamie Pyfrom regarding "Re: Gowan loyalty reporting," bearing Bates SGS-FTC-000028067 |
| 84. | Excerpt of "Gowan" worksheet, Simplot Excel file titled "2022 All Vendors Loyalty Report," bearing Bates SGS-FTC-000018409 |
| 85. | 2024 Winfield Marketing Agreement, dated October 1, 2023, bearing Bates WIN_MDNC_0196911 |
| 86. | 2024 Helena Marketing Agreement, dated October 1, 2023, bearing Bates SYT_REBATELIT_04474312 |
| 87. | 2024 Syngenta Crop Protection and Seedcare Retail Program, dated May 17, 2023, bearing Bates SYT_REBATELIT_02741645 |
| 88. | Excerpts from the transcript of the deposition of Michael Boden, in his personal capacity, dated April 9, 2025 |

x

| Exhibit Number | Description |
|---|---|
| 89. | Excerpts from the transcript of the deposition of Scott Langkamp, in his personal capacity, dated April 4, 2025 |
| 90. | Excerpts from the transcript of the deposition of Robert Fisher, in his personal capacity, dated March 26, 2025 |
| 91. | 2018 Wilbur-Ellis Marketing Agreement, dated October 1, 2017, bearing Bates WECSUB_00036958 |
| 92. | 2024 Wilbur-Ellis Marketing Agreement, dated October 1, 2023, bearing Bates SYT_REBATELIT_04242625 |
| 93. | Syngenta Defendants' Responses and Objections to MDL Plaintiffs' Third Set of Interrogatories, dated July 22, 2025 |
| 94. | 2018 Chem Nut Marketing Agreement, dated October 1, 2017, bearing Bates CNIAG-00101384 |
| 95. | 2023 Simplot Marketing Agreement, dated October 1, 2022, bearing Bates SGS-FTC-000040672 |
| 96. | November 11, 2023 email from Willie Negroni to Bret Horner regarding "Confidential: Brand vs. Generics," bearing Bates WECSUB_00012258 |
| 97. | Excerpts from the transcript of the deposition of Randy Semadeni, in his personal capacity and as corporate representative of Simplot Grower Solutions, dated June 3, 2025 |
| 98. | Slide deck titled "2019 Wilbur Ellis Exception Request," dated October 2018, bearing Bates SYT_REBATELIT_01418660 |
| 99. | Slide deck titled "2019 Wilbur Ellis Exception Request," dated November 2018, bearing Bates SYT_REBATELIT_02584713 |

xi

| Exhibit Number | Description |
|---|---|
| 100. | Slide deck regarding "Exception: WinField United Azoxystrobin Competitive Support Bonus Payment," bearing Bates SYT_REBATELIT_01560935 |
| 101. | Excerpts from the transcript of the deposition of Jamie Eichorn, in his personal capacity and as corporate representative of the Syngenta Defendants, dated March 6, 2025 |
| 102. | 2024 Nutrien Marketing Agreement, dated October 1, 2023, bearing Bates SYT_REBATELIT_04393572 |
| 103. | 2024 Tenkoz Marketing Agreement, dated October 1, 2023, bearing Bates SYT_REBATELIT_02942808 |
| 104. | Slide deck titled "2015 – 2019 US Azoxystrobin Marketing Plan," dated January 14, 2015, bearing Bates SYT_REBATELIT_00028939 |
| 105. | Slide deck titled "Azoxystrobin 2018-2023 US Product Marketing Plan," dated December 1, 2017, bearing Bates SYT_REBATELIT_00038101 |
| 106. | Slide deck titled "Mesotrione Update," dated March 21, 2016, bearing Bates SYT_REBATELIT_00211633 |
| 107. | Slide deck titled "S-metolachlor 2018-2023 US Product Marketing Plan," bearing Bates SYT_REBATELIT_00117169 |
| 108. | Comment by Scott A. Pace, Chairman, Metolachlor Task Force, U.S. Env't Prot. Agency, published online on February 20, 2015, at https://www.regulations.gov/document/EPA-HQ-OPP-2014-0772-0016 |

| Exhibit Number | Description |
|---|---|
| 109. | Excerpts from the transcript of the deposition of Brent Lackey, in his personal capacity and as corporate representative of the Syngenta Defendants, dated June 3, 2025 |
| 110. | Excerpts from the transcript of the deposition of Justin Kraskouskas, in his personal capacity, dated April 24, 2025 |
| 111. | Excerpts from the transcript of the deposition of John Van Diest, in his personal capacity and as corporate representative of Van Diest Supply Company, dated July 15, 2025 |
| 112. | Excerpts from the transcript of testimony given during the FTC's investigational hearing by Michael Steffeck, in his personal capacity and as corporate representative of Simplot, dated September 21, 2021, bearing Bates CX7010-001 |
| 113. | Pinnacle 2017 Marketer Key AI Share Form, dated October 24, 2017, bearing Bates Syngenta_FTC_00595573 |
| 114. | Plaintiffs' Responses and Objections to Syngenta Defendants' First Set of Interrogatories, dated July 18, 2025 |
| 115. | Expert Reply Report of C. Scott Hemphill, dated October 31, 2025 |
| 116. | Excerpts from the transcript of testimony given during an FTC investigational hearing by Stanley Bernard, in his personal capacity and as corporate representative of Drexel Chemical Company, dated June 1, 2021, bearing Bates FTC-PROD-0000017661 |

| Exhibit Number | Description |
|---|---|
| 117. | Excerpts from the transcript of testimony given during an FTC investigational hearing by Thomas Chavez, in his personal capacity and as corporate representative of Rotam Crop Sciences, dated July 26, 2021, bearing Bates FTC-PROD-0000019324 |
| 118. | Mesotrione Supply and Data Access Agreement, dated January 30, 2018, bearing Bates SYT_REBATELIT_00113065 |
| 119. | Mesotrione Supply and Data Access Agreement, dated October 1, 2022, bearing Bates SYT_REBATELIT_01849981 |
| 120. | Supply Agreement for S-Metolachlor Products, dated July 1, 2006, bearing Bates SYT_REBATELIT_00062316 |
| 121. | FRE 1006 Summary Exhibit regarding S-metolachlor/Metolachlor Products Sold as of 2024 |
| 122. | Expert Reply Report of Jonathan Orszag, dated October 31, 2025 |
| 123. | Slide deck titled "North America 2016 CP & SC Pricing Strategy Summary," dated May 2016, bearing Bates SYT_REBATELIT_00114308 |
| 124. | Slide deck titled "2019 Pricing Guidance – US Herbicides," dated May 2018, bearing Bates SYT_REBATELIT_00037947 |
| 125. | Slide deck titled "Corn herbicide competitive profiles," bearing Bates SYT_REBATELIT_00068250 |
| 126. | Slide deck titled "2016 Crop Protection Bulk Account Management," bearing Bates SYT_REBATELIT_00885051 |

xiv

| Exhibit Number | Description |
|---|---|
| 127. | Slide deck titled "Mesotrione and Bicyclopyrone (HPPD) 2019-2024 US Product Marketing Plan," dated January 7, 2019, bearing Bates SYT_VAL_00000371 |
| 128. | Slide deck titled "Trivapro Fungicide," bearing Bates SYT_REBATELIT_00130242 |
| 129. | Slide deck titled "Acuron Yield Advantage," bearing Bates Syngenta_FTC_00129730 |
| 130. | Slide deck regarding 2021 East Heartland CU Business Plan, bearing Bates Syngenta_FTC_00150394 |
| 131. | Slide deck titled "2020 AgroTrak Report," dated May 6, 2021, bearing Bates Syngenta_FTC_00957852 |
| 132. | Slide deck titled "2018 Marketing Campaign Plan – WHL Commercial Unit," bearing Bates Syngenta_FTC_00056755 |
| 133. | Slide deck titled "Corn herbicide market…Current state," bearing Bates SYT_REBATELIT_00055787 |
| 134. | Slide deck titled "Territory Portfolio Review," dated February 2016, bearing Bates Syngenta_FTC_00111404 |
| 135. | Slide deck titled "5 year plan: SMS Summary," dated February 3, 2017, bearing Bates Syngenta_FTC_00588411 |
| 136. | Slide deck titled "Price Sensitivity – Quilt Xcel," bearing Bates SYT_REBATELIT_00487356 |
| 137. | September 22, 2020 email from Phil Hollis to Tim Dlabaj regarding "FW: SYN HPPD Prices changes," bearing Bates HAE (CID)_0051379 |

| Exhibit Number | Description |
|---|---|
| 138. | September 14, 2022 email from Mark Bishop to Matt Olson and others regarding "CP Assumptions 2023," bearing Bates CNIAG-00170777 |
| 139. | Deline's Responses and Objections to Syngenta Defendants' First Set of Interrogatories, dated June 11, 2025 |
| 140. | Excerpts from the transcript of the deposition of C. Scott Hemphill, dated November 20, 2025 |
| 141. | Excerpts from the transcript of the deposition of C. Scott Hemphill, dated November 21, 2025 |
| 142. | Excerpts from the transcript of the deposition of Janie Yeargin, in her personal capacity, dated June 20, 2025 |
| 143. | Excerpts from the transcript of the deposition of Michael Shows, in his personal capacity and as corporate representative of Gavin Brothers, dated July 24, 2025 |
| 144. | Expert Report of Loren K. Smith, dated August 22, 2025 |
| 145. | Declaration of Cheryl Quain (Syngenta Corporation), dated December 19, 2025 |
| 146. | Excerpts from the transcript of the deposition of Charles Flippin, in his personal capacity, dated June 26, 2025 |
| 147. | February 20, 2020 email from Roy Jones Jr. to Charles Flippin regarding "FW: 2019 Pricing Reconciliation/ 2020 Pricing – EverpreX /Cinch Brands/ MESO Tech," bearing Bates SYT_REBATELIT_00526166, and attaching a spreadsheet titled "ATZ Pricing 2020" |

| Exhibit Number | Description |
|---|---|
| 148. | Document titled "2021 Syngenta Crop Protection and Seedcare Retail Program," dated April 9, 2021, bearing Bates SYT_REBATELIT_03541848 |
| 149. | Document titled "2024 Syngenta Crop Protection and Seedcare Retail Program," dated April 18, 2024, bearing Bates SYT_REBATELIT_04376607 |
| 150. | 2021 Winfield Marketing Agreement, dated October 1, 2020, bearing Bates SYT_REBATELIT_03215818 |
| 151. | Excerpts from the transcript of the deposition of Pat Menagh, in his personal capacity and as corporate representative of Solera Source Dynamics LLC, dated January 14, 2025 |
| 152. | Excerpts from the transcript of the deposition of Dave Schumacher, in his personal capacity and as corporate representative of Helm Agro US Inc., dated March 6, 2025 |
| 153. | Excerpts from the transcript of the deposition of Kyle Maple, in his personal capacity and as corporate representative of Winfield United and Winfield Solutions, LLC, dated July 15, 2025 |
| 154. | Excerpts from the transcript of the deposition of Stanley Bernard, in his personal capacity and as corporate representative of Drexel Chemical Company, dated February 19, 2025 |
| 155. | Excerpts from the transcript of the deposition of Kenneth Barham, in his personal capacity and as corporate representative of NuFarm, dated May 22, 2025 |
| 156. | Excerpts from the transcript of the deposition of Greg Fowler, in his personal capacity and as corporate representative of ChemNut, Inc., dated June 18, 2025 |

| Exhibit Number | Description |
|---|---|
| 157. | Excerpts from the transcript of the deposition of Michael Boden, in his personal capacity, dated April 8, 2025 |
| 158. | 2021 Chem Nut (CNI) Marketing Agreement, dated October 1, 2020, bearing Bates SYT_REBATELIT_03278848 |
| 159. | 2022 Chem Nut (CNI) Marketing Agreement, dated October 1, 2021, bearing Bates SYT_REBATELIT_02942158 |
| 160. | Competitive Impact Statement, *United States v. Bayer AG*, No. 1:18-cv-01241 (D.D.C. May 29, 2018) |
| 161. | Competitive Impact Statement, *United States v. The Dow Chem. Co.*, No. 1:17-cv-01176 (D.D.C. June 15, 2017) |
| 162. | Complaint, *In the Matter of Novartis AG, et al.*, Dkt. No. C-3979 (Nov. 1, 2000) |
| 163. | Decision and Order, *In the Matter of Novartis AG, et al.*, Dkt. No. C-3979 (Nov. 1, 2000) |

FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5.5 ORDER

<u>**CERTIFICATE OF SERVICE**</u>

I, Patrick M. Kane, an attorney, certify that on December 19, 2025, I caused to be served upon counsel of record for Plaintiffs via email the Memorandum of Law in Support of the Syngenta Defendants' Motion for Summary Judgment.

<u>/s/ *Patrick M. Kane*</u>
Patrick M. Kane (NC Bar No. 36861)