# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., <br><br> Defendants. | Case No. 1:22-cv-00828-TDS-JEP <br><br><br> **PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** <br><br><br> **[FILED UNDER SEAL]** |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES..................................................................................................... v

I.      NATURE OF THE MATTER ................................................................................... 1

II.     STATEMENT OF FACTS......................................................................................... 7

     A.      Legal Exclusivity: Patents and FIFRA.......................................................... 7

     B.      The Six AIs..................................................................................................... 8

     C.      Defendants Fear a Genericized Market with Lower Grower
         Prices .............................................................................................................. 9

         1.      Generics Threatened Defendants' Profits and Market
             Shares ................................................................................................. 9

         2.      Defendants Track and Monitor Generic Competition by
             AI......................................................................................................... 15

     D.      Defendants Use Loyalty Programs to "Erect Barriers to Entry"
         that "Keep the Channel Locked Up"............................................................. 18

         1.      The Traditional Distribution Channel Is the Most Efficient
             Path to Market ................................................................................... 21

             a.      The Traditional Channel Influences Grower
                 Product Selection .................................................................. 22

             b.      The Traditional Channel Provides Unique Benefits
                 to Manufacturers .................................................................. 23

             c.      Syngenta and Corteva Implement Their Loyalty
                 Programs with Substantially All of the Traditional
                 Channel .................................................................................. 24

         2.      Defendants' Loyalty Programs Are Structured to Exclude
             Generics.............................................................................................. 26

              a.      High Loyalty Thresholds ....................................................... 26

              b.      First-Dollar Payments ........................................................... 29

              c.      "Sticky Money": Defendants Share Monopoly
                 Profits with Distributors in Exchange for Exclusion ............ 30

              d.      Program and Payment Structure: "Complex and
                 Risky"..................................................................................... 34

             e.      Retaliation and Credible Penalties: Leaving
                 Loyalty "Would Be Suicide" ................................................. 40

i

|  |  | f. | Defendants Offer—and Take Away—Additional Profit Opportunities Based On Loyalty | 48 |

    E.    Defendants' Mesotrione and Metolachlor Supply Agreements ................. 50

    F.    Defendants' Loyalty Programs Have Foreclosed Generic Competition For the AIs Included In Loyalty Programs ........................... 52

    G.    Defendants' Loyalty Programs Have Resulted in Higher Prices ............... 59

III.    QUESTIONS PRESENTED ................................................................. 62

IV.    ARGUMENT ........................................................................................ 63

    A.    Summary Judgment Standard ........................................................ 63

    B.    Elements of Plaintiffs' Claims ...................................................... 64

        1.    Federal Claims ................................................................. 64

        2.    State Claims ..................................................................... 66

    C.    Defendants' Conduct Should Be Analyzed Under the Rule of Reason, Not Predatory Pricing Law ............................................. 67

        1.    The Rule of Reason Applies to Loyalty Rebate Programs When Price Is Not the Predominant Mechanism of Exclusion ...................................................................... 68

            a.    The Overwhelming Weight Of Authority, Including New Fourth Circuit Precedent, Supports Applying the Rule of Reason ............................... 68

            b.    Defendants Cite Inapposite Cases ....................... 73

        2.    The Evidence Establishes that Price Is Not the Predominant Mechanism of Exclusion ........................... 75

            a.    Defendants' Exclusion of Generics Is Not Achieved By Offering Lower Prices ................... 76

            b.    The Loyalty Programs Have Structural Non-Price Mechanisms of Exclusion ................................... 79

        3.    Each of the Five Non-Price Mechanisms of Exclusion Identified by the Court at the Pleading Stage Is Amply Supported by the Record ................................................. 83

            a.    Defendants' Loyalty Programs Extend and Increase Significant Barriers to Entry and Expansion ........................ 84

            b.    Distributors Are Also Incentivized to Comply with Loyalty Programs Because They Fear Loss of Supply ............................................................... 92

ii

|  |  | c. | Threats and Deferred Payments Have Long-Term Effects ....................................................................... 95 |
|  |  | d. | Corteva's Program Shares Features with Bundling .............. 97 |
|  |  | e. | Syngenta and Corteva's Exclusive Supply Agreements Enhance the Exclusionary Effect...................... 99 |

D. Disputed Fact Issues Preclude Summary Judgment on the Relevant Product Markets .......................................................................... 101

    1. The Existence of Broader Markets Is Immaterial To Whether Single-AI Markets Are the Relevant Markets Here ...................................................................................................... 103

    2. Defendants Anticipated That Unfettered Generic Entry Would Crater Prices, and Structured Their Loyalty Programs to Address that Competition .......................................... 107

    3. Professor Hemphill's Implementation of the HMT Supports Plaintiffs' Proposed Markets............................................ 112

        a. Professor Hemphill's HMT is Reliable and Robustly Supported.............................................................. 112

        b. Defendants' Criticisms Fail ................................................ 116

    4. The *Brown Shoe* Factors Confirm That Summary Judgment Is Inappropriate Here ...................................................... 123

        a. Industry and Public Recognition........................................ 124

        b. Peculiar Characteristics and Uses ...................................... 126

        c. Distinct Prices and Sensitivity to Price Changes ................ 131

        d. Other *Brown Shoe* Factors ................................................ 133

    5. Defendants' Switching Arguments At Most Raise Disputed Issues of Fact That Must Be Tested At Trial.................. 134

E. Defendants' Programs Have Probable Anticompetitive Effects............... 138

    1. Defendants' Loyalty Programs Have Resulted in Substantial Foreclosure ................................................................ 140

        a. Defendants' Loyalty Programs Cause Foreclosure Far Above Thresholds Required by Case Law ................... 140

        b. Defendants Cannot Rebut Plaintiffs' *Prima Facie* Showing of Substantial Foreclosure ................................... 143

iii

|  | c. | Defendants' Mesotrione Agreements Demonstrate the Loyalty Programs' Power to Foreclose Generic Rivals | 155 |

c. Defendants' Mesotrione Agreements Demonstrate the Loyalty Programs' Power to Foreclose Generic Rivals ................................................................................ 155

2. Plaintiffs Have Robust Direct Evidence that Defendants' Loyalty Arrangements Caused Anticompetitive Harm .................. 156

    a. Defendants' Conduct Foreclosed Rivals and Resulted in Higher Prices and Reduced Innovation ........... 157

    b. Defendants' Loyalty Programs Caused Rival Generic Manufacturers to Exit or Decline to Enter AI Markets ........................................................................... 164

    c. Defendants' Anticompetitive Intent Supports a Finding of Competitive Harm .............................................. 167

    d. Defendants Misstate the Legal Standards Governing Anticompetitive Effects .................................... 168

F. Defendants Do Not Challenge the FTC's Standalone Section 5 Claim ..................................................................................................... 171

G. Defendants Do Not Address, and Are Thus Not Entitled to Summary Judgment on, Plaintiffs' Section 1 Claim as it Relates to Defendants' Mesotrione and Metolachlor Supply Agreements ............ 172

H. Defendants Are Not Entitled to Summary Judgment on State Claims ..................................................................................................... 174

    1. Defendants Are Not Entitled to Summary Judgment on California's State Law Claims ......................................................... 174

    2. Defendants Are Not Entitled to Summary Judgment on Indiana's IDCSA Claims ................................................................ 175

    3. Defendants Are Not Entitled to Summary Judgment on Iowa's Consumer Fraud Act Claims ............................................. 176

I. The Claims Against Syngenta Crop Protection AG and Syngenta Corporation Must Proceed To Trial ......................................................... 177

V. CONCLUSION ............................................................................................. 182

iv

Page(s)

**Cases**

*Advanced Health-Care Servs. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ................................................................. 65

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .................................................... 150, 171

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
306 F. Supp. 3d 610 (S.D.N.Y. 2018) ................................................. 123

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ............................................................... 149

*American Motor Inns, Inc. v. Holiday Inns, Inc.*,
521 F.2d 1230 (3d Cir. 1975) .............................................................. 143

*Ansell Inc. v. Schmid Lab'ys, Inc.*,
757 F. Supp. 467 (D.N.J. 1991) ........................................................... 124

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
900 F.3d 623 (9th Cir. 2018) ...................................................... 177, 178

*Arkansas ex rel. Griffin v. Syngenta Crop Prot. AG*,
2025 WL 551660 (E.D. Ark. Feb. 19, 2025) ............................... 4, 71, 72

*Aventis Env't Sci. USA LP v. Scotts Co.*,
383 F. Supp. 2d 488 (S.D.N.Y. 2005) ................................................. 140

*B & R Supermarket, Inc. v. Visa, Inc.*,
2024 WL 4252031 (E.D.N.Y. Sept. 20, 2024) ..................................... 118

*Bank v. Huizar*,
178 N.E.3d 326 (Ind. Ct. App. 2021) .................................................. 176

*Barr Labs., Inc. v. Abbott Labs.*,
978 F.2d 98 (3d Cir. 1992) .................................................................... 91

*Bepco, Inc. v. Allied-Signal, Inc.*,
106 F. Supp. 2d 814 (M.D.N.C. 2000) ................................................ 150

Case 1:22-cv-00828-TDS-JEP    Document 461    Filed 04/27/26    Page 6 of 203

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) ........................................................................................ 7

*Bradburn Parent/Tchr. Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*,
2000 WL 34003597 (E.D. Pa. July 25, 2003) ...................................................... 168

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ...................................................................... 67, 69, 70

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ...................................................................... passim

*Caruso Mgmt. Co. v. Int'l Council of Shopping Centers,*
403 F. Supp. 3d 191 (S.D.N.Y. 2019) .................................................. 117, 121, 142

*Chavez v. Whirlpool Corp.*,
93 Cal.App.4th 363 (2001) .................................................................... 174

*Chuck's Feed & Seed Co. v. Ralston Purina Co.*,
810 F.2d 1289 (4th Cir. 1987) ............................................................ 142, 171, 172

*Concord Boat v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .......................................................... 74, 91

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ........................................................... 156, 168

*DeSoto Cab Co., Inc. v. Uber Techs., Inc.*,
2020 WL 10575294 (N.D. Cal. Mar. 25, 2020) ...................................................... 91

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ........................................................... 172, 173

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ............................................................ passim

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) .............................................................. 107

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .................................................... 104, 109, 119, 136

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ............................................................ passim

vi

*Epic Games, Inc. v. Apple, Inc.*,
 67 F.4th 946 (9th Cir. 2023)........................................................................ 119, 175

*Epic Games, Inc. v. Apple, Inc.*,
 161 F.4th 1162 (9th Cir. 2025)............................................................................ 174

*FTC v. Brown Shoe Co.*,
 384 U.S. 316 (1966) ........................................................................................... 171

*FTC v. IQVIA Holdings Inc.*,
 710 F. Supp. 3d 329 (S.D.N.Y. 2024)................................................................. 105

*FTC v. Meta Platforms, Inc.*,
 775 F. Supp. 3d 16 (D.D.C. 2024) .............................................................. 133, 136

*FTC v. Meta Platforms, Inc.*,
 2025 WL 3458822 (D.D.C. Dec. 2, 2025) .......................................................... 136

*FTC v. Motion Picture Advert. Serv. Co.*,
 344 U.S. 392 (1953) ................................................................................... 153, 171

*FTC v. Peabody Energy Corp.*,
 492 F. Supp. 3d 865 (E.D. Mo. 2020)................................................................. 102

*FTC v. Penn State Hershey Med. Ctr.*,
 838 F.3d 327 (3d Cir. 2016) ....................................................................... 116, 118

*FTC v. RAG-Stiftung*,
 436 F. Supp. 3d 278 (D.D.C. 2020) .................................................................... 117

*FTC v. Sanford Health*,
 926 F.3d 959 (8th Cir. 2019)....................................................................... 116, 118

*FTC v. Shkreli*,
 581 F. Supp. 3d 579 (S.D.N.Y. 2022)................................................................. 106

*FTC v. Sperry & Hutchinson Co.*,
 405 U.S. 233 (1972) ........................................................................................... 176

*FTC v. Staples, Inc.*,
 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................ 118, 120

*FTC v. Surescripts, LLC*,
 665 F. Supp. 3d 14 (D.D.C. 2023) ................................................................ 84, 169

*FTC v. Syngenta Crop Protection AG*,
No. 22-cv-828, Doc. 160 (M.D.N.C. 2024) ...................................................passim

*FTC v. Tapestry, Inc.*,
755 F. Supp. 3d 386 (S.D.N.Y. 2024) ......................................... 101, 103, 124, 126

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ........................................................ 120, 133

*Gasbi, LLC v. Sanders*,
120 N.E.3d 614 (Ind. Ct. App. 2019) ......................................................... 175, 176

*Geneva v. Barr Labs,*
386 F.3d 485 (2d Cir. 2004) ........................................................................ 103, 134

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) .............................................................................. 134

*Impax Labs. v. FTC*,
994 F.3d 484 (5th Cir. 2021) ............................................................................... 156

*In re Aggrenox Antitrust Litig.*,
199 F. Supp. 3d 662 (D. Conn. 2016) ................................................. 106, 109, 136

*In re Cipro Cases I & II*,
61 Cal.4th 116 (2015) .......................................................................................... 174

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
44 F4th 959 (10th Cir. 2022) ..................................................................... 73, 74, 166

*In re Google Play Store Antitrust Litig.*,
147 F.4th 917 (9th Cir. 2025) ....................................................................... 109, 174

*In re Loestrin 24 Fe Antitrust Litig.*,
433 F. Supp. 3d 274 (D.R.I. 2019) .............................................................. 117, 142

*In re Lorazepam & Clorazepate Antitrust Litig.*,
467 F. Supp. 2d 74 (D.D.C. 2006) ...................................................................... 164

*In re Nexium Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ......................................................... 105, 106

*In re Packaged Seafood Prods. Antitrust Litig.*,
2022 WL 836951 (S.D. Cal. Mar. 21, 2022) ...................................................... 178

viii

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024).......................................................... 156, 170

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
753 F. Supp. 3d 849 (N.D. Cal. 2024)................................................................ 176

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone)*
*Antitrust Litig.*,
622 F. Supp. 3d 22 (E.D. Pa. 2022)................................................................ 72, 98

*In re Surescripts Antitrust Litigation*,
608 F.Supp.3d 629 (N.D. Ill. 2022)........................................................... 69, 72, 89

*In re Zetia (Ezetimibe) Antitrust Litig.*,
2021 WL 6689718 (E.D. Va. Nov. 1, 2021) ....................................................passim

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
661 F. Supp. 2d 1039 (D. Minn. 2009) ................................................................ 119

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
812 F.2d 786 (2d Cir. 1987) .................................................................................. 91

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
2016 WL 160263 (D. Md. Jan. 14, 2016) ............................................................ 177

*Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports*
*Enters., Inc.*,
694 F. Supp. 3d 625 (M.D.N.C. 2023)................................................................... 63

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F. 3d 676 (4th Cir. 2016)............................................................................... 110

*Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.*,
748 F. 32 160 (4th Cir. 2014).................................................................... 150, 151

*Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.*,
2012 WL 1155218 (E.D. Va. Apr. 5, 2012)......................................................... 151

*L. G. Balfour Co. v. FTC*,
442 F.2d 1 (7th Cir. 1971)........................................................................... 171, 172

*Laumann v. Nat'l Hockey League*,
56 F. Supp. 3d 280 (S.D.N.Y. 2014) ................................................................... 139

ix

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  762 F.3d 1114 (10th Cir. 2014) ................................................................ 169, 177

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................ 78

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ................................................................ passim

*Meijer, Inc. v. Barr Pharms., Inc.*,
  572 F. Supp. 2d 38 (D.D.C. 2008) .......................................................... 104

*Menasha Corp. v. News America Marketing In-Store, Inc.*,
  354 F.3d 661 (7th Cir. 2004) .................................................................. 119

*Meredith Corp. v. Sesac, LLC,*
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) ........................................................ 102

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
  172 F. Supp. 2d 680 (D. Md. 2000) ........................................................ 173

*Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.,*
  35 F. Supp. 2d 1138 (D. Minn. 1999) ..................................................... 149, 154

*Mylan Pharms. Inc. v. Sanofi-Aventis LLC*,
  2026 WL 201152 (W.D. Pa. Jan. 27, 2026) ............................................ 67

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ................................................................... 143

*NicSand Inc. v. 3M Co.*,
  507 F.3d 442 (6th Cir. 2007) .................................................................. 73

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
  670 F. Supp. 1313 (D. Md. 1986) ........................................................... 110

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ................................................................................ 138, 156, 170

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ................................................................ 146

*Pepsico, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2nd Cir. 2002) ................................................................. 110

x

*Pfaff v. Wells Elecs., Inc.*,
525 U.S. 55 (1998) ........................................................................................... 7

*Reading International, Inc. v. Oaktree Capital Management, LLC*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................................. 178

*Rebel Oil Co., Inc., v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ......................................................................... 89, 90

*Reynolds Tobacco Co. v. Philip Morris Inc.*,
199 F. Supp. 2d 362 (M.D.N.C. 2002) ................................................................ 91

*Rightline, LLC v. FMC Corp.*,
2025 WL 1550234 (E.D. Pa. 2025) ...................................................................... 72

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ...................................................................... 153, 154

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
2019 WL 1109868 (D. Del. Mar. 8, 2019) .......................................................... 145

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ......................................................................................... 8

*Sandoz, Inc. v. United Therapeutics, Corp.*,
2020 WL 697137 (D.N.J. Feb. 4, 2020) ............................................................. 120

*Standard Oil Co. of California v. United States*,
337 U.S. 293 (1949) ...................................................................................... 153

*State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*,
694 N.W.2d 518 (Iowa 2005) ............................................................................ 176

*State v. TikTok, Inc.*,
245 N.E.3d 681 (Ind. Ct. App. 2024) ................................................................. 175

*Stiles v. Walmart, Inc.*,
639 F. Supp. 3d 1029 (E.D. Cal. 2022) .............................................................. 119

*Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*,
267 F. Supp. 3d 649 (M.D.N.C. 2017) ................................................... 86, 90, 121

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) ................................................................................. passim

*Times-Picayune Pub. Co. v. United States*,
　345 U.S. 594 (1953) ...................................................................................... 104

*Todd v. Exxon Corp.*,
　275 F.3d 191 (2d Cir. 2001) ......................................................................... 124

*United States v. Aetna Inc.*,
　240 F. Supp. 3d 1 (D.D.C. 2017) .................................................................. 105

*United States v. Alum. Co. of Am.*,
　377 U.S. 271 (1964) ...................................................................................... 105

*United States v. Am. Express Co.*,
　838 F.3d 179 (2d Cir. 2016) ......................................................................... 115

*United States v. Bazaarvoice, Inc.*,
　2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ................................................... 118

*United States v. Bertelsmann SE & Co.*,
　646 F. Supp. 3d 1 (D.D.C. 2022) .................................................................. 105

*United States v. Black & Decker Mfg. Co.*,
　430 F. Supp. 729 (D. Md. 1976) ..................................................................... 87

*United States v. Dentsply Intern. Inc.*,
　399 F.3d 181 (3d Cir. 2005) ..................................................................... passim

*United States v. Google LLC*,
　747 F. Supp. 3d 1 (D.D.C. 2024) ............................................. 87, 150, 152, 170

*United States v. Google LLC*,
　778 F. Supp. 3d 797 (E.D. Va. 2025) ..................................................... 84, 169

*United States v. Google LLC*,
　687 F. Supp. 3d 48 (D.D.C. 2023) ............................................................... 170

*United States v. H & R Block, Inc.*,
　833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................ 102, 118

*United States v. Leavis*,
　853 F.2d 215 (4th Cir. 1988) ........................................................................ 177

*United States v. Microsoft Corp.*,
　253 F.3d 34 (D.C. Cir. 2001) .................................................................... passim

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ........................................................................................ 173

*United States v. United States Sugar Corp.*,
73 F. 4th 197 (3d Cir. 2023) ..................................................................... 117, 134

*United States v. Visa, Inc.*,
788 F. Supp. 3d 585 (S.D.N.Y. 2025) ............................................................. 123

*Valuepest.com of Charlotte, Inc. v. Bayer Corp.*,
561 F.3d 282 (4th Cir. 2009) ............................................................................ 65

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
257 F.3d 256 (2d Cir. 2001) ............................................................................. 74

*White v. City of Greensboro*,
608 F. Supp. 3d 248 (M.D.N.C. 2022) .......................................................... 63, 64

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ...................................................................... passim

*Zinner v. Olenych*,
108 F. Supp. 3d 369 (E.D. Va. 2015) ............................................................. 172

**Statutes**

15 U.S.C. § 1 ............................................................................................ passim

15 U.S.C. § 2 ............................................................................................ passim

15 U.S.C. § 14 .......................................................................................... passim

15 U.S.C. § 45 .......................................................................................... passim

35 U.S.C. § 154(a)(2) ........................................................................................ 7

7 U.S.C. § 136a(c)(1)(F)(i) .............................................................................. 7

7 U.S.C. § 136a(c)(1)(F)(ii) ............................................................................. 7

7 U.S.C. § 136a(c)(1)(F)(iii) ........................................................................... 86

California's Cartwright Act .......................................................................... 174

California's Unfair Competition Law ....................................................... 174, 175

Ind. Code § 24-5-0.5-1(a) ............................................................................... 175

Ind. Code § 24-5-0.5-3 ..................................................................................... 66

Iowa Code § 714.16 .................................................................................... 66, 176

**Rules**

Fed. R. Civ. P. 56 ......................................................................................... 3, 63

**Other Authorities**

Areeda & Hovenkamp, ANTITRUST LAW (2025) ................................... 64, 69, 171

Areeda & Hovenkamp, ANTITRUST LAW (2011) .................................. 68, 88, 157

Areeda & Hovenkamp, ANTITRUST LAW (1996) ......................................... 170

Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 ANTITRUST L.J. 49 (2010) ................................. 119

Restatement (Third) of Agency § 7.03(1)(a) ................................................ 178

Case 1:22-cv-00828-TDS-JEP   Document 461   Filed 04/27/26   Page 15 of 203

## I.  NATURE OF THE MATTER

Millions of farmers (or "growers," as they are frequently called in the industry) rely on crop protection products like insecticides, herbicides, and fungicides to cost-effectively protect America's food supply from pests. Defendants Syngenta and Corteva are two of the largest crop protection product (or agricultural "pesticide") manufacturers in the United States, each selling billions of dollars of these products every year. But growers pay far more than they should because Defendants have each engaged in a scheme to exclude lower-price generic competitors from the market.

Congress created a system to govern the development, manufacture, and sale of crop protection products. This regime combines patent protection and "exclusive use" provisions that richly reward companies like Defendants—"branded" manufacturers that innovate and develop new Active Ingredients ("AIs")—with 20 years or more of protection from generic AI competition. But that lawful monopoly does not last forever. After the exclusivity period expires, Congress encourages other companies to produce and sell generic versions of those AIs, introducing price competition and consumer choice. As Defendants repeatedly concede in their documents, growers choose the cheaper generic products when they are available; "[o]nce the market starts to see an increase in generics, it is almost impossible to stop"; and generic entry leads "to a vicious cycle of downward price pressure" for all products containing that AI—generic and branded alike.

Defendants have no desire to compete on the merits with generic manufacturers because lowering price would mean losing margin, revenue, and profits. Instead, they

developed loyalty programs designed to "make it difficult for [generics] to enter" the market, "keep the channel locked up," and "block[] generic[s]" in the post-patent period. Defendants designed their loyalty programs to most effectively achieve their mission to "keep generics below critical volumes" and "Maintain price premium." Defendants admit internally that, without these loyalty programs, their "margins would likely drop precipitously."

Understanding the critical importance of the traditional distribution channel, Defendants "handcuff" nearly every distributor with their market-wide exclusive dealing arrangements. Distributors must strictly limit their yearly sourcing of generic product (sometimes to as low as 1%) which "keep[s] generics below critical volumes." Compliant distributors benefit from favorable supply terms and year-end, large lump-sum payments that they retain in significant part. Non-compliant distributors risk loss of access to Defendants' dominant products on competitive terms, or even loss of supply altogether, which one distributor described as "suicide."

As a result, distributors overwhelmingly comply with Defendants' loyalty programs, forcing generic manufacturers to compete only in the narrow band of "open space" permitted under the programs or via alternative, less efficient routes to market. The effect is to suppress and delay generic entry and expansion, sustain supracompetitive prices, and harm growers nationwide.

An extensive evidentiary record bears out the facts of this case. It includes documents, data, and testimony from Defendants, distributors, and generic

manufacturers, as well as rigorous expert analysis grounded in the factual record and sound economic theory.

Faced with this evidentiary record, at summary judgment Defendants retreat to formalistic legal arguments and import their own facts and their own spin into the actual record. But recycling the same rejected theories they advanced at the motion-to-dismiss stage is no more successful at summary judgment than it was before. And Defendants' attempts to whitewash their own conduct and rewrite their own documents simply injects pages-upon-pages of disputed facts into the record. None of this meets the Rule 56 standard.

First, Defendants renew their argument that the price-cost test, and not the rule of reason, should apply to Plaintiffs' exclusive dealing claims. But no matter how Defendants try to recast their programs, the evidence is clear that these programs are *not* simply winning business by offering a low price to distributors. Even accounting for Defendants' loyalty payments, generics remain cheaper. Rather, the evidence in the record establishes that the *structure* of the loyalty program, and in particular the share-based exclusivity condition linked to loyalty payments and product access, is the mechanism of exclusion of generics, *not* low prices. There is compelling evidence of all of the "non-price" mechanisms of exclusion identified by this Court at the pleading stage, including coercion and retaliation of distributors that Defendants claim never happened.

That factual record must be viewed in light of the Fourth Circuit's recent and binding decision in *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,* which

3

reversed a grant of summary judgment and held that the trial court improperly applied the price-cost test at summary judgment in light of evidence that the structure of the defendant's scheme (and not its pricing component) was the predominant means of exclusion. 111 F.4th 337 (4th Cir. 2024), *cert. denied*, 2026 WL 79821 (U.S. Jan. 12, 2026). Defendants also do not mention that since this Court issued its order denying their motions to dismiss, the district court in Arkansas hearing the state of Arkansas's challenge to *these very programs* held that the claims should be assessed under the rule of reason, not the price-cost test, because the plaintiff "does not allege that low pricing was the means defendants used to exclude competition." *Arkansas ex rel. Griffin v. Syngenta Crop Prot. AG*, 2025 WL 551660, at *9–10 (E.D. Ark. Feb. 19, 2025). The weight of the case law already overwhelmingly supported the application of the rule of reason to assess Defendants' loyalty programs; these latest cases should put the question to rest.

Next, Defendants charge that Plaintiffs' market definition is too narrow and "gerrymandered" also fails. These single-AI markets come directly from Defendants' own business plans. Their post-patent ("generic defense") strategies are built on the premise that their branded products compete most closely with generic equivalents. Defendants' documents show that they fear the downward price impact of generic entry, and that even the limited generic entry they permit results in observable price effects. The stated objective of their loyalty programs in essence describes the hypothetical monopolist test that defines an antitrust market: they aim to exclude same-AI competition and thereby sustain high prices and profits for their products that contain that AI. And

4

Defendants' internal documents confirm the distinctive uses and characteristics of the individual AIs in question.

Defendants largely ignore this evidence and instead claim that there exist larger markets consisting of multiple AIs that broadly substitute for each other. Even if such markets exist (Defendants and their experts have not formally defined them), that does not negate the existence of narrower single-AI markets consisting of closer substitutes. And Defendants' error is compounded by the fact that the supposed substitutability between AIs is distorted by the very loyalty programs Plaintiffs challenge. Where, as here, anticompetitive conduct in a market elevates prices and excludes lower-priced alternatives, the observed levels of substitution to products outside the market will be artificially inflated.

Market definition is a question of fact, and Plaintiffs have marshalled extensive factual evidence showing that branded products compete more closely with their generic equivalents than with products containing other AIs. Defendants cannot possibly show on this record that, despite extensive record evidence of Defendants' extraordinary efforts to shield themselves from same-AI competition, there is no sufficient basis on which a trier of fact could adopt Plaintiffs' single-AI market definitions.

Finally, Plaintiffs have shown harm to competition because Defendants' programs substantially foreclose generics and result in higher prices, reduced output and reduced innovation in each market. Defendants claim that generic rivals are not completely excluded by the loyalty programs and have entered, causing some price declines. But the

5

antitrust laws do not require total exclusion; competitive harm arises when rival entry or expansion into a monopolized market is lessened or slowed and/or the rivals are forced into less efficient distribution. Here, the record shows that Defendants' loyalty programs foreclose generics from the most efficient distribution channel and have harmed competition relative to a but-for world without Defendants' loyalty programs. Defendants designed their programs to *impede* their generics rivals—inducing the most efficient distributors to significantly limit their purchases—and these programs have been extraordinarily successful.

Defendants' programs function in just this manner, permitting limited generic entry and tolerating some price declines while preventing the robust entry, expansion, and price competition that would occur absent these restraints. Again, Defendants have at best identified a material dispute over whether Defendants have harmed competition relative to the but-for world—a question for trial.

Defendants have used their "loyalty" programs to subvert competition and innovation for crop protection products for long enough. American growers are entitled to a choice of products and to the benefits of generic competition. This Court should deny Defendants' motions for summary judgment and proceed to trial.

6

## II.  STATEMENT OF FACTS[1]

### A.  Legal Exclusivity: Patents and FIFRA

Congress has designed a statutory scheme that provides crop protection product manufacturers robust incentives to innovate while also carefully protecting lower-priced generic companies' ability to enter and compete. Manufacturers who develop "new and useful" AIs can obtain patents granting the AI developer exclusive rights to use that AI for twenty years. 35 U.S.C. § 154(a)(2). Additionally, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), provides applicants that register pesticides with new AIs "exclusive use" of data used to support registration. FIFRA § 3(c)(1)(F)(i), 7 U.S.C. § 136a(c)(1)(F)(i). FIFRA's exclusive-use protection lasts ten years and can be extended. FIFRA § 3(c)(1)(F)(ii), 7 U.S.C. § 136a(c)(1)(F)(ii).

Ultimately, however, patent and FIFRA rights expire so that generic manufacturers can copy new AIs. The limited exclusivity period granted under patent law reflects Congress's intentional decision to "careful[ly] balance the need to promote innovation and the recognition that imitation . . . [is] necessary to invention itself and the very lifeblood of a competitive economy." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989); *see also Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998) (similar).

---

[1] Exhibit citations are typically to the last three digits of the Bates number or, if it does not contain a page-specific Bates number, to a relevant pin-cite, such as "slide," "tab," or deposition page-and-line range.

FIFRA recognizes the same tradeoff. Congress intended to "eliminate costly duplication of research and streamline the registration process," to "mak[e] new end-use products available to consumers more quickly" and "eliminate a significant barrier to entry into the pesticide market, thereby allowing greater competition among producers of end-use products" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014–15 (1984) (citation omitted).

## B. The Six AIs

Defendants patented the six AIs that are directly at issue in this case: azoxystrobin, mesotrione, and metolachlor (Syngenta); and rimsulfuron, oxamyl, and acetochlor (Corteva). Legal exclusivity for each of the AIs expired in 2014 or earlier.[2]

As of 2023, Corteva holds ██% market share for rimsulfuron; ██% market share for oxamyl; and ██% market share for acetochlor.[3]



---

[2] Ex. 1 (Hemphill Initial Rep.) Fig. 5.

[3] Ex. 1 Fig. 19.

As of 2023, Syngenta holds over ▮ market share for azoxystrobin, ▮ market share for mesotrione, and ▮ market share for metolachlor.[4]



### C. Defendants Fear a Genericized Market with Lower Grower Prices

### 1. Generics Threatened Defendants' Profits and Market Shares

Defendants long ago recognized that their AI portfolio faced serious threats from potential generic entry. In 2001, Syngenta warned of an ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Syngenta was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮[6] Among the most vulnerable: metolachlor, with over $▮▮▮ in net sales, mesotrione (roughly $▮▮▮ net sales), and azoxystrobin (nearly $▮▮▮ sales).[7] Syngenta looked to past examples of genericized AIs like



---

[4] Ex. 1 Fig. 18.

[5] Ex. 25 at slide 2.

[6] Ex. 26 at slides 5, 11. That proportion has since increased. Ex. 27 at slide 2 (off-patent sales growing to ▮ in 2013).

[7] Ex. 26 at slides 5, 11.

██████████████████████████████████████████████████████████████

██████████████████████████████████████ as cautionary tales.[8] Syngenta later

learned that after ████████████████ came off patent in 2007, ████████████

███████████████████████████████████████████████[9] A top

concern for Syngenta's was that, as AIs came off patent, generics would drive the same

████████████████████ for azoxystrobin, mesotrione, and metolachlor.[10]

Syngenta sought to avoid a world where generics competed robustly, because a

"genericised market" would lead to ████████████████████████████████████

███████[11] Its 2002 ████████████████ sought to maintain monopoly shares, with a

stated objective ██████████████████████████████████████████████

██████████████████████████████████████████████████[12]

Maintaining share was important because—according to the Syngenta executive

responsible for the 2002 presentation—"██████████████████████████████████

████████████████████[13] This theme persists over time; in 2015, Syngenta asked its

employees to ████████████████████████████████████████████████████.

---

[8] Ex. 28 at slide 60.

[9] Ex. 29 at -333; *see also* Ex. 28 at Slide 30.

[10] Ex. 30 at slide 5 & notes (azoxystrobin and mesotrione); *see* Ex. 227 at slide 6 (similar re: metolachlor).

[11] Ex. 28 at slide 59.

[12] Ex. 26 at CX2835-016.

[13] Ex. 32 at 162:17–165:8.

10

████████████████████████████████████████████████████████████████

████████████████████ [14]

       To defeat generic competition, Syngenta needed to secure the cooperation and loyalty of distributors of crop protection products ███████████████████, with the

█████████████████████████████████████████████████████████████

████████ [15] Put differently: it needed to answer ████████████████████████████

███████████████████████████ [16] Syngenta recognized that there was "greater opportunity" in the U.S. than elsewhere to ████████████████████

████████████████████████████████████████████████ [17]

Syngenta viewed ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████ [18] The "Distribution Strategy" that Syngenta decided on: ██████████████████████████████████████████████

---

[14] Ex. 33 at -357, -359; Ex. 34 at CX2100-080; *see also* Ex. 305 at slide 17 ████████████

██████████████████████████████████████████████████████████

██████████████████ .

[15] Ex. 28 at slide 55.

[16] Ex. 34 at CX2100-086.

[17] Ex. 35 at slide 14.

[18] Ex. 35 at slide 15. "Farmgate price" is an industry term meaning the price a grower pays.

11



[19]

Syngenta presented its plan to distributors. ████████████████████

███████████████████████████████████████████████████████████████████

████ Syngenta warned against price wars: █████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████ [22] █████████████████

████████████████████████████████████████ [23]

Corteva was similarly concerned about generic pressure. As a former Corteva president testified, with patent-protected AIs, Corteva is "typically the only one selling that product and [] can determine the pricing. As products are off patent, there's a lot more competition in the market, and there's downward pressure on pricing."[24] A 2010 presentation by Corteva's predecessor Dow warned: ███████████████████

---

[19] Ex. 36 at slide 17.

[20] Ex. 37 at slide 2.

[21] Ex. 37 at slide 3.

[22] Ex. 37 at slide 5.

[23] Ex. 37 at slide 6.

[24] Ex. 38 at 35:4–12; *see also* Ex. 40 (Van Vooren (Corteva)) at 185:23–186:7 ("In my experience over 42 and a half years, pretty much every time a generic would come into a market, price would erode, go down call it, go down, and the brand's volume would go down, both.").

████████████████████████████████████████████████████████ [25] Corteva's

internal documents show specific concern about generics pressuring acetochlor,

rimsulfuron, and oxamyl prices.[26] As one Corteva employee lamented, referring to selling

post-patent AIs: "It isn't fun to manage a slowly sinking ship."[27]

Corteva employees explained their goal: ███████████████████████

████████████████████████████████████████████████████████

██████████████ [28] By limiting generic volume, Corteva could ███████████

██████ [29] During the formation of Corteva, the company stated its loyalty program

objective: ██████████████████████████████ in the face of generic

competition.[30]

Each Defendant adopted a strategy that would, in Syngenta's words, ████

████████████████████████████████ [31] The strategy would

---

[25] Ex. 41 at slide 16.

[26] Ex. 42 at slide 41 (acetochlor); Ex. 43 at slide 3 (rimsulfuron); Ex. 44 at slide 23 (oxamyl).

[27] Ex. 45 at -058.

[28] Ex. 46 at -899–900.

[29] Ex. 46 at -899–900.

[30] Ex. 294 at slide 82.

[31] Ex. 34 at CX2100-086.

13

█████████████████████████████████████████████

██████████████[34]:



As Corteva put it, the "[g]oal" of "[g]eneric defense" is to "█████████████████

███████████████████████████████████████[35]:

[32] Ex. 78 (Cecil (Syngenta)) at 15:17–17:4 ██████████████████████ ████).

[33] Ex. 47 at CX2034-003.

[34] Ex. 48 at slide 7.

[35] Ex. 49 at slides 6–7; Ex. 17 (Leifker (Corteva)) at 172:16–174:19 ("████████ ████████████████████████); *see also* Ex. 60 at -316 ████████████████ ████████████████████████████████.

14



### 2. Defendants Track and Monitor Generic Competition by AI

Recognizing generics' unique competitive threat, Defendants track generic competition and market share by individual AI. For example, a 2020 Syngenta management presentation reported an ▮▮▮▮▮▮▮▮▮▮▮▮▮ for certain azoxystrobin product chemistries.[36] In 2023, Syngenta reported its import mesotrione molecular market share as ▮▮▮.[37] And Syngenta's SMOC [S-metolachlor] Post-Patent Strategy Update compared ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[38] Syngenta's 2014 strategy for azoxystrobin and mesotrione refers to ▮▮▮▮▮▮▮▮▮▮▮▮

---

[36] Ex. 51 at slide 5.

[37] Ex. 52 at -106.

[38] Ex. 24 at -662.

████████████████████████████████████████████████████
█████████████████████[39]

Syngenta documents reflect "post-patent" strategies specific to the individual AIs and their particular market conditions. In strategy documents, Syngenta highlights same-AI generic competition as a particularly potent threat. For example, in an azoxystrobin post-patent strategy presentation, Syngenta reports an ████████████████████ ████████████████████████████████[40] Syngenta's "Mesotrione Post Patent Workshop" included mesotrione ████████████████████████ ██████████████ and notes that with ████████████████████████████ ████████████████████████████████████████[41] Syngenta's "SMOC Post-Patent Strategy Update" identifies ████████████████ ████████████████████████[42] At the very least, this creates an issue of disputed fact regarding industry recognition of AI-specific markets.

Contrary to Corteva's claims (Corteva Memo. ISO Summary Judgment (hereinafter "Cor. Br.") at 10, 13),[43] Corteva also monitors its market share on an AI-by-AI basis. For instance, a DowDuPont presentation discusses its ████████████████

---

[39] Ex. 53 at slides 2, 24.

[40] Ex. 54 at slide 2.

[41] Ex. 34 at CX2100-017.

[42] Ex. 24 at slide 2.

[43] Corteva does not claim that it calculates oxamyl market share by reference to other AIs.

16

████████████████████████████████████[44] Other Corteva documents refer to "Rimsulfuron market shares."[45] Corteva does the same with acetochlor- and oxamyl-based products, specifically calculating its market share for each AI in comparison to generic suppliers of the same AI.[46]

Corteva's internal documents reveal that its competitive strategy focuses on generic competition as a principal threat. Corteva monitors generic AI imports for rimsulfuron, acetochlor, and oxamyl.[47] Corteva's "generic defense strategies" target competition from generic equivalents.[48] Corteva evaluates and sets prices and desired profit margins with generic competition in mind. In one instance, Corteva recognized that introducing lower-priced offerings for rimsulfuron in a market with generics ██████████████████████████"[49] and Corteva should instead: ██████████████████████████████████████████████████████████████████████████ Corteva's own documents contradict its claim that plaintiffs "adduced no evidence" that industry participants recognize the existence of AI-specific markets. Cor. Br. at 52.

---

[44] Ex. 55 at CX1609-003.

[45] Ex. 56 at slides 10–11.

[46] Ex. 57 at -052–53 (acetochlor and rimsulfuron); Ex. 59 at slides 6, 8 (acetochlor); Ex. 60 at (oxamyl); Ex. 18 at slide 21 (oxamyl).

[47] Ex. 61 at slide 11 (rimsulfuron); Ex. 62 at -198 (acetochlor); Ex. 63 at -522 (oxamyl).

[48] Ex. 64 at slide 6.

[49] Ex. 65 at -019.

[50] Ex. 65 at -019.

17

**D.  Defendants Use Loyalty Programs to "Erect Barriers to Entry" that "Keep the Channel Locked Up"**

Defendants were unwilling to compete with generics on the merits after patent and FIFRA protection expired. Instead, they sought to minimize generic entry to maintain elevated prices for their branded products for as long as possible. Defendants developed "loyalty" programs to limit potential generic competitors' access to key distributors. As described more fully below, each Defendant agrees to make distributors large, end-of-year payments if they strictly limit their purchases of generic products for a given AI by meeting "loyalty" thresholds calculated as a specific share of the distributors' total needs of that AI.

Syngenta understands its lifecycle management strategy as a series of hurdles for generics, ████████████████████████████████████████████████ ████████[51]

---

[51] Ex. 69 at slide 1.



Syngenta spends ▮▮▮▮▮▮▮▮▮▮ dollars annually on payments to major distributors under its "Key AI" loyalty program.[52] Key AI has covered the Syngenta AIs azoxystrobin (since 2013); mesotrione (since 2014); and metolachlor (since 2002).[53]

As far back as 2010, Corteva (then Dow) used its loyalty program to ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[54] In other words, and as a Corteva executive described, [55] Like

---

[52] Ex. 1 ¶ 322 & Fig. 23.

[53] Ex. 70 at -671–72 (azoxystrobin); Ex. 71 at -294 (mesotrione); Ex. 25 at slide 9 (metolachlor).

[54] Ex. 66 at -225; Ex. 67 at -949.

[55] Ex. 68 at CX1305-054, row 9.

Syngenta, Corteva spends tens of millions of dollars annually on loyalty related payments.[56] Corteva Account Manager Douglas Van Vooren described ███████ of Corteva's loyalty program: ████████████████████████████████

████████████████████████████████████[57]

Corteva's loyalty program has covered the Corteva AIs rimsulfuron, oxamyl, and acetochlor since ████████████████████.[58] ████████████████



.[60]

As described below, Defendants' loyalty programs target the traditional distribution channel and are structured to limit and exclude generic manufacturers' access to that channel.[61]

---

[56] *See* Ex. 72 at slide 4 ████████████████████ ████████████ Ex. 1 ¶ 328 & Fig. 24.

[57] Ex. 73 at -214.

[58] Ex. 74 at 36:25–37:8 (rimsulfuron); Ex. 58 at 314:12–315:2 (oxamyl); Ex. 74 at 35:3–12 (acetochlor). ████████████████████████████ ██████████

[59] *See* Ex. 75 at 133:18–134:1; *e.g.*, Ex. 76 at CX1105-008, row 26 (acetochlor).

[60] *Infra* Section II.D.2.d.

[61] *See infra* Sections II.D.1.–D.2.

### 1. The Traditional Distribution Channel Is the Most Efficient Path to Market

The traditional channel is largely comprised of five national distributors: Nutrien AG Solutions ("Nutrien"), Tenkoz,[62] WinField United, Helena, and J.R. Simplot. These distributors handle 81% of crop protection sales made through distributors.[63] As Defendants acknowledge, by limiting generic manufacturers' access to this channel, Defendants effectively limit their opportunities to compete with Defendants' branded products.[64]

Access to the traditional channel is crucial for efficient distribution because the traditional channel provides numerous important services to manufacturers that alternative routes to market cannot replicate. As Syngenta observed in 2003 when it was first rolling out its loyalty programs, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[65]

---

[62] Tenkoz is a buying group comprising 12 regional distributors. *See* Ex. 4 at 24:10–25:7.

[63] Ex. 1 ¶ 86 & Fig. 9. Neither Corteva nor Syngenta dispute this fact for purposes of summary judgment. Cor. Br. at 23–24*;* Syn. Br. at 13 (just the subset of distributors that are integrated with retail comprise ▮▮ of sales).

[64] *See, e.g.,* Ex. 77 at slide 2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 79 at slide 4 ( "Loyalty" agreements with distribution channel are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[65] Ex. 80 at CX2836-150.

### a. The Traditional Channel Influences Grower Product Selection

Defendants recognize the power of the traditional channel to steer growers toward their branded products, and away from generics. Syngenta identifies the traditional channel as having ███████████████████████████████████████ [66] Corteva's expert Dr. Grey details that growers commonly delegate product selection to "crop advisors" employed by the channel.[67] One grower cited by Dr. Grey testified that

████████████████████████████████████████████████████

█████████████████████████████.[68]

As one Syngenta document explained, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████[69] A former Corteva Vice President of National Accounts admitted that Corteva found the traditional channel ███████████████████████████

█████████████████"[70]

---

[66] Ex. 80 at CX2836-150. *See also* Ex. 81 at slide 3 (████████████████████ ████████████); Ex. 50 at 38:16–40:16.

[67] Ex. 82 ¶ 35.

[68] Ex. 82 ¶ 35 n.51 (citing Kirven (MDL Plaintiff) 88:14–24, 92:2–10; Ott (MDL Plaintiff) 59:8–60:10).

[69] Ex. 84 at slide 12.

[70] Ex. 85 at 37:4–24.

22

### b. The Traditional Channel Provides Unique Benefits to Manufacturers

The traditional channel provides several unique benefits to crop protection product manufacturers. First, by selling through a relatively small number of distributors, a manufacturer can reach thousands of retailers, and in turn, hundreds of thousands of farms. As Corteva's Distribution Strategy Channel Leader testified: "[t]here is *no possible way* for our sales reps to sell to millions of end users."[71] The distribution channel eliminates the need to manage countless direct relationships and provides scale efficiencies that manufacturers cannot cost-effectively replicate on their own.[72]

Second, multiple market participants testified that distributors provide core logistics—cost-efficient warehousing and transportation services—at scale.[73] This allows manufacturers, including generics, to distribute their products across the country, reduces manufacturers' freight and warehousing burdens, and gets product closer to customers.

---

[71] Ex. 86 at 68:16–69:6 (emphasis added); *see also* Ex. 39 (Carpino (Syngenta)) at 96:3–11 ██████████████████████████████). Generics agree. *See* Ex. 87 (Menagh (Solera)) at 57:10–58:3, 83:23–84:4; ███████████████.

[72] *See* ██████████████████████████████████████████████); *see also* Ex. 86 (Feauto (Corteva)) at 68:16–69:6 (Corteva "would not be financially able to sustain a business model without our selling through a channel"); Ex. 91 (Cecil (Syngenta)) at 40:21–41:25 ███████████████████████████████.

[73] *See* Ex. 85 (Kaehler (Corteva)) at 37:13–24; Ex. 92 (Vance (Albaugh)) at 108:10–109:15; ████████████████, 51:15–22; Ex. 94 (Ripato) at 331:5–24.

23

Finally, numerous generic manufacturers testified that the traditional channel provides critical protection from credit risk. One generic manufacturer explained: "[T]hey are 100 percent responsible for what they sell to a retailer, that if the retailer doesn't pay them . . . that doesn't affect us. So there is a significant benefit of not having to try to manage credit with either very large growers or hundreds of dealers, retailers, across the country."[74] Generic manufacturers cannot efficiently manage these risks outside of the traditional channel.[75]

### c. Syngenta and Corteva Implement Their Loyalty Programs with Substantially All of the Traditional Channel

Rather than partner with one or two individual distributors to achieve the marketing and logistics efficiencies of the traditional channel, Defendants have generally implemented their loyalty programs across *all* of the major distributors, as well as mid-size distributors CNI and Growmark.[76] Defendants acknowledge that loyalty programs require broad participation by major distributors. For example, a January 2014 Syngenta post-patent strategy document about azoxystrobin describes Syngenta's "Through and With the Channel" approach to the market, noting that Syngenta has loyalty programs in

---

[74] Ex. 92 (Vance (Albaugh)) at 109:20–110:9; *see also* ███████████████████ ███ ; Ex. 95 (Schumacher (Helm)) at 67:3–15, 66:9–18.

[75] *See* Ex. 96 (Vance (Albaugh)) at 106:17–107:14; █████████████████████ .

[76] Syn. Br. Ex. 30 (Orszag Report) Fig. 1 (summarizing Key AI payments to all major distributors plus CNI and Growmark); Ex. 74 (Kaehler (Corteva)) at 33:4–25 ████████ ████████████████████████████████████████

24

place with a ███████████ of the traditional channel.[77] Corteva also recognized that

substantial generic sales by major distributors threatened to impose pricing pressure and

erode inflated prices sustained by the loyalty program.[78] Corteva regularly reminded

distributors that everyone needed to "stay together" because "[a]nything else will create a

'race to the bottom.'"[79]

Distributors understand this: Tenkoz emphasized to Syngenta that having a



███████[80] And ███████ asked Corteva to confirm that its loyalty payments would be high

enough to "keep everyone from 'jumping ship.'"[81] Corteva "assured [██████] the

Loyalty value would be significant ███████████████."[82] As the regional

distributor CNI explained, if "a major channel player [] chooses not to participate," it can

"prey on the loyalty participants," leading to "lower[] prices[.]"[83] "The result is the

loyalty program ceases to function as intended."[84] And a former Syngenta employee—a

---

[77] Ex. 53 at slide 27.

[78] *See* Ex. 99 at -431 (worrying that "a hot head customer" will "switch[] to generic" "and in turn break our loyalty program").

[79] Ex. 100 at -191–93; *see also* Ex. 101 at -519 ("if [Helena] break[s], we would likely all suffer as prices fall further").

[80] Ex. 102 at slide 16.

[81] Ex. 103 at -176.

[82] Ex. 103 at -176.

[83] Ex. 104 at slide 4.

[84] Ex. 104 at slide 4.

2002 "architect" of Syngenta's original loyalty program—testified that if generic market penetration were to expand to somewhere ███ 30% and 40%, ████████████████ [85]

## 2. Defendants' Loyalty Programs Are Structured to Exclude Generics

### a. High Loyalty Thresholds

Defendants condition their loyalty payments on a distributor meeting high loyalty thresholds, thereby strictly limiting its purchases of generic products. To qualify in a given year, a distributor must source a high percentage of its yearly total of a given AI from Syngenta or Corteva, as applicable, as opposed to any generic manufacturer.[86] The set percentage share usually leaves 15% or less available for generics—and sometimes as little as 1%.[87] In practice, loyalty thresholds are often close to 100%. In 2021, for example, Syngenta's thresholds were ███ for azoxystrobin, ███ for mesotrione, and ███ for metolachlor.[88] In 2016, Syngenta's prevailing thresholds were ███ for azoxystrobin, ███ for mesotrione, and ███ for metolachlor.[89]

---

[85] Ex. 32 (Ripato) at 90:20–91:22, 183:11–20.

[86] Ex. 105 (Hawkins (Syngenta)) at 255:5–12; Cor. Br. at 26.

[87] *See* Ex. 108 at -226.

[88] Ex. 109 at CX2534-015; *see also* Ex. 1 ¶ 300 & Fig. 20.

[89] Ex. 110 at CX2528-178.

26



And in 2020, Corteva's loyalty thresholds were ▉% for rimsulfuron, ▉% for oxamyl, and ▉% for acetochlor.[90]



---

[90] Ex. 1 ¶ 312 & Fig. 22.

Defendants' high loyalty thresholds leave the distributors minimal "open space" or "headroom" within which to sell generic versions of that AI.[91] The purpose and effect of setting—and maintaining—high thresholds is to slow generic entry and avoid downward pricing pressure for as long as possible. As a Corteva executive explained internally,



[92] Defendants' repeatedly discussed internally the need to keep thresholds high to avoid ██████████████████████████[93] Corteva's Van Vooren described Corteva's "Matrix [rimsulfuron] strategy" as "████ ████████████████████████████████████████████████████████████████ ███████████████████████████"[94]

Syngenta acknowledges that ██████████████████████████████ ████████████████████████████████████████████████████████ ████████[95] Syngenta also recognizes that ████████████████████████ ████████████████████████████████████████████████████████ █████████████████████[96] So Syngenta needs to ██████████████████████

<hr>

[91] Ex. 106 (Hawkins (Syngenta)) at 333:11–334:21; Ex. 107 (Urbanowski (Corteva)) at 126:22–127:8.

[92] Ex. 111 at -007.

[93] Ex. 112 at -861; *see also* Ex. 113 at -427 ████████████████████ ██████████████████████████████████████████ .

[94] Ex. 114 at -310.

[95] Ex. 115 at -824.

[96] Ex. 116 at -954.

28

████████ [97] As a Corteva presentation explained, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ [98]

Consistent with this, Defendants recognize that once products become commoditized and the channel is no longer able to hold value, there is no reason to retain loyalty requirements.[99]

### b. First-Dollar Payments

Defendants pay for loyalty on a "first-dollar" basis, which provides powerful incentives for distributors to meet or exceed loyalty thresholds. As Corteva admits (Cor. Br. at 24), if—and only if—the distributor crosses the required share-purchase threshold, then the distributor is eligible for payment. The payment is "first dollar" because it is calculated not just on purchases beyond the threshold, but also earlier purchases.[100] This structure confers a large one-time benefit (or one-time penalty) for meeting loyalty requirements (or missing them). With this structure, buying even modest amounts from

---

[97] Ex. 116 at -954.

[98] Ex. 117 at CX1361-012 *see also* Ex. 118 at -613 ████████████
███████████████████ ).

[99] *See* Ex. 119 (Gesse (Syngenta)) at 197:8–199:21 (██████████████████
███████████ ); Ex. 120 at slide 11 (██████████████████
██████████████████ .

[100] *See* Ex. ¶¶ 261–62.

generic suppliers can cause distributors to risk falling below thresholds and losing payments on all purchases.[101]

### c. "Sticky Money": Defendants Share Monopoly Profits with Distributors in Exchange for Exclusion of Generics

Defendants' loyalty payments are intended for distributors to keep the payments they receive, not pass them onto growers, as Defendants claim. Cor. Br. at 5; Syngenta Memo. ISO Summary Judgment (hereinafter "Syn. Br.") at 29. Loyalty payments are intended to be "sticky money": Defendants want distributors to keep the payments as additional profit margin, not use the payments to subsidize price discounts down the channel.[102] In Corteva's words: ██████████████████████████████

████ "[103] Or as Syngenta put it: █████████████████████████

█████████████████████████████ [104] and " ████████████████████

---

[101] *See* Ex. 121 at CX2382-069 (████████████████████████████████
████████████████████████████████████████████ ; Ex. 3 (Fowler (CNI)) at 45:20–46:21 ████████████████████████████
████████████████████████████████████████ ); *id.* at 170:14–171:6 (████████████████████████████████████████████████
████████████████████████████████████████ ).

[102] Ex. 122 at slide 2; Ex. 123 at -658 ████████████████████████
████████████████████████████ .

[103] Ex. 124 at slide 4.

[104] Ex. 125 at slide 10 & notes; *see also* Ex. 91 (Cecil (Syngenta)) at 87:23–88:11 (████████████████████████████████████████████████ ); Ex. 240 at slide 14; *see also id.* at slide 12 (███████████████████
████████████████████████████████████████████████
████████ ).

30

 [105] Complete pass-through of payments to farmgate prices is inimical to Defendants' goal of ensuring they can maintain the elevated prices and margins of their branded products.

Defendants use loyalty payments to share their monopoly profits with distributors in exchange for the distributors restricting generic distribution. Syngenta told the channel [106] Syngenta wanted [107] Internally, Syngenta referred to loyalty [108] Syngenta Head of Marketing Jeff Cecil testified that [109]

Corteva testimony and documents similarly confirm that loyalty payments are intended as profit-sharing mechanisms, and not to subsidize channel discounts. Corteva's

---

[105] Ex. 53 at slide 28; *see also* Ex. 125 at slides 2, 10 ( .

[106] Ex. 126 at slide 6.

[107] Ex. 126 at slide 4.

[108] Ex. 127 at slide 28.

[109] Ex. 91 at 155:19–156:8.

31

former President of Global Crop Protection admitted that loyalty programs provide

distributors with ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████ [110] A Corteva document explains: ███████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████ [111] Instead, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████ [112] Corteva considered ███████████████████████████████████████

███████████████████████████████████ [113]

Distributors likewise understand that loyalty payments are intended to insulate

their profit margins from generic pressure.[114] The distributor CNI candidly acknowledged

that "the channel like[s]" loyalty programs because they "maintain market values and

associated margins" and "keep margins and market share at pre generic levels"[115]:

[110] Ex. 128 at 239:19–240:25; *see also* Ex. 129 (Corteva's Response to Plaintiffs' First Set of Interrogatories, No. 12) at 35 (3/24/2025) ███████████████████████████████ ███████████████████████████████████████████████████████ ; Ex. 86 (Feauto (Corteva)) at 106:15–23 (affirming that Corteva's loyalty program is " ████████████████████████████ ████████████████████████████ ).

[111] Ex. 65 at -019.

[112] Ex. 65 at -019.

[113] Ex. 122 at Slide 2.

[114] Ex. 130 at -571 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ .

[115] Ex. 104 at slide 2.



Distributors treat loyalty payments as profit reward, not price discount.[116] ███████

██████████████████████████████████████████████████████████

████████████████████ ▯ ████████████████████████████████████

████████[118]

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████.[119] Defendants recognize this feature of their programs. As a Corteva

National Account Manager explained when describing one distributor's ████████:

████████████████████████████████████████████████

---

[116] Ex. 104 at slide 9 ████████████████████████████████████
████████████████████████████).

[117] ████████████████.

[118] ████████████████; *see also* ████████████████████████████
████; Ex. 132 (Cole (Tenkoz)) at 100:12–15 (agreeing that Tenkoz members "████
████████████████████████").

[119] Ex. 133 (Card (WinField)) at 70:20–72:16; Ex. 134 (Steffeck (former Simplot &
Pinnacle)) at 181:16–19; ████████████████████████████; Ex. 1 ¶¶ 347–50.

33

█████████████████████████████████████████ [120] Program complexity—including intricate qualification and calculation requirements—further diminishes the likelihood of pass-through by making it more difficult for distributors to factor loyalty payments into per-unit costs, minimizing the use of payments to reduce grower prices.[121]

Distributors' internal documents reflect this reality: distributors repeatedly acknowledge that they benefit from the elevated prices resulting from the loyalty programs. As one distributor put it: "We live on the rebates – and the Basics [branded manufacturers] live on us."[122] Distributors view ████████████████████████

███████████████████████████████████████████████.[123] ██

███████████████████████████████████████████████

██████ [124]

### d. Program and Payment Structure: "Complex and Risky"

Defendants add more complexity to the loyalty programs through payment calculation and structuring. Syngenta varies payments by product, applying different

---

[120] Ex. 135 at -194. Corteva amplifies this uncertainty by deferring payments across multiple years. *See infra* Section II.D.2.d.; Ex. 1 ¶¶ 351–53.

[121] Ex. 1 ¶¶ 343–46; Ex. 32 (Ripato (former Syngenta, Tenkoz)) at 36:16–37:17, 38:18–39:21, 69:23–70:16, 71:8–73:9 (describing loyalty program features that are designed to allow distributors to retain payment instead of being passed through).

[122] Ex. 136 at -352.

[123] Ex. 137 at -427.

[124] Ex. 137 at -427.

34

percentage payments to different products,[125] and the total product payment is often the sum of multiple components reflecting varying percentages tied to specific requirements.[126] For example, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ [127]

For premixes (products containing multiple AIs), Syngenta calculates Key AI payments as a percentage of the full product price, including the other AIs, some of which may remain under patent or regulatory protection.[128] And in some cases distributors must meet Key AI thresholds on multiple AIs to qualify for certain bonuses.[129] These features amplify the penalties for missing loyalty and increase the uncertainty of payment, while increasing distributors' incentive to comply and decreasing the likelihood distributors will pass through the payments to reduce farmgate prices. Tenkoz described Syngenta's "dual qualifier with both indexing and loyalty" as

---

[125] *See* Ex. 1 ¶ 344.

[126] *See* Ex. 1 ¶ 343.

[127] *See* Ex. 1 ¶ 343.

[128] *See* Ex. 1 at App. C ¶ 18; *id.* at App. E ¶¶ 3–5. Acuron contains bicyclopyrone (which still has FIFRA exclusivity protection), mesotrione, metolachlor, and atrazine. *See id.* at App. C ¶ 18. Distributors must meet mesotrione loyalty thresholds, but the amount at risk is calculated as a percentage of the full purchase price covering all four AIs. *See id.* at App. E ¶ 5 & Fig. 40.

[129] *See, e.g.*, Ex. 138 at -567 ████████████████████████████████
█████████████████████████████); Ex. 132 (Cole (Tenkoz)) at 225:18–226:11 (explaining that payment "hinges" on "[Tenkoz's] index" and "loyalty").

35

"punitive" and asked Syngenta to "unlink" the requirements to "put a little bit more certainty in outcome and income stream."[130]

Internally, Corteva describes its own program ██████████████████████ ████████████████████████[131] Corteva has carefully designed its payment structure to amplify the penalties for missing loyalty on one AI through (1) bundling, (2) deferred payments, and (3) tying incentives to the lucrative "Corporate Offer" incentives. These features further discourage distributors from either buying generics or using loyalty payments to reduce grower prices. Corteva attempts to whitewash its program by omitting critical aspects that impact the function and effect of the program and those facts are disputed. Cor. Br. at 25–31.

First, ███████████████████████████████████ ████████████████████████████████████.[132] Corteva understands that this AI bundling amplifies the penalty for noncompliance. As a Corteva employee wrote, ████████████████████████████████████ ████████████████████████████████ Corteva ██████████████

---

[130] Ex. 132 (Cole (Tenkoz)) at 226:12–17; Ex. 140 at -052.

[131] Ex. 117 at CX1361-011.

[132] Ex. 142 (Arens (Corteva)) at 151:18–153:4; *see also id.* 32:4–11 (listing different offers).

██████████████ specific products. ████████████████████████████████████

████ ”[133]

Second, Corteva defers a portion of payments the distributor has earned to later years. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ .[134] The share of ████████████████████████████

████████████████████████████████████████████ [135]

This is not offering "earlier payment for higher-tier performance" (Cor. Br. at 31), but is instead deferring earned payments to increase the anticipated penalties of missing future loyalty thresholds.

Corteva's ██████████████ risks forfeiture of payments by magnifying the penalty for disloyalty and—as Corteva witnesses admitted—is intended to "incentivize" "continued participation" in loyalty.[136] As Corteva documents and testimony show, ██████████████████████████ also limits the likelihood that they are passed through to growers in the form of lower prices.[137] In one instance, a Corteva National

---

[133] Ex. 143 at -309–11; *see also* Ex. 144 at -925 ████████████████████
██████████████████████████████████████████
████

[134] Ex. 10 (Messner (Corteva)) at 104:5–105:3; Ex. 142 at 157:22–158:5.

[135] *See, e.g.*, Ex. 145 at -001, -004.

[136] Ex. 10 at 103:19–104:4; Ex. 85 at 97:9–20.

[137] *See* Ex. 146 at -092 ("Deferment further keeps earning out of pricing"); Ex. 128 (Wasson (Corteva)) at 164:2–20 (████████████████████████

Account Manager "encouraged" Nutrien ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████ ”[138] The distributor IAP equates loyalty to "handcuffs," calling Corteva's

program "too complex and too RISKY" because distributors "cannot count on a cost, and

they can't run their business without understanding exact cost."[139] Contrary to Corteva's

assertion (Cor. Br. at 31), ██████████████████████████████████████

████████████████████.[140]

Finally, ████████████████████████████████ ████████████████

████████████████████.[142] Corteva tries to argue that the Corporate Offer allows

███████████████████████████████ (Cor. Br. at 27), but this is

wrong. In reality, ██████████████████████████████████████████

█████████████████████████████████████████████████████████[143]

Corteva regularly reminded distributors of this risk. When Helena considered

"break[ing]" loyalty on the AI oxyfluorfen, Corteva's Van Vooren ██████████████

---

███████████████████████████████████████████████████████████████
████████████████████████████████████████

[138] Ex. 147 at -542.

[139] Ex. 148 at -796.

[140] *See, e.g.,* Ex. 183 at 137:14–17.

[141] Ex. 149 at slides 16, 19.

[142] Ex. 150 at -213; *see also* Ex. 142 at 40:6–8.

[143] Ex. 142 (Arens (Corteva)) at 218:10–24.

38

.”[144] In another instance, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ [145]

Corteva's documents also reveal this tying strategy. Corteva predecessor Dow explained that ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ ”[146] Corteva's Channel Lead for Distribution Strategy confirmed that ███████████████████████████████████

████████████████████████████ ”[147] He went on to explain that ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ [148] In a presentation to its customers, ████████████

████████████████████████████████████ :[149]

---

[144] Ex. 101 at -519.

[145] Ex. 156 at -493, -496.

[146] Ex. 153 at slide 70.

[147] Ex. 154 at -261.

[148] Ex. 154 at -261 (emphasis added).

[149] Ex. 155 at -675, -691.

39



In short, Corteva designed its program to ensure that disloyalty on even a single AI would trigger penalties far exceeding any short-term benefit a distributor might gain, effectively locking distributors into compliance across Corteva's entire product line.

### e. Retaliation and Credible Penalties: Leaving Loyalty "Would Be Suicide"

Defendants emphatically dispute that they retaliate or threaten penalties on distributors who fail to participate in their loyalty programs. *See, e.g.,* Cor. Br. at 33–34, Syn. Br. at 50–53. The record disagrees: both Defendants retaliated against numerous distributors for daring to defy them.

40

 [150] One of Pinnacle's product lines was

Innvictis, which Pinnacle sold to growers through Pinnacle retailers.[151]

.[152]

[153]

[154]

[155]

[156]

---

[150] Ex. 134 ████████████████████████ at 22:4–10, 25:14–26:6.

[151] Ex. 134 at 27:2–9.

[152] Ex. 157 at -977; Ex. 158 at -818.

[153] Ex. 105 (Hawkins (Syngenta)) at 283:4–284:4; Ex. 159 at -651–52.

[154] Ex. 134 at 161:15–22, 177:14–178:5; Ex. 50 at 60:4–23.

[155] Ex. 89 at 261:24-262:8; *see also* Ex. 160 (Semadeni (Simplot)) at 35:4–20; Ex. 161 ████████████ at 300:2–25.

[156] Ex. 162 at CX2360-007.

41

When Pinnacle needed Syngenta products, it was forced to purchase from another distributor or broker, which is generally more expensive, less predictable, or both.[157]

.[159] Simplot eventually broke from Syngenta in 2024.

Both Defendants retaliated against IAP, a buying group for independent retailers, for failing to follow their respective loyalty programs.

---

[157] Ex. 183 (Fowler (CNI)) at 200:21–201:22 ); Ex. 161 (Baioni (Nutrien)) at 299:3–6.

[158] .

[159] Ex. 89 (Langkamp (Syngenta)) at 296:12–302:6; Ex. 160 at 40:7–41:22, 80:22–81:18.

[160] Ex. 165 at slide 2.

[161] Ex. 89 (Langkamp (Syngenta)) at 166:19–167:22.

42

████████████████████████████████████████████████[162] As a former IAP executive described, this forced some IAP members to buy from other distributors at higher prices;[163] other IAP members were able to purchase directly from Syngenta, but at a higher price than they had received through IAP.[164] And in 2018, Corteva canceled its loyalty program and dissolved its distribution agreement with IAP because "IAP [was] not acting as 'one'" or "meeting loyalty."[165]

That was hardly the only time Corteva retaliated against distributors for disloyalty. In 2019, Corteva limited product supply to three distributors (███████████████ ██████) because of Corteva's belief they were supporting generics. Van Vooren explained:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████[166]

Corteva also targeted Gar Bennett, a California distributor-retailer, for lack of loyalty. In 2018, Gar Bennett agreed to limit purchases of generic rimsulfuron and instead purchase Corteva's Matrix in exchange for loyalty payments.[167] As part of this

---

[162] Ex. 166 at -552–53 ██████████████████████████████████ ████████████████████

[163] Ex. 87 at 202:4–23; Ex. 166 at -552–53.

[164] Ex. 87 at 203:16–205:16; Ex. 166 at -552.

[165] Ex. 167 at -920; Ex. 129 (Corteva's Responses to Plaintiffs' First Set of Interrogatories) at 3.

[166] Ex. 168 at -235.

[167] Ex. 169 at -875; Ex. 170 at -423.

43

process, Corteva threatened that "Lack of Support = Change in B2B"—an end to their direct (business-to-business) relationship.[168] Over the next two years, Gar Bennett acquiesced and sharply limited its generic rimsulfuron sales to comply with Corteva's conditions.[169] In 2021, Corteva responded to reports that Gar Bennett might be "go[ing] generic" by sending it "█████████████████," ████████████████████ ████████████████████.[170] A Corteva employee explained: "My opinion is that if they go a different way, we evaluate the whole relationship. We don't need them on our patented products. I would not let them [c]herry pick us."[171]

In 2023, Corteva threatened to end the benefits of the Gar Bennett "partnership" if it did not "stay loyal to branded products."[172] In response, Gar Bennett "promised" "they will stay with Corteva."[173] Later that same year, Corteva told Gar Bennett it was cancelling multiple payments because it lacked a "firm commitment . . . going forward" on Corteva's "entire" portfolio, including Matrix in particular.[174] Gar Bennett responded to Corteva the next day about "get[ting] us back on track together."[175]

---

[168] Ex. 171 at -183.

[169] Ex. 172 (Bodily (Corteva)) at 123:15–124:18; Ex. 173 at -572; Ex. 174 at -883; Ex. 1 ¶ 386 n.497; Ex. 175 at -633.

[170] Ex. 169 at -875 (Van Vooren (Corteva)).

[171] Ex. 169 at -875.

[172] Ex. 176 at -591.

[173] Ex. 177 at -104; Ex. 178 (Bodily (Corteva)) at 248:22–249:10.

[174] Ex. 179 at -696.

[175] Ex. 179 at -695.

Corteva repeatedly discussed punishing disloyal distributors by cutting their supply allocations. For example, when Simplot pursued generic alternatives, an internal Corteva presentation set out a proposed threat: ██████████████████████ ████████████████████████████████████████████████████████ ██████████████████████[176] A Corteva sales leader similarly proposed in 2018 that Corteva "lower[]" two distributors' (████████████) allocations "due to their lack of support" for Corteva's branded products.[177] He elaborated: "[W]e would just pull back a small amount of the allocation (enough that they realized support of Matrix and other generic brands is noticed) . . . and that those who have been loyal feel that are making a good decision in remaining 100% loyal across all of Corteva."[178] The goal? To "signal" "our desire for customers to remain loyal across the entire Corteva portfolio."[179] Consistent with this, Corteva executive Nate Feauto testified that Corteva generally favors compliant distributors as ████████████████.[180] As he also put it in a text message to his colleagues: "I'm a firm believer in not giving the best deal to ones that are not loyal to us and have left us."[181]

---

[176] Ex. 303 at slide 18.

[177] Ex. 180 (Bodily) at -101.

[178] Ex. 180 at -099.

[179] Ex. 180 at -099.

[180] Ex. 181 at 397:7–25.

[181] Ex. 182 at -880.

45

Distributors believe that Defendants' threats are credible and act accordingly. As Tenkoz's President testified: If the distributor "kick[s the basic manufacturer] in the shins on those products that have loyalty programs," it is "naïve" to expect the manufacturer "to treat you like a trusted value partner on the rest of their portfolio."[182] According to another, "if we fight with a branded company on the stuff that is really important to them [and] in late life cycle products . . . [we] are not going to be able to put programs [or] private labels or other types of . . . mechanisms for us to make money in place."[183]

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████.[184] ████████████████████████████

████████████████████████████████████████████████

████████████████.[185] A Tenkoz executive similarly viewed ████████████████

████████████, discussed above, as a cautionary tale. Responding to a proposal for

Tenkoz to sell more generics, he wrote:

> What you are proposing is an IAP strategy of a few years ago, which failed….they pursued the cheapest options and subsequently took too much share to generics and lost their credibility, support and distribution contracts with key R&D

[182] Ex. 132 at 146:5–147:10.

[183] Ex. 32 (Ripato (Tenkoz)) at 42:8–21.

[184] Ex. 183 at 119:25–121:6.

[185] Ex. 3 at 63:25–66:25.

46

suppliers. Today, they are a small fraction of who they were 10 years ago.[186]

Distributors believe disloyalty will lead to being cut off from Defendants' products—even those unrelated to loyalty.



[187]

[188] Growmark's President similarly testified that if Growmark were to stop participating in Defendants' loyalty programs, it risks "los[ing] our ability to be an authorized distributor of these companies and not hav[ing] access to the portfolio."[189] Tenkoz's President agreed that "there's a concern on Tenkoz's part that participation in loyalty is important to help it keep access to supplier products that are not in the loyalty programs."[190]

Distributors also fear losing access to Defendants' products on competitive terms if they are disloyal.

---

[186] Ex. 184 at -391.

[187] Ex. 3 at 270:3–11.

[188] Ex. 3 at 62:9–19.

[189] Ex. 185 at 117:20–119:1.

[190] Ex. 132 at 147:6–10; *see also* Ex. 186 at slide 2 (listing "retain distribution contract" as a reason to participate in loyalty). Distributors' fears of being cut off extend to new products. *See* Ex. 187 (Bernard (Drexel)) at 283:24–284:19 ( .

47



.191

.192

193

### f. Defendants Offer—and Take Away—Additional Profit Opportunities Based On Loyalty

Defendants' allocation of private-label products is another tactic Defendants use to reward distributors who are loyal and punish those who are not.

Private-label products are sold by manufacturers to distributors for distributors to sell under their own name.[194] These products are generally priced just below the branded product's price, but well above the generic price.[195] Because Defendants charge distributors less for private-label products than for branded, distributors' margin on private labels is often even *higher* than the margin on branded products.[196]

---

[191] Ex. 183 at 119:14–120:14.

[192] Ex. 3 at 88:23–90:3; *see also* Ex. 4 (Cole (Tenkoz)) at 141:15–146:11 (

.

[193] Ex. 186 at slide 2 (

); Ex. 3 at 60:10–61:15.

[194] Ex. 78 (Cecil (Syngenta)) at 37:1–3.

[195] ; Ex. 188 at CX2474-019.

[196] Ex. 32 (Ripato (Tenkoz)) at 62:6–63:23; Ex. 125 at slide 8

).

Defendants' internal documents confirm that they consider private-label products to be ███████████████████████████████.[197] Access to private-label opportunities is conditioned on loyalty, with private-label products reserved for ████████ ████████████ or █████████████████████████ According to Syngenta, private labels are an ███████████████████[199] Corteva documents likewise ████████████████████████████████████████████████████ ███████████████[200]

Distributors, too, understand that private-label products are intended to offer more profit-sharing opportunities conditioned on loyalty.[201] Internal Tenkoz documents describe private labels as "margin opportunity to serve as loyalty incentive for the channel,"[202] and ██████████████████████████████████████████ ██████.[203]

[197] Ex. 189 at -610; Ex. 190 at slide 7; Ex. 191 at slide 18; Ex. 193 at slide 4.

[198] Ex. 34 at CX2100-064; *see also* Ex. 194 at slide 16; Ex. 192 at slide 2 (████████ ████████████████████████████████████).

[199] Ex. 196 at -133.

[200] Ex. 197 at slides 3–4.

[201] Ex. 32 (Ripato (Tenkoz)) at 42:8–21, 43:16–21; *see also* Ex. 137 at -021 ("████████████████████████████████████████").

[202] Ex. 102 at CX2838-023.

[203] Ex. 195 at -769.

49

### E. Defendants' Mesotrione and Metolachlor Supply Agreements

Syngenta-Corteva supply agreements enhance and exemplify the exclusionary effects of Defendants' loyalty programs. In particular, Syngenta's loyalty program deterred Corteva from purchasing lower-cost generic mesotrione for a popular crop protection product, which resulted in Corteva and Syngenta entering into an *explicitly* exclusive mesotrione supply agreement.[204]

After Syngenta's mesotrione patent expired, Corteva developed a pesticide product (Resicore) containing mesotrione.[205] Syngenta recognized that if Corteva ███████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████[206] Syngenta used its loyalty program to respond to this competitive threat.

A Corteva executive testified that, absent loyalty, Corteva could have sourced mesotrione from a low-cost generic supplier.[207] But Syngenta's loyalty program was a "sticking point" because the thresholds would have prevented distributors from

---

[204] Ex. 198 at -069 ████████████████████████████████████ ████████████████████████████████████████████████).

[205] Ex. 199 at 61:24–62:6.

[206] Ex. 200 at -519.

[207] Ex. 201 at 130:4–131:4, 143:18–21; Ex. 202 at -785.

purchasing Corteva mesotrione products in significant amounts.[208] Internally, Corteva

acknowledged that ███████████████████████████████████████

█████████████████████████████████[209]

Syngenta agreed ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████[210] ████████████████████████████

█████████████████████[211] Ultimately, Defendants saw Resicore's inclusion

in Syngenta's loyalty program as a way for them to ███████████[212] Corteva

acknowledged that its favorable treatment under Syngenta's loyalty program

demonstrated to the market that it was "aligned" with Syngenta and expressed that it was

"committed to . . . supporting the post patent strategy for Mesotrione."[213]

---

[208] Ex. 203 at -834.

[209] Ex. 204 at -233.

[210] Ex. 202 at -785 ████████████████████████████████████ ███████████; Ex. 9 at 265:7–15; Ex. 198 at -069.

[211] Ex. 9 (Messner (Corteva)) at 256:12–257:24.

[212] Ex. 205 at -873.

[213] Ex. 204 at -233. Syngenta repeated this pattern in negotiations with other basic manufacturers, including Bayer. Bayer initially pursued opportunities with lower costs generics (Ex. 206 at -002–003) but abandoned its efforts after calculating that having its products count against Syngenta's loyalty program would cost Bayer ███████. Ex. 207 at -001–002. Ultimately, Bayer chose to retain favorable loyalty treatment, despite ████████████████████████████████████████████████████████" *Id.* at -003.

51

**F. Defendants' Loyalty Programs Have Foreclosed Generic Competition For the AIs Included In Loyalty Programs**

Defendants' tactics have worked. Defendants have extensively documented how their loyalty programs have prevented, delayed, and diminished generic entry and expansion.

In 2014, as Syngenta was planning and implementing post-patent strategies for mesotrione and azoxystrobin, Syngenta highlighted the success of its "Post Patent Management," explaining that ███████████████████████████████████████ █████████████████████████████████████████████████[214] Syngenta touted its status as "██████████████████████████████████████████ ████████████████████████████[215] The reason for this success? "Syngenta's post-patent strategies," including Key AI, which Syngenta deemed a ████████ ████████████████████████████[216] Later Syngenta documents acknowledged that █████████████████████████████████████████████[217]

Syngenta believed that its loyalty program was ███████████████████████ █████████████████████████████, and believed that without it,

---

[214] Ex. 47 at CX2034-003; *see also* Ex. 53 at slides 9–10 (noting ████████████ ██████████████████████████████████████████████████████████████████████ ████████████████ .

[215] Ex. 27 at slide 2.

[216] Ex. 27 at slide 2; Ex. 47 at CX2034-031.

[217] Ex. 208 at -815. ██████████████████████████████ ██████████████████████████████████████████ *Id.* at -818.

52

Syngenta would have ███████████████ When Syngenta executives analyzed █ ███████████████████████████████, they expressed grave concern about the ████████████████████████████████████.[219] Syngenta predicted that the resulting generic competition would cause Syngenta's ████████ ██████████████████████████████████████████████ ███████.[220] ████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████[221]

Corteva has repeatedly touted the success of its loyalty programs. In 2010, Corteva's predecessor Dow described itself as ████████████████████████ ██████."[222] Internally, Corteva employees regularly reported that loyalty programs were successfully preventing distributors from stocking generics. In 2018, Corteva reported on the distributor ██████ feeling that ████████████████████████████████



[218] Ex. 211 ████████████████████████████████████████
████████████████

[219] Ex. 209 at -712–13.

[220] Ex. 212 at -997.

[221] Ex. 213 at slide 12; *see also* Ex. 214 at -061 ████████████████████
████████████████████████; Ex. 215 at -733 ████████
████████████████████████████████████████████

[222] Ex. 41 at CX1540-015.

53

████████████████████████████████ [223] Corteva also described ██████ as ██████ explaining that ████████████████████████ [224]

Corteva specifically highlighted its successes in excluding generics from the markets for oxamyl and rimsulfuron. In 2019, when discussing whether to give Nutrien a "break" on oxamyl loyalty requirements, Corteva's Channel Lead wrote: "I would hate to lower loyalty levels to let generics get back in the game, ***when we potentially could be so close to pushing them out completely***."[225] A few months later, a Corteva Product Manager praised Corteva's success with oxamyl loyalty:

> On the generic side our team truly has done an ***A+ job blocking generics***. I am very proud of the coordinated, team effort and understand the desire to thwart future generics. A few facts on this: This year only ████████████████ ████████████████████████ ████████████████████ [226]

Also in 2019, a Corteva executive highlighted its successful exclusion of generic rimsulfuron in the period since the Dow-DuPont merger:


[227]

---

[223] Ex. 216 at -945–46. Corteva noted that ████████████████████████ ████████████████████████ *Id.*.

[224] Ex. 79 at slide 4.

[225] Ex. 217 at -914 (emphasis added).

[226] Ex. 60 at -317 (emphasis added).

[227] Ex. 218 at -566.

Referring to Corteva's threats to Gar Bennett, he continued: ████████████████

████████████████████████████████████████████████████████████ [228]

Professor Hemphill's expert analysis confirms Defendants' judgment that loyalty programs have minimized generic entry, resulting in substantial foreclosure.[229] In every year for which Professor Hemphill calculated foreclosure (since 2018), the share of sales foreclosed is 61% or more—and in some instances as high as 95%.[230]



The high levels of foreclosure calculated by Professor Hemphill are consistent with Defendants' high loyalty thresholds ██████████, the traditional channel's general adherence to loyalty requirements, and the importance of the traditional channel.[231]

---

[228] Ex. 218 at -566; *see also supra* Section II.D.2.e.

[229] Ex. 1 § 4.7.

[230] Ex. 1 Fig. 28.

[231] *See supra* Sections II.D.1., II.D.2.a.; Ex. 1 Figs. 26–27; *see also infra* Section IV.E.1.b.iv.

55

Distributors acknowledge that Defendants' loyalty agreements have caused generic exclusion.

<span style="display:none"></span>

.232

.233

.234

235

Generic manufacturers repeatedly testified, and evidence in the record shows, that because of loyalty programs, they did not enter the six relevant AI markets, have limited

---

232 Ex. 3 at 45:20–48:24; *see also* Ex. 219 at CX4442-007–CX4442-0009 ▮

). *See also* Ex. 220 at 81:24–84:16 (if Van Diest was not subject to loyalty program, it would have purchased generic metolachlor for customer).

233 ▮

234 Ex. 220 (Van Diest (Van Diest)) at 81:24–84:16; Ex. 183 (Fowler (CNI)) at 114:2–115:1; Ex. 161 (Baioni (Nutrien)) at 271:25–272:3 ("Q. Has Nutrien ever declined to fulfill a requested purchase for generic product because of open space considerations? A. Yes."); Ex. 133 (Card (WinField)) at 119:21–120:11 ("[W]e could not meet [generic] demand because [we had] made the decision to meet the loyalty program.").

235 Ex. 88 (Bernard (Drexel)) at 88:16–89:6; 115:22–116:12.

their product offerings in those markets, or have been unable to gain the necessary foothold to meaningfully compete with Defendants:

- *Azoxystrobin*: ███████ exited the U.S. market[236]; Rotam did not enter because of a lack of market access caused by Syngenta's loyalty programs, despite selling azoxystrobin products worldwide[237]; Helm registered product that it abandoned due to loyalty[238]; Summit Agro opted against introducing a premix of azoxystrobin and a proprietary AI partly due to loyalty.[239]

- *Mesotrione*: ███████████████████████████████ ████████████████████████████Helm decided to stop offering a mesotrione/metolachlor premix because of Syngenta loyalty.[241]

- *Metolachlor*: ████████████████████████████████ █████;[242] Helm decided to stop offering a mesotrione/metolachlor premix because of Syngenta loyalty.[243]

- *Rimsulfuron*: Albaugh did not enter the market due to DuPont's loyalty program;[244] Helm did not pursue sales because of limited selling

---

[236] Ex. 222 ███████████████ at 195:12–196:7.

[237] Ex. 98 (Chavez (Rotam)) at 195:9–196:10.

[238] Ex. 95 (Schumacher (Helm)) at 38:3–39:17.

[239] Ex. 223 at -757.

[240] Ex. 222 ███████████████ at 251:6–252:20.

[241] Ex. 95 (Schumacher (Helm)) at 160:4–15.

[242] Ex. 222 ███████████████ at 257:17–258:13.

[243] Ex. 95 (Schumacher (Helm)) at 160:4–15.

[244] Ex. 96 (Vance (Albaugh)) at 139:3–140:15. DuPont (a Corteva predecessor) owned rimsulfuron brand (Matrix) and included it in a loyalty program ("SU Partnership"). Ex. 294 at slides 82–83.

opportunity under loyalty;[245] Rotam delayed entry for at least six years due to Corteva loyalty programs.[246]

- *Oxamyl*: AMVAC and Atticus suspended their generic operations after Corteva implemented its loyalty program.[247] Rotam delayed entry into the market because of loyalty.[248]

- *Acetochlor*: Loyalty programs discouraged Summit Agro from introducing an acetochlor premix product;[249] ██████████████ ████████████████████████████████ [250]

Generic manufacturers' lack of domestic success contrasts with other geographies where Defendants do not use loyalty programs, and generics have achieved greater market penetration.[251] But in the United States, generic manufacturers have resorted to selling products through the alternative channel because traditional distributors were unwilling to sell their products due to limited headspace.[252] As an executive from generic

---

[245] Ex. 95 (Schumacher (Helm)) at 184:15–185:13.

[246] Ex. 98 (Chavez (Rotam)) at 153:20–155:23.

[247] Ex 60 at -317.

[248] Ex 98 (Chavez (Rotam)) at 241:5–20.

[249] Ex. 224 (Lewis (SummitAgro)) at 116:5–18.

[250] Ex. 222 ████████████████ at 241:7–243:18.

[251] Ex. 225 (Schumacher (Helm)) at 187:14–189:6 (in other geographies, generic "sales are higher when there's no loyalty agreement—or loyalty programs in place, and we have more freedom to operate"); ████████████████████████████████████ ████████████████████████████████████████ ; *see also* Ex. 24 at slide 6 (comparing ████████ in several countries); Ex. 53 at slide 9 (noting that ████████████████████████████████████████████ ████████████████████████████████ .

[252] Ex. 225 (Schumacher (Helm)) at 101:19–102:4.

Case 1:22-cv-00828-TDS-JEP    Document 461    Filed 04/27/26    Page 73 of 203

manufacturer Albaugh explained: "We'd prefer not to [sell through the alternative channel], but we can't get the sustainable levels of volumes we need on some of those products selling through traditional distribution because of the loyalty programs."[253]

### G. Defendants' Loyalty Programs Have Resulted in Higher Prices

There is ample evidence that Defendants' loyalty programs have resulted in higher prices compared to a world without the loyalty program—i.e., with unconstrained generic competition. Defendants themselves have repeatedly acknowledged in internal documents that loyalty thresholds are designed to keep branded products' prices elevated and have successfully done so.

Syngenta's internal documents repeatedly confirm its understanding that absent loyalty programs, it would face significant generic competition, resulting in lower prices.

- In a 2015 marketing plan, Syngenta predicted ███████████████████████████████ ██████████████████.[254]

- In 2017, Syngenta estimated ████████████████████████████████████████████████ ████████████████████[55] Syngenta predicted ████████████████████████████████ ████████[256]

- In a 2019 presentation, Syngenta assessed █████████████████████████████████ ████████████████████

---

[253] Ex. 96 at 104:9–24.

[254] Ex. 226 at slide 33.

[255] Ex. 212 at -997.

[256] Ex. 212 at -997.

[█████████████████████████████████]<sup>257</sup>

- In 2020, Syngenta calculated ████████████████████████ ████████████████████████████<sup>258</sup>

Corteva has similarly acknowledged in internal documents and testimony that loyalty thresholds have successfully kept the prices and sales volume of their products artificially elevated, and that in the event of generic competition prices would drop.

As Van Vooren emphasized to his colleagues █████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████<sup>259</sup> Additionally:

- In 2014, Corteva employees explained "why our generic defense strategy works so well. **Answer: We maintain market value.** We maintain value for everyone. **Without our approach, market value goes to zero**."<sup>260</sup> "[T]he margin collapse would only be worst [sic] █████ ████████████████████████████████ ████████<sup>261</sup>

- In 2018, █████████████████████████████ ████████████████████████████████████

<hr>

<sup>257</sup> Ex. 227 at slide 6.

<sup>258</sup> Ex. 228 at -788.

<sup>259</sup> Ex. 229 at -967.

<sup>260</sup> Ex. 230 at -827–28 (emphasis added).

<sup>261</sup> Ex. 230 at -826 (emphasis added).

<sup>262</sup> Ex. 68 at CX1305-057.

60

- In 2019, Corteva explained regarding Matrix (rimsulfuron) that once Corteva ████████████████████████████████████ ████████████████████████████████████ [263]

- Van Vooren testified that, without the loyalty program, Corteva would not have "the same support" "of our channel partners[.]"[264]

It is not just Defendants who predicted lower prices and greater generic output absent loyalty programs—their customers did as well. For example, in 2010 ████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████"[265] The forecast's author—who helped create Syngenta's loyalty program in 2002 and later worked for Tenkoz—stands by that forecast as of 2025.[266] Similarly, when a Nutrien employee was asked what he thought would happen if a competing distributor stopped participating in a Defendant's loyalty program, he testified that the competitor "would likely come to market with a cheaper alternative," which "would drive price down in the market."[267]

As Professor Hemphill explains, "given defendants' substantial market power within each AI market, basic economic theory and examples of generic penetration as to

---

[263] Ex. 231 at -263.

[264] Ex. 40 at 151:2–19.

[265] Ex. 232 at -027–28.

[266] Ex. 32 at 104:23–105:3 (████████ management position in 2010 and Ripato's position in 2025 are "the same"); *id.* at 183:11–20.

[267] Ex. 21 at 137:19–138:6.

other AIs support the expectation that unfettered generic competition results in lower prices, compared to a world without such competition."[268] In addition, the Plaintiff States' expert Dr. Loren Smith concludes that Defendants' loyalty programs "increased Syngenta's and Corteva's profits above what they would have realized in the absence of those programs" and "caused prices paid by end-use growers in Illinois and Nebraska to be higher than they would have been absent those programs."[269]

As this robust evidentiary record amply demonstrates, Defendants' loyalty programs have excluded generic manufacturers and raised prices for growers. More importantly, at this stage of the case, there are myriad disputes of material fact that can only be resolved at trial.

## III. QUESTIONS PRESENTED

A. Have Defendants clearly demonstrated that low price is Defendants' predominant method of excluding generic competition such that that no reasonable factfinder could find otherwise and the Court should depart from the default exclusive dealing rule-of-reason standard?

B. Have Defendants clearly demonstrated that no reasonable factfinder could accept Plaintiffs' proposed market definition?

C. Have Defendants clearly demonstrated that no reasonable factfinder could find that Defendants' conduct harmed competition?

---

[268] Ex. 1 ¶ 447.

[269] Ex. 233 ¶ 14.

62

D.      Have Defendants clearly demonstrated that no reasonable factfinder could conclude that Syngenta Crop Protection AG or Syngenta Corporation controlled, dictated, encouraged, or participated in anticompetitive conduct?

## IV.      ARGUMENT

### A.      Summary Judgment Standard

Summary judgment is appropriate only where the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The court's role at summary judgment "is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Duke Energy*, 111 F.4th at 353 (emphasis in original; citation omitted). Courts should therefore "only enter summary judgment in favor of the moving party when the record shows a right to judgment with such clarity as to leave no room for controversy and clearly demonstrates that the non-moving party cannot prevail under any circumstances." *White v. City of Greensboro*, 608 F. Supp. 3d 248, 256 (M.D.N.C. 2022) (Schroeder, J.) (cleaned up; citation omitted).

In determining whether there is a genuine dispute of material fact, "the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 694 F. Supp. 3d 625, 656 (M.D.N.C. 2023) (Schroeder, J.) (quotation omitted). The moving party bears the burden to show there is no genuine

dispute of material fact for each challenged claim. *City of Greensboro*, 608 F. Supp. 3d at 256.

## B.      Elements of Plaintiffs' Claims

Plaintiffs claim that Syngenta and Corteva are each violating federal and state antitrust laws through a course of unlawful exclusive dealing conduct. Doc. 81 (Amended Complaint) ¶¶ 203–11. Exclusive dealing takes various forms, but is in essence an agreement between a buyer and a seller that prevents the buyer from purchasing from another seller or requires the buyer to purchase from that seller. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1800a (5th ed. 2025) ("Areeda & Hovenkamp"). Exclusive dealing may be unlawful whether express or *de facto* and whether it requires complete exclusivity or not. *See* Doc. 160 (Memo. Op. & Order Denying Defendants' Mot. Dismiss) at 60–61.

### 1.      Federal Claims

Each Defendant's unlawful exclusive dealing conduct violates Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the FTC Act. *See* Doc. 149 (Amended Complaint) ¶¶ 203–11. Each of these statutes, at a minimum,[270] supports a violation where plaintiffs prove by a preponderance of evidence the following elements: "(1) the relevant product market; (2) the geographical area of competition for the product market; and (3) that the arrangement at issue extends to a 'substantial share of the

---

[270] Defendants have not challenged the FTC's standalone Section 5 claim, which is discussed further in Section IV.F below.

relevant market.'" Doc. 160 at 36–37 (citation omitted). These factors allow the court to assess the "probable effect" that the exclusive deal has on competition. *Id.* (citations omitted).

The two Sherman Act claims have additional elements not required by Clayton Act Section 3 and FTC Act Section 5. Section 1 requires that plaintiffs show an agreement and the possession of market power, and Section 2 requires that plaintiffs show that the defendant possesses monopoly power. *See, e.g.*, *Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144–49 (4th Cir. 1990); *see also Duke Energy*, 111 F.4th at 352–53; *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 286 (4th Cir. 2009). Both Sherman Act statutes generally require a showing of likely harm to competition, but in the exclusive dealing context, the substantial-foreclosure requirement provides a "useful screening function" for the challenged conduct's probable effect. *United States v. Microsoft Corp.*, 253 F.3d 34, 69–71 (D.C. Cir. 2001) (analyzing a Section 2 exclusive dealing claim and finding harm to competition due to substantial foreclosure).

Defendants admit that their loyalty programs constitute agreements, and they do not move for summary judgment as to geographic market definition—these elements are not disputed for purposes of these motions. Further, neither Defendant moves for summary judgment as to the elements of market and monopoly power in the markets as alleged by Plaintiffs. Instead they claim that, should they prevail regarding market definition, Plaintiffs' allegations regarding market and monopoly power necessarily fail.

65

Syn. Br. at 90-91; Cor. Br. at 80. However, Defendants make no attempt to establish that there is insufficient evidence to find market and monopoly power in Plaintiffs' proposed markets. Corteva only notes that, under Plaintiffs' proposed markets, Plaintiffs have not shown monopoly power for acetochlor. Cor. Br. at 80. This is immaterial given that Plaintiffs have alleged that Corteva possesses ***market power*** in the acetochlor market.

Therefore, the only bases for Defendants' motions relate to (1) the definitions of relevant product markets and (2) the probable effect of the challenged conduct on competition, including substantial foreclosure. Plaintiffs amply show that issues of disputed material fact dominate these elements. Each of Plaintiffs' federal claims should be set for trial.

### 2. State Claims

Most Plaintiffs States' state law claims in this case rise and fall with the Sherman Act claims.[271] Defendants are not entitled to summary judgment on the former for the same reason they are not entitled to summary judgment on the latter. As discussed below (Section IV.H.), Defendants also are not entitled to summary judgment on California's state-law claims, Indiana's Deceptive Consumer Sales Act ("IDCSA") claims, or Iowa's Consumer Fraud Act claims because Defendants ignore the distinctions between California law and the Sherman Act and misconstrue what is needed to establish claims under Indiana's IDCSA and Iowa's Consumer Fraud Act.

---

[271] Washington is no longer seeking proprietary damages. *See* Ex. 238 (Plaintiffs' Initial Objections to Syngenta Defendants' First Set of Interrogatories) at 54.

66

### C. Defendants' Conduct Should Be Analyzed Under the Rule of Reason, Not Predatory Pricing Law

Plaintiffs bring exclusive dealing claims, which are properly analyzed under the effects-based, burden-shifting framework of the rule of reason. *See Mylan Pharms. Inc. v. Sanofi-Aventis LLC*, 2026 WL 201152, at \*20 (W.D. Pa. Jan. 27, 2026) ("The default antitrust test for exclusive dealing arrangements is the rule of reason test."). At summary judgment, Defendants seek to recast Plaintiffs' exclusive dealing claims as "predatory-pricing" claims to trigger the defendant-friendly price-cost test that applies only to predatory pricing. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993) ("[A] plaintiff seeking to establish competitive injury *resulting from a rival's low prices* must prove that the prices complained of are below an appropriate measure of its rival's costs.") (emphasis added).

That effort fails both as a matter of law and in light of the factual record. The Court may reject use of the price-cost test at the outset based on the nature of Plaintiffs' claims. Plaintiffs challenge not a low price (nor a payment, nor a rebate), but an ***exclusivity arrangement*** between Defendants and distributors that excludes ***lower-priced*** rivals. Plaintiffs' claims are directed at the exclusionary effect of structural features of Defendants' loyalty program (the share-based exclusivity conditions and Defendants' tools for implementing those restrictions). Plaintiffs do not claim any exclusionary effect caused by "low price"—in fact, Defendants' prices are ***higher*** than generic prices. The great weight of the case law confirms that when price is not the clearly predominant mechanism of exclusion the rule of reason should apply rather than the price-cost test.

In addition, the Court should reject Defendants' invocation of the price-cost test because Plaintiffs have assembled substantial evidence establishing each of the five non-price mechanisms of exclusion referenced in this Court's motion-to-dismiss decision. Doc. 160 at 49–51. Defendants may dispute these facts, but summary judgment is inappropriate because a reasonable fact finder could determine that price is not the predominant means of exclusion. *See Duke Energy*, 111 F.4th at 359 (reversing application of price-cost test at summary judgment because "factual dispute[s] preclude summary judgment").

### 1. The Rule of Reason Applies to Loyalty Rebate Programs When Price Is Not the Predominant Mechanism of Exclusion

#### a. The Overwhelming Weight Of Authority, Including New Fourth Circuit Precedent, Supports Applying the Rule of Reason

Exclusive dealing arrangements raise antitrust concerns because they "may be used by a monopolist to strengthen its position, which may ultimately harm competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). They do so by restricting competitors' access to the market, excluding potential rivals and enabling the incumbent to maintain supracompetitive prices. *Id.* at 271; *see also McWane, Inc. v. FTC*, 783 F.3d 814, 827–28 (11th Cir. 2015) (exclusive dealing can violate the antitrust laws when a dominant firm "impose[s] exclusive deals on downstream dealers to 'strengthen or prolong its market position'" (quoting Antitrust Law ¶ 760b7)). As this Court has recognized, exclusive dealing is assessed under a form of the rule of reason that considers the probable competitive effects of the conduct, including the degree of foreclosure of

rivals, and balances those harmful effects against any cognizable procompetitive benefits. Doc. 160 at 35–37.

Defendants want to avoid that fact-specific inquiry into their loyalty programs and therefore urge the Court to apply the bright-line "price-cost" test, which is applicable to evaluating a different type of conduct. Cor. Br. at 62; Syn. Br. at 35. The Supreme Court adopted the price-cost test in *Brooke Group*, 509 U.S. at 222, to assess competitor complaints that a firm is engaged in "predatory pricing"— anticompetitively lowering its prices but otherwise leaving customers free to determine whether and how much product to buy from the defendants and their rivals. Under this test, a defendant will not be held liable for low pricing unless it is pricing below its own cost. *Id.* Predatory pricing claims are analyzed under the demanding price-cost test because they challenge price cutting. *Id.*

But adding a "payment" or "pricing" element to an exclusive dealing program to induce customers to accept the exclusivity requirement does not allow the program to escape scrutiny under the rule of reason. "A discount conditioned on exclusivity should generally be treated as no different from an orthodox exclusive-dealing arrangement." Areeda & Hovenkamp, ¶ 1807b1 (2025)*; see also In re Surescripts Antitrust Litigation*, 608 F. Supp. 3d 629, 643 (N.D. Ill. 2022) ("Predatory pricing concerns below-market prices, not pricing disparities a monopolist creates among its own customers.").

Thus, to determine whether the rule of reason or the price-cost test applies, courts focus on the predominant mechanism of exclusion (*i.e.*, the reason that competitors face difficulty achieving sales). The rule of reason applies "where there are mechanisms

69

beyond price-cutting that exclude competition," and the price-cost test applies when low price "clearly predominates over other alleged non-price mechanisms of exclusion." Doc. 160 at 45, 55. As posed by this Court, a relevant question is whether "the loyalty programs leverage the Defendants' monopolist status and the market's substantial barriers to entry to exclude competition for the AIs." Doc. 160 at 49.

Courts in this Circuit and elsewhere have rejected antitrust defendants' efforts to extend the price-cost test beyond cases where a rival's inability to match a low price is the alleged mechanism of exclusion. Most recently, and following this Court's decision on Defendants' motions to dismiss, three highly relevant decisions have been issued rejecting use of the price-cost test in monopolization cases.

The Fourth Circuit addressed the issue in August 2025, rejecting application of the price-cost test to a Duke Energy scheme designed to purchase exclusivity, cautioning that "*Brooke Group* does not provide a one-size-fits-all analytic framework for assessing exclusionary pricing allegations." *Duke Energy*, 111 F.4th at 359. Defendant Duke Energy offered a key customer discounts and payments on existing contracts in exchange for the customer signing a new exclusive long-term contract at rates higher than the excluded rival was offering. Duke Energy characterized the discounts and payments as price reductions and argued that the price-cost test should apply. But the Fourth Circuit concluded that, because there was a factual dispute as to whether Duke Energy's conditional discount was *structured* in such a manner as to exclude lower-priced rivals at consumers' expense, the district court should not have applied the price-cost test and

70

granted summary judgment. The Fourth Circuit found the transaction structure at issue in *Duke Energy* to be potentially exclusionary for three reasons: first, it "hindered a new entrant's ability to compete on the basis of efficiency"; second, it was designed by an incumbent monopolist "with the intent of foreclosing" new entrants from competing on the merits; and third, it was designed to charge elevated prices to end user customers. 111 F.4th at 357–58.

Here, too, Defendants do not seek to exclude generics by pricing below them; rather they have laden their offers to customers with conditions that limit low-priced generics' market access at growers' expense. Corteva mentions *Duke Energy* only for a different point (about its cross-AI bundling), and Syngenta does not address it at all. But *Duke Energy* is controlling authority that is directly relevant to whether, at summary judgment, Defendants can use the price-cost test to avoid rule-of-reason analysis of their loyalty programs. They cannot.

Two other recent cases (each a district court decision on a motion to dismiss) address the price-cost-test question in the context of pesticide loyalty programs. In February 2025, a federal district court in Arkansas rejected these same Defendants' argument that the price-cost test applies to these very same loyalty programs. *Arkansas*, 2025 WL 551660, at *9–*10 . Recognizing that Arkansas "does not allege that low pricing was the means defendants used to exclude competition," the court held that the rule of reason would be appropriate where, as alleged there (and here), "competition has been significantly foreclosed in the relevant markets and . . . it has been difficult for any

71

generic competitor to enter the market successfully, due to defendants' loyalty programs." *Id.*

Similarly, in *Rightline, LLC v. FMC Corp.* the court evaluated complaint allegations that FMC, a monopolist in the pesticide AI sulfentrazone, "effectively block[ed] generic manufacturer Rightline's access to the primary method of distribution" via high loyalty program share thresholds. 2025 WL 1550234, at *4 (E.D. Pa. 2025). The Court held that the price-cost test does not apply to such allegations, which "plainly set forth a plausible non-price-based exclusionary program." *Id*. (noting also that Rightline was "not alleging that it is excluded from the market because of the price of FMC's sulfentrazone"). In *Rightline*, as here, the mechanism of exclusion is not price but the condition required of distributors to obtain a payment.

These three decisions join a long string of cases rejecting application of the price-cost test to exclusionary conduct that—like Defendants' loyalty programs—does not use low price to exclude. *See, e.g.*, *ZF Meritor*, 696 F.3d at 277 (holding that "price-cost test cases are inapposite" when "price itself was not the clearly predominant mechanism of exclusion"); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 65 (E.D. Pa. 2022) ("Where, however, price is not clearly the predominant mechanism of exclusion, the price-cost test does not apply."); *In re Surescripts*, 608 F. Supp. 3d at 642 (rejecting price-cost test because plaintiffs did not allege that defendants' "prices are now, or ever were, too low").

Defendants' cited cases do not change the result. Both Syngenta (at 39) and

Corteva (at 67) cite *NicSand* to suggest that the antitrust laws do not prohibit paid-for

exclusivity. *NicSand Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc). Yet neither

take on—as this Court did in its motion to dismiss decision—the peculiarities of the

market at issue in that case. In *NicSand*, "exclusivity was an essential feature of this

specific retail market because the retailers (i.e., the buyers) required exclusivity." Doc.

160 at 39. Thus, the main source of competition was dueling exclusive dealing

arrangements. In that context, "When one exclusive dealer is replaced by another

exclusive dealer, the victim of the competition does not state an antitrust injury."

*NicSand*, 507 F.3d at 456. That is wholly unlike the markets here, where distributors can

and do sell both the named brand and their generic equivalent, except as limited by

Defendants' loyalty thresholds.

Corteva cites *In re EpiPen* for the proposition that "courts have recognized that

price rebates . . . should be 'strenuously protect[ed]' from antitrust attack, absent

evidence they cross the line into the rare case of predatory below-cost pricing." Cor. Br.

at 64 (quoting *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 1000

(10th Cir. 2022)) (Corteva's modifications). That is an inaccurate description. The

*EpiPen* court "appl[ied] the full rule of reason analysis to Mylan's exclusive rebate

agreements." *In re EpiPen*, 44 F.4th at 984 n.7. In considering a different issue—whether

to "infer substantial foreclosure because Sanofi was only able to overcome exclusion by

paying a $36 million access tax" on the insulin drug Lantus—the court stated the basic

rule that it "cannot and should not infer any exclusionary conduct on the part of Mylan simply because Sanofi had to slash its prices to compete with Mylan." *Id*. at 999–1000. Those price cuts "exemplified vigorous price competition" that courts should "strenuously protect." *Id*. at 1000. Here, Plaintiffs do not complain that generic suppliers must lower their prices to compete. Generic products are already priced below Defendants' products. Generic manufacturers are excluded by the restrictive share conditions Defendants impose upon distributors.[272]

Finally, Defendants urge this Court to apply a different test, one that focuses on the distributors' motivation for agreeing to exclusivity, rather than evaluating the mechanism of exclusion. *See, e.g.*, Syn. Br. at 38 (addressing why distributors agree to the loyalty payments, rather than why competitors are excluded from the market); Cor. Br. at 62–63 (same). Defendants argue that distributors are induced by payments to accept exclusivity, and that therefore the price-cost test should apply. But, even if the distributors' motivation for agreeing to exclusivity were the determinative factor, the rule of reason would still be appropriately applied here. What appeals to distributors is not Defendants' low price vis-à-vis generics (Defendants' prices are higher), but that

---

[272] In *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), the court did not apply the price-cost test for either claim. Instead, for one claim the court found it significant that the discounts at issue left prices above cost, but did not rely on that fact alone, and applied the rule of reason. *Id.* at 1060–63. Corteva's citation to *Virgin Atlantic Airways Ltd. v. British Airways PLC*, is even more unavailing because there the plaintiffs actually brought a predatory pricing claim. 257 F.3d 256, 259 (2d Cir. 2001).

74

Defendants have designed and implemented a scheme that encourages all participating distributors to retain profits.

In addition to providing an incomplete picture of the incentives at play, this approach leads to senseless results. For example, if Defendants offered payments (bribes) to a distributor in return for that distributor setting fire to the factory operated by a generic manufacturer, the Defendants could not escape liability (in antitrust or arson) by claiming that the bribe was a "price cut," and the net price of their pesticides after netting out the bribes was "above cost." Similarly, Defendants cannot escape liability for exclusivity arrangements secured by payments simply by claiming that their prices net of the payments are "above cost."

### 2. The Evidence Establishes that Price Is Not the Predominant Mechanism of Exclusion

The factual record clearly refutes Defendants' claims (in the case of Syngenta) that its "payments to distributors and retailers" are "nothing more than price reductions" that lead to "price-based 'exclusion'" of competitors that cannot sell at that same low price (Syn. Br. at 38–39) and (in the case of Corteva) that "Corteva has been forced to lower its prices—via loyalty rebates—as the mechanism to win sales from branded and generic manufacturers." Cor. Br. at 65. Defendants' loyalty programs do not use low prices to out-compete higher-priced rivals; rather, they put in place a contractual mechanism that excludes the *lower-priced* competition that would ordinarily follow patent expiration and the unimpeded entry and expansion of generic manufacturers. As in *Duke Energy*,

75

Defendants have "designed" their loyalty programs "to cut out a more efficient competitor at consumers' expense." *Duke Energy*, 111 F.4th at 360.

### a. Defendants' Exclusion of Generics Is Not Achieved By Offering Lower Prices

Low prices are not a mechanism of exclusion at all under Defendants' loyalty programs—much less the predominant one—because Defendants are not pricing below the generic competition they seek to exclude.[273] Defendants admit that they intentionally price their products *higher* than generics.[274] As Syngenta's Head of Key Account Management testified, it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



.[277] For

---

[273] *See infra* Section IV.E.2.a. (collecting evidence that for each AI, Defendants price at a premium to generic equivalents).

[274] *See* Ex. 16 (Gesse (Syngenta)) at 68:9-19; Ex. 50 (Weikel (Syngenta)) at 133:16-134:12, 213:20-214:13; Ex. 17 (Leifker (Corteva)) at 61:2-11, 191:7-14.; Ex. 224 (Lewis (Syngenta)) 167:19-168:20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).

[275] Ex. 83 (Langkamp (Syngenta)) at 419:2-20.

[276] *See* Ex. 234 at -511 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; Ex. 50 (Weikel (Syngenta)) at 133:16-134:12; Ex. 273 at slide 10 (setting prices for s-metolachlor fighting brand products at a ▮▮▮▮▮▮ to generics); Ex. 257 at slide 2 ▮▮▮▮▮▮▮▮▮▮▮▮ ; Ex. 3 (Fowler (CNI)) at 53:3-54:25.

[277] *See infra* Section IV.E.2.a.ii.

76

example, for both rimsulfuron and oxamyl Corteva charges a ████████████
████████████████████████████"[278]

Moreover, Defendants' internal documents and distributor communications confirm that their loyalty programs are **_price-raising_** schemes that rely on distributor exclusivity—not low prices—to impede market entry and expansion by generic manufacturers. Syngenta admits its loyalty program ████████████████████ ████████████████████████████████████████████████[279] It is not a ████████[280]

Consistent with that ████████, Syngenta teaches distributors that its loyalty program helps avoid price-based competition from generics to keep prices high. In Syngenta's words, competition leading to declining consumer prices threatens █ ████████████████████████████████████████[281] To ████████████████████████████████████, Syngenta works with distributors to ████████████████████████████████████████[282] telling its distributors, ████████████████████████████████████ ████████████████████[283] They ████████████ through Syngenta's loyalty

---

[278] *See infra* Section IV.E.2.a.ii; Ex. 290 at -372–73.

[279] Ex. 91 (Cecil (Syngenta)) at 156:4–9.

[280] Ex. 91 (Cecil (Syngenta)) at 155:19–156:9.

[281] Ex. 37 at slide 5.

[282] Ex. 126 at slide 6.

[283] Ex. 126 at slide 5.

program that induces the distribution channel to forgo purchases of lower-priced generic products.[284]

Corteva recognizes the same price-raising effect. It understands that █████████ ████████████████████████████████████████████████████████████[285] Although it tells this Court that its loyalty programs reflect "robust price competition," Cor. Br. at 65, its business-planning documents confirm that its ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████[286] To slow the ██████████████████████████████ that accompanies loss of patent protection and generic entry, Corteva tells its distributors to ████████████████ ████████████[287]

In both cases, it is generic competition, not the Defendant, that threatens to drive prices down. Defendants structure their loyalty programs to thwart that competitive process.



---

[284] For these reasons, this is completely unlike *Matsushita*, which Syngenta cites to argue that its price-raising efforts are "'the very essence of competition.'" Syn. Br. at 38 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)). *Matsushita* did not address share-based loyalty arrangements, but rather allegations of a conspiracy among 21 electronics manufacturers to "price ***below-market*** levels." *Matsushita*, 475 U.S. at 597 (emphasis added).

[285] Ex. 111 at -007; *see also* Ex. 236 at -906.

[286] Ex. 117 at CX1361-012.

[287] Ex. 237 at -975.

### b. The Loyalty Programs Have Structural Non-Price Mechanisms of Exclusion

#### i. The share condition excludes generic products

Each Defendant's loyalty program conditions receipt of large, end-of-year, lump-sum payments on distributors meeting an AI-based share requirement nearing 100%.[288] This share condition is an exclusionary non-price term. Had Defendants simply lowered their per-unit prices by the pro rata amount of the loyalty payment, with no share condition attached, the price-cost test would apply and the price cut (unless below cost) would be a welcome competitive response to generic entry. With the share condition attached, however, the programs keep out lower-priced generics and prevent prices from falling to the competitive level.[289] And the high thresholds combine with inherent program complexity and market unpredictability (distributors cannot predict how much they will sell later in the year) to often dissuade distributors from selling any generic product at all, lest lower-than-predicted branded sales cause them to miss the threshold. As Corteva explained when discussing its program: ███████████████████ ███████████████████████[290] As described in Section II.F, distributors say that they turn down generic business to meet loyalty thresholds, and

---

[288] *See supra* Section II.D.2.

[289] *See supra* Section II.F.

[290] Ex. 114 at -310.

acknowledge that without the programs' share requirements, they would buy and sell substantially more generic product.

### ii. The at-risk loyalty payment is calculated across purchases and across AIs

Defendants assess a distributor's compliance with the loyalty program at the end of the year. If a distributor purchases too much generic product it risks forfeiting millions of dollars in loyalty payments, calculated as a percentage of all purchases of products containing the relevant AI (many of which contain other AIs as well), over all purchases in the entire year.[291] The at-risk loyalty payments are thus multiplied across products and over time, and their resulting size incentivizes distributors to comply with the loyalty thresholds.[292]

Further, as this Court has recognized and as addressed further in Sections IV.C.3.c.–d. below, these incentives are magnified even further in the case of Corteva, which conditions payments on compliance across multiple years, and conditions payments as to one AI on loyalty compliance as to others.[293]

### iii. The loyalty programs share supracompetitive profits with distributors, at growers' expense

Both Defendants' documents confirm that the design of their programs—including the end-of-year timing, complexity, and uncertainty, together with jawboning by

---

[291] *See supra* Section II.D.2.; *see also* Ex. 1 § 4.4.2.

[292] *See supra* Section II.D.2.b.–d.; *see also* Ex. 1 ¶¶ 336–39.

[293] *See supra* Section II.D.2.d.

Defendants—discourages complete pass-through of loyalty payments to growers. The loyalty programs enable Defendants to share their inflated profits with distributors at the expense of growers downstream. *Cf. Duke Energy*, 111 F. 4th at 358 (offer was designed to shift cost of payment to downstream customers). Section II.D.2.c. above recounts the evidence that Corteva and Syngenta understand the loyalty program structure to be a means of compensating distribution for excluding generics and maintaining high prices.

Corteva calls this "sticky money."[294] The loyalty payments stick at the distributor (*i.e.*, they are not passed on to farmers). And as Corteva President of Global Protection Susanne Wasson testified, distributors ██████████████████████████████ ████████████████████████████████[295] Syngenta too views its loyalty program as a way to deliver profit to distributors, not lower prices to growers,[296] and acknowledges that its pricing strategy succeeds because distributors retain significant portions of the loyalty payments as profits.[297] As Syngenta's head of marketing testified regarding Syngenta's program payments, ██████████████████████████████ ████████████████████████████████[298]

---

[294] Ex. 122 at -390.

[295] Ex. 128 at 239:19–240:25 (emphasis added).

[296] Ex. 240 at slide 9; Ex. 125 at slide 2 ████████████████████████████████ ██████████████████████████████████████.

[297] Ex. 91 (Cecil (Syngenta)) at 87:23–88:11.

[298] Ex. 256 at CX2029-030–31 (J. Cecil *Willowood* Deposition at 109:24–110:7).

Defendants cannot substantively dispute that their loyalty programs maintain high prices by sharing monopoly profits with distributors. Instead, they respond in two ways. First, Syngenta resorts to an ad hominem attack on Professor Hemphill—who explains this economic reality in his expert report—by branding him as being on a "crusade." Syn. Br. at 41 (citing Hemphill's academic work as evidence of that "crusade"). That Professor Hemphill's expert opinions are consistent with his article published in the Yale Law Journal does not change the fact that Defendants shared their monopoly profits with distributors as part of an "inducement to secure the distributors' acceptance" of these loyalty programs.[299]

Second, Syngenta insists that Plaintiffs cannot argue both that distributors are "coerced" to participate in the loyalty programs through non-price mechanisms and that they are "complicit in sharing purported monopoly profits." Syn. Br. at 41. Yet those two things are plainly compatible, just as they were in *ZF Meritor*. A scheme that transfers monopoly rents to distributors reduces the level of coercion necessary to secure their participation. Distributors are more willing to buy Defendants' expensive products—and disappoint customers that would prefer the lower-priced generics—because agreeing to those higher prices earns a share of Defendants' higher margin. The coercive aspects of Defendants' loyalty programs provide a stick when that carrot is not enough.

---

[299] Ex. 1 ¶ 50.

The structural features of Defendants' programs—further detailed in Section II.D.2, above, and in the reports of Plaintiffs' expert Professor C. Scott Hemphill,[300] are entirely different from a "lower price" offer that would merit the price-cost test. The loyalty payments amount to paying off the entire distribution channel with a share of monopoly profits in exchange for the broad exclusion of low-priced generics, maintaining high prices to growers.

### 3. Each of the Five Non-Price Mechanisms of Exclusion Identified by the Court at the Pleading Stage Is Amply Supported by the Record

In denying Defendants' motion to dismiss, this Court identified five "non-price mechanisms of exclusion" that "foreclose application of the price-cost test." Doc. 160 at 49. In addition to (and overlapping with) the structural non-price mechanisms described above, each of these mechanisms is present and fully supported by the summary judgment record. A reasonable factfinder could determine that (1) the "loyalty programs leverage the Defendants' monopolist status and the market's substantial barriers to entry to exclude competition for the AIs," (2) Defendants have threatened to—and actually have—cut off supply when distributors fail to meet loyalty thresholds, (3) there is a "longer-term effect" created by renewals, threats of retaliation, and deferred payments, (4) Corteva's program has some features akin to bundling that exacerbate its exclusionary effect, and (5) the Syngenta-Corteva supply agreements for mesotrione and metolachlor

---

[300] Ex. 1 § 4.6; Ex. 235 § 4.2.

"enhance[] the exclusive effect of the loyalty programs." Doc. 160 at 49–51. This additional evidence further establishes that a reasonable factfinder could conclude that price is not the predominant mechanism of exclusion such that the rule of reason applies.

### a. Defendants' Loyalty Programs Extend and Increase Significant Barriers to Entry and Expansion

In its motion-to-dismiss decision, this Court noted that loyalty programs can "aggravat[e] existing barriers to enter the market," that foreclosing the market in that way is a non-price mechanism of exclusion, and that Plaintiffs adequately alleged that Defendants' loyalty programs "exacerbate[] the already high costs to enter the market by locking up access to the most efficient channel of distribution." Doc. 160 at 48–50. Defendants say that undisputed evidence disproves that allegation. Syn. Br. at 59–60; Cor. Br. at 83. Defendants' own documents show the opposite. There is more than enough evidence for a reasonable factfinder to conclude that each Defendants' loyalty program exacerbates—in duration and extent—the existing barriers to generic entry into the relevant AI markets.

### i. The significant existing barriers to entry

A barrier to entry is "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm." *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 44 (D.D.C. 2023) (internal quotations and citations omitted); *United States v. Google*,

84

778 F. Supp. 3d 797, 850 (E.D. Va. 2025) ["*Google Ads*"]. In the U.S. crop protection industry, these barriers are "high."[301]

The first barriers are legal. For the initial period of an AI product life cycle, Defendants enjoy grants of exclusivity under patent and environmental laws.[302] Generics arrive on the scene "post-patent," facing an incumbent monopolist with established brands, registrations, knowhow, and relationships.[303]

Next are capital and technical barriers to entry. Generic manufacturers must source the technical AI, typically from abroad;[304] spend millions to secure manufacturing and logistical capabilities to overcome incumbents' supply chain "cost [] advantage;"[305] and expend resources to formulate the finished product.[306]

Next are regulatory barriers. A generic manufacturer must register both the technical AI and the final product with the EPA. The former is a months-long process that requires detailed chemical analysis and sampling.[307] The latter generally requires

---

[301] Ex. 241 at CX5114-103.

[302] *See supra* Section II.A.

[303] *See supra* Sections II.C., II.D.

[304] Ex. 1 ¶ 243.

[305] Ex. 242 at -759 ███████████████████████████████████████
██████ ).

[306] Ex. 243 at -931 (the crop protection industry's concentration is due in part to the "high R&D spend" requirement); Ex. 1 ¶ 242.

[307] ████████████████████████

obtaining studies from the basic manufacturer that demonstrate the product's safety and efficacy.[308]

FIFRA is designed to ease these regulatory burdens by giving a generic manufacturer the option to pay the basic manufacturer for the right to use its regulatory data rather than bearing the greater expense of compiling the data itself. 7 U.S.C. § 136a(c)(1)(F)(iii).[309] But even this somewhat reduced cost is still a significant "barrier[] to entry."[310] So much so that, in other litigation, Syngenta's experts opined that data exclusivity creates a significant barrier to entry. *See Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*, 267 F. Supp. 3d 649, 656 (M.D.N.C. 2017) ("Syngenta's data exclusivity for mesotrione [and azoxystrobin] created similar barriers against generics entering both markets"). Basic manufacturers regularly demand seven-figure sums and can drag the process out ███████████████[311] Some generics "decide the investment is too rich and get out."[312]

If generic manufacturers vault the legal, capital, technical, and regulatory hurdles, they must still gain sufficient access to the concentrated traditional channel to justify the

---

[308] Ex. 244 (Vance Dep. (Albaugh)) at 442:9–19 ("[T]o go generate all that data yourself is way more expensive . . . .").

[309] Ex. 245 at slide 16 (describing a congressional objective behind FIFRA's data use provisions as being to "[f]oster competition by reducing barriers to entry").

[310] Ex. 66 at -224–25 ████████████████████████████).

[311] Ex. 246 at -195 ("Where do we stand on the data compensation discussion? Is there anything we can do here to create a delay?"); Ex. 26 at CX2835–024 (███████████ ██████████████████████████).

[312] Ex. 247 at -408.

86

costs incurred. *See McWane*, F.3d at 823–24 (finding that limited access to major distributors in the pipe fittings market was an important barrier because if a new entrant was "unable to attract distributors, [it] was prevented from generating the revenue needed to [grow] into a rival that could challenge McWane's monopoly power"); *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 751–52 (D. Md. 1976) ("The ability to obtain marketing outlets . . . constituted an entry barrier."); *United States v. Google LLC*, 747 F. Supp. 3d 1, 120 (D.D.C. 2024) ["*Google Search*"] (crediting Google's control over the most efficient distribution channel as an important entry barrier). Without the traditional channel, generics cannot sell enough volume to make entry worthwhile.[313] To use Syngenta's words, a ███████████████████████████████████[314]

> ii. **Exclusion from the traditional distribution channel exacerbates barriers to entry and imposes barriers to expansion**

Defendants' loyalty programs exacerbate already formidable barriers. Courts have recognized that an incumbent monopolist can use exclusive dealing contracts to slow entry and expansion by rivals.

> A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

---

[313] Ex. 92 (Vance (Albaugh)) at 148:14–149:19 ("I think we would go bankrupt" without the channel.).

[314] Ex. 33 at -357.

*McWane*, 783 F.3d at 832 (quoting Areeda & Hovenkamp, ¶ 1802c (1996)); *see also ZF Meritor*, 696 F.3d at 270 (same). Defendants' loyalty programs do just this. They exacerbate the already formidable barriers—and thwart FIFRA's objective of lowering barriers—by curtailing generic access to the most efficient path to market.

As Corteva puts it, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[315] Similarly, Syngenta's high AI thresholds permit distributors to sell generic without ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so that distributors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[316] As Syngenta was first developing its loyalty program, it calculated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[317] Syngenta ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[318] The point is the same for both companies: the traditional sales channel is



---

[315] Ex. 66 at -225; *see also* Ex. 248 at -559 (discussing plan to hold distributors "to ▮▮ % loyalty" to "block generic entrants").

[316] Ex. 249 at -448; Ex. 208 at -818 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[317] *See* Ex. 26 at CX2835-045–46 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 32 (Ripato (Syngenta)) at 166:18–168:8 (describing same).

[318] Ex. 32 (Ripato (Syngenta)) at 167:20–168:8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

an essential path to market and their loyalty programs close off so much of the space as to render entry and expansion at least uninviting, if not uneconomic, to competitors.

These efforts are successful. As detailed in Section IV.E.1., Defendants' loyalty programs foreclose generics from substantial portions of the AI markets—markets that the capital, technical, regulatory and legal barriers make already difficult to enter. *See ZF Meritor*, 696 F.3d at 284 (applying rule of reason where "no significant external supplier ha[d] entered into the market"). That Syngenta asserts the opposite in its motion (Syn. Br. at 59) does not undo the admissions in its documents, nor carry its summary judgment burden to show no material issue of disputed fact.

### iii. Limited generic entry is consistent with high barriers to entry and expansion

Defendants' argument that significant barriers cannot exist because some generics have entered the market "misses the point." *Microsoft*, 253 F.3d at 55. "That some" entry has occurred "is not at all inconsistent with the finding that" the market's "barriers to entry discourage[] many from" doing so. *Id.*; *see also Rebel Oil Co., Inc., v. Atlantic Richfield Co.*, 51 F.3d 1421, 1440–41 (9th Cir. 1995) ("The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers . . . . Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals."); *McWane*, 783 F.3d at 831–32 (collecting cases). Competitors had entered the markets in *ZF Meritor*, *McWane*, and *In re Superscripts*, and those courts still determined that the defendants' anticompetitive schemes aggravated natural barriers to entry. *ZF Meritor*, 696 F.3d at 284–85; *McWane*, 783 F.3d at 831–32; *In re Surescripts*, 608 F.

89

Supp. 3d at 636, 645–46. Indeed, in other cases, Syngenta has recognized meaningful barriers to entry in these same markets, despite some generic entry. *Willowood*, 267 F. Supp. 3d at 656.

Even for those generic manufacturers that do enter, Defendants' loyalty programs impose barriers to their expansion, thereby preventing the market from becoming fully competitive. *See Rebel Oil*, 51 F.3d at 1441 ("Competitors may not be able to increase output if there are barriers to expansion."). Syngenta's expert acknowledges that market power may be protected by barriers to expansion, including insufficient access to effective distribution.[319] A former Syngenta employee—one of the "architects" of Syngenta's loyalty program— ███████████████████████████████████ ████████ 30% and 40% ████████████████████████████████ ███.[320] He further testified that, absent loyalty programs, this generic expansion and resulting price competition would come to pass.[321]

Defendants' cases neither hold that entry disproves the existence of entry barriers nor bear on which legal standard applies here. Defendants' cases determined that competitive entry indicated a defendant (1) lacked circumstantial market power or market

---

[319] Ex. 250 (Orszag (Syngenta Expert)) at 285:25–287:12 (market power can be protected by barriers to expansion, as distinct from barriers to entry, and access to distribution can be one such barrier to expansion).

[320] Ex. 32 (Ripato (Syngenta)) at 90:20–91:22, 183:11–20.

[321] Ex. 32 (Ripato (Syngenta)) at 104:7–105:3; *see also* Ex. 232 at -027 (███████ ████████████████████████████ ).

power sufficient to establish attempted monopolization, *see, e.g.*, *Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 394 (M.D.N.C. 2002);[322] or (2) did not substantially foreclose the market, *see, e.g.*, *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) ("[T]he test is not total foreclosure.").[323] The market power cases are irrelevant because Defendants do not (and could not) dispute that there is substantial evidence that they have market power in the six AI markets. *See, e.g.*, *Reynolds Tobacco*, 199 F. Supp. 2d at 394 (70% market share "is usually 'strong evidence' of monopoly power"). The foreclosure cases are irrelevant because evidence establishes that Defendants' loyalty programs have substantially foreclosed the at-issue markets, *see* Section IV.E.1.

---

[322] *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 114 (3d Cir. 1992) (affirming grant of summary judgment to defendant on attempted monopolization claim where defendant had 50% market share and the number of competitors increased in relevant years); *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) (reversing denial of defendant's motion for judgment notwithstanding the verdict on attempted monopolization claim for similar reasons); *DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, 2020 WL 10575294, at *4-5 (N.D. Cal. Mar. 25, 2020) (determining plaintiff failed to plead market power where the complaint "contain[ed] no allegations that existing competitors in the market, for which they are several, are unable to expand their output or offerings to challenge Uber's market behavior").

[323] *Concord Boat*, 207 F.3d at 1059 (reversing denial of defendant's motion for judgment as a matter of law where plaintiffs "presented scant evidence that firms have difficulty entering the stern drive engine manufacturing market" and Toyota had been able to not only "enter[] the market" but "was on its way to competing with established manufacturers").

### b. Distributors Are Also Incentivized to Comply with Loyalty Programs Because They Fear Loss of Supply

#### i. Distributors fear loss of supply if they are noncompliant

The evidence fully supports a finding that Defendants have threatened to and in fact have cut off supply to distributors that fail to meet loyalty thresholds, and that the potential for such retaliation influences distributors' purchasing decisions. Defendants gloss over this issue, with Syngenta telling only part of the Pinnacle story, Syn. Br. at 51–53, and Corteva insisting there is no "non-price consequence" for breaking loyalty, Cor. Br. at 67. Their arguments, at most, raise disputed issues of fact for trial.

Syngenta's punishment of Pinnacle shows that the consequences of breaking loyalty can go beyond the loss of that year's payment. When Pinnacle missed its loyalty obligations in 2016 and 2017, Syngenta terminated Pinnacle's distribution contract and stopped selling its products to Pinnacle.[324] Both Syngenta and Corteva similarly retaliated against IAP, a buying group for independent retailers, for failing to follow their respective loyalty programs.[325] Corteva also threatened Gar Bennett, a California distributor and retailer, and others for lack of loyalty, threatening, for example, to end the benefits of Corteva's "partnership," including "product allocations" and "equal access to new products," if the distributor did not "stay loyal to branded products."[326]

---

[324] *See supra* Section II.D.2.e.

[325] *See supra* Section II.D.2.e.

[326] Ex. 176 at -591; *supra* Section II.D.2.e.

92

Corteva also considers compliance with AI loyalty thresholds when allocating supply. Corteva's Nate Feauto testified that Corteva considers compliance with AI thresholds as ████████████████.[327] As an internal Corteva presentation explains:

████████████████████████████████████████████████████████

████████████████████████████████████████[328] Corteva has put that ethos into practice, limiting distributors' supply of crop protection products Intrepid and Intrepid Edge based on generic support.[329]

It does not take more than a few public examples to discipline a concentrated industry like crop protection distribution, particularly for distributors that rely heavily on access to maintain their businesses. *See* Doc. 160 at 50 (even "limited instances" of follow-though on threats can support the inference that "threats to restrict supply are effective deterrence against non-compliance"). There are examples of that influence throughout the record, as described in Section II.D.2.e. above.

At summary judgment, where all reasonable inferences must be drawn in the Plaintiffs' favor, these examples of actual punishment and its chilling effect evidence an additional non-price mechanism of exclusion.

---

[327] Ex. 181 (Feauto (Corteva)) at 397:7–25.

[328] Ex. 303 at slide 18.

[329] Ex. 168 at -235.

93

### ii. Distributors fear loss of profitable "private-label" opportunities if they are noncompliant

Each Defendant commonly allows loyal distributors to sell their own "private-label" products containing its name-brand AIs. Those products are generally priced just below the branded product, but well above the generic.[330] Yet distributors maintain high profit margins because Defendants charge distributors less for private-label products compared to branded products.[331] Indeed, distributor margins are high enough that Defendants view them as "channel profit opportunities."[332]

Not all distributors get the opportunity to sell these high-margin products. Access is contingent on loyalty. Syngenta offers private-label opportunities as ███████ ████████████████ or ██████████████ [333] It uses these █████ ████████ as a ████████████████████ and an ████████████████ ███████ [334] Syngenta told distributor Nutrien that private labels are ██████████ to ███



---

[330] *See* Ex. 4 (Cole (Tenkoz)) at 193:25–194:24; Ex. 188 at CX2474-019 (comparing prices of Tenkoz S-MOC Private Label Brawl ($39) against generic S-metolachlor prices of $31).

[331] Ex. 32 (Ripato (Tenkoz)) at 62:6–63:23 (private-label products have "a better cost position, and that allows them to make more money").

[332] See Ex. 189 at -610; Ex. 190 at slide 7; Ex. 191 at CX2353-020 (private labels are ████████████████████████████████████████████████████ ); Ex. 193 at slide 4 (explaining that private labels ██████████████████████████████████████ ████ ).

[333] Ex. 34 at CX2100-064; *see also* Ex. 194 at slide 16.

[334] Ex. 191 at CX2353-20; Ex. 196 at -133.

███████ distributors.[335] Corteva documents likewise emphasize the value of private labels to ████████████████████████████████████████████ [336]

Distributors recognize that conditionality and act accordingly. Former Tenkoz (and before that Syngenta) executive Mark Ripato testified that, "if we fight with a branded company on the stuff that is really important to them . . . in late life cycle products," "it means that we just are not going to be able to put programs [or] private labels or other types [of] mechanisms for us to make money in place."[337] For example,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████.[338] That consideration is an added reason why distributors comply with loyalty thresholds.

### c. Threats and Deferred Payments Have Long-Term Effects

Defendants' agreements have long-term effects because they are tethered to product availability, because they are kept in place and adhered to year after year, and because, in Corteva's case, they include terms that defer payments into subsequent years.

Defendants' linking of product supply to loyalty extends the programs' effect beyond any contract duration. As discussed above in Sections II.D.2.e.–f., distributors

---

[335] Ex. 192 at slide 2.

[336] Ex. 197 at CX5117-005–006.

[337] Ex. 32 at 42:8–21.

[338] Ex. 195 at -769.

face potential loss of supply, and loss of private-label opportunities, if they do not remain loyal. And if one distributor endures such a loss, it sets a lasting example for the others. For example, as late as 2018, distributor Tenkoz viewed IAP's loss of distribution contracts years earlier (around 2010) as a cautionary tale.[339] ███████████ ██████████████████████████████████████ ████████████████████████.[340] In both cases, a long past example of the consequences of disloyalty was cited as a reason for other distributors to remain loyal.

Taken on their own terms, the loyalty programs encourage long-term adherence. As discussed in Section IV.E.1.b.iv below, even nominally short-term or "at-will" exclusive arrangements can accomplish the anticompetitive effects of long-term exclusive contracts, and the record establishes that Defendants' loyalty programs result in long-term foreclosure of generic rivals. Both the Third Circuit (in *Dentsply*) and the Eleventh Circuit (in *McWane*) have recognized that under exclusivity deals, "in spite of the legal ease with which the relationship can be terminated, the [distributors] have a strong economic incentive to continue [buying defendant's product]." *McWane*, 783 F.3d at 834 (quoting *United States v. Dentsply Intern. Inc.*, 399 F.3d 181, 193–94 (3d Cir. 2005)).

The record shows that the incentives for distributor compliance provided by the loyalty programs do not materially change over time, and distributors meet loyalty

---

[339] Ex. 184 at -391; *see also supra* Section II.D.2.e.

[340] Ex. 3 (Fowler (CNI)) at 64:24–66:25; *see also supra* Section II.D.2.e.

thresholds year after year, with only occasional exceptions.[341] And Corteva's program layers on additional features that further incentivize distributors to continue adhering to loyalty thresholds year after year. By deferring portions of its loyalty payments into future years and making payment contingent on future loyalty compliance, Corteva locks distributors into a cycle of compliance, using retained payments to force compliance with future loyalty obligations.[342]

### d. Corteva's Program Shares Features with Bundling

The large amounts at risk under each Defendant's program if a distributor breaks loyalty are multiplied further in the case of Corteva, because Corteva ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Doc 160 at 51.[343]

Those facts are borne out in the factual record.[344] As described in Section II.D.2.d. above, Corteva recognizes that its bundling approach increases the incentive for distributors to comply with loyalty and ████████████████ [345] and Corteva regularly reminds distributors of these increased stakes.

---

[341] Ex. 1 Figs. 26–27; *see also infra* Section IV.E.1.b.iv.

[342] *Supra* Section II.D.2.d.

[343] *See supra* Section II.D.2.d.

[344] *See supra* Section II.D.2.d.

[345] Ex. 154 at -261.

Corteva insists that this conduct should not be judged under the rule of reason because "the mechanism used to lower prices does not matter so long as the result is lower (above-cost) prices." Cor. Br. at 70 (Corteva's emphasis). That argument fails because Corteva uses its loyalty payments to maintain **high prices** above those that would prevail without them. *See supra* Section IV.C.2.a.; *infra* Section IV.E.2.

Corteva next argues that, even if the bundling keeps prices high, Plaintiffs still must demonstrate "that it is the 'predominant' exclusionary mechanism." Cor. Br. at 70–71 (Corteva's emphasis) (quoting *ZF Meritor*, 696 F.3d at 275). That gets the test backwards. The rule-of-reason applies *unless* "price is the clearly predominant mechanism of exclusion." *ZF Meritor*, 696 F.3d at 275; *In re Suboxone*, 622 F. Supp. 3d at 65 ("Where, however, price is *not* clearly the predominant mechanism of exclusion, the price-cost test does not apply."). The bundled nature of Corteva's Corporate Offer need not be the predominant exclusionary mechanism for the rule of reason to apply; it need only be one factor among many showing that price is not the predominant exclusionary mechanism.

Finally, Corteva argues (Cor. Br. at 71–73) that its bundling cannot matter because bundled discounts violate the antitrust laws only when "the bundled rebates excluded rivals from the market <u>because</u> rivals are not able to supply all the products in the bundle." (Corteva's emphasis). That misses the point. Plaintiffs do not allege that Corteva's bundling, standing alone, violates the antitrust laws. The allegation (and evidence) here is that these bundling features of Corteva's program, and the similar, less

extreme features of Syngenta's program (*see supra* Section II.D.2.d.), heighten the consequences of breaking loyalty and therefore exacerbate the exclusionary effect of the loyalty programs.

### e. Syngenta and Corteva's Exclusive Supply Agreements Enhance the Exclusionary Effect

Exclusive supply agreements between Syngenta and Corteva also enhance the exclusionary effect of Defendants' loyalty programs. It is undisputed that Corteva and Syngenta have agreements for mesotrione and metolachlor that allow Corteva to manufacture products using those AIs, and that Syngenta's loyalty program does not penalize distributor sales of the resulting Corteva products.[346] This enhances the exclusionary effect of Defendants' loyalty programs by further limiting the available paths to market for generic manufacturers.

The history of Defendants' mesotrione agreement illustrates both the foreclosure effect of Defendants' loyalty programs and the price-raising consequences of that foreclosure. After Syngenta's mesotrione patent expired, Corteva developed a pesticide product (Resicore) containing mesotrione.[347] Syngenta saw this as a ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[346] *See supra* Section II.E.

[347] *See supra* Section II.E.

[REDACTED][348]

Syngenta leveraged its loyalty program to avoid that generic-fueled price war and keep prices high. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED][350] Defendants ultimately agreed that the

[REDACTED]

[REDACTED]"[351] The result is straightforward: Corteva's Resicore costs growers significantly more than it would absent loyalty, and generic manufacturers lose another piece of the market.

Corteva suggests that these agreements "expand the variety and volume of competing products that are not subject to the allegedly 'exclusionary effect of Key AI thresholds.'" Cor. Br. at 61. But the exact opposite is true. Syngenta recognized [REDACTED]

[REDACTED]

---

[348] *See supra* Section II.E.

[349] *See supra* Section II.E.

[350] *See supra* n.210 & text.

[351] Ex. 151 at -835.

100

██████████████ .[352] Rather than engage in price competition, however, Syngenta and Corteva agreed to protect Syngenta's monopoly prices for mesotrione by including Corteva's products in Syngenta's loyalty program. As Corteva's executives acknowledged in internal communications, these agreements show that Corteva and Syngenta ██████████ and that Corteva is ████████████████████ ████████████████████████████████ [353] The result of that collaboration: Syngenta continues to charge supracompetitive prices for mesotrione; Corteva incorporates those high prices into its mesotrione products; and Defendants use Syngenta's loyalty program to pass those higher prices on to growers.

In sum, Defendants' efforts to invoke the price-cost test should fail as a matter of law both on the basis of the nature of the challenged programs and Plaintiffs' claims, and in light of the summary judgment record. The rule of reason is the appropriate vehicle for evaluation of Defendants' loyalty programs.

### D. Disputed Fact Issues Preclude Summary Judgment on the Relevant Product Markets

"Market definition is a question of fact." Doc. 160 at 25; *see also FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 415 (S.D.N.Y. 2024). Here, Defendants introduce factual disputes about the existence of broad markets, quibble about market definition analysis offered by Plaintiffs' expert, and misrepresent their own strategies and documents

---

[352] *See supra* Section II.E.

[353] Ex. 204 at -233.

supporting Plaintiffs' single-AI markets. None of this establishes, as Defendants must to obtain summary judgment, that there is not "sufficient evidence on which a trier of fact *could* adopt plaintiff[s'] market definition." *Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180, 219 (S.D.N.Y. 2014).

Defendants criticize Plaintiffs' single-AI markets as "too narrow" and "gerrymandered." Syn. Br. at 63, 82; Cor. Br. at 40. This is the same argument Defendants made in support of their failed motions to dismiss, and it fails again now. Narrower and broader markets can and often do coexist. *See FTC v. Peabody Energy Corp.,* 492 F. Supp. 3d 865, 896 (E.D. Mo. 2020) (whether product competes in a broader market "does not affect whether the [proposed] market qualifies as a relevant market"); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) (similar). The relevant question is not whether there is some evidence of broader markets; it is whether Plaintiffs have evidence (contested or otherwise) supporting their narrower single-AI markets. *See Peabody,* 492 F. Supp. 3d at 895 (explaining that plaintiffs are not required to disprove all other potential markets; they need only "show that [their proposed] market satisfies the criteria for a relevant product market"). They do.

In denying Defendants' motion to dismiss, the Court found that Plaintiffs' allegations regarding "(1) Defendants' own conduct; (2) the 'hypothetical monopolist test'; and (3) the factors set out in *Brown Shoe*" plausibly alleged single-AI markets. Doc. 160 at 26 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)). Plaintiffs have now marshalled substantial evidence supporting those allegations. The record in this

102

case—including (1) evidence of the loyalty programs' structure, (2) Professor Hemphill's expert opinion applying the hypothetical monopolist test (HMT); and (3) Defendants' own documents and testimony recognizing single-AI markets and describing the AI's particular characteristics, uses, and prices—demonstrate a sufficient factual basis for each of Plaintiffs' six AI product markets. Each category of evidence is sufficient standing alone to support Plaintiffs' proposed markets. Given this robust factual record, Defendants cannot possibly meet their heavy burden to establish that Plaintiffs' market definition fails as a matter of law.

### 1. The Existence of Broader Markets Is Immaterial To Whether Single-AI Markets Are the Relevant Markets Here

It is axiomatic that a product may exist in more than one market. But Defendants' core argument against Plaintiffs' proposed market definition is that there exist other, broader markets that include products that do not contain the AI in question. Syn. Br. at 69–73; Cor. Br. at 60–61. Defendants' extensive arguments for broader markets fall well short of actual market definition and in any event are not dispositive. This Court is free to conclude that broader markets exist and still find that Plaintiffs' properly-defined, single-AI markets are the relevant product markets in this case. At most, Defendants' arguments demonstrate the existence of material issues of disputed fact as to market definition.

The essence of Defendants' position is that certain crop protection products may be put to the same use. Cor. Br. at 42–43; Syn. Br. at 65. Yet a product's potential substitutes do not necessarily fall within the same relevant product market. *Tapestry*, 755 F. Supp. 3d at 416; *see also Geneva v. Barr Labs,* 386 F.3d 485, 496 (2d Cir. 2004) (even

103

"therapeutically equivalent" products may be in separate markets). "Functional interchangeability" is "certainly not dispositive" of a market's boundaries. *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 58 (D.D.C. 2008); *see also* Doc. 160 at 24 (reasonable interchangeability requires "more than simply technical interchangeability"). So, the fact that some consumers may substitute to products outside the candidate relevant market does not mean the market's boundaries should be expanded. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range.").

Rather, and as this Court has explained, the guidepost for the bounds of the market is "reasonable interchangeability" as generally determined by "cross-elasticity of demand." Doc. 160 at 24. Cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992). "If a price change causes a considerable number of customers to switch products, then there is a high cross-elasticity of demand between the products," and the products "compete in the same market." *In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6689718, at *13 (E.D. Va. Nov. 1, 2021), *report and recommendation adopted*, 587 F. Supp. 3d 356 (E.D. Va. 2022). By contrast, products that are "interchangeable to some degree" (experience some degree of substitution) are not necessarily in the same market. *In re Zetia*, 587 F. Supp. 3d at 361. "This analytical approach guides antitrust courts in attempting to answer

104

one key question: whether particular products are sufficiently close substitutes such that substitution to one could constrain any anticompetitive pricing in the other." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (ellipsis and quotation marks omitted).

Within a broader market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325; *see also United States v. Alum. Co. of Am.*, 377 U.S. 271, 275 (1964) (that aluminum and insulated copper conductors could be analyzed as "single product market" "does not preclude their division . . . into separate submarkets" for antitrust purposes). But the existence of a broader market "does not render the [narrower] one identified by [Plaintiffs] unusable." *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 368 (S.D.N.Y. 2024) (quoting *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022)). Even Corteva's market-definition expert admits that the existence of a broader market does not preclude the existence of a narrower market.[354]

Courts have repeatedly found that "a brand-name drug and its generic analogs," similar to the single-AI markets here, can constitute a relevant market where a branded manufacturer's anticompetitive conduct restrains generic competition. *In re Nexium Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013); *see also* Doc. 160 at 25-26

---

[354] Ex. 251 (Hill (Corteva Expert)) at 86:6–9 ("Q. But it's possible to have two valid markets, one broader and one narrow; is that right? A. Correct."); *id*. at 291:18–21 ("[T]he fact that the broader market passes the HMT using Dr. Hemphill's methodology doesn't mean that a narrower market can't also pass.").

105

(collecting cases). Defendants do not even address these cases, let alone distinguish them. For example, in *In re Aggrenox Antitrust Litigation*, the district court defined a market limited to Aggrenox and its generic equivalents. 199 F. Supp. 3d 662, 663 (D. Conn. 2016). Functional substitution to drugs other than the generic equivalent does not defeat the narrower branded-and-generic-only market. *See Zetia*, 587 F. Supp. 3d at 361 (in pay-for-delay case, market for branded and generic ezetimibe products necessarily excluded other cholesterol-lowering medicines, such as statins); *Nexium*, 968 F. Supp. 2d at 388 (similar); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 626 (S.D.N.Y. 2022) ("Pharmaceutical drugs that are 'therapeutically equivalent' can nevertheless exist in separate markets."). The same is true here: evidence of potential functional substitution to pesticides containing other AIs cannot establish the cross-price elasticity necessary to define a market. Given this evidence, Defendants cannot show that there is no dispute of fact as to the single-AI markets.

Neither does it avail Defendants to observe that FTC and DOJ have previously defined functional crop protection product markets in merger review—it merely illustrates that broader and narrower markets may coexist. Syn. Br. at 75–76; Cor. Br. at 40. Mergers between chemical companies without same-AI overlaps but with product overlaps in broader markets, may, consistent with the principles described above, be assessed in broader markets. And where the merging parties each had products with the same AI, as with ChemChina's 2017 acquisition of Syngenta (which neither Defendant references), the FTC has alleged—and assessed competitive effects in—narrower markets

106

at the active-ingredient level.[355] Thus, prior market definitions in the pesticide industry illustrate that market definition is context-dependent and that products may exist within broader and narrower markets.

### 2. Defendants Anticipated That Unfettered Generic Entry Would Crater Prices, and Structured Their Loyalty Programs to Address that Competition

Plaintiffs' market definition evidence begins with Defendants' own expectations that, following patent expiration, unimpeded generic entry would trigger more intense price competition than existed when a branded AI competed only with products that include different AIs. As this Court explained in denying Defendants' motion to dismiss, "Defendants' own conduct and recognition of the market" is evidence that "a product market is properly constituted." Doc. 160 at 26.

Defendants' loyalty programs demonstrate that they "view themselves as competing" with generic manufacturers who offer products containing the same AIs. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442–43 (4th Cir. 2011). There is ample evidence as to each of the six AIs that Defendants foresaw a grave risk to pricing from unconstrained generic entry at patent expiration.[356] Syngenta anticipated that generic azoxystrobin competition would cause ███████████████,[357] and generic

---

[355] *See* Ex. 252 at ¶ 6.

[356] *See supra* Sections II.C.1., II.G.

[357] *See supra* Section II.G.

107

metolachlor could result in a ██████████████ [358] Syngenta identified generic

mesotrione as ████████████████████████████ for Syngenta's

mesotrione products.[359] Corteva estimated that unconstrained entry would cause ████████

██████████ for acetochlor,[360] would cause the rimsulfuron ████████ to ████████████ [361]

and would ████████████ on oxamyl products.[362]

Defendants' documented fear that generic entry will cause dramatic price decreases demonstrates their understanding that, for each AI, the generic products are the closest substitutes to their branded counterparts. *See Zetia*, 587 F. Supp. 3d at 362 (evidence that no other drugs significantly constrained branded drug's pricing "in the years before generic launch" supported brand-and-generic only product market definition). If branded products containing other AIs truly constrained pricing of Defendants' products to the competitive level, Defendants would not expect that generic entry would have a dramatic effect. Defendants' expectations for generic entry therefore contradict their claimed broader markets and confirm the propriety of Plaintiffs' proposed markets.

Defendants' response in the face of generic threat—implementing AI-based loyalty programs—is further evidence supporting single-AI markets. Doc. 160 at 32

---

[358] *See supra* Section II.G.

[359] Ex. 33 at -357, -359; *see also supra* Section II.C.1.

[360] *See supra* Section II.G.

[361] *Supra* Section II.G.

[362] Ex. 253 at slide 2.

("[T]hat Defendants' own loyalty programs cover only individual AIs[] plausibly suggests that Defendants view the market as including only one AI but not others."). Defendants design their loyalty programs around individual AIs to impede generic competition.[363] Both of these programs condition rebate payments on the quantity of AI contained in branded and generic products that distributors purchase.[364] Syngenta implements its loyalty program to ███████████████████████████ ████████████████[365] The goal of Corteva's loyalty program is similarly to "erect barriers to entry" and "prevent product from selling is before it is made."[366] And Corteva uses loyalty to avoid a competitive "race to the bottom" with generics on price. The fact that loyalty programs are specifically directed at generics with the same AI is robust evidence of single-AI markets. *See Aggrenox*, 199 F. Supp. 3d at 663 ("[T]he relevant market in this case is determined by the nature of the challenged agreement."); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 935 (9th Cir. 2025) ("[T]he nature of the claim can affect the proper market definition.").

Plaintiffs' AI-based markets reflect the industry's "commercial realities," around which relevant product markets are defined. *Eastman Kodak*, 504 U.S. at 482. This

---

[363] *See supra* Section II.D.2.

[364] *See supra* Section II.D.2.a.

[365] Ex. 34 at CX2100-086; *see also id.* at -800 (████████████████████ ████████).

[366] Ex. 66 at -225; *see also* Ex. 67 at -949; Ex. 114 at -310 ██████████████ ███████████████████████████████ ████████████████████.

109

distinguishes Defendants' cited cases involving "gerrymandered" markets. For example, Syngenta cites (Syn. Br. at 64) *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2nd Cir. 2002), where the plaintiff "failed to provide evidentiary support for its market definition restricted by distributor and customer," and its "own survey of 99 major customers" and "internal strategy documents" suggested that market did not exist. *See id*. at 106; *see also Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1318-19 (D. Md. 1986) (proposed market "essentially limited to the products of one company"). That is completely unlike this case where Defendants organize their commercial efforts around the same AI-specific markets Plaintiffs allege.

*It's My Party, Inc. v. Live Nation, Inc*., cited by Corteva (Cor. Br. at 40–41), involved a regional market for "major amphitheaters" that "have a capacity of 8,000 or more, actually sell 8,000 or more tickets, and be in use only from May to September." 811 F.3d 676, 682–83 (4th Cir. 2016). Plaintiff's market failed because it had no "record evidence demonstrating that artists are so likely to stick to amphitheaters in the event of a price increase that amphitheaters comprise their own market." *Id*. at 683. Here, as explained below, *infra* Section IV.D.3., in the face of an acetochlor supply shortage acetochlor prices increased—without a similar increase in metolachlor prices— suggesting that growers do not respond to price increases for one AI by switching to other AIs.

Defendants' attempts to dispute the structure of their loyalty programs at best raise factual issues for trial, and at worst mischaracterize the record. Syngenta claims that it

110

has other incentives that target competition in broader markets (Syn. Br. at 73–74), but despite those programs, Syngenta still chooses to implement Key AI ██████████ once patents expire.[367] These broader programs cannot sufficiently reduce the risk of generic competition. Syngenta also argues that its program is structured around AIs merely for administrative convenience (*id.*), but that is unsupported by any ordinary course document—Syngenta instead cites a made-for-summary judgment declaration from Vern Hawkins.[368] These arguments also ignore that distributors generally must meet the Key AI thresholds as a condition for receiving any additional incentives contained within the distributor marketing agreements,[369] and it is thus "integral" to Syngenta's post-patent strategy.[370] For example, the purportedly broader incentive Syngenta cites—the ██████████████████████████—is *contingent on meeting the Key AI thresholds.*[371]

Corteva similarly argues that some of its programs are based on multi-AI purchases. Cor. Br. at 59. This, too, at best raises fact disputes for trial. In any event, like Syngenta's similar argument: (1) Corteva's ███████████████ was in place prior to

---

[367] Ex. 134 ███████████████ at 81:2–84:1.

[368] Syn. Br. at 73 & n.225 (citing Syn. Br. at 23–24 & n.88 (Syn. Br. Ex. 3 (Hawkins Decl.) ¶¶ 11–14)).

[369] *See, e.g.,* Syn. Br. Ex. 85 at -916 ("In order to qualify for the Special Marketing Bonus(es) . . . Marketer must achieve the Threshold Share on an Active Ingredient by Active Ingredient basis . . . ."); *see also supra* Section II.D.2.a.

[370] Ex. 234 at -512.

[371] Syn. Br. Ex. 86 at -325 ███████████████████████████████████████████████████████████████████████████

111

acetochlor being added to Corteva's loyalty program,[372] and (2) Corteva's single AI

loyalty program is not only "Key" to its generic defense strategy,[373] it is the "glue" that

holds that strategy together.[374]

### 3. Professor Hemphill's Implementation of the HMT Supports Plaintiffs' Proposed Markets

#### a. Professor Hemphill's HMT is Reliable and Robustly Supported

Plaintiffs further ground their product market definition in the economic analysis

that antitrust authorities commonly use to assess the relevant market: the HMT. As this

Court explained in its order denying Defendants' motion to dismiss:

> The HMT is an aid in determining if the relevant product is
> properly constituted. The court begins by hypothesizing that
> every good as alleged in the product market is under the
> control of a hypothetical monopolist. Under such conditions,
> if the hypothetical monopolist could profitably impose a
> small but significant and nontransitory increase in price
> ("SSNIP"), then the product market is properly defined.

Doc. 160 at 27. Professor Hemphill conducted his HMT using multiple accepted

approaches, including record evidence (his assessment of natural experiments and review

of internal documents) and arithmetic-based (his recapture rate analysis) methods. First,

he studied a series of natural experiments around generic entry,[375] and supply shocks.[376]

---

[372] Ex. 254 at -620, -627.

[373] Ex. 72 at slide 3.

[374] Ex. 255 at -765.

[375] Ex. 1 § 3.2.3.

[376] Ex. 1 §§ 3.2.4, 3.2.5.

112

Using Defendants' documents and (where available) pricing data, Professor Hemphill observed that prices for branded products featuring five of the six AIs fell substantially when and because generic versions entered the market.[377] For the sixth (acetochlor), Professor Hemphill observed a *price increase* on acetochlor products during a period of supply constraint for that AI, without a corresponding price increase for other herbicide products.[378] Second, Professor Hemphill analyzed Defendants' documents forecasting that significant price decreases would be required to compete with generics (indeed, the exact evidence described in Section IV.D.2, *supra*).[379] Finally, Professor Hemphill described a calculation-based HMT for some of the AIs, where data was available.[380]

Professor Hemphill's economic analysis thus confirms Defendants' business judgments: when generic equivalents enter, Defendants' products face competition that requires Defendants to either cut prices or act anticompetitively to maintain prices. He concludes that a hypothetical monopolist that controlled both the branded product and all generic versions would be able to maintain prices above the competitive level (akin to the pre-patent expiration world). This is evidence that the AI-based markets are properly defined.

---

[377] Ex. 1 § 3.2.3; 3.2.4

[378] Ex. 1 ¶¶ 197–98 & Fig. 17.

[379] *E.g.*, Ex. 1 § 3.2.2.

[380] Ex. 235 App. C (recapture rate analysis).

113

Notably, in addition to Professor Hemphill's analysis of Defendant pricing data, he analyzes and relies on real-world documents to support the HMT. Far from "hypothetical," then, the evidence shows that a monopolist over products with the same AI has in fact exercised power over price. Syngenta documents and Syngenta witnesses recognize that when ███████████████████████████████████████

██████████ █████ ██ ████████████████████████████████████████████

███████ Corteva documents likewise explain that Corteva was forced to drop the price of its rimsulfuron[384] and oxamyl[385] products in response to limited generic entry. And when acetochlor faced supply constraints, Bayer and Corteva "aggressive[ly]" raised prices on acetochlor products, highlighting that a hypothetical monopolist of acetochlor products would have power over price.[386] Of course, as discussed in Section IV.E.2, this price response has not brought prices to the competitive level; prices remain elevated due to the loyalty programs.

---

[381] Ex. 256 at 71:21–72:2; Ex. 257 at slides 10–11.

[382] Ex. 258 at -869; Ex. 259 (Langkamp (Syngenta)) at 57:10–57:20.

[383] Ex. 285 at slides 20–21; *see also* Ex. 260 at slides 7–9; Ex. 119 (Gesse (Syngenta)) at 191:22–192:15 ████████████████████████).

[384] Ex. 261 at slides 2, 7, 10.

[385] *See* Ex. 141 at CX5112–005–006 ██████████████████████████ ████████████████████████████████████); Ex. 263 at –401 (attributing changed competitive conditions for oxamyl products to generics).

[386] Ex. 264 at -001; *see also* Ex. 1 ¶ 197.

114

Professor Hemphill's HMT also puts the lie to Defendants' contention that Plaintiffs lack "farmer-level evidence" of substitution. Cor. Br. at 42–43; *see also* Syn. Br. at 65–68. The HMT is a measure of what ***consumers—i.e., growers—view as substitutes***.[387]

The hypothetical monopolist test asks whether consumers will respond to price increases by substituting:

> If the hypothetical monopolist can impose [a small but significant non-transitory increase in price ("SSNIP")] without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market. ***By contrast, if consumers are able and inclined to switch away from the products in the proposed market in sufficiently high numbers to render the SSNIP unprofitable***, then the proposed market definition is likely too narrow and should be expanded.

*United States v. Am. Express Co.*, 838 F.3d 179, 199 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) (emphasis added).

Professor Hemphill's HMT relies on grower purchasing data.[388] Professor Hemphill's HMT tells us what growers have done with their limited opportunities to buy generics. Growers' demand for products with Defendants' AIs, combined with some limited generic availability, forced Defendants to dip into (but not eliminate) the

---

[387] Ex. 235 ¶ 56 ("[T]he HMT[] . . . evaluates substitution by assessing the profitability of a producer price rise for a collection of products.").

[388] Ex. 1 ¶ 165.

115

monopoly surcharge on those products.[389] Defendants react to competition in the market (the emergence of generic AIs) by lowering their prices on the named-brand AI.[390] That actual and expected reaction to generic entry—captured in Professor Hemphill's HMT— is the best evidence of grower behavior, because rather than relying on one-off statements such as the grower declarations submitted by Syngenta, it tells the Court how sophisticated suppliers address grower preferences throughout the market. On this record, a reasonable factfinder could easily accept Plaintiffs' proposed markets.

### b. Defendants' Criticisms Fail

Syngenta argues that the Court must consider other "evidence of a broader market"—beyond the HMT—to "determine if a product market is properly constituted." Syn. Br. at 84. This is incorrect. A market that passes the hypothetical monopolist test "is properly defined." *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016); *see also* Doc. 160 at 27; *FTC v. Sanford Health*, 926 F.3d 959, 963–64 (8th Cir. 2019). Contrary to Syngenta's suggestion that the HMT "ignore[s] evidence of a broader market" (Syn. Br. at 84), the HMT answers the exact question relevant here, which is whether substitution outside the market will defeat a hypothetical monopolist's price

---

[389] *See* Ex. 1 § 3.2.3. (describing how in some circumstances limited generic entry provoked a price response); *id.* at § 4.9. (describing higher prices from exclusion of generics).

[390] Ex. 1 § 3.2.3.

116

increase.[391] Neither of Syngenta's cited cases remotely suggests that a properly conducted HMT is insufficient to carry Plaintiffs' burden to define a market. Rather, both rulings issued only after a factfinder had the opportunity to assess and weigh market-definition evidence from multiple sources. *United States v. United States Sugar Corp.* (cited Syn. Br. at 84), was decided "[a]fter an expedited trial" where the Court "determined credibility of the expert witnesses and carefully weighed the evidence." 73 F.4th 197, 202 (3d Cir. 2023). *FTC v. RAG-Stiftung* (cited Syn. Br. at 84), was a preliminary-injunction ruling made after an evidentiary hearing. 436 F. Supp. 3d 278, 287 (D.D.C. 2020). These cases establish that a ***factfinder*** may assess and weigh multiple sources of market-definition evidence, and may define a market based on *Brown Shoe* evidence alone—not that a plaintiff must present evidence beyond the HMT.

Defendants' incorrect claim that Professor Hemphill "misapplied" the HMT (Syn. Br. at 85–90; Cor. Br. at 52–59) is not a basis for summary judgment. Where "competing expert witnesses" both "present credible economic analys[e]s," "the persuasiveness of their opinions" is a "question[] for the [factfinder]." *Caruso Mgmt. Co. v. Int'l Council of Shopping Centers,* 403 F. Supp. 3d 191, 207 (S.D.N.Y. 2019) (cleaned up); *see also In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 302 (D.R.I. 2019). These criticisms (recycled from their *Daubert* motion), go to the weight of Professor Hemphill's opinions,

---

[391] *See supra* Section IV.D.1.; *see also* Ex. 250 (Syngenta Expert)) at 58:23–59:13 ("Q. And a SSNIP can be profitable even if some customers switch away from the hypothetical monopolist's product, right? A. That is correct.").

not their admissibility. Professor Hemphill's opinions are admissible and sufficient to create a genuine dispute of material fact regarding market definition.

Tellingly, Defendants cite no case in which a court granted summary judgment for a defendant based on an economic experts' supposed misapplication of the HMT.[392] This is because there are a variety of acceptable approaches to conducting an HMT. *See Sanford Health*, 926 F.3d at 963 (HMT satisfied by "claims data and testimony"); *McWane*, 783 F.3d at 829 (with only record evidence and without "a cross-elasticity of demand study"); *B & R Supermarket, Inc. v. Visa, Inc.*, 2024 WL 4252031, at *9–10 (E.D.N.Y. Sept. 20, 2024) (with "consumers' preferences"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 122 (D.D.C. 2016) (with "record evidence" and "testimony"); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *29–30 (N.D. Cal. Jan. 8, 2014) (with "trend[s] among top retailers," "customer testi[mony]," "documents," evidence of "head-to-head competition," and arithmetic); *H & R Block, Inc.*, 833 F. Supp. 2d at 52 (with "business documents," "testimony," "and the analyses of the parties' expert economists"); *In re Zetia Antitrust Litig.*, 2021 WL 6689718, at *15 (E.D. Va. Nov. 1, 2021) (Mag. J., Report and Recommendation) (with "natural experiments"). The "hypothetical monopolist" analysis "must be resolved 'on a case-by-case basis, focusing

---

[392] Instead, Syngenta cites *Hershey* for the proposition that misapplication of the HMT is legal error. Syn. Br. at 85. That decision reversed a district court denial of a preliminary injunction after a five-day evidentiary hearing. *Hershey*, 838 F.3d at 334. Beyond the markedly different procedural context, the district court effectively failed to apply the HMT at all because it "declined to make" the "prediction" (required in merger cases) of how a hypothetical monopolist within geographic market would set prices. *Id.* at 343–45.

118

on the 'particular facts disclosed by the record.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023) (quoting *Eastman Kodak*, 504 U.S. at 467).

*Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 663–66 (7th Cir. 2004) does not support Syngenta. Syn. Br. at 89. Professor Hemphill's reliance on natural experiments, internal documents, and recapture rate analysis is far from the "armchair economics" at issue in *Menasha*, where plaintiffs' economic expert submitted a conclusory analysis that amounted to "sales of X rose, therefore X is a market." 354 F.3d at 664–65; *see also Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1059 (D. Minn. 2009) (recognizing that in *Menasha*, "the plaintiff had not come forth with sufficient evidence supporting its proposed relevant market").[393]

Syngenta further claims that Professor Hemphill should have "[held] constant prices of products outside of his single-AI candidate market" when implementing his HMT. Syn. Br. at 87. But this argument depends on an analysis conducted by Syngenta expert Mr. Orszag that Professor Hemphill explains is unreliable.[394] Moreover, there is no hold-constant "requirement" (Syn. Br. at 87) because that would be feasible only for a subset of quantitative evidence.[395] *See* Carl Shapiro, THE 2010 HORIZONTAL MERGER

---

[393] Syngenta's citation to *Stiles v. Walmart, Inc.*, 639 F. Supp. 3d 1029 (E.D. Cal. 2022) is equally unavailing. Syn. Br. at 90. There, the plaintiff's expert evidence did not rest on *any* data or evidence and was instead contradicted by *undisputed* record evidence that made his theories unreasonable. *Id.* at 1048–50.

[394] Ex. 235 ¶¶ 78–80.

[395] Ex. 235 ¶ 81.

GUIDELINES: FROM HEDGEHOG TO FOX IN FORTY YEARS, 77 Antitrust L.J. 49, 70–71 & n.81 (2010) (merger simulation models estimate the price response of other products, instead of holding their prices fixed); *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 826–827 (S.D. Tex. 2025) (describing after a full evidentiary hearing the use of hold constant applied to an arithmetic approach to the HMT called "critical loss" analysis). Syngenta ignores that in addition to conducting an arithmetic-based, recapture rate analysis for certain AIs where data was available, Professor Hemphill also implemented an HMT by studying a series of natural experiments around generic entry and supply shocks.[396]

Corteva argues that Professor Hemphill's HMT fails to account for confounding factors by not performing "any regression that might isolate the cause of the alleged price effects." Cor. Br. at 53. No regression is necessary here because Professor Hemphill informs his HMT with the robust record evidence of direct competition between Corteva products and their generic equivalents.[397] *See Staples*, 190 F. Supp. 3d at 121–22 (approving expert's reliance on "record evidence" to "conclude[]" that the elimination of competition in proposed market would enable hypothetical monopolist to raise prices). That evidence reflects Corteva's business judgment as to the impact of generic entry (price drops); and thus provides the "further context" for the price movements Professor

---

[396] Ex. 1 §§ 3.2.3–3.2.5.

[397] Ex. 1 ¶ 37 & § 3.2.2; Ex. 235 ¶ 51.

120

Hemphill observes. *Sandoz, Inc. v. United Therapeutics, Corp.*, 2020 WL 697137, at * 10 (D.N.J. Feb. 4, 2020).

In any event, Corteva fails to identify the confounding factors that supposedly infect Professor Hemphill's analysis, including any of the purported "industry wide supply shocks" that he supposedly ignored. Cor. Br. at 55. Even if Corteva could identify evidence of confounding factors, such evidence would at most be fodder for cross-examination of Professor Hemphill at trial, not a basis for summary judgment. *Willowood*, 267 F. Supp. 3d at 655 ("[T]he failure[] to control for certain variables" is a "factual issue best addressed by cross examination and not by exclusion").

Corteva makes several AI-specific criticisms that highlight the fact-intensive nature of the parties' market definition disputes.

On acetochlor, Professor Hemphill observes an "aggressive" price increase during an acetochlor supply shock, with no corresponding increase in the price of metolachlor, and opines that indicates a separate market for acetochlor.[398] Corteva argues, citing its own expert report, that Professor Hemphill's approach implies a broader market of acetochlor and metolachlor. Cor. Br. at 54. This is a classic factual dispute. *See Caruso*, 403 F. Supp. 3d at 207. In fact, Corteva's economic expert admitted at his deposition that "the fact that the broader [acetochlor and metolachlor] market passes the HMT using Dr.

---

[398] Ex. 1 ¶ 197–98.

Hemphill's methodology doesn't mean that a narrower market [branded acetochlor and other acetochlor] can't also pass."[399]

Regarding rimsulfuron, Corteva simply injects factual disputes. It first argues that very limited generic entry occurred in 2011, and more robust generic entry occurred in 2016, but a price response did not manifest until 2019. Cor. Br. at 56. This does not mean, as Corteva suggests, that generic entry did not provoke a price response. Rather, widespread loyalty adherence tamped down Corteva's price response until 2019.[400] Corteva's speculation that a drop in demand for almonds caused this price response (Cor. Br. at 57), is contradicted by Corteva ordinary-course documents attributing the price response to generic entry.[401]

Regarding oxamyl, Corteva claims that "undisputed evidence" shows that products based on other AIs saw increasing sales when oxamyl was unavailable on the market. Cor. Br. at 58. But as Professor Hemphill explains, when "a product is not available . . . growers are faced with what amounts to an infinite price increase" so outside-market substitution is uninformative.[402] Indeed, demand for oxamyl products in particular persisted. As one customer explained: ███████████████████████████ ████████████████████████████████[403]

---

[399] Ex. 251 at 291:2–21.

[400] Ex. 235 ¶ 92.

[401] Ex. 265 at -111 ███████████████████████████████.

[402] Ex. 235 ¶ 101.

[403] Ex. 266 at -237.

### 4. The *Brown Shoe* Factors Confirm That Summary Judgment Is Inappropriate Here

*Brown Shoe* evidence provides further support for Plaintiffs' proposed product markets. "In *Brown Shoe*, the [Supreme] Court endorsed considering the following factors when defining a product market: 'industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" Doc. 160 at 28 (quoting *Brown Shoe*, 370 U.S. at 325). The list of Brown Shoe factors is "neither mandatory nor exhaustive." *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 607 (S.D.N.Y. 2025) (citation omitted). "That is, the presence of some, and absence of others, is not dispositive." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 620 (S.D.N.Y. 2018) (cleaned up).

There is ample evidence supporting the existence of single-AI markets with respect to at least three *Brown Shoe* factors: (1) "peculiar uses or characteristics" of the products; (2) "industry or public recognition," and (3) "distinct prices [and] sensitivity to price changes." Defendants' challenges to that evidence are either irrelevant or raise disputed issues of fact.[404]

---

[404] Corteva's claim that Plaintiffs cannot present evidence of *Brown Shoe* factors because Professor Hemphill did not provide analysis of each factor (Cor. Br. at 52) is wrong. Professor Hemphill of course analyzed a significant amount of regular course evidence (regardless of how he organized it) and in any event *Brown Shoe* analysis is a legal and factual test that this Court is more than qualified to assess.

### a. Industry and Public Recognition

This *Brown Shoe* factor asks whether there is "industry or public recognition of the market as a separate economic entity" or "distinct group" of products. *Tapestry*, 755 F. Supp. 3d at 430, 438 (cleaned up).

***Syngenta***. Syngenta's claim that "[t]here is no industry or public recognition of Plaintiffs' single-AI markets" (Syn. Br. at 69) is wrong. The structure of Defendants' loyalty programs, discussed in greater detail above, indicates that Defendants conceive of competition in the industry at the AI level. *See Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (noting the "well-established probative value of defendants' perceptions" with respect to *Brown Shoe*'s industry recognition factor); *Ansell Inc. v. Schmid Lab'ys, Inc.*, 757 F. Supp. 467, 472 (D.N.J.), *aff'd*, 941 F.2d 1200 (3d Cir. 1991).

Numerous ordinary course Syngenta documents also speak to competition in single-AI markets. Syngenta routinely tracks its market share in terms of AI (or "molecule") sales.[405] Syngenta also develops strategies, reflected in what it calls "post-patent strategy" documents[406] that highlight competition from generic equivalents as a

---

[405] *See supra* Section II.C.2. (collecting ordinary-course documents tracking market share by AI); Ex. 267 at slide 5.

[406] Ex. 54 at slide 2 ("Syngenta Azoxystrobin Strategy Summary"); Ex. 34 at CX2100-009 ("Mesotrione Post Patent strategy overview"); Ex. 24 at -657 ("S-MOC Post Patent Strategy Update").

124

particularly potent threat—including for mesotrione,[407] metolachlor,[408] and azoxystrobin.[409]

Syngenta's recognition of single-AI markets is echoed by generic competitors, who testified that when setting prices for their products they only reference other products that contain the same AIs.[410]

Syngenta's claim that its ordinary-course documents also show that it " considers rival brands using different AIs to be close substitutes" is again beside the point. Syn. Br. at 70–73. These documents merely suggest the existence of a broader market in addition to the single-AI markets that are also robustly acknowledged by Syngenta.[411]

*Corteva*. Corteva designs its loyalty programs around AI-specific share targets and monitors its market share on an AI-by-AI basis. As previously shown in Section II.C.2, Corteva measures its market shares for rimsulfuron, acetochlor, and oxamyl against those of generic suppliers, but omits suppliers of other (supposedly interchangeable) AIs. For instance, a DuPont presentation entitled "Matrix Market Defense" discusses its Matrix

---



[407] Ex. 34 at CX2100-027 █████████████████████

[408] Ex. 24 at -658 ████████████████████████████████████ ██████████ .

[409] Ex. 54 at slide 2 (████████████████████████████████ █████████████████████████

[410] ████████████████████████████████████; Ex. 92 (Vance (Albaugh)) at 80:15–81:16; 102:13–103:3; Ex. 225 (Schumacher (Helm)) at 69:4–70:23.

[411] *See supra* at Section II.C.2.

125

████████████████████████████████████████.[412] Similarly, a DuPont presentation

lauds the uniqueness of oxamyl as a nematicide ██████████████████████████

█████████████████████████████████████████████████████████████████[413]

Corteva's generic-focused approach to competition is also reflected in Corteva's practice

of monitoring generic AI imports, as well as its aptly named "generic defense

strategies."[414] Corteva's focus on AI-market share has been motivated in part by a

concern that distributors will "throw in the towel" on participation in Corteva's

exclusionary scheme once generics gain sufficient AI share.[415]

### b. Peculiar Characteristics and Uses

This *Brown Shoe* factor asks whether different products have physical or

functional differences that make them less likely to be interchangeable. 370 U.S. at 325.

Evidence that two products have different compositions or functionality can establish that

the products are properly considered to be in different markets. *See, e.g., Tapestry*, 755 F.

Supp. 3d at 418.

*Acetochlor* is typically used as an herbicide for corn—to kill weeds that reduce

corn crop yields. Corteva's claim that other AIs used for this purpose "have nearly

identical attributes as Corteva's acetochlor products" (Cor. Br. at 8) is belied by the clear

---

[412] Ex. 55 at CX1609-003.

[413] Ex. 18 at slide 21.

[414] *Supra* Section II.C.2.

[415] *See* Ex. 268 at -781.

record of acetochlor's unique and distinct characteristics. Distributors stock and recommend acetochlor products for purposes that differ from other herbicides, depending on soil and environmental conditions, among other factors.[416] ███████████████ Helena, Wilbur-Ellis, ████ and Tenkoz ██████████████████████████ ████████████████████████████████████████████████████ ███████████████.[417] As a Wilbur-Ellis witness explained, "just because something says it's the same mode of action does not mean it is—they work the same in a cropping environment."[418]

Corteva documents further demonstrate that acetochlor possesses distinct characteristics and uses. Presentations by Corteva and its predecessor DowDupont highlight acetochlor's "sharper weed control" compared to other herbicide AIs like metolachlor,[419] and that acetochlor is commonly combined with mesotrione (to complement and broaden the latter's spectrum of control) and may be marketed as offering benefits absent in metolachlor.[420]

*Azoxystrobin* is a broad-spectrum fungicide used on a variety of crops. Syngenta claims that azoxystrobin does not have distinctive features that are not found in other AIs.

---

[416] Ex. 2 (Bloodworth (Helena)) at 124:12–126:13.

[417] Ex. 2 (Bloodworth (Helena)) at 124:12–126:13; Ex. 3 (Fowler (CNI)) at 130:3–132:21; Ex. 4 (Cole (Tenkoz)) at 211:19–213:17.

[418] Ex. 5 at 220:12–222:15.

[419] Ex. 6 at slide 2; Ex. 7 at CX5087-049; Ex. 8 at slide 49.

[420] Ex. 9 at 50:25–52:11; Ex. 10 at 298:18–301:4.

Syn. Br. at 77. This is disputed. ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████.[421]

Syngenta marketing materials describe "some of the unique chemical properties of azoxystrobin," including its "xylem-mobile, systematic activity," which Syngenta terms the "X-Factor."[422] "Xylem mobile" means that the fungicide travels through the plant's xylem vessels, protecting parts of the plant that are not directly sprayed.[423] Syngenta's grower declarations also support the peculiar uses and characteristics of azoxystrobin, as compared to other fungicides.[424]

*Mesotrione* is a pre-emergent herbicide used on corn. Syngenta claims that mesotrione does not have characteristics that distinguish it from other corn herbicides. Syn. Br. at 77. This fact is disputed. ██████████████████████████████

████████████████████████████████████████████████.[425] These specific uses include the pre-emergent application of mesotrione to corn, a use for which the EPA

---

[421] Ex. 2 at 130:11–132:5; Ex. 3 at 137:20–139:14.

[422] Ex. 11 (Eichorn (Syngenta)) at 168:25–169:20; Ex. 12 at CX2617-030.

[423] Ex. 1 App. C, ¶ 2. Syngenta witness Andrew Fisher confirms that xylem mobility is a ██████████████████████████████████████████████ Ex. 13 at 87:5–88:8; *see also* Ex. 14 (Heiniger (Syngenta Expert)) at 182:22–185:4.

[424] Boyd Foster describes applying azoxystrobin products "at the time of planting" while using fungicides with different AIs "[f]ollowing planting." Syn. Br. Ex. 17 at ¶¶ 6–7.

[425] Ex. 2 (Bloodworth (Helena)) at 126:19–127:13; Ex. 3 (Fowler (CNI)) at 134:25–135:15.

128

concluded mesotrione "has no good alternatives."[426] Syngenta witness Kevin Gesse describes how mesotrione is "set apart" by its low application rate, its control of broadleaf weeds, and its bleaching effect that disrupts chlorophyll production.[427]

***Oxamyl*** is an insecticide and nematicide manufactured by Corteva. Corteva claims that there are a number of AIs that are substitutable for oxamyl. Cor. Br. at 14–18. This is disputed. Corteva representatives and marketing materials laud oxamyl's direct foliar applicability, in contrast to other kinds of nematicides that can only be applied at the root level or be mixed into soil.[428] Corteva documents also highlight oxamyl's relatively low impact on beneficial bacteria and fungi in soil, its superior crop safety, as well as its rapid action on a broad spectrum of insects and nematodes at various stages.[429] The EPA noted that oxamyl as a nematicide has no alternatives for certain applications, and oxamyl as an insecticide presents multiple niche benefits.[430]

Distributors carry oxamyl alongside other insecticides due to growers' AI-specific preferences based on prior experience, among other reasons.[431]

---

[426] Ex. 15 at page 2.

[427] Ex. 16 at 123:22–124:10. The specific uses of mesotrione explain why Syngenta markets two products—Acuron and Storen—that contain a premix of two separate HPPD inhibitors (mesotrione and bicyclopyrone). *Id.* at 129:23–130:8.

[428] *See* Ex. 17 at 55:6–12; Ex. 18 at slide 21.

[429] *See* Ex. 19 at -663; Ex. 18 at slide 21.

[430] Ex. 20 at -255, -266, -270.

[431] Ex. 21 (Baioni (Nutrien)) at 193:16–194:18.

***Rimsulfuron***, like acetochlor, is an herbicide but possesses unique and distinct characteristics as compared to other herbicides, even those designed for specialty products. Accordingly, Corteva's assertion that rimsulfuron is frequently substituted with other AIs that "share a number of the same characteristics" (Cor. Br. at 12–14) is disputed. Nutrien carries herbicides containing rimsulfuron as well as other AIs to cater to growers' AI-specific preferences based on performance, control, and previous experience.[432]

Corteva documents and witnesses equally emphasize the low use rate, lack of soil restrictions, multiple application methods and notably broad spectrum of weed control (among other factors) distinguishing rimsulfuron-based herbicides like Matrix SG from other herbicides.[433] Corteva witness Bob Leifker pointed out that rimsulfuron's low use rate means its products do not "take up a lot of storage space," as one of several advantages he could list "off the top of [his] head."[434]

***Metolachlor*** is a pre-emergent herbicide used on corn, soybeans, and other crops. Record evidence disputes Syngenta's claim that metolachlor has no distinctive features that separate it from other AIs used for similar purposes. Distributors carry metolachlor together with other herbicides because of the distinct benefits of metolachlor, a list of distinctions so extensive that one distributor witness remarked "[w]e'll be here all day" if

---

[432] Ex. 21 at 190:8–192:20.

[433] Ex 22 at -440–42, -447–48, -450; Ex. 23 at slide 8; Ex. 17 at 47:24–49:21.

[434] Ex. 17 at 47:24–49:21.

130

he were to describe all the reasons to carry metolachlor.[435] Syngenta's "SMOC Post-Patent Strategy Update" document confirms that "S-Metolachlor (S-MOC) remains the performance standard of residual weed control of major crops."[436]

### c. Distinct Prices and Sensitivity to Price Changes

*Syngenta*. Syngenta argues that the products containing Syngenta AIs do not have distinct prices. Syn. Br. at 80. This is incorrect. Syngenta ████████████████████ ████████████████████████████████████████████████████ ███████████████████████████[437] When evaluating its AI-specific post-patent strategies, Syngenta ███████████████████████████████████████.[438] For each AI, ██████████████████████████████████████████████████ ██████████.[439]

Syngenta argues that "the products at the top of Syngenta's brand ladder" are "closer in price to the prices of competing brands with different AIs." Syn. Br. at 80. This

---

[435] Ex. 2 (Bloodworth (Helena)) at 124:12–126:13; *see also* Ex. 3 at 130:11–132:21 (████████████████████████████████████████████).

[436] Ex. 24 at -658.

[437] Ex. 16 at 141:4–12; Ex. 270 at slide 3 ████████████████████████████ ██████████████).

[438] Ex. 34 at CX2100-017 ██████████████████████████████████); Ex. 24 at – 661 (██████████████████████████████████████████ *see also* Ex. 271 at CX2919-009 ██████████████████████████████ ██████.

[439] *See* Ex. 257 at slide 2 ████████████████████████████ ███████████████████; Ex. 272 at slide 13 (██████████████████ ██████████ Ex. 273 at slide 10 (████████████████████████ ██████████████.

131

Case 1:22-cv-00828-TDS-JEP   Document 461   Filed 04/27/26   Page 146 of 203

argument, based on an analysis conducted by Mr. Orszag, at most creates an issue of fact. Mr. Orszag's analysis does not control for whether the comparison products are higher priced premixes (containing multiple AIs) or lower priced straight goods (containing one AI).[440] Naturally, products that contain multiple AIs will be priced higher than products that contain just one AI. When Professor Hemphill corrects this analysis by comparing similar product chemistries, Syngenta's prices are similar to—while still higher than—those of their generic counterparts.[441]

*Corteva*. Corteva's assertion that its AIs are not especially sensitive to price changes (Cor. Br. at 52) also is incorrect. As previously explained in Section II.C.2., Corteva's internal documents and witnesses indicate that prices for Corteva's AIs change in response to generic entry and pricing. For instance, ███████████████████ ██████████████████████████████████████████████████ ███████████████████████[442] Later documents show that Corteva followed through on ██████ price reductions ████████████████[443] and Corteva witness Doug Van Vooren explained that ███████, "just like every other product that went off patent that [he] saw in [his] 42 years," experienced an unavoidable reduction in price after generic entry.[444] Corteva similarly discussed adjusting prices for oxamyl-based

---

[440] Ex. 250 at 176:9–177:11; Ex. 235 at ¶ 84.

[441] Ex. 235 at ¶¶ 85–87.

[442] Ex. 55 at CX1609-003, -016, -022.

[443] Ex. 265 at –111.

[444] Ex. 40 at 186:19–187:22.

132

products to "be ahead of" generic oxamyl offerings,[445] and Corteva compared its Vydate-CLV pricing against the price of generic oxamyl.[446] In acetochlor's case, Professor Hemphill's analysis and Corteva's internal documents both show that, in response to ███ ████████████████████████ that "significantly and adversely" affected acetochlor supply,[447] the price of Corteva-branded acetochlor products sharply rose where those of other corn herbicides like metolachlor did not.[448] The foregoing evidence shows that price sensitivity weighs in favor of Plaintiffs' AI-specific markets for rimsulfuron, oxamyl, and acetochlor.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.[449]

### d. Other *Brown Shoe* Factors

Defendants' emphasis on the remaining *Brown Shoe* factors carries no weight. As Defendants' own cited cases show, to define a product market, Plaintiffs need not adduce evidence corresponding to every factor. *See, e.g.*, *Tempur Sealy*, 768 F. Supp. 3d at 787; *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 45 (D.D.C. 2024). Rather, the focus is

---

[445] Ex. 274 at –332.

[446] Ex. 275 at 123:5–15.

[447] Ex. 276 at –516.

[448] Ex. 1 § 3.2.5 & Fig. 17.

[449] *See* ████████████████ .

on the factors relevant to the "commercial realties of the industry." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1048–51 (5th Cir. 2023) (cleaned up).

Plaintiffs' *Brown Shoe* evidence is sufficient to demonstrate a dispute of material fact as to market definition, independent of the HMT. *E.g., Sugar Corp.*, 73 F.4th at 206 (focusing on *Brown Shoe* evidence for market definition, rather than HMT); *Illumina,* 1048–50 (relying on *Brown Shoe* factors, without reference to the HMT, to determine the relevant market); *Geneva*, 386 F.3d at 496 (same).

### 5. Defendants' Switching Arguments At Most Raise Disputed Issues of Fact That Must Be Tested At Trial

Defendants argue that farmer substitution patterns defeat the AI-based markets. Cor. Br. at 43; Syn. Br. at 65. But as described above in Section IV.D.1., simply pointing to evidence of substitution to products outside the relevant market—whether agronomic, grower declarations, or otherwise—does not establish cross-elasticity of demand. *See In re Zetia*, 587 F. Supp. 3d at 364 ("[T]herapeutic substitutability cannot replace the showing of cross-price elasticity key to defining the relevant product market."). Even Syngenta's economic expert admits that a market can be properly defined where customers switch away from products within the market to products outside the relevant market.[450]

---

[450] Ex. 250 (Orszag (Syngenta Expert)) at 58:19–59:2. Syngenta's economic expert did not himself perform any hypothetical monopolist test, nor does he opine that any market satisfies the hypothetical monopolist test. *Id.* at 90:10–91:10.

134

The switching evidence cited by Defendants cannot reliably define a market currently distorted by loyalty programs. Crucially, Defendants draw their switching evidence from a world where loyalty programs have suppressed demand for, and availability of, generic alternatives. As detailed below, there is ample evidence of substantial foreclosure of generic suppliers and generic products are in limited supply at traditional channel outlets, including retail outlets.[451] Indeed, Syngenta post-patent strategy documents ██████████████████████████████████ ███████████[452] Further, the traditional channel, including retailers, influences grower selection of crop protection products, such as through recommendations to growers.[453] Even Mr. Orszag admits that the results of switching analyses can be impacted if certain products are "not in the store" as "if the supply is not there for any product, that may influence [the growers'] decision."[454]

Defendants also do not appropriately account for the effect of the *Cellophane Fallacy*, which is the logical and legal error arising from observing "substitution" away from a monopolist's already-elevated prices and concluding that additional products or

---

[451] *See infra* Section IV.E.1.; Ex. 1 § 4.7.3. (addressing substantial foreclosure).

[452] Ex. 84 at slide 12.

[453] Ex. 250 (Orszag (Syngenta Expert)) at 209:5–210:3; Ex. 81 at slide 3 ████████ ███████████████████████████████████████████████); Ex. 50 (Weikel (Syngenta)) at 38:16–40:16 ███████████████████████████████████████████); *see also* Syn. Br. Ex. 37 at ¶ 3 ("We also look to our Nutrien salesperson for recommendations and advice.").

[454] Ex. 250 at 138:4–139:6.

firms belong in the relevant market. *See Eastman Kodak*, 504 U.S. at 471 ("[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power.") (cleaned up). This is because "[a]t a high enough price, even poor substitutes look good to the consumer." *Aggrenox*, 199 F. Supp. 3d at 667 (cleaned up).

Corteva argues that the Court should "reject" Professor Hemphill's opinion that the *Cellophane* Fallacy calls into question Defendants' switching evidence. Cor. Br. at 48. But the Court cannot simply ignore this fact-dependent analysis for purposes of summary judgment. Corteva cites *FTC v. Meta*, but in that case the court held the fallacy was not "a risk" only after taking evidence during a 25-day trial, 2025 WL 3458822, at *27 (D.D.C. Dec. 2, 2025), and after having held that the fallacy and related disputes regarding the defendant's empirical studies precluded summary judgment. *See FTC v. Meta*, 775 F. Supp. 3d at 47. *Cellophane* Fallacy risk is especially high when the monopolization conduct actually results in foreclosure of substitute products and practically limits buyer's choices. This explains why growers may substitute to AIs outside the relevant market rather than to generic AIs within it. *See* Cor. Br. at 43.

*Purported Expert Switching Studies*. Corteva cites to analyses from its expert Nicholas Hill based on farmer-level purchasing data. Cor. Br. at 43–46. Dr. Hill's analyses purport to show that, given current prices, inter-AI substitution occurs "in some cases more than" substitution to generic equivalents. Cor. Br. at 43. As Professor

136

Hemphill explains, these switching analyses are fatally flawed,[455] and yet again these expert disputes raise factual issues that cannot be resolved at summary judgment.

First, Dr. Hill's switching analyses are irrelevant to market definition because he does not address whether there is sufficient substitution such that a hypothetical monopolist in Plaintiffs' single-AI markets would be substantially constrained from increasing prices.[456] Dr. Hill's substitution studies do not measure economic substitution because they are unrelated to a change in price.[457]

Dr. Hill also did nothing to control for whether his switches occurred as part of a resistance management program.[458] Indeed, Mr. Orszag recognizes that growers may switch AIs to address resistance management, and that switching for resistance management is not economic substitution.[459] Although Corteva argues that Professor Hemphill should have examined whether the switches were for resistance management (Cor. Br. at 49–50), it is Corteva, not Professor Hemphill, who advances this flawed study.

Dr. Hill also overstates inter-AI switching by failing to account for switches between same-AI Corteva products and instead only counting switches from Corteva to

---

[455] *See* Ex. 235 § 3.1.4.

[456] Ex. 235 ¶ 41.

[457] Ex. 235 ¶¶ 42–43; Ex. 251 at 235:6–10 ("Q. Okay. And so in assessing these stoppages or reductions, you did not attempt to measure or assess which shorten in response to a price increase; is that right? A. Correct.").

[458] Ex. 235 ¶¶ 125–26, 134; Ex. 251 (Hill (Corteva Expert)) at 240:1–4.

[459] Ex. 250 at 116:19–117:15.

137

non-Corteva products.[460] Professor Hemphill's correction of this defect found markedly lower levels of switching to a different AI.[461]

*Syngenta's grower declarations*.[462] Syngenta argues, based on declarations obtained from a handful of growers, that growers choose crop protection products based on "functionality" and not the "presence of the AI." Syn. Br. at 65–66. Syngenta does not even attempt to establish that these growers are representative of growers generally. Declarations from a limited number of hand-picked growers not subject to cross examination cannot overcome Plaintiffs' economic and practical indicia evidence as to market definition described above.

### E. Defendants' Programs Have Probable Anticompetitive Effects

To prove an exclusive deal's anticompetitive effects, a plaintiff need not provide "definitive proof" or "clear evidence," but instead need only show that anticompetitive harm is the arrangement's "probable effect." *McWane*, 783 F.3d at 836 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961)). Such harm can be established "indirectly" by showing substantial foreclosure of rivals—a "proxy for anticompetitive harm," 783 F.3d at 835, 837—or "direct evidence" such as "reduced output, increased prices, or decreased quality." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).

---

[460] Ex. 235 ¶ 132; Ex. 251 (Hill (Corteva Expert)) at 255:18–25.

[461] Ex. 235 ¶ 132 & Fig. 6.

[462] The MDL Plaintiffs have moved to exclude these declarations as untimely disclosed when used in the class certification motions in that case. If they are excluded there they should be excluded here for the same reasons.

At the pleading stage, the Court identified several allegations supporting competitive harm, including "substantial[] foreclos[ure]" of generic manufacturers "from the most efficient channel of distribution," "Defendants' internal analyses acknowledg[ing] that the loyalty programs lead to supracompetitive prices for end-consumers," and "that the loyalty programs have caused generics to exit or never enter the market." Doc. 160 at 66–67. Plaintiffs have substantiated these allegations with evidence, including: (1) Professor Hemphill's analysis, supported by record evidence, showing that Defendants' loyalty programs cause exclusion of lower-priced generic rivals, depriving them of scale and impeding their ability to compete, resulting in higher prices and reduced innovation; (2) Defendants' ordinary course documents showing that the purpose and effect of their loyalty programs is to delay and minimize generic manufacturers' access to the distribution channel, and artificially inflate prices; and (3) testimony from generic manufacturers that Defendants' loyalty programs have blocked their access to the traditional distribution channel.

Defendants argue that there has been some generic entry, and some reduction in prices, so there cannot be residual harm to competition. This is wrong on the law and, at most, creates disputes of material fact. Plaintiffs have presented more than enough evidence for a reasonable factfinder to conclude that Defendants' conduct results in "probable" anticompetitive effects. *See, e.g.*, *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 298 (S.D.N.Y. 2014) (denying summary judgment because "[p]laintiffs have carried their initial burden of showing an actual impact of competition" by

139

presenting expert analysis showing "that consumers pay higher prices . . . and have less choice" than they would absent defendants' anticompetitive conduct); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 504 (S.D.N.Y. 2005) (denying summary judgment where "[plaintiff's] expert has provided evidence to support the contention that competition was harmed"). Defendants' arguments to the contrary ignore the record and misunderstand the requirements for proving anticompetitive harm.

### 1. Defendants' Loyalty Programs Have Resulted in Substantial Foreclosure

Summary judgment is not appropriate because Plaintiffs have adduced robust evidence that Defendants' loyalty schemes substantially foreclose generic rivals from the market. In its opinion denying Defendants' motion to dismiss, the Court found Plaintiffs' allegations that Defendants foreclosed generics from "approximately 70% or more of each applicable market" demonstrated substantial foreclosure. Doc. 160 at 65. The Court recognized that Plaintiffs need not show "total foreclosure" or "complete exclusivity" with each customer. Doc. 160 at 62–63 (citing *ZF Meritor*, 696 F.3d at 283); *see also Dentsply*, 399 F.3d at 191 (total foreclosure is unnecessary, as "exclusive dealing contracts may slow the rival's expansion . . . Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth."). Plaintiffs have now substantiated their allegations with evidence.

### a. Defendants' Loyalty Programs Cause Foreclosure Far Above Thresholds Required by Case Law

Defendants do not contest that they have, year-on-year, agreed to loyalty programs with the largest distributors, who collectively control over 80% of crop protection sales in

140

the United States.[463] It is further undisputed that Defendants' loyalty programs set high loyalty-compliance thresholds for the six AIs.[464] The record contains ample evidence that due to high loyalty thresholds, distributors carefully track loyalty compliance and limit or entirely forgo purchases of generic products.[465] As a result, it is unsurprising that Defendants' loyalty programs foreclose generic competitors from the market at high levels[466]:



| Program Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| **Syngenta** Azoxystrobin Mesotrione Metolachlor | | | | | | |
| **Corteva** Rimsulfuron Oxamyl Acetochlor | | | | | | |

FIGURE 28: FORECLOSURE SHARES

Foreclosure shares were greater than ▮ percent for all six products in 2023.[467] Professor Hemphill calculated this foreclosure level from manufacturer invoice data for each of the

---

[463] *See supra* Section II.D.1.c.; Cor. Br. at 23; Ex. 250 (Orszag (Syngenta Expert)) at 205:1–20.

[464] *See* Ex. 1 ¶¶ 300, 312 (▮▮▮ rimsulfuron: 85–95%; oxamyl: 70% in 2018, 90% in all later years; acetochlor: 95–97%).

[465] *See supra* Section II.F.

[466] Ex. 1 Fig. 28.

[467] *See supra* Section II.F.

141

AIs (branded and generic). The foreclosure shares reflect sales of Defendants' products containing the relevant AI that are made through loyal distributors, as well products made by other manufacturers who source the relevant AI from the Defendant, divided by the quantity of AI contained in all finished products containing each AI.[468] Beyond disputing the underlying market definition, Defendants' motions do not challenge Plaintiffs' foreclosure calculations.[469]

As this Court has already held, these percentages are more than enough to be considered "substantial foreclosure" under applicable caselaw. Doc. 160 at 37; *Microsoft*, 253 F.3d at 70 ("40% or 50%" foreclosure sufficient under Section 1; less under Section 2); *McWane*, 783 F.3d at 837; *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1294 (4th Cir. 1987) (24% under Clayton Act Section 3).

Defendants' loyalty programs foreclose over 70 percent of the *total* market to generic rivals and likely foreclose a much higher percentage of traditional distributors. The anticompetitive effects of foreclosing the most efficient routes of distribution are well-recognized by case law. *See Dentsply*, 399 F.3d at 193; *ZF Meritor*, 696 F.3d at 283–84 (incumbent supplier's agreements limiting four major distributors' purchases

---

[468] Ex. 1 § 4.7.3 & Fig. 28 notes. Foreclosure shares for acetochlor include Bayer sales made pursuant to its acetochlor partnership with Corteva, which counted towards compliance with Corteva's loyalty program, and rimsulfuron foreclosure shares are focused on products that are labeled for specialty crops. *Id.*

[469] Although Defendants' experts contest plaintiffs' foreclosure calculations to varying degrees, those expert disputes are issues of material fact and must be resolved in favor of plaintiffs at this stage. *See Caruso,* 403 F. Supp. 3d at 207; *Loestrin*, 433 F. Supp. 3d at 302.

from new suppliers to 10% of sales substantially foreclosed competitors). As the record shows, the traditional distribution channel (composed of the major distributors locked up by Defendants' loyalty programs) is the most efficient route for crop protection manufacturers to access the market.[470] Thus, Dr. Hemphill's foreclosure calculations likely understate the true foreclosure effect of Defendants' loyalty programs, as generic manufacturers are forced to make a portion of their sales through higher cost, less efficient means. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015) ("For there to be an antitrust violation, generics need not be barred from all means of distribution if they are barred from the cost-efficient ones."); *Dentsply*, 399 F.3d at 193. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[471]

And as generic manufacturer Albaugh explained, it would not be able to "stay in business just selling through the alternative distribution channel."[472]

### b. Defendants Cannot Rebut Plaintiffs' *Prima Facie* Showing of Substantial Foreclosure

The fact that Defendants' loyalty programs result in ████ foreclosure is *prima facie* evidence of competitive harm. *See Microsoft*, 253 F.3d at 70; *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975). And the record contains

---

[470] *See supra* Section II.D.1.

[471] Ex. 90 at 51:17–52:6; *see also supra* Section II.D.1.

[472] Ex. 92 at 148:14–149:19.

ample additional evidence that Defendants' loyalty programs substantially foreclose generic rivals. Defendants nonetheless argue that, despite these high foreclosure shares, their loyalty programs do not have the probable effect of foreclosing rivals. Their arguments fall flat, and at most constitute disputed issues of fact.

### i. Limited Evidence of Entry Does Not Rebut a Finding of Substantial Foreclosure

Defendants' assertions that less than complete exclusivity and limited generic entry undercut Plaintiffs' foreclosure calculation (Cor. Br. at 84–85; Syn. Br. at 93–95) at most raises factual disputes for trial and alternatively are irrelevant as a matter of law.[473] As Corteva concedes, "the question . . . is not the number of entrants but the level of competitive pressure in the market." Cor. Br. at 84.[474] The fact that these 21 "generic suppliers" combined are able to capture, at most, "a quarter of each of [the] alleged single-AI markets" (Syn. Br. at 2) shows that individually and collectively these firms have not made inroads sufficient to erode Syngenta's monopolies. *See Dentsply*, 399 F.3d at 184 (finding anticompetitive foreclosure even where thirteen smaller rivals remained in

---

[473] Syngenta's observation that "there are 21 generic suppliers selling finished products containing one of more of the Syngenta AIs" (Syn. Br. at 10) is misleading because it includes distributor private-label brands, including products such as Loveland sourced from Syngenta itself. *See, e.g.* Syn. Br. Ex. 11; Ex. 278 (Baioni (Nutrien)) at 420:25–422:2.

[474] Corteva's suggestion that the threat of (unidentified) "new entrants" creates a competitive threat sufficient to neutralize Corteva's market power is unsupported. Cor. Br. at 84–85. The evidence shows that Corteva has been able to maintain high prices and exclude rivals consistently with the help of its loyalty programs. *See supra* Sections II.F.–G.

the market); *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1109868, at *11 (D. Del. Mar. 8, 2019) (substantial foreclosure can occur even where "a substantial number of rivals" with "significant market share" are not foreclosed).

In 2023 for Syngenta: (1) for azoxystrobin, no single generic competitor had more than ▮ market share by volume, with ▮ of the ▮ generic competitors having ▮ or less market share; (2) for mesotrione, no single generic competitor had more than ▮ market share, with ▮ of the ▮ generic competitors having ▮ or less market share; and (3) for metolachlor, no single generic competitor had more than ▮ market share, with all other generic competitors having ▮ or less market share.[475]

Corteva's competitors have fared no better. Based on the data credited by Corteva's expert, for 2024: (1) for acetochlor, all three generic manufacturers combined held less than ▮% market share by volume; (2) for rimsulfuron, all three generic competitors combined held approximately ▮% market share in the specialty straight good market;[476] and (3) for oxamyl,[477] two generic manufacturers combined held ▮% market

---

[475] Ex. 279 (Orszag Reb. Rep. Backup Materials, "Hemphill Generic and Branded Volumes by AI and Year" excerpts).

[476] Corteva mischaracterizes testimony from Dr. Hemphill, claiming that he describes generic rimsulfuron entry as "meaningful." Cor. Br. at 84. In fact, Dr. Hemphill describes generic rimsulfuron entry as "limited," which provoked a "meaningful" price response from Corteva. Ex. 280 at 444:10–22. And, even then, rimsulfuron prices remain elevated compared to the but-for world without loyalty programs. Ex. 280 at 451:9–17.

[477] Dr. Snyder provided oxamyl data from 2023.

145

share.[478] And despite Corteva's arguments to the contrary (Cor. Br. at 84–85), the evidence shows that eliminating loyalty programs would allow *both* more generic entry, and the growth of existing generic rivals into stronger competitors.[479]

Finally, Syngenta claims that generic suppliers gained market share in each AI market in various time period between 2018 and 2023. Syn. Br. at 58. But as its employees testified, Syngenta experienced supply shortages in that period.[480] As Syngenta admits, after these cherry-picked time periods, generic market shares decreased. Syn. Br. at 58. Regardless, even if competitors are able to "enter and grow," it does not make exclusive dealing harmless, particularly where the record shows (as it does here) that growth is "meaningfully (and deliberately) slowed and [competitors'] development into a rival that could constrain [the defendant's] monopoly power [is] stunted." *McWane,* 783 F.3d at 840.[481] Generic manufacturers' minimal success in the United States contrasts with other foreign jurisdictions where Defendants do not use loyalty

---

[478] Ex. 281 (Snyder Reb. Rep. backup: "Acetochlor Charts" excerpts; "Oxamyl Charts" excerpts; "Rimsulfuron Charts" excerpts).

[479] *See supra* Sections II.F., IV.C.3.a.

[480] Ex. 39 at 106:5–18 (supply constraints in 2020 and 2021); Ex. 11 at 122:10–21 (supply constraints in 2022 and 2023); Ex. 50 at 228:9–229:18 (supply constraints in 2022 and 2023).

[481] *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) does not support Syngenta's argument that modest generic entry and expansion "preclude[s] a finding" that its loyalty programs are an entry barrier. Syn. Br. at 94. *Omega* involved a much lower foreclosure share—24% to 38% versus ▮▮▮ or more here. 127 F.3d at 1162. Additionally, in *Omega* "undisputed evidence" showed that direct sales to consumers was a viable path to market in that case, whereas here traditional distribution is necessary. 127 F.3d at 1163; *supra* Section II.D.1.

146

programs and where generics achieve greater market penetration.[482] For example,

Syngenta competes █████████████████████████████████████████

███████████████████████ consequently, Syngenta's 2019 metolachlor share vs.

generics is lower in █████████████ and ███████████ compared to the United States

(████).[483] Generics describe greater success abroad and attribute it to the absence of

loyalty programs.[484]

### ii. Generic Manufacturers' Ability to Make Limited Sales Through the Traditional Distribution Channel Does Not Rebut Substantial Foreclosure

Syngenta implies that generic manufacturers have not been foreclosed because,

although generic sales overall are quite small, a "large percentage of generic sales run

through the traditional channel." Syn. Br. at 16. This syllogism is faulty. The better

inference is that although the traditional channel is largely foreclosed, the alternatives are

simply inadequate and generics are forced to sell the limited amounts allowed through the

traditional channel.

Syngenta also claims that because "distributors do not always satisfy Key AI

thresholds for . . . Syngenta AIs," generics can access traditional distribution. Syn. Br. at

96–97. But the record shows that major distributors almost always comply with

---

[482] *See supra* Section II.F.

[483] Ex. 24 at -662. In 2019, almost ████████████████ generic metolachlor went to ███████ as went to the United States. Ex. 139 (Tudor (AG)) at 145:19–146:8.

[484] Ex. 225 (Schumacher (Helm)) at 187:14–189:6; ███████████████████████ ███ .

147

Syngenta's loyalty thresholds.[485] Through 2023, traditional distributors complied with azoxystrobin thresholds ██ percent of the time, mesotrione thresholds almost ██ percent of the time, and metolachlor thresholds over █ percent of the time.[486]

Syngenta also claims decisions by Pinnacle and (after acquiring Pinnacle) Simplot to not participate in Key AI shows that its loyalty program does not exclude generics. Syn. Br. at 96–97. But the significant foreclosure shares Professor Hemphill calculates account for Simplot's participation patterns, and prove that the programs still foreclose a substantial portion of the market. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████[487] Defendants' arguments to the contrary at most raise disputed issues of material fact.

### iii. Defendants' Other Attempts to Portray Their Loyalty Programs as Non-Exclusionary Fail

Defendants claim that their loyalty programs are incapable of foreclosing rivals. *See* Syn. Br. at 42–46, 92–95; Cor. Br. at 80, 85–86. Yet again, these arguments misstate the applicable caselaw and are at most factual disputes that cannot support summary

---

[485] Ex. 1 Fig. 26.

[486] Ex. 1 Fig. 26. Syngenta's speculation that generics could convince distributors to forego Syngenta's loyalty programs in exchange for "modest consideration" is unsupported. Syn. Br. at 96.

[487] Ex. 160 at 102:4–102:11 ████████████████████████████ ████████████████████████████ *see also* Ex. 235 ¶ 278.

148

judgment. As recognized by this Court, contracts without express exclusivity terms can nonetheless be *de facto* exclusive where their "practical effect" is to prevent buyers from purchasing competitors' products. Doc. 160 at 61 (citing *Tampa Electric*, 365 U.S. at 326); *McWane,* 783 F.3d at 833–35 (holding that exclusive dealing need not involve a "binding contract" where the "practical effect" of the restraint forecloses distributors from switching to rival suppliers); *ZF Meritor*, 696 F.3d at 270. Contracts thus may result in anticompetitive harm even when, by their terms, they are short-term or easily terminable. *Dentsply*, 399 F.3d at 193; *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.,* 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999). Defendants' programs have been in place for years and distributors have overwhelmingly complied for years—the practical effect of which has been exclusion of generics, supracompetitive prices, and reduced innovation.[488] Defendants' formalistic arguments ignore this reality.

Syngenta cites *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 995–97 (9th Cir. 2010), for the proposition that market-share discounts cannot constitute unlawful exclusive dealing. Syn. Br. at 44–45. By its own terms, however, *Allied* was narrowly decided "on the facts of [that] case," which (unlike here) included "no evidence" that rivals lacked effective alternative distribution channels. *Allied*, 592 F.3d at 997.[489] And the same court made clear later that "rebates conditioned on . . . purchase of a specified quantity or market share . . . may be understood as 'de

---

[488] *See supra* Sections II.F.–G.

[489] *See supra* Section II.D.1.

facto' exclusive dealing contracts." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016).[490]

Syngenta's reliance (Syn. Br. at 92) on *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 829 (M.D.N.C. 2000) for the proposition that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern" is misplaced. In *Bepco*, the court merely recognized that exclusive distributorships do not harm the ultimate consumers if "sufficient channels are available for all manufacturers to distribute their product." 106 F. Supp. 2d at 829. As the Fourth Circuit later recognized in *Kolon Industries Inc. v. E.I. DuPont de Nemours & Co.*, the foreclosure of "access to distribution networks" can actually result in *greater* foreclosure when the "distribution networks [are] shown to be necessary to reach many end customers." 748 F.3d 160, 176 (4th Cir. 2014); *see also Dentsply*, 399 F.3d at 193 (finding foreclosure where non-foreclosed methods of distribution were not an "effective means of competition"); *Google Search*, 747 F. Supp. 3d at 156 (finding foreclosure where defendant foreclosed "most efficient" access to the market). Here, material facts show that Syngenta's loyalty agreements foreclose the most efficient channels of

---

[490] The *Allied* court also distinguished *Tampa Electric* because it was a Section 3 case. 592 F.3d at n.1. Here, Plaintiffs have pled a cause of action under Clayton Act Section 3, and moreover this Court has correctly recognized that *de facto* exclusive dealing theories are viable under all four statutes at issue if the "practical effect" is to substantially lessen competition. Doc. 160 at 36–37.

distribution, and that ultimate consumers were harmed in the form of higher prices and decreased choice.[491]

Corteva argues that its contracts cannot foreclose generic rivals because violations of its program result in distributors merely losing a "discount" and customers are "free to switch to a different product." Cor. Br. at 75, 85. But the record evidence shows that the consequences for missing Corteva's loyalty thresholds are far greater than simply foregoing "discounts," including losing loyalty payments for other bundled products, "clawing back" of payments earned in prior years, losing supply allocations, and losing access to private-label products.[492]

These elements of Corteva's program also render it nothing like the program described in *Eisai*, 821 F.3d at 404–407.[493] In *Eisai* (unlike here): (1) customers would not have to "repay . . . contractual savings,"[494] 821 F.3d at 406; (2) customers "did not

---

[491] *See supra* Sections II.D.1., II.F.–G.

[492] *See* Section II.D.2.

[493] Corteva's reliance (Cor. Br. at 85) on *Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.*, 2012 WL 1155218 (E.D. Va. Apr. 5, 2012) fares no better. As recognized by the Fourth Circuit, the plaintiff in *Kolon* failed entirely to show the "volume of commerce" foreclosed by the defendant's agreements, which covered only twenty-one of approximately 1,000 potential customers. 748 F.3d at 176. Not so here. *See supra* Section II.F. Similarly, the Fourth Circuit emphasized that *Kolon* involved foreclosure of "customers" as opposed to, as here, "distribution networks [that are] necessary to reach many end-customers." 748 F.3d at 176–77; *see also* Section II.D.1.

[494] Corteva's programs require effective repayment of contractual savings in two ways. First, Corteva loyalty payments are retroactive and paid out at the end of the year, *supra* Section II.D.2.b., meaning that distributors stand to lose payments on twelve months of purchases by missing a single loyalty threshold, and second, Corteva's deferred payment

151

risk penalties or supply shortages" for violating *Eisai*'s discount program, 821 F.3d at 406–407; and (3) *Eisai's* program did not "condition discounts on purchases across various lines." 821 F.3d at 405. Thus, Corteva's program is more akin to *ZF Meritor*, where customers that "did not meet . . . market-share penetration target[s] for one year . . . could [be required to repay] all contractual savings," and believed that supply disruptions may be a consequence of non-compliance with loyalty programs. *Id.* at 265, 282–83. And of course, in *Eisai*, program characteristics were not central to the holding because there was neither evidence of substantial foreclosure nor "concrete examples of anticompetitive consequences." 821 F.3d at 404, 406. Both substantial foreclosure and anticompetitive consequences are present here.[495]

Corteva further faults Plaintiffs for not specifying what "the competitive level of entry or generic competition should be." Cor. Br. at 86. But it is not Plaintiffs' burden to "reconstruct" the but-for world with precision. *See Google Search*, 747 F. Supp. 3d at 153 ("[N]either plaintiffs nor the court can confidently reconstruct a world absent the defendant's exclusionary conduct."). Regardless, there is substantial evidence in the

---

structure claws back already earned rebates from prior years absent distributor loyalty over a three-year period. *See supra* Section II.D.2.d.

[495] *See supra* Sections II.F., II.G.

record that generics achieve greater market penetration when an AI is removed from loyalty.[496]

Finally, Corteva asserts that loyalty programs are used by other basic manufacturers. Cor. Br. at 81. But, as confirmed by a Bayer witness, not all basic manufacturers use loyalty programs.[497] Regardless, the fact that other basic manufacturers utilize loyalty programs does not insulate Corteva from liability. *Standard Oil Co. of California v. United States*, 337 U.S. 293, 295, 315 (1949) (upholding liability for exclusive dealing under Clayton Act Section 3 even though defendant's "competitors employ similar exclusive dealing arrangements"); *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 393 (1953) (finding liability for exclusive dealing under FTC Act Section 5 where defendant and three competitors "had exclusive arrangements [covering] approximately three-fourths" of the market).

### iv. Defendants' Loyalty Programs Result in Long-Term Generic Foreclosure

Corteva claims that its contracts are lawful because they "are of, maximum, one year duration." Cor. Br. at 78.[498] As a factual matter, Corteva's loyalty programs are

---

[496] Ex. 87 (Menagh (Source Dynamics)) at 146:13–147:25 (could better sell paraquat after it was removed from loyalty); Ex. 95 (Schumacher (Helm)) at 62:13–62:16 (paraquat sales doubled in 2 years after Syngenta dropped loyalty); *see also supra* Section II.F.

[497] Ex. 282 at 449:9–14.

[498] Corteva's reliance (Cor. Br. at 79) on the "presumptively lawful" language from *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) is misplaced. The *Roland* contracts were technically terminable within 90 days, and the allegedly excluded competitor was already a "major factor" in the market. 749 F.2d at 394–95.

153

████████████████████████████████████████████████████

███████████████████████████████████████████.[499] As distributor

and Corteva witnesses have testified, this ██████ payment mechanism is designed to

keep distributors loyal to Corteva's products over the long term.[500] Corteva's claims to

the contrary at most create a dispute of fact.

As a legal matter, this Court has rejected Corteva's argument that "formally

voluntary" short-term agreements cannot amount to unlawful *de facto* exclusivity. Doc.

160 at 61. Even nominally short-term or "at-will" arrangements can accomplish the

anticompetitive effects of long-term exclusive contracts. *Dentsply*, 399 F.3d at 193. As

discussed, courts consider the "practical effect," rather than "merely [the] form" of the

contract in determining whether an exclusive arrangement is truly short term. *Minn.*

*Mining,* 35 F. Supp. 2d at 1144. Here, the consistent participation of nearly all major

distributors in Defendants' programs year after year confirms the persistent long-term

nature of the loyalty programs. Between 2016 and 2023, the five largest national

distributors (Nutrien, Tenkoz, WinField, Helena, and Simplot) complied with loyalty

thresholds for azoxystrobin on ██████ opportunities, for mesotrione on ██████

---

Regardless, modern courts have rejected the "formalistic" analysis of *Roland* and
consider the "market realities" of exclusive dealing arrangements. *See McWane*, 783 F.3d
at 833–34 (*citing Tampa Electric*, 365 U.S. at 326–28, and rejecting *Roland* rationale);
*Dentsply*, 399 F.3d at 193; *ZF Meritor*, 696 F.3d at 270; *Minn. Mining,* 35 F. Supp. 2d at
1144.

[499] *See supra* nn.134–37 & text.

[500] *See supra* Section II.D.2.d.

opportunities, for metolachlor on ███████ opportunities, for rimsulfuron on █ out of █ opportunities, for oxamyl on █ out of █ opportunities, and for acetochlor on █ out of █ opportunities.[501] Loyalty requirements for the six AIs have been in place since at least 2017 (and in many cases much longer), meaning that generic manufacturers were substantially foreclosed from the distribution channel for at least eight years.[502]

### c. Defendants' Mesotrione Agreements Demonstrate the Loyalty Programs' Power to Foreclose Generic Rivals

Syngenta and Corteva's negotiation surrounding the companies' mesotrione supply agreement is additional evidence that Defendants' loyalty programs exclude cheaper AI supply from generic competitors. Specifically, Syngenta leveraged its loyalty program to prevent Corteva from sourcing generic mesotrione for its Resicore herbicide product, and extract a significantly higher price for its mesotrione. Syngenta's ability to do so hinged on the fact that Syngenta's loyalty program would have prevented distributors from purchasing Corteva's Resicore in any meaningful amounts. The final supply agreement between Syngenta and Corteva also results in generic foreclosure, as it explicitly requires Corteva to purchase mesotrione exclusively from Syngenta for a range of Corteva products. This episode, as well as the similar negotiations between Syngenta

---

[501] Ex. 1 Figs. 26–27. The loyalty compliance statistics for azoxystrobin, mesotrione, and metolachlor includes ███████████████████████████████ ████████████████████████████████████████ *See, e.g.,* Ex. 283 at -063.

[502] *See supra* Section II.D.

and Bayer, shows that even large basic manufacturers have been unable to overcome the power of Defendants' loyalty programs to foreclose generic manufacturers.[503]

### 2. Plaintiffs Have Robust Direct Evidence that Defendants' Loyalty Arrangements Caused Anticompetitive Harm

Plaintiffs' *prima facie* evidence of foreclosure is confirmed through direct evidence of anticompetitive effects. It is well-established that plaintiffs may show anticompetitive harm through direct evidence of impact to prices, output, and quality. *American Express*, 585 U.S. at 542; *see also* Doc. 160 at 20. The test for anticompetitive effects is not whether prices have declined or generic entry has occurred, it is whether conditions are less competitive than they would be in a hypothetical "but-for world"— that is, the conditions that would exist in the absence of the challenged conduct. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781–82 (6th Cir. 2002) (upholding jury verdict for plaintiff and finding that although competitor's market share grew in the period affected by defendant's conduct, "in the but for world of unimpeded competition, consumers and [plaintiff] would have done substantially better" (cleaned up)); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 83 (E.D.N.Y. 2024) (*citing American Express*, 585 U.S. at 547–48).

Evidence showing the exit, failed entry, or hindered expansion of rivals is also evidence of competitive harm. *See* Doc. 160 at 66; *Impax Labs. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) ("Eliminating potential competition is, by definition,

---

[503] *See supra* Section II.E.

156

anticompetitive."); *ZF Meritor*, 696 F.3d at 289 (holding that evidence of competitor exit from the market was evidence of harm to competition); *McWane*, 783 F.3d at 832 (citing Areeda & Hovenkamp, ¶ 1802c (1996)) ("Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth."). And courts commonly consider the intent of a defendant in undertaking its conduct when evaluating the probable effects of that conduct. *Duke Energy*, 111 F.4th at 367 (denying summary judgment in part because of evidence that defendant consciously sought to exclude plaintiff resulting in harm to competition); *McWane*, 783 F.3d at 840.

Here, Plaintiffs have adduced substantial evidence on all dimensions: supracompetitive prices, limited output, suppressed generic innovation, exits (or failed entry) of generic rivals, and Defendants' anticompetitive intent in promulgating loyalty programs.

### a. Defendants' Conduct Foreclosed Rivals and Resulted in Higher Prices and Reduced Innovation

#### i. Syngenta's Contemporaneous Business Documents Admit the Anticompetitive Effect of Its Loyalty Programs

As described above, Syngenta fully understood that, absent loyalty programs, it would face significant generic competition and the prices of its branded products would fall—its Key AI program maintains a "price premium."[504] Syngenta's own analysis further proves that the Key AI program kept prices higher than they would be without the

---

[504] *See supra* Section II.G.

program. In 2014, Syngenta evaluated ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ [505] A few years later, Syngenta similarly determined ████████████████████████ ████████████████████████████████████████████████████ ██████████████ ”[506] Finally, in 2020, ████████████████████████ ████████████████ Syngenta observed ████████████████████████ ██████████████████████ ”[507] Confirming Syngenta's admissions, generic

manufacturers testified that they were much more successful in selling paraquat after it

was removed from the Key AI program.[508]

Syngenta's documents confirm that Key AI produced these same anticompetitive

price effects for each of the Syngenta AIs. In 2015, Syngenta assessed ████████████ ████████████████████████████████████████████ [509] but ████████████



---

[505] *See* Ex. 47 at CX2034-011 (████████████████████████████████████); *supra* Section II.C.1.

[506] *See supra* nn.219–221 & text; *see also* Ex. 210 (████████████████████████████ ████████████████████████); Ex. 211 ████████████████████████████████ ██████████████████████ .

[507] *See* Ex. 213 at slide 12; Ex. 215 ████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ .

[508] *See* Ex. 87 (Menagh (Source Dynamics)) at 143:22–146:11; Ex. 225 (Schumacher (Helm)) at 170:24–172:24.

[509] Ex. 226 at slide 33.

[510] A 2020 Syngenta presentation demonstrates ███████████████████████████████████ [511] And a similar 2020 presentation confirmed ██████████████████████████████████████████████████████████████████████████ [512]

Syngenta's mesotrione supply agreement provides further direct evidence of supracompetitive pricing stemming from Key AI.[513] Corteva agreed to pay a premium for mesotrione in exchange for its products being ██████████████████████████████████████████████████████████████████████████████████████████ [514] Defendants recognized that distributors would be less likely to buy Corteva mesotrione products if they counted against Key AI, in the same way that distributors do not purchase generics that violate Key AI.[515] Corteva also agreed to ███████████ mesotrione from Syngenta,[516] thus foreclosing generics

[510] *See supra* Section II.G.

[511] *See* Ex. 284 at slide 5.

[512] *See* Ex. 285 at slides 17, 21.

[513] *See supra* Section II.E.

[514] Ex. 286 at -737 (███████████████████████████████████████████ █████████████████████████████████████

[515] *See supra* Section II.E.

[516] *See supra* Section II.E.

159

from those sales and eliminating the chance that Corteva would lower its own product prices and drive down Syngenta prices.[517]

Finally, and contrary to Syngenta's claim (Syn. Br. at 97), loyalty programs have also limited generic manufacturers' incentives and ability to innovate. For example,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ [518] Helm delayed the introduction of an innovative mixture product containing metolachlor due to the loyalty thresholds that would result in limited sales.[519]

### ii.    Corteva's Contemporaneous Business Documents Demonstrate That Its Loyalty Program Caused Antitcompetitive Harm

Corteva's internal analyses confirm that loyalty thresholds have successfully kept its branded products' prices high, and that prices would be lower absent the loyalty programs.[520] Corteva's ████████████████████████████████████

██████████████████████████████ [521] Corteva confirmed that its programs ███████████████████████████████████████

---

[517] Ex. 287 ████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████

[518] Ex. 288 (Gertz (Sipcam)) at 223:23–226:14.

[519] Ex. 225 at 180:7–181:10, 189:18–190:13; Ex. 95 at 163:2–164:17.

[520] *See supra* Section IV.C.2.

[521] Ex. 117 at CX1361-012.

████████████████████████████████████████████████ [522] Corteva also acknowledged its program structure leads to ████████████ ████████████████████████████.[523] The conclusion of the study was that if the programs were removed, ████████:[524]



These views persisted within Corteva. In 2022, Corteva concluded that ████████████████████████████████ ███████████████████████████████████████ ████████████████████:[525]

[522] Ex. 117 at CX1361-012.

[523] Ex. 117 at CX1361-010–11.

[524] Ex. 117 at CX1361-013.

[525] Ex. 289 at -723.



For each of the Corteva AIs, the record contains evidence of supracompetitive prices resulting from the loyalty programs. ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████ [526] Corteva employees ██████████████████ ████████████████████████████ [527] Corteva knew that for oxamyl products it would ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ .[528] Loyalty also kept acetochlor prices

---

[526] Ex. 114 at -310.

[527] Ex. 114 at -310.

[528] Ex. 290 at -372.

elevated, resulting in a Corteva estimate that limited generic acetochlor entry would

cause a "███████████████████████████████."[529]

Corteva claims that when a Corteva AI (oxyfluorfen) was removed from loyalty,

farmgate prices increased rather than decreased. Cor. Br. at 82. These facts are disputed.

There were a number of factors, including COVID-19 and the transfer of marketing

rights, that could have affected prices during this time.[530] Regardless, the evidence shows

that the prices of branded products containing the AI oxyfluorfen fell significantly after

removal from Corteva's loyalty programs.[531]

The record also shows that Corteva's loyalty program played a key role in generic

manufacturers' decisions not to bring innovative mixtures to market, limiting consumer

choice. *See* Doc. 160 at 66 (recognizing "stunted innovation" as antitrust injury). Generic

manufacturer Summit Agro testified that it did not bring an innovative acetochlor premix

to market because it was concerned it would "run afoul on the acetochlor loyalty

programs and we would have much more headwind."[532]

---

[529] *See supra* Section II.G.

[530] Ex. 291 ¶ 85.

[531] Ex. 291 ¶ 16; *see also* Ex. 96 (Vance (Albaugh)) at 191:4–192:5 (generic sold five to seven times more units after loyalty ended).

[532] Ex. 224 at 114:3–116:18; *see also* Ex. 1 ¶ 459 (discussing Helm's plans to delay introduction of innovative premix due to loyalty).

163

### iii. Professor Hemphill's Analysis Provides Further Evidence of Harm

Professor Hemphill concluded that "that the exclusion of generic competition has resulted in higher prices and less innovation in the relevant AI markets, compared to a but-for world without the challenged conduct," citing: (1) Defendants' sustained, costly distributor exclusion payments, which were rational only because they secured elevated prices;[533] (2) Defendants' own documents and analyses recognizing price elevation from the loyalty programs;[534] (3) empirical evidence of price decline in the face of limited generic entry, finding evidence that removing loyalty would further decrease price;[535] and (4) evidence from generics that loyalty deterred introduction of innovative products.[536]

### b. Defendants' Loyalty Programs Caused Rival Generic Manufacturers to Exit or Decline to Enter AI Markets

Record evidence of generic manufacturers delaying or declining entry into, or exiting from, each of the six relevant AI markets is additional direct proof of actual exclusion of rivals and anticompetitive effects.[537] *See ZF Meritor*, 696 F.3d at 289 (where competitors "exited the market," jury could conclude that their "inability to grow was a direct result of [defendant's] exclusionary conduct"); *In re Lorazepam & Clorazepate*

---

[533] Ex. 1 ¶ 448.

[534] Ex. 1 ¶¶ 449–453; § 3.2.2.

[535] Ex. 1 ¶ 454; § 3.2.3.

[536] Ex. 1 ¶¶ 457-460. *See generally id.* § 4.9.

[537] *Supra* Section II.F. Syngenta appears to concede that at least three generic suppliers chose to exit, or not enter, markets for products containing azoxystrobin, mesotrione, and metolachlor. Syn. Br. at 94.

164

*Antitrust Litig.*, 467 F. Supp. 2d 74, 83 (D.D.C. 2006) (evidence that manufacturers were unable to "get . . . into the market" demonstrated foreclosure). Contrary to Defendants' false assertions that "there is no evidence" that Defendants' loyalty programs kept generic manufacturers out of the market (Syn. Br. at 94–95; *see also* Cor. Br. at 86), generic manufacturers repeatedly testified that they *directly* attribute their decisions to exit, delay entering, or not enter the relevant markets to Defendants' loyalty programs:[538]

- *Azoxystrobin*: Rotam (now Albaugh) and Sipcam did not enter. ▇▇▇▇ exited. Helm abandoned an already registered product.

- *Mesotrione*: ▇▇▇▇ did not enter. Rotam delayed entry. Helm exited a mesotrione and metolachlor premix product.

- *Metolachlor*: ▇▇▇▇ did not enter, and Helm exited a mesotrione and metolachlor premix product.

- *Rimsulfuron*: Albaugh and Helm did not enter. Rotam delayed entry for at least six years.

- *Oxamyl*: AMVAC ceased importing oxamyl. Atticus suspended sales of existing product.

- *Acetochlor*: Albaugh, ▇▇▇▇, and Summit Agro did not enter.

Plaintiffs' evidence ties the exit (or non-entry) of these firms directly to Defendants' anticompetitive conduct *and* demonstrates clearly that the loyalty programs resulted in supracompetitive prices. Corteva's insistence that "[f]irms exiting a market *alone* says nothing about the impact of alleged exclusionary conduct" (Cor. Br. at 86) (emphasis added) is irrelevant, because this evidence shows more than exit: it

---

[538] *See* Supra Section II.F.

165

demonstrates a direct causal line from Defendants' exclusionary conduct to the resulting exclusion of competitors.[539]

Syngenta argues, without support, that these real-world examples of generic exit are insufficient to prove competitive harm because "evidence regarding so few market actors is immaterial at summary judgment." Syn. Br. at 95. This misstates the relevant standard; Plaintiffs do not need to show every instance of aborted entry to prove competitive harm. It is enough when looking at an arrangement holistically, the "probable effect" is to cause anticompetitive harm. *McWane,* 783 F.3d at 836 (citing *Tampa Electric*, 365 U.S. at 329).

*Eisai*, cited by Syngenta, is not to the contrary. In *Eisai*, the court found that evidence showing only a "few dozen" hospitals representing less than one percent of the 6,000 hospitals was insufficient to demonstrate "substantial foreclosure." 821 F.3d at 404. In contrast, the distributors locked up by Syngenta's loyalty program represent over ██ percent of crop protection product sales in the United States, easily meeting substantial foreclosure thresholds in the case law.[540] And while the alleged foreclosure in

---

[539] *In re EpiPen* is inapt. An out-of-circuit case, *EpiPen* required that a plaintiff show that—in addition to substantial foreclosure—the exclusion will result in anticompetitive effects (44 F.4th at 986), which Plaintiffs have done here.

[540] *See Supra* Section II.F. Even were one to accept Syngenta's apples-to-oranges comparison of foreclosed buyers (hospitals in *Eisai*) to exited rivals (████████████████ ████), the simplistic comparison masks the fact that ████████████████ are some of the most significant generic competitors to Syngenta. Ex. 292 at slide 13 (listing █████████████████████████████████).

*Eisai* occurred via contracts with end-consumer hospitals, 821 F.3d at 400, in this case foreclosure occurs via contracts with essential distributors.

### c. Defendants' Anticompetitive Intent Supports a Finding of Competitive Harm

As detailed in Sections II.C., II.D.2., II.F., and II.G., the record clearly shows that Defendants designed and operated their loyalty programs in order to exclude generics and thereby maintain supracompetitive prices in relevant markets. From their inception, both Syngenta's and Corteva's programs were intended and expected to exclude generic competition, thereby maintaining profit margins and resulting in anticompetitively high prices to growers.[541]

Such evidence of anticompetitive intent is "highly probative" of the existence of an antitrust violation because it "may help the court to interpret facts and to predict consequences" and can "support the inference" that the conduct harmed competition. *McWane*, 783 F.3d at 840 (finding "particularly powerful" evidence that the defendant implemented exclusive dealing arrangements to prevent its rival from reaching a critical mass and out of concern that lower prices could result) (cleaned up); *see also Dentsply*, 399 F.3d at 189–90 (considering anticompetitive intent evidence as representing economic realities); *Microsoft*, 253 F.3d at 59 (intent is relevant "to the extent it helps us understand the likely effect of the monopolist's conduct"). The Court of Appeals for the Fourth Circuit has held that evidence of "anticompetitive malice," such as efforts to

---

[541] Section II.C.1.

167

"exclude" a rival from a market, counsels against summary judgment. *Duke Energy*, 111 F.4th at 367 (intent evidence "bolsters our conclusion that the case is trial worthy," in part because "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles.") (cleaned up). Defendants' clear intent is similarly strong evidence of effects here.

> ### d. Defendants Misstate the Legal Standards Governing Anticompetitive Effects

Defendants make no attempt to grapple with the substantial quantity of documentary, testimonial and economic evidence demonstrating that Defendants' loyalty programs have harmed competition in each AI market. Instead, Defendants seek to neutralize that evidence—the existence of which clearly precludes summary judgment—by misstating the legal standards that Plaintiffs must meet.

First, Defendants incorrectly claim that any drop in prices over time—either because of limited competition from generics (as Syngenta argues) or because distributors pass through some loyalty payments to customers (as both companies posit)—establishes a lack of harm. *See* Syn. Br. at 93, 96; Cor. Br. at 80.

Price declines do not establish an absence of anticompetitive effects. A plaintiff may show that absent the anticompetitive conduct, entry could have been more robust and prices lower. *Conwood*, 290 F.3d at 781–82; *see also, e.g., Bradburn Parent/Tchr. Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 2000 WL 34003597, at *4 (E.D. Pa. July 25, 2003) ("it is not necessary . . . to allege the existence of price increases" when a plaintiff "would have paid less" for a product absent defendant's anticompetitive

conduct); *see also Google Ads*, 778 F. Supp. 3d at 854 ("[P]rices that remain consistent or fall over time may still indicate monopoly power, so long as those prices are supracompetitive."); *cf. Surescripts,* 665 F. Supp. 3d at 47–48 (holding that price declines during relevant period does not establish lack of harm). Thus, whatever evidence Syngenta offers that prices have fallen does not support summary judgment. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,* 762 F.3d 1114, 1129 (10th Cir. 2014) (finding genuine issue of material fact on harm to competition where plaintiffs presented evidence that defendant had ability "to charge supra-competitive prices"). In short, limited entry by rivals in the face of the challenged conduct does not negate a finding of substantial foreclosure, nor does the fact that prices have declined to some degree over time.

This same standard applies to Defendants' arguments regarding the partial pass-through of loyalty payments to growers. Syn. Br. at 96; Cor. Br. at 29–30, 87. Evidence shows that distributors do *not* pass through substantial portions of the payments, as discussed in Section II.D.2.c. But even if the payments were passed through in full that would not erase Plaintiffs' evidence that prices remain higher than they would be absent the challenged programs.

Second, Corteva incorrectly insists that Plaintiffs must identify a specific "competitive price" to prove supracompetitive pricing. Cor. Br. at 82. This is wrong—a precise description of the but-for world is neither necessary nor (in many situations)

169

possible.[542] The only case Corteva cites in support, *American Express*, did not require identification of a specific competitive price to determine whether real-world prices were elevated, as other courts have recognized. *See In re Payment Card*, 714 F. Supp. 3d at 102 ("*Amex* is not so stringent as to demand an exact number – either in terms of price or output."). As the D.C. Circuit explained, "[t]o require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." *Microsoft*, 253 F.3d at 79; *see also Google Search*, 747 F. Supp. 3d at 153 (explaining that "neither plaintiffs nor the court can confidently reconstruct a world absent the defendant's exclusionary conduct. To some degree, the defendant is made to suffer the uncertain consequences of its own undesirable conduct.") (citing Areeda & Hovenkamp, ¶ 651c (1996)) (cleaned up).

Finally, the evidence of anticompetitive harm in this case is not "speculative." Cor. Br. at 81. Corteva relies on cases in which plaintiffs cited no evidence or had critical evidentiary gaps, in contrast to the substantial evidence adduced here that prices would be lower, generic entry would have been more robust, and there would be more innovation absent Defendants' loyalty programs. *See, e.g., United States v. Google LLC*, 687 F. Supp. 3d 48, 81–82 (D.D.C. 2023) (denying summary judgment where there were genuine disputes of material fact, but granting summary judgment for count where

---

[542] *See supra* Section IV.E.1.b.iii.

plaintiffs did not cite any record facts); *Aerotec*, 836 F.3d at 1181–83 (plaintiffs adduced no evidence of the alleged exclusive "contracts, the claimed extra-contractual conditions, or preferential treatment terms").

### F. Defendants Do Not Challenge the FTC's Standalone Section 5 Claim

Neither Syngenta nor Corteva address the elements of FTC Act Section 5 or substantiate arguments for summary judgment on the Section 5 claims.

As this Court recognized in denying the motions to dismiss, there are "distinctions" between claims under Section 5 and claims under the Sherman or Clayton Acts. Doc. 160 at 67 n.10. Section 5 "'supplement[s] and bolster[s]'" those statutes. Doc. 160 at 17 (quoting *Motion Picture Advert.*, 344 U.S. at 394–95). An anticompetitive practice need not violate the Sherman Act or the Clayton Act in order to violate [Section 5]." *Chuck's Feed*, 810 F.2d at 1293 (citation omitted); *see also FTC v. Brown Shoe Co.*, 384 U.S. 316, 319–22 (1966) ("exclusive dealing agreement" violated Section 5 even without violating other federal antitrust statutes); *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 20–21 (7th Cir. 1971) ("The Commission, however, need not find all the elements necessary to establish a Section 3 Clayton Act violation in holding exclusive dealing contracts illegal under Section 5." (citations omitted)).

Those distinctions among antitrust statutes favor the FTC here because Defendants cannot prove that their market definition and price-cost test arguments apply to the Section 5 claims. Defendants provide no reason or basis for this Court to apply the price-cost test to an FTC action seeking an injunction and targeted at obviously anticompetitive conduct. *See* Areeda & Hovenkamp, ¶ 302h3 (2025) (price-cost test "need not hamper the

171

FTC, which should be able to find some instances of strategic pricing unlawful under §5 even when they do not involve prices below cost").

Detailed market definition is also not required for an exclusive dealing claim brought under Section 5; the FTC need only "identify[] the particular type of goods . . . involved." *Chuck's Feed*, 810 F.2d at 1295. Indeed, where there is a showing of lessening of competition, Section 5 does not require a "definition of [the] market" at all. *Balfour Co.*, 442 F.2d at 21 (noting also that the FTC considered evidence of the relevant market and the defendant's share in that market).

**G. Defendants Do Not Address, and Are Thus Not Entitled to Summary Judgment on, Plaintiffs' Section 1 Claim as it Relates to Defendants' Mesotrione and Metolachlor Supply Agreements**

In addition to challenging Defendants' loyalty programs under Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, Section 5 of the FTC Act, and applicable state statutes, Plaintiffs also challenge Defendants' mesotrione and metolachlor supply agreements as unreasonable restraints of trade under Sherman Act Section 1. Doc. 149 ¶¶ 204, 208. Defendants do not independently address that claim. They have therefore forfeited any argument that they are entitled to summary judgment on that claim. *See Zinner v. Olenych*, 108 F. Supp. 3d 369, 398 (E.D. Va. 2015) (defendants waived argument addressed for the first time on reply).

In the Fourth Circuit, claims under § 1 and § 2 must be analyzed separately even if they "share[] a common goal" of "maintaining . . . monopolies." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). A "§ 1 violation 'is legally distinct from that under § 2 . . . though the two sections overlap in the sense that a monopoly under § 2 is a

172

species of trade restraint under § 1.'" *Id*. (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940)).

Here, Plaintiffs' Section 1 and Section 2 claims are distinct in two ways.[543] First, the Section 1 claim as to the supply agreements is subject to the rule of reason even if Plaintiffs' other claims were subject to the price-cost test (they are not) because they are explicitly exclusive supply agreements. *Tampa Elec.*, 365 U.S. at 327–35; *Microsoft*, 253 F.3d at 69–70; *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 692 & n.46 (D. Md. 2000). Second, the § 1 claim is subject to its *own* rule of reason analysis that asks whether Defendants' agreements "aided the maintenance of" Syngenta's monopoly by, for example, "resulting in increased prices . . . and decreased opportunities for rival . . . firms to gain access to consumers." *Dickson*, 309 F.3d at 206–07, 210. Evidence shows Defendants' agreements do so: Corteva acknowledged that it pays Syngenta ▮▮▮▮▮ more for technical mesotrione than it would pay a generic manufacturer because the agreement ▮▮▮▮▮▮ with respect to Corteva mesotrione;[544] a Syngenta analysis shows that mesotrione farmgate prices are ▮▮▮ ▮▮ as a result of Syngenta's leveraging of its loyalty program to enter the exclusive

---

[543] Defendants do not move for summary judgment on the issue of market definition for Plaintiffs' § 1 claim. To the extent Defendants' § 2 market definition arguments apply to Plaintiffs' § 1 claim, substantial evidence shows, at minimum, material disputes of fact on the issue for the reasons identified in Section IV.D of this brief.

[544] Ex. 202 at -785; *see also* Ex. 227 at slide 5 (explaining Syngenta supply agreement strategy is to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

173

mesotrione agreement;[545] and Syngenta acknowledges that the agreements are built to

████████████████████████████████████████████████████████

██████[546]

### H. Defendants Are Not Entitled to Summary Judgment on State Claims

#### 1. Defendants Are Not Entitled to Summary Judgment on California's State Law Claims

Defendants are not entitled to summary judgment on California's state law claims because Defendants fail to independently address those claims. Neither California's Cartwright Act nor California's Unfair Competition Law ("UCL") is "expressly harmonized with federal antitrust law." *Contra* Cor. Br. at 87–88. The Cartwright Act is "broader in range and deeper in reach than the Sherman Act," so "[i]nterpretations of federal antitrust law are at most instructive, not conclusive." *In re Cipro Cases I & II*, 61 Cal.4th 116, 142, 160 (2015) (internal quotations omitted). Similarly, conduct can be "unfair" under the UCL even if it is not "unlawful" under any other law. *Epic Games, Inc., v. Apple, Inc.* 161 F.4th 1162, 1191–92 (9th Cir. 2025); *In re Google Play Store*, 147 F.4th at 933 n.3.[547] The UCL's "unfair" prong "is intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable

---

[545] Ex. 233 ¶ 124 (citing Ex. 152 at CX2105-025–31).

[546] Ex. 77 at slide 12; Ex. 26 at slide 32 (████████████████████████████ ██████████████████████).

[547] *Chavez v. Whirlpool Corp.*, 93 Cal.App.4th 363 (2001) held only that a UCL claim could not be based solely on a defendant's refusal to deal protected from antitrust liability under the *Colgate* doctrine. *See id*. at 374–75; *see also Epic Games,* 161 F.4th at 1191–92.

174

new schemes which the fertility of man's invention would contrive." *Epic Games*, 67 F.4th at 1000 (internal quotation and citations omitted). Market definition is unnecessary for California's UCL claim. *See id.* at 1002 (rejecting argument that "the UCL mandates trial courts to define a relevant market").

### 2. Defendants Are Not Entitled to Summary Judgment on Indiana's IDCSA Claims

Defendants are also not entitled to summary judgment on Indiana's Deceptive Consumer Sales Act ("IDCSA") claims. *See* Ind. Code § 24-5-0.5-1(a); *State v. TikTok, Inc.*, 245 N.E.3d 681, 696 (Ind. Ct. App. 2024) (discussing expansion of law following 2014 amendments). Neither Defendant's single sentence devoted to discussing the IDCSA establishes the absence of a triable issue of material fact regarding whether their conduct is unfair, abusive, or deceptive.

Corteva rehashes an inaccurate argument this Court already rejected. Doc. 160 at 86–87 (denying motion to dismiss the IDCSA claims). Indiana need not show standalone deceptive conduct: conduct that violates the Indiana Antitrust Act may also violate the IDCSA. *See Gasbi, LLC v. Sanders*, 120 N.E.3d 614, 620 (Ind. Ct. App. 2019) ("[C]onduct prohibited elsewhere in the Indiana Code could also be a deceptive act under the Consumer Act.").

Syngenta argues that Indiana's IDCSA claims fail for the same reason that California's UCL claims do, incorrectly asserting that Indiana's claims have the same legal elements as California's UCL. Indiana need not show a fraudulent practice or specific legislatively declared policy: the IDCSA clearly prohibits unfair practices and

175

permits freestanding claims for unfair acts. *See, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 903–04 (N.D. Cal. 2024)[548] (holding that Indiana law permits claims premised on unfairness (citing *Gasbi*, 120 N.E.3d at 618)); *Bank v. Huizar*, 178 N.E.3d 326, 338 (Ind. Ct. App. 2021)). That the Indiana legislature left the term "unfair" undefined in the IDCSA reflects an intent to provide courts flexibility to recognize unfairness in its infinite forms. *Cf. FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240 (1972) (noting that Congress declined to define "unfair" in the FTC Act because "[i]t is impossible to frame definitions which embrace all unfair practices [because] [t]here is no limit to human inventiveness in this field").

### 3. Defendants Are Not Entitled to Summary Judgment on Iowa's Consumer Fraud Act Claims

Nor are Defendants entitled to summary judgment on Iowa's Consumer Fraud Act Claims. *See* Iowa Code § 714.16(2). Corteva and Syngenta both re-argue that deception is a necessary element of Iowa's consumer protection claims—an argument this Court rejected when it denied Defendants' motions to dismiss. Doc. 160 at 87–88. Conduct may be unfair without being deceptive, and § 714.16 "requires proof of only one, not both, sorts of conduct." *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 527 (Iowa 2005).

---

[548] Appeals dismissed on grounds unrelated to Indiana's unfairness claims under the IDCSA.

176

## I. The Claims Against Syngenta Crop Protection AG and Syngenta Corporation Must Proceed To Trial

Syngenta's motion as to Syngenta Crop Protection AG ("AG") and Syngenta Corporation ("Corporation") fails because the factual record demonstrates that both entities encouraged or participated in Syngenta's anticompetitive conduct.

The Syngenta Defendants belong to one integrated corporate family: the Syngenta Group. AG owns Corporation, which in turn indirectly owns Syngenta Crop Protection, LLC. The three entities function as a single enterprise, and Plaintiffs will necessarily present the same evidence at trial regardless of whether AG and/or Corporation are dismissed.[549]

As Syngenta concedes, AG and Corporation can be liable for "control[ling], dictat[ing], *or* encourag[ing]" Syngenta's "anticompetitive conduct." Syn. Br. at 104 (quoting Doc. 160 at 71); *see Intell. Ventures I LLC v. Cap. One Fin. Corp.*, No. PWG-14-111, 2016 WL 160263, at *5 (D. Md. Jan. 14, 2016). Mere encouragement is enough: AG and Corporation need not themselves "independently satisfy every element" of the antitrust claims "in order to be held liable." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017); *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631–32 (9th Cir. 2018); *cf. United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) ("[A] defendant need not be involved in every phase of

---

[549] Syn. Br. Ex. 145 ¶¶6–7 (Syngenta Group corporate structure); *id.* ¶1 (Corporation employee "lead[s] Syngenta Group's Global Compliance and Risk Management Team"); *id.*

th[e] conspiracy to be deemed a participant."). "[K]nowledge" and approval is sufficient to establish "encourag[ement.]" *In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 836951, at *10 (S.D. Cal. Mar. 21, 2022); *see* Restatement (Third) of Agency § 7.03(1)(a) (principal "direct[ly] liab[le]" when "agent acts with actual authority" or principal "ratifies" agent's conduct).[550] Alternatively, evidence of an affiliate's "acts in furtherance" of anticompetitive conduct is sufficient for liability. *Packaged Seafood*, 2022 WL 836951, at *10; s*ee Arandell*, 900 F.3d at 632 (affiliate liability for acts "further[ing]" anticompetitive scheme of "commonly owned affiliates"). Such joint action of affiliates gives rise to liability even if one affiliate lacks "the anticompetitive intent of the other." *Arandell*, 900 F.3d at 632.

Syngenta's claim that AG and Corporation had no "involvement in[ ]" the unlawful conduct (Syn. Br. at 103) is contradicted by the summary judgment record. *See Arandell*, 900 F.3d at 634 n.12 ("dispute[s]" about "how much" affiliate participated in unlawful conduct "are issues for the trier of fact").

First, AG explicitly and repeatedly discussed, approved, and encouraged LLC's use of Key AI both generally and for specific AIs. Syngenta tries to distance LLC from the March 2005 "White Book" (Syn. Br. at 105–06), but the White Book is a global

---

[550] *Reading International, Inc. v. Oaktree Capital Management, LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003) (Syn. Br. at 106), is irrelevant. There, the issue was only whether a 17% owner (as opposed to a 100% owner) had the power to control that company's anticompetitive conduct. *Id.* at 324–25. The court explained that determining such control was a "fact-specific inquiry" that "must await a hearing on the merits." *Id.*

178

strategy document, provided by AG to LLC, directly related to loyalty programs. Syngenta's claim that LLC did not use the White Book is contradicted by the fact that LLC's actual post-patent defense and loyalty strategies mirror those in the Book, and by the Book's incorporation into LLC strategy documents.[551]

After issuing the White Book, AG remained involved in setting post-patent defense and loyalty strategy. For example,



──────────────

[551] *See* Ex. 28 at slide 54 (████████████████████████████); Ex. 296 at -797 (███████████████████████████); Ex. 91 (Cecil Dep. (Syngenta)) at 72:7–76:13.

[552] Ex. 297 (Parr (AG)) at -618, -625; *see* Ex. 298 (Parr (AG)) at 24:15–28:5.

[553] Ex. 298 at 137:10–141:15; Ex. 299 at -073.

[554] Ex. 299 at -075.

[555] Ex. 300 at -764–65 ████████████████████████████ ████████████████████████

179

█████████████████████████████[556]█████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████[557]

Contemporaneous business documents confirm that AG's involvement in post-patent strategy and defense continues under Ioana Tudor's global crops team.[558] The contrary assertions in Tudor's post-deposition declaration create a factual dispute.

Record evidence likewise demonstrates that Corporation encouraged and/or participated in Syngenta's anticompetitive conduct through pricing strategy discussions and receipt of the financial benefits (unlawful profits) from Syngenta's loyalty programs. Slide decks from Corporation's board meetings demonstrate ████████████████

████████████████████████████████████████████████████████████████

████████[559] This evidence contradicts Syngenta's claim that Corporation provides only "back-office non-commercial support." Syn. Br. at 107. The record also indicates that profits from Syngenta's loyalty programs roll up to Corporation, because LLC's financials are consolidated with other U.S. subsidiaries and reported on Corporation's balance sheet.[560] Moreover, during the relevant period, the same individual (Vern

---

[556] Ex. 301; Ex. 105 (Hawkins (Syngenta)) at 279:21–282:21.

[557] Ex. 209 at -712–03 (AG employees Parr, Neill, Boin, and Quandt).

[558] Ex. 302 at -620–621; Ex. 31 at slides 2, 12; Ex. 139 (Tudor (AG)) at 80:3–84:6.

[559] *See, e.g.*, Ex. 239 at slide 3; Ex. 269 at slide 3; Ex. 277 at CX2930-025 (████████ ███████████████████████████████████████████); *see also* Ex. 293 at CX2931-009.

[560] *See, e.g.*, Ex. 293 at CX2931-004–06; Ex. 295 at CX2932-017–20.

Hawkins) served as President of LLC and Corporation, and the same individual (Jeffrey Rowe) served as Chief Operating Officer of the two entities.[561] *See* Doc. 160 at 71 (allegation that "same individual served as the president of both companies" supported affiliate's "coordinated activity"). Mr. Hawkins had critical input into Key AI requirements[562] and through his role on Syngenta's global crop protection leadership team was deeply involved in Syngenta's global crop protection strategy (of which loyalty was a component).[563] Hawkins's extensive involvement with global issues reflects more than "sharing of corporate directors" (Syn. Br. at 107) because it raises a material dispute of fact as to whether his relevant conduct was undertaken on LLC's or Corporation's behalf.

Second, and separately, AG is liable for its direct actions "negotiating" and "sign[ing]" the mesotrione agreement with Corteva.[564] *See* Syn. Br. at 106. Corteva's agreement to ▮▮▮▮▮▮▮ mesotrione from Syngenta at a higher price in exchange for ▮▮▮▮ in the loyalty program, directly excluded generics from the mesotrione

---

[561] Ex. 301 at -243.

[562] Ex. 304 (Weikel (Syngenta)) at 486:21–487:8.

[563] Ex. 105 (Hawkins (Syngenta)) 30:4–22; Ex. 139 (Tudor (AG)) 16:6-24 (global team "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[564] Ex. 198 (mesotrione agreement) at -065; Ex. 164 at -025 (▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 262 at -729 ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Ex. 24 at slide 20.

181

market and eliminated the chance Corteva would lower its own prices (in turn driving down Syngenta prices), resulting in supracompetitive mesotrione prices.[565]

## V. CONCLUSION

The Court should deny Defendants' motions in their entirety.

---

[565] Ex. 287 at -707.

182

Dated: February 20, 2026

Respectfully submitted,

 /s/ Allyson M. Maltas
ALLYSON M. MALTAS
Deputy Chief Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3646
Email: amaltas@ftc.gov

KARNA ADAM
JOSEPH R. BAKER
WESLEY G. CARSON
ROBERT Y. CHEN
ELIZABETH A. GILLEN
GEOFFREY M. GREEN
PATRICIA C. JERJIAN
PHILIP J. KEHL
LAUREN B. PATTERSON
MICHAEL J. TURNER

*Attorneys for Plaintiff Federal Trade Commission*

/s/ Nicole S. Gordon
NICOLE S. GORDON
Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94610
Telephone: (415) 510-4400
Email: nicole.gordon@doj.ca.gov

*Attorney for Plaintiff State of California*

/s/ Conor J. May
ARIC J. SMITH
CONOR J. MAY
Assistant Attorneys General
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 9th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Aric.Smith@coag.gov
        Conor.May@coag.gov

*Attorneys for Plaintiff State of Colorado*

183

/s/ Paul J. Harper
PAUL J. HARPER
Assistant Attorney General, Antitrust
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
Telephone: (312) 814-3000
Email: paul.harper@ilag.gov

ALEX KAPLAN
RYAN CAUGHEY
ADAM CARLIS
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Email: akaplan@susmangodfrey.com
         rcaughey@susmangodfrey.com
         acarlis@susmangodfrey.com

BETSY ARONSON
REBEKAH G.S. GREENE
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
Email: baronson@susmangodfrey.com
         rgreene@susmangodfrey.com

*Attorneys for Plaintiff State of Illinois*

/s/ Noah Goerlitz
NOAH GOERLITZ
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 725-1018
Email: noah.goerlitz@ag.iowa.gov

*Attorney for Plaintiff State of Iowa*

/s/ Jennifer Linsey
JENNIFER LINSEY
CHRISTI FOUST
JESSE MOORE
Deputy Attorneys General
SCOTT BARNHART
Chief Counsel and Director of Consumer Protection
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (463) 261-7401
Email: jennifer.linsey@atg.in.gov
         christi.foust@atg.in.gov
         jesse.moore@atg.in.gov
         scott.barnhart@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

/s/ Katherine Moerke
KATHERINE MOERKE
ELIZABETH ODETTE
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 296-3353
Email: katherine.moerke@ag.state.mn.us
         elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

184

/s/ Justin McCully
JUSTIN MCCULLY
Assistant Attorney General
Office of the Attorney General of
Nebraska
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: Justin.McCully@nebraska.gov


ALEX KAPLAN
RYAN CAUGHEY
ADAM CARLIS
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Email: akaplan@susmangodfrey.com
         rcaughey@susmangodfrey.com
         acarlis@susmangodfrey.com

BETSY ARONSON
REBEKAH G.S. GREENE
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
Email: baronson@susmangodfrey.com
         rgreene@susmangodfrey.com

*Attorneys for Plaintiff State of Nebraska*

/s/ Rachel K. Sowray
RACHEL K. SOWRAY
Senior Assistant Attorney General
Economic Justice Section
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 689-0249
Email: Rachel.Sowray@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

/s/ William Shieber
Austin Kinghorn
Deputy Attorney General for Civil Litigation
WILLIAM SHIEBER
Senior Staff Attorney, Antitrust Division
PAIGE ETHERINGTON
Assistant Attorney General
Office of the Attorney General of Texas
300 West 15th Street, 7th Floor
Austin, TX 78701
Telephone: (512) 463-1710
Email: William.Shieber@oag.texas.gov

*Attorneys for Plaintiff State of Texas*

185

/s/ Hamilton Millwee
HAMILTON MILLWEE
Assistant Attorney General
Office of the Attorney General of
Tennessee
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

/s/ Luminita Nodit
LUMINITA NODIT
Assistant Attorney General,
Antitrust Division
Washington State Office
of the Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104
Telephone: (206) 254-0568
Email: Lumi.Nodit@atg.wa.gov

*Attorney for Plaintiff State
of Washington*

/s/ Caitlin M. Madden
CAITLIN M. MADDEN
LAURA E. MCFARLANE
Assistant Attorneys General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

186

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that the foregoing brief is less than 45,000 words, excluding the caption, table of contents, table of authorities, signature lines, certificate of compliance, and certificate of service.

Dated: February 20, 2026

*/s/ Allyson M. Maltas*
ALLYSON M. MALTAS

187

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN, | Case No. 1:22-cv-00828-TDS-JEP |
| Plaintiffs, | |
| v. | **CERTIFICATE OF SERVICE** |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., | |
| Defendants. | |

I, Allyson M. Maltas, an attorney, certify that on February 20, 2026, I caused to be served upon counsel of record for Defendants via email and/or secure file transfer protocol a true and correct copy of the following:

- Plaintiffs' Consolidated Brief in Opposition to Defendants' Motions for Summary Judgment;

- The Declaration of Allyson M. Maltas In Support of Plaintiffs' Consolidated Brief in Opposition to Defendants' Motions for Summary Judgment; and

- The exhibits to Plaintiffs' Consolidated Brief.

/s/ Allyson M. Maltas
ALLYSON M. MALTAS