# Exhibit 201

## Filed Under Seal

# Exhibit 202

**Filed Under Seal**

Case 1:22-cv-00828-TDS-JEP     Document 461-10     Filed 04/27/26     Page 2 of 108

# Exhibit 203

## Filed Under Seal

# Exhibit 204

**Filed Under Seal**

# Exhibit 205

**Filed Under Seal**

# Exhibit 206

**From:** Frank Rittemann [/O=BAYMAIL/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=PSRTF]
**Sent:** 3/27/2019 10:08:52 PM
**To:** Gregory Herman [gregory.herman@bayer.com]
**Subject:** RE: Harness MAX - March 27 notes

Thank you Greg!

Freundliche Grüße / Best regards,

## Frank Rittemann
**Product Manager Selective Corn Herbicides, North America**

////////////////////

Bayer U.S. LLC
Crop Science, Crop Science
Crop Product & Project Mgmt Midwest
PO Box 12014, Research Triangle Park, NC 27709
2400 Ellis Road, Durham, NC 27703
United States
Tel: +1 919 475-0839
E-mail: frank.rittemann@bayer.com
Web: http://www.bayer.us

**/// Follow Bayer on:**
/// Twitter /// Facebook /// Instagram /// LinkedIn /// YouTube

**From:** Gregory Herman <gregory.r.herman@monsanto.com>
**Sent:** Wednesday, March 27, 2019 6:01 PM
**To:** Frank Rittemann <frank.rittemann@bayer.com>; Bruno Kaisin <bruno.kaisin@monsanto.com>; Simone Seifert-Higgins <simone.seifert-higgins@monsanto.com>; Jay Butka <jay.a.butka@monsanto.com>; Guillaume Huchet <guillaume.huchet@bayer.com>; Kirsten Riley <kirsten.j.riley@monsanto.com>; Emily Maclin <emily.v.maclin@monsanto.com>; Travis Franke <tefrank@monsanto.com>; Jacob Daufeldt <jacob.a.daufeldt@monsanto.com>; Todd Friedman <todd.friedman@monsanto.com>
**Subject:** RE: Harness MAX - March 27 notes

Frank,
See my comments below.

## Greg Herman
Global Procurement
////////////////////

Bayer U.S. - Crop Science
Monsanto Company
Procurement
St Louis, MO 63167 USA
Tel: +1 314 694 2299
Cell +1 214 529-9039
E-mail: gregory.herman@bayer.com
Web: http://www.bayer.com

**/// Follow Bayer on:**

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

/// Twitter /// Facebook /// Instagram /// LinkedIn /// YouTube

**From:** Frank Rittemann <frank.rittemann@bayer.com>
**Sent:** Wednesday, March 27, 2019 4:52 PM
**To:** KAISIN, BRUNO [AG/1000] <bruno.kaisin@monsanto.com>; SEIFERT-HIGGINS, SIMONE [AG/1005] <simone.seifert-higgins@monsanto.com>; BUTKA, JAY A [AG/1000] <jay.a.butka@monsanto.com>; HUCHET, GUILLAUME [BAYER] <guillaume.huchet@bayer.com>; HERMAN, GREGORY R [AG/1000] <gregory.r.herman@monsanto.com>; RILEY, KIRSTEN J [AG/1000] <kirsten.j.riley@monsanto.com>; MACLIN, EMILY V. [AG/1000] <emily.v.maclin@monsanto.com>; FRANKE, TRAVIS E [AG/1630] <tefrank@monsanto.com>; DAUFELDT, JACOB A [AG/1630] <jacob.a.daufeldt@monsanto.com>; FRIEDMAN, TODD [AG/1000] <todd.friedman@monsanto.com>
**Subject:** RE: Harness MAX - March 27 notes

Thank you for providing the notes from today's call Bruno!



Best,
Frank

**From:** Bruno Kaisin <bruno.kaisin@monsanto.com>
**Sent:** Wednesday, March 27, 2019 4:35 PM
**To:** Simone Seifert-Higgins <simone.seifert-higgins@monsanto.com>; Jay Butka <jay.a.butka@monsanto.com>; Guillaume Huchet <guillaume.huchet@bayer.com>; Gregory Herman <gregory.r.herman@monsanto.com>; Frank Rittemann <frank.rittemann@bayer.com>; Kirsten Riley <kirsten.j.riley@monsanto.com>; Emily Maclin <emily.v.maclin@monsanto.com>; Travis Franke <tefrank@monsanto.com>; Jacob Daufeldt <jacob.a.daufeldt@monsanto.com>; Todd Friedman <todd.friedman@monsanto.com>
**Subject:** Harness MAX - March 27 notes

Participated – Todd, Greg and Bruno;   Next update – April 10th.



ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00000793_0002
CX3462-002

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)



ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00000793_0003

CX3462-003

Cost Model (Emily)

- Worked with Bruno to understand and model the process components
- ███████████████████████████████████████████████████
- Frank worked with KAMs to understand value of Key AI program. Currently a nice to have but mainly only a tie breaker
- Recommend we build the model with a sensitivity to understand impact of different scenarios

Thanks
Bruno


**From:** BUTKA, JAY A [AG/1000]
**Sent:** Monday, March 04, 2019 11:09 AM
**To:** HUCHET, GUILLAUME [BAYER] <guillaume.huchet@bayer.com>; HERMAN, GREGORY R [AG/1000] <gregory.r.herman@monsanto.com>; RITTEMANN, FRANK [BAYER] <frank.rittemann@bayer.com>; RILEY, KIRSTEN J [AG/1000] <kirsten.j.riley@monsanto.com>; KAISIN, BRUNO [AG/1000] <bruno.kaisin@monsanto.com>; MACLIN, EMILY V. [AG/1000] <emily.v.maclin@monsanto.com>; FRANKE, TRAVIS E [AG/1630] <tefrank@monsanto.com>; DAUFELDT, JACOB A [AG/1630] <jacob.a.daufeldt@monsanto.com>
**Cc:** SEIFERT-HIGGINS, SIMONE [AG/1005] <simone.seifert-higgins@monsanto.com>; FRIEDMAN, TODD [AG/1000] <todd.friedman@monsanto.com>; GRAF, JEANNA M [AG/1000] <jeanna.m.graf@monsanto.com>
**Subject:** RE: Harness MAX - Meso Cost Model

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Jeanna will send out invites for a cost model followup meeting for the To:s and for an every 2 week project meeting for everyone on this note.

Jay


**From:** BUTKA, JAY A [AG/1000]
**Sent:** Sunday, March 03, 2019 4:58 PM
**To:** HUCHET, GUILLAUME [BAYER] <guillaume.huchet@bayer.com>; HERMAN, GREGORY R [AG/1000] <gregory.r.herman@monsanto.com>; RITTEMANN, FRANK [BAYER] <frank.rittemann@bayer.com>; RILEY, KIRSTEN J [AG/1000] <kirsten.j.riley@monsanto.com>; KAISIN, BRUNO [AG/1000] <bruno.kaisin@monsanto.com>; MACLIN, EMILY V. [AG/1000] <emily.v.maclin@monsanto.com>; FRANKE, TRAVIS E [AG/1630] <tefrank@monsanto.com>
**Cc:** SEIFERT-HIGGINS, SIMONE [AG/1005] <simone.seifert-higgins@monsanto.com>; FRIEDMAN, TODD [AG/1000] <todd.friedman@monsanto.com>
**Subject:** Harness MAX - Meso Cost Model

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)



Jay

*Jay Butka*
**Global Crop Protection Portfolio Lead**

///////////////////

Bayer Crop Science
Crop Protection Operations
Building C
St Louis, 63167, USA
Tel:     +1-314-694-2636
Cell:    +1-314-602-8879
E-mail:    jay.butka@bayer.com
Web:       http://www.bayer.com

**/// Follow Bayer on:**
/// Twitter /// Facebook /// Instagram /// LinkedIn /// YouTube

*The information contained in this e-mail is for the exclusive use of the intended recipient(s) and may be confidential, proprietary, and/or legally privileged. Inadvertent disclosure of this message does not constitute a waiver of any privilege. If you receive this message in error, please do not directly or indirectly use, print, copy, forward, or disclose any part of this message. Please also delete this e-mail and all copies and notify the sender. Thank you.*

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00000793_0005

CX3462-005

The information contained in this e-mail is for the exclusive use of the intended
recipient(s) and may be confidential, proprietary, and/or legally
privileged.  Inadvertent disclosure of this message does not constitute a waiver of any
privilege.  If you receive this message in error, please do not directly or indirectly
use, print, copy, forward, or disclose any part of this message.  Please also delete this
e-mail and all copies and notify the sender.  Thank you.

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00000793_0006

CX3462-006

# Exhibit 207

Message
_____

**From:** Frank Rittemann [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CA454763AA5A4C13A3F70E5D071C5ABA-PSRTF]
**Sent:** 11/20/2019 3:42:13 PM
**To:** Sabine Stolz [sabine.stolz@bayer.com]
**Subject:** FW: Harness Maxx - Meso Update 06/11/19 // meeting notes + actions

**From:** Kirsten Riley <kirsten.riley@bayer.com>
**Sent:** Friday, November 8, 2019 4:55 PM
**To:** Frank Rittemann <frank.rittemann@bayer.com>
**Subject:** Re: Harness Maxx - Meso Update 06/11/19 // meeting notes + actions

That makes sense to me! ███████████████████████
Kirsten

**From:** Frank Rittemann <frank.rittemann@bayer.com>
**Sent:** Friday, November 8, 2019 3:50 PM
**To:** Kirsten Riley <kirsten.riley@bayer.com>
**Subject:** RE: Harness Maxx - Meso Update 06/11/19 // meeting notes + actions

Hi Kirsten,



Does that sound about right?

Thank you and have a nice weekend!

Best,
Frank

**From:** Kirsten Riley <kirsten.riley@bayer.com>
**Sent:** Friday, November 8, 2019 3:26 PM
**To:** Sabine Stolz <sabine.stolz@bayer.com>; Gregory Herman <gregory.herman@bayer.com>; Todd Friedman
<todd.friedman@monsanto.com>; Simone Seifert-higgins <simone.seifert-higgins@monsanto.com>; Bruno Kaisin
<bruno.kaisin@monsanto.com>; Emily Maclin <emily.v.maclin@monsanto.com>; Travis Franke
<travis.franke@bayer.com>; Frank Rittemann <frank.rittemann@bayer.com>; Jacob Daufeldt
<jacob.daufeldt@bayer.com>; Guillaume Huchet <guillaume.huchet@bayer.com>
**Subject:** Re: Harness Maxx - Meso Update 06/11/19 // meeting notes + actions

Sabine,

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)



Kirsten

**From:** Sabine Stolz <sabine.stolz@bayer.com>
**Sent:** Wednesday, November 6, 2019 10:09 AM
**To:** Kirsten Riley <kirsten.riley@bayer.com>; Gregory Herman <gregory.herman@bayer.com>; Todd Friedman <todd.friedman@monsanto.com>; Simone Seifert-higgins <simone.seifert-higgins@monsanto.com>; Bruno Kaisin <bruno.kaisin@monsanto.com>; Emily Maclin <emily.v.maclin@monsanto.com>; Travis Franke <travis.franke@bayer.com>; Frank Rittemann <frank.rittemann@bayer.com>; Jacob Daufeldt <jacob.daufeldt@bayer.com>; Guillaume Huchet <guillaume.huchet@bayer.com>
**Subject:** Harness Maxx - Meso Update 06/11/19 // meeting notes + actions

Hi all,

Thanks for your participation! Below my notes and please don't hesitate to comment if I hadn't captured everything correctly...

Thanks!

Sabine

# Harness Maxx - Meso Update 06/11/19

Mittwoch, 6. November 2019

16:31

**Participants: Kirsten Riley, Bruno Kaisin, Gregory Herman, Sabine Stolz, Simone Seifert-Higgins, Frank Rittemann**

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)



ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00001167_0003
CX3463-003



Created with Microsoft OneNote 2016.

ATTORNEY'S EYES ONLY (HIGHLY CONFIDENTIAL)

FTC-Bayer-00001167_0004

CX3463-004

# Exhibit 208

## Filed Under Seal

# Exhibit 209

**From:**      jeff.cecil@syngenta.com [jeff.cecil@syngenta.com]
**Sent:**      12/8/2016 9:01:20 PM
**To:**        Hawkins Vern USGR [vern.hawkins@syngenta.com]
**Subject:**   Re: loyalty program

Thanks

Jeff

On Dec 8, 2016, at 8:45 PM, Hawkins Vern USGR <vern.hawkins@syngenta.com> wrote:

Jon,

A scenario that makes ▮▮▮▮ look like the winner in our ▮▮▮▮▮▮▮ transaction is problematic and likely the worst outcome. I'm also not sure ▮▮▮▮ having ownership of our branded business for the a.i.'s questioned will satisfy the ▮▮▮

▮▮▮▮▮▮▮▮ The removal of the Key A.I. program for the a.i.'s in question will generate multi-dimensional risks with some of our key customer partnerships beyond the devaluing of our brand ladder. Jeff has provided an assessment of the value loss associated with losing control of the brand ladder for these a.i.'s , but it is important to recognize our customer's profitability will also likely be impacted negatively by the devaluing of our brand ladder. This potentially will create customer confidence, support and share growth challenges with some of our customers who experience reduced profitability as a result of this change.

The strength of our customer partnerships and support levels is critical to enabling profitable market share growth so we need to minimize the damage caused by the compromising position we now find ourselves managing. If you would like to discuss further, please advise.

-Vern

**From:** Cecil Jeff USGR
**Sent:** Thursday, December 08, 2016 2:48 AM
**To:** Parr Jon CHBS <jon.parr@syngenta.com>
**Cc:** Neill Rob CHBS <rob.neill@syngenta.com>; Hawkins Vern USGR <vern.hawkins@syngenta.com>; Boin PierreEtienne CHBS <pierreetienne.boin@syngenta.com>; Quandt Ingolf-Christian CHBS <ingolf-christian.quandt@syngenta.com>
**Subject:** Re: loyalty program

Jon
The key a.i. Program has been very successful at pulling along our commodity products. Without that tool we will have significant losses.

With that said, offering these products to ▮▮▮▮ could be very damaging to our customer relationships.

Jeff

HIGHLY CONFIDENTIAL

On Dec 8, 2016, at 12:58 AM, Parr Jon CHBS <jon.parr@syngenta.com> wrote:

Jeff, Vern, Rob,

So does this argue that even if we cant offer them direct to the ▮ instead of ▮▮▮ reparations that we shoudl offer them to ▮▮ as compensation, becaus ethey wont be worth so much to us? That way we could presumably be specific that its the straight product only.

This analysis tends to suggest significant damage.

Rob I'll call you later to discuss.

Jon

---

**From:** Cecil Jeff USGR
**Sent:** Donnerstag, 8. Dezember 2016 00:05
**To:** Parr Jon CHBS <jon.parr@syngenta.com>; Neill Rob CHBS <rob.neill@syngenta.com>; Hawkins Vern USGR <vern.hawkins@syngenta.com>
**Cc:** Boin PierreEtienne CHBS <pierreetienne.boin@syngenta.com>; Quandt Ingolf-Christian CHBS <ingolf-christian.quandt@syngenta.com>
**Subject:** RE: loyalty program

All,
Please see below, but after working this through, I am estimating that the removal of PQT and ABA from our Key A.I. loyalty program will cost Syngenta ▮▮▮ in year 1 and up to $▮▮▮ after only 3 years.

Jeff

## Question:
## What is the potential revenue loss to the US if Abamectin & Paraquat are removed from the Key AI program…??

## ABA:
Removal from the Key AI Program w/ all assumptions outlined below remaining in place would result in the follow
**Potential Revenue Loss Year One =** ▮▮▮ ; **Year Two =** ▮▮▮ **Year Three =** ▮▮▮ **Total** ▮ **year cumulative loss of** ▮▮▮

Assumptions

- ▮▮▮▮▮▮ ▮▮▮
- ▮▮▮▮▮▮ ▮▮▮▮
- ▮▮▮▮▮ ▮▮▮▮
- ▮▮▮▮▮▮▮ ▮▮▮▮▮▮
  ▮▮▮▮▮
- ▮▮▮▮▮ ▮▮▮▮▮▮
  ▮▮
- ▮▮▮▮▮ ▮▮▮▮

- ██████████████████████████ ████████████████████████████

<< OLE Object: Picture (Device Independent Bitmap) >>

## PQT:

Removal from the Key AI Program w/ all assumptions outlined below remaining in place would result in the following Potential Revenue Loss Year One = ███████ ; Year Two = ████████ ; Year Three = ███████ **Total █ year cumulative loss of $**████████

Assumptions



<< OLE Object: Picture (Device Independent Bitmap) >>

HIGHLY CONFIDENTIAL

# Exhibit 210

## Filed Under Seal

# Exhibit 211

## Filed Under Seal

# Exhibit 212

## Filed Under Seal

# Exhibit 213

**Filed Under Seal**

# Exhibit 214

**Filed Under Seal**

# Exhibit 215

## Filed Under Seal

# Exhibit 216

**From:** Van Vooren, Douglas (D)
**To:** Feauto, Nate (N)
**Sent:** 11/15/2018 9:52:52 PM
**Subject:** RE: ███████, Matrix, ██████, and strategy

███████████████████████████████████████████████████████

████████████████████████████████████████

There was no option to save the business. We believe ██████████████ took the business with generic.

This is business Daniel was told we had, and then the grower changed and told ████████ they could not tell Corteva because they "didn't want some rep coming with a program". All they wanted was a cheap price up front……but they can't be trusted.

Sucks I know.

Yes, I will track any commitment I make. Have not made any thus far.

Doug VanVooren
Account Manager
Corteva Agriscience™
Agriculture division of DowDuPont™
██████████████████████

**From:** Feauto, Nate (N)
**Sent:** Thursday, November 15, 2018 1:44 PM
**To:** Van Vooren, Douglas (D) <DDVANVOOREN@dow.com>
**Subject:** RE: ███████ Matrix ████████ and strategy

Doug,

I would assume this would go against the ██████████████████ bucket I have accrued? Are you keeping track of these then or do you want me to? Is this the only one we have so far?

I mentioned a ████████ bucket of funds, but I got stuck more things to account for on Matrix expenses that I had no idea about (imagine that, this is still happening over a year later)…can we try to manage to a ██████████ budget for now. If we have to we can increase it later.

Thanks,
Nate

**From:** Van Vooren, Douglas (D)
**Sent:** Thursday, November 1, 2018 12:33 PM
**To:** BODILY, REDGE <redge.bodily@dupont.com>; HEMMAN, MICHAEL T <mike.hemman@dupont.com>; FRANKLIN, ALISON W <alison.w.franklin@dupont.com>; Bouck, Dan (D) <DHBOUCK@dow.com>; Feil, Phil (P) <pfeil@dow.com>
**Cc:** Feauto, Nate (N) <Feauto@dow.com>
**Subject:** ██████████, Matrix, ██████, and strategy

Confidential Treatment Requested by Corteva

I spoke with Rob Phillips today and gave him the green light to go to ███████████████ Asked him to make sure they understand the price can't be shopped around. We agreed that ██████ may tell us to pound sand because they don't like being told what to do.

Rob was going to talk to Manny and the owners if they were available.

My memory is ██████ is around 10,000 ounces? They purchased 3,000 of generic according to Rob. I asked Rob to confirm back what he can about volume and ██████ response.

Redge, I think you probably need to bring Daniel in the loop? Important that Daniel knows he shouldn't proactively talk about this with Manny. We need to protect Rob in this, but I think Daniel needs to know in case something is said. I will let you handle that as you see fit.



I'm sure there will be plenty of debate over the next 6 months as we develop plans for 2019-20, and Spencer may say something different when he thinks about the big picture.

Just wanted to share what Rob told me.

Dan and Phil, call me if you want full understanding.

Doug VanVooren
Account Manager
Corteva Agriscience™
Agriculture division of DowDuPont™
███████████████

Confidential Treatment Requested by Corteva

# Exhibit 217

| | |
|---|---|
| **From:** | Feauto, Nate |
| **To:** | Messner, Ryan |
| **CC:** | Bouck, Dan; Swanson, Lars; Hay, J |
| **Sent:** | 5/31/2019 4:12:45 PM |
| **Subject:** | RE: Oxamyl Loyalty - ▮▮▮ Update and Request |

Any chance we can circle up together and discuss this real quick Monday or Tuesday? ▮▮▮▮▮▮▮▮▮▮

Atticus, just today, has submitted for voluntary registration termination, so they will no longer be a threat in the future as Dan noted.

Additionally as Lars knows, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ I would hate to lower loyalty levels to let generics get back in the game, when we potentially could be so close to pushing them completely out.

Thanks,
Nate

**From:** Messner, Ryan ▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, May 30, 2019 12:25 PM
**To:** Feauto, Nate ▮▮▮▮▮▮▮
**Subject:** FW: Oxamyl Loyalty - ▮▮▮ Update and Request

Nate,

Heads up.
R

**From:** Bouck, Dan ▮▮▮▮▮▮▮▮
**Sent:** Thursday, May 30, 2019 11:18 AM
**To:** Swanson, Lars ▮▮▮▮▮▮▮▮▮▮▮ >; Messner, Ryan < ▮▮▮▮▮▮▮▮▮ >; Hay, J

**Subject:** RE: Oxamyl Loyalty - ▮▮▮ Update and Request

Lars, Ryan and Jim:

I had a follow-up call with Cesar on this today and he told me he is going to go forward with this generic oxamyl purchase as it is going to sell to another party if he does not do it.

I know from a conversation with Lars last week that the likely scenario is that we are going to make an adjustment to loyalty for all distributors. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Cesar's "ask" is to not penalize him on ▮▮▮▮▮▮▮▮▮▮

---

\*\*\* New E-mail - ▮▮▮▮▮▮▮▮ \*\*\*

**Dan Bouck**  National Account Manager
**Corteva Agriscience**™
Agriculture Division of DowDuPont™
▮▮▮▮▮  ▮▮▮▮▮

Dow AgroSciences LLC

9330 Zionsville Rd.
Indianapolis, IN 46268

**From:** Bouck, Dan
**Sent:** Thursday, May 23, 2019 12:31 PM
**To:** Swanson, Lars ██████████████████ >; Messner, Ryan ████████████████ ; Hay, J
████████████

**Subject:** Oxamyl Loyalty - ████ Update and Request

Lars,

Please give me a call after reviewing this e-mail so we can talk on the phone about it as I'd appreciate your help in coordinating our response.

Lars, Ryan and Jim:

I received a call form Cesar Anzola today regarding oxamyl. I'm hoping between the four of us we can piece together the background on this.

████████████████████████████████████████████
████████████████████████████ I was not involved in this but hope that it will ring a bell with Lars. Cesar indicated he had also talked to Jim Hay about it.

Cesar indicates that ████ is going to get out of the oxamyl business. I believe this is confidential but Cesar thought our global group was probably already aware of this. ████████████████████████
████████████████████████████████████████
████████████████

His rationale is:

- ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████

████████████████████████████████████████

████████████████████████████████████████████

---

*** **New E-mail -** ████████████████ ***

**Dan Bouck**  National Account Manager
**Corteva Agriscience**™
Agriculture Division of DowDuPont™
████████████  ██████████████

Dow AgroSciences LLC
9330 Zionsville Rd.
Indianapolis, IN 46268

Confidential Treatment Requested by Corteva

# Exhibit 218

## Filed Under Seal

# Exhibit 219

## Filed Under Seal

# Exhibit 220

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

- - - - - - - - - - - - - - - X

FEDERAL TRADE                    :

COMMISSION, et al.,              :

         Plaintiffs,      :

vs.                              : 1:22-cv-00828-TDS-JEP

SYNGENTA CROP PROTECTION         :

AG, et al.,                      :

         Defendants.      :

- - - - - - - - - - - - - - - X

IN RE CROP PROTECTION            : 1:23-md-3062-TDS-JEP

PRODUCTS LOYALTY PROGRAM         :

ANTITRUST LITIGATION             :

- - - - - - - - - - - - - - - X

*** HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY ***


VOLUME I OF THE REMOTE VIDEOTAPED 30(b)(6),
DEPOSITION OF VAN DIEST SUPPLY COMPANY, THROUGH
JOHN VAN DIEST


July 14, 2025

8:11 a.m.


Job No. 42273

Reported by:  Rita A. DeRouen, RPR, CRR

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC
Page: 1
Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 38 of 108

Q. What about for S-metolachlor?

A. Yes.

Q. What about azoxystrobin?

A. Yes.

Q. Are you currently able to meet all of your customer demand for generic products?

MR. McCLAMMY:

Objection; form.

A. No.

BY MR. GOERLITZ:

Q. Why not?

A. Because of loyalty programs.

MR. GOERLITZ:

We've been going for about another hour again, so why don't we take a break. Let's go off the record.

VIDEO SPECIALIST:

We are off the record. The time is 10:13.

(A break was taken.)

VIDEO SPECIALIST:

We're back on the record. The time is 10:22.

BY MR. GOERLITZ:

Q. Mr. Van Diest, I'd like to show you

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 39 of 108

again what's already been marked as Exhibit 1.

I'd ask that it be displayed to Mr. Van Diest.

Mr. Van Diest, do you see Exhibit 1 on your screen?

A. Yes, sir.

MR. GOERLITZ:

I'd like to please control Exhibit 1.

BY MR. GOERLITZ:

Q. Mr. Van Diest, I'm showing you what's the second page of Exhibit 1, which bears the label FTC-Van Diest-00013435.

Do you see that?

A. Yes.

Q. Okay. And at the top here, you mention a product called Bulk Brawl.

A. Yes.

Q. What is Bulk Brawl?

A. Well, Brawl would be a private-label S-metolachlor that we source from Syngenta. The word "bulk" is simply stating a package size; in other words, it's bulk, it's not a 2 1/2 gallon container.

Q. So I'm highlighting the first paragraph that says, "Here is an update regarding our

long-term customer in SW Iowa who has purchased 25,000 gallons of Bulk Brawl from us each year for the last few years that was recently quoted unsafened metolachlor for $23.50 (equivalent to $35.07 for Brawl)."

Do you see that?

A. Yes, sir.

Q. And then right after you say, "After trying unsuccessfully to work with Syngenta and retain this business for all of us, we all have lost the business."

Do you see that?

A. Yes, sir.

Q. Can you explain why you lost this business?

A. So 23.50 metolachlor would be equal to 35.07 S-metolachlor; S-metolachlor is the result isomer of metolachlor and is more active, more potent, than the regular metolachlor; therefore, you use less of it per acre, okay? So that's why the S-metolachlor would be equivalent to 35.07.

And I don't recall what my cost was on Bulk Brawl at that time, but clearly my cost of Bulk Brawl was higher than the 35.07. When I say working with Syngenta, I don't recall if I was

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC
Page: 82
Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 41 of 108

asking Syngenta, Hey, can you give me a lower price, can you give me some funding.  I don't recall that.

I'm sure I worked with like the local Syngenta rep, Hey, can you go in and try and influence this retailer to stay with the private label and, you know, just try to use his influence, that would be one way.

Q.    Is S-metolachlor an herbicide?

A.    Yes, sir.

Q.    And Van Diest sells herbicides that don't contain S-metolachlor; is that right?

A.    Correct, correct.

Q.    Is it your understanding that this customer was going to buy metolachlor product elsewhere instead of purchasing a different non-metolachlor-containing product from Van Diest?

MR. McCLAMMY:

Object to form, foundation.

A.    A retailer buys multitudes of different herbicides, okay?  For this market segment, which would be -- let's see, an unsafened would be on the soybean side, I believe.  As a base or a foundation herbicide, that was what he chose to use.  There are other actives, but that's the one

he wanted to use.

BY MR. GOERLITZ:

Q. So is there demand for specific actives?

A. Yes.

Q. If Van Diest wasn't participating in a loyalty program, do you believe that you would have lost this business?

A. I would not have.

Q. Why do you say that?

A. Because there was obviously generics out there at a price point less than $35 that I'm sure I could have accessed.

Q. And so if you were not subject to the loyalty program, would you have sold this customer the generic?

A. Sure.

Q. I'm going to move down to the paragraph on page 1 of Exhibit 1, and I have the section highlighted, that says, "This is our second major loss with this customer this fall. This is the customer that purchased 30,000 gallons of generic Lexar about a month ago."

Do you see that section?

A. Yes, sir.

Q. What is Lexar?

215-341-3616  transcripts@everestdepo.com
Everest Court Reporting LLC
Page: 84
Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 43 of 108

A. Lexar is a brand of Syngenta's. It is a premix, meaning it has more than one active in it. I believe Lexar has S-metolachlor, mesotrione, and I think atrazine in it.

Q. And what is your understanding of why Van Diest lost this business?

A. The price of the generic Lexar was cheaper than the fighting brand that Syngenta was supplying to us.

Q. And if Van Diest wasn't participating in Syngenta's loyalty program, do you believe you would have lost this business?

A. No.

Q. Why?

A. Because, there again, the generic was at a significantly lower price point, and if I wouldn't have been limited or restricted, if you will, I would have bought the generic and supplied it to my customer.

MR. GOERLITZ:

Okay. I'm going to put that document aside. I'd like to pull up the document that ends in 13613, and I'd like to have that document marked as Exhibit 3.

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 44 of 108

# Exhibit 221

## Filed Under Seal

# Exhibit 222

Q. Does azoxystrobin belong to a class of fungicides with similar modes of action?

A. The strobilurin class of chemistry. There's quite a few of those.

Q. How does -- what makes azoxystrobin unique or different from other strobins within this class?

A. That one and really pyraclostrobin from BASF are very similar in nature. I'm going to talk about both together because biologically they both work very similar. They provide good curative disease control on a number of diseases along with some preventative disease control in addition to both give you that plant health benefit, which is not synonymous among all of strobins.

Q. You mentioned that azoxystrobin can be used on a number of different crops. What was the use case that NuFarm has looked at or is interested in with azoxystrobin in the past?

A. I was not at NuFarm when the decision was made to go into it. So I'm not necessarily sure of the exact details on what went into the decision on the positioning of the product.

Q. Were you at NuFarm when NuFarm was selling an azoxystrobin product?

A. Yes. So I was -- Azure Xtra, I was here during

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 47 of 108

the end of that.  So during the process of exit and then the subsequent cancellization and agreement that was in place with Syngenta.

Q.  So at the time that NuFarm was still making sales, understanding that it was towards at the tail end of its use of Azure Xtra in the market, what was Azure Xtra sold for by NuFarm?  Were there specific crops?

A.  Weed was its best fit in the market.  That was driven by the presence of the cyproconazole in the mixture.

Q.



Q. And whose loyalty -- what basic manufacturer's loyalty program was affecting the sale of NuFarm's Azure Xtra product?

A. Syngenta.

Q. You mentioned that BASF has a very similar product called pyraclostrobin. To your knowledge, does BASF have a loyalty program for pyraclostrobin?

A. I have not worked on pyraclostrobin from an entry standpoint. And probably the bigger drive for that is between azoxy and pyraclo, they are so similar in nature from a portfolio standpoint, I think our decision would be to only have one of the two. Not both.

Q. You were mentioning earlier that loyalty programs are targeted on an AI-by-AI basis. And do you have any knowledge about whether, from your time at NuFarm whether Syngenta's loyalty program would include BASF's pyraclostrobin product?

A. I'm not aware of that.

Q. So given that pyraclostrobin and azoxystrobin are so similar, why wasn't it an option for NuFarm just to target its azoxystrobin product towards

pyraclostrobin applications or pyraclostrobin sales where potentially the loyalty program wouldn't apply to those sales?

A. I was not at NuFarm during the time that decision was made, so I don't know what went into the process of selection between the two.

Q. I'm sorry, I realize I didn't make myself clear. You were at NuFarm when the decision was made to exit the Azure Xtra product; is that right?

A. That is correct, yeah.

Q. So given the similarity between pyraclostrobin and azoxystrobin, would growers view them -- to your knowledge, view them as substitutes?

A. In certain applications, yes. There are some applications where, no, that is more driven by the scope of which the crops they go across. Azoxy probably does go across more crops, but in corn, for example, they would be very interchangeable.

Q. I guess I'm trying to understand, you know, you said that the loyalty -- Syngenta's loyalty program from NuFarm's perspective essentially closed off the opportunities that it had to sell Azure Xtra into the market. And I'm trying to understand why couldn't NuFarm just try to use its azoxystrobin product to compete against similar products that maybe would not

more common and you can use some of -- I'll give you an example of some of the things that Kumiai is doing, which is a Japanese research and development company where they are licensing giving active ingredient to multiple companies.  It is becoming more common, but I wouldn't say it's a common practice.

Q.  To your knowledge, do Corteva or Bayer have loyalty programs that include acetochlor within them?

A.  I have not had a conversation with channel partners on acetochlor.  So I don't know how that program structure is.



Case 1:22-cv-00828-TDS-JEP     Document 461-10     Filed 04/27/26     Page 51 of 108



Q.  You mentioned that you've seen some use case analysis for acetochlor in the past, although you also say you are not very close to this ingredient.  Based on sort of like your history at NuFarm and any sort of conversations that you have had and production and documents that you have seen, sort of what happened in NuFarm's analysis of acetochlor as a potential chemical and potentially entering with an acetochlor product?

A.  I don't know the definitive outcome of stuff. Again, I think some of this may have been done before I arrived, because I know acetochlor has been in the market for a period of time.  But we would be subject

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 52 of 108

to the same structural barriers, whether it's loyalty or grower programming that would be in place with the companies that are involved.  And so to my knowledge, we haven't advanced anything, and that would be the likely reason why we have not advanced products of this size.

Q.  So you say that's the likely reason, sort of the structural barriers, including loyalty that you've seen with other chemicals.  But do you have specific knowledge about whether structural barriers like loyalty discouraged NuFarm from entering with acetochlor products?

A.  Yeah, I don't have the specific detail of those barriers that were in the conclusions of the analysis.

Q.  Have you ever had a conversation or been in a meeting where someone has mentioned that loyalty played a role in NuFarm not bringing an acetochlor product to market?



Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 53 of 108

Q.  Have you had conversations, either internally with NuFarm, you said you haven't with customers, where it's been reported by customers that there is sort of loyalty or other structures that would prevent them from buying significant acetochlor levels of acetochlor from NuFarm?

A.  In those meetings that I referenced, I have heard other people from NuFarm say that those -- for acetochlor specifically that there was a concern. Acetochlor is one of the ones that I have not directly had a conversation with a customer that I recall or do I recall specific details even of what the NuFarm people were saying about it.

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 54 of 108



Q.   Does the fact, just based on your experience in marketing and with crop protection products at NuFarm and over the course of your career, does the fact that product is not as large mean that NuFarm might have to make more marketing or other sales efforts in order to drive interest for the product throughout the

Case 1:22-cv-00828-TDS-JEP     Document 461-10     Filed 04/27/26     Page 55 of 108

who it is.

Q. Are there any other active ingredients that sort of are similar to mesotrione in the sense they can be used on the same crops for the same diseases and are considered roughly comparable in use?

A. Bayer has an HPPD offer. The brand is escaping me right this second, though.

Q. Is that product -- finish your answer.

A. That was the only other one I could think of.

Q. Is the Bayer HPPD product still under patent exclusivity or data compensation exclusivity to your knowledge?

A. To my knowledge, I haven't looked at that one and I don't know any of the details of when that might have happened or would happen in the future.

Q. Has NuFarm considered offering a mesotrione-containing product in the United States?

A. I do know that we have looked at that as a potential offer.

Q. Were you involved in those considerations at NuFarm?

A. Yes, I was.



Q.   So when you are referring in this context to structural barriers, you are referring to the loyalty program and Syngenta's loyalty program in place for the mesotrione AI?

A.   That's correct.

Q.   How did you at NuFarm sort of have awareness or

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 57 of 108

knowledge about the loyalty program that was in place that covered mesotrione?

A. So it really centers on more of an assumption with where we were at this stage. We had also monitored market research reports on the success, again, I believe the company was Rotam that had entered and really observing the volume of product they were moving into and subsequently through the channel and seeing what market shares they had gained and then also looking a bit closer at just the general pricing structure based on the market data that we had and some of the trends.



Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 58 of 108

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

Q.   Which other companies, post-patent companies had you observed entering the market and struggling with the loyalty programs?

A.   Rotam was the main one because going back to an earlier conversation we had had, ████████████████████

████████████████████████████   ██████████

███████████████████████████████████

█████████   ██████████████   ████████████████

███████████████████████████████████████

████████████████████████   ██████████████████

█████████████████████████████████████

█████████████████████████████████████

Q.   You know --

A.   Based on -- that's based on a conversation we had when we had the meeting when we were couching mesotrione.

Q.   We were discussing earlier the Leopard product and the fact that ██████████████████████████

█████████████████████████████████████

████████████████████████   █████████████

█████████████████████████████████████████████

                            EVENING SESSION

                                          (5:30 p.m.)

          BY MR. TURNER:

          Q.   So we've talked quite a bit about metolachlor
at least with reference to acetochlor.  So some of
this, you know, you may have answered, but just to make
sure we cover our bases with this particular active
ingredient, how is metolachlor marketed and how is it
different from acetochlor?  You mentioned that there
are some similarities between the two products.

          A.   There are some similarities largely, to my
knowledge, offered in mixture.  I think there maybe are
some straight products, but the vast majority of that
market is in mixture form.  You know, today it's gone
to the refined s-metolachlor product that Syngenta
offers.  So that's probably one of the main
differences, but -- yeah, beyond that.

          Q.   Is it the case that there's a metolachlor AI
that's offered in certain products, but then Syngenta
markets a product with a different name called
s-metolachlor for certain products?

          A.   That is correct.

          Q.   To your knowledge, what is the difference
between metolachlor and s-metolachlor?

          A.   During my time at NuFarm I really haven't

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 60 of 108

studied the agronomy between the two.  So I can't knowledgeably speak to it.

Q.  So other than the fact that metolachlor and s-metolachlor are technically different registrations, I assume, is that correct that they are different registrations?

A.  That's my understanding, yes.

Q.  You are not aware of any other differences between metolachlor and s-metolachlor?

A.  No.

Q.  Are you aware of whether --

MR. MACY:  Can we go off the record for just a second.

(Discussion off the record.)

(A recess was taken.)

BY MR. TURNER:



Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 61 of 108



Q.   Are there any other products that kind of fall in this category where NuFarm would like to enter to offer that would be a good product in terms of fit within its portfolio or just there's a good margin opportunity or some other financial factor that it's taking a look and it just decided that it's not worth trying to sell to a loyalty constrained market?

A.   I do think we've had several projects that we did not carry forward that the structural barriers of the market would have prohibited our economic models from working and we've made similar decisions.

Q.   Could you describe the ones that come to mind?

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 62 of 108

Case 1:22-cv-00828-TDS-JEP     Document 461-10     Filed 04/27/26     Page 63 of 108

CERTIFICATE OF WITNESS

I hereby certify that I have read and examined The foregoing transcript, and the same is a true and Accurate record of the testimony given by me.

Any additions or corrections that I feel are Necessary, I will attach on a separate sheet of paper To the original transcript.

I hereby certify, under penalty of perjury, That I have affixed my signature hereto on the date so Indicated.

DATED:

_____

KEN BARHAM

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

CERTIFICATE OF WITNESS


I here y certi y th t I ha e re d a d examin d
T e foregoi g transcrip , a d t e sa e  s a tr e a d
Accura e reco d  f t e testimo y giv n  y me.

Any addit on  or correct ons  h t I  eel are
Necess r , I  ill at ac  n a sepa ate s ee  of p pe
To the orig nal transcri t.

I  ereby ce tify, under p na ty of perjur ,
 hat   have a fi ed my sig ature  er to  n th  d te so
Indicated.


ATED: Fe rua y 11, 2022


*ken Barham*
_____
KEN BARHAM

FOIA CONFIDENTIAL — HIGHLY CONFIDENTIAL
CONTAINS PROPRIETARY INFORMATION

**WITNESS:** KEN BARHAM

**DATE:** JUNE 30, 2021

**CASE:** PESTICIDES

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|---|
| Global | | Replace "NuFarm" with "Nufarm" | To correct the record (correct formatting of "Nufarm" name) |
| 3 | 11 | Change "cmacy@bakermckenzie.com" to "creighton.macy@bakermckenzie.com" | To correct the record |
| 3 | 13 | Please add Thomas Ryan, Associate General Counsel - North America<br><br>Contact information:<br><br>Nufarm Americas Inc.<br>11901 South Austin Avenue<br>Alsip, Illinois 60803<br>+1 708-377-1445<br>thomas.ryan@nufarm.com | Additional attorney appearing on behalf of Nufarm |
| 15 | 25 | Change "of" to "or" | To correct the record |
| 16 | 8 | Change "to" to "the" | To correct the record |
| 18 | 12 | Change "AI patent" to "AI patent fall" | To correct the record |
| 19 | 13 | Change "right now" to "ran out" | To correct the record |
| 20 | 5 | Change "peers" to "tiers" | To correct the record |
| 21 | 23 | Change "longer term" to "longer term control" | To clarify the record |
| 25 | 18 | Change "in" to "with" | To correct the record |
| 32 | 25 | Change "Vice president of sales crop protection" to "Vice President of Sales, Crop Protection" | To clarify the record |
| 33 | 19 | Change "project leaders inside that portfolio team" to "project leaders.  Inside that portfolio team" | To clarify the record |
| 37 | 10 | Change "Simplot, Innvictis" to "Simplot/Innvictis" | To clarify the record |
| 39 | 25 | Change "teams and guidance" to "teams with guidance" | To correct the record |
| 42 | 12 | Change "region" to "regional" | To correct the record |
| 42 | 17 | Change "region" to "regional" | To correct the record |
| 45 | 17 | Change "cops" to "crops" | To correct the record |
| 48 | 19 | Delete "maybe" | To clarify the record |
| 54 | 12 | Change "an azoxy" to "a phenoxy" | To correct the record |
| 66 | 9 | Change "everybody in the" to "everybody in the industry" | To correct the record |
| 80 | 19 | Change "wheat" to "we" | To correct the record |
| 107 | 4 | Change "resource" to resources" | To correct the record |
| 112 | 21 | Change "That's not brief" to "That's not free" | To correct the record |
| 119 | 1 | Change "empathy" to "pathway" | To correct the record |
| 121 | 3 | Change "is we" to "is do we" | To correct the record |
| 132 | 23 | Change "discounted" to "discounting" | To correct the record |

| | | | |
|---|---|---|---|
| 141 | 10 | Change "chair" to "share" | To correct the record |
| 142 | 16 | Change "NuFarm is one" to "Nutrien is one—" | To correct the record |
| 143 | 3 | Change "still has" to "still has some" | To correct the record |
| 152 | 5 | Change "toll" to "pull" | To correct the record |
| 158 | 14 | Change "futures" to "future" | To correct the record |
| 162 | 13 | Change "pawn" to "run" | To correct the record |
| 173 | 2 | Change "MiCrop P" to "dichlorprop-p" | To correct the record |
| 181 | 9 | Change "call" to "call-in" | To correct the record |
| 183 | 7 | Change "often all" to "often at all" | To correct the record |
| 193 | 2 | Change "glycine sulfuron" to "thifensulfuron" | To correct the record |
| 228 | 18 | Change "vast number" to "vast number of cases" | To correct the record |
| 229 | 18 | Change "opportunity direct" to "opportunity to direct" | To correct the record |
| 230 | 6 | Change "calls to reply" to "costs arise" | To correct the record |
| 230 | 20 | Change "glycine sulfuron" to "thifensulfuron" | To correct the record |
| 230 | 22 | Change "merchant acquisition" to "merger and acquisition" | To correct the record |
| 231 | 24 | Change "all agronomy" to "all the agronomy" | To correct the record |
| 233 | 4 | Change "to be a" to "to be as" | To correct the record |
| 235 | 17 | Change "lean or" to "lean on" | To correct the record |
| 237 | 10-11 | Change "glycine rimsulfuron" to "thifensulfuron" | To correct the record |
| 237 | 14-15 | Change "glycine rimsulfuron" to "thifensulfuron" | To correct the record |
| 237 | 21 | Change "another glycine" to "thifensulfuron" | To correct the record |
| 240 | 4 | Change "giving" to "a given" | To correct the record |
| 245 | 25 | Change "for" to "or" | To correct the record |
| 253 | 19 | Change "couching" to "pitching" | To correct the record |
| 268 | 1 | Change "Schwier" to "Schwehr" | To correct the record |
| 273 | 24 | Change "IAP member" to "IAP members" | To correct the record |
| 278 | 23 | Change "can" to "can't" | To correct the record |

# Exhibit 223

**Filed Under Seal**

# Exhibit 224

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WINSTON-SALEM DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF TEXAS, STAE OF WASHINGTON, and STATE OF WISCONSIN, | ) ) ) Case No. ) 1:22-cv-00828- ) TDS-JEP ) ) ) ) ) ) ) ) |
|        Plaintiffs, | ) ) |
| vs. | ) ) |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC., and CORTEVA, INC., | ) ) ) ) ) |
|       Defendants. | ) ) |
| _____ | ) |

***HIGHLY CONFIDENTIAL***

VIDEOTAPED DEPOSITION OF

BILL LEWIS

Tuesday, March 18, 2025

Reported By:

CATHI IRISH, RPR, CRR, CLVS

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 70 of 108

LEWIS - HIGHLY CONFIDENTIAL

that makes acetochlor, so they obviously had a better relationship and were a bigger Corteva supporter and that's why they decided to source the acetochlor from them.

Q. You mentioned that sourcing from the defendants including Corteva would mean that you would run into less headwind around loyalty programs. What did you mean by that?

MR. ANDERSON: Objection to form.

BY MR. CHEN:

Q. Go ahead.

A. My comment is that it was -- it was re -- it would be considered program neutral if not program positive because it was being sourced from them.

Q. Do you know if this acetochlor premix is program neutral?

A. All I know is what our customers said why they needed to source from there. Whether that happened they didn't sit there and tell me at the end of the day.

Q. Why did SummitAgro help -- I'm

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 71 of 108

LEWIS - HIGHLY CONFIDENTIAL

sorry, let me back up.

Q.    Did SummitAgro have a partner in introducing the acetochlor premix?

A.    Help me when you say partner. What do you mean?

Q.    Did SummitAgro work with anyone in introducing this premix?

A.    Yes, Tenkoz.

Q.    And why did SummitAgro help Tenkoz introduce the acetochlor premix?

A.    One, because the solo market for tolpyralate is a very narrow segment of the corn herbicide business and by mixing it with one of these what I'll call base herbicides that are used across almost all corn acres, it opened up more market opportunity for tolpyralate.

Q.    Mixing with acetochlor opened up more market opportunity for tolpyralate?

A.    Correct.

LEWIS - HIGHLY CONFIDENTIAL



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

LEWIS - HIGHLY CONFIDENTIAL

Q. Why not introduce the acetochlor premix to the market under SummitAgro's name brands?

A. Because we would run afoul on the acetochlor loyalty programs and we would have much more headwind getting it placed.

Q. Loyalty programs discourage SummitAgro from introducing this acetochlor premix as its own product instead of as a private label product?

MR. ANDERSON: Objection.

BY MR. CHEN:

Q. Go ahead, Mr. Lewis.

A. Yes.

Q. Let's move on to the private label metolachlor products that SummitAgro mixes for Helena. This is Empyros?

A. Correct.

Q. What is Empyros?

A. Empyros is a mixture of S-metolachlor herbicide, a base treatment

LEWIS - HIGHLY CONFIDENTIAL

corn herbicide, a premix with tolpyralate in it and in our case, Helena also put some atrazine, another active ingredient, atrazine is used on almost every corn acre.

Q. Would the atrazine product you're referring to, is that in addition to metolachlor and tolpyralate?

A. It is.

Q. What is metolachlor or S-metolachlor?

A. A base, they are also known the acid analid type of chemistries, those acetochlor, S-metolachlor type of products.

Q. Is metolachlor proprietary?

A. It used to be. It's not anymore.

Q. Who owned the rights to metolachlor before those rights expired?

A. Syngenta.

Q. Is metolachlor included in one of the defendants' loyalty programs?

A. Yes, it is.

Q. Which one?

LEWIS - HIGHLY CONFIDENTIAL

THE WITNESS: I don't remember exactly who would supply -- for example Micro Flo weren't making it themselves. I don't have a clue, either China, India or some other part in the world, but Syngenta used to keep track of every place in the world that were putting in chemical synthesis plants so they knew where stuff was coming from and in many cases they would find out the process they were using and know whether they were going to be competitive with it or not.

BY MR. CHEN:

Q. Did generic manufacturers of crop protection products have a lower cost position in abamectin than Syngenta?

MR. THOMSON: Object to form.

THE WITNESS: When this work was being done, there was a fear they did.

BY MR. CHEN:

Q. You see where this slide is referring to the cost plus market

LEWIS - HIGHLY CONFIDENTIAL

structure being disastrous?

A. Yes.

Q. Why would a cost plus market -- what is a cost plus market structure?

A. Oh, my goodness, that's Walmart. All right? I mean nothing against my friend from Arkansas but bottom line is it's where -- there's two ways to look at your profitability. A gross margin which is a percentage of your profit on your sales price or your pricing is I get it at this level and no matter what, I only put 10 percent on it or 15 or 5. Market plus is not where you're trying to extract all the value that you can out of your product's features, advantages and benefits.

Q. Is Syngenta a cost plus manufacturer?

A. No.

Q. Why not?

A. Because that's not -- it's not in their DNA and they can't fund their research R&D by doing that. No

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Case 1:22-cv-00828-TDS-JEP   Document 461-10   Filed 04/27/26   Page 77 of 108

LEWIS - HIGHLY CONFIDENTIAL

manufacturer, not just Syngenta.  I shouldn't just pick on them.  None of the basics.

Q.    Are generic companies -- do you know if generic companies operate on a cost plus basis?

A.    There have been a handful in the past that have.  I would say a lot of them have tried to change that model and where they can extract more value.

Q.    Do you see where the slide refers to generic producers improving quality? Second bullet.

A.    Second bullet?  Yes, I see that.

Q.    What does that refer to?

A.    That -- in the past, in the old days of the first generics, many times they were not -- they were not of the best quality.  Either their formulation was poor, their packaging was poor, a lot of different things when you compared it to the original company was not up to the same standards so for a long time they were considered or they were painted as

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 78 of 108

LEWIS - HIGHLY CONFIDENTIAL

inferior.  That has changed dramatically over the years.

Q.  Do you see where this same bullet is referring to Rotam selling Romectin to FMC?

A.  I do.

Q.  And combining it with bifenthrin, B-I-F-E-N-T-H-R-I-N.  What is Rotam or what was Rotam?

A.  Rotam was a generic company either out of China or Hong Kong.  I can't remember originally where they came out of.

Q.  Is it still in existence?

A.  It is.  They are not doing as much business but they are still in busy know selling in certain parts of the world.

Q.  Do you know whether they have been acquired by another company?

A.  I think they were.  Either they were acquired or they merged with another company.

Q.  Does Albaugh ring a bell?

# Exhibit 225

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

FEDERAL TRADE COMMISSION,
STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF ILLINOIS,
STATE OF INDIANA, STATE OF IOWA,
STATE OF MINNESOTA, STATE OF
NEBRASKA, STATE OF OREGON,
STATE OF TENNESSEE, STATE OF
TEXAS, STATE OF WASHINGTON, and
STATE OF WISCONSIN,

     Plaintiffs,

vs.              Case No. 1:22-cv-00828-TDS-JEP

SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION,
SYNGENTA CROP PROTECTION, LLC,
and CORTEVA, INC.,

     Defendants.

VIDEO-RECORDED REMOTE ZOOM and IN-PERSON
30(b)(6) and 30(b)(1) DEPOSITION OF HELM
AGRO US, INC./DAVID SCHUMACHER, VOL. I
(PORTIONS MARKED HIGHLY CONFIDENTIAL
FOR OUTSIDE ATTORNEYS' EYES ONLY)
Taken on Thursday, March 6, 2025
Scheduled for 9:00 a.m. CST

REPORTED BY:  DANA S. ANDERSON-LINNELL

marketplace.

Q.     So breaking that down, I guess, what does your sales team -- what type of information does your sales team usually gather from customers?

A.     As our sales team interacts with customers on the sales planning process and what the customer needs, the customer will share with them what they're seeing in the marketplace on active ingredients and mixtures, me-toos, around certain pricing in the market. And we'll take that feedback from our sales team and try to understand where we feel the market is and price accordingly.

We generally price -- well, I'll stop my answer there.

Q.     So I'll sort of drill down on more specifics.

Let's talk about azoxystrobin first, for example.  Does HELM consider the prices of Syngenta azoxystrobin products when pricing your Fearless products?

A.     No.  I think you're getting them mixed up.  Azoxystrobin is not Fearless.  It's HELMstar Plus.

Q.    As everyone knows, there's a lot of --

A.    No, I get it.  I get it.

Q.    I'll reask that.

Does HELM consider the prices of Syngenta azoxystrobin products when pricing your HELMstar Plus product?

A.    We would to the best of our ability try to understand where their pricing is in the market, along with other people that are selling azoxy-based products, so yes.

Q.    Is the same generally true for other active ingredients that HELM sells, you would consider the prices of basic manufacturer products containing the same active ingredient?

A.    Yes.

MS. MILLER:  Object to form.

THE WITNESS:  Yes.

BY MS. GILLEN:

Q.    So just for the sake of clarity, I'll ask some more specific questions.  I'll start with mesotrione.

Do you consider the prices of Syngenta's mesotrione products when setting prices for Argos and Helmet Maxx?

A.    Yes.

Q.    Correct me if I have the names wrong.

A.    No, you do have the names right.

Yes, we consider -- we consider that, along with many other players that are in that market.

Q.    Other players that are selling mesotrione products?

A.    Correct.

Q.    Do you consider the prices of Syngenta metolachlor products when setting prices for Helmet and Helmet Maxx?

A.    Yes.

Q.    And does HELM consider the prices of Corteva acetochlor products when setting prices for Fearless?

A.    Yes.

Q.    For Fearless products, I should say.

A.    Yes.

Q.    When HELM is pricing its products, do you also consider prices of other generic products that include the same active ingredient?

A.    Yes.

Q.    And how is that -- or why is that important or helpful?

Case 1:22-cv-00828-TDS-JEP    Document 461-10    Filed 04/27/26    Page 84 of 108

A.     Because as customers want to explore pricing of particular products, they want to understand where the market is.

So as we're talking with customers about our value proposition and competitive marketplace, we want to understand a full picture of that product so that we can meet the needs and align our value proposition to the market.

Q.     What does it mean to align your value proposition to the market?

A.     We need to be competitive in pricing. So if the marketplace is at a certain price point, we -- we're not going to be as successful if we are outside of what an acceptable range would be for a commodity-type product -- commodity-type product -- a generic-type product in the market.

Q.     So when HELM considers competitor prices, is it HELM's goal to set prices lower than its competitors?

A.     In a competitive range.  Yeah, in a competitive range.

Q.     When you say "in a competitive range," does that connotate, you know, a certain amount

lower, or does it depend on other factors?

A.      Generally, the basic manufacturer who was the originator of that active ingredient holds the highest price in the marketplace. And if we're selling a product that's considered a generic version of that, the expectation of the marketplace is that it's a lower price than the original originator of the product.

Q.      Thank you for that.  Backtracking a bit, I also asked whether HELM looks to prices of other generic products containing the same AI.

         Do you remember that?

A.      Yes.

Q.      So just speaking more specifically about the active ingredients we've been focusing on today, when HELM is pricing its own products containing azoxystrobin, do you consider the pricing of other generic products that contain azoxystrobin?

A.      Yes.

Q.      And is that the same for mesotrione?

A.      Yes.

Q.      And the same for metolachlor?

A.      Yes.

Before the break, we were talking about different means by which HELM distributes its products.

Do you remember that?

A.    Yes.

Q.    And are you familiar with the term "the alternate" or "alternative distribution channel"?

A.    Yes.

Q.    And what does that term mean to you?

A.    I would describe that term as the distribution that's not affiliated with those major companies.  Generally, they're more independent retail locations, smaller, maybe one-location, two-location retailers, and oftentimes they don't follow -- they use more generic-type products.

Q.    When you say "they use more generic-type products," what do you mean by that?

A.    So they -- if a -- one of the national retail accounts would probably be more aligned with basic distribution, basic manufacturers.  And some of these alternative ones would create a portfolio of different products for customers, which would tend to be the -- a

generic line or private-label-type lines, a little lower priced.

Q.     So you mentioned some types of companies that make up the alternate or alternative distribution channel.  You mentioned independent retailers and smaller retailers.

Would that channel also include those selling direct to growers?

A.     Yes.  They would sell direct to growers, correct.

Q.     Would it also include brokers?

A.     Yes.

Q.     And what about online platforms?

A.     Yes.

Q.     So generally speaking, does HELM sell crop protection products through the alternative distribution channel?

A.     Yes.

Q.     Why does HELM sell products through the alternative distribution channel rather than through the national accounts we were talking about earlier?

A.     So in the cases of some of our products, the national accounts aren't willing to sell those products due to the limited headspace, so

we need to find other customers in the marketplace to sell these products to, and generally that group isn't as aligned on loyalty programs.

Q.    What portion of HELM's sales, you know, ballpark, would you say are through the alternative channel, you know, overall for the past market year?

A.    This is -- I would say it's a general statement.  I don't have the exact numbers.  I would say slightly less than 50 percent.

Q.    And understand if you don't have the numbers in front of you, but I'm going to ask more specifically about the active ingredients we've been focusing on today, if you know.  If you don't, that's fine.

You know, do you have a sense of what portion of HELM's sales of products containing azoxystrobin were sold through the alternative channel in the 2023 to 2024 market year?

A.    I would suspect less than 20 percent. Oh, I'm sorry.  Did you say the alternative market or -- yeah.

Q.    The alternative market, yes.

A.    The alternative market, 80, 80 percent.

Q.      And same question, but I'll ask about mesotrione now.

A.      Mesotrione -- oh.

Q.      I'm sorry.  Go ahead.

A.      Mesotrione, I would suspect 70.

Q.      What about metolachlor?

A.      Metolachlor, 70.

Q.      And what about acetochlor?

A.      Ninety.

Q.      I think before the break we were talking about the traditional distribution.  You explained that HELM would like to sell a higher volume of product to the national accounts, is that accurate?

A.      Yes, it is.

Q.      So what are some of the advantages that selling to the national accounts offers when compared to these alternative rates?

A.      Nationwide market access, credit and collections, they're more financially stable. They have some R&D support that can help us position our products within their business. We have warehousing relationships with them.

        Many of them, we'll ship into a centralized hub, and they will ship it to the

Case 1:22-cv-00828-TDS-JEP     Document 461-10     Filed 04/27/26     Page 90 of 108

talked much about today, which is rimsulfuron.

You testified earlier that HELM does not currently sell any products containing rimsulfuron, is that right?

A.    That's right.

Q.    Has HELM ever offered products containing rimsulfuron for sale in the U.S.?

A.    We considered it.  Actually, I think we submitted for a registration for it and decided to withdraw it because we didn't see -- after further exploring it, we didn't see that we were going to be able to make an impact in the market due to the loyalty agreements related to rimsulfuron.

Q.    Other than loyalty agreements relating to rimsulfuron, are there any other reasons you can think of, sitting here today, as to why HELM decided to stop exploring a rimsulfuron product?

A.    That was the -- that was the main reason as we went and talked to our customers about portfolio, portfolio expansion, and we asked: What's the likelihood of them purchasing from us if we came to a registration with it?  And they said:  Very little, due to loyalty

agreements.

Q.     Would you agree that a Corteva loyalty program limiting the open space in the channel for rimsulfuron reduces the amount of sales HELM would expect to make?

MS. GOSWAMI:  Objection to the form.

THE WITNESS:  Yes.  And also rimsulfuron's not a huge product in the market, not like some of the others that we're talking about.

BY MS. GILLEN:

Q.     So I think earlier today I asked you about the active ingredient oxamyl.  And you testified that HELM does not sell any products containing oxamyl, is that right?

A.     That's correct.

Q.     Has HELM ever offered any oxamyl-containing products for sale in the U.S.?

A.     No.

Q.     Has HELM ever considered offering products containing oxamyl?

A.     No.

Q.     We've been talking a lot about the effects of the Syngenta and Corteva loyalty

programs on HELM's business. And, again, I'm going to sort of go through these -- some questions on an active-ingredient basis.

But, you know, generally speaking, has HELM ever conducted any assessments or evaluations of what would happen to its sales if loyalty programs were discontinued generally?

MS. GOSWAMI: Objection to the form.

THE WITNESS: Yes. We talk about it. We are one of the leading companies that market paraquat in the U.S. And paraquat was under a loyalty agreement in -- might get this date wrong, but it's somewhere around 2015.

And when Syngenta was going to be purchased by ChemChina, I think there was an obligation that ADAMA had to divest some active ingredients, including paraquat. And that went to AMVAC.

And also at that time loyalty agreements on paraquat seemed to go away. And our sales doubled in two years. And we're -- right now we sell five times the amount that we sold in 2015.

BY MS. GILLEN:

Q.    So aside from paraquat being removed from loyalty, are there any other changes that you believe may have affected HELM's ability to sell paraquat over the past, I guess, nine years?

A.    Market size might have went up a little bit, but not -- not as much.  No.  We've gained nice share during that time frame.

Q.    And has the willingness of distributors to buy paraquat from HELM changed since paraquat went off loyalty?

MS. MILLER:  Object to form.

THE WITNESS:  Yes.

BY MS. GILLEN:

Q.    I guess I'll clarify.

Has the willingness of national account customers to buy paraquat from HELM changed since paraquat was removed from loyalty?

MS. MILLER:  Object to form.

THE WITNESS:  Yes.  I would -- and I would estimate this, but probably 80 percent of our paraquat sales go through national accounts.

BY MS. GILLEN:

Q.    Do you remember what percentage of

HELM's paraquat sales went through national accounts prior to 2015?

A.    I don't know the answer to that one. I'm sorry.

Q.    Is it a smaller number than 80 percent?

A.    I honestly don't know.

Q.    Is it your view that national accounts became more willing to buy paraquat from HELM after it was removed from loyalty programs?

MS. MILLER:  Object to form.

THE WITNESS:  Yes.

BY MS. GILLEN:

Q.    Other than paraquat, does HELM have any other experience selling active ingredients that were at one point subject to loyalty constraints but at one point -- at some point went off loyalty?

A.    The only other one would be glyphosate. But the loyalty agreement on glyphosate would have been gone for a while.  So -- and with glyphosate, we were selling a significant amount to WinField, a significant amount to Helena, a significant amount to CNI, and we were selling some to Simplot, but it was Pinnacle at that time, and Pinnacle got bought

MS. GOSWAMI:  Objection to the form.

THE WITNESS:  Yeah.  I would assume we would see some significant growth.

BY MS. GILLEN:

Q.    And do you think that generic manufacturers will be better able to compete with basic manufacturers for a larger portion of the national account demand for acetochlor?

MS. GOSWAMI:  Objection to the form.

THE WITNESS:  Yes.

BY MS. GILLEN:

Q.    And do you believe we would see lower prices offered to farmers for acetochlor-containing products?

A.    Yes, I would agree, for the same reasons as others, increased competition, increased market access, increased choices for farmers.

Q.    Do you have a view -- let me start over.

I know you have mentioned a few times today that HELM is moving into a space of more innovative products.

Does that include innovative mixes with multiple active ingredients?

A.    Yes.

Q.    Do you have a view as to whether

Syngenta's loyalty program affects HELM's ability to develop new innovative mixes?

MS. MILLER: Object to form.

THE WITNESS: Yes, it does negatively impact us.

BY MS. GILLEN:

Q. Can you tell me why?

A. So we were able to gain access to market a product where the active ingredient is tiafenacil out of Japan through ISK. And we have a brand name of it of Reviton. It is a herbicide that has a broad spectrum of control. And we launched that in, I think, late 2001. That product does not have any loyalty associated with it because there is no comparable product on the marketplace. There's no generic tiafenacil on the marketplace.

So we've been able to gain great success with those national accounts and broad distribution.

We are working on brand extensions for Reviton. And we have two products that we are going to bring to the market later in 2025 pending regulatory approval. One of those products is -- we want to mix it, create a

premix of Reviton and metolachlor. So that will give our product control when the plant is growing. But then metolachlor has soil residual, so it will prevent weeds from coming up. So customers are tank mixing right now. And as we create a premix, we'll make it more user-friendly and convenient with that mixture being together.

I'll stop there because that was a lot of information.

Q. That's helpful. I believe you stated that HELM has been able to -- you know, been successful with national accounts and with broader distribution. Do you attribute that to the fact that there's no loyalty encumbrances there for this product?

A. Yes.

MS. MILLER: Object to form.

THE WITNESS: Yes, we have -- we have -- we have a great relationship with those national accounts. They want to support us and they are supporting us when we're bringing, you know, unique products to the market.

MS. GILLEN: So I'm nearing the end of my questions here. I probably have about

ten more minutes of questions, and then I would propose we go off the record and take a short break, and I can, you know, discuss with my colleagues for a few minutes.

I just want to ask folks if they would rather take a break now since I know we've been going about an hour, or are you okay going, you know, ten more minutes?

THE WITNESS:  How about in the room?

I think we're all good to continue --

MS. GILLEN:  Okay.

THE WITNESS:  -- if you're okay with it.

MS. GILLEN:  Absolutely.

BY MS. GILLEN:

Q.     I'm going to shift gears a little bit.

We talked much earlier in the day -- I believe at the very beginning of the day about the various international markets that HELM operates in.

Do you remember that?

A.     Yes.

Q.     And I guess I'll clarify here that I am talking about HELM AG as a whole and not just

the U.S. entity. And I believe you testified that HELM sells crop protection products in Europe and the Americas, is that right?

A.    Yes, that's correct.

Q.    All right. I'm going to go through the active ingredients again to make sure that we're not blurring them together. But does HELM sell azoxystrobin outside the United States?

A.    Yes.

Q.    In which markets?

A.    Oh, now you're testing me. Mexico, Brazil, Argentina. I don't think we're selling it in Europe.

Q.    Do you know when HELM entered those markets, or was that before your time?

A.    No, that was before my time. Well -- so registration timelines in Brazil are very, very, very long, like, it takes eight to nine years to bring products to market, where in the U.S. it takes, like, two to three.

So they may have been working on it, but they're not selling it as long.

Q.    And is azoxystrobin subject to a Syngenta loyalty program in Mexico, Brazil or

Argentina?

MS. MILLER: Object to form.

THE WITNESS: Yeah, to my knowledge, we are not experiencing any loyalty agreements on azoxystrobin anywhere else outside the U.S.

BY MS. GILLEN:

Q. In your experience, what has been -- or what has been HELM's experience selling azoxystrobin products in these overseas markets where Syngenta does not have a loyalty program?

MS. MILLER: Object to form.

THE WITNESS: Positive.

BY MS. GILLEN:

Q. Can you think of any other differences that might -- might affect the different geographies, or do you attribute it to the lack of loyalty program?

A. Well, it's just -- in those markets -- I'd say in the United States market, the distribution is very consolidated into a few major players on distribution, like those national accounts that I shared with you of the WinField, Tenkoz, Helena, Nutrien, yeah.

And in everywhere else in the world, it's much more fragmented. So there's many,

many, many accounts that make up the marketplace.

So the idea of a loyalty never comes into those markets, so it's we're competing on just quality of product, performance and price and customer relationship.

Q. Okay. Do you know whether HELM sells mesotrione outside the United States?

A. Yes, we do. We sell that -- I believe we sell it in Europe. I believe we sell it in Argentina, Mexico and Brazil.

Q. I'm not trying to test you here. But if you know -- or do you know when HELM entered those markets selling mesotrione? If you don't, that's okay.

A. I don't. I don't recall. Each country would be different, but I don't recall.

Q. Is mesotrione subject to Syngenta's loyalty program in Europe, Argentina, Mexico or Brazil?

MS. MILLER: Object to form.

THE WITNESS: To my knowledge, we don't run into any loyalty agreements outside the U.S.

BY MS. GILLEN:

Q.      And what has been HELM's experience selling products with mesotrione in overseas markets where HELM does not run into any loyalty agreements?

          MS. MILLER:  Object to form.

          THE WITNESS:  I would say overall favorably.  They're in the portfolio.  They have a good fit in the portfolio, and we're continuing to sell them.

BY MS. GILLEN:

Q.      Does HELM sell metolachlor outside the U.S.?

A.      Yes.

Q.      In which markets?

A.      I know Argentina, I know Brazil, I think Mexico.  I don't think we do in Europe.

Q.      Do you happen to know when HELM entered those markets with the metolachlor product?

A.      I don't remember, no.

Q.      And is metolachlor subject to Syngenta's loyalty program in Argentina, Brazil or Mexico?

          MS. MILLER:  Object to form.

          THE WITNESS:  No.  To my knowledge, there is not a loyalty agreement on metolachlor in those countries.

BY MS. GILLEN:

Q.    And what has been HELM's experience selling products with metolachlor in those countries where Syngenta does not have a loyalty program?

MS. MILLER:  Object to form.

THE WITNESS:  We would have a favorable business in that space and selling products to customers.

BY MS. GILLEN:

Q.    Does HELM sell acetochlor outside the United States?

A.    No.

Q.    So for the products that -- for the active ingredients that HELM sells in overseas markets, azoxystrobin, mesotrione and metolachlor, do you see any differences in terms of HELM's market shares for these active ingredients when you compare geographies where loyalty programs exist and those where loyalty programs do not exist?

A.    Yeah.  Generally, margins are higher when -- and sales are higher when there's no loyalty agreement -- or loyalty programs in place, and we have more freedom to operate.

I would say the -- in the U.S. we're transitioning our portfolio much more rapidly to -- away from generic products than the rest of the world because the rest of the world are still making, you know, a good margin on those products.

Q.    And in your experience, you know, how can you tell that, you know, some of these differences are due to loyalty programs specifically and not something else in those overseas markets?

A.    Well -- so in my time -- I lived in South Africa for two and a half years, in that market.  And coming from the U.S., loyalty agreements were significant in the post-patent space.

And when I was at Villa, we would -- we were all about getting post-patent products and being the quickest to market.  And there was -- there was no loyalty.

So generics in that marketplace probably had 70 percent market share, and the basic manufacturers were probably more around the 30, where, you know, in the U.S. it's probably the other way around.

So -- and I would say when you look at the Mexico, Brazil, Argentina market, we don't run into loyalty as an issue. It's more foreign exchange rates and getting paid, but that's nothing to do with marketing of the products.

Q. Thank you for that. I'm almost done. I promise. But I want to go back to follow up on one aspect of your testimony relating to ISK.

A. Yes.

Q. Do you remember that?

A. Yes.

Q. In the -- I believe you said the name is Reviton, is that right?

A. That's correct.

Q. That's the product?

A. That's the brand name.

Q. And it contains metolachlor?

A. Reviton contains tiafenacil, which is an active ingredient that we are -- HELM is the only company in the United States marketing tiafenacil. And we've been marketing that product since 2021.

Now, as we are working on life cycle management of that product, we're creating two

premixes that we've been developing over the past three to four years, and we're in the registration process right now.

One of those products is -- we're going to call it Reviton Resi for residual control. And that's going to be a premix with Reviton and metolachlor or tiafenacil and metolachlor.

So a farmer using that product will get the control of Reviton and the residual control of metolachlor.

So we're bringing that product to the market when it's registered, which we think will be, in Q2, Q3 of 2025.

Q.    What barriers to entry does HELM face with respect to the Reviton Resi premix?

A.    Well, as we went to introduce this product to our customers to share with them what this product can be, what it will do for them, how we intend to position it in the marketplace and how we see that it could benefit some of their customers, the feedback that we run into is they like it, they think it's a great product concept.

Their concern is:  We don't know if we're going to have enough headspace on

metolachlor to support the product.

Q.    And how does your experience bringing Reviton Resi to market contrast with the straight Reviton product that doesn't contain metolachlor?

A.    With the straight product, there's really no -- very few objections to supporting it.  The price is in line, the performance is in line, the amount of money that they're making on the product is in line.

You know, this would bring -- another product would have some of those similar attributes.  But with that product -- with metolachlor being into the loyalty agreements, we're concerned, and the feedback from our customers have told us that:  We might not be able to support this product in every geography because we have limited headspace.  We think it's a good product, but we have limited headspace.

Q.    And so is it your view that the limited headspace due to loyalty programs is the primary barrier to entry for the Reviton Resi premix?

MS. MILLER:  Object to form.