# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>STATE OF CALIFORNIA,<br>STATE OF COLORADO,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF IOWA,<br>STATE OF MINNESOTA,<br>STATE OF NEBRASKA,<br>STATE OF OREGON,<br>STATE OF TENNESSEE<br>STATE OF TEXAS,<br>STATE OF WASHINGTON,<br>　　and<br>STATE OF WISCONSIN,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>SYNGENTA CROP PROTECTION AG,<br>SYNGENTA CORPORATION,<br>SYNGENTA CROP PROTECTION,<br>LLC,<br>　　and<br>CORTEVA, INC.,<br><br>　　　　Defendants. | Case No. 1:22-cv-00828-TDS-JEP<br><br>**REPLY BRIEF IN SUPPORT OF THE SYNGENTA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .................................................................................................5

I. THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFFS' FEDERAL ANTITRUST CLAIMS ...........5

    A. The Price-Cost Test Applies Because, as a Matter of Law, Price Is the Predominant Mechanism of Exclusion ......................5

        1. Governing Law ........................................................... 5

        2. Key AI Is Quintessentially a Pricing Practice ....................... 9

        3. Key AI Lacks Any Non-Price Mechanism of Exclusion ....... 11

            a. Key AI's Conditional Nature Is Not an "Exclusionary Non-Price Term" ......................... 12

            b. Compliance with Key AI Thresholds Is Not Driven by Any Threat of Supply Reduction .................. 13

            c. There Are No "Long-Term Effects" of the Annual Key AI Program .......................................... 17

        4. Other Factors Support Applying the Price-Cost Test to the Key AI Program................................ 19

            a. Barriers to Entry Are Low and Key AI Does Not Aggravate Them............................... 19

            b. There Is No Evidence that Syngenta's Supply Agreements "Enhance" Anticompetitive Effects........... 24

    B. Plaintiffs' Antitrust Claims Do Not Survive the Full Rule of Reason ................................................................27

        1. Plaintiffs' Single-AI Markets Are, as a Matter of Law, Too Narrow.......................................... 27

            a. Plaintiffs Fail to Rebut the Authority Holding that the Relevant Market Includes All Reasonably Interchangeable Products .................... 28

            b. Plaintiffs Fail to Controvert the Evidence That Other AIs Are Reasonably Interchangeable with the Syngenta AIs................................................... 31

            c. Plaintiffs Have Not Created a Triable Issue of Fact Under *Brown Shoe*.................................. 34

i

    d. Plaintiffs' Challenges to Syngenta's Switching Evidence Do Not Defeat Summary Judgment ............. 37

   2. Key AI Does Not, as a Matter of Law, Harm Competition .. 38

    a. As a Matter of Law, Distributors' Choices in Response to Price-Based Incentives Have No Anticompetitive Effect .................................................... 39

    b. Plaintiffs' Evidence Is Not Probative of Anticompetitive Foreclosure ......................................... 41

    c. There Is No Evidence of Supracompetitive Pricing ...... 43

    d. There Is No Evidence of Less Innovation ..................... 44

II. PLAINTIFFS' FTC ACT CLAIM FAILS FOR THE SAME REASONS AS PLAINTIFFS' OTHER FEDERAL LAW CLAIMS ....... 45

III. PLAINTIFFS HAVE NO SECTION 1 CLAIM UNSCATHED BY SYNGENTA'S SUMMARY JUDGMENT MOTION ............................ 48

IV. SYNGENTA IS ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIMS ......................................................... 50

V. THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS AGAINST SYNGENTA CROP PROTECTION AG AND SYNGENTA CORPORATION AS A MATTER OF LAW ..................... 52

CONCLUSION........................................................................................... 56

APPENDIX A - TABLE OF EXHIBITS......................................................... 59

ii

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Advanced Health-Care Servs., Inc. v. Giles Mem'l Hosp.*,
846 F. Supp. 488 (W.D. Va. 1994) ................................................................ 26

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ...................................................................... 39

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 20

*Arkansas ex rel. Griffin v. Syngenta Crop Prot. AG*,
2025 WL 551660 (E.D. Ark. Feb. 19, 2025) ................................................. 8

*Barr Lab'ys, Inc. v. Abbott Lab'ys*,
978 F.2d 98 (3d Cir. 1992) .......................................................................... 21

*Bayer Schering Pharma. AG v. Watson Pharma., Inc.*,
2010 WL 11578470 (D. Nev. March 31, 2010) ........................................... 36

*Bepco, Inc. v. Allied-Signal, Inc.*,
106 F. Supp. 2d 814 (M.D.N.C. 2000) .................................................. 21, 40

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .................................................................. 23, 26

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................ 9, 11, 38

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................ *passim*

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 P.2d 527 (1999) ................................................................. 50

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ..................................................................................... 47

*Chuck's Feed & Seed Co. v. Ralston Purina Co.*,
810 F.2d 1289 (4th Cir. 1987) ............................................................... 46, 47

*Columbia Broad. Sys., Inc. v. FTC*,
414 F.2d 974 (7th Cir. 1969) ....................................................................... 47

iii

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ................................................................ 21, 23

*Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*,
33 F.3d 390 (4th Cir. 1994) ....................................................................... 52

*Duke Energy Carolinas LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ............................................................ 6, 7, 8

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984) ....................................................................... 46

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3rd Cir. 2016) ................................................ 6, 38, 39, 40, 41

*Eisai, Inc. v. Sanofi Aventis U.S.*,
2014 WL 1343254 (D.N.J. 2014) ............................................................... 24

*Emmett v. Johnson*,
532 F.3d 291 (4th Cir. 2008) ..................................................................... 55

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd in part on other grounds*,
67 F.4th 946 (9th Cir. 2023) ....................................................................... 50

*In re EpiPen Antitrust Litig.*,
545 F. Supp. 3d 992 (D. Kan. 2021), *aff'd*,
44 F.4th 959 (10th Cir. 2022) ..................................................................... 18

*Flovac, Inc. v. Airvac, Inc.*,
817 F.3d 849 (1st Cir. 2016) ...................................................................... 36

*FTC v. IQVIA Holdings Inc.*,
710 F. Supp. 3d 329 (S.D.N.Y. 2024) ....................................................... 29

*FTC v. Meta Platforms, Inc.*,
2025 WL 3458822 (D.D.C. Dec. 2, 2025) ............................................. 29, 38

*FTC v. Peabody Energy Corp.*,
492 F. Supp. 3d 865 (E.D. Mo. 2020) ....................................................... 29

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) ........................................................... 28

iv

*FTC v. Shkreli,*
581 F. Supp. 3d 579 (S.D.N.Y. 2022) ...................................................... 30, 31

*FTC v. Tapestry, Inc.,*
755 F. Supp. 3d 386 (S.D.N.Y. 2024) ......................................................... 37

*FTC v. Whole Foods Mkt., Inc.,*
548 F.3d 1028 (D.C. Cir. 2008) ................................................................. 30

*In re German Auto. Manuf. Antitrust Litig.,*
497 F. Supp. 3d 745 (N.D. Cal. 2020) ....................................................... 35

*Harris v. Home Sales Co.,*
499 F. App'x 285 (4th Cir. 2012) ............................................................... 45

*Hyland v. HomeServices of Am.,*
No. 3:05-CV-612-R (W.D. Ky. July 18, 2012) ............................................ 54

*In re Impax Labs., Inc.,*
2019 WL 1552939 (FTC 2019) .................................................................. 30

*It's My Party, Inc. v. Live Nation, Inc.,*
811 F.3d 676 (4th Cir. 2016) ............................................................. *passim*

*Kentucky Speedway, LLC v. NASCAR, Inc.,*
588 F.3d 908 (6th Cir. 2009) .................................................................... 34

*Lamonds v. GMC,*
34 F. Supp. 2d 391 (W.D. Va. 1999) ......................................................... 49

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
762 F.3d 1114 (10th Cir. 2014) ................................................................. 37

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
847 F.3d 1122 (10th Cir. 2017) ................................................................. 54

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003) ..................................................................... 7, 8

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................................................................. 47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ................................................................................. 11

*McWane, Inc. v. FTC,*
783 F.3d 814 (11th Cir. 2015) ........................................................ 13, 19, 22

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.,*
354 F.3d 661 (7th Cir. 2004) .................................................................. 32

*Mylan Pharms. Inc. v. Warner Chilcott PLC,*
838 F.3d 421 (3d Cir. 2016) .................................................................. 30

*Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.,*
2015 WL 1736957 (E.D. Pa. Apr. 16, 2015) ............................................. 37

*NicSand, Inc. v 3M Co.,*
507 F.3d 442 (6th Cir. 2007) ................................................................... 9

*Office Cantonal des Faillites de la Republique et du Canton de Geneve v.
Expedia, Inc.,*
2024 WL 381181 (W.D. Wash. Feb. 1, 2024) ............................................. 53

*Ohio v. Am. Express Co.,*
585 U.S. 529 (2018) ............................................................................. 46

*Omega Env't, Inc. v. Gilbarco, Inc.,*
127 F.3d 1157 (9th Cir. 1997) ................................................................ 18

*In re Packaged Seafood Prods. Antitrust Litig.,*
2022 WL 836951 (S.D. Cal. Mar. 21, 2022) ............................................. 55

*In re Penn. Title Ins. Antitrust Litig.,*
648 F. Supp. 2d 663 (E.D. Pa. 2009) ...................................................... 55

*PepsiCo, Inc. v. Coca-Cola Co.,*
114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd,*
315 F.3d 101 (2d Cir. 2002) ............................................................. 35, 38

*Rebel Oil Co. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) .......................................................... 20, 22, 23

*Rightline, LLC v. FMC Corp.,*
2025 WL 1550234 (E.D. Pa. 2025) ........................................................... 8

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
801 F.3d 412 (4th Cir. 2015) ................................................................. 54

*Sumotext Corp. v. Zoove, Inc.*,
2020 WL 6544410 (N.D. Cal. Nov. 6, 2020), *aff'd*,
2021 WL 4988024 (9th Cir. Oct. 27, 2021) ........................................... 32, 33

*In re Surescripts Antitrust Litig.*,
608 F. Supp. 3d 629 (N.D. Ill. 2022) ........................................................ 22

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*,
48 F.3d 810 (4th Cir. 1995) ...................................................................... 17

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) .................................................................................. 47

*Tart v. Johns*,
2021 WL 11139974 (M.D.N.C. June 11, 2021) ....................................... 55

*Thales Avionics, Inc. v. Matsushita Avionics Sys, Corp.*,
2006 WL 8569652 (C.D. Cal. Apr. 6, 2006) ....................................... 52, 53

*United States v. AMR Corp.*,
140 F. Supp. 2d 1141 (D. Kan. 2001), *aff'd*,
335 F.3d 1109 (10th Cir. 2003) ........................................................... 21, 24

*United States v. Dentsply Int'l, Inc.*,
277 F. Supp. 2d 387 (D. Del. 2003),
*rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005) ..................... 13,18, 19

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................... 28

*United States v. Microsoft*,
84 F. Supp. 2d 9 (D.D.C. 1999) ............................................................... 22

*Uzzell v. Murray*,
2019 WL 4463332 (W.D.N.C. Sept. 17, 2019) ........................................ 16

*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*,
540 U.S. 398 (2004) ............................................................................ 11, 30

*In re Zetia (Ezetimibe) Antitrust Litig.*,
587 F. Supp. 3d 356 (E.D. Va. 2022) ................................................. 27, 30

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3rd Cir. 2012) .......................................................... *passim*

STATUTES & RULES

FTC Act § 5, 15 U.S.C. § 45 ........................................................ 4, 46

Sherman Act § 1, 15 U.S.C. § 1 .................................................... 57

Cal. Cartwright Act § 16700 *et seq.* ........................................ 49, 50

Cal. Bus. & Prof. Code § 17200 *et seq.* ...................................... 50

Ind. Code Ann. § 24-5-0.5 ........................................................ 51

Iowa Code Ann. § 714.16 .......................................................... 51


OTHER AUTHORITIES

Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application.* (4th & 5th ed. 2023) ................. 33

Case 1:22-cv-00828-TDS-JEP    Document 462    Filed 04/27/26    Page 9 of 71

<u>**PRELIMINARY STATEMENT**</u>[1]

Plaintiffs' opposition confirms that the price-cost test defeats their antitrust challenge to Syngenta's Key AI rebate program. Plaintiffs have failed to adduce the evidence they promised of coercive, non-price features of Syngenta's program that supposedly overshadow the rebate's price-reduction incentive. Syngenta's rebates thus constitute predominantly price-based competition subject to the price-cost test. Because Plaintiffs acknowledge that Syngenta's above-cost prices pass the price-cost test, this Court should grant summary judgment dismissing Plaintiffs' federal claims.

Plaintiffs try various approaches to avoid this result. All of them fail.

First, Plaintiffs advocate for new law and, in essence, for reconsideration of this Court's motion to dismiss decision. They argue that the price-cost test applies only to "predatory pricing" (an argument this Court previously rejected) or to unconditional discounts. They posit that rebates must be passed through "completely" to growers to qualify as price competition, and press a fabricated distinction between "profit rewards" and rebate payments. Plaintiffs' proposals are all contrary to established

---

[1] Unless noted, emphasis has been added to quotations, and internal quotations, brackets, citations, footnotes, and deposition objections have been omitted.

This brief uses the terms defined in Syngenta's moving brief. In citations, "Mem." refers to the moving brief, "Opp." refers to Plaintiffs' opposition, and "Ex." and "Pls.' Ex." refer to Syngenta's and Plaintiffs' exhibits, respectively.

1

precedent, under which rebates are, as a matter of law, price reductions, and share-based rebates are eligible for the price-cost test. Indeed, Plaintiffs ask this Court to find a triable issue of fact as to non-price exclusion without any of the indicia that prior courts have cited. Plaintiffs offer no persuasive reason to disrupt settled law to support their preferred outcome.

Next, Plaintiffs manufacture facts. They invent "threats" of supply restriction to posit a "chilling effect" on distributors but lack evidence of a *single* threat, much less that Syngenta has actually coerced any distributor with threats. In fact, as uncontroverted evidence shows, distributors— including those supposedly "threatened" or "chilled"—often choose not to meet rebate thresholds, and do not lose access to or lose the ability to purchase Syngenta products, or suffer *any* consequence other than forgoing a rebate. Plaintiffs improperly use Corteva's conduct against Syngenta through vague references to "Defendants" and blatant misattribution of Corteva-specific evidence. Plaintiffs rejected the Court's admonition to clearly differentiate between Defendants and "separately respon[d] to each of the motions,"[2] in an attempt to conceal the ubiquitous, and fatal, gaps in their case against Syngenta.

---

[2] Oct. 3, 2025 Hr'g Tr. at 37:8-38:9.

Finally, Plaintiffs ignore undisputed evidence that defeats their claims. Plaintiffs cannot controvert, and thus avoid, overwhelming evidence that distributors and retailers repeatedly miss Key AI thresholds without any consequence other than not earning a rebate that year for that AI. Plaintiffs also ignore Syngenta's evidence of robust generic entry and expansion—and even refuse to acknowledge their own liability expert's concessions that generic entry and expansion are competitively consequential. This evidence negates, as a matter of law, any conclusion that Key AI aggravates barriers to entry—or poses any "barrier" at all, apart from procompetitive price competition.

Ultimately, Plaintiffs cannot escape the fact that distributors and retailers participate in Key AI principally because of the profit incentive provided by rebates. Under Plaintiffs' own cases, Plaintiffs' claims are thus subject to the price-cost test and fail as a result.

Plaintiffs' claims also fail under the full rule of reason. Plaintiffs cannot meet their burden to prove their single-AI markets in the face of undisputed evidence that other AIs are "reasonably interchangeable." Plaintiffs contend that multi-AI markets are irrelevant because generics are "closer" substitutes for each of the Syngenta AIs than are other AIs, but under controlling precedent, a relevant product market consists of *all* "reasonably interchangeable" products, and Plaintiffs bear the burden of

3

"excluding" these products from the market. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016). Plaintiffs proffer no evidence that other AIs are not reasonably interchangeable.

Plaintiffs also lack evidence of anticompetitive foreclosure. Confronted with indisputable evidence (including from their own expert) of competitively consequential generic entry and expansion, Plaintiffs insist that generic market shares should be vaguely "higher." But Plaintiffs mistake a lack of greater generic success for anticompetitive foreclosure. The antitrust laws do not guarantee success; they merely protect the ***opportunity*** to compete—an opportunity that generics, based on their undisputed success, have. As a matter of law, price-based competition from Key AI does not entail anticompetitive foreclosure.

Plaintiffs wrongly assert that Syngenta did not move against their FTC Act claim and did not respond to their Section 1 claim to the extent it challenges the supply agreements between Syngenta and Corteva. Syngenta clearly showed in its moving papers that the evidence does not support either claim.

Plaintiffs' response also fails to defeat Syngenta's arguments on Plaintiffs' state law claims. Those also should be dismissed, for the same reasons that the federal claims fail or for reasons specific to particular claims, as set forth below.

4

Finally, all claims against Syngenta Crop Protection AG and Syngenta Corporation should be dismissed because neither entity "directs, controls, or encourages" the Key AI rebate program.

Because Plaintiffs' response fails to controvert Syngenta's showing that all of Plaintiffs' claims fail as a matter of law, summary judgment should be granted in full.

## ARGUMENT

### I. THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFFS' FEDERAL ANTITRUST CLAIMS

#### A. The Price-Cost Test Applies Because, as a Matter of Law, Price Is the Predominant Mechanism of Exclusion

##### 1. Governing Law

Plaintiffs' federal antitrust claims challenge Syngenta's share-based Key AI rebates as a form of *de facto* exclusive dealing. The price-cost test applies to Plaintiffs' challenge if price is the "clearly predominant mechanism of exclusion." D.E. 160 at 55.

Confronted with the lack of evidence of alleged non-price mechanisms of exclusion, Plaintiffs revive an argument that the Court rejected at the motion to dismiss stage: the price-cost test does not apply to Plaintiffs' "exclusive dealing" claims.[3] Opp. at 67.

---

[3] Likewise, Plaintiffs argued on the motion to dismiss that "[t]he price-cost test applies to predatory pricing, not exclusive dealing." D.E. 112 at 29.

Plaintiffs provide no persuasive reason for the Court to revisit its decision on the motion to dismiss. The settled law on which the Court relied explains that "a plaintiff's characterization of its claim as an exclusive dealing claim does not take the price-cost test off the table." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3rd Cir. 2012). Indeed, the framework expressly "extend[s] to above-cost discounting or rebate programs, which condition the discounts or rebates on the customer's purchasing of a specified volume or a specified percentage of its requirements from the seller." *Id.*; *see also Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 409 (3rd Cir. 2016) ("When pricing predominates over other means of exclusivity, the price-cost test applies. This is usually the case when a firm uses a single-product loyalty discount or rebate to compete with similar products.").[4]

Plaintiffs rely on *Duke Energy Carolinas LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), in which the Fourth Circuit endorsed *ZF Meritor*'s "price itself [as] the clearly predominant mechanism of exclusion" test, but declined to apply "specific conduct tests" to "allegations of a complex or atypical exclusionary campaign." *Id.* at 354, 360.

---

[4] Plaintiffs contend that this standard somehow would require applying the price-cost test to "bribes" paid "for setting fire to the factory operated by a generic manufacturer." Opp. at 74 -75. But no case considers bribes for arson as eligible for the price-cost test, whereas an entire body of precedent treats share-based rebates as eligible.

6

The exclusionary campaign challenged in *Duke Energy* bristled with non-price mechanisms of exclusion not present here, especially bundling across products and years (alleged features of Corteva's rebate program but not Syngenta's program). The defendant utility had a multi-year exclusive deal with a customer, providing "massive discounts" on the power sold to the customer (cross-subsidized by the utility's other customers). *See id.* at 347. Those discounts were "bundled" with the utility's agreement to pay "extraordinarily high prices" for power it purchased from the customer. *Id.* at 347, 357. In further bundling, the customer received the discounts only in exchange for agreeing to higher prices in a long-term renewal agreement. *See id.* at 347, 349 -50; *see also id.* at 357 (explaining the "bundling" of deal terms). The utility also interfered with the plaintiff's ability to supply the customer by blocking access to the utility's (monopoly) power grid. *See id.* at 349.

On those facts, the Fourth Circuit declined to endorse the incomplete version of the price-cost test advanced by the utility, which ignored bundled terms. *See id.* at 357. The Fourth Circuit emphasized that the challenged conduct involved a "package discount," and thus followed the reasoning in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) that "[t]he anticompetitive feature of package discounting is the strong incentive it gives buyers to take increasing amounts or even all of a product in order to take advantage of a

7

discount aggregated across multiple products." *Id.* at 357 (quoting *LePage's*, 324 F.3d at 155). As the Third Circuit recognized in *ZF Meritor*, "*LePage's* is inapplicable where, as here, only one product is at issue and the plaintiffs have not made any allegations of bundling or tying." 696 F.3d at 274 n.11. Because Key AI undisputedly does not involve multi-product or multi-year bundling, both *ZF Meritor* and *Duke Energy* dictate that the price-cost test applies. *Cf. id.*; *see Duke Energy*, 111 F.4th at 357, 359-60.

Plaintiffs also cite two district court decisions. Opp. at 71-72. Plaintiffs portray *Arkansas ex rel. Griffin v. Syngenta Crop Prot. AG*, 2025 WL 551660 (E.D. Ark. Feb. 19, 2025)—declining to dismiss similar claims as here, brought by the State of Arkansas—as conflicting with this Court's motion to dismiss decision, and Plaintiffs appear to prefer their characterization of that decision to this Court's decision. Opp. at 71-72. But there is no conflict. Like this Court, the Arkansas court applied *ZF Meritor*'s "clearly predominant" test to the allegations, and allowed the claims to proceed to discovery. *Griffin*, 2025 WL 551660, at *9 (citing *ZF Meritor*, 696 F.3d at 277).

Nor is *Rightline, LLC v. FMC Corp.*, 2025 WL 1550234 (E.D. Pa. 2025) helpful to Plaintiffs. *Rightline* turned on allegations of bundled rebates (*id.* at *4), which, again, applies to Corteva but not to Syngenta.

8

In sum, there is no reason for this Court to depart from the legal standards set forth in its motion to dismiss decision. Plaintiffs lack evidence showing that as to the Key AI rebate program's inclusion of the Syngenta AIs, price is not the clearly predominant mechanism of exclusion. This defeats Plaintiffs' antitrust claims. Mem. at 35-38.

### 2. Key AI Is Quintessentially a Pricing Practice

Syngenta's evidence shows that distributors and retailers satisfy Key AI thresholds (to the extent they choose to) in order to meet grower demand and obtain the benefit of rebate payments. Mem. at 38-41. Plaintiffs' opposition corroborates distributors' and retailers' price-driven motivation.

Plaintiffs admit that Syngenta "pay[s] for loyalty" through rebates, "which provid[e] powerful incentives for distributors to meet or exceed loyalty thresholds." Opp. at 29; *see also, e.g.*, *id.* at 33 n.116 (describing "loyalty payments" as a "profit opportunity" for distributors and retailers). This is the very essence of price competition.

Plaintiffs advance a spurious distinction between a "profit reward" and a "price discount." Opp. at 33. That distinction is key to Plaintiffs' contention that price itself is not the clearly predominant mechanism of exclusion. But the distinction is contrary to settled precedent, under which rebates are, as a matter of law, "nothing more than price reductions." *NicSand, Inc. v 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007); *see also Brooke*

9

*Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 239 (1993)

(explaining a product's "net price … was determined not only by list prices,

but also by a wide variety of discounts and promotions to consumers and by

rebates to wholesalers").

Similarly, Plaintiffs suggest that Key AI rebates are not a pricing

practice because they are not "complete[ly] pass[ed] through … to growers."

Opp. at 80-81. By framing their argument in terms of "***complete*** pass

through," Plaintiffs implicitly acknowledge the evidence that Key AI rebates

***are*** passed through to growers.[5] Mem. at 29 n.115, 49, 96. Plaintiffs cite no

authority for a "complete pass-through" requirement, because it is contrary to

existing precedent holding that rebates are price reductions as a matter of

law. A "complete pass-through" requirement also would nonsensically

penalize Syngenta for the independent downstream pricing decisions of third

parties when those third parties decide to retain margin and fund services to

customers in lieu of passing lower prices to their customers. Ultimately, the

uncontroverted evidence shows that Key AI reduces the prices that

Syngenta's customers pay and that, as Plaintiffs' evidence highlights, Key AI

---

[5] The States' proffered expert on disgorgement estimates that net price reductions are passed through at an ***86% rate***, but fails to break that out as between list price reductions and rebate payments. Ex. 164 (Smith Dep.) 71:9-72:16. Because his "composite" rate fails to isolate the rate for list price reductions, his pass-through rate is not probative of pass-through in the "but for" world without rebates.

does not limit Syngenta's customers' flexibility to price the products they choose to sell.  Indeed, customers' flexibility to qualify for Key AI rebates (or not), and to choose what to do with earned rebates, weighs ***in favor of*** applying the price-cost test, not against it.  *Cf. ZF Meritor*, 696 F.3d at 285 (declining to apply price-cost test because the program "deprive[s] customers of the ability to make a meaningful choice.").

Moreover, Plaintiffs' premise of "supracompetitive profits" assumes the conclusion to the price-cost inquiry.  Because Key AI is predominately price competition, Syngenta's profits are, as a matter of law, not supracompetitive.  In any event, even charging "monopoly prices" is "not only not unlawful; it is an important element of the free-market system."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also Brooke Grp.*, 509 U.S. at 223.  In essence, Plaintiffs' argument amounts to a plea for precisely the sort of "mistaken inferenc[e]" in price-cutting cases that the Supreme Court has warned against.  D.E. 160 at 45 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).

### 3. Key AI Lacks Any Non-Price Mechanism of Exclusion

In contrast to the overwhelming evidence that distributors and retailers are enticed by the price incentive provided by Syngenta's rebate payments, there is no evidence that Syngenta's Key AI program leverages

11

coercive, non-price mechanisms of exclusion that would preclude application of the price-cost test.

Plaintiffs do not dispute that Key AI imposes no purchase obligations on distributors or retailers. Mem. at 44-45. Nor do Plaintiffs dispute that Key AI has a one-year duration, which falls squarely within the realm of "short, easily terminable" arrangements that courts have found unlikely to pose anticompetitive concerns. *Id*. at 45-46. Plaintiffs do not assert that Key AI features clawbacks, bundling, or tying. *Id*. at 47-48. Plaintiffs have no response to the undisputed fact that loyalty rebates, such as the Key AI rebate, are widely used within the industry. *Id*. at 48-50. Indeed, enjoining Syngenta from including the Syngenta AIs in the Key AI program would place Syngenta at a competitive disadvantage. These factors reinforce the conclusion that price is the clearly predominant mechanism of competition (and "exclusion"). *Id*. at 42-50.

### a. Key AI's Conditional Nature Is Not an "Exclusionary Non-Price Term"

Plaintiffs argue that the conditional nature of Key AI rebates is, itself, "an exclusionary non-price term." Opp. at 79. As this Court explained, however, the relevant precedent addresses the scenario in which "a company offers discounts in exchange for purchasing a certain percentage of goods from that company." D.E. 160 at 38. Thus, the conditional nature of the

12

rebate or discount is the starting point for the settled analysis of whether the price-cost test applies, and not a factor that weighs against applying the test. Plaintiffs' contrary argument reinforces that their case is premised on their fundamental disagreement with existing precedent, including this Court's motion to dismiss decision.

### b. Compliance with Key AI Thresholds Is Not Driven by Any Threat of Supply Reduction

In its motion to dismiss decision, this Court framed the relevant inquiries as whether alleged threats by Syngenta to restrict supply "exemplify the [Key AI rebate] program" and "effective[ly] deter[] against non-compliance." D.E. 160 at 50. In other words, Plaintiffs must proffer evidence that threats are a feature of the Key AI program,[6] and that such threats have successfully coerced compliance with Key AI thresholds. *Id.*; *see also* Mem. at 50 n.162. Far from meeting that burden, Plaintiffs' opposition instead confirms there is **no evidence** that Syngenta **ever** threatened **any** distributor with **any** penalty for not satisfying Key AI rebate thresholds—

---

[6] *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 820-21 (11th Cir. 2015) (letter announcing the "Full Support Program" to distributors provided that "distributors who bought domestic fittings from other companies … might lose their rebates or be cut off from purchasing McWane's domestic fittings for up to three months"); *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 413 (D. Del. 2003) (finding that "[i]n publishing Dealer Criterion 6 …, Dentsply expressly stated its refusal to do business with dealers that added its rivals' tooth lines"), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005).

13

much less that (nonexistent) threats coerced distributors to meet thresholds (which distributors frequently do not do).[7]

In its moving brief, Syngenta cited evidence that "the only consequence under Key AI for missing the threshold for an AI is ineligibility for Key AI rebates on that AI for that year, ███████████████████████ ██████████ Mem. at 50. Syngenta showed that the "record [is] replete with instances of distributors and retailers falling short of Key AI thresholds," and that "every year numerous retailers of all sizes do not satisfy the thresholds." *Id.* at 50-51. Syngenta also noted the absence of "any evidence of compliance with thresholds caused by any threat by Syngenta to terminate the business relationship." *Id.* at 51.

In response, Plaintiffs baldly assert that Syngenta ███████████ ██████████████████████████████████ " but the evidence they cite ***shows no threat.*** Opp. at 41 & n.153.[8] Moreover, even if there had ███████████ (though the record shows no such thing), it was spectacularly

_____

[7] Plaintiffs do not allege or now argue that retailers have ever been threatened.
[8] That evidence instead merely shows: (1) ██████████████████████████ ████████████████████████ (Pls.' Ex. 159 at CX2361-006); (2) ███████████████████████████████████████████████ (Pls.' Ex. 162 at CX2360-007); (3) ██████████████████████████████████ ████████████████████ Pls.' Ex. 159 at CX2361-001–002, -004; Pls.' Ex. 105 at 281:15-25, 283:4-284:4.

14

"[in]effective deterrence against non-compliance" (D.E. 160 at 50) because

███████████████████████ ██ ██████████████████████

████████████████████████████████████████████[9]

Plaintiffs identify no other instance of a supposed threat by Syngenta. Plaintiffs discuss Syngenta's relationship with distributors IAP and Simplot (Opp. at 42-43), but Plaintiffs do not (as they cannot) claim that Syngenta threatened either entity with penalties for choosing not to meet Key AI thresholds—much less that either "complied" with such a threat. To the extent IAP's and Simplot's relationships with Syngenta are relevant at all, they demonstrate traditional distributors' freedom to sell as much generic product as they choose and the market will bear. *See id.* at 42 (conceding "██████████████████████" to focus on generic products); Pls.' Ex. 89 at 166:19-167:5 ████████████████████████████████ ██████); *see also* Mem. at 52-53.[10]

---

[9] Pinnacle described the mutual termination of Pinnacle's marketing agreement following the 2017 season as "amicable," including because Pinnacle "could still … access … [Syngenta's] technology and products as an authorized retailer"; to Pinnacle, "a good outcome." Ex. 165 (Steffeck IH) at 150:10-25.

[10] Plaintiffs cite a Syngenta document that reflects Syngenta's concern with Plaintiffs taking statements regarding Simplot out of context to bolster Plaintiffs' litigation position. Opp. at 42 & n.160. Ironically, Plaintiffs then do exactly that with the document. In fact, the document confirms that Syngenta does not ████████████████████████████████████████████████████ Pls.' Ex. 165 at CX2663-005.

15

Case 1:22-cv-00828-TDS-JEP    Document 462    Filed 04/27/26    Page 24 of 71

Plaintiffs suggest that never-threatened, never-penalized distributors Tenkoz and CNI were incentivized to comply with Key AI thresholds by Syngenta's non-existent "threats." Opp. at 46-48. ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████[11]

Plaintiffs' suggestion that Tenkoz and CNI meet rebate thresholds because of "threats" is further undermined by evidence marshalled by Plaintiffs themselves that these very distributors support Key AI because rebates are profitable to them. Opp. at 32 & n.114; *see supra* Point I.A.2.[12]

Even if some distributors feared supply restrictions based on speculation about another distributor's circumstances, that fear is not

---

[11] *See* Ex. 50 491:2-25, 495:19-496:6; 25; █████████████████
███████████████ *Compare* Ex. 167 (2017 share form) *with* Ex. 168 (2018 share form reflecting continued supply); *Compare* Ex. 169 (2017 share form) *with* Ex. 170 (2018 share form).

[12] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████ | ██████ | ████████. *See* ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

probative of any actual threat that "exemplif[ies] the [Key AI] program" and acts as "effective deterrence against non-compliance"—especially in light of the undisputed evidence of "non-compliance" by those same distributors. D.E. 160 at 50; *see*, *e.g.*, *Uzzell v. Murray*, 2019 WL 4463332, at \*5 (W.D.N.C. Sept. 17, 2019) ("[A] court considering a motion for summary judgment cannot deny the motion on the basis of a scintilla of evidence and may, in fact, ignore the nonmoving party's version of events if that version of events seems implausible given the weight of the evidence submitted by the moving party.") (citing *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995)).

Plaintiffs' "evidence" thus bears no resemblance to the cases on which they rely, in which an express threat of supply termination was communicated to all distributors as a feature of the challenged program. *See supra* note 6. The Court should decline Plaintiffs' invitation to radically extend those precedents based on nothing more than distributors' speculation about purported consequences of noncompliance with Key AI thresholds that, the evidence shows, did not exist.

**c.  There Are No "Long-Term Effects" of <u>the Annual Key AI Program</u>**

Despite conceding that Syngenta's Key AI marketing agreements with distributors have a one-year duration and the retailer program is likewise

17

annual, Plaintiffs argue that "Defendants' agreements have long-term effects because they are tethered to product availability." Opp. at 95. But, as just explained, no such tether exists.

Plaintiffs' argument that the agreements "are kept in place and adhered to year after year" (Opp. at 95) is inaccurate, but also legally irrelevant given uncontroverted facts that Syngenta's agreements with distributors terminate and are renegotiated annually, and Syngenta does not sign agreements with retailers. *See* Mem. at 22 & n.81, 26 & nn.99-102. The significance of an "exclusive" agreement's short term is that it provides competitors with regular opportunities to strike their own alternative bargains with each distributor. *See In re EpiPen Antitrust Litig.*, 545 F. Supp. 3d 992, 1011 (D. Kan. 2021) (no triable issue as to harmful effects of short-term, terminable, "frequently renegotiated" rebate agreements because customers were "free to walk away"), *aff'd*, 44 F.4th 959 (10th Cir. 2022); *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (short duration and terminability of agreements negated anticompetitive potential because "a competing manufacturer need only offer a better product or a better deal to acquire their services"). Here, generics have an annual opportunity to sign their own "exclusive" agreements with any number of distributors—or, short of that, to incentivize distributors to forgo Key AI rebates. In fact, because compliance with Key AI rebates is voluntary (Mem.

18

at 44-45), generics can incentivize distributors and retailers to exceed rebate thresholds *at any time* during the year.

Plaintiffs rely on *Dentsply* and *McWane* (Opp. at 96), which held that unilaterally imposed, non-negotiable total exclusivity policies—in each case, of ambiguous duration—were not the sort of short-term, freely negotiable arrangements (as are present here) generally considered to avoid antitrust concern.  *See Dentsply*, 399 F.3d at 188, 190; *McWane,* 783 F.3d at 820-22. Neither case is instructive.

### 4. Other Factors Support Applying the Price-Cost Test to the Key AI Program

#### a. Barriers to Entry Are Low and Key AI Does Not Aggravate Them

In its moving brief, Syngenta demonstrated that the barriers to entry are low and that Key AI has not prevented robust generic entry and expansion:  there are at least *a dozen* generic competitors for *each* of the three Syngenta AIs; generic suppliers have achieved shares of up to about 30 percent of each alleged single-AI market; and there are dozens of generic products containing each Syngenta AI.  Mem. at 30 & nn.57-58, 116-126, 185-89.[13]  A large percentage of generic sales are made through the traditional

---

[13] Plaintiffs' observation that private-label brands may source from Syngenta does not, as Plaintiffs mistakenly assert, undermine Syngenta's accounting of relevant generic suppliers.  Opp. at 144 n. 473.  Plaintiffs' logic fails because private-label brands can—and do—source different products from different suppliers, including generic suppliers.  (Of note, Plaintiffs have shown no evidence that Syngenta has

19

channel.  *Id.* at 16 n.57.  On these facts, Plaintiffs' liability expert necessarily concedes that generics have "made significant inroads" selling the AIs at issue, and that the presence of generic competitors in the market is competitively significant.[14]

In response, Plaintiffs neither controvert the facts quantifying generic entry and expansion nor acknowledge their expert's concessions that generics are competitively consequential.  Instead, Plaintiffs downplay generic success by modifying "generic entry" with the adjectives "limited" and "some."  *E.g.*, Opp. at 4, 6, 89.  But mere words cannot block summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("genuine" dispute only if there is a ***sufficient evidentiary basis*** to permit a fact-finder to return a verdict for the nonmoving party).

Unable to controvert the evidence of generic entry and expansion, Plaintiffs argue that the evidence "misses the point."  Opp. at 89.  But Plaintiffs' own cases show that evidence of entry is probative of the competitive significance of barriers to entry.  *See, e.g., ZF Meritor*, 696 F.3d at 285 (one significant entry over 20 years "refut[es] … [defendant's] theory" of low entry barriers); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441

---

threatened or retaliated against distributors that source generic private label products.)

[14] Ex. 5 ¶¶ 172, 184.

(9th Cir. 1995) (barriers to entry existed where only "two small rivals entered the market").

Where, as here, evidence shows "continued entry of competition," entry barriers are not sufficiently high to pose antitrust concern as a matter of law. *Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 113-14 (3d Cir. 1992); *see also Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 830 (M.D.N.C. 2000) ("[I]f new competitors are able to enter the relevant market, plaintiff's claim that the defendant enjoys the power to exclude competition is severely damaged."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (holding that entry barriers could not have been significant considering new competitor entry); *United States v. AMR Corp.*, 140 F. Supp. 2d 1141, 1209 (D. Kan. 2001) ("[T]he most conclusive evidence of the lack of significant barriers to entry is actual entry."), *aff'd*, 335 F.3d 1109 (10th Cir. 2003).  Courts have found far smaller degrees of competitive entry than present here sufficient to refute allegations of competitively significant entry barriers.  Mem. at 56-58.  And courts have held that evidence of specific competitors' difficulties in gaining (or maintaining) a foothold is insufficient to establish a triable issue when meaningful competitive entry has occurred. *See AMR*, 140 F. Supp. 2d at 1157-73, 1209-10 (evidence of three market exits insufficient to overcome conclusion of low entry barriers based on evidence of seven entrants).

21

Plaintiffs cite cases for the proposition that "some" entry is not "inconsistent" with the existence of meaningful entry barriers. Opp. at 89. But Plaintiffs use "some" to obscure the fact that none of their cases involved anywhere near ***a dozen*** entrants achieving shares of up to about 30 percent of the alleged market, which the undisputed facts establish here. *ZF Meritor*, 696 F.3d at 264 (only one significant entry in prior twenty years); *McWane*, 783 F.3d at 822, 830-32 (only one entrant with no more than 5-10% market share); *Rebel Oil*, 51 F.3d at 1441 ("two small rivals entered"); *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 636 (N.D. Ill. 2022) (pharmacy plaintiffs alleged there was "no commercially reasonable e-prescribing alternative" to the defendant); *United States v. Microsoft*, 84 F. Supp. 2d 9, 19, 22-23 (D.D.C. 1999) (the defendant had at least 90-95% of the alleged market with two or three competitors).

The dispositive differences between the cases relied on by Plaintiffs and this case run deeper. Mem. at 59-60. In contrast to *McWane*, in which the entrant "had no effect on [the defendant's] prices," 783 F.3d at 830, Plaintiffs' expert acknowledges "intense competition between branded and generic products" containing Syngenta AIs,[15] resulting in "branded price decreases."[16]

---

[15] Ex. 115 ¶ 74.

[16] *Id.* ¶ 72; *see also*, *e.g.*, Ex. 5 ¶ 168 & fig. 11 (azoxystrobin); *id.* ¶ 173 & fig. 12 (mesotrione); *id.* ¶ 185 (metolachlor/s-metolachlor). Plaintiffs' expert also admits that Key AI has not prevented price competition between other AIs in the Key AI

22

In contrast to *Rebel Oil*, in which the court reasoned "[a] juror could reasonably conclude that two gasoline stations would have insufficient capacity to offset supracompetitive pricing by a would-be monopolist," 51 F.3d at 1441, Plaintiffs' expert admits that generic entrants have "constrained [Syngenta's] ability to exercise market power."[17]

Further, Plaintiffs do not dispute that Syngenta's prices are above cost, meaning efficient competitors can compete on price. *Concord Boat*, 207 F.3d at 1059 (above-cost discounts "left ample room for new competitors … to enter [the market] and to lure customers away by offering superior discounts"). In fact, Syngenta's prices are higher than competing generics (Opp. at 132 & n.441), and "high prices, far from damaging competition, ***invite*** new competitors into [an allegedly] monopolized market." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 n.12 (2d Cir. 1979).

Finally, Plaintiffs' argument that the price-cost test is inapplicable where a pricing structure allegedly creates high entry barriers is fundamentally flawed. The undisputed fact that distributors and retailers are "free to walk away from [Syngenta's] discounts at any time … discredit[s] [Plaintiffs'] theory that the discounts created … entry barriers." *Concord*

---

program and their respective generic competitors from "becom[ing] highly intense." Ex. 5 ¶ 399.

[17] Ex. 115 ¶ 72.

*Boat*, 207 F.3d at 1063.  Moreover, as the district court in *Eisai* recognized, even if a loyalty program did arguably raise entry barriers, that would not make it a non-price mechanism of exclusion.  *See Eisai, Inc. v. Sanofi-Aventis, U.S.*, 2014 WL 1343254, at *28 (D.N.J. March 28, 2014).  As the court noted, even if a defendant's share-based discounts "raised buyer switching costs" or "worsened rival efficiency," those factors "are both better understood as an effect of the [loyalty program] as opposed to mechanisms of exclusion."  *Id*.  Further, "even if these could possibly be considered mechanisms of exclusion, [they] still relate back to price."  *Id*.  Allegations that a defendant's price discounting creates entry barriers are "not valid" under the antitrust laws if the defendant's prices are not predatory.  *AMR*, 140 F. Supp. 2d at 1215 (allegations that defendant's pricing created entry barriers "are not valid if the underlying conduct ([defendant's] pricing) in fact was not objectively below cost"), *aff'd*, 335 F.3d 1109 (10th Cir. 2003).

### b.   There Is No Evidence that Syngenta's Supply Agreements "Enhance" Anticompetitive Effects

Plaintiffs do not dispute that Syngenta's agreements to supply mesotrione and s-metolachlor to Corteva have diversified product offerings to growers by enabling new Corteva-branded products containing those AIs.  *See* Mem. at 61.  Nonetheless, Plaintiffs claim that the agreements "enhance" the supposed anticompetitive exclusionary effects of Key AI because the supply

24

agreements "limi[t] the available paths to market for generic manufacturers." Opp. at 99.

As a threshold matter, Plaintiffs' argument paints with far too broad a brush. Plaintiffs do not explain how the mesotrione and s-metolachlor agreements relate to ***azoxystrobin*** (because, of course, they do not). Plaintiffs' opposition also entirely ignores the s-metolachlor agreement. Plaintiffs do not show that the two agreements are materially similar, or even that they have similar effects. Plaintiffs' arguments regarding any exclusion-enhancing effect of the s-metolachlor supply agreement should thus be considered forfeited.

In any event, the only potentially relevant "path" is the sale of inputs ***to a single manufacturer*** (Corteva). That path remains available to any other competitor who is comparably efficient in providing the same product. And, regardless, the markets in which suppliers sell inputs to manufacturers are ***not*** alleged relevant markets.

As relevant to this case, the supply agreements do not limit sales of ***any*** products to distributors, retailers, or growers. Moreover, the mesotrione agreement that Plaintiffs singularly focus on ensures " ███████ under Key AI for Corteva products containing mesotrione, ███████████████ ████████ ██████ ██████████████████████████████████ . Opp. at 100. Thus, the supply agreement plainly is not exclusionary.

25

In fact, Plaintiffs' arguments imply that the supply agreements *increase* opportunities for generic suppliers in the relevant markets. Plaintiffs argue that Syngenta's technical-grade mesotrione costs more than the generic alternative, resulting in higher prices for Corteva's and Syngenta's mesotrione products (*id.*)—thus making competing generics more attractive to buyers. *See, e.g.*, *Berkey Photo*, 603 F.2d at 274-75 ("[H]igh prices, far from damaging competition, invite new competitors into [an allegedly] monopolized market."); *Advanced Health-Care Servs., Inc. v. Giles Mem'l Hosp.*, 846 F. Supp. 488, 494 n.11 (W.D. Va. 1994) ("[A]ny attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods for less.").

The lack of any exclusionary effect of the supply agreements in the alleged finished-product markets is consistent with the dramatic growth in the number of generic products containing mesotrione and s-metolachlor—which is currently in the dozens for *each* AI.[18]

---

[18] *See* Ex. 57 ¶¶ 131, 241; Mem. at 30 & nn.116-126, 57-58 & nn.185-189.

### B. Plaintiffs' Antitrust Claims Do Not Survive the Full Rule of Reason

#### 1. Plaintiffs' Single-AI Markets Are, as a Matter of Law, Too Narrow

Syngenta has presented overwhelming uncontroverted evidence of reasonable interchangeability among products containing each AI at issue and products containing other AIs. Mem. at 17-20, 65-82. Under governing precedent, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). As the proponent of single-AI markets, Plaintiffs bear the burden of proffering evidence "*excluding*" from their markets the other AIs that are "reasonably interchangeable." *It's My Party*, 811 F.3d at 683; *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 587 F. Supp. 3d 356, 362 (E.D. Va. 2022) (same).

But Plaintiffs offer no such evidence.[19] Plaintiffs do not even deny the existence of multi-AI markets. Opp. at 102. And Plaintiffs expressly

---

[19] Plaintiffs point to evidence that "in the face of an acetochlor supply shortage acetochlor prices increased—without a similar increase in metolachlor prices." Opp. at 110. Putting aside for purposes of this motion the debate between the parties' experts about the competitive significance of this evidence and whether metolachlor prices did increase, the evidence relates only to substitution between one Corteva product and one Syngenta product, and is not probative of lack of substitution among AIs more broadly—including substitution among metolachlor and other AIs.

27

acknowledge, for example, that Syngenta "considers rival brands using different AIs to be close substitutes" for its branded products. Opp. at 125.

Plaintiffs' response to the undisputed evidence of multi-AI markets is to ask the Court to ignore it, because generic products are supposedly "closer substitutes" for products containing the Syngenta AIs. Opp. at 5, 108. But where, as here, a plaintiff fails to define a relevant product market that includes all reasonably interchangeable substitutes, summary judgment is warranted. Mem. at 64 (citing cases).

Plaintiffs' argument that evidence of broader markets "fall[s] well short of actual market definition" confuses the burden. Opp. at 103. It is Plaintiffs' burden to present economic evidence supporting their proposed markets, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020), and excluding other potentially substitutable products, *It's My Party*, 811 F.3d at 683, which they have failed to do.

### a. Plaintiffs Fail to Rebut the Authority Holding that the Relevant Market Includes <u>All Reasonably Interchangeable Products</u>

Plaintiffs' proffered relevant markets must, as a matter of law, include "**all** reasonably interchangeable products … according to the cross-elasticity of demand for the product and its alternatives." D.E. 160 at 24.

Plaintiffs identify no authority displacing reasonable interchangeability with their proposed "close[ness]" standard (Opp. at 103-07) and cite **no**

28

*authority* endorsing a market definition that excludes reasonably interchangeable products. Instead, Plaintiffs' cases merely confirm that the defined market must "include[] *all* reasonably interchangeable products." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 884-901 (E.D. Mo. 2020) ("If customers are able to substitute one product or service in response to a nontrivial increase in the price of another, these products or services *must* fall within the same product market."); *see also, e.g., United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 50-60 (D.D.C. 2011) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use by consumers or the cross-elasticity of demand.").

In addition, Plaintiffs' invented standard is meaninglessly vague; evidence apparently proves "closer" substitution if Plaintiffs say it does. That is neither an objective nor a workable standard.

Plaintiffs inappropriately invoke "submarkets" (Opp. at 105), but there is no legal basis to subdivide relevant markets "into cognizable niches," as Plaintiffs well know from their own recent litigation. *FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *28 (D.D.C. Dec. 2, 2025), *appeal docketed*, No. 26-5028 (D.C. Cir. 2026). Rather, "the only relevant concept is the product market, indivisible as an atom." *Id.; see also FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 353-55 (S.D.N.Y. 2024) (equating "submarket" inquiry under *Brown Shoe* to analysis of whether products are "reasonably

29

interchangeable"); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008) (Brown, J.) (treating Brown Shoe "submarket" factors and empirical substitution evidence as identical); *id.* at 1044-45 (Tatel, J., concurring) (same).

Plaintiffs invoke pharmaceutical industry cases where courts defined markets consisting of a branded medication and its generic equivalents. Opp. at 105-06 (collecting cases). At the motion to dismiss stage, the Court found these cases supported Plaintiffs' theory that single-AI markets were ***plausible***. D.E. 160 at 31. Against the now-fully developed record, that theory fails. As the FTC has recognized, whether "a brand and its generics" constitute a market depends on the "case or context." *In re Impax Labs., Inc.*, 2019 WL 1552939, at *46 n.29 (FTC 2019) (citing *Mylan Pharms. Inc. v. Warner Chilcott PLC*, 838 F.3d 421, 437 (3d Cir. 2016)); *see also, e.g.*, *Trinko*, 540 U.S. at 411 (the question under antitrust law is "the particular structure and circumstances of the industry at issue").

To the extent relevant, Plaintiffs' pharmaceutical cases demonstrate the importance of ***affirmative proof excluding*** other branded products. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig*, 587 F. Supp. 3d at 365 (evidence showed "***insignificant*** cross-price elasticity" with products within the proffered broader market); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 630-32 (S.D.N.Y. 2022) (low cross-price elasticity pervaded the proposed broader

market).[20]  As shown below, the record here is devoid of such evidence; that absence is fatal to Plaintiffs' proposed markets.

>    **b.    Plaintiffs Fail to Controvert the Evidence That Other AIs Are Reasonably <u>Interchangeable with the Syngenta AIs</u>**

There is no evidence that generics are "closer" substitutes for the Syngenta AIs than are other AIs.  The uncontroverted evidence shows that growers consider other AIs *and* generics as substitutes for the AIs at issue.  Mem. at 65-68.  Plaintiffs cite no evidence of grower product-switching behavior, or of cross-price elasticity of demand, to dispute the demonstrated cross-AI substitutability.

In fact, Plaintiffs' attempts to show that generics are "close[r]" substitutes founder on Plaintiffs' own evidence—the documents they cite prove both intra- *and* inter-AI competition.[21]  Plaintiffs fail to address, much

---

[20] The FTC's expert in *Shkreli*—who is Plaintiffs' liability expert here— acknowledged that "an important component of" market definition "is an evaluation of the competitive roles played by other" products.  There, unlike here, he properly considered products "other than branded and generic" equivalents and empirically assessed that customers did not switch to them.  *See* Ex. 172 (Pages from Corrected Expert Report of C. Scott Hemphill, at 3-4, *FTC v. Vyera Pharms., LLC*, No. 1:20-cv-00706 (S.D.N.Y. November 19, 2021), ECF No. 677-3).

[21] *See, e.g.*, Pls.' Ex. 54 at CX2654-005 (azoxystrobin strategy document stating ███████████████████████████████████████████████ ████████████████████████████ Pls.' Ex. 272 at CX2924-025– 027 (corn herbicides marketing plan ██████████████████ ████████████████████████████████████ Pls.' Ex. 273 at CX2723- 012 (SMOC Pricing Strategy presentation noting that ████████████

less controvert, the opinions of Syngenta's agronomy expert that growers substitute among each Syngenta AI and several other AIs for the same agronomic need with no material difference on crop yield.[22]  Plaintiffs attempt to discredit sworn declarations from growers that confirm cross-AI substitution (Opp. at 138), which highlights the absence of Plaintiffs' own evidence from the growers they purport to champion.

Unable to elicit evidence from growers, Plaintiffs stake their market definition on an N.Y.U. law professor, whose hypothetical monopolist test (HMT) is supposedly the "best evidence of grower behavior."  Opp. at 116. Plaintiffs contend that Hemphill's HMT "confirms" their single-AI markets. Opp. at 113.  But Hemphill's finger-in-the-wind version of the HMT for the Syngenta AIs—which Plaintiffs dub "natural experiments" (Opp. at 120)—is nothing more than "armchair economics."  *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004).  Concluding that "sales of X rose, therefore X is a market"—akin to what Hemphill has done here—is neither proper expert testimony nor is it determinative of the bounds of a relevant market.  *Id.* at 665; *see also Sumotext Corp. v. Zoove, Inc.*, 2020 WL 6544410, at *7-9 (N.D. Cal. Nov. 6, 2020) (rejecting HMT based upon "natural

---

[22] Ex. 4  ¶¶ 62-67.

32

Case 1:22-cv-00828-TDS-JEP    Document 462    Filed 04/27/26    Page 41 of 71

experiment[s]" where expert observed price changes over time of products within candidate market that excluded competing products), *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021).

Critically, Hemphill's HMT flouts the legal requirement that in performing an HMT, prices of potential substitute products outside the candidate market must be held constant. Mem. at 85-86 (citing cases). This principle is reflected in this Court's motion to dismiss decision, in which the Court explained that a significant drop in "the price of one incumbent product … in response to new entry" shows that the "first incumbent product, plus the new entrant, is very likely a market" only if "the prices of other incumbents do not" drop. D.E. 160 at 32 (quoting Areeda & Hovenkamp ¶ 561b2 (4th & 5th ed. 2023)). Hemphill's flawed HMT rests on his observation that Syngenta reduced prices of products containing the Syngenta AIs following generic entry, while ignoring evidence that the prices of other AIs identified as substitutes in Syngenta internal documents ***also dropped***. *See* Mem. at 85-90.

Plaintiffs complain that satisfying this legal requirement was not "feasible," but Hemphill did conduct a version of the HMT (which Plaintiffs call his "arithmetic-based, recapture rate analysis" (Opp. at 120)) that purports to address the "hold constant" requirement. However, that more rigorous analysis addresses only ***Corteva*** AIs. Plaintiffs misleadingly accuse

33

Syngenta of "ignor[ing]" this more rigorous HMT. Opp. at 120. But because the HMT does not analyze any Syngenta AI, it is relevant to Syngenta only in that it emphasizes, by contrast, what is fatally omitted from Hemphill's HMT for the Syngenta AIs.

### c. Plaintiffs Have Not Created a Triable Issue of Fact Under *Brown Shoe*

Plaintiffs' selective invocation of the *Brown Shoe* factors does not satisfy Plaintiffs' burden of "excluding" other AIs from their single-AI markets. *It's My Party*, 811 F.3d at 683. Indeed, *Brown Shoe* analysis "come[s] into play only after the outer boundaries of a product market are determined by evaluating the reasonable interchangeability of use or the cross-elasticity of demand." *Kentucky Speedway, LLC v. NASCAR*, Inc., 588 F.3d 908, 917-19 (6th Cir. 2009); *see also* D.E. 160 at 28 (explaining that some of the *Brown Shoe* factors are "merely evidentiary proxies for direct proof of substitutability"). Regardless, *Brown Shoe* analysis favors Syngenta, and Plaintiffs' protestations to the contrary fail to create a triable issue of fact.

Plaintiffs do not dispute that three *Brown Shoe* factors—distinct customers, specialized vendors, and unique production facilities—support multi-AI markets. Opp. at 123, 133. The remaining factors do so as well.

**Industry or public recognition**. There is no industry or public recognition of single-AI markets. Mem. at 69-76. Plaintiffs argue that the

34

"structure" of Key AI, and certain Syngenta documents that "speak to" individual AIs, show that Syngenta "conceives of" competition at the AI level. Opp. at 124. But as in *PepsiCo Inc. v. Coca-Cola Co.*, Plaintiffs cannot bootstrap a relevant market based upon one element of Syngenta's business strategy. 315 F.3d 101, 104-06 (2d Cir. 2002).[23] Plaintiffs concede that Syngenta "considers rival brands using different AIs to be close substitutes" for its branded products. Opp. at 125. Plaintiffs' own exhibits reinforce this fact.[24] Plaintiffs' evidence fails to create a triable issue of fact because it does not show that Plaintiffs' proffered markets are "meaningfully insulated … from competition with other products in the broader market." *In re German Auto. Manuf. Antitrust Litig.*, 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020).

**Peculiar characteristics and uses**. Plaintiffs fail to controvert the record evidence that each Syngenta AI is functionally equivalent to other AIs. Mem. at 17-20, 76-77. Plaintiffs tout purportedly "distinct" features (Opp. at 126-31), but tellingly ignore the opinions of Syngenta's expert agronomist—

---

[23] Plaintiffs incorrectly claim *PepsiCo* "is completely unlike this case" because "Defendants organize their commercial efforts around the same AI-specific markets Plaintiffs allege." Opp. at 110 (citing 315 F.3d at 109). The very same was true in *PepsiCo,* where loyalty provisions directed **only** at independent food service distributors ("IFDs") were insufficient to justify plaintiffs' alleged "market for fountain-dispensed soft drinks distributed through IFDs" at summary judgment. 315 F.3d at 104-06.

[24] *See supra* note 21.

whose opinions Plaintiffs neither have rebutted nor seek to exclude—that there are a wide variety of AIs that growers can and do use for the same agronomic needs as each Syngenta AI.[25] Claims that a product exhibits "unique" properties (Opp. at 128) are insufficient to define a single-product market under *Brown Shoe*. *See Bayer Schering Pharma. AG v. Watson Pharma., Inc.,* 2010 WL 11578470, at *3-4 (D. Nev. March 31, 2010) (allegations of purported "uniqueness" are insufficient to plead single-product market). Lawyers' arguments that certain AIs are "better suited" for certain uses "ha[ve] no bearing on the key questions of product interchangeability and cross-elasticity of demand from the perspective of consumers." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854-55 (1st Cir. 2016).

**Distinct prices and sensitivity to price changes**. Plaintiffs do not address Syngenta's evidence that prices of Syngenta AI products are not meaningfully distinct from products containing different, interchangeable AIs. Mem. at 80-82. Instead, Plaintiffs focus on evidence that Syngenta AI products are priced at "premiums to" and "higher than" generics. Opp. at 131-32.

Thus, as the record stands, the prices of the Syngenta AIs are not meaningfully different from substitutable AIs, but are higher than generics.

---

[25] Ex. 4 ¶¶ 62-67.

This does not satisfy Plaintiffs' burden of "excluding" the other AIs from their single-AI markets. *It's My Party*, 811 F.3d at 683; *see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1122 (10th Cir. 2014) ("[A] substantial price difference, along with other factors, can bear on definition of the product market"); *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 423 (S.D.N.Y. 2024) (the "distinct prices" *Brown Shoe* factor relates to "price differentials" or different "pricing models" between two products).

### d.    Plaintiffs' Challenges to Syngenta's Switching Evidence Do Not Defeat Summary Judgment

Lacking their own direct evidence of grower behavior, Plaintiffs attempt to discredit Syngenta's evidence. That misguided challenge "ignore[s] that [Plaintiffs] [them]sel[ves] carr[y] the burden of defining the relevant market," and thus does not carry Plaintiffs' burden of proof to proceed past summary judgment. *Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*, 2015 WL 1736957, at *10 (E.D. Pa. Apr. 16, 2015), *aff'd*, 838 F.3d 421 (3d Cir. 2016).

Plaintiffs invoke the *Cellophane* fallacy to speculate that growers might switch to out-of-market AIs at a supracompetitive price but not at a competitive price. Opp. at 135-36. But the *Cellophane* fallacy does not explain why growers switched more to products containing other AIs than

37

containing the same AI.[26]  *Meta*, 2025 WL 3458822, at \*27 (*Cellophane* fallacy does not affect the "order of substitution" from the product at issue to competing products).  The price decreases Plaintiffs admit occurred in the relevant markets (*e.g.*, Opp. at 114) reinforce that Plaintiffs' appeal to *Cellophane* is inapt.  *Cf. PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 257-58 (S.D.N.Y. 2000) (no risk of *Cellophane* fallacy when plaintiff had "not submitted any evidence to show that [defendant's] prices are supracompetitive").

### 2. Key AI Does Not, as a Matter of Law, Harm Competition

Plaintiffs' proffered evidence of "foreclosure" is not probative of anticompetitive exclusion.  Plaintiffs' "[f]oreclosure shares" for Syngenta merely reiterate Syngenta's shares of the alleged markets.  *Compare* Opp. at 9 fig. 18 ("Market Shares") *with* Opp. at 141 fig. 28 (almost identical figures captioned "Foreclosure Shares").  The antitrust laws protect the opportunity to compete, but do not guarantee success.  *E.g.*, *Brooke Grp.*, 509 U.S. at 224 (antitrust laws protect "competition, not competitors").  Thus, Syngenta's success in the marketplace does not equal anticompetitive foreclosure.  *See Eisai*, 821 F.3d at 403 (the "concern" when analyzing foreclosure "is not about which products a consumer chooses to purchase, but about which products

---

[26] *See* Ex. 57  fig. 8.

38

are reasonably available to that consumer"). Because Plaintiffs cannot "establish that [generics' allegedly] lower market share [is] attributable to anticompetitive conduct by [Syngenta] as opposed to other factors," summary judgment against Plaintiffs is warranted. *Id.* at 402, 410 (affirming summary judgment absent such evidence).

Plaintiffs otherwise fail to present evidence of any generic foreclosure resulting from any ***anticompetitive*** effect of Key AI. To the contrary, the undisputed facts show robust generic penetration, which Plaintiffs' liability expert acknowledges is competitively significant. Notably, Plaintiffs do not dispute that there is "***zero evidence***" of growers having difficulty finding generic versions of Syngenta AI products when they wish to use them. Mem. at 97. On this record, Key AI has not harmed competition.

### a. As a Matter of Law, Distributors' Choices in Response to Price-Based Incentives Have No Anticompetitive Effect

Again, Plaintiffs' own evidence corroborates that distributors and retailers ***choose*** to satisfy Key AI thresholds in response to the rebate's financial incentives. *See supra* point I.A.2. Where, as here, distributors are free to "forego the discount offered by [the defendant] and purchase from a generic competitor," summary judgment is warranted. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010); *see also Eisai*, 821 F.3d at 403 ("[I]f customers are free to switch to a

different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share.").

Plaintiffs contend that *Allied* was "narrowly decided" on its facts (Opp. at 149), but the facts are analogous—both Key AI and the program in *Allied* "provid[e] only for substantial discounts to customers that actually purchas[e] a high percentage of [the relevant product] from [the defendant]" and the only ramification of "purchasing less than the agreed upon percentage of [the defendant's products] was loss of the negotiated discount." *Id.* at 995-96.

Plaintiffs argue that the rebates in *Eisai* affected a smaller share of the market. Opp. at 166-67. But that is irrelevant to *Eisai*'s reasoning, which identifies a qualitative factor (customers' ability to switch to competing products) that precludes a finding of anticompetitive foreclosure, without regard to any quantitative factor. *Eisai*, 821 F.3d at 403-04.

Plaintiffs' attempt to distinguish *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814 (M.D.N.C. 2000), also fails. Plaintiffs contend that *Bepco*'s holding is limited to cases in which "sufficient" distribution is available to all manufacturers (Opp. at 150), but Plaintiffs' expert concedes that the same is true here, as generic penetration is "significant" and the resulting

40

competition has effectively "constrained [Syngenta's] ability to exercise market power."[27]

### b. Plaintiffs' Evidence Is Not Probative of Anticompetitive Foreclosure

Plaintiffs' evidence does not distinguish between anticompetitive foreclosure and "merely disadvantaging rivals." *Eisai*, 821 F.3d at 403. Plaintiffs mischaracterize any effect of Key AI as anticompetitive foreclosure, regardless of whether it results from Key AI's price-based incentive to purchase Syngenta products. *E.g.*, Opp. at 56-58. For example, Plaintiffs cite (self-interested) testimony from generics that they would sell more product absent "loyalty programs" (Opp. at 147) but there is no indication the testimony refers to anything beyond the procompetitive price competition inherent in Key AI.

Plaintiffs try to downplay generic success by attributing it to pandemic-induced shortages of Syngenta products. Opp. at 146 & n.480. In doing so, Plaintiffs affirmatively undermine their argument that "foreclosure" is driven by Key AI rebate thresholds.[28] *If* the rebate thresholds actually constrained

---

[27] Pls.' Ex. 1 at ¶¶ 172, 184; Pls.' Ex. 235 at ¶¶ 72, 74.

[28] In their amended complaint, Plaintiffs allege ███ "foreclosure" calculated from percentages including rebate thresholds of "███ D.E. 81 ¶ 171. That allegation was the basis for this Court's statement, on which Plaintiffs now rely (Opp. at 140), that "Plaintiffs have pleaded a foreclosure of 'approximately ███ or more of each applicable market.'" D.E. 160 at 65 (quoting D.E. 81 ¶ 171).

41

generics' shares of the alleged markets, ***then*** as supply shortages reduced Syngenta's sales, the percentage of "open space" would not change and generics would be unable to gain any ***share*** of the alleged markets (and generic sales volume would decline as the volume of "open space" declined proportionately with Syngenta's sales). Instead, as Plaintiffs spotlight, generic ***shares*** grew dramatically. In fact, Key AI was demonstrably not an obstacle to generics' ability to penetrate up to about 30 percent of the alleged markets (*see supra* Point I.A.4.a), so Plaintiffs cannot blame Key AI for subsequent lower shares.

Nor is it relevant that generic manufacturers supposedly have "greater market penetration" in other countries. Opp. at 58, 146-47. Plaintiffs present no evidence that this blunt comparison, which disregards innumerable differences among countries, is probative of Key AI's effects, let alone any anticompetitive effect. Moreover, Plaintiffs' contention that "Syngenta's 2019 metolachlor share vs. generics is lower in … ███████ (███ compared to the United States (███ )" (Opp. at 147) is contradicted by Plaintiffs' evidence that Syngenta's U.S. market share for metolachlor was ███ in 2019. Opp. at 9 fig. 18. A conflict within the non-movant's own evidence creates no obstacle to summary judgment. *See In re Fam. Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).

### c. There Is No Evidence of Supracompetitive Pricing

Plaintiffs contend that prices for Syngenta's products containing the Syngenta AIs would be lower in a "hypothetical 'but-for world'" without the purported anticompetitive effects of the Key AI program.  Opp. at 156.

Plaintiffs' contention depends on disingenuous readings of Syngenta documents.  For example, Plaintiffs mischaracterize a Syngenta document that hypothesizes, shortly after entry of lower-priced generic azoxystrobin,

██████████████████████████████████████████████████

███████████████████████████████.  *See* Opp. at 59, 158-59 (citing Pls.' Ex. 226).  Plaintiffs (and their experts) portray this document as showing lower prices in a "hypothetical 'but-for world'" ***without*** the Key AI program.  But Syngenta's post-patent strategy is not synonymous with Key AI; indeed, Plaintiffs ignore that product innovation is a principal pillar of that strategy;[29] and the hypothetical ██████ ████████████

█████████████ █████████████████████████████

████████████████████████████████████████████

████████████████████████████[30]

---

[29] *See, e.g.*, Pls' Ex. 190 at -5496 (explaining "[i]nnovation is key" and situating "Innovation" at the top of the "Post Patent Pillars").

[30] Pls.' Ex. 226 at CX2518-027, -034.

Syngenta's recognition of the possibility that prices could fall if there were significantly less demand from distributors and retailers for Syngenta's premium azoxystrobin products (████████████████████████) is not proof that Key AI raises prices. To the contrary, it shows that Key AI would be powerless to prevent the distribution channel from switching to lower-priced generics, and that less demand for Syngenta's premium products would place downward pressure on prices.

In another example, Plaintiffs cite a Syngenta document predicting that prices of two AIs—not among the Syngenta AIs—would decrease if removed from the Key AI program. Opp. at 158. It is undisputed that the prediction proved false. *See* Ex. 57 at 135-41.

Plaintiffs' mischaracterization of evidence highlights the fallacy at the heart of their case: that the substantial generic entry, intense price competition, and significant price reductions, which have already occurred, would be any greater if Syngenta did not offer its Key AI rebate.

### d. There Is No Evidence of Less Innovation

Plaintiffs' opposition confirms they have no evidence that Key AI is an obstacle to innovation. Plaintiffs instead cite testimony from two Syngenta rivals claiming that they decided not to introduce, or delayed introduction of, two new products based on vague "loyalty concerns." Opp. at 160. But without any indication that a witness is referring to an anticompetitive effect

44

of Key AI, as opposed to its price-based incentive, such conclusory, self-interested testimony is not probative of anticompetitive effects.  *See Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) ("Although we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [a witness's] self-serving testimony.").

## II.   PLAINTIFFS' FTC ACT CLAIM FAILS FOR THE SAME REASONS AS PLAINTIFFS' OTHER FEDERAL LAW CLAIMS

Plaintiffs are wrong that Syngenta does not challenge the FTC's claim under the "unfair method of competition" prong of Section 5 of the FTC Act. Opp. at 171.  In moving for summary judgment, Syngenta stated that "Plaintiffs' federal claims," including under "the FTC Act (§ 5)[,] all advance the same antitrust theory," and "Plaintiffs have failed to meet their burden" on that theory, "warranting summary judgment on *all of Plaintiffs' federal claims*."  Mem. at 34-35; *see also* D.E. 380 ¶ 7.

Plaintiffs question the relevance of market definition and the price-cost test to the Section 5 claim, and argue there is no basis to apply the price-cost test to an FTC action "target[ing] obviously anticompetitive conduct."  Opp. at 171.[31]  By focusing on the "anticompetitive conduct" requirement,

---

[31] Plaintiffs question the application of the price-cost test, but not the full rule of reason, to their Section 5 claim.  However, "the price-cost test is a specific

Plaintiffs answer their own question: the price-cost test and market definition are used to analyze claims of anticompetitive conduct. *See Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987) (discussing the FTC's "power … to declare anticompetitive trade practices" in violation of Section 5).

As this Court explained, the price-cost test is a "measure of anticompetitive conduct." D.E. 160 at 33. Using Section 5 to condemn conduct that is protected as procompetitive under the price-cost test would directly contradict the FTC Act's purpose of "protect[ing] society against oppressive anti-competitive conduct." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d Cir. 1984).

Similarly, market definition is relevant because "it serves as the frame through which the court analyzes monopoly power and substantial market foreclosure" under the rule of reason. D.E. 160 at 21; *see Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.").[32] Accordingly, the market definition requirement has been

_____

application of the rule of reason when applied in the context of exclusive dealing." D.E. 160 at 35 n.7.

[32] Plaintiffs' liability expert concedes that "[l]oyalty programs may or may not harm competition, depending on the circumstances," including whether the firm possesses "market power." Ex. 5 ¶¶ 23-24. Therefore, "[d]emonstrating market power is

expressly applied to Section 5. *See Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974, 978 (7th Cir. 1969) ("To determine whether the [challenged conduct] is an unfair method of competition under Section 5 of the [FTC] Act, the relevant market within which to measure the effect on competition must be defined.").[33]

While urging the Court to reject these well-established legal tools, Plaintiffs articulate only an "obvious[ness]" standard to replace them. Opp. at 171. But "we know anticompetitive conduct when we see it" provides the Court no guidance. Nor do old, likely obsolete cases deferring to the FTC on a petition for review of an agency adjudication. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Under settled precedent governing loyalty programs, inclusion of the Syngenta AIs in the Key AI program is not anticompetitive. The outcome under Section 5 is no different.

---

important in order to establish the existence or likelihood of adverse consequences from the conduct under scrutiny." *Id.* ¶ 31.

[33] Plaintiffs quote *Chuck's Feed* to argue that "[d]etailed market definition" is not "required for an exclusive dealing claim brought under Section 5." Opp. at 172 (quoting 810 F.2d at 1295). But the Fourth Circuit observed there that "the appropriate analysis to apply to an exclusive dealing arrangement under the FTC Act" requires "determin[ing] the nature of the relevant market by identifying the particular type of goods and the geographical area involved," using similar language and citing to *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961), an exclusive dealing Supreme Court decision that rigorously evaluated market definition. *See Chuck's Feed*, 810 F.2d at 1293-95.

47

## III. PLAINTIFFS HAVE NO SECTION 1 CLAIM UNSCATHED BY SYNGENTA'S SUMMARY JUDGMENT MOTION

Plaintiffs argue that they have **two** Section 1 claims—challenging Syngenta's loyalty program and Defendants' supply agreements, respectively—and the latter claim survives summary judgment because Syngenta "d[id] not **independently** address that claim." Opp. at 172. Plaintiffs' argument is devoid of substance.

Plaintiffs assert a single Section 1 claim alleging that Key AI and the Syngenta-Corteva supply agreements violate Section 1. D.E. 81 ¶ 208. Syngenta moved for summary judgment against Plaintiffs' Section 1 claim (Mem. at 34), including by rebutting Plaintiffs' allegations that the supply agreements are anticompetitive (Mem. at 3-4, 60-62). Thus, Syngenta has addressed Plaintiffs' challenge to the supply agreements under Section 1.

It is true that Syngenta did not address Plaintiffs' challenge to the supply agreements "independently" from Plaintiffs' challenge to Key AI. But that is because, **as Plaintiffs represented to the Court**, Plaintiffs do not independently challenge the supply agreements. In moving to dismiss, Syngenta observed that "Plaintiffs plead no facts showing that either of these (unremarkable) supply agreements has a substantial effect on competition." D.E. 102 at 24. Plaintiffs responded that "**the agreements cannot be assessed in isolation**; they must be considered with the rest of the conduct,

48

which forecloses over ███ of each relevant market."  D.E. 112 at 19 n.5.

Plaintiffs cited their allegation that "each Defendant's [*loyalty*] *program*

has effectively foreclosed generic competitors from approximately ███ or

more of each applicable Relevant Market."  D.E. 81 ¶ 171; *see also id.* ¶ 164

("Each Defendant has also harmed competition through other anticompetitive

conduct ***deployed in conjunction with loyalty programs***, including

Defendants' exclusive supply agreements with each other.").

This Court accepted Plaintiffs' argument, and Plaintiffs' challenge to

the supply agreements survived ***only*** on the theory that "Plaintiffs plausibly

allege that the Syngenta-Corteva supply agreement for mesotrione and

metolachlor allegedly ***enhances the exclusive effect of the loyalty***

***programs***."  D.E. 160 at 51.[34]

Plaintiffs' articulation of the Section 1 analysis supposedly omitted

from Syngenta's summary judgment papers describes the arguments that

Syngenta advanced.  Plaintiffs argue that Syngenta did not address "whether

Defendants' agreements aided the maintenance of Syngenta's monopoly by,

for example, resulting in … decreased opportunities for rival … firms to gain

access to consumers."  Opp. at 173.  But that is exactly what Syngenta

---

[34] Plaintiffs are judicially estopped from now challenging the supply agreements independently of Key AI.  *See, e.g., Lamonds v. GMC*, 34 F. Supp. 2d 391, 395 (W.D. Va. 1999) (collecting cases).

49

addressed in asserting that there is no evidence that the agreements "enhanc[e] the [allegedly] exclusive effect of Key AI." Mem. at 60-61 (quoting D.E. 160 at 51).

## IV. SYNGENTA IS ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIMS

Plaintiffs concede that all but four state law claims "rise and fall with the Sherman Act claims." Opp. at 66. The supposed outliers—California's Cartwright Act claim, and California, Indiana, and Iowa's consumer protection law claims (Opp. at 174-76)—also fail. Mem. at 100-03.

***Cartwright Act***. Plaintiffs admit that federal antitrust law is "instructive" for Cartwright Act claims (Opp. at 174), and provide no basis for ignoring that instruction. Where, as here, a plaintiff fails to meet its burden to identify "specific and material differences between the Cartwright Act and the Sherman Act, [the] plaintiff cannot prevail on a Cartwright Act [claim] where its claims fail under the Sherman Act." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1048 (N.D. Cal. 2021), *rev'd in part on other grounds*, 67 F.4th 946 (9th Cir. 2023).

***California Unfair Competition Law ("UCL")***. Plaintiffs vaguely assert that claims under the UCL's "unfair" prong can succeed where analogous antitrust claims fail because the word "unfair" is "broad." Opp. at 174. But as the California Supreme Court has held, where—as here—a

plaintiff alleges anticompetitive practices, "the word 'unfair' ... means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws ..., or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999).[35]  Thus, that Key AI is *procompetitive* under federal antitrust analysis renders it incapable of violating the UCL.

*Indiana's Deceptive Consumer Sales Act* **("IDCSA").**  Plaintiffs rest their defense of the IDCSA claim on the spurious observation that the IDCSA prohibits "unfairness in its infinite forms."  Opp. at 175-76.  Even were that true, Plaintiffs' claim fails alongside the UCL claim for Plaintiffs' failure to articulate *any* theory of liability under the statute separate from their failed antitrust theory, let alone to cite authority imposing IDCSA liability on analogous facts.

*Iowa's Consumer Fraud Act* **("CFA")**.  Plaintiffs devote their discussion of the CFA to rebutting "Syngenta['s] ... [argument] that deception is a necessary element" of the claim.  *Id.* at 176.  But Syngenta made no such argument.  Mem. at 103.  Regardless, Plaintiffs again make no effort to

---

[35] As to the statute's other prongs, Plaintiffs neither contend that Syngenta's alleged conduct is "fraudulent" nor dispute that Syngenta's alleged conduct is not "unlawful" under the UCL if it does not violate antitrust law.  Mem. at 101-03.

51

articulate how, on this record, Syngenta's rebates are "unfair" to consumers, despite being procompetitive under the antitrust laws, much less to identify precedent recognizing liability under the CFA for similar conduct. Summary judgment is warranted. *See*, *e.g.*, *Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 394 (4th Cir. 1994) (granting summary judgment where the nonmoving party "made no effort to call the court's attention to evidence in the record" and offered minimal legal analysis).

## V. THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS AGAINST SYNGENTA CROP PROTECTION AG AND SYNGENTA CORPORATION AS A MATTER OF LAW

Plaintiffs concede that claims against SCPAG and Syngenta Corp. must be dismissed unless the entities "control[ed], dictat[ed], or encourag[ed]" the alleged anticompetitive conduct. Opp. at 177. But Plaintiffs proffer no evidence that SCPAG or Syngenta Corp. controlled, dictated or encouraged ***Key AI***, much less any anticompetitive feature of it.

***Post-Patent Strategy***. Plaintiffs assert the 20-year-old "White Book" —an "Ancient Documen[t]" under Federal Rule of Evidence 901(b)(8)—shows SCPAG's involvement "in setting post-patent defense and loyalty strategy." Opp. at 178-79. But this concededly "***global*** strategy document" is irrelevant because Plaintiffs fail to controvert that ***Syngenta alone*** conceived, developed, implemented and maintains ***Key AI***. Mem. at 104-05; *see Thales Avionics, Inc. v. Matsushita Avionics Sys., Corp.*, 2006 WL 8569652, at *5

52

(C.D. Cal. Apr. 6, 2006) (granting summary judgment where an affiliate's general involvement in offering discounts was "insufficient" for liability). Plaintiffs' evidence regarding SCPAG's ███████████, which concededly provided "**global**" guidance on generic "Post Patent Strategy and Defense" (Opp. at 179), fails for the same reason. Plaintiffs' evidence of a purported "audit" of Key AI "for compliance with ████" (*id.*) shows nothing more than a routine revenue audit of U.S. marketing activities.[36] *See Office Cantonal des Faillites de la Republique et du Canton de Geneve v. Expedia, Inc.*, 2024 WL 381181, at *4 (W.D. Wash. Feb. 1, 2024) ("monitoring" and "supervisi[ng]" a subsidiary's conduct will not give rise to liability for a parent).

***Routine Updates.*** Plaintiffs incorrectly assert that SCPAG was directly involved in enforcing Key AI. Opp. at 179-80 & n.556. The cited testimony shows that Syngenta merely updated SCPAG on the outcome of negotiations with a distributor, ████████████████████████



███████████████████████████████████████

████████████████████████████"[37] Similarly, Plaintiffs' claim that SCPAG was "involved" in complying with the FTC's ChemChina merger

---

[36] Pls' Ex. 300.

[37] Pls.' Ex. 105 at 282:18-21. In yet another instance of misrepresenting evidence, Plaintiffs cite to a credit report (Pls' Ex. 301) that makes no mention of SCPAG. *See* Opp. at 179-80 n.556.

order shows nothing more than a routine update with follow-ups.[38]  Likewise, evidence that Syngenta Corp. receives "updates" on topics other than Key AI (Opp. at 180) is immaterial.  *See* Ex. 173 (*Hyland v. HomeServices of Am.*, No. 3:05-CV-612-R, at \*43-44 (W.D. Ky. July 18, 2012) (monthly updates to a parent is insufficient to extend liability)).

*Roll-up Reporting.*  Plaintiffs concede that SCPAG does not exercise full control over funding the U.S. business and that its budget reviews do not reach the "plans" Syngenta implements to meet its budget.  Mem. at 105. Instead, Plaintiffs cite roll-up profits and consolidated financials, but "[a]ntitrust law doesn't recognize … imputing corporate liability to any affiliated company unlucky enough to be a bystander to its sister company's alleged misdeeds."  *See* Mem. at 104 (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015)); *see also, e.g.*, *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) (no affiliate liability "merely by virtue of its place in the same corporate family").

*Approvals.*  Plaintiffs claim that SCPAG "approved" the addition of AIs to Key AI, but Plaintiffs' own evidence clarifies that SCPAG merely

███████████████████████████████████████

███████████████████████████████████████

---

[38] Pls.' Ex. 209 at CX2593-001.

███████████████████████[39] In any event, "approval and assent" is a legally insufficient basis to extend liability to affiliates. *In re Penn. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009). Plaintiffs claim that *Packaged Seafood* shows "knowledge and approval is sufficient" (Opp. at 178), but liability there was based on a parent's "crucial" involvement, including ***"policing and enforcing"*** collusive agreements. *In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 836951, at \*10 (S.D. Cal. Mar. 21, 2022).

***Shared Officers.*** Plaintiffs do not dispute that sharing officers cannot alone give rise to liability across affiliates. Mem. at 107-08. Plaintiffs speculate that Vern Hawkins' involvement with Key AI was undertaken as an employee of Syngenta Corp., rather than Syngenta. Opp. at 181. But Plaintiffs do not and cannot offer ***evidence*** of that theory, because it is undisputed that ***Syngenta*** (and not Syngenta Corp.) implements and oversees the program. Plaintiffs cannot manufacture a "genuine issue of material fact through mere speculation." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008); *Tart v. Johns*, 2021 WL 11139974, at \*4 (M.D.N.C. June 11, 2021).

---

[39] Pls.' Ex. 298 at 27:3-13.

55

*Supply Agreements.* Finally, Plaintiffs argue that SCPAG is liable for "negotiating" and "sign[ing]" the Corteva supply agreements. Opp. at 181. But Plaintiffs do not dispute that SCPAG was involved because of the agreements' global scope (Mem. at 106), and do not contend (much less support with evidence) that SCPAG somehow controlled, directed, or encouraged **Key AI** through its involvement in the agreements.

## CONCLUSION

The Court should enter summary judgment dismissing all of Plaintiffs' claims against the Syngenta Defendants.

Date: March 20, 2026

*s/ Patrick M. Kane*
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC 27401
Telephone: 336.378.5200

Charles S. Duggan*
charles.duggan@davispolk.com
James I. McClammy*
james.mcclammy@davispolk.com
Michael Scheinkman*
michael.scheinkman@davispolk.com
David B. Toscano*
david.toscano@davispolk.com

56

Alison B. Miller*
alison.miller@davispolk.com
Daniel J. Thomson*
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292

Benjamin M. Miller*
benjamin.miller@davispolk.com
DAVIS POLK & WARDWELL LLP
1050 17th Street, NW
Washington, DC 20036
Telephone: (202) 962-7133

Jesse Solomon*
jsolomon@paulweiss.com
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7312

*Specially appearing under L.R.
83.1(d)


*Attorneys for Defendants Syngenta
Crop Protection AG, Syngenta
Corporation, and Syngenta Crop
Protection, LLC*

57

Case 1:22-cv-00828-TDS-JEP    Document 462    Filed 04/27/26    Page 66 of 71

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), I certify that the foregoing brief is less than 12,500 words, excluding the caption, table of contents, table of authorities, signature lines, certificate of compliance, and certificate of service.

Dated:  March 20, 2026

/s/ *Patrick M. Kane*
Patrick M. Kane (NC Bar No. 36861)

58

## APPENDIX A - TABLE OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| 164. | Excerpts from the transcript of the deposition of Loren K. Smith, dated December 4, 2025 |
| 165. | Excerpts from the transcript of testimony given during the FTC's investigational hearing by Michael Steffeck, in his personal capacity and as corporate representative of Pinnacle, dated September 21, 2021, bearing Bates FTC-PROD-0000020302 |
| 166. | Excerpts from the transcript of the deposition of Greg Fowler, in his personal capacity and as corporate representative of CNI, dated June 20, 2025 |
| 167. | November 28, 2017 email from D. Carpino to J. Kraskouskas et al. containing 2017 Marketer Key AI Share Form for Tenkoz, bearing Bates SYT_REBATELIT_03162899 |
| 168. | 2018 Marketer Key AI Share Form for Tenkoz, dated November 9, 2018, bearing Bates SYT_REBATELIT_03278754 |
| 169. | 2017 Marketer Key AI Share Form for Chemnut Inc., dated October 23, 2017, bearing Bates, SYT_REBATELIT_02290474 |
| 170. | 2018 Marketer Key AI Share Form for Chemnut, Inc., dated November 5, 2018, bearing Bates SYT_REBATELIT_03278746 |
| 171. | Excerpts from the transcript of testimony given during the FTC's investigational hearing by Greg Fowler, in his personal capacity and as corporate representative of Chemnut, Inc., dated October 21, 2021, bearing Bates FTC-PROD-0000021591 |
| 172. | Pages from Corrected Expert Report of C. Scott Hemphill, *FTC v. Vyera Pharms., LLC*, (S.D.N.Y. November 19, 2021) |
| 173. | *Hyland v. HomeServices of Am.*, No. 3:05-CV-612-R, at *43-44 (W.D. Ky. July 18, 2012) |

59

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEBRASKA, STATE OF OREGON, STATE OF TENNESSEE STATE OF TEXAS, STATE OF WASHINGTON, and STATE OF WISCONSIN,     Plaintiffs,     v. SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.,     Defendants. | Case No. 1:22-cv-00828-TDS-JEP **CERTIFICATE OF SERVICE** |

Consistent with the Court's Order of February 18, 2026, D.E. 415, the undersigned counsel certifies that on March 20, 2026, counsel of record for Plaintiffs and Corteva, Inc. were timely served via electronic means with the Reply Brief in of the Syngenta Defendants' Motion for Summary Judgment, including Exhibits 164-173.

This the 20th day of March 2026.

*s/Patrick M. Kane*
Patrick M. Kane
N.C. Bar No. 36861
pkane@foxrothschild.com
Sean T. Placey
N.C. Bar No. 56683
splacey@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC 27401
Telephone: 336.378.5200
Facsimile: 336.378.5400

Charles S. Duggan*
charles.duggan@davispolk.com
James I. McClammy*
james.mcclammy@davispolk.com
Michael Scheinkman*
michael.scheinkman@davispolk.com
David B. Toscano*
david.toscano@davispolk.com
Alison B. Miller*
alison.miller@davispolk.com
Daniel J. Thomson*
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

Benjamin M. Miller*
benjamin.miller@davispolk.com
DAVIS POLK & WARDWELL LLP
1050 17th Street, NW
Washington, DC 20036
Telephone: (202) 962-7133

2

Jesse Solomon\*
jsolomon@paulweiss.com
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7312

\*Specially appearing under L.R.
83.1(d)

*Attorneys for Defendants Syngenta
Crop Protection AG, Syngenta
Corporation, and Syngenta Crop
Protection, LLC*

3